UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| ESTATE OF | : | |
| ROGER D. OWENSBY JR., | : | |
| | : | |
| | : | Case No. 01-CV-769 |
| Plaintiff, | : | |
| | : | Senior Judge S. Arthur Spiegel |
| v. | : | |
| | : | |
| CITY OF CINCINNATI, ET AL., | : | |
| | : | |
| | : | |
| Defendants. | : | |
| | : | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANT CITY OF CINCINNATI'S MOTION FOR SUMMARY JUDGMENT
ON PENDANT AND ANCILLARY STATE TORT CLAIMS (doc. 49)**

On November 7, 2000, a group of Cincinnati Police Officers beat Roger Owensby, Jr., choked him, handcuffed him, and left him to die in the back seat of a Golf Manor police cruiser. This lawsuit, brought by Mr. Owensby's father and executor, alleges violations of constitutionally-created civil rights afforded to all United States citizens as well as state claims for the wrongful death of his son at the hand of these defendants.

Defendant City of Cincinnati has now moved for summary judgment on Plaintiff's state tort claims, seeking to avoid liability for its actions and those of its officers on the basis of Ohio's sovereign immunity act. Doc. 49, Cincinnati MSJ. Defendant's motion for summary judgment should be denied because Ohio's Constitution prohibits such immunity limitations.

Defendant also moved for summary judgment on Plaintiff's claims for punitive damages, arguing that they are not recoverable under Ohio's wrongful death statute. This argument should likewise be rejected because the recovery of wrongful death damages are not so limited,

especially where the decedent suffered personal injury as is the case here.

## STATEMENT OF FACTS[1]

### I.    BACKGROUND

Roger Owensby, Jr., was 29 year old at the time of his death.  He previously served in the United States Army for seven years, following the example set by his father, Roger Owensby Sr., who is now a retired Army Master Sergeant.

Roger, Jr., served in the United States, Germany and Bosnia.  After receiving an Honorable Discharge in 1998, he returned to live with his parents at their North College Hill home.  Roger was married while in the Army but he and his wife divorced as a result of the strain of serving his country overseas.  Roger's daughter, Myiesha L. Owensby, lived with him and his parents.  Myiesha turned 13 in August, 2003.

Roger was scheduled to start classes at Cincinnati Technical College on November 8, 2000.

He never attended these classes because he was beaten and left to die the night before.

### II.    THE NOVEMBER 7, 2000 STOP AND SEARCH OF ROGER OWENSBY, JR.

At approximately 7:30 p.m. on election night, Tuesday, November 7, 2000, Roger Owensby, Jr., walked into a Sunoco gas station convenience store at the corner of Seymour Avenue and Langdon Farm Road.  He purchased a couple cigars and a soft drink.  While paying for these items, defendant Cincinnati Police Officers Robert B. Jorg, Patrick Caton and David

---

[1]Defendant City of Cincinnati has filed this Motion for Summary Judgment months before discovery is scheduled to conclude.  The undersigned counsel have been involved in this case for approximately one month.  Docs. 45-47.  Further, although Plaintiff's counsel are in the process of arranging for depositions of defendants and other witnesses, no depositions have been taken to date.  Therefore, this Statement of Facts is based upon transcribed statements obtained by defendant City of Cincinnati's Police Department soon after Mr. Owensby's death.

Hunter approached the entrance to the convenience store.  As Mr. Owensby attempted to leave he was stopped and questioned by Officers Jorg, Caton and Hunter.

According to Officers Jorg and Hunter, they stopped Mr. Owensby because they thought he had assaulted an officer while eluding arrest on a drug bust ten days earlier at an adjacent establishment, Sam's Carryout.  The officers were wrong.  Officer Hunter, an eyewitness to the prior drug bust, described the man who fled as a clean-shaven African-American male.  Mr. Owensby had a beard.  In fact, while serving in the Army, Mr. Owensby was diagnosed with pseudofolliculitis barbae, a condition that prevented him from being clean shaven.  Despite this mismatch in identity, the defendant police officers stopped and questioned Mr. Owensby as he left the convenience store.[2]

As Mr. Owensby tried to leave the store, Officer Jorg stopped him at the entrance and asked him to put his drink on the ground.  Mr. Owensby complied.  Officer Jorg then asked Mr. Owensby whether he had any weapons on him.  Saying that he was unarmed, Mr. Owensby lifted his shirt above his pants to show Officer Jorg that he had no weapons.  Officer Jorg then asked Mr. Owensby if he could pat him down for weapons.  Mr. Owensby agreed and Officer Jorg conducted a thorough frisk.[3]  Throughout this stop and search, Mr. Owensby was cooperative and respectful.[4]

None of the defendant police officers told Mr. Owensby that this was a consensual stop

---

[2]Looking at Mr. Owensby while he was in the store, Officer Hunter said, "I don't remember the facial hair. But that's him."  Officer Jorg then said, "Okay.  Well let's go talk to him."  Exhibit A, Cincinnati Office of Municipal Investigation ("OMI") report of Internal Investigation Section ("IIS"), 3/11/02 Interview of Officer Jorg, pp. 3.

[3]Exhibit A, p. 4-5.

[4]Exhibit C, 10/8/00 Statement of George Weaver to Cincinnati Police, pp. 13-14.

and that he was free to go.[5]  Officer Jorg admits that he did not have probable cause to arrest Mr. Owensby at that time.[6]

According to Officer Caton, Mr. Owensby began to question why he was being stopped, searched and interrogated.  In response, Officer Caton claims to have said, "We're looking for somebody who committed an assault offense, was known to carry a firearm and is known to fight and run from the police."[7]  To which Mr. Owensby replied, "I never ran from the police."[8]

Thus, according to the police officers, they were looking for an armed, clean-shaven African-American male who had run from the police ten days ago.  The only similarity between the person they were looking for and Mr. Owensby was that he was an African-American male.

## III.    THE ARREST AND BEATING OF ROGER OWENSBY, JR.

Despite the lack of similarity between Mr. Owensby and the suspect, Officer Hunter told Officers Jorg and Caton, "That's him!"[9]  Officer Jorg then grabbed Mr. Owensby's hand and reached for his handcuffs.[10]  Mr. Owensby was never told that he was under arrest or that he was going to be arrested.[11]

When Mr. Owensby saw that he was going to be arrested even though he did not match

---

[5]Exhibit B, OMI report of IIS 3/22/02 Interview of Officer Patrick Caton, pp. 15.

[6]Exhibit A, p. 4.

[7]Exhibit B, pp. 15-16.

[8]Exhibit A, p. 5.

[9]Exhibit B, p. 16.

[10]Exhibit A, p. 5.

[11]Exhibit B, p. 16.

the description of the suspect, he tried to get away from the officers, running five or six steps. The defendant police officers tackled Mr. Owensby and Officer Caton broadcasted an officer-needs-assistance call.

Mr. George Weaver, a store customer, saw the officers grab Mr. Owensby and slam him into a parked car just outside the store entrance and then to the ground.[12]  Mr. Owensby lay face down on the asphalt on his arms with the three Cincinnati Police Officer on him or at his side. While accounts vary, all agree that the Officers beat, maced and handcuffed Mr. Owensby.

According to a witness, Mr. Owensby was motionless and unresponsive while on the ground.[13]  Officer Jorg was on top of Mr. Owensby with his knees in Mr. Owensby's back, applying a choke-hold to Mr. Owensby's neck.[14]

Another witness says that Mr. Owensby struggled to avoid being handcuffed.  At that time the witness says that one officer knelt on Mr. Owensby's back placing his arm around Mr. Owensby's throat in a choke-hold.  While this was going on, another officer was yelling to the third officer to "Mace him! Mace him! Mace this Motherf***er!"[15]

According to Officer Jorg, Mr. Owensby sustained a bloody wound to his head as he hit the ground.  Nevertheless, Officer Jorg says that Mr. Owensby resisted giving him his arms to be handcuffed.  Officer Jorg says that he applied a "mandibular angle pressure point" and wrapped his arm around Mr. Owensby's head.  Jorg verifies that:  Officer Caton told Officer Hunter to

---

[12]Exhibit C, pp.16-18; Exhibit A, p. 5.

[13]Exhibit C, p. 18.

[14]Exhibit D, 11/13/00 Statement of George Weaver, p. 6.

[15]Exhibit E, 11/12/00 Statement of Aerial St. Clair, pp. 5-11.

"mace this motherf***er;" that Caton struck Mr. Owensby several times in the ribs, back and arm while he lay face down on the asphalt; and that Officer Hodge joined the fray, using a PR-24 police baton to maneuver Mr. Owensby's arm to handcuff him.[16]

Officer Caton admits that he struck Mr. Owensby several times on the arm and ribs and that he told Officer Hunter to "mace this motherf***er."  He also says that Officer Hodge used a PR-24 police baton to leverage Mr. Owensby's right hand to get his wrists together to be cuffed.[17]

Officer Hunter echos Jorg's and Caton's claim that Mr. Owensby struggled and says  that Officer Caton repeatedly struck Mr. Owensby.  He admits that he asked Officer Jorg to pull Mr. Owensby's head back whereupon he sprayed mace into Mr. Owensby's face.  He also verifies that Officer Hodge used a PR-24 police baton to get Mr. Owensby's arms free to be cuffed.

In response to the officer-needs-assistance call, a number of Cincinnati and Golf Manor police officers flocked to the scene along with Huntington Meadows housing security guards.

When defendant Cincinnati Police Officer Darren Sellers arrived, he saw Mr. Owensby laying face down on the asphalt, not yet handcuffed.  Mr. Owensby was not moving and said nothing.  Officer Jorg was at the top of Mr. Owensby's torso and Officer Caton was on Mr. Owensby's right side.  Sellers handed Caton his handcuffs while Caton continued to struggle with Mr. Owensby's arm even though Mr. Owensby was motionless.  He heard Officer Caton direct Officer Hodge to "mace this motherf***er."  He then assisted in placing the handcuffs on

---

[16]Exhibit A, pp. 6-7.

[17]Exhibit B, pp. 16-17.

Mr. Owensby.[18]

Sellers also saw Caton continue beating Mr. Owensby in the back above his handcuffed hands, even though Mr. Owensby was handcuffed and offering no resistence, laying motionless face down on the asphalt.  Officer Caton stopped striking Mr. Owensby only when Officer Sellers twice exclaimed, "He's already handcuffed!"[19]  Officer's Jorg and Caton then lifted Mr. Owensby off the ground into a standing position.  Mr. Owensby said nothing, did not struggle, and did not move.  Officer Caton saw a Golf Manor police car nearby and asked for permission to place Mr. Owensby in the back of the Golf Manor police cruiser.  A Golf Manor Officer said "Sure" and Mr. Owensby was carried to the car.  According to Officer Sellers, Mr. Owensby's toes dragged on the ground.  He never walked.  Officer's Jorg and Caton placed Mr. Owensby in the back seat of the Golf Manor police cruiser.[20]

Officer Hunter also saw Officer Caton continue to punch Mr. Owensby in the back after he was handcuffed.  Only after Officer Hunter exclaimed, "What the hell is he [Officer Caton] doing!" or "What the f*** is he doing!" did the beating stop.  According to Officer Hunter, Mr. Owensby offered no resistence as he was carried with his feet dragging to the Golf Manor police car.  Officer Hunter did not see Mr. Owensby's eyes but his head was "sagging toward his chest."  Once Mr. Owensby was placed in the Golf Manor police car, Officer Hunter saw Officer Caton swinging his arms inside the car like he was "throwing punches" toward Mr. Owensby's head.[21]

---

[18]Exhibit F, OMI report of IIS 4/13/02 Interview of Officer Darren Sellers, pp. 26-27.

[19]*Id.* at pp. 27-28.

[20]*Id.*

[21]Exhibit G, OMI report of IIS 7/15/02 Interview of Officer David Hunter, pp. 25-26.

Cincinnati Police Officer Abraham Lawson responded to the officer-needs-assistance call and says that Mr. Owensby lay motionless on the ground for 2-3 minutes after he was handcuffed. When Mr. Owensby was picked up, his face was bloody and his eyes were swollen.[22]

The civilian witnesses say that Mr. Owensby was motionless and unresponsive when he was carried to the Golf Manor police cruiser.[23]

Once in the Golf Manor cruiser, Officer Caton reported that a suspect was in custody and "we need a boss for a macing." Officer Caton then told other police officers arriving at the scene that, "We kicked his ass" or "We beat the sh*t out of him."[24]

## IV.    THE LACK OF MEDICAL CARE

No officer attempted to administer any first aid or obtain medical care for Mr. Owensby.

Golf Manor Officers Robert Heiland and Chris Campbell say that Mr. Owensby was placed in the passenger side rear seat of the Golf Manor police cruiser. He was laying on the seat facing the trunk. Officer Campbell shined a flashlight on Mr. Owensby but did not detect any movement.[25] Nothing was done to care for Mr. Owensby or to check on his well-being by either the numerous Cincinnati or Golf Manor police officers at the scene.

When Cincinnati Police Officer Brian Brazile arrived on the scene he walked over to the

---

[22]Exhibit H, 11/11/00 Statement of Officer Abraham Lawson, p. 9; Exhibit I, 11/30/00 Statement of Officer Abraham Lawson, pp. 6-7.

[23]Exhibit C, p. 24; Exhibit E, p. 17.

[24]Exhibit B, p. 20; Exhibit P, 11/8/00 Statement of Officer Alex Hasse, p. 15.

[25]Exhibit J, 11/8/00 Statement of Golf Manor Officer Robert Heiland, pp. 4-5; Exhibit K, 11/7/00 Statement of Golf Manor Officer Chris Campbell, pp. 6-7.

Golf Manor cruiser to see Mr. Owensby.  He turned his flashlight on Mr. Owensby who was

laying on the back seat and told Golf Manor Officer Heiland, "This looks f***ed up.....Can he

breathe?...It don't look like he can from the way he's laying."  Officer Brazile nonetheless went

back to his car to get his hat instead of helping Mr. Owensby.  He then spoke with Cincinnati

Police Sergeant Shirley Browner who had arrived on the scene, and stood around while Sergeant

Browner questioned Officer Jorg.[26]

It wasn't until Cincinnati Police Sergeant William "Pete" Watts arrived on the scene at

approximately 7:50 p.m., that someone checked on Mr. Owensby's condition.  Sergeant Watts

interviewed Officer Jorg for about 3 minutes.  He then walked over to the Golf Manor cruiser to

check on Mr. Owensby's status as a result of the macing.  Mr. Owensby did not respond to

Sergeant Watts who thought "a guy who had just struggled with the police would be breathing a

lot harder."  Watts reached into the car to check Mr. Owensby's pulse and saw blood and saliva

coming out of Mr. Owensby's mouth.

Sergeant Watts then, for the first time, told Sergeant Browner to call for a medical rescue

unit.[27]  Cincinnati Police Officer Alex Hasse, a trained EMT, removed Mr. Owensby from the car

with the assistance of Officer Caton and began CPR.  However, Officer Hasse believed that Mr.

Owensby was dead because his pupils were dilated.[28]

Thus, in the span of approximately 30 minutes, this healthy 29-year-old man, who did not

---

[26]Exhibit L, 11/13/00 Statement of Officer Brian Brazile, pp. 1-8.

[27]Exhibit M, 11/8/00 Statement of Sergeant William "Pete" Watts, pp. 7-11; Exhibit N, 11/12/00 Statement of Sgt. Watts, p. 3; Exhibit O, 11/16/00 Statement of Sgt. Watts, pp. 6-7..

[28]Exhibit P, 11/8/00 Statement of Officer Alex Hasse, pp. 10-15; Exhibit Q, 11/12/00 Statement of Officer Alex Hasse, pp. 10-15.

fit the description of the person these officers were looking for, was stopped, searched, severely beaten, maced, choked, handcuffed, beaten some more, denied medical care for his injuries, and left to die in the back seat of a police car.

Medical assistance finally arrived and transported Mr. Owensby to University of Cincinnati Hospital Emergency Room where he was pronounced dead at 8:47 p.m.—an hour after he attempted to leave the convenience store.

The cause of death was listed as "mechanical asphyxia."[29]  Mr. Owensby had been choked to death.

## ARGUMENT

Defendant City of Cincinnati's Motion for Summary Judgment is narrowly drafted, limiting itself to Plaintiff's state tort claims, while leaving untouched the federal claims advanced under 42 U.S.C. §§ 1983 and 1988.[30]  The Motion advances three arguments.  First, that the City of Cincinnati is immune from liability for state tort claims because of Ohio's 1985 Sovereign Immunity Act.[31]  Second, it claims that the defendant police officers enjoy qualified immunity only as to state negligence claims, while leaving untouched state tort claims based upon the "malicious and willful conduct."[32]  Finally, it claims that Plaintiff's wrongful death claims cannot include punitive damages.[33]  The City is incorrect on each point.

---

[29]Exhibit R, Death Certificate.

[30]Doc. 49, MSJ, pp. 1, 4 n.1.

[31]*Id.* at 1, 7-8.

[32]*Id.* at 1, 9.

[33]*Id.* at 1, 10-11.

I.    **OHIO'S CONSTITUTION AND ITS SOVEREIGN IMMUNITY ACT**

Ohio's Constitution was adopted in 1851.  At that time, and in the years preceding the

adoption of Ohio's Constitution, the common law of this country and Ohio recognized no

impediments to recovery against a corporate political subdivision of the state like the City of

Cincinnati.[34]

Over the ensuing century, Ohio's judiciary engrafted principles of sovereign immunity

into the common law.[35]  However, what the judiciary creats the judiciary can abolish.  In 1982,

the Ohio Supreme Court did just that in *Haverlack v. Portage Homes, Inc.*[36]

The Ohio General Assembly responded with the 1985 enactment of a sovereign immunity

statute, Chapter 2744 of the Ohio Revised Code.  The City correctly asserts that Ohio Rev. Code

§ 2744.02(A)(1) purports to confer immunity on a political subdivision for state tort claims and

---

[34]*Butler v. Jordan*, 92 Ohio St.3d 345, 365, 750 N.E.2d 554, 564 (2001) *citing*, *Hack v. Salem*, 174 Ohio St. 383, 392, 189 N.E.2d 857, 862 (1963) ("In the early reported American cases it apparently was assumed, without argument and as a matter of basic justice, that municipal corporations were subject to actions for torts"); *Goodloe v. Cincinnati*, 4 Ohio 500, 514 (1831) ("When a corporation acts illegally or maliciously, we conceive it ought to be made directly responsible.  Such is the plain dictate of justice, and we see no technical rule of law that forbids us to act upon it"); *Smith v. Cincinnati*, 4 Ohio 514 (1831) (Holding the City of Cincinnati liable for allegations of negligence); *Rhodes v. Cleveland*, 10 Ohio 159, 161 (1840) ("corporations [political subdivisions] are liable like individuals, for injuries done, although the act was not beyond their lawful powers."); *McCombs v. Town Council of Akron*, 15 Ohio 474 (1846) (political subdivision liable in negligence); *Hooe v. Alexandria*, 1 Cranch C.C. 90, 12 F. Cas. 461 (1802); Barnett, *The Foundations of the Distinction Between Public and Private Functions in Respect to the Common-Law Tort Liability of Municipal Corporations*, 16 Ore.L.Rev. 250, 259 (1937).

[35]*W. College of Homeopathic Medicine v. Cleveland*, 12 Ohio St. 375 (1861); *Thacker v. Bd. of Trustees of Ohio State Univ.*, 35 Ohio St. 2d 49, 67-68, 298 N.E.2d 542, 552-553 (1973).

[36]2 Ohio St.3d 26, 30, 442 N.E.2d 749, 752 (1982) ("*Stare decisis* alone is not sufficient reason to retain the doctrine which serves no purpose and produces such harsh results. Therefore, we join with the other states in abrogating the doctrine.").

that Ohio Rev. Code § 2744.03(A)(6) purports to confer qualified immunity on the defendant police officers for their purely negligent conduct, as opposed to conduct that is "malicious" or "willful" for which there is no immunity.  However, defendant has forgotten that Ohio's sovereign immunity statute, like all legislative enactments, must first pass constitutional muster to be enforceable in our courts.  Here, statutory immunity fails in light of two separate sections of the Ohio Constitution.

Two years ago the Ohio Supreme Court invited such a constitutional challenge to Ohio Revised Code Chapter 2744.  In, *Butler v. Jordan*.[37] an eight-month-old child died at a daycare center when duct tape was placed over the infant's nose and mouth.  The parents sued the daycare center and the Cuyahoga County Department of Human Services ("CCDHS"), alleging that CCDHS was negligent and/or reckless in the licensing and certification of the daycare center.[38]  The Ohio Supreme Court upheld the dismissal of CCDHS as immune from liability based on Ohio Rev. Code 2744(A)(1), noting "[t]he tragedy of this case is that appellant is able to shuck its clear duty and responsibilities, as are other political subdivisions, on the sole basis of the doctrine of sovereign immunity."[39]

Outraged that the "government" had "accorded itself the right to negligently injure its citizens with immunity, all in disregard of the constitutional protections reserved by its citizens to themselves," the Ohio Supreme Court found that its hands were tied because *Butler* appellant had

_____

[37]92 Ohio St. 3d 354, 358, 750 N.E.2d 554, 558 (2001).

[38]*Id.* at 354-55, 750 N.E.2d at 555-56.

[39]*Id.* at 357-58, 750 N.E.2d at 558.

-12-

not properly challenged the constitutionality of Chapter 2744.[40]  But the Court  nevertheless

conducted an extensive analysis of the Ohio sovereign immunity laws and invited such a

challenge in the future.[41]  To our knowledge, no such challenge has been raised—until now.

**A.    The City Is Not Immune From Liability For State Tort Claims Because Ohio Rev. Code  § 2744.02(A)(1) Is Unconstitutional.**

**1.    Redress in Courts: Article I, Section 16, of the Ohio Constitution abolishes sovereign immunity for political subdivision.**

As enacted in 1851, the Ohio Constitution, Article I, Section 16,  affords all Ohio citizens

unfettered access to the courts for all injuries suffered:

**Redress in courts.**  All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have just

In 1912, Ohio added an amendment to this section of its Constitution abolishing

sovereign immunity for the State:

Suits may be brought against the state, in such courts and in such manner, as may be provided by law.

Later, Ohio created its Court of Claims (Chapter 2743 of the Ohio Revised Code) as the

forum to address grievances against the State.  The unintended inequity of abolishing sovereign

immunity for the State while political subdivision immunity remained was addressed in,

*Haverlack v. Portage Homes, Inc.*,[42] when the Ohio Supreme Court eliminated political

subdivision sovereign immunity.

Three years later, in 1985, the Ohio General Assembly enacted Ohio's first Sovereign

---

[40]*Id.* at 358, 750 N.E.2d at 558.

[41]*Id. a*t 358-74, 750 N.E.2d at 558-71.

[42]2 Ohio St.3d 26, 30, 442 N.E.2d 749, 752 (1982).

Immunity Act, Chapter 2744, in an attempt to statutorily insulate political subdivisions.  Since

this enactment, courts have been engaged in varying mental gymnastics to find exceptions to

Chapter 2744 political subdivision immunity in an attempt to administer justice for Ohio

citizens.[43]  *Butler*, 92 Ohio St. 3d at 367-68, 750 N.E.2d at 566-67, *citing Muenchenbach v.

Preble Cty.*, 91 Ohio St. 3d 141, 742 N.E.2d 1128 (2001) (holding that a four-wheeled tractor

equipped with a street-sweeping brush on the front and a scraper blade on the back, being used in

construction work, was a motor vehicle "employed in general highway transportation"); *Perkins

v. Norwood City Schools*, 85 Ohio St. 3d 191, 707 N.E.2d 868 (1999); *Carter v. Cleveland*, 83

Ohio St. 3d 24, 697 N.E.2d 610 (1998) (holding that the glare of sunlight reflecting off of a glass-

paneled wall along side a city swimming pool constituted a nuisance).

     In *Garrett v. Sandusky*, the Ohio Supreme Court held that a municipal wave pool was not

a "swimming pool" (protected by Chapter 2744 immunity) and instead was "more akin to an

amusement ride, which is not an immunized municipal function according to R.C. Chapter

2744."[44]  In a concurring opinion, Justice Pfeifer explained that such immunity violates the

constitutional guarantee of redress in the courts, found in Section 16, Article I of the Ohio

Constitution:

> The General Assembly is responsible for determining the appropriate 'courts' in
> which suits against the state are to be filed, and it must design the "manner," or
> procedures, for plaintiffs to follow in these courts.  Nowhere in the provision does
> it say that the General Assembly shall determine what causes of action can be
> brought against the state.  Thus, the true intent of the amendment to Section 16,
> Article I was to abolish sovereign immunity in its entirety....**Governmental**

---

[43]Plaintiff's discussion and constitutional challenge is limited to statutory immunity for
political subdivisions, not the state, which historically has a different argument for its grant of
immunity.

[44]68 Ohio St. 3d 139, 140 624 N.E.2d 704, 706 (1994).

**immunity, including municipal immunity, is contrary to the clear meaning and mandate of the Ohio Constitution.**[45]

As explained by the sponsor of the 1912 constitutional amendment, B.F. Weybrecht: "Let the humblest citizen feel that while the state can impose on him all the duties of citizenship, taxation, obedience to law and the common defense, he is the equal of the sovereign before the law."[46] Here, through Ohio Rev. Code 2744.02(A)(1), the City of Cincinnati would enjoy the benefits of governing and taxing its citizens, like Mr. Owensby and his family, while raising itself above the tort laws of this state in violation of Ohio's Constitution.

    2.    **<u>Trial by Jury</u>: Article I, Section 5 of the Ohio Constitution prohibits sovereign immunity for political subdivisions.**

The Ohio Supreme Court decision in *Butler* also explained that Ohio's Sovereign Immunity Act violates the constitutionally-conferred right to trial by jury.[47] The right to a jury trial in Ohio is a substantive right, not a mere procedural right.[48] It is codified in Ohio's Constitution at Article I, Section 5:

> The right to trial by jury shall be **inviolate**, except that, in civil cases, laws may be passed to authorize the rendering of a verdict by a concurrence of not less than three-fourths of the jury.

(Emphasis supplied).

---

[45] *Id.* at 144, 624 N.E.2d at 708 (emphasis added).

[46] *Id.* at 143, 624 N.E.2d at 708, citing, 2 Proceedings and Debates of the Constitutional Convention of the State of Ohio 1431 (1912).

[47] *Butler*, 92 Ohio St. 3d at 370-73, 750 N.E.2d at 568-71.

[48] *Id.* at 370, 750 N.E.2d at 568, *citing, Cleveland Ry. Co v. Halliday*, 127 Ohio St. 278, 284, 188 N.E. 1, 3 (1933); *Kneisley v. Lattimer-Stevens Co.*, 40 Ohio St. 3d 354, 356, 533 N.E.2d 743, 746 (1988).

Here, Plaintiff has demanded a trial by jury.[49]  Thus, in the context of this action, Plaintiff's right to pursue his right to jury trial on his state tort claims against the City of Cincinnati and the defendant police officers is infringed by the Sovereign Immunity Act, in violation of Article I, Section 5 of the Ohio Constitution.  Accordingly, Ohio Rev. Code § 2744.02(A)(1) should not be applied to negate the state tort liability of these defendants, since doing so would violate Section 5, Article I of the Ohio Constitution.

> **B.    Defendant's Argument For Qualified Immunity From State Tort Negligence Claims For The Defendant Police Officers, Pursuant To Ohio Rev. Code § 2744.03(A)(6), Is Unconstitutional.**

Defendant City of Cincinnati also argues that its defendant police officers enjoy qualified immunity as to state tort negligence claims pursuant to Ohio Rev. Code § 2744.03(A)(6), while acknowledging that the defendant police officers would be liable for state tort claims based on "malicious, willful conduct."  Doc. 49, MSJ, pp. 9-10.  Thus, this motion for summary judgment is limited solely to state tort claims against the defendant police officers grounded in simple negligence.  *Id.*

Nevertheless, this claim of qualified immunity—based on Ohio Rev. Code § 2744.03(A)(6)—is also unconstitutional for the same reasons articulated above, in derogation of Sections 5 and 16 of the Ohio Constitution.


**II.    PLAINTIFF MAY RECOVER PUNITIVE DAMAGES ON HIS WRONGFUL DEATH CLAIM BECAUSE HE HAS SUFFERED PERSONAL INJURY.**

Defendant argues that Plaintiff may not recover punitive damages on his wrongful death

---

[49]Doc. 1, Complaint.

claim. Doc. 49, MSJ, p.10. Wrongful death actions did not exist at common law. Originally, all rights of action for personal injury were extinguished upon the death of the person injured.[50] In Ohio, this common law rule was abrogated by Sections 10770 and 10772 of the Ohio General Code, which provided only for the recovery of pecuniary damages and also limited the amount that could be recovered.[51]

In 1912, Section 19a was added to Article I of the Ohio Constitution, providing:

> **Damage for wrongful death**. The amount of damages recoverable by civil action in the courts for death caused by the wrongful act, neglect, or default of another, shall not be limited by law.

In 1923, the Ohio Supreme Court considered a constitutional challenge to the existing wrongful death statute's limitation of "pecuniary injury"—General Code §§ 10770 and 10772—in light of the constitutional guarantee that "the amount of damages recoverable...shall not be limited by law."[52] Specifically, the Court considered whether this constitutional provision allowed for the recovery of loss of society damages beyond pecuniary damages. In ruling that wrongful death damages were limited by the statutory restriction to "pecuniary injury," the Ohio Supreme Court found that Section 19a prohibited all limitations upon the *amount, but not the type,* of damages.[53] In so ruling, the Ohio Supreme Court noted that wrongful death statutes in other states did not limit or qualify damages with the word "pecuniary" as was the case in Ohio.[54]

---

[50]*Kennedy v. Byers*, 107 Ohio St. 90, 91, 140 N.E. 630, 631 (1923).

[51]*Id.*

[52]*Id.*

[53]*Id.* at 96, 140 N.E. at 632-33.

[54]*Id.* at 93, 140 N.E. at 631-32.

-17-

Since then, Ohio's wrongful death statute has been amended a number of times to its present form, which contains no limitation or qualification upon its  "damages:"

> When the death of a person is caused by wrongful act, neglect, or default which would have entitled the party injured to maintain an action and recover damages if death had not ensued, the person who would have been liable...shall be liable to an action for damages, notwithstanding the death of the person injured and although the death was caused under circumstances which make it aggravated murder, murder, or manslaughter.[55]

In fact, Ohio's wrongful death statute now provides, "In determining the amount of damages to be awarded, the jury or court may consider all factors existing at the time of the decedent's death that are relevant to a determination of the damages suffered by reason of the wrongful death."[56]

Further, to confer what the *Kennedy* Court said was statutorily prohibited, the present statute also states that, "Compensatory damages may be awarded in an action for wrongful death and may include damages for...loss of support...loss of services...loss of society...loss of prospective inheritance...[and] mental anguish."  Ohio Rev. Code § 2125.02(B).  Nothing in the present wrongful death statute limits a plaintiff's general entitlement to "damages."  And nothing in the definition of compensatory damages found in § 2125.02(B) says that it is an exhaustive list of recoverable damages.

Nevertheless, some Ohio court have so limited the wrongful death statute, as indicated by defendant.  Doc. 49, MSJ, p. 10.  However, Ohio courts also have recognized a right to recover punitive damages in a wrongful death action if the decedent suffered personal injury or property

---

[55]Ohio Rev. Code § 2125.01.

[56]Ohio Rev. Code § 2125.02(A)(3)(b)(i).

damage.

> In addressing the award of punitive damages in an action for wrongful death, it is well established that there is no such damages unless it is proven that the decedent has suffered personal injury or property damage resulting from intentional, reckless or willful conduct resulting in death. [57]

Further, Ohio Rev. Code § 2351.21 expressly authorizes the recovery of punitive damages in a tort action (defined as "a civil action for damages for injury or loss to person or property") if: (1) the actions or omissions of the defendant demonstrate malice, aggravated or egregious fraud, oppression, or insult, or that the defendant as principal or master authorized, participated in, or ratified actions or omissions of an agent or servant; and (2) there is proof of actual damages that resulted from the actions or omissions.

Here, Plaintiff's wrongful death action constitutes a "tort action" as defined by Ohio Rev. Code § 2315.21(A)(1). And Mr. Owensby unquestionably suffered extensive personal injury in the beating and lack of medical care at the hands of the defendants. Therefore, Plaintiff is entitled to have the jury assess punitive damages upon his wrongful death claim. Defendant also concedes that Plaintiff is permitted to recover punitive damages on the survivor/personal injury claims if it can be proven that defendants acted intentionally, maliciously, wantonly, or in bad faith.[58] The facts will support such a finding.

Thus, defendants' attempt to avoid punitive damages for its horrific misconduct on the night of November 7, 2000, must be rejected.

## CONCLUSION

---

[57] *Gollihue v. Consol. Rail Corp.*, 120 Ohio App. 3d 378, 406, 697 N.E.2d 1109, 1127 (1997); Ohio Rev. Code § 2315.21(B).

[58] Doc. 49, MSJ, p. 10 n. 3, *citing, Rubeck v. Huffman*, 54 Ohio St. 2d, 20, 23, 374 N.E.2d 411, 413 (1978).

In 1982 the Ohio Supreme Court abolished sovereign immunity for the City of Cincinnati. The Ohio legislature attempted to reinstate this preferential treatment for municipalities in its 1985 Sovereign Immunity Act, Chapter 2744 of the Ohio Revised Code. Again, in its 2001 decision in *Butler v. Jordan,* the Ohio Supreme Court has strongly and clearly indicated that such a statute violates the right of access to the courts and the right to jury trial guaranteed to all Ohio citizens by Sections 5 and 16 of Article I to the Ohio Constitution.

The City of Cincinnati's reliance on an unconstitutional sovereign immunity statute to avoid or limit its responsibility for the conduct of its officers should be denied. Likewise, claims of qualified immunity for the officers who beat, maced, handcuffed, beat some more, and then left Mr. Owensby to die in the back seat of a police cruiser, should be rejected for the same constitutional infirmities.

Finally, Plaintiff's wrongful death claim for punitive damages arising out of this unconscionable conduct is justified pursuant to Ohio Rev. Code. § 2315.21 and case law that allows for wrongful death recovery of punitive damages where the decedent suffered personal injury.

For these reasons, defendant City of Cincinnati's Motion for Summary Judgment on Pendent and Ancillary State Tort Claims (doc. 49) should be denied.

Respectfully submitted,


/s/ James B. Helmer, Jr.
/s/ Paul B. Martins
James B. Helmer, Jr.  (0002878)
Paul B.  Martins (0007623)
Frederick M. Morgan, Jr.  (0027687)
HELMER, MARTINS & MORGAN CO., LPA
Fourth & Walnut Centre
Suite 1900
105 East Fourth Street
Cincinnati, Ohio 45202-4008
Telephone:  (513) 421-2400
Facsimile:  (513) 421-7902
*Trial Attorney for Plaintiff*

Mark T. Tillar (0029898)
240 Clark Road
Cincinnati, Ohio  45202
*Trial Attorney for Plaintiff*

John J. Helbling (0046727)
3672 Springdale Road
Cincinnati, Ohio 45251
*Trial Attorney for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Plaintiff's Memorandum in Opposition to Defendant City of Cincinnati's Motion for Summary Judgment On Pendant and Ancillary State Tort Claims (doc. 49) was electronically filed on September 4, 2003.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

<u>/s/ Paul B. Martins</u>