# City of Cincinnati



## OFFICE OF MUNICIPAL INVESTIGATION

## REPORT

| | |
|---|---|
| **CASE NUMBER:** | 00333 |
| **COMPLAINANT:** | Police Communications |
| **ALLEGATIONS:** | Death in Custody |
| **RESPONDENTS:** | Officer Robert Blaine Jorg |
| | Officer Patrick Caton |
| | Officer David Hunter |
| | Officer Jason Hodge |
| | Officer Darren Sellers |
| | Officer Victor Spellen |
| | Officer Brian Brazile |
| **DATE OF COMPLAINT:** | November 7, 2000 |
| **DATE OF REPORT:** | October 2, 2002 |
| **OMI INVESTIGATOR:** | John Plahovinsak |

**APPROVED BY:** _____

Mark A. Gissiner
Acting Municipal Investigation Manager

**EXHIBIT A**

18. Written Transcript of Officer Victor Spellen, Unit #4261 MVR Tape

19. CPD Injury to Prisoner Report

20. CPD Medical Report Run Form 33

21. CPD Incident Report

22. CPD Procedure 12.600, Handcuffing

23. CPD Procedure 12.545, Use of Force

24. CPD Procedure 12.554, Levels of Police Contact

25. Ohio Peace Officer Training Commission (OPOTC), Basic Training Curriculum

26. *Terry v. Ohio*, 392 U.S. 1 (1968)

27. *Graham v. Connor*, 490 U.S. 386 (1989)

28. *Darrah v. City of Oak Park*, 255 F.3d 301, 307 (6th Cir. 2001)

29. *Darrah*, 255 F. 3d at 307

30. *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992)

31. *Saucier V. Katz*, 121 S. Ct. 2151, 2158 (2001) 2001 WL 672265, **7 (U.S.)

32. *Collins v. Nagle*, 892 F. 2d 489, 493 (6th Cir. 1989)

33. *Ornelas v. United States*, 517 U.S. 690, 696 (1996)

34. *State v. Evans*, 67 Ohio St. 3d 405 (1993)

35. *Spiegel v. Cortese*, 196 F. 3d 717, 723 (7th Cir. 1999)

36. *State v. Timson,* 38 Ohio St. 2d 122, (1974)

37. *State v. Evans*, 67 Ohio St. 3d 405 (1993)

## III. EVIDENCE

### 1. Summary of the Internal Investigation Section (IIS) Interview with Officer Robert Blaine Jorg, Respondent

The Internal Investigation Section (IIS) interviewed Officer Robert Blaine Jorg on March 11, 2002.[1]

Officer Jorg said that on November 7, 2000, he was on duty with his partner, Officer Patrick Caton. During their shift, they were requested to deliver documents to either Officer Darren Sellers or Officer Alexander Hasse. The police officers met at Sam's Carryout, 2092 Seymour Avenue. Officer Jorg said he believed Officer Caton talked to Officer Hasse while he engaged Officers Dave Hunter and Sellers in a conversation, which occurred after 7:00 p.m.

Officer Jorg said that during this conversation, Officer Hunter observed an individual that resisted his (Hunter's) arrest a few weeks ago (on September 27, 2000).[2]

With regard to the incident of September 27, 2000, Officer Jorg said:

> On September 27, 2000, he and Officer Hunter were assigned to an undercover detail interdicting the drug traffic in the parking lot of Sam's Carryout. Officer Hunter attempted to arrest the individual selling the narcotics, but the individual was able to flee from him. Officer Jorg questioned other individuals remaining in the parking lot and they identified the individual that fled from Officer Hunter as "L.A." Neither Officer Hunter nor Officer Jorg signed a John Doe warrant for the individual that fled that evening. Officer Hunter told Officer Jorg that he was going to locate "L.A." since he chased him.[3]

Officer Jorg said on November 7, 2000, Officer Hunter told him that he observed Mr. Owensby walking toward the Sunoco Gas Station.[4] Officer Jorg said he asked Officer Hunter if he was positive about his identification and Officer Hunter replied: "I'm pretty sure that's him."

Officer Jorg said Officers Hunter and Caton started to walk toward the Sunoco Gas Station and he followed them. The Sunoco Gas Station also had a convenience store called Sam's Telecom located on its location. Officer Jorg said this was the store that Mr. Owensby went into for his purchases.

All three officers, according to Officer Jorg, stood outside the store and looked inside through the window at Mr. Owensby. Officer Jorg remembered that Officer Caton asked Officer Hunter: "Is that the guy?" Officer Hunter, according to Officer Jorg, replied: "I don't remember the facial hair. But that's him." Officer Jorg then said, "Okay. Well let's go talk to him."

Officer Jorg said he was going to make contact and Officer Caton was going to back him up. Officer Jorg said Officer Hunter stayed out of sight outside the building. The overall plan,

---

[1] The Office of Municipal Investigation (OMI) scheduled an interview with Officer Jorg on March 20, 2002. On that day, Officer Jorg resigned from the Cincinnati Police Department and cancelled the interview. OMI attempts to interview Officer Jorg after March 20, 2002 have been unsuccessful.
[2] This individual was later identified as Roger Owensby, Jr.
[3] Police Records indicate that a radio broadcast was made of the September 27, 2000, encounter; however, no written report was made.
[4] The Sunoco Gas Station borders Sam's Carryout on the south.

according to Officer Jorg, was to identify Mr. Owensby as the individual that previously ran from Officer Hunter and then to arrest him for "Resisting and Obstructing" for that incident.

Officer Jorg said he waited until Mr. Owensby completed his purchase at the cashier before approaching him. Officer Jorg said he believed Mr. Owensby was conducting business at the store and, therefore, was not a direct threat to Officer Jorg because Officer Jorg could see Mr. Owensby's hands. Officer Jorg said that was the main reason he waited until Mr. Owensby exited the store.

Officer Jorg said when Mr. Owensby exited the store he asked him to put down his drink and if he had any weapons on his person. Officer Jorg said his initial plan was "to start questioning him (Mr. Owensby) about the drive-by shootings that happened on Rhode Island (Avenue)." Officer Jorg believed that shooting indicated a suspect's name of "L.A." and a description of a vehicle. Officer Jorg said although the shooting might be related to "L.A.", "Officer Hunter was the one that started the investigation and pulled Caton and I into it that night."

Officer Jorg acknowledged:

> "The only mistake we made is we didn't have a plan. I wanted to cuff him immediately. Pat (Caton) wanted to walk him over to the car. You know, we're miscommunicating. My interpretation was from what I was getting from Dave (Officer Hunter) and my partner, said this guy, if he (Officer Hunter) ID'd him, he's (Mr. Owensby) immediately going into handcuffs."

Officer Jorg said he justified the detainment of Mr. Owensby as a *Terry* stop.[5] According to Officer Jorg, in a *Terry* stop:

> "We must have a reasonable, articulate suspicion that a crime has been committed or is going to be committed and that the person that you are stopping has either committed or is going to be committing a crime and is possibly armed."

Officer Jorg said that he did not have probable cause for an arrest at this time. He said: "But this again is reasonable articulatible suspicion. It's not probable cause. Probable cause is facts and circumstances that will lead you to believe. We have circumstances. We don't have any facts yet." (Sic)

Officer Jorg said he asked Mr. Owensby if he had any weapons. Mr. Owensby said no and started to lift his shirt. Officer Jorg said he asked Mr. Owensby if he could pat him down and Mr. Owensby replied, "Sure, go ahead." Officer Jorg also stated that the conversation included: Officer Jorg asking: "Do you mind if I check you out?" Officer Jorg said Mr. Owensby said: "Sure, everything's cool" or something to that effect. Officer Jorg said he believed that he had reasonable suspicion to check Mr. Owensby for weapons.

Officer Jorg said he patted down Mr. Owensby and found no weapons. Officer Jorg believed that during the pat down he felt, through Mr. Owensby's pants, what appeared to be a bag of

---

[5] *Terry v. Ohio.*

marijuana in Mr. Owensby's pocket. Officer Jorg said possession of marijuana is only a misdemeanor and police officers were not supposed to handcuff offenders for misdemeanors.[6]

Officer Jorg said Officer Caton started to question Mr. Owensby after he was patted down. Although Officer Jorg could not remember the exact questions posed by Officer Caton, he recalled that these questions were similar to:

- "Have you ever run from the police?"
- "When was the last time you had contact with the police?"
- "Where do you live at?"

Officer Jorg said that Mr. Owensby said: "I never ran from the police. I've never had any contact with Cincinnati officers." Officer Jorg said that Mr. Owensby "emphatically denied" running from police.

Officer Jorg said Officer Hunter stepped into the doorway of the store and said, "When was the last time you ran from the cops?" According to Officer Jorg, Officer Hunter then said either "Cuff him" or "That's the guy." Officer Jorg said he grabbed Mr. Owensby's hand and reached for his handcuffs.

According to Officer Jorg:

> "If we (Officer Jorg and Officer Caton) miscommunicated between ourselves, that's our fault. We should have had a better plan. Obviously Pat (Caton) wasn't thinking the same thing or I wasn't thinking the same as Pat was."

According to Officer Jorg, Mr. Owensby broke free from his grasp, ran past Officer Caton and struck Officer Hunter. Officer Jorg said he believed that Mr. Owensby would never run with three police officers in the immediate vicinity and this sudden break caught him off guard.

Officer Jorg said Mr. Owensby proceeded approximately 10 feet past the door and hesitated. Officer Jorg believed because of the positioning of a car in front of the store, Mr. Owensby did not know which direction he wanted to run when he hesitated.

Officer Jorg said: "[He] couldn't make up his mind. It looked like he either wanted to stop and change directions." Officer Jorg said Mr. Owensby tripped and he (Jorg) "hit him from behind and wrapped him up."

Officer Jorg recalled hearing Officer Caton yelling, "Officer needs assistance." Officer Jorg said Officer Caton came out of the store's entrance, followed by Officer Hunter. Officer Jorg said Officer Caton went to the right of both Officer Jorg and Mr. Owensby on the ground.

Officer Jorg said he and Mr. Owensby hit a parked car and came down on the ground. Officer Jorg estimated that they landed "a foot and a half or two feet" from the rear tire of the car.

---

[6] According to police records, Mrs. Sue Flottemesch, University Hospital Emergency Room nurse recovered a baggie containing marijuana and crack cocaine from the personal effects of Mr. Owensby.

Initially, Officer Jorg said Mr. Owensby was on top of him while Officer Jorg was on his back on the ground, but Officer Jorg rolled and "flipped him over onto his stomach." Officer Jorg estimated that this movement took less than one second. Officer Jorg said he tried to grab Mr. Owensby's left hand or arm in the triceps/bicep area, but "he was one of the strongest guys (that) had resisted us in quite some time."

Officer Jorg said he was unable to pull Mr. Owensby's hand out from underneath his body. Officer Jorg said that in addition to both of his arms being underneath his chest, Mr. Owensby's knees did not bend. Officers Jason Hodge and Darren Sellers then arrived to provide assistance. In terms of the location of the police officers, Officer Jorg said:

- Officer Caton was at the "back of his (Mr. Owensby) thighs/buttocks area."
- Officer Hunter was "either standing or kneeling at his (Mr. Owensby) head."
- Officer Hodge "was on his (Mr. Owensby) right shoulder trying to get his arm."
- Officer Sellers was standing behind Officer Caton.

Officer Jorg said he reached his arm under Mr. Owensby's body and attempted to gain control of Mr. Owensby's arm. Officer Jorg said Mr. Owensby rolled his body onto Officer Jorg's arm, "hyper extending my elbow."[7] Officer Jorg said when this occurred, he pulled his arm from underneath Mr. Owensby's body and disengaged from the struggle. Officer Jorg said that Officers Sellers and Hodge had also arrived at the time he disengaged.

According to Officer Jorg, Officer Hodge was attempting to gain control of Mr. Owensby's right arm, Officer Caton was on Mr. Owensby's legs, Officer Sellers was standing behind Officer Caton and Officer Hunter was near the top of Mr. Owensby's head. After disengaging, Officer Jorg decided that "one of the things we were taught at the academy, when someone whose hands are underneath 'em, pressure point. It works." To activate a pressure point, according to Officer Jorg, pressure and counter-pressure is required. Officer Jorg said he attempted the "touch pressure" technique. Officer Jorg stated there were three types of pressure points: touch pressure, quick penetration and deep impact.

Officer Jorg said that he "reached up around his head, trapping his head, holding it where I applied what's called the mandibular angle pressure point." Officer Jorg denied that his arm fell below Mr. Owensby's nose while employing the technique. According to Officer Jorg, while one hand stabilized the head, his other hand applied pressure with his finger at the base of the jawbone. Officer Jorg described the stabilization of the head as a "head wrap." According to Officer Jorg, this is when the forehead of Mr. Owensby is in the crease of Officer Jorg's elbow. Officer Jorg said he was positive that his arm never moved down any lower than Mr. Owensby's hairline.

Officer Jorg said he stated to Mr. Owensby: "Give me your hands. Stop resisting." When Mr. Owensby did not comply, Officer Jorg repeated the commands. Officer Jorg said the third time he repeated the same commands, Mr. Owensby let his hand come out from under his body. After the third command, Officer Jorg felt Mr. Owensby's elbow coming into his vest area. Officer

---

[7] Later in this interview, Officer Jorg said he hyper extended his wrist.

Jorg estimated that he utilized the mandibular angle pressure point technique for "only about two and half, three seconds."

Officer Jorg said he believed that Mr. Owensby kept his hands under him so that he could "get enough weight up underneath him (so) that he could roll and take off running again." Officer Jorg said Mr. Owensby attempted to place his head on the ground to gain a "balance point" for an anticipated roll. Officer Jorg said he negated that tactic by stabilizing Mr. Owensby's head with his arm.

Officer Jorg said prior to Mr. Owensby's arm coming out from underneath him on the third command, Officer Jorg was laying with all his (Jorg's) "body parts on the ground" except for his right arm which was near Mr. Owensby's head and his left arm which was around the top of his head. As Officer Jorg released the mandibular angle pressure point to grasp the arm, he recalled that Officer Caton shouted: "Someone mace this guy" or "Mace this mother f**ker."

Officer Jorg said no police officer was on top of Mr. Owensby's body at this time. According to Officer Jorg, the only control that he had of Mr. Owensby was by his head in the head wrap technique. Officer Jorg said he removed his right hand at a slight 45-degree angle from the head wrap position over Mr. Owensby's head to prevent Mr. Owensby from biting him. Officer Jorg said he released the head wrap of Mr. Owensby only when he felt Mr. Owensby's hand come out from underneath his body.

Officer Jorg said Officer Hunter told him to move his arm so he could spray him with mace. Officer Jorg said he pulled his left arm away from Mr. Owensby at this time and Officer Hunter sprayed Mr. Owensby with chemical irritant. Officer Jorg recalled that the spraying with the chemical irritant was the only action taken by Officer Hunter during the incident. Officer Jorg said Officer Sellers did nothing to assist the arrest during the encounter. Officer Jorg said when he released the mandibular angle pressure point, he said that Mr. Owensby's head raised and he was sprayed with the chemical irritant. Officer Jorg denied that he pulled up Mr. Owensby's head to be sprayed by the chemical irritant.

Officer Jorg said he then trapped Mr. Owensby's arm and brought the arm behind his back and "knelt down on his shoulder of the super scapula area." Officer Jorg described this location in the joint of the shoulder. Officer Jorg said his knee was "at the top of the super scapula nerve, which is at the top of the shoulder in the back." Officer Jorg said he saw that Officer Hodge was having difficulty gaining control of Mr. Owensby's right arm, while utilizing Officer Hunter's PR-24. Officer Jorg said Officer Hodge was applying the PR-24 in the incorrect manner, so, "I leaned over and grabbed it and broke his arm over."[8]

Officer Jorg said when he utilized that maneuver, he was able to gain access to both wrists. Officer Jorg described this technique as "the wrist is slightly bent so you can put a gooseneck joint manipulation hand lock on him. From that point, it's a control issue. It's not a muscle issue. It's how you overcome strength."

---

[8] Officer Jorg did not physically break Mr. Owensby's arm, but only neutralized the arm from its present position underneath the body.

# City of Cincinnati



:

## OFFICE OF MUNICIPAL INVESTIGATION

### REPORT

| | |
|---|---|
| CASE NUMBER: | 00333 |
| COMPLAINANT: | Police Communications |
| ALLEGATIONS: | Death in Custody |
| RESPONDENTS: | Officer Robert Blaine Jorg |
| | Officer Patrick Caton |
| | Officer David Hunter |
| | Officer Jason Hodge |
| | Officer Darren Sellers |
| | Officer Victor Spellen |
| | Officer Brian Brazile |
| DATE OF COMPLAINT: | November 7, 2000 |
| DATE OF REPORT: | October 2, 2002 |
| OMI INVESTIGATOR: | John Plahovinsak |

APPROVED BY:_____

              Mark A. Gissiner
              Acting Municipal Investigation Manager

**EXHIBIT B**

(Officer Hunter) would have helped me get one of his arms or whatever, it would have ended sooner."

## 2. Summary of the OMI Interview with Officer Patrick Caton, Respondent

OMI interviewed Officer Patrick Caton on March 22, 2002.[10]

Officer Caton said he and his partner, Officer Robert Blaine Jorg, were on duty at approximately 7:30 p.m. on November 7, 2000 when they received a MDT message from Officers Hasse and Sellers requesting that they bring an NTA to Sam's Carryout, near Langdon Farm Road.[11] They arrived at the scene at 7:33 p.m. Officer Caton said Officers Hasse and Sellers already had a suspect in custody for a marijuana violation, a minor misdemeanor.

Officer Caton said Officer Hasse showed Officer Caton the two bags of marijuana seized and indicated that the suspect might be persuaded to provide information in lieu of a lighter sentence. Officer Caton said the bags were two sandwich-sized bags and Officer Caton estimated that they weighed about 20 to 30 grams each.

Officer Caton said he decided to interview the suspect in custody to gather useful drug intelligence. Officer Caton said Officer Hasse had already contacted Officer Abe Lawson. Officer Lawson was assigned to the Mini Tac Unit. Officer Caton said Officer Hasse remained in the front seat of the police vehicle, while Officer Caton continued to question the suspect in the rear of the police vehicle. Officer Caton believed that the suspect "thought that he was in trouble for something more serious."

Officer Caton said Officer David Hunter arrived at this time and started a conversation with Officers Jorg and Sellers. Officer Caton said Officer Lawson notified him that he would be at Roselawn Park in a few minutes, so Officer Caton walked over to join the other three police officers. Officer Caton stated that he contacted Officer Lawson using his personal cell telephone.

Officer Caton said Officer Lawson wanted to meet at Roselawn Park to interview the suspect, instead of the Sam's Carryout location. Officer Caton said before he could relay this information to the other police officers, Officer Jorg stated to Officer Caton that he was looking at another suspect.

Officer Caton said during the discussion with the four police officers, Officer Hunter stated that an individual that was crossing Seymour Avenue resembled a suspect, nicknamed "L.A." who had resisted arrest and escaped.[12] Officer Caton said Officer Hunter's words were: "I think that's 'L.A.'" Officer Caton estimated that Officer Hunter was approximately 40 to 50 yards away from the suspect when he made that identification.

---

[10] The Internal Investigation Section (IIS) also interviewed Officer Caton on March 21, 2002. On October 31, 2001, Officer Caton provided testimony in the case of *State of Ohio v. Patrick E. Caton*.

[11] MDT refers to a Mobile Data transmitter and NTA refers to a ticket book document.

[12] This incident occurred on September 27, 2000.

Officer Caton said Officer Jorg make the first contact with Mr. Owensby after he exited the store.[14] According to Officer Caton, Officer Jorg said: "Sir, can we talk to you for a minute?" Mr. Owensby responded: "What's this all about?" Officer Caton said Officer Jorg asked Mr. Owensby to place his drink down and Mr. Owensby placed it down. Officer Caton said that Officer Jorg told Mr. Owensby that he needed to ask him a few questions.

Officer Caton classified his actions and that of Officer Jorg as the contact officers for the encounter. Officer Caton said that Officer Hunter was acting in a cover role for both contact officers.

Officer Caton said the detainment of Mr. Owensby was considered a consensual stop. However, Officer Caton acknowledged that Mr. Owensby was never informed during the discussion that he was free to leave at any time. Officer Caton said that he "didn't know we (police officers) had to tell 'em that they were free to go."

Officer Caton said Mr. Owensby provided his name to Officer Jorg and, according to Officer Caton, added; "You can run me through the computer. You'll see I'm not wanted." Officer Caton said to Mr. Owensby, "Do you have any identification, and we won't have to go over to the car?" Mr. Owensby responded that he did not have any identification on him. Officer Caton said Mr. Owensby said he currently resided in North College Hill.

Officer Caton said Mr. Owensby was asked (by Officer Jorg) what brought him to this part of town since he stated that he lived in North College Hill. Mr. Owensby responded to that he had a girlfriend that lived on Yorktown Street. According to Officer Caton, Mr. Owensby behavior was becoming more nervous and he was not making eye contact with the police officers. Officer Caton described Mr. Owensby's behavior as "having happy feet" and he was looking beyond the police officers for an exit route.

Officer Caton said Officer Jorg told Mr. Owensby that the police had a subject that was the victim of an assault and the description of the attacker matched Mr. Owensby's description. Officer Caton then told Mr. Owensby that the person they are seeking is known to carry a weapon. Mr. Owensby replied that he did not have a weapon on him and started to raise his shirt to show the police officers that he was not armed. Officer Caton acknowledged that he grabbed Mr. Owensby's arm and told him, "Don't reach towards your pant line! Don't reach for anything!"

Officer Caton said Mr. Owensby granted permission for the police officers to search him and Officer Jorg conducted a pat down search of Mr. Owensby. Officer Caton described this pat down as a check of the outer garments to indicate if the person was carrying any firearms or weapons. After Officer Jorg patted Mr. Owensby down for weapons, Officer Caton believed Mr. Owensby relaxed and began to aggressively ask questions. According to Officer Caton, Mr. Owensby said, "Why are you coming at me this way? I don't appreciate it, appreciate the way you're coming at me."

---

[14] The security system tape from Sam's Telecom verified that Officer Jorg, Officer Caton and Officer Hunter detained Mr. Owensby outside as he exited the store.

Officer Caton told Mr. Owensby: "We're looking for somebody who committed an assault offense, was known to carry a firearm and is known to fight and run from the police." Mr. Owensby replied to Officer Caton: "It's been a long time since I ran from the police." At that point, according to Officer Caton, Officer Hunter stepped up from behind Officer Caton, confronted Mr. Owensby and said: "Really?  When was the last time you ran from the police?"

According to Officer Caton, Mr. Owensby became nervous and started looking left and right. Officer Caton believed that Mr. Owensby recognized Officer Hunter from the September 27, 2000 incident and knew that he was going to be arrested for resisting that arrest.  Officer Caton said Officer Hunter then said, "That's him!"  Officer Caton said Officer Jorg reached for his handcuffs to place Mr. Owensby in custody but Mr. Owensby broke free of Officer Jorg's attempt to handcuff him and pushed aside Officer Hunter.[15]

Officer Caton said that Mr. Owensby was never informed that he was under arrest nor was he told that he was going to be arrested.  Officer Caton said Mr. Owensby never voluntarily placed his hands behind his back during the encounter.

Officer Caton said that Mr. Owensby had only taken five or six steps when Officer Jorg caught up with him, wrapped him up in a bear hug and both of them landed on the ground next to a parked car.  Officer Caton said that Officer Jorg tackled Mr. Owensby high, around his shoulder area, to bring him down to the ground.

Officer Caton said he landed on top of Mr. Owensby's legs and grabbed Mr. Owensby's right ankle with both hands.  Officer Caton said that Officer Jorg was lying on the ground with his weight on Mr. Owensby's left shoulder near the chest at this time, but he did not know what Officer Jorg was doing.  Officer Caton said this view, was only "a split second view out of the corner of my eye."  Officer Caton said he initiated the "officer needs assistance call" and started to work his body up the length of Mr. Owensby's right leg to get closer to his body.[16]

Officer Sellers responded on foot, from 2092 Seymour Avenue to 2098 Seymour Avenue, while Officer Hasse remained with the prisoner.  Officer Hodge and Officer Lawson responded to 2092 Seymour Avenue and Officer Hasse directed Officer Hodge to the 2098 Seymour Avenue location, where he participated in the arrest.

Officer Caton described Mr. Owensby as "extremely strong" and "struggling and kicking" during the encounter.  Officer Caton said he was being kicked while he worked his way up Mr. Owensby's leg, but he eventually wound up with his chest over Mr. Owensby's buttocks.

Officer Caton said the only thing that he heard Mr. Owensby say at this time was, "Get off me." Officer Caton could not recall how many times Mr. Owensby made this same comment.

---

[15] The security system tape from Sam's Telecom indicated that Officer Caton grasped Mr. Owensby's right arm while Officer Jorg reached for his handcuffs.  When Mr. Owensby ran from the police officers, all police officers and Mr. Owensby were no longer visible on the security system tape from Sam's Telecom.
[16] Officer Caton initiated the "officer needs assistance" call at 1948 hours on November 7, 2000.

According to Officer Caton, Mr. Owensby had both of his arms pulled up underneath him and Officer Jorg was working on trying to get hold of one of the arms. Officer Caton said Mr. Owensby had his hands way up in front of him. Officer Caton acknowledged that he was not watching what Officer Jorg was doing, but only focused on what he was doing.

Officer Caton said he was attempting to gain control of Mr. Owensby's right arm; however, Mr. Owensby succeeded in pulling it free from Officer Caton's grasp. Officer Caton acknowledged that he delivered two palm strikes to the right side of Mr. Owensby's body. Officer Caton said both of these strikes were delivered at the bottom of the rib cage. Officer Caton shouted out, "Give me your arm!" or "Give me your hands!" each time he struck Mr. Owensby.

Officer Caton said he was able to pull Mr. Owensby's hand from underneath his body and yelled out loud, "Somebody give me a cuff." Someone dressed in a white shirt appeared over Officer Caton's right shoulder opened up his right cuff case and gave him the handcuffs.

Officer Caton said he grasped the handcuffs and was able to place a handcuff on Mr. Owensby's right hand. Officer Caton said that Mr. Owensby continued to pull his arm underneath him and he was losing ground. Officer Caton called out to someone to spray chemical irritant at Mr. Owensby. Officer Caton did not recall if he called for the chemical irritant before he had the handcuff on or after it was secured. Officer Caton said he called for someone to spray the chemical irritant several times during the encounter. Officer Caton said the last time he shouted, "Mace this mother fucker!"

Officer Caton said that Officer Hunter applied the chemical irritant. Officer Caton acknowledged that he did not actually see Officer Hunter squirting the chemical irritant at Mr. Owensby. Officer Caton said that even with the application of the chemical irritant, he was still unable to bring Mr. Owensby's arm across and over his body.

Officer Caton said that he delivered three additional open palm strikes in quick succession. Officer Caton said one strike was to the forearm and two strikes were to the upper arm. Every time he struck Mr. Owensby, he yelled, "Stop resisting! Stop resisting!"

Officer Caton said Officer Jorg had gained control of Mr. Owensby's left arm and they both were attempting to get Mr. Owensby's wrists together to be handcuffed. Officer Caton said Officer Hodge arrived on the scene and they both were able to leverage Officer Hodge's PR-24 under Mr. Owensby's right hand to get both wrists together and handcuffed.

Officer Caton said all the police officers stopped and caught their breaths as Mr. Owensby continued to struggle on the ground. Officer Caton said that the police officers could feel Mr. Owensby struggling under their weights.

Officer Caton said he said: "Okay guys, let's stand this guy up!" Officer Caton said he tried to pick him up by his waist. Officer Caton said that everyone that he had handcuffed in the past that was flat on his stomach, had to be assisted to the upright standing position. Officer Caton said in this instance this technique was unsuccessful. Officer Caton said Mr. Owensby was

## POLICE INTERVENTION OF ROGER OWENSBY, JR.

### CASE # 00 PI 04

### STATEMENT

### OF

### GEORGE WEAVER

Code to persons speaking in statement:

    Q.    Police Officer Robert Heinlein
            Homicide Unit, C.I.S.
            Cincinnati Police Division

    QQ.   Specialist Charles Beaver
            Homicide Unit, C.I.S.
            Cincinnati Police Division

    A.    George Weaver

(Note: Inaudible portions of statement are indicated by dashes)

    Q.    ........Charlie Beaver, Criminal Investigation Section, Homicide Unit. The date is October 8th. The year 2000. The time now is 0140 A.M. This interview will be with one George Weaver. W-E-A-V-E-R. He is a witness in a police intervention investigation, which occurred on October 7th. Also year 2000. Uh, which started at approximately 1905 hours and 1940 hours I believe. 1948.

    QQ.    _ _ _

    Q.    And the address is uh, 2098 Seymour Avenue up in uh, Roselawn area.

C001250

C001250

**EXHIBIT C**

hand behind the back, they instantly started grabbing.  That, one of 'em grabbed his right arm.

Q.    Now you said they told him to turn around.  Are the officers

A.    Correct.

Q.    facing him looking into the store and he's lookin' out.

A.    They, they

Q.    or

A.    Was like this.  They was facing to the store.  An' he was faced out the store.

Q.    Okay.

A.    So he come out the store.  They tell him turn around, put his hands behind his back.  So then

Q.    'kay, after they question him.

A.    Right.  After they question.

Q.    Were the officers loud at this point at all?

A.    No, they wasn' loud.

Q.    Were just asking questions, normal voice?

A.    Right.  Right.  Right.

Q.    Was

A.    Right.

Q.    Was uh, "L.A." loud or disruptive or anything at this time?

A.    No.

Q.    Nothing.

C001262

001137

A.    No, he wasn't loud.

Q.    So everything's quiet and peaceful.

A.    Right.

Q.    And you're, you're watching this.

A.    Ri-, right.  So

Q.    And you're next in line trying to pay for your, for your pizza and that.

A.    Oh, no.  I was

Q.    And you're next in line because, because he just paid for his and he walked out the door, right?

A.    Well, when that jumped off, I sat my pizza on the counter.  An' then I bo- I wa-, I stepped back to like two, three steps back.  An' looked over like.  Cause I, I was like where the door at, it's like right here.  Say this the door.  You know I'm sayin'.  Let's say like this the door part right here.  Come in the door.  An' then right here, is where you pay for the stuff at all, right here.  So I took like two, three steps back.  An' the manager was standin' right here at the door.  So I'm standin' right there with the manager.  You know I'm sayin', lookin' like you know I'm sayin'.  Talkin' to him like dang why, what's goin' on, what's goin' on.  Say man, I don't know.  I, you know I'm sayin'.

Q.    Okay.  Let's get back to the handcuffing then.

A.    Okay.  So the handcuff.  Okay.  So they got one cuff on.  Next thing

Q.    "They" who?  Which, which person handcuffed him?

A.    Uh.                                                            C001263

Q.    We're gonna go with uh, the short black cop?  The sleeveless officer?

001169

right arm behind his back.  And the other uh, his left arm is kind

QQ.    Juggling and shoving.

Q.    An' shoveling and touch

QQ.    _ _ _.

A.    Right.  So I guess when they couldn't get it back, that's when it just,

it just an' he try to run.  _ _ _ an' he try to run.  When he, when he try to run you know I

mean it, that's when they just grabbed him.  Really grabbed him like.  "Rrrrw"  Access

for-,exce-, excessive force.

Q.    "They" who grabbed him?

A.    Uh, well I mean they already well Caton already really had him.  The

other, the sleeveless really I don't think sleeveless really could, could hold him.  You

know I'm sayin'.  That's when they start callin' for back up and this and that.  An'

Q.    Now you said he's

A.    _ _

Q.    _ _ he started to run.  When he ran, was he completely free of the

officers when he ran?

A.    Oh, no.  He was never free.  Never

Q.    The officer still had

A.    Right.

Q.    control of him.

QQ.    Ahold of him the whole time.

A.    Right.  Tha-, that's why I said like how you gonna try to run an' they,

an' they got him.  You know I'm sayin'.  They had him.

C001265

001140

Q.    So which one's had control and what did they do?

A.    Uh, Caton an' sleeveless had control.

Q.    What did they do then?

A.    So then they slammed him. Well, kinda slid off of the car. Off,

off of the back of my brother car. When they was struggling with him. Cause he was

kinda

QQ.    Were they struggling up on the car?

A.    No.

QQ.    Or just against it and then slid off to the ground?

A.    Right.

QQ.    Okay. Now what I just said

A.    It went like this.

QQ.    that's a lot different than slamming somebody.

A.    It was like when he bumped into it that's when like when, when he, when

he slid like, they slid across the car like this, like around across the bumper.

QQ.    Un-huh.

A.    Like a slide. So then, that's when they _ _ _ "boom" _ _ _

QQ.    And took him down to the ground.

A.    An' they took him down, right. Cause I mean they was having a hard

time. You know what I mean.

QQ.    He was fighting.

Q.    Was he

A.    Basically yeah

C001266

CC1141

QQ.    Now when you say slam, you think they threw him too hard to hurt him or you think they were doing their job and had to put him down on the ground to control him?

A.    Well, to be, to be truthful, I think that they was doin' their job. But I also doin' it too much. You know

QQ.    All right.

A.    I s-, they was doin' their job but they just went too far with it. You know I'm sayin'. Cause like one, like I, like I said once he hit the ground _ _ _ it was no more movement, nothin'. No more struggling or nothin'. It was just the cops that were strugglin'. You know I'm sayin' like

Q.    So who brought him to the ground when they slid off the car, who was

A.    Uh, it was

Q.    Which officer's were _ _ ?

A.    It was Caton an' sleeveless.

Q.    Okay. An' then they, then he hits the ground.

A.    Right.

Q.    Then what happened?

A.    An' then they just piled on top of him like. Like a pile on, like just start pilin' on. They piled on top of 'im. An' then I didn't even see him no more after that. I, you know what I'm sayin'. I really, you really couldn't even seen him. So that's when I told the manager like come on, man. Walk to the end of the car with me, you know I'm sayin', just so, so I be standin' here with you. That way they can't say nothin', the cops won't say nothin' like leave or nothin'.

C001267

A.    Right. They didn't nobody even know he wasn' movin'.

QQ.    How did you know he wasn' moving then?

A.    I, I know he wasn'

QQ.    I mean, I mean nobody, I mean if cops are on top of him and they're rocking an' rolling

Q.    You said you couldn't see.

QQ.    and shaking and punching, what makes you think he wasn't conscious at that point and struggling to get up?

A.    Cause once he hit the ground, it was it. They, they threw that arm right behind his arm like click instantly.  You know I'm sayin', he knew he wasn't

QQ.    Okay.

A.    He wasn' usin' no force.  I mean he wasn' tryin' to struggle no more. That, that's lettin' me know when they threw that arm back there like click, I mean it just went flimsy like this.  You know I'm sayin'.  Like a piece of paper slippin'.  It just went right back like that.  Like when they was draggin' him, his legs was just flockin' like this. You know I'm sayin' they

QQ.    Un-huh.

A.    they drug him by his arm.  You know what I mean.  An', an' when they put him in the car they put him in like down, you know I'm sayin'.  Then they put his legs in an' they shut the door.

QQ.    How'd they get his legs in?  I mean they fold 'em up or something or

A.    Yeah, they yeah, they folded 'em up.

QQ.    Picked 'em up.

C001273

001148

24

<u>**00 PI 04**</u>

<u>**POLICE INTERVENTION    (ROGER OWENSBY, JR.)**</u>

<u>**AND STATEMENT OF**</u>

<u>**GEORGE WEAVER**</u>


(Second Interview)


Code to persons speaking in statement:

Q:    Detective David Feldhaus
      Homicide Unit
      Cincinnati Police Division
      824 Broadway Street

QQ:   Detective Gregory Ventre
      Homicide Unit
      Cincinnati Police Division
      824 Broadway

A:    George Weaver

(Note: Inaudible portions of statement indicated by dashes)


Q:    Okay.  Today's date is November 13th, the year 2000.  This is Detectives Dave

Feldhaus and Greg Ventre of the Cincinnati Police Homicide Unit.  We're interviewing a

George Weaver.  Uh Mr. Weaver's a male, black, twenty.  He's got an address of 2065 Faith

Street, Cincinnati, Ohio 45237.  Has a home phone number of 731-5928.  Mr. Weaver is being

interviewed at C.I.S. in reference to a police intervention case involving the death of Roger

Owensby, also known as "L.A"., which occurred on November 7th, 2000 approximately 1948

hours at 2098 Seymour Avenue.  The homicide case of this is 00 PI 04.  George uh you were

brought in here today.  I understand you told us you were interviewed uh the night that this uh

on November 7th, the night that uh this incident happened.  Is that correct?

A:    Yes.

C001312

001180

1

**EXHIBIT D**

that night he was out there. I 'on't. That was the first time I seen him back on the force since it was Hill Crest.

Q:    And you saw him kicking?

A:    Right. So he was kicking him and the other cop just tried to ignore him, cause the other security just tried to put a hand on him. You know what I'm saying. Trying to make sure everything. But it was really over. I mean it wasn't. I mean the way the cops was still coming and getting on top of him and putting they knee on him, holding him down all this. It was, it all wasn't called for, cause I mean, he was already handcuffed.

Q:    How many policemen were on him you think?

A:    Uh I say it like six at the least. And it was probably like ten at the most. I'm not really for sure. I can't. I can't really give a good estimate, but there was around.

Q:    Before we went on tape, we were talking to you and you told us that one of them had him in a, like a head lock.

A:    Yeah. It was more of like a, like a, like a choke hold I mean.

Q:    Okay.

A:    Like he just had his arm up under, under his neck you know.

Q:    And who had him like that?

A:    Uh I'm not really for sure now, but that night I thought it was the Golf Manor cops. Uh it was a, a cop, a cop from Golf Manor.

Q:    So it wasn't any. You don't think it was any of the Cincinnati policemen?

A:    But to uh, to fix all that, I'm not really for sure.

Q:    Okay. Are, what are you sure? Are you sure. Let's take it by the, the uh three policemen originally.

A:    Was there on, on the scene first.

C001317

001191

6

## POLICE INTERVENTION OF ROGER OWENSBY

### CASE # 00 PI 04

### STATEMENT

### OF

### AERIAL ST. CLAIR

### (2nd INTERVIEW  11/12/00)

Code to persons speaking in statement:

>     Q.    Specialist David Feldhaus
>           Homicide Unit, C.I.S.
>           Cincinnati Police Division
>
>     QQ.   Specialist James Zieverink
>           Homicide Unit, C.I.S.
>           Cincinnati Police Division
>
>     A.    Aerial St. Clair

(Note: Inaudible portions of statement are indicated by dashes)


Q.    Okay.  Today's date is November 12th.  The year 2000.  The time now is

approximately uh, 1410 hours.  This is Detective Dave Feldhaus and Jim Zieverink of the

Cincinnati Police Homicide Unit.  We are at CIS interviewing an Aerial St. Clair.  Uh,

Aerial is a female, black, 17.  She has an address of 3445 McHenry Road, Apartment

15, Cincinnati, Ohio 45225.  Uh, this is her, she lives with her mother at this address.

A.    No, my daddy.

Q.    Or I'm sorry.  Lives with her dad at this address.  Her phone number,

C001209

001087

**EXHIBIT E**

Q.    And you're saying that they threw him on the ground.

A.    Yeah. But he hit the car first.

Q.    He hit the car which belongs to

A.    George.

Q.    George. You know George's last name?

A.    Huh-uh. He one of the witnesses.

Q.    Okay. So he hit his car an' then he went to the ground.

A.    Un-huh.

Q.    And which way did he hit the ground, when he fell to the ground, which way was he positioned?

A.    Face down.

Q.    Face down?

A.    Un-huh.

Q.    Okay. And then what happened?

A.    And then they uh, starte' hitting on him an' stuff cause he was still resisting. An' they couldn't get his hands behind his back.

Q.    Now "they" meaning the s-, the police officers?

A.    Un-huh.

Q.    And how many were on him at this time?

A.    About five.

Q.    There's five on him on that quick? First of all you said there was three of 'em approached him at the door.

A.    Un-huh. Un-huh.

C001213

001091

Q.    So from the time he walked outta the door _ _ _ two other officers came up?

A.    From the time he hit the ground that's how quick it, that's how Quick it happened like. I don't know how

Q.    Okay. All right. Just, what, just tell us what you seen. So then he's on the ground.

A.    Un-huh.

Q.    And there's, you're thinking five officers on him.

A.    Un-huh.

Q.    Okay. And what happened then?

A.    And uhm, at first they couldn't get his hands behind his back. And they had got his right arm.

Q.    Did you hear what they were saying?

A.    "Put your hands behind your back."

Q.    And was, was uh

A.    _ _ _?

Q.    L.A. doing what they said?

A.    No.

Q.    Okay. Where was his hand postitioned at?

A.    First they was in the front. But then they had got his right arm behind his back and they still couldn't get his left arm. His left arm was like still in the front..

Q.    So he's still

A.    Resistin'.

C001214

001092

6

Q.   resisting.

A.   Un-huh.

Q.   And do you remember anything they were saying to him?

A.   One officer just kept saying "mace this motherfucker, mace this motherfucker."

Q.   Okay.  Do you know which officer said that?

A.   No.

Q.   'kay.

A.   Cause it was like they was all bunched.  An' you could just hear him sayin'.

Q.   Okay.  And then uhm, what were the other officers doing?  Just, did 'hey just have ahold of his arms?  Were they hitting him or anything like that?

A.   No.  They was hittin' 'im an' kickin' 'im and stuff.

Q.   Okay.  Did you see where they were hitting him at?

A.   Like in his back an' his _ _ an' like right here an' in his back.  Stuff.

Q.   In his head.  Anything like that or was it all on the side of the body?

A.   I couldn't really see his head cause like

Q.   Okay.

A.   the way they was uh, around him an' stuff.

Q.   So they're basically hitting him in the side that you could see.

A.   In his side.  Un-huh.

Q.   And they were telling him to put your hands back.

A.   Un-huh.

C001215

7

001098

Q.     And from what you could tell is that he was basically still resisting 'em?

A.     Un-huh.

Q.     But he did have one ha-, they did

A.     Ha-

Q.     pry one hand out.

A.     Un-huh.

Q.     And did they have a handcuff on this hand?

A.     Yeah, they did.

Q.     They did have a handcuff on one hand.

A.     Yeah.

Q.     Okay.  Go ahead, then what happened?

A.     And then after that, some kind of way they had got his left arm.  And then they was handcuffin' him.  An' one officer was macin' him.  And then the other officer got on his, put his knee in his back and just started choking him.

Q.     Okay.  Describe, did you see the police officer that maced him?

A.     No.

Q.     Okay.  Did you see the police officer now?  You're describing other police officer getting on his back.

A.     Un-huh.

Q.     Is

A.     And he put his right knee in his back.

Q.     So he had his right knee on his back.  And then he, you're, you're indicating he had his, on-, one of his arms.

C001216

001094

8

A.    Un-huh.  Was cho-

Q.    Around his neck.

A.    Yes, sir.

Q.    And choking him.

A.    Yes, sir.

Q.    And at what point, what was the position of L.A.?  Was both his hands handcuffed at this time or was he still resisting?

A.    The officer, it's like as he was putting other handcuff on he was putting His knee in his back an' was choking him.

Q    All right.  Did he have the handcuffs on or was it

A.    Yeah.  I guess he was choking him.

Q.    So was it the same officer that handcuffed him?

A.    Yeah.

Q.    Put the second cuff on him. ·

A.    Yes, sir.

Q.    Is the one that reached up and then put his

A.    Yes, sir.

Q.    arm around his neck.

A.    Yes, sir.

Q.    Okay.  And how long do you th-, indicate, before we went on tape you ind-, you basically went over this same story.  Is that correct?

A.    Yes, sir.

Q.    And we were trying to determine how long he had his arm around

C001217

001095

his neck. Is that correct?

A.    Yes, sir.

Q.    And we basically had you try to time the amount or approximate

amount of time that you felt he had this as you described like a, a

A.    Yes, sir.

Q.    choke hold. Or

A.    I guess. I don't know nothin' about stuff like that.

Q.    I know but I mean a type of hold you were saying he was

A.    Yes, sir.

Q.    I, I forget what you used the word describe it.  A

A.    I forgot what I used too. I just know he was choking him.

Q.    Okay. That's what I said. You described

A.    Yeah.

Q.    it as like he was choking him with a choke hold.

A.    Yes, sir.

Q.    How long did you feel he was, you, we asked you how long you felt

this lasted and timed it. And it came out to roughly ten seconds. Is that correct?

A.    Yes, sir.

Q.    Okay. Then what happened?

A.    Then after he was choking him and stuff, like he was, he did

it for ten seconds. Then he let go. Like and then like for a while like he was still,

L.A. was still moving like but you could tell like he was in pain cause like he was kinda

like trying to like he was, it's like he was trying to stay something but like he couldn't

C001218
061096

say it or something like. We just heard 'im like moanin' or something like. An' then after that they had like the officers, two officers, one grabbed him right here and one grabbed him right here. And the way, I don't know how they got him up cause it was like, it was crazy. It was so fast like. An' they just started draggin' 'im to the car. They, to mean they, they could'a checked to see, well they didn't check to see nothing like. They just

Q.    Okay. But we just you know, just tell us what you seen. Okay. So he's laying, after that ten seconds

A.    Un-huh.

Q.    He's sa-, you're saying that uh, he let go.

A.    Un-huh.

Q.    And then go over it again what, what you seen.

A.    Okay. Okay, then he was, L.A. was still there for a minute like they was still, I don't know what they was doing. But like they was all rushing around. Couldn't really see like . Then about a minute or two then they had picked him up and Drug him to police car.

Q.    Okay.

QQ.   So he laid there for about a minute or two before

A.    Yeah. They was still around him

QQ.   After they cuffed him.

A.    but you couldn't really tell what they were doin' or nothing like. I don't know if they knew he was dead then or what. Uh duh huh.

Q.    To go back, okay. One thing to go back, and you told us before

C001219

001097

11

# City of Cincinnati



## OFFICE OF MUNICIPAL INVESTIGATION

### REPORT

| | |
|---|---|
| CASE NUMBER: | 00333 |
| COMPLAINANT: | Police Communications |
| ALLEGATIONS: | Death in Custody |
| RESPONDENTS: | Officer Robert Blaine Jorg |
| | Officer Patrick Caton |
| | Officer David Hunter |
| | Officer Jason Hodge |
| | Officer Darren Sellers |
| | Officer Victor Spellen |
| | Officer Brian Brazile |
| DATE OF COMPLAINT: | November 7, 2000 |
| DATE OF REPORT: | October 2, 2002 |
| OMI INVESTIGATOR: | John Plahovinsak |

APPROVED BY:

Mark A. Gissiner
Acting Municipal Investigation Manager

**EXHIBIT F**

total vision, but he saw Officer Caton's swinging motion toward where Mr. Owensby's head should be located on the seat.

Officer Hunter said that Mr. Owensby was attempting to escape during the incident of September 27, 2000, and it appeared that he only wanted to escape from the police during this incident. Officer Hunter said although Mr. Owensby was struggling during the encounter, he was not throwing any punches or attempting to inflict injuries to the police officers.

Officer Hunter said that he gave his maximum effort in the encounter and he did so primarily because of officer safety. According to Officer Hunter, Mr. Owensby may have had a weapon concealed that Officer Jorg may have missed in his "generic" search. Officer Hunter said he attempted to focus his energy during the encounter on controlling the right wrist because "hands kill."

### 4. Summary of the OMI Interview with Officer Darren Sellers, Witness

OMI interviewed Officer Darren Sellers on April 3, 2002.[24]

Officer Sellers said that he was on regular uniform duty on November 7, 2000 with his partner, Officer Alex Hasse. Both police officers were in the vicinity of Sam's Carryout to investigate complaints of loitering and drug activity.

Officer Sellers said he stopped and arrested an individual, who was in possession of marijuana, and they had requested other police vehicles for support assistance. Officer Sellers said Officers Hunter, Jorg, and Caton then arrived at that location. Officer Sellers said Officer Jorg asked him if he knew anything about an individual nicknamed "L. A." Officer Sellers said he recently transferred to District Four and Officer Jorg had told him that he and partner were searching for "L. A." Officer Jorg provided Officer Sellers with a brief description of "L. A." and he wanted to be informed if Officer Sellers had any contact with this individual in the future.

Officer Sellers said five minutes after having this discussion with Officer Jorg, an individual walked across the street toward the Sunoco Gas Station and Officer Hunter suddenly stated, "L.A. That looks like L. A.!" Officer Sellers said he heard Officer Jorg remark that: "He has a lot of balls to come out here in front of all these cops." Five minutes later, Officer Sellers said that Officer Jorg stated that they (referring to Officers Jorg, Hunter and Caton) were going to interview the individual that walked into the Sunoco Gas Station.

Officers Sellers said he and Hasse stayed at their location to process their prisoner on the marijuana charge. About five minutes later, Officer Sellers said a radio dispatch went out that an "officer needs assistance." Officer Sellers said Officer Hasse signaled him to provide assistance with the phrase, "I got the prisoner, go ahead and go over there and help him!" Officer Sellers said he ran over to the Sunoco Gas Station entrance from his location at Sam's Carryout.

---

[24] In addition to this OMI interview, Officer Sellers also provided testimony in the case of *State of Ohio vs. Robert B. Jorg* on October 25, 2001 and the case of *State of Ohio vs. Patrick E. Caton* on October 26, 2001 and November 1, 2001.

When Officer Sellers arrived at the scene, he observed three police officers on the ground with Mr. Owensby. According to Officer Sellers, Mr. Owensby "was laying there. He didn't make any overt movements or him rolling over or anything like that." Officer Sellers said Officer Jorg "was at the top part of his (Mr. Owensby) torso, (Officer) Hunter on his left (side), what would be his left side when you came around, and (Officer) Caton was on his right-hand side."

Officer Sellers said Mr. Owensby was lying on his face on the ground and not handcuffed. Although Officer Sellers witnessed Officer Jorg at the top of Mr. Owensby's body, he said he did not see what Officer Jorg was doing. Officer Sellers said his attention was focused on Mr. Owensby and his hands because he did not know whether Mr. Owensby had a weapon.

Officer Sellers said his first action upon arriving at the scene was to reach for his handcuffs, but they were already on the suspect in the police vehicle at Sam's Carryout. Officer Sellers said he then went around Officer Caton's back and removed Officer Caton's handcuffs from his belt.

Officer Sellers said Officer Caton had both of his hands around Mr. Owensby's right wrist when he arrived. According to Officer Sellers, Officer Caton "appeared" to be struggling to get the right wrist handcuffed, but Officer Caton observed no movement of Mr. Owensby on the ground. Officer Sellers also said that Mr. Owensby did not say anything while he was on the ground. Officer Sellers said it was very unusual for someone struggling not to say anything.

Officer Sellers said that Officer Hunter had gone around to Mr. Owensby's right side near his head after Officer Caton had shouted, "Mace this f**ker! Mace this f**ker!" Officer Seller could not remember if Officer Hunter sprayed Mr. Owensby with the chemical irritant before one hand was handcuffed or not.

Officer Sellers said he placed a handcuff on the right wrist that Officer Caton was struggling with and he told Officer Caton that he had "one cuff on." Officer Sellers said he than went to Mr. Owensby's left side to attempt to assist the handcuffing of that arm. While working to pull out Mr. Owensby's arm from underneath his body, Officer Sellers noticed Officer Hodge arriving. Officer Hodge assisted him in pulling out Mr. Owensby's left arm. Once Mr. Owensby's left arm was out from underneath his body, Officer Sellers was able, with Officer Caton's assistance, to get both hands handcuffed. Officer Sellers said he said: "I got him cuffed, I got him cuffed."

Officer Sellers said after Mr. Owensby was handcuffed on the ground, he stood up and he observed Officer Caton striking Mr. Owensby in the back above his handcuffed hands. According to Officer Sellers, Mr. Owensby "wasn't doing anything. He was laying there." Officer Sellers said while Officer Caton was striking Mr. Owensby, he said Officer Caton was saying, "Stop resisting. Stop resisting."

According to Officer Sellers, Officer Caton kept repeating that phrase. Officer Sellers said he said, "He's already handcuffed! He's already handcuffed!" Officer Sellers said that he saw no reason for Officer Caton to deliver the blows to Mr. Owensby once he was handcuffed.

27

Officer Sellers said after Officer Caton stopped striking Mr. Owensby, he stood up and both Officer Caton and Officer Jorg lifted Mr. Owensby into a standing position by placing their arms underneath each of Mr. Owensby's arms.  According to Officer Sellers, both police officers "had trouble picking him up because he wasn't a little guy, but they got him up."  Officer Sellers said that Mr. Owensby was not struggling and did not either move or say anything.

Officer Sellers said Officer Caton saw the Golf Manor police car and asked if they could place Mr. Owensby in that vehicle.  A Golf Manor police officer said, "Sure" and Mr. Owensby was taken to the Golf Manor police vehicle.

According to Officer Sellers, the police officers put Mr. Owensby halfway in the car and halfway out of the car.  Officer Sellers said Mr. Owensby's feet and knees were hanging outside the car, while his head and torso were inside the car.

Officer Sellers said Mr. Owensby had to be carried to the police car and also placed in this vehicle.  Officer Sellers said Mr. Owensby never walked and he observed Mr. Owensby's toes being dragged on the ground.  Officer Sellers said Officers Caton and Jorg "escorted" Mr. Owensby to the police vehicle and Officer Sellers walked directly behind them.

### 5. Summaries of the Criminal Investigation Section (CIS) and Internal Investigation Section (IIS) Interview with Officer Jason Hodge, Witness

(The following is a compilation of the three interviews.) [25]

The CPD Criminal Investigation Section (CIS) interviewed Officer Hodge on November 20, 2000 and the CPD Internal Investigation Section (IIS) conducted an interview on May 2, 2002.

Officer Hodge said he and Officer Abe Lawson were on duty and waiting at Roselawn Park for police officers to bring a prisoner to talk to them.  After waiting approximately five minutes, Officer Hodge heard an officer needs assistance call.  Both police officers responded and Officer Lawson parked the unmarked vehicle at Sam's Carryout.  Officer Hodge said Officer Hasse was standing outside his police vehicle at Sam's Carryout and he pointed to the Sunoco Gas Station.

Officer Hodge said he observed three police officers struggling with a suspect on the ground at the Sunoco Gas Station parking lot and he ran over to the site to provide assistance.  The officers were struggling in back of a parked car near the front door of the Sunoco Gas Station.  Officer Hodge identified the police officers on the ground as Officers Sellers, Jorg and Caton.  Officer Hunter, according to Officer Hodge, was standing nearby the police officers.

According to Officer Hodge, Mr. Owensby was laying facedown on the ground and Officer Jorg was leaning off to the side of the head, between his head and left shoulder.  According to Officer

---

[25] Officer Hodge invoked his Fifth Amendment Right to the CIS immediately after the incident occurred on November 8, 2000.  Twelve days later he gave a consensual statement to CIS.  In addition to the CIS and IIS interviews, Officer Hodge also presented testimony at the case of *State of Ohio vs. Patrick Caton* on October 31, 2000.

# City of Cincinnati



:

## OFFICE OF MUNICIPAL INVESTIGATION

### REPORT

| | |
|---|---|
| CASE NUMBER: | 00333 |
| COMPLAINANT: | Police Communications |
| ALLEGATIONS: | Death in Custody |
| RESPONDENTS: | Officer Robert Blaine Jorg |
| | Officer Patrick Caton |
| | Officer David Hunter |
| | Officer Jason Hodge |
| | Officer Darren Sellers |
| | Officer Victor Spellen |
| | Officer Brian Brazile |
| DATE OF COMPLAINT: | November 7, 2000 |
| DATE OF REPORT: | October 2, 2002 |
| OMI INVESTIGATOR: | John Plahovinsak |

APPROVED BY:_____

  Mark A. Gissiner
  Acting Municipal Investigation Manager

**EXHIBIT G**

had a scraped up knee. And there might have been some blood but none that would have gotten on my uniform." Officer Caton believed that the blood was from Mr. Owensby. Officer Caton first observed the blood after he had performed CPR on Mr. Owensby.

Officer Caton said Sergeant Shearer informed him that the situation was now a death in custody investigation and he should speak to representatives of the Criminal Investigation Section (CIS). Officer Caton said upon the advice of an attorney, Officer Caton declined to provide a statement to the CIS immediately after the incident. Acting on the advice of the Fraternal Order of Police (FOP) Attorney Steven Lazarus, Officer Caton, together with Officers Hunter, Jorg, Sellers, and Hodge invoked their Fifth Amendment Right not to answer questions or provide any statements regarding their contact with Mr. Owensby.

Officer Caton acknowledged that he did discuss the incident with Officer Jorg after November 7, 2000. Officer Caton estimated that he talked to Officer Jorg "within a day or a couple of days of the incident."

Officer Caton said that he was angry after the incident for several reasons:

- He was upset that a police officer stood by and watched the fight. Officer Caton acknowledged that Officer Hunter did mace Mr. Owensby, but only "after I bellowed at him to do it. If I hadn't done it, I still think Officer Hunter would still be sitting there watching this whole thing."

- Officer Caton was upset that another police officer heard an officer needs assistance broadcast and did not respond. Officer Caton identified this police officer as Officer Hasse.

### 3. Summary of the OMI Interview with Officer David Hunter, Witness

OMI interviewed Officer David Hunter on July 15, 2002.[22]

Officer Hunter said he had two involvements with Mr. Roger Owensby. The first involvement occurred on September 27, 2000 and the second contact occurred on November 7, 2000.

During the first contact on September 27, 2000, Officer Hunter said he was on a drug investigation detail in the Langdon Farm and Seymour Avenue area when Mr. Owensby started to interfere with their undercover operation. Officer Hunter said he was dressed in plain clothes during this detail. Officer Hunter said that Mr. Owensby was warning people in the area that the police were coming.

Officer Hunter said after he identified himself as a police officer, Mr. Owensby pushed him and escaped. Officer Hunter said that he chased Mr. Owensby for approximately five minutes before Mr. Owensby escaped into an apartment building. Officer Hunter said he did not know Mr. Owensby's name at the time, but he may have had prior contact with him. Officer Hunter said

---

[22] In addition to this OMI interview, Officer Hunter also provided testimony in the case of *State of Ohio vs. Robert B. Jorg* on October 24, 2001 and the case of *State of Ohio vs. Patrick E. Caton* on October 25, 2001.

handcuffed on the ground. After Mr. Owensby was handcuffed, Officer Hunter said he and Officer Jorg and Officer Hodge stood up from the ground.

Officer Hunter said after Mr. Owensby was handcuffed, Officer Caton and Mr. Owensby remained on the ground. Officer Hunter said Officer Caton straddled Mr. Owensby and struck him in the lower middle back with his fist several times. Officer Hunter said that Officer Caton struck Mr. Owensby more than two or three times, but less than 30 times. During this time Officer Caton, according to Officer Hunter, was yelling, "Stop resisting." Officer Hunter said when he saw Officer Caton striking Mr. Owensby after he was already handcuffed, Officer Hunter said something out loud, similar to: "What the hell is he doing!" or "What the "F" is he doing!" According to Officer Hunter, Officer Caton stopped striking Mr. Owensby.

Officer Hunter said that Officer Caton arose and then, with the assistance of another police officer, lifted Mr. Owensby up to an upright position. Officer Hunter said Officer Caton asked a Golf Manor police officer if he could use their police vehicle. Officer Hunter said that the Golf Manor police officers responded to the officer needs assistance call and all the City of Cincinnati police vehicles were still in front of Sam's Carryout. Officer Hunter remembered that Officer Caton yelled: "Can we use this car?" to the Golf Manor police officers.

According to Officer Hunter, the police officers then took Mr. Owensby to that vehicle. Officer Hunter said he did not know why Officer Caton was in a hurry to place Mr. Owensby in the Golf Manor police vehicle because Mr. Owensby was not belligerent or struggling with the police officers. Officer Hunter said that Officer Caton made that call and acted on it instantly.

Officer Hunter did not recall when the Golf Manor police vehicle arrived, but he said he saw the vehicle "immediately after" Officer Hunter stood up "and it was the closest car to us." Officer Hunter estimated that the police vehicle was only two and a half car length away from them. When the other City of Cincinnati police vehicles arrived, according to Officer Hunter, they parked everywhere on the lot.

Officer Hunter said he never saw Mr. Owensby walk to the Golf Manor police vehicle after he was stood upright. Officer Hunter described that Mr. Owensby was carried by the police officers and his feet were dragging on the ground. Officer Hunter said the reason that he observed the position of Mr. Owensby feet being dragged was because he was looking around on the ground for his equipment and he "saw the bottom portion of his legs being dragged." Officer Hunter said he identified this equipment he was seeking as his PR-24, keys and mace canister. Officer Hunter said he did not see Mr. Owensby's eyes, but he did notice that Mr. Owensby's head "was sagging toward his chest."

Officer Hunter acknowledged that he did not see Mr. Owensby being initially placed inside the police vehicle. However, when he looked over to the Golf Manor police vehicle, he observed the rear driver's door being open and Officer Caton leaning inside.

Mr. Owensby, according to Officer Hunter, was already inside the vehicle on the seat. Officer Hunter said Officer Caton was swinging his arms inside the vehicle like he was "throwing punches' at Mr. Owensby. Officer Hunter said the open door of the vehicle was blocking his

25

total vision, but he saw Officer Caton's swinging motion toward where Mr. Owensby's head should be located on the seat.

Officer Hunter said that Mr. Owensby was attempting to escape during the incident of September 27, 2000, and it appeared that he only wanted to escape from the police during this incident. Officer Hunter said although Mr. Owensby was struggling during the encounter, he was not throwing any punches or attempting to inflict injuries to the police officers.

Officer Hunter said that he gave his maximum effort in the encounter and he did so primarily because of officer safety. According to Officer Hunter, Mr. Owensby may have had a weapon concealed that Officer Jorg may have missed in his "generic" search. Officer Hunter said he attempted to focus his energy during the encounter on controlling the right wrist because "hands kill."

### 4. Summary of the OMI Interview with Officer Darren Sellers, Witness

OMI interviewed Officer Darren Sellers on April 3, 2002.[24]

Officer Sellers said that he was on regular uniform duty on November 7, 2000 with his partner, Officer Alex Hasse. Both police officers were in the vicinity of Sam's Carryout to investigate complaints of loitering and drug activity.

Officer Sellers said he stopped and arrested an individual, who was in possession of marijuana, and they had requested other police vehicles for support assistance. Officer Sellers said Officers Hunter, Jorg, and Caton then arrived at that location. Officer Sellers said Officer Jorg asked him if he knew anything about an individual nicknamed "L. A." Officer Sellers said he recently transferred to District Four and Officer Jorg had told him that he and partner were searching for "L. A." Officer Jorg provided Officer Sellers with a brief description of "L. A." and he wanted to be informed if Officer Sellers had any contact with this individual in the future.

Officer Sellers said five minutes after having this discussion with Officer Jorg, an individual walked across the street toward the Sunoco Gas Station and Officer Hunter suddenly stated, "L.A. That looks like L. A.!" Officer Sellers said he heard Officer Jorg remark that: "He has a lot of balls to come out here in front of all these cops." Five minutes later, Officer Sellers said that Officer Jorg stated that they (referring to Officers Jorg, Hunter and Caton) were going to interview the individual that walked into the Sunoco Gas Station.

Officers Sellers said he and Hasse stayed at their location to process their prisoner on the marijuana charge. About five minutes later, Officer Sellers said a radio dispatch went out that an "officer needs assistance." Officer Sellers said Officer Hasse signaled him to provide assistance with the phrase, "I got the prisoner, go ahead and go over there and help him!" Officer Sellers said he ran over to the Sunoco Gas Station entrance from his location at Sam's Carryout.

---

[24] In addition to this OMI interview, Officer Sellers also provided testimony in the case of *State of Ohio vs. Robert B. Jorg* on October 25, 2001 and the case of *State of Ohio vs. Patrick E. Caton* on October 26, 2001 and November 1, 2001.

## 00-PI-4

## POLICE INTERVENTION OF ROGER OWENSBY

## STATEMENT

## OF

## POLICE OFFICER ABRAHAM LAWSON

Code to persons speaking in statement:

Q.    Detective James Engelhardt
      Homicide Unit, C.I.S.
      Cincinnati Police Division

QQ.   Detective James Zieverink
      Homicide Unit, C.I.S.
      Cincinnati Police Division

A.    Police Officer Abraham Lawson
      District Four
      Cincinnati Police Division

Note: Inaudible portions of statement are indicated by dashes.

Q.    Today's date is November the 11th, the year 2000; the time now is

      approximately 0115.  This is Detective Jim Engelhardt an' Detective

      Jim Zieverink both of the Cincinnati Police Homicide Unit.  This is a

      statement, an interview in reference to case number 00-PI-4, the death

      of Roger Owensby.  This in, this incident occurred at 2098 East

C000589

000197

**EXHIBIT H**

A.    Sergeant Browner advised to have him uh, removed from the vehicle an' uh, to initiate, to check his vital stats an' initiate CPR. At which point an' time an' uh, Fire was also uh, dispatched to that location.

Q.    Do you know who started CPR on him, which officer?

A.    Officer Caton an' uh, Hasse.

QQ.   Did you actually see, were you there the whole time that they put him in the car?

A.    Yes.

QQ.   Any struggle going on, getting him into the car?

A.    No. There was no struggle. He was handcuffed an' escorted to uh, to the Golf Manor uniform car.

Q.    Did you ever see any blood on this, on this individual that you can remember?

A.    Uh there was, seem like uh, a notation of blood on his face. I know his eyes were swollen?

Q.    Okay. Did you see any blood on any of the officers or any injuries on the uniform officers?

A.    Uh, just blood on uh, uniform shirts.

Q.    Did any of the officers say they were injured that you remember?

A.    Uh, no one claimed to be injured.