## POLICE INTERVENTION OF ROGER OWENSBY, JR.

## CASE #00 PI 04

## STATEMENT

## OF

## POLICE OFFICER, ABRAHAM LAWSON

(First statement on 11/30/00 re-interview)

Code to person speaking in statement:

Q:      Specialist James Engelhardt
         Homicide Unit
         Cincinnati Police Division
         824 Broadway Street

QQ:    Specialist James Zieverink
         Homicide Unit
         Cincinnati Police Division
         824 Broadway Street

A:      Police Officer, Abraham Lawson, Badge #P-241
         Cincinnati Police Division
         District Four

AA:    Donald Hardin, Attorney
         (Representing Police Officer
         Abraham Lawson individually)

(Note: Inaudible portions of statement indicated by dashes)

Q:      Today's date is November the 30th, the year 2000. The time now is approximately uh

12:30. Uh this is Detective Jim Engelhardt and Detective Jim Zieverink both of the Cincinnati

Police Homicide Unit. And this is a uh a re-interview of Police Officer Abe Lawson in

reference to case number 00 PI 04, the death in custody of Roger Owensby. Uh just for

purposes of the tape uh we were on uh. Present at this interview is, is Officer Lawson and Don

**EXHIBIT I**      **C000604**

Q:    Okay. From the time you got the assistance call, ho- how long do you think it took you to get to the scene in front of the Sunoco station? Just roughly.

A:    Roughly about a minute or two.

Q:    Okay. Once you're on the scene, and the struggle is continuing uhm when you exit your vehicle. Correct?

A:    Correct.

Q:    How long did the struggle continue before Mr. Owensby was handcuffed?

A:    Between three, about three to five minutes later maybe. --------.

Q:    Okay. Three to five minutes. After Mr. Owensby handcuffed, just approximately roughly estimate how long wa-, did he remain on the ground before officers picked him up and transported him to the Golf Manor car?

A:    About two to three minutes.

Q:    Okay.

QQ:   He laid there for two to three minutes cuffed?

A:    Yes.

Q:    While he was cuffed and laying on the, on the pavement, did any officer go over to him and administer any blows, strikes, holds that you saw?

A:    No.

Q:    Did anybody go over to Mr. Owensby at all in that two or three minutes he was laying on the pavement?

A:    Not that I'm aware of. He was just picked up after uh, after everyone had basically stood up.

Q:    And.

QQ:   Nobody went back over to him while he was laying there?

6

C000611

C00010

Q:     Other than to pick him up?

A:     Well I mean everyone was pretty much well standing right there at him. No one left.

Q:     But they're all standing right around where he was laying.

A:     Right.

Q:     Okay.

QQ:    Was he moving at all after they cuffed him and they all stood up? Do you remember seeing him moving or kicking?

A:     I didn't notice any movement. Only movement I noticed was him kinda rocking side to side when they were trying to get his right hand pulled behind his back.

Q:     But after he was handcuffed, did you notice him making any movements?

A:     No. I didn't notice any moves.

Q:     Did you hear him say anything?

A:     No.

Q:     Did he make any noise?

A:     No.

Q:     Grunt, groan, anything like that?

A:     No. I didn't hear anything.

Q:     After Owensby is transported to the Golf Manor police car, what do you do next?

A:     That's when I uh acquire uh crime scene tape from a Golf Manor unit and begin uh taping the scene.

Q:     Now who do you speak to after the, after he's transported to the car?

A:     I spoke briefly to Officer George.

Q:     Okay. Just tell me the.

A:     Jorg.

C000612

7

## POLICE INTERVENTION OF ROGER OWENSBY, JR.

### CASE # 00 PI 04

### STATEMENT

### OF

### GOLF MANOR POLICE OFFICER ROBERT HEILAND

Code to persons speaking in statement:

> Q.    Specialist James Engelhardt
> Homicide Unit, C.I.S.
> Cincinnati Police Division

> QQ.    Specialist James Zieverink
> Homicide Unit, C.I.S.
> Cincinnati Police Division

> A.    Police Officer Robert Heiland
> Golf Manor Police Department

(Note: Inaudible portions of statement are indicated by dashes)

Q.    Today's date is November the 8th. The year 2000. The time now is approximately 0020 hours. This is Detective Jim Engelhardt, along with Detective Jim Zieverink. Both of the Cincinnati Police Homicide Unit. This is a statement and interview in connection with Case Number 00 PI 4. The death of Roger Owensby. This uh, incident occurred at 2098 East Seymour Avenue in District Four. And occurred approximately at 2030 hours on the 7th of November. The statement and interview is being taken from Patrolman Robert Heiland. That's H-E-I-L-A-N-D. He is a Golf Manor police officer. Was operating tonight as Unit Number 5 George 25. His work hours were 1800 to 2400. And he has been a sworn Golf Manor police officer for

001047

Q.    Okay.

A.    Uh, coming out of the Sunoco.  So maybe I can put it in uh, distance.
If you walked straight out of the doors of the Sunoco, maybe ten feet.  _ _

Q.    Ten feet outside the front of the door.  Okay.

A.    And uhm, like I said, he appeared to be handcuffed at that time.
So I just stood there.  They were still struggling with it.  He was

Q.    Was he on the ground or was he being

A.    He was

Q.    Picked up or, can you describe how he was when you pulled up?

A.    One officer was on each side.  It appeared that they had uhm, their
arms under his.  And they were I don't know if you wanna say they were holding
him up or what not.  But, but they weren't on the ground.

Q.    Okay.

A.    They were standing.  The officers were standing.  And

Q.    Okay.

A.    they were struggling.  I was standing in front of my cruiser, on the
driver side.  Uh, and they yelled "can we put him in the back", "can we put him
in your cruiser?"

Q.    Okay.

A.    I said "sure."  Went around to my side, my driver door.  Unlocked
the doors.  Walked back to the front of my cruiser, back to the uh, rear door.  Opened
the door for 'em.

Q.    'kay.  This is the passenger side or the driver side?

C001166

001050

4

A.    This is uh

Q.    That you opened.

A.    passenger side.

Q.    Okay.  Okay.

A.    Opened the door.  Took a couple steps back.  Uh, at that time, I guess there was a plainclothes officer there also.

Q.    Okay.

A.    But I didn't know he was an officer.  Uh, an', an' he could'a been assistin' the other two officers.

Q.    Okay.

A.    Getting him over to the car.  I don't recall.

Q.    Were there two uniformed officers taking him to the car?

A.    Two uniformed officers.

Q.    Okay.  Okay, go ahead.

A.    So I step back after I open the door.  They put him in the cruiser.  And this time cars were showing up.  Cars had, actually cars had started showing up about the time they started walking him over to the cruiser.

Q.    Okay.

A.    I can't recall how many cruisers showed up.  They were just you know coming from everywhere.  Uh, somebody had went around to the driver's side rear door.

Q.    Okay.

A.    And opened that door.  Cause they were having trouble getting him in. He was still struggling with him.

C001167

001051

5

## POLICE INTERVENTION OF ROGER OWENSBY, JR.

### CASE # 00 PI 04

### STATEMENT

### OF

### GOLF MANOR POLICE OFFICER CHRIS CAMPBELL

Code to persons speaking in statement:

> Q.    Specialist James Engelhardt
> Homicide Unit, C.I.S.
> Cincinnati Police Division

> QQ.   Specialist James Zieverink
> Homicide Unit, C.I.S.
> Cincinnati Police Division

> A.    Police Officer Chris Campbell
> Golf Manor Police Department

(Note: Inaudible portions of statement are indicated by dashes)

Q.    Today's date is November the 7th. The year 2000. The time now

is approximately 2356 hours. This is Detective Jim Engelhardt and Detective Jim

Zieverink of the Cincinnati Police Homicide Unit. This is a interview and statement

in reference to Case Number 00 PI 4. This involved the death of a Roger D. Owensby.

And the incident occurred at 2098 East Seymour in District Four, at approximately

2030 hours. This int-, s-, interview and statement is being taken from Patrolman

**EXHIBIT K**        **C001143**        001028

is fighting, there's no more going on over there.

Q.    Anybody say anything to you from the, from that group?

A.    No.

Q.    Okay. Then what happens? If you can

A.    Uhm, basically once he was secured uh, since he was in Officer

Highland's car uhm, Officer Highland's is uh, very new. So I wanted to stay up there

until uh, he was relieved, until we can get him into a City car.

Q.    Okay. So you stayed by Officer Highland's car?

A.    Yeah.

Q.    Okay. Where were you roughly in relation to the car?

A.    Just

Q.    Just around it?

A.    Yeah. Yeah.

Q.    Was Officer Heiland with you?

A.    Uh, yeah most of the time.

Q.    Okay.

A.    Yeah. No particular place.

Q.    Did you hear the suspect say anything to you's while you were

outside the car?

A.    No.

Q.    You remember what position he was in inside the car, if you can

remember.

A.    Uhm, when I saw him he was laying down on the seat. Uh, his

6

C001148

head would'a been on the driver side of the car.

Q.    He was laying on the seat.

A.    Yeah.  It looked like he was on his uh, right side, facing the rear

of the car.

QQ.    And you say his head was on driver's side of the car on the seat.

A.    Yeah.

Q.    His head was behind the driver's side.

A.    His head would be

Q.    Okay.

A.    behind the driver's side.

QQ.    He was on his right side.

A.    He's on his right side.  Facing the trunk.

Q.    So he was facing the, the trunk.

A.    Yeah.

Q.    Was he moving at all?  Did you see, notice him moving around at all?

A.    I didn't notice him.  I uh, I shined my light in to make sure he wasn't

kicking a, kicking our car or anything like that.  I didn't see any you know I didn't see

any movement.

Q.    Okay.

A.    Uhm, I couldn't tell you.

Q.    Okay.  So he didn't

A.    Nothing that caught my attention.

Q.    He didn't s-, he didn't yell out or anything while he was in the car

C001149                C01034

## POLICE INTERVENTION OF ROGER OWENSBY, JR.

### CASE #00 PI 04

### STATEMENT

### OF

### POLICE OFFICER, BRIAN BRAZILE

Code to persons speaking in statement:

Q:      Specialist James Zieverink
        Homicide Unit
        Cincinnati Police Division
        824 Broadway Street

QQ:     Specialist Gregory Ventre
        Homicide Unit
        Cincinnati Police Division
        824 Broadway Street

A:      Police Officer, Brian Brazile, Badge #P-398
        Cincinnati Police Division
        District Four

(Note: Inaudible portions of statement indicated by dashes)

Q:      This is Detective Jim Zieverink from Cincinnati Police Homicide. Also in the room

with me is uh Detective Greg Ventre of Cincinnati Homicide, and uh Police Officer Brian

Brazile, badge number P398. Uh this interview is being conducted at C.I.S. headquarters in the

interview room. Time now is 11:25 in the morning on November the 13th. Uh this is in

regards to incident or case number 00 PI 04, uh the death in custody of Roger Owensby, which

occurred on November the 7th at approximately 1948 hours at 2098 Seymour Avenue uh Sam's

Sunoco Station. Uh Officer Brazile was on scene after the incident that night. And uh Brian

we're gonna go ahead and let you give your account of what happened, uh your involvement in

000549

1

EXHIBIT L          C000642

this once you uh received the uh, the assistance run up there. So go ahead and start with your end, your version of what happened.

A:    Okay. Uh uh a officer assistance came out. Uhm I responded up to the scene. Uh once I got there on scene, assistance was uh cancelled as I was uh pulling up. So I uh, once I approached, parked, got out.

Q:    Okay. Where did you park?

A:    On the side of uh the Sunoco on the uh, I guess that would be the west side maybe. Parked. Got out. Saw the officers uh on the side. I believe there were two officers standing right there on the side of the Sunoco.

Q:    Do you remember which officers?

A:    I believe it was Hunter and uh Sellers I believe. Talked to them. Asked them were they okay, and found the other officers.

QQ:    What did they say when you asked if they were okay?

A:    "Yeah." They say, "we're okay."

Q:    Okay.

A:    "We're fine." "We're fine." Uh all the other officers uh Officer Jorg and uh Caton, I asked them uh the same question. Were they okay? They responded, "Yeah, we're fine." I said, "What happened to your arm?" "Is your arm okay?" He said, "Yeah that's not blood from me." He said, "That's from the uh, from the bad guy." So I said, "Okay." Uh and uh after that account, I uh was standing around and I walked over to the car uh.

Q:    Which car are you ind---- uh?                              C000643

A:    Cincinn-. Uh. No, I, I'm sorry. I asked four of the guys where, where he was after I found out everybody was okay. Asked where the guy was?. Say, "He's in the car." And they kinda like say, "He's in the car." They didn't point or any thing. So I just looked in the cars

2

C00050

that were right in the immediate vicinity. I couldn't find him. Somebody shouted, and like I

said before, I don't remember who it was. They say, "He's in the, in the Golf Manor car." It

sounded like Blaine's voice. But I, I'm not a hundred percent sure. So I looked and uh there

was two Golf Manor guys close to the vehicle. Uhm so I walked over there and I uh looked

and seen there was someone in there. And uh at that point, I proceeded to uh take my light out,

cause I couldn't see who he was. I just wanted to see his face, see if he was one of the guys

that normally be hanging out up at Sam's,

Q:    Uh-hum.

A:    you know. So I uh shined my light in. I looked at him. Didn't recognize him. Seen

some uh cuts and uh things like that on his face. And knowing he was laying uh. Noticed he

was laying in an awkward position. And uh at that point, like I said, I made a comment to uh

Golf Manor you know. And.

Q:    What did you say?

A:    I told 'em it looked fucked up, you know.

Q:    Which, which Golf Manor guy did you say that too?

A:    Heiland. Cause I know Heiland.

Q:    You know Heiland.

A:    Like I said, we went to the academy together.

Q:    You said, "This looks fucked up."

A:    That's exac-, exactly what I said. And uh he was just shaking his head. And I said,

"You know this guy?" He said, "No." I was like oh, "Okay." I said uh, "Can he breathe?" I

said, "It don't look like he can from the way he's laying." And then uh he was just, he just

shook, he just shook his head. And uh then I said that because he was in his car.

Q:    Uh-hum.

C000644

C000651

A:    In Golf Manor's car. So that kinda you know. I just wanted to let them know. I, I don't know if they looked at him previously or what. But that was just a comment that I had made. And then at that point uh, I believe I had walked off. Uhm I went to get my hat out the vehicle. Put my hat on. Came back.

Q:    Wait a minute. You say you walked off. You got your hat. Is that when you uh moved your car? You were driving a scout car. Right?

A:    Yeah. I had the scout car.

Q:    'kay.

A:    And uhm, uh the supervisors were showing up at that time.

Q:    Which one did you see first?

A:    I believe Sergeant Browner, cause she parked next to my scout car in the CDOP van.

Q:    Okay.

A:    And uh when she walked back over, uhm.

Q:    Did you talk to her?

A:    I said, "Hi ma'am." "How you doing?" And that was basically it, about it. And uh shortly after that, uh like I said, I don't remember everywhere I went and where I walked,

Q:    Uh-hum.

A:    you know. But uh when I look at the tape, it kinda refreshed me a little bit on you know, where I walked and things like that. Uhm. (Cell phone ringing) Hold on a second. (Pause) Uhm got my hat. Came back. I heard some uh. I think they were asking what happened at that time.

Q:    Who was asking?

A:    Uh the bosses.

Q:    But then who were they asking? Do you remember?

C000645

4

A:    Uhm Sergeant uh Browner uhm was asking I think Blaine what happened.

Q:    And where, where were they positioned when she asked this?

A:    Over by the uhm, over by the car by Golf Manor's car. Some where over there.

Q:    And were you over there?

A:    Yes. I wasn't exactly where they were. Cause all the uh. I believe the officers that were, oh were over there all in the same area, but I was kinda like away from them. Cause I didn't have anything to do with that. So I didn't have no reason to be right in the you know, where she was asking her questions at. So I was kinda like a distance away, but I was still like right there in the, in the, in the area.

Q:    Okay. Just for, for purposes of this, uh this tape uhm, you were allowed to review uh a vehicle uh tape from Officer Spellen's car. Correct?

A:    Was that from.

Q:    Yes.

A:    Okay. Correct.

Q:    Th-, the tape that we showed you. And you recall on that tape it shows Sergeant Browner walking over by the Golf Manor car and then it shows all the uh, the involved officers and then you and Officer Spellen also walk

A:    Uh-hum. Correct

Q:    just to the drivers side of Officer Spellen's car. Correct?

A:    Correct.

Q:    And that's where Sergeant Browner asked Officer Jorg his version of what happened?

A:    I believe so. That's the spot right there I

Q:    And you.

A:    believe that where I heard that.

C000646

Q:     you were standing within hearing distance of their conversation.  Correct?

A:     Right.  I could hear, not everything.  All I can hear was them talking and basically him going over some of the things that happened.

Q:     So could you hear part of the conversation or what did, what did you hear?

A:     Uhm I heard basically how uh they saw the uh subject uh inside the store and how uh they waited for him to come out.  And they had some questions for him.  He proceeded then to uh flee from them, after they uh told him to put his hands behind his back.  And uh I believe Pat put out the assistance.  And I think I remember that real good, because I remember hearing his voice.  I always know when he's running.  Cause I can, I can tell his voice.

Q:     Pat.  You're talking about

A:     Caton.

Q:     Pat.

A:     I'm sorry.  Yeah.

Q:     That's okay.

A:     Caton.  And uh uh at that point, all the officers uh were getting there from what I heard.  And they were just trying to get him into custody.  And like I said before, I heard something about they had a cuff on him.  And they were trying to get the other arm cuffed.  And they had some trouble getting it cuffed.  And like I said as, as, as well uhm Hodge, I think I heard him talking too.

Q:     Hold on.

A:     Somethin' about.

Q:     Hold.  Before.  While Officer Jorg was giving this version, only Jorg is talking.  Correct?

C000647

000554

A:    Uhm there's some other people talking. But not, not right where he was though. You know other officers ---.

Q:    Okay. But Jorg is the only among

A:    Addressing.

Q:    these officers talking to Sergeant Browner and giving -------.

A:    Right. Addressing Sergeant Browner.

Q:    And you heard him say that he was, they was trying to cuff him and they were having trouble?

A:    Right. Not in those words but basically.

Q:    Right.

A:    Right.

Q:    And what else did he say?

A:    Uhm trying to get him cuffed. And then uh there were, he took off from 'um. And they caught up with him. And that you know, he didn't get far when he tried to run. And uh they caught up with him. Attempted again uh to get him to comply, which he didn't. Uhm I guess other officers were showing up at this time. I think I remember him saying somethin' to that effect. And uh they were, that's when they were trying to get the cuffs on him. And they had one on. And they uh had trouble getting the other cuff on.

Q:    Did he mention which,

A:    And they went.

Q:    which arm was cuffed?

**C000648**

A:    I don't recall which arm it was. Oh yeah, and they went uh, he said they went, they went to the ground. He didn't say how. I think I remember him saying, they went to the

000055

ground. Still trying to get the guy cuffed. And then after they got him cuffed, and I don't

remember after that. They got him cuffed.

Q:    You don't remember any more of this conversation about what happened?

A:    They got him cuffed. Then they tried to get him.

Q:    Okay. He said they got him cuffed.

A:    Right. Said we got him. They had got him cuffed.

Q:    Did he mention anything about macing or anybody hitting him, kicking him, striking

him, getting him in a headlock, anything like that?

A:    About the mace.

Q:    What about the mace?

A:    Uhm that somebody had maced him. I thought he said it was, it was, it was Hunter. I

thought. I'm not sure on that. But he maced him and uh it wasn't working. It wasn't working

when they maced him.

Q:    Okay. Did he mention anything about any punches, any strikes, any use of the, the

PR24?

A:    Uhm I don't remember hearing Blaine say nothing about that. But I believe I heard uh

Hodge.

Q:    What.

A:    I don't know his first name

Q:    What did Hodge say?

A:    Uhm something about, "he had to use the, the PR24 to get his arm back behind his

back, cause he was still struggling and, and fighting."

Q:    Did he say how he used the PR24?

C000649

000550

8

# POLICE INTERVENTION OF ROGER OWENSBY, JR.

## CASE # 00 PI 04

## STATEMENT

## OF

## SERGEANT PETE WATTS

## (1st INTERVIEW    11/08/00)

Code to persons speaking in statement:

Q.      Specialist Gregory Ventre
        Homicide Unit, C.I.S.
        Cincinnati Police Division

QQ.     Specialist Timothy Campbell
        Homicide Unit, C.I.S.
        Cincinnati Police Division

A.      Sergeant Pete Watts

(Note: Inaudible portions of statement are indicated by dashes)

Q.      This Police Specialist Greg Ventre with Cincinnati Police Homicide

Unit. Today's date is November the 8th, year 2000. The time is 2 o'clock in the morning.

Uh, with me is Police Specialist Tim Campbell, also with the Homicide Unit. It's going

to be an inner-, interview with Sergeant Pete Watts, Badge S 618. Uh, he's a District

Four second relief supervisor, working 1500 to 2300 hours. And this evening he was

C000713
000518

**EXHIBIT M**

supervisor. And asked was he hurt.

Q.    Now when you spoke with the police officers on the scene, what was their, what was the action that they told you they took? There was uh, he tried to run through them.

A.    That's correct.

Q.    Okay. And they, did they explain to you the injury to the head? How that

A.    Yes.

Q.    that occurred.

A.    That when they fell to the ground, his head hit the uh, concrete and caused a bruise on his forehead.

Q.    Okay. Minor bruise or was it something that needed medical attention?

A.    It was just like the skin had been scraped off. It wasn't like

Q.    Okay. You said Officer Hunter maced him.

A.    Yes.

Q.    And you said before that none of 'em had said anything about striking him with a PR24.

A.    That's correct. Nobody s-, I asked and they said no, nobody's struck.

Q.    Did you talk an-, any of the other officers on the scene there?

A.    No. Because after I got like I said a, a quick briefing, I went to talk to uh, Mr. Owensby. And uh, when I asked him if he was all right, he didn't respond. I starte' to look at him. I figure a guy who had just got through struggling with the police would be breathing a lot harder.

C000719    000624

Q.    Un-huh.

A.    So I reached in. Tried to check his pulse. Tried to turn him a little bit. That's how I ended up with blood on my sleeve. An' uh, called out to him, called out to him. And then I think I shouted to Sergeant Browner to call for a rescue. I had two other cars ope-, open up the uh, passenger side of the rear door to, said let's turn him. And then's let get him outta the car. Cause I was concerned about his breathing ability at that time. And then that's when I said let's uh, seal off the area, things of that nature.

Q.    Did anybody g-, did any one begin life support on him?

A.    Yes. Uh, Officer Alex Hasse uh, and Officer Caton.

Q.    They began CPR?

A.    That's correct. And the uh, Golf Manor officer had the uh, breathing apparatus that they brought back from their car. An' uh, Hasse started using it.

Q.    Did they continue that until rescue unit got there?

A.    That's correct.

Q.    Did you notice anything about Owensby when they pulled him from the car? Or while they were working on him.

A.    I had him open his eyes and I uh, shined my flashlight in his eyes. And I guess you call his pupil was enlarged.

Q.    Un-huh.

A.    And again, he just wasn't breathing heavy enough for an individual who had just doing anything strenuous, sir. Or running from the police. And uh, I waited for the Fire Company to examine him, do what they could before I could find out

8

C000720

000825

if you know, get some preliminary uh, analysis of what they thought the situation might

be so. At that particular time uh, I's trying to check on his condition and then preserve

the crime scene at the same time.

Q.    Was there any s-, we have a report of some substance that came from

his mouth. That was preserved. Were you there when that occurred?

A.    No. Officer Hodge was uh, was close by him when they were uh,

uhm, giving him medical attention. And he said that uh, a foamy white substance

was emitted from his mouth. And they used a gauze or something to clear his air, his

airway so he could, so he could breath. And he uh, took the gauze and preserved it.

Cause he thought it might'a been cocaine.

Q.    Okay. Did you see any other physical injuries

A.    No.

Q.    to Owensby?

A.    No. They took his shirt off. I didn't see any bruises on him or

anything. Other than

Q.    No bruises on him. On his

A.    Only the scar of his forehead and (burps) 'scuse me. When we turned

him over, I saw blood coming from his mouth and onto the, the rear of this uh,

the cruiser. Blood and saliva.

Q.    Did you know Mr. Owensby

A.    No.

Q.    prior to this?

A.    I'd never seen him before.                    C000721

9

000626

Q.    Less than five minutes.

A.    Yeah.

Q.    So he was not in the car that long.

A.    No. I checked with Communications. They said the officer needs assistance came out at 1948. I wrote on my pad when I started talking to them. I wrote down the address and the time which said 1950. Uh, like I said, I got a quick uh, analysis from uh, Officer Jorg and Caton. And then I went over to check on the prisoner. Then that's when I went to introduce myself. And then things went from there. So I doubt if it was five minutes. Actu-, I would say less.

Q.    From the time you went over to talk to him, you seen no movement.

A.    He was laying down in the back seat. So an', an' the way the car was situated with the lighting

Q.    Un-huh.

A.    in that gas station, you really couldn't see him anyway. Cause the car was facing us. And from the glare of the, of the uh, gas station, like she couldn't see 'im. I had to go around to the side to talk to him.

Q.    Did you speak with the uhm, other officers from the, from Golf Manor? Did you

A.    Yes.

Q.     speak with them?

A.    Yes.

Q.    Were they involved in the arrest in any way?

A.    No. Uh, Officer (sighs) Highlander. What'd I do with my pad?

C000723

000628

11

## POLICE INTERVENTION OF ROGER OWENSBY, JR.

### CASE # 00 PI 04

### STATEMENT

### OF

### SERGEANT PETE WATTS

### (2nd INTERVIEW    11/12/00)

Code to persons speaking in statement:

    Q.    Specialist David Feldhaus
          Homcide Unit, C.I.S.
          Cincinnati Police Division

    QQ.   Specialist James Zieverink
          Homicide Unit, C.I.S.
          Cincinnati Police Division

    A.    Sergeant Pete Watts
          District Four, Badge S-618
          Cincinnati Police Division

(Note: Inaudible portions of statement are indicated by dashes)

    Q.    Okay. Today's date is November 12th. Year 2000. The time now is

approximately 1900 hours. This Detective Dave Feldhaus and Jim Zieverink of

the uh, Cincinnati Police Homicide Unit. We're interviewing a Sergeant Pete

Watts of District Four. Badge Number S 618. Uh, Sergeant Watts is being interviewed

in reference to police intervention 00 PI 4, involving the death of uh, Roger

**EXHIBIT N**    C000726    C00031

checked with all the officers to make sure everybody you know I was asking "if anybody

hurt, everybody's okay, anybody hurt." And all the guys said they were fine. Nobody

was injured. And at that particular time I started talking to Officer Jorg. And he starte'

telling me what happened. That the uh, the officers had identified the suspect as someone

who was involved in a, an assault on a police officer just a few days before. And Officer

Hunter identified I asked who maced him. He said Hunter had maced him. I asked him

how did he get blood on his shirt. And he said from holding the uh, suspect down. Said

we all fell to the ground. He said his head hit the ground. And he has a bruise on his

forehead. And when I responded over to the car just moments later, uh, I did see the

bruise on uh, Mr. Owensby, as we know him now. His head. Uhm, and then from that

particular point I wanted to interview Mr. Owensby and I asked the uh, Golf Manor

officers to lower the window. Because they said he was, he had fought all the way to the

car. But cause of the way he was seated and the fact that he wasn't breathing hard, I

asked him to unlock the door. I checked Mr. Owensby's pulse. (Coughs) And I checked

his neck. 'scuse me. Uh, touched his neck to see if you know he could feel anything

there. I couldn't. I asked the other officers to open up the other door. Let's reposition

him and I was trying to move him from my side. Uh, turn him over. When we mo-,

tried to move him, he rolled over onto his stomach. And at that particular time I saw

blood come out of his blood. Blood, saliva. I looked up at Sergeant Browner. I said

call a rescue. And at that time, I'm not sure who the officers were who pulled him

out the passenger side. But I think it was Hasse and Caton. Alex Hasse and Pat Caton.

They took him out. Put him on the ground. Uh, we checked his eyes. His pupil was

dilated. And they started uh, performing CPR on him. And until the rescue got there.

C000728

**00-PI-4**

**POLICE INTERVENTION (ROGER OWENSBY, JR.)**

**STATEMENT OF**

**POLICE SERGEANT PETE WATTS**

Code to persons speaking in statement:

Q:    Sergeant Anthony Carter
       Homicide Unit
       Cincinnati Police Division
       824 Broadway Street

QQ:    Sergeant John Newsom
       Homicide Unit
       Cincinnati Police Division
       824 Broadway Street

A:    Police Sergeant Pete Watts
       District Four
       Cincinnati Police Division

(Note: Inaudible portions of statement indicated by dashes)

Q:    This is Sergeant Carter uh, Cincinnati Police Homicide Unit. Today's date is

Thursday, November 16th, the year 2000. The time is 1620 hours. This is a follow-up

interview in reference 00-PI-04. This interview is being conducted at 824 Broadway uh,

C.I.S. fifth floor. Uh, subject of the interview is uh, District Four Sergeant Pete Watts.

Also present for the interview is Homicide Sergeant John Newsom. Uh, Sergeant Watts

again this interview is to clarify some points uh, that were brought up as a part of the

investigation, the uh, in-custody death of Mr. Roger Owensby. Uh, we discussed some of

this off tape and we just wanna go back through again on statements that uh, we believe

might of been made by you or in your presence uh, statements that were picked up off the

1

**EXHIBIT O**

C000733

000008

the, the tape, the, the MVR tape an' viewing the uh, enhanced audio tape, is that the, the

set of uh, the sequence. Is that pretty well, I mean is that?

A:    What I think took place at that particular time, this is where uh, Jorg has walked

off briefly or walked away from me or no, no. I walked away from him, because I was

going to see, check on Owensby.

Q:    Uh hum.

A:    An' then like I said, Hunter walked up pretty much at the end of my conversation

with Jorg, and I believe this is where Sergeant Browner is getting her first full account of

what took place from Jorg and Hunter together.

Q:    Okay. So they might be in the immediate area of each other an' you're only a few

feet away,

A:    Yeah.

Q:    because

A:    I, I walked away from 'em.

Q:    Okay.

A:    To again, because it's, it's before I had asked Jorg where, where Owensby was, he

told me and he was still saying some things an' I, that's some of those comments are on

the, on the final page four where it says uh, "I didn't and I didn't and I'm gonna, well you

know." Those --- comments and I, and that's why I thought maybe I, I didn't hear 'im

because I was walkin' away.

Q:    Okay.

A:    But it, it may be he just didn't finish the statement ---.

C000738

000040

6

Q:    Okay. Can you draw, this is a continual dialog that probably last a matter of a few seconds in, in all actuality.

A:    The first interview with him an', an' when Hunter walked up was less than three, four minutes.

Q:    Okay. Now you, you observed Sergeant Browner when she came on the scene and she was speaking with Caton an' Jorg an' you were walking away going up to the Golf Manor vehicle to check on Owensby.

A:    When we first, when I first walked away uh, like I said, she walked up an' she said, what do we have. And at that particular time we are both walking away

Q:    Okay.

A:    from, from Jorg an' Hunter. An' then I go around the car, an' only thing I can speculate now is that that's when she, they're all still close to Spellen's car an' she's getting her first full explanation from these two indi-, two individuals.

Q:    Okay. How far is Spellen's car from the Golf Manor car?

A:    Eight feet maybe.

Q:    Okay. So it's reason,

A:    Yeah.

Q:    it's close proximity?

A:    They're not that far no.

Q:    Okay. And the reason I'm sayin' that is because as, as you're sayin', I, I walked away, it still because there's another question, you know, you get the account or you got the account an' you're walkin' away, but there's a couple more questions or one or at least one more question that you ask, which is, "Did anybody strike 'im, who sprayed

C000739

000044

<u>**00-PI-4**</u>

**<u>POLICE INTERVENTION OF ROGER OWENSBY</u>**

**<u>STATEMENT</u>**

**<u>OF</u>**

**<u>POLICE OFFICER ALEX HASSE</u>**

Code to persons speaking in statement:

Q.     Police Darrin Hoderlein
       Homicide Unit, C.I.S.
       Cincinnati Police Division

QQ.   Police Officer Robert Randolph
       Homicide Unit, C.I.S.
       Cincinnati Police Division

A.     Police Officer Alex Hasse
       District Four
       Cincinnati Police Division

Note: Inaudible portions of statement are indicated by dashes.

Q.        This is Darrin Hoderlein, with me is Detective Bob Randolph,

we're at 824 Broadway up on the fifth floor, C.I.S., uh,

interview room. The time now is 0053 hours. The date is uh,

November the 7th, year 2000.

QQ.  8th.

C000832

009734

**EXHIBIT P**

A.    Uh, I was standing in front of Sam's lot looking uh, eastbound but the
action was taking place behind a parked vehicle, which was parked in
front of Sunoco.  So everything was taking place right behind the
parked vehicle, where I could not actually see -- --.

Q.    Are they standing or they on the ground?

A.    They were on the ground because, because the Huntington Meadows
Officer were, officers were standing.  I was able to see them.  So all
the Cincinnati unit were on the ground, beneath the, beneath the eye
level of the vehicle.

Q.    An' do you know how they got on the ground?

A.    Uh, I assumed uh.

Q.    From what you saw, could you tell how they.

A.    Not from what I saw.

Q.    Okay.  So then, then you take your prisoner an' you go over there an'
you see that this individual is in the back of the Golf Manor car an'
he, he appears to be unresponsive?

A.    Correct.

Q.    What happens then?

C000839

A.    Uh, we uh, I put, they gave a pair of gloves to Officer Caton an' I put
another pair of gloves on myself, an' we took him out of the vehicle. I

000741

8

done, did a uh, a head tilt, chin lift, an', an' tried to listen for any breathing. --- ---- his chest an' there was none. An' I uh, I commenced chest compressions. Uh, one of the Golf Manor units stated that he had a uh, CPR mask an' he went to go get it. Uh, I continued uh, chest compression until that point. When uh, brought the mask back, I assembled the mask an' uh, instructed Officer Caton continue chest compressions while I did the uh, well I --- --- --- an' we did CPR until the Fire Department came.

Q.    At any point an' time did this individual become responsive?

A.    No.

Q.    Uh, at any an' point time when you responded over to where they were at, did you ever see this individual uh, any motion from this individual from the first time you took notice of him?

A.    No.

Q.    He was unresponsive then?

A.    Correct.

Q.    Do you have any idea how long he had been in the back of the Golf Manor car at that point an' time?

A.    No I don't.

C000840

# POLICE INTERVENTION OF ROGER OWENSBY

## 00-PI-4

## STATEMENT

## OF

## POLICE OFFICER ALEX HASSE

### 2nd interview

Code to persons speaking in statement:

Q.     Police Specialist Charles Beaver
       Homicide Unit, C.I.S.
       Cincinnati Police Division

QQ.    Police Specialist James Engelhardt
       Homicide Unit, C.I.S.
       Cincinnati Police Division

A.     Police Officer Alex Hasse
       District Four
       Cincinnati Police Division

Note: Inaudible portions of statement are indicated by dashes.

C000848

009750

**EXHIBIT Q**

Q.    Okay.

A.    I, if.

Q.    So you noticed to that he wasn't moving, or

A.    Yes

Q.    He was unresponsive or.

A.    Yes.

Q.    Or whatever.

A.    Uh, they had been, they had been there, you know they had seen him seconds or a minutes or two longer than I had.  So, they may have had more uh, uh, a longer time seeing him being unresponsive.  So it was all, I mean.

Q.    I mean we're just talking like a minute or two here or are we talking like, yeah we stood around an', an' you know shot the shit for fifteen, twenty minutes an' then.

A.    No.

Q.    An' then they noticed the guy.

A.    No. From, from when I walked up to the car it was probably uh, from when I walked up to the car an' saw the individual lying on the back seat, it was probably ten, fifteen seconds, twenty seconds, before we decided to get him out.

C000857

000759

10

Q.    Okay.

A.    Put our gloves on an' start, an', an' pulled him out.

Q.    Uh, when you pulled him out did you, did you, I know you checked for a clear airway an' that. You raise his chin an' did that.

A.    Yeah.

Q.    Was there any type, did you notice any kind of a pulse or breathing at that time or was he totally unresponsive, no heart beat?

A.    Yeah, he was totally unresponsive. I also did, did a uh, a pupil check for his, uh, pupils were completely dilated an' total unresponsive.

Q.    That's alright. Are you EMT trained or something or?

A.    I, I was prior, I'm sure my certification has expired.

Q.    Okay.

A.    Since I haven't pursued that. But yes I was ---.

Q.    So you've seen dead people before?

A.    Yes.

Q.    Uh, in that case I'm gonna refer you your professional, professional uh, occupation at this time. --- --- Were you MT or a uh?

A.    EMT.

Q.    EMT. Uh, under your opinion when you got him out was he alive or dead?

C000858

009760

11

A.    Uh, I'd say in my opinion he was dead.

Q.    Okay. An' I guess uh, like I said I'm, --- ---EMT or medically trained

--- --- original first aid class in the academy, thirty years ago. But uh is

there anyway you can determine how, how long he was dead or

anything, -- --- like that or just?

A.    No. No.

Q.    Okay but his, his pupils were fixed an' dilated?

A.    Correct.

Q.    No pulse, heartbeat anything like that.

A.    Not that I could see at all.

Q.    Uh, during the point of your CPR, you made reference to a white

substance like vomit is coming out of his mouth.

A.    Uh, actually during the CPR when I had the mask on him uh, every

time I would blow a breath in I would hear a gurgling as the air

expired back out. Uh, so I could tell that the airway was block with

either blood or, or some other substance. But at least definitely blood

because he did have blood in and around his mouth an', an' even more

so out of his nose as I recall. Uh, the uh, the white substance I noticed

I, I actually did not know this until the Fire Department was there,

was using the suctioning device to clear out his airway. An' as they

C000859

C00761

12

were doing that is when the, I saw the, what I thought or think is uh, crack that came out of his airway.

Q.     Okay that's what you think came out of his airway?

A.     Correct.

QQ.    Uh, did the Fire Company get any vitals on him at all do you know?

A.     Uh, I believe they did, they got what they called uh, v-fib which is basically a uh, the monitor was detecting, not a beat at all but a uh, almost like a, just a quivering or vibration of the heart.

QQ.    Okay.

A.     Uh, it, it was not flat lined as I recalled.

QQ.    Okay.

A.     But it's definitely not a heart beat.

Q.     Could that be a uh, that uh, vibration again, you know, maybe I'm talkin' out of sorts here as far as knowledge but uh, could that be, that type of little rumbling or whatever be attributed to like the CPR you guys gave at all. Like basically, I ask, I guess a, a muscular reaction or twitch opposed to an actually, any type of beat or life.

A.     Uh, that I don't know. I would say the, the uh, the way heart works is all electro an' magnetic type uh, of is how the uh, heart works.

Q.     If you say so, go ahead.

C000860

000762
13

A.    An' uh, basically what I think what they saw in the monitor was basically left over from when his heart was beating.

Q.    Okay.

A.    It may have been attributed to the left over after we were doing CPR.

Q.    Okay. Alright. An' of course you an' uh, Police Officer Caton took a sample of the white stuff an' just scooped it in an envelope?

A.    Uh Officer Hodge.

Q.    Officer Hodge did that.

A.    Right.

Q.    Alright.

QQ.   Any conversation at all with anybody at the scene that was involved about what they had done.

Q.    Or did you over hear any of the involved officers explain to a supervisor or anything like about any type of uh, mechanical uh, restraints or objects used. Like who maced him uh, anybody using their stick uh, blows, strikes, holds?

A.    I didn't hear anything as far as holds. Uh, after the incident, after, immediately after they put him in the car, I was still over at the Sam's lot, uh next door uh, with a prisoner. An' as I recall it was Officer

C000861    000763

14

Caton, an' I believe Officer Hunter that walked back over. An', you

know I asked what had gone on.

QQ.   An' what did they say?

A.    Uh, I don't recall any conversation with Officer Hunter specifically.

Uh, Officer Caton was, stated, I'm trying to remember specific words

if I can. Uh, I remember him stating something along the lines of, you

know he fought us, he tried to run or, he tried to get passed us or

something along those lines an' we got him. Uh, or he didn't get very

far, somethin' along those lines. An' uh, I do recall Officer Caton

stating uh, that we did beat the uh, s-h-i-t out of him.

Q.    Okay. Officer Caton say anything about on uh, who did what or

anything like that?

A.    No.

Q.    It was just generically said that we.

A.    Generically.

Q.    Okay. Anybody else say anything or did you ever hear anything else

as far as uh, who did what or made any statements to anybody when

you, when you went over on the other side?

A.    Once I was, I remember talking to uh, Sellers, who I was partners with

that night. An' I remember him stating that, as he, he ran over there

**EXHIBIT R**

Ohio Department Of Health
VITAL STATISTICS
**CERTIFICATE OF DEATH**
TYPE OR PRINT IN PERMANENT BLACK INK

Reg. Dist. No. _____
Primary Reg. Dist. No. _____
Registrar's No. _____

State File No. _____

DO NOT WRITE IN MARGIN RESERVED FOR ODH DATA CODING

**DECEDENT**

| 1. Decedent's Name (First, Middle, LAST) | 2. Sex | 3. Date Of Death (Month, Day, Year) |
|---|---|---|
| Roger  OWENSBY  Jr. | Male | November 7, 2000 |

| 4. Social Security Number | 5a. Age-Last Birthday (Years) | 5b. Under 1 Year Months / Days | 5c. Under 1 Day Hours / Minutes | 6. Date Of Birth (Month, Day, Year) | 7. Birthplace (City, County and State or Foreign Country) |
|---|---|---|---|---|---|
| 574 - 76 - 9267 | 29 | | | March 27, 1971 | Cincinnati, OH |

8. Was Decedent Ever In U.S. Armed Forces?  ☑ Yes  ☐ No

9. Place of Death (Check Only One)
Hospital: ☐ Inpatient  ☑ ER/Outpatient  ☐ DOA   Other ☐
☐ Nursing Home  ☐ Residence  ☐ Other (Specify)

| 9a. Facility Name (If Not Institution, Give Street And Number) | 9b. City, Village, Twp., or Location of Death | 9c. County of Death |
|---|---|---|
| University of Cincinnati Hospital | Cincinnati | Hamilton |

| 10. Marital Status-Married, Never Married, Widowed, Divorced  (Specify) | 11. Surviving Spouse (If Wife, Give Maiden Name) | 12a. Decedent's Usual Occupation (Give kind of work done during most of working life. Do not  use Retired.) | 12b. Kind Of Business/Industry |
|---|---|---|---|
| Divorced | | Chef | Food Service |

| 13a. Residence-State | 13b. County | 13c. City, Town, Twp., or Location | 13d. Street and Number |
|---|---|---|---|
| OH | Hamilton | Cincinnati | 6570 Monte Vista Drive |

| 13e. Inside City Limits? ☑ Yes ☐ No | 13f. ZIP Code 45224 | 14 Was Decedent of Hispanic Origin? ☐ Yes ☑ No (If Yes, Specify Cuban, Mexican, Puerto Rican, etc.) | 15. Race-American Indian, Black, White, etc.  (Specify) Black | 16. Decedent's Education Elementary/Secondary (0-12) 12  College (1-4 or 5+) |

**PARENTS**

| 17. Father's Name (First, Middle, Last) | 18. Mother's Name  (First, Middle, Maiden Surname) |
|---|---|
| Roger Owensby | Brenda Ray |

**INFORMANT**

| 19a. Informant's Name (Type/Print) | 19b. Mailing Address (Street and Number or Rural Route Number, City or Town, State, ZIP Code) |
|---|---|
| Roger Owensby | 6570 Monte Vista Drive Cincinnati, OH 45224 |

**DISPOSITION**

| 20a. Method of Disposition ☑ Burial  ☐ Cremation ☐ Donation ☐ Other (Specify) ☐ Removal from State | 20b. Place of Disposition (Name of Cemetery, Crematory or Other Place) Crown Hill Memorial Park | 20c. Location City Or Town, State Cincinnati, OH |
|---|---|---|

| 20d. Date of Disposition November 14, 2000 | 21a. Name of Embalmer (First, Middle, Last) Dewey Baskin | 21b. License Number 6581A |
|---|---|---|

| 22a. Signature of Funeral Director or Other Person ▶ Dewey Baskin | 22b. License Number(of Licensee) 5697 | 23. Name and Address of Facility  (Include City, State and ZIP code) Thompson, Hall and Jordan Funeral Service 11400 Winton Road, Forest Park, Ohio 45240 |
|---|---|---|

| 24. Registrar's Signature ▶ | 25. Date Filed (Month, Day, Year) ▶ | |
|---|---|---|

**REGISTRAR**

| 26a. Signature of Person Issuing Permit ▶ | 26b. Dist. No. | 27. Date Permit Issued |
|---|---|---|

**CERTIFIER**

28a. Certifier (Check Only One)
☐ Certifying Physician
To the best of my knowledge, death occurred at the time, date, and place, and due to the cause(s) and manner as stated.
☑ Coroner
On the basis of examination, and/or investigation, in my opinion, death occurred at the time, date, and place, and due to the cause(s) and manner as stated

| 26b. Time of Death 8:47 P.M. | 28c. Date pronounced Dead (Month, Day, Year) November 7, 2000 | 28d. Was Case Referred to Coroner? ☑ Yes ☐ No |
|---|---|---|

| 28e. Signature And Title Of Certifier ▶ ____ M.D. Coroner | 28f. License Number 35-04-5999 | 28g. Date Signed (Month, Day, Year) December 4, 2000 |
|---|---|---|

29. (Type/Print) Name (First, Middle, Last) And Address of Person who Completed Cause of Death  (Include City, State and ZIP code)
Carl L. Parrott, Jr., M.D., Coroner, 3159 Eden Avenue, Cincinnati, Ohio 45219

**CAUSE OF DEATH**

SEE INSTRUCTIONS ON REVERSE SIDE

30. Part I. Enter the diseases, injuries, or complications that caused the death. Do not enter the mode of dying, such as cardiac or respiratory arrest, shock, or heart failure. List only one cause on each line. Type or print in permanent  black ink.

Approximate Interval Between Onset and Death

| Immediate Cause (Final disease or condition resulting in death) ──▶ | a. Mechanical asphyxia | minutes |
|---|---|---|
| Sequentially list conditions, if any, leading to the immediate cause. Enter Underlying Cause LAST (Disease or injury that initiated events resulting in death) | b. Due to (or as a Consequence of): | |
| | c. Due to (or as a Consequence of): | |
| | d. Due to (or as a Consequence of): | |

Part II. Other Significant Conditions contributing to death but not resulting in the underlying cause given in Part I.

| 31a. Was an autopsy performed? ☑ Yes ☐ No | 31b. Were Autopsy Findings available Prior To Completion of Cause of Death? ☑ Yes ☐ No |
|---|---|

| 32. Manner Of Death ☐ Natural  ☑ Pending Investigation ☐ Accident ☐ Suicide  ☐ Could Not be Determined ☑ Homicide | 33a. Date of Injury 11/07/00 | 33b. Time of Injury approx. 7:48 P.M. | 33c. Injury at Work? ☐ Yes ☑ No | 33d. Describe How Injury Occurred Asphyxiated during attempts to restrain during arrest by police |
|---|---|---|---|---|
| | 33e. Place of Injury - At Home, Farm, Street, Factory, Office Building etc. (Specify) parking lot of service station at | | | 33f. Location (Street and Number or Rural Route Number, City or Town, State) 2099 Seymour Avenue, Cincinnati, Ohio 45237 |

HEA 2717
5152 08 Rev  2/97