UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| THE ESTATE OF ROGER D. | : | Case No. C-1-01-769 |
| OWENSBY, JR., BY AND THROUGH | : | |
| ROGER D. OWENSBY, | : | Judge Spiegel |
| | : | |
| Plaintiff, | : | |
| | : | **MOTION FOR SUMMARY JUDGMENT** |
| v. | : | **ON BEHALF OF DEFENDANTS,** |
| | : | **THE VILLAGE OF GOLF MANOR,** |
| CITY OF CINCINNATI, et al., | : | **CHIEF STEPHEN TILLEY, ROBERT** |
| | : | **HEILAND, AND JOHN DOE #7 N/K/A** |
| Defendants. | : | **CHRIS CAMPBELL** |

Come now Defendants, the Village of Golf Manor, Chief Stephen Tilley, Robert Heiland, and John Doe #7 n/k/a Chris Campbell, who, pursuant to Fed. R. Civ. P. 56 respectfully move this Court for summary judgment in their favor as there is no genuine issue as to any material fact and said moving parties are entitled to judgment as a matter of law.  This Motion is supported by the attached Memorandum, the Affidavits of Stephen Tilley, Robert Heiland, Chris Campbell, and excerpts from the depositions of Robert Heiland, Chris Campbell, Robert Jorg, and Patrick Caton, all of which are appended hereto.

Respectfully submitted,

/s/      Wilson G. Weisenfelder, Jr.
Wilson G. Weisenfelder, Jr. (0030179)
RENDIGS, FRY, KIELY & DENNIS, L.L.P.
One West Fourth Street, Suite 900
Cincinnati, OH  45202-3688
(513) 381-9292
(513) 381-9206 - Facsimile
wgw@rendigs.com

Trial Attorney for Defendants, Village of Golf Manor, Stephen Tilley, Robert Heiland and John Doe #7 n/k/a Chris Campbell

## MEMORANDUM

### I.     INTRODUCTION.

This case stems from the death of Roger Owensby, Jr. on November 7, 2000.  The events leading up to Owensby's death occurred at Sam's Carry Out located at Langdon Farm Road and Seymour Avenue in Cincinnati, Ohio.  Succinctly, Owensby was spotted near the intersection of Seymour and Langdon Farm by a Cincinnati police officer, David Hunter, on November 7, 2000.  Hunter believed Owensby was the same person he had encountered several weeks earlier during a drug investigation.  That person, when approached by Hunter, ran away.

A struggle ensued between the Cincinnati officers and Owensby.  During the course of this struggle, an all-county broadcast was issued that  an "officer needs assistance".  Golf Manor police officers, Robert Heiland and Chris Campbell, were at the Golf Manor station when they heard the "officer needs assistance" broadcast.  Golf Manor is

contiguous to the City of Cincinnati and a participant in a mutual aid pact among various police departments, including Cincinnati, throughout Hamilton County. Heiland and Campbell went to the scene in separate Golf Manor police cars. Heiland parked his car in the middle of the Sunoco parking lot. Shortly after getting out of his car Heiland was asked by one or more of the Cincinnati officers if they could place Owensby in the Golf Manor cruiser. Heiland consented and the Cincinnati officers placed Owensby in the rear of the Golf Manor cruiser.

Several minutes later a supervisor from Cincinnati arrived and attempted to speak with Owensby in the Golf Manor cruiser. Owensby was unresponsive and the supervisor ordered Cincinnati officers to remove Owensby from the Golf Manor car.

Attempts at CPR were unsuccessful and Owensby was later pronounced dead.

Neither Golf Manor officer had anything to do with the altercation between the Cincinnati officers and Owensby. They did not participate in the arrest, scuffle, handcuffing, macing, or physically placing Owensby in or removing him from the Golf Manor car. Neither officer saw any of the Cincinnati officers strike Owensby.

The Estate of Roger Owensby filed this case on November 8, 2001. The Estate named the City of Cincinnati, various officials and police officers in addition to Golf Manor, its Police Chief, S. Tilley, and Officers Heiland and Campbell. The claims assert alleged violations of Owensby's Constitutional rights made actionable under 42 U.S.C. §1983 and various state law claims.

## II.     STATEMENT OF THE CASE.

### A.     September 27, 2000 Incident.

Defendant, Robert Jorg ("Jorg") first encountered a person thought to be Roger Owensby, Jr. a few weeks before the incident of November 7, 2000.  (Pp. 45, 46, Jorg Depo.)  Jorg and Defendant, David Hunter ("Hunter") were working "old clothes" detail and were parked in the Cincinnati Gardens parking lot.  (P. 46, Jorg Depo.)

Hunter was observing drug transactions through binoculars from his vantage point in the parking lot.  (P. 47, Jorg Depo.)  The drug transactions were taking place across the street near Sam's Carry Out.  (P. 48, Jorg Depo.)[1]

Jorg and Hunter radioed a request for an additional car to assist in an anticipated stop of individual(s) related to the drug activity.  (P. 50, Jorg Depo.)

Jorg and Hunter approached a group and identified themselves as police officers.  One in the group fled and was pursued by Hunter.  (P. 51, Jorg Depo.)

Hunter returned sometime later and told Jorg the suspect had gotten away.  (P. 62, Jorg Depo.)  Owensby was believed to be that suspect when he was encountered on November 27, 2000.

### B.     November 7, 2000 Incident.

Jorg and Caton were partners on November 7, 2000.  They received a call from Officers Sellers and Hasse they needed a "notice to appear" book.  (P. 84, Jorg Depo.)  Jorg and Caton went to deliver the NTA book to them in the vicinity of Sam's Carry Out.  (P. 62, Caton Depo.)  Officer Hunter also arrived at Sam's.  (P. 85, Jorg Depo.)

---

[1] Sam's Carry Out is the location of the November 7, 2000 incident.

Jorg and Caton recall hearing Hunter state "That's the guy who ran from me" or "I think that's LA" (P. 86, Jorg Depo.; P. 73, Caton Depo.) He was referring to a person identified as LA (presumably Owensby) on the opposite side of Seymour Avenue. (P. 88, Jorg Depo.) They watched as Owensby crossed the street and entered Sam's to make a purchase. (P. 90, Jorg Depo.; P. 85 Caton Depo.)

When Owensby left Sam's he was approached by Jorg and asked if he could talk to him. (P. 99, Jorg Depo.) Owensby consented and when asked his name responded "Roger Owensby". (P. 100, Jorg Depo.) Owensby had a bottle and complied when asked to put it down. Owensby said he was not armed and consented to a pat-down search. (Pp. 87, 92, Caton Depo.; P. 101 Jorg Depo.)

Caton asked Owensby for some form of identification and Owensby indicated he didn't have any identification. (P. 93, Caton Depo.) Owensby later made a comment it had been a long time since he had run from the police. Hunter approached Owensby and asked "When's the last time you ran from the police?". (Pp. 93, 94, Caton Depo.) Hunter indicated that's him and Jorg went to grab Owensby's wrist and Owensby fled on foot. (P. 96, Caton Depo., P. 102 Jorg Depo.)

Jorg gave chase and he and Owensby collided with a car in the parking lot. (P. 107, Jorg Depo.) Caton assisted Jorg in apprehending Owensby. (P. 99, Caton Depo.) At some point in subduing Owensby, Hunter applied mace to Owensby's face as requested by Caton. (P. 110, Caton Depo.; P. 126, Jorg Depo.)

Ultimately, Owensby was subdued and handcuffed. (P. 114, Caton Depo.; P. 141, Jorg Depo.) The arresting officers included Cincinnati officers Caton, Jorg, Hunter, Sellers and Hodge and the arrest was viewed as a "team effort". (P. 142 Jorg Depo.; P. 119,

Caton Depo.)  Caton attempted to lift Owensby by his waistband and at the same time was looking for a Cincinnati cruiser in which to place Owensby.  (P. 121, Caton Depo.)  Caton and Jorg each saw a Golf Manor cruiser and asked an unidentified Golf Manor officer if they could place Owensby in the car.  (P. 123, Caton Depo.; P. 144, Jorg Depo.)

Two Golf Manor officers, Heiland and Campbell, had responded to the scene based upon an all-county broadcast "officer needs assistance".  (P. 16, Campbell Depo.; P. 20, Heiland Depo.)  Golf Manor was a participant in a Mutual Aid Agreement with other municipalities, including the City of Cincinnati.  (P. 69, Heiland Depo.; Exhibit 78, Heiland Depo.)  When Heiland arrived, Owensby was on the ground in the company of two Cincinnati officers and appeared to be handcuffed.  (P. 21, Heiland Depo.)  Campbell, upon his arrival, recalls seeing Cincinnati officers moving Owensby toward Heiland's cruiser.  (P. 17, Campbell Depo.)  In fact, when Campbell arrived the County dispatcher indicated the situation was Code 4, meaning that it was over.  (P. 17, Campbell Depo.)

Heiland gave permission to the Cincinnati officers to place Owensby in the rear of the Golf Manor cruiser.  (P. 22, Heiland Depo.)  Heiland didn't watch Owensby as he was being placed in the car and instead walked to Campbell's car.  (P. 23, Heiland Depo.)  Heiland saw Owensby lying in the back of his cruiser.  (P. 25, Heiland Depo.)  Heiland recalls another Cincinnati officer, Brazille, also present.  Brazille made some type of inquiry about Owensby though Heiland cannot recall the specifics.  (Pp. 27-29, Heiland Depo.)

Heiland viewed Owensby as Cincinnati's prisoner and thereby Cincinnati's responsibility.  (P. 73, Heiland Depo.)  Campbell expressed the same belief.  (P. 36, Campbell Depo.)  Heiland believes the prisoner was the responsibility of the arresting officer in the jurisdiction where the arrest occurs.  (P. 74, 95, Heiland Depo.)

Heiland did not see any Cincinnati officer strike Owensby.  (P. 128, Heiland Depo.)  Campbell arrived after Owensby was subdued.  (P. 17, Campbell Depo.)

Neither Campbell nor Heiland thought Owensby was unconscious or seriously injured when he was placed in the Golf Manor cruiser.  Had they, permission would not have been given to place Owensby in the car or the Cincinnati officers would have been asked to check on him.  (P. 129, Heiland Depo.; P. 43, Campbell Depo.)

It was the intention of the arresting Cincinnati officers to use the Golf Manor car as a temporary holding facility until Owensby could be transferred to a Cincinnati cruiser.  (Pp. 176, 234, Caton Depo.; P. 217, Jorg Depo.)

Cincinnati Sergeant Watts arrived on the scene and checked on Owensby.  (P. 140, Caton Depo.)  Owensby was removed from the car and Sgt. Watts radioed for medical assistance.  (P. 34, Heiland Depo.)  The Cincinnati fire rescue arrived and Owensby was taken from the scene.  (P. 36, Heiland Depo.)

## III.    ARGUMENT OF LAW.

### A.    Summary of Allegations.

Plaintiff has asserted five claims for relief stemming from the alleged events of November 7, 2000.

The first claim contains several allegations against the Golf Manor Defendants.  They include assertions Owensby was attacked, beaten, handcuffed, maced and taken into custody by R. Heiland and John Doe No. 7 n/k/a Chris Campbell.  (Complaint at ¶ 26)

The first claim also asserts deprivation of life and liberty without due process of law.  (Complaint at ¶ 31)

It is also alleged Stephen Tilley authorized and ratified the alleged wrongful acts, that the incident occurs as a result of police practices of Golf Manor to use excessive force. (Complaint at ¶ 33)

The first claim contains allegations of a failure to obtain immediate medical attention.  (Complaint at ¶ 34)

Finally, there is an allegation in the first claim of failure to train on the part of the municipality.  (Complaint at ¶ 37)

The second claim is one for negligence.  (Complaint at ¶ 42)

The third claim alleges kicking, punching and striking the decedent by all Defendants.

The fourth claim asserts Golf Manor is vicariously liable for the acts of its employees.

The fifth claim sets forth the Estate's claim for damages.

**B.    Claims of Excessive Force.**

There is no evidence before the Court either of the Golf Manor officers, Heiland or Campbell, ever touched Owensby.  (*See* Heiland and Campbell Affidavits)  There is no dispute the Golf Manor officers did not participate in the arrest, handcuffing, or macing of Owensby.  In fact, both Heiland and Campbell have asserted they had no physical contact with Owensby.  In the absence of evidence Heiland and Campbell had any physical contact with Owensby, claims against them  of excessive force cannot be sustained and summary judgment is appropriate.  *LaPointe v. UAW Local 600*, 103 F.3d 45 (6th Cir. 1996).

### C.    Failure to Obtain Medical Attention.

Plaintiff alleges the Defendants, including Heiland and Campbell, failed to obtain medical attention for Owensby.  However, there is no basis in fact or law to support these claims against Heiland and Campbell.

Heiland and Campbell responded to an all-county broadcast "officer needs assistance" which they heard while at the Golf Manor police station.  Their response was in accordance with a Mutual Aid Agreement in which Cincinnati and Golf Manor were participants.  (*See*, Exhibit 78 - R. Heiland Depo.)

Neither Heiland nor Campbell saw any Cincinnati officer strike Owensby.  In fact, Owensby had been subdued and handcuffed by the time Heiland and Campbell arrived at Sam's Carry Out.  Heiland and Campbell had no physical contact with Owensby and were not the arresting officers.  Owensby did not appear to be unconscious or injured to either Heiland or Campbell.

It is undisputed Cincinnati officers arrested Owensby in Cincinnati.  The Golf Manor officers had absolutely no involvement in the confrontation and arrest of Owensby.  The only connection between Owensby and Golf Manor was the request by the Cincinnati officers to place Owensby in the Golf Manor cruiser.  Custody of Owensby was not transferred from the Cincinnati officers to Golf Manor.  No request was made of the Golf Manor officers by Cincinnati officers other than for permission to place Owensby in the Golf Manor cruiser.  Additionally, the Cincinnati officers viewed the placement of Owensby in the Golf Manor cruiser as temporary until a Cincinnati cruiser could be obtained.  These facts do not support a claim Heiland and Campbell failed to obtain medical attention for Owensby.

The legal issue framed by the allegations against Heiland and Campbell in the context of the applicable facts is whether they violated a Constitutional right of Owensby by not seeking medical attention.  The short answer is they did not.

The issue of whether a Constitutional right exists in the context of a state actor failing to provide or act on behalf of one in jeopardy was addressed by the Court in *DeShaney v. Winnebago*, 489 U.S. 189 (1989).  In *DeShaney* state social workers knew the petitioner, a minor, had been beaten by his father yet the social workers failed to act to remove him from the home.  The issue was whether that alleged failure to act could be regarded as a violation of the petitioner's Constitutional rights.

The Court in *DeShaney* reasoned no Constitutional violation occurred since the petitioner was not in the custody of the state when the injury occurred.  In addition, the harm inflicted did not occur because of state action.  Subsequent decisions have interpreted *DeShaney* to mean a "special relationship" must exist between the state actor and a person needing medical attention before a Constitutional duty arises.

The affirmative duty to protect arises not from the state's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which has been imposed on his freedom to act on his own behalf.  *Id.* at 200.

While the facts in *DeShaney* envision a state's failure to protect an individual from the acts of a private citizen, the same analysis is appropriate to the facts *sub judice*.  Simply, there was no "special relationship" between Owensby and the Golf Manor officers.

As recognized in *Revere v. Massachusetts General Hospital*, 463 U.S. 239 (1983), the due process clause requires the <u>responsible</u> government entity to provide medical care to persons who have been injured while being apprehended by the police.

The duty to act is a function of the "special relationship" created between the police and an individual. This relationship arises in custodial settings.

In *Tucker v. Callahan*, 867 F.2d 909, 914 (6th Cir. 1989) the Court rejected a claim against an officer who failed to provide medical attention to the plaintiff who had been injured by a non-state actor. The §1983 claim was rejected because no "special relationship" existed between the officer and the plaintiff.

In like fashion, no "special relationship" was found to exist between the police and decedent, hence no Constitutional duty in *Gazette v. City of Pontiac*, 41 F.3d 1061 (6th Cir. 1994). In *Gazette*, it was alleged the officers' failure to act/investigate the disappearance of the decedent violated her Constitutional rights. The District Court dismissed the action finding no special relationship between the police and the victim. That decision was affirmed and the Court of Appeals noted:

> Accepting Gazette's allegations as true, the facts do not show a special relationship between the City of Pontiac and Bandy. Bandy was never in the custody of the City. *Id.* at 1065.

The absence of the "special relationship" was the result of the decedent not being in custody of the defendants.

More recently, in *Weeks v. Portage Cty. Exec. Officers*, No. 99-3927 (6th Cir. 2000)[2] the Court upheld summary judgment in favor of law enforcement officers on the basis no special relationship existed. In that case, the decedent died allegedly as a result of the law enforcement officers not taking him into protective custody or providing medical attention on finding him in need. The Court in upholding the entry of summary judgment recognized:

---

[2] Unpublished disposition attached as Exhibit "A".

> We have held that unless the police have a "special relationship" with the victim, the victim has no constitutional right to have the police provide medical assistance or intervene to protect him from the actions of private actors. *Id.* at 3.

The Court observed the "special relationship" does not arise until the person is in police custody. (*See also, Sargi v. Kent*, 70 F.3d 907 (6th Cir. 1995); *Cartwright v. Marine City*, 336 F.3d 487(6th Cir. 2003)). If there is no custodial relationship, there can be no Constitutional duty. *Deanzona v. City of Denver*, 222 F.3d 1229 (10th Cir. 2000).

These cases make clear that a duty, in the Constitutional sense, to render medical care on the part of a state actor to a civilian does not arise in the absence of a "special relationship". While the cases cited generally involve a state actor encountering an individual injured by a non-state actor there is nothing to suggest the analysis should differ as it relates to Heiland and Campbell. The simple fact is, Owensby was never in the custody of Heiland or Campbell. This fact is clear when considering who restrained Owensby's freedom to leave or ability to care for his own well being. Specifically:

1. The confrontation with Owensby occurred in Cincinnati with Cincinnati police officers;

2. Cincinnati officers maced Owensby;

3. Cincinnati officers handcuffed Owensby;

4. Cincinnati officers arrested Owensby;

5. Cincinnati officers asked permission to place Owensby in the Golf Manor car;

6. Cincinnati officers escorted Owensby to the Golf Manor car;

7. Cincinnati officers placed Owensby in the Golf Manor car;

8. Cincinnati officers removed Owensby from the Golf Manor car.

There is nothing to suggest Owensby was ever in the custody of Golf Manor. There is not a single act attributable to Golf Manor which can be said to have restrained Owensby's freedom or liberty. Golf Manor never exercised any control over Owensby.

The facts demonstrate Owensby was never in custody of Golf Manor which is also consistent with the policy set forth in the Mutual Aid Agreement for law enforcement. (Exhibit 78 - R. Heiland Depo.) That Agreement provides in pertinent part:

> I(A)   . . . Control of any arrested person, evidence and the crime scene shall be relinquished to the first available officer from the jurisdiction within which the crime took place.

In this instance, the arresting officers were Cincinnati officers within their home jurisdiction, Cincinnati. The Agreement makes clear that control of the arrested person would never have been transferred to Golf Manor. Even if Golf Manor had made the arrest of Owensby, the control of Owensby would have been immediately transferred to the first Cincinnati officer on the scene. According to the Agreement, control of Owensby remained with the arresting jurisdiction, Cincinnati.

Notwithstanding the agreement concerning control of the arrested person, the Agreement also provides what agency was in control of the assisting officers. Paragraph 6(D) of the Mutual Aid Agreement provides:

> Whenever the law enforcement employees of one cooperating agency are providing police services upon request to another cooperating agency, they will be under the lawful direction and authority of the commanding law enforcement officer of the agency to which they are rendering assistance.

By the very terms of the Agreement, Heiland and Campbell were under the direction and control of Cincinnati officers. Heiland and Campbell were never asked by any of the Cincinnati officers to render or seek medical attention for Owensby.

The Estate's claims against Heiland and Campbell for an alleged failure to seek or render medical assistance to Owensby must fail. There was never a "special relationship" between Owensby and Heiland and Campbell since Owensby was never in custody of the Golf Manor officers. For this reason, no Constitutional duty arose on the part of Heiland or Campbell to seek or render medical attention to Owensby. Accordingly, these claims must be dismissed.

**C.    Qualified Immunity.**

Chief Tilley and Officers Heiland and Campbell are entitled to qualified immunity. The Sixth Circuit utilizes a three-step analysis in order to assess entitlement to qualified immunity. The first inquiry is whether a Constitutional violation occurred. The second inquiry is whether the violation involved a clearly established Constitutional right of which a reasonable person would have known. The last determination is whether plaintiff has offered sufficient evidence to indicate what the official allegedly did was objectively unreasonable in light of the clearly established Constitutional right.. *Feathers v. Aey*, 319 F.3d 843 (6th Cir. 2003); *Toms v. Taft,* 338 F.3d 519(6th Cir. 2003); *Sallier v. Brooks*, 343 F.3d 868 (6th Cir. 2003).

The inquiry ends if no Constitutional violation occurred. If it is arguable a Constitutional right was violated, it must be determined whether the right was clearly established. The Court in *Saucier v. Katz*, 533 U.S. 194 (2001), offered guidance concerning a determination whether a right was clearly established. Specifically:

> This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable. *Id.* at 200.

The first portion of the inquiry was addressed *supra* with the conclusion the Golf Manor Defendants did not violate Owensby's Constitutional rights.

In the alternative, if a right was arguably violated, it certainly was not clearly established in the context of these specific facts. The instruction from *Saucier, supra,* makes this abundantly clear.

The fact specific aspect of this case must be analyzed. This is so since there is no case law addressing this issue in the context of a similar factual scenario. Specifically, Golf Manor officers responded to a contiguous jurisdiction, Cincinnati, pursuant to an all-county that "an officer needs assistance". Their response was authorized by a mutual aid pact of which the City of Cincinnati and the Village of Golf Manor were participants. The Cincinnati officers subdued, handcuffed, and maced Owensby and asked the Golf Manor officer whether Owensby could be placed in the Golf Manor cruiser. Owensby was Cincinnati's prisoner and custody of Owensby was never transferred to Golf Manor. Cincinnati officers placed Owensby in the Golf Manor cruiser and subsequently removed Owensby from the Golf Manor cruiser. The Golf Manor officers never touched or had any physical contact with Owensby. The Golf Manor officers did absolutely nothing to restrain Owensby's freedom or liberty.

The Golf Manor officers did not know Owensby was seriously injured.

In addition, the Mutual Aid Agreement made clear the arrested person was to be under the control of the jurisdiction in which the arrest occurred. Further, the Golf Manor officers were under the direction and control of the Cincinnati Police Department in accordance with the Mutual Aid Agreement.

It cannot be said Owensby had a Constitutional right to have the Golf Manor officers seek medical attention for him in the absence of custody by Golf Manor. If such a right exists it certainly was not clearly established at the time of this incident.

Finally, the actions of the Golf Manor officers cannot be deemed objectively unreasonable. This is so since they had absolutely no contact with Owensby, did not see the Cincinnati police struggle with Owensby other than escorting him to the Golf Manor car and were not aware of any serious injuries to Owensby.[3]

Based on the foregoing, Chief Tilley and these officers are entitled to qualified immunity.

### D.    Failure to Train.

The Estate alleges Golf Manor Police Chief, Stephen Tilley, failed to establish proper procedures to train and/or supervise its officers. Presumably, this claim is made as to Chief Tilley in his official capacity and, as such, is a claim against the Village. *Kentucky v. Graham*, 473 U.S. 159 (1985).

Notwithstanding the Estate's allegations, Campbell and Heiland each received training and graduated from police academies. (Pp. 12, 13, Heiland Depo.; P. 13, Campbell Depo.) There is nothing before the Court to indicate either officer was improperly trained. More importantly, there is no evidence that any alleged failure to train either officer amounted to deliberate indifference to the Constitutional rights of Owensby. Such is the standard in order to assert such a claim. *City of Canton v. Harris*, 489 U.S. 378 (1989).

---

[3] It should be noted Chief Stephen Tilley was not present at the scene and, in fact, was on medical disability at the time of the incident. (*See*, Tilley Affidavit)

In fact, the Estate's claim with regard to failure to train does not assert conduct of Chief Tilley rose to the level of deliberate indifference.

For these reasons, this claim too must be dismissed.

### E.    Negligence.

The Estate alleges the acts and omissions of the Defendants amounts to negligence with regard to their alleged failure to transport Owensby to a hospital, etc.  State law claims of negligence are barred under the applicable provisions of §2744.01, *et seq.,* of the Ohio Revised Code.

It is not clear from the Estate's Complaint as to whether claims of negligence are asserted against the political subdivisions and/or the individuals.  In any event, such a distinction is of no moment in that claims of negligence against either are barred.

Section 2744.02(A)(1) is a blanket grant of immunity to political subdivisions subject to five exceptions set forth in §2744.02(B)(1) - (5).  A review of the five exceptions to immunity afforded a political subdivision reveals none is applicable to the issues joined herein.

In similar fashion, the employees of a political subdivision are immune pursuant to the provisions of §2744.03(A)(6).  Again, the exceptions to employee immunity do not exist and accordingly the employees of Golf Manor are likewise immune.

By virtue of the immunity afforded under §2744.01, *et seq.* of the Revised Code, the Estate's claims of negligence against these Defendants must fail.

### F.    Vicarious Liability.

It is not entirely clear whether the Estate seeks to impose vicarious liability with respect to its claims asserted pursuant to 42 U.S.C. §1983 and/or its state law claims.  In either event, the claim of vicarious liability must too fail.

There is no vicarious liability for claims asserted under 42 U.S.C. §1983.  *Monnell v. Dept. of Soc. Services*, 436 U.S. 658 (1978).

Further, any claim for negligence against the individuals which the Estate seeks to impose liability against a political subdivision is also barred by §2744.02 of the Revised Code.  As noted earlier, there are five exceptions to immunity related to claims against a political subdivision.  The claims asserted in the within action do not fall within any of those exceptions and accordingly there is no basis for vicarious liability against Golf Manor.

## IV.    CONCLUSION

Based on the foregoing, it is respectfully requested that judgment be entered in favor of Golf Manor, Stephen Tilley, Robert Heiland, John Doe #7 n/k/a Christopher Campbell as there is no genuine issue as to any material fact and said moving parties are entitled to judgment as a matter of law.

/s/     Wilson G. Weisenfelder, Jr.
Wilson G. Weisenfelder, Jr. (0030179)
RENDIGS, FRY, KIELY & DENNIS, L.L.P.
One West Fourth Street, Suite 900
Cincinnati, OH  45202-3688
(513) 381-9292
(513) 381-9206 - Facsimile
wgw@rendigs.com

Trial Attorney for Defendants, Village of Golf Manor, Stephen Tilley, Robert Heiland and John Doe #7 n/k/a Chris Campbell

## CERTIFICATE OF SERVICE

I hereby certify that on January 30, 2004, I electronically filed the foregoing Motion for Summary Judgment with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

James B. Helmer, Jr., Esq.
Paul B. Martins, Esq.
Frederick M. Morgan, Jr., Esq.
HELMER, MARTINS & MORGAN
Fourth & Walnut Centre, Suite 1900
105 E. 4th Street
Cincinnati, OH 45202-4008

John J. Helbling, Esq.
3672 Springdale Road
Cincinnati, OH  45251

Mark T. Tillar, Esq.
240 Clark Road
Cincinnati, OH 45215

Donald E. Hardin, Esq.
HARDIN, LEFTON, LAZARUS & MARKS
915 Cincinnati Club Building
30 Garfield Place
Cincinnati, OH  45202-4322

Dale A. Stalf, Esq.
BUCKLEY, KING & BLUSO
1420 PNC Center
201 East Fifth Street
Cincinnati, OH  45202

Geri H. Geiler, Esq.
Julie Bissinger, Esq.
Assistant City Solicitors
Room 214 City Hall
801 Plum Street
Cincinnati, OH  45202

Neil F. Freund, Esq.
FREUND, FREEZE & ARNOLD
One Dayton Centre, Suite 1800
1 South Main Street
Dayton, OH 45402-2017.

I do hereby certify that I have mailed by United States Postal Service a copy of the

Motion for Summary Judgment to the following non-CM/ECF participants:

Ravert J. Clark, Esq.
114 E. 8th St., Suite 400
Cincinnati, OH 45202


/s/    Wilson G. Weisenfelder, Jr.
Wilson G. Weisenfelder, Jr.