1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - - - -

ESTATE OF ROGER D. OWENSBY JR., et al.,

   Plaintiffs,

vs.        Case No. 01-CV-769
          (Judge S. A. Spiegel)

CITY OF CINCINNATI, et al.,

   Defendants.

- - - - - - - - - - - - - - - -

   Videotaped deposition of PATRICK EDMUND CATON, a defendant herein, called by the plaintiffs for cross-examination, pursuant to the Federal Rules of Civil Procedure, taken before me, Wendy Davies Welsh, a Registered Diplomate Reporter and Notary Public in and for the State of Ohio, at the offices of Helmer, Martins & Morgan Co. LPA, 1900 Fourth & Walnut Centre, 105 East Fourth Street, Cincinnati, Ohio, on Friday, October 17, 2003, at    a.m.

COPY

1  sharing a cruiser together?
2      A.   That's correct.
3      Q.   In that time period did Officer Jorg ever
4  mention to you that he was looking for someone who
5  went by the nickname of LA?
6      A.   No, not that I recall.  The first time I
7  ever heard the nickname LA was on November 7th.
8      Q.   When you -- directing your attention now
9  to November 7th of 2000, you and Officer Jorg
10 respond to a request for an NTA and proceed to Sam's
11 Carry Out.  Would there be any -- to your knowledge,
12 based on police practices and procedures, would
13 there be any record of the time when you folks
14 pulled into Sam's Carry Out?
15     A.   I believe we -- I'm not sure if we put
16 ourselves out on the run at that point or not.  If
17 we did, then there would be a record on the MDT that
18 we were on scene.
19          I don't know -- there were radio
20 communications with regard to our location at Sam's
21 that night.  Because that was one of my concerns
22 when the fight began in the Sunoco lot, the --
23 Communications had the wrong location for where we
24 were, so --

1  would be, so...
2      Q.   All right.  But it's approximately half a
3  football field?
4      A.   Approximately half a football field.
5      Q.   And where were you at this time?
6      A.   Basically here (indicating).
7      Q.   Okay.  Would you mark that with a C for
8  Caton.
9      A.   (Witness complies.)
10     Q.   Thank you.  So you saw the person going
11 across the street.  Did you think anything of it?
12     A.   Well, he was -- to me he was little bit
13 more than a shadow.  Again, it -- it -- it was dark
14 out there and the only light that I could see was
15 a -- a passing vehicle.  And I got little more than
16 a silhouette of the individual.
17          I -- I could see that it was a medium-
18 sized man, I suspected, but that -- beyond that, it
19 wasn't until he got into the well-lit area of the
20 Sunoco lot that I could make out any details, and at
21 that point it really wasn't many more details.
22          Now, Officer Hunter had said, when he
23 commented, when he pointed at it -- at -- at -- at
24 him, he said, "I think that's LA."

1   A.   Well, we were now looking inside a
2 well-lit building, probably the distance of the edge
3 of this table to where the picture is on the wall,
4 looking at Roger Owensby make a purchase at the
5 counter.
6       And he's well lit and we can make out his
7 facial features now, and this is -- I -- I'm
8 confident that this is the person I saw walk into
9 the store.
10  Q.   Across the street from Seymour?
11  A.   That's correct.
12  Q.   Would you estimate for us the distance
13 that you're talking about.  Are we talking 15,
14 20 feet?
15  A.   15 feet.  15 --
16  Q.   Okay.
17  A.   -- 20 feet.
18  Q.   All right.  Continue.
19  A.   Officer Hunter -- it was -- I mean, it
20 was -- it was almost perfect with regard to
21 identifying somebody, the way it was lit, because
22 it -- it was almost like a lineup.  I mean, he
23 was -- actually had a light shining on his face and
24 we could see him fairly clearly.

Merit
602 Main Street, Suite 703, Cincinnati, OH  45202
(513) 381-8228 * (800) 578-1542 * www.merit-ls.com

1          So that's what we began to do.  And when
2 we approached this individual as he exited the
3 store, Officer Jorg initially engaged him in
4 conversation and we both back and forth engaged him
5 in conversation.
6     Q.    Now, at this point in time am I correct in
7 understanding, based on what you've told me, that
8 you, Officer Jorg, as well as Officer Hunter, are
9 going to talk to a person that you believe may be
10 someone who had previously assaulted a police
11 officer, had punched a police officer?
12     A.    Possibility.
13     Q.    And had then run away or escaped
14 apprehension from that police officer?
15     A.    That's correct.
16     Q.    Okay.  Continue.
17     A.    He came out of the store holding a bottle
18 in his hand.  I think the first part of the
19 conversation was something to the effect of, sir,
20 can we speak with you for a moment.
21          He was cooperative at that point.  We
22 indicated to him, "Please put the bottle down,"
23 because we didn't want it to be used as a weapon
24 against us.  He complied with that.

1 carrying any weapons. Again, this was only a
2 pat-down of his outer garments for weapons.
3           At that point --
4      Q.   And based on your training, at this point
5 you weren't permitted to do anything else, right?
6      A.   No. He was not under arrest at this
7 point.
8      Q.   Because he was not under arrest and at
9 least at this point there was no probable cause to
10 arrest him?
11     A.   In my opinion, that's correct.
12     Q.   Okay. Continue.
13     A.   Anyhow, the -- I'm trying to remember
14 where I left off. The -- when he -- after the
15 pat-down of Mr. Owensby, he became a little bit more
16 verbal, became a little bit more loud. He said,
17 "You know, I really don't appreciate you coming at
18 me this way."
19          And I said, "Well" -- and I explained to
20 him again, "Well, the person we're looking for is
21 known to carry a firearm. He's dangerous. He
22 fights and he runs from the police."
23          He -- he became a little bit more
24 assertive and said, "Well, it's been a long time

1  since I ran from the police."
2      Q.   Now, at this point in time you knew that
3  he was not carrying a firearm?
4      A.   That's correct.
5      Q.   And you knew that Officer Hunter had told
6  you he didn't remember the person that he was
7  looking for as having facial hair, correct?
8      A.   That's right.
9      Q.   Okay.  Continue.
10     A.   The -- again, the indication -- we were
11 trying to get him to go voluntarily to the car, and
12 he -- he -- he also said, you know, "Run me" -- I
13 think he stated his name one more time.  He said,
14 "Go ahead and run it through the computer.  You'll
15 see I don't have any warrants on me."
16          I said, "Well" -- let me back up.  I do
17 recall now something I did say.  "Well, if you have
18 ID, we don't have to go all the way over to our
19 cars.  I can do it over the radio."
20          And that's when he said he didn't have any
21 identification, so we do -- we did have to proceed
22 to our cars so I could do a computer search.
23     Q.   At this point did anyone ask this person
24 whether or not he went by the nickname of LA?

1    A.    No.

2    Q.    Continue.

3    A.    So, again, when he said, "My name is
4 Roger" -- he made the comment, "It's been a long
5 time since I ran from the police," at which point
6 Officer Hunter approached him, was face to face with
7 Mr. Owensby about this close (indicating), and said,
8 "Really? When's the last time you ran from the
9 police?"

10   Q.    Now, at this point did you feel
11 uncomfortable with Officer Hunter being that close
12 to this person?

13   A.    Yes, very -- very uncomfortable.

14   Q.    Did the person feel uncomfortable having a
15 police officer that close to -- to them?

16   A.    Based on his reaction -- his eyes got real
17 wide. He started to get, in my opinion, nervous.
18 He started looking left and right, basically for an
19 avenue of escape.

20   Q.    That's how you took it?

21   A.    That's -- that's what I -- well, that
22 might be 20/20 hindsight, based on what happened.

23   Q.    All right.

24   A.    But that's -- and, again, this whole thing

1  Q.  All right. And as I understand your
2  testimony, neither you nor Officer Jorg could back
3  Officer Hunter up, because there just wasn't enough
4  time between him doing that and Mr. Owensby then
5  trying to take off?
6  A.  In -- in that whole instant, Officer
7  Hunter indicated to Officer Jorg that that's him.
8  Officer Jorg reached for his handcuffs and I think
9  reached for Owensby. And actually, I -- I didn't
10 see that. I know that because I've seen the tape
11 now, but --
12       And before any-- anybody could move, it
13 became a blur of activity at that point. There was
14 an -- an explosion of movement, the best way I can
15 describe it. Suddenly Dave Hunter wasn't there
16 anymore, Owensby wasn't there anymore, my partner's
17 running across, and I'm realizing we're now engaged
18 in a foot pursuit.
19       I start running. Blaine stayed about step
20 for step with Owensby. I don't know where Dave
21 went. I can only conclude he got knocked down or
22 punched at that point.
23       I reach up -- I start running and reach up
24 to key up my mike to put out a foot pursuit. Before