UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ESTATE OF                               :
ROGER D. OWENSBY JR., et al.,           :
                                        :
                                        :   Case No. 01-CV-769
          Plaintiff,                    :
                                        :   Senior Judge S. Arthur Spiegel
v.                                      :
                                        :
CITY OF CINCINNATI, et al.,             :
                                        :
                                        :
          Defendants.                   :
                                        :

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
AGAINST DEFENDANTS VILLAGE OF GOLF MANOR, ITS POLICE CHIEF
AND ITS INDIVIDUAL POLICE OFFICERS
FOR THEIR FAILURE TO PROVIDE CRITICAL MEDICAL CARE**

Mark T. Tillar (0029898)             James B. Helmer, Jr.  (0002878)
240 Clark Road                       Paul B.  Martins (0007623)
Cincinnati, Ohio  45202              Frederick M. Morgan, Jr.  (0027687)
Telephone: (513) 761-2958            HELMER, MARTINS & MORGAN CO., LPA
                                     Fourth & Walnut Centre, Suite 1900
                                     105 East Fourth Street
John J. Helbling (0046727)           Cincinnati, Ohio 45202-4008
3672 Springdale Road                 Telephone:    (513) 421-2400
Cincinnati, Ohio 45251               Facsimile:    (513) 421-7902
Telephone: (513) 923-9740

                                     *Trial Attorneys for Plaintiff*

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
AGAINST DEFENDANTS VILLAGE OF GOLF MANOR, ITS POLICE CHIEF
AND ITS INDIVIDUAL POLICE OFFICERS
FOR THEIR FAILURE TO PROVIDE CRITICAL MEDICAL CARE**

Plaintiff hereby moves for partial summary judgment, pursuant to Rule 56(c) and (d),

Fed. R. Civ. P.,  as to liability under 42 U.S.C. § 1983 against Defendants Village of Golf Manor,

its Police Chief, Stephen Tilley, and its individual police officer defendants, Robert Heiland and

Christopher Campbell,[1] for failure to provide any medical care to decedent, Roger Owensby, Jr.,

in violation of Mr. Owensby's constitutionally protected rights.

Respectfully submitted,

/s/Paul B. Martins

| | |
|---|---|
| Mark T. Tillar (0029898) | James B. Helmer, Jr.  (0002878) |
| 240 Clark Road | Paul B.  Martins (0007623) |
| Cincinnati, Ohio  45202 | Frederick M. Morgan, Jr.  (0027687) |
| Telephone: (513) 761-2958 | HELMER, MARTINS & MORGAN CO., LPA |
| | Fourth & Walnut Centre, Suite 1900 |
| John J. Helbling (0046727) | 105 East Fourth Street |
| 3672 Springdale Road | Cincinnati, Ohio 45202-4008 |
| Cincinnati, Ohio 45251 | Telephone:    (513) 421-2400 |
| Telephone: (513) 923-9740 | Facsimile:    (513) 421-7902 |

*Trial Attorneys for Plaintiff*

---

[1] Chris Campbell was originally designated in Plaintiff's Complaint as Defendant John Doe #7.  Doc. 1.  Thereafter Officer Campbell appeared in this case, answered and asserted affirmative defenses and identified himself as the John Doe #7.  Doc. 2, Golf Manor Answer.

## TABLE OF CONTENTS AND SUMMARY

**MEMORANDUM IN SUPPORT OF
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
AGAINST DEFENDANTS VILLAGE OF GOLF MANOR, ITS CHIEF OF POLICE
AND ITS INDIVIDUAL POLICE OFFICERS
FOR THEIR FAILURE TO PROVIDE CRITICAL MEDICAL CARE**

<u>Page</u>

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Plaintiff hereby moves for partial summary judgment, pursuant to Rule 56(c) and (d), Fed. R. Civ. P., as to liability under 42 U.S.C. § 1983 against Defendants Village of Golf Manor, its Police Chief, Stephen Tilley, and its individual police Officer defendants, Robert Heiland and Christopher Campbell, for failure to provide any medical care to decedent, Roger Owensby, Jr., in violation of Mr. Owensby's constitutionally protected rights.

This motion is filed contemporaneously with its companion, Plaintiff's Motion for Partial Summary Judgment Against Defendants City of Cincinnati and Its Individual Police Officers.

II.     FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

On November 7, 2000, two Golf Manor police officers, Officers Robert Heiland an Christopher Campbell, responded to an officer-needs-assistance-call from a Cincinnati police officer at a Sunoco station convenience store located approximately 0.6 miles away. This assistance run was made pursuant to a Mutual Aid Agreement between Golf Manor and the City of Cincinnati.

Upon arrival, Officer Heiland saw two Cincinnati police officers, Officers Jorg and Caton, picking a handcuffed prisoner, Roger Owensby, off of the asphalt in front of the convenience store. Officer Heiland agreed to allow Officers Jorg and Caton place Roger Owensby in the back seat of his Golf Manor cruiser. At that time, Officer Heiland, a trained EMT and former combat medic, saw that Mr. Owensby: was handcuffed; was bleeding from the nose and mouth; and, was being carried to the Golf Manor cruiser by Officers Jorg and Caton. He also noticed that both Officers Jorg and Caton were breathing heavily and looked "disheveled" but Mr. Owensby (who he believed had just been in a struggle with several officers, including Officers Jorg and Caton) was not breathing heavily. Officer Campbell also saw that Mr. Owensby was bleeding and never saw any movement nor heard any sound from Mr. Owensby. Nevertheless, neither Officer Heiland nor Officer Campbell ever checked on the condition of the man placed in the back of his cruiser.

Officer Heiland saw Officers Jorg and Caton slide Mr. Owensby head-first into his Golf Manor cruiser. He acknowledged that conscious prisoners usually enter the back seat of a cruiser feet-first, not head-first. Both Officers Heiland and Campbell saw that the handcuffed Mr. Owensby was left laying on the back seat of the Golf Manor cruiser. Nevertheless, neither Officer Heiland nor Officer Campbell made any effort to check on or provide any medical care to Mr. Owensby.

Some time thereafter, Cincinnati police Officer Brian Brazile approached the Golf Manor cruiser and looked in at the handcuffed Mr. Owensby. Officer Brazile then said to Officers Heiland and Campbell, ""This looks f**ked up. Can he breathe? It don't look like he can from

i

the way he's laying." In response, the two Golf Manor police officers shrugged their shoulders in indifference and did nothing.

At least another five minutes passed before a Cincinnati police sergeant asked Officer Heiland to roll down the back window of the cruiser for him to talk to Mr. Owensby. There was no response from Mr. Owensby and the Cincinnati police sergeant called for Fire and Rescue. It took the Cincinnati paramedics four minutes to arrive. Had Officer Heiland called the Golf Manor Life Squad located at the Wiehe Road station located 0.6 miles away, help could have arrived in less than a minute.

Officer Heiland acknowledges that he would have been able to determine whether Mr. Owensby was unconscious if he had checked on him, even if it was just to administer first aid to the cuts that he saw on Mr. Owensby's face when he was place in the cruiser.

Mr. Owensby was never resuscitated.

The Hamilton County Coroner has ruled Mr. Owensby's death a "homicide (police intervention: asphyxiation during restraint attempts)." The cause of death was "mechanical asphyxia." It is a medical fact that mechanical asphyxia takes minutes to result in death. It is an undisputed fact that at least eleven Cincinnati police officers were milling around the Golf Manor cruiser while Mr. Owensby lay inside, handcuffed and dying. It is also uncontested that both Golf Manor officers did nothing during this crucial five to six minute period.

## III.    STANDARD OF REVIEW ............................................... 9

Summary Judgment as to § 1983 liability is appropriate where, as we have here, no genuine issues of material fact exist concerning the failure of the defendants to provide constitutionally-required critical medical care to Mr. Owensby. Rule 56, Fed. R. Civ. P.

## IV.    42 U.S.C. § 1983: LIABILITY FOR THE FAILURE TO
    PROVIDE MEDICAL CARE ......................................... 10

To establish a claim under 42 U.S.C. § 1983, two elements are required: (1) conduct committed by a person acting under color of state law that (2) deprives plaintiff of rights, privileges, or immunities secured by the Constitution or the laws of the United States. *Culberson v. Doan*, 125 F. Supp. 2d 252, 263 (S.D. Ohio 2000). It is uncontested that the officers were acting in their official capacities on November 7, 2000 when they responded to the officer-needs-assistance-call. Therefore, the only remaining issue to prove is that they deprived Roger Owensby of a constitutionally-protected right.

### A.    The Constitutional Right To Medical Care ........................... 11

Twenty years ago the Supreme Court established the duty of law enforcement to provide medical care to pretrial detainees. *Bell v. Wolfish*, 441 U.S. 520, 535 n. 16 (1979); *City of Revere v. Massachusetts Gen.* Hospital, 463 U.S. 239, 244 (1983); *DeShaney v. Winnebago County Dept. Of Soc. Servs.*, 489 U.S. 189, 198-200 (1989); *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998).

This constitutional duty to provide medical care exists even in noncustodial settings. *Ewolski v. City of Brunswick*, 287 F.3d 492, 509 (6th Cir. 2002) ("state officials may be subject to constitutional liability if they fail to provide protection for individuals in state custody....Even in noncustodial settings, however, state officials may violate the Due Process Clause when their affirmative actions directly increase the vulnerability of citizens to danger or otherwise place citizens in harm's way"); *Gazette v. City of Pontiac*, 41 F.3d 1061, 1065 (6th Cir. 1994) ("A duty

to protect can arise in a noncustodial setting if the state does anything to render an individual more vulnerable to danger."); *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982) ("If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit.").

Thus, once Roger Owensby was handcuffed, all of the officers on the scene, including the Golf Manor officers, had a constitutional duty to provide for his medical care. The evidence is undisputed that none of the Cincinnati or Golf Manor police officers sought or provided any medical care for Mr. Owensby in the critical time while he lay unconscious and dying in the Golf Manor cruiser.

**B.    The Fourth Amendment Objective Reasonableness Test** . . . . . . . . . . . . . .  13

All claims arising out of the excessive use of force, including the failure to provide medical care, are analyzed under the Fourth Amendment objective reasonableness test. *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Alexander v. Beale Street Blues Co., Inc.*, 108 F. Supp. 2d 934 (W.D. Tenn. 1999); *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586 (7th Cir. 1997). That is, the court must determine whether the officers' actions in failing to provide medical care to Mr. Owensby is "objectively reasonable" in light of the facts and circumstances. *Graham*, 490 U.S. at 396-97; *Darrah v. City of Oak Park*, 225 F.3d 301, 307 (6th Cir. 2001).

**C.    Liability Of The Officers In Their Individual Capacities** . . . . . . . . . . . . . . . . . . . . . . .17

The deliberate indifference of Officers Heiland and Campbell to providing medical care to a handcuffed Roger Owensby as he lay across the back seat of the Golf Manor cruiser for a crucial period of five to six minutes when these Golf Manor officers knew that he was unresponsive, bleeding, not moving and making no sound, is an objectively unreasonable seizure and an excessive use of force. Couple with this the fact that at least five critical minutes of medical indifference elapsed *after* Cincinnati police Officer Brazile told both Officers Heiland and Campbell that, "It don't look like he can [breathe] from the way he's laying." This actual notice of medical distress was met with shrugged shoulders and callous indifference. Such actions are objectively unreasonable and a blatant violation of an established constitutional duty to provide medical care.

**D.    Qualified Immunity Is Inapplicable** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

The Cincinnati police officer defendants are not entitled to qualified immunity because they violated a clearly established constitutional right to medical care that has existed for over twenty years.

**E.    Municipal Liability Of Golf Manor** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

Municipal liability for the failure of the Golf Manor officer to provide medical care to Mr. Owensby lies in the failure of Golf Manor and its Police Chief to properly train and supervise their officers.

More than ten years before Mr. Owensby's arrest and death, the Supreme Court established that a municipality like Golf Manor may be held liable under § 1983 for

iii

constitutional violations arising from it failure to train its employees. *City of Canton v. Harris*, 489 U.S. 378 (1989). Inadequate training may serve as a basis for § 1983 liability where the failure to train amounts to "deliberate indifference" to the constitutional rights of persons with whom the police may come into contact. *Id.* at 388. In adopting this standard the Supreme Court expressly stated that the need to train its police force in the constitutional limitation on the exercise of deadly force is "so obvious" that failure to do so could constitute "deliberate indifference" to constitutional rights. *Id.* at 390 n.10.

1.    **Mutual Aid Agreement** ....................................... 22

When Golf Manor responded to the officer-needs-assistance call of Cincinnati police Officer Caton, it did so pursuant to a Mutual Aid Agreement between Golf Manor and the City of Cincinnati. Exhibit 78. The evidence of record establishes that Golf Manor provided no training to its police officers in implementing a Mutual Aid Agreement between it and the City of Cincinnati. In fact, Officer Heiland testified that he received no training from Golf Manor on whether he should determine whether a prisoner is conscious before that prisoner, arrested by another police department, is placed in his cruiser pursuant to the Mutual Aid Agreement.

Golf Manor officers received no training, instruction, memoranda or directives explaining their respective duties and responsibilities when operating under the Mutual Aid Agreement with another police department. This resulted in the all-too-foreseeable tragic consequence – the Golf Manor officers failed to provide critical medical care to Mr. Owensby because they believed it to be the responsibility of the Cincinnati officers who arrested him, while the Cincinnati officers believed the responsibility to provide critical medical care fell to Golf Manor because Mr. Owensby was in Golf Manor's custody and in the Golf Manor cruiser. The well-established constitutional fact was that the duty to provide critical medical care to Mr. Owensby resided with *all* of the police officers on the scene from *both* Golf Manor and the City of Cincinnati. Golf Manor's failure to train its officers in this most basic duty associated with of the use of force, along with Cincinnati's similar failure to train, cost Mr. Owensby his life.

**V.    CONCLUSION** ................................................... 26

The undisputed failure to provide medical attention to a bleeding, maced and unconscious detained suspect is properly analyzed as "excessive force" and is a well established Fourth Amendment constitutional injury that has existed for twenty years. It is uncontested that no Golf Manor officer provided any medical care in the critical minutes after Mr. Owensby's arrest, despite being put on notice that Mr. Owensby did not appear to be breathing.

It is also undisputed that the Village of Golf Manor failed to train its officers concerning their duty to provide such critical medical care. Having signed a Mutual Aid Agreement with the City of Cincinnati, Golf Manor knew that its officers would be involved in collaborative law enforcement actions that would likely involve the use of force and the need to provide medical care to injured prisoners as a result. Nevertheless, Golf Manor never provided any training, instruction, directives or memoranda to its officers explaining their respective duties and responsibilities in such collaborative efforts. The result of this failure to train was the very foreseeable consequence of its officers failing to provide basic constitutionally required critical medical care to Roger Owensby on November 7, 2000 as he lay handcuffed, bleeding, unconscious and dying in the back seat of a Golf Manor cruiser. As such, summary judgment should be granted against the Village of Golf Manor and its officers, under § 1983, for their failure to provide medical care to Mr. Owensby.

# TABLE OF AUTHORITIES

Page

*Alexander v. Beale Street Blues Co.*, 108 F. Supp. 2d 934 (W.D. Tenn. 1999)  . 11, 12, 13, 16, 19

*Anderson v. Creighton*, 483 U.S. 635 (1987)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 18, 20

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Bell v. Wolfish*, 441 U.S. 520 (1979)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 19

*Bowers v. DeVito*, 686 F.2d 616 (7th Cir. 1982)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 21

*Brower v. County of Inyo*, 489 U.S. 593 (1989)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Brown v. Shaner*, 172 F.3d 927 (6th Cir. 1999)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Bukowski v. City of Akron,* 326 F.3d 702 (6th Cir. 2003)  . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*California v. Hodari D.*, 499 U.S. 621 (1991)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*City of Canton v. Harris*, 489 U.S. 378 (1989)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 25

*City of Revere v. Massachusetts Gen. Hospital*, 463 U.S. 239 (1983)  . . . . . . . . . . . . . . . 11, 19

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998)  . . . . . . . . . . . . . . . . . . . . . 11, 13, 19, 21

*Culberson v. Doan*, 125 F. Supp. 2d 252 (S.D. Ohio 2000)  . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Darrah v. City of Oak Park*, 225 F.3d 301 (6th Cir. 2001)  . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*DeShaney v. Winnebago County Dept. Of Soc. Servs.*, 489 U.S. 189 (1989)  . . . . . . 11, 17, 19, 21

*Estate of Phillips v. City of Milwaukee*, 123 F.3d 586 (7th Cir. 1997)  . . . . . . . . . . . . . 13, 16, 17

*Ewolski v. City of Brunswick*, 287 F.3d 492 (6th Cir. 2002)  . . . . . . . . . . . . . . . . 11, 15, 18, 19, 21

*Gazette v. City of Pontiac*, 41 F.3d 1061 (6th Cir. 1994)  . . . . . . . . . . . . . . . . . . . . . . . . . 11, 21

*Gomez v. Toledo*, 446 U.S. 635 (1980)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Graham v. Connor*, 490 U.S. 386 (1989)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 17

Page

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Horn v. Madison County Fiscal Court*, 22 F.3d 653 (6th Cir. 1994) . . . . . . . . . . . . . . . . . . 11, 19

*Leisure v. City of Cincinnati*, 267 F. Supp. 2d 848 (S.D. Ohio 2003) . . . . . . . . . . . . . . . . . . . . 18

*Roberts v. City of Troy*, 773 F. 2d 720 (6th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 19

*Sargi v. Kent City Board of Educ.*, 70 F.3d 907 (6th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Saucier v. Katz*, 533 U.S. 194 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Spurlock v. Satterfield*, 167 F.3d 995 (6th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Stemler v. City of Florence*, 126 F.3d 856 (6th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Lanier*, 520 U.S. 259 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Constitution:

U.S. Const. amend. IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12, 13, 14, 15, 16, 17, 26

Statutes:

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 10

Federal Rules of Civil Procedure:

Rule 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Rule 56(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**MEMORANDUM IN SUPPORT OF
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
AGAINST DEFENDANTS VILLAGE OF GOLF MANOR, ITS POLICE CHIEF
AND ITS INDIVIDUAL POLICE OFFICERS
FOR THEIR FAILURE TO PROVIDE CRITICAL MEDICAL CARE**

## I.    INTRODUCTION

On November 7, 2000, a bleeding, maced, unconscious, and handcuffed Cincinnati citizen was placed into the back seat of a Golf Manor police cruiser.  A Golf Manor officer gave express permission for his vehicle to be used to house this prisoner and held the door open while two Cincinnati officers placed the prisoner inside.  A Golf Manor officer observed the prisoner's sorry condition.  A Golf Manor officer held the keys to the cruiser at all times.

But neither of two Golf Manor officers made any effort to provide medical attention for the prisoner in their squad car, even after a Cincinnati officer alerted them to his observation that the prisoner might not be breathing.

The prisoner, a 29 year African-American male with a twelve year old daughter, died in the back seat of that Golf Manor cruiser.

Plaintiff does not claim that the Golf Manor officers assaulted the prisoner.  Those details are set forth in a companion motion for partial summary judgment filed this date against several Cincinnati police officers and the City of Cincinnati.

Instead, Plaintiff herein seeks partial summary judgment against two Golf Manor police officers, Robert Heiland and Chris Campbell, for failing to provide medical attention to Roger Owensby, Jr. in violation of his constitutional rights.  In addition, Plaintiff also seeks partial summary judgment against Defendants Village of Golf Manor and its Police Chief, Stephen Tilley, for failure to adequately train its officers to provide such necessary assistance.

Specifically, Plaintiff requests this Court enter partial summary judgment against these defendants and render the following findings:

1.      Roger Owensby, Jr. was entitled to be provided medical care while a handcuffed prisoner;

2.      It was obvious to any reasonable, objective observer that the maced, bleeding and unconscious Mr. Owensby needed prompt medical attention;

3.      Even if Mr. Owensby was not in custody of the Golf Manor Officers, they still owed a constitutional duty to him to provide him medical assistance;

4.      By permitting a Golf Manor police cruiser to be used to detain or hold Mr. Owensby, both Golf Manor officers undertook a duty to provide medical care for Mr. Owensby;

5.      Neither Golf Manor police officers Heiland nor Campbell made any effort to provide or obtain medical care for Mr. Owensby;

6.      Both the United States Constitution and the policy of Golf Manor mandated that Officers Heiland and Campbell provide medical assistance to Mr. Owensby;

7.      The Village of Golf Manor and the City of Cincinnati have entered into a Mutual Aid Agreement;

8.      That Mutual Aid Agreement specifies that all officers acting pursuant to it have the *same* duties;

9.      Neither the Village of Golf Manor nor its Police Chief ever properly trained its police officers concerning their duties and responsibilities in providing medical attention to distressed prisoners when acting under the Mutual Aid Agreement;

10.     Officers Heiland, Campbell, Police Chief Tilley, and the Village of Golf Manor violated Mr. Owensby's constitutional rights.

## II.    FACTS

Plaintiff adopts the Statement of Facts detailed in his companion summary judgment motion against Defendants City of Cincinnati, its police chief and its individual police officers. This statement of facts begins with the arrival of Golf Manor onto the scene of Mr. Owensby's homicide.

2

On the evening of November 7, 2000, Golf Manor police officers Robert Heiland and Chris Campbell were on duty at the Golf Manor police station on Wiehe Road, approximately 0.6 miles from the Sunoco station at the corner of Langdon Farm Road and Seymour Avenue.[1]  They heard an officer-needs-assistance call from a Cincinnati police officer at the Sunoco station and drove there in separate Golf Manor cruisers with their lights and sirens on.[2]  It took them between 30 seconds to a minute to arrive at the Sunoco station.[3]  Golf Manor has a life squad and EMT unit at the same station.[4]

Officer Heiland had previously worked at Good Samaritan Hospital as a health technician, at Eldercare as an EMT, and was trained as a combat medic at the Army Major Medical Center at Fort Sam Houston.[5]  As he got out of his cruiser he saw some Cincinnati police officers standing over an African-American man on the ground who appeared to be handcuffed.[6]  Officer Heiland stayed by his cruiser as Cincinnati police Officers Jorg and Caton picked up the handcuffed Roger Owensby and brought him toward the car.[7]

---

[1] Heiland 12/3/03 Depo., pp. 20:10-22, 112:22 - 113:10; Campbell 12/3/03 Depo., p. 16:9-15.

[2] Heiland 12/3/03 Depo., pp. 20:10-22, 112:22 - 113:10; Campbell 12/3/03 Depo., p. 16:9-15.

[3] Heiland 12/3/03 Depo., pp. 66:24 - 67:24.  Golf Manor Officer Chris Campbell estimated that it took him 1 ½ to 2 minutes to travel the 0.6 miles from the Golf Manor station to the scene.  Campbell 12/3/03 Depo., pp. 28:7 - 29:6.

[4] Heiland 12/3/03 Depo., pp. 66:24 - 67:24; Campbell 12/3/03 Depo., p. 28:17-23.

[5] Heiland 12/3/03 Depo., pp. 14:1 - 15:22.

[6] Heiland 12/3/03 Depo., p. 21:17-18.

[7] Heiland 12/3/03 Depo., pp. 22:2-9.

3

Officers Jorg and Caton were on either side of Mr. Owensby and were carrying him toward the Golf Manor cruiser with their arms under each arm.[8]  They asked Officer Heiland if they could put Mr. Owensby in his Golf Manor cruiser.  Officer Heiland said, "Sure."[9]

Officer Heiland, a trained EMT, faced and watched as Officers Caton and Jorg brought Mr. Owensby over to his cruiser.[10]  He saw that Mr. Owensby was bleeding from the nose and mouth.[11]  He noted that Officers Jorg and Caton were breathing heavily and appeared "disheveled" but does not recall Mr. Owensby breathing heavily.  In fact, Mr. Owensby was silent and made no movement.[12]  Officer Heiland did not know if Mr. Owensby was conscious or unconscious when he was placed in his cruiser.  However, everything he saw suggested that Mr. Owensby was unconscious—he made no movement and no sound.[13]  Officer Heiland never checked to determine whether the person being placed in his cruiser was unconscious.[14]

Officer Heiland opened the back passenger door for Officers Jorg and Caton, who placed Mr. Owensby head first in the back seat of the Golf Manor cruiser.[15]  Officer Heiland acknowledges that conscious suspects usually get in a car feet first.[16]  Once Officers Jorg and Caton started putting Mr. Owensby in the back seat of his cruiser, Officer Heiland saw officer

---

[8] Heiland 12/3/03 Depo., p. 22:11-14; Campbell 12/3/03 Depo., pp. 25:10-13, 31:9-12.

[9] Heiland 12/3/03 Depo., p. 22:3-11.

[10] Heiland 12/3/03 Depo., p. 44:1-12.

[11] Heiland 12/3/03 Depo., pp. 74:23 - 75:1.

[12] Heiland 12/3/03 Depo., pp. 44:14 - 47:1.

[13] Heiland 12/3/03 Depo., pp. 47:2-19, 89:21 - 90:9.

[14] Heiland 12/3/03 Depo., p. 89:14-20.

[15] Heiland 12/3/03 Depo., pp. 22:11-14, 48:16-18.

[16] Heiland 12/3/03 Depo., pp. 48:19 - 49:5.

Caton walk over to the driver's side back door. Officer Heiland then walked away from his car and walked toward the Golf Manor cruiser of Officer Chris Campbell.[17] As a result, he did not see Officers Jorg and Caton place Mr. Owensby in the Golf Manor cruiser.[18] When Officer Heiland finally returned to his cruiser, the doors were closed and Mr. Owensby was lying on the back seat.[19] Officer Heiland still did not check on the condition of Mr.Owensby.[20]

Some time later, Officers Heiland and Campbell looked in the cruiser and saw that Roger Owensby was lying on his right side on the back seat facing toward the trunk.[21] Mr. Owensby was motionless and made no sounds.[22]

Officer Campbell remembers seeing blood on Roger Owensby's face and on the back seat of the Golf Manor cruiser. Officers Heiland and Campbell did nothing in response.[23]

As some point while Officers Heiland and Campbell were standing near the Golf Manor cruiser, Cincinnati police Officer Brian Brazile came over, looked at Mr. Owensby, and then talked to Officers Heiland and Campbell.[24]

---

[17] Heiland 12/3/03 Depo., p. 23:3-12.

[18] Heiland 12/3/03 Depo., p. 23:3-12.

[19] Heiland 12/3/03 Depo., p. 24:3-5.

[20] Heiland 12/3/03 Depo., p. 24:6-11.

[21] Heiland 12/3/03 Depo., pp. 24:12 - 26:14; Campbell 12/3/03 Depo., p. 21:12-15.

[22] Heiland 12/3/03 Depo., pp. 47:2-19, 89:21 - 90:9; Campbell 12/3/03 Depo., pp. 26:15 - 27:1.

[23] Heiland 12/3/03 Depo., p. 27:17-24; Campbell 12/3/03 Depo., p.p. 23:13-17, 26:15 - 27:1.; 43:10-14, 49:4-16.

[24] Heiland 12/3/03 Depo., pp. 28:3 - 29:11; Campbell 12/3/03 Depo., p. 24:1-21. Officer Brazile viewed the suspect before Officer Spellen's cruiser arrived on the scene. Officer Spellen's cruiser video, with its on-screen timer, established that no officer checks on Mr. Owensby for at least five minutes. Exhibit 20.

5

Both Officers Heiland and Campbell remember Officer Brazile speaking to them, but neither remember what he said. But Officer Brazile does remember. Over the three years since Mr. Owensby's death, Officer Brazile has consistently and repeatedly testified that he told Officers Heiland and Campbell, "This looks f\*\*ked up. Can he breathe? It don't look like he can from the way he's laying."[25]

In response, the two Golf Manor police officers shrugged their shoulders in indifference.[26] The two Golf Manor police officers did nothing. Officer Brazile then went back to his car to get his hat.[27]

Throughout the time that Roger Owensby lay on the back seat of the Golf Manor cruiser, Officers Heiland and Campbell acknowledge that they never checked on Mr. Owensby and no first aid was ever administered to him.[28] Officer Heiland also acknowledges that, had he attempted to examine Mr. Owensby to determine whether he needed first aid, he would have determined that Mr. Owensby was unconscious.[29]

Some time after Roger Owensby was placed in the Golf Manor cruiser and after Officer Brazile told Officers Heiland and Campbell that it didn't look as though Mr. Owensby was breathing, Cincinnati police Officer Victor Spellen drove onto the scene in his police cruiser in response to the officer-needs-assistance call. Officer Spellen's cruiser video camera continued to

---

[25] Exhibit 47, Brazile 11/13/00 Statement; Brazile 11/6/03 Depo., pp. 56:14-20, 64:13 - 68:8; Heiland 12/3/03 Depo., pp. 29:14 -32:7; Campbell 12/3/03 Depo., pp. 40:8 - 42:24.

[26] Brazile 11/6/03 Depo., pp. 56:21 - 57:3.

[27] Brazile 11/6/03 Depo., p. 57:1-6.

[28] Heiland 12/3/03 Depo., pp. 75:2-6, 87:10-15; Campbell 12/3/03 Depo., p. 43:10-14.

[29] Heiland 12/3/03 Depo., pp. 78:20-24; 87:16-23.

6

run for the 5 minutes that he was on the scene.[30]  His car was parked next to Officer Heiland's

Golf Manor cruiser in which Mr. Owensby lay.  There were at least eleven Cincinnati police

officers on the scene at this time[31] along with the two Golf Manor police officers.[32]  *No one

checked on or provided medical care to Roger Owensby.*[33]

After Officer Spellen left, Cincinnati Sergeant William Watts asked Officer Heiland to

roll down the back window on the cruiser so that he could talk to Mr. Owensby.  That was the

first time that anyone attempted to check on Mr. Owensby's condition since Officer Brazile told

both Golf Manor officers that Mr. Owensby did not appear to be breathing.  By that time Roger

Owensby had been in the Golf Manor cruiser for more than five minutes.[34]

There was no response or movement from Roger Owensby.[35]  Now, for the first time,

someone (Sergeant Watts) calls for Fire and Rescue units.[36]  At the direction of Sergeant Watts,

Mr. Owensby was removed from the Golf Manor cruiser and CPR was administered by

Cincinnati police officers Caton and Hasse (another EMT at the scene).[37]  Cincinnati EMTs with

---

[30] Exhibit 20; 32:8 - 33:20.  The video includes a timer display which shows the amount of elapsed time.

[31] Cincinnati police officers Robert B. Jorg, Patrick Caton, Darren Sellers, Alexander Hasse, David Hunter, Jason Hodge, Abraham Lawson, Victor Spellen, Brian Brazile, Sgt. William Watts, and Sgt. Shirley Browner.

[32] Golf Manor police officers Robert Heiland and Chris Campbell.

[33] Exhibit 20, Spellen cruiser video.

[34] *Id.*

[35] Heiland 12/3/03 Depo., pp. 33:21 - 34:1.

[36] Heiland 12/3/03 Depo., p. 34:4-24.

[37] *Id.* at 35:6-7; Caton 10/17/03 Depo., pp. 140:14 - 141:11.

the Fire Rescue were called at 7:56 p.m. and the first unit arrived four minutes later at 8:00 p.m.[38]
Had Officer Heiland called the Golf Manor station, located approximately ½ mile away, for life
squad and EMT personnel help could have arrived in less than a minute.[39]

The Coroner has ruled that Roger Owensby's death was a "homicide (police intervention:
asphyxiation during restraint attempts)."[40]  The cause of death was "mechanical asphyxia."[41]  It is
a medical fact that mechanical asphyxia takes minutes to result in death.[42]  It is likewise a
medical certainty that, when Mr. Owensby was picked up off of the asphalt, he was not able to
walk on his own power and was not able to actively resist.[43]  This fact is verified, not only by
Officers Heiland and Campbell, but also by Cincinnati Officers Darren Sellers and David
Hunter.[44]  Medically, it is impossible to say whether Mr. Owensby was dead or merely
unconscious when placed in the Golf Manor cruiser.[45]  However, according to Cincinnati Officer
Caton, who put Mr. Owensby in the back seat of the Golf Manor car, Mr. Owensby changed his
position on the seat while in the car, suggesting that he was still alive when placed in the Golf
Manor cruiser.[46]

---

[38] Exhibit 99, Cincinnati Fire Medical Run Report; Coburn 12/15/03 Depo., pp. 17:22 -
20:8.

[39] Heiland 12/3/03 Depo., pp. 66:24 - 67:24.

[40] Exhibit 103, Coronor's Report.

[41] *Id.*

[42] Schultz 12/17/03 Depo., p. 64:17-23.

[43] Exhibit 108, Wecht 9/10/02 Report, p. 11; Schultz 12/17/03 Depo., pp. 71:18 - 72:19.

[44] Hunter 12/4/03 Depo., p. 177:1-12; Sellers 10/21/03 Depo., p. 56:1-22.

[45] Exhibit 108, Wecht 9/10/02 Report, p. 11; Schultz 12/17/03 Depo., pp. 70:20 - 71:17.

[46] Caton 10/17/03 Depo., pp. 141:18 - 143:16.

Mr. Owensby was never resuscitated by the Cincinnati Fire Rescue.[47]  He was transported to University Hospital Emergency Room where a team of doctors and nurses attempted unsuccessfully to revive him.[48]  He was pronounced dead at 8:47 p.m. that evening.[49]

## III.    STANDARD OF REVIEW

Rule 56, Fed. R. Civ. P., eliminates those lawsuits in which there is no "genuine issue as to any material fact."  It is the function of the Court to decide whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."[50]  The question is "whether a fair-minded jury could return a verdict for the [non-moving party] on the evidence presented."[51]  The initial burden is on the movant to specify the basis upon which summary judgment should be granted and to identify portions of the record which demonstrate that absence of a genuine issue of material fact.[52]  The burden then shifts to the non-movant to come forward with specific facts, supported by the evidence in the record, upon which a reasonable jury could find there to be a genuine fact issues for trial.[53]  If, after adequate time for discovery on material matters at issue, the non-movant fails to make a showing sufficient to establish the existence of a material disputed fact, summary judgment is appropriate.[54]

---

[47] Coburn 12/15/03 Depo., p. 57:6-15; Exhibit 99.

[48] Coburn 12/15/03 Depo., p. 53:15-19.

[49] Exhibit E, Death Record.

[50] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

[51] *Id.* at 252.

[52] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[53] *Anderson*, 477 U.S. at 248.

[54] *Celotex Corp.*, 477 U.S. at 323.

9

## IV.    42 U.S.C. § 1983: LIABILITY FOR THE FAILURE TO PROVIDE MEDICAL CARE

Plaintiff alleges that the failure of Defendants Golf Manor, its Police Chief and its police officers on the scene, Robert Heiland and Christopher Campbell, to provide immediate medical care for Roger Owensby improperly deprived him of his constitutional right to be free from unreasonable seizure under the Fourth Amendment and his right to life and liberty under the Fourteenth Amendment, all in violation of 42 U.S.C. § 1983.[55]

Title 42 U.S.C. § 1983 provides, in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory of the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable in an action at law, suit in equity, or other proper proceeding for redress.

To establish a claim under § 1983, two elements are required: (1) conduct committed by a person acting under color of state law that (2) deprives plaintiff of rights, privileges, or immunities secured by the Constitution or the laws of the United States.[56]

It is uncontested that Roger Owensby was under arrest at the time that Officer Heiland helped Officers Jorg and Caton place the handcuffed prisoner in the back seat of the Golf Manor cruiser.  All of this was done by these police officers in their official capacities under color of their state-conferred authority.[57]  Therefore, the only issue remaining for § 1983 liability is establishing that the failure of the Golf Manor Defendants to provide prompt medical care to Mr.

---

[55] Doc. 1, Complaint, First Claim.

[56] *Culberson v. Doan*, 125 F. Supp. 2d 252, 263 (S.D. Ohio 2000) *citing Gomez v. Toledo*, 446 U.S. 635, 640 (1980); *Sargi v. Kent City Board of Educ.*, 70 F.3d 907, 910 (6th Cir. 1995).

[57] Jorg 10/14/03 Depo., pp. 223:23 - 224:4; Caton 10/17/03 Depo., p. 215:9-14.

Owensby while he lay handcuffed in the back of the Golf Manor cruiser deprived him of his

rights, privileges, or immunities secured by the Constitution or laws of the United States.

### A.    The Constitutional Right To Medical Care.

More than 20 years before the arrest of Roger Owensby, the Supreme Court established

that police who act with deliberate indifference to the serious medical needs of pretrial detainees

violate the constitutional rights of that citizen.[58]

> [W]hen the State takes a person into its custody and holds him there against his
> will, the Constitution imposes upon it a corresponding duty to assume some
> responsibility for his safety and general well-being.  The rationale for this
> principle is simple enough: when the State by the affirmative exercise of its power
> so restrains an individual's liberty that it renders him unable to care for himself,
> and at the same time fails to provide for his basic human needs—*e.g.*, food,
> clothing, shelter, ***medical care***, and reasonable safety—it transgresses the
> substantive limits on state action set by the Eighth Amendment and the Due
> Process Clause.[59]

This constitutional duty of Golf Manor to provide for medical care exists even in

noncustodial settings.

> state officials may be subject to constitutional liability if they fail to provide
> protection for individuals in state custody....Even in noncustodial settings,
> however, state officials may violate the Due Process Clause when their
> affirmative actions directly increase the vulnerability of citizens to danger or
> otherwise place citizens in harm's way.[60]

---

[58] *Bell v. Wolfish*, 441 U.S. 520, 535 n. 16 (1979); *City of Revere v. Massachusetts Gen. Hospital*, 463 U.S. 239, 244 (1983); *DeShaney v. Winnebago County Dept. Of Soc. Servs.*, 489 U.S. 189, 198-200 (1989); *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998); *Roberts v. City of Troy*, 773 F. 2d 720, 723 (6th Cir. 1985); *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994); *Alexander v. Beale Street Blues Co.*, 108 F. Supp. 2d 934, 944 (W.D. Tenn. 1999).

[59] *DeShaney*, 489 U.S. at 200 (emphasis supplied); *Ewolski v. City of Brunswick*, 287 F.3d 492, 509 (6th Cir. 2002);  *Lewis*, 523 U.S. at 851.

[60] *Ewolski*, 287 F.3d at 509; *Gazette v. City of Pontiac*, 41 F.3d 1061, 1065 (6th Cir. 1994) ("A duty to protect can arise in a noncustodial setting if the state does anything to render an individual more vulnerable to danger."); *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982) ("If the state puts a man in a position of danger from private persons and then fails to protect him, it

As a result, any argument by Golf Manor that it or its officers owed no duty to provide Mr. Owensby with medical care because he was somehow not technically in their custody fails for three undisputed reasons.  First, he *was* physically in their custody, locked and handcuffed in the back seat of their cruiser.  Second, the Mutual Aid Agreement which conferred upon Golf Manor and its officers the authority to act under color of state law outside of their jurisdiction at the Sunoco station also imposed upon those Golf Manor officer the same duties and responsibilities as if they were acting within the jurisdiction of Golf Manor.[61]  Third, as established above, twenty years of clearly established Sixth Circuit law required Golf Manor and its officers to provide medical care for Mr. Owensby, regardless of whether he was technically in their custody.

While courts usually analyze the constitutional duty to provide medical care for pretrial detainees as a Fourteenth Amendment substantive due process violation, it is equally true that the right to prompt medical attention also arises under the Fourth Amendment.  The Sixth Circuit has addressed this issue and definitively ruled that a Fourteenth Amendment right does not preclude a finding that the right is clearly established when analyzed under the Fourth Amendment.[62]  Indeed, the Supreme Court has also cautioned against analysis of constitutional violations as substantive due process claims where the offending behavior may be governed by another constitutional provision.

> [B]ecause we have always been reluctant to expand the concept of substantive due process, we held in *Graham v. Connor* that where a particular amendment

---

will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit.").

[61]*See* Section E.1., *infra*; Exhibit 78, Mutual Aid Agreement, ¶ VI.C.

[62] *Spurlock v. Satterfield*, 167 F.3d 995, 1006 n.19 (6th Cir. 1999); *Alexander*, 108 F. Supp. 2d at 944 n.10.

provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.[63]

Thus, once Roger Owensby was handcuffed, all of the defendant officers on the scene, including the Golf Manor officers, had a constitutional duty to provide for his medical care. It is an uncontested fact that neither Golf Manor officer ever provided any medical assistance to Roger Owensby on November 7, 2000. In fact, it is uncontested that neither Golf Manor officer even examined Roger Owensby during the crucial six minutes before his death as he lay in the Golf Manor cruiser, handcuffed, bleeding and unconscious.

The Golf Manor Defendants' failure to provide critical medical care goes hand-in-glove with the excessive force used in effectuating the illegal arrest of Roger Owensby on November 7, 2000. In fact, the willful determination or deliberate indifference in failing to provide medical attention to Roger Owensby is part of the excessive force used against him.[64] The excessive use of force in Mr. Owensby's arrest violates the Fourth Amendment guarantee that citizens will be protected from unreasonable seizures of their person.

### B.    The Fourth Amendment Objective Reasonableness Test.

The Fourth Amendment provides, in relevant part: "The right of the people to be secure in their persons...against unreasonable searches and seizures, shall not be violated."[65]

---

[63] *Lewis*, 523 U.S. at 842, *citing Graham*, 490 U.S. at 395, *see also id.* at 843 ("'If a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.'") *quoting United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997).

[64] *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 595 (7th Cir. 1997); *Alexander*, 108 F. Supp. 2d at 944-45.

[65] U.S. Const. amend. IV.

In *Graham v. Connor*, the Supreme Court determined that "all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."[66]  That is, the "reasonableness" of a particular use of force or, in this case, the medical indifference must be judged objectively from the perspective of a reasonable officer on the scene.  One must determine whether the officer's actions are "objectively reasonable" in light of the facts and circumstances.[67]

In examining the totality of the particular circumstances, the Supreme Court instructs courts to pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight."[68]

In this case, the evidence establishes that the only crime for which Roger Owensby could properly have been charged was jaywalking on September 27—a minor misdemeanor traffic

---

[66] *Graham*, 490 U.S. at 395; *Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989) ("a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement *through means intentionally applied.*"); *Lewis*, 523 U.S. 833, 844 (1998). Here, there is no question that the Fourth Amendment applies since there was a governmental termination of Roger Owensby's freedom of movement through means intentionally applied.

[67] *Graham*, 490 U.S. at 396-97; *Darrah v. City of Oak Park*, 225 F.3d 301, 307 (6th Cir. 2001).

[68] *Graham*, 490 U.S. at 396.

ticket offense that would not even justify physical arrest.[69]  From Golf Manor's perspective there is no evidence that the officers on the scene even knew what the charges were against Mr. Owensby when they allowed Officers Jorg and Caton to lay him in the back seat of the Golf Manor cruiser.  The evidence is equally clear that Mr. Owensby posed no immediate threat to the safety of the Golf Manor officers or to anyone else.  At the time Officers Heiland and Campbell arrived, Mr. Owensby was already handcuffed, on the ground, surrounded by several Cincinnati police officers, and showed no signs of movement or resistance as he was carried to the Golf Manor cruiser.[70]  Finally, it does not appear that Mr. Owensby was even conscious, much less a flight risk.[71]

All of Plaintiff's allegations stem from a common nucleus—the conduct of police officers in stopping and seizing Roger Owensby, Jr., on November 7, 2000.  Roger Owensby was "seized" within the meaning of the Fourth Amendment once the Cincinnati officers tackled and gained physical control of him.[72]  Thus, he was certainly under the control of the Cincinnati police officers once he was handcuffed, before he was raised from the asphalt and placed in the Golf Manor cruiser.  And he was certainly under the control of the Golf Manor officers as he lay handcuffed on the back seat of the Golf Manor cruiser.  Courts that have evaluated constitutional

---

[69] *See* Plaintiff's Motion for Partial Summary Judgment Against Defendants City of Cincinnati And Its Individual Police Officers, Section II.G., filed contemporaneously with this motion.

[70] Heiland 12/3/03 Depo., pp. 89:21 - 90:9.

[71] *Id.*

[72] *California v. Hodari D.*, 499 U.S. 621 (1991); *Ewolski*, 287 F.3d at 506.

violations arising from the failure to provide medical care associated with an arrest have done so under the rubric of a Fourth Amendment violation.[73]

In *Alexander v. Beale Street Blues Co., Inc.*, the Western District of Tennessee addressed facts that bear some resemblance to those present in this case, although not nearly as brutal.  In *Alexander* a patron of a Memphis nightclub was thrown to the floor while several nightclub employees held him down with their body weight.[74]  Memphis police arrived to find the patron in obvious need of medical attention.  Nevertheless, the officers assisted nightclub employees in handcuffing the now motionless patron, carrying him outside of the club and placing him behind the police cruiser "in a contorted position" creating a risk of death by positional asphyxia.  The patron was taken to the hospital by ambulance and later died as a result of traumatic asphyxia. The plaintiff filed a § 1983 action claiming a failure to provide timely medical treatment.[75]

*Alexander* determined that the Fourth Amendment objective reasonableness analysis was appropriate.[76]  Specifically, *Alexander* ruled that, "Plaintiffs' medical indifference claim will be examined under the framework of the Fourth Amendment to determine whether the officers' alleged denial of medical care was reasonable under the circumstances.[77]

Likewise, in *Estate of Phillips v. City of Milwaukee*, the Seventh Circuit analyzed a § 1983 claim of failure to provide medical care under the Fourth Amendment objective reasonableness test where an extremely obese man, suffering from Graves' disease,

---

[73] *Alexander*, 108 F. Supp. 2d 934; *Estate of Phillips*, 123 F.3d 586.

[74] *Alexander*, 108 F. Supp. 2d at 939.

[75] *Id.*

[76] *Id.* at 940-43.

[77] *Id.* at 941.

schizophrenia and an enlarged thyroid, died after he was handcuffed face down on the floor with his hands behind his back.[78]  *Estate of Phillips* acknowledges that "it is somewhat awkward to conceptualize such an act or failure to act [failure to provide medical care] as 'excessive force;' indeed, the duty to render medical aid is more often thought of as one arising under the Due Process Clause or the Eight Amendment."[79]  However, the Seventh Circuit concluded that Fourth Amendment objective reasonableness analysis was proper because "the complained-of police actions occurred during the course of Mr. Phillips' seizure."[80]  Thus, the Fourth Amendment "requires that seizures be reasonable under all the circumstances; and we do think that it would be objectively unreasonable in certain circumstances to deny needed medical attention to an individual placed in custody who cannot help himself."[81]

## C.    Liability Of The Officers In Their Individual Capacities.

The deliberate indifference of Officers Heiland and Campbell to providing medical care to a handcuffed Roger Owensby as he lay across the back seat of the Golf Manor cruiser for a crucial period of five to six minutes when these Golf Manor officers knew that he was unresponsive, bleeding, not moving and making no sound, is an objectively unreasonable seizure and an excessive use of force.  Couple with this the fact that at least five critical minutes of medical indifference elapsed *after* Cincinnati police officer Brazile told both Officers Heiland and Campbell that, "It don't look like he can [breathe] from the way he's laying."[82]  This actual

---

[78] *Estate of Phillips*, 123 F.3d at 590.

[79] *Id.* at 595 *citing DeShaney*, 489 U.S. at 200.

[80] *Id.* at 596 *citing Graham*, 490 U.S. at 389-90.

[81] *Id.*

[82] Exhibit 20, Spellen video; Exhibit 47, Brazile 11/13/00 Statement; Brazile 11/6/03 Depo., pp. 56:14-20, 64:13 - 68:8, 95:14 - 97:1.

notice of medical distress was met with shrugged shoulders and callous indifference.[83]  Such

actions are objectively unreasonable and a blatant violation of an established constitutional duty

to provide medical care.

> **D.    Qualified Immunity Is Inapplicable.**

Golf Manor and its individual officers have asserted the affirmative defense of qualified

immunity.[84]

Qualified immunity is "an affirmative defense shielding governmental officials from

liability as long as their conduct does 'not violate clearly established statutory or constitutional

rights of which a reasonable person would have known.'"[85] The qualified immunity inquiry is

composed of two parts: (1) whether a constitutionally protected right has been violated; and, (2)

whether the right is so clearly established that a reasonable official would understand that what

he is doing violates that right.[86]  For a right to be clearly established,

> The contours of the right must be sufficiently clear that a reasonable official
> would understand that what he is doing violates that right.  This is not to say that
> an official action is protected by qualified immunity unless the very action in
> question has previously been held unlawful, but it is to say that in the light of pre-
> existing law the unlawfulness must be apparent.[87]

Here, both Golf Manor officers, Heiland and Campbell, knew that Roger Owensby was

bleeding from the face and that he was unresponsive and silent when he was placed head-first

---

[83] Brazile 11/6/03 Depo., pp. 56:21 - 57:3.

[84] Doc. 3, Answer of Golf Manor, Second Affirmative Defense.

[85] *Bukowski v. City of Akron*, 326 F.3d 702, 708 (6th Cir. 2003) *quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Leisure v. City of Cincinnati*, 267 F. Supp. 2d 848, 851 (S.D. Ohio 2003).

[86] *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001); *Bukowski*, 326 F.3d at 708; *Leisure*, 267 F. Supp. 2d at 851.

[87] *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Ewolski*, 287 F.3d at 501.

into the back seat of the Golf Manor cruiser.  Mr. Owensby's stillness and silence, immediately

after a significant physical altercation with five Cincinnati police officers who themselves were

breathing heavily, are all consistent with the fact that Mr. Owensby was unconscious.  Moreover,

Officer Heiland acknowledges that conscious prisoners do not normally enter a police cruiser

head-first.  It could not be clearer to this trained EMT that the man whom he allowed to be

placed in his cruiser was unconscious and needed medical attention.

More than twenty years ago, the Supreme Court established the constitutional duty of

police officers to provide medical care for pretrial detainees.[88]  These officers and their Golf

Manor Police Department had a clearly established constitutional duty to care for a citizen who,

because of the restraint imposed upon him by the police, was unable to provide for his own

medical well-being.

Golf Manor's Policy 6-07, Prisoner Transport provides:

•       it is the policy of this department that EVERY prisoner transported in a police
        vehicle shall be searched and handcuffed by the transporting officer prior to being
        transported, unless specifically exempted under provisions of this procedure.[89]

Neither Officers Heiland nor Campbell searched Mr. Owensby on November 7 because

they believed that they were not going to be transporting him.  Officer Heiland admits that he

would have been in a better position to determine that Mr. Owensby was unconscious and needed

prompt medical aid if he had attempted to search him.[90]

---

[88] *Bell*, 441 U.S. at 535 n. 16; *City of Revere*, 463 U.S. at 244; *DeShaney*, 489 U.S. at
198-200; *Lewis*, 523 U.S. at 849; *Roberts*, 773 F. 2d at 723; *Horn*, 22 F.3d at 660; *Ewolski*, 287
F.3d at 509; *Alexander*, 108 F. Supp. 2d at 944.

[89] Exhibit 77, Golf Manor Policy 6-07, Prisoner Transportation, ¶ II.A.

[90] Heiland 12/3/03 Depo., pp. 77:16 - 79:7.

- Every prisoner shall be placed in the Police vehicle and secured with seat belts.[91]

No one secured Mr. Owensby with a seat belt or even attempted to sit him up to place him in a seat belt.[92]  Again, had a trained EMT like Officer Heiland attempted to sit Mr. Owensby up to fasten a seat belt he would have determined Mr. Owensby's critical condition.

- Any prisoner who is sick or injured shall be examined by life squad personnel and offered treatment for their injury or illness prior to being transported to any jail or detention facility.[93]

No one attempted to determine whether Mr. Owensby was injured and needed treatment, even through both Officers Heiland and Campbell saw blood on his face.  Again, Officer Heiland admits that, had he attempted to ask Mr. Owensby whether he wanted treatment for the cuts on his face, he would have been able to determine that he was not conscious.[94]

- Unconscious prisoners shall not be transported in a police vehicle, but shall be taken to a hospital or medical facility by ambulance.[95]

Even though everything they saw about Mr. Owensby suggested that he was unconscious, neither Officers Heiland nor Campbell checked to see if Mr. Owensby was unconscious.  In fact, Officer Heiland testified that he received no training from Golf Manor on whether he should determine whether a prisoner is conscious *before* that prisoner, arrested by another police department, is placed in his vehicle pursuant to the Mutual Aid Agreement.[96]

---

[91] Exhibit 77, ¶ II.D.

[92] Heiland 12/3/03 Depo., p. 82:1-13.

[93] Exhibit 77, ¶ II.E.

[94] Heiland 12/3/03 Depo., pp. 86:5 - 87:23.

[95] Exhibit 77, ¶ II.E.5.

[96] Heiland 12/3/03 Depo., pp. 89:9 - 90:24.

20

Although promulgated to fulfill the constitutional duty of the police to care for injured citizens under arrest, neither Officers Heiland nor Campbell made any attempt to provide the medial care envisioned by these Golf Manor policies.

The only explanation provided was that the Golf Manor police officers believed they were under no obligation to provide any medical care to Mr. Owensby because they did not think that they were going to transport him. There are at least two flaws in this argument. First, no one ever told the Golf Manor officers that they were *not* going to be transporting Mr. Owensby.[97] Second, regardless of what the Golf Manor policies said or did not say, these officers had an affirmative duty to provide medical care for the handcuffed and unconscious Roger Owensby when he was placed in their car, regardless of whether they had arrested him.[98] Officer Heiland admitted as much during his deposition.[99]

---

[97] Heiland 12/3/03 Depo., pp. 85:19 - 86:4.

[98] *DeShaney*, 489 U.S. at 200 ("The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basis human needs—e.g., ...medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause."); *Ewolski*, 287 F.3d at 509 ("**state officials may be subject to constitutional liability if they fail to provide protection for individuals in state custody....Even in noncustodial settings, however, state officials may violate the Due Process Clause when their affirmative actions directly increase the vulnerability of citizens to danger or otherwise place citizens in harm's way.**") (emphasis supplied); *Gazette*, 41 F.3d at 1065 ("A duty to protect can arise in a noncustodial setting if the state does anything to render an individual more vulnerable to danger."); *Bowers,* 686 F.2d at 618 ("If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit."); *Lewis*, 523 U.S. at 851.

[99] Heiland 12/3/03 Depo., p. 74:17-22.

> Q.     Regardless of who is technically responsible for the well-being of a prisoner, if you know that a prisoner is injured and needs medical attention, is it your understanding that you have a duty to provide medical attention?
>
> A.     Yes.

As such, neither of the defendant police officers can avoid § 1983 liability based upon the affirmative defense of qualified immunity.

### E.     Municipal Liability Of Golf Manor.

Municipal liability for the failure of these officer to provide medical care to Mr. Owensby lies in the failure of Golf Manor and its Police Chief to properly train and supervise their officers.

More than ten years before Mr. Owensby's arrest and death, the Supreme Court established that a municipality like Golf Manor may be held liable under § 1983 for constitutional violations arising from it failure to train its employees.[100]  Inadequate training may serve as a basis for § 1983 liability where the failure to train amounts to "deliberate indifference" to the constitutional rights of persons with whom the police may come into contact.[101]  In adopting this standard the Supreme Court expressly stated that the need to train its police force in the constitutional limitation on the exercise of deadly force is "so obvious" that failure to do so could constitute "deliberate indifference" to constitutional rights.[102]

#### 1.     Mutual Aid Agreement.

When Golf Manor responded to the officer-needs-assistance call of Cincinnati police officer Caton, it did so pursuant to a Mutual Aid Agreement between Golf Manor and the City of Cincinnati.[103]  The evidence of record establishes that Golf Manor provided no training to its police officers in implementing a Mutual Aid Agreement between it and the City of Cincinnati.

---

[100] *City of Canton v. Harris*, 489 U.S. 378 (1989).

[101] *Id.* at 388.

[102] *Id.* at 390 n.10.

[103] Exhibit 78, Mutual Aid Agreement for Law Enforcement; Heiland 12/3/03 Depo., pp. 69:1-17, 97:13-18; Streicher 12/22/03 Depo., pp. 347:22 - 356:9.

This Mutual Aid Agreement expressly covered the situation that arose here—the use of a Golf Manor cruiser in conjunction with a Cincinnati arrest. However, having signed the Mutual Aid Agreement and instructed its police force to work collaboratively with other municipal police forces, Golf Manor failed to provide any training for its officers concerning their respective duties and responsibilities.[104] Such conduct by Golf Manor "amounts to deliberate indifference to the rights of persons with whom the police came into contact."[105] The resulting foreseeable confusion cost Mr. Owensby his life.

Golf Manor provided no classes to its officers on what their duties and responsibilities were when operating under the Mutual Aid Agreement.[106] The officers were provided with no directives or memoranda.[107] In fact they were provided with no instruction on which police department's policies, rules or regulations governed their conduct when they responded to a scene pursuant to the Mutual Aid Agreement.[108]

The Mutual Aid Agreement provides:

Whenever the law enforcement employees of one cooperating Agency are providing police services in or to another cooperating agency pursuant to the authority contained in this contract, other legislative authority or state law, such employee will have the **_same_** power, **_duties_**, rights and immunities as if taking action within the territory of their employing Agency.[109]

---

[104] Heiland 12/3/03 Depo., p. 72:5-13.

[105] *City of Canton*, 489 U.S. at 388.

[106] Heiland 12/3/03 Depo., pp. 92:22 - 93:9.

[107] Heiland 12/3/03 Depo., p. 93:10-13; Campbell 12/3/03 Depo., pp. 43:24 - 44:4.

[108] Heiland 12/3/03 Depo., p. 72:5-13; Campbell 12/3/03 Depo., p. 43:21-23.

[109] Exhibit 78, ¶ VI.C. (Emphasis supplied).

23

Golf Manor officers received no training concerning their duties or responsibilities when responding as a cooperating Agency.[110]  In fact, the nearest that Golf Manor came to training was to provide its officers with a copy of the Mutual Aid Agreement.  Beyond that, the officers were left to figure out their responsibilities and duties among themselves through on the job training.[111]  This practice left Officer Heiland with the following understanding:

> My understanding at that time is I would be responsible for my prisoners, anybody that was in my custody.  If somebody is not my prisoner, not in my custody, then on the assistance call if somebody puts their prisoner in the back of my car, they asked to put them in the back of my car and I'm there for assistance.  It's their prisoner and it's in their custody.  So it's their responsibility.[112]

This failure to train on this most obvious and foreseeable situation is even more apparent with Golf Manor Officer Campbell:

> Q.    Had you received any training on this issue [a prisoner of another agency is placed in a Golf Manor cruiser] as far as what you were obligated to do and what you were not obligated to do?
>
> A.    I can't remember.
>
> Q.    Do you have any understanding that, regardless of whose prisoner it is, once a person is placed in your cruiser that you are responsible for that person's welfare?
>
> Mr. Weisenfelder: Objection.  Go ahead.
>
> A.    No.
>
> Q.    No?
>
> A.    No.
>
> Q.    Regardless of whose prisoner it is, if you know that a person is injured, as a Golf Manor police officer, do you believe that you have a duty to provide medical assistance to that person?

---

[110] Heiland 12/3/03 Depo., p. 97:8-12; Campbell 12/3/10 Depo., p. 43:21-23.

[111] Heiland 12/3/03 Depo., pp. 93:18 - 94:11.

[112] Heiland 12/3/03 Depo., p. 73:4-11.

Mr. Weisenfelder: Objection.  Go ahead.

A.    Not me personally.[113]

There can be no clearer example of the unconstitutional consequences of a failure to train. As explained in our companion motion, Golf Manor was not alone in this failure to train.  Its Mutual Aid Agreement partner, the City of Cincinnati, also failed to provide any training to its officers.  This resulted in each police force believing, or at least now arguing, that the other was responsible for the care of Mr. Owensby.  For example, Cincinnati Officer Brazile, who looked at Mr. Owensby handcuffed in the back seat of the Golf Manor cruiser and told the Golf Manor officers that Mr. Owensby did not appear to be breathing, did nothing else because he believed that Mr. Owensby's welfare was Golf Manor's responsibility.[114]

The fatal and all-too-foreseeable result was that none of the thirteen police officers, including Officer Heiland (a trained EMT) and two other Cincinnati police officers who had EMT training, did anything as Roger Owensby lay dying in the Golf Manor cruiser.

Municipal liability is established against Golf Manor if it acted in "deliberate indifference" to obvious consequences of its failure to train its police force in the need for medical care arising from its use of force.[115]

The utter failure to provide any guidance to its officers as to the probable and foreseeable consequences of violating the constitutional duty to provide medical attention to an injured citizen who has been subjected to the use of force—as evidenced by the confusion voiced by the

---

[113] Campbell 12/3/03 Depo., p. 39:4-21.

[114] Exhibit 47, Brazile 11/13/00 Statement; Brazile 11/6/03 Depo., pp. 59:2-7 ("I told the people who I felt was responsible for the person in that car."), 50:11 - 74:4.

[115] *City of Canton*, 489 U.S. at 388-90; *Stemler v. City of Florence*, 126 F.3d 856, 865 (6th Cir. 1997); *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999).

25

officers on the scene—constitutes deliberate indifference to that use of force and results in §

1983 liability against Golf Manor and its Police Chief.

## V.    CONCLUSION

The undisputed failure to provide medical attention to a bleeding, maced and unconscious

detained suspect is properly analyzed as "excessive force" and is a well established Fourth

Amendment constitutional injury that has existed for twenty years. It is uncontested that no Golf

Manor officer provided any medical care in the critical minutes after Mr. Owensby's arrest,

despite Mr. Owensby's obvious injured condition and despite being put on notice that Mr.

Owensby look like he was not breathing.

It is also undisputed that the Village of Golf Manor failed to train its officers concerning

their duty to provide such critical medical care.  Having signed a Mutual Aid Agreement with the

City of Cincinnati, Golf Manor knew that its officers would be involved in collaborative law

enforcement actions that would likely involve the use of force and the need to provide medical

care to injured prisoners as a result.  Nevertheless, Golf Manor never provided any training,

instruction, directives or memoranda to its officers explaining their respective duties and

responsibilities in such collaborative efforts.  The result of this failure to train was the very

foreseeable consequence of its officers failing to provide basic constitutionally required critical

medical care to Roger Owensby on November 7, 2000 as he lay handcuffed, bleeding,

unconscious and dying in the back seat of a Golf Manor cruiser.

As such, summary judgment should be granted against the Village of Golf Manor and its

officers, under § 1983, for their failure to provide medical care to Mr. Owensby.

Respectfully submitted,

/s/Paul B. Martins

Mark T. Tillar (0029898)         James B. Helmer, Jr.  (0002878)
240 Clark Road                  Paul B.  Martins (0007623)
Cincinnati, Ohio  45202       Frederick M. Morgan, Jr.  (0027687)
Telephone: (513) 761-2958     HELMER, MARTINS & MORGAN CO., LPA
                                Fourth & Walnut Centre, Suite 1900
John J. Helbling (0046727)     105 East Fourth Street
3672 Springdale Road        Cincinnati, Ohio 45202-4008
Cincinnati, Ohio 45251       Telephone:    (513) 421-2400
Telephone: (513) 923-9740    Facsimile:    (513) 421-7902

*Trial Attorneys for Plaintiff*

27

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing Plaintiff's Motion For Partial Summary Judgment Against Defendants Village of Golf Manor, Its Police Chief And Its Individual Police Officers For Their Failure To Provide Critical Medical Care, was electronically filed on February 2, 2004.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.


/s/ Paul B. Martins