Estate of Roger Owensby vs. City of Cinti.
October 17, 2003

PATRICK E. CATON

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - - -
ESTATE OF ROGER D.              :
OWENSBY JR., et al.,           :
                               :
        Plaintiffs,            :
    vs.                        :   Case No. 01-CV-769
                               :  (Judge S. A. Spiegel)
CITY OF CINCINNATI,            :
et al.,                        :
                               :
        Defendants.            :
- - - - - - - - - - - - - - -


        Videotaped deposition of PATRICK EDMUND

CATON, a defendant herein, called by the plaintiffs

for cross-examination, pursuant to the Federal Rules

of Civil Procedure, taken before me, Wendy Davies

Welsh, a Registered Diplomate Reporter and Notary

Public in and for the State of Ohio, at the offices

of Helmer, Martins & Morgan Co. LPA, 1900 Fourth &

Walnut Centre, 105 East Fourth Street, Cincinnati,

Ohio, on Friday, October 17, 2003, at  a.m.

Case 1:01-cv-00769-SAS    Document 87-11    Filed 02/02/2004    Page 2 of 6

Estate of Roger Owensby vs. City of Cinti.
October 17, 2003                                    PATRICK E. CATON

Page 2

1  APPEARANCES:

2      On behalf of the Plaintiffs:

3          Paul B. Martins, Esq.
           Don Stiens, Esq.
4          Frederick M. Morgan, Jr. Esq.
           Helmer, Martins & Morgan Co. LPA
5          Suite 1900, Fourth & Walnut Centre
           105 East Fourth Street
6          Cincinnati, Ohio  45202
           Phone:  (513) 421-2400
7
           John J. Helbling, Esq.
8          The Helbling Law Firm, L.L.C.
           3672 Springdale Road
9          Cincinnati, Ohio 45251
           Phone:  (513) 923-9740
10
       On behalf of the Defendants City of Golf Manor,
11     Stephen Tilley, Roby Heiland and Chris
       Campbell:
12
           Lynne Marie Longtin, Esq.
13         Rendigs, Fry, Kiely & Dennis
           900 Fourth & Vine Tower
14         One West Fourth Street
           Cincinnati, Ohio 45202-3688
15         Phone:  (513) 381-9200

16     On behalf of Defendants City of Cincinnati,
       Darren Sellers, Jason Hodge:
17
           Geri Hernandez Geiler, Esq.
18         Assistant City Solicitor
               and
19         Julie F. Bissinger, Esq.
           Chief Counsel
20         Department of Law
           Room 214, City Hall
21         801 Plum Street
           Cincinnati, Ohio 45202
22         Phone:  (513) 352-3346

23

24

Page 3

1  APPEARANCES (Continued):

2      On behalf of the Defendants Robert B. Jorg,
       Patrick Caton, Jason Hodge, Victor Spellen and
3      Darren Sellers:

4          Donald E. Hardin, Esq.
           Hardin, Lefton, Lazarus & Marks, LLC
5          915 Cincinnati Club Building
           30 West Garfield Place
6          Cincinnati, Ohio 45202
           Phone: (513) 721-7300
7
   Also present:
8
   Richard W. Grubb, Videograher
9
   Lisa Damstrom, Law Clerk
10 Helmer, Martins & Morgan Co., L.P.A.

11 Wendy M. Weller, Paralegal
   Buckley, King & Bluso
12
   Mr. Roger Owensby
13
   Mrs. Brenda Owensby
14
   Mr. Shawn Owensby
15
   Victor N. Spellen
16

17                  - - -

18

19

20

21

22

23

24

Page 4

1              S T I P U L A T I O N S

2      It is stipulated by and among counsel for the

3  respective parties that the deposition of PATRICK

4  EDMUND CATON, a defendant herein, called by the

5  plaintiffs for cross-examination, pursuant to the

6  Federal Rules of Civil Procedure, may be taken at

7  this time by the notary; that said deposition may be

8  reduced to writing in stenotype by the notary, whose

9  notes may then be transcribed out of the presence of

10 the witness; and that proof of the official

11 character and qualifications of the notary is

12 expressly waived.

13                  - - -

14

15

16

17

18

19

20

21

22

23

24

Page 5

1              I N D E X

2      Examination by:          Page

3      Mr. Martins . . . . . . . . 6

4      Ms. Longtin . . . . . . . 232

5      Mr. Martins. . . . . . . .238

6                  - - -

7

8          E X H I B I T S

9                                Page
   Deposition Exhibit 28 . . . . . . . . . . . . . . . . . .   22
10 Deposition Exhibit 29 . . . . . . . . . . . . . . . . . .   30
   Deposition Exhibit 30 . . . . . . . . . . . . . . . . . .   43
11 Deposition Exhibit 31 . . . . . . . . . . . . . . . . . .   65
   Deposition Exhibit 32 . . . . . . . . . . . . . . . . . .  115
12 Deposition Exhibit 33 . . . . . . . . . . . . . . . . . .  186
   Deposition Exhibit 34 . . . . . . . . . . . . . . . . . .  191
13 Deposition Exhibit 35 . . . . . . . . . . . . . . . . . .  194
   Deposition Exhibit 36 . . . . . . . . . . . . . . . . . .  207
14

15                  - - -

16

17

18

19

20

21

22

23

24

Estate of Roger Owensby vs. City of Cinti.                                    PATRICK E. CATON
October 17, 2003

---

Page 138

1  you told him, We kicked his ass, or I guess his
2  version is, We beat the shit out of him. One of
3  those two statements was made?
4     A. That's right.
5     Q. Correct? After that statement was made,
6  what happened?
7     A. I got in my car and we returned back to
8  the scene, as you see me in the videotape rolling up
9  on the scene.
10    Q. Okay. Officer Hasse also gets in his car
11 and brings his car over?
12    A. That's correct.
13    Q. What happens after that?
14    A. Officer Hodge approaches me and asks me if
15 I had any alcohol rub in the cruiser or in my gear.
16 And I said, "Why?"
17       And he said, "Because Blaine has some
18 blood on him."
19       And I said, is he hurt, or something to
20 that effect.
21       And he said, "No, I -- we're not sure
22 where the blood came from."
23       And when he asked me for the alcohol rub,
24 that -- that's consistent with a ground struggle.

---

Page 139

1  You know, we quite fre-- I had scuffs on my hands,
2  and it was used to clean hands. I -- you see me go
3  back to the trunk of my car where I normally carry
4  it, open it up and check my seat out bag, which
5  is --
6     Q. I'm sorry?
7     A. The seat out bag. It's the gear bag that
8  police officers carry with all their equipment in
9  it.
10       And I didn't have any left, and that's
11 when I guess Officer Hodge went on to try to secure
12 some from some other officer.
13       At that point I realized Sergeant Watts
14 was on scene and I approached Sergeant Watts. This
15 would be after Victor had just driven away, Officer
16 Spellen had just driven away. And he was standing
17 on the opposite side of the Golf Manor car, on the
18 driver's side of the Golf Manor car.
19       And I walked up to him and I said, "Hey,
20 Sarge, I got to tell you what happened here." And I
21 began to tell him, "We approached this" -- tell the
22 story in chronological order. And he stopped me
23 after a few seconds and said, "Start at the
24 beginning. What's this guy's name?"

---

Page 140

1     And I said, "He said his name was Roger
2  something, but I can't recall."
3     He said, "Well, let's begin there." And
4  that's when we approached the Golf Manor cruiser.
5     And he looked in the passenger -- or the
6  driver's side rear door and realized that he wasn't
7  moving, and he opened -- he opened the door and
8  started to lean in.
9     And I stopped him. I said, "Sarge, be
10 careful. He might be playing possum," indicating
11 from experience when you have a violent prisoner
12 sometimes they'll try and lure you back in the car
13 so they can hurt you.
14       And he said "No, Pat, I don't think that
15 guy's breathing." And we shined the flashlight in
16 and we realized he was actually not breathing. And
17 that's when we began the process of getting him out
18 of the car.
19    Q. This is from the driver's side?
20    A. The driver's side.
21    Q. So his head would have been toward you and
22 his feet would have been away from you?
23    A. That's correct.
24    Q. Did -- okay. What -- what happened next?

---

Page 141

1     A. That's where we began today. That's when
2  I looked up. And the first person I saw was Officer
3  Hasse, whom I -- I had known from talking to him
4  that he -- he was an EMT before he was a cop.
5       I said, "Do you have any rubber gloves?"
6       He said, "Yeah."
7       "You got an extra pair?"
8       "Yes."
9       "Glove up. Let's get this guy out of the
10 back seat of the car," and then we began the CPR
11 procedures on him.
12    Q. When you got him out of the back seat of
13 the car, did you take him out from the driver's side
14 or from the passenger's side?
15    A. From the passenger's.
16    Q. So you came around, opened the door?
17    A. Right.
18    Q. How was Mr. Owensby situated in the back
19 seat of the car?
20    A. His position had changed from when I saw
21 it last. When I came back and saw it now, he had
22 been -- he was rolled over on his back and his head
23 was pinned at like an angle between -- I want to say
24 between his shoulder and the back of the seat.

---

Estate of Roger Owensby vs. City of Cinti.
October 17, 2003

PATRICK E. CATON

Page 142

1  Q. When you left him, he was on his left
2  shoulder?
3  A. He was face down essentially, with his
4  head turned towards the front seat of the cruiser,
5  with one foot on the floor and one foot underneath
6  him.
7  And I'm -- I'm very specific about that,
8  because I truly thought all he would have to do is
9  put his left foot down on the floor and rock up into
10  a seated position. That's why I exited the car as
11  quickly as I could.
12  Q. So he -- excuse me. He was -- when you
13  first put him in the car, he was -- both of his
14  shoulders were down, he was face down with his face
15  to the right?
16  A. Essentially like this (demonstrating) with
17  his -- he would have been looking over his right
18  shoulder towards the front -- out the front of the
19  car.
20  Q. All right. And when you opened the door
21  with Sergeant Watts, how was he positioned?
22  A. He was rolled over on his back with his
23  head -- would have been on -- like his ear against
24  his right shoulder, with his head pressed into the

Page 143

1  back of the seat.
2  Q. So his -- was his right shoulder against
3  the back seat?
4  A. Yes.
5  Q. And his head was pressed toward the right?
6  A. It was off to the right, with the --
7  which -- the top of his head against the back of the
8  seat.
9  Q. Was the rest of his body -- was he laying
10  on his back at that time or was his body still --
11  A. I would say his shoulders --
12  Q. -- kind of twisted around?
13  A. It -- it -- it -- it was kind of twisted
14  around. I would say his shoulders were now flat
15  against the back of the seat, with his head twisted
16  and his -- and his -- his hands were underneath him.
17  Q. I think you said when you placed him in
18  the car, his right foot was on the floor?
19  A. Correct.
20  Q. Was his right foot still on the floor, if
21  you -- if you recall?
22  A. I don't -- I don't know.
23  Q. And then at that point you began CPR with
24  Officer Hasse, correct?

Page 144

1  A. That's correct.
2  Q. How much time elapsed before the fire
3  rescue unit showed up?
4  A. I don't know.
5  Q. When the fire rescue unit shows up, they
6  take over performing CPR, correct?
7  A. Yes.
8  Q. Were you the person that took off the
9  handcuffs?
10  A. Yes, I was.
11  Q. After you removed the handcuffs on Mr.
12  Owensby, did you have any other contact with Mr.
13  Owensby?
14  A. No, I did not.
15  Q. Where did you go after removing the
16  handcuffs?
17  A. Well, I -- I stayed in the immediate
18  vicinity, at that immediate -- immediate vicinity,
19  right around -- like I said, we witne-- I did
20  witness the material come out of his mouth.
21  And the supervisors, who took charge of
22  the scene by that point, were basically realizing
23  that this was becoming a critical incident. And the
24  procedure with regard to critical incidents is to

Page 145

1  separate all the officers and witnesses concerned.
2  So I was directed to -- basically Sarge
3  said, "Go ahead and climb in that cruiser. Just
4  wait until -- don't talk to anybody. Just wait
5  until we come -- come get you." And that cruiser,
6  it turned out to be Sergeant Julie Shearer's.
7  Q. Do you know how far the cruiser was from
8  where Mr. Owensby was?
9  A. The one that I was in?
10  Q. Yes.
11  A. As I recall, her cruiser was parked along
12  the side here of the store -- the Sunoco lot, and
13  Mr. Owensby was -- was somewhere in this vicinity
14  here where the fire engine was -- where the crew was
15  working on him (indicating).
16  Q. Draw a rectangle for what you -- where you
17  recall Sergeant Shearer's car being, on, I guess --
18  What exhibit is that, 32?
19  Q. 31.
20  Q. 31. Okay. We'll just make another copy
21  of it.
22  And put, in the rectangle, SH for Shearer.
23  A. (Witness complies.)
24  Q. And then if you would draw a circle with

Case 1:01-cv-00769-SAS     Document 87-11     Filed 02/02/2004     Page 5 of 6
Estate of Roger Owensby vs. City of Cinti.
October 17, 2003
PATRICK E. CATON

**Page 214**

1    A. I -- I think he said something along the
2 lines of it's this -- the other guy's blood, or
3 something like that.
4    Q. And -- and I wasn't going to ask you about
5 that, but --
6    A. Okay.
7    Q. -- but -- my question is, when you're
8 asked about the alcohol gel or the alcohol or the
9 rubbing alcohol, where Officer Hodge is looking for
10 this, did he tell you that it was to remove blood?
11    A. No. The -- the -- the gel is used to
12 neutralize any germs, any pathenogens (sic) that can
13 be transferred, blood-borne pathogens that could be
14 transferred from it. It won't remove the stain of
15 blood from clothing or anything along that lines. I
16 think the concern was Blaine had been exposed to
17 blood from somebody else, and he wanted to kill
18 whatever germs that might be in that blood.
19    Q. It will remove blood from the skin,
20 though?
21    A. As water would, yeah, it would -- or I --
22 I guess it would.
23    Q. With respect to Exhibit 36, I take it you
24 remember talking to John Plahovinsak?

**Page 215**

1    A. For a relatively short period of time.
2    Q. All right. On or about March 22nd of
3 2002?
4    A. That's correct. I believe the meeting
5 lasted for about 45 minutes.
6    Q. I'm sorry. I didn't --
7    A. I believe the meeting lasted for about 45
8 minutes.
9    Q. 45 minutes. Would you agree that
10 throughout the events of November 7, 2002 you and
11 the other officers involved in the arrest of Roger
12 Owensby were acting in their capacities as
13 Cincinnati police officers?
14    A. I would agree with that.
15    Q. Would you also agree that there wasn't a
16 warrant for Mr. Owensby's arrest? Correct?
17    A. Correct.
18    Q. And that the arrest was based solely upon
19 the statement of Officer Hunter?
20    A. Correct.
21    Q. To the best of your knowledge, it was not
22 based upon any informant's tip or informant's
23 information?
24    A. You asked Officer Jorg that same question

**Page 216**

1 the other day and he said no. Are you referring
2 to -- I -- I want to ask you this question: Are you
3 referring to the gentleman in the back seat of
4 Officer Hasse's car or are you referring to some --
5    Q. Or any -- or any informant.
6    A. No, there -- no, it was not based on --
7    Q. Any informant?
8    A. -- any informant's information.
9    Q. And as to the person in the back seat of
10 the car, of Officer Sellers and Hasse's car, we
11 talked about what you said to him and what he said
12 to you?
13    A. That's correct.
14    Q. Was the arrest, the decision to arrest
15 based on anything that he said?
16    A. No.
17    Q. So he didn't -- his infor-- whatever
18 information he provided to you played no part in the
19 decision to arrest?
20    A. Correct.
21    Q. You agree that every American citizen has
22 a right, when being arrested, to be free from the
23 use of excessive force?
24    A. I would agree with that.

**Page 217**

1    Q. Do you agree also that if -- if an officer
2 sees another officer using excessive force, that
3 officer has a -- an affirmative duty to step in and
4 stop the officer?
5    A. Absolutely.
6    Q. Have you ever done that?
7    A. Have I ever stepped in?
8    Q. Let me -- let me break it down. Have you
9 ever seen another officer use excessive force?
10    MR. HARDIN: Objection.
11    You may answer.
12    A. I've never seen an officer use excessive
13 force, but I have seen officers lose their temper in
14 the field. And removing them from the situation
15 kept that from happening.
16    Q. Before there was any use of excessive
17 force?
18    A. That's correct.
19    Q. In your opinion, did Officer Hunter lose
20 his temper when he got into the face of Mr. Owensby?
21    A. You're going to have to ask Officer Hunter
22 that question. I don't know what was going through
23 his mind.
24    Q. No, I'm asking your perception.

244

17:00:39  1          MR. HARDIN:  Caton.

17:00:39  2          VIDEOGRAPHER:  Sorry.  Mr. Caton, you have

17:00:39  3    a right to review this videotape deposition

17:00:39  4    prior to its being shown to a court or jury.

17:00:39  5    Will you waive that right?

17:00:39  6          THE WITNESS:  No.

17:00:40  7          VIDEOGRAPHER:  We're off the record.  The

17:00:42  8    time showing is 5:04 p.m.

17:00:42  9          MR. MARTINS:  I take it you also want

17:00:49  10   signature on the deposition?

17:00:51  11         MR. HARDIN:  Yes.  Yes.

17:00:52  12
17:00:52
17:00:52  13
17:00:52
17:00:52  14   _____
17:00:52       PATRICK EDMUND CATON
17:00:52  15
17:00:52
17:00:52  16                    -  -  -
17:00:52
17:00:52  17       (Deposition concluded.)
17:00:52
          18
                                  -  -  -
          19

          20

          21

          22

          23

          24