Case 1:01-cv-00769-SAS   Document 87-12   Filed 02/02/2004   Page 1 of 6

Estate of R. Owensby, Jr. vs. City of Cinti.
December 15, 2003                                    CRAIG R. COBURN

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - - - -

ESTATE OF ROGER D.               :
OWENSBY JR., et al.,             :
                                 :
          Plaintiffs,            :
    vs.                          :  Case No. 01-CV-769
                                 :  (Judge S. A. Spiegel)
CITY OF CINCINNATI,              :
et al.,                          :
                                 :
          Defendants.            :

- - - - - - - - - - - - - - - -


        Deposition of CRAIG RICHARD COBURN, a

witness herein, called by the plaintiffs for

cross-examination, pursuant to the Federal Rules of

Civil Procedure, taken before me, Wendy Davies

Welsh, a Registered Diplomate Reporter and Notary

Public in and for the State of Ohio, at the offices

of Helmer, Martins & Morgan Co. LPA, 1900 Fourth &

Walnut Centre, 105 East Fourth Street, Cincinnati,

Ohio, on Monday, December 15, 2003, at 10:01 a.m.

Case 1:01-cv-00769-SAS   Document 87-12   Filed 02/02/2004   Page 2 of 6
Estate of R. Owensby, Jr. vs. City of Cinti.
December 15, 2003
CRAIG R. COBURN

Page 2

```
 1  APPEARANCES:
 2      On behalf of the Plaintiffs:
 3          Paul B. Martins, Esq.
            Helmer, Martins & Morgan Co. LPA
 4          Suite 1900, Fourth & Walnut Centre
            105 East Fourth Street
 5          Cincinnati, Ohio  45202
            Phone:  (513) 421-2400
 6
            John J. Helbling, Esq.
 7          The Helbling Law Firm, L.L.C.
            3672 Springdale Road
 8          Cincinnati, Ohio  45251
            Phone:  (513) 923-9740
 9
    On behalf of the Defendants City of Golf Manor,
10  Stephen Tilley, Roby Heiland and Chris
    Campbell:
11
            Lynne Marie Longtin, Esq.
12          Rendigs, Fry, Kiely & Dennis
            900 Fourth & Vine Tower
13          One West Fourth Street
            Cincinnati, Ohio  45202-3688
14          Phone:  (513) 381-9200

15  On behalf of Defendants City of Cincinnati,
    Darren Sellers, Jason Hodge:
16

17          Geri Hernandez Geiler, Esq.
            Assistant City Solicitor
18          Department of Law
            Room 214, City Hall
19          801 Plum Street
            Cincinnati, Ohio  45202
20          Phone:  (513) 352-3346
```

Page 3

```
 1  APPEARANCES (Continued):
 2  On behalf of the Defendants Robert B. Jorg,
    Patrick Caton, Jason Hodge, Victor Spellen and
 3  Darren Sellers:
 4          Donald E. Hardin, Esq.
            Hardin, Lefton, Lazarus & Marks, LLC
 5          915 Cincinnati Club Building
            30 Garfield Place
 6          Cincinnati, Ohio  45202
            Phone: (513) 721-7300
 7
 8              - - -
```

Page 4

```
 1              S T I P U L A T I O N S
 2      It is stipulated by and among counsel for the
 3  respective parties that the deposition of CRAIG
 4  RICHARD COBURN, a witness herein, called by the
 5  plaintiff for cross-examination, pursuant to the
 6  Federal Rules of Civil Procedure, may be taken at
 7  this time by the notary; that said deposition may be
 8  reduced to writing in stenotype by the notary, whose
 9  notes may then be transcribed out of the presence of
10  the witness; and that proof of the official
11  character and qualifications of the notary is
12  expressly waived.
13              - - -
```

Page 5

```
 1              I N D E X
 2      Examination by:            Page
 3      Mr. Martins . . . . . . . .   6
 4              - - -

 6              E X H I B I T S
 7                                  Page
 9  Plaintiff's Exhibits 98 & 99 . . . . . .   8
    Plaintiff's Exhibit 100 . . . . . . . .  48
10              - - -
```

Case 1:01-cv-00769-SAS   Document 87-12   Filed 02/02/2004   Page 3 of 6

Estate of R.Owensby, Jr. vs. City of Cinti.
December 15, 2003
CRAIG R. COBURN

Page 14

1  20 weeks.
2  Q. I want to ask you, some of the police
3  officers that were on the scene on November 7th when
4  you got there, I want to run through some of the
5  names with you and ask you whether or not you know
6  these officers.
7  A. Okay.
8  Q. First one is officer Robert Blaine Jorg?
9  A. No, sir, I do not know him.
10 Q. Patrick Caton?
11 A. No, sir, I do not know him.
12 Q. David Hunter?
13 A. No, sir.
14 Q. Jason Hodge?
15 A. No, sir.
16 Q. David Sellers?
17 A. No, sir.
18 Q. Okay. On November 7th it's my
19 understanding that at approximately 8:00 you arrived
20 at the Sunoco station at the corner of Seymour
21 Avenue and Langdon Farm Road; is that right?
22 A. Yeah. According to the run report here
23 our arrival was eight minutes after 8:00.
24 Q. 2008 is how it's indicated?

Page 15

1  A. Yes, sir.
2  Q. Do you recall how you received
3  notification to go to that scene?
4  A. Yes, sir. From what I recall in reading
5  this, I remember it was the election night. And I
6  don't know what we were doing around the firehouse,
7  but one of the -- either I heard it or one of the
8  other firefighters had heard the call come in on the
9  radio that one of the engine companies was
10 requesting a rescue unit up on Langdon Farm.
11     So we knew that that was our first due
12 area as a rescue unit. And then one -- probably 30
13 seconds later our Zetron went off, which is the
14 notification system in the fire station to dispatch
15 us on a run.
16 Q. Where is your fire station in relation to
17 Langdon Farm and Seymour?
18 A. Rescue 46 is located at the corner of Erie
19 and Michigan, in Hyde Park.
20 Q. Is there an engine company associated with
21 this location at Erie and Michigan, in Hyde Park?
22 A. Yes, sir, Engine Company 46.
23 Q. So Rescue 46 and Engine Company 46?
24 A. Yes, sir.

Page 16

1  Q. Based on your recollection, from the time
2  that you received notice of a need to go to this
3  location, how long did it take to get there?
4  A. According to the run report, which is
5  taken off of our computer system with the
6  dispatcher, it was approximately eight minutes.
7  Q. By run report, you're referring to
8  Exhibit 99, right?
9  A. Yes, sir.
10 Q. Let's take a look at this. At the top
11 block it says 11-7-00.
12 A. Yes, sir.
13 Q. Unit shift: 3. And then across from that
14 it says Company #, and there's 8/2, and then R46. I
15 think that would be Rescue 46. What does the 8/2
16 mean?
17 A. That block is where the first responding
18 engine company puts their number. There were two
19 engine companies on the scene that evening. It was
20 Engine 8 and Engine 2.
21 Q. Did they also come from the
22 Erie/Michigan/Hyde Park --
23 A. No, sir. Engine Company 8 is located at
24 Montgomery and Langdon Farm Roads, and Engine 2 is

Page 17

1  located at Seymour and Vine.
2  Q. Then under that, the second line begins,
3  Incident No., and there's a number 179 there. Is
4  that just, to your knowledge, issued on a sequence?
5  A. Yes, sir. Every night at midnight the
6  runs start over again at zero. So that was the
7  179th run for that day starting between midnight --
8  starting at midnight on the 7th.
9  Q. This would be for citywide for the city of
10 Cincinnati?
11 A. Yes, sir.
12 Q. Then there's an F -- it looks like an FDZ?
13 A. Yes, sir.
14 Q. What is that?
15 A. That's referred to as the fire demand
16 zone. I'm not exactly sure of it's purpose, but
17 what I've been told is that it tracks the runs in
18 certain areas. Each street, area of the city, is
19 issued a fire demand zone. And that comes up -- we
20 obtain that from the dispatch, the computer-aided
21 dispatch.
22 Q. Next to that is a block called, it looks
23 like Call Received?
24 A. Yes, sir.

Case 1:01-cv-00769-SAS   Document 87-12   Filed 02/02/2004   Page 4 of 6

Estate of R. Owensby, Jr. vs. City of Cinti.
December 15, 2003
CRAIG R. COBURN

Page 18

1  Q. There's 1956 hours and then 2000 hours.
2  Do you know what that means?
3  A. Yes, sir. The first engine company was
4  dispatched at 1956 and Rescue 46 was dispatched at
5  2000 hours.
6  Q. So I read from the top above that, Engine
7  8 and 2 were dispatched at 1956?
8  A. Actually, I believe it was just Engine
9  Company 8 that was dispatched. Engine Company 2
10 apparently heard the run. And a lot of times, not
11 just in this case, but on a daily basis when it
12 sounds like people need help or they need an extra
13 set of hands, companies take it upon themselves to
14 kind of mosey or go on over that way and assist
15 whoever needs help.
16 Q. So Rescue 46 received the call at 8:00,
17 2000 hours, and then On Scene, Engine 2 arrives at
18 2000 hours and Rescue 46 arrives at 2008. Am I
19 reading that correctly?
20 A. Yes, sir.
21 Q. When you arrived on the scene in Rescue
22 46, can you describe for me what you saw.
23 A. I could probably review this a little bit,
24 but --

Page 19

1  Q. For the record, you're looking at
2  Exhibit 98?
3  A. Yes, sir.
4  Q. All right.
5  A. Yeah. From what I recall there are two
6  engine companies on the scene, which is Engine
7  Company 8 and Engine Company 2. I believe we parked
8  our ambulance -- I get the streets mixed up up
9  there. We didn't pull into the lot. We just parked
10 out onto the street. And then we took the cot out
11 of the back of our ambulance and we walked up to the
12 scene. And there was a paramedic that was
13 intubating the patient.
14 Q. Who was that paramedic?
15 A. It says here that it was Ron Killion.
16 Q. Do you know Mr. Killion?
17 A. Yes.
18 Q. Did anyone attempt to fill you in on the
19 status of the patient?
20 A. I don't really recall. Normally we try to
21 find out what exactly happened or the events leading
22 up to why a person went into cardiac arrest. On any
23 run we try to figure out what happened prior to that
24 just so we know what our course of action would be,

Page 20

1  and also for the hospital. The doctors there
2  usually like to know what happened.
3  Q. Did someone tell you that Mr. Owensby was
4  in cardiac arrest?
5  A. Well, when we walked up he was being
6  intubated and some of the firefighters were doing
7  CPR, so that's definitely an indication that
8  somebody's in cardiac arrest.
9  Q. Could you tell when you walked up whether
10 or not he was handcuffed?
11 A. No, sir. I do not recall. I don't know
12 if it's in here or not.
13 Q. So what happens next?
14 A. Basically, from reading this and what I
15 can recall, we kind of stood back, and there were
16 already a couple paramedics on the scene, and they
17 were on the engine companies and they are providing
18 the ALS care. From what I recall, my partner and I
19 just kind of assisted them, getting them the drugs
20 out of the drug box and assisting them with that.
21 And then we moved the patient onto the cot and
22 transported to the hospital.
23 Q. Who rode in the back of the rescue unit
24 with the patient?

Page 21

1  A. It was myself and paramedic Greg Presuteo.
2  Q. Anyone else?
3  A. No, sir.
4  Q. When you got on the scene -- well, let me
5  ask you this: I take it you have experience with
6  administering to people in cardiac arrest before
7  this time?
8  A. Yes, sir.
9  Q. Based on your training and your
10 experience, is it your understanding that if someone
11 goes into cardiac arrest that providing prompt
12 medical assistance, whether it be CPR or other
13 medical assistance, is critical?
14 A. Yes, sir.
15 Q. That time is of the essence?
16 A. Yes, sir.
17 Q. In looking at Exhibit 99, you have
18 information on here describing the treatment given
19 for the patient. And you also have information at
20 the top of the page concerning the background
21 information, that it was Roger Owensby Junior, his
22 age, his address, and the like. Do you see that?
23 A. Yes, sir.
24 Q. Where did you get this?

Page 54

1 working on your run report?
2  A. Yes, sir.
3  Q. Which is Exhibit 99?
4  A. Yes, sir.
5  Q. Is that when you were copying over what
6 was in the run report, the original run report,
7 because it had blood on it?
8  A. Yes, sir. This portion, my narrative,
9 would not have been written until we were at the
10 hospital. So the only part that was copied was
11 probably the top portion there.
12  Q. As I understand it, as far as the
13 background information on Mr. Owensby, you don't
14 know how that was obtained?
15  A. No, sir, I don't.
16  Q. In the second block, second set of blocks,
17 it says Location Of Call: 2098 Seymour. Nature of
18 Call: Injured person. And then Chief Complaint:
19 Cardiac arrest. Did you fill that in? I mean,
20 originally?
21  A. No, sir.
22  Q. Do you know how it was determined that the
23 chief complaint was cardiac arrest?
24  A. Only by assumption would be that when

Page 55

1 Engine 8 arrived on the scene the person was in
2 cardiac arrest.
3  Q. Well the top two blocks filled out by
4 Engine 8?
5  A. I do not know. I would assume, but I
6 don't know.
7  Q. Then there's vital signs. Under Vital
8 Signs it says 1st Resp, and then 1st Set. What does
9 that mean?
10  A. That means the first responder set. Most
11 of the time they are able to obtain a set of vital
12 signs before a transport unit arrives on the scene.
13  Q. So it's vital signs from the first
14 responder, and then the next line is a transport
15 unit, that would be yours?
16  A. Yes, sir.
17  Q. Second set?
18  A. Yes, sir.
19  Q. The time was 10 minutes after eight?
20  A. Yes, sir.
21  Q. Does that mean that at 10 minutes after
22 eight Mr. Owensby's body was on the board and in
23 Rescue 46?
24  A. I cannot -- I don't recall exactly what

Page 56

1 the time frame was, but usually, yes, once we move
2 them to -- usually, once we move them from wherever
3 they're at to the ambulance, we'll obtain another
4 set of vital signs and record it then.
5  Q. So the practice is that second set is when
6 the person is actually in the ambulance?
7  A. Normally, sir, yes, sir.
8  Q. Is there any reason to believe that this
9 was done any differently on this night?
10  A. No, sir.
11  Q. Then you have 3rd Set, and the time, I
12 can't quite make out. What is that?
13  A. It looks like it would be 2030, but,
14 again, I --
15  Q. At 8:30, when was the vital signs -- or
16 where were you and Mr. Owensby at that time?
17  A. Sir, I do not recall. However, it is my
18 practice that I try to obtain the third set of
19 vitals if there's an extended transport time of
20 greater than 10 minutes after the first set. Or
21 usually right upon our arrival at the hospital I
22 always obtain another set to see if there was any
23 changes in the treatment that I gave somebody.
24  Q. Based on your practice and custom, when

Page 57

1 would you say your third set of vital signs were
2 taken?
3  A. I would say probably close to -- either at
4 or close to University Hospital.
5  Q. 1st Responder Primary Assessment, and it
6 says: Patient under CPR upon arrival by police, and
7 then I can't make out the rest of that?
8  A. Looks like, "E8 took over CPR."
9  Q. By E8, you mean Engine 8?
10  A. Yes, sir.
11  Q. On the vital signs, we have blood
12 pressure, pulse, and respiration?
13  A. Yes, sir.
14  Q. All of those were negative?
15  A. Yes, sir. Zero.
16  MR. MARTINS: Thank you, sir. I have no
17 further questions.
18
19  CRAIG RICHARD COBURN
20  ---
21
22  (Deposition concluded at 11:20 a.m.)
23  ---
24

Case 1:01-cv-00769-SAS    Document 87-12    Filed 02/02/2004    Page 6 of 6

Estate of R. Owensby, Jr. vs. City of Cinti.
December 15, 2003
CRAIG R. COBURN

**Page 50**

1   A. No, sir.
2   Q. Do you know who Dr. Schultz is, Daniel
3 Schultz, deputy coroner?
4   A. No, sir.
5   Q. So I take it you wouldn't know if he
6 arrived on the scene while you were there?
7   A. No, I would not know that.
8   Q. I take it you do not recall whether
9 anyone, other than this police officer identified on
10 page 3 of Exhibit 98, were ever with the body of Mr.
11 Owensby, obviously, other than you?
12   A. Yeah. I don't know.
13   Q. Have you performed CPR on individuals?
14   A. Yes, sir.
15   Q. Based on your experience and training on
16 performing CPR, should the individual be laying flat
17 on the ground?
18   A. Yes, sir.
19   Q. That's so that you have an area to push on
20 the chest?
21   A. Yes, sir. Specifically, the upper half of
22 the chest should be on a flat surface.
23       MR. MARTINS: Let's take a short break.
24       (Recess taken: 11:07 a.m. - 11:11 a.m.)

**Page 51**

1 BY MR. MARTINS:
2   Q. Do you happen to know any of the personnel
3 that were on the scene at Seymour Avenue and Langdon
4 Farm from Engine 8?
5   A. From what I recall, Greg Phelia was there.
6 I know who the guys on Engine 8 were, but I can't
7 say exactly who -- I just don't remember exactly who
8 was there that night.
9   Q. Mr. Phelia was doing what?
10   A. When we arrived he was attempting to start
11 the IV.
12   Q. Other than Mr. Phelia, I take it you can't
13 recall the identities of any of the Engine 8
14 personnel?
15   A. No, sir, not offhand.
16   Q. What about Engine 2, can you identify any
17 Engine 2 personnel?
18   A. Yeah. Engine 2, it was Ron Killion, and I
19 remember Leah Weddle. I don't remember who the
20 other two personnel were that were there.
21   Q. How do you spell that?
22   A. Leah is L-E-A-H. And her last name is
23 W-E-D-D-L-E.
24   Q. Is Leah Weddle a paramedic?

**Page 52**

1   A. No, sir, she's a firefighter/EMT.
2   Q. Do you know whether or not Ms. Weddle was
3 performing any medical services at the time?
4   A. I don't recall exactly when she was doing
5 when we pulled up. All I know is, from what I
6 remember, she's the one that drove us to the
7 hospital in the ambulance.
8   Q. Say that again?
9   A. She drove the ambulance to the hospital.
10   Q. Did you go to the hospital in your rescue
11 unit?
12   A. Yes.
13   Q. So she drove?
14   A. Yes. So my partner and I could ride in
15 back.
16   Q. Do you know what she did once you got to
17 the hospital?
18   A. I do not know.
19   Q. Do you know how she got back to Engine 2?
20   A. Yes, sir. We took her back to Engine 2.
21   Q. So when you eventually came out of the
22 resuscitation room you hooked up with your partner
23 and Ms. Weddle and you drove back, or one of you
24 drove back?

**Page 53**

1   A. Yeah. I don't remember who drove back.
2   Q. Do you have a recollection of when you got
3 back to your home base?
4   A. I don't recall. I don't remember what
5 time it was.
6   Q. Do you recall if it was before midnight or
7 after midnight?
8   A. I'm -- I would say, yeah, it would have
9 been before midnight.
10   Q. Based on your recollection, I know you
11 can't give me the exact time that you left UC
12 hospital, but can you give me an idea of how much
13 time you spent at UC hospital? Are we talking a
14 half-hour, are we talking an hour?
15   A. I would say probably at least a half-hour.
16 Because I remember reading, it said that they had
17 worked on him for 20 to 25 minutes. And I was there
18 until after they pronounced him. So during that
19 time, and give or take another five or ten minutes.
20   Q. Would it be fair to say somewhere between
21 a half-hour and an hour?
22   A. Yes, sir.
23   Q. As I understand your statement, while you
24 are in the resuscitation room, is that when you're