Case 1:01-cv-00769-SAS  Document 87-13  Filed 02/02/2004  Page 1 of 20

Owensby, et al. vs. City of Cincinnati
December 3, 2003
ROBERT B. HEILAND, JR.

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - - -

ESTATE OF ROGER D. :
OWENSBY JR., et al., :
  :
  Plaintiffs, :
 vs. : Case No. 01-CV-769
  : (Judge S. A. Spiegel)
CITY OF CINCINNATI, :
et al., :
  :
  Defendants. :

- - - - - - - - - - - - - - -


    Deposition of ROBERT B. HEILAND JR.,

defendant herein, called by the plaintiffs for

cross-examination, pursuant to the Federal Rules of

Civil Procedure, taken before me, Wendy Davies

Welsh, a Registered Diplomate Reporter and Notary

Public in and for the State of Ohio, at the offices

of Helmer, Martins & Morgan Co. LPA, 1900 Fourth &

Walnut Centre, 105 East Fourth Street, Cincinnati,

Ohio, on Wednesday, December 3, 2003, at 10:10 AM.

Case 1:01-cv-00769-SAS   Document 87-13   Filed 02/02/2004   Page 2 of 20

Owensby, et al. vs. City of Cincinnati
December 3, 2003
ROBERT B. HEILAND, JR.

Page 2

1  APPEARANCES:

2     On behalf of the Plaintiffs:

3        Paul B. Martins, Esq.
         Don Stiens, Esq.
4        Frederick M. Morgan Jr., Esq.
         Helmer, Martins & Morgan Co. LPA
5        Suite 1900, Fourth & Walnut Centre
         105 East Fourth Street
6        Cincinnati, Ohio 45202
         Phone: (513) 421-2400
7
         John J. Helbling, Esq.
8        The Helbling Law Firm, L.L.C.
         3672 Springdale Road
9        Cincinnati, Ohio 45251
         Phone: (513) 923-9740
10
      On behalf of the Defendants City of Golf Manor,
11    Stephen Tilley, Roby Heiland and Chris
      Campbell:
12
         Wilson G. Weisenfelder, Jr., Esq.
13       Rendigs, Fry, Kiely & Dennis
         900 Fourth & Vine Tower
14       One West Fourth Street
         Cincinnati, Ohio 45202-3688
15       Phone: (513) 381-9200

16    On behalf of the Defendant City of Golf Manor:

17       Terrence M. Donnellon, Esq.
         Donnellon, Donnellon & Miller
18       9079 Montgomery Road
         Cincinnati, Ohio 45242
19       Phone: (513) 891-7087

Page 3

1  On behalf of Defendants City of Cincinnati,
   Darren Sellers, Jason Hodge:
2
3        Geri Hernandez Geiler, Esq.
         Assistant City Solicitor
4        Department of Law
         Room 214, City Hall
5        801 Plum Street
         Cincinnati, Ohio 45202
6        Phone: (513) 352-3346

7  On behalf of the Defendants Robert B. Jorg,
   Patrick Caton, Jason Hodge, Victor Spellen and
8  Darren Sellers:

9        Donald E. Hardin, Esq.
         Hardin, Lefton, Lazarus & Marks, LLC
10       915 Cincinnati Club Building
         30 Garfield Place
11       Cincinnati, Ohio 45202
         Phone: (513) 721-7300
12
   Also present:
13
   Chief Stephen Tilley
14
   Lisa Damstrom, Law Clerk
15 Helmer, Martins & Morgan Co., L.P.A.

16              - - -

Page 4

1              S T I P U L A T I O N S

2     It is stipulated by and among counsel for the

3  respective parties that the deposition of ROBERT B.

4  HEILAND JR., defendant herein, called by the

5  plaintiffs for cross-examination, pursuant to the

6  Federal Rules of Civil Procedure, may be taken at

7  this time by the notary; that said deposition may be

8  reduced to writing in stenotype by the notary, whose

9  notes may then be transcribed out of the presence of

10 the witness; and that proof of the official

11 character and qualifications of the notary is

12 expressly waived.

                    - - -

Page 5

1                    I N D E X

2       Examination by:              Page

3       Mr. Martins . . . . . . . .    6

4       Mr. Hardin  . . . . . . . .  104

5       Mr. Martins . . . . . . . .  132

6       Mr. Hardin  . . . . . . . .  139

                    - - -

                  E X H I B I T S

                                      Page

11 Plaintiff's Exhibits 69 & 70 . . . . . . . . . .   12
   Plaintiff's Exhibit 71 . . . . . . . . . . . . .   29
12 Plaintiff's Exhibit 72 . . . . . . . . . . . . .   50
   Plaintiff's Exhibit 73 . . . . . . . . . . . . .   51
13 Plaintiff's Exhibit 74 . . . . . . . . . . . . .   56
   Plaintiff's Exhibit 75 . . . . . . . . . . . . .   66
14 Plaintiff's Exhibit 76 . . . . . . . . . . . . .   68
   Plaintiff's Exhibit 77 . . . . . . . . . . . . .   75
15 Plaintiff's Exhibit 77A  . . . . . . . . . . . .   77
   Plaintiff's Exhibit 78 . . . . . . . . . . . . .   92
16 Plaintiff's Exhibits 79 & 80 . . . . . . . . . .  137

                    - - -

Owensby, et al. vs. City of Cincinnati
December 3, 2003
ROBERT B. HEILAND, JR.
Case 1:01-cv-00769-SAS    Document 87-13    Filed 02/02/2004    Page 3 of 20

Page 14

1  a guide for some other employment history. If you
2  go to the second page, midway through we have the
3  Hamilton County juvenile court officer, and then
4  from, am I correct in reading this, from '94 through
5  '97 you worked at Good Samaritan Hospital as a
6  health tech?
7      A. That's correct.
8      Q. What are the duties of a health tech,
9  technician?
10         MR. WEISENFELDER: Then or now?
11     Q. At this time. What were your duties as a
12  health technician?
13     A. At that time, the best way to explain it,
14  I think, is the hospital did away with nursing
15  assistants and LPNs and they kind of combined the
16  two jobs. So my duties would be to assist the
17  nurse, an RN: Vital signs, bed pans, just basically
18  being a nursing assistant.
19     Q. Did you have to have any particular
20  qualifications in order to be a health technician?
21     A. Good Samaritan Hospital trains you. I
22  think it was a six to eight week program that they
23  trained you in-house.
24     Q. Before that, from '93 to '94, if I'm

Page 15

1  reading this correctly, you worked for Eldercare as
2  an EMT; is that right?
3      A. That's correct.
4      Q. Prior to that, from '91 to '93, College of
5  Mt. St. Joe, retail coordinator?
6      A. Yes.
7      Q. What is a retail coordinator?
8      A. Basically, worked in shipping/receiving in
9  the college bookstore.
10     Q. If you turn the page again, on the third
11  page there is a question concerning military
12  service. And I see that you at some point in time
13  were a combat medic in the United States Army
14  Reserve. Can you explain to me when you were a
15  combat medic?
16     A. Yes. I attended Basic Training '91, '92.
17  After that went to Fort Sam Houston for combat medic
18  training. Subsequently was transferred to the
19  Inactive Reserve for the remaining of my service.
20     Q. Fort Sam Houston is a major medical center
21  in the Army, isn't it?
22     A. Yes.
23     Q. Then in the Inactive Reserve were you
24  assigned to a unit?

Page 16

1      A. Yes. It was a unit out of St. Louis.
2      Q. Without going into any detail, what kind
3  of training did you receive as a combat medic?
4      A. Basic first aid for combat type injuries:
5  Give shots, IVs, assessments.
6      Q. Would that include CPR?
7      A. Yes.
8      Q. Do these two documents, 69 and 70, fairly
9  reflect your employment history?
10     A. Yes.
11     Q. Are EMTs licensed? Is there a
12  qualification process that they go through?
13     A. Yes.
14     Q. Certification?
15     A. At the time they had a national
16  certification and a state certification. Some
17  states would adopt, if you were nationally
18  registered, they would adopt you.
19     Q. I gather that when you worked for
20  Eldercare you were a certified EMT?
21     A. Yes.
22     Q. When you worked for Good Sam were you a
23  certified EMT?
24     A. I'm not sure if my certification -- how

Page 17

1  long it carried on.
2      Q. In 2000 were you a certified EMT?
3      A. No.
4      Q. But you had the EMT experience and the
5  knowledge?
6      A. Yes.
7      Q. Had you been asked, do you feel that you
8  would have been qualified to provide CPR to Mr.
9  Owensby on the night of November 7, 2000?
10        MR. WEISENFELDER: Objection.
11        Go ahead. Go ahead.
12        THE WITNESS: I'm sorry?
13        MR. MARTINS: Counsel will make objections
14     from time to time, but unless he instructs you
15     not to answer, you still have to answer the
16     question.
17        THE WITNESS: Okay.
18        MR. MARTINS: So he just made an objection
19     and he told you to go ahead and answer.
20     A. Okay. What was the question? I was
21  confused.
22     Q. Had you been asked, do you feel that you
23  would have been qualified to provide CPR to Mr.
24  Owensby on the night of November 7, 2000?

Case 1:01-cv-00769-SAS   Document 87-13   Filed 02/02/2004   Page 4 of 20
Owensby, et al. vs. City of Cincinnati
December 3, 2003
ROBERT B. HEILAND, JR.

Page 18

1    MR. WEISENFELDER: Objection.
2         Go ahead.
3    A. Was I qualified to perform CPR? Did I
4 feel I was qualified? Yes, had I been asked.
5    Q. Have you ever provided, I'm going to use
6 the term CPR, but I'm looking at in my mind
7 resuscitation of somebody who has drowned?
8    A. Somebody that has drowned?
9    Q. Yes. You often hear of kids falling in a
10 pool or people --
11   A. Have I actually done CPR --
12   Q. Performed CPR.
13   A. -- on somebody that's drowned? No.
14   Q. Have you performed CPR on somebody who was
15 unconscious?
16   A. Yes.
17   Q. Were you successful in resuscitating the
18 individual?
19   A. No.
20   Q. Had there been occasions where you were
21 successful?
22   A. No. That was the only one time.
23   Q. Oh, it was only once?
24   A. (Nodding head.)

Page 19

1    Q. I take it as an officer for the Village of
2 Golf Manor there is some medical first aid type
3 training that you also undergo?
4    A. I have not.
5    Q. Has the Village of Golf Manor required
6 that, or do you know whether or not the Village of
7 Golf Manor requires that officers have any CPR
8 training?
9         MR. WEISENFELDER: Just to keep everything
10        straight, you're talking about 2000 or now?
11        MR. MARTINS: Now.
12        MR. WEISENFELDER: Three years later?
13        MR. MARTINS: Yes. I'm talking now.
14        MR. WEISENFELDER: Okay.
15   A. I am not.
16   Q. You're not aware?
17   A. I'm not aware.
18   Q. Now I'm going to go back. As of
19 November 7, 2000, do you know whether or not the
20 Village of Golf Manor required that its officers
21 have CPR training?
22   A. I do not know.
23   Q. Nevertheless, on the night of November 7,
24 2000 you feel that you were qualified to perform CPR

Page 20

1 based on your past experience; is that right?
2    A. That's right.
3    Q. I take it from what I've seen in this case
4 you did not perform any CPR or any medical --
5 provide any medical assistance to Mr. Owensby; is
6 that right?
7         MR. WEISENFELDER: Objection.
8         Go ahead.
9    A. That's right.
10   Q. I want to take you back now to November 7,
11 2000, to that evening. As I understand it, you were
12 at the Golf Manor police station and received a
13 notification of an officer needs assistance call; is
14 that right?
15   A. That's right.
16   Q. Starting from that point would you walk me
17 through what happened.
18   A. At that point I got into my cruiser. I
19 was actually in the police station when the call
20 came out. I knew it was close, so I went to my
21 cruiser, turned the lights and sirens on, and
22 responded to the scene.
23        Pulled onto the parking lot, the Sunoco
24 parking lot, parked my car, got out of my car, went

Page 21

1 around the front of the cruiser. And by the time I
2 got to the front corner, the passenger's side, I saw
3 a Huntington Meadows security guy waiving me down
4 like everything was okay, slow down.
5    Q. That's what you understood it to mean?
6    A. That's what I understood it to mean.
7    Q. Okay.
8    A. So I stopped at the front of my cruiser
9 and I saw some distance away the rear passenger's
10 side of a car, two police officers, and who I now
11 know to be Roger Owensby laying on the ground.
12   Q. Okay. Go ahead.
13   A. Did I answer your question?
14   Q. No. When you said two police officers,
15 and then you said Owensby, I thought obviously he
16 was not one of the police officers. Okay.
17   A. He appeared to be handcuffed, to me. And
18 there was one on each side of him.
19   Q. Can you clarify that for a second? He
20 appeared to be handcuffed? When you say "to me,"
21 you mean it appeared to you that he was handcuffed?
22   A. It appeared to me --
23   Q. That he was handcuffed?
24   A. -- that he was handcuff.

Case 1:01-cv-00769-SAS   Document 87-13   Filed 02/02/2004   Page 5 of 20

Owensby, et al. vs. City of Cincinnati
December 3, 2003
ROBERT B. HEILAND, JR.

Page 22

1  Q. All right.
2  A. And there was a police officer on each
3  side of him, there was a few people around. And one
4  of the officers asked if they could put him in my
5  cruiser.
6  Q. When that question was asked where was Mr.
7  Owensby?
8  A. Mr. Owensby was still on the ground or
9  they were in the process of picking him up.
10  Q. Picking him up? Okay. Go ahead.
11  A. I said, "Sure." They picked him up, one
12  on each side, under each arm, and brought him to my
13  cruiser. I opened the rear passenger door and they
14  placed Mr. Owensby in the back of my car.
15  Q. Let me show you what's previously been
16  marked as Exhibit 9. Do you recall whether or not
17  that is a photograph of the car that the officers
18  and Mr. Owensby were near when you pulled in?
19  A. I don't recall what type of car it was. I
20  can't see the background in the picture.
21  Q. As perspective goes, this is taken from
22  the entrance of the convenience store looking out.
23  A. Having said that, then they would have
24  been at the rear of this car.

Page 23

1  Q. Did you watch them place Mr. Owensby in
2  the back seat of the car, of the Golf Manor car?
3  A. I opened the door, took a step away, and
4  they were having trouble placing him in the back of
5  the car. No. I didn't watch them place him all the
6  way in the car.
7  Q. What did you do as they were placing him?
8  Where was your attention directed as they were
9  placing him in the car?
10  A. Looking out the rest of the parking lot.
11  At one point I walked away and went over to another
12  Golf Manor officer, Officer Campbell.
13  Q. Was there a point in time where you
14  returned to your cruiser?
15  A. Yes.
16  Q. So you walk away toward Officer Campbell,
17  and then some time goes by and you and Officer
18  Campbell, or at least you, return to your cruiser,
19  right?
20  A. Correct.
21  Q. Do you have an estimate of how much time
22  went by in that interval?
23  A. I don't recall.
24  Q. When you returned to your cruiser was

Page 24

1  Officer Campbell with you?
2  A. I don't recall.
3  Q. When you returned to the cruiser were the
4  doors, the back doors, closed?
5  A. Yes, they were.
6  Q. Did you check on Mr. Owensby?
7     MR. WEISENFELDER: Objection.
8     Go ahead.
9  A. No.
10  Q. No?
11  A. No.
12  Q. Did you ever look in to check on Mr.
13  Owensby?
14     MR. WEISENFELDER: Objection.
15     Go ahead.
16  A. Yes.
17  Q. When?
18  A. I don't know how long it was, but I did
19  look in the back of the cruiser.
20  Q. When you did look in -- let me back up.
21     The cruiser was situated near a gas
22  island, correct?
23  A. Correct.
24  Q. The gas island has those halogen lights on

Page 25

1  it, correct?
2  A. I don't recall.
3  Q. In any event, there was sufficient light
4  from the gas island and from the convenience store
5  to see Mr. Owensby in the back seat of the car,
6  right?
7  A. The scene was well lit.
8  Q. When you did look in, what did you see?
9  A. Mr. Owensby was handcuffed and laying in
10  the back of the cruiser.
11  Q. How was he situated in the back seat?
12  Sitting up, laying down?
13  A. He was laying down.
14  Q. Where was his head?
15  A. His head was facing the passenger's side
16  of the car.
17  Q. When you looked in were you on the
18  passenger's side of the car?
19  A. Correction. His head was facing the
20  driver's side of the car. When I looked in I was on
21  the passenger's side.
22  Q. So you were looking in through the
23  passenger's side rear window?
24  A. Correct.

**Page 26**

1  Q. The windows I take it were rolled up?
2  A. Yes.
3  Q. So when you looked in, the part of Mr.
4  Owensby's body closest to you on the passenger's
5  side would have been his feet and legs?
6  A. That's correct.
7  Q. Were they on the seat?
8  A. I don't recall.
9  Q. Now, was he laying on his side, on his
10 stomach, on his back? How was he positioned on the
11 seat?
12  A. He was on his side.
13  Q. Do you know which side?
14  A. I believe it was his right side.
15  Q. Was his face then facing the trunk?
16  A. I don't recall.
17  Q. Let me show you what's previously been
18 marked as Exhibit 67. I believe that is a
19 photograph of the back seat of your Golf Manor
20 cruiser?
21      MR. HARDIN: I'm sorry, what was the
22 number?
23      MR. MARTINS: 67.
24  Q. Can you tell whether or not that's taken

**Page 27**

1 from the driver's side or the passenger's side?
2  A. I can't tell.
3  Q. Do you recall if he was laying on his
4 right side, and his head would have been behind the
5 driver's seat, correct?
6  A. His head was behind the driver's seat.
7  Q. So then he would have been facing the
8 trunk of the car?
9      MR. WEISENFELDER: Objection.
10     Go ahead.
11  A. What's the question?
12  Q. If he's laying on the back seat of the car
13 and his head is behind the driver's seat, he's
14 laying on his right shoulder, on his right side,
15 wouldn't his face be facing the trunk?
16  A. I don't recall how his face was.
17  Q. When you looked in at him did you notice
18 any movement?
19  A. No.
20  Q. Did you hear any sounds?
21  A. No.
22  Q. Did you do anything in response to looking
23 in on Mr. Owensby?
24  A. No.

**Page 28**

1  Q. Why did you look in?
2  A. I don't know.
3  Q. While you were standing outside the car
4 near the passenger rear door did you talk with any
5 other officers?
6  A. Yes.
7  Q. Who did you talk to?
8  A. I spoke with Officer Brazile.
9  Q. He's a Cincinnati police officer?
10  A. He's a Cincinnati police officer, that's
11 correct.
12  Q. You know him from the academy?
13  A. I do.
14  Q. Did you talk with anyone else?
15  A. Officer Campbell. I don't know if I spoke
16 with anybody else at that time.
17  Q. What did you and Officer Campbell talk
18 about?
19  A. I don't recall.
20  Q. What did you and Officer Brazile talk
21 about?
22  A. I hadn't seen him in a while. We went to
23 the academy together at Scarlet Oaks, and I asked
24 him how he was doing. He said, "Good." And we

**Page 29**

1 shook hands.
2  Q. Did Officer Brazile look in the car?
3  A. Yes.
4  Q. Do you recall whether or not he used a
5 flashlight?
6  A. I don't recall if he did or not.
7  Q. Did he say anything to you after he looked
8 in the car?
9  A. He did say something.
10  Q. Do you recall what he said?
11  A. I don't recall exactly what he said.
12      (Plaintiff's Exhibit 71
13      was marked for identi-
14      fication.)
15  Q. I'll direct you, but this is an excerpt
16 from Officer Brazile's deposition. It's marked as
17 Exhibit 71.
18      MR. WEISENFELDER: Do you want him to read
19  the whole thing?
20      MR. MARTINS: No.
21  Q. I'll direct you. Specifically, I want to
22 direct your attention to page 54.
23      Beginning at line 3, you see the question
24 is posed: "Did you say anything to Officer Heiland
    at that time, after seeing Mr. Owensby with your

Case 1:01-cv-00769-SAS   Document 87-13   Filed 02/02/2004   Page 7 of 20

Owensby, et al. vs. City of Cincinnati
December 3, 2003

ROBERT B. HEILAND, JR.

Page 30

1 flashlight?"
2     And Officer Brazile says, "Yes."
3     The question is: "What did you say to
4 Officer Heiland?
5     "Answer: I walked around to the other
6 side of the vehicle.
7     "Question: To the -- to the --
8     "Answer: To where they were.
9     "Question: -- rear of the passenger's
10 side of the vehicle?
11     "Answer: Where they were standing.
12     "Question: Okay.
13     "And I asked him, I said, 'The guy you
14 have in your car, is he okay?' I said, 'Can he
15 breathe?' I said, 'He's in a' -- you know, position
16 that looked like he was in, it may have been hard,
17 so I asked him. I'm figuring he's their prisoner.
18 No one ever said whose he was. I figured he was
19 theirs, because he was in their car.
20     "And basically I was just trying to let
21 them know to check on him, just to see what's going
22 on with him or did they know or had they checked. I
23 don't know. I just had arrived.
24     "And basically when I told them, you know,

Page 31

1 they basically just stood there and kind of like
2 shrugged their shoulders.
3     "Question: Both of them?
4     "Answer: From what I recall."
5     Does that refresh your recollection as to
6 what was said?
7     A. No. I don't -- I don't recall what he
8 said. I know we had a conversation and I --
9     Q. So you don't know if what he's saying here
10 is accurate or inaccurate?
11     A. I do not.
12     Q. If you look at page 56, beginning with
13 line 14 the question is: "As I recall, your
14 statement was something along the lines of: This
15 looks fucked up, can he breathe, it don't look like
16 he can from the way he's laying."
17     Answer is: "Uh-huh."
18     "Question: Is that accurate to your
19 recollection?
20     "Answer: Yes.
21     "And you saying, in response to that,
22 Officer Heiland and possibly the other officer
23 simply shrugged their shoulders?"
24     "Answer: Yes."

Page 32

1     Do you recall shrugging your shoulders in
2 response to something that Officer Brazile said?
3     A. I do not recall.
4     Q. Do you recall whether or not Officer
5 Brazile looked in the car before or after you looked
6 in the car to see Mr. Owensby?
7     A. I do not know.
8     Q. What's the next thing you remember as far
9 as standing at the back of the car? You had a
10 conversation with Officer Brazile, what's the next
11 thing that happens?
12     A. The next thing that happens, I believe, is
13 a sergeant, Cincinnati sergeant --
14     Q. Male?
15     A. Male sergeant. I don't recall his name.
16     Q. Sergeant Watts?
17     A. Sergeant Watts. I think some of my
18 statements I say Sergeant Browner. I think there
19 was two sergeants there.
20     Q. There were.
21     A. Sergeant Watts, the male sergeant, asked
22 me -- he wanted to speak to the prisoner. So I went
23 over to the side of the car to roll down the window
24 for him. He subsequently opened it. I rolled the

Page 33

1 window down. He opened the door and tried to speak
2 to Mr. Owensby.
3     Q. When you rolled down the window you did
4 this from the driver's door?
5     A. That's correct.
6     Q. These are automatic windows?
7     A. Yes, sir.
8     Q. Where was Sergeant Watts in relation to
9 your cruiser? Was he on the driver's side? Was he
10 on the passenger's side?
11     A. He was on the driver's side by the rear
12 door.
13     Q. Do you recall if anybody was with Sergeant
14 Watts?
15     A. I don't know.
16     Q. So you rolled down the window for him, and
17 what does he do?
18     A. He says something to the effect of, Hey,
19 buddy, can I talk to you? Hey. He tries to arouse
20 Mr. Owensby.
21     Q. Did you hear any response from Mr.
22 Owensby?
23     A. No.
24     Q. Did you see Mr. Owensby move?

Case 1:01-cv-00769-SAS   Document 87-13   Filed 02/02/2004   Page 8 of 20
Owensby, et al. vs. City of Cincinnati
December 3, 2003
ROBERT B. HEILAND, JR.

## Page 34

1  A. No.
2  Q. Were you looking in the car at the time?
3  A. I don't believe so.
4  Q. You hear no response from Mr. Owensby.
5  What's the next thing that happens?
6  A. The sergeant starts to give some orders to
7  the other officers.
8  Q. This is after he's opened the door?
9  A. Correction. Let me back up.
10     Sergeant gets on his radio, calls for
11 medical, and he starts giving directions to the
12 officers to get Mr. Owensby out of the car.
13  Q. Does all of this occur after the sergeant
14 has opened the back door, the driver's side back
15 door?
16  A. Yes.
17  Q. When the sergeant opened the driver's side
18 back door did he reach in and touch Mr. Owensby?
19  A. I don't know.
20  Q. What happens after that?
21  A. Sergeant Watts is giving directions to the
22 officers to get him out. I walked over to the other
23 side and stood off to the side with Officer
24 Campbell.

## Page 35

1  Q. So you walked over to the passenger's
2  side, rear passenger's side, of your cruiser?
3  A. To that side. I wasn't standing by that
4  immediate area. We were off to the side.
5  Q. What did you see and hear at that time?
6  A. At that time City of Cincinnati officers
7  were performing CPR.
8  Q. Was Mr. Owensby still handcuffed?
9  A. I don't know.
10  Q. Do you know, based on your training as a
11 medic and as an EMT, whether or not CPR can be
12 properly performed if a person's hands are
13 handcuffed behind their back?
14  A. I don't know if it can or not.
15  Q. From your training, isn't it true that the
16 person should be laying flat on the ground when
17 you're doing the chest compression?
18  A. I would think that they should be flat on
19 the ground.
20  Q. Having the arms handcuffed behind the back
21 would hinder laying the person flat on the ground,
22 wouldn't it?
23     MR. HARDIN: Objection.
24     MR. WEISENFELDER: Go ahead.

## Page 36

1  A. Are you asking for my opinion?
2  Q. Well, based on your experience as an EMT
3  and as a medic.
4  A. It could.
5  Q. Were you there when the, I guess, fire
6  rescue, Cincinnati Fire Rescue, arrived?
7  A. I was still there.
8  Q. Did you observe what those people, the
9  fire rescue, did?
10  A. I don't recall.
11  Q. Do you recall hearing anyone from the fire
12 rescue when they arrived telling the officers to
13 remove the handcuffs from Mr. Owensby?
14  A. I don't recall.
15  Q. Did you assist in any way in performing
16 CPR or providing any medical aid for Mr. Owensby
17 once he was taken out of the car?
18  A. No, sir.
19  Q. Did Officer Campbell?
20  A. No, sir, I don't believe so. He went to
21 get a mask, if that's assisting.
22  Q. Explain to me what a mask is.
23  A. A CPR mask, basically just a round
24 plastic, sometimes plastic, mask. The ones we have

## Page 37

1  are plastic, with a tube that comes out. Basically
2  creates a good vacuum, so to speak, so you can blow
3  in. And if any vomit or anything else comes out, it
4  will not contaminate the person performing CPR.
5  Q. Based on your experience, it's not
6  uncommon when performing CPR for vomit or other
7  materials from either the lungs or in the throat to
8  come out?
9     MR. WEISENFELDER: Objection.
10    Go ahead.
11  A. I don't think I have enough experience in
12 actually performing it to say.
13  Q. Okay. Did you observe any vomit or other
14 material come out of Mr. Owensby's mouth while the
15 CPR was being performed?
16  A. No.
17  Q. Were you able to tell one way or the other
18 if anything was coming out of his mouth?
19  A. No.
20  Q. You weren't close enough?
21  A. Correct.
22  Q. All right. What's the next thing that
23 happened? Fire rescue arrives, they're performing
24 CPR. What else happens?

Case 1:01-cv-00769-SAS   Document 87-13   Filed 02/02/2004   Page 9 of 20
Owensby, et al. vs. City of Cincinnati
December 3, 2003
ROBERT B. HEILAND, JR.

Page 42

1  Q. Do you know whether or not any lawyers
2  showed up on the scene?
3  A. I don't know. The news was across the
4  street.
5  Q. The what?
6  A. The news.
7  Q. What is the news?
8  A. The news. The media.
9  Q. Oh. Okay.
10 A. Yeah.
11    MR. WEISENFELDER: Wait until there's a
12 question.
13    THE WITNESS: Sorry.
14 Q. Am I correct in understanding that when
15 you initially pulled into the Sunoco station you saw
16 two Cincinnati Police Department uniformed officers
17 kneeling down over Mr. Owensby?
18 A. Correct.
19 Q. Were they kneeling on him or next to him?
20 A. From where I was standing I couldn't be
21 exact -- I couldn't say with certainty where their
22 knees were. It appeared that they were just next to
23 him, crouched down.
24 Q. As you got out of your car and circled

Page 43

1  around to the right of the -- to the front of the
2  car and the Huntington Meadows security officer
3  waved you down, at this point in time the officers
4  were picking up Mr. Owensby off of the ground; is
5  that right?
6  A. Correct.
7  Q. When he was picked up off the ground you
8  believe he was handcuffed; is that right?
9  A. I believe he was.
10 Q. That's because of the position of his
11 arms?
12 A. Correct.
13 Q. The officers that picked him up, were
14 those officers Jorg and Caton?
15 A. Yes.
16 Q. It was those two officers who escorted Mr.
17 Owensby towards your car?
18 A. Correct.
19 Q. Do you recall which officer asked you for
20 permission to place Mr. Owensby in your car?
21 A. I do not know.
22 Q. Do you know whether or not it was one of
23 those two, that is Caton or Jorg?
24 A. I do not know.

Page 44

1  Q. As they were coming toward you bringing
2  Mr. Owensby, were you facing them?
3  A. Yes.
4  Q. So you were also facing Mr. Owensby,
5  right?
6  A. Yes.
7  Q. Could you see his face?
8  A. Yes.
9  Q. What did his face look like?
10 A. It appeared that he had a little bit of
11 blood on his face, and I don't recall that there was
12 any facial expression or anything like that.
13 Q. Did he have any blood on his forehead?
14 A. I don't recall.
15 Q. Were his eyes opened or closed?
16 A. I don't know.
17 Q. Was his head erect or down or back?
18 A. It was down a little bit.
19 Q. Did you hear him say anything as they were
20 bringing him toward your cruiser?
21 A. No.
22 Q. Did you see him move in any fashion as
23 they were bringing him towards your cruiser?
24 A. No.

Page 45

1  Q. I mean, obviously he's moving, because
2  they're bringing him, but I mean, in terms of
3  actively resisting, trying to pull away from them or
4  kicking at them, anything like that?
5  A. I didn't see him kick. No major
6  movements. It appeared that they were struggling to
7  get him to the cruiser.
8  Q. As you sit here today, you don't recall
9  whether or not the struggling was because they were
10 carrying somebody who was unconscious or whether or
11 not it was resistance of some sort?
12 A. I do not know.
13 Q. Would you describe for me how they were
14 bringing him to the cruiser, that is their position
15 in relation to Mr. Owensby.
16 A. One officer on each side with their arm
17 through his (indicating).
18 Q. So his arms are handcuffed behind his
19 back?
20 A. Handcuffed.
21 Q. They are on each side? Who is on Mr.
22 Owensby's right as you're looking, your left? Do
23 you understand what I'm saying?
24 A. No.

Case 1:01-cv-00769-SAS   Document 87-13   Filed 02/02/2004   Page 10 of 20
Owensby, et al. vs. City of Cincinnati
December 3, 2003
ROBERT B. HEILAND, JR.

Page 46

1   Q. Mr. Owensby is coming towards you.
2   A. Okay.
3   Q. Who is to Mr. Owensby's right? Who is
4  holding his right arm?
5   A. If I'm looking at them and they're coming
6  towards me, Officer Jorg is on --
7   Q. -- Owensby's left?
8   A. Owensby's left. Officer Caton is on the
9  right.
10   Q. As I understand it, his arms are
11  handcuffed behind his back and each officer has an
12  arm through, I guess, near his elbow through the
13  arm?
14   A. I believe so, yes.
15   Q. Were the officers breathing heavily like
16  someone who had just been in a struggle?
17   A. They appeared that they were breathing
18  heavy, disheveled.
19   Q. Right. Did you notice whether or not Mr.
20  Owensby was breathing heavily?
21   A. I did not.
22   Q. Am I correct in understanding that you saw
23  no movement and heard no sounds from Mr. Owensby as
24  they brought him toward the car?

Page 47

1   A. That's correct.
2   Q. Could you tell whether or not, as they
3  approached you and your car, whether or not Mr.
4  Owensby was unconscious?
5   A. I couldn't tell.
6   Q. I take it you did not check?
7     MR. WEISENFELDER: Objection.
8     Go ahead.
9   A. I did not.
10   Q. So am I correct in understanding that when
11  Jorg and Caton placed Mr. Owensby in your car you
12  did not know the condition of Mr. Owensby at that
13  time?
14   A. I did not know.
15   Q. The physical condition of Mr. Owensby?
16   A. I did not.
17   Q. You did not know whether or not he was
18  conscious or unconscious?
19   A. I did not.
20   Q. As I understand it, after you opened the
21  door Officer Jorg and Caton put Owensby in the back
22  seat and then Caton went around to the driver's side
23  to pull Owensby into the back seat; is that right?
24   A. He did go around to the other side to

Page 48

1  help --
2   Q. Did you see him -- I'm sorry, I didn't
3  mean to interrupt you. Go ahead.
4   A. -- to help, I assumed to help get Mr.
5  Owensby in the car.
6   Q. Did you see what Officer Caton did when he
7  went around to the driver's rear door?
8   A. No.
9   Q. Did you see him open the driver's rear
10  door?
11   A. No.
12   Q. So when you turn your attention away from
13  the car, Mr. Owensby was being placed in the car and
14  Caton was going around to the driver's rear door?
15   A. Correct.
16   Q. When they placed Mr. Owensby in the car he
17  was placed in head first, correct?
18   A. Correct.
19   Q. In your experience, when you place a
20  prisoner in a car, in a police cruiser, who's
21  handcuffed, assuming the prisoner is conscious,
22  would they go in head first or would they place
23  their feet in and then their butt and then the rest
24  of their torso in?

Page 49

1     MR. HARDIN: Objection.
2     MR. WEISENFELDER: You can answer.
3     THE WITNESS: Objection, go ahead?
4   A. Assuming that they're conscious, that's
5  correct, feet first and set them in the cruiser.
6   Q. In this case he was head first and torso
7  in, and then you saw Caton go around to the other
8  side of the car?
9   A. Correct.
10   Q. When Officer Caton walked around to the
11  other side of the car were Mr. Owensby's legs still
12  outside of the car?
13   A. I don't know.
14   Q. Did you hear any grunting or groaning from
15  the officers as they were trying to put Mr. Owensby
16  in the car?
17     MR. WEISENFELDER: I'm going to object.
18     Grunting or groaning from the officers or from
19     Mr. Owensby?
20     MR. MARTINS: From the officers. From
21     either Jorg or Caton.
22   Q. You can answer.
23     MR. WEISENFELDER: You can answer.
24     THE WITNESS: Okay.

Case 1:01-cv-00769-SAS   Document 87-13   Filed 02/02/2004   Page 11 of 20
Owensby, et al. vs. City of Cincinnati
December 3, 2003
ROBERT B. HEILAND, JR.

Page 66

1 of this car being parked next to your car?
2    A.  No.
3    Q.  At this point in time do you know whether
4 or not you had already had your conversation with
5 Officer Brazile?
6    A.  I do not.
7    Q.  We're at 4 minutes 30 seconds. Do you
8 know whether or not at this point in time you had
9 checked on Mr. Owensby, that is looked in on him?
10   A.  I do not know.
11   Q.  4 minutes, 33 seconds. There is a car in
12 the middle of the screen. That would be Officer
13 Campbell's Golf Manor cruiser?
14   A.  Correct.
15       (Discussion off the record.)
16       (Plaintiff's Exhibit 75
          was marked for identi-
17       fication.)
18   Q.  Let me show you, sir, Exhibit 75, which I
19 believe is a transcript of your testimony during
20 Officer Caton's trial. If you'd just take a look at
21 that and tell me whether or not that seems to be the
22 case.
23   A.  Yes, it does.
24   Q.  What's your best estimate of, from the

Page 67

1 time you got the officer needs assistance call, how
2 much time it took to get to the scene, to the
3 convenience store parking lot?
4    A.  30 seconds to a minute maybe.
5    Q.  Does the police station where you were
6 located, does it have a life squad or an EMT unit
7 there?
8    A.  Yes.
9    Q.  So for them to get to that same location
10 would have taken approximately the same amount of
11 time?
12   A.  I don't know how long it would have taken
13 them.
14   Q.  Well, it took you between 30 seconds and a
15 minute?
16   A.  Correct.
17   Q.  Is there any reason to believe that it
18 would have taken them a longer amount of time?
19      MR. WEISENFELDER: Objection.
20      Go ahead.
21   A.  If they had to -- I don't know how life
22 squad and fire departments work, if they have to get
23 dressed and get down to the car and take off. I
24 don't know the procedures.

Page 68

1       (Plaintiff's Exhibit 76
         was marked for identi-
2       fication.)
3    Q.  Let me show you what's marked as
4 Exhibit 76. Exhibit 76 is the oath that you took in
5 February 1, 2000 when you became a police officer
6 for the Village of Golf Manor, correct?
7    A.  Correct.
8    Q.  Before November 7, 2000 did you have any
9 experience with an arrest being made by another
10 police department and them placing their prisoner in
11 a Golf Manor cruiser?
12   A.  I don't know.
13   Q.  Since November 7, 2000 have you had any
14 experience with a police department, other than Golf
15 Manor, making an arrest and placing the prisoner in
16 a Golf Manor cruiser?
17      MR. HARDIN: Objection.
18   A.  No.
19   Q.  Do you know if on November 7, 2000 there
20 was a policy or some guidance in place that
21 addressed the situation that arose that evening?
22      MR. WEISENFELDER: I'm going to object as
23 to the vague question in terms of situation.
24      MR. MARTINS: Yes. Let me rephrase.

Page 69

1    Q.  Do you know whether or not Golf Manor had
2 a policy or guidance for its officers on November 7,
3 2000 to address the situation where a Golf Manor
4 officer is asked to give permission to place a
5 person who has been arrested by another police
6 department in a Golf Manor cruiser?
7       MR. WEISENFELDER: Objection.
8       Go ahead, you can answer.
9    A.  I knew at that time, based on working,
10 training, that we could go over to other departments
11 and assist them with whatever they needed.
12   Q.  I don't mean to cut you off.
13   A.  That's okay.
14   Q.  That was this mutual aid agreement that
15 was signed by the various police departments in the
16 greater Cincinnati area?
17   A.  Correct.
18   Q.  Other than knowing that you could assist
19 other police departments, do you know whether or not
20 there was any policy or guidance or custom in place
21 at Golf Manor to address what an officer's duties
22 and responsibilities were where another police
23 department asked him to place their prisoner in his
24 car?

Owensby, et al. vs. City of Cincinnati
December 3, 2003
Case 1:01-cv-00769-SAS    Document 87-13    Filed 02/02/2004    Page 12 of 20
ROBERT B. HEILAND, JR.

Page 70

1  A. When we would respond to a scene to assist
2  another department we would be under their command,
3  no matter what the rank. If you pull up on the
4  scene you assist them in how they need you to
5  assist.
6  Q. Did you have an understanding as to
7  whether or not you would, in this situation,
8  November 7, 2000, when you responded to the Sunoco
9  station, did you understand that you were assisting
10 the Cincinnati Police Department?
11 A. Yes. The assistance call came out.
12 That's why I was there.
13 Q. In responding to this assistance call, did
14 you understand that you would be subject to the
15 rules, policies, and customs of the Cincinnati
16 Police Department or the Golf Manor Police
17 Department?
18 A. My understanding was I would be there at
19 the scene to assist them how they needed me to.
20 Q. But what rules governed your conduct? Was
21 it Golf Manor or was it Cincinnati Police
22 Department?
23     MR. WEISENFELDER: Objection.
24     Go ahead.

Page 71

1  Q. If you know.
2  A. I don't know.
3  Q. Do you recall receiving any instruction or
4  guidance concerning what rules a Golf Manor officer
5  had to follow when he was in this situation of
6  assisting another police department?
7  A. Through working with other officers in
8  field training and going to other scenes and other
9  departments, I just understood that we were under
10 their direction for as long as they needed
11 assistance and that was it.
12 Q. Did you have any understanding that you
13 would be bound -- or whether or not you would be
14 bound by the policies, rules, and regulations of the
15 Cincinnati Police Department if you were assisting
16 the Cincinnati Police Department?
17 A. I didn't know.
18 Q. You didn't know?
19 A. I didn't -- at that time I don't -- I
20 don't know.
21 Q. And as I take it at that time you had
22 received no instruction on whether or not you were
23 bound by, say in this case, Cincinnati's rules and
24 regulations or continued to be bound by Golf Manor's

Page 72

1  rules and regulations; is that correct?
2      MR. WEISENFELDER: Objection as to form.
3      If you can answer that, go ahead.
4  A. I can't answer it.
5  Q. My question is just whether or not you had
6  any instruction on November 7th as to which
7  department's rules and regulations you were to
8  follow when you were assisting another police
9  department.
10     MR. WEISENFELDER: Objection.
11 Q. The question is just whether or not you
12 had any instruction.
13 A. No.
14 Q. As of November 7, 2000, did you have any
15 understanding as to whether you had any
16 responsibilities for the safety of a prisoner who
17 was placed in your cruiser?
18     MR. WEISENFELDER: I'm going to object
19     again as to the form.
20     Go ahead.
21 A. The question again, please?
22 Q. As of November 7, 2000, did you have any
23 understanding of your responsibilities for the
24 safety of a prisoner who is arrested by another

Page 73

1  police force but placed in your cruiser?
2      MR. WEISENFELDER: Objection.
3      Go ahead.
4  A. My understanding at that time is I would
5  be responsible for my prisoners, anybody that was in
6  my custody. If somebody is not my prisoner, not in
7  my custody, then on the assistance call if somebody
8  puts their prisoner in the back of my car, they
9  asked to put them in the back of my car and I'm
10 there for assistance. It's their prisoner and it's
11 in their custody. So it's their responsibility.
12 Q. Did you have any understanding that by
13 accepting the prisoner and placing him in the back
14 seat of the Golf Manor cruiser that the prisoner was
15 now in your custody?
16     MR. WEISENFELDER: Objection as to the
17     word "accepting."
18     Go ahead and answer.
19 A. No.
20 Q. Did you receive any training as to the
21 distinction we've just been talking about, that
22 whether or not a prisoner placed in a Golf Manor car
23 from another jurisdiction, as to who had custody of
24 the prisoner?

Case 1:01-cv-00769-SAS   Document 87-13   Filed 02/02/2004   Page 13 of 20

Owensby, et al. vs. City of Cincinnati
December 3, 2003

ROBERT B. HEILAND, JR.

Page 74

1   A. From going to other calls and seeing it
2 done before, the prisoner's always the arresting
3 officer's or the agency's jurisdiction where you're
4 at.
5   Q. You had had this arise in the past?
6   A. I have seen it done on other calls.
7   Q. Before November 7, 2000?
8   A. I don't recall exact dates, but, yeah.
9   Q. But before the night of November 7, 2000;
10 is that right?
11   A. Yes.
12   Q. Did you feel that you had any
13 responsibility for the well-being of Mr. Owensby?
14   A. No.
15       MR. WEISENFELDER: Objection.
16       Go ahead.
17   Q. Regardless of who is technically
18 responsible for the well-being of a prisoner, if you
19 know that a prisoner is injured and needs medical
20 attention, is it your understanding that you have a
21 duty to provide medical attention?
22   A. Yes.
23   Q. You knew that this person, Mr. Owensby,
24 had blood around his nose and mouth; is that right?

Page 75

1   A. Yes.
2   Q. Did you take any steps to administer any
3 first aid for the blood around the nose and mouth?
4       MR. WEISENFELDER: Objection.
5       Go ahead.
6   A. No.
7   Q. Had you done so, do you think you would
8 have been in a better position to determine whether
9 or not Mr. Owensby was conscious or unconscious at
10 the time he was placed in your vehicle?
11       MR. WEISENFELDER: Objection.
12       Go ahead.
13   A. I don't know.
14   Q. I know you said that you don't recall what
15 Officer Brazile told you, but do you recall whether
16 or not you took any action in response to what
17 Officer Brazile told you?
18   A. I don't recall.
19       (Plaintiff's Exhibit 77
           was marked for identi-
20       fication.)
21   Q. Let me show you a portion of the Golf
22 Manor manual, marked as Exhibit 77. Exhibit 77 is
23 the Golf Manor manual provision 6-07 concerning
24 prisoner transportation; is that right?

Page 76

1   A. That's correct.
2   Q. That's one of the sections of the Golf
3 Manor manual that you reviewed in preparation for
4 your deposition today?
5   A. That's correct.
6   Q. Did you select out the sections to review
7 today or did someone else select them out for you?
8 The sections of the manual.
9   A. Did I select these today?
10   Q. No, no. When you were getting ready for
11 your deposition, for today's deposition, you
12 reviewed various sections of the Golf Manor manual.
13 My question is did you select out those provisions
14 to look at or did someone else select them out for
15 you?
16       MR. WEISENFELDER: I'm going to object. I
17   think your invading the attorney-client
18   privilege now, to the extent that the attorney
19   may have been present when he was preparing for
20   the deposition, and what he may have been
21   instructed to review by an attorney I believe
22   falls within that.
23   Q. The only question I want to know is
24 whether or not you selected the sections, either a

Page 77

1 yes or no, not as to any communication with any
2 attorney.
3       MR. WEISENFELDER: You can answer.
4   A. No, I did not select the sections.
5   Q. In Exhibit 77, if you go to page 4 you
6 will see that it is blank. I have what I believe is
7 page 4 based on what counsel has provided.
8       MR. WEISENFELDER: Counsel will represent
9   that when responding to request for production
10   of documents approximately a year ago, that
11   apparently in copying what was believed to be a
12   responsive portion of the manual, page 4
13   apparently was blacked out, not intentionally.
14       (Plaintiff's Exhibit
           77A was marked for
15       identi- fication.)
16   Q. So I'm going to mark page 4 with
17 Exhibit -- as 77A. I want to direct your attention
18 to section II. A of the manual, which is on the
19 first page of Exhibit 77.
20       The second sentence of II. A. says,
21 "Therefore, it is the policy of this department that
22 EVERY prisoner transported in a police vehicle shall
23 be searched and handcuffed by the transporting
24 officer prior to being transported, unless

Case 1:01-cv-00769-SAS   Document 87-13   Filed 02/02/2004   Page 14 of 20
Owensby, et al. vs. City of Cincinnati                          ROBERT B. HEILAND, JR.
December 3, 2003

Page 78

1  specifically exempted under provisions of this
2  procedure." Do you see that?
3      A. I do.
4      Q. Do you see that the word "EVERY" is
5  capitalized?
6      A. Yes.
7      Q. Neither you nor Officer Campbell searched
8  Mr. Owensby on the night of November 7, 2000; is
9  that right?
10     A. That's correct.
11     Q. Had you searched Mr. Owensby do you
12 believe that you would have been in a better
13 position to discover whether or not at a minimum he
14 was conscious or unconscious at the time that he was
15 placed in the vehicle?
16         MR. WEISENFELDER: Objection.
17         Go ahead.
18     A. Yes. We didn't search him because we
19 weren't going to transport him.
20     Q. If you had determined that he was
21 unconscious, regardless of whether or not he was in
22 your custody, would you have administered first aid
23 to him?
24     A. Yes. Or let the city --

Page 79

1      Q. Or called for --
2      A. -- let the city officers, the arresting
3  officers, know.
4      Q. None of that was done, correct?
5          MR. WEISENFELDER: Objection.
6          Go ahead.
7      A. Correct.
8      Q. Am I correct in understanding that your
9  reason as to why none of that was done was because
10 you were not going to be transporting Mr. Owensby?
11     A. Correct.
12     Q. Have there been situations where Golf
13 Manor has responded to a scene, that more than one
14 Golf Manor car has responded to a scene, and a Golf
15 Manor prisoner was placed in one car and then when
16 it came time to transport the prisoner, the prisoner
17 was moved to another Golf Manor car?
18         MR. WEISENFELDER: Objection.
19         Go ahead.
20     A. I'm sure the situation has a --
21         MR. WEISENFELDER: The question is do you
22     know of one?
23     A. If there's two police -- two Golf Manor
24 cruisers there and there's only one prisoner, would

Page 80

1  he be transported by another agency?
2      Q. No, no. My question is can you recall a
3  situation where Golf Manor made an arrest and there
4  was more than one Golf Manor car there at the scene.
5  Okay?
6      A. (Nodding head.)
7      Q. The prisoner, the Golf Manor prisoner, is
8  taken and placed in a Golf Manor car, but when it
9  comes time to transport the prisoner, for some
10 reason the prisoner is moved to another Golf Manor
11 car. Maybe the car that he was originally placed in
12 has another call to go to or something, so he's
13 taken out and moved to another car to be
14 transported. Do you recall any such situations?
15     A. I don't recall.
16     Q. Based on your training, if that happened,
17 would Golf Manor search, be under an obligation to
18 search the prisoner when he was being placed in the
19 first car?
20         MR. WEISENFELDER: Objection. Calls for
21     speculation.
22         Go ahead. You can answer.
23     A. I don't understand the question.
24     Q. A person is drunk and disorderly. Three

Page 81

1  Golf Manor cars arrive on the scene in response.
2      A. Okay.
3      Q. The person is arrested and is placed in
4  the first Golf Manor car.
5      A. Okay.
6      Q. In the back seat. He's handcuffed and
7  placed in the back seat. As it turns out, the
8  officer that's driving the first car receives a call
9  and has to go somewhere else. Okay?
10     A. (Nodding head.)
11     Q. So the person is taken out of the back
12 seat of the car and moved into the second Golf Manor
13 car for transport. Understood?
14     A. Uh-huh.
15         MR. WEISENFELDER: Yes?
16     A. Yes.
17     Q. In that situation, when the arrestee is
18 placed in the first Golf Manor car, is it your
19 understanding that per the Golf Manor manual that
20 arrestee has to be searched?
21     A. Before being placed in the first Golf
22 Manor car?
23     Q. Correct.
24     A. Yes.

Case 1:01-cv-00769-SAS   Document 87-13   Filed 02/02/2004   Page 15 of 20

Owensby, et al. vs. City of Cincinnati  
December 3, 2003  
ROBERT B. HEILAND, JR.

### Page 82

1  Q. Go to paragraph D on that same page,
2  bottom of the page. The second sentence says,
3  "Every prisoner shall be placed in the Police
4  vehicle and secured with seat belts." See that?
5  A. Yes.
6  Q. In this case Mr. Owensby was not secured
7  with seat belts, was he?
8      MR. WEISENFELDER: Objection.
9      Go ahead.
10 A. No.
11 Q. Had he been secured with a seat belt he
12 would have been sitting up, would he not?
13 A. Correct.
14 Q. Had you received any training from Golf
15 Manor concerning positional asphyxia?
16 A. At that time?
17 Q. At that time.
18 A. No.
19 Q. Since that time have you received any
20 training concerning positional asphyxia?
21     MR. WEISENFELDER: Objection.
22     Go ahead.
23 A. Since that time we've received a video.
24 There's a video, yes.

### Page 83

1  Q. On positional asphyxia?
2  A. Yes.
3  Q. What is your understanding of what
4  positional asphyxia is?
5  A. My understanding is if somebody is in a
6  position that it's hard for them to breathe is what
7  it comes down to. That's my understanding of it.
8  Somebody's in a position where it makes it hard for
9  them to breathe.
10 Q. Do you have any understanding as to why
11 Mr. Owensby was not seat belted in the Golf Manor
12 cruiser on the evening of November 7, 2000?
13 A. No.
14 Q. Take a look at section II. I., which is on
15 page 3. It says, "Prior to being transported to or
16 from a detention facility, the transporting officer
17 shall ensure that a positive identification of the
18 prisoner has been made, and that all required
19 paperwork has been completed and accompanies the
20 prisoner." See that?
21 A. Yes.
22 Q. I take it that was not done in this case,
23 correct?
24     MR. WEISENFELDER: Objection. By Golf

### Page 84

1  Manor or by Cincinnati?
2      MR. MARTINS: By Golf Manor.
3  A. Correct.
4  Q. To your knowledge, was it done by
5  Cincinnati?
6  A. I do not know.
7  Q. Am I correct in understanding that the
8  reason it was not done was because you were not
9  asked to transport?
10     MR. HARDIN: Objection. Are you saying it
11     wasn't done by Golf Manor?
12     MR. MARTINS: By Golf Manor. Sorry.
13     MR. WEISENFELDER: You can answer.
14 A. Correct.
15 Q. Have you been in situations in part of
16 this cooperation or assistance agreement where Golf
17 Manor was asked to transport a prisoner?
18     MR. WEISENFELDER: Okay. For point of
19     clarification since we're dealing, I believe,
20     with what you're referring to is the mutual aid
21     agreement.
22     MR. MARTINS: Mutual aid agreement.
23     MR. WEISENFELDER: Being asked to
24     transport a prisoner from whose jurisdiction by

### Page 85

1  what agency?
2  Q. A prisoner of another agency, Golf Manor
3  is being asked to transport.
4  A. I don't recall if I personally have been
5  in that situation.
6  Q. Have you heard of that?
7      MR. WEISENFELDER: Objection.
8      Go ahead.
9  A. I have heard of it.
10 Q. In that situation what is your
11 understanding of whether or not the Golf Manor
12 officer has an obligation to ensure the positive
13 identification of the prisoner has been made?
14 A. If an officer is going to be transporting
15 somebody, they should, for example, if they're
16 transporting to the jail, they should make sure they
17 have the proper paperwork and that they have that
18 person.
19 Q. On November 7, 2000 you were simply asked
20 by the Cincinnati police officers if they could
21 place Mr. Owensby in the back seat of your cruiser,
22 correct?
23 A. Correct.
24 Q. You said yes?

Case 1:01-cv-00769-SAS   Document 87-13   Filed 02/02/2004   Page 16 of 20
Owensby, et al. vs. City of Cincinnati
December 3, 2003
ROBERT B. HEILAND, JR.

Page 86

1  A. I said, "Sure."
2  Q. "Sure." Did anyone say to you words to
3  the effect, "We're going to transport him later"?
4  A. No.
5  Q. Go to page 6, please. Section II. E.,
6  first paragraph says, "Any prisoner who is sick or
7  injured shall be examined by life squad personnel
8  and offered treatment for their injury or illness
9  prior to being transported to any jail or detention
10 facility." See that?
11 A. Yes, sir.
12 Q. On November 7, 2000 did you understand
13 that to be the policy and requirements of Golf
14 Manor?
15 A. Yes.
16 Q. Did you make any attempt to determine
17 whether or not Mr. Owensby was injured, other than
18 seeing the blood around his nose and mouth?
19     MR. WEISENFELDER: Objection.
20     Go ahead.
21 A. No.
22 Q. I take it you took no steps to ensure that
23 he was examined by life squad personnel, correct?
24     MR. WEISENFELDER: Objection.

Page 87

1     Go ahead.
2  A. Correct.
3  Q. The only life squad personnel involved
4  would have been when Sergeant Watts called for
5  medical assistance, correct?
6     MR. HARDIN: Object to the form of the
7     question.
8     MR. WEISENFELDER: Go ahead.
9  A. Correct.
10 Q. You never offered treatment for Mr.
11 Owensby's injuries on the night of November 7, 2000,
12 correct?
13    MR. WEISENFELDER: Objection.
14    Go ahead.
15 A. Correct.
16 Q. Had you attempted to ask him, ask Mr.
17 Owensby, whether or not he wanted treatment for his
18 injuries, the blood that you saw around the nose and
19 mouth, you would have been able to determine whether
20 or not he was conscious or unconscious, correct?
21    MR. WEISENFELDER: Objection.
22    Go ahead.
23 A. Correct.
24 Q. Did you know whether or not Mr. Owensby

Page 88

1  was Maced?
2  A. I did not know.
3  Q. Did you smell Mace when you got there?
4  A. I did not.
5  Q. Did you see any police officers or other
6  individuals coughing or reacting to Mace?
7  A. Not that I recall.
8  Q. Have you used Mace?
9  A. Yes.
10 Q. Have you been Maced?
11 A. Yes.
12 Q. Based on your experience, what is the
13 reaction to Mace?
14 A. Based on my experience, it's rather
15 unpleasant. It causes you to sneeze or your mucus
16 membranes to excrete.
17 Q. Does it make breathing difficult?
18 A. To me personally, it didn't -- it wasn't
19 tough for me to breathe when I was Maced. I can't
20 speak for other people. I have heard that, but it
21 wasn't for me.
22 Q. Over the radio did you hear any report
23 that Mr. Owensby had been Maced?
24 A. No.

Page 89

1  Q. Paragraph E. 3. on page 6. It says, "If
2  necessary, the Golf Manor Life Squad may be called
3  to provide an ambulance for transportation to a
4  medical facility." In this situation the Golf Manor
5  life squad was never called, correct?
6     MR. WEISENFELDER: Objection.
7     Go ahead.
8  A. Correct.
9  Q. At E. 5. it says, "Unconscious prisoners
10 shall not be transported in a police vehicle, but
11 shall be taken to a hospital or medical facility by
12 ambulance." Do you see that?
13 A. Yes.
14 Q. Again, there was no attempt by you or
15 anyone on behalf of Golf Manor to determine whether
16 or not the person being placed in your vehicle was
17 conscious or unconscious, correct?
18    MR. WEISENFELDER: Objection.
19    Go ahead.
20 A. Correct.
21 Q. In fact, based on what you observed, your
22 observations were consistent with someone who was
23 unconscious, correct?
24    MR. WEISENFELDER: Objection.

Case 1:01-cv-00769-SAS   Document 87-13   Filed 02/02/2004   Page 17 of 20
Owensby, et al. vs. City of Cincinnati
December 3, 2003
ROBERT B. HEILAND, JR.

## Page 90

1    Go ahead.
2    A. I didn't know if he was conscious or
3  unconscious.
4    Q. Well, you heard no sounds from the
5  individual at any time, correct, from Mr. Owensby?
6    A. Correct.
7    Q. You saw no movement from him at any time,
8  correct?
9    A. Correct.
10   Q. As of November 7, 2000, had you had any
11 training from Golf Manor as to whether or not you
12 should make a determination of whether a prisoner is
13 conscious or unconscious before that prisoner is
14 placed in your vehicle when you are in a situation
15 of assisting another police department?
16   A. No.
17   Q. Had you received any training on that
18 subject?
19   A. No.
20   Q. As you sit here today, have you received
21 any training on that subject?
22     MR. WEISENFELDER: Objection.
23     Go ahead.
24   A. No.

## Page 91

1    Q. Based on your understanding of the rules
2  and regulations, policies of Golf Manor, if Officer
3  Campbell had made an arrest and the subject was
4  unconscious, would you believe that it would be okay
5  for Officer Campbell to place the subject in your
6  car, even though he was unconscious?
7      MR. WEISENFELDER: Objection.
8      Go ahead.
9    A. No.
10   Q. Am I correct in understanding that if the
11 subject is unconscious the policy is that he should
12 not be placed in any car and that an ambulance
13 should be called?
14     MR. WEISENFELDER: Objection.
15     Go ahead.
16   A. Correct.
17   Q. In addition to observing that Mr. Owensby
18 made no sounds and made no motion that evening, you
19 understood when you arrived on the scene that there
20 had been some sort of struggle in the arrest,
21 correct?
22   A. It appeared that there had been a
23 struggle, yes.
24   Q. You base that not only on the call for

## Page 92

1  assistance, but when you arrived the officers were
2  disheveled and were breathing heavily, correct?
3    A. Correct.
4    Q. Again, in contrast to that you saw Mr.
5  Owensby was not breathing heavily, correct?
6    A. I don't recall.
7    Q. You did not notice that he was breathing
8  heavily?
9    A. I did not notice, correct.
10         (Plaintiff's Exhibit 78
10         was marked for identi-
11         fication.)
12   Q. Let me show you Exhibit 78, a document
13 that we received yesterday. This is the mutual aid
14 agreement between Golf Manor and other police
15 departments in the greater Cincinnati area and
16 Cincinnati Police Department?
17   A. Correct.
18   Q. Have you in the course of performing your
19 duties at Golf Manor had the opportunity to review
20 this mutual aid agreement?
21   A. I have.
22   Q. Have you had any training at Golf Manor
23 concerning how to operate under the mutual aid
24 agreement?

## Page 93

1      MR. WEISENFELDER: Objection as to what
2      he's already testified concerning his
3      understanding from other officers about the
4      agreement.
5    Q. I'm asking about formal training from Golf
6  Manor.
7    A. What do you mean by formal training?
8    Q. A class.
9    A. No.
10   Q. Have there been any directives or memos
11 given to you concerning how a Golf Manor officer is
12 to carry out the mutual aid agreement?
13   A. Not that I'm aware of.
14   Q. Have any superiors at Golf Manor explained
15 to you how an officer should behave in carrying out
16 the mutual aid agreement?
17   A. Not that I recall.
18   Q. Other than reading the mutual aid
19 agreement, which you said you did, have you received
20 any guidance from Golf Manor on how the terms of the
21 agreement should be carried out, what your
22 obligations are, what your duties are?
23   A. From working on the road with an FTO and
24 responding to other agencies, it's my understanding

Case 1:01-cv-00769-SAS    Document 87-13    Filed 02/02/2004    Page 18 of 20
Owensby, et al. vs. City of Cincinnati                                ROBERT B. HEILAND, JR.
December 3, 2003

Page 94

1  that you're under the authority of the jurisdiction
2  where you're at. Other than that, that's about as
3  far as the explanations went. I mean, you go there
4  to assist, help out with what they need you to help
5  out with, and then you go.
6      Q. When you say an FTO, that's a field
7  training officer?
8      A. Correct.
9      Q. Is that someone who is like a mentor to
10 you?
11     A. Yes.
12     Q. Look at page 7 of Exhibit 78,
13 paragraph VI. C. It says, "Whenever the law
14 enforcement" employee of one cooperating Agency" --
15 "employees of one cooperating Agency are providing
16 police services in or to another cooperating agency
17 pursuant to the authority contained in this
18 contract, other legislative authority or state law,
19 such employees will have the same power, duties,
20 rights and immunities as if taking action within the
21 territory of their employing Agency." What did you
22 understand your duties to be under this
23 circumstance?
24     A. To respond and to assist the Cincinnati

Page 95

1  Police Department however they needed.
2      Q. You see that it says the same duties as if
3  taking action within the territory of Golf Manor.
4      A. Yes.
5      Q. If you were responding in the territory of
6  Golf Manor to the arrest of Mr. Owensby would you
7  have been responsible for his well-being?
8      A. If he was my prisoner --
9          MR. WEISENFELDER: Objection.
10         Go ahead.
11     A. If he was my prisoner, yes.
12     Q. If he was not your prisoner, but you were
13 located in Golf Manor and he was placed in your car,
14 would you have been responsible for his well-being?
15         MR. WEISENFELDER: Objection.
16         Go ahead.
17     A. No.
18     Q. Why not?
19     A. Because he wasn't my prisoner. Unless the
20 arresting officer specifically asked me, "Can you
21 keep an eye on my prisoner for me? I've got to go
22 here."
23     Q. Say this takes place in Golf Manor and the
24 arresting officer is Officer Campbell, and you show

Page 96

1  up and Officer Campbell says, "Can I place Owensby
2  in the back seat of your cruiser?" and you say,
3  "Sure," are you responsible for Owensby's
4  well-being?
5          MR. WEISENFELDER: Objection.
6          Go ahead.
7      A. No.
8      Q. Am I correct in understanding the reason
9  you say no is because you did not arrest Mr.
10 Owensby?
11     A. At that point he would not be my prisoner.
12     Q. Why?
13     A. Because I did not arrest him.
14 Mr. Campbell placed him under arrest.
15     Q. Look at page 8, paragraph G. I'm looking
16 at the second sentence. "Each Agency shall be
17 responsible for the negligence of its employees to
18 the extent specified by law." Do you have any
19 understanding of what that means?
20         MR. WEISENFELDER: Objection.
21         Go ahead.
22         If you do --
23     A. I don't.
24     Q. Did you receive any training or guidance

Page 97

1  as to how that provision could impact on you and the
2  performance of your duties for Golf Manor?
3      A. Provision G?
4      Q. G. The sentence I just read to you, "Each
5  Agency shall be responsible for the negligence of
6  its employees to the extent specified by law."
7      A. To that specific -- no.
8      Q. Have you received any training from Golf
9  Manor as to any responsibilities of its officers
10 created by a violation of a citizen's constitutional
11 rights where Golf Manor is a cooperating agency?
12     A. No.
13     Q. Is it your understanding that this
14 Exhibit 78 was in effect on November 7, 2000?
15     A. Yes.
16     Q. That was part of the reason why you
17 responded on November 7, 2000?
18     A. That's correct.
19     Q. I want to ask about a couple of
20 apprehension techniques.
21     A. Okay.
22     Q. Did you ever hear of a head wrap
23 technique?
24     A. I've never heard of a head wrap.

Case 1:01-cv-00769-SAS   Document 87-13   Filed 02/02/2004   Page 19 of 20

Owensby, et al. vs. City of Cincinnati
December 3, 2003
ROBERT B. HEILAND, JR.

**Page 110**

1   A. I heard something on the radio, yes.
2   Q. Which you identified as somebody saying,
3 "shoot him"?
4   A. Something's going on, some type of
5 trouble.
6   Q. Let me refer you if I may to Exhibit
7 Number 72. If you go to page 2, about halfway down.
8 Do you see the question: "Do you remember exactly
9 what you heard?
10      "Answer: I can't make out exactly what I
11 heard. I thought I heard somebody say shoot him."
12   A. Yes.
13   Q. Now, this statement was given the early
14 morning hours of November 8th, 2000?
15   A. Correct.
16   Q. Right, basically, after the incident
17 occurred?
18   A. I believe the time is after midnight when
19 they took the statement.
20   Q. 0020 hours, if you look on the first page?
21   A. Correct.
22   Q. So that's 20 minutes after midnight?
23   A. Correct.
24   Q. That you gave your statement?

**Page 111**

1   A. Yes.
2   Q. Would you feel that your recollection of
3 the events was clearer on that day than it is today?
4   A. Possibly. I mean, a lot of things were
5 clearer that night, yeah.
6   Q. The event had just occurred?
7   A. It just occurred.
8   Q. Maybe a few hours before?
9   A. Right.
10   Q. You hadn't talked to anybody about the
11 incident, had you, from the time that it occurred
12 until you were interviewed?
13   A. No.
14   Q. So you were giving to the investigators
15 who were taking the statement your best recollection
16 about what had just occurred?
17   A. Correct.
18   Q. Do you recall telling them that you
19 thought you heard somebody say, "shoot him"?
20   A. Yes, I do recall.
21   Q. That's why you tapped him on the shoulder?
22   A. That's why I tapped my partner on the
23 shoulder.
24   Q. That was before the actual assistance run

**Page 112**

1 came out?
2   A. That was before the actual assistance run.
3   Q. So did you respond to the statement that
4 you thought you heard about somebody saying, "shoot
5 him"? Did you respond to that or did you respond to
6 the assistance run that came out later?
7   A. We responded when the officer needs
8 assistance run came out.
9   Q. You didn't respond when you heard them
10 say, "shoot him"?
11      MR. MARTINS: Objection. Asked and
12 answered.
13   A. No.
14   Q. I'm sorry?
15      MR. WEISENFELDER: He said no.
16   Q. Go down if you will to the bottom of page
17 2 of that same statement that you gave on
18 November 8, 2000. And your answer was, "Knowing
19 what I know now, that wasn't anything that I heard,"
20 meaning "shoot him," right?
21   A. Correct.
22   Q. "But I, I that's why I tapped him. And I
23 started heading to the, an address came out. He
24 said it was down at Sam's, right around the corner,

**Page 113**

1 on Seymour. So I ran to my cruiser. Uhm, jumped
2 in. Lights and sirens. Started heading down. The,
3 the assistance call came out at that time, as I was
4 proceeding down Wiehe towards Langdon Farm." Is
5 that correct?
6   A. That's what it says in this statement,
7 correct.
8   Q. Do you have any reason to doubt the
9 accuracy of this statement?
10   A. No reason to doubt it, no.
11   Q. You reviewed this statement prior to the
12 deposition today?
13   A. Correct. Yes.
14   Q. After reading that, does that refresh your
15 recollection as to whether or not you responded to
16 the words "shoot him" or you responded to the
17 assistance call?
18   A. We responded to the assistance call.
19   Q. But you were already on your way, weren't
20 you, when the assistance call came out?
21   A. If you read the statement, that's the way
22 it does sound.
23   Q. Right.
24   A. But we did not go to the scene, because

# AFFIDAVIT

- - -

STATE OF OHIO      :
                   :   SS
COUNTY OF HAMILTON :

I, Wendy L. Welsh, Notary Public in and for the State of Ohio, do hereby state that the transcript of the deposition of ROBERT B. HEILAND, JR., deponent herein, having been submitted to said deponent for review and signature, has not been signed within the thirty (30) day period allowed under the Federal Rules; said deposition to now have the same force and effect as though signed.

_____
Wendy L. Welsh, Court Reporter

Sworn to before me this 27th day of January, 2004.

_____
Thomas M. Blasing
Notary Public - State of Ohio

My commission expires:
May 4, 2004.