UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ESTATE OF                                    :
ROGER D. OWENSBY JR., et al.,                :
                                             :
                                             :     Case No. 01-CV-769
              Plaintiff,                     :
                                             :     Senior Judge S. Arthur Spiegel
v.                                           :
                                             :
CITY OF CINCINNATI, et al.,                  :
                                             :
                                             :
              Defendants.                    :
                                             :

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
AGAINST DEFENDANTS CITY OF CINCINNATI, ITS CHIEF OF POLICE
AND ITS INDIVIDUAL POLICE OFFICERS
FOR THEIR FAILURE TO PROVIDE CRITICAL MEDICAL CARE**

Mark T. Tillar (0029898)                James B. Helmer, Jr.  (0002878)
240 Clark Road                          Paul B.  Martins (0007623)
Cincinnati, Ohio  45202                 Frederick M. Morgan, Jr.  (0027687)
Telephone: (513) 761-2958               HELMER, MARTINS & MORGAN CO., LPA
                                        Fourth & Walnut Centre, Suite 1900
                                        105 East Fourth Street
John J. Helbling (0046727)              Cincinnati, Ohio 45202-4008
3672 Springdale Road                    Telephone:    (513) 421-2400
Cincinnati, Ohio 45251                  Facsimile:    (513) 421-7902
Telephone: (513) 923-9740

*Trial Attorneys for Plaintiff*

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
AGAINST DEFENDANTS CITY OF CINCINNATI, ITS CHIEF OF POLICE
AND ITS INDIVIDUAL POLICE OFFICERS
FOR THEIR FAILURE TO PROVIDE CRITICAL MEDICAL CARE**

Plaintiff hereby moves for partial summary judgment, pursuant to Rule 56(c) and (d), Fed. R. Civ. P., as to liability under 42 U.S.C. § 1983 against Defendants City of Cincinnati, its Police Chief, Thomas Streicher, Jr., and its individual police officer defendants, Robert Jorg, Patrick Caton, David Hunter, Darren Sellers, and Victor Spellen,[1] in both their individual and official capacities, for their failure to provide any medical care to decedent, Roger Owensby, Jr., in violation of Mr. Owensby's constitutionally protected rights.

This is a civil rights case involving the homicide of a Cincinnati citizen by the brutal actions of several Cincinnati police officers. There are several legal claims and issues which will need to be determined by a jury.

But the undisputed facts and well-settled legal precedent establish that, as to one aspect of this case, the plaintiff is entitled to summary judgment. That aspect concerns the failure of several Cincinnati and Golf Manor police officers to provide obviously necessary medical care to an injured and detained suspect. In addition, the undisputed evidence demonstrates both a failure of City policies and a lack of adequate training as to carrying out this critical constitutional obligation. As such, plaintiff hereby requests partial summary judgment in this case establishing:

1.     That decedent Roger Owensby, Jr., a suspected jaywalking violator, who was
       seriously injured while being arrested by several Cincinnati police officers, had a

---

[1] A sixth individual Cincinnati police officer defendant, Jason Hodge, has been absent from this litigation, serving in the military in Iraq. He is expected to return in April 2004. Consequently, Plaintiff has not been able to conduct any discovery against Officer Hodge. Because of this fact, and in deference to the Servicemembers Civil Relief Act, 50 U.S.C. app. §§ 501-594, Plaintiff does not seek summary judgment against Officer Hodge at this time.

constitutional right to receive medical care provided by any and all officers present;

2.    No such medical care was provided or even considered for several minutes despite the knowledge that Mr. Owensby was bleeding, had been maced in the face from a distance of six inches and was unconscious;

3.    The constitutional right to medical care of a detained injured suspect is so well established that no officer in this case can avail himself of qualified immunity;

4.    That although Cincinnati City policies (and the United States Supreme Court) require such medical attention be rendered, the City policy was so vague on when such medical care should be provided that no officer, including the Cincinnati Chief of Police, believed such policy had been triggered;

5.    The City of Cincinnati and its Police Chief failed in providing adequate training to its officers so that their obligation to provide medical care could be carried out.

Plaintiff is filing a companion motion directed at the Defendant Village of Golf Manor and its individual officers.

All of the defendants, save one who is serving on foreign military duty, have now given sworn depositions.  Plaintiff has also obtained videotapes and critical documents.  While other discovery matters have not yet been resolved, such unresolved matters are not critical to summary judgment resolution concerning the lack of medical care issues.

Respectfully submitted,

/s/Paul B. Martins

| | |
|---|---|
| Mark T. Tillar (0029898) | James B. Helmer, Jr.  (0002878) |
| 240 Clark Road | Paul B.  Martins (0007623) |
| Cincinnati, Ohio  45202 | Frederick M. Morgan, Jr.  (0027687) |
| Telephone: (513) 761-2958 | HELMER, MARTINS & MORGAN CO., LPA |
| | Fourth & Walnut Centre, Suite 1900 |
| John J. Helbling (0046727) | 105 East Fourth Street |
| 3672 Springdale Road | Cincinnati, Ohio 45202-4008 |
| Cincinnati, Ohio 45251 | Telephone:    (513) 421-2400 |
| Telephone: (513) 923-9740 | Facsimile:    (513) 421-7902 |

*Trial Attorneys for Plaintiff*

<u>**TABLE OF CONTENTS AND SUMMARY**</u>

**MEMORANDUM IN SUPPORT OF
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
AGAINST DEFENDANTS CITY OF CINCINNATI, ITS CHIEF OF POLICE
AND ITS INDIVIDUAL POLICE OFFICERS
FOR THEIR FAILURE TO PROVIDE CRITICAL MEDICAL CARE**

<u>**Page**</u>

I.      **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **1**

Plaintiff moves for partial summary judgment, pursuant to Rule 56(c) and (d), Fed. R.
Civ. P., against Defendants City of Cincinnati, its Police Chief, Thomas Streicher, Jr., and the defendant
Cincinnati police officers, in their individual as well as official capacities, for their failure to provide any
medical care to decedent, Roger Owensby, Jr., in violation of Mr. Owensby's constitutionally protected
rights. The undisputed facts establish that these defendants failed to provide *any* medical care to Mr.
Owensby after beating him into unconsciousness and leaving him to die while handcuffed on the back
seat of a Golf Manor police cruiser.

II.     **FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **2**

        A.  <u>**Election Day, November 7, 2000—**</u>
            **The Meeting Of Five Police Officers** . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **2**

On November 7, 2000, at about 7:15 p.m., five Cincinnati police officers (Officers Jorg, Caton,
Hunter, Sellers, and Hasse) gathered at Sam's Carryout on Seymour Avenue. In the course of their
discussions, officer Jorg began describing an incident about six weeks earlier when an unidentified
African-American man ran from Officer Hunter in the nearby Huntington Meadows apartment complex.
Officer Hunter then pointed out an African-American man about 50 yards across the street and said that
he believed that man was the same person who had previously run from him. The other officers looked
but could only make out the shape of a man. In response, Officer Jorg, who was Officer Hunter's partner
on the prior occasion, said "If that's him, he has a lot of balls showing up here." Officer Jorg then went
to his cruiser to retrieve his PR-24 night stick. The African-American man crossed Seymour Avenue and
entered a convenience store at a Sunoco service station next to Sam's Carryout. Officers Jorg, Caton and
Hunter then walked to the Sunoco service station at approximately 7:44 p.m.

        B.  **The Stop Of Roger Owensby, Jr.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **4**

Officers Jorg and Caton stopped Roger Owensby, Jr. as he attempted to leave the convenience
store, with Officer Hunter remaining off to the side. They were looking for an African-American man of
average height and build, clean shaven, with a short afro, who went by the nickname "LA," and was
believed (by Officers Jorg and Caton) to be carrying a gun. The man they stopped, Roger Owensby, Jr.,
was an African-American man of average height and build, had a beard, short dreadlocks, and was
unarmed. He was respectful and cooperative. He identified himself as Roger Owensby, explained that he
lived in North College Hill and was visiting a girlfriend in the area. Officer Jorg conducted a pat-down of
Mr. Owensby and verified that he was unarmed. The officers told Mr. Owensby that they were looking
for a man who had assaulted a police officer. No one ever asked Mr. Owensby whether he went by the
nickname of "LA." Officer Hunter got very close to Mr. Owensby, in his personal space, and said,
"When's the last time you ran from the police?" Officer Hunter then told Officers Jorg and Caton,
"That's the guy." At that point Mr. Owensby tried to run away. He got about 5 to 7 steps and was

tackled into a parked car by Officers Jorg and Caton.

**C. The Arrest And Beating Of Roger Owensby, Jr.** ........................ **7**

Officer Jorg tackled Mr. Owensby around the shoulders and Officer Caton grabbed Mr. Owensby's legs. Officer Caton put out an officer-needs-assistance call. Roger Owensby ended up face down on the asphalt parking with his arms pinned under him. Officer Jorg lay on Mr. Owensby's upper back with a knee in his left shoulder blade, his left arm wrapped around Mr. Owensby's head, and using a "mandibular angle pressure point technique with his right hand (applying pressure with his right finger against the area at the base of Mr. Owensby's right ear). Officer Hunter straddled Mr. Owensby's lower back striking Mr. Owensby's right arm and lower back and trying to pull Mr. Owensby's right arm out from under him.

Officer Caton demanded that officer Hunter, "Mace this Motherf**ker." In response, Officer Hunter told Officer Jorg to move his head away from Mr. Owensby so that he would not be maced. Officer Jorg pulled his own head back while pulling Mr. Owensby's head up to be maced, thereby driving his knees into Mr. Owensby's back. Officer Hunter maced Mr. Owensby from a distance of 6 inches, even though the Cincinnati Use of Force procedure states that mace should be applied from a distance of 5 to 10 feet. Exhibit 60, Procedure 12.545. Officer Sellers testified that the unresisting Mr. Owensby was maced after he was handcuffed. During this time, the three officers were joined by Officer Jason Hodge (who used a PR-24 night stick to get Mr. Owensby's arm out from under him) and Officer Sellers (who eventually handcuffed Mr. Owensby).

After Roger Owensby was handcuffed, Officers Sellers and Hunter saw Officer Caton deliver several punches to Mr. Owensby's lower back just above his handcuffed wrists. Mr. Owensby was defenseless, not moving and offering no resistance.

**D. Roger Owensby Is Placed In The Back Seat Of A Golf Manor Cruiser And Beaten** ................................................... **10**

Mr. Owensby was then carried and slid into the back seat of a Golf Manor cruiser driven by Golf Manor Officer Robert Heiland who also responded to the assistance call. At this time the handcuffed Mr. Owensby was bleeding from his face, made no sounds and was not moving. Officer Hunter then saw Officer Caton repeatedly punch Mr. Owensby while he lay handcuffed and unconscious in the back seat of the Golf Manor cruiser.

**E. No Medical Attention Is Provided To Roger Owensby, Jr.** ................ **11**

Mr. Owensby lay unconscious and handcuffed in the back seat of the Golf Manor cruiser for more than five minutes. Exhibit 20. Despite knowledge that Roger Owensby had been beaten, maced, his face was cut, he was unresponsive and probably unconscious, *none of the Cincinnati police officers on the scene ever attempted to provide any medical care to Mr. Owensby.* Additionally, the Golf Manor police officer who assisted Officers Jorg and Caton place a bloody and unconscious Owensby in his car failed to even check on his condition.

During the time that Mr. Owensby lay in the back seat of the Golf Manor cruiser there were at least eleven Cincinnati police officers on the scene, two of whom were trained EMTs. No one provided any medical care for Mr. Owensby. Exhibit 20, Officer Spellen cruiser video. Instead the officers greeted each other, put on their hats and joked over how Mr. Owensby was "hurting" a lot. Exhibit 21, Transcript of Spellen cruiser video.

Additionally, the Golf Manor officer in whose car Mr. Owensby lay, was also a trained EMT.  He and his fellow Golf Manor officer provided no medical care to Mr. Owensby, despite having been expressly told by a Cincinnati officer, "Can he breathe?  It don't look like he can from the way he's laying."

### F.  The Death Of Roger Owensby, Jr. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

Eventually, when a Cincinnati police sergeant tried to question Mr. Owensby at approximately 7:56 p.m., he discovered that Mr. Owensby was not breathing.  Resuscitation efforts were unsuccessful.  The Hamilton County Coroner conducted an autopsy and determined that Mr. Owensby's death was a "homicide (police intervention:  asphyxiation during restraint attempts)."  The cause of death was "mechanical asphyxia."  Exhibit 103.  It is a medical certainty that mechanical asphyxia takes minutes to result in death.  These findings were verified by Dr. Cyril Wecht, M.D., the Coroner for Pittsburg whom the City hired in assessing administrative discipline against some of its police officers.  Exhibit 108.

### G.  September 27, 2000—The Motive For Police Street Justice . . . . . . . . . . . . . . .   17

In order to fully understand the brutality of the "street justice" beating and refusal to provide any medical attention to an obviously seriously injured prisoner, one must examine the events some six weeks prior to Mr. Owensby's homicide.  On September 27, 2000, Officers Hunter and Jorg, were working undercover in the same area.  Officer Hunter pulled his gun on and chased an unknown man who he says obstructed a drug investigation.  He did not catch the man and maced himself during the chase.  Further, two drug trafficking suspects that Officers Jorg and Hunter arrested had no drugs or drug money.

Officer Hunter says the two men they arrested identified the man who ran from him as "LA."  However, neither arrestee could have seen the man who ran from Officer Hunter because they were at Sam's Carryout and he was some distance away in the Huntington Meadows apartment complex.  Further, Officer Hunter says that, had he arrested the man, he would have charged him with obstruction of a drug investigation and jaywalking.  However, the only valid charge that could be levied against this man was jaywalking since there was no underlying evidence of drug trafficking.  *State v. Bronaugh*, 69 Ohio App. 2d 24, 25-26, 429 N.E.2d 1084, 1086 (1st App. Dist. 1980).

## III.    STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

Summary Judgment as to § 1983 liability is appropriate where, as we have here, no genuine issues of material fact exist concerning the failure of the defendants to provide constitutionally-required critical medical care to Mr. Owensby.  Rule 56, Fed. R. Civ. P.

## IV.    42 U.S.C. § 1983: LIABILITY FOR THE FAILURE TO PROVIDE
##        MEDICAL CARE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

To establish a claim under 42 U.S.C. § 1983, two elements are required: (1) conduct committed by a person acting under color of state law that (2) deprives plaintiff of rights, privileges, or immunities secured by the Constitution or the laws of the United States.  *Culberson v. Doan*, 125 F. Supp. 2d 252, 263 (S.D. Ohio 2000).  It is uncontested that the officers were acting in their official capacities on November 7, 2000.  Therefore, the only remaining issue to prove is that they deprived Roger Owensby of a constitutionally-protected right.

**A.    The Constitutional Right To Medical Care** . . . . . . . . . . . . . . . . . . . . . . . . . **24**

Twenty years ago the Supreme Court established the duty of law enforcement to provide medical care to pretrial detainees. *Bell v. Wolfish*, 441 U.S. 520, 535 n. 16 (1979); *City of Revere v. Massachusetts Gen.* Hospital, 463 U.S. 239, 244 (1983); *DeShaney v. Winnebago County Dept. Of Soc. Servs.*, 489 U.S. 189, 198-200 (1989); *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998). Thus, once Roger Owensby was handcuffed, all of the officers on the scene had a constitutional duty to provide for his medical care. The evidence is undisputed that none of the Cincinnati or Golf Manor police officers sought or provided any medical care for Mr. Owensby in the critical time while he lay unconscious and dying in the Golf Manor cruiser.

**B.    The Fourth Amendment Objective Reasonableness Test** . . . . . . . . . . . . . . **26**

All claims arising out of the excessive use of force, including the failure to provide medical care, are analyzed under the Fourth Amendment objective reasonableness test. *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Alexander v. Beale Street Blues Co., Inc.*, 108 F. Supp. 2d 934 (W.D. Tenn. 1999); *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586 (7th Cir. 1997). That is, the court must determine whether the officers' actions in failing to provide medical care to Mr. Owensby is "objectively reasonable" in light of the facts and circumstances. *Graham*, 490 U.S. at 396-97; *Darrah v. City of Oak Park*, 225 F.3d 301, 307 (6th Cir. 2001).

**C.    Liability Of The Officers In Their Individual Capacities.** . . . . . . . . . . . . . **30**

The above facts establish that § 1983 summary judgment is appropriate against the Cincinnati police Officer defendants, Robert Jorg, Patrick Caton, Darren Sellers, Victor Spellen, and David Hunter, in their individual capacities, for their callous and deliberate refusal to provide constitutionally required medical care to Roger Owensby.

**D.    Qualified Immunity Is Inapplicable** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **32**

The Cincinnati police officer defendants are not entitled to qualified immunity because they violated a clearly established constitutional right to medical care that has existed for over twenty years.

**E.    Municipal Liability Of The City Of Cincinnati** . . . . . . . . . . . . . . . . . . . . . . **34**

The City of Cincinnati is liable under § 1983 for failing to properly train its officers in the obvious and foreseeable consequences of their use of force and associated duty to provide medical care for their injured prisoners. *City of Canton v. Harris*, 489 U.S. 378 (1989).

**1.    Cincinnati Police Procedure 12.545** . . . . . . . . . . . . . . . . . . . . . . . . . . **35**

Cincinnati's Use of Force Procedure 12.545, requires that medical care be rendered immediately, "once the incident scene is stabilized." Exhibit 60. The policy neither defines when a scene is stabilized or provides any examples. Cincinnati provided no training to its officers as to when a scene is stabilized. This vague policy resulted in confusion or cover for officers who claim they were under no obligation to provide medical care to the handcuffed Mr. Owensby in the Golf Manor cruiser because the scene was not "stabilized." Even the Cincinnati Police Chief could not identify when the scene was stabilized.

Officer Jorg also testified that Cincinnati policy and custom *prohibited* him and the other four officers involved in Mr. Owensby's arrest from providing any medical care because they were involved in the use of force incident with Mr. Owensby.

iv

2.      **Mutual Aid Agreement** .................................. **39**

On November 7, 2000, Cincinnati and its neighboring municipalities were parties to a Mutual Aid Agreement which authorized police from various municipalities to work together. Exhibit 78. However, the record is clear that Cincinnati provided no training to its officers concerning their duties and responsibilities under the Mutual Aid Agreement. Nor did Golf Manor. The foreseeable and tragic result was that Cincinnati officers now say Golf Manor was responsible for Mr. Owensby's medical care because he was in their custody in their car while Golf Manor's officers maintain that Mr. Owensby's medical care was the responsibility of Cincinnati officers since they made the arrest. Neither the Village nor the City trained their officers. Setting aside the unseemly finger-pointing, the fact is *all* of the officers on the scene had a constitutional duty to provide for Mr. Owensby's medical care and *none* of them did so.

3.      **The Department Of Justice's Criticism Of The City Of Cincinnati's Poor Training** ......................................... **41**

Less than a year after Mr. Owensby's death, the Department of Justice issued a report criticizing Cincinnati's use of force training: "We recommend that the in-service training, like the new recruit training, provide more instruction in the use of force decision-making. Currently, officers spend one hour in the classroom during which they are read portions of the use of force policies by the instructor." Exhibit 117, p.11. One hour of reading policies silent on when officers should provide medical assistance to an obviously distressed citizen is a failure as a matter of law to fulfill constitutional obligations.

V.      **CONCLUSION** ..................................................... 42

The undisputed failure to provide medical attention to a bleeding, maced and unconscious detained suspect is properly analyzed as "excessive force" and therefore is a well established Fourth Amendment constitutional injury that has existed for twenty years. It is uncontested that none of the defendants provided any medical care in the critical minutes after Mr. Owensby's arrest. It is also undisputed that the City of Cincinnati failed to train its officers concerning their duty to provide such critical medical care. The vagueness of the City's policy, coupled with this failure to train, resulted in the foreseeable and tragic consequence that resulted in the death of Roger Owensby on November 7, 2000. As such, summary judgment should be granted against the City of Cincinnati and its officers, under § 1983, for their failure to provide medical care to Mr. Owensby.

# TABLE OF AUTHORITIES

## CASES

*Alexander v. Beale Street Blues Co.*,
    108 F. Supp. 2d 934, 944 n.10 (W.D. Tenn. 1999) . . . . . . . . . . . . . . . . 24, 25, 26, 27, 28, 30, 34

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*Bell v. Wolfish*, 441 U.S. 520, 535 n. 16 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 34

*Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Bukowski v. City of Akron*, 326 F.3d 702, 708 (6th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*California v. Hodari D.*, 499 U.S. 621 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

*City of Canton v. Harris*, 489 U.S. 378 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 35, 39, 41

*City of Revere v. Massachusetts Gen. Hospital*, 463 U.S. 239, 244 (1983) . . . . . . . . . . . . . . . . . . . 24, 34

*County of Sacramento v. Lewis.*, 523 U.S. 833, 842 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . 24, 26, 27, 34

*Culberson v. Doan*, 125 F. Supp. 2d 252, 263 (S.D. Ohio 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Darrah v. City of Oak Park*, 225 F.3d 301, 307 (6th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*DeShaney v. Winnebago County Dept. Of Soc. Servs.*,
    489 U.S. 189, 198-200 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 29, 30, 34

*Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 595 (7th Cir. 1997) . . . . . . . . . . 26, 27, 28, 29, 30

*Ewolski v. City of Brunswick*, 287 F.3d 492, 509 (6th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . 24, 25, 28, 33

*Gazette v. City of Pontiac*, 41 F.3d 1061, 1065 (6th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

*Gomez v. Toledo*, 446 U.S. 635, 640 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Graham v. Connor*, 490 U.S. 386, 395 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27, 28, 30

*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Horn v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994) . . . . . . . . . . . . . . . . . . . . 24, 34

*Leisure v. City of Cincinnati*, 267 F. Supp. 2d 848, 851 (S.D. Ohio 2003) . . . . . . . . . . . . . . . . . . . . 33

*Roberts v. City of Troy*, 773 F. 2d 720, 723 (6th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 34

*Sargi v. Kent City Board of Educ.*, 70 F.3d 907, 910 (6th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Saucier v. Katz*, 533 U.S. 194, 200-01 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Spurlock v. Satterfield*, 167 F.3d 995, 1006 n.19 (6th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*State v. Bronaugh*, 69 Ohio App. 2d 24, 25-26, 429 N.E.2d 1084, 1086 . . . . . . . . . . . . . . . . . . . . . . 21

*State v. Cooper*, 151 Ohio App. 3d 790, 786 N.E.2d 88 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*State v. Jelliffe*, 5 Ohio Misc. 2d 20, 449 N.E.2d 810 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*State v. McCullough*, 61 Ohio Misc. 2d 607 580 N.E.2d 1180 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*State v. Rowland*, 67 Ohio St. 3d 374, 382, 618 N.E.2d 138, 145 (1993) . . . . . . . . . . . . . . . . . . . . . 21

*State v. Smith*, 2000 Ohio App. LEXIS 1840 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Stemler v. City of Florence*, 126 F.3d 856, 865 (6th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26


## CONSTITUTION:

U.S. Const. amend. IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27


## STATUTES

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 31, 35, 43

50 U.S.C. app. §§ 501-594 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**
**AGAINST DEFENDANTS CITY OF CINCINNATI, ITS CHIEF OF POLICE**
**AND ITS INDIVIDUAL POLICE OFFICERS**
**FOR THEIR FAILURE TO PROVIDE CRITICAL MEDICAL CARE**

## I.    INTRODUCTION

On November 7, 2000, a group of five Cincinnati police officers beat Roger Owensby, Jr., choked him, and handcuffed him.  After he was handcuffed, Mr. Owensby was maced from a distance of six inches by one Cincinnati Police officer.  Another Cincinnati Police officer continued to beat the handcuffed, unresisting Mr. Owensby, even after he was placed in the rear seat of a Golf Manor police cruiser.

Mr. Owensby died in the back seat of that cruiser.

Although surrounded by officers from two municipalities, including at least three officers who were trained emergency medical technicians (EMTs), no one bothered to provided him any medical attention.

There is no dispute that the evidence of record establishes that Cincinnati and Golf Manor police officers on the scene failed to provide any medical attention for Mr. Owensby's injuries for a critical period of time of between six to ten minutes.  As a result Mr. Owensby died of mechanical asphyxia which took place over this time period.  Defendant City of Cincinnati failed to train its police officers to provide medical care under these circumstances in deliberate indifference to this foreseeable, and fatal, consequence.  The City policy, although requiring that medical attention be provided, is so vague as to when such assistance should begin that not one officer, including the Chief, has been able clearly to define its requirements.

This lawsuit, brought by Roger Owensby's father and estate administrator, alleges violations of constitutionally-created civil rights afforded to all United States citizens under 42 U.S.C. § 1983 as well as state constitutional and tort claims for the wrongful death of his son at the hands of these defendants.  Mr. Owensby, a 29-year-old African-American man, is survived by his twelve-year-old daughter and her mother, his parents and his brother.  Doc. 1, Complaint.

## II.    FACTS

### A.    Election Day, November 7, 2000—The Meeting Of Five Police Officers.

At dusk on election day, November 7, 2000, five uniformed Cincinnati police officers were parked at Sam's Carryout, 2092 Seymour Avenue, Cincinnati, Ohio.  The officers had arrived in three Cincinnati police cruisers.  The first cruiser on the scene, Unit 4251, was manned by Defendant Officer Darren Sellers and his partner, Officer Alexander Hasse.  They had arrested someone on a minor misdemeanor charge of marijuana possession and needed a Notice To Appear ("NTA") ticket book to write the misdemeanor citation.  The request for an NTA book was broadcast through their police cruiser Mobile Data Transmitter ("MDT") at 7:17 p.m. specifically and only to two other District 4 police cruisers:  Officers Robert Blaine Jorg and Patrick Caton in Unit 4252, and Officer David Hunter in Unit 4256.[2]  Thus, by 7:30 p.m. three Cincinnati police cruisers and five Cincinnati police officers in uniform were at Sam's Carryout.

While standing near their respective police cruisers, Officer Jorg began talking to Officers Caton, Hunter, and Sellers about a prior incident in this area when he was working undercover with Officer Hunter.  In that prior incident, an African-American male of average height and weight—known only to Officers Jorg and Hunter as "LA"—ran from Officer Hunter and was never found.[3]  During this conversation, Officer Hunter pointed out an African-American male walking on the other side of Seymour Avenue, approximately 50 yards away, saying, "I think that's him."[4]  Because of the distance and darkness, Officer Sellers could only

---

[2] Exhibit 112, Cincinnati Police MDT Logging Activity Detail.  For consistency, Plaintiff retains the same numerical exhibit designations as used during depositions in this action. Exhibits designated with letters were produced by Defendants in discovery but not used in depositions.

[3] Hunter 12/4/03 Depo., pp. 124 - 126; Sellers 10/21/03 Depo., pp. 32-34; Jorg 10/14/03 Depo., pp. 86:24 - 87:1, 96:20 - 97:4.

[4] Sellers 10/21/03 Depo., pp. 34:13-23, 36:13-19; Hunter 12/4/03 Depo., p. 124:9-17; Caton 10/17/03 Depo., p. 72:17-19; Jorg 10/14/03 Depo., pp. 86:23 - 87:1, 91:1-3.

make out a person walking on the opposite sidewalk;[5] Officer Jorg "couldn't make him out from anyone;"[6] and, all Officer Caton could see was "little more than a silhouette of an individual."[7]

In response, Officer Jorg, the senior officer on the scene with five years of service, said to the other officers, "If that's him, he has a lot of balls showing up here" or "Well, he's got a lot of balls to come out here and all these police officers and all these cruisers out here."[8]  The other officers asked Officer Hunter whether he was sure about his identification, to which Officer Hunter replied, "I think so."[9]  That's when Officer Jorg said, "Well, we're going to go over here and investigate and see who this guy is."[10]  By this time the person who the officers had seen walking up Seymour Avenue had crossed the street and entered the Sunoco convenience store next door, 2098 Seymour Avenue, at the corner of Seymour Avenue and Langdon Farm Road.[11]

At 7:44 p.m., Officers Caton and Hunter began walking to the Sunoco convenience store.  Officer Jorg briefly returned to his cruiser to retrieve his PR-24 night stick and then joined Officers Caton and Hunter.[12] The three officers stood outside the convenience store watching several African-American men purchasing

---

[5] Sellers 10/21/03 Depo., p. 36:5-11.

[6] Jorg 10/14/03 Depo., pp. 88:23 - 89:1.

[7] Caton 10/17/03 Depo., p. 73:13-16.

[8] Sellers 10/21/03 Depo., p. 35:9-12; Jorg 10/14/03 Depo., p. 87:17-19; Hunter 12/4/03 Depo., p. 126:14-20.

[9] Sellers 10/21/03 Depo., p. 36:13-17.

[10] Sellers 10/21/03 Depo., p. 36:17-19.

[11] Jorg 10/14/03 Depo., pp. 89:22 - 90:1.

[12] Jorg 10/14/03 Depo., pp. 91:24 - 92:3.  The City of Cincinnati produced a audio tape of the radio channel communication of the police with ten-second time designations.  A transcript of this tape recording is attached as Exhibit A.

items.  Roger Owensby, Jr. was one of these men.  He purchased two cigars and an energy drink.[13]

According to Officer Hunter, he positively identified Mr. Owensby as the person who ran from him previously.[14]  However, Officers Jorg and Caton tell a different story.  They say that Officer Hunter still was not positive that Mr. Owensby was the person who ran.[15]  In fact, to this day we are not certain that Mr. Owensby was the man whom Officer Hunter sought.

Officer Jorg positioned himself in the Sunoco convenience store doorway holding his night stick.  He stopped Mr. Owensby as he attempted to leave.  A store surveillance camera captured the stop of Mr. Owensby.  That surveillance video was seized by the Cincinnati Police the next day and a copy is filed herewith as Exhibit B.  The video displays the interrogation and search of Mr. Owensby which we now describe.

**B.     The Stop of Roger Owensby, Jr.**

At the time that the three officers stopped Mr. Owensby as he tried to leave the Sunoco convenience store with his purchases, they were looking for:

- an African-American male;
- of average height and weight;
- clean shaven;
- with a short afro;[16]
- known by the nickname or alias of  "LA;" and,

---

[13] Caton 10/17/03 Depo., p. 88:5-16.

[14] Hunter 12/4/03 Depo., pp. 131:21 - 132:3.

[15] Jorg 10/14/03 Depo., p. 96:8-11 ("Dave [Hunter] really, in my opinion, wasn't sure if it was the person that ran from him or not."); Caton 10/17/03 Depo., p. 86:1-8 ("And Officer Hunter's comment to me was, he didn't have all that facial hair, but I thing that's him or I'm almost sure that's him or I'm 90 percent sure that's him.  It was something along that lines.  And what it indicated to me was even though we've got a perfect look at this—at this guy, he's still not sure that this is the guy that assaulted him, I guess the 27th of September.")

[16] Hunter 11/6/03 Depo., pp. 86:22 - 87:1.

4

- was believed to be carrying a gun.[17]

The man they stopped, Roger Owensby, Jr., was:

>   - an African-American male;
>   - of average height and weight;
>   - had a beard;
>   - wore dreadlocks;
>   - did not go by the nickname or alias of "LA;"[18]and,
>   - was unarmed.

While Officer Hunter stood off to the side, Officers Jorg and Caton stopped Roger Owensby at the entrance to the Sunoco convenience store and asked if they could talk to him.[19]  Mr. Owensby agreed.  Mr. Owensby was asked to place his drink on the ground next to him.  He did.[20]  Officer Jorg asked for his name and he identified himself as Roger Owensby.[21]  Officer Jorg asked him where he lived and Mr. Owensby told

---

[17] This "suspicion" comes from two different stories.  Officer Jorg testified that he believed that the "LA" that they were looking for had been involved in a drive-by shooting.  Officer Jorg 10/14/03 Depo., pp. 97:5 - 100:17.  On the other hand, Officer Caton testified that he questioned the person that Officer Hasse had arrested on November 7, 2000 and that person told him that he knew a person named "LA" who was usually armed.  Caton 10/17/03 Depo., pp. 76:3 - 77:2.  None of the other officers remember Officer Caton talking to the person arrested at Sam's Carryout by Officer Hasse.  Hasse 11/19/03 Depo., pp. 60:3 - 61:2; Sellers 10/21/03 Depo., pp. 37:23 - 38:11; Hunter 12/4/03 Depo., p. 123:2-18.  In contrast to both Officers Caton and Jorg, Officer Hunter had never heard that "LA" carried any firearm.  Hunter 12/4/04 Depo., p. 130:15-23.

[18] None of the three police officers who stopped and questioned Mr. Owensby asked whether he went by the alias of "LA."  Jorg 10/14/03 Depo., pp. 103:17 - 104:3.  His prior police mugshot does not identify Mr. Owensby as having an alias of "LA."  Exhibit C.  However, in response to Plaintiff's document request, Defendant City of Cincinnati produced records on an African-American male, Larry Antonio Fields, who has an alias of "LA."  Mr. Fields has 17 misdemeanor convictions, 4 felony convictions, and 12 traffic convictions, including convictions for: drug trafficking in 1994; cocaine trafficking in 2002; disorderly conduct in 2002; and, DUIs in 1993 and 2000.  Exhibit D.

[19] Exhibit B; Jorg 10/14/03 Depo., pp. 98:20 - 99:1.

[20] Jorg 10/14/03 Depo., p. 99:2-4.

[21] Jorg 10/14/03 Depo., pp. 99:22 - 100:2.

5

him that he lived in North College Hill.[22]  When asked why he was in the Roselawn-Bond Hill area, he explained that he had a girlfriend in this area.[23]  By Officer Jorg's own admission, Mr. Owensby was cooperative and respectful.[24]

Officer Jorg told Mr. Owensby that they were looking for a person who had assaulted someone and was known to carry a firearm.  Mr. Owensby told him that he was unarmed and pulled up his shirt to show him that he was unarmed.[25]  He also told Officers Jorg and Caton, "You can run me on [your] computer and see I'm not wanted for anything."[26]

Mr. Owensby agreed to allow the officers to conduct a pat-down of his person to confirm that he was unarmed.  Officer Jorg conducted what he described as a thorough pat- down.[27]  This is visible on the surveillance videotape.[28]  Mr. Owensby was unarmed.   Nor were any suspicious items of any kind found.

As Officers Jorg and Caton continued to interrogate Mr. Owensby, he said, "I don't appreciate you coming at me this way."[29]  The officers then asked Mr. Owensby whether he had ever struck a police officer or run from the police.[30]  Mr. Owensby said he had not.[31]

---

[22] *Id.* at 100: 6-13; Caton 10/17/03 Depo., p. 91:12-15.

[23] Caton 10/17/03 Depo., p. 90:7-12.

[24] Jorg 10/14/03 Depo., p. 100:17-20.

[25] Jorg 10/14/03 Depo., pp. 100:22 - 101:3; Caton 10/17/03 Depo., p. 89:1-6.

[26] Caton 10/17/03 Depo., p. 89:16-17.

[27] Jorg 10/14/03 Depo., p. 101:3-6; Caton 10/17/03 Depo., pp. 90:17 - 91:7; Exhibit B.

[28] Exhibit B.

[29] Caton 10/17/03 Depo., pp. 90:15-16, 92:15-18.

[30] Jorg 10/14/03 Depo., p. 101:12-16; Caton 10/17/03 Depo., p. 92:20-24.

[31] Jorg 10/14/03 Depo., p. 101:16.

### C.    The Arrest And Beating Of Roger Owensby, Jr.

At this point, Officer Hunter approached very close to Mr. Owensby and said, "Really? When's the last time you ran from the police?"[32]  Officer Hunter then said:  "That's the guy."[33]

Officer Caton describes Officer Hunter's distance as uncomfortably close and in Mr. Owensby's personal space,[34] and says that this confrontation triggered a "flight response" from Mr. Owensby.[35]

But Mr. Owensby did not go far.  Mr. Owensby attempted to slide past Officers Hunter and Caton.[36] He only got, at most, 5 to 7 steps when he was tackled into a parked car by Officer Jorg (around the shoulders) and Officer Caton (at the back of the legs).[37]

Mr. Owensby fell face down on the asphalt parking lot with Officer Jorg on his upper back and Officer Caton on his legs.  Officer Caton issued an officer-needs-assistance call at 7:47 p.m.[38]  Both Mr. Owensby's arms were pinned under his chest by the combined nearly 500 pounds of weight of the two Cincinnati police officers.[39]

Officer Caton straddled Mr. Owensby's thighs and buttocks and was trying to pull Mr. Owensby's

---

[32] Caton 10/17/03 Depo., p. 94:6-9.

[33] Jorg 10/14/03 Depo., p. 102:20.

[34] Caton 10/17/03 Depo., pp. 94:10-15, 95:22.

[35] Caton 10/17/03 Depo., pp. 95:5-7, 98:8-10.

[36] Jorg 10/14/03 Depo., pp. 102:21 - 103:1, 106:11-24; Exhibit B.

[37] Jorg 10/14/03 Depo., pp. 107:1-10, 115:1-7; Caton 10/17/03 Depo., pp. 96:6 - 99:14, 101:18-20.

[38] Caton 10/17/03 Depo., p. 100:1-9; Exhibit A, Transcript of Cincinnati Police Channel.

[39] Caton 10/17/03 Depo., p.104:9-13.

right arm out from under him while Officer Jorg was trying to pull his left arm out.[40]  Officer Caton began striking Mr. Owensby's lower back and right arm as he attempted to pull Mr. Owensby's arm out from under him.  Officer Caton also used a night stick (PR-24) on Mr. Owensby's legs as a means of "pain compliance."[41]

Officer Jorg lay across Mr. Owensby's shoulders, placing his left arm around Mr. Owensby's head with the crease of his elbow at the center of Mr. Owensby head in a "head wrap."  While doing this Officer Jorg exerted pressure at the base of Mr. Owensby's right ear with his right hand, employing what he claims was a "mandibular angle pressure point" pain compliance technique.[42]  He also admits to placing his knee on Mr. Owensby's left shoulder in the area of the left scapula.[43]

In response to the officer-needs-assistance-call, both Cincinnati and neighboring Golf Manor police officers flocked to the Sunoco store.  Officer Sellers, hearing the assistance call, ran from his cruiser at the next door Sam's Carryout parking lot, leaving his partner, Officer Hasse, with the minor misdemeanor marijuana arrestee.  Upon arriving, Officer Sellers noticed that Mr. Owensby was not moving.[44]  Further, it was impossible to tell whether the difficulty that Officers Jorg and Caton reported in getting Mr. Owensby's arms out from under him was the result of resistance or the consequence of the combined weight of Officers Jorg and Caton on Mr. Owensby along with his own weight.[45]  Officer Sellers pulled Roger Owensby's left

---

[40] Caton 10/17/03 Depo., pp.104; Jorg 10/14/03 Depo., pp. 41:7-15, 124:7-11.

[41] Hunter 12/4/03 Depo., p. 171:3-9.

[42] Jorg 10/14/03 Depo., pp. 23:20 - 35:21.

[43] Jorg 10/14/03 Depo., p. 41:2-15.

[44] Sellers 10/21/03 Depo., p. 50:10-14.

[45] Sellers 10/21/03 Depo., p. 50:15-23.

8

arm out and handcuffed the right and left wrists together behind Mr. Owensby's back.[46]  At that point Officer Sellers told the other officers, "He's cuffed."[47]

Defendant Cincinnati police Officer Jason Hodge also arrived in response to the "officer needs assistance" call.  Officer Hodge used a night stick (PR-24) to pry Mr. Owensby's right arm out from under him.[48]

Officer Caton yelled for Officer Hunter to "Mace this mother f**ker."[49]  In response, Officer Hunter told Officer Jorg to lift Mr. Owensby's head so that he could mace him in the face.  He also told Officer Jorg to move his own head away from Mr. Owensby so that he would not be sprayed with mace. Keeping his arm around Mr. Owensby's neck and head, Officer Jorg pulled Mr. Owensby's head up, turned his own head away, and drove his knees into Mr. Owensby's back.[50]  Officer Hunter sprayed mace two times into Mr. Owensby's eyes and nose from a distance of 6 inches.[51]  Mr. Owensby only grimaced in response to the mace—no cough, no cry, no sound.[52]

---

[46] Sellers 10/21/03 Depo., pp. 47:8 - 50:9.

[47] Sellers 10/21/03 Depo., p. 49:12-16.

[48] Jorg 10/14/03 Depo., pp. 129:19 - 132:15.

[49] Caton 10/17/03 Depo., p.110:18-20; Jorg 10/14/03 Depo., p.128:11-12.

[50] A witness to this arrest, Ms. Aerial St. Clair, described officer Jorg as kneeling on Mr. Owensby's back with his arm around Mr. Owensby's neck.  Ms. St. Clair was called as a prosecution witness in Jorg's criminal trial, passed several polygraph examinations, and her testimony was relied upon by the City of Cincinnati in its administrative disciplinary procedures arising from this incident.  Exhibit 108, 9/10/02 Report of Cyril Wecht, M.D., J.D., to the City of Cincinnati, pp. 3-4, 16.  *See also*, Hunter 12/4/03 Depo., p. 164:3-10.

[51] Hunter 12/4/03 Depo., p. 166:5-17.  The Cincinnati Police Use of Force Policy, 12.545, states, "when spraying chemical irritant, if possible spray five to ten feet from an individual." Exhibit 60, p. 9, ¶ C.4.

[52] Hunter 12/4/03 Depo., pp.167:22 - 168:9; Sellers 10/21/03 Depo., p. 53:21-24.

According to Officer Sellers, Officer Hunter maced Mr. Owensby *after* he was handcuffed.[53] Also, both Officers Sellers and Hunter saw Officer Caton repeatedly strike Owensby in the back after he was handcuffed, just above his handcuffed hands.[54] Upon seeing Officer Caton punching a handcuffed Mr. Owensby, Officer Hunter exclaimed out loud, "What the hell is he doing!" Only then did Officer Caton stop punching Mr. Owensby, temporarily.[55] Mr. Owensby was offering no resistance and was totally defenseless.[56]

At this time all five officers—Jorg, Caton, Hunter, Hodge and Sellers—stood up over Mr. Owensby. With his hands handcuffed behind his back, Mr. Owensby was picked up. Mr. Owensby's face was battered, cut and bleeding.[57] Officers Jorg and Caton had blood from Mr. Owensby on the sleeves of their shirts. Mr. Owensby's saliva was also mixed with his blood on Officer Jorg's sleeve that was wrapped around Mr. Owensby's neck.[58]

**D.    Roger Owensby Is Placed In The Back Seat Of A Golf Manor Cruiser And Beaten.**

Officers Jorg and Caton carried Mr. Owensby to a nearby Golf Manor cruiser that had just arrived in response to the officer-needs-assistance call.[59] They received permission to put Mr. Owensby in the back seat

---

[53] Sellers 10/21/03 Depo., p. 52:15-23.

[54] Sellers 10/21/03 Depo., pp. 51:24 - 52:14; Hunter 12/4/03 Depo., pp. 171:16 - 172:5.

[55] Hunter 12/4/03 Depo., pp. 173:19 - 174:1.

[56] Hunter 12/4/03 Depo., p. 174:8-14.

[57] Jorg 10/14/03 Depo., p. 145:4-16; Heiland 12/3/03 Depo., p. 44:7-14.

[58] Exhibit 12, Official Crime Laboratory Serology Report establishing the presence of amylase (a digestive enzyme found in saliva) on Jorg's left sleeve; Schultz 12/17/03 Depo., pp. 72:23 - 73:11.

[59] Hunter 12/4/03 Depo., pp. 175:23 - 177:17; Sellers 10/21/03 Depo., pp. 54:23 -55:21.

of the cruiser operated by Defendant Golf Manor police officer Robert Heiland "Heiland").[60]  They laid the

handcuffed and unconscious Mr. Owensby head-first on the back seat of the Golf Manor cruiser.[61]  Officer

Caton went around to the other side to drag Mr. Owensby into the cruiser.[62]

After Mr. Owensby was taken to the Golf Manor cruiser, Officer Hunter looked over to the cruiser

and was shocked to see Officer Caton beating the handcuffed and unconscious Owensby.[63]

> He [Caton] was leaning in the doorway. He was between the door and the inside of the car.
> He was leaning in, and I could see him drawing back and coming down, drawing back,
> coming down, throwing either punches or open hand, I can't say, but he was throwing blows.
> He was delivering blows.  And Mr.—and the only thing he—he could eith—he could have
> been punching Mr. Owensby or he could have been punching the back seat.[64]

Despite seeing Officer Caton punching Mr. Owensby in the head, Officer Hunter did not walk over

to check on the health of Mr. Owensby or attempt to stop Officer Caton's assault on the defenseless suspect.[65]

### E.    No Medical Attention Is Provided To Roger Owensby, Jr.

Despite knowledge that Roger Owensby had been beaten, his face was cut, blood was on the shirt

sleeves of Officers Jorg and Caton, he had been maced, and he was unresponsive and probably unconscious,

*none* of the Cincinnati police officers on the scene even attempted to provide any medical care to Mr.

Owensby.  Additionally, the Golf Manor police officer who saw Officers Jorg and Caton place a bloody and

---

[60] Heiland 12/3/03 Depo., p. 22:2-14; Caton 10/17/03 Depo., p. 123:4-8; Hunter 12/4/03 Depo., pp. 175:23 - 177:17; Jorg 10/14/03 Depo., p.150:4-20

[61] Sellers 10/21/03 Depo., p. 57:2-4.

[62] Caton 10/17/03 Depo., p. 126:7-24.

[63] Hunter 12/4/03 Depo., pp. 178:1 - 182:18.

[64] Hunter 12/4/03 Depo., p. 179:14-22.

[65] Hunter 12/4/03 Depo., p. 185:12-19.

unconscious Owensby in his car failed to even check on his condition.[66]

The evidence is undisputed that Roger Owensby lay handcuffed in the back seat of the Golf Manor cruiser close to six minutes.[67] Soon after Officer Caton finished his final beating of Mr. Owensby in the back seat of the Golf Manor cruiser, Cincinnati police officer Victor Spellen drove onto the scene in his police cruiser in response to the officer-needs-assistance call. Officer Spellen's cruiser video camera continued to run for the 5 minutes that he was on the scene.[68] His car was parked next to the Golf Manor cruiser in which Mr. Owensby lay. There were at least eleven Cincinnati police officers on the scene at this time[69] along with two Golf Manor police officers.[70] *No one checked or provided medical care to Roger Owensby.*[71] Instead, the record establishes that the police officers spent this critical time greeting each other,[72] making sure that they had their hats on for the supervisors who would soon be present,[73] and joking about the beating that Mr.

---

[66] Heiland 12/3/03 Depo., p. 27:17-24; Campbell 12/3/03 Depo., p. 23:13-17, 26:15 - 27:1.; 43:10-14, 49:4-16.

[67] Hunter 12/4/03 Depo., pp. 185:20 - 186:4; Exhibit 20, Spellen Cruiser Video.

[68] Exhibit 20. The video includes a digital clock counter in the picture.

[69] Cincinnati police officers Robert B. Jorg, Patrick Caton, Darren Sellers, Alexander Hasse, David Hunter, Jason Hodge, Abraham Lawson, Victor Spellen, Brian Brazile, Sgt. William Watts, and Sgt. Shirley Browner.

[70] Golf Manor Police Officers Robert Heiland and Chris Campbell.

[71] Exhibit 20.

[72] Exhibits 20, 21.

[73] Brazile 11/6/03 Depo., p. 72:6-13 ("any time supervisors show up on the run, basically you're supposed to be in your full uniform. Things like that get written up sometimes. If you're on something and you don't have your hat on, it – it – it's a big deal."); Caton 10/17/03 Depo., pp. 130:18-22, 131:24 - 132:5 (as Caton goes back to Sam's Carryout to retrieve his cruiser, Hunter asks him to bring his hat); Hunter 12/4/03 Depo., pp. 204:19 - 205:7 ("when, you know, everything is starting to become under control, that's like a big thing for the police and the chief: to wear your hat."); Sellers 10/21/03 Depo., p. 58:13-15 ("And then I sat there at the car, tried to get myself together. I got may hat..."). Had the City of Cincinnati placed as much emphasis and

Owensby had received.[74]

Three of the police officers standing in close proximity to Mr. Owensby were trained

EMTs:

- Officer Hasse was a trained Army medic and had experience as an EMT in the West Chester Fire Department.[75] Although he remained next door with the misdemeanor marijuana suspect, he testified that, if called, he could have been on the scene to help Mr. Owensby in less than 10 seconds.[76]

- Officer Spellen, who parked next to the Golf Manor cruiser that held Mr. Owensby, had previously worked as an EMT for an ambulance service in New York and had received advanced EMT training from Queens College.[77]

- Golf Manor Officer Heiland, the officer in whose car Mr. Owensby lay, had worked at Good Samaritan Hospital as a health technician, at Eldercare as an EMT, and was a trained combat medic at the Army Major Medical Center at Fort Sam Houston.[78]

None of these officers provided any care for Mr. Owensby in the six minutes while he lay handcuffed

and dying in the back seat of the Golf Manor cruiser.

But one officer did bother to check on Mr. Owensby. Before Officer Spellen arrived on the scene with

his cruiser video,[79] Cincinnati police officer Brian Brazile arrived in response to the officer-needs-assistance

___

training on providing prompt medical care for injured prisoners as it places on its officers wearing their hats, Mr. Owensby would likely be alive today.

[74] Exhibit 20; Exhibit 21, Transcript of the Spellen cruiser video prepared by the City of Cincinnati, p. 4 (exchange between officers Spellen and Brazile: "Looks like he's uh, hurting a little bit." "Yeah. Lot a bit." "Yeah.").

[75] Hasse 11/19/03 Depo., pp. 17:4 -18:17.

[76] Hasse 11/19/03 Depo., pp. 72:11 - 73:6.

[77] Spellen 10/15/03 Depo., pp. 21:2-20, 50:23 - 51:6.

[78] Heiland 12/3/03 Depo., pp. 14:1 - 15:22.

[79] Brazile 11/6/03 Depo., pp. 95:14 - 97:1.

call.  Officer Brazile saw the blood on Officer Jorg's sleeve and was told, "That's from the bad guy."[80]  He

also knew that Mr. Owensby had been maced.[81]  Using his flashlight, Officer Brazile looked in the back seat

of the Golf Manor cruiser.[82]  He noticed that Mr. Owensby's face was bleeding and that he didn't look like

he could breathe.[83]  Officer Brazile then told both Golf Manor officers , Heiland and Campbell, who were

standing next to the back door of the cruiser, "This looks f**ked up.  Can he breathe?  It don't look like he

can from the way he's laying."[84]  In response, the two Golf Manor police officers shrugged their shoulders

in indifference and did nothing.[85]

Officer Brazile took no steps to check further on the obviously distressed prisoner nor did he attempt

to obtain or provide medical assistance.  Instead, he then went back to his car to get his hat.[86]

### F.    The Death Of Roger Owensby, Jr.

The record is clear that at least six minutes pass before anyone checked on Mr. Owensby as he lay

handcuffed, bleeding, maced and unconscious in the back seat of the Golf Manor cruiser.[87]  Eventually,

Cincinnati Sergeant Watts checked on Mr. Owensby and noticed what Officer Brazile determined over five

---

[80] Brazile 11/6/03 Depo., p. 47:9-13.

[81] Brazile 11/6/03 Depo., p. 48:10-18.

[82] Brazile 11/6/03 Depo., p. 50:11-21.

[83] Brazile 11/6/03 Depo., pp. 52:4 - 60:8.

[84] Exhibit 47, Brazile 11/13/00 Statement; Brazile 11/6/03 Depo., pp. 56:14-20, 64:13 - 68:8.

[85] Brazile 11/6/03 Depo., pp. 56:21 - 57:3.

[86] Brazile 11/6/03 Depo., p. 57:1-6.

[87] Exhibits 20, 21, A.

minutes earlier—that Mr. Owensby was not breathing.[88]  At that point, Mr. Owensby was removed from the Golf Manor cruiser and CPR was administered by Officers Caton and Hasse.[89]  However, even though he was unresponsive and had no pulse, these officers elected to attempt to perform CPR on Mr. Owensby with his hands handcuffed behind his back.[90]  Cincinnati EMTs with the Fire Rescue were called at 7:56 p.m. and the first unit arrived four minutes later at 8:00 p.m.[91]

More than thirteen minutes had passed from when Officers Jorg and Caton tackled Roger Owensby to the asphalt.  More than ten minutes had elapsed from when the handcuffed and unresponsive Mr. Owensby was placed in the Golf Manor cruiser.

The Coroner has ruled that Roger Owensby's death was a "homicide (police intervention: asphyxiation during restraint attempts)."[92]  The cause of death was "mechanical asphyxia."[93]  Mechanical asphyxia is death as a result of compression of the lungs and chest and/or the neck.[94]  When the chest is compressed, the lungs cannot expand to fill with oxygen for the blood.  In response, the heart pumps more blood to the lungs in an attempt to get more oxygen to the brain and vital organs.  The lungs then become

---

[88] Caton 10/17/03 Depo., p. 18:14-18.

[89] Caton 10/17/03 Depo., pp. 140:14 - 141:11.

[90] Caton 10/17/03 Depo., pp. 13:6 - 14:3, 143:23 - 144:14.

[91] Exhibit 99, Cincinnati Fire Medical Run Report; Coburn 12/15/03 Depo., pp. 17:22 - 20:8.

[92] Exhibit 103, Coroner's Report.

[93] *Id.*  Mechanical asphyxia resulting from compression of the chest and/or neck found by the Coroner is also consistent with knees and elbows on Mr. Owensby's back as Officer Jorg wrapped his left arm around Mr. Owensby's head and neck and applied his mandibular angle pressure point hold with his right hand to the area around the base of Mr. Owensby's lower ear, near the jugular vein and carotid artery.

[94] *Id.*; Schultz 12/17/03 Depo., p. 51:7-23.

congested and begin to fill with edema fluid and some red blood cells.[95]  The autopsy also revealed petechia (hemorrhages of blood vessels in the eyes).  These injuries are consistent with compression of the chest or the veins in the neck.[96]

Officer Jorg stood 6'4'' and weighed about 225 pounds on November 7.[97]  In uniform with his vest, utility belt, and required equipment, Officer Jorg weighed approximately 250 pounds.[98]  Officer Caton, who was on Mr. Owensby's lower back, stood 5'10'' and weighted 190 pounds—218 in uniform.[99]  Officer Hunter stood 5'7" and weighed 175 pounds plus equipment weight.[100]  Officer Sellers was 5'10" and 185 plus equipment weight.[101]  And Officer Hodge was 5' 10" and 198 plus equipment weight.[102]  Officers Jorg and Caton combined weighed almost 500 pounds.  Collectively, with their uniform equipment, these five officers who physically arrested Mr. Owensby weighed over 1,000 pounds.

It is a medical certainty that mechanical asphyxia takes minutes to result in death.[103]  It is likewise certain that when Mr. Owensby was picked up off of the asphalt, he was not able to walk on his own power

---

[95] Schultz 12/17/03 Depo., pp. 33:21 - 34:5, 41:6-16, 65:17 - 66:4.

[96] Schultz 12/17/03 Depo., pp. 26:20 - 27:10.

[97] Jorg 10/14/03 Depo., p. 7:14-20.

[98] Hunter 12/4/03 Depo., pp. 118:22 - 119:5 (required equipment adds approximately 28 pounds to an officer's weight).

[99] Caton 10/17/03 Depo., pp. 6:24 -7:2.

[100] Hunter 11/6/03 Depo., p. 5:18-22.

[101] Exhibit 38, Excerpt from Sellers personnel file.

[102] Exhibit F, Excerpt from Hodge personnel file.

[103] Schultz 12/17/03 Depo., p. 64:17-23.

and was not able to actively resist.[104]  This fact is verified by Officers Sellers and Hunter.[105]  Medically, it is impossible to say whether Mr. Owensby was dead or merely unconscious when placed in the Golf Manor cruiser.[106]  However, according to Officer Caton, Mr. Owensby changed his position on the seat while in the car, suggesting that he was still alive when placed in the Golf Manor cruiser.[107]

Mr. Owensby was never resuscitated by the Fire Rescue.[108]  Mr. Owensby was transported to University Hospital Emergency Room where a team of doctors and nurses attempted unsuccessfully to revive him.[109]  He was pronounced dead at 8:47 p.m. that evening.[110]

G.    September 27, 2000—The Motive For Police Street Justice.

What would bring Cincinnati Police officers to treat an unarmed citizen suspected of little more than jaywalking in such a fashion?

In order to begin to understand the brutality of the "street justice" beating and refusal to provide any medical attention to an obviously seriously injured prisoner, one must examine the events some six weeks prior to Mr. Owensby's homicide, September 27, 2000.

On that afternoon, Officers Jorg and Hunter were working undercover or "old clothes."[111]  Officer Hunter observed four individuals engaged in what he believed to be drug trafficking activity at a public phone

---

[104] Exhibit 108, Wecht 9/10/02 Report, p. 11; Schultz 12/17/03 Depo., pp. 71:18 - 72:19.

[105] Hunter 12/4/03 Depo., p. 177:1-12; Sellers 10/21/03 Depo., p. 56:1-22.

[106] Exhibit 108, Wecht 9/10/02 Report, p. 11; Schultz 12/17/03 Depo., pp. 70:20 - 71:17.

[107] Caton 10/17/03 Depo., pp. 141:18 - 143:16.

[108] Coburn 12/15/03 Depo., p. 57:6-15; Exhibit 99.

[109] Coburn 12/15/03 Depo., p. 53:15-19.

[110] Exhibit E, Death Record.

[111] Jorg 10/14/03 Depo., p. 45:11-19.

17

located between Sam's Carryout (2092 Seymour Avenue) and the Sunoco service station (2098 Seymour Avenue). Officers Hunter and Jorg called for uniformed backup as they moved in to arrest the four individuals. As Officers Hunter and Jorg approached their four suspects, two of them started to cross Seymour Avenue heading toward the Huntington Meadows Apartment complex.[112]

Being in "old clothes," Officer Jorg had no problem in approaching and arresting the two individuals remaining at Sam's Carryout. Officer Hunter followed the other two across Seymour Avenue into Huntington Meadows.[113] A uniformed Cincinnati police officer met the plains clothed Hunter on Seymour Road. They decided to split up, with the uniformed officer going around a Huntington Meadows apartment building from one side while Hunter, in his old clothes, followed the two individuals around the building from the other side.[114]

As Officer Hunter followed the two suspects, a person happened upon them and said "The boys" or "Five-O."[115] Upon hearing this the two suspects, who were just leaving Officer Hunter's view, ran off.[116] Officer Hunter walked over to the man who had happened upon the scene and put his left arm around him.[117] He was an African-American male of average height and weight, was clean shaven and had a short afro.[118]

---

[112] Hunter 11/6/03 Depo., p. 54:12-24.

[113] Hunter 11/6/03 Depo., pp. 55:1-11, 71:6-15.

[114] Hunter 11/6/03 Depo., pp. 55:10-14, 72:5 - 73:14.

[115] Hunter 11/6/03 Depo., pp. 74:13 - 75:7.

[116] Hunter 11/6/03 Depo., pp. 55:14-19, 75:11-15.

[117] Hunter 11/6/03 Depo., pp. 76:12 - 77:8.

[118] Hunter 11/6/03 Depo., pp. 86:13 - 87:1.

18

Officer Hunter told the individual that he shouldn't have warned the other two.[119]  As they spoke, Officer Hunter pulled his badge out from under his shirt.  The person—who was not involved in the suspected drug transaction—pulled away and tried to run.  Officer Hunter grabbed the hood of his sweatshirt which ripped as the person started running away.[120]

Officer Hunter drew his pistol and told the person, "Don't move....Freeze."  But the man continued to run through the Huntington Meadows apartment complex toward the intersection of Rhode Island Avenue and Seymour Avenue.  Officer Hunter chased him with his weapon drawn.[121]  At a red light at the intersection, Officer Hunter holstered his weapon and chased the man around a car that was waiting for the light to change.  The man then ran further down Seymour Avenue and tripped on the sidewalk.  Officer Hunter attempted to mace the individual but the person recovered and ran away, resulting in Officer Hunter running into the backwash of his own mace.[122]

Officer Hunter chased the individual down Seymour Avenue but lost him when he veered back into the Huntington Meadows apartment complex and ran into one of the buildings.[123]  Officer Hunter returned to his undercover partner, Officer Jorg, empty handed, exhausted, and having maced himself.  He then learned that the two individuals that he and Officer Jorg arrested at Sam's Carryout had no drugs and no large sums

---

[119] Hunter 11/6/03 Depo., pp. 55:20 - 56:13, 76:20 - 77:16 (the conversation between Hunter and the individual was: "What's up?" "What's up" "You know, you can't be doing what you just did." "What's that?" "You can't be telling people – you can't be warning people that the police is here.  That's interfering with an investi...")

[120] Hunter 11/6/03 Depo., pp. 56:10-18, 77:17 - 78:17.

[121] Hunter 11/6/03 Depo., pp. 56:14 -57:5, 81:7-11.

[122] Hunter 11/6/03 Depo., pp. 57:2-19, 81:10 - 84:2.

[123] Hunter 11/6/03 Depo., pp. 57:20 - 58:10, 84:3 - 85:9.

of money one would expect to find on a drug trafficker.[124]  The two individuals were charged with criminal trespass and one was charged with having an open container of beer.[125]

Officer Hunter did not know the man who ran from him on September 27, 2000.[126]  Nor does anyone else.  Officer Jorg never saw him.  According to Officer Hunter, he questioned the individuals arrested by Officer Jorg and learned from them that this person went by the nickname of "LA."[127]  Officer Hunter admitted that Officer Jorg and his arrestees could not see Officer Hunter nor the person who said "The boys" or "Five-O" because Officer Jorg was at Sam's Carryout and Officer Hunter was some distance away in the Huntington Meadows apartment complex when this unknown person appeared.[128]

The only police officer to have contact with the person Officer Hunter says was identified as "LA" was Officer Hunter.  Officer Hunter admits that the person who ran from him on that day *was not* one of the individuals he suspected of drug activity.[129]  Further, had he been able to arrest that person, Officer Hunter states that he would only have charged the person with jaywalking and obstruction of a police drug

---

[124] Hunter 11/6/03 Depo., pp. 87:10 - 89:2; Exhibit 6, Arrest and Investigation Reports on Jaysen Hill and Jarvis Nixon.

[125] Exhibit 6.

[126] Hunter 11/6/03 Depo., p. 53:15-19.

[127] Hunter 11/6/03 Depo., pp.58:12 - 59:7.

[128] Hunter 11/6/03 Depo., pp. 79:14-21, 103:9 - 105:13.  According to where Officer Hunter says the meeting occurred it is impossible for someone at Sam's Carryout to have observed it.  Officer Jorg tells a different story about the September 27 incident but also admits that he could not identify the person who ran from Officer Hunter.  Jorg 10/14/03 Depo., p. 102:1-4.

[129] Hunter 11/6/03 Depo., p. 76:12-19.

investigation.[130]  Officer Hunter would not have charged that person with assault on a police officer.[131]

In truth, the only valid charge against whomever Officer Hunter confronted was jaywalking.  The purported obstruction of a drug trafficking investigation charge was not valid because: (1) there is no evidence of the underlying offense of drug trafficking;[132] (2) there was no evidence that the person knew of any drug trafficking, much less a drug trafficking investigation, since he was not involved in the suspected drug activity;[133] (3) the person did not know that officer Hunter was an undercover police officer until officer Hunter produced his badge and, thus, could not have intended to obstruct a police drug investigation by anything he said or did prior to that time;[134] (4) the person's statement of  "The boys" or "Five-O" did not prevent Hunter from making his arrest;[135] and, (5) the act of fleeing from a police officer does not constitute obstruction.[136]

Approximately one month after this incident, on October 25 at 11:29 p.m., Officer Hasse used the police computer at District 4 to pull up personal identification information on Roger Owensby, including his address, social security number, and the license plate of the car he drives.[137]  Officer Hasse could not explain

---

[130] Hunter 11/6/03 Depo., p. 94:16-23.

[131] Hunter 11/6/03 Depo., p. 95:8-14.

[132] *State v. Bronaugh*, 69 Ohio App. 2d 24, 25-26, 429 N.E.2d 1084, 1086 (1st App. Dist. 1980).

[133] *Id.*

[134] *State v. Cooper*, 151 Ohio App. 3d 790, 786 N.E.2d 88 (2nd App. Dist. 2003).

[135] *State v. Jelliffe*, 5 Ohio Misc. 2d 20, 449 N.E.2d 810 (Ham. Cty. 1982).

[136] *State v. Smith*, 2000 Ohio App. LEXIS 1840 (3rd App. Dist. March 31, 2000); *State v. McCullough*, 61 Ohio Misc. 2d 607 580 N.E.2d 1180 (1990); *State v. Rowland*, 67 Ohio St. 3d 374, 382, 618 N.E.2d 138, 145 (1993) (defendant's avoidance of police is not an illegal act).

[137] Goldschmidt [Hamilton County Regional Crime Information Center computer systems analyst] 12/19/03 Depo., pp. 5:6-24, 16:7 - 18:22, 23:2 - 24:10; Exhibit 109, computer printout

why he made such an inquiry less than two weeks before Mr. Owensby was confronted and killed.[138]

However, some light is shed on this subject by a police academy classmate of Officer Jorg, Renee Hinton.  In December 2000, a month after Roger Owensby's death, Ms. Hinton and a girlfriend ran into Officer Jorg while Christmas shopping.  After exchanging pleasantries, they discussed the Owensby arrest.  Officer Jorg explained to Ms. Hinton that, "We was mad, he got away, we was looking for him."  When Ms. Hinton asked how Officer Jorg knew that Mr. Owensby was in the Huntington Meadows area, Officer Jorg said, "I got a call that he was there."[139]  This, coupled with the fact that on November 7, 2000, Officer Hasse's request for an NTA book went only to the two officers involved in the September 27 failed drug bust—Jorg and Hunter[140]—indicates that this was street justice, pure and simple.  These police officers were going to make sure that "LA" finally got maced and never ran from them again.

## III.    STANDARD OF REVIEW

Rule 56, Fed. R. Civ. P., eliminates those lawsuits in which there is no "genuine issue as to any material fact."  It is the function of the Court to decide "whether the evidence present a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."[141]  The question is "whether a fair-minded jury could return a verdict for the [non-moving party] on the evidence presented."[142]  The initial burden is on the movant to specify the basis upon which summary judgment should be granted and to identify portions of the record which demonstrate the absence

---

of queries into the Regional Crime Information System concerning Roger Owensby, Jr.

[138] Hasse 11/19/03 Depo., pp. 106:2 - 107:18.

[139] Hinton 12/1/03 Depo., pp.10:5 - 11:11.

[140] Exhibit 112.

[141] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

[142] *Id.* at 252.

of a genuine issue of material fact.[143]  The burden then shifts to the non-movant to come forward with specific

facts, supported by evidence in the record, upon which a reasonable jury could find there to be genuine fact

issues for trial.[144]  If the non-movant fails to make a showing sufficient to establish the existence of a material

disputed fact, summary judgment is appropriate.[145]

## IV.    42 U.S.C. § 1983: LIABILITY FOR THE FAILURE TO PROVIDE MEDICAL CARE

Plaintiff alleges that Defendants' failure to provide immediate medical care for Roger Owensby

improperly deprived him of his constitutional right to be free from unreasonable seizure under the Fourth

Amendment and his right to life and liberty under the Fourteenth Amendment, all in violation of 42 U.S.C.

§ 1983.[146]

Title 42 U.S.C. § 1983 provides, in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any
State or Territory of the District of Columbia, subjects, or causes to be subjected, any citizen
of the United States or other person within the jurisdiction thereof to the deprivation of any
rights, privileges, or immunities secured by the Constitution and laws, shall be liable in an
action at law, suit in equity, or other proper proceeding for redress.

To establish a claim under § 1983, two elements are required: (1) conduct committed by a person

acting under color of state law which (2) deprives plaintiff of rights, privileges, or immunities secured by the

Constitution or the laws of the United States.[147]

It is uncontested that the actions of the Cincinnati Police on November 7, 2000 in arresting,

---

[143] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[144] *Anderson*, 477 U.S. at 248.

[145] *Celotex Corp.*, 477 U.S. at 323.

[146] Doc. 1, Complaint, First Claim.

[147] *Culberson v. Doan*, 125 F. Supp. 2d 252, 263 (S.D. Ohio 2000) *citing Gomez v.
Toledo*, 446 U.S. 635, 640 (1980); *Sargi v. Kent City Board of Educ.*, 70 F.3d 907, 910 (6th Cir.
1995).

handcuffing, beating, macing, and placing Mr. Owensby in the Golf Manor cruiser, were all taken by uniformed police officers acting in their official capacities under color of state-conferred authority.[148] Therefore, the only issue remaining for § 1983 liability on this claim is establishing that the failure of the Defendants to provide prompt medical care to Mr. Owensby in the critical six to seven minutes after his arrest and while he lay handcuffed in the back of the Golf Manor cruiser deprived him of his rights, privileges, or immunities secured by the Constitution and laws of the United States.

A.    **The Constitutional Right To Medical Care.**

More than 20 years before the death of Roger Owensby, the Supreme Court established that police who act with deliberate indifference to the serious medical needs of pretrial detainees violate the constitutional right of those citizen.[149]

> [W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, ***medical care***, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.[150]

This constitutional duty to provide medical care for an obviously injured pretrial detainee remained with the Cincinnati police officer even after they placed Mr. Owensby in the Golf Manor cruiser, for the duty

---

[148] Jorg 10/14/03 Depo., pp. 223:23 - 224:4; Caton 10/17/03 Depo., p. 215:9-14.

[149] *Bell v. Wolfish*, 441 U.S. 520, 535 n. 16 (1979); *City of Revere v. Massachusetts Gen. Hospital*, 463 U.S. 239, 244 (1983); *DeShaney v. Winnebago County Dept. Of Soc. Servs.*, 489 U.S. 189, 198-200 (1989); *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998); *Roberts v. City of Troy*, 773 F. 2d 720, 723 (6th Cir. 1985); *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994); *Alexander v. Beale Street Blues Co.*, 108 F. Supp. 2d 934, 944 (W.D. Tenn. 1999).

[150] *DeShaney*, 489 U.S. at 200 (emphasis supplied); *Ewolski v. City of Brunswick*, 287 F.3d 492, 509 (6th Cir. 2002); *Lewis*, 523 U.S. at 851.

exists even in noncustodial settings "when their affirmative actions directly increase the vulnerability of citizens to danger or otherwise place citizens in harm's way."[151]  Thus, when the Cincinnati police officers laid the handcuffed, bleeding and unconscious Roger Owensby in the back seat of the Golf Manor cruiser, closed the doors and walked away without providing any medical aid, they "render[ed] an individual more vulnerable to danger" and violated their clearly established constitutional duty of medical care.[152]

While Courts often analyze the constitutional duty to provide medical care for pretrial detainees as a Fourteenth Amendment substantive due process violation, it is equally clear that the right to prompt medical attention is also required in a Fourth Amendment context.  The Sixth Circuit has addressed this issue and definitively ruled that a Fourteenth Amendment right does not preclude a finding that the right is clearly established when analyzed under the Fourth Amendment.[153]  In fact, the Supreme Court has also cautioned against analysis of constitutional violations as substantive due process claims where the offending behavior may be governed by another constitutional provision:

> because we have always been reluctant to expand the concept of substantive due process, we held in *Graham v. Connor* that where a particular amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide

---

[151] *Ewolski v. City of Brunswick*, 287 F.3d 492, 509 (6th Cir. 2002) ("state officials may be subject to constitutional liability if they fail to provide protection for individuals in state custody....Even in noncustodial settings, however, state officials may violate the Due Process Clause when their affirmative actions directly increase the vulnerability of citizens to danger or otherwise place citizens in harm's way."); *Gazette v. City of Pontiac*, 41 F.3d 1061, 1065 (6th Cir. 1994); *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982) ("If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit.").

[152] *Gazette*, 41 F.3d at 1065 ("a duty to protect can arise in a noncustodial setting if the state does anything to render an individual more vulnerable to danger.")

[153] *Spurlock v. Satterfield*, 167 F.3d 995, 1006 n.19 (6th Cir. 1999); *Alexander v. Beale Street Blues Co.*, 108 F. Supp. 2d 934, 944 n.10 (W.D. Tenn. 1999).

for analyzing these claims.[154]

Thus, once Roger Owensby was handcuffed, all of the defendant officers on the scene had a constitutional duty to provide for his medical care. Instead, Officer Caton beat him after he was handcuffed, Officer Hunter maced him after he was handcuffed, and Officer Caton beat him again while he lay handcuffed on the back seat of the Golf Manor cruiser. While these facts may be contested by Officers Hunter and Caton, the fact that no one checked on Mr. Owensby's medical condition or provided any medical care in the crucial six or seven minutes after he was handcuffed is uncontested.[155]

The defendants' failure to provide critical medical care goes hand-in-glove with the excessive force used in effectuating the illegal arrest of Roger Owensby on November 7, 2000. In fact, the willful determination or deliberate indifference in failing to provide medical attention to Roger Owensby is part of the excessive force used against him.[156] The deprivation of necessary medical care for Mr. Owensby, who was obviously seriously injured in the arrest, violates the Fourth Amendment guarantee that citizens will be protected from unreasonable seizures of their person.

**B.    The Fourth Amendment Objective Reasonableness Test.**

The Fourth Amendment provides, in relevant part: "The right of the people to be secure in their

---

[154] *County of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) *citing Graham*, 490 U.S. at 395 *see also id.* at 843 ("'If a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.'") *quoting United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997).

[155] Nor is it contested that when Officer Brazile did check on Mr. Owensby and verbally expressed concern about whether he was breathing to both Golf Manor officers, no officer from Cincinnati or Golf Manor did anything.

[156] *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 595 (7th Cir. 1997); *Alexander*, 108 F. Supp. 2d at 944-45.

26

persons...against unreasonable searches and seizures, shall not be violated."[157]

In *Graham v. Connor*, the Supreme Court determined that "all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."[158]  That is, the "reasonableness" of a particular use of force or, in this case, the medical indifference must be judged objectively from the perspective of a reasonable officer on the scene.  One must determine whether the officer's actions are "objectively reasonable" in light of the facts and circumstances.[159]

In examining the totality of the particular circumstances, the Supreme Court instructs courts to pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight."[160]

Here, the evidence establishes that the only crime for which Roger Owensby could properly have been charged was jaywalking on September 27—a minor misdemeanor traffic ticket offense that would not even

---

[157] U.S. Const. amend. IV.

[158] *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989) ("a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement *through means intentionally applied.*"); *Lewis*, 523 U.S. at 844 (1998).  Here, there is no question that the Fourth Amendment applies since there was a governmental termination of Roger Owensby's freedom of movement through means intentionally applied.

[159] *Graham*, 490 U.S. at 396-97; *Darrah v. City of Oak Park*, 225 F.3d 301, 307 (6th Cir. 2001).

[160] *Id.* at 396.

27

justify physical arrest.[161]   The evidence is equally clear that Mr. Owensby posed no immediate threat to the safety of the officers or to anyone else.  He freely disclosed that he was unarmed, agreed to a pat-down search which verified that he had no weapons, and at 5'7" was smaller than Jorg, Caton, Sellers and Hodge.[162]  Also, according to Officer Sellers, who arrived shortly after Mr. Owensby was tackled to the ground, he offered no resistence to these officers who continued to beat and mace him.[163]

All of Plaintiff's allegations in this action stem from a common nucleus—the conduct of police officers in stopping and seizing Roger Owensby, Jr., on November 7, 2000.  He was "seized" within the meaning of the Fourth Amendment once the Cincinnati officers tackled and gained physical control of him.[164]  Thus, he was certainly under the control of the Cincinnati police officers once he was handcuffed, before he was raised from the asphalt and placed in the Golf Manor cruiser.  Courts that have evaluated constitutional violations arising from the failure to provide medical care associated with an arrest have done so under the rubric of a Fourth Amendment violation.[165]

In *Alexander v. Beale Street Blues Co., Inc.*, the Western District of Tennessee addressed facts that bear some resemblance to those present in this case, although not nearly as brutal.  In *Alexander* a patron of a Memphis nightclub was thrown to the floor while several nightclub employees held him down with their body weight.[166]   Memphis police arrived to find the patron in obvious need of medical attention.

---

[161] Section II.G., *supra.*

[162] Sections II.B., and II.F., *supra*.

[163] Sellers 10/21/03 Depo., p. 50:10:14.

[164] *California v. Hodari D.*, 499 U.S. 621 (1991); *Ewolski v. City of Brunswick*, 287 F.3d 492, 506 (6th Cir. 2002).

[165] *Alexander*, 108 F. Supp. 2d 934; *Estate of Phillips*, 123 F.3d 586 (7th Cir. 1997).

[166] *Alexander*, 108 F. Supp. 2d at 939.

Nevertheless, the officers assisted nightclub employees in handcuffing the then motionless patron, carrying him outside of the club and placing him behind the police cruiser "in a contorted position" and creating a risk of death by positional asphyxia.  The patron was taken to hospital by ambulance and later died as a result of traumatic asphyxia.   The plaintiff filed a § 1983 action claiming a failure to provide timely medical treatment.[167]

*Alexander* determined that the Fourth Amendment objective reasonableness analysis was appropriate.[168]  Specifically, *Alexander* ruled that, "Plaintiffs' medical indifference claim will be examined under the framework of the Fourth Amendment to determine whether the officers' alleged denial of medical care was reasonable under the circumstances.[169]

Likewise, in *Estate of Phillips v. City of Milwaukee*, the Seventh Circuit analyzed a § 1983 claim of failure to provide medical care under the Fourth Amendment objective reasonableness test where an extremely obese man, suffering from Graves' disease, schizophrenia and an enlarged thyroid, died after he was handcuffed face down on the floor with his hands behind his back.[170]  *Estate of Phillips* acknowledges that "it is somewhat awkward to conceptualize such an act or failure to act [failure to provide medical care] as 'excessive force;' indeed, the duty to render medical aid is more often thought of as one arising under the Due Process Clause or the Eight Amendment."[171]  However, the Seventh Circuit concluded that Fourth Amendment objective reasonableness analysis was proper because "the complained-of police

---

[167] *Id.*

[168] *Id.* at 940-43.

[169] *Id.* at 941.

[170] *Estate of Phillips*, 123 F.3d at 590.

[171] *Id.* at 595 *citing DeShaney*, 489 U.S. at 200.

29

actions occurred during the course of Mr. Phillips' seizure."[172]  Thus, the Fourth Amendment "requires that seizures be reasonable under all the circumstances; and we do think that it would be objectively unreasonable in certain circumstances to deny needed medical attention to an individual placed in custody who cannot help himself."[173]

Here, the placement and abandonment of the handcuffed Roger Owensby across the back seat of the Golf Manor cruiser for more than five crucial minutes with no medical care, when officers knew that he was unresponsive, not moving and making no sound, is an objectively unreasonable seizure.  The unequivocal evidence of record also establishes that the defendant Cincinnati police officers knew that Roger Owensby was bleeding and had been maced when they left him handcuffed in the cruiser.  Couple this with the fact that at least five critical minutes of medical indifference elapsed *after* a Cincinnati police officer, Brazile, had observed Roger Owensby and stated to his fellow Golf Manor officers that, "It don't look like he can [breathe] from the way he's laying."[174]  Such actions are objectively unreasonable and a blatant abuse of an established constitutional right to medical care.

###    C.    Liability Of The Officers In Their Individual Capacities.

The above facts establish that § 1983 summary judgment is appropriate against the Cincinnati police officer defendants, Robert Jorg, Patrick Caton, Darren Sellers, Victor Spellen, and David Hunter, for their callous and deliberate refusal to provide constitutionally required  medical care to Roger Owensby.

Officer Jorg verifies that no one provided medical care to Mr. Owensby during the period from when he was handcuffed, picked up off the asphalt, taken to the Golf Manor cruiser, and laid on the back seat of

---

[172] *Id.* at 596 *citing Graham*, 490 U.S. at 389-90.

[173] *Id.*

[174] Exhibit 20, Spellen video; Exhibit 47, Brazile 11/13/00 Statement; Brazile 11/6/03 Depo., pp. 56:14-20, 64:13 - 68:8, 95:14 - 97:1.

the cruiser even though everyone knew that Mr. Owensby had just been involved in a "struggle" with five police officers, was bleeding and had been maced.[175]

Officer Hunter verifies that no Cincinnati police officer provided any first aid for Mr. Owensby as he lay on the back seat of the Golf Manor cruiser.[176] Officer Hunter also acknowledges that Cincinnati Police Department standards required that any person maced be exposed to fresh air and given the opportunity to "rinse their face with plenty of clear, cool water."[177] He also acknowledges that, had someone attempted to provide water to rinse his face, they would have discovered that Mr. Owensby was unconscious.[178]

Likewise, Officer Sellers, made no attempt to seek or provide any medical care despite: (1) participating in the arrest with four other officers and witnessing the brutality of the arrest; (2) knowing that Mr. Owensby was maced after he was handcuffed; (3) seeing Officer Caton repeatedly strike Mr. Owensby in the back after he was handcuffed; (4) seeing that, when carried to the Golf Manor cruiser, Roger Owensby could not walk on his own, his head was hanging down, he was motionless and made no sound; and (5) seeing that Mr. Owensby had to be slid head-first across the back seat of the Golf Manor cruiser.[179]

Officer Spellen arrived on the scene within a minute or two after Roger Owensby was placed in the Golf Manor cruiser and knew that Mr. Owensby had been maced. We know that he parked next to the Golf Manor cruiser for approximately 5 minutes. During that time he observed Mr. Owensby handcuffed, bleeding and unconscious in the back seat of the Golf Manor cruiser. Officer Spellen, a trained EMT, made no attempt to seek or provide any medical care for Mr. Owensby. Instead, he socialized with the other Cincinnati

---

[175] Jorg 10/14/03 Depo., pp. 176:19 - 177:1.

[176] Hunter 12/4/03 Depo., p. 253:1-9.

[177] Exhibit 60, Cincinnati Police Department Procedure 12.545, ¶ C.5.

[178] Hunter 12/4/03 Depo., pp. 254:12 - 255:18.

[179] Sellers 10/21/03 Depo., pp. 46:19 - 57:4.

31

officers and joked that Mr. Owensby was "hurting" a lot.[180]

Officer Caton acknowledges that, as one of the five arresting officers, he was responsible for the care of Mr. Owensby, including care for his injuries and his macing.[181]  In fact, he correctly states that the duty to care for Mr. Owensby "extended to every officer that was on that scene."[182]  Incredibly, Officer Caton attempts to explain away his failure to expose the maced Mr. Owensby to fresh air by arguing that: "I thought there was plenty of fresh air inside the cruiser."[183]  He also attempts to circumvent his failure to provide medical care to Mr. Owensby by making the circular argument that officers were only responsible to check on Mr. Owensby's medical condition if they believed him to be injured.[184]  Even the City of Cincinnati did not buy this argument as Officer Caton was fired for failing to provide medical attention to Mr. Owensby and for beating this citizen after he was handcuffed.[185]

### D.    Qualified Immunity Is Inapplicable.

The individual Cincinnati police officer defendants have asserted the affirmative defense of qualified immunity.[186]

Qualified immunity is "an affirmative defense shielding governmental officials from liability as long as their conduct does 'not violate clearly established statutory or constitutional rights of which a reasonable

---

[180] Exhibits 20, 21; Spellen 10/15/03 Depo., pp. 21:2-20, 50:23 - 52:19.

[181] Caton 10/17/03 Depo., p. 177:12-21.

[182] Caton 10/17/03 Depo., pp. 177:22 - 178:2.

[183] Caton 10/17/03 Depo., p. 19:5-10.

[184] Caton 10/17/03 Depo., pp. 236:2 - 237:7.

[185] Exhibit 35, Pre-disciplinary Hearing Summary on Officer Caton, including 2/25/03 Dismissal order of the Cincinnati City Manager, Valerie A. Lemmie.

[186] Doc. 3, Answer of Cincinnati Defendants, Third Defense.

person would have known.'"[187]  The qualified immunity inquiry is composed of two parts: (1) whether a constitutionally protected right has been violated; and, (2) whether the right is so clearly established that a reasonable official would understand that what he is doing violates that right.[188]  For a right to be clearly established,

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.[189]

Here, there were at least eleven Cincinnati police officers at the scene, five of whom participated in the physical arrest of Roger Owensby.  Two Cincinnati officers were trained EMTs.  The arresting officers knew that Mr. Owensby was bleeding and had been maced.  Many others knew that he was not moving and unresponsive when carried to the Golf Manor cruiser.  They also knew that he had been laid across the back seat, instead of sitting upright—increasing the risk of asphyxia.  And at least one Cincinnati officer determined that it looked as though Mr. Owensby could not breathe.  Despite all of these uncontested, known facts, not one Cincinnati officer attempted to provide medical care for Roger Owensby.  Instead, during the crucial five to six minutes as Mr. Owensby lay handcuffed and unconscious, Cincinnati police officers gathered their hats and joked that Owensby was "hurting."[190]

More than twenty years ago, the Supreme Court established the constitutional duty of police officers

---

[187] *Bukowski v. City of Akron*, 326 F.3d 702, 708 (6th Cir. 2003) *quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Leisure v. City of Cincinnati*, 267 F. Supp. 2d 848, 851 (S.D. Ohio 2003).

[188] *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001); *Bukowski*, 326 F.3d at 708; *Leisure*, 267 F. Supp. 2d at 851.

[189] *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Ewolski*, 287 F.3d at 501.

[190] *See* Notes 72 and 73, *supra*.

to provide medical care for pretrial detainees.[191]  No credible argument can be presented that these officers

and their Cincinnati Police Department were unaware of this constitutional duty to care for a citizen who,

because of the restraint imposed upon him by the police, was unable to provide for his own medical well-

being.  Moreover, while there is much finger-pointing about who should have provided medical care to Mr.

Owensby, the uncontested fact is that Mr. Owensby had a constitutional right to such medical care, it was not

provided, and *all* of the police officers on the scene had a constitutional duty to provide that medical care.

As such, none of the defendant police officers can avoid § 1983 liability based upon the affirmative defense

of qualified immunity.

> **E.    Municipal Liability Of The City Of Cincinnati.**

Municipal liability for the failure of these officer to provide medical care to Mr. Owensby lies in the

failure of the City of Cincinnati and its Police Chief to properly train and supervise their officers.

More than ten years before Mr. Owensby's arrest and death, the Supreme Court established that a

municipality like the City of Cincinnati may be held liable under § 1983 for constitutional violations arising

from it failure to train its employees.[192]  Inadequate training is a basis for § 1983 liability where the failure

to train amounts to "deliberate indifference" to the constitutional rights of persons with whom the police may

come into contact.[193]  In adopting this standard the Supreme Court expressly stated that the need to train its

police force in the constitutional limitation on the exercise of deadly force is "so obvious" that failure to do

---

[191] *Bell*, 441 U.S. at 535 n. 16; *City of Revere*, 463 U.S. at 244; *DeShaney*, 489 U.S. at 198-200; *Lewis*, 523 U.S. at 849; *Roberts*, 773 F. 2d at 723; *Horn*, 22 F.3d at 660; *Alexander*, 108 F. Supp. 2d at 944.

[192] *City of Canton v. Harris*, 489 U.S. 378 (1989).

[193] *Id.* at 388.

so could constitute "deliberate indifference" to constitutional rights.[194]

### 1.    Cincinnati Police Procedure 12.545.

At the time of Mr. Owensby's arrest and death, the City had in place Procedure 12.545, Use of Force

which required:

> Following any use of force resulting in a citizen's injury, officers will ensure appropriate first
> aid is rendered immediately once the incident scene is stabilized.[195]

There is no further definition or description in the City policies of when an "incident scene is stabilized."

Furthermore, the City *never* trained its officers in the meaning of the term "once the incident scene

is stabilized."[196]  This led to the foreseeable and tragic situation that arose on November 7, 2000 and was

improperly used as an excuse by those officers on the scene who chose not to provide medical care to an

obviously injured Mr. Owensby.

Officers Jorg, Caton and Spellen interpreted this phrase as meaning that they were under no obligation

to provide any medical care for Mr. Owensby's critical injuries while he lay in the Golf Manor cruiser

because the scene was not yet "stabilized."  According to them, even though Roger Owensby was handcuffed

and in a secure police cruiser surrounded by over a dozen police officers, the scene would not be "stabilized"

until they were ready to leave the scene, paperwork was being completed, the perimeter was protected, and

evidence had been collected.[197]  On the other hand, Officers Hasse, and Hunter believed that the scene was

"stabilized" and the officers were required to provide immediate first aid to Mr. Owensby once he was

---

[194] *Id.* at 390 n.10.

[195] Exhibit 60, p. 3.

[196] Hasse 11/19/03 Depo., p. 23:5-20; Hunter 11/6/03 Depo., p. 19:1-15.

[197] Spellen 10/15/03 Depo., p. 80:6-23; Jorg 10/14/03 Depo., pp. 216:4 - 217:16, 223:4 - 22; Caton 10/17/03 Depo., pp. 179:4 - 181:21, 233:23 - 224:4.

handcuffed and placed in the Golf Manor cruiser.[198]

This failure to train also impacted upon the officer's determination of when they were required to provide care for a mace victim like Mr. Owensby. Cincinnati's Use of Force Procedure 12.545, requires that mace victims be exposed to fresh air and provided with plenty of water.

> Expose individuals sprayed with chemical irritant to fresh air. Give them an opportunity to rinse their face with plenty of clear, cool water.[199]

This policy makes no mention of a scene being "stabilized" before aid is to be provided to the maced victim.

However, Officer Caton understood that he was not required to provide fresh air and water to the maced Mr. Owensby because the scene was not yet stabilized.[200] And Officer Hasse believed that he was only obligated to provide fresh air and water to mace victims if they requested it.[201] Of course, Officer Hasse never received any training on what to do if the person maced was incapable of requesting water and fresh air.[202]

The City's failure to train with respect to the use of deadly force was further dramatized by the testimony of Officer Jorg, the senior officer on the scene, who said that Cincinnati policy and custom *prohibited* him and the four other arresting officers from providing *any* medical care to Mr. Owernsby, even though they knew that Mr. Owensby had been maced and lay bleeding and handcuffed on the back seat of the Golf Manor cruiser.[203]

---

[198] Hasse 11/19/03 Depo., pp. 23:21 - 24:8; Hunter 11/6/03 Depo., pp. 19:16 - 20:15.

[199] Exhibit 60, p. 9, ¶ C.5.

[200] Caton 10/17/03 Depo., pp. 18:8 - 19:8, 179:4-16, 196:17 - 197:12.

[201] Hasse 11/19/03 Depo., pp. 24:20 - 25:14.

[202] Hasse 11/19/03 Depo., pp. 25:15 - 26:13.

[203] Jorg 10/14/03 Depo., pp. 184:14 - 186:2.

Q.  As an officer involved in the arrest of Mr. Owensby, did you believe that you had any responsibility for the well-being of Mr. Owensby?

A.  Per our sergeants, when involved in a situation of this nature, we are not to have any further contact with the subject.  The officers responding on the scene are to take over.  So, no.[204]

*    *    *    *    *    *

Q.  What I'm asking about is, before any of the officers arrive, any of the sergeants, supervisors, arise -- arrive on the scene, you have a person who you know is bleeding, you know has been Maced, has been involved, even by your account, in a severe struggle with five police officers and has been placed in the back seat of a Golf Manor cruiser, do you believe, as one of the officers involved in that arrest, that you had a responsibility for the well-being of that person?

A.  No.

Q.  Do you believe that Officer Caton had a responsibility for the well-being of that person?

A.  No.

Q.  Do you believe Officer Hunter had a responsibility for the well-being of that person?

A.  No.

Q.  Do you believe Officer Sellers had a responsibility for the well-being of that person?

A.  No.

Q.  Do you believe Officer Hodge had a responsibility for the well-being of that person?

A.  No.[205]

Officer Jorg, the senior arresting officer with almost five years experience on the Cincinnati police force, also testified that he understood Cincinnati policy as prohibiting him from providing any medical aid, even if he had shot a citizen.[206]  Such a policy or custom is an affirmative municipal policy that violates the

---

[204] Jorg 10/14/03 Depo., pp. 179:19 - 180:1.

[205] Jorg 10/14/03 Depo., pp. 180:15 - 181:13.

[206] Jorg 10/14/03 Depo., 183:14 - 184:13.

37

constitutional requirement to provide medical care to injured pretrial detainees.

Even the Cincinnati Chief of Police, Thomas Streicher, acknowledged that the officers on the scene had varying opinions on when the scene was "stabilized" and their duty to provide medical care was triggered.[207]  He maintained a scene is "stabilized" and medical care takes precedence over all other issues once force is no longer needed.[208]  Fair enough.  However, the Chief could not identify any written policy, training or instruction that clarified this interplay between the need to provide medical care and the requirement to stabilize the scene.[209]  He saw no deficiency in the language of Use of Force Procedure 12.545 and saw no need to clarify it despite the obvious confusion exhibited by numerous of his officers on when such medical care should be provided.[210]

In fact, the Chief could not say whether the November 7 scene was "stabilized," i.e., use of force was no longer needed, after the unarmed Mr. Owensby was handcuffed and surrounded by several police officers.[211]  He could not say whether the scene was stabilized when Officer Caton beat Mr. Owensby in the back as he lay handcuffed.[212]  He could not say whether the scene was stabilized at the time that Officer Spellen drove onto the scene with his cruiser video on and Mr. Owensby lay handcuffed in the Golf Manor cruiser.[213]  In fact, he could not specify any time when the appropriate use of force was no longer necessary

---

[207] Streicher 12/22/03 Depo., pp. 128:10 - 134:20; Exhibit 60.

[208] Streicher 12/22/03 Depo., pp. 133:15 - 139:15.

[209] Streicher 12/22/03 Depo., pp. 134:21 - 137:6.

[210] Streicher 12/22/03 Depo., pp. 137:23 - 138:22.

[211] Streicher 12/22/03 Depo., p. 141:13-17.

[212] Streicher 12/22/03 Depo., p. 145:4-10.  Chief Streicher not only found Officer Caton struck Mr. Owensby after he was handcuffed, he also recommended to the City Manager that Officer Caton be fired for so doing.

[213] Streicher 12/22/03 Depo., pp. 145:11 - 146:17.

in Mr. Owensby's case.[214]   In a circular argument, the Chief  then said that the officers were under no obligation to provide medical care to Mr. Owensby until they realized that he needed medical care.[215]   It appears that even the Police Chief himself is not trained on what a "stabilized" crime scene is or when a detained suspect must be afforded medical attention.  He certainly will not find the answer in the poorly written City policy.

## 2.    Mutual Aid Agreement.

The evidence of record establishes that the City of Cincinnati provided no training to its police officers in implementing a Mutual Aid Agreement between the City and the neighboring villages like Golf Manor.  When Golf Manor responded to the officer-needs-assistance call of Office Caton, it did so pursuant to a Mutual Aid Agreement between Golf Manor and the City of Cincinnati.[216]   This Mutual Aid Agreement expressly covered the situation that arose here—the use of a Golf Manor cruiser in conjunction with a Cincinnati arrest.  However, having signed the Mutual Aid Agreement and instructed its police force to work collaboratively with other municipal police forces, Cincinnati failed to provide any training for its officers with respect to their respective duties and responsibilities.  Such conduct by the City of Cincinnati "amounts to deliberate indifference to the rights of persons with whom the police came into contact."[217]   The resulting foreseeable confusion cost Mr. Owensby his life.

Cincinnati police Officer Hunter had received no training concerning his duties and responsibilities under the Mutual Aid Agreement concerning care for a prisoner who is arrested by one police department but

---

[214] Streicher 12/22/03 Depo., p. 141:18-23.

[215] Streicher 12/22/03 Depo., p. 142:14-17.

[216] Exhibit 78, Mutual Aid Agreement for Law Enforcement; Streicher 12/22/03 Depo., pp. 347:22 - 356:9.

[217] *City of Canton*, 489 U.S. at 388.

39

placed in another police department's car.[218]  However, he believed that the police department that had

physical custody of the prisoner (Golf Manor) was responsible for that prisoner's medical well-being.[219]

Likewise, Cincinnati police Officer Hasse, an EMT at the scene, admitted that he received no training in

determining who was responsible for the care of a suspect arrested by Cincinnati police officers but placed

in another police force's vehicle.[220]

Cincinnati officer Brazile, who looked at Mr. Owensby handcuffed in the back seat of the Golf Manor

cruiser and told the Golf Manor officers that Mr. Owensby did not appear to be breathing, did nothing else

because he believed that Mr. Owensby's welfare was Golf Manor's responsibility.[221]

Officer Jorg believed that once Mr. Owensby was placed in the Golf Manor cruiser, the responsibility

for his medical care transferred to Golf Manor and its police officer, Officer Heiland.[222]  In contrast, Golf

Manor Officer Heiland, an EMT, understood that the Cincinnati police officers were responsible for the safety

of Mr. Owensby since they had arrested him.[223]  As with the Cincinnati officers, Officer Heiland had received

no training concerning the Mutual Aid Agreement or its effect on his duties and responsibilities in responding

to the scene.[224]

The tragic result was that none of the thirteen police officers (including 3 EMTs) around  Roger

---

[218] Hunter 11/6/03 Depo., pp. 24:10 - 27:15.

[219] *Id.*

[220] Hasse 11/19/03 Depo., pp. 29:19 - 30:12.

[221] Exhibit 47, Brazile 11/13/00 Statement; Brazile 11/6/03 Depo., pp. 59:2-7 ("I told the people who I felt was responsible for the person in that car."), 50:11 - 74:4.

[222] Jorg 10/14/03 Depo., pp. 181:19 - 182:13; 214:22 - 215:6, 228:6 - 229:10.

[223] Heiland 12/3/03 Depo., pp. 72:14 - 73:19.

[224] Heiland 12/3/03 Depo., pp. 69:14 - 72:13; 92:12 - 93:17.

Owensby did anything as he lay dying in the Golf Manor cruiser.

3.    **The Department Of Justice's Criticism Of The City Of Cincinnati's Poor Training.**

A Department of Justice 10/23/01 Report to the City of Cincinnati criticized the Police Department Use of Force training as follows:

> We recommend that the in-service training, like the new recruit training, provide more instruction in the use of force decision-making. Currently, officers spend one hour in the classroom during which they are read portions of the use of force policies by the instructor.[225]

One whole hour. Chief Streicher did not know if reading portions of the Use of Force policy to officers was the extent of training provided to Cincinnati police officers.[226] He described no other training.

\*    \*    \*

Municipal liability is established against the City of Cincinnati if it acted in "deliberate indifference" to obvious consequences of its failure to train its police force in the need for medical care arising from its use of force.[227] Here, the Cincinnati Chief of Police acknowledged what the Supreme Court recognized as "obvious"—proper training addressing medical needs of a citizen arising out of the use of force is necessary because:

> there is a possibility, in fact, a probability in some situations, where a person may be injured during that use of force. And that once the use of force situation or the need for using force is over with, then the people that are in custody, the person that is in custody of an officer, that officer has a duty to care for that person and to provide medical assistance as best they can if a person is in need.[228]

---

[225] Exhibit 117, p. 11; Streicher 12/22/03 Depo., pp.163:5 - 166:24.

[226] Streicher 12/22/03 Depo., p. 166:11-24.

[227] *City of Canton*, 489 U.S. at 388-90; *Stemler v. City of Florence*, 126 F.3d 856, 865 (6th Cir. 1997); *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999).

[228] Streicher 12/22/03 Depo., p. 137:11-22.

The utter failure to provide any guidance to its officers as to the probable and foreseeable consequences of the constitutional duty to provide medical attention to an injured citizen who has been subjected to the use of force—as evidenced by the confusion voiced by the officers on the scene—constitutes deliberate indifference to that use of force and result in § 1983 liability against the City of Cincinnati and its Police Chief.

## V.    CONCLUSION

In October of 2003, more than seven months before the scheduled trial of this case and before Plaintiff had taken the depositions of the numerous defendant officers in this case, the City of Cincinnati moved to bifurcate into separate trials the excessive force of its officers from the unconstitutionally vague City customs, policies and lack of training of its officers.  The City contended that the Plaintiff must first establish "a constitutional injury, as prerequisite for pursuing the official practice/policy claims against the municipal defendants."  Doc. 57, Motion to Bifurcate into Separate Trials, p. 6.  Our current Motion for Partial Summary Judgment demonstrates "a constitutional injury" and the lack of merit to the City's Motion to Bifurcate.

This Court need not concern itself today with whether the conduct of the defendant officers in striking, macing and choking Mr. Owensby constituted "excessive force."  The undisputed failure to provide medical attention to a bleeding, unconscious, maced detained suspect is properly analyzed itself as "excessive force" and therefore a constitutional injury.

The duty of the individual officer defendants to provide such medical assistance to a handcuffed prisoner who is unable to fend for himself has clearly been the law of the land for many years.  The City of Cincinnati itself recognizes this duty.  The City has a policy mandating such duty of medical care and in fact fired Officer Caton for failure to comply with that policy.  Officers enjoy no qualified immunity when such a clear constitutional right is disregarded.

42

But the City's very policy recognizing the constitutional obligations of its officers to provide "immediate medical care once the scene is stabilized" is so poorly written that no one – including each of the defendant officers and the City's own police chief – knows when the obligation to provide medical care begins.  The term, "stabilized," undefined and unexplained in the City's policies, was not uniformly understood by its officers or chief and, here, was improperly used as an excuse for officers who chose not to provide medical care to an obviously seriously injured prisoner.  The evidence is uncontroverted that no training whatsoever was provided concerning this vague term.

As a result, a Cincinnati citizen was left bleeding, unconscious, maced and handcuffed to die while over a dozen officers of the law milled around, straightened their uniforms and joked about the street justice they had inflicted.

There are issues in this case which will need to be addressed by a jury.  But the constitutional injury to Roger Owensby, Jr. for failure to provide medical attention, the lack of qualified immunity for that clear constitutional violation and the inadequacy of the City's policies and lack of training about such policies should be determined now.  We ask the Court to grant partial summary judgment on those issues.

Respectfully submitted,

/s/Paul B. Martins

Mark T. Tillar (0029898)          James B. Helmer, Jr.  (0002878)
240 Clark Road                    Paul B.  Martins (0007623)
Cincinnati, Ohio  45202           Frederick M. Morgan, Jr.  (0027687)
Telephone: (513) 761-2958         HELMER, MARTINS & MORGAN CO., LPA
                                  Fourth & Walnut Centre, Suite 1900
John J. Helbling (0046727)        105 East Fourth Street
3672 Springdale Road              Cincinnati, Ohio 45202-4008
Cincinnati, Ohio 45251            Telephone:    (513) 421-2400
Telephone: (513) 923-9740         Facsimile:    (513) 421-7902

                                  *Trial Attorneys for Plaintiff*

43

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Plaintiff's Motion For Partial Summary Judgment Against Defendants City of Cincinnati, Its Chief of Police And Its Individual Police Officers For Their Failure To Provide Critical Medical Care, was electronically filed on February 2, 2004. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.


/s/ Paul B. Martins