SHR:SBC:JE:TMG:LN
DJ 207-58-3P

U. S. Department of Justice
Civil Rights Division
Special Litigation Section
P O. Box 65400
Washington D. C. 20035-6400

October 23, 2001

William R. Martin, Esq.
Dyer Ellis & Joseph
Watergate, Eleventh Floor
600 New Hampshire Avenue, NW
Washington, DC 20037

Re: Investigation of the Cincinnati Police Division

Dear Mr. Martin:

As an initial matter, my team and I would like to echo the sentiments of Mr. Boyd at last month's meeting and express our own appreciation for the considerable cooperation we have received from the City, the Police Chief and the men and women of the Cincinnati Police Division in our mutual effort to improve policing in Cincinnati. The Division's willingness to review and improve its policies and procedures is gratifying We likewise want to thank the Fraternal Order of Police, the Sentinel Police Association and community leaders who share the Division's desire constantly to improve police practices.

At the meeting Mr. Boyd outlined, in general terms, some of the recommendations we can make at this preliminary stage. recommendations were in the areas of use of force policy, use of force reporting, public accountability, monitoring and auditing, and training. He also committed to provide, in writing, more specifics about our police practices experts recommendations. In this letter, we convey in greater detail our recommendations.

To date we have reviewed relevant CPD directives and conducted interviews with City officials, abroad cross-section of the CPD (including a large number of its command staff), and those charged with oversight of the CPD. We have also talked with representatives of the police union and the Sentinel Police Association, as well as community leaders and citizens.

This letter is not meant to be exhaustive, but rather focuses on significant recommendations we can provide at t-his preliminary stage of the investigation under 42 U.S.C. 5 14141. important aspects of our fact-gathering process have yet to be completed, most notably reviewing the incident reports included in the documerts we received from the City in August. Therefore this letter is preliminary in nature.

We hope this letter will assist in our mutual goal of ensuring that the CPD provides the best possible police service to the people of Cincinnati, and we look forward to continued cooperation toward this goal. We would also be happy to provide' examples of policies used by other police departments that might address some of the issues we raise below.

I. USE OF FORCE POLICY

The CPD should revise its policies to clarify terms, and to ensure that force is only wed in appropriate circumstances.

The use of force policy states that force may be used when reasonably necessary to "apprehend the

C -004204

Exh. 117

offender," or "effect the arrest" and also states that officers may use force to protect themselves and to "perform their duty." It is unclear whether "perform their duty" in this context is intended only to be equivalent to "effect the arrest" and "apprehend the offender," or authorizes force in other, undefined situations. This ambiguity may lead officers to believe they are justified in using force in situations in which it would be unreasonable. While the Supreme Court has recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of force, there are many activities within a police officer's duty that do not require any force. For example, an officer cannot reasonably use force when conducting a traffic stop unless such force is necessary to effect an arrest or protect the officer or others.

The use of force policy states that "courts could consider a choke hold or similar type hold as deadly force." According to CPD officials, this statement is intended to be a blanket prohibition on the use of choke holds. If this is the case, we recommend that the policy make this prohibition explicit. At a minimum, the policy should state that a choke hold or similar hold may not be used in any circumstance in which the use of deadly force would be unreasonable.

Other examples of such ambiguity are provided in the sections below addressing the use of chemical irritant and the usa of canines.

The multiple instances of vague or unclearly defined terms cited in this letter raise the concern that other policies contain terms which are not sufficiently defined. all critical terms in all policies are defined, we recommend a thorough review of all CPD policies aimed at eliminating undefined terms.

The CPD should modify its policy regarding the use of chemical irritant to limit its use to appropriate circumstances. The CPD should also track and monitor the amount of chemical irritant officers use, and the ways in which they use it.

The CPD use of force policy states that officers "will use chemical irritant as the primary response to aggressive citizen behavior." This suggests that chemical irritant should or must be used even when verbal commands or less serious types of force would be equally effective. In addition, the term "aggressive citizen behavior" should be explicitly defined to limit the use of chemical ir.tant to those cases in which the force is necessary to effect an arrest or to protect the safety of the officer or a civilian.

The use of force policy also allows for the use of chemical irritant as a "crowd control device in self-defense situations, or to disperse a disorderly crowd." The policy does not define a "self-defense situation" or a "disorderly crowd" and therefore does not provide enough guidance to ensure that chemical irritant is only used when such force is reasonable. We also recommend, absent exigent circumstances, that the approval of a supervisor be required any time chemical irritant is used against a crowd.

Additionally, the use of force policy provides procedures for using chemical irritant against a "disorderly prisoner" after the prisoner is handcuffed and sitting in the back of a police vehicle. This suggests that chemical irritant may be used against a restrained individual, when in fact it is the exceptional case in which chemical irritant can be constitutionally used in such situations. chemical irritant should be subject to the highest level of scrutiny.

We received reports about CFD officers using chemical irritant at closer range than is allowed pursuant to the CPD's policy, or quantities that seem unreasonable. For example, interviewees related instances in which officers emptied entire canisters of chemical irritant on a single subject or sprayed chemical irritant up subjects' noses or down their throats. At the in-service training we attended, officers engaged in a drill in which they sprayed chemical irritant on a target. The participating officers used different amounts of chemical irritant and in some cases, none the irritant actually reached the target.

To ensure the appropriate use of chemical irritant, the CPD should weigh officers' canisters on a regular basis or, at least, track the number of canisters annually distributed to and utilized by each officer. The CPD should also provide regular in-service training on the proper amount of irritant to

C -004205

use, how to deliver irritant effectively, and the proper anatomical targets for chemical irritant.

The use of large quantities of chemical irritant may also indicate that the CPD is not using the most effective type of chemical irritant for its purposes. We recommend that the CPD review recent research regarding chemical irritant, principally that conducted by the National Institute of Justice, and consider whether it should switch to a different type of irritant. Some of these studies have reported that the use of pepper spray is favored in many departments because it is highly effective and causes less risk of injury to subjects.

The CPD should adopt a "find and bark" policy and eliminate undefined terms from its canine policy. It should also provide more guidance to its officers regarding when canines are to be deployed. Moreover, we recommend that the CPD track and monitor the frequency with which its canines bite civilians when making apprehensions.

The CPD's canine policy does not specify whether it has a "find and bite" policy (which allows dogs to bite upon locating the subject) or a "find and bark" policy (requiring a dog to bark, rather than bite). According to canine unit supervisors, the CPD's policy is "find and bite." We recommend that the CPD explicitly adopt a find and bark policy. A find and bark policy prevents canines from biting subjects in situations in which such force is not necessary to effect an arrest or protect the safety of officers or civilians.

The canine policy also does not provide for giving verbal warnings before releasing a canine. The policy should require, absent exigent circumstances, a set number of announcements, and a sufficient interval between announcement and deployment to allow for subject surrender. Except when conducting a building search, the policy also should prohibit releasing the canine from the leash before the canine is ready to be deployed. The policy also fails to provide guidance for post-release handler controls of the canine.

Moreover, critical terms in the canine policy are undefined and unit supervisors were unable to provide clarification. For example, according to the CPD policy, canines can be used for "psychological deterrent" in high crime areas. However, there is no definition of that term.' Additionally, canines can be used to arrest those who commit a felony or a "serious misdemeanor." While some examples of serious misdemeanors are given, the term is not sufficiently defined to limit the situations in which it might be viewed as authorizing the release of a canine.

In general, canine deployment for purposes of apprehending a person should be limited to searches for serious felons or to cases where a subject is armed or has the potential to use force or cause harm to the officer, the subject or others. Moreover, deployments should always be made in accordance with appropriate safeguards.

We were told that the CPD does not track apprehensions made by the canine unit. Instead, it tracks dispatches to a scene and bites. An apprehension is defined as any time the canine is deployed and plays a clear and well-documented role in the capture of a person. The mere presence of a canine at the scene of an arrest does not count. Not only does this failure to track apprehensions make the monitoring of the use of canines more difficult, but it prevents the CPD from properly calculating bite ratios. Bite ratios are properly defined as the number of apprehensions accomplished by means of a dog bite divided by the total number of apprehensions (both with or without a bite). Bite ratios enable a police department to assess its canine unit and individual canine teams.

Finally, we understand that supervisors do not receive formal standardized training in canine handling procedures. Such traiing should be provided not only to supervisors in the canine unit, but to all supervisors, because CPD policy allows supervisers not assigned to the canine unit to supervise handlers in some situactions.

The CPD should adopt a use of force continuum.

The CPD does rot utilize a use of force continuum. When properly designed and implemented, a use of force continuum is a fluid and flexible policy guide. Moreover, many major city police departments

C -004206

employ a use of force continuum because it provides a useful tool in training officers to consider lower levels of force first, which protects the safety of both the officer and the civilian. Moreover, a use of force continuum would enable the CPD to emphasize that officers' presence, verbal commands, and use of "soft-hands" (using hands to escort rather than control subjects) can often be used as an alternative not only to chemical irritant (which pursuant to CPD policy is the "primary response to aggressive citizen behavior"), but also to other more significant uses of force.

The CPD should create a committee to advise the Planning Section on policy development, and should increase community involvement in this process.

We understand that the Planning Section seeks feedback on proposed policy changes by sending copies to every section and district commander. This method does not ensure that the Planning Section receives the benefits of feedback from the entire CPD, including the rank and file. We recommend that the CPD create a policy committee which includes a cross section of ranks (both sworn ance civilian employees) and a representative of OMI. Each member of the committee would be required to respond to each proposed change (even if merely to state that they agreed with the policy without comment). Membership on this committee could be rotated to give as many employees as possible a chance to participate.

We also recommend that policy revisions be sent to community representatives for feedback. We recognize that some policies and some revisions are of more interest to the community than others, and that such consultations may not be practical for minor or chemical changes to the policies. We iso understand the concern that the public may lack the expertise to provide useful feedback in some areas. The very act of asking for such feedback, however, increases community acceptance and provides an opportunity for public education. Moreover, there are clearly scree policies (i.e., the comlaint resolutio process, civil disturbance) in which the public has a major interest, and therefore should play an important part in any revisions.

Finally, we recommend that every policy charge be evaluated by the City Solicitor's Office. The Planning Section should consider the input of the committee, the public and the Solicitor's Office, make its recommendation regarding the policy change, and retain all comments in a central file.

II. USE OF FORCE REPORTING

The CPD should require officers to report all uses and shows of force.

The CPD's use of force policy distinguishes between "force" and "restraining force."[2] Although officers are required to report all uses of "force," they are not required to report restraining force or other physical contacts with civilians unless those contacts lead to injury. This artificial distinction causes the under-reporting of force. The CPD should report all physical and instrumental (i.e., baton or firearm) acts that impose any degree of force on a civilian, including all acts that would currently be regarded as restraining force. To do this, the CPD could revise its definition of "use of force" to include all physical and instrumental acts, and any use of chemical irritant.

The CPD uses different forms for reporting different types of uses of force (e.g., taser, canine, chemical irritant), but only one use of force form is filled out for any one incident. This practice may undermine the ability of the CPD to track all uses of force because more than one type of force may be used in a particular incident. For example, it is impossible to count every use of chemical irritant without reviewing all use of force reports, use of taser reports, canine reports and injury to prisoner reports, and determining, in each case, whether the box indictating the use of chemical irritant is checked. As a result, simply counting the number of chemical irritant reports would seriously underestimate the number of times chemical irritant was used. Moreover, tracking multiple uses of force on one report may well lead to supervisors not evaluating the appropriateness of each and every use of force. For example, if an officer uses both chemical irritant and some other form of force, there is no place on the arm for the supervisor to evaluate the appropriateness of the use of chemical irritant. We recommend that the CPD use a single uniform use of force report that indicates each and every type of force that was used and requires the evaluation of each use of force. Not only will this aid the CPD in investigating and reviewing uses of force, but it will also allow the CPD to take

C -004207

advantage of available computer systems to track and evaluate uses of force.

We nave particular concerns with the reporting of chemical irritant use. As discussed in more detail below, the CPD, when it reports the use of chemical irritant, does not provide a narrative of the incident. Narratives should be provided in all instances. In addition, the CPD does not require, but should, that photographs be taken in instances where complainants suffer prolonged physical injury resulting from the use of chemical irritant. We recommend that when the use of a chemical irritant results in prolonged physical injury, the CPD report uses of chemical irritant as it reports other serious uses of force by including in the report a taped statement, photos, and (if treated) a medical release' summarizing the doctor's diagnosis. This is especially important given the CPD's direction that chemical irritant be used as the "primary response to aggressive citizen behavior."

Finally, we have talked to many civilians who believed that firearms were improperly pointed at themselves or their families. For example, we were told about guns being drawn on citizens for minor traffic violations where there was no indication that a felony was commited or that the occupants were armed. We also learned from some CPD officers that they are trained to brandish their firearms in a wide variety of circumstances, including, for example, any time they make a traffic stop on a car with tinted windows. This information raises concerns that CPD officers are un-holstering and pointing their guns in circumstances where it is not appropriate under the CPD's policy. Therefore, we recommend that CPD officers be required to report any instance in which they un-holster their firearm and point it at an iindividual. This reporting requirement would allow the CPD to identify, monitor, and evaluate the types of circumstances in which officers un-holster and seriously consider using firearms.

The CPD should revise its use of force reporting forms to clarify terms and to ensure that force is only used in appropriate circumstances.

CFD use of force reporting forms have boxes for supervisors to indicate the civilian's conduct which led to the use of force. We found considerable confusion among the officers we interviewed about what many of the boxes were intended to convey (e.g., "resistive tension," "conspicuously ignoring" and "excessive emotioral tension"). Moreover, some of these boxes could be read to authorize force in response to civilian conduct that would rot, in a significant number of circumstances, provide sufficient justification for that force to be reasonable (e.g., "conspicuously ignoring," "ceased all movement" and "violent history") . We recommend that these boxes be revised to clearly indicate the conduct that they are designed to measure, and to avoid suggesting that force can be used in inappropriate ways. Moreover, these boxes should not take the place of requiring the officer who uses the force to provide a written narrative explaining the sequence of events and circumstances that prompted each use of force. Such a narrative is required for supervisors to fully evaluate uses of force.

III. PUBLIC ACCOUNTABILITY

The CPD should better disseminate information to the public about the citizen complaint process and should solicit feedback regarding public perception of that process.

Each district police station should have information about the complaint process posted in a visible place in the public reception area. A pamphlet providing this information should be added to the information brochures currently available at City Hall. The CPD should also consider making information about the complaint process available on-line. Finally, we recommend that the CPD re-institute its customer satisfaction surveys, and include questions regarding the public's perception of the complaint process.

The CPD should change aspects of its citizen complaint process that have the potential to discourage the filing of complaints, and to impair their effective tracking and resolution. Supervisors should also receive appropriate training in handling and adjudicating citizen complaints.

The CPD should revise its use of force reporting forms to clarify terms and to ensure that force is only used in appropriate circumstances.

C -004208

CFD use of force reporting forms have boxes for supervisors to indicate the civilian's conduct which led to the use of force. We found considerable confusion among the officers we interviewed about what many of the boxes were intended to convey (e.g., "resistive tension," "conspicuously ignoring" and "excessive emotioral tension"). Moreover, some of these boxes could be read to authorize force in response to civilian conduct that would rot, in a significant number of circumstances, provide sufficient justification for that force to be reasonable (e.g., "conspicuously ignoring," "ceased all movement" and "violent history") . We recommend that these boxes be revised to clearly indicate the conduct that they are designed to measure, and to avoid suggesting that force can be used in inappropriate ways. Moreover, these boxes should not take the place of requiring the officer who uses the force to provide a written narrative explaining the sequence of events and circumstances that prompted each use of force. Such a narrative is required for supervisors to fully evaluate uses of force.

## III. PUBLIC ACCOUNTABILITY

The CPD should better disseminate information to the public about the citizen complaint process and should solicit feedback regarding public perception of that process.

Each district police station should have information about the complaint process posted in a visible place in the public reception area. A pamphlet providing this information should be added to the information brochures currently available at City Hall. The CPD should also consider making information about the complaint process available on-line. Finally, we recommend that the CPD re-institute its customer satisfaction surveys, and include questions regarding the public's perception of the complaint process.

The CPD should change aspects of its citizen complaint process that have the potential to discourage the filing of complaints, and to impair their effective tracking and resolution. Supervisors should also receive appropriate training in handling and adjudicating citizen complaints.

CPD policy requires, where circumstances allow, that supervisors, typically sergeants, accept incoming citizen complaints. Nonetheless, both command staff and CPD offiicers acknowledged being aware of instances where citizens attempting to file a citizen complaint were inappropriately made to wait to file their complaint with a particular sergeant, or were told to go to a different district to file a complaint. This may also discourage the filing of complaints. The CPD should reinforce with its staff that failure to accept a citizen complaint is always unacceptable. In addition, while the CPD's complaint policy allows complaints to be registered in person, by mail, or by telephone, the policy requires CPD employees to ask individuals who attempt to register a complaint by telephone to appear in person. This practice may have a deterrent effect on would-be-complainants who fear retaliation or who are simply unable or otherwise reluctant to come to a police station.

We understand that it is the CPD's practice to allow some citizen complaints to be deemed resolved by a sergeant without being reduced to writing. This practice interferes with the effective monitoring and resolution of citizen complaints. We recommend that a citizen complaint form be completed every time a person enters a police district to make a complaint, telephones the district to make a complaint, or sends in a complaint by mail. Immediately upon completion of the form, it should be assigned a unique identifier (that is provided to the complainant) and tracked by the type of complaint (e.g., excessive force, discourtesy, improper search). This numbering and tracking should be done by a central control desk.

In completing citizen complaint forms, the policy encourages CPD officers to include an analysis of the complainant's apparent mental and physical description, specifically to describe whether "complainant/subject exhibits any unusual behavior." This encourages the CPD officer to make a number of subjective judgments about the complainant's credibility and may provide the officer with an opportunity to be dismissive of the complainant. Furthermore, not only could such judgments intentionally be used to protect an officer who engaged in misconduct, but such an evaluation may well be outside the officer's area of expertise. These subjective judgments may therefore bias the complaint process. We recommend this policy of encouraging or even allowing such subjective descriptions be eliminated.

C -004209

We also recommend that sergeants charged with accepting citizen complaints be given appropriate training on handling citizen complaints with an emphasis on interpersonal skills. Additionally, supervisory staff we interviewed gave varying explanations for the appropriate standard of proof to be used in evaluating citizen complains. CPD should provide training on appropriate burddens of proof (i.e., preponderance of the evidence) to supervisors who are responsible for investigating and determining the outcome of a complaint, and the factors to consider when evaluating complainant or witness credibility (to ensure that their recommendations regarding dispositions are unbiased, uniform and legally appropriate).

The City should clarify the roles of all entities charged with investigating serious allegations of misconduct by the CPD and it should provide adequate resources for such investigations. The City should better educate civilians and CPD officers about the citizen complaint process.

We understand from our investigation that CPD's Internal Investigations Section is responsible for investigating complaints of serious police misconduct, criminal conduct, sexual misconduct, uses of excessive force and investigations directed by the Chief. All other complaints, such as discourtesy, use of unnecessary restraining force, lack of proper service or procedural violations, are typically investigated at the district level by an officer's supervisor. In addition to these internal processes, three non-CPD bodies receive citizen complaints: 1) The Office of Municipal Investigation ("OMI"); 2) the Citizens Police Review Panel ("CPRP"); and 3) the Human Relations Commission ("HRC").

OMI, an independent review body initially created by the City Council approximately fifteen years ago in response to several shooting incidents, was originally charged with reviewing and investigating officer involved shooting incidents and any otter wrongdoing by other City employees. According to its past and current directors, OMI has never had sufficient staff to carry out its mission of investigating all serious allegations of mis-induct by the CPD. They told us that OMI has had only two or three staff people available to investigate the as many as 450 complaints per year it receives about CPD officers. This information strongly suggests that OMI is not sufficiently staffed. Moreover, even when OMI does investigate an incident and finds misconduct or deficiencies related to the incident, there is no formal mechanism to ensure that the CPD addresses the results of the investigation. Finally, QMI directors, both past and present, reported a lack of coordination between OMI and the CPD when both are investigating bc the incident. Formal procedures regarding timing, notification, and the interviewing of witnesses should be developed to ensure that such parallel investgations do not impair the effective investigation of incidents

CPRP was reportedly formed three years ago as the result of a media ion conducted by the Community Relations Service. Although there is some dispute about the scope of its authority, CPRP is generally authorized to review all complaints alleging police misconduct. According to its members, the CPRP does not conduct its own investigations of serious allegations of misconduct against the CPD, but only reviews the investigations conducted by the CPD and OMI. CPRP reports its ultimate findings to the City Manager, although it is within the City Manager's discretion to decide whether to follow a recommendation made by the CPRP. We understand that the HRC docs not investigate complaints, but only attempts to informally resolve complaints with the officer's chain of command.

To provide oversight of the CPD's complaint resolution process and to aid in ensuring that citizen complaints are handled in an objective and thorough manner, we recommend that there be a non-CPD body that actually investigates all serious allegations of misconduct. There should be formal mechanisms for the CPD to respond in writing to any discrepancies between its own investigations and the one conducted by the non-CPD body. In such cases, the CPD should be required to explain, again in writing, how the discrepancy was resolved, and why it was resolved in that manner. Moreover, the CPD should conduct additional community outreach to expand public awareness on how complaints are adjudicated and how each of these investigatory bodies function. Similarly, we recommend that members of the investigative bodies be allowed to address recruits at the academy and members of the rank and file to explain their purpose and "unction. This will encourage an atmosphere of trust and cooperation for future interactions.

The CPD should change aspects of the Citizen Complaint Review Process ("CCRP") that may discourage citizens from participating. The CPD should also take measures to prevent inclusion of a complaint in the CCRP from interfering with the effective investigation and appropriate adjudication of

C -004210

that complaint.

Citizen complaints that the CPD determines do not require review by its Internal Investigations Section are subject to CCRP, a "feedback" session conducted internally by the CPD. The civilian involved in the incident is asked to attend a resolution meeting at the district with the officer and the officer's superisor. Prior to the meeting, the officer's supervisor is suppoed to investigate and adjudicate the complaint. The CPD intends the CCRP to allow citizens and officers to air their concerns about a particular incident in a structured setting and perhaps, allow the CPD to clear up any misunderstandings with the citizen.

Allegations of serious misconduct such as excessive restraining force and unlawful searches and seizures and handled through the CCRC. While the CPD seems to regard complaints of the improper use of restraining force as a minor matter, improper restraining force, because it is an unreasonable use of force, is a constitutional violation. Moreover, despite the seriousness of these types of allegations, according to many senior CPD officials, the most severe form of discipline that can result from allegations deemed appropriate for CCRP resolution, including excessive restraining force and unlawful searches and seizures, is an oral reprimand or an entry in the district's Evaluation Supplement Log. Inclusion in the CCRP should not prevent the imposition of serious discipline for serious misconduct.

Additionally, we were told by some of the officers and citizens we interviewed that complaints were considered resolved, without a full investigation and an administrative adjudication, if the complainant declined to participate in the Complaint Resolution Meeting.[3] Command staff also advised us that complaints are sometimes considered resolved, simply because the complainant is deemed to be "satisfied" with the explanation provided at the meeting. We interviewed several civilian claimants the CPD reportedly had deemed "satisfied." They told us that they werc not satisfied with the CPD's explanation and still believed the CPD officer(s) had engaged in misconduct.

Complaints handled through the CCRP should be fully investigated, and adjudicated, prior to a complaint resolution meeting. Moreover, it should be made explicit that the complainant's willingness to participate in the CCRP, and the outcome of any meeting (i.e., whether the complainant came away from the meeting "satisfied") shall have no bearing on the investigation or the adjudication of that complaint. We also recommend that the CPD consider narrowing the categories of complaints that are investigated through the CCRP to those involving discourtesy, rudeness or similar complaints. The CCRP should not be used for complaints of excessive force, discrimination or improper searches and seizures.

Finally, many people we talked to whose complaints were desigrated for the CCRP objected to being asked to attend a meeting, to which they were not allowed to bring any kind of support person, at the police station, with the officer and the officer's supervisor. A number of citizens reported that they believed this created an adversarial environment, intimidated them, and discouraged them from participating in the process. Therefore, we recommend that the CPD consider changing where these meetings are held, having a higher level supervisor or a non-CPD mediator conduct the meetings, and allowing a support person to accompany the complainant.

The CPD should increase and improve its interactions with the community councils.

During our investigation, we spoke to a number of leaders of the community councils that represent the neighborhoods of Cincinnati. We understand from CPD officials that meetings between these leaders and the CPD are the primary way in which the CPD interacts with the community. Officers attend meetings of the community councils, and community council leaders attend resource meetings at the police districts.

However, we learned from some community council leaders that they had never been invited to a resource meeting, even though council leaders from other neighborhoods within the same district reported frequent invitations. We also learned that the frequency of such resource meetings varied considerably between districts, and depended on the inclinations of the district commander. We recommend that these resource meetings be well publicized (to ensure that all community leaders

C-004211

have the opportunity to attend), and that the CPD require that such meetings occur on a regular basis in all districts.

We were told by community council leaders and CPD officials that community policing officers (who are referred to as "neighborhood officers") regularly attend community council meetings. We recommend that all other officers who patrol that community, not just neighborhood officers, be encouraged (whenever schedules and resources permit) to attend community council meetings. Finally, we were told of several incidents in which neighborhood officers were abruptly designated to be trasferred to another district. We recomnmerd that such transfers only be made with sufficient lead time to allow for a transition period to a new neighborhood officer.

## IV. MONITORING AND AUDITING

The CPD should centralize all information regarding uses of force by its officers, and take steps to ensure that all of its commanders fully use this information.

In interviewing various CPD management officials, we learned that while some general summary statistics regarding uses of force are reported in an Executive Information Summary, sufficiently specific trend data (i.e., citizen complaints broken down by type of complaint or use of force data broken down by shift) is not regularly available to, or used by, district commanders. This makes it difficult for district commanders to measure and manage the use of force by their officers, especially if they are relatively new to their command. We understand all of the district commanders have been in their current assignments for less than a year. We are also concerned by the opinion expressed by some CPD command staff that the collection and review of data by the Inspections and Planning Sections lessened their responsibility to monitor the officers under their command. Trend data must be available to supervisors, and it should be made clear that it is their responsibility, not just the responsibility of the Inspections Section, to monitor this information to ensure that officers under their command are using force appropriately.

The CPD should centralize all of its disciplinary information regarding officers.

We learned from a number of the district commanders and other CPD management officials that the complete disciplinary records of officers are difficult to review because they are kept in a number of different files housed in a number of locations. For example, information about an officer's record could be housed at internal affairs, OMI and any district or unit in which they served. Moreover, many of these files are reportedly not organized or automated in ways that are conducive to retrieval. We recommend that all disciplinary information (from the most serious misconduct to the types of minor courseling entered in district logs) be centralized and automated.

The CPD should expand its review of firearm discharges by its officers.

We're commend that CPD expand and normalize its mechanism for reviewing firearm discharges to incorporate a cross-section of division personnel who will review the incident for compliance with policy and procedure requirements, as well as for tactical and training related implications. Ore way for CPD to accomplish this is to designate formally personnel to review the investigate files and report to the Chief. Many police Departments convene a special board to review all officer firearm discharges. These boards hear presentations about the incident from the internal investigations unit and determine whether the discharge was within policy and whether any tactical errors were made. At a minimum, such boards typically include high ranking command staff officials, a training academy representative, and a City Attorney or Solicitor's office representative. Some departments augment their boards with Field Training Officers, a representative of the police u-.ion, and a community representative.

The CPD should institute risk management and audit systems that track a wider variety of conduct over a longer period of time.

According to CPD management, the CPD currently has a risk management system that only alerts CPD management or "flags" officers who repeatedly engage in the same type of conduct within a

C -004212

certain time period (e.g., when officers use chemical irritant a certain number of times or receive a certain number of citizen complaints). We also understand that past risk management systems have only tracked one year's worth of incidents. Reportedly, the CPD is working on a new system that will flag officers based on the accumulation of various types of conduct (e.g., some number of complaints plus some number of uses of chemical irritant). We support this change.

In devising this new system, we recommend that at a minimum the CPD account for shootings, uses of force (including chemical irritant and restraining force), citizen complaints (whether filed with the CPD, OMI, the CPRP or the HRC) criminal charges against officers, civil suits alleging officer misconduct, and disciplinary actions (including counseling, redirecting, and reinforcing). Moreover, the one year time frame is too short and should be increased. Finally, in regard to citizen complaints, the CPD should track all citizen complaints. For example, the CPD should track those complaints that are not sustained because of factual discrepancies that can not be resolved by the investigation. Non-sustained complaints containing allegations of similar types of misconduct (e.g., verbal abuse, use of excessive force, improper search and seizure) should be tracked because the repeated appearance of these complaints may indicate that the officer is engaging in a pattern of inappropriate behavior. The resulting supervisory review of the officer's conduct should result, where appropriate, in non-disciplinary corrective actions.

The CPD should standardize its auditing practices and increase the scope and frequency of its audits.

We were informed during our investigation that the Inspections Section (the CPD body that is primarily responsible for auditing) does not have standardized procedures or checklists for conducting the types of audits it currently performs. We recommend that such standardization occur, to ensure @edits are thorough, complete and consistent. We also recommend that the Inspections Section conduct its audits on a regular and fixed schedule to ensure that such audits occur with sufficient frequency, and reach all parts of the CPD (i.e., cover all five of the districts). For example, we understand that the Inspections Section selected a sample of complaints that were processed through the CCRP and attempted to contact the complainants to evaluate whether the actions and views of the citizen were captured correctly in the CCRP report. However, we were told that such an audit does not happen regulating We commend the CPD for conducting this type of audit, but believe it should happen more regularly, and should cover all five districts. Such an audit should also examine whether there is consistency in the CCRP across districts.

We also recommend that the CPD increase the scope of its audit function. For example, the CPD should monitor the frequency with which officers charge civilians with resisting arrest, assault of a police office", and obstruction of justice. The CPD should examine instances in which particular officers use such charges more frequently then their peers, because such charges can be used to mask misconduct. The CPD should also monitor patterns and trends regarding officers' court acctivity (including the dismissal of charges and officers' failure to appear to testify). We also recommend that the Inspections Section have regular meetings with the local pprosecutors to identify problems in officer performance. Finally, we recommend that the CPD audit investigations conducted by the Internal Investigations Section.

The CPD should increase its crime analysis capabilities.

We understand from our investigation that the CPD uses a crime analysis system that tracks calls for service and certain types of crimes. We recommend that the CPD take fuller advantage of this type of system by tracking additional types of police activity. For example the system should be used to track pursuits and citizen complaints. To aid in the better utilization of this system, we recommend that the CPD add to its crime analysis staff. This could be done by adding civilian staff mergers or even out-sourcing crime analysis functions.

The CPD should require its officers to use mobile video cameras in more circumstances, supervisors should increase their review of such tapes, and the tapes should be used by supervisors for more purposes.

Currently, mobile vehicle cameras automatically record when the police vehicle's emergency lights

C -004213

are activated. Officers are only required to manually activate the equipment when operating in "emergency mode" for all traffic stops and pursuits.[4] We suggest that the CPD make greater use of this equipment by enlarging those situations in which it is required to be used. For example, instead of making the recording of prisoner transports optional, the CPD should give circumstances (e.g., when the prisoner being transported is violent) in which officers are required to activate the recording device.

We also recommend that the CPD make greater use of the tapes produced by these cameras. Currently, CPD supervisors review the tapes, at random, for general training purposes. We recommend that the tapes also be used to correct or discipline officers who engage in improper conduct. Moreover, supervisors should be required not only to review any tapes that may be relevant to a questionable use of force or a citizen complaint, but should retain and preserve those tapes beyond the current 30-day retention period. We also recommend that the CPD eliminate an ambiguity in the policy requiring supervisors to review tapes. The policy states that "if applicable" supervisors should review the tapes. It is unclear what "if applicable" means in this context, and this ambiguity may cause inappropriate failures to review tapes.

We also recommend that supervisors be required, rather than encouraged, to conduct random checks of the working condition of the cameras during each shift.

The CPD should upgrade its communications technology, ensure that officers responding to calls for service have information about locations to which they respond, and provide more guidance to its telephone operators about the information they should gather from callers.

We understand that the CPD is in the process of upgrading its communications technology. We recommend that this occur as soon as possible because the current equipment lags well behind the state-of-the-art. In general, given the considerable information technology challenges the CPD faces, we recommend that the CPD have a separate technology budget so that the funding of technology does not come at the expense of other programs.

According to communications staff, they do not receive information from CPD commanders about on-going special operations. This lack of information can cause an officer to be dispatched to a location by the communications section in response to a call for service without the officer being aware of other police activity at that location. This could endanger the officer or compromise police operations. We recommend that the district commanders regularly inform the communications section about on-going operations.

We also recommend that the telephone operators be given more guidance on the types of questions to ask in particular situations. For example, they could be given a script or checklist to ensure that they obtain all information about the incident being reported, which would reduce the chance of operators speculating about details they forget to inquire about. The CPD should consider having different scripts or checklists for different types of incidents.

V. TRAINING

The CPD should provide adequate use of force decision-making training, both for recruits and experienced officers, and more in-service training in weapons use.

Training in "use of force decision-making" should encompass both training officers to only use reasonable force, and instructing them in tactics and de-escalation techniques that can eliminate the need for an officer to use force. En response to feedback from our expert consultants the training academy instituted a new course that covers aspects of use of force decision-making. We applaud this addition to the curriculum. The training academy staff deserves special recognition, not just for their knowledge, dedication, and general effectiveness as instructors, but also for their commitment to constantly re-evaluating the curriculum and their openness to new ideas to improve officer training.

We recommend, however, that this training emphasize how officers can avoid the use of force, or

C-004214

minimize the force they are required to use, rather than focusing solely on when officer are legally justified in using force, and the types of force they can use. Moreover, we recommend that this training focus on discussions with officers about particular scenarios (preferably taken from actual incidents involving CPD officers) with the goal of educating the officers regarding the legal and tactical issues raised by the scenarios.

The CPD should also provide more in-service training regarding both use of force decision-making and weapons use. All CPD officers receive 3 types of in-service firearms training. One day of firearms training (divided between classroom instruction and firearms qualification), one day of civil disturbance training (divided between instruction in tactics to be used at civil disturbances and additional time for firearms qualification), and an hour or two of firearms simulation training (which presents officers with scenarios in which they make use of force decisions).

We recommend that the CPD provide its officers with more in-service training in the use of firearms. We agree with the opinion expressed by the firearms training staff that firearm qualification (which focuses on testing officer's current proficiency) is not a substitute for firearm training (which focuses on improving the officer's proficiency, safe handling skills, and shooting technique). In short, testing is not the same as training. Moreover, the CPD should provide additional training a simulate the car ditiors officers will face in the field. Specifically, we recommend that the officers receive night training (the current use of glasses to simulate darkness is not a sufficient substitute), and stress training (i.e., training in using a firearm after undergoing physical exertion).

We recommend that the in-service training, like the new recruit training, provide more instruction in use of force decision-making. Currently, officers spend one hour in the classroom during which they are read portions of the use of force policies by the instructor. Rather than reading from the policies, we recommend that this training, like the new recruit training, focus on discussing with officers particular scenarios (preferably taken from actual incidents involving CPD officers) with the goal of educating the officers regarding the legal and tactical issues raised by the scenarios. This type of training is so critical that a small amount of time using a simulator and one hour in the classroom is not sufficient. Finally, use of force decision-making should be emphasized at every opportunity during in-service training. For example, we observed a drill in which officers were instructed to command a person to "stop and drop the weapon," but, there was no discussion or instruction regarding how an officer should decide when and if to use deadly force.

The CPD should institute formal mechanisms for the training academy staff to receive information regarding incidents that may raise training issues.

There is no formal mechanism for the training academy staff to be notified about firearms discharges by CPD officers. If provided with this information, the staff could tailor its training to reflect the types of situations actually encountered by CPD officers. The training staff also receives no feedback from the Internal Investigations Section regarding issues identified during misconduct investigations that may suggest the need for additional training. The training academy staff does not meet with the Solicitor's Office every time a civil suit is settled. Such meetings could prevent future constitutional violations and help the City avoid future liability. In general, the more the training staff knows about the situations actually encountered by CPD officers, the better able it will be to provide for their training needs.

The CPD should provide greater incentives to attract volunteers to be Field Training Officers (FTOs), take additional measures to ensure officers with troubling disciplinary histories are not selected as FTOs, give district commanders greater control over FTOs, and provide the training staff and recruits with a role in the FTO program.

We were concerned to hear from many CPD staff we interviewed that the CPD has trouble getting a sufficient number of qualified volunteers for these positions. We recommend that the CPD provide additional incentives to attract the best officers to the FTO program. Such incentives could include not only greater monetary inducements, but non-monetary incentives such as priority to receive new types of training (annual and in-service, local and national).

C-004215

While the policy for selection of FTOs states that an officers' disciplinary record should be one factor in selection, many officers we talked to reported that officers with less than stellar disciplinary records were being selected as FTOs. This may result from the absence, discussed above, of centrally located, complete disciplinary histories for district commanders to consult in making their selections. We recommend that any CPD officer who has a significant disciplinary history or who has received a significant neer of citizen complaints (other than those which were determined to be unfounded) be ineligible for the FTO program.

We also understand that district commanders have no authority to remove an officer they have concerns about from serving as an FTO, but can only refuse to assign that officer a recruit. We recommend that district commanders be given this authority and that selection to serve as an FTO be made for a limited term (subject to reappointment if the district commander believes that it is warranted).

The training staff at the academy should be enlisted to provide feedback to the FTOs. For example, designated sergeants from the training academy should have a role both in the selection of FTOs and in evaluating whether a particular FTO is retained after a certain period of time. That role would include providing input into the evaluations of FTOs.

Finally there should be a mechanism for recruits to provide anonymous evaluations of their FTOs. This will aid the CPD in better training and evaluation of its FTOs.

CPD should form additional units to review and audit training.

To ensure that lesson plans are consistent with department policy, we recommend that the CPD institute a curriculum review or curriculum development unit within the training academy. In addition to core academy staff, the unit should include field personnel that represent a wide cross-section of the organization, including CPD command staff (at all levels), and lawyers from the City Solicitor's office. Moreover, we recommend that the academy create an audit committee to ensure that mandated objectives, and only mandated objectives and approved lesson plans, are taught by instructors, and that what is being taught at the academy comports with CPD policy.

The CPD should have more exposure to the policies, practices and procedures of other police departments.

The CPD management seems to have had limited exposure to the practices of other police departments. Greater exposure would provide the CPD with access to new ideas and innovations. It would also provide a valuable mechanism for re-evaluation of its policies and practices in light of those used by other departments. This exposure could be achieved in many ways. For example, more CPD officers could be sent to a greater number and variety of law enforcement conferences. The CPD could also ask outside agencies to review and evaluate its policies and procedures.

In conclusion, we appreciate the cooperation we have received from City and CPD officials and look forward to continued discussion about the issues raised by this letter.

Sincerely,

Steven H. Rosenbaum
Chief
Special Litigation Section

---

[1] We understand that as a result of feedback from our police practices experts, the CPD is going to change the canine policy to prohibit deployment of canines in crowd control situations.

[2] For purposes of this letter, except when explicitly referring to the CPD's definition of "use of force," the term "use of force" is intended to refer to any physical and instrumental acts that impose any degree of force on the civilian, including the use of chemical irritant and what the CPD calls

C -004216

"restraining force."

[3] This Practice may result from ambiguity in the complaint resolution policy, which states that a full investigation should be conducted but also provides that if the claimant fails to attend the scheduled meetings "the complaint/problem will be deemed to have been resolved by the supervisor's inquiry and the file will indicate same."

[4] The policy states that the camera may be deavtivated if "the enforcement action is complete" or recording is "no longer necessary." There is no statement of why it may be "no longer necessary" and this ambiguity may undermine the requirement that the camera be activated. We suggest the CPD eliminate this ambiguity.

C-004217