Case 1:01-cv-00769-SAS   Document 89-2   Filed 02/02/2004   Page 1 of 12

Owensby, et al. vs. City of Cincinnati
November 6, 2003
BRIAN ANTHONY BRAZILE

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - -

| | |
|---|---|
| ESTATE OF ROGER D. OWENSBY JR., et al., | : : : |
| Plaintiffs, | : |
| vs. | : Case No. 01-CV-769 : (Judge S. A. Spiegel) |
| CITY OF CINCINNATI, et al., | : : |
| Defendants. | : |

- - - - - - - - - - - - - -

Videotaped deposition of BRIAN ANTHONY

BRAZILE, a witness herein, called by the plaintiffs

for cross-examination, pursuant to the Federal Rules

of Civil Procedure, taken before me, Wendy Davies

Welsh, a Registered Diplomate Reporter and Notary

Public in and for the State of Ohio, at the offices

of Helmer, Martins & Morgan Co. LPA, 1900 Fourth &

Walnut Centre, 105 East Fourth Street, Cincinnati,

Ohio, on Thursday, November 6, 2003, at 11:02 a.m.

Case 1:01-cv-00769-SAS    Document 89-2    Filed 02/02/2004    Page 2 of 12

Owensby, et al. vs. City of Cincinnati
November 6, 2003

BRIAN ANTHONY BRAZILE

Page 2

```
1  APPEARANCES:

2      On behalf of the Plaintiffs:

3          Paul B. Martins, Esq.
           Don Stiens, Esq.
4          Helmer, Martins & Morgan Co. LPA
           Suite 1900, Fourth & Walnut Centre
5          105 East Fourth Street
           Cincinnati, Ohio 45202
6          Phone: (513) 421-2400

7          John J. Helbling, Esq.
           The Helbling Law Firm, L.L.C.
8          3672 Springdale Road
           Cincinnati, Ohio 45251
9          Phone: (513) 923-9740

10     On behalf of the Defendants City of Golf Manor,
       Stephen Tilley, Roby Heiland and Chris
11     Campbell:

12         Wilson G. Weisenfelder Jr., Esq.
           Rendigs, Fry, Kiely & Dennis
13         900 Fourth & Vine Tower
           One West Fourth Street
14         Cincinnati, Ohio 45202-3688
           Phone: (513) 381-9292
15
       On behalf of the Defendants City of Cincinnati,
16     Darren Sellers, Jason Hodge:

17         Geri Hernandez Geiler, Esq.
           Assistant City Solicitor
18         Department of Law
           Room 214, City Hall
19         801 Plum Street
           Cincinnati, Ohio 45202
20         Phone: (513) 352-3346
```

Page 3

```
1  APPEARANCES (Continued):

2      On behalf of Brian Anthony Brazile and the
       Defendants Robert B. Jorg, Patrick Caton, Jason
3      Hodge, Victor Spellen and Darren Sellers:

4          Donald E. Hardin, Esq.
           Hardin, Lefton, Lazarus & Marks, LLC
5          915 Cincinnati Club Building
           30 Garfield Place
6          Cincinnati, Ohio 45202
           Phone: (513) 721-7300
7
   Also present:
8
   Richard W. Grubb, Videographer
9
   Lisa Damstrom, Law Clerk
10 Helmer, Martins & Morgan Co., L.P.A.

11 Mr. Roger Owensby

12 Mrs. Brenda Owensby

13 Mr. Shawn Owensby

14

15            - - -

16
              STIPULATIONS
17
18     It is stipulated by and among counsel for the
19 respective parties that the deposition of BRIAN
20 ANTHONY BRAZILE, a witness herein, called by the
21 plaintiffs for cross-examination, pursuant to the
22 Federal Rules of Civil Procedure, may be taken at
23 this time by the notary; that said deposition may be
24 reduced to writing in stenotype by the notary, whose
```

Page 4

```
1  notes may then be transcribed out of the presence of
2  the witness; and that proof of the official
3  character and qualifications of the notary is
4  expressly waived.
5
              - - -
6
7             I N D E X
8      Examination by:              Page
9      Mr. Martins . . . . . . . .     5
       Mr. Weisenfelder. . . . .     110
10     Mr. Martins . . . . . . .     135
11
12            E X H I B I T S
13                                   Page
   Deposition Exhibit 47 . . . . . . . .  64
14 Deposition Exhibit 48 . . . . . . . .  75
   Deposition Exhibit 49 . . . . . . . .  77
15 Deposition Exhibit 50 . . . . . . . .  78
   Deposition Exhibit 51 . . . . . . . .  80
16 Deposition Exhibit 52 . . . . . . . .  93
   Deposition Exhibit 53 . . . . . . . . 102
```

Page 5

1    VIDEOGRAPHER: The time is 11:02 a.m. The
2 date is November the 6th. The year is 2003.
3    Would you please swear the witness, ma'am.
4    BRIAN ANTHONY BRAZILE
5 being by me first duly cautioned and sworn, deposes
6 and says as follows:
7    VIDEOGRAPHER: We're on the record, Mr.
8 Martins. This is videotape number 1 for this
9 deposition.
10   MR. MARTINS: Thank you.
11         CROSS-EXAMINATION
12 BY MR. MARTINS:
13   Q. Sir, would you state for the record your
14 full name, please.
15   A. My full name is Brian Anthony Brazile.
16   Q. And your date of birth?
17   A. Is 11/11/70.
18   Q. Have you ever had your deposition taken
19 before?
20   A. No, sir.
21   Q. Let me cover some ground rules with you.
22 As you have just observed, the court reporter places
23 you under oath. I will be asking you questions. If
24 I should ask you a question that either you don't

Case 1:01-cv-00769-SAS   Document 89-2   Filed 02/02/2004   Page 3 of 12

Owensby, et al. vs. City of Cincinnati
November 6, 2003
BRIAN ANTHONY BRAZILE

Page 54

1  A. It was sort of like fetal sort of
2 position.
3  Q. Did you say anything to Officer Heiland at
4 that time, after seeing Mr. Owensby with your
5 flashlight?
6  A. Yes.
7  Q. What did you say to Officer Heiland?
8  A. I walked around to the other side of the
9 vehicle.
10  Q. To the -- to the --
11  A. To where they were.
12  Q. -- rear of the passenger's side of the
13 vehicle?
14  A. Where they were standing.
15  Q. Okay.
16  A. And I asked him, I said, "The guy you have
17 in your car, is he okay?" I said, "Can he breathe?"
18 I said, "He's in a" -- you know, position that
19 looked like he was in, it may have been hard, so I
20 asked him. I'm figuring he's their prisoner. No
21 one ever said whose he was. I figured he was
22 theirs, because he was in their car.
23       And basically I was just trying to let
24 them know to check on him, just to see what's going

Page 55

1 on with him or did they know or had they checked. I
2 don't know. I just had arrived.
3       And basically when I told them, you know,
4 they basically just stood there and kind of like
5 shrugged their shoulders.
6  Q. Both of them?
7  A. From what I recall.
8  Q. Did they say --
9  A. But I was mainly talking to -- to Rob.
10  Q. To -- to Heiland?
11  A. Correct.
12  Q. Did Officer Heiland or the other officer,
13 Officer Campbell, say anything to you in response?
14  A. No. No, sir.
15  Q. In your -- after you told them that --
16 voiced your concern that you weren't sure that the
17 person could breathe, or "Can he breathe," I guess,
18 was your -- your question to them, and they shrugged
19 their shoulders, was the -- the shrug, did you take
20 that to mean, We don't know, or -- or how -- how did
21 you interpret the shrug of the shoulders?
22  A. Well, once I made the statement that I
23 made and, you know, he shrugged, kind of shrugged
24 his shoulders, I took it as everything was fine.

Page 56

1 Because they didn't actually go and check.
2       I figure if it was my vehicle and someone
3 told me that, you know, something may or possibly
4 could have been wrong, you know, I would probably
5 run right over and check and see what's going on.
6       But for some reason they didn't, so I took
7 it that probably they had already checked on him and
8 they knew what was -- you know, maybe he was fine,
9 maybe, I don't know, was overexaggerating maybe.
10  Q. In any event, they -- they took no action
11 in response to your question to them as far as "Can
12 he breathe," right?
13  A. No, sir.
14  Q. As I recall, your statement was something
15 along the lines of: this looks fucked up, can he
16 breathe, it don't look like he can from the way he's
17 laying.
18  A. Uh-huh.
19  Q. Is that accurate to your recollection?
20  A. Yes.
21  Q. And you saying, in response to that,
22 Officer Heiland and possibly the other officer
23 simply shrugged their shoulders?
24  A. Yes.

Page 57

1  Q. What did you do then?
2  A. At that point in time I took it as I guess
3 everything was okay then. I went back to my vehicle
4 and proceeded to put my hat on. And like I say,
5 right after that, that's when supervisors and
6 everybody started showing up on -- onto the scene.
7  Q. Okay. So you walk back to your -- to the
8 scout car, get your hat out, put your hat on?
9  A. Uh-huh.
10  Q. Is Officer Jorg still around the area?
11  A. Somewhere, yes.
12  Q. Is Caton still around the area?
13  A. Everybody was still in the area, yes.
14  Q. Hunter's in the area?
15  A. Everyone.
16  Q. Hodge, Lawson are in the area, right?
17  A. Correct.
18  Q. Did you say to any of them, Hey, can that
19 guy breathe; it doesn't look like he's breathing in
20 the back of that Golf Manor car? Did you say
21 anything like that to them?
22       MR. HARDIN: Objection to the form of the
23 question.
24  A. Not to them.

Case 1:01-cv-00769-SAS   Document 89-2   Filed 02/02/2004   Page 4 of 12
Owensby, et al. vs. City of Cincinnati
November 6, 2003
BRIAN ANTHONY BRAZILE

Page 50

1 know Officer Campbell?
2    A. No, sir.
3    Q. But you knew -- on that evening you knew
4 Officer Heiland from, I guess, prior experience?
5    A. Yes.
6    Q. Did you have any -- well, what -- what's
7 the next thing that happened? You walked there.
8 You saw Officer Heiland and Officer Campbell at the
9 rear passenger quarter panel of the Golf Manor car.
10 What's the next thing that happens?
11    A. I believe I looked in the car, like I
12 said, to see if I can recognize the guy. I wanted
13 to see what was going on there, if I knew him,
14 because sometimes I have to make runs up to that
15 area, to see if it was one of the guys that usually
16 hang out.
17        So once I looked, shined my light, I
18 didn't recognize his face. And as I looked, like I
19 say, he had a couple of little like abrasions or
20 maybe cuts maybe on his forehead here. And he had a
21 little like blood right here by his nostril
22 (indicating).
23        So at that point in time I went back
24 around to the car and --

Page 51

1    Q. Well, wait. Before -- before you --
2    A. Okay.
3    Q. Before we get to that, let me ask you some
4 questions.
5    A. Uh-huh.
6    Q. You say you looked in with your light.
7 This is your flashlight?
8    A. Correct.
9    Q. Did you look in from the passenger rear
10 door area? Is that -- is that through that window?
11    A. No. I --
12    Q. Or how did you look in?
13    A. I was on the driver's side.
14    Q. Okay. So --
15    A. Rear -- rear door.
16    Q. All right. So the driver's side rear
17 door, you shone your -- your flashlight through
18 the -- the window to the person on the back seat?
19    A. Correct.
20    Q. The window was up?
21    A. From what I recall, yes.
22    Q. Okay. What was the position of the person
23 in the back seat?
24    A. It appeared to be cuffed, because his

Page 52

1 hands were back here. I couldn't actually see a
2 cuff, though.
3    Q. Was he sitting up, laying down?
4    A. He was laying down, back toward the seat
5 back. So his face was basically kind of facing
6 forward to the back of the front seat.
7    Q. And his face or his head was toward the
8 driver's side of the car?
9    A. No. His head was right in the rear of the
10 passenger's side front seat, right behind the
11 passenger's side seat.
12    Q. Okay. So his -- as we --
13    A. Facing forward.
14    Q. Right. As you look, if you stand in front
15 of the Golf Manor cruiser, the person's head was on
16 either the driver's side or the passenger's side?
17 And that's what I'm asking you.
18        MR. HARDIN: Objection.
19    Q. Was it --
20        MR. HARDIN: It's already asked and
21    answered.
22    Q. Was it -- which side was it on?
23    A. It was on the passenger's side, if you
24 were looking directly straight at the car.

Page 53

1    Q. Correct.
2    A. Right. On the left.
3    Q. And his -- where was -- where were his
4 feet?
5    A. Would be on the driver's side.
6    Q. Okay. Were they up on the seat?
7    A. Yeah, appeared to be.
8    Q. And you were on the driver's side, looking
9 in the window?
10    A. At the rear.
11    Q. The rear window?
12    A. Correct.
13    Q. So his feet were closest to you?
14    A. Correct. Correct.
15    Q. When you shown your -- your light in then
16 and looked at his -- his face, you said his face was
17 facing toward, I guess, the passenger, the front
18 passenger seat; is that correct?
19    A. Correct.
20    Q. Did you notice whether or not there was
21 blood on the seat?
22    A. No, I can't recall that. I didn't see any
23 blood.
24    Q. Were Mr. Owensby's knees bent or straight?

Case 1:01-cv-00769-SAS   Document 89-2   Filed 02/02/2004   Page 5 of 12
Owensby, et al. vs. City of Cincinnati
November 6, 2003
BRIAN ANTHONY BRAZILE

Page 46

1  Q. And what did they say?
2  A. They say, "Yes, we're fine."
3  Q. Did you ask what happened?
4  A. No.
5  Q. Okay. What happened next? What did you
6  do next?
7  A. Proceeded to go to all the other officers
8  and ask the same question.
9  Q. Okay. Who was the next officer that you
10 went to?
11 A. I believe it may have been Jorg at that
12 time.
13 Q. Did -- did Officer Jorg have a PR-24 in
14 his hand when you talked to him?
15 A. Hmm. I can't recall.
16 Q. What did you say to Officer Jorg and what
17 did he say to you?
18 A. I asked him was he okay.
19 Q. And what did he say?
20 A. And he say, "Yes, I'm fine."
21 Q. Did you -- did you and he discuss anything
22 else?
23 A. Yes.
24 Q. What else was said?

Page 47

1  A. Well, I seen he had blood on his shirt, so
2  that's really why I wanted to know was he okay. And
3  he say, "Yes, I am."
4  Q. You pointed out to him that: you got
5  blood on your shirt?
6  A. No, I didn't point it out to him.
7  Q. Okay. But you just saw it?
8  A. But I seen it, yeah.
9  Q. Anything else said between you and Officer
10 Jorg?
11 A. He says that "That's not from me." He
12 said, "That's from the bad guy." That's what he
13 said.
14 Q. Anything else?
15 A. From him, no.
16 Q. Okay. Who did you talk to next?
17 A. May have been Hunter or some other
18 officers. I was asking them were they okay.
19 Q. And what did Officer Hunter say to you?
20 A. "Yeah." Every-- everyone, all the
21 officers there said they were fine.
22 Q. Okay. Did you ever ask how's the suspect
23 or arrestee, the person that was arrested?
24 A. I asked someone where was he, and someone

Page 48

1  pointed off and they said, "In the Golf Manor car."
2  Q. And then did you walk over to the Golf
3  Manor car?
4  A. Yes.
5  Q. Was that the next thing that happened or
6  did something else happen?
7  A. At that time I -- I may have asked someone
8  else probably were they okay and then probably made
9  my way over to the -- to the car there.
10 Q. Before you approached the Golf Manor car,
11 had anyone mentioned to you that the person, the --
12 that had been arrested had been Maced?
13 A. I think I heard that over the air.
14 Q. What do you mean, over the air?
15 A. Over the radio.
16 Q. Oh, before you got to the -- to the
17 parking lot?
18 A. Yes, I believe so.
19 Q. Okay. So when you arrived, you knew that
20 the person had been Maced, and based on your
21 conversation with Officer Jorg, you knew that the
22 person was bleeding in some fashion, because there
23 was blood on Jorg's shirt that he said came from the
24 bad guy, right?

Page 49

1  A. That's what he said.
2  Q. Right. Okay. So then you make your way
3  over to the Golf Manor cruiser. Is anyone around
4  the Golf Manor cruiser?
5  A. Uh-huh. Yes.
6  Q. Who?
7  A. Two Golf Manor officers.
8  Q. Who were the -- the -- did you know either
9  of the officers?
10 A. Yes. I knew one of them.
11 Q. Who did you know?
12 A. Robert Heiland.
13 Q. And where was Officer Heiland in relation
14 to the Golf Manor cruiser?
15 A. He was on the other side of the -- the
16 passenger's side of the vehicle, toward the back
17 quarter panel.
18 Q. By the -- the rear quarter panel?
19 A. Him and another Golf Manor officer.
20 Right.
21 Q. Do you know whether or not that other
22 officer is Chris Campbell?
23 A. Yeah, now I know it to be, yes.
24 Q. Okay. At the time, I take it, you did not

Case 1:01-cv-00769-SAS    Document 89-2    Filed 02/02/2004    Page 6 of 12

Owensby, et al. vs. City of Cincinnati
November 6, 2003
BRIAN ANTHONY BRAZILE

Page 58

1  Q. Other than the statement that we just
2 discussed that you made to Officer Heiland, did you
3 say to anyone else, any Cincinnati police officer,
4 words to the effect of "Can he breathe? It doesn't
5 look like he can from the way he's laying"?
6  A. No.
7  Q. After you get your hat, where do you go
8 from there?
9  A. I believe I was just standing around.
10 Like I said, a supervisor was showing up and they
11 were getting ready to get statements from the use of
12 force and things like that. So I was basically out
13 of the way.
14  Q. And you know who Officer -- Sergeant
15 Browner is, right?
16  A. Correct.
17  Q. You saw Sergeant Browner arrive on the
18 scene; is that right?
19  A. She pulled -- yes.
20  Q. And you talked to her briefly when she got
21 out of her car?
22  A. I believe I spoke to her.
23  Q. You said something like hi, ma'am, or how
24 are you or something like that?

Page 59

1  A. Yeah, from what I recall, yes.
2  Q. And at that point you didn't raise any
3 concern to her that the guy in the back seat of the
4 Golf Manor cruiser doesn't look to me like he can
5 breathe, did you?
6  A. No, not to her. I told the people who I
7 felt was responsible for the person in that car.
8  Q. That -- that would have been Officer
9 Heiland?
10  A. And whoever -- and his partner.
11  Q. And -- and the other -- the other Golf
12 Manor officer?
13  A. Correct.
14  Q. When you saw Officer Caton at the scene,
15 did you notice that he had -- whether or not he had
16 blood on his shirt?
17  A. Believe he may have. I can't recall.
18  Q. By this point in time had -- did you have
19 an understanding that there had been a physical
20 altercation with the person who was in the back seat
21 of the Golf Manor cruiser?
22  A. Yes.
23  Q. He had been arrested through the use of
24 force?

Page 60

1  A. Yes.
2  Q. And you also knew that he had been Maced?
3  A. From a transmission over the air, yeah.
4  Q. Right. And from your personal observation
5 you saw that he had -- from shining your flashlight,
6 he had several cuts on his face; is that right?
7  A. Correct. I don't know how many, but yeah,
8 you could see maybe an abrasion or two.
9  Q. Had you received any training that in
10 placing a suspect in a vehicle that the suspect
11 should be sitting up as opposed to laying on the --
12 on the car, the car seat?
13  A. Yes, but it's not uncommon as well for a
14 person to be laying down in the vehicle.
15  Q. Is there -- have you received any training
16 of -- that there is any danger when a suspect is
17 laying prone on the back seat of a cruiser?
18  A. Not that I can recall.
19  Q. Do you recall receiving any training that
20 there's a danger of asphyxiation, positional
21 asphyxiation when a subject is laid on the back seat
22 of a cruiser?
23  A. Well, yes. You can throw up or something.
24 I guess you could choke or something.

Page 61

1  Q. Well, have you -- have you received any
2 training on that?
3  A. Some instruction, yes.
4  Q. What do you recall your instruction to
5 have been?
6  A. I mean, basically, anyone you arrest and
7 put in a vehicle should be sitting up and
8 seat-belted. That's what the roll bar is for in the
9 vehicle, to help position them, for one, so they
10 can't get out and be moving around, and for two, to
11 keep them stabilized in the vehicle.
12  Q. Did it strike you as odd that this person
13 was not sitting up and was laying prone on the back
14 seat of the Golf Manor cruiser?
15  A. You say strike me as what?
16  Q. Odd, unusual.
17  A. Not -- no, not at the time. I've seen it
18 before.
19  Q. In the training, though, that you've had,
20 the preferred, I guess, method of securing a suspect
21 in the back seat of a cruiser is to have the person
22 sitting up and seat-belted; is that right?
23  A. Correct, for transportation.
24  Q. And did you voice any concern to anyone as

Case 1:01-cv-00769-SAS   Document 89-2   Filed 02/02/2004   Page 7 of 12

Owensby, et al. vs. City of Cincinnati  
November 6, 2003

BRIAN ANTHONY BRAZILE

Page 62

1 to why this person wasn't seated up and was not
2 seat-belted?
3   A. No, I didn't. He was not in -- he was in
4 Golf Manor's custody and control. I don't know what
5 their policies are.
6   Q. Well, but just for the safety of the
7 person --
8   A. Uh-huh.
9   Q. -- did you raise these -- these issues?
10   A. No.
11   Q. I mean, these are -- these are safety
12 issues, right?
13       MR. HARDIN: Objection.
14   Q. Regardless of -- regardless of whose car
15 they're in, the reason the person is sitting up as
16 opposed to laying down is, at least in part, that
17 they won't suffocate or have any asphyxia, correct?
18       MR. HARDIN: Objection.
19       You may answer.
20   A. Okay.
21   Q. That's -- I mean, that's part of your
22 training, right?
23   A. Yes.
24   Q. Okay. And the same thing for a seat belt;

Page 63

1 a person wears a seat belt for their safety,
2 correct?
3   A. Correct.
4       MR. HARDIN: Objection.
5       You may answer.
6   Q. And so what I'm asking is, when you saw
7 this person laying down, not seat-belted, in the
8 back seat of the cruiser, did you raise any concern
9 not out of who was responsible but just out of --
10 for the safety of the person in the car?
11       MR. HARDIN: Objection. Asked and
12     answered.
13       You may answer.
14   A. That was the whole reasoning of me talking
15 to the Golf Manor officers, you know, to bring it to
16 their attention.
17   Q. When -- when you said it doesn't look --
18 he doesn't look like he can breathe?
19   A. Well, yeah, I'm saying, period, from when
20 I looked in.
21       MR. HARDIN: Objection to the form of the
22     question. I -- I am going to object to you
23     stating something that this witness did not
24     say, in the question.

Page 64

1       (Deposition Exhibit 47
          was marked for identi-
2         fication.)
3   Q. Let me hand you, sir, what is marked as
4 Exhibit 47. If you would take a look at that and
5 just tell me whether or not that is a transcript of
6 a statement you gave to police Homicide detectives
7 on November 13th, 2000.
8   A. Yes, it is.
9   Q. And that's one of the statements that you
10 looked at in preparation for this deposition,
11 correct?
12   A. Yes, it is.
13   Q. I want to direct your attention to page 3.
14 About halfway down the page there's a question that
15 says, "What did you say?" Do you see that?
16   A. Yes.
17   Q. Okay. And then your answer is, "I told
18 'em it looked fucked up, you know."
19       Question: Which, which Golf Manor guy did
20 you say this to?
21       "Answer: Heiland. Cause I know Heiland."
22       MR. HARDIN: Excuse me a minute.
23       THE WITNESS: That was never said.
24       MR. HARDIN: Just -- okay. Just go ahead

Page 65

1 and keep reading. Can you start over again so
2 the --
3   Q. "Question: What did you say?
4       "Answer: I told 'em it looked fucked up,
5 you know.
6       "Question: Which, which Golf Manor guy
7 did you say that too (sic)?
8       "Answer: Heiland. Cause I know Heiland.
9       "Question: You know Heiland.
10      "Answer: Like I said, we went to the
11 academy together.
12      "Question: You said, 'This looks fucked
13 up.'"
14      Answer: That's exactly, "exactly what I
15 said. And uh he was just shaking his head. And I
16 said, 'You know this guy?' He said, 'No.' I was
17 like oh, 'Okay.' I said uh, 'Can he breathe?' I
18 said, 'It don't like he can'" -- "'he can from the
19 way he's laying.' And then uh he was just, he just
20 shook, he just shook his head. And uh then I said
21 that" -- "And uh then I said that because he was in
22 the car."
23      Did I read that accurately?
24   A. Yeah, pretty much, that I can recall.

Case 1:01-cv-00769-SAS   Document 89-2   Filed 02/02/2004   Page 8 of 12
Owensby, et al. vs. City of Cincinnati
November 6, 2003
BRIAN ANTHONY BRAZILE

Page 66

1  Q. Okay. And that's -- and that's -- that is
2  consistent with your recollection?
3       MR. HARDIN: For the record, before --
4  before this, I'm -- I'm going to indicate to
5  you that I am not aware of the actual accuracy
6  of this transcript. I have reason to doubt the
7  accuracy of transcripts from the Cincinnati
8  Police Division, so I'm going to register that
9  objection and let him answer the question,
10 though.
11      MR. MARTINS: Okay. Do you have any
12 indication that what I've read is inaccurate as
13 to what was said?
14 A. Some wording.
15 Q. No, I'm asking Counsel on the objection.
16 A. Oh.
17      MR. HARDIN: Mr. Martins, if I actually
18 knew that there was an inaccuracy, I'd tell
19 you.
20      MR. MARTINS: Okay.
21      MR. HARDIN: I just have reason to doubt
22 the accuracy.
23      MR. MARTINS: All right, sir.
24 BY MR. MARTINS:

Page 67

1  Q. Now, you were saying?
2  A. In the case where it says --
3       MR. WEISENFELDER: What page?
4       THE WITNESS: I'm sorry. I think it's 3.
5  A. Okay. Where it -- right under where it
6  says, "What did you say" right in the middle where
7  you started at --
8  Q. Yes?
9  A. -- "I told 'em it looked fucked up," no, I
10 didn't say "it." I said "this."
11 Q. "This looks fucked up?"
12 A. Yes.
13 Q. All right.
14 A. That's meaning the whole incident. I
15 didn't say "he" or -- I'm sorry, or "it." I -- I
16 was talking about the situation as a whole.
17 Q. Anything else?
18 A. No. That's it.
19 Q. So with respect to -- and later on, I
20 guess, he says -- further down there's a question
21 that says, "You said, 'This looks fucked up.'" I
22 guess that's -- that's accurate, right?
23 A. Okay.
24 Q. Is that correct?

Page 68

1  A. Yes.
2  Q. And then as to the other statements that
3  this transcript says you said, "Can he breathe? I
4  said," I don't -- "It don't look like he can from
5  the way he's laying," do you have a recollection of
6  saying that to Officer Heiland?
7  A. That sounds accurate.
8  Q. All right.
9       MR. HARDIN: Are you finished with that --
10 that examination about this statement?
11      MR. MARTINS: Yes. Yes.
12      MR. HARDIN: I'm -- I'm going to indicate
13 to you the only reason I objected is because I
14 think your question, as it was originally
15 posed, said that he said he cannot breathe, and
16 that is different than what he said in his
17 transcript. That's the reason the objection
18 was as to the form.
19      MR. MARTINS: Well, the -- the quote is,
20 "Can he breathe? It don't look like he can
21 from the way he's laying."
22      MR. HARDIN: I -- I understand that.
23      MR. MARTINS: Okay.
24      MR. HARDIN: But he didn't say: he cannot

Page 69

1  breathe.
2       MR. MARTINS: All right.
3       MR. HARDIN: Okay.
4  BY MR. MARTINS:
5  Q. After talking with Officer -- with
6  Sergeant Browner, did you talk to anyone else?
7  A. No.
8  Q. I'm sorry?
9  A. No, I didn't.
10 Q. At the time you spoke with Sergeant
11 Browner, am I correct in understanding that you knew
12 that there had been a physical altercation involving
13 several Cincinnati police officers? Correct?
14 A. Correct. I knew something went on, yes.
15 Q. You knew that there had been an officer
16 needs assistance call, because that's how you went
17 to that scene, correct?
18 A. Correct.
19 Q. You saw blood on Jorg's sleeve, correct?
20 A. Correct.
21 Q. And he had told you that it came from the
22 guy that you saw in the back seat of the cruiser?
23 A. Correct.
24 Q. You had seen some blood on Caton's sleeve,

Case 1:01-cv-00769-SAS    Document 89-2    Filed 02/02/2004    Page 9 of 12

Owensby, et al. vs. City of Cincinnati
November 6, 2003
BRIAN ANTHONY BRAZILE

## Page 70

1 correct?
2  A. Possibly, yeah. I don't remember fully
3 like I do remember Jorg, but could have been, yes.
4  Q. You had heard over police communication
5 that the person in the back seat of the Golf Manor
6 cruiser had been Maced, right?
7  A. Correct, uh-huh.
8  Q. You had seen that the person in the back
9 seat had some cuts on his face, correct?
10  A. Correct.
11  Q. From his position in the car you believe
12 that he was handcuffed with his hands behind his
13 back, correct?
14  A. That's what it appeared to be.
15  Q. You saw that he was not sitting up,
16 correct?
17  A. Correct.
18  Q. You saw that he was not moving, correct?
19  A. Well, I wasn't looking to see if he was
20 moving. I just looked at his face, but when I
21 looked at his face, right, there was no movement.
22  Q. You -- you never saw his body move?
23  A. No. No.
24  Q. And from your observation it looked to you

## Page 71

1 like you had a serious question as to whether or not
2 he could breathe; is that right?
3  A. It was just a question.
4  Q. A question that you posed to the -- to
5 Officer Heiland?
6  A. Correct.
7  Q. And the reason you posed that is because
8 from what you saw you had a question as to whether
9 or not he could breathe or he was breathing?
10      MR. HARDIN: Objection.
11  Q. Correct?
12      MR. HARDIN: You may answer.
13  A. Uh-huh. I wanted him to check to see if
14 his prisoner was okay.
15  Q. Right. And as I understand your
16 testimony, other than the statement that we've just
17 covered that you gave to Officer Heiland, you did
18 not repeat those concerns to any other Cincinnati
19 police officers at the scene, correct?
20  A. That's correct.
21  Q. Did you at any time that evening ask
22 Officer Heiland to make a call for medical
23 assistance?
24  A. Did I ask him to?

## Page 72

1  Q. Yes.
2  A. No, I did not.
3  Q. And I take it you did not call for medical
4 assistance?
5  A. No.
6  Q. You then walk -- after you talk to Officer
7 Heiland, you walk back to your car to get your hat.
8 Why did you need to get your hat?
9  A. Well, any time supervisors show up on the
10 run, basically you're supposed to be in your full
11 uniform. Things like that get written up sometimes.
12 If you're on something and you don't have your hat
13 on, it -- it -- it's a big deal.
14  Q. Look at Exhibit 4 -- I'm sorry, 47 that
15 you have before you, on page 4, the next page. At
16 about halfway down the page you're asked about
17 Sergeant Browner. You say, "I believe Sergeant
18 Browner, cause she parked next to my scout car" --
19 car -- "in the CDOP van." Do you see that?
20  A. Okay. Yes.
21  Q. What is a CDOP van?
22  A. It actually is CDOP, civil disturbance
23 operations procedure van.
24  Q. Is it -- all right. And then further down

## Page 73

1 there's a question, "Did you talk to her?"
2      And the answer is, "I said, 'Hi, ma'am.
3 'How you doing?' And that was basically it, about
4 it. And uh shortly after that, uh like I said, I
5 don't remember" everything -- "everywhere I went and
6 where I walked." Do you see that?
7  A. Uh-huh.
8  Q. Okay. As far as what you said to Officer
9 Browner, to the best of your recollection, is that
10 accurately reflected in the "Hi, ma'am. How you
11 doing?"
12  A. From what I can remember.
13  Q. At some point after talking to Sergeant
14 Browner you overheard Officer Jorg talking to
15 Sergeant Watts; is that right?
16  A. Vaguely, yes.
17  Q. Where was Officer Jorg and Sergeant Watts
18 at that point?
19  A. I think they were -- where the cruiser
20 was, I think they were in the rear of it, maybe
21 about 15, maybe 20 feet.
22  Q. When you say the cruiser, are you
23 referring to --
24  A. The Golf Manor.

Case 1:01-cv-00769-SAS   Document 89-2   Filed 02/02/2004   Page 10 of 12

Owensby, et al. vs. City of Cincinnati  
November 6, 2003  
BRIAN ANTHONY BRAZILE

Page 74

1  Q. The Golf Manor cruiser?
2  A. Yeah.
3  Q. The cruiser in which Mr. Owensby lay?
4  A. Correct.
5  Q. And where were you in relation to both of
6  them: Watts and Jorg?
7  A. I believe I was -- might have been
8  standing on the side somewhere close to the building
9  maybe.
10  Q. What did you hear Officer Jorg say to
11  Sergeant Watts and what did you hear Sergeant Watts
12  say to Officer Jorg?
13  A. I couldn't really hear a lot of the
14  conversation. He just started to explain how the
15  events unfolded, you know, how they seen him go into
16  the store or something, and then somebody was the
17  guy that they was looking for from another past time
18  or something, and basically waiting for him to come
19  out the store or something. Something to that
20  effect, but I didn't hear the whole explanation that
21  he gave to the supervisor.
22  Q. Did you hear Officer Hodge talk to
23  Sergeant Watts?
24  A. Hodge, Hodge, Hodge. I don't recall if I

Page 75

1  do remember him --
2  Q. I'm sorry?
3  A. I said I don't recall if I remember him
4  speaking to the sarge.
5  Q. Do you recall anyone else talking to
6  Sergeant Watts?
7  A. It was Jorg, I believe, and I believe it
8  was -- it might have been Caton. I -- I just can't
9  recall. It might have been him.
10  Q. Do you recall Caton saying anything to
11  Watts?
12  A. Not that I can remember.
13         (Deposition Exhibit 48
               was marked for identi-
14         fication.)
15  Q. Let me show you Exhibit 48. Is this the
16  other statement that you gave to Internal
17  Investigation on November 8th, 2000?
18  A. Yes.
19  Q. And this is the other statement that you
20  looked at, correct?
21       MR. HARDIN: Objection. That's --
22  Q. In preparation for the deposition?
23       MR. HARDIN: That's not what this is, what
24  you identified.

Page 76

1  Q. This is a statement you gave on
2  November 8th, 2000 to Detective Jim Engelhardt and
3  Detective Jim Zieverink, Cincinnati Police Homicide
4  Unit, correct?
5  A. Okay. Yes.
6  Q. And you reviewed this statement before in
7  preparation for this deposition; is that right?
8  A. Yes, I looked over it.
9  Q. Okay. To your knowledge, did you give any
10  other statements beyond the two that you have before
11  you, Exhibit 47 and 48?
12  A. I believe there was an OMI interview and
13  there was an Internal interview.
14  Q. Separate and apart from those two?
15  A. Yes.
16  Q. Do you know Officer Spellen?
17  A. Yes.
18      MR. MARTINS: In the exhibit book, the
19  bottom one.
20  Q. Let me show you what's previously been
21  marked as Exhibit 7. Oh, I'm sorry. No. Never
22  mind.
23      When you were talking -- did you talk to
24  Officer Spellen at the scene?

Page 77

1  A. I didn't remember talking to him, but they
2  showed me a tape or something and said, "Yeah, and
3  here's you right here and here's him." So yeah, I
4  guess I did.
5  Q. Okay. Do you recall an exchange between
6  him where Officer Spellen says "Looks like he's ...
7  hurting a little bit" and you say a "Lot a bit" and
8  he -- Spellen -- says "Yeah"?
9  A. I don't recall that.
10         (Deposition Exhibit 49
               was marked for identi-
11         fication.)
12  Q. Exhibit 49 I'm handing you now.
13  Exhibit 49, there are several documents. The first
14  is a -- first page is a February 25, 2003 memorandum
15  from the city manager to the chief of police,
16  adopting a report and concurring with the chief's
17  recommendation of a 24-hour suspension. Do you see
18  that?
19  A. Yes.
20  Q. Have you seen this document before today?
21  A. Not this front page, but the second page.
22  Q. All right. The second day's -- the second
23  page is a February 27, 2003 notice of suspension.
24  And that's your signature on it; is that right?

Case 1:01-cv-00769-SAS   Document 89-2   Filed 02/02/2004   Page 11 of 12
Owensby, et al. vs. City of Cincinnati                BRIAN ANTHONY BRAZILE
November 6, 2003

Page 94

1 (indicating).
2  Q. Where you've drawn a triangle?
3  A. Yes.
4  Q. Okay. And that's around the gas island?
5  A. I think here's the front door of the
6 store.
7  Q. Right.
8  A. And it was probably up under the -- I
9 think it was like under the --
10  Q. The -- the --
11  A. -- awning, I believe, if I remember right.
12 So yeah, somewhere in that area right there.
13  Q. All right. And while you're at it, would
14 you draw a rectangle as to where your car was when
15 you parked your -- the scout car.
16  A. (Witness complies.)
17     Yeah. Someplace like --
18  Q. And you've drawn a --
19  A. With a circle around it.
20  Q. -- a triangle with a circle around it as
21 the location of where your scout car was?
22  A. Yeah. Somewhere in that area right there.
23  Q. Thank you. I'm pausing it at a minute,
24 four seconds. There are two Cincinnati police

Page 95

1 officers standing right in front of our view in the
2 center of the screen. Can you identify either one
3 of them or both? Let me -- I'll run it and --
4  A. Yeah, run it again.
5     Looked like one was Sellers and looked
6 like the other one was Spellen. Yeah. Yeah.
7  Q. An officer just walked -- we're at a
8 minute 27 into the tape. An officer just walked by
9 with a hat on, glasses.
10  A. Uh-huh.
11  Q. Who was that?
12  A. Sergeant Watts.
13  Q. Thank you.
14     There's an officer -- we're at a minute 32
15 into the tape. There's an officer walking directly
16 toward us, with a hat on. Take a look and see if
17 you can identify that person.
18  A. That's me.
19  Q. That's you?
20  A. Yes, it is.
21  Q. All right. At this point in time where
22 you're talking to Officer Spellen had -- you have
23 your hat, so you've already looked at Mr. Owensby in
24 the back of the cruiser?

Page 96

1  A. Yeah, I believe at that time, yeah, I did.
2  Q. Right. So -- so at this point in time you
3 had arrived, walked over, talked to Jorg, went over,
4 looked in the back seat of the cruiser, talked to
5 Heiland, went back to your car and got your hat.
6 This had all transpired by this point, correct?
7  A. I believe so, yes.
8  Q. All right.
9     We're at a minute 51 into the tape and
10 there is a female officer wearing a hat, walking
11 toward us. Do you know who that is?
12  A. Yes.
13  Q. Who is that?
14  A. Sergeant Browner.
15  Q. At this point in time had you already said
16 hello to -- to Sergeant Browner?
17  A. I believe so. I believe I had, because
18 she had already parked her car and -- yeah, and she
19 was walking now into the area. So I believe so.
20  Q. So, again, before we first see you or
21 Sergeant Browner appear on this videotape, you had
22 already retrieved your hat and had talked to her. I
23 think it was something like "Hi, ma'am. How you
24 doing," something like that. Right?

Page 97

1  A. Yes.
2  Q. Okay.
3     There is on the -- we're at two minutes
4 seven seconds into the tape. On the right-hand side
5 of the screen there is a van and another vehicle
6 next to it. Is the van the van that Sergeant
7 Browner was driving?
8  A. Correct.
9  Q. All right. The vehicle next to the van,
10 is that your vehicle, the scout vehicle?
11  A. Looks like it.
12     Yes.
13  Q. We're at two minutes 11 seconds into the
14 tape. There's a gentleman in the center of the
15 screen wearing a white Cincinnati Reds baseball cap.
16 Do you know who that person is?
17  A. Yes.
18  Q. Who is that?
19  A. Looks like Officer Lawson.
20  Q. At the time Officer Jorg -- we're at two
21 minutes 42 seconds into the tape. At the time
22 Officer Jorg is -- is talking to Sergeant Watts --
23     We can hear that. We can't see it, but we
24 can hear it.

# AFFIDAVIT

- - -

STATE   OF   OHIO        :
                         :   SS
COUNTY OF HAMILTON       :

I, Wendy L. Welsh, Notary Public in and for the State of Ohio, do hereby state that the transcript of the deposition of BRIAN ANTHONY BRAZILE, deponent herein, having been submitted to said deponent for review and signature, has not been signed within the thirty (30) day period allowed under the Federal Rules; said deposition to now have the same force and effect as though signed.

_____
Wendy L. Welsh, Court Reporter

Sworn to before me this _15_ day of _January_, 2004.

_____
Thomas M. Blasing
Notary Public - State of Ohio

My commission expires:
May 4, 2004.