Case 1:01-cv-00769-SAS    Document 89-3    Filed 02/02/2004    Page 1 of 26

Estate of Roger Owensby vs. City of Cinti.                    PATRICK E. CATON
October 17, 2003

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - - -
ESTATE OF ROGER D.          :
OWENSBY JR., et al.,        :
                            :
        Plaintiffs,         :
    vs.                     :  Case No. 01-CV-769
                            : (Judge S. A. Spiegel)
CITY OF CINCINNATI,         :
et al.,                     :
                            :
        Defendants.         :
- - - - - - - - - - - - - - -


        Videotaped deposition of PATRICK EDMUND

CATON, a defendant herein, called by the plaintiffs

for cross-examination, pursuant to the Federal Rules

of Civil Procedure, taken before me, Wendy Davies

Welsh, a Registered Diplomate Reporter and Notary

Public in and for the State of Ohio, at the offices

of Helmer, Martins & Morgan Co. LPA, 1900 Fourth &

Walnut Centre, 105 East Fourth Street, Cincinnati,

Ohio, on Friday, October 17, 2003, at  a.m.

Estate of Roger Owensby vs. City of Cinti.                    PATRICK E. CATON
October 17, 2003

Page 2

1  APPEARANCES:

2      On behalf of the Plaintiffs:

3          Paul B. Martins, Esq.
           Don Stiens, Esq.
4          Frederick M. Morgan, Jr. Esq.
           Helmer, Martins & Morgan Co. LPA
5          Suite 1900, Fourth & Walnut Centre
           105 East Fourth Street
6          Cincinnati, Ohio  45202
           Phone:  (513) 421-2400
7
           John J. Helbling, Esq.
8          The Helbling Law Firm, L.L.C.
           3672 Springdale Road
9          Cincinnati, Ohio 45251
           Phone:  (513) 923-9740
10
       On behalf of the Defendants City of Golf Manor,
11     Stephen Tilley, Roby Heiland and Chris
       Campbell:
12
           Lynne Marie Longtin, Esq.
13         Rendigs, Fry, Kiely & Dennis
           900 Fourth & Vine Tower
14         One West Fourth Street
           Cincinnati, Ohio  45202-3688
15         Phone:  (513) 381-9200

16     On behalf of Defendants City of Cincinnati,
       Darren Sellers, Jason Hodge:
17
           Geri Hernandez Geiler, Esq.
18         Assistant City Solicitor
               and
19         Julie F. Bissinger, Esq.
           Chief Counsel
20         Department of Law
           Room 214, City Hall
21         801 Plum Street
           Cincinnati, Ohio 45202
22         Phone:  (513) 352-3346

23

24

Page 3

1  APPEARANCES (Continued):

2      On behalf of the Defendants Robert B. Jorg,
       Patrick Caton, Jason Hodge, Victor Spellen and
3      Darren Sellers:

4          Donald E. Hardin, Esq.
           Hardin, Lefton, Lazarus & Marks, LLC
5          915 Cincinnati Club Building
           30 West Garfield Place
6          Cincinnati, Ohio 45202
           Phone: (513) 721-7300

7
   Also present:
8
   Richard W. Grubb, Videograher
9
   Lisa Damstrom, Law Clerk
10 Helmer, Martins & Morgan Co., L.P.A.

11 Wendy M. Weller, Paralegal
   Buckley, King & Bluso
12
   Mr. Roger Owensby
13
   Mrs. Brenda Owensby
14
   Mr. Shawn Owensby
15
   Victor N. Spellen
16

17          - - -

18

19

20

21

22

23

24

Page 4

1                S T I P U L A T I O N S

2      It is stipulated by and among counsel for the

3  respective parties that the deposition of PATRICK

4  EDMUND CATON, a defendant herein, called by the

5  plaintiffs for cross-examination, pursuant to the

6  Federal Rules of Civil Procedure, may be taken at

7  this time by the notary; that said deposition may be

8  reduced to writing in stenotype by the notary, whose

9  notes may then be transcribed out of the presence of

10 the witness; and that proof of the official

11 character and qualifications of the notary is

12 expressly waived.

13              - - -

14

15

16

17

18

19

20

21

22

23

24

Page 5

1                I N D E X

2      Examination by:          Page

3      Mr. Martins . . . . . . . . 6

4      Ms. Longtin . . . . . . . 232

5      Mr. Martins. . . . . . . .238

6              - - -

7

8            E X H I B I T S

9                              Page
   Deposition Exhibit 28 ...................   22
10 Deposition Exhibit 29 ...................   30
   Deposition Exhibit 30 ...................   43
11 Deposition Exhibit 31 ...................   65
   Deposition Exhibit 32 ...................  115
12 Deposition Exhibit 33 ...................  186
   Deposition Exhibit 34 ...................  191
13 Deposition Exhibit 35 ...................  194
   Deposition Exhibit 36 ...................  207
14

15              - - -

16

17

18

19

20

21

22

23

24

(800) 578-1542 * MERIT * (513) 381-8228

Estate of Roger Owensby vs. City of Cinti.                                                    PATRICK E. CATON
October 17, 2003

---

**Page 6**

1  VIDEOGRAPHER: The date is October the
2  17th. The year is 2003.
3  Would you please swear the witness, ma'am.
4  PATRICK EDMUND CATON
5  being by me first duly cautioned and sworn, deposes
6  and says as follows:
7  CROSS-EXAMINATION
8  VIDEOGRAPHER: At this point, Mr. Martins,
9  we're on the record with videotape number 1 for
10  this witness.
11  BY MR. MARTINS:
12  Q. Sir, would you state for the record your
13  name, please.
14  A. Patrick Edmund Caton.
15  Q. Address?
16  MR. HARDIN: Objection.
17  MR. MARTINS: You're not going to allow
18  him to answer?
19  MR. HARDIN: No, I will not.
20  Q. What is your age?
21  A. 37.
22  Q. Date of birth?
23  A. 2/4/66.
24  Q. On November 7, 2000, what was your height

---

**Page 7**

1  and weight?
2  A. About 5'10", 190 pounds.
3  Q. Sir, I know that you've attended the prior
4  deposition of Officer Jorg and Officer Spellen, but
5  let me ask you, have you ever had your deposition
6  taken?
7  A. Yes. Once before.
8  Q. Under what circumstance? Was it a civil
9  case or --
10  A. A civil case.
11  Q. What was the civil case about?
12  A. Otha Smiley versus the City of Cincinnati.
13  Q. You were a witness?
14  A. Yes.
15  Q. Witness for the City of Cincinnati?
16  A. That's correct.
17  Q. What was Ms. Smiley alleging, if you know?
18  A. He was --
19  Q. Mr.
20  A. -- alleging excessive use of force.
21  Q. When was your deposition?
22  A. I can't recall. It was --
23  Q. Do you know --
24  A. -- over a year ago.

---

**Page 8**

1  Q. -- the year?
2  A. Over a year ago.
3  Q. In 2001?
4  A. I can't -- it was 2001 or 2002. I can't
5  recall.
6  Q. Was the allegation of excessive use of
7  force directed toward you?
8  A. No, it was not.
9  Q. Who was it directed toward?
10  A. Officer Shawn George.
11  Q. G-E-O-R-G-E?
12  A. That is correct.
13  Q. George? Were you Officer George's
14  partner?
15  A. We were working together that night. We
16  were -- we were working separately, but we were
17  together on the same incident.
18  Q. Did the matter go to trial?
19  A. Yes, it did.
20  Q. And do you know what the result of the
21  trial was?
22  A. I believe there was a settlement between
23  the City and the Smileys.
24  Q. Was the case brought in the federal court?

---

**Page 9**

1  A. I believe so.
2  Q. Who was your attorney, if anyone, during
3  your deposition?
4  A. My attorney? Was Mr. Hardin.
5  Q. Yes, sir. Who was the attorney for -- who
6  questioned you?
7  A. I can't remember -- I can't recall his
8  name.
9  Q. Do you know who the attorney was
10  representing Mr. Smiley?
11  A. That was the attorney who questioned me.
12  I can't recall his name.
13  Q. Was the deposition held here in
14  Cincinnati?
15  A. Yes, it was.
16  Q. What was the nature of the alleged
17  excessive use of force?
18  A. I can't recall.
19  Q. Do you recall the circumstances that gave
20  rise to the charge of excessive use of force?
21  A. Are you asking me if I recall the
22  incident?
23  Q. Yes.
24  A. Vaguely. It happened in 1998 or '99.

---

Page 6 - Page 9

Estate of Roger Owensby vs. City of Cinti.                    **PATRICK E. CATON**
October 17, 2003

---

Page 10

1    Q. **What do you recall?**
2    A. It was a matter of a Terry stop with
3  regard to a drug investigation. Mr. Smiley was
4  asked to be seated on the ground. He refused. He
5  was told that he'd be placed under arrest if he
6  didn't sit down on the ground. He continued to
7  refuse. Officer George walked up to make contact
8  with him, at which time Mr. Smiley punched Officer
9  George in the face.
10    Q. **What happened after that?**
11    A. A struggle ensued. Mr. Smiley was placed
12  in custody and arrested and transported to 2020
13  Juvenile Hall.
14    Q. **I'm sorry. I missed the last part.**
15  **Transported to?**
16    A. 2020 Juvenile Hall.
17    Q. **How old was Mr. Smiley?**
18    A. I think at the time he was about 16 or 17
19  years of age.
20    Q. **Where did this take place?**
21    A. In Corryville.
22    Q. **Do you know the streets or the location in**
23  **Corryville?**
24    A. I believe it's the Van Street lot

---

Page 11

1  behind -- it's a group of businesses just east of on
2  Short Vine.
3    Q. **Were you involved in the struggle that**
4  **ensued?**
5    A. I was.
6    Q. **And what, if anything, did you do in the**
7  **struggle?**
8    A. I aided in handcuffing and I -- I think I
9  Maced him during the struggle.
10    Q. **Did you strike him?**
11    A. No.
12    Q. **Was Mr. Smiley -- other than the Macing,**
13  **was he physically injured as a result of the arrest?**
14    A. Not that I recall.
15    Q. **Was he bleeding?**
16    A. Not that I recall.
17    Q. **Was there a Cincinnati Police Department**
18  **disciplinary proceeding as a result of this**
19  **incident?**
20    A. No, there was not.
21    Q. **Is Mr. Smiley an African American?**
22    A. Yes, he is.
23    Q. **Other than the deposition on Mr. Smiley's**
24  **case against the City of Cincinnati, have you had**

---

Page 12

1  your deposition taken in any other case?
2    A. No, I have not.
3    Q. **As you've probably heard me say with the**
4  other people that have been deposed, I will be
5  asking you questions, such as we've been doing, and
6  if you have any questions or you haven't heard the
7  question, ask me to repeat or to clarify the
8  question. Do you understand that?
9    A. I understand.
10    Q. **And if you give an answer to the question,**
11  I'm going to assume that you heard the question and
12  understood the question.
13    A. I understand.
14    Q. **Is that fair?**
15    A. That's fair.
16    Q. **All right. Are you under any physical or**
17  mental impairment that would cause you not to
18  understand my questions or give truthful answers to
19  my questions?
20    A. No, I am not.
21    Q. **Taking any medication?**
22    A. No, I'm not.
23    Q. **When did you first realize that Roger**
24  Owensby Jr. was dead?

---

Page 13

1    A. When Sergeant Julie Shearer got into the
2  cruiser with me to transport me to CIS, I asked her
3  if this guy was going to make it. And her response
4  was, "I believe he's already two seven," indicating
5  that he had passed.
6    Q. **You assisted in removing Mr. Owensby from**
7  **the Golf Manor cruiser, correct?**
8    A. That is correct.
9    Q. **And as a result of that, you and Officer**
10  Hasse attempted to resuscitate Mr. Owensby, using
11  CPR?
12    A. That is correct.
13    Q. **At the time that you and Officer Hasse**
14  were employing CPR, Mr. Owensby was still
15  handcuffed, correct?
16    A. That is correct.
17    Q. **And you did not remove the handcuffs at**
18  that time?
19    A. No, not until Fire arrived.
20    Q. **And you took or attempted to take his**
21  pulse on his wrist; is that right?
22    A. No. I attempted to take his pulse at his
23  neck.
24    Q. **At his neck?**

**(800) 578-1542 * MERIT * (513) 381-8228**

PATRICK E. CATON

Estate of Roger Owensby vs. City of Cinti.
October 17, 2003

Page 14

1  A. That is correct.
2  Q. **And was there a pulse?**
3  A. I couldn't find one.
4  Q. **Did Officer Hasse try to take his pulse at**
5  **his wrist?**
6  A. I -- I don't think he could. No, I would
7  say no, because his hands were underneath him at --
8  at that point. Officer Hasse was also -- had to use
9  both hands to use the -- the rescue breathing mask
10 that was supplied by a Golf Manor officer.
11  Q. **Did Officer Hasse say anything to you**
12 **concerning the condition of Mr. Owensby at that**
13 **time?**
14  A. Well, while we were giving him CPR, like I
15 said, his hands had to be on the mask in order to
16 employ it. And I basically did all the manipulation
17 of Mr. Owensby to get him in the proper position,
18 and the the -- and --
19 and periodically taking his pulse through the
20 incident.
21      At one point Officer Hasse, who is EMT
22 trained, said -- asked me if air was going into his
23 lungs or going into his stomach.
24      And I said, "How do you tell?"

Page 15

1      And he says, "Is his chest rising and
2  falling or is his stomach rising and falling?" And
3  when he gave two rescue breaths, I -- I observed his
4  stomach rising and falling.
5      He then said, "That means something's
6  blocking his throat," at which point I repositioned
7  Mr. Owensby's head with a chin tilt and attempted to
8  physically clear his airway. At that point I
9  couldn't find anything, and we began the rescue
10 breathing and CPR again.
11  Q. **When you say "couldn't find anything,"**
12 **there was no obstruction as far as his --**
13  A. I can only reach as deep as the back of
14 his mouth.
15  Q. **Right. And you -- you found no**
16 **obstruction?**
17  A. I -- I couldn't find an obstruction at --
18 from -- at that point.
19  Q. **Had you --**
20  A. Officer --
21  Q. **I'm sorry.**
22  A. I'm sorry. I was going to continue.
23 Officer Hasse believed that there was something
24 obstructing his airway at that point and called.

Page 16

1 When Fire arrived, he immediately -- I -- I can't
2 remember the technical term he used. It was -- he
3 referenced, "We need the suction device off the
4 truck to clear his airway."
5  Q. **Had you received training as a Cincinnati**
6 **police officer in conducting CPR in circumstances**
7 **such as this?**
8  A. Once.
9  Q. **When?**
10  A. Received about four hours of training at
11 the academy in 1997.
12  Q. **No follow-up training?**
13  A. No.
14  Q. **Had anyone ever instructed you that in**
15 **order to do CPR, the handcuffs had to be removed**
16 **from the suspect so that his arms were not behind**
17 **his back?**
18  A. No. What I was instructed is that his
19 back and shoulders must be flat on the ground in
20 order to do chest -- chest compressions correctly.
21 And I believed at that time they were.
22  Q. **What has to be flat on the ground?**
23  A. His back -- his back and shoulders.
24  Q. **Now, when the fire rescue unit arrived --**

Page 17

1 well, let me ask you, where were they from?
2  A. I don't know what fire unit responded.
3  Q. **Okay. In any event, when they arrived,**
4 **one of the first things that you and Officer Hasse**
5 **were told to do was to remove the handcuffs from Mr.**
6 **Owensby, correct?**
7  A. That's correct.
8  Q. **Let me ask you, when did you first realize**
9 **that Roger Owensby was injured?**
10  A. What -- what kind of injury are we talking
11 about?
12  Q. **Any injury that requires some medical**
13 **attention.**
14  A. Medical assistance. Okay. When Sergeant
15 Watts and I approached the cruiser afterwards to get
16 information from Mr. Owensby, Sergeant Watts opened
17 the cruiser door and made a statement to the effect
18 of, Pat, I don't think he's breathing.
19      And that's when I looked in, and he was in
20 a real awkward position at that point. And I looked
21 up, saw Officer Hasse standing on the other side of
22 the Golf Manor cruiser at that point. And realizing
23 that he's EMT trained, I said, "Have you got any
24 rubber gloves?"

Estate of Roger Owensby vs. City of Cinti.                    PATRICK E. CATON
October 17, 2003

| Page 18 | Page 20 |
|---|---|
| 1   He said, "Yeah." | 1   A. That's correct. |
| 2       We gloved up, and Sergeant Watts said, | 2   Q. And when you were doing that, were you |
| 3   "Get him out of the car." And Officer Hasse and I | 3   looking at him? |
| 4   removed him from the car. | 4   A. At his feet. |
| 5   Q. Is that the first time you realized that | 5   Q. Not at his face? |
| 6   Roger Owensby was injured? | 6   A. No. |
| 7   A. That's correct. | 7   Q. When you put him into the cruiser, as I |
| 8   Q. Well, you knew before you placed him in | 8   understand it, Officer Sellers put him in the |
| 9   the car that he had been Maced, right? | 9   cruiser from the rear passenger door and you went |
| 10   A. That's correct. | 10   around to the driver passenger door and crawled in, |
| 11   Q. And isn't it true that the standard for | 11   grabbed him by the shoulders and pulled him toward |
| 12   care of someone who has been Maced is to provide | 12   you; is that right? |
| 13   them with water and fresh air? | 13   A. Well, that's a much shortened version of |
| 14   A. That is correct. | 14   it, but that's essentially correct. |
| 15   Q. And that was not provided? | 15   Q. And when you pulled Mr. Owensby into the |
| 16   A. I wouldn't consider that an injury. | 16   cruiser toward you, weren't you face to face with |
| 17   Q. What do you consider someone having been | 17   him? |
| 18   Maced? | 18   A. No, I wouldn't say face to face. My head |
| 19   A. An irri-- it's an irritation. It's a | 19   was ducked and it was very dark inside the cruiser. |
| 20   device used to irritate and cause pain. It doesn't | 20   Mr. Owensby was a little more than a shadow to me at |
| 21   cause injury. | 21   that point. |
| 22   Q. Okay. Well, in any event, you knew that | 22   Q. The cruiser was parked next to a gas |
| 23   he had been Maced, you knew that the standards were | 23   island? |
| 24   to provide water and fresh air, and you knew that | 24   A. That's correct. |

| Page 19 | Page 21 |
|---|---|
| 1   water and fresh air were not provided, correct? | 1   Q. And the gas island is illuminated by six |
| 2   A. Well, it -- they're supposed to be | 2   halogen lamps, correct? |
| 3   provided after the scene is stabilized. And the | 3   A. That is correct. |
| 4   scene, in my opinion, was never stabilized. | 4   Q. And the cruiser itself had its lights on? |
| 5   Q. At the time you placed Roger Owensby in | 5   A. I don't know if the lights were on or off. |
| 6   the back seat of the Golf Manor cruiser with the | 6   They weren't -- the interior lights were not on. |
| 7   windows up, he had not been provided with water or | 7   Q. There was no dome light on; is that what |
| 8   fresh air, correct? | 8   you're saying? |
| 9   A. I thought there was plenty of fresh air | 9   A. That's correct. |
| 10   inside the cruiser. | 10   Q. But there were lights from the -- from the |
| 11   Q. Had you provided him with water? | 11   top of the car that were on? |
| 12   A. No, I had not. | 12   A. I don't recall if there were lights on or |
| 13   Q. And when you placed him or walked him | 13   off on top of the cruiser. |
| 14   toward the cruiser, you knew that he had several | 14   MR. MARTINS: Let me have the tape. |
| 15   lacerations on his face? | 15   Q. I'm going to show you -- I'm going to show |
| 16   A. No, I did not. | 16   you, sir, what has previously been marked as |
| 17   Q. How far away were you from Mr. Owensby's | 17   Exhibit 20. This is the video of -- from Officer |
| 18   face as you escorted him to the cruiser? | 18   Spellen's car. |
| 19   A. I would put us at shoulder distance -- we | 19       (Videotaped played.) |
| 20   were shoulder to shoulder essentially, as I walked | 20   Q. I'm pausing it here. You can see the gas |
| 21   him towards the cruiser. | 21   island with the halogen lamps at the top, correct? |
| 22   Q. And while you were doing this, as I | 22   A. That's correct, about 20 feet away. |
| 23   understand your prior testimony, you were commanding | 23   Q. Well, we're not up to the car yet. |
| 24   him to put his feet down, right? | 24   A. No. |

(800) 578-1542 * MERIT * (513) 381-8228

Estate of Roger Owensby vs. City of Cinti.                                    PATRICK E. CATON
October 17, 2003

|  | Page 70 |
|---|---|

1 looked at his ID and the conversation was along the
2 lines of I see you live in Reading; what brings you
3 down here?
4        And he said, "I bought -- this is where I
5 come to get my marijuana. And I'll show you where
6 if you'll let me go with a" -- what's referred to as
7 a weed ticket.
8    Q. What -- clarify, what's a weed ticket?
9    A. It's a $100 payout citation for a minor
10 misdemeanor, marijuana possession.
11    Q. Which is what he would have received
12 anyway?
13    A. Oh, I -- I'm not -- you're going to have
14 to speak with Officer Hasse with regard to the
15 charges. I think Officer Hasse originally also
16 wanted to charge him with criminal trespassing, but
17 I'm not sure.
18    Q. Okay.
19    A. I'm not sure.
20    Q. All right. Please continue.
21    A. So he was willing to show us where he'd
22 make a buy. I guess the -- the idea was we wanted
23 to see if police officers could make a buy, and
24 proceed with possibly a trafficking investigation,

|  | Page 71 |
|---|---|

1 which was essentially out of my league. Uniformed
2 officers have a real difficult time walking up to a
3 drug house and trying buying drugs.
4        So I -- that's when I used my cell phone
5 to call our Mini-Tac Unit, and I spoke with Officer
6 Lawson, told him what we had. He spoke with his
7 partner, Officer Hodge. They indicated they were
8 interested in interviewing this suspect, they would
9 come up and -- they would come up and meet us and
10 talk to him.
11    Q. Let me ask you, is there a reason, a
12 tactical reason or otherwise, why you made that call
13 on your private phone as opposed to using the --
14 either the mike or the MDT in your car?
15    A. Well, it was a fairly extensive
16 conversation, and you want to use short
17 transmissions over your radio. You don't want to
18 tie up the radio with conversation --
19        The Mini-Tac Unit doesn't have an MDT,
20 because they are undercover officers and they work
21 in undercover cars. It was just more convenient
22 just to give them a call, District 4, for -- to
23 expedite the matter.
24    Q. All right. Continue.

|  | Page 72 |
|---|---|

1    A. At that point Off-- I -- I told what
2 Offic-- Officer Jorg and Officer Sellers -- I
3 believe Officer Hunter had arrived at that -- at
4 that point also.
5        I said, "This is what we got. The
6 Mini-Tac Unit's interested in talking to these --
7 this guy. I guess we've just got to stand by and
8 wait for the continuing investigation."
9        At that point or at some point --
10    Q. Sorry. While you're waiting, had Officer
11 Hasse -- did you already hand him the NTA book?
12    A. Yes. He already had it.
13    Q. He had that. And had he -- if you recall,
14 had he already written out the citation?
15    A. I don't know.
16    Q. Okay. Sorry. Continue.
17    A. It's at that point Officer Hunter pointed
18 at an individual crossing Seymour Avenue, I'd say
19 about 50 yards, roughly up here on the map.
20    Q. Would you draw on the map a line
21 indicating the path of the person across Seymour
22 Avenue, and putting the letter A next to that.
23    A. Again, I would have estimated the distance
24 at 50 yards. On this map I don't know what 50 yards

|  | Page 73 |
|---|---|

1 would be, so...
2    Q. All right. But it's approximately half a
3 football field?
4    A. Approximately half a football field.
5    Q. And where were you at this time?
6    A. Basically here (indicating).
7    Q. Okay. Would you mark that with a C for
8 Caton.
9    A. (Witness complies.)
10    Q. Thank you. So you saw the person going
11 across the street. Did you think anything of it?
12    A. Well, he was -- to me he was little bit
13 more than a shadow. Again, it -- it -- it was dark
14 out there and the only light that I could see was
15 a -- a passing vehicle. And I got little more than
16 a silhouette of the individual.
17        I -- I could see that it was a medium-
18 sized man, I suspected, but that -- beyond that, it
19 wasn't until he got into the well-lit area of the
20 Sunoco lot that I could make out any details, and at
21 that point it really wasn't many more details.
22        Now, Officer Hunter had said, when he
23 commented, when he pointed at it -- at -- at -- at
24 him, he said, "I think that's LA."

Estate of Roger Owensby vs. City of Cinti.                                PATRICK E. CATON
October 17, 2003

Page 74

1    Q. Was it Officer Hunter's comment that
2 directed your attention to the person crossing the
3 street?
4    A. Yes.
5    Q. So if Hunter had not said anything, you
6 wouldn't have paid any attention?
7    A. That's correct.
8    Q. Okay. Please continue.
9    A. When -- when he said, "I think that's LA,"
10 LA -- I -- I heard you say the other day that LA is
11 a common name in Bond Hill. I had never in three
12 years ever heard the nickname LA, working Bond Hill.
13       And in the -- the book that you're looking
14 for, we do compile nicknames and aliases, so I -- my
15 immediate response is "Who's LA?" And he proceeded
16 to tell the story of what, I guess, happened on
17 September 27th. And that was the first time I had
18 heard that story.
19    Q. All right. Is this Officer Hunter
20 talking?
21    A. Officer Hunter.
22    Q. Do you recall what Officer Hunter said as
23 to the prior incident?
24    A. I can't remember the exact conversation,

Page 75

1 but he had indicated to me that an assault had taken
2 place on him while he attempted to make a -- an
3 arrest for a drug charge of some kind. Whether it
4 was trafficking or not, I don't know. And he also
5 indicated to me that he had made a recovery.
6    Q. Did he explain what kind of recovery?
7    A. No, and I didn't ask. When you say you're
8 in-- I -- when you're saying -- when you say I was
9 investigating a drug incident and I made a recovery,
10 that says to me you recovered some type of narcotic,
11 some type of illegal substance.
12    Q. So that's -- that's what you understood --
13    A. That's what I understood him to say.
14    Q. -- from Officer Hunter?
15    A. That's correct.
16    Q. Did he mention anything about a sweat
17 shirt?
18    A. No.
19    Q. Continue.
20    A. Somebody at that point said, "Maybe this
21 guy," referring to the person that we had in
22 custody, "knows something about LA and can give us
23 some further information."
24       Because when I asked, "Do we know LA's

Page 76

1 name," nobody -- you know, why wasn't a warrant
2 signed, nobody knew his real name.
3       So because I had already developed a
4 rapport with the suspect, I went and talked to him
5 again. And I said, "Let me ask you a few questions
6 about some people in the area."
7       He said, "Okay."
8       And "Have you ever heard of a guy named
9 LA?"
10       And at that point he said, "Yeah."
11       I said, "How well do you know him?"
12       "I know him real well."
13       "Okay. What's his real name?"
14       "I don't know."
15       "Okay. How do you know him?"
16       "Well, he's a drug dealer in the area."
17       And I said, "Do you know him well enough,
18 if I walk somebody over here, could you identify him
19 as being LA?"
20       And he said, "Yes, but don't let him see
21 me."
22       And I said, "Why don't you want to see
23 you?"
24       And he said, "Because he's dangerous."

Page 77

1       "Dangerous how?"
2       "He's known to carry a gun."
3       I relayed that information to Officer
4 Hunter and Officer Jorg. I -- I believe Officer
5 Sellers was standing there, too. And I'm pretty
6 sure, when I was having this conversation, that
7 Officer Hasse was sitting in the front seat of his
8 cruiser taking care of paperwork with regard --
9       In addition to the NTA, you have to fill
10 out evidence, submission forms and evidence bags.
11 He was taking care of paperwork, and I can only
12 assume that he heard this conversation, too.
13    Q. Is there a divider between the back seat
14 and the front seat, like a plastic or a Plexiglas --
15    A. Yeah, there's --
16    Q. -- screen or --
17    A. There's a Plexiglas screen. Half of it's
18 metal and the top half it -- half of it is Plexiglas
19 and then there's a slid-- door that you can slide
20 back and forth.
21       And as I recall, I believe it was opened.
22 So if Hasse was sitting there, I don't think it
23 would have been difficult for him to hear this
24 conversation. Even with it closed, I don't think it

Estate of Roger Owensby vs. City of Cinti.                    PATRICK E. CATON
October 17, 2003

| Page 86 |
|---|

1       And Officer Hunter's comment to me was, he
2   didn't have all that facial hair, but I think that's
3   him or I'm almost sure that's him or I'm 90 percent
4   sure that's him. It was something along that lines.
5   And what it indicated to me was even though we've
6   got a perfect look at this -- at this guy, he's
7   still not sure that this is the guy that assaulted
8   him, I guess the 27th of September.
9       Q. Did Officer Hunter ever explain what the
10  assault was?
11      A. I don't recall the details of the assault,
12  but I think the word he used was "tussle" and he got
13  punched at some point during the tussle.
14      Q. All right. Continue.
15      A. Well, it was decided at that point that
16  Officer Jorg and I would approach the suspect as he
17  exited the store and engage him in conversation, and
18  if Officer Hunter was capable of identifying him at
19  that point, he should indicate to us that that's him
20  in some subtle, I was hoping in some subtle way.
21      If he couldn't, the plan was to see if he
22  would voluntarily come back to one of our cruisers
23  to be run, at which point he might be able to be
24  identified as LA by the individual in the cruiser.

| Page 87 |
|---|

1       So that's what we began to do. And when
2   we approached this individual as he exited the
3   store, Officer Jorg initially engaged him in
4   conversation and we both back and forth engaged him
5   in conversation.
6       Q. Now, at this point in time am I correct in
7   understanding, based on what you've told me, that
8   you, Officer Jorg, as well as Officer Hunter, are
9   going to talk to a person that you believe may be
10  someone who had previously assaulted a police
11  officer, had punched a police officer?
12      A. Possibility.
13      Q. And had then run away or escaped
14  apprehension from that police officer?
15      A. That's correct.
16      Q. Okay. Continue.
17      A. He came out of the store holding a bottle
18  in his hand. I think the first part of the
19  conversation was something to the effect of, sir,
20  can we speak with you for a moment.
21      He was cooperative at that point. We
22  indicated to him, "Please put the bottle down,"
23  because we didn't want it to be used as a weapon
24  against us. He complied with that.

| Page 88 |
|---|

1       Q. When you --
2       A. He --
3       Q. I'm sorry.
4       A. Go ahead.
5       Q. When you and Officer Hunter and Officer
6   Jorg were at the window watching him, did you happen
7   to notice what he was purchasing?
8       A. As a matter of fact, I did. He had, I
9   beli-- it was a bot-- it was a drink. I can't
10  remember -- the bottle was a drink. I can't
11  remember what it was. And I believe he also
12  purchased two blunts.
13      Q. Blunts. Explain that.
14      A. It's a --
15      Q. Cigars?
16      A. -- cigar.
17      Q. All right. When he came out of the store
18  and you and Officer Jorg approached him, he had the
19  bottle in his hand. Do you know where the cigars
20  were?
21      A. No, I don't.
22      Q. He didn't have them in his hand?
23      A. He could have. I don't recall.
24      Q. All right. Please continue.

| Page 89 |
|---|

1       A. We engaged him in conversation. We asked
2   him -- well, actually we explained to him -- he
3   asked what -- he asked what this was all about. We
4   explained that we had a victim of an assault who has
5   given a description of his assailant, and you match
6   that description.
7       He was -- I think he objected to that in
8   some way to the effect of I -- I didn't assault
9   anybody.
10      And I said, "Well, at this point it's just
11  an investigation. Do you have any identification on
12  you?"
13      And he said no. And identification was
14  later found on his person. He -- I think he
15  actually said at one point, "My name's Roger
16  Owensby. You can run me on computer and see I'm not
17  wanted for anything."
18      Q. He also give you his address, or at least
19  where, what part of town?
20      A. Well, that was later in the conversation.
21      Q. I'm sorry. I'm --
22      A. That was later --
23      Q. Go ahead, then.
24      A. -- in the conversation.

(800) 578-1542 * MERIT * (513) 381-8228

Estate of Roger Owensby vs. City of Cinti.                     PATRICK E. CATON
October 17, 2003

| Page 90 | Page 92 |
|---|---|

**Page 90**

1    It -- this was a conversation that was
2  kind of seesawing back and forth between Officer
3  Jorg and I and Mr. Owensby. As I -- as I recall the
4  conversation going, he gave us his name, and -- and
5  we asked him what part of town he was from. He said
6  he was from Northside.
7       He then -- we asked him what brought him
8  to the Roselawn-Bond Hill area. He said he had a
9  girlfriend. And he -- I -- I don't recall if he
10  said Yorktown or Huntington Meadows, but essentially
11  somewhere in the area of the apartments, of the
12  Huntington Meadows apartments.
13       He asked us what this was all about, and
14  we explained the circumstances. And he again said,
15  Well, I don't -- something to the effect I -- I
16  don't appreciate you coming at me this way.
17       We explained to him the person we're
18  looking for is, our understanding, is possibly
19  dangerous and possibly carrying a gun, at which
20  point he reaches for his shirt and starts to lift it
21  up to show us that he wasn't carrying a gun.
22       And we stop him real quick, because we
23  don't want him making any overt movements at this
24  point, and we explain to him, "We understand you're

**Page 92**

1  carrying any weapons. Again, this was only a
2  pat-down of his outer garments for weapons.
3       At that point --
4    Q. And based on your training, at this point
5  you weren't permitted to do anything else, right?
6    A. No. He was not under arrest at this
7  point.
8    Q. Because he was not under arrest and at
9  least at this point there was no probable cause to
10  arrest him?
11    A. In my opinion, that's correct.
12    Q. Okay. Continue.
13    A. Anyhow, the -- I'm trying to remember
14  where I left off. The -- when he -- after the
15  pat-down of Mr. Owensby, he became a little bit more
16  verbal, became a little bit more loud. He said,
17  "You know, I really don't appreciate you coming at
18  me this way."
19       And I said, "Well" -- and I explained to
20  him again, "Well, the person we're looking for is
21  known to carry a firearm. He's dangerous. He
22  fights and he runs from the police."
23       He -- he became a little bit more
24  assertive and said, "Well, it's been a long time

| Page 91 | Page 93 |
|---|---|

**Page 91**

1  not carrying any weapons. Do you mind if we pat you
2  down to ensure you're not carrying any weapons?"
3       And he was reluctant at first, but he
4  agreed to, and I think I -- I made the comment, "If
5  you don't have a weapon on you, you don't have
6  anything to worry about."
7       And he said, "Okay." And --
8    Q. When -- when he -- when you asked him or
9  either you or Officer Jorg asked him what part of
10  town he was from, I think you said Northside.
11    A. Uh-huh.
12    Q. Do you recall whether or not he said North
13  College Hill?
14    A. He might have said North College Hill
15  instead of Northside. I -- I remember North.
16    Q. Okay.
17    A. That's all I remember.
18    Q. All right. So we're up to the point of
19  the pat-down. What -- what happened?
20    A. Officer George -- Officer Jorg conducted
21  the pat-down. Since Officer Jorg didn't place him
22  in custody at that point, or any indication to me
23  that he had reason to place him in custody, I felt
24  that he -- I was satisfied that Owensby wasn't

**Page 93**

1  since I ran from the police."
2    Q. Now, at this point in time you knew that
3  he was not carrying a firearm?
4    A. That's correct.
5    Q. And you knew that Officer Hunter had told
6  you he didn't remember the person that he was
7  looking for as having facial hair, correct?
8    A. That's right.
9    Q. Okay. Continue.
10    A. The -- again, the indication -- we were
11  trying to get him to go voluntarily to the car, and
12  he -- he -- he also said, you know, "Run me" -- I
13  think he stated his name one more time. He said,
14  "Go ahead and run it through the computer. You'll
15  see I don't have any warrants on me."
16       I said, "Well" -- let me back up. I do
17  recall now something I did say. "Well, if you have
18  ID, we don't have to go all the way over to our
19  cars. I can do it over the radio."
20       And that's when he said he didn't have any
21  identification, so we do -- we did have to proceed
22  to our cars so I could do a computer search.
23    Q. At this point did anyone ask this person
24  whether or not he went by the nickname of LA?

Estate of Roger Owensby vs. City of Cinti.                                    PATRICK E. CATON
October 17, 2003

Page 94

1  A. No.
2  Q. Continue.
3  A. So, again, when he said, "My name is
4  Roger" -- he made the comment, "It's been a long
5  time since I ran from the police," at which point
6  Officer Hunter approached him, was face to face with
7  Mr. Owensby about this close (indicating), and said,
8  "Really? When's the last time you ran from the
9  police?"
10  Q. Now, at this point did you feel
11  uncomfortable with Officer Hunter being that close
12  to this person?
13  A. Yes, very -- very uncomfortable.
14  Q. Did the person feel uncomfortable having a
15  police officer that close to -- to them?
16  A. Based on his reaction -- his eyes got real
17  wide. He started to get, in my opinion, nervous.
18  He started looking left and right, basically for an
19  avenue of escape.
20  Q. That's how you took it?
21  A. That's -- that's what I -- well, that
22  might be 20/20 hindsight, based on what happened.
23  Q. All right.
24  A. But that's -- and, again, this whole thing

Page 95

1  went down (snapping fingers) about that fast.
2  Q. Did -- did either you or Officer Jorg try
3  to push Officer Hunter back maybe an arm's length
4  from Mr. Owensby?
5  A. We didn't have time. We didn't have time.
6  As soon as he did that, he triggered a flight
7  response.
8  Q. So we have Officer Hunter comes, as you
9  indicated, maybe six inches from --
10  A. I would say he was standing about this far
11  from him (indicating). He was face to face. And if
12  you watch the videotape from the store camera,
13  you'll see it.
14  Q. All right. And -- and you're
15  demonstrating between, say, six and eight inches?
16  Would that be fair?
17  A. Well, I --
18  Q. Or -- or maybe --
19  A. My arm's not long enough. In my opinion,
20  he was in --
21  Q. Maybe -- maybe a foot?
22  A. He was in his personal space was --
23  Q. Okay.
24  A. That would describe it.

Page 96

1  Q. All right. And as I understand your
2  testimony, neither you nor Officer Jorg could back
3  Officer Hunter up, because there just wasn't enough
4  time between him doing that and Mr. Owensby then
5  trying to take off?
6  A. In -- in that whole instant, Officer
7  Hunter indicated to Officer Jorg that that's him.
8  Officer Jorg reached for his handcuffs and I think
9  reached for Owensby. And actually, I -- I didn't
10  see that. I know that because I've seen the tape
11  now, but --
12  And before any-- anybody could move, it
13  became a blur of activity at that point. There was
14  an -- an explosion of movement, the best way I can
15  describe it. Suddenly Dave Hunter wasn't there
16  anymore, Owensby wasn't there anymore, my partner's
17  running across, and I'm realizing we're now engaged
18  in a foot pursuit.
19  I start running. Blaine stayed about step
20  for step with Owensby. I don't know where Dave
21  went. I can only conclude he got knocked down or
22  punched at that point.
23  I reach up -- I start running and reach up
24  to key up my mike to put out a foot pursuit. Before

Page 97

1  I can actually say it, Blaine catches Owensby around
2  the top of the shoulders and they run into a parked
3  car, I believe the car that you have marked here on
4  the Sunoco lot. It was probably a five- to
5  seven-step run.
6  Q. Do you know if, when Mr. Owensby started
7  to move away, whether or not Officer Jorg had any --
8  his arm or his wrist in his hand?
9  A. I don't know.
10  Q. Okay. And going back to -- I had asked
11  you a question. I'm not sure we got a clear answer
12  on this. The reason neither you nor Officer Jorg
13  moved Officer Hunter back a little bit from Mr. -- I
14  think you termed it Mr. Owensby's personal space,
15  was because the events that then happened were in
16  such rapid succession that neither one of you would
17  have had the time to do that?
18  A. Well, I'll be honest with you, I was kind
19  of shocked at Officer Hunter's reaction and I -- I
20  couldn't believe he was doing -- if -- if he rec--
21  when -- when we have -- when we indicate that
22  somebody --
23  It's my experience and what we do in the
24  field, when we indicate that we're about to arrest

Estate of Roger Owensby vs. City of Cinti.                    PATRICK E. CATON
October 17, 2003

Page 98

1  somebody and you want to communicate that to the
2  other officers, you do it in some subtle fashion.
3  You don't want to let the arrestee know that he's
4  about to be arrested, especially in a situation that
5  could be potentially dangerous.
6      I mean, Hunter is saying that, This is the
7  guy who assaulted me, this is a very dangerous
8  situation at this point. And to in a sense tip your
9  hand, for lack of a better term, created the flight
10 response, in my opinion.
11     Q. Right. Let me show you an exhibit that
12 was previously marked.
13         MR. MARTINS: In the binder.
14     Q. This was previously marked as Exhibit 9.
15 Is that the car that Officer Jorg, Mr. Owensby --
16 where -- where Officer Jorg caught up with Mr.
17 Owensby?
18     A. I can't remember the car, but based on
19 this exhibit I would suspect that this is the car
20 that they ran into. My concentration was --
21     Q. You just know that --
22     A. There was a car there.
23     Q. You just know that they hit a car?
24     A. They hit a car, and this looks, yeah --

Page 99

1  I'm -- I'm willing to bet this is the car they hit,
2  but I -- I can't recall the actual car.
3      Q. Okay. All right. At the time that
4  Officer -- I think you indicated Officer Jorg had
5  tackled Mr. Owensby high, grabbed him around the
6  shoulders.
7      A. That's correct.
8      Q. Is that right? Did you tackle Mr. Owensby
9  also?
10     A. As I approached Jorg and Owensby, they
11 were already halfway to the ground, and the only
12 exposed part of Owensby that I could see were his
13 legs. So I dropped low and started to go in to take
14 him at the legs to take him to the ground.
15     Now, I don't know if my impact caused the
16 fall to the ground. I don't know if they were
17 already onto the ground or -- all I know is that,
18 like I said, it was a blur of activity. I've got
19 faint moments of pictures in my mind as to what
20 happened.
21     When we were on the ground and now
22 struggling with Owensby, I had essentially ahold of
23 his right foot. At some point I keyed up my mike
24 and started screaming, "Sunoco lot. Sunoco lot.

Page 100

1  Give us some cars."
2      Q. Did you say: officer needs assistance?
3      A. I didn't. No, I didn't use those words.
4  Those -- those words are actually very rarely used
5  to get an officer needs assistance broadcast.
6      Q. So the -- so the -- the get us some cars,
7  in your mind, was the equivalent of officer needs
8  assistance?
9      A. That's -- yes, that's fair. That's fair.
10     Q. Do you know what part of your body -- in
11 the initial contact that you had with Mr. Owensby,
12 do you know what part of your body came in contact
13 with what part of his body?
14     A. I -- I don't remember.
15     Q. You don't know?
16     A. (Shaking head.)
17     Q. Have you played football?
18     A. Not -- not -- not since grade school.
19     Q. Okay. All right.
20     A. I mean, in actually trained or just Flag
21 Football, yeah. I --
22     Q. I mean, I'm -- I'm asking, was this like a
23 tackle where someone goes around the waist --
24     A. I was --

Page 101

1      Q. -- and tries to grab the person?
2      A. I was trying to actually get in towards
3  his legs, to confine his legs to keep him from
4  running. But like I said, I don't know if my
5  contact caused the fall to the ground or they were
6  already on the ground. When -- when we all ended up
7  on the ground, I had him around his right ankle is
8  the best way I can describe it.
9      Q. Was this before or after Officer Jorg says
10 that initially when they landed, Mr. Owensby was on
11 top of him and he swept him over, and then Mr.
12 Owensby was face down on the asphalt and Officer
13 Jorg was on top?
14     A. I don't recall that happening. I'm not
15 saying it didn't happen, but I -- I just don't
16 recall. Again, this was a flurry of movement.
17 The -- I don't recall seeing where Officer Jorg
18 landed and how. And -- and I -- I just remember
19 that essentially this was a tackle going to the
20 ground and I ended up in it.
21     Q. And your recollection is that you're
22 holding onto Mr. Owensby's right foot or calf?
23 Would that be --
24     A. Roughly around the calf-ankle.

Estate of Roger Owensby vs. City of Cinti.                                    PATRICK E. CATON
October 17, 2003

|                                                                 Page 102 |
|---|

1 Q. All right. At this point is Mr. Owensby
2 face down?
3 A. He's face down at this point when I'm
4 around his right ankle, yes.
5 Q. So the -- so you are at his -- his heel or
6 the back of his calf?
7 A. Essentially at his heel.
8 Q. All right. Continue.
9 A. There -- I need to backtrack one -- one
10 more point that I just -- when I -- we were talking
11 about the radio. There was a radio transmission
12 made as we walked over to the store, that you can
13 hear on the tape, and it's Officer Jorg's voice.
14 It's the radio transmission of the Mini-Tac team
15 going: 35. We're on scene in Roselawn. Come
16 meet -- in Roselawn Park. Come meet us over here.
17         At which point Officer Jorg responds to,
18 "We're looking at another suspect. Stand by."
19 Q. Was the plan then that you would or
20 somebody would take the person that was in Officer
21 Hasse's car over to Roselawn to meet with the
22 Mini-Tac team?
23 A. After we concluded what this -- yes,
24 eventually that's what we were going to end up

|                                                                 Page 104 |
|---|

1 bringing my knees up underneath me to get some
2 leverage.
3 Q. Where's your head at this point? Is it in
4 the small of his back or are you raised up?
5 A. I'm -- I'm raising up --
6 Q. Okay.
7 A. -- at this point. I try to reach
8 underneath with one arm, try -- he's got his right
9 arm, both arms pinned under his body like this
10 (demonstrating) and he's not surrendering his arms.
11 I reach under his body with my right arm and attempt
12 to pull his right arm out, and he just snaps it back
13 from me.
14 Q. Is -- is the kicking that's going on
15 kicking -- if -- if you're laying face down, is it
16 kicking like raising your knee to raise your foot up
17 or -- or is he kicking from his hip?
18 A. I -- I don't know.
19 Q. You don't know?
20 A. I don't know.
21 Q. Continue.
22 A. The -- at some point I took a slight blow
23 to the shoulder while he was kicking. I -- I don't
24 know how he was kicking at that point.

|                                                                 Page 103 |
|---|

1 doing.
2 Q. All right. Continue.
3 A. It -- it just never got that far.
4 Q. Continue.
5 A. At that point I put out the assistance
6 call. By the -- I -- I felt it was a very dangerous
7 situation. The first-level -- the -- the first-
8 level response to this was -- first level of force
9 is presence, and the more officers we can get there
10 quickly, the quicker this event will be over and,
11 hopefully, neither I or any of my partners would be
12 injured. And, too -- and -- and, too, another fact,
13 so, hopefully, the suspect isn't injured.
14         And we're in a very dangerous situation,
15 rolling around on the ground with the suspect and
16 there's three firearms present, is what's running
17 through my mind.
18         I begin climbing up the length of
19 Owensby's right leg, essentially working my way up
20 his leg. His left leg is kicking. I remember
21 actually turning my head away to keep from getting
22 kicked in -- in the head.
23         I then ended up at some point with my
24 chest essentially on his right buttock and I start

|                                                                 Page 105 |
|---|

1 Q. All right.
2 A. I reached underneath. His hand snapped
3 back. I then pivoted around to get -- being more
4 perpendicular to his body, taking my left knee out
5 from between from his legs, and getting more along
6 the sides of his legs so I can reach under with both
7 hands at this point and pull his left -- pull his
8 right arm out from underneath him. I start to pull
9 it with both --
10         Want me to stop?
11 Q. Well, I just wanted to ask you, is your --
12 so at this point both your knees are to Mr.
13 Owensby's right side?
14 A. That's correct.
15 Q. Is your chest still in contact with his
16 buttock area?
17 A. I don't -- I don't think so. I don't
18 know. I really don't know.
19 Q. All right. You -- you were saying you
20 reached under?
21 A. Reach under -- I reached underneath him,
22 and he was strong enough to just rip his arm right
23 back out of my right -- my hands. At that point I
24 delivered two palm strikes to the lower back part of

Estate of Roger Owensby vs. City of Cinti.                      PATRICK E. CATON
October 17, 2003

---

| Page 110 |
| --- |

1  towards the middle of his back and I wasn't moving.
2  It simply wasn't moving. And, because I didn't
3  already smell it, I figured Mace wasn't employed at
4  this point. And I screamed, "Mace this guy," and
5  nothing happened. And I screamed again, "Somebody
6  Mace this guy," and nothing happened.
7      And I looked up and I saw David Hunter on
8  one knee near the head of Roger Owensby, and the
9  best way I can describe it is he had like a deer
10 caught in the headlights look on his face and he's
11 looking at Roger Owensby's face.
12     Officer Jorg at this point is laying at an
13 angle across Owen-- I guess it would be Owensby's
14 left shoulder.
15     Q. Where's Officer Jorg's head?
16     A. Up near Owensby's head.
17     Q. Okay.
18     A. And I looked at Officer Hunter and I
19 bellowed at the top of my lungs, "Mace this mother
20 fucker." The intent was to shock him into action.
21     Q. Okay.
22     A. At which point he snapped, went to his
23 Mace canister and started to pull it out. And I --
24 my -- I dropped my attention back to the handcuff.

---

| Page 111 |
| --- |

1  And I started working it behind his back as best as
2  I could.
3      I know the Mace was employed at that
4  point.
5      Q. Because you could smell it?
6      A. I could smell it. I can only assume Dave
7  Hunter Maced him. I delivered three strikes --
8  well, at -- at this point Officer Jorg is becoming
9  successful with getting the left hand out from
10 behind Owensby, which I -- I believe he was digging
11 for it.
12     Q. When you looked up toward Officer Hunter,
13 did you notice whether or not Officer Jorg had his
14 arm around Mr. Owensby's head?
15     A. At that point I don't know.
16     Q. You just don't know one way or the other?
17     A. All I --
18     Q. He --
19     A. All I could see was -- I don't know one
20 way or another. All I could see is Owens-- Officer
21 Jorg's back at that point.
22     Q. So you couldn't even see Mr. Owensby's
23 head?
24     A. I -- I really don't recall.

---

| Page 112 |
| --- |

1      Q. Continue.
2      A. Officer Jorg starts bringing his left arm
3  back. At this point I screamed, "Stop resisting,
4  stop resisting, stop resisting," and -- and
5  delivered three more blows to the forearm.
6      His arm is starting to bend a little bit,
7  but it's not getting into a position where I can get
8  his right hand close enough to his left hand to
9  handcuff it, and I deliver three more blows along
10 the forearm, around the ar-- elbow, above the elbow
11 area. It's now coming back closer to his back and
12 his arm starts to bend a little bit more.
13     And we're still in a struggle. I can see
14 now Owensby's left hand coming back to me. I can
15 see the right hand's getting there, but it's still a
16 matter of -- it's a battle for inches now to try and
17 get his left hand into his -- into the left cuff.
18     At some point out of the corner of my eye
19 I see a PR-24 introduced to the right arm. The
20 right arm suddenly levers to the left. The left arm
21 goes into the cuff. We close the cuffs.
22     Q. As to the PR-24, how was it used?
23     A. As -- as a lever tool. As a tool to lever
24 his arm back.

---

| Page 113 |
| --- |

1      Q. Was it placed under the arm?
2      A. I -- I would guess it was. I wasn't
3  looking at the PR-24. All I know is I saw the
4  glimpse of the PR-24 and all of a sudden his right
5  arm came across his body.
6      Q. Do you know who was using the PR-24?
7      A. I can only assume Officer Hodge was. And
8  I've been yelled at, don't assume anything in the
9  IIS interview, but when I -- when we all stood up,
10 Officer Hodge was holding a PR-24, so...
11     Q. Have you received training on the use of a
12 PR-24 to get a suspect's arm behind his back?
13     A. Yes.
14     Q. And how do you -- according to your
15 training, how do you use the PR-24?
16     A. In -- in this case? In this --
17     Q. In this kind of scenario.
18     A. In this kind of scenario I -- I would
19 place -- I would place the PR-24 at an angle
20 underneath his arm and just kind of lever it.
21 That's what I would do in that -- in that case.
22     (Discussion off the stenographic record.)
23     Q. I don't have a PR-24, but I do have a
24 little bat. Can you show me how you would use -- if

---

Estate of Roger Owensby vs. City of Cinti.                    PATRICK E. CATON
October 17, 2003

Page 122

1  lot" and they all were dispatched to Sam's.
2     Q. If I may, at this point now, Mr. Owensby
3  is handcuffed, right?
4     A. That's correct.
5     Q. So his -- his arm is behind his back and
6  you go to his right side. Are you grabbing his
7  upper arm, his elbow, his forearm? What are you
8  grabbing?
9     A. Basically had him by his upper arm and
10 under his elbow.
11    Q. All right. Who, if anyone, has the other
12 side, the -- the left side of Mr. Owensby?
13    A. To my immediate left is Officer Sellers.
14 I don't know if anybody's further left than him.
15    Q. Officer Sellers is behind Mr. Owensby
16 then?
17    A. Yes.
18    Q. Is he still holding Mr. Owensby around the
19 waist?
20    A. I don't know.
21    Q. Where is Officer Hodge?
22    A. I don't know.
23    Q. Where's Officer Hunter?
24    A. I don't know.

Page 123

1     Q. Where's Officer Jorg?
2     A. I don't know.
3     Q. Okay. What happens?
4     A. We look up, we see the Golf Manor officer,
5  and I think we all said it at once, "Can we use your
6  car?" And he just nods and starts walking towards
7  his cruiser, presumably to open up the back door of
8  it, and we start walking towards the cruiser.
9        I would describe Owensby's behavior as
10 being passively resisting. At one point he raised
11 his legs up off the ground to keep us from walking
12 towards the cruiser, and we almost all pitched
13 forward back to the ground at that point. And
14 somebody said, "Put your feet down and walk," and he
15 did.
16    Q. Did you say that?
17    A. I -- I don't recall. I could have -- I
18 could have been the one who said that.
19    Q. The officer, the Golf Manor officer that
20 you and the others had asked to place Mr. Owensby in
21 the car, do you know who that was?
22    A. No, I don't.
23    Q. Do you know who Officer Heiland is?
24    A. I've heard the name, but I don't know

Page 124

1  which of the two officers who were there was Officer
2  Heiland.
3     Q. Can you describe the officer?
4     A. He was in a gray uniform. You know,
5  I'm -- he was a white male in a gray uniform.
6  That's basically all I remember.
7     Q. Okay. Hair color?
8     A. I don't remember.
9     Q. All right. Continue.
10    A. We start towards the cruiser. He's taking
11 what I would conclude are half-steps towards the
12 cruiser. We're not walking in -- full strides.
13 We get him to the cruiser, and as the cruiser door's
14 opened up into me, I have to release him because I'm
15 on the right side.
16    Q. At this point who's -- who else has ahold
17 of Mr. Owensby?
18    A. Officer Sellers.
19    Q. Do you know where Officer Jorg is?
20    A. No, I don't.
21    Q. Do you know where Officer Hunter is?
22    A. No, I don't.
23    Q. Hodge?
24    A. No, I don't.

Page 125

1     Q. Okay. Continue.
2     A. As he attempts to put him in the back seat
3  of the car, Owensby, what I've described as makes
4  himself bigger by essentially butterflying out. He
5  brings his elbows out as wide as he can, he tries to
6  stand up straight, to make it difficult to put him
7  in the back seat of the cruiser.
8     Q. Where is -- where -- where is Officer
9  Sellers in relation to Mr. Owensby at this time?
10    A. Behind him.
11    Q. He's behind him?
12    A. That's correct.
13    Q. Where are you?
14    A. At this point the door is between me and
15 them. So I go around to the driver's side of the
16 door and open up the rear driver's side door.
17    Q. When you say Mr. Owensby made himself big,
18 where were you?
19    A. Right there at the door.
20    Q. Do you know where Officer Sellers had his
21 hands at that point?
22    A. I -- I don't know.
23    Q. Do you know if he was trying to hoist him
24 up by the arms, which would cause the arms to come

Estate of Roger Owensby vs. City of Cinti.                    PATRICK E. CATON
October 17, 2003

Page 130

1    Q. Now, at this point in time, though, there
2  are Cincinnati police vehicles at the Sunoco
3  station, right?
4    A. No.
5    Q. Well, the video is from --
6    A. That's the -- that's the --
7    Q. -- Officer Spellen's video.
8    A. That -- now I know that that one is
9  arriving as I walk away from -- to go get my car.
10  I -- it hasn't registered with me that that was a
11  Cincinnati cruiser arriving, from the angle that it
12  came from.
13    Q. You didn't ask, then, Officer Spellen if
14  you could immediately transfer Mr. Owensby from the
15  Golf Manor cruiser into his cruiser?
16    A. No.
17    Q. Continue.
18    A. So I walk -- walked over. As I leave,
19  David Hunter stops me and asks -- asks me to do him
20  a favor. I think he wanted his hat. I continue
21  over to the Sam's lot, where I encounter Officer
22  Hasse leaning against his cruiser at that time.
23        My response to Officer Hasse was an
24  unasked question. I just kind of shrugged my

Page 131

1  shoulders and looked at him in shock. And his
2  immediate reply was to point at the guy he had in
3  the back of the seat, said, "I had to guard my
4  prisoner."
5    Q. Before we get to the discussion you had
6  with Officer Hasse, let me -- I think -- I think
7  this is already in. Let me run this video. This,
8  again, I'm referencing Exhibit 20.
9        (Videotape played.)
10    Q. That's you asking Officer Hodge for the
11  keys, right?
12    A. Officer Jorg.
13    Q. I'm sorry, Officer Jorg; is that correct?
14    A. That's correct.
15    Q. So that's -- this is what you just
16  described? You're -- you're heading back to get the
17  car?
18    A. Right.
19    Q. Okay.
20    Q. The police car or the car to your, as
21  you're walking away, to your immediate right is a
22  Huntington Meadows car; is that right?
23    A. That's correct.
24    Q. The person that just walked up to you, was

Page 132

1  that Officer Hunter?
2    A. That's Officer Hunter.
3    Q. And that's where you say he asked you to
4  bring his hat?
5    A. That's correct.
6    Q. You see there's a white van that's pulling
7  out. Do you see that?
8    A. No, I don't. Go ahead and back up. I
9  didn't see it.
10    Q. All right. It's -- it's behind the Golf
11  Manor cru-- or not Golf -- Huntington Meadows
12  cruiser. Let me just rewind it. See that?
13    A. Yes.
14    Q. Do you know what that is?
15    A. It looks like it's a Cincinnati police
16  scout car.
17    Q. So that car was in the area at that time
18  also?
19    A. That's correct. I -- I -- yes, I can
20  only -- yes. By that video, yes.
21    Q. Right. Let me back up. Let's take it
22  from the time Officer Spellen pulls into the lot.
23  That car is a Golf Manor cruiser, correct?
24    A. Correct.

Page 133

1    Q. This Golf Manor cruiser is the cruiser in
2  which you and Officer Sellers have just placed Mr.
3  Owensby?
4    A. Yes.
5    Q. And you indicate that the -- the van or
6  SUV that's departing looks like a scout -- did you
7  say scout?
8    A. Scout car. It's a Suburban.
9    Q. What is a scout car?
10    A. It's a Suburban. We refer to it as a
11  scout car.
12    Q. Okay. Does it -- how does it function? I
13  mean, is it like a cruiser or does it have some
14  special function?
15    A. It functions like a cruiser. It has a
16  special function that it has extra gear in it. It
17  used to be used for transporting bodies when we
18  transferred -- used to do the morgue transfers and
19  when we transferred dead bodies from DOA scenes down
20  to the morgue.
21        It can be used and -- and most commonly
22  it's used right now for transporting people. It is,
23  other than regular transportation to the jail, is
24  for the use of violent, violent prisoners who refuse

Page 130 - Page 133

Estate of Roger Owensby vs. City of Cinti.
October 17, 2003

PATRICK E. CATON

Page 138

1  you told him, We kicked his ass, or I guess his
2  version is, We beat the shit out of him.  One of
3  those two statements was made?
4      A.  That's right.
5      Q.  Correct?  After that statement was made,
6  what happened?
7      A.  I got in my car and we returned back to
8  the scene, as you see me in the videotape rolling up
9  on the scene.
10     Q.  Okay.  Officer Hasse also gets in his car
11 and brings his car over?
12     A.  That's correct.
13     Q.  What happens after that?
14     A.  Officer Hodge approaches me and asks me if
15 I had any alcohol rub in the cruiser or in my gear.
16 And I said, "Why?"
17         And he said, "Because Blaine has some
18 blood on him."
19         And I said, is he hurt, or something to
20 that effect.
21         And he said, "No, I -- we're not sure
22 where the blood came from."
23         And when he asked me for the alcohol rub,
24 that -- that's consistent with a ground struggle.

Page 140

1          And I said, "He said his name was Roger
2  something, but I can't recall."
3          He said, "Well, let's begin there."  And
4  that's when we approached the Golf Manor cruiser.
5          And he looked in the passenger -- or the
6  driver's side rear door and realized that he wasn't
7  moving, and he opened -- he opened the door and
8  started to lean in.
9          And I stopped him.  I said, "Sarge, be
10 careful.  He might be playing possum," indicating
11 from experience when you have a violent prisoner
12 sometimes they'll try and lure you back in the car
13 so they can hurt you.
14         And he said "No, Pat, I don't think that
15 guy's breathing."  And we shined the flashlight in
16 and we realized he was actually not breathing.  And
17 that's when we began the process of getting him out
18 of the car.
19     Q.  This is from the driver's side?
20     A.  The driver's side.
21     Q.  So his head would have been toward you and
22 his feet would have been away from you?
23     A.  That's correct.
24     Q.  Did -- okay.  What -- what happened next?

Page 139

1  You know, we quite fre-- I had scuffs on my hands,
2  and it was used to clean hands.  I -- you see me go
3  back to the trunk of my car where I normally carry
4  it, open it up and check my seat out bag, which
5  is --
6      Q.  I'm sorry?
7      A.  The seat out bag.  It's the gear bag that
8  police officers carry with all their equipment in
9  it.
10         And I didn't have any left, and that's
11 when I guess Officer Hodge went on to try to secure
12 some from some other officer.
13         At that point I realized Sergeant Watts
14 was on scene and I approached Sergeant Watts.  This
15 would be after Victor had just driven away, Officer
16 Spellen had just driven away.  And he was standing
17 on the opposite side of the Golf Manor car, on the
18 driver's side of the Golf Manor car.
19         And I walked up to him and I said, "Hey,
20 Sarge, I got to tell you what happened here."  And I
21 began to tell him, "We approached this" -- tell the
22 story in chronological order.  And he stopped me
23 after a few seconds and said, "Start at the
24 beginning.  What's this guy's name?"

Page 141

1      A.  That's where we began today.  That's when
2  I looked up.  And the first person I saw was Officer
3  Hasse, where I -- I had known from talking to him
4  that he -- he was an EMT before he was a cop.
5          I said, "Do you have any rubber gloves?"
6          He said, "Yeah."
7          "You got an extra pair?"
8          "Yes."
9          "Glove up.  Let's get this guy out of the
10 back seat of the car," and then we began the CPR
11 procedures on him.
12     Q.  When you got him out of the back seat of
13 the car, did you take him out from the driver's side
14 or from the passenger's side?
15     A.  From the passenger's.
16     Q.  So you came around, opened the door?
17     A.  Right.
18     Q.  How was Mr. Owensby situated in the back
19 seat of the car?
20     A.  His position had changed from when I saw
21 it last.  When I came back and saw it now, he had
22 been -- he was rolled over on his back and his head
23 was pinned at like an angle between -- I want to say
24 between his shoulder and the back of the seat.

Page 138 - Page 14

Estate of Roger Owensby vs. City of Cinti.                                   PATRICK E. CATON
October 17, 2003

Page 142

1    Q. When you left him, he was on his left
2 shoulder?
3    A. He was face down essentially, with his
4 head turned towards the front seat of the cruiser,
5 with one foot on the floor and one foot underneath
6 him.
7        And I'm -- I'm very specific about that,
8 because I truly thought all he would have to do is
9 put his left foot down on the floor and rock up into
10 a seated position. That's why I exited the car as
11 quickly as I could.
12    Q. So he -- excuse me. He was -- when you
13 first put him in the car, he was -- both of his
14 shoulders were down, he was face down with his face
15 to the right?
16    A. Essentially like this (demonstrating) with
17 his -- he would have been looking over his right
18 shoulder towards the front -- out the front of the
19 car.
20    Q. All right. And when you opened the door
21 with Sergeant Watts, how was he positioned?
22    A. He was rolled over on his back with his
23 head -- would have been on -- like his ear against
24 his right shoulder, with his head pressed into the

Page 143

1 back of the seat.
2    Q. So his -- was his right shoulder against
3 the back seat?
4    A. Yes.
5    Q. And his head was pressed toward the right?
6    A. It was off to the right, with the --
7 which -- the top of his head against the back of the
8 seat.
9    Q. Was the rest of his body -- was he laying
10 on his back at that time or was his body still --
11    A. I would say his shoulders --
12    Q. -- kind of twisted around?
13    A. It -- it -- it -- it was kind of twisted
14 around. I would say his shoulders were now flat
15 against the back of the seat, with his head twisted
16 and his -- and his -- his hands were underneath him.
17    Q. I think you said when you placed him in
18 the car, his right foot was on the floor?
19    A. Correct.
20    Q. Was his right foot still on the floor, if
21 you -- if you recall?
22    A. I don't -- I don't know.
23    Q. And then at that point you began CPR with
24 Officer Hasse, correct?

Page 144

1    A. That's correct.
2    Q. How much time elapsed before the fire
3 rescue unit showed up?
4    A. I don't know.
5    Q. When the fire rescue unit shows up, they
6 take over performing CPR, correct?
7    A. Yes.
8    Q. Were you the person that took off the
9 handcuffs?
10    A. Yes, I was.
11    Q. After you removed the handcuffs on Mr.
12 Owensby, did you have any other contact with Mr.
13 Owensby?
14    A. No, I did not.
15    Q. Where did you go after removing the
16 handcuffs?
17    A. Well, I -- I stayed in the immediate
18 vicinity, at that immediate -- immediate vicinity,
19 right around -- like I said, we witne-- I did
20 witness the material come out of his mouth.
21        And the supervisors, who took charge of
22 the scene by that point, were basically realizing
23 that this was becoming a critical incident. And the
24 procedure with regard to critical incidents is to

Page 145

1 separate all the officers and witnesses concerned.
2        So I was directed to -- basically Sarge
3 said, "Go ahead and climb in that cruiser. Just
4 wait until -- don't talk to anybody. Just wait
5 until we come -- come get you." And that cruiser,
6 it turned out to be Sergeant Julie Shearer's.
7    Q. Do you know how far the cruiser was from
8 where Mr. Owensby was?
9    A. The one that I was in?
10    Q. Yes.
11    A. As I recall, her cruiser was parked along
12 the side here of the store -- the Sunoco lot, and
13 Mr. Owensby was -- was somewhere in this vicinity
14 here where the fire engine was -- where the crew was
15 working on him (indicating).
16    Q. Draw a rectangle for what you -- where you
17 recall Sergeant Shearer's car being, on, I guess --
18        What exhibit is that, 32?
19    A. 31.
20    Q. 31. Okay. We'll just make another copy
21 of it.
22        And put, in the rectangle, SH for Shearer.
23    A. (Witness complies.)
24    Q. And then if you would draw a circle with

Estate of Roger Owensby vs. City of Cinti.
October 17, 2003

---

Page 174

1 your hand, you're able to transfer more energy and
2 thus create more pain with the heel of your hand
3 than you can with your fist. Because your fist will
4 absorb the shock, whereas the heel of your hand will
5 not. It's a much more stable platform.
6     Q. So striking in the manner that you did
7 would cause more pain than striking with a closed
8 fist?
9     A. Yes, in my opinion it would.
10     Q. While placing Mr. Owensby in the back seat
11 of the Golf Manor cruiser, did you ever strike at
12 Mr. Owensby with either a -- a palm strike or a fist
13 strike?
14     A. No, I did not.
15     Q. Do you have an opinion as to how long or
16 an estimation as to how long the -- strike that.
17 Let me start over.
18         Do you have an estimation of the amount of
19 time from when Officer Jorg initially tackled Mr.
20 Owensby around the shoulders to the time you closed
21 your door, or the door on the Golf Manor cruiser,
22 having placed Mr. Owensby in the back seat of the
23 cruiser?
24     A. Well, yes, I do, and it's based on the

---

Page 175

1 audiotape of the incident. From the time I put out
2 the officer needs assistance broadcast, which is
3 pretty much as we all hit the -- as soon as we're on
4 the ground, to the time that I say, Prisoner's
5 secure, we need a boss for a Macing, is right at two
6 minutes.
7     Q. And when you said, Prisoner's secure, we
8 need a boss for Macing, that was right after you had
9 closed the door to the Golf Manor cruiser?
10     A. That's correct.
11     Q. Did you and Officer Sellers place Mr.
12 Owensby in the back seat of the cruiser, the Golf
13 Manor cruiser because Mr. Owensby was in such a
14 condition that it was difficult to get him to walk?
15     A. No. He walked to the Golf Manor cruiser.
16     Q. If that were the case, why didn't you walk
17 him to your cruiser?
18     A. Because my cruiser was over 100 yards
19 away, over a guarder that you had to climb over to
20 get to it. And as violently as he resisted, I
21 didn't want to give him that much more time to
22 recover and begin resisting again. I wanted to
23 secure him as quickly as possible.
24         The Golf Manor cruiser was the only

---

Page 176

1 cruiser on scene, and it was there. It was my
2 intention to use it as a temporary holding facility
3 until we could bring a cruiser over and transfer him
4 to a Cincinnati cruiser.
5     Q. The guardrail you're talking about -- I'm
6 referring you to Exhibit 31. The guardrail you're
7 talking about having to climb over is the one to the
8 south side of Sam's? Is that -- is that what you're
9 referring to?
10     A. I believe it's the northwest side, where
11 your thumb is. Oh, I'm sorry, the south side --
12     Q. Of Sam's.
13     A. -- of Sam's, yes.
14     Q. Of Sam's?
15     A. The south side of Sam's, that's correct.
16     Q. Okay. But in this area you can walk him
17 on the sidewalk and not have to climb over any
18 guardrail, right?
19     A. Actually, that's not fairly accurate. The
20 guardrail, as I recall it that night, comes almost
21 all the way out to the street.
22     Q. Well, the sidewalk --
23     A. There's a --
24     Q. -- is not -- there's no guardrail --

---

Page 177

1     A. Well, there's a sidewalk.
2     Q. -- splitting the sidewalk?
3     A. There's no guardrail at the sidewalk.
4     Q. Right.
5     A. But then that would have increased the
6 distance that we would have had to go to get to our
7 cruiser.
8     Q. By maybe three steps?
9     A. By maybe about 15 or 20 yards as opposed
10 to making a straight-line distance here. The bottom
11 line is the Golf Manor cruiser was closer.
12     Q. Do you acknowledge that you as one of the
13 arresting officers was -- were responsible for the
14 care of Mr. Owensby while in custody?
15     A. Yes.
16     Q. And so if he was injured, you had a
17 responsibility to care for those injuries?
18     A. Yes.
19     Q. Including caring for him as a result of
20 having been Maced?
21     A. Yes.
22     Q. You al-- that duty also extended to
23 Officer Jorg as another one of the arresting
24 officers?

(800) 578-1542 * MERIT * (513) 381-8228

Estate of Roger Owensby vs. City of Cinti.    PATRICK E. CATON
October 17, 2003

Page 178

1    A. That duty, in my opinion, extended to
2 every officer that was on that scene.
3    Q. Beyond the five officers that were
4 involved in the actual physical arrest?
5    A. I -- if they had seen something that was
6 wrong with Roger Owensby, I -- I think they should
7 have acted. But beyond that, they didn't know what
8 had happened at that point. They were coming to
9 assist.
10        And those other officers, I believe,
11 really got there at the point where -- with the
12 exception of Officer Hodge, Officer Lawson, Officer
13 Sellers, had got it -- got there at a point where
14 the incident, from their point of view, probably was
15 over. They were just coming to make sure everybody
16 was okay.
17    Q. At the time people like Officer Spellen
18 arrive, there is virtually no danger of Mr. Owensby
19 running away, right?
20    A. Yes.
21    Q. I mean, he's --
22    A. He's --
23    Q. He's handcuffed; he's in the back seat of
24 a police cruiser?

Page 179

1    A. Unless -- unless he kicks out, rolls over
2 and kicks out a window, there's really no danger.
3 And -- and that happens. That happens frequently.
4    Q. The -- the only thing left, at the time
5 Officer Spellen drives up, to do is to retrieve
6 equipment that's been dropped and to assess the
7 scene and start taking care of the documentation of
8 what happened; is that right?
9    A. Well, secure the scene, assess it to
10 determine what needs to be done, begin
11 documentation, determine if anybody's hurt at that
12 point, specifically the officers who are on scene.
13        We knew that Mr. Owensby had been Maced,
14 but -- and as you'd stated, fresh air and water is
15 part of the procedure, but that would be after the
16 scene is secured.
17        My experience is that the best remedy for
18 Mace is fresh air, not water. If you put water on
19 it too soon, all you do is turn it back into the
20 chemical and you end up irritating, making --
21 basically making the situation worse.
22        The only time I've ever seen water used,
23 used at all on somebody who's been Maced, is after
24 they've been taken down to the justice center and

Page 180

1 the -- the -- the Mace is turned into a crystal that
2 can be washed away. The --
3    Q. And as to the fresh air, the general
4 procedure is to have the person face in-- into the
5 wind or into some sort of fan or something to --
6    A. If there --
7    Q. -- blow the contaminant off?
8    A. If there's wind or fan or walk them
9 around.
10    Q. Right.
11    A. That's correct. And we were going to --
12 we -- I was in the process of getting ready to
13 transfer him from one car to the other. That would
14 have been -- in my opinion, had fit the --
15    Q. Well, what we know from Officer Spellen,
16 at least five minutes went by where none of that was
17 happening?
18    A. Yes. Because we were in the process of
19 securing that scene. We hadn't done any of the
20 steps required to secure that scene. He --
21    Q. So there's no --
22    A. He shows up right -- you'll -- if you
23 listen to the tape, he shows up right at the end of
24 the assistance call. You'll -- if you listen to the

Page 181

1 beginning of the tape, you can actually hear me say
2 on his videotape we need a boss for Macing. And
3 that's immediately after I've closed the door.
4    Q. Is it -- is it your understanding that
5 until all of the procedures that you've just
6 described in securing the scene takes place, the
7 officers are under no duty to provide any medical
8 care to the suspect?
9    A. If they perceive a medical emergency, I
10 would say they're -- they're required to act on it,
11 but I don't think anybody perceived one.
12    Q. Is there --
13    A. I certainly didn't.
14    Q. Is it -- was there any duty to check to
15 see if there was a medical emergency?
16    A. Yes, there was a duty, but we hadn't
17 gotten to that point yet. He hadn't in-- it
18 certainly -- he did not indicate to me, by his
19 fighting and struggling all the way to the car and
20 going into the car, that he was having some type of
21 medical emergency.
22    Q. Did he say anything to you when you were
23 placing him into the car, when you were pulling him
24 into the car?

(800) 578-1542 * MERIT * (513) 381-8228

Estate of Roger Owensby vs. City of Cinti.                    PATRICK E. CATON
October 17, 2003

Page 194

1   not.
2       Q.  All right.
3       (Deposition Exhibit 35
        was marked for identi-
4       fication.)
5       Q.  Hand you Exhibit 35.  I'll direct you to
6   what we're going to look at.  Exhibit 35 is a
7   document entitled Pre-Disciplinary Hearing relating
8   to Police Officer Patrick Caton, and I want to say
9   they are not Bates numbered.
10      Let me direct your attention about three
11  quarters of the way back.  There is a document
12  entitled Pre-Disciplinary Hearing Summary - Police
13  Officer Patrick Caton.  It is dated December 10 of
14  '02.
15      A.  Let me see what you're looking at.
16      Q.  (Indicating.)  It's got a City of
17  Cincinnati -- its logo and title on it.
18      A.  Pre-Disciplinary Hearing Summary - Police
19  Officer Patrick Caton.  Okay.
20      Q.  Got it?
21      A.  "Copy."  It's dated 12/10/02?
22      Q.  Correct.
23      A.  Okay.
24      Q.  First let me ask you if you've seen this

Page 195

1   document before.
2       A.  No, I have not.
3       Q.  There are then -- well, take a minute and
4   look it over.
5       A.  Any particular part you want me to refer
6   to or just read the whole thing?
7       Q.  Well, you don't have to read the whole
8   thing, but if you would just kind of scan it.  It
9   runs some ten pages.
10      Well, let me direct you.  On the first
11  page you see there's a Specification I.  See that?
12      A.  That's correct.
13      Q.  And right above that it says
14  Representation, and it says:  Mr. Don Hardin, Lodge
15  69 FOP attorney represented Officer Caton at the --
16  at the hearing.
17      Do you recall attending a hearing on
18  November 18, 2000, 10:30 a.m.?
19      A.  Yes.
20      Q.  At that time were you advised of a
21  Specification I, stating that on November 7,
22  2000 you were "aware of the use of chemical
23  irritant.  Officer Caton carried Mr. Owensby to
24  patrol car ... failed to provide him with fresh air

Page 196

1   and/or water"?  Do you have a recollection of that
2   specification?
3       A.  Yes.
4       Q.  Do you have a recollection of the -- well,
5   let me just ask you.  It then cites to sections of
6   the police manual, rules and regulations.  It goes
7   from the bottom of page 1 onto page 2, citing to a
8   Procedure 12.545 regarding use of force,
9   specifically the use of chemical irritant.  Do you
10  have any reason to doubt that those standards were
11  applicable to you as a Cincinnati police officer on
12  November 7, 2000?
13      A.  Yes.
14      Q.  You do doubt that?
15      A.  Oh.  Oh, I'm sorry.  I -- no.  They were
16  applicable, yes.
17      Q.  Okay.  And you see under 12.545 it says
18  "Use of chemical irritant," and then it says "in
19  part."
20      Expose the "individuals sprayed with
21  chemical irritant to fresh air.  Give them an
22  opportunity to rinse their face with plenty of
23  clear, cool water."  Were you aware of that standard
24  procedure on November 7th, 2000?

Page 197

1       A.  Yes.  But there's a part that's missing
2   from here and there's a part that includes, upon the
3   stabilization of the scene, that that's supposed to
4   take effect.
5       Q.  And so you -- am I correct in
6   understanding you felt that until the scene was
7   stabilized, you had no obligation to provide Mr.
8   Owensby with fresh air or water?
9       A.  With regard to his exposure to Mace, that
10  is correct.  I don't think I denied him fresh air on
11  a November evening by putting him in the back seat
12  of a cruiser.
13      Q.  Were the windows up?
14      A.  I believe so.  I -- I couldn't tell you.
15      Q.  Was the cruiser -- was the engine running?
16      A.  I don't recall.
17      Q.  At the hearing do you recall whether
18  either you or your attorney voiced this position
19  that you've just articulated, that the scene was not
20  stabilized yet?
21      A.  I believe my attorney did, yes.
22      Q.  Turn now to Specification II.  It
23  discusses "On November 7, 2000, Officer Caton was
24  aware Mr. Owensby was injured.  Officer Caton failed

Page 194 - Page 197

Estate of Roger Owensby vs. City of Cinti.    PATRICK E. CATON
October 17, 2003

---

Page 214

1    A. I -- I think he said something along the
2  lines of it's this -- the other guy's blood, or
3  something like that.
4    Q. And -- and I wasn't going to ask you about
5  that, but --
6    A. Okay.
7    Q. -- but -- my question is, when you're
8  asked about the alcohol gel or the alcohol or the
9  rubbing alcohol, where Officer Hodge is looking for
10  this, did he tell you that it was to remove blood?
11    A. No.  The -- the -- the gel is used to
12  neutralize any germs, any pathenogens (sic) that can
13  be transferred, blood-borne pathogens that could be
14  transferred from it.  It won't remove the stain of
15  blood from clothing or anything along that lines.  I
16  think the concern was Blaine had been exposed to
17  blood from somebody else, and he wanted to kill
18  whatever germs that might be in that blood.
19    Q. It will remove blood from the skin,
20  though?
21    A. As water would, yeah, it would -- or I --
22  I guess it would.
23    Q. With respect to Exhibit 36, I take it you
24  remember talking to John Plahovinsak?

---

Page 215

1    A. For a relatively short period of time.
2    Q. All right.  On or about March 22nd of
3  2002?
4    A. That's correct.  I believe the meeting
5  lasted for about 45 minutes.
6    Q. I'm sorry.  I didn't --
7    A. I believe the meeting lasted for about 45
8  minutes.
9    Q. 45 minutes.  Would you agree that
10  throughout the events of November 7, 2002 you and
11  the other officers involved in the arrest of Roger
12  Owensby were acting in their capacities as
13  Cincinnati police officers?
14    A. I would agree with that.
15    Q. Would you also agree that there wasn't a
16  warrant for Mr. Owensby's arrest?  Correct?
17    A. Correct.
18    Q. And that the arrest was based solely upon
19  the statement of Officer Hunter?
20    A. Correct.
21    Q. To the best of your knowledge, it was not
22  based upon any informant's tip or informant's
23  information?
24    A. You asked Officer Jorg that same question

---

Page 216

1  the other day and he said no.  Are you referring
2  to -- I -- I want to ask you this question:  Are you
3  referring to the gentleman in the back seat of
4  Officer Hasse's car or are you referring to some --
5    Q. Or any -- any informant.
6    A. No, there -- no, it was not based on --
7    Q. Any informant?
8    A. -- any informant's information.
9    Q. And as to the person in the back seat of
10  the car, of Officer Sellers and Hasse's car, we
11  talked about what you said to him and what he said
12  to you?
13    A. That's correct.
14    Q. Was the arrest, the decision to arrest
15  based on anything that he said?
16    A. No.
17    Q. So he didn't -- his infor-- whatever
18  information he provided to you played no part in the
19  decision to arrest?
20    A. Correct.
21    Q. You agree that every American citizen has
22  a right, when being arrested, to be free from the
23  use of excessive force?
24    A. I would agree with that.

---

Page 217

1    Q. Do you agree also that if -- if an officer
2  sees another officer using excessive force, that
3  officer has a -- an affirmative duty to step in and
4  stop the officer?
5    A. Absolutely.
6    Q. Have you ever done that?
7    A. Have I ever stepped in?
8    Q. Let me -- let me break it down.  Have you
9  ever seen another officer use excessive force?
10    MR. HARDIN:  Objection.
11    You may answer.
12    A. I've never seen an officer use excessive
13  force, but I have seen officers lose their temper in
14  the field.  And removing them from the situation
15  kept that from happening.
16    Q. Before there was any use of excessive
17  force?
18    A. That's correct.
19    Q. In your opinion, did Officer Hunter lose
20  his temper when he got into the face of Mr. Owensby?
21    A. You're going to have to ask Officer Hunter
22  that question.  I don't know what was going through
23  his mind.
24    Q. No, I'm asking your perception.

---

Page 214 - Page 217

Estate of Roger Owensby vs. City of Cinti.                         PATRICK E. CATON
October 17, 2003

---

Page 222

1  I you were assigned to District 1?
2      A. That's correct.
3      Q. And that's how you came to listen to what
4  he had to say?
5      A. Yes.
6      Q. What was -- if you know, what was the
7  change in the use of force policy that had just gone
8  into effect that caused Colonel Janke to come and
9  talk to the officers at the roll call?
10     A. I -- I -- it was a procedure -- procedural
11 change with regarding to the reporting of the use of
12 force and what had to be -- what had -- had to
13 take -- take place from this point on.
14         I could give examples.  I can't really get
15 into the procedures specifically, because I don't
16 know it.  I don't know it anymore.  It had to do
17 with regard to --
18         For example, things that were no longer
19 reportable uses of force were now considered uses of
20 force.  Tackling somebody on November 7th, 2000
21 would not have been considered a use of force.
22 Tackling somebody today is considered a use of
23 force.
24         Wrestling somebody's hands behind their

---

Page 223

1  back on November 7th of 2000 would not have been a
2  use of force.  Wrestling, what's called heavy hands
3  or hard hands, is now considered a use of force.
4      Q. Using a PR-24 to force someone's hand
5  behind their back to be handcuffed on November 7,
6  2000, was that considered a use of force?
7      A. I don't know.  I don't know.  I don't
8  think it was.  Not -- not using it the way it was
9  used.  If he delivered a strike with it, that
10 obviously would have.  But I'm not sure, the way he
11 used it, if it would have been a use of force,
12 but --
13     Q. I take it --
14     A. -- that's -- that, you just tell the
15 supervisor the story and the supervisor makes that
16 decision.
17     Q. I take it as of 2001, with Lieutenant
18 Colonel Janke's visit, that would be considered a
19 use of force?
20     A. I don't know.  I don't know.  I -- I --
21 there are so many things already in that scenario
22 that would today be considered uses of force that I
23 don't know if that particular one would be.  I would
24 suspect it would be, yes.

---

Page 224

1      MS. GEILER:  Excuse me.
2      Q. Do you --
3      MS. GEILER:  The City's going to object to
4  the use of force prior and post 11/7/2000.
5  Continuing line of objection, if you don't
6  mind.
7      MR. HARDIN:  While we're -- while we're --
8      Q. On November --
9      MR. HARDIN:  -- stopped here, it's
10 J-A-N-K-E.
11     MR. MARTINS:  Okay.
12     MR. HARDIN:  Go ahead.
13 BY MR. MARTINS:
14     Q. On November 7, 2000 was the use of the
15 palm strike considered a use of force?
16     A. Absolutely.
17     Q. Was the -- and that would be something
18 worthy of report or imposing an obligation on the
19 officer to report?
20     A. Yes.
21     Q. Was the use of the mandibular angle
22 pressure point technique a use of force, requiring
23 that it be reported?
24     A. I would report it just to be safe.  The --

---

Page 225

1  so as not to accidentally not report a use of force.
2  But I -- I don't think it actually fell as a u-- I
3  think that would have fallen into -- under the
4  category of restraining holds.  And restraining
5  holds, I believe, were not considered a use of force
6  back then.
7      Q. When was the first time that you told any
8  supervisor that you had administered palm strikes to
9  Mr. Owensby?
10     A. Well, as I said before, I approached
11 Sergeant Watts to begin that process, but it became
12 overcome by the event of finding Mr. Owensby.  And
13 then we were seg-- you know, we began CPR and then
14 we were segregated, with the -- with the
15 instructions not to make any statements.
16         And then Sergeant Julie Shearer entered
17 the vehicle to drive me to CIS, at which point I
18 asked whether or not he was two seven, and she
19 said -- or whether or not he was going to make it,
20 and she said, "I think he's going to be two seven."
21         And I was in shock at that point.  And I
22 said, "Sarge, I hit this guy, but there's no way I
23 hit him hard enough to kill him."
24         And I started to describe what I did, and

---

(800) 578-1542 * MERIT * (513) 381-8228

Estate of Roger Owensby vs. City of Cinti.                                    PATRICK E. CATON
October 17, 2003

---

Page 230

1  involving a person identified as LA?
2      A. You're asking me as to my recollection on
3  November 7th regarding a drive-by --
4      Q. No. No.
5      A. -- regarding somebody named LA or at this
6  point?
7      Q. No. What I'm asking is, in the month
8  before November 7th, 2000, do you recall receiving
9  any information about a drive-by shooting on LA --
10 I'm sorry, on Rhode Island that involved a person by
11 the name of LA?
12     A. I don't recall. I don't -- I don't know.
13     Q. You were present for Officer Jorg's
14 deposition. Do you recall we discussed the
15 procedure for securing property that is seized in
16 the course of the day, if you're busy, what -- what
17 you do with that?
18     A. Yes.
19     Q. Do you recall that discussion?
20     A. Yes.
21     Q. As I recall Officer Jorg's testimony, it
22 was along the lines that if you were busy, then the
23 property would be placed in the trunk of the car,
24 the cruiser, until, either at the end of the shift

---

Page 231

1  or at whatever opportunity presented itself, you
2  would then take it out and begin the process of
3  logging that evidence in at District 4, and from
4  there it would take its course.
5      A. Into a locked property room, yes, that's
6  correct.
7      Q. Until what?
8      A. In a locked property room. And then yes,
9  you're correct, it would take its course.
10     Q. And I -- I take it you agree with that
11 outline of procedure that Officer Jorg gave?
12     A. Yes, I would.
13        (Discussion off the stenographic record.)
14     MR. MARTINS: Let's take a short break.
15     VIDEOGRAPHER: Off the record.
16        (Recess taken: 4:44 p.m. - 4:48 p.m.)
17     VIDEOGRAPHER: Back on the record, Mr.
18 Martins.
19 BY MR. MARTINS:
20     Q. Sir, presently do you have any -- are you
21 receiving any income?
22     A. No.
23     Q. Do you own any real property, real estate?
24     A. My wife and I own a house.

---

Page 232

1      Q. That's it?
2      A. We bought it last year. Yes.
3      Q. Do you have any savings?
4      A. No.
5      Q. Own any stocks or bonds?
6      A. No.
7      Q. Have an IRA or a 401(k) retirement plan?
8      A. No.
9      MR. MARTINS: Thank you, sir. I have no
10 further questions.
11     MS. LONGTIN: I just have a few.
12        CROSS-EXAMINATION
13 BY MS. LONGTIN:
14     Q. Mr. Caton, my name is Lynne Longtin and I
15 represent the Golf Manor defendants. I know you've
16 been here for a long time and I just have a few
17 questions.
18        I want to take you back a little bit when
19 you said that after you had handcuffed Mr. Owensby,
20 you stood up and you said that you asked a Golf
21 Manor officer for permission to put him into their
22 vehicle. Is that correct?
23     A. That's correct.
24     Q. And -- and I think you said: we all kind

---

Page 233

1  of did at the same time?
2      A. I thought I did, but everybody since has
3  said we all asked him, and we could have conceivably
4  all asked him at once.
5      Q. Okay. Do you have any specific
6  recollection of anyone other than you asking a Golf
7  Manor officer?
8      A. No, I don't.
9      Q. Okay. Did you ask one officer or two?
10 Were there a group of them?
11     A. I only remember one officer.
12     Q. One -- you only remember seeing one
13 officer?
14     A. At that point, yes.
15     Q. Okay. And you may have been asked this
16 before, I'm sorry, but do you recall what he looked
17 like?
18     A. Male, white, same build as me.
19     Q. Gray -- I think you maybe said gray --
20     A. Gray uniform.
21     Q. That's about it?
22     A. (Shaking head.)
23     Q. Okay. And I've heard two different terms
24 to refer to -- to what I think is the same thing. I

---

(800) 578-1542 * MERIT * (513) 381-8228

Estate of Roger Owensby vs. City of Cinti.
October 17, 2003

Page 234

1  think you used "secure the scene," but I think
2  Officer Jorg may have used "stabilize the scene."
3  Is that the same thing in your mind?
4      A. Relatively the same thing, yes.
5      Q. Okay. And is it true that one of the
6  things that at least you intended to do to stabilize
7  the scene was to take Mr. Owensby and put him back
8  into a Cincinnati police officer cruiser? Is that
9  correct?
10     A. Absolutely.
11     Q. Okay. And I think you used the word "a
12 temporary," the Golf Manor cruiser was a temporary
13 holding place for him.
14     A. Yes.
15     Q. Is that correct?
16     A. Yes, ma'am.
17     Q. Okay. And that was your intent when you
18 put him into the vehicle?
19     A. Until we could get one of the officer's
20 cars, Cincinnati cars over, who was involved in the
21 incident.
22     Q. Okay. Do you have any idea whether the
23 one Golf Manor officer or any Golf Manor officers
24 had any idea of whether Mr. Owensby was injured when

Page 235

1  you put him -- before you put him in the car?
2      A. I would believe that he did not think Mr.
3  Owensby was injured at that point.
4      Q. Okay.
5      A. I don't think a reasonable officer would,
6  especially without knowing what just happened, would
7  allow officers to put an unconscious suspect into
8  the back of a crui-- his cruis-- I know I wouldn't.
9          If I were him and I, looking at Mr.
10 Owensby as we headed towards him, thought he was
11 unconscious or in need of some medical aid, I'd stop
12 them and say, wait a minute, you're not putting him
13 in my car, there's certain things that have to
14 happen first.
15     Q. Okay.
16         MR. MARTINS: Objection. Move to strike
17 as speculation.
18     Q. Which is going to take me to my -- my next
19 question. That's -- that's based on your belief?
20     A. That's based on my belief.
21     Q. And I understand that. Do you have any
22 specific knowledge that either this Golf Manor
23 officer or any Golf Manor officers actually knew
24 whether Mr. Owensby was injured?

Page 236

1      A. I have no specific knowledge, no.
2      Q. Okay. Thank you. Do you believe that any
3  Golf Manor officer that night had any responsibility
4  to check on Mr. Owensby after he was placed in the
5  Golf Manor cruiser?
6          MR. MARTINS: Objection.
7      Q. You can answer.
8      A. If he felt he was injured, yes. If he
9  felt he was injured. And I didn't -- all those
10 officers on scene, in my opinion, were reasonable
11 men. I have to assume they were reasonable
12 officers, by virtue of the fact that they had
13 commissions.
14     Q. Okay.
15     A. And if -- I -- I don't think -- in my
16 opinion, Mr. Owensby was not left unattended.
17     Q. Okay.
18     A. There were numerous officers in close
19 proximity, both Cincinnati and Golf Manor officers.
20 I don't think anybody on that scene felt that Roger
21 Owensby was injured.
22     Q. Okay.
23         MR. MARTINS: Objection. Calls for
24 speculation. Move to strike.

Page 237

1      Q. So in your belief, the only way a Golf
2  Manor officer would have responsibility to check on
3  Mr. Owensby would be if that Golf Manor -- Manor
4  officer believed he was injured.
5      A. Correct.
6      Q. Is that correct?
7          MR. MARTINS: Objection.
8      Q. Okay. And then I think you talked about
9  where the Golf Manor officers were standing in
10 relation to the Golf Manor vehicle after you placed
11 Mr. Owensby in the car, and you may have mentioned
12 two officers. Do you remember seeing two officers
13 at a later point, Golf Manor officers?
14     A. I know I -- I saw two Golf Manor officers
15 at a later point. I've seen two Golf Manor officers
16 in the videotape, walking away from the Golf Manor
17 car, essentially where, in my recollection, where I
18 saw them when we put Owensby in the back seat of the
19 cruiser.
20         That's my recollection as it stands today.
21 I don't know if it's because I've been through this
22 so many times that that's how I -- I put -- put
23 pieces of the puzzle together or I actually saw them
24 both standing there at that point.

244

17:00:39  1      MR. HARDIN:  Caton.

17:00:39  2      VIDEOGRAPHER:  Sorry.  Mr. Caton, you have

17:00:39  3  a right to review this videotape deposition

17:00:39  4  prior to its being shown to a court or jury.

17:00:39  5  Will you waive that right?

17:00:39  6      THE WITNESS:  No.

17:00:40  7      VIDEOGRAPHER:  We're off the record.  The

17:00:42  8  time showing is 5:04 p.m.

17:00:42  9      MR. MARTINS:  I take it you also want

17:00:49  10  signature on the deposition?

17:00:51  11      MR. HARDIN:  Yes.  Yes.

17:00:52  12
17:00:52
17:00:52  13
17:00:52
17:00:52  14  _____
17:00:52      PATRICK EDMUND CATON
17:00:52  15
17:00:52
17:00:52  16              - - -
17:00:52
17:00:52  17      (Deposition concluded.)
17:00:52
          18              - - -

          19

          20

          21

          22

          23

          24