Case 1:01-cv-00769-SAS    Document 89-6    Filed 02/02/2004    Page 1 of 10

Owensby, et al vs. City of Cincinnati, et al.                        ALEXANDER HASSE
November 19, 2003

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - - - -
ESTATE OF ROGER D.              :
OWENSBY JR., et al.,            :
                                :
        Plaintiffs,             :
    vs.                         :  Case No. 01-CV-769
                                :  (Judge S. A. Spiegel)
CITY OF CINCINNATI,             :
et al.,                         :
                                :
        Defendants.             :
- - - - - - - - - - - - - - - -


        Deposition of ALEXANDER HASSE, a witness

herein, called by the plaintiffs for examination,

pursuant to the Federal Rules of Civil Procedure,

taken before me, Wendy Davies Welsh, a Registered

Diplomate Reporter and Notary Public in and for the

State of Ohio, at the offices of Helmer, Martins &

Morgan Co. LPA, 1900 Fourth & Walnut Centre, 105

East Fourth Street, Cincinnati, Ohio, on Wednesday,

November 19, 2003, at 10:12 a.m.

Case 1:01-cv-00769-SAS   Document 89-6   Filed 02/02/2004   Page 2 of 10

Owensby, et al vs. City of Cincinnati, et al.
November 19, 2003
ALEXANDER HASSE

Page 2

```
 1  APPEARANCES:

 2      On behalf of the Plaintiffs:

 3          Paul B. Martins, Esq.
            Don Stiens, Esq.
 4          Helmer, Martins & Morgan Co. LPA
            Suite 1900, Fourth & Walnut Centre
 5          105 East Fourth Street
            Cincinnati, Ohio 45202
 6          Phone: (513) 421-2400

 7          John J. Helbling, Esq.
            The Helbling Law Firm, L.L.C.
 8          3672 Springdale Road
            Cincinnati, Ohio 45251
 9          Phone: (513) 923-9740

10      On behalf of the Defendants City of Golf Manor,
        Stephen Tilley, Roby Heiland and Chris
11      Campbell:

12          Richard T. Lauer, Esq.
            Rendigs, Fry, Kiely & Dennis
13          900 Fourth & Vine Tower
            One West Fourth Street
14          Cincinnati, Ohio 45202-3688
            Phone: (513) 381-9200
15
        On behalf of Defendants City of Cincinnati,
16      Darren Sellers, Jason Hodge:

17          Geri Hernandez Geiler, Esq.
            Assistant City Solicitor
18          Department of Law
            Room 214, City Hall
19          801 Plum Street
            Cincinnati, Ohio 45202
20          Phone: (513) 352-3346

21

22

23

24
```

Page 3

```
 1  APPEARANCES (Continued):

 2      On behalf of Alexander Hasse and the Defendants
        Robert B. Jorg, Patrick Caton, Jason Hodge,
 3      Victor Spellen and Darren Sellers:

 4          Donald E. Hardin, Esq.
            Hardin, Lefton, Lazarus & Marks, LLC
 5          915 Cincinnati Club Building
            30 Garfield Place
 6          Cincinnati, Ohio 45202
            Phone: (513) 721-7300
 7

 8                      - - -

 9              STIPULATIONS

10      It is stipulated by and among counsel for the

11  respective parties that the deposition of ALEXANDER

12  HASSE, a witness herein, called by the plaintiffs

13  for examination, pursuant to the Federal Rules of

14  Civil Procedure, may be taken at this time by the

15  notary; that said deposition may be reduced to

16  writing in stenotype by the notary, whose notes may

17  then be transcribed out of the presence of the

18  witness; and that proof of the official character

19  and qualifications of the notary is expressly

20  waived.

21

22                      - - -

23

24
```

Page 4

```
 1                  I N D E X

 2      Examination by:                Page

 3      Mr. Martins . . . . . . . . .   5
        Mr. Lauer . . . . . . . . . . 111
 4      Mr. Hardin  . . . . . . . . . 116
        Mr. Martins . . . . . . . . . 117
 5      Mr. Lauer . . . . . . . . . . 119

 6                      - - -

 7                  E X H I B I T S

 8                                           Page
    Deposition Exhibit 59 . . . . . . . . . . 15
 9  Deposition Exhibit 60 . . . . . . . . . . 23
    Deposition Exhibit 61 . . . . . . . . . . 68
10  Deposition Exhibit 62 . . . . . . . . . . 93
    Deposition Exhibit 63 . . . . . . . . . . 94
11  Deposition Exhibit 64 . . . . . . . . . . 95
    Deposition Exhibit 65 . . . . . . . . . . 97
12  Deposition Exhibit 66 . . . . . . . . . . 99
    Deposition Exhibit 67 . . . . . . . . . .102
13  Deposition Exhibit 68 . . . . . . . . . .104

14                      - - -
```

Page 5

1    ALEXANDER HASSE
2  being by me first duly cautioned and sworn, deposes
3  and says as follows:
4            EXAMINATION
5  BY MR. MARTINS:
6    Q. Would you state for the record, sir, your
7  name.
8    A. Alexander Hasse, H-A-S-S-E.
9    Q. And your age?
10   A. 29.
11   Q. Date of birth?
12   A. 11/9/74.
13   Q. Have you ever had your deposition taken
14  before?
15   A. No.
16   Q. Let me cover some ground rules for you.
17  As you know, as you've just seen, the court reporter
18  has placed you under oath and will take down
19  everything that you say, so try to keep your answers
20  audible. Try to avoid saying uh-huh or huh-uh,
21  things like that which can be confusing on the
22  transcript.
23       I will ask you questions, and if you don't
24  understand a question or you haven't heard the

Page 14

1 what was said, I honestly don't remember.
2  Q. Did you ever write out an account of the
3 facts as you know them that transpired on
4 November 7, 2000? And by write out I'm including
5 typing.
6  A. I know I never typed anything. I know
7 there's a form we have, the police have, that's
8 often handed out at the scene of certain types of
9 incidents.
10  Q. That's called Police Notes, I think, or
11 something like that?
12  A. I think so.
13  Q. I think I have that to show you.
14  A. Yeah. I thought I remembered doing that.
15  Q. The way we do this is I'll hand you a
16 document. It will be marked with an exhibit
17 sticker, and I'll try to refer to it by the exhibit
18 number. Just take a look at it. Once you have a
19 familiarity with it, just look back up to me or
20 signal me, and then I'll ask you whatever the
21 question is.
22   This one is just -- is this what you were
23 referring to? I'm handing you Exhibit 59.
24

Page 15

1  (Deposition Exhibit 59 was marked for identi-
2  fication.)
3  A. Yes, this is what I was referring to.
4  Q. Anything else that you wrote out?
5  A. I don't recall anything else.
6  Q. I'd like you, sir, to cover for me your
7 job experience. Let's start first with your present
8 position. You are a Cincinnati police officer. Are
9 you still assigned to District 4?
10  A. Yes, I am.
11  Q. When did you graduate from the police
12 academy?
13  A. December of '99.
14  Q. At that time in December of '99 were you
15 assigned directly from the academy to District 4?
16  A. Yes, I was.
17  Q. And you said, with Officer Sellers as your
18 partner, that was the only day you had been assigned
19 with Officer Sellers?
20  A. I may have run with him a couple other
21 times, but he was not my regular partner.
22  Q. Who was your regular partner?
23   MR. HARDIN: Do you mean on the day --
24   MR. MARTINS: Well, in 2000.

Page 16

1   MR. HARDIN: Okay.
2  A. I know somewhere in 2000 I was partnered
3 with Lewis Arnold, but since I was still new, I know
4 for a while I was running by myself, as all new
5 officers do. So at what point I started being a
6 regular partner with Lewis Arnold, I don't remember
7 the date.
8  Q. Presently who is your regular partner?
9  A. I don't have one.
10  Q. In 2001 did you have a regular partner?
11  A. I'd say still Lewis Arnold.
12  Q. And in 2002?
13  A. No.
14  Q. It's my understanding that when officers
15 come out of the academy and begin working at
16 districts, there is a time period where they work
17 with a more senior officer, kind of an apprentice
18 period, and I know it has a name.
19  A. Field training officer.
20  Q. Field training officer. There we go. Who
21 was your field training officer?
22  A. For second shift my primary was Carlos
23 Robertson. And then for third shift it was Jeff
24 McKinney.

Page 17

1  Q. I want to cover before going to the
2 academy in '99. Just take me back in time and tell
3 me what jobs you held.
4  A. After high school I went into the Army. I
5 was in the Army National Guard as a medic. So after
6 basic training in the medic school, I came back
7 home.
8  Q. Where is home? I don't need an address,
9 but --
10  A. West Chester area. That's where my
11 parents live.
12  Q. Where did you go to high school?
13  A. My senior year was in Columbus, Indiana.
14  Q. Army National Guard, where were you
15 stationed?
16  A. 68 Shadybrook Drive.
17  Q. Where is that?
18  A. Hartwell.
19  Q. As a medic in the Army National Guard, was
20 that kind of a reserve position or was it a full-
21 time position?
22  A. Correct. It's reserve. It's one weekend
23 a month, two weeks in the summer.
24  Q. What, if any, job did you have in the time

Case 1:01-cv-00769-SAS   Document 89-6   Filed 02/02/2004   Page 4 of 10

Owensby, et al vs. City of Cincinnati, et al.
November 19, 2003
ALEXANDER HASSE

Page 18

1  when you weren't serving in the Army National Guard
2  as a medic?
3  A. Initially, I was actually delivering
4  pizza, and then after that I became an EMT for West
5  Chester and a firefighter.
6  Q. Any other employment other than National
7  Guard, EMT, West Chester, firefighter?
8  A. I worked at Montgomery Cyclery and I
9  worked at a company for two years called
10 Transamerica Intellitech.
11 Q. How long were you an EMT for West Chester?
12 A. I believe it was around two years. Maybe
13 a little bit more than two years.
14 Q. Can you give me the beginning and ending
15 time period?
16 A. I'd say around January of '94 to around
17 October of '97.
18 Q. Between October '97 and '99, say in '98,
19 what job, if any, did you have?
20 A. That was at Transamerica.
21 Q. What was your job at Transamerica, or
22 duties?
23 A. Initially it was just customer service for
24 software, and then I became the manager of the

Page 19

1  customer service department.
2  Q. It's a software company?
3  A. Correct, yes, a real estate software.
4  Q. Am I correct in understanding that after
5  Transamerica that's when you went into the police
6  academy?
7  A. That's correct.
8  Q. Are you still affiliated with the National
9  Guard?
10 A. No.
11 Q. How long did you serve in the National
12 Guard as a medic?
13 A. Six years, and then two years of inactive
14 reserve, which means not going at all.
15 Q. In the six years of active duty, can you
16 give me the start and end date on that, or at least
17 a year?
18 A. I started in very early '93, actually
19 before I graduated high school, so it was probably
20 around February, March. And then six years later.
21 So I think February of '99.
22 Q. And the inactive duty would be from '99 to
23 approximately '01?
24 A. Correct.

Page 20

1  Q. Are you familiar with the Cincinnati
2  Police Department policies and procedures?
3  A. Yes, somewhat. Probably could study more
4  than I have.
5  Q. Do you have an understanding of the
6  Cincinnati Police Department policy or custom in
7  place on November 7, 2000 concerning use of force?
8  A. Do I now have an understanding what it was
9  then or did I understand it at the time?
10 Q. Let's start with at the time. Did you
11 have an understanding of the use of force policy or
12 custom in place on November 7, 2000?
13 A. Not all of it, but I had a general
14 familiarity with it, yes.
15 Q. Today do you have an understanding of the
16 policy or custom of the police department concerning
17 use of force in effect on November 7, 2000?
18 A. Yes. More than I did then.
19 Q. What is your understanding of the policy
20 or custom of the police department concerning the
21 use of force in effect on November 7, 2000?
22 A. Can you be more specific as far as what
23 type of activity --
24 Q. What did you understand an officer could

Page 21

1  do or could not do concerning the use of force,
2  according to Cincinnati policies or customs that
3  were in effect on November 7, 2000?
4  A. A police officer can use the minimum
5  amount of force necessary to effect an arrest.
6  Q. Am I correct in understanding that
7  Cincinnati Police Department policies and customs
8  concerning use of force would have been covered at
9  the academy?
10 A. Yes.
11 Q. And in your case it was covered at the
12 academy?
13 A. Yes.
14 Q. After getting out of the academy, am I
15 correct in understanding that there are refresher
16 courses, or I think they call them in-service days,
17 for police officers to refamiliarize themselves with
18 customs and policies of the police department?
19 A. Yes.
20 Q. Do you know whether or not since getting
21 out of the academy you have had in-service training
22 concerning use of force?
23 A. As far as that in-service, I'm not sure.
24 I know that at our firearms familiarization yearly

Owensby, et al vs. City of Cincinnati, et al.
November 19, 2003

Case 1:01-cv-00769-SAS    Document 89-6    Filed 02/02/2004    Page 5 of 10

ALEXANDER HASSE

Page 22

1 at the firearms range that has been covered.
2    Q. It's covered in some fashion, maybe not as
3 an in-service?
4    A. Correct.
5    Q. Again referencing November 7, 2000, are
6 you familiar with the policy or custom of the police
7 department concerning obligations of officers to
8 provide care for an injured citizen who has been
9 arrested?
10    A. Yes.
11    Q. What was the policy or custom of the
12 police department concerning the obligations of
13 officers to provide care to an arrestee who is
14 injured?
15    A. If an officer is aware that an arrestee is
16 injured, then to provide whatever care is necessary,
17 within security measures, obviously, to assist that
18 individual.
19    Q. Let me show you something. Just to make
20 it easier for us to talk back and forth on this, I'm
21 handing you as Exhibit 60 the Cincinnati use of
22 force policy 12.545. I believe it is the correct
23 version. It says revision July 2000, replacing
24 May 2000.

Page 23

1    MR. HARDIN: Off the record.
2    (Discussion off the record.)
3    (Deposition Exhibit 60 was marked for identi-
4    fication.)
5    Q. Officer Hasse, I just want to direct you
6 to one paragraph in here at this point, and that is
7 on page 3. The second paragraph says, "Following
8 any use of force resulting in a citizen's injury,
9 officers will ensure appropriate first aid is
10 rendered immediately once the incident scene is
11 stabilized." Do you see that?
12    A. Yes, I do.
13    Q. Did you understand that to be the policy
14 and custom in place in November of 2000?
15    A. Yes.
16    Q. Have you received or did you receive any
17 training on what it means by the phrase "once the
18 incident scene is stabilized"?
19    A. I don't recall any specific training
20 particular to that statement.
21    Q. Did you have any understanding of the
22 phrase "once the incident scene is stabilized," of
23 what that meant, say, in November of 2000?
24    A. I would say once the scene is under

Page 24

1 control, once any suspects are under arrest,
2 detained.
3    Q. How did you come to that understanding?
4    A. That's just what I get from reading it.
5    Q. Do you recall having any discussions with
6 any other police officers about what the phrase
7 "once the incident scene is stabilized" means?
8    A. No.
9    Q. When you arrived at the scene, as I
10 understand it, Mr. Owensby was already in the Golf
11 Manor cruiser?
12    A. Correct.
13    Q. And he was already handcuffed?
14    A. Correct.
15    Q. In your opinion, was the scene stabilized
16 at that time?
17    MR. HARDIN: Objection to the question.
18    You may answer.
19    A. Yes.
20    Q. Were there Cincinnati policies or customs
21 in place concerning the use of chemical irritant on
22 a person?
23    A. Yes.
24    Q. Again, I'm talking as of November of 2000.

Page 25

1 What was your understanding of the policy concerning
2 care for someone who has been subjected to chemical
3 irritant?
4    A. If requested, they're to be provided with
5 fresh air and a decontam-- I believe it says
6 decontamination. I can't recall if that means -- I
7 don't remember if it says if they want water they
8 can have water, but I know at least it says fresh
9 air.
10    Q. You indicated, you said "if requested."
11 How did you arrive at that understanding that the
12 person has to request it?
13    A. I guess mainly just from personal
14 experience.
15    Q. Have you received any training on that,
16 training saying that fresh air and water or
17 decontaminant is something that's provided only if
18 the person requests it?
19    A. No, not specifically stating that, no.
20    Q. Do you have an understanding of what you
21 should do if the person is somehow incapable of
22 requesting it?
23    A. Can you repeat the question?
24    Q. Sure. We were talking about whether or

Case 1:01-cv-00769-SAS   Document 89-6   Filed 02/02/2004   Page 6 of 10

Owensby, et al vs. City of Cincinnati, et al.
November 19, 2003
ALEXANDER HASSE

Page 26

1 not the person who has been Maced or subject to a
2 chemical irritant requests fresh air, water,
3 decontaminant. And my question is, what do you do
4 if the person is somehow incapable of making a
5 request?
6    A. If they're incapable of making that
7 request, I guess I would find out why they're
8 incapable and, if there's a larger issue going on,
9 address that issue.
10    Q. Do you recall receiving any training on
11 this subject that we just covered, where the person
12 is incapable of making a request?
13    A. No, I don't recall that.
14    Q. If you'd look at Exhibit 60 before you and
15 go to page 9, you see that there's a section C.
16 called Use of Chemical Irritant. And C. 5. I want
17 to direct your attention to says, "Expose
18 individuals sprayed with chemical irritant to fresh
19 air. Give them an opportunity to rinse their face
20 with plenty of clear, cool water. Individuals
21 should not rub or hold their faces, or use any oils,
22 creams, or ointments." Are you familiar with this
23 policy?
24    A. I have read it before, yes.

Page 27

1    Q. Is this your understanding of what the
2 policy was in place in November of 2000?
3    A. I believe so, yes.
4    Q. Do you know if anywhere, if you know, if
5 there's anywhere in here where it says that the
6 person must request fresh air or clear, cool water?
7    A. No.
8    Q. Also look at paragraph 4. It says, "When
9 spraying chemical irritant, if possible, spray five
10 to ten feet from an individual." Do you see that?
11    A. Yes.
12    Q. Do you recall receiving any training on
13 how to administer Mace or a chemical irritant?
14    A. Yes.
15    Q. Were you told to stay five to ten feet
16 from the individual?
17    A. When possible, yes.
18    Q. Why is that?
19    A. Probably for several reasons. The closer
20 you are to a suspect, the more danger you yourself
21 could be in. And another reason is sprayback or
22 splashback could also affect the officer as well.
23    Q. When you spray chemical irritant, is it a
24 mist or is it --

Page 28

1    A. It's more of a stream.
2    Q. A stream?
3    A. (Nodding head.)
4    Q. Have you ever been subject to a chemical
5 irritant, a Mace?
6    A. Yes.
7    Q. What's it feel like?
8    A. It hurts.
9    Q. How? Describe it. I have not, other than
10 when I was in the Army, and that was much different.
11         (Discussion off the record.)
12    Q. Go ahead.
13    A. It stings the eyes and makes your mucus
14 glands overstimulated, I guess.
15    Q. So your nose runs?
16    A. Correct.
17    Q. Do you have trouble breathing?
18    A. Yes.
19    Q. Do you recall whether or not, again, going
20 back to November of 2000, whether there was any
21 policy or procedure in place by the police
22 department requiring officers to have a plan of
23 action before approaching someone to make an arrest?
24    A. Was there a specific policy or procedure

Page 29

1 in place requiring officers to discuss beforehand,
2 before approaching a subject, what their plan of
3 action was?
4    Q. What their plan of action is going to be.
5    A. I'm not aware of that, no.
6    Q. I've heard, in other officers that we've
7 talked to, discussions about someone being a primary
8 contact and the other person being like a secondary.
9 Do you have an understanding of what that means?
10    A. Correct. Yes.
11    Q. What is your understanding?
12    A. Generally, one officer is the primary. As
13 the primary officer, he's the one that speaks to the
14 individual, has all verbal contact with the
15 individual, while the second officer basically
16 provides more of a perimeter protection for the
17 officer, for basically watching the officer's back
18 and for anyone else around the scene.
19    Q. The last thing I want to ask you as far as
20 policies and procedures in effect on November of
21 2000 is do you recall receiving any instruction
22 concerning how or the obligations that officers had
23 for care for an injured person who has been arrested
24 but placed in a vehicle belonging to another police

Owensby, et al vs. City of Cincinnati, et al.
November 19, 2003

ALEXANDER HASSE

Page 30

1 department?
2    A. I don't recall that training.
3    Q. To make it more specific, in this
4 situation here where you have a person who was
5 arrested by Cincinnati police officers but placed in
6 a Golf Manor cruiser, do you recall any instruction,
7 whether it be verbal or written, articulating a
8 policy of how officers are to care for that
9 individual, whether they even have an obligation to
10 care for that individual?
11   A. I don't recall receiving any training
12 specific to that.
13   Q. I know that you were a trained EMT when
14 you joined the police academy and became a police
15 officer, but at the police academy did you have EMT
16 training as part of the course?
17   A. Basic first aid training.
18   Q. Would that include CPR?
19   A. Yes.
20   Q. Did you receive any training on when an
21 officer should call for an EMT or an ambulance?
22   A. I guess whenever a subject requires
23 further assistance than we're able to provide.
24   Q. Was that covered in the academy courses?

Page 31

1    A. I believe it was. I don't remember
2 specifically hearing that, but I believe so, yes.
3    Q. You're wearing your uniform today and you
4 have your mike on, and I've heard the term "keying
5 up the mike." Can you just explain to me what
6 keying up the mike means.
7    A. Basically, just --
8    Q. -- pressing the key?
9    A. Pressing the button, yes.
10   Q. When you press the button, does that
11 automatically activate the mike to a dispatcher or
12 someone else?
13   A. Yes.
14   Q. Who does it activate to?
15   A. Basically, everyone can hear you, everyone
16 on the channel you're on.
17   Q. How is it determined what channel gets
18 assigned to who?
19   A. Each district has its own channel,
20 Districts 1 through 5 are assigned channels 1
21 through 5.
22   Q. So if you key up your mike now, District 4
23 officers who are on duty are going to hear what you
24 say?

Page 32

1    A. Correct.
2    Q. Anyone else?
3    A. I believe -- yeah, they can be picked up
4 by scanners, civilian scanners.
5    Q. Is there a District 4 dispatcher that
6 would also hear what is keyed up?
7    A. Yes.
8    Q. Is that dispatcher just for District 4 or
9 is --
10   A. Yes.
11   Q. As I understand it, once you let go of the
12 key, you no longer are communicating?
13   A. Correct.
14   Q. Are other officers able to communicate
15 with you through -- I mean, they press it and it
16 goes to everyone, but is there a way to communicate
17 just with you through the use of the mike?
18       MR. HARDIN: Are you talking about when he
19    keys up or --
20       MR. MARTINS: If another officer wants to
21    talk to Officer Hasse and wants to talk only to
22    Officer Hasse.
23   Q. Is there a way in using the mike to do so?
24   A. To a point. We have what's called channel

Page 33

1 7 and channel 8. Channel 7 is unassigned. The
2 range is not as far as the other channels. So you
3 can have an officer switch to channel 7 and address
4 them personally. Other people can listen in if they
5 are within range, though.
6    Q. Is there any way to key the mike so that
7 it stays on even though your hand is not on the
8 mike? In other words, keep it on so that your
9 hands, you can do other things?
10   A. No.
11   Q. Have you ever heard of either a restraint
12 technique or a use of force technique that is
13 referred to as a head wrap?
14   A. I've heard of it, yes.
15   Q. Have you heard of it in the form of formal
16 instruction received from either the academy or in
17 one of the follow-up instructions from the police
18 department?
19   A. No.
20   Q. How have you heard of a head wrap?
21   A. I've heard of it just from speaking to
22 individuals who have martial arts experience, just
23 through casual conversations.
24   Q. What have they explained to you is a head

Page 70

1 on?
2   A. (Witness complies.)
3   Q. Okay.
4   A. I believe I was just short of the
5 guardrail. I was trying to get a view.
6   Q. Were you on the sidewalk?
7   A. Yes, I was on the sidewalk.
8   Q. So you could still see your car?
9   A. Correct.
10   Q. And you were trying to look over to see.
11 And as I understand it, you could not see either Mr.
12 Owensby or Jorg, Caton, Hunter; is that right?
13   A. That's correct.
14   Q. Could you see Officer Sellers?
15   A. No.
16   Q. So you couldn't see him either?
17   A. Correct.
18   Q. And the reason you couldn't see them was
19 because your view was blocked by a car that was
20 parked in a parking spot near the front door of the
21 Sunoco station?
22   A. Correct.
23   Q. Mr. Williams, who was in the back seat of
24 your car, could he see what was going on?

Page 71

1   A. No.
2   Q. Because Sam's, the building at Sam's Carry
3 Out would have blocked his view?
4   A. Correct.
5   Q. How long, what's your best estimate of the
6 amount of time that transpired from when you saw
7 Jorg, Caton and Hunter begin to walk over to the
8 Sunoco station and the time that the tone came over
9 your radio concerning the officer needs assistance?
10   A. You want an estimation?
11   Q. Yes, sir.
12   A. Two to four minutes.
13   Q. Then at some point -- I take it also you
14 did not see the officers transport Mr. Owensby into
15 the Golf Manor cruiser?
16   A. Correct.
17   Q. So did you leave where you were at some
18 point in time or --
19   A. Yes.
20   Q. How long did you remain near the
21 guardrail, watching or trying to see what was going
22 on?
23   A. I guess less than a minute.
24   Q. Then why did you -- I take it you returned

Page 72

1 to your car?
2   A. Yes.
3   Q. Why did you then turn around and return to
4 your car?
5   A. The officer needs assistance was canceled.
6   Q. At any time while you were watching or
7 looking over toward the station, the Sunoco station,
8 near the guardrail, were you able to see what any of
9 the police officers on the scene were doing?
10   A. No.
11   Q. From where you were to where the car was
12 parked or where the officers were on the other side
13 of the car, what's your best estimate of the
14 distance?
15   A. 100 yards or -- I guess between 75,
16 100 yards.
17   Q. If you were to run over there as fast as
18 you could, how long do you think it would take you
19 to get there?
20       MR. HARDIN: Objection.
21       You may answer.
22   A. Seven or eight seconds.
23   Q. How about from your cruiser? If you were
24 standing outside the front of your cruiser and

Page 73

1 received a call to run over to the area where the
2 arrest was taking place, how long do you think it
3 would take you?
4       MR. HARDIN: Objection.
5       You may answer.
6   A. 10 or 11 seconds.
7       (Discussion off the record.)
8   Q. I take it while all of this is going on,
9 while you're standing at the guardrail and then when
10 you walked back to your car, Mr. Williams is in the
11 back seat of the car?
12   A. Correct.
13   Q. What happened next?
14   A. There were other units arriving on scene.
15 Some had already arrived.
16   Q. So you're at your car, but you're seeing
17 units coming in?
18   A. Yes.
19   Q. I mean -- well, how would you know that
20 other units are arriving but for seeing them arrive?
21   A. Well, initially you could hear their
22 lights and siren. That's one of the reasons we
23 canceled the officer needs assistance, so they were
24 not driving in emergency mode to get there.

Case 1:01-cv-00769-SAS   Document 89-6   Filed 02/02/2004   Page 9 of 10

Owensby, et al vs. City of Cincinnati, et al.
November 19, 2003
ALEXANDER HASSE

Page 106

1  A. No.
2  Q. I want to direct your attention down to
3  the -- there's a month, day and year column, first
4  column. If you go to October 25 of, it looks like
5  2000, and then there's what appears to be a time
6  function at 2329 hours and 2330 hours, and then
7  there's some initials and then it says District 4,
8  A Hasse. Do you have any understanding of what
9  that means?
10  A. I don't know for sure what that means.
11  Q. If we go to the first October 25,
12  2000 line at 2329 hours, there's the initials, under
13  Function, QHW. Do you know what that means?
14  A. Query of history of wants.
15  Q. Query of history of warrants?
16  A. I understand it to mean wants.
17  Q. Wants.
18  A. Wants or warrants. Actually, it's
19  interchangeable.
20  Q. What is your understanding; what does that
21  mean?
22  A. Basically that individual's criminal
23  history.
24  Q. So somebody is making an inquiry as to the

Page 107

1  person's criminal history?
2  A. Yes.
3  Q. To your knowledge, is there anyone else in
4  the Cincinnati Police Department named A. Hasse?
5  A. No.
6  Q. Do you have any recollection of making a
7  criminal history inquiry concerning Roger Owensby in
8  October 25 of 2000?
9  A. No.
10  Q. As I understand your testimony, you didn't
11  know who Roger Owensby was until after November of
12  2000, correct?
13  A. Correct.
14  Q. Then there's two other entries October 25,
15  2000, a minute later at 2330 hours, QPS. Do you
16  have understanding of what QPS means?
17  A. I don't know what those initials stand
18  for.
19       MR. MARTINS: Let's take a short break.
20       (Recess taken: 1:02 p.m. - 1:12 p.m.)
21  BY MR. MARTINS:
22  Q. I'd like to play for you, sir, what has
23  previously been marked as Exhibit 20. This is a
24  video from the camera in the cruiser of Officer

Page 108

1  Spellen's vehicle. I don't know if you've seen it
2  before. Do you have any recollection of seeing
3  that?
4  A. Sounds familiar, but I --
5  Q. What I'm going to do is run it through
6  once, and then I'll go back and ask you questions.
7       (Videotape played.)
8  Q. Did you see your car in this video?
9  A. No.
10  Q. Did you see yourself?
11  A. I thought I saw myself there at the end.
12  Q. Did you see your partner: Officer
13  Sellers?
14  A. Yes.
15  Q. Let me fast-forward here. We're at
16  2 minutes 8 seconds into the video. The person that
17  just walked by in plainclothes, talking to Officer
18  Jorg, do you know who that was?
19  A. Jason Hodge.
20  Q. That's Hodge. There's another person in
21  plainclothes with a white baseball cap. Do you know
22  who that is?
23  A. Abraham Lawson.
24  Q. Thank you.

Page 109

1      We're at 2 minutes 52 seconds into the
2  video. There's a police cruiser that's pulling into
3  the station. Do you know whose cruiser that is?
4  A. No.
5  Q. That's not yours?
6  A. I don't believe so, no.
7  Q. We're at 3 minutes and 16 seconds into the
8  video. There's a cruiser that's pulled up facing
9  Officer Spellen's, and that is the cruiser that
10  belongs to Officers Jorg and Caton; is that right?
11  A. It appears that Officer Caton got out of
12  the driver's seat, yes.
13  Q. I take it you have not seen yourself in
14  this video yet?
15  A. I thought I saw someone just come out of
16  the right screen, right side of the screen.
17  Q. Let me back up.
18  A. That's far enough.
19  Q. The person that just walked toward the
20  rear, in the uniform, at 3 minutes 10 seconds, is
21  that who you're thinking is --
22  A. I think so.
23  Q. You think that's you?
24  A. (Nodding head.) That looked like me that

# AFFIDAVIT

---

STATE OF OHIO       :
                    :  SS
COUNTY OF HAMILTON  :

I, Wendy L. Welsh, Notary Public in and for the State of Ohio, do hereby state that the transcript of the deposition of ALEXANDER HASSE, deponent herein, having been submitted to said deponent for review and signature, has not been signed within the thirty (30) day period allowed under the Federal Rules; said deposition to now have the same force and effect as though signed.

_____
Wendy L. Welsh, Court Reporter

Sworn to before me this 27th day of January, 2004.

_____
Thomas M. Blasing
Notary Public - State of Ohio

My commission expires:
May 4, 2004.