Case 1:01-cv-00769-SAS    Document 89-7    Filed 02/02/2004    Page 1 of 11

Owensby, et al. vs. City of Cincinnati
December 3, 2003
ROBERT B. HEILAND, JR.

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - - -

ESTATE OF ROGER D.          :
OWENSBY JR., et al.,        :
                            :
        Plaintiffs,         :
    vs.                     :  Case No. 01-CV-769
                            :  (Judge S. A. Spiegel)
CITY OF CINCINNATI,         :
et al.,                     :
                            :
        Defendants.         :

- - - - - - - - - - - - - - -


        Deposition of ROBERT B. HEILAND JR.,

defendant herein, called by the plaintiffs for

cross-examination, pursuant to the Federal Rules of

Civil Procedure, taken before me, Wendy Davies

Welsh, a Registered Diplomate Reporter and Notary

Public in and for the State of Ohio, at the offices

of Helmer, Martins & Morgan Co. LPA, 1900 Fourth &

Walnut Centre, 105 East Fourth Street, Cincinnati,

Ohio, on Wednesday, December 3, 2003, at 10:10 AM.

Case 1:01-cv-00769-SAS   Document 89-7   Filed 02/02/2004   Page 2 of 11

Owensby, et al. vs. City of Cincinnati
December 3, 2003
ROBERT B. HEILAND, JR.

Page 2

```
 1  APPEARANCES:

 2     On behalf of the Plaintiffs:

 3         Paul B. Martins, Esq.
           Don Stiens, Esq.
 4         Frederick M. Morgan Jr., Esq.
           Helmer, Martins & Morgan Co. LPA
 5         Suite 1900, Fourth & Walnut Centre
           105 East Fourth Street
 6         Cincinnati, Ohio 45202
           Phone: (513) 421-2400
 7
           John J. Helbling, Esq.
 8         The Helbling Law Firm, L.L.C.
           3672 Springdale Road
 9         Cincinnati, Ohio 45251
           Phone: (513) 923-9740
10
       On behalf of the Defendants City of Golf Manor,
11     Stephen Tilley, Roby Heiland and Chris
       Campbell:
12
           Wilson G. Weisenfelder, Jr., Esq.
13         Rendigs, Fry, Kiely & Dennis
           900 Fourth & Vine Tower
14         One West Fourth Street
           Cincinnati, Ohio 45202-3688
15         Phone: (513) 381-9200

16     On behalf of the Defendant City of Golf Manor:

17         Terrence M. Donnellon, Esq.
           Donnellon, Donnellon & Miller
18         9079 Montgomery Road
           Cincinnati, Ohio 45242
19         Phone: (513) 891-7087
```

Page 3

```
 1     On behalf of Defendants City of Cincinnati,
       Darren Sellers, Jason Hodge:
 2
 3         Geri Hernandez Geiler, Esq.
           Assistant City Solicitor
 4         Department of Law
           Room 214, City Hall
 5         801 Plum Street
           Cincinnati, Ohio 45202
 6         Phone: (513) 352-3346

 7     On behalf of the Defendants Robert B. Jorg,
       Patrick Caton, Jason Hodge, Victor Spellen and
 8     Darren Sellers:

 9         Donald E. Hardin, Esq.
           Hardin, Lefton, Lazarus & Marks, LLC
10         915 Cincinnati Club Building
           30 Garfield Place
11         Cincinnati, Ohio 45202
           Phone: (513) 721-7300
12
    Also present:
13
    Chief Stephen Tilley
14
    Lisa Damstrom, Law Clerk
15  Helmer, Martins & Morgan Co., L.P.A.

16                   - - -
```

Page 4

```
 1              STIPULATIONS

 2     It is stipulated by and among counsel for the

 3  respective parties that the deposition of ROBERT B.

 4  HEILAND JR., defendant herein, called by the

 5  plaintiffs for cross-examination, pursuant to the

 6  Federal Rules of Civil Procedure, may be taken at

 7  this time by the notary; that said deposition may be

 8  reduced to writing in stenotype by the notary, whose

 9  notes may then be transcribed out of the presence of

10  the witness; and that proof of the official

11  character and qualifications of the notary is

12  expressly waived.

                     - - -
```

Page 5

```
 1               I N D E X

 2     Examination by:           Page

 3     Mr. Martins . . . . . . . .  6

 4     Mr. Hardin  . . . . . . . . 104

 5     Mr. Martins . . . . . . . . 132

 6     Mr. Hardin  . . . . . . . . 139

 7                   - - -

 8            E X H I B I T S

 9                              Page

10
11  Plaintiff's Exhibits 69 & 70 . . . . . . . . . .  12
    Plaintiff's Exhibit 71 . . . . . . . . . . . . .  29
12  Plaintiff's Exhibit 72 . . . . . . . . . . . . .  50
    Plaintiff's Exhibit 73 . . . . . . . . . . . . .  51
13  Plaintiff's Exhibit 74 . . . . . . . . . . . . .  56
    Plaintiff's Exhibit 75 . . . . . . . . . . . . .  66
14  Plaintiff's Exhibit 76 . . . . . . . . . . . . .  68
    Plaintiff's Exhibit 77 . . . . . . . . . . . . .  75
15  Plaintiff's Exhibit 77A  . . . . . . . . . . . .  77
    Plaintiff's Exhibit 78 . . . . . . . . . . . . .  92
16  Plaintiff's Exhibits 79 & 80 . . . . . . . . . . 137

17                   - - -
```

Case 1:01-cv-00769-SAS    Document 89-7    Filed 02/02/2004    Page 3 of 11

Owensby, et al. vs. City of Cincinnati
December 3, 2003
ROBERT B. HEILAND, JR.

Page 22

1  Q. All right.
2  A. And there was a police officer on each
3  side of him, there was a few people around. And one
4  of the officers asked if they could put him in my
5  cruiser.
6  Q. When that question was asked where was Mr.
7  Owensby?
8  A. Mr. Owensby was still on the ground or
9  they were in the process of picking him up.
10 Q. Picking him up? Okay. Go ahead.
11 A. I said, "Sure." They picked him up, one
12 on each side, under each arm, and brought him to my
13 cruiser. I opened the rear passenger door and they
14 placed Mr. Owensby in the back of my car.
15 Q. Let me show you what's previously been
16 marked as Exhibit 9. Do you recall whether or not
17 that is a photograph of the car that the officers
18 and Mr. Owensby were near when you pulled in?
19 A. I don't recall what type of car it was. I
20 can't see the background in the picture.
21 Q. As perspective goes, this is taken from
22 the entrance of the convenience store looking out.
23 A. Having said that, then they would have
24 been at the rear of this car.

Page 23

1  Q. Did you watch them place Mr. Owensby in
2  the back seat of the car, of the Golf Manor car?
3  A. I opened the door, took a step away, and
4  they were having trouble placing him in the back of
5  the car. No. I didn't watch them place him all the
6  way in the car.
7  Q. What did you do as they were placing him?
8  Where was your attention directed as they were
9  placing him in the car?
10 A. Looking out the rest of the parking lot.
11 At one point I walked away and went over to another
12 Golf Manor officer, Officer Campbell.
13 Q. Was there a point in time where you
14 returned to your cruiser?
15 A. Yes.
16 Q. So you walk away toward Officer Campbell,
17 and then some time goes by and you and Officer
18 Campbell, or at least you, return to your cruiser,
19 right?
20 A. Correct.
21 Q. Do you have an estimate of how much time
22 went by in that interval?
23 A. I don't recall.
24 Q. When you returned to your cruiser was

Page 24

1  Officer Campbell with you?
2  A. I don't recall.
3  Q. When you returned to the cruiser were the
4  doors, the back doors, closed?
5  A. Yes, they were.
6  Q. Did you check on Mr. Owensby?
7     MR. WEISENFELDER: Objection.
8     Go ahead.
9  A. No.
10 Q. No?
11 A. No.
12 Q. Did you ever look in to check on Mr.
13 Owensby?
14    MR. WEISENFELDER: Objection.
15    Go ahead.
16 A. Yes.
17 Q. When?
18 A. I don't know how long it was, but I did
19 look in the back of the cruiser.
20 Q. When you did look in -- let me back up.
21    The cruiser was situated near a gas
22 island, correct?
23 A. Correct.
24 Q. The gas island has those halogen lights on

Page 25

1  it, correct?
2  A. I don't recall.
3  Q. In any event, there was sufficient light
4  from the gas island and from the convenience store
5  to see Mr. Owensby in the back seat of the car,
6  right?
7  A. The scene was well lit.
8  Q. When you did look in, what did you see?
9  A. Mr. Owensby was handcuffed and laying in
10 the back of the cruiser.
11 Q. How was he situated in the back seat?
12 Sitting up, laying down?
13 A. He was laying down.
14 Q. Where was his head?
15 A. His head was facing the passenger's side
16 of the car.
17 Q. When you looked in were you on the
18 passenger's side of the car?
19 A. Correction. His head was facing the
20 driver's side of the car. When I looked in I was on
21 the passenger's side.
22 Q. So you were looking in through the
23 passenger's side rear window?
24 A. Correct.

Case 1:01-cv-00769-SAS    Document 89-7    Filed 02/02/2004    Page 4 of 11

Owensby, et al. vs. City of Cincinnati
December 3, 2003

ROBERT B. HEILAND, JR.

Page 42

1  Q. Do you know whether or not any lawyers
2  showed up on the scene?
3  A. I don't know. The news was across the
4  street.
5  Q. The what?
6  A. The news.
7  Q. What is the news?
8  A. The news. The media.
9  Q. Oh. Okay.
10  A. Yeah.
11     MR. WEISENFELDER: Wait until there's a
12  question.
13     THE WITNESS: Sorry.
14  Q. Am I correct in understanding that when
15  you initially pulled into the Sunoco station you saw
16  two Cincinnati Police Department uniformed officers
17  kneeling down over Mr. Owensby?
18  A. Correct.
19  Q. Were they kneeling on him or next to him?
20  A. From where I was standing I couldn't be
21  exact -- I couldn't say with certainty where their
22  knees were. It appeared that they were just next to
23  him, crouched down.
24  Q. As you got out of your car and circled

Page 43

1  around to the right of the -- to the front of the
2  car and the Huntington Meadows security officer
3  waved you down, at this point in time the officers
4  were picking up Mr. Owensby off of the ground; is
5  that right?
6  A. Correct.
7  Q. When he was picked up off the ground you
8  believe he was handcuffed; is that right?
9  A. I believe he was.
10  Q. That's because of the position of his
11  arms?
12  A. Correct.
13  Q. The officers that picked him up, were
14  those officers Jorg and Caton?
15  A. Yes.
16  Q. It was those two officers who escorted Mr.
17  Owensby towards your car?
18  A. Correct.
19  Q. Do you recall which officer asked you for
20  permission to place Mr. Owensby in your car?
21  A. I do not know.
22  Q. Do you know whether or not it was one of
23  those two, that is Caton or Jorg?
24  A. I do not know.

Page 44

1  Q. As they were coming toward you bringing
2  Mr. Owensby, were you facing them?
3  A. Yes.
4  Q. So you were also facing Mr. Owensby,
5  right?
6  A. Yes.
7  Q. Could you see his face?
8  A. Yes.
9  Q. What did his face look like?
10  A. It appeared that he had a little bit of
11  blood on his face, and I don't recall that there was
12  any facial expression or anything like that.
13  Q. Did he have any blood on his forehead?
14  A. I don't recall.
15  Q. Were his eyes opened or closed?
16  A. I don't know.
17  Q. Was his head erect or down or back?
18  A. It was down a little bit.
19  Q. Did you hear him say anything as they were
20  bringing him toward your cruiser?
21  A. No.
22  Q. Did you see him move in any fashion as
23  they were bringing him towards your cruiser?
24  A. No.

Page 45

1  Q. I mean, obviously he's moving, because
2  they're bringing him, but I mean, in terms of
3  actively resisting, trying to pull away from them or
4  kicking at them, anything like that?
5  A. I didn't see him kick. No major
6  movements. It appeared that they were struggling to
7  get him to the cruiser.
8  Q. As you sit here today, you don't recall
9  whether or not the struggling was because they were
10  carrying somebody who was unconscious or whether or
11  not it was resistance of some sort?
12  A. I do not know.
13  Q. Would you describe for me how they were
14  bringing him to the cruiser, that is their position
15  in relation to Mr. Owensby.
16  A. One officer on each side with their arm
17  through his (indicating).
18  Q. So his arms are handcuffed behind his
19  back?
20  A. Handcuffed.
21  Q. They are on each side? Who is on Mr.
22  Owensby's right as you're looking, your left? Do
23  you understand what I'm saying?
24  A. No.

Case 1:01-cv-00769-SAS   Document 89-7   Filed 02/02/2004   Page 5 of 11

Owensby, et al. vs. City of Cincinnati
December 3, 2003

ROBERT B. HEILAND, JR.

Page 66

1 of this car being parked next to your car?
2   A.  No.
3   Q.  At this point in time do you know whether
4 or not you had already had your conversation with
5 Officer Brazile?
6   A.  I do not.
7   Q.  We're at 4 minutes 30 seconds. Do you
8 know whether or not at this point in time you had
9 checked on Mr. Owensby, that is looked in on him?
10  A.  I do not know.
11  Q.  4 minutes, 33 seconds. There is a car in
12 the middle of the screen. That would be Officer
13 Campbell's Golf Manor cruiser?
14  A.  Correct.
15      (Discussion off the record.)
16      (Plaintiff's Exhibit 75 was marked for identi-
17      fication.)
18  Q.  Let me show you, sir, Exhibit 75, which I
19 believe is a transcript of your testimony during
20 Officer Caton's trial. If you'd just take a look at
21 that and tell me whether or not that seems to be the
22 case.
23  A.  Yes, it does.
24  Q.  What's your best estimate of, from the

Page 67

1 time you got the officer needs assistance call, how
2 much time it took to get to the scene, to the
3 convenience store parking lot?
4   A.  30 seconds to a minute maybe.
5   Q.  Does the police station where you were
6 located, does it have a life squad or an EMT unit
7 there?
8   A.  Yes.
9   Q.  So for them to get to that same location
10 would have taken approximately the same amount of
11 time?
12  A.  I don't know how long it would have taken
13 them.
14  Q.  Well, it took you between 30 seconds and a
15 minute?
16  A.  Correct.
17  Q.  Is there any reason to believe that it
18 would have taken them a longer amount of time?
19      MR. WEISENFELDER: Objection.
20      Go ahead.
21  A.  If they had to -- I don't know how life
22 squad and fire departments work, if they have to get
23 dressed and get down to the car and take off. I
24 don't know the procedures.

Page 68

1      (Plaintiff's Exhibit 76 was marked for identi-
2      fication.)
3   Q.  Let me show you what's marked as
4 Exhibit 76. Exhibit 76 is the oath that you took in
5 February 1, 2000 when you became a police officer
6 for the Village of Golf Manor, correct?
7   A.  Correct.
8   Q.  Before November 7, 2000 did you have any
9 experience with an arrest being made by another
10 police department and them placing their prisoner in
11 a Golf Manor cruiser?
12  A.  I don't know.
13  Q.  Since November 7, 2000 have you had any
14 experience with a police department, other than Golf
15 Manor, making an arrest and placing the prisoner in
16 a Golf Manor cruiser?
17      MR. HARDIN: Objection.
18  A.  No.
19  Q.  Do you know if on November 7, 2000 there
20 was a policy or some guidance in place that
21 addressed the situation that arose that evening?
22      MR. WEISENFELDER: I'm going to object as
23      to the vague question in terms of situation.
24      MR. MARTINS: Yes. Let me rephrase.

Page 69

1   Q.  Do you know whether or not Golf Manor had
2 a policy or guidance for its officers on November 7,
3 2000 to address the situation where a Golf Manor
4 officer is asked to give permission to place a
5 person who has been arrested by another police
6 department in a Golf Manor cruiser?
7       MR. WEISENFELDER: Objection.
8       Go ahead, you can answer.
9   A.  I knew at that time, based on working,
10 training, that we could go over to other departments
11 and assist them with whatever they needed.
12  Q.  I don't mean to cut you off.
13  A.  That's okay.
14  Q.  That was this mutual aid agreement that
15 was signed by the various police departments in the
16 greater Cincinnati area?
17  A.  Correct.
18  Q.  Other than knowing that you could assist
19 other police departments, do you know whether or not
20 there was any policy or guidance or custom in place
21 at Golf Manor to address what an officer's duties
22 and responsibilities were where another police
23 department asked him to place their prisoner in his
24 car?

Owensby, et al. vs. City of Cincinnati
December 3, 2003
ROBERT B. HEILAND, JR.

Case 1:01-cv-00769-SAS    Document 89-7    Filed 02/02/2004    Page 6 of 11

Page 70

1  A. When we would respond to a scene to assist
2  another department we would be under their command,
3  no matter what the rank. If you pull up on the
4  scene you assist them in how they need you to
5  assist.
6     Q. Did you have an understanding as to
7  whether or not you would, in this situation,
8  November 7, 2000, when you responded to the Sunoco
9  station, did you understand that you were assisting
10 the Cincinnati Police Department?
11    A. Yes. The assistance call came out.
12 That's why I was there.
13    Q. In responding to this assistance call, did
14 you understand that you would be subject to the
15 rules, policies, and customs of the Cincinnati
16 Police Department or the Golf Manor Police
17 Department?
18    A. My understanding was I would be there at
19 the scene to assist them how they needed me to.
20    Q. But what rules governed your conduct? Was
21 it Golf Manor or was it Cincinnati Police
22 Department?
23        MR. WEISENFELDER: Objection.
24        Go ahead.

Page 71

1     Q. If you know.
2     A. I don't know.
3     Q. Do you recall receiving any instruction or
4  guidance concerning what rules a Golf Manor officer
5  had to follow when he was in this situation of
6  assisting another police department?
7     A. Through working with other officers in
8  field training and going to other scenes and other
9  departments, I just understood that we were under
10 their direction for as long as they needed
11 assistance and that was it.
12    Q. Did you have any understanding that you
13 would be bound -- or whether or not you would be
14 bound by the policies, rules, and regulations of the
15 Cincinnati Police Department if you were assisting
16 the Cincinnati Police Department?
17    A. I didn't know.
18    Q. You didn't know?
19    A. I didn't -- at that time I don't -- I
20 don't know.
21    Q. And as I take it at that time you had
22 received no instruction on whether or not you were
23 bound by, say in this case, Cincinnati's rules and
24 regulations or continued to be bound by Golf Manor's

Page 72

1  rules and regulations; is that correct?
2        MR. WEISENFELDER: Objection as to form.
3        If you can answer that, go ahead.
4     A. I can't answer it.
5     Q. My question is just whether or not you had
6  any instruction on November 7th as to which
7  department's rules and regulations you were to
8  follow when you were assisting another police
9  department.
10       MR. WEISENFELDER: Objection.
11    Q. The question is just whether or not you
12 had any instruction.
13    A. No.
14    Q. As of November 7, 2000, did you have any
15 understanding as to whether you had any
16 responsibilities for the safety of a prisoner who
17 was placed in your cruiser?
18       MR. WEISENFELDER: I'm going to object
19       again as to the form.
20       Go ahead.
21    A. The question again, please?
22    Q. As of November 7, 2000, did you have any
23 understanding of your responsibilities for the
24 safety of a prisoner who is arrested by another

Page 73

1  police force but placed in your cruiser?
2        MR. WEISENFELDER: Objection.
3        Go ahead.
4     A. My understanding at that time is I would
5  be responsible for my prisoners, anybody that was in
6  my custody. If somebody is not my prisoner, not in
7  my custody, then on the assistance call if somebody
8  puts their prisoner in the back of my car, they
9  asked to put them in the back of my car and I'm
10 there for assistance. It's their prisoner and it's
11 in their custody. So it's their responsibility.
12    Q. Did you have any understanding that by
13 accepting the prisoner and placing him in the back
14 seat of the Golf Manor cruiser that the prisoner was
15 now in your custody?
16       MR. WEISENFELDER: Objection as to the
17       word "accepting."
18       Go ahead and answer.
19    A. No.
20    Q. Did you receive any training as to the
21 distinction we've just been talking about, that
22 whether or not a prisoner placed in a Golf Manor car
23 from another jurisdiction, as to who had custody of
24 the prisoner?

Case 1:01-cv-00769-SAS    Document 89-7    Filed 02/02/2004    Page 7 of 11

Owensby, et al. vs. City of Cincinnati
December 3, 2003
ROBERT B. HEILAND, JR.

Page 74

1  A. From going to other calls and seeing it
2  done before, the prisoner's always the arresting
3  officer's or the agency's jurisdiction where you're
4  at.
5  Q. You had had this arise in the past?
6  A. I have seen it done on other calls.
7  Q. Before November 7, 2000?
8  A. I don't recall exact dates, but, yeah.
9  Q. But before the night of November 7, 2000;
10 is that right?
11 A. Yes.
12 Q. Did you feel that you had any
13 responsibility for the well-being of Mr. Owensby?
14 A. No.
15     MR. WEISENFELDER: Objection.
16     Go ahead.
17 Q. Regardless of who is technically
18 responsible for the well-being of a prisoner, if you
19 know that a prisoner is injured and needs medical
20 attention, is it your understanding that you have a
21 duty to provide medical attention?
22 A. Yes.
23 Q. You knew that this person, Mr. Owensby,
24 had blood around his nose and mouth; is that right?

Page 75

1  A. Yes.
2  Q. Did you take any steps to administer any
3  first aid for the blood around the nose and mouth?
4      MR. WEISENFELDER: Objection.
5      Go ahead.
6  A. No.
7  Q. Had you done so, do you think you would
8  have been in a better position to determine whether
9  or not Mr. Owensby was conscious or unconscious at
10 the time he was placed in your vehicle?
11     MR. WEISENFELDER: Objection.
12     Go ahead.
13 A. I don't know.
14 Q. I know you said that you don't recall what
15 Officer Brazile told you, but do you recall whether
16 or not you took any action in response to what
17 Officer Brazile told you?
18 A. I don't recall.
19         (Plaintiff's Exhibit 77
           was marked for identi-
20         fication.)
21 Q. Let me show you a portion of the Golf
22 Manor manual, marked as Exhibit 77. Exhibit 77 is
23 the Golf Manor manual provision 6-07 concerning
24 prisoner transportation; is that right?

Page 76

1  A. That's correct.
2  Q. That's one of the sections of the Golf
3  Manor manual that you reviewed in preparation for
4  your deposition today?
5  A. That's correct.
6  Q. Did you select out the sections to review
7  today or did someone else select them out for you?
8  The sections of the manual.
9  A. Did I select these today?
10 Q. No, no. When you were getting ready for
11 your deposition, for today's deposition, you
12 reviewed various sections of the Golf Manor manual.
13 My question is did you select out those provisions
14 to look at or did someone else select them out for
15 you?
16     MR. WEISENFELDER: I'm going to object. I
17     think your invading the attorney-client
18     privilege now, to the extent that the attorney
19     may have been present when he was preparing for
20     the deposition, and what he may have been
21     instructed to review by an attorney I believe
22     falls within that.
23 Q. The only question I want to know is
24 whether or not you selected the sections, either a

Page 77

1  yes or no, not as to any communication with any
2  attorney.
3      MR. WEISENFELDER: You can answer.
4  A. No, I did not select the sections.
5  Q. In Exhibit 77, if you go to page 4 you
6  will see that it is blank. I have what I believe is
7  page 4 based on what counsel has provided.
8      MR. WEISENFELDER: Counsel will represent
9      that when responding to request for production
10     of documents approximately a year ago, that
11     apparently in copying what was believed to be a
12     responsive portion of the manual, page 4
13     apparently was blacked out, not intentionally.
14         (Plaintiff's Exhibit
           77A was marked for
15         identi- fication.)
16 Q. So I'm going to mark page 4 with
17 Exhibit -- as 77A. I want to direct your attention
18 to section II. A of the manual, which is on the
19 first page of Exhibit 77.
20     The second sentence of II. A. says,
21 "Therefore, it is the policy of this department that
22 EVERY prisoner transported in a police vehicle shall
23 be searched and handcuffed by the transporting
24 officer prior to being transported, unless

Case 1:01-cv-00769-SAS    Document 89-7    Filed 02/02/2004    Page 8 of 11
Owensby, et al. vs. City of Cincinnati                              ROBERT B. HEILAND, JR.
December 3, 2003

Page 78

1 specifically exempted under provisions of this
2 procedure." Do you see that?
3    A. I do.
4    Q. Do you see that the word "EVERY" is
5 capitalized?
6    A. Yes.
7    Q. Neither you nor Officer Campbell searched
8 Mr. Owensby on the night of November 7, 2000; is
9 that right?
10    A. That's correct.
11    Q. Had you searched Mr. Owensby do you
12 believe that you would have been in a better
13 position to discover whether or not at a minimum he
14 was conscious or unconscious at the time that he was
15 placed in the vehicle?
16        MR. WEISENFELDER: Objection.
17        Go ahead.
18    A. Yes. We didn't search him because we
19 weren't going to transport him.
20    Q. If you had determined that he was
21 unconscious, regardless of whether or not he was in
22 your custody, would you have administered first aid
23 to him?
24    A. Yes. Or let the city --

Page 79

1    Q. Or called for --
2    A. -- let the city officers, the arresting
3 officers, know.
4    Q. None of that was done, correct?
5        MR. WEISENFELDER: Objection.
6        Go ahead.
7    A. Correct.
8    Q. Am I correct in understanding that your
9 reason as to why none of that was done was because
10 you were not going to be transporting Mr. Owensby?
11    A. Correct.
12    Q. Have there been situations where Golf
13 Manor has responded to a scene, that more than one
14 Golf Manor car has responded to a scene, and a Golf
15 Manor prisoner was placed in one car and then when
16 it came time to transport the prisoner, the prisoner
17 was moved to another Golf Manor car?
18        MR. WEISENFELDER: Objection.
19        Go ahead.
20    A. I'm sure the situation has a --
21        MR. WEISENFELDER: The question is do you
22    know of one?
23    A. If there's two police -- two Golf Manor
24 cruisers there and there's only one prisoner, would

Page 80

1 he be transported by another agency?
2    Q. No, no. My question is can you recall a
3 situation where Golf Manor made an arrest and there
4 was more than one Golf Manor car there at the scene.
5 Okay?
6    A. (Nodding head.)
7    Q. The prisoner, the Golf Manor prisoner, is
8 taken and placed in a Golf Manor car, but when it
9 comes time to transport the prisoner, for some
10 reason the prisoner is moved to another Golf Manor
11 car. Maybe the car that he was originally placed in
12 has another call to go to or something, so he's
13 taken out and moved to another car to be
14 transported. Do you recall any such situations?
15    A. I don't recall.
16    Q. Based on your training, if that happened,
17 would Golf Manor search, be under an obligation to
18 search the prisoner when he was being placed in the
19 first car?
20        MR. WEISENFELDER: Objection. Calls for
21    speculation.
22        Go ahead. You can answer.
23    A. I don't understand the question.
24    Q. A person is drunk and disorderly. Three

Page 81

1 Golf Manor cars arrive on the scene in response.
2    A. Okay.
3    Q. The person is arrested and is placed in
4 the first Golf Manor car.
5    A. Okay.
6    Q. In the back seat. He's handcuffed and
7 placed in the back seat. As it turns out, the
8 officer that's driving the first car receives a call
9 and has to go somewhere else. Okay?
10    A. (Nodding head.)
11    Q. So the person is taken out of the back
12 seat of the car and moved into the second Golf Manor
13 car for transport. Understood?
14    A. Uh-huh.
15        MR. WEISENFELDER: Yes?
16    A. Yes.
17    Q. In that situation, when the arrestee is
18 placed in the first Golf Manor car, is it your
19 understanding that per the Golf Manor manual that
20 arrestee has to be searched?
21    A. Before being placed in the first Golf
22 Manor car?
23    Q. Correct.
24    A. Yes.

Case 1:01-cv-00769-SAS   Document 89-7   Filed 02/02/2004   Page 9 of 11

Owensby, et al. vs. City of Cincinnati
December 3, 2003
ROBERT B. HEILAND, JR.

Page 86

1  A. I said, "Sure."
2  Q. "Sure." Did anyone say to you words to
3  the effect, "We're going to transport him later"?
4  A. No.
5  Q. Go to page 6, please. Section II. E.,
6  first paragraph says, "Any prisoner who is sick or
7  injured shall be examined by life squad personnel
8  and offered treatment for their injury or illness
9  prior to being transported to any jail or detention
10 facility." See that?
11 A. Yes, sir.
12 Q. On November 7, 2000 did you understand
13 that to be the policy and requirements of Golf
14 Manor?
15 A. Yes.
16 Q. Did you make any attempt to determine
17 whether or not Mr. Owensby was injured, other than
18 seeing the blood around his nose and mouth?
19     MR. WEISENFELDER: Objection.
20     Go ahead.
21 A. No.
22 Q. I take it you took no steps to ensure that
23 he was examined by life squad personnel, correct?
24     MR. WEISENFELDER: Objection.

Page 87

1      Go ahead.
2  A. Correct.
3  Q. The only life squad personnel involved
4  would have been when Sergeant Watts called for
5  medical assistance, correct?
6      MR. HARDIN: Object to the form of the
7      question.
8      MR. WEISENFELDER: Go ahead.
9  A. Correct.
10 Q. You never offered treatment for Mr.
11 Owensby's injuries on the night of November 7, 2000,
12 correct?
13     MR. WEISENFELDER: Objection.
14     Go ahead.
15 A. Correct.
16 Q. Had you attempted to ask him, ask Mr.
17 Owensby, whether or not he wanted treatment for his
18 injuries, the blood that you saw around the nose and
19 mouth, you would have been able to determine whether
20 or not he was conscious or unconscious, correct?
21     MR. WEISENFELDER: Objection.
22     Go ahead.
23 A. Correct.
24 Q. Did you know whether or not Mr. Owensby

Page 88

1  was Maced?
2  A. I did not know.
3  Q. Did you smell Mace when you got there?
4  A. I did not.
5  Q. Did you see any police officers or other
6  individuals coughing or reacting to Mace?
7  A. Not that I recall.
8  Q. Have you used Mace?
9  A. Yes.
10 Q. Have you been Maced?
11 A. Yes.
12 Q. Based on your experience, what is the
13 reaction to Mace?
14 A. Based on my experience, it's rather
15 unpleasant. It causes you to sneeze or your mucus
16 membranes to excrete.
17 Q. Does it make breathing difficult?
18 A. To me personally, it didn't -- it wasn't
19 tough for me to breathe when I was Maced. I can't
20 speak for other people. I have heard that, but it
21 wasn't for me.
22 Q. Over the radio did you hear any report
23 that Mr. Owensby had been Maced?
24 A. No.

Page 89

1  Q. Paragraph E. 3. on page 6. It says, "If
2  necessary, the Golf Manor Life Squad may be called
3  to provide an ambulance for transportation to a
4  medical facility." In this situation the Golf Manor
5  life squad was never called, correct?
6      MR. WEISENFELDER: Objection.
7      Go ahead.
8  A. Correct.
9  Q. At E. 5. it says, "Unconscious prisoners
10 shall not be transported in a police vehicle, but
11 shall be taken to a hospital or medical facility by
12 ambulance." Do you see that?
13 A. Yes.
14 Q. Again, there was no attempt by you or
15 anyone on behalf of Golf Manor to determine whether
16 or not the person being placed in your vehicle was
17 conscious or unconscious, correct?
18     MR. WEISENFELDER: Objection.
19     Go ahead.
20 A. Correct.
21 Q. In fact, based on what you observed, your
22 observations were consistent with someone who was
23 unconscious, correct?
24     MR. WEISENFELDER: Objection.

Case 1:01-cv-00769-SAS    Document 89-7    Filed 02/02/2004    Page 10 of 11

Owensby, et al. vs. City of Cincinnati
December 3, 2003
ROBERT B. HEILAND, JR.

Page 90

1  Go ahead.
2  A. I didn't know if he was conscious or
3  unconscious.
4  Q. Well, you heard no sounds from the
5  individual at any time, correct, from Mr. Owensby?
6  A. Correct.
7  Q. You saw no movement from him at any time,
8  correct?
9  A. Correct.
10 Q. As of November 7, 2000, had you had any
11 training from Golf Manor as to whether or not you
12 should make a determination of whether a prisoner is
13 conscious or unconscious before that prisoner is
14 placed in your vehicle when you are in a situation
15 of assisting another police department?
16 A. No.
17 Q. Had you received any training on that
18 subject?
19 A. No.
20 Q. As you sit here today, have you received
21 any training on that subject?
22     MR. WEISENFELDER: Objection.
23     Go ahead.
24 A. No.

Page 91

1  Q. Based on your understanding of the rules
2  and regulations, policies of Golf Manor, if Officer
3  Campbell had made an arrest and the subject was
4  unconscious, would you believe that it would be okay
5  for Officer Campbell to place the subject in your
6  car, even though he was unconscious?
7      MR. WEISENFELDER: Objection.
8      Go ahead.
9  A. No.
10 Q. Am I correct in understanding that if the
11 subject is unconscious the policy is that he should
12 not be placed in any car and that an ambulance
13 should be called?
14     MR. WEISENFELDER: Objection.
15     Go ahead.
16 A. Correct.
17 Q. In addition to observing that Mr. Owensby
18 made no sounds and made no motion that evening, you
19 understood when you arrived on the scene that there
20 had been some sort of struggle in the arrest,
21 correct?
22 A. It appeared that there had been a
23 struggle, yes.
24 Q. You base that not only on the call for

Page 92

1  assistance, but when you arrived the officers were
2  disheveled and were breathing heavily, correct?
3  A. Correct.
4  Q. Again, in contrast to that you saw Mr.
5  Owensby was not breathing heavily, correct?
6  A. I don't recall.
7  Q. You did not notice that he was breathing
8  heavily?
9  A. I did not notice, correct.
10       (Plaintiff's Exhibit 78
11       was marked for identi-
           fication.)
12 Q. Let me show you Exhibit 78, a document
13 that we received yesterday. This is the mutual aid
14 agreement between Golf Manor and other police
15 departments in the greater Cincinnati area and
16 Cincinnati Police Department?
17 A. Correct.
18 Q. Have you in the course of performing your
19 duties at Golf Manor had the opportunity to review
20 this mutual aid agreement?
21 A. I have.
22 Q. Have you had any training at Golf Manor
23 concerning how to operate under the mutual aid
24 agreement?

Page 93

1      MR. WEISENFELDER: Objection as to what
2      he's already testified concerning his
3      understanding from other officers about the
4      agreement.
5  Q. I'm asking about formal training from Golf
6  Manor.
7  A. What do you mean by formal training?
8  Q. A class.
9  A. No.
10 Q. Have there been any directives or memos
11 given to you concerning how a Golf Manor officer is
12 to carry out the mutual aid agreement?
13 A. Not that I'm aware of.
14 Q. Have any superiors at Golf Manor explained
15 to you how an officer should behave in carrying out
16 the mutual aid agreement?
17 A. Not that I recall.
18 Q. Other than reading the mutual aid
19 agreement, which you said you did, have you received
20 any guidance from Golf Manor on how the terms of the
21 agreement should be carried out, what your
22 obligations are, what your duties are?
23 A. From working on the road with an FTO and
24 responding to other agencies, it's my understanding

# AFFIDAVIT

- - -

STATE OF OHIO      :
                   :  SS
COUNTY OF HAMILTON :

I, Wendy L. Welsh, Notary Public in and for the State of Ohio, do hereby state that the transcript of the deposition of ROBERT B. HEILAND, JR., deponent herein, having been submitted to said deponent for review and signature, has not been signed within the thirty (30) day period allowed under the Federal Rules; said deposition to now have the same force and effect as though signed.

_____
Wendy L. Welsh, Court Reporter

Sworn to before me this 27th day of January, 2004.

_____
Thomas M. Blasing
Notary Public - State of Ohio

My commission expires:
May 4, 2004.