Case 1:01-cv-00769-SAS   Document 89-9   Filed 02/02/2004   Page 1 of 16

Owensby, et al. vs. City of Cincinnati              DAVID WILLIAM HUNTER, JR.
November 6, 2003

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - - - -

ESTATE OF ROGER D.                :
OWENSBY JR., et al.,              :
                                  :
        Plaintiffs,               :   Case No. 01-CV-769
vs.                               :   (Judge S. A. Spiegel)
                                  :
CITY OF CINCINNATI,               :        VOLUME I
et al.,                           :
                                  :
        Defendants.               :

- - - - - - - - - - - - - - - -

Videotaped deposition of DAVID WILLIAM HUNTER JR., a witness herein, called by the plaintiffs for cross-examination, pursuant to the Federal Rules of Civil Procedure, taken before me, Wendy Davies Welsh, a Registered Diplomate Reporter and Notary Public in and for the State of Ohio, at the offices of Helmer, Martins & Morgan Co. LPA, 1900 Fourth & Walnut Centre, 105 East Fourth Street, Cincinnati, Ohio, on Thursday, November 6, 2003, at 2:43 p.m.

Case 1:01-cv-00769-SAS    Document 89-9    Filed 02/02/2004    Page 2 of 16

Owensby, et al. vs. City of Cincinnati  
November 6, 2003                                              DAVID WILLIAM HUNTER, JR.

Page 2

```
 1  APPEARANCES:
 2      On behalf of the Plaintiffs:
 3          Paul B. Martins, Esq.
            Don Stiens, Esq.
 4          Frederick M. Morgan Jr., Esq.
            Helmer, Martins & Morgan Co. LPA
 5          Suite 1900, Fourth & Walnut Centre
            105 East Fourth Street
 6          Cincinnati, Ohio 45202
            Phone: (513) 421-2400
 7
            John J. Helbling, Esq.
 8          The Helbling Law Firm, L.L.C.
            3672 Springdale Road
 9          Cincinnati, Ohio 45251
            Phone: (513) 923-9740
10
       On behalf of the Defendants City of Golf Manor,
11  Stephen Tilley, Roby Heiland and Chris
    Campbell:
12
            Wilson G. Weisenfelder Jr., Esq..
13          Rendigs, Fry, Kiely & Dennis
            900 Fourth & Vine Tower
14          One West Fourth Street
            Cincinnati, Ohio 45202-3688
15          Phone: (513) 381-9200
16     On behalf of the Defendants City of Cincinnati,
    Darren Sellers, Jason Hodge:
17
            Geri Hernandez Geiler, Esq.
18          Assistant City Solicitor
                       and
19          Julie F. Bissinger, Esq.
            Chief Counsel
20          Department of Law
            Room 214, City Hall
21          801 Plum Street
            Cincinnati, Ohio 45202
22          Phone: (513) 352-3346
23
24
```

Page 3

```
 1  APPEARANCES (Continued):
 2      On behalf of the Defendants Robert B. Jorg,
    Patrick Caton, Jason Hodge, Victor Spellen and
 3  Darren Sellers:
 4          Donald E. Hardin, Esq.
            Hardin, Lefton, Lazarus & Marks, LLC
 5          915 Cincinnati Club Building
            30 Garfield Place
 6          Cincinnati, Ohio 45202
            Phone: (513) 721-7300
 7
       On behalf of the David William Hunter Jr.:
 8
            Jay Clark, Esq.
 9          114 East 8th Street
            Suite 400
10          Cincinnati, Ohio 45202
            Phone (513) 587-2887
11
    Also present:
12
    Richard W. Grubb, Videographer
13
    Lisa Damstrom, Law Clerk
14  Helmer, Martins & Morgan Co., L.P.A.
15  Mr. Roger Owensby
16  Mrs. Brenda Owensby
17
18              - - -
19
              S T I P U L A T I O N S
20
21     It is stipulated by and among counsel for the
22  respective parties that the deposition of DAVID
23  WILLIAM HUNTER JR., a witness herein, called by the
24  plaintiffs for cross-examination, pursuant to the
```

Page 4

```
 1  Federal Rules of Civil Procedure, may be taken at
 2  this time by the notary; that said deposition may be
 3  reduced to writing in stenotype by the notary, whose
 4  notes may then be transcribed out of the presence of
 5  the witness; and that proof of the official
 6  character and qualifications of the notary is
 7  expressly waived.
 8              - - -
 9
10              I N D E X
11  Examination by:                Page
12  Mr. Martins . . . . . . .        5
13              - - -
14
15              E X H I B I T S
16                                 Page
17
18  Deposition Exhibit 6A ...................  89
    Deposition Exhibit 54 ...................  29
19  Deposition Exhibit 55 ...................  43
    Deposition Exhibit 56 ...................  62
20  Deposition Exhibit 57 ...................  64
    Deposition Exhibit 58 ...................  67
21
22              - - -
23
24
```

Page 5

1    VIDEOGRAPHER: Time is 2:43 p.m. The date
2  is November the 6th. The year is 2003.
3    If you'd please swear the witness, ma'am.
4    DAVID WILLIAM HUNTER JR.
5  being by me first duly cautioned and sworn, deposes
6  and says as follows:
7    VIDEOGRAPHER: We're on the record, Mr.
8  Martins. This is videotape number 1, sir.
9    CROSS-EXAMINATION
10 BY MR. MARTINS:
11   Q. Sir, would you state for the record your
12 full name, please.
13   A. David William Hunter Jr.
14   Q. And your age?
15   A. 36.
16   Q. Date of birth?
17   A. 5/20/67.
18   Q. What is your height?
19   A. 5' 7."
20   Q. And on November 7th of 2000 what was your
21 weight?
22   A. Approximately 175.
23   Q. Have you ever had your deposition taken
24 before?

Case 1:01-cv-00769-SAS    Document 89-9    Filed 02/02/2004    Page 3 of 16

Owensby, et al. vs. City of Cincinnati  
November 6, 2003

DAVID WILLIAM HUNTER, JR.

Page 18

1 or division at that time, respond out if the suspect
2 complained of any injuries or if we observed any
3 injuries to the suspect.
4   Q. So if either the suspect complains of
5 injuries or if any of the officers observe any
6 injuries, they are to call the fire department?
7   A. Yes.
8   Q. And that was a policy that was in place on
9 November 7, 2000?
10   A. Yes.
11   Q. How did you learn about that policy?
12   A. The same way I learned about the
13 procedures far -- as far as use of force and use of
14 chemical irritant.
15   Q. And that was at the police academy?
16   A. Academy.
17   Q. And in-service training?
18   A. Yes.
19   Q. Do you know whether or not the other
20 officers that were with you on the evening of
21 November 7, 2000 had that same training?
22   A. Yes, they did.
23   Q. They did?
24   A. Yes.

Page 19

1   Q. There is a -- I want to read you a
2 sentence from Procedure 12.545, which is Use of
3 Force, and I want to ask you a question about it.
4 It says "Following any use of force resulting in the
5 citizen's injury, officers will ensure appropriate
6 first aid is rendered immediately once the incident
7 scene is stabilized." Do you recall seeing that in
8 the past?
9   A. Yes.
10   Q. And what I want to ask you about is the
11 last part of that sentence, "once the incident scene
12 is stabilized." Do you recall having any --
13 receiving any training concerning what that term,
14 "once the incident scene is stabilized," means?
15   A. Not specifically, no.
16   Q. Was there any policy or custom in the
17 police department as to what once the scene is --
18 the incident scene is stabilized meant?
19   A. Okay. When you say custom, I -- I take
20 that as what we would normally do. And once the
21 scene is stabilized and we're okay and all officers
22 are all right and we got everything under control,
23 that's -- that's what I perceive as being stabilized
24 then.

Page 20

1   Q. Was that your understanding on the night
2 of November 7, 2000 as to what once the scene is
3 stabilized meant?
4   A. Yes.
5   Q. Do you know if other officers shared that
6 same understanding that you've just voiced?
7     MR. HARDIN: Objection.
8   Q. You can answer.
9   A. I -- I don't know. I can't speak for
10 them.
11   Q. Once Mr. Owensby -- on the night of
12 November 7, 2000, once Mr. Owensby was handcuffed
13 and placed in the back seat of the Golf Manor
14 cruiser, in your opinion, was the scene stabilized?
15   A. Yes.
16   Q. Did you -- was there a Cincinnati policy
17 or custom in place on November 7, 2000 concerning
18 care, the type of care to be provided to a citizen
19 who has been subjected to a chemical irritant or
20 Mace?
21   A. Yes.
22   Q. What is your understanding of what the
23 policy or custom was for the Cincinnati Police
24 Department as to care for someone who's been Maced

Page 21

1 or subjected to a chemical irritant?
2   A. Make sure that they have fresh air and
3 provide a face wash if -- provide some type of face
4 wash if they wish to wash their face.
5   Q. To your knowledge, was that ever afforded
6 to Mr. Owensby on the night of November 7, 2000?
7   A. No.
8   Q. You did not see that?
9   A. No.
10   Q. Did anyone discuss, any one of the
11 officers, discuss providing that care to Mr. Owensby
12 on the night of November 7, 2000?
13   A. No.
14   Q. Do you know whether or not the City of
15 Cincinnati Police Department has a policy or a cus--
16 had a custom or policy in place on November 7,
17 2000 requiring that officers have a plan of action
18 among themselves before they go to effectuate a --
19 an arrest?
20   A. Yeah, we had a custom. I mean, that's
21 something that -- that's normally done. We discuss
22 how we are going to effect the arrest. But that's
23 normally done when we're going to a real high --
24 like a dangerous type run.

Case 1:01-cv-00769-SAS   Document 89-9   Filed 02/02/2004   Page 4 of 16

Owensby, et al. vs. City of Cincinnati
November 6, 2003
DAVID WILLIAM HUNTER, JR.

Page 22

1  Q. Did you receive any training on that?
2     (Julie F. Bissinger, Esq. entered the
3  deposition hearing room; Geri Hernandez Geiler,
4  Esq. left the deposition hearing room.)
5  A. On -- on discussing?
6  Q. Yeah. On -- on having a plan before
7  effectuating an arrest.
8  A. Nothing formal. I mean, this is just
9  something that, you know, you -- you learn on the
10 job from veteran officers.
11    MR. MARTINS: Let's go off the record for
12 a second.
13    VIDEOGRAPHER: Off the record.
14    (Discussion off the record.)
15    VIDEOGRAPHER: Back on the record, sir.
16 BY MR. MARTINS:
17 Q. Sir, before we took the pause we were
18 talking about this policy or custom concerning
19 having a plan of action when you're effectuating --
20 when officers are effectuating an arrest. You
21 indicated that that was -- there was nothing in
22 writing, that it was normally something done when
23 you're going to a high-risk situation; is that -- is
24 that fair?

Page 23

1  A. Well, I can't really say whether it's in
2  writing. It's -- it may be in a -- in a manual that
3  I may not have read, but when I say I haven't had
4  any formal training, I mean, it's not something that
5  I actually had a class on.
6  Q. All right. And you -- as I take it, then,
7  you do not recall ever seeing anything in writing
8  concerning having a plan before officers step in to
9  effectuate an arrest?
10 A. No.
11 Q. Is that right?
12 A. I don't -- I -- I don't recall being
13 there.
14 Q. On the evening of November 7, 2000, when
15 you, Officer Caton and Officer Jorg approached Mr.
16 Owensby as he started to leave the Sunoco
17 convenience store, did the three of you have a plan
18 of action agreed to among yourselves?
19 A. Nothing more than to go over there -- I
20 asked them to walk over with me to identify him, and
21 then once the identification was made, then we would
22 effect the arrest.
23 Q. And when you asked Jorg and Caton to walk
24 over with you, you were still over by Sam's Carry

Page 24

1  Out, right?
2  A. Yes.
3  Q. And what I'm asking is when you were at
4  the Sunoco station, standing outside looking in and
5  it was decided that the three of you would walk over
6  to the front door, was there any plan of action
7  agreed to between Officer Jorg, Caton and you as to
8  what the three of you were going to do?
9  A. No.
10 Q. Do you recall whether or not on
11 November 7, 2000 the Cincinnati Police Department
12 had any policy or custom in place concerning care
13 for an injured citizen who has been arrested by a
14 Cincinnati police officer but temporarily placed in
15 a vehicle belonging to another police department?
16 A. I wasn't familiar with that at all that
17 night.
18 Q. Had you ever received any training or
19 discussion by -- from supervisors or any guidance
20 concerning that situation?
21 A. The only guidance I guess you could call
22 it, just talking to other -- you know, other
23 officers, like veteran officers or -- or something
24 like that. I was under the impression whomever

Page 25

1  vehicle it was, they took responsibility for that
2  prisoner once you put him in the back seat.
3     I mean, that's -- when I'm pa-- when I'm
4  on patrol up -- even up until that night, any --
5  anytime I was on a run or involved in anything at
6  work, if somebody placed an individual in my car I
7  took responsibility for it.
8     Whether or not they had weapons, if a
9  person passed a prisoner off to me, even if they
10 checked them, say they patted them down, searched
11 them thoroughly before they go in my car, I pat them
12 down, I search them again, because I take
13 responsibility for that, for that individual as far
14 as for weapons or anything.
15    And if somebody set a person in my car,
16 same thing. I would make sure that that person is
17 coherent. I don't allow prisoners that I transport,
18 whether they be signal 5s, that's individuals that
19 have been drinking too much, intoxicated, I don't
20 allow them to lay across the back seat. They always
21 have to sit up, and I -- I always try to keep a
22 watch on them.
23 Q. Why not let them lay across the back seat?
24 A. Because I want to --

Case 1:01-cv-00769-SAS   Document 89-9   Filed 02/02/2004   Page 5 of 16
Owensby, et al. vs. City of Cincinnati
November 6, 2003
DAVID WILLIAM HUNTER, JR.

Page 26

1  Q. What's the danger of that?
2  A. I want to -- I want to know that they're
3  coherent, that while I'm transporting them I'm
4  getting them there, and they -- and that's it. I
5  don't want to be driving along and find out when I
6  get to the jail that, oh, that person had a little
7  bit too much to drink, he's alcohol-poisoned, and
8  then I got a problem.
9  Q. And was it your understanding also that
10 that responsibility for the person in the car also
11 extended to caring for, providing medical care if
12 that person needed medical care?
13 A. Yes.
14      MR. WEISENFELDER: Objection.
15 Q. You say you -- you understood this from
16 talking to other officers; is that right?
17 A. Well, just in talking to other officers.
18 Q. Okay.
19 A. Just something that was like discussed
20 like during -- during a period of time when we go
21 through our FTO-ship, our 12 weeks riding with a
22 field training officer, a lot of things you pick up
23 from veteran officers.
24 Q. And that was one of the things that was

Page 27

1  handed down to you by other officers?
2  A. Yes. Just between that -- that time where
3  you're trying to learn your way around, how things
4  are supposed to be done. Just like on-the-job
5  training.
6  Q. Did you receive any training -- strike
7  that.
8      Other than this word-of-mouth information
9  that you received concerning a prisoner or a person
10 placed in your car, did you receive any formal
11 training or see anything in writing concerning
12 responsibilities for a person arrested by a
13 Cincinnati police officer but placed in another
14 police department's vehicle?
15 A. No.
16 Q. What training, if any, did the Cincinnati
17 Police Department provide you concerning medical, I
18 guess medical care? I take it you had a CPR course?
19 A. Yes.
20 Q. Was that while you were in the -- in the
21 academy?
22 A. Yes.
23 Q. Did you have any other medical assistance
24 type courses that were provided to you by the police

Page 28

1  department?
2  A. No. Oh, wait. Stri-- I need to back up.
3  I was assigned to District 3.
4      I did. I had -- we were a pilot
5  district --
6  Q. Okay.
7  A. -- for --
8      MR. CLARK: Defibrillators?
9  A. -- the defibrillators, I'm sorry, and I
10 was trained on defibrillators.
11 Q. Was that before or after November 7, 2000?
12 A. I think that was before. Yeah, it was
13 before. I was in District 4 at the time of this
14 incident. I was in District 3 when --
15 Q. When you had the training?
16 A. When I had -- oh, give me a -- give me a
17 minute. I need to think about this for a second.
18     Hmm. I -- I think it was before. I
19 think. I'm not -- I can't be certain, because I --
20 I went back and forth. I was in District 3 and then
21 I left and I came back.
22 Q. Let me see if I can help you on that.
23 A. All right.
24     VIDEOGRAPHER: Sir, can I get you to slide

Page 29

1  your mike up a little bit, just --
2      THE WITNESS: Up?
3      VIDEOGRAPHER: Yes, up towards the knot on
4  your tie.
5      THE WITNESS: Okay.
6      VIDEOGRAPHER: You're awfully soft-spoken.
7  Close to your --
8      THE WITNESS: Thanks.
9      VIDEOGRAPHER: Sure.
10         (Deposition Exhibit 54
10         was marked for identi-
11         fication.)
12 Q. Let me hand you, sir, what is marked as
13 Exhibit 54. What I'm going to do in the course of
14 the deposition is hand you documents that are marked
15 as exhibits. If you'll just leaf through them, once
16 you've had a chance to familiarize yourself with the
17 document, then just look up at me and I'll know that
18 I can then ask you some questions.
19 A. Uh-huh.
20     (Discussion off the stenographic record.)
21 Q. Exhibit 54, sir, is at least part of your
22 personnel record; is that right?
23 A. Yes, sir.
24 Q. And you'll see on the bottom right-hand

Case 1:01-cv-00769-SAS   Document 89-9   Filed 02/02/2004   Page 6 of 16

Owensby, et al. vs. City of Cincinnati
November 6, 2003
DAVID WILLIAM HUNTER, JR.

Page 50

1 11:50 a.m. there's a course, Suspect Approaches,
2 taught by two people, Broering and Hoffbauer. Do
3 you recall this course?
4    A. Yes.
5    Q. What was covered in Suspect Approaches?
6    A. How to approach a suspect on a traffic
7 stop, how to approach a suspect on the street, the
8 contact-cover concept.
9    Q. I'm sorry. I missed that.
10   A. Contact-cover concept.
11   Q. Okay.
12   A. One officer is the contact person, he does
13 all the talking, and the other person is the cover
14 person.
15   Q. With respect to Mr. Owensby, was there a
16 contact-cover person or persons involved in that?
17   A. Yes. When we approached him, Officer Jorg
18 and Caton began immediately talking to him. I just
19 assumed the posi-- I -- I assumed the con-- the
20 cover. I assumed the cover.
21   Q. So --
22   A. Because I didn't want everybody talking,
23 focused, you know, on him and then nobody is
24 providing cover.

Page 51

1    Q. So Jorg and Caton were the contact and you
2 were the cover?
3    A. Yes. But, theoretically, it should just
4 be one contact person.
5    Q. Go to week 18, page Bates number 2047.
6 November 6, 1996, Wednesday, between 8:00 and
7 9:50 a.m., Straight Baton, taught by Specialist
8 Hood. Is that the PR-24?
9    A. Yes.
10   Q. On the evening of November 7, 2000 did you
11 have a cell phone with you?
12   A. Yes.
13   Q. And did you use the cell phone that
14 evening?
15   A. Yes.
16   Q. Who did you call?
17   A. My wife. Well, now ex-wife.
18   Q. Other than calling your --
19   A. Could I back up for a second. Are you
20 talking about before, after or during?
21   Q. From, say, 7:00 p.m. on that evening.
22   A. From 7:00 on?
23   Q. 7:00 on.
24   A. Yes. Uh-huh. Yes, I did.

Page 52

1    Q. Okay. And other than calling your wife,
2 did you call anyone else?
3    A. No.
4    Q. Do you know if Officer Caton had a cell
5 phone with him that evening?
6    A. I don't know.
7    Q. Do you know whether or not Officer Lawson
8 had a cell phone?
9    A. I don't know.
10   Q. How about Hodge?
11   A. Don't know.
12   Q. How about Sellers?
13   A. Don't know.
14   Q. How about Officer Jorg?
15   A. I don't know. Now, Sellers, I know he do
16 have a cell phone, because I had his number. But
17 whether he had it that night, don't know.
18   Q. Did you see -- in the time that you were
19 at the Sunoco station, did -- did you see any
20 officers using their cell phones that evening?
21   A. I don't remember seeing anybody use
22 theirs.
23   Q. How long did you remain at the Sunoco
24 station? Well, let me rephrase that. When did you

Page 53

1 leave the Sunoco station?
2    A. I don't know the exact time. I was up
3 there for a while. It seemed like forever, I mean,
4 you know.
5    Q. Do you know if it was before midnight or
6 after midnight?
7    A. I'm going to guess and say before
8 midnight, but not -- I mean, not too much before.
9    Q. All right. Before November 7, 2000 when
10 was the first time that you saw Roger Owensby?
11      Before November 7, 2000 when was the first
12 time you saw Roger Owensby?
13   A. As it pertained to this, I'll say
14 September.
15   Q. Had you seen him before September of 2000?
16   A. It's possible.
17   Q. Possible? Do you have a recollection of
18 it?
19   A. No.
20   Q. Okay. And I take it the reason you say
21 it's possible, because your family had some
22 connection with the Owensby family?
23   A. That's correct.
24   Q. All right. But you personally have no

Case 1:01-cv-00769-SAS   Document 89-9   Filed 02/02/2004   Page 7 of 16
Owensby, et al. vs. City of Cincinnati
November 6, 2003
DAVID WILLIAM HUNTER, JR.

Page 54

1 recollection of seeing Roger Owensby before
2 September of 2000?
3   A. N--
4   Q. Correct?
5   A. No. As far as what I just said.
6   Q. Right.
7   A. I know it's kind of confusing, but I'm
8 trying to answer as truthful as possible.
9   Q. Right. You have no recollection of seeing
10 Roger Owensby before September of 2000?
11   A. Right. Okay.
12   Q. Okay. Walk me through what happened in
13 September of 2000.
14   A. Me and Officer Jorg were working
15 plainclothes, old clothes, and we were doing an
16 investigation in front of the Sam's Drive Thru. It
17 was three to four individuals that we observed
18 making drug transactions. We wanted to stop those
19 individuals.
20       Officer Jorg stayed with -- with one or
21 two of the individuals and then two of the
22 individuals went across the street, across from
23 Sam's Drive Thru, across -- that would be Seymour,
24 in the direction of Huntington Meadows Apartment

Page 55

1 complex. So I responded across the street behind
2 them.
3       Another uniform car -- another uniform car
4 met me across the street, and that officer was
5 Officer Walker. I advised Officer Walker to go
6 around, because I wanted him to flank the two guys
7 we were trying to catch up to.
8       Because I could pretty much walk up to
9 them, because they probably wouldn't -- wouldn't
10 have taken me as being a police officer, but Officer
11 Walker was in uniform of the day.
12       After we had that discussion, I started in
13 one direction. Officer Walker started in another
14 direction. That's when Mr. Owensby alerted the
15 individuals that we were trying to catch up to to
16 apprehend that the police were coming and that we
17 were in the area. So they got away, because they
18 had a jump on us anyway, because -- and they're
19 already behind -- around the building.
20       So I walked up to Mr. Owensby and I put my
21 left hand on his shoulder. And I said, "What's up?"
22       And he replied, "What's up?"
23       And then I said, "You know, you can't be
24 doing what you just did."

Page 56

1       And he said, "What's that?" Or something
2 to that nature.
3       I said, "You can't be telling people" --
4 as I was saying this to him, I reached into my shirt
5 with my other hand. I was wearing my badge on a
6 chain around my neck. "You can't be telling --
7 you -- you can't be warning people that the -- the
8 police is here. That's -- and -- that's interfering
9 with an investi"--
10       As I was saying investigation or whatnot,
11 I flipped my badge out and it dropped down dangling
12 around my neck. When he saw my badge, he pushed me
13 off him, and I grabbed the back --
14       He had a hooded sweat shirt on. I grabbed
15 the back of his sweat shirt, and he tugged and
16 pulled and his sweat shirt ripped. And I was just
17 basically standing there holding his sweat shirt,
18 because he ripped right out of it.
19       At that point I -- I actually drew my
20 weapon. And I told him, "Don't move." You know,
21 "Freeze." He -- he kind of faked to the left, to
22 the right or whatever, and took off running. I had
23 no intention of shooting. I -- I didn't have the
24 authority to shoot him, and he probably knew that.

Page 57

1 That's why he probably took off running.
2       I gave chase. We ran through Huntington
3 Meadows, between the buildings, out onto Rhode
4 Island, into the intersection of Rhode Island and
5 Seymour.
6       Right there at the traffic light is a
7 crosswalk. There was a car stopped at a red light.
8 I was chasing Mr. Owensby around the car. We
9 actually went -- circled the car once or twice. And
10 then he proceeded toward -- in the direction -- on
11 Seymour in the direction of Reading Road down the
12 sidewalk.
13       At that point I was able to put my --
14 secure my weapon and I went to Mace, my chemical
15 spray. He was running down the sidewalk, and at
16 some point he tripped and fell on his own. And I
17 was trying to run up to him to Mace him, but I was
18 running and spraying at the same time. So some of
19 the chemical irritant sprayed back toward me.
20       He was on the ground. He managed to make
21 his way by using his hands and his feet, making his
22 way back to his feet. He then ran in between some
23 apartment buildings.
24       I continued to chase him. He ran into one

Case 1:01-cv-00769-SAS    Document 89-9    Filed 02/02/2004    Page 8 of 16

Owensby, et al. vs. City of Cincinnati
November 6, 2003
DAVID WILLIAM HUNTER, JR.

Page 58

1 of the apartment buildings, into the hall. And I
2 stopped. I called out exactly where I was at and
3 requested another car meet me there, so we can go
4 and check the hallway.
5    When another car -- when another officer
6 responded to my location, we went inside and we just
7 assumed that he went inside one of the apartment
8 buildings. Or he may have made it out the back, I
9 don't know, because I did not go -- I did not follow
10 him in.
11    Q. Anything else?
12    A. After that happened, went back to the two
13 guys that we did have under arrest. We questioned
14 the one individual if he knew the -- the guy --
15 the -- the first guys that we were actually after.
16    And then later on, and this kind of -- I
17 can't remember exactly how it came up, but we got
18 the nickname of LA from one of the suspects. Well,
19 actually, one of the people that we arrested. And
20 they -- they stated that that was the individual
21 that ran from me.
22    And -- and that's all we knew at that
23 particular time as far as any kind of
24 identification. His name is -- his -- his nickname

Page 59

1 was LA and he stayed or be up in the Huntington
2 Meadows area.
3    Q. Okay. The -- the people that were -- that
4 gave you the information of the nickname of LA was
5 one of the two people that Officer Jorg had
6 arrested?
7    A. I -- I think it was.
8    Q. You didn't arrest anyone?
9    A. No.
10    Q. Right?
11    A. Huh-uh.
12    Q. Did Officer Walker arrest anyone?
13    A. I can't really remember exactly. I -- I
14 just know that when I came back, there was two
15 people. And I don't know exactly who -- who
16 arrested them or, you know, but it was a total of
17 four that we wanted altogether.
18    Q. When you came back --
19    A. And two got away.
20    Q. I'm sorry.
21    A. I'm sorry.
22    Q. When you came back, the two people were
23 with Officer Jorg?
24    A. From -- yeah. From what I remember, yes.

Page 60

1    Q. Where was Officer Walker?
2    A. I don't know at that time.
3    Q. Okay.
4    A. I don't know.
5    Q. You and he had split up?
6    A. Yes.
7    Q. When was the next time you saw Officer
8 Walker?
9    A. Hmm. When I was standing outside the
10 apartment building where the suspect had ran into,
11 where I lost him.
12    Q. Where you were waiting for backup?
13    A. Yes.
14    Q. And when Officer Walker showed up, did he
15 have anyone in custody?
16    A. No, not when he showed up.
17    Q. Okay. At the time when Officer Walker
18 showed up, did -- did you and he then enter the
19 apartment building?
20    A. I remember going to the -- to the -- yeah,
21 just -- I mean, just like right through the door and
22 that's it. I mean, that was as far as we went -- I
23 went. I don't remember if he stepped in or not.
24    Q. Okay. But at that point is it fair to say

Page 61

1 that you determined that you weren't going to start
2 knocking on doors of apartments or you were -- you
3 were calling off your pursuit of this person?
4    A. Yes.
5    Q. Okay. And did you say something to that
6 effect to Officer Walker?
7    A. I told Officer Walker that "Don't worry
8 about it. We'll get him next time."
9    Q. At that point then you walked back to join
10 Officer Jorg?
11    A. Yes.
12    Q. Do you know what Officer Walker did? Did
13 he accompany you?
14    A. I don't recall.
15       (Ms. Geiler returned to the deposition
16    hearing room.)
17    Q. And I take it the time that Officer Walker
18 was with you at the apartment building Officer
19 Walker did not have anyone in custody?
20    A. Not to my knowledge, but I don't know.
21    Q. Where were you and Officer Jorg located --
22 where were you and Officer Jorg located when you
23 first observed, I think you said drug transactions,
24 going on?

Case 1:01-cv-00769-SAS   Document 89-9   Filed 02/02/2004   Page 9 of 16

Owensby, et al. vs. City of Cincinnati  
November 6, 2003

DAVID WILLIAM HUNTER, JR.

**Page 70**

1 up and we got out.
2   Q. Okay.
3   A. But I don't know. Because I don't recall
4 or remember exactly where we stopped and parked the
5 car, because we still had to try to get up to them
6 before they spotted the -- the Neon.
7   Q. Right. Okay. So regardless of how you
8 got out of the car or -- or where you parked the
9 car, do you have a recollection of what side of
10 Sam's Carry Out you approached the individuals from?
11   A. No. I -- I really can't remember. I'm
12 sorry. I can't remember exactly.
13   Q. What is your best recollection of -- at --
14 at some point, though, the individuals -- well,
15 what --
16   A. Two of the individuals started walking
17 across the street.
18   Q. Okay. Toward Huntington Meadows?
19   A. Huntington Meadows, yes.
20   Q. All right. Would you draw with a pen, an
21 arrow, indicating the path that the two individuals
22 took from the phone booth to cross the street. And
23 you can do it on the -- probably on the aerial
24 photograph will probably be the easiest one.

**Page 71**

1   A. (Witness complies.)
2   Q. Okay. And then once they -- if you could
3 continue that across the street in which -- whatever
4 direction they walked.
5   A. (Witness complies.)
6   Q. Thank you. Now, at this point did you and
7 Officer Jorg approach the two individuals that
8 stayed?
9   A. Yes. And then that's when Officer Jorg
10 said he had them. Because we had other cars coming
11 and in the area.
12   Q. All right. So Officer Jorg stays --
13   A. Uh-huh. And then I --
14   Q. -- with those two?
15   A. Right. And then I --
16   Q. You --
17   A. I go after the two, walking with Officer
18 Walker.
19   Q. Okay. Officer Walker was there at the
20 time?
21   A. He was just pulling up.
22   Q. Okay. Where did Officer Walker pull his
23 car up?
24   A. I don't remember if he parked it on the

**Page 72**

1 Sunoco side or the -- the side of the street where
2 Integrity Hall was at. I don't remember exactly
3 where. I just remember he met up with me on this
4 side of the street in the direction --
5     On the -- on the diagram, in the direction
6 that they were walking, he met up with me right
7 before you actually get to the -- the buildings of
8 the, you know, the apart-- where the apartment
9 buildings actually start, Huntington Meadows.
10   Q. Okay. I'm going to ask you, on the aerial
11 photograph, draw first a circle around Integrity
12 Hall.
13   A. (Witness complies.)
14   Q. All right. And put an "I" in there.
15   A. (Witness complies.)
16   Q. Second thing is draw a W in a circle where
17 Officer Walker met up with you.
18   A. Hmm-hmm. (Witness complies.)
19   Q. And at that -- am I correct in
20 understanding from what you've told me at that point
21 you and Officer Walker decided to split up to flank
22 the two people that were walking away?
23   A. Yes. Our -- our intention was -- if he
24 made it around there, they see him, he would flush

**Page 73**

1 them to me, but if they -- or vice versa. If they
2 identify me or assume that I'm a police officer,
3 because, you know, they look back and notice that
4 Jorg was standing there with the two guys detained,
5 that I would flush him to Curtis, to Officer Walker.
6   Q. Now, the building -- the building that you
7 and Officer Walker were going to do this flanking
8 maneuver around, was that a Huntington Meadows
9 apartment?
10   A. Yes. Because we were -- we were like --
11 it's like right there, right -- right -- right where
12 they -- they -- the actual buildings start. And
13 then to the left I think it -- it was not, but to
14 the right it was Huntington Meadows buildings.
15   Q. Can you identify that building on this
16 aerial photograph?
17   A. Oh, boy. Maybe. I'm thinking this one --
18   Q. Just draw a circle around it.
19   A. -- here.
20   Q. Put the letter H in there.
21   A. H.
22   Q. Okay. So that's the building that you and
23 Officer Walker are going to do this flanking
24 maneuver around?

Case 1:01-cv-00769-SAS   Document 89-9   Filed 02/02/2004   Page 10 of 16

Owensby, et al.vs. City of Cincinnati
November 6, 2003
DAVID WILLIAM HUNTER, JR.

Page 74

1  A. Well --
2  Q. Did you want to say something?
3  A. It was not -- it was not a set -- like
4  a -- like a -- just one building. It was like
5  buildings. It was --
6  Q. Okay.
7  A. You know, it was -- it was like two or
8  three like together, but you can go through the
9  courtyard and then you can come around, and there's
10 like a building here on the right (indicating).
11 That's the way Curtis went, Officer Walker. And
12 then I was going to cut through.
13 Q. All right. At some point, then, you
14 folk-- you and Officer Walker split up and you start
15 to go your way and he goes his, right?
16 A. Yes.
17 Q. At that point someone says something to
18 warn the two individuals; is that right?
19 A. Yes.
20 Q. That's the next thing that happens?
21 A. Yes.
22 Q. Okay. And that person, if I'm
23 understanding you correctly, was Mr. Owensby?
24 A. Yes.

Page 75

1  Q. Are you sure of that?
2  A. Yes.
3  Q. What is the best of your recollection of
4  what Mr. Owensby said?
5  A. It was, The boys or Five-oh.
6  Q. Say that again.
7  A. It was either, The boys or Five-oh.
8  Q. And in response to what -- could you see
9  the two individuals at the time Mr. Owensby said
10 this?
11 A. They would -- they were just -- as he said
12 it, they were just leaving out of my view.
13 Q. Did you see -- so then you could not see
14 what, if anything, they did in response?
15 A. Oh. Ran.
16 Q. You did see that?
17 A. Yes. Uh-huh.
18 Q. Okay. Do you know if Mr. Owensby said
19 that toward them or was saying it to someone else?
20 A. He's saying it toward them, because he
21 turned to them and said it, in their direction.
22 Q. Do you know where Officer Walker was at
23 the time?
24 A. No.

Page 76

1  Q. Do you know if the individuals started
2  running because of what Mr. Owensby said or because
3  they saw a uniformed officer?
4  A. Beca--
5     MR. HARDIN: Objection.
6     You may answer.
7  A. Because of what Mr. Owensby said. Because
8  when that happened, Officer Walker didn't have
9  enough time to get around. So they -- they had --
10 they had -- they -- they couldn't have possibly even
11 seen him yet.
12 Q. But as I understand it, Mr. Owensby was
13 not one of the four individuals that you and Officer
14 Jorg had observed conducting drug activity at the
15 phone booth?
16 A. That's correct.
17 Q. He was just somebody that you happened
18 upon as you were going around the building?
19 A. Yes.
20 Q. At that point, as I understand it, you
21 walk up to Mr. Owensby and put your left hand on his
22 shoulder?
23 A. Yes.
24 Q. What shoulder did you put it on?

Page 77

1  A. On his left shoulder.
2  Q. Were you facing him face to face or did
3  you come up from behind?
4  A. Walking to his right, right beside him.
5  Q. So you put your left arm -- you're --
6  you're to his -- his right and you put your left
7  hand on his left shoulder?
8  A. Yes.
9  Q. And you say "What's up?" And he says,
10 "What's up?" And you say, you know, You can't be
11 doing that, or something like that, right?
12 A. Yes.
13 Q. And he said, What do you -- What do you
14 mean or what. And you said, What you just did. Is
15 that right?
16 A. Yes.
17 Q. And then you started to reach in your
18 shirt to pull your badge out, which was hanging on a
19 chain around your neck?
20 A. Yes.
21 Q. Do you know whether or not you got the
22 badge all the way out before Mr. Owensby started to
23 run?
24 A. Yes, I got it out.

Page 74 - Page 77

Case 1:01-cv-00769-SAS   Document 89-9   Filed 02/02/2004   Page 11 of 16

Owensby, et al. vs. City of Cincinnati
November 6, 2003
DAVID WILLIAM HUNTER, JR.

Page 78

1  Q. You got it all the way out?
2  A. Yes.
3  Q. And at that point you said he pushed off,
4  or how -- what -- what happened then?
5  A. He pushed off.
6  Q. Okay.
7     MS. GEILER: I'm sorry. What was that?
8     THE WITNESS: Pushed off. I'm sorry.
9     MS. GEILER: Okay.
10  Q. And you grabbed the hood of his sweat
11  shirt?
12  A. Yes.
13  Q. And it -- it ripped and he wiggled out of
14  or got out of the sweat shirt and took off running?
15  A. Yes.
16  Q. What did you do with the sweat shirt?
17  A. Dropped it.
18  Q. After --
19     MR. HARDIN: I'm sorry. I couldn't hear
20  the answer.
21     THE WITNESS: Dropped it. Let it go.
22  Q. After the incident did you return to get
23  the sweat shirt?
24  A. After the incident, to the best of my

Page 79

1  knowledge, Officer Jorg recovered the sweat shirt
2  and there was some plastic Baggies. There weren't
3  anything in them. They were just little small
4  plastic Baggies in that same area where the -- that
5  actually fell out of -- fell out of his pocket or
6  off of his person when that happened, when the sweat
7  shirt ripped.
8  Q. Did you see them fall out of his pocket or
9  off of his person?
10  A. I saw something fall, but I didn't know
11  what it was. When I came back, it was -- you know,
12  Officer Jorg had picked up the sweat shirt and the
13  Baggies.
14  Q. Were you within the eyesight of Officer
15  Jorg at that time?
16  A. No.
17  Q. So he could not see what was going on?
18  A. See what?
19  Q. Between you and Mr. Owensby and the sweat
20  shirt.
21  A. No.
22  Q. How did he know --
23  A. I told him. I told him what happened.
24  Q. -- to come to the area to collect the

Page 80

1  sweat shirt?
2  A. I told him what happened and where it
3  happened. Because after it happened I -- me
4  personally, I went back to in between the first set
5  of buildings where I was chasing him, because I had
6  my cell phone while I was chasing him and it fell.
7  I went to go find my cell phone.
8  Q. If you know, what happened to the sweat
9  shirt and the plastic bags?
10  A. After that do I know what happened to
11  them?
12  Q. Yeah. You said Officer Jorg picked it up.
13  A. Uh-huh.
14  Q. What happened to it after that?
15  A. I -- I don't know. I assumed he tagged
16  them or whatever. I don't know. I -- I don't know
17  what happened to them after that.
18  Q. You've never seen them since?
19  A. No.
20  Q. Did you ever fill out a property receipt
21  or -- or some property chain of custody document on
22  it?
23  A. Nope. I didn't -- I didn't have the
24  property.

Page 81

1  Q. Did you see -- well, he was your partner.
2  Did -- did you see Officer Jorg fill out a property
3  receipt?
4  A. No. Huh-uh.
5  Q. Did you see him put it in the car?
6  A. No.
7  Q. After Mr. Owensby wiggled out of the sweat
8  shirt, you drew your weapon?
9  A. Yes.
10  Q. He ran away; there was a chase down to
11  Rhode Island where Rhode Island intersects Seymour.
12  Do you see that on the Exhibit 57, the aerial
13  photograph?
14  A. Yes.
15  Q. And would you mark with the letter R in a
16  circle where the intersection of Rhode Island and
17  Seymour is.
18  A. Circle it?
19  Q. An R in a circle.
20  A. Okay.
21  Q. And I take it at -- at that point, if I'm
22  understanding you correctly, you and Mr. Owensby ran
23  around a car?
24  A. Yes. It was a female --

Case 1:01-cv-00769-SAS  Document 89-9  Filed 02/02/2004  Page 12 of 16

Owensby, et al. vs. City of Cincinnati  
November 6, 2003  
DAVID WILLIAM HUNTER, JR.

Page 82

1  Q. One -- one or two times?
2  A. Couple times. One or -- it was either
3  one -- I know it was one full time and it was either
4  another half time or it may be another full time.
5  It was a female black driver and a couple kids in
6  the car.
7      Because they were -- I -- I remember that
8  just because while I'm chasing him around the car
9  they were looking at us like we were crazy. And
10 I -- you know, they had to be wondering what was
11 going on.
12 Q. At this point that you're running around
13 the car, did you still have your weapon out?
14 A. Yep.
15 Q. So you still had your --
16 A. Yeah. I mean, yes.
17 Q. You had your -- your revolver drawn --
18 A. Well, let me -- let me back up. When we
19 got to the point of actually getting -- going into
20 the street, I recovered it. Where I have to admit
21 that I messed up was when we -- when I first
22 initially started chasing him, I wasn't supposed to
23 have my weapon out, running.
24 Q. Okay. But my only question, is at -- at

Page 83

1  the intersection of Rhode Island and Seymour when
2  you and Mr. Owensby are running around this red car,
3  you -- did you have your --
4  A. No, that's -- I --
5  Q. -- your revolver out?
6  A. I put it up. I put it up.
7  Q. Okay.
8  A. Because the mother and her kids and -- and
9  seeing -- you know, that was -- it was already
10 looking bad, you know.
11 Q. Okay. So at that point you have holstered
12 your -- your revolver?
13 A. Uh-huh.
14 Q. Is that when you take out your Mace?
15 A. I got the Mace out after the -- okay. I
16 was -- I managed to get my weapon secured, running
17 around the car. And then as he went to the sidewalk
18 to con-- you know, to go down the sidewalk, that's
19 when I went for my Mace. And he tripped.
20     Because he had -- he had me by a good four
21 steps, a good three or four steps till he fell.
22 When he fell, that's when I was able to -- I -- I
23 thought I was going to catch up to him and be able
24 to get him. As -- you know, but I was going for my

Page 84

1  Mace. Well, I actually got it out. And when I
2  sprayed it, I got backlash.
3  Q. The -- at that point where were you on the
4  aerial photograph? Can you mark with, say, the
5  letter M for Mace where you first deployed your
6  Mace?
7  A. Just past -- I -- I want to put it just
8  past the -- that intersection. It was after he got
9  back to the -- back on pavement on the sidewalk.
10 Q. All right.
11 A. Running in that direction.
12 Q. And you marked that with a M and a circle?
13 A. Yes.
14 Q. Thank you. After that, then you chased
15 him down Seymour Avenue on the sidewalk?
16 A. We were going -- we were going down
17 Seymour Avenue, but then he started to veer to the
18 left in between the buildings.
19 Q. Okay. Draw an arrow as to his path as you
20 proceeded down Seymour and then veer off to the
21 left.
22 A. (Witness complies.)
23 Q. You have an arrow?
24 A. Yes.

Page 85

1  Q. Okay. And then circle the building that
2  Mr. Owensby ran into.
3  A. I'm not -- hmm. From this picture I can't
4  really tell for sure which building it was, but it
5  was in this vicinity. I think it was this one
6  (indicating). This is the one I think it was. I'm
7  not sure, I'm not all the way positive, but I think
8  it's that one. I called out -- I know I called out
9  the -- the address over the air, so --
10 Q. The building number?
11 A. The building number.
12 Q. All right. And mark that circle with the
13 letter B for building.
14 A. (Witness complies.)
15 Q. And that's where you were joined by
16 Officer Walker?
17 A. Yes.
18 Q. When Mr. Owensby said, The guys or
19 Five-oh --
20 A. The boys.
21 Q. The boys. I'm sorry.
22 A. The boy -- it was The boy's, Five-oh,
23 Police. It was -- it was clear -- I mean, how he
24 said it and what he said, it was clear that he was

Case 1:01-cv-00769-SAS   Document 89-9   Filed 02/02/2004   Page 13 of 16

Owensby, et al. vs. City of Cincinnati
November 6, 2003
DAVID WILLIAM HUNTER, JR.

Page 86

1  letting them know that we were there.
2  Q. How -- how far was he from you when he
3  said that?
4  A. About, hmm, maybe from here to that wall
5  (indicating).
6  Q. What, ten feet?
7  A. Oh, more than that.
8  Q. More?
9  A. Maybe --
10 Q. 20 feet?
11 A. Maybe. Maybe 20 feet. I don't know
12 exactly.
13 Q. All right. When you had walked up to Mr.
14 Owensby, put your arm -- your left hand on his left
15 shoulder, around him, when you were talking to him,
16 were you looking at him?
17 A. Directly at him, yes.
18 Q. Did you notice if he had any facial hair?
19 A. If he did, it was like real light. I
20 don't remember having like a full beard or full
21 mustache or anything.
22 Q. Did he have the -- did he have -- how was
23 his hair? Was it in dreadlocks, was it short-cut?
24 How -- how was it?

Page 87

1  A. Like a short afro.
2  Q. At that point, as I understand your
3  testimony, you then return to Officer Jorg, tell him
4  what happened, right?
5  A. Uh-huh. Yes.
6  Q. And maybe -- maybe you've already answered
7  this, but do you recall whether or not Officer
8  Walker joined you and Officer Jorg?
9  A. I don't recall if he came back over there.
10 Q. Do you recall who of the two people that
11 were arrested, who was cited, their -- their names?
12 A. I don't remember their names.
13 Q. Let me show you -- let me show you what's
14 previously been marked as Exhibit 6. These are
15 two -- Exhibit 6 are two arrest and investigation
16 reports. The first one is for a Jaysen Hill and the
17 second is for a Jarvis Nixon.
18      You see the arrest location is the Sam's
19 Carry Out address of 2092 Seymour Avenue and the
20 arresting officer is Jorg, with your name also
21 listed. Do you see that?
22 A. Yes.
23 Q. Are these the two individuals that Officer
24 Jorg arrested --

Page 88

1  A. Yes.
2  Q. -- on that day?
3  A. Yes.
4  Q. Do you see that with respect to Jaysen
5  Hill he is charged with criminal trespass and an
6  open container?
7  A. Yes.
8  Q. Is there any reason why there's no charge
9  of trafficking --
10 A. Yes.
11 Q. -- or any kind of drug activity?
12 A. Yes.
13 Q. Why?
14 A. Because we didn't recover the drugs.
15 Q. Did you recover any money, any large sums
16 of money on these people out of these drug deals?
17 A. I didn't.
18    THE REPORTER: I'm sorry?
19    THE WITNESS: I did not.
20 Q. Do you know whether Officer Jorg did?
21 A. Not to my knowledge he didn't.
22 Q. So based on what you found on these
23 individuals -- well, let's talk about the second
24 one. Mr. Nixon is cited with criminal trespass.

Page 89

1  Same thing, there were no -- no drugs and no large
2  sums of money found, correct?
3  A. That's correct.
4  Q. Based on what you found at the scene when
5  you got there, there was no evidence of drug
6  activity taking place, was there?
7  A. Are you talking about after the fact?
8  Q. When -- when you're -- based on the arrest
9  and what you found on the person of these
10 individuals.
11 A. Okay. What we observed to put us there
12 went with the two that got away.
13 Q. Okay. That's what you believe?
14 A. That's what I believe.
15 Q. Let me show you what I'm going to mark as
16 Exhibit 6A.
17    (Deposition Exhibit 6A
       was marked for identi-
18     fication.)
19 Q. You see Exhibit 6A is an arrest and
20 investigation report for one Dominic Peterson, same
21 location, same date, same time. And the person is
22 searched by Officer Walker, and this person is
23 charged with criminal trespass. Was Mr. Peterson
24 also involved in this?

Case 1:01-cv-00769-SAS    Document 89-9    Filed 02/02/2004    Page 14 of 16
Owensby, et al. vs. City of Cincinnati
November 6, 2003
DAVID WILLIAM HUNTER, JR.

Page 94

1  A. No. Jorg marked all of these when he
2  filled out the --
3  Q. Do you recall -- do you --
4  A. -- the arrest slips.
5  Q. Do you recall any discussion between you
6  and Officer Jorg as to who was going to go to court?
7  A. No.
8  Can I add something to this?
9  Q. Sure.
10 A. It's not directly related to this
11 particular thing, but when this incident happened,
12 after the night of November 7th, 2000, Officer Jorg
13 and Officer Caton were going around saying, that
14 same night, that the -- that Mr. Owensby was wanted
15 for assault on a PO and obstructing.
16 He ran from me. It was basically my
17 investigation that day. That night and from there
18 on I always said, had this tragedy not happened, the
19 only charges I was going to place on him was
20 obstruction and jaywalking. And the jaywalking is
21 because he -- I chased him through a crosswalk,
22 around a car. And obstructing is for warning the --
23 the individuals of our presence.
24 And that goes back to what I was telling

Page 95

1  you about different officers and officer discretion
2  and different styles. I wouldn't have placed a
3  criminal trespass. If, for whatever reason, I
4  didn't get the drugs and the money to make my case,
5  even though we set there and we observed them, we
6  watched them, if I couldn't make it, you know, I try
7  again another day, the next time.
8  Same way with Mr. Owensby. He pushed me
9  to flee. He didn't strike me or -- I didn't -- I
10 wasn't under the impression that he was trying to
11 harm -- or cause me harm. Therefore, I would not
12 have charged him with felon-- with assault on a PO,
13 with assault on a police officer. But they would
14 have. That's the difference between this and that.
15 That -- I'm trying to show you the --
16 Q. Right.
17 A. Okay.
18 Q. Thank you.
19 A. You're welcome.
20 Q. Do you think -- was the push a result of
21 you having your hand and arm around his shoulder?
22 MR. HARDIN: Objection.
23 A. It was when I identified myself as a
24 police officer. And he pushed me and kept saying,

Page 96

1  "I didn't do anything, I didn't do nothing, I didn't
2  do nothing." That's why I felt like he was just
3  trying to basically get away. He -- he wasn't try
4  to hurt me.
5  Q. When you put your arm around Mr. Owensby,
6  he didn't know that you were a police officer,
7  right?
8  A. No.
9  Q. Based on your training, was that an
10 assault on Mr. Owensby?
11 A. No.
12 Q. Why not?
13 A. Because I didn't strike him, I didn't -- I
14 didn't cause or attempt to cause or knowingly
15 attempt to cause him any physical harm.
16 Q. And was -- you've already indicated when
17 Mr. Owensby tried to push away, he wasn't trying to
18 strike you?
19 A. No.
20 Q. And he wasn't trying to cause you any
21 harm?
22 A. No.
23 Q. When -- when you Maced Mr. Owensby and
24 the -- the -- the blowback that you described, did

Page 97

1  you then file some sort of report about deploying
2  your Mace?
3  A. No.
4  Q. I thought that earlier today you had
5  indicated that when Mace is used, you have to --
6  A. If you actually Mace --
7  Q. -- the officer has to --
8  A. Yeah, if you actually Mace somebody. I
9  didn't get -- I didn't get to Mace him.
10 Q. How do you know the Mace didn't get to
11 him?
12 A. I don't. I don't. I don't know.
13 Q. Okay.
14 A. You're right. You're right. I don't
15 know. But I don't think it did, in my opinion.
16 Q. What color was the sweat shirt, the -- the
17 hooded sweat shirt?
18 A. Dark color. Dark blue or black.
19 Q. In the radio transmission or the
20 transcript of -- well, let me show you what's
21 previously been marked as Exhibit 7. This is a
22 transcription of the radio traffic on September 27,
23 2000. And what I want to direct your attention
24 to -- are you -- are you -- first of all, are you

Case 1:01-cv-00769-SAS   Document 89-9   Filed 02/02/2004   Page 15 of 16
Owensby, et al. vs. City of Cincinnati
November 6, 2003
DAVID WILLIAM HUNTER, JR.

Page 102

1  "4055: 55. That's correct.
2  "Dispatcher: 'kay. Correction on the
3  description. Male, black, gray shirt, teal green
4  pants.
5  "4061: 61. We're inside 1856 Yorktown."
6  Does this assist you in figuring out who
7  4061 is?
8  A. No.
9  Q. No?
10  A. I don't remember who 4061 was.
11  Q. Tell me, did -- did Officer Jorg have a
12  different number than you or were both of you 4055?
13  A. I honestly don't remember. I --
14  Q. What's the practice? If -- if two
15  officers are --
16  A. In plainclothes.
17  Q. -- are riding in the same car --
18  A. Oh.
19  Q. -- do they use the same call?
20  A. If you're in uniform, but if you're in old
21  clothes you can have different numbers.
22  Q. And you don't recall here?
23  A. I'm sorry. I just don't remember for
24  sure.

Page 103

1  Q. Am I correct in understanding that one of
2  the people that is identif-- or one of the persons
3  identified on either Exhibit 6 or 6A is the person
4  that told you that the person who ran was known
5  as -- who got away from you was known as LA?
6      MR. HARDIN: Objection.
7  A. Could you just repeat that que-- I'm
8  trying to figure this out, how --
9  Q. Well, either -- either -- either Mr. Hill,
10  Mr. Nixon or Mr. Peterson would be the people --
11  A. One of them, one of the guys --
12  Q. -- who --
13  A. -- that went to jail that day --
14  Q. -- who told --
15  A. -- is -- is the one that ident--
16  identified him as -- with -- with the nickname of
17  LA.
18  Q. LA?
19  A. Yeah. Yes.
20  Q. With respect to Hill and Peterson -- I'm
21  sorry, with respect to Hill and Jarvis, they were
22  with Officer Jorg back at the telephone booth,
23  right?
24  A. I --

Page 104

1  Q. Right?
2  A. I guess, yes.
3  Q. And you already indicated that Officer
4  Jorg couldn't see when you approached Mr. Owensby
5  and put your arm around him.
6  A. No.
7  Q. So can you explain to me how these people
8  back at the phone booth were able to tell you that
9  the person who ran from you was -- went by a
10  nickname of LA, if they never saw him?
11  A. In that area everybody pretty much know
12  everybody. So through whatever, I don't know, word
13  of mouth or whatever, I -- I was given information
14  that that -- that the individual that ran from me
15  went by the nickname of LA.
16      And when -- the next time I came across
17  that individual was that night on November. When I
18  stopped him that night and I identified him as --
19  you know, in my mind that this was the same
20  individual that ran from me, the same person I was
21  given the information that that -- that he was LA,
22  that same night of November 7, 2000, when I was on
23  my -- my perimeter, the crowd, there was people in
24  the crowd actually yelling, "Oh, they killed LA."

Page 105

1  So...
2  Q. Well, but my question is, how could people
3  who didn't see who ran from you identify --
4  A. I am --
5  Q. -- that person to you as LA?
6  A. That was just the information that I got
7  that day, that that's -- that he went --
8  Q. And you don't --
9  A. -- by the name of LA.
10  Q. And you don't know who gave you the
11  information?
12  A. No, I don't remember who exactly. It was
13  one of those guys.
14  Q. Do you know a person by the name of Curtis
15  Boswell?
16  A. That don't ring a bell for me. I mean, I
17  don't --
18      MR. MARTINS: Okay. Let's adjourn the
19      deposition for now. We'll pick it up in the
20      next week or two.
21      VIDEOGRAPHER: Time is 5:03 p.m. We're
22      off the record.
23  (Deposition continued in progress at 5:03 p.m.)
24      - - -

Page 102 - Page 105

# AFFIDAVIT

- - -

STATE   OF   OHIO         :
                          :   SS
COUNTY OF HAMILTON        :

I, Wendy L. Welsh, Notary Public in and for the State of Ohio, do hereby state that the transcript of the deposition of DAVID WILLIAM HUNTER, JR., deponent herein, having been submitted to said deponent for review and signature, has not been signed within the thirty (30) day period allowed under the Federal Rules; said deposition to now have the same force and effect as though signed.

_____
Wendy L. Welsh, Court Reporter

Sworn to before me this 27th day of January, 2004.

_____
Thomas M. Blasing
Notary Public - State of Ohio

My commission expires:
May 4, 2004.