107

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - - - -

ESTATE OF ROGER D.            :
OWENSBY JR., et al.,          :
                             :
        Plaintiffs,          :  Case No. 01-CV-769
vs.                          : (Judge S. A. Spiegel)
                             :
CITY OF CINCINNATI,          :      VOLUME II
et al.,                      :
                             :
        Defendants.          :
- - - - - - - - - - - - - - - -


        Continued videotaped deposition of DAVID

WILLIAM HUNTER JR., a witness herein, called by the

plaintiffs for cross-examination, pursuant to the

Federal Rules of Civil Procedure, taken before me,

Wendy Davies Welsh, a Registered Diplomate Reporter

and Notary Public in and for the State of Ohio, at

the offices of Helmer, Martins & Morgan Co. LPA,

1900 Fourth & Walnut Centre, 105 East Fourth Street,

Cincinnati, Ohio, on Thursday, December 4, 2003, at

10:11 a.m.


                        Pages:  107 - 282

Page 108

```
1   APPEARANCES:

2       On behalf of the Plaintiffs:

3           Paul B. Martins, Esq.
            Don Stiens, Esq.
4           Helmer, Martins & Morgan Co. LPA
            Suite 1900, Fourth & Walnut Centre
5           105 East Fourth Street
            Cincinnati, Ohio  45202
6           Phone:  (513) 421-2400

7           John J. Helbling, Esq.
            The Helbling Law Firm, L.L.C.
8           3672 Springdale Road
            Cincinnati, Ohio 45251
9           Phone:  (513) 923-9740

10      On behalf of the Defendants City of Golf Manor,
        Stephen Tilley, Roby Heiland and Chris
11      Campbell:

12          Wilson G. Weisenfelder Jr.,  Esq.
            Rendigs, Fry, Kiely & Dennis
13          900 Fourth & Vine Tower
            One West Fourth Street
14          Cincinnati, Ohio 45202-3688
            Phone:  (513) 381-9200
15
        On behalf of the Defendants City of Cincinnati,
16      Darren Sellers, and Jason Hodge:

17          Geri Hernandez Geiler, Esq.
            Assistant City Solicitor
18          Department of Law
            Room 214, City Hall
19          801 Plum Street
            Cincinnati, Ohio 45202
20          Phone:  (513) 352-3346

21

22

23

24
```

Page 109

```
1   APPEARANCES (Continued):

2       On behalf of the Defendants Robert B. Jorg,
        Patrick Caton, Jason Hodge, Victor Spellen and
3       Darren Sellers:

4           Donald E. Hardin, Esq.
            Hardin, Lefton, Lazarus & Marks, LLC
5           915 Cincinnati Club Building
            30 Garfield Place
6           Cincinnati, Ohio 45202
            Phone:  (513) 721-7300
7
        On behalf of David William Hunter Jr.:
8
            Jay Clark, Esq.
9           114 East 8th Street
            Suite 400
10          Cincinnati, Ohio  45202
            Phone (513) 587-2887
11
    Also present:
12
    Richard W. Grubb, Videographer
13
    Lisa Damstrom, Law Clerk
14  Helmer, Martins & Morgan Co., L.P.A.

15  Roger Owensby Senior

16  Brenda Owensby

17  Shawn Owensby

18                  - - -

19
                STIPULATIONS
20

21      It is stipulated by and among counsel for the

22  respective parties that the deposition of DAVID

23  WILLIAM HUNTER JR., a witness herein, called by the

24  plaintiffs for cross-examination, pursuant to the
```

Page 110

```
1   Federal Rules of Civil Procedure, may be taken at

2   this time by the notary; that said deposition may be

3   reduced to writing in stenotype by the notary, whose

4   notes may then be transcribed out of the presence of

5   the witness; and that proof of the official

6   character and qualifications of the notary is

7   expressly waived.

8                   I N D E X

9       Examination by:                      Page

10      Mr. Martins . . . . . . .  111, 277

11      Mr. Hardin. . . . . . . .      258

12              - - -

13          E X H I B I T S

14                                          Page
    Deposition Exhibit 85 ...................  120
15  Deposition Exhibit 86 ...................  131
    Deposition Exhibit 87 ...................  152
16  Deposition Exhibit 88 ...................  219
    Deposition Exhibit 89 ...................  221
17  Deposition Exhibit 90 ...................  234
    Deposition Exhibit 91 ...................  236
18  Deposition Exhibit 92 ...................  238
    Deposition Exhibit 93 ...................  244
19  Deposition Exhibit 94 ...................  244
    Deposition Exhibit 95 ...................  245
20  Deposition Exhibit 96 ...................  250

21              - - -

22

23

24
```

Page 111

```
1           DAVID WILLIAM HUNTER JR.

2   being by me previously duly cautioned and sworn,

3   deposes and says as follows:

4       VIDEOGRAPHER:  Time is 10:11 a.m.  The

5   date is December the 4th.  The year is 2003.

6       We're on the record, sir.

7       CONTINUED CROSS-EXAMINATION

8   BY MR. MARTINS:

9       Q. Officer Hunter, we're picking up where we

10  left off after November 6, your first couple hours

11  of your deposition.  Remind you that you are still

12  under oath.  Okay?

13      A. Yes, sir.

14      Q. All right.  Have you talked with anyone

15  about your deposition on November 6th between

16  November 6th and today?

17      A. No, besides my attorney.

18      Q. Okay.  Have you discussed the facts of the

19  Owensby case with anyone between November 6th and

20  today?

21      A. No.

22      Q. I want to direct your attention now to

23  November 7, 2000.  I understand in the -- sometime

24  on that day you received an MTD message request for
```

Estate of Roger D. Owensby, Jr.                     **DAVID WILLIAM HUNTER, JR.**
December 4, 2003                                                      **VOLUME II**

| Page 112 | Page 114 |
|---|---|
| 1 a misdemeanor citation traffic ticket book. Is that | 1  A. Yes. |
| 2 right? | 2  Q. As part of your duty uniform on that day, |
| 3  A. Yes. | 3 are -- do you wear a vest under the shirt, like a |
| 4  Q. Where were you when you received that? | 4 bullet-- |
| 5  A. Near University -- near the University of | 5  A. Vest? Vest? |
| 6 Cincinnati, around the Corry, Vine Street area. | 6  Q. --proof vest? |
| 7  Q. And did you type in some acknowledgment | 7  A. Yes. |
| 8 that you were going to respond with a -- | 8  Q. Okay. Do you know how much that weighs? |
| 9   Is it NDT? | 9  A. No. |
| 10  A. NTA. | 10  Q. Do you have an estimate? |
| 11  Q. NTA. Okay. -- NTA book? | 11  A. I estimate -- estimate it to be maybe two |
| 12  A. Yes. | 12 or three pounds. |
| 13  Q. And that was to Officer Hasse and Sellers? | 13  Q. Okay. And you have a belt that has |
| 14  A. I don't recall exactly who I sent it to, | 14 various implements on it; is that right? |
| 15 but I -- I responded to whoever sent me the message. | 15  A. Yes. |
| 16  Q. All right. Am I correct in understanding | 16  Q. Do you know how much that belt weighs with |
| 17 that you then drove your police cruiser over to the | 17 all of its accoutrements? |
| 18 Sam's Carry Out on Seymour Avenue? | 18  A. 46 pounds. |
| 19  A. Yes. | 19  Q. 46 pounds? |
| 20  Q. Do you know what time you got there? | 20  A. Yeah, about. |
| 21  A. No, not exactly. | 21  Q. Oh, four to six pounds? |
| 22  Q. Was the sun still up? | 22  A. 46. |
| 23  A. I believe it was. | 23  Q. Okay. |
| 24  Q. When you arrived, who was there? | 24  A. Wait a minute. No, no, no. No way. |

| Page 113 | Page 115 |
|---|---|
| 1  A. Officer Jorg, Officer Caton, Officer | 1 We -- I don't know. I don't know. I -- I don't |
| 2 Sellers and Officer Hasse. | 2 know. |
| 3  Q. And Caton and Jorg were in one Cincinnati | 3  Q. What's on the belt that you wear? |
| 4 police cruiser; Sellers and Hasse were in another? | 4  A. Gun, nightstick, baton -- PR-24, |
| 5  A. I know Sellers and Hasse were partners | 5 flashlight. See, all the -- every belt going to |
| 6 that day. I don't recall exactly whether or not | 6 vary. I -- I carry a two-pouch handcuff case, so I |
| 7 Jorg and Caton were partners. They could have been. | 7 carry two pair -- pairs of handcuffs. Some people |
| 8  Q. How many police cruisers were there? | 8 only carry one. Some people carry a long PR-24, |
| 9  A. I don't remember. | 9 just -- just one piece. Some people carry |
| 10  Q. We know that at least two were there: | 10 collapsibles. So I would actually have to weigh |
| 11 yours, and Sellers and Hasse? | 11 that belt to give you a precise weight, but it's -- |
| 12  A. Yes. | 12 it's pretty heavy, I mean. |
| 13  Q. Do you know how Jorg and Caton got there? | 13  Q. And I'm just trying to get your estimate |
| 14  A. I'm sure they drove there, sir. I -- I | 14 of the belt that you were wearing on that day. |
| 15 just don't remember if they were partners that day. | 15  A. On that day? I -- I'll estimate it to be |
| 16  Q. Okay. | 16 about 30 pounds. |
| 17  A. I just don't want to say, you know, either | 17  Q. 30 pounds? |
| 18 way. I'm -- I can't be for sure. I can't be | 18  A. Uh-huh. |
| 19 certain. | 19  Q. Okay. |
| 20  Q. They were in uniform: Jorg and Caton? | 20  A. It's pretty heavy. |
| 21  A. Yes. | 21  Q. All right. Do you know if Officer Jorg |
| 22  Q. And Hasse and Sellers were in uniform? | 22 was wearing a vest, bulletproof vest? |
| 23  A. Yes. | 23  A. I don't know for sure, but per procedure |
| 24  Q. And you were in uniform? | 24 he's supposed to have been wearing one. |

Page 112 - Page 115

Estate of Roger D. Owensby, Jr.
December 4, 2003

DAVID WILLIAM HUNTER, JR.
VOLUME II

Page 116

1  Q. Okay. And so per procedure, I guess Caton
2  should have been wearing one also?
3     A. Yes.
4  Q. As would Sellers and Hasse?
5     A. Yes.
6  Q. And Officer Jorg had on a belt with at
7  least a revolver on it; is that right?
8     A. We carry semiautomatics, but yes, a
9  pistol.
10    Q. Okay. A pistol?
11    A. Yes.
12    Q. Do you know if he had a nightstick?
13    A. Yes.
14    Q. Okay. He did. Do you know if he had
15 Mace?
16    A. He should. Well, when I say yes, I mean
17 this is what he should have had on his belt.
18    Q. Okay. So there are certain --
19    A. Whenever --
20    Q. -- things that are --
21    A. Right. Whenever we get out of the car, we
22 should have our PR-24 with us. That's why some
23 people carry collapsibles. Because you can wear it
24 while you're driving. Some people like the old

Page 117

1  style, but you have to remember to grab it when you
2  get out the car.
3     Q. All right. So there are certain things
4  that are required to be on the belt, and the officer
5  in his discretion may add other things; is that
6  right?
7     A. Yeah, as far as a spare set of handcuffs,
8  something of that nature --
9     Q. Right.
10    A. -- yes, you could add onto it.
11    Q. All right. And I'm trying to understand
12 what is required to be on the belt.
13    A. Handcuff, flashlight, your PR-24, your
14 gun. Did I say flashlight? I don't remember.
15    Q. Yes.
16    A. Okay. And belt keeps, but they don't
17 weigh that much. That's just to keep your belt in
18 place. And a pouch for gloves.
19    Q. And if I'm understanding you correctly,
20 the belt that you normally wear, the only additional
21 thing you have to what is supposed to be on the belt
22 is a second pouch for handcuffs?
23    A. No.
24    Q. What else?

Page 118

1     A. I -- I have -- it's a single pouch, but it
2  car-- it holds two pair of handcuffs.
3     Q. Oh, okay. So you have an extra pair of
4  handcuffs?
5     A. Right. And I also carry a Gerber tool on
6  my belt.
7     Q. What's a Gerber tool?
8     A. It's like a Leatherman. It's pliers,
9  screwdriver.
10    Q. Okay.
11    A. It has a knife. It folds.
12    Q. All right. Anything else that you had
13 that is not usually found on a police officer's
14 belt?
15    A. No.
16    Q. As far as the extra handcuff and the
17 Gerber tool, what would you estimate the weight of
18 that, those two things?
19    A. Those two things together?
20    Q. Just those two things.
21    A. Maybe a pound, pound and a half.
22    Q. All right. So would it be fair to say
23 that if -- if an officer was wearing just a regular
24 belt with the items that are supposed to be on,

Page 119

1  nothing additionally, that in your estimate --
2  estimation, the weight would be somewhere around,
3  say, 28 pounds?
4     A. I'll say I estimate it to be about that,
5  yes.
6     Q. All right. Now, you arrive, and I presume
7  that you give somebody this NTA book. Is that
8  right?
9     A. No.
10    Q. Okay. What happened?
11    A. I arrived and I saw an NTA book laying on
12 the hood of somebody's car. And then I said, "Why
13 you all calling me up here to bring an NTA book and
14 you already have one? You all could have -- you all
15 could have disregarded me."
16    Q. Who'd you say that to?
17    A. I don't remember. It was -- Caton and
18 Jorg was standing out there. I don't know if I was
19 talking to Hess (sic) -- I don't know if I was
20 talking to Hasse or if I was talking to Sellers.
21 I -- you know, I just made a -- just a general, you
22 know, statement.
23    Q. Where -- where was Caton and Jorg at that
24 time?

Estate of Roger D. Owensby, Jr.
December 4, 2003

DAVID WILLIAM HUNTER, JR.
VOLUME II

Page 124

1    MS. GEILER: Thank you.
2    THE WITNESS: You're welcome.
3 BY MR. MARTINS:
4    Q. What happened once you saw Mr. Owensby
5 walking in the vicinity of Integrity Hall?
6    A. Noth-- I brought it to Jorg and Caton's
7 attention.
8    Q. What did you say to them?
9    A. I said, "That guy looked like the guy that
10 ran from me. Remember when we" -- well, then I was
11 talking to Officer Jorg. I said, "Remember when we
12 was working old clothes that day?"
13    Q. And what, if anything, did Jorg say in
14 response?
15    A. He asked me if I was sure if that was him.
16 I said, "Well, from this distance and in this light,
17 no, I can't be sure from here."
18    Q. Were you able to tell at -- at that point
19 in time whether or not Mr. Owensby had facial hair?
20    A. From that distance?
21    Q. From that distance.
22    A. No.
23    Q. What was it about the person that you saw
24 by Integrity Hall that made you think it looked like

Page 125

1 the person that had run from you on September 27th?
2    A. His height, size. And from where I was
3 standing, he was walking at an angle, and I could
4 get like a -- I could see like his face from a
5 distance as far as like, you know, he looked similar
6 to the person that ran from me at that time.
7    Q. What was his height?
8    A. I don't know his height.
9    Q. Would it be fair to say he was average
10 height?
11    A. Yeah. Medium build.
12    Q. Average height, medium build?
13    A. (Nodding head.)
14    Q. Okay.
15    A. Uh-huh.
16    Q. And if I understand you correctly, from
17 his -- from that distance you could not tell if he
18 had facial hair. Were there any other
19 distinguishing characteristics about him that caused
20 you to think that he was the person that ran from
21 you on September 27?
22    A. Like I say, he just -- he had the features
23 of the person that I remember that had ran from
24 me --

Page 126

1    Q. And what I'm --
2    A. -- previously.
3    Q. -- trying to understand is, what were
4 those features?
5    A. His -- his build, his height, his -- I
6 mean, just -- his stature. And like I said, it
7 wasn't light -- I mean, the sun wasn't up, but it
8 was -- it was like not completely dark either.
9    Q. Can you identify any other distinguishing
10 feature of the person that you saw by Integrity Hall
11 that caused you to think that that was the same
12 person that ran from you on September 27th?
13    A. No. Not -- I mean, no.
14    Q. The -- when you said -- pointed him out to
15 Officer Jorg, do you know whether or not Officer
16 Jorg said something to you to the effect, words to
17 the effect that that takes balls to walk past
18 cruisers and uniformed officers?
19    A. That sound familiar to me. That -- that
20 does sound familiar to me, but I can't recall.
21    Q. I'm -- I'm not sure I'm quoting it
22 direct -- correctly, but some -- words to that
23 effect.
24    A. I'm just saying I remember hearing

Page 127

1 something like that.
2    Q. Okay. Did Officer Caton say anything to
3 you?
4    A. I don't remember. I mean, I --
5    Q. When you were talking to Officer Jorg,
6 pointing out this person over by Integrity Hall, was
7 Officer Caton there also?
8    A. Yes.
9    Q. Did Officer Jorg explain or -- or did you
10 explain to Officer Caton who this person was that --
11 that you were referring to?
12    A. Well, he was standing there while me and
13 Jorg was talking, so he could just gather it from
14 that what we were talking about, because he knew
15 about the incident.
16    Q. And that's what I'm trying to understand,
17 is how did he know about the incident?
18    A. From Jorg, I'm sure.
19    Q. Did -- did -- did you hear Jorg talk to
20 him about the incident?
21    A. No, but me and Jorg was talking back and
22 forth about the incident.
23    Q. And Caton was there?
24    A. And Caton was there.

Page 128

1    Q. And what you were telling Officer Jorg,
2 was that reminding him about the incident on
3 September 27th when the guy ran away from you, you
4 had grabbed the hood of the sweat shirt?
5    A. Yes.
6    Q. What happened next?
7    A. I asked Officers Jorg and Caton to walk
8 over to the Sunoco lot with me, because I wanted to
9 get a closer look to see if that was -- if I can
10 identify him, positively identify this individual.
11       So we walked over to the Sunoco lot -- me,
12 Officer Caton and Officer Jorg -- and I looked at --
13       Was you about to say something?
14    Q. I was going to stop you --
15    A. Oh.
16    Q. -- just to ask you some -- some questions
17 there.  Did you -- before you, Officer Jorg and
18 Officer Caton started to head over to the Sunoco
19 lot, did you mention to Jorg and Caton that the
20 person you were looking for was known as LA?
21    A. Yes.
22    Q. And did either Jorg or Caton make any
23 attempt to go to see if the person that was in the
24 back seat of Hasse's cruiser knew who this LA person

Page 129

1 was?
2    A. I don't know if they had done that or not,
3 but from the time I asked them to walk over to the
4 lot with me, we just walked over.  At that time they
5 did not, but I don't know if they had previously
6 asked about that or -- you know.
7       Because when I was up there on the scene,
8 I might have -- I remember saying something to
9 either Hasse or to Sellers.  Because when they said
10 they had -- when I said we was just standing around
11 talking, I asked one of those officers if the person
12 they had in the back of the car, if he knew LA or if
13 he bought his, whatever he -- this marijuana that he
14 had, from an individual known as LA, nickname LA.
15    Q. And did they -- whoever you told this to,
16 did they go and ask the person?
17    A. I believe they did.
18    Q. And did they come back with an answer?
19    A. I don't remember if they -- at that time
20 if they came back and said anything or not.
21    Q. And this would have been before you saw
22 Mr. Owensby walking --
23    A. Yes, that would be before I saw him
24 walking.

Page 130

1    Q. Okay.  The person that they had in the
2 back seat of the car had been arrested for
3 possession of marijuana, right?
4    A. Yes.
5    Q. And it was less than 100 grams, so it was
6 a minor misdemeanor?
7    A. Yes.
8    Q. Did you see the bag of marijuana?
9    A. No, I don't remember seeing it.
10    Q. Do you know whether or not there was one
11 bag, two bags that they had --
12    A. I don't --
13    Q. -- charged the person with?
14    A. I don't know.
15    Q. As you and Jorg and Caton walked over to
16 the Sunoco station, did anyone mention a concern
17 that this person LA was known to be armed, carry a
18 firearm?
19    A. No.
20    Q. As you walked to the station, did -- at
21 that point in time, had anyone told you that LA is
22 known to be carrying a firearm?
23    A. No.
24    Q. Let's continue, then.  You get -- you get

Page 131

1 to the Sunoco station.  What happens at that point?
2    A.  I walk up and I looked in the window,
3 which the window I looked in, it's directly behind
4 the cash register and the clerk would be standing
5 right in front, you know, right there with his back
6 to that window.  And then people making purchases
7 would be facing that -- that direction.
8    Q.  Let me give you what I'm going to mark as
9 Exhibit 86, and it is a drawing of the Sunoco
10 station.
11       (Deposition Exhibit 86
         was marked for identi-
12          fication.)
13    Q.  If you would just indicate with a circle
14 and the number 1 where you were located, the -- the
15 window that you were looking through.
16    A.  (Witness complies.)
17    Q.  Thank you.  Were -- were Jorg and Caton
18 standing at that window with you?
19    A.  They were standing just behind me.
20    Q.  All right.  What happens at that point?
21    A.  I look in the window.  The -- the person,
22 Mr. Owensby, he steps to the counter to pay for his
23 drink.  And I step back and I tell Caton and Jorg,
24 That's him.

Estate of Roger D. Owensby, Jr.
December 4, 2003

**DAVID WILLIAM HUNTER, JR.
VOLUME II**

Page 132

1 Q. At that point did you feel that you had
2 made a positive identification?
3    A. Yes.
4    Q. Did you think that at that point you had
5 probable cause to arrest him?
6    A. Yes.
7    Q. And what would the charge be?
8    A. Obstructing and jaywalking.
9    Q. The obstructing refers to what?
10   A. Our investigation, our original
11 investigation where he warned other individuals that
12 we are trying to apprehend that we were coming.
13   Q. And that, you're referring there back to
14 the September 27th incident?
15   A. Yes.
16   Q. At that incident, and we covered this the
17 last time that we met, as I understand it, there
18 were four individuals that you and Officer Jorg were
19 observing. As you approached Sam's, two individuals
20 crossed the street and headed toward Huntington
21 Meadows, which you followed, and Officer Jorg
22 arrested the two individuals that remained at the
23 Sam's telephone booth area; is that right?
24   A. That's the -- that's what I remember.

Page 133

1 That's --
2    Q. Okay. And as a result of that, two
3 individuals -- the two individuals that Officer Jorg
4 arrested had no drugs on them, no large sums of
5 money, correct?
6    A. I don't know about the money, but as far
7 as drugs, they weren't charged. So I assume that
8 they didn't have any on them.
9    Q. And in fact, they were charged with
10 criminal trespass, right?
11   A. Yes.
12   Q. And I think one person was charged with an
13 open container of Budweiser; is that right?
14   A. I don't remember that.
15   Q. Let me show you -- this has previously
16 been marked as Exhibit 6. Exhibit 6 is comprised of
17 two tickets or arrests, investigation -- I'm sorry,
18 two arrest and investigation reports, the first one
19 for a Jaysen Hill, arrested on September 27th. The
20 time was about 5:10 and -- or 5:00, and the
21 arresting officer was Officer Jorg. And you see
22 that for Mr. Hill he's charged with trespass and an
23 open -- open container. See that?
24   A. Yes.

Page 134

1    Q. Okay. And then the second person --
2 Mr. Nixon --
3       MR. HARDIN: I'm just going to object on
4    asked and answered already.
5       Go ahead.
6    Q. The second person, Mr. Nixon, is charged
7 with criminal trespass?
8    A. Yes.
9    Q. All right. So as of November 7th you had
10 no -- no evidence that there was any drug activity,
11 any sale of drugs going on on the afternoon or
12 evening of September 27th.
13      MR. HARDIN: Objection.
14   Q. Right?
15      MR. HARDIN: The form of the question.
16   A. On September 27th?
17   Q. No, no. On the day we're talking about,
18 November 7th --
19   A. Okay.
20   Q. -- you said that you were going to arrest
21 Mr. Owensby for obstructing. And the obstructing
22 was --
23   A. Was the previous.
24   Q. -- was in relation --

Page 135

1    A. Right.
2    Q. -- to September 27?
3    A. That's correct.
4    Q. And what I'm saying is on November 7th
5 now --
6    A. Okay.
7    Q. -- you know that you had no evidence of
8 any drug activity on September 27, because the two
9 people you arrested you found no drugs on, no large
10 sums of money, correct?
11      MR. HARDIN: Objection.
12   A. Yeah. On that day our investigation was
13 incomplete because of his obstructing, because of
14 the two people that got away. Those two people, you
15 know, as far as evidence, the -- if the question is
16 did we have physical evidence, no, because they got
17 away.
18   Q. Did you have any evidence that -- that the
19 two people that ran away were dealing in drugs?
20   A. Nothing but the observations that we made
21 before we moved in.
22   Q. And the observations that you had made
23 were based on four people acting in concert,
24 correct?

(800) 578-1542 * MERIT * (513) 381-8228

Page 164

1 length of Officer Jorg's arm was the middle of Mr.
2 Owensby's forehead?
3    A. Probably right -- probably right about,
4 yeah, I guess, the elbow.
5    Q. In the -- in the elbow?
6    A. In the elbow part.
7    Q. So Officer Jorg leans back, and in leaning
8 back, then he's pulling Mr. Owensby's head back
9 also.
10    A. Yes.
11    Q. Correct?
12    A. Uh-huh.
13    Q. Did Mr. Owensby say anything in response,
14 when Officer Jorg is leaning back and pulling his
15 head back?
16    A. No.
17    Q. Did Officer -- did Mr. Owensby make any
18 sound? Regardless of whether he said something, was
19 there a groan or a -- an exhale or anything like
20 that?
21    A. When I sprayed him with the Mace, he
22 groaned.
23    Q. I'm talking -- okay.
24    A. Oh. I'm sorry.

Page 165

1    Q. I'm talking before.
2    A. Before that? No.
3    Q. When -- when -- when Jorg leans back and
4 pulls his head back, did -- did Mr. Owensby make any
5 sound?
6    A. No, not that I remember. No. I don't
7 remember that.
8    Q. Now, while this is going on, officers are
9 still yelling at him to give them his arms and --
10    A. Right.
11    Q. -- and things like that, right?
12    A. And at that point Caton started punching
13 him.
14    Q. Okay. But --
15    A. Or striking him. I --
16    Q. Right.
17    A. I can't say punch. He -- he was striking
18 him. How, I don't know, but he was swinging.
19    Q. Okay. But my question is when -- when
20 Jorg is pulling Mr. Owensby's head back with his
21 arm, other officers are -- are yelling at Mr.
22 Owensby; is that right?
23    A. Uh-huh.
24    Q. You have to say yes or no.

Page 166

1    A. I'm sorry. Yes.
2    Q. Okay. So Officer Jorg pulls his head
3 back. You have your Mace. What do you do?
4    A. I sprayed him.
5    Q. How far were you from Mr. Owensby when you
6 administered the Mace?
7    A. I was point blank, right there in his
8 face. Right --
9    Q. Okay.
10    A. I mean, right there.
11    Q. The distance of -- of the canister from
12 his eyes?
13    A. Six inches maybe.
14    Q. And did you spray once, more than once?
15    A. Hmm. Hmm. I think twice.
16    Q. What area of his face did you spray?
17    A. The eyes and the nose.
18    Q. At that point did you -- were you looking
19 when you were spraying it?
20    A. Yes.
21    Q. Did you notice whether or not Mr. Owensby
22 was bleeding?
23    A. Hmm. I think he was. I think he was.
24    Q. Where was he bleeding?

Page 167

1    A. I think it was like wet like around the
2 nose and on the forehead. I -- I -- it was
3 something wet on his forehead and the no-- around
4 the nose area.
5    Q. How could you see the forehead if Officer
6 Jorg's arm was around his forehead?
7    A. The part that I could see. When he had
8 him like this (demonstrating), when I sprayed him
9 and he moved back his arm, you know, just kind of --
10 it on-- it didn't stay like right there the whole
11 time.
12        Like when he moved just like, you know,
13 just -- I didn't see the whole forehead, but like
14 you can just see like just a little bit of this or a
15 little of this right here like above the brow.
16    Q. All right.
17    A. And I said I didn't see the whole -- you
18 know, to see if he had a laceration or anything like
19 that.
20    Q. Once you sprayed Mr. Owensby, was there
21 any -- did Mr. Owensby make any sounds in response?
22    A. I don't remember him making no sound.
23 Only thing I remember is he made like a grimace
24 like, you know, like a -- like -- that's the only

Estate of Roger D. Owensby, Jr.
December 4, 2003

DAVID WILLIAM HUNTER, JR.
VOLUME II

Page 168

1 reaction to the -- to the Mace that I remember him
2 doing.
3    Q. You noticed no coughing?
4    A. No.
5    Q. No groan or -- or any -- any sound from
6 him?
7    A. Not that I remember. Like I said, the
8 only thing I remember him doing is just making a
9 face. I don't remember any -- any noise.
10    Q. Once you finished administering the Mace
11 to Mr. Owensby, what happened next?
12    A. I went back down.
13    Q. To his arm?
14    A. To his arm.
15    Q. And were you then able to get his arm out?
16    A. Eventually, yes.
17    Q. How did you get it out?
18    A. Doing the same thing I was doing before.
19    Q. Which was?
20    A. Just pulling and tugging.
21    Q. At that point do you know whether or not
22 Officer Caton was able to get Mr. Owensby's left arm
23 out from under him?
24    A. Yes. At some point, yeah, he did, because

Page 169

1 we eventually got him handcuffed.
2    Q. How much time elapsed from after you had
3 sprayed Mr. Owensby with the Mace to the time that
4 you got his right arm out?
5    A. A matter of maybe -- maybe a minute or
6 less.
7    Q. How much time was this entire procedure
8 from the time that Mr. Owensby ran between you and
9 the other officers to the time the handcuffs were
10 put on?
11    A. I did know the answer to that, because I
12 saw it, but right now I don't remember even reading
13 it. I honestly, you know, saw from the incident the
14 exact time. But when it happened, it seemed like
15 it -- maybe three and a half minutes, four minutes,
16 something like that.
17    Q. The -- you get his right arm out. Officer
18 Caton, I guess, gets the left arm out?
19    A. Yes.
20    Q. What happens next?
21    A. He was cuffed.
22    Q. Who cuffed him?
23    A. I don't remember.
24    Q. Did Officer Caton ever leave -- well,

Page 170

1 while this is all going on, did Officer Caton ever
2 change his position?
3    A. Okay. When you say that, you mean as far
4 as in the act of getting him cuffed?
5    Q. Before getting him cuffed.
6    A. Okay.
7    Q. While -- while you are -- were on the
8 right side of Mr. Owensby --
9    A. Okay.
10    Q. -- then you went up to the head to
11 administer the Mace, in that time period was Officer
12 Caton still on the left side of Mr. Owensby?
13    A. He was on the left side of Mr. Owensby,
14 but I think at some point he went down to his legs
15 and then came back up.
16    Q. All right. Would you draw --
17    A. But I don't -- I don't -- I can't say that
18 for sure, because like I said, when I was moving up
19 here, from here to here, I wasn't really paying
20 attention to what he was doing.
21    Q. Okay. What leads you to believe at some
22 point he went down to the legs and then came back
23 up?
24    A. Because when -- hold on. Let me -- let me

Page 171

1 try to think about this for a second, because it's
2 been a little while.
3       I think it was. I think, now. I think
4 it was Hodge who asked for my PR-24 to try to do the
5 pain compliance. But he wasn't in position, he
6 wasn't in good position to do it. And if I'm not
7 mistaken, I think Caton had moved down and he ended
8 up with my PR-24, trying to get the pain compliance
9 with the legs, using my PR-24.
10    Q. When you got Mr. Owensby's right arm out
11 and put around to his back, were -- where was
12 Officer Caton?
13    A. He was back up on the left side.
14    Q. On the left side?
15    A. Yes.
16    Q. Officer -- I'm sorry. Mr. Owensby is then
17 handcuffed?
18    A. Yes.
19    Q. What happens then?
20    A. Officer Caton straddles him, with both
21 knees on either side of Mr. Owensby, and he started
22 punching him in the lower back.
23    Q. Was it above or below Mr. Owensby's
24 handcuffed arms?

Page 172

1    A. Above.
2    Q. Hands?
3    A. Above.
4    Q. Above?
5    A. Yes.
6    Q. Was -- when Officer Caton was straddling
7  him, was Mr. Owensby's handcuffed wrists in front of
8  Officer Caton?  In other words, was he sitting on
9  the handcuffs, or were the handcuffs in front of his
10 crotch?
11   A. I don't remember.  I don't know if he was
12 sitting on them or not.
13   Q. Where in the back was Officer Caton
14 striking Mr. Owensby?
15   A. I just said the lower -- to me it looked
16 like the lower back.
17   Q. All right.  Would you draw a circle of the
18 area and put an S.
19   A. (Witness complies.)
20   Q. How many times did Officer Caton strike
21 Mr. Owensby after he was handcuffed?
22   A. About at least four to five times.
23   Q. Were these punches, fist closed?
24   A. Yes.  I believe they were.

Page 173

1    Q. Where were you when this was happening?
2    A. I was standing up off to the right side,
3  maybe about here (indicating).
4    Q. Okay.  Would you indicate that with a
5  circle and an H in the middle.
6    A. (Witness complies.     )
7    Q. Did Mr. Owensby react in any way to these
8  four or five punches in the small of his back?
9    A. No.  I couldn't see his face, but as far
10 as --
11   Q. Did you -- did you hear anything?
12   A. No.
13   Q. Other than his body moving to the -- to
14 the punches, did he move his body in any way in
15 response to the punches?
16   A. Not that I remember, because when -- when
17 all this was taking place at this point, it's like
18 in my mind it's supposed to be over.  Okay?  So
19 to -- to see Caton punching him after he was
20 handcuffed, that was like a shock.  So I -- I mean,
21 it was like --
22     I was like, "What the hell is he doing?"
23 I mean, I said that before, and that's -- because I
24 said it out loud.  I said, "What the hell is he

Page 174

1  doing?"  And then, you know, he stopped.
2    Q. Was Caton saying anything while he was
3  punching Mr. Owensby in the back after he was
4  handcuffed?
5    A. Yes.
6    Q. What was he saying?
7    A. "Stop resisting."
8    Q. Was he resisting?
9    A. No.
10   Q. Because he was handcuffed?
11   A. Yes.
12   Q. And he wasn't moving or -- or saying
13 anything?
14   A. No.
15   Q. Where was Officer Jorg while Officer Caton
16 was punching Mr. Owensby in the back after he was
17 handcuffed?
18   A. Standing up.
19   Q. Where?
20   A. Up here by the head.
21   Q. Okay.
22   A. Or just -- like I said, I was looking at
23 this guy (indicating) and -- but Jorg was here and
24 he got up.  I know he got up.  He stood up when I

Page 175

1  stood up.
2    Q. All right.
3    A. Or somewhere about.
4    Q. Do you know -- do you know if Officer Jorg
5  was standing either to the right or to the left of
6  Mr. Owensby?
7    A. I don't -- I can't recall where, exactly
8  where he was standing, because I was watching -- I
9  was looking at this person (indicating).
10   Q. But Officer Jorg was standing somewhere
11 around the head area?
12   A. He was standing somewhere in close
13 proximity to where he just got up from.  So he was
14 in -- in this area somewhere (indicating).
15   Q. Did anyone else say anything to Officer
16 Caton in response to seeing him punching Mr. Owensby
17 in the small of the back after he was handcuffed?
18     MR. HARDIN:  Objection to the form of the
19   question.
20   A. I don't recall anybody saying anything
21 directly to Caton about it.
22   Q. What happened next?
23   A. Caton and Jorg, they got Mr. Owensby up.
24 Well, they -- as they were getting him up, it was a

Page 176

1 Golf Manor officer near, his car was near. Caton
2 yelled to the Golf Manor officer, "Can we put him in
3 your car?" And the Golf Manor officer said yes.
4         Caton and Jorg took Mr. Owensby over to
5 the car, and I was still standing around picking up,
6 you know, I picked up my Mace, and then checking my
7 belt to make sure I had everything.
8         And they -- as they took him over to the
9 car --
10    Q. Let --
11    A. -- I walked over to the -- okay. Go
12 ahead.
13    Q. Now let -- let me stop you. How did they
14 pick up Mr. Owensby?
15    A. By the arms.
16    Q. Okay. So he's handcuffed and they -- they
17 pick him up. Who is on the right side, who's on the
18 left side, if you know?
19    A. I don't know for sure, but I think Caton,
20 for the most part, he was on the left side. So I'm
21 going to assume that he stayed on the left side when
22 he -- when they picked him up and then Officer Jorg
23 was on the right. They picked him up and then they
24 took him to the car.

Page 177

1    Q. Did you see -- could you tell whether or
2 not Mr. Owensby was able to walk to the car?
3    A. Yes, I can tell.
4    Q. And what -- what did you see?
5    A. No.
6    Q. He could not walk?
7    A. No. He -- we -- he --
8    Q. How --
9    A. I don't -- if he could or couldn't, he was
10 not walking. He did not walk to the car.
11    Q. He was being carried?
12    A. Yes.
13    Q. His -- his feet were dangling?
14    A. Dragging.
15    Q. Okay. And the -- Officer Jorg and Caton
16 had Mr. Owensby by the arms?
17    A. Yes.
18    Q. Did anyone else assist in taking Mr.
19 Owensby to the Golf Manor cruiser?
20    A. There might have been another person over
21 there, but like I said, I didn't actually watch them
22 place him all the way in the car. So I don't know
23 if anybody might have got any hands on to help pull
24 him in or get him situated in the back of that car.

Page 178

1    Q. All right. What happens next?
2    A. I was still standing -- I -- I was --
3 after they get him over to the car, I walked toward
4 the car. And there was no need for me to be over
5 there, really, so I walked back over, same thing,
6 into the area, just looking down on the ground or
7 whatever, around the area where this just happened.
8         And I looked up and I looked across over
9 toward the Golf Manor police car and I saw the back
10 door open and I saw Officer Caton swinging.
11    Q. Now, what side of the Golf Manor car was
12 Officer Caton on?
13    A. Oh. The -- oh, God. I -- whichever side
14 Mr. Owensby's head was at, because that's the
15 side -- that -- the back door. He was at -- he was
16 standing at the back door where --
17         Because they had Mr. Owensby laying across
18 the back seat. And the side where his head was
19 nearest to the door, that door was open and that's
20 the door -- that's where Officer Caton was standing.
21    Q. Was the other door open?
22    A. No.
23    Q. Do you know if the car was in -- from
24 where you were and where Officer Caton was, was the

Page 179

1 car between you two? In other words, were you
2 looking toward Officer Caton's face or were you
3 looking toward his back?
4    A. Hmm. Hmm. Right this minute I can't say
5 for -- for sure, but I do know that from where I was
6 standing, what I saw was the door was open and I can
7 see Caton making swinging motions. But the door was
8 between my vision and Mr. Owensby, so I could not
9 see him making contact, but I can see him swinging.
10    Q. When you say he was swinging, would you
11 either demonstrate or describe for me what you saw.
12    A. Him -- I'll demonstrate.
13    Q. Okay.
14    A. He was leaning in the doorway. He was
15 between the door and the inside of the car. He was
16 leaning in, and I could see him drawing back and
17 coming down, drawing back, coming down, throwing
18 either punches or open hand, I can't say, but he was
19 throwing blows. He was delivering blows. And
20 Mr. -- and the only thing he -- he could eith-- he
21 could have been punching Mr. Owensby or he could
22 have been punching the back seat.
23    Q. And do you know how many blows Officer
24 Caton administered?

Page 180

1    A. About -- I'm just ballparking it. I mean,
2 maybe four.
3    Q. Did you hear Officer Caton say anything in
4 respon-- or while he was administering these blows
5 to Mr. Owensby?
6    A. No, I couldn't hear him say anything then.
7    Q. Did you do anything in response to seeing
8 this?
9    A. When I saw --
10    Like I said, it -- it was like maybe, like
11 I said, three to four, roughly.
12    -- I started walking toward the Golf Manor
13 car. And I took maybe two, maybe two or three steps
14 in that direction. He stopped. So at that point I
15 was like, to myself, damn, you know. Not only did
16 he do this messed-up stuff on the ground --
17    Q. You mean hitting him after he was
18 handcuffed?
19    A. Right.
20    Q. Okay.
21    A. -- then he turned around and does this.
22 So in my mind I was like, well, I have no choice but
23 to notify a supervisor when a supervisor get on the
24 scene, tell him what I saw, what he did.

Page 181

1    Because I wasn't the only one that saw
2 this, you know. When he was on the ground,
3 handcuffed, getting punched, it was a crowd forming,
4 you know. So they -- they saw what I saw. I can
5 only assume that they saw what I saw, you know, and
6 I'm not going to sit back and say, you know, I
7 didn't see anything. I was right there. I saw
8 everything. I saw the whole thing.
9    Q. Did any other officers tell you that they
10 saw Mr. -- Officer Caton punch Mr. Owensby while he
11 was on the ground and handcuffed?
12    A. Sellers.
13    Q. Anyone else?
14    A. No.
15    Q. And when -- did any other officers tell
16 you that they saw Officer Caton punching Mr. Owensby
17 while he lay in the back seat of the Golf Manor
18 cruiser?
19    A. No, I don't remember nobody telling me
20 that.
21    Q. Did you see -- as you were taking your two
22 steps or so toward the Golf Manor car, when Officer
23 Caton stopped, did you see Officer Caton then close
24 the door to the car?

Page 182

1    A. I don't remember if -- no, I don't
2 remember seeing him actually close the door. He may
3 have, but like I say, my mind was elsewhere at that
4 time.
5    I mean, I was already thinking about
6 repercussions, I mean, you might as well say. When
7 you see something like that and then you already
8 made up your mind that you're going to tell what you
9 saw, then there's consequences and repercussions
10 that follow when you do something like that.
11    Q. Did you -- what did you do then?
12    A. After that happened?
13    Q. After that. After you saw Mis-- Officer
14 Caton punching Mr. Owensby in the back seat of the
15 Golf Manor cruiser, what was the next thing that you
16 did?
17    A. I think I asked somebody to bring my car
18 over from where it was parked.
19    Q. Do you know who you asked?
20    A. No. I don't remember.
21    Q. Did you that evening talk to Officer
22 Caton?
23    A. No, huh-uh.
24    Q. Did you --

Page 183

1    MR. HARDIN: I'm sorry. I didn't hear the
2    answer.
3    THE WITNESS: No, I did not.
4    Q. Did you talk to Officer Jorg about what
5 you had seen?
6    A. No.
7    Q. Did you talk to any other officers about
8 what you had seen?
9    A. No.
10    Q. Did you talk to any sergeants that night
11 about what you had seen?
12    A. No.
13    Q. Why did you not tell any sergeants what
14 you had seen that night?
15    A. Once he -- we found out that it was a
16 problem with his health in the back of that car,
17 everything changed.
18    Q. How so?
19    A. Because this turned into a critical
20 incident where, you know, somebody was either in
21 danger of losing their life or they was going to
22 lose their life, which it did happen. So at that
23 point it's like a golden rule that you don't say
24 anything till you talk to your attorney. And when

Page 180 - Page 183

Page 184

1  they --
2  **Q. And so that -- and that was your decision**
3  **at that point?**
4  A. At that point when I found out that Mr.
5  Owensby health had deteriorated, yes.
6      Well, actually, wait a minute. Let me
7  back up. When -- when that happened and then they
8  took me off of my crowd control post and told me to
9  sit in my car and don't talk to anybody, that's when
10 I knew I was going down to be interviewed.
11     So once we got down to CIS to be
12 interviewed that night, or earlier that morning,
13 into the morning, had they 2.26'ed me, I'd have told
14 them everything.
15    **Q. What's that?**
16    A. That's where -- that's where they give us
17 a 2.26, the department, where we're ordered to tell
18 what happened but it's not used against us
19 criminally.
20     So I was waiting to be 2.26'ed when I got
21 in --
22     MR. WEISENFELDER: I'm sorry, to be what?
23     THE WITNESS: 2.26'ed.
24     MR. WEISENFELDER: What do you mean,

Page 185

1  2.26'ed?
2  A. So when I got called in to be interviewed,
3  they didn't 2.26 me; they read me my rights. So
4  after talking to FOP-appointed lawyers, I had
5  told -- I told them everything, the whole story,
6  the -- in the car, out the car, on the ground,
7  handcuffed, getting punched. I told them
8  everything. I was advised by FOP attorneys to
9  invoke my Fifth Amendment right and remain silent.
10    **Q. Which you did?**
11    A. Yes.
12    **Q. Now, going back to the scene, after**
13 **Officer -- you saw Officer Caton punching Mr.**
14 **Owensby in the back seat of the Golf Manor cruiser,**
15 **did you go over to check on the health of Mr.**
16 **Owensby?**
17     MR. HARDIN: Objection to the form of the
18    question.
19    A. No.
20    **Q. How much time elapsed, to your best**
21 **recollection, between the time that you saw Officer**
22 **Caton striking Mr. Owensby in the back seat of the**
23 **cruiser to the time that someone pulled Mr. Owensby**
24 **out of the Golf Manor cruiser?**

Page 186

1      MR. HARDIN: Objection to the form of the
2  question on putting information in that is not
3  in evidence.
4  A. I think it's about five to six minutes.
5  **Q. And during that time period what were you**
6  **doing, in that five -- five-minute period?**
7  A. Of him being taken out of the car?
8  **Q. During the time period between you saw**
9  **Officer Caton at -- at the car --**
10 A. Uh-huh.
11 **Q. -- and the time that Officer -- the time**
12 **that Mr. Owensby was -- was taken out of the car.**
13 A. Okay. That's when it's -- I ended up on
14 the post, just hold-- keeping the crowd back,
15 because it was turning into a crime scene.
16    **Q. Were you present when Mr. Owensby was**
17 **taken out of the Golf Manor cruiser?**
18 A. No.
19    **Q. When did you first know that Mr. Owensby**
20 **was taken out of the Golf Manor cruiser?**
21 A. When I looked over and seen -- it was one
22 of the officers, I think it was Hesse (sic), trying
23 to administer -- it was either Hesse (sic) or Caton.
24 It was a white officer. They were trying to

Page 187

1  administer CPR.
2  **Q. Was this on the asphalt parking lot of the**
3  **Sunoco station next to the Golf Manor car?**
4  A. Yes.
5  **Q. Do you know whether or not Mr. Owensby was**
6  **still handcuffed?**
7  A. I don't know.
8  **Q. What happened then? After you saw the**
9  **officer trying to administer CPR, what happened**
10 **next?**
11 A. Fire was -- Fire had been called and they
12 responded. And then from that point it was like I
13 was either on the crowd control post until I was
14 told by a supervisor to get in my car and just stay
15 there until I was escorted down to CIS.
16    **Q. Do you know what time you were escorted**
17 **down to CIS?**
18 A. About 11:30, something like that, maybe --
19 might have been closer to midnight. I'm not sure.
20    **Q. Did you know any of the fire/rescue people**
21 **that came out to the scene?**
22 A. No.
23    **Q. Did you see or hear them say anything,**
24 **the -- the fire and rescue people, when they arrived**

Page 204

1 seconds. There's a Golf Manor car in the middle of
2 the screen. Is that the car that Mr. Owensby was
3 placed in?
4    A. I think so.
5       Yes. Yes, it was. I'm sorry. I was just
6 trying to see where the door was at and everything.
7    Q. Yeah.
8    A. That's the -- that's the car.
9    Q. That's it? Okay.
10      We're at 57 seconds into the video.
11 There's a person walking toward -- toward Officer
12 Caton. Is that you?
13    A. Yeah. Uh-huh. Yes.
14    Q. Do you know what you said to Officer Caton
15 there?
16    A. I probably -- since he was going to get
17 his car, I probably asked him to either bring my car
18 over, too, or have somebody bring it over.
19    Q. Do you recall whether or not you asked him
20 to get your hat?
21    A. Maybe. I mean, that's like -- when, you
22 know, everything is starting to become under
23 control, that's like a big thing for the police and
24 the chief: to wear your hat. So I probably -- I

Page 205

1 might have asked for my hat.
2    Q. I'm just curious. How -- how do you know
3 that's a big thing?
4    A. Because we get reprimanded for not wearing
5 our hats.
6    Q. For not wearing your hat?
7    A. Yes.
8    Q. Okay.
9       We're at a minute 23 seconds into the
10 video. You were just describing the fact that Mr.
11 Owensby ran from you in the past and that you had
12 him by the hood of the sweat shirt.
13    A. Uh-huh.
14    Q. You heard that?
15    A. Yes.
16    Q. You're talking to two police officers. Do
17 you know who they are?
18    A. Speed it up a little bit and I'll show
19 you.
20    Q. All right.
21    A. That's Officer Sellers, and I think that's
22 Spellen with his back to me right now.
23    Q. All right.
24    A. I think. I'm not sure.

Page 206

1       THE REPORTER: I'm sorry. You think
2 that's who?
3       THE WITNESS: Officer Spellen.
4    Q. There's a --
5    A. I know that's Darren Sellers for sure.
6    Q. With the glasses?
7    A. The glasses.
8    Q. All right. And there's another officer,
9 beginning at twenty -- a minute 25 seconds in, who's
10 beginning to cross the screen from your right to
11 your left. Do you know who that is?
12    A. Yeah. That's Sergeant Watts.
13    Q. All right.
14       There's an officer that you were just
15 shaking hands with who has a hat on. We're at a
16 minute 38 into the video. Who is that?
17    A. That's Officer Brazile.
18    Q. We're at a minute 53 into the video.
19 There's a female officer crossing the screen.
20 That's Officer Browner?
21    A. Sergeant Browner.
22    Q. Or Sergeant Browner.
23       We're at two minutes 11 seconds into the
24 video. There's a person in plainclothes in the

Page 207

1 middle of the screen. Do you know who that is?
2    A. Abe Lawson.
3    Q. Okay.
4    A. Officer Lawson.
5    Q. At two minutes 26 -- 26 seconds into the
6 video there is a white person in -- in plainclothes
7 crossing the screen. Is that Officer Hodge?
8    A. Yes.
9    Q. You can hear Officer Jorg talking to
10 someone?
11    A. Uh-huh. Yes.
12    Q. In the video. Were you present when Jorg
13 was talking?
14    A. Yes.
15    Q. Who was he talking to?
16    A. Talking to Sergeant Browner and Sergeant
17 Watts.
18    Q. Browner and Sergeant Watts?
19    A. Yes.
20    Q. Thanks.
21       We're at 4 minutes 4 seconds. While all
22 of this is going on, Mr. Owensby is in the Golf
23 Manor cruiser off to the left side of the screen; is
24 that right?

Page 204 - Page 207

Page 252

1    the third page in from the end is relevant in
2    explaining what a 2.26 is, as referenced by
3    Officer Hunter.
4        Q. I want to show you, sir, what's previously
5    marked as Exhibit 60. This is the Cincinnati Police
6    Department use of force policy that was in effect in
7    November of 2000, correct?
8        A. Yes.
9        Q. And I want to direct your attention to
10    page 3, please. You see in bold there is a word
11    "Procedure" about a third of the way down the page?
12        A. Yes.
13        Q. Okay. Paragraph right above that says,
14    "Following any use of force resulting in a citizen's
15    injury, officers will ensure appropriate first aid
16    is rendered immediately once the incident scene is
17    stabilized."
18        Now, we covered in -- in the first part of
19    your deposition on November 6 that, in your opinion,
20    the scene was stabilized once Officer -- once Mr.
21    Owensby was handcuffed and placed in the back seat
22    of the cruiser; is that right?
23        A. Yes.
24        Q. Okay. Am I correct in understanding that

Page 253

1    no Cincinnati police officers immediately provided
2    appropriate first aid for Mr. Owensby while he lay
3    in the back seat of that cruiser; is that right?
4        A. Yes.
5        Q. It wasn't until Sergeant Watts, five
6    minutes or -- or later, ordered him removed from the
7    cruiser that anyone began to consider first aid for
8    Mr. Owensby, right?
9        A. Yes.
10        Q. Go to page 9 of that document, Exhibit 60.
11    At paragraph C on that page it says Use of Chemical
12    Irritant. And at number 4 under letter C it says,
13    "When spraying chemical irritant, if possible spray
14    five to ten feet" from the -- "from an individual.
15    The target should be" the "individual's eyes, nose,
16    and mouth."
17        This was the -- remember I asked you
18    earlier today the standard for the distance that an
19    officer should apply chemical irritant. This was
20    the standard that was in place on November 7, 2000;
21    is that right?
22        A. Yes.
23        Q. And you did not spray the irritant from
24    five to ten feet but, rather, from approximately

Page 254

1    six inches?
2        A. Yes.
3        Q. Is there a reason for that?
4        A. Yes.
5        Q. What was the reason?
6        A. The reason was we was trying to get him to
7    comply, and for me to spray him and not hit Officer
8    Jorg with overspray, I had to be as close as I could
9    to him. That was my reason. I ain't saying it's --
10    it's not -- it's obvious that it wasn't procedurally
11    correct, but that was my reason.
12        Q. Number 5 says Exposed individuals sprayed
13    with chemical irritant" -- or "Expose individuals
14    sprayed with chemical irritant to fresh air. Give
15    them an opportunity to rinse their face with plenty
16    of clear, cool water." That was never provided to
17    Mr. Owensby, was it?
18        A. No. And water was never provided to us.
19        Q. Well, nobody else was Maced, were they?
20        A. No. Not us meaning us as far as if we got
21    Maced on a scene. I mean, we didn't carry water
22    around in our cruisers.
23        Q. Okay. But you were at a convenience
24    store?

Page 255

1        A. Right.
2        Q. There was water there, right?
3        A. Yes, uh-huh.
4        Q. There was -- there was bottled water in
5    the refrigerators at the convenience store?
6        A. Yes, uh-huh.
7        Q. And no one ever went to try to offer Mr.
8    Owensby any clear, cool water?
9        A. No.
10        Q. Had that been done once he was handcuffed,
11    do you believe that officers would have immediately
12    been able to determine that he was unconscious?
13        A. Yes.
14        Q. And if officers had immediately determined
15    that he was unconscious, then the officers would
16    have also then had an obligation to administer first
17    aid?
18        A. Yes.
19        Q. Officer Hasse, who was present once Mr.
20    Owensby was placed in the back seat of the cruiser,
21    Officer Hasse was a trained EMT, was he not?
22        A. I don't --
23        Q. You don't know?
24        A. I don't know.