Estate of Owensby vs. City of Cincinnati
October 14, 2003
Case 1:01-cv-00769-SAS   Document 89-11   Filed 02/02/2004   Page 1 of 17
ROBERT BLAINE JORG

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - - - -

ESTATE OF ROGER D.               :
OWENSBY JR., et al.,             :
                                 :
         Plaintiffs,             :
    vs.                          :   Case No. 01-CV-769
                                 :   (Judge S. A. Spiegel)
CITY OF CINCINNATI,              :
et al.,                          :
                                 :
         Defendants.             :

- - - - - - - - - - - - - - - -


     Videotaped deposition of ROBERT BLAINE JORG, a

defendant herein, called by the plaintiffs for

cross-examination, pursuant to the Federal Rules of

Civil Procedure, taken before me, Wendy Davies

Welsh, a Registered Diplomate Reporter and Notary

Public in and for the State of Ohio, at the offices

of Helmer, Martins & Morgan Co. LPA, 1900 Fourth &

Walnut Centre, 105 East Fourth Street, Cincinnati,

Ohio, on Tuesday, October 14, 2003, at 10:12 a.m.

Estate of Owensby vs. City of Cincinnati
October 14, 2003
Case 1:01-cv-00769-SAS   Document 89-11   Filed 02/02/2004   Page 2 of 17
ROBERT BLAINE JORG

Page 2

1 APPEARANCES:

2   On behalf of the Plaintiffs:

3       Paul B. Martins, Esq.
        Don Stiens, Esq.
4       Helmer, Martins & Morgan Co. LPA
        Suite 1900, Fourth & Walnut Centre
5       105 East Fourth Street
        Cincinnati, Ohio 45202
6       Phone: (513) 421-2400

7       John J. Helbling, Esq.
        The Helbling Law Firm, L.L.C.
8       3672 Springdale Road
        Cincinnati, Ohio 45251
9       Phone: (513) 923-9740

10  On behalf of the Defendants City of Golf Manor,
    Stephen Tilley, Roby Heiland and Chris
11  Campbell:

12      Lynne Marie Longtin, Esq.
        Rendigs, Fry, Kiely & Dennis
13      900 Fourth & Vine Tower
        One West Fourth Street
14      Cincinnati, Ohio 45202-3688
        Phone: (513) 381-9200

15
    On behalf of Defendants City of Cincinnati,
16  Darren Sellers, Jason Hodge:

17
        Geri Hernandez Geiler, Esq.
18      Assistant City Solicitor
            and
19      Julie F. Bissinger, Esq.
        Chief Counsel
20      Department of Law
        Room 214, City Hall
21      801 Plum Street
        Cincinnati, Ohio 45202
22      Phone: (513) 352-3346

Page 3

1 APPEARANCES (Continued):

2   On behalf of the Defendants Robert B. Jorg,
    Patrick Caton, Jason Hodge, Victor Spellen and
3   Darren Sellers:

4       Donald E. Hardin, Esq.
        Hardin, Lefton, Lazarus & Marks, LLC
5       915 Cincinnati Club Building
        30 West Garfield Place
6       Cincinnati, Ohio 45202
        Phone: (513) 721-7300

7
    Also present:
8
    Richard W. Grubb, Videograher
9
    Lisa Damstrom, Law Clerk
10  Helmer, Martins & Morgan Co., L.P.A.

11  Wendy M. Weller, Paralegal
    Buckley King
12
    Mr. Roger Owensby
13  Mrs. Brenda Owensby
    Mr. Shawn Owensby
14
    Patrick Edmund Caton
15
    Victor Spellen

Page 4

1           STIPULATIONS

2   It is stipulated by and among counsel for the

3 respective parties that the deposition of ROBERT

4 BLAINE JORG, a defendant herein, called by the

5 plaintiffs for cross-examination, pursuant to the

6 Federal Rules of Civil Procedure, may be taken at

7 this time by the notary; that said deposition may be

8 reduced to writing in stenotype by the notary, whose

9 notes may then be transcribed out of the presence of

10 the witness; and that proof of the official

11 character and qualifications of the notary is

12 expressly waived.

                - - -

Page 5

1           I N D E X

2   Examination by:              Page

3   Mr. Martins . . . . . . . .   6

4   Ms. Longtin . . . . . . . . 227

5           - - -

6           E X H I B I T S

7                                Page
    Plaintiffs' Exhibit 1 . . . . . . . . . . . . . .  18
8   Plaintiffs' Exhibit 2 . . . . . . . . . . . . . .  25
    Plaintiffs' Exhibit 3 . . . . . . . . . . . . . .  48
9   Plaintiffs' Exhibit 4 . . . . . . . . . . . . . .  48
    Plaintiffs' Exhibit 5 . . . . . . . . . . . . . .  51
10  Plaintiffs' Exhibit 6 . . . . . . . . . . . . . .  58
    Plaintiffs' Exhibit 7 . . . . . . . . . . . . . .  72
11  Plaintiffs' Exhibit 8 . . . . . . . . . . . . . .  86
    Plaintiffs' Exhibit 9 . . . . . . . . . . . . . . 107
12  Plaintiffs' Exhibit 10 . . . . . . . . . . . . . 132
    Plaintiffs' Exhibit 11 . . . . . . . . . . . . . 161
13  Plaintiffs' Exhibit 12 . . . . . . . . . . . . . 165
    Plaintiffs' Exhibit 13 . . . . . . . . . . . . . 178
14  Plaintiffs' Exhibit 14 . . . . . . . . . . . . . 199
    Plaintiffs' Exhibit 15 . . . . . . . . . . . . . 201
15  Plaintiffs' Exhibit 16 . . . . . . . . . . . . . 206
    Plaintiffs' Exhibit 17 . . . . . . . . . . . . . 212

            - - -

Estate of Owensby vs. City of Cincinnati
October 14, 2003
ROBERT BLAINE JORG
Case 1:01-cv-00769-SAS Document 89-11 Filed 02/02/2004 Page 3 of 17

**Page 6**

1  VIDEOGRAPHER: The time is 10:16 a.m. it
2  is October the 14th. The year is 2003. If you
3  would swear the witness, ma'am.
4      ROBERT BLAINE JORG
5  being by me first duly cautioned and sworn, deposes
6  and says as follows:
7      VIDEOGRAPHER: We're on the record, Mr.
8  Martins.
9          CROSS-EXAMINATION
10 BY MR. MARTINS:
11     Q. Sir, would you state for the record your
12 name, please.
13     A. Robert Blaine Jorg.
14     Q. Your address?
15     MR. HARDIN: Objection. He will not
16 provide his address.
17     MR. MARTINS: Why not?
18     MR. HARDIN: I'll get into it. I'll talk
19 to you privately about it.
20     Q. State your address, please.
21     MR. HARDIN: Objection. Instruct the
22 witness not to answer.
23     Q. Are you going to follow the direction of
24 counsel not to provide your address?

**Page 7**

1      A. Yes, I am.
2      Q. State your age.
3      A. 32.
4      Q. Date of birth?
5      A. 9/14/71.
6      Q. Before the deposition started, sir, there
7  were -- you were standing outside and there were two
8  other gentlemen with you and they have followed you
9  into the room. Who are those people?
10     A. Patrick Caton and Victor Spellen.
11     Q. Point out for us who Patrick Caton is?
12     A. Patrick Caton is sitting to my rear on the
13 right, Victor Spellen to my rear on the left.
14     Q. On November 7th, 2000, what was your
15 weight?
16     A. I have no idea.
17     Q. Generally?
18     A. Right around 220, 225.
19     Q. And you are 6 foot 4?
20     A. Correct.
21     Q. Have you ever had a deposition taken
22 before?
23     A. No, I have not.
24     Q. Let me explain some ground rules for you,

**Page 8**

1  sir. You've been placed under oath. You are being
2  videotaped. I will ask you questions. If you do
3  not understand a question that I have asked or you
4  have not heard a question that I have asked, please
5  ask for clarification and I will endeavor to provide
6  you with clarification. If at any time I ask you a
7  question and you provide an answer, I'm going to
8  assume that you heard and understood the question
9  and have provided a truthful answer in response. Is
10 that fair?
11     A. That's fair.
12     Q. Also, if at any time you want to take a
13 break, please ask and we'll endeavor to accommodate
14 you in that regard.
15     Are you under any physical or mental
16 impairment that would cause you not to understand
17 questions put to you today?
18     (Witness and counsel conferred.)
19     MR. MARTINS: Objection to the
20 consultation. This is a deposition.
21     Q. You don't get to talk to counsel. Answer
22 the question.
23     A. I have unfortunately not been able to
24 reach my psychologist that I am seeing at this time.

**Page 9**

1  I am under evaluation by him. I don't know if that
2  is going to impair the ability, but it does make the
3  situation a little bit more uncomfortable, yes.
4      Q. Do you -- are you taking any medication?
5      A. Not at this time.
6      Q. Do you believe that you are able to
7  accurately recall facts?
8      A. Yes.
9      Q. Do you believe that you will be able to
10 truthfully provide answers to my questions?
11     A. Yes.
12     Q. When was the first time that you realized
13 that Roger Owensby Jr. was dead?
14     A. I believe it was informed to me on the way
15 to CIS.
16     Q. Who told you?
17     A. Whoever was driving me down. I believe it
18 was Lieutenant Luebbe.
19     Q. I'm sorry, I missed that. Lieutenant --
20     A. -- Luebbe, I believe that's who he was.
21     Q. Were you in Lieutenant Luebbe's car?
22     A. Correct.
23     Q. Was this the evening of November 7th,
24 2000?

Page 22

1  A. Correct.
2  Q. The next page, 1617, is an Official Oath,
3 and is that your signature on that page?
4  A. Yes.
5  Q. And that is the oath that you take when
6 you become a Cincinnati police officer; is that
7 correct?
8  A. Yes.
9  Q. Is this an oath that is taken with other
10 officers or is something that you do privately?
11  A. I believe they swore us all in at the same
12 time.
13  Q. So someone stands up and asks you to swear
14 that you "do solemnly swear that I will support the
15 Constitution of the United States of America, and
16 the Constitution and Laws of the State of Ohio, and
17 the Charter, Laws and Ordinances of the City of
18 Cincinnati, and that I will well and faithfully
19 discharge these duties of the office of Cincinnati
20 police officer to which I have been appointed,
21 according to Law and the best of my ability;" is
22 that correct?
23  A. Right. Correct.
24  Q. Do you know who administered that oath to

Page 23

1 you?
2  A. I believe it was one of the sergeants in
3 the Academy. I'm not sure which one it was. It may
4 have been the commander of the academy. I don't
5 remember.
6  Q. And then sometime later you signed this
7 oath?
8  A. Correct.
9  Q. And, in that case, you did that in the
10 presence of a notary, in this case, a Roger Wolf?
11  A. Correct.
12  Q. And that was all accomplished on June 6th
13 of 1996, correct?
14  A. Correct.
15  Q. On the next page we have C1618. It says
16 Continuous Service Record. It indicates that on
17 January 14, 1996 you were "appointed to Police
18 Recruit" and "assigned to Training Section"; is that
19 correct?
20  A. Yes.
21  Q. And where, physically, were you located to
22 be "assigned to Training Section"?
23  A. I don't remember the address. It was on
24 Pete Rose Way.

Page 24

1  Q. Is this the Cincinnati -- well, what was
2 the name of the facility in which you were -- to
3 which you were assigned?
4  A. It was the Police Academy.
5  Q. Police Academy. And then on June 9th,
6 1996, approximately six months later, you are
7 "promoted to Police Officer; assigned to District
8 2," correct?
9  A. Correct.
10  Q. On October 5, 19 -- is that '97?
11  A. Yes.
12  Q. Transferred to District 4. Why were you
13 transferred from District 2 to District 4?
14  A. We were the last class to rotate. What
15 they used to do was, I believe it was every year,
16 once you get to your main district, you were then --
17 once you settled in and figured your roots out, they
18 would then transfer you to another district to give
19 you a fresh start. That was just a practice that
20 they had kept. We were the last class to do that.
21  Q. And I take it then, when you were at
22 District 4 that practice discontinued and you simply
23 remained at District 4?
24  A. That's correct.

Page 25

1  Q. The last entry is December 2 of 2001,
2 "Transferred to Impound Unit"; is that right?
3  A. Yes.
4  Q. Why were you transferred to the Impound
5 Unit?
6  A. I'm trying to think when that was. I
7 believe that's when I had my police powers
8 reinstated from Chief Streicher, and while the
9 investigation was still going on I was transferred
10 there.
11  Q. Where is the Impound Unit?
12  A. On Spring Grove Avenue.
13  Q. And how long did you stay in the Impound
14 Unit?
15  A. I believe to the mid of March.
16  Q. What happened then?
17  A. I left the Cincinnati Police Division.
18      (Plaintiffs' Exhibit 2
18      was marked for identi-
19      fication.)
20  Q. Handing you, sir, Plaintiffs' Exhibit
21 Number 2.
22      Exhibit 2, sir, is made up of three
23 documents. First is a January 25, 2001 City of
24 Cincinnati internal correspondence sheet memorandum

Case 1:01-cv-00769-SAS    Document 89-11    Filed 02/02/2004    Page 5 of 17

Estate of Owensby vs. City of Cincinnati
October 14, 2003
ROBERT BLAINE JORG

Page 26

1 from Kent Ryan, Safety Director -- I'm sorry, to
2 Kent Ryan, Safety Director, from S. Gregory Baker,
3 Assistant Safety Director, with copies to Chief
4 Streicher. The subject is listed as Police Officer
5 Robert B. Jorg, Pre-Disciplinary Hearing. Have you
6 ever seen this document before?
7    A. No, I have not.
8    Q. Okay. Let's go to the next document. I
9 apologize, these pages are not Bates numbered, but
10 if you go to the next document, which is a City of
11 Cincinnati internal correspondence sheet dated
12 January 4, 2001, it is addressed to Police Officer
13 Robert B. Jorg, from Colonel Thomas H. Streicher
14 Jr., Police Chief. Subject, Notice of Suspension of
15 Police Powers, and it is -- I'm not sure if I
16 recognize the signature. Do you recognize the
17 signature?
18    A. I believe that's Captain Snider.
19    Q. Snider?
20    A. I believe so.
21    Q. Do you recall being notified on January 4,
22 2001 of a suspension of your police powers?
23    A. I remember being suspended, but not the
24 date.

Page 27

1    Q. And if you go to the last page, on
2 March 20, 2002, we have an internal correspondence
3 sheet to Colonel Thomas H. Streicher Jr., Police
4 Chief, from Officer Robert B. Jorg, Impound Unit,
5 Subject is Resignation, stating that, "I will resign
6 from the Police Department on Wednesday, March 20,
7 2002. My last working day will Be Tuesday,
8 March 19th, 2002." Is that your signature?
9    A. Yes.
10    Q. And it's dated March 20, 2002. Do you
11 recall submitting this resignation?
12    A. Yes.
13    Q. Do you recall having the -- or receiving a
14 copy back that it had been approved by Chief
15 Streicher?
16    A. I don't recall ever receiving any further
17 correspondence from Chief Streicher.
18    Q. Are you currently employed?
19    A. No, I am not.
20    Q. After March 20 of 2002, between that time
21 period and today, have you been employed?
22    A. Yes.
23    Q. Where have you been employed?
24    A. Pierce Township Police Department,

Page 28

1 Clermont County, Ohio.
2    Q. And were you employed in Pierce Township
3 Police Department as a police officer?
4    A. Yes, I was.
5    Q. How long were you employed there?
6    A. From April 1st until, I believe it was
7 June 30th of this year.
8    Q. Why did you -- why was your employment
9 with Pierce Township ended on June 30, 2003?
10    A. I have been seeing a doctor, psychologist,
11 in reference to this situation, and with the
12 diagnosis he gave me, I applied for disability
13 retirement. I am now on a psychological disability.
14    Q. Is it called a disability retirement?
15    A. Yes.
16    Q. Who is your -- this psychiatrist or
17 psychologist that provided you with the diagnosis?
18    A. Dr. Daum.
19    Q. Dr. --
20    A. Daum, D-A-U-M.
21    Q. Is this doctor a psychiatrist or a
22 psychologist, if you know?
23    A. I believe he is a psychologist.
24    Q. Where is Dr. Daum located?

Page 29

1    A. On Auburn Avenue.
2    Q. I take it since June 30, 2003 then, you
3 have not been employed?
4    A. That is correct.
5    Q. On November 7, 2000 you employed, I
6 believe, what you termed a "head wrap technique"; is
7 that right?
8    A. Correct.
9    Q. Where did you learn the head wrap
10 technique?
11    A. Cincinnati Police Academy.
12    Q. Who taught you?
13    A. I believe it was, at the time, Police
14 Officer Herb Hood and Sergeant Mike Gardner.
15    Q. Were there any precautions that these
16 officers, Hood and Gardner, advised you of when
17 using the head wrap technique?
18    A. Not that I can recall. Precautions? Can
19 you be a little bit more specific?
20    Q. I'm sorry?
21    A. Can you be a little bit more specific in
22 regards to precautions.
23    Q. How to apply it, dangers in -- in
24 employing it, how not to apply it, those sorts of

Estate of Owensby vs. City of Cincinnati
October 14, 2003
Case 1:01-cv-00769-SAS   Document 89-11   Filed 02/02/2004   Page 6 of 17
ROBERT BLAINE JORG

Page 30

1 things.
2   A. They walked through me how it should be
3 accomplished and expressed, what signs you need to
4 look for, that type of thing, to gain compliance of
5 a suspect, yes.
6   Q. Where upon the head did they advise you
7 the head wrap technique should be employed?
8   A. Several different locations.
9   Q. Okay. Could you tell me where those
10 locations were, according to what they told you.
11   A. Underneath the chin, on the side of the
12 head, the top of the head, the forehead.
13   Q. Under the chin, side of the head, top of
14 the head, and forehead?
15   A. Correct.
16   Q. Those are the four?
17   A. Yes.
18   Q. With respect to the under-the-chin
19 implementation of the head wrap technique, could you
20 demonstrate for me, not by using someone, but just
21 showing me with your arms or pointing on your face,
22 where your arms would be employed?
23   A. If you're using under the chin, you'd cup
24 your hand and it goes under the chin (indicating).

Page 31

1   Q. So it's just the hand --
2   A. Correct.
3   Q. -- being placed under the chin? As to the
4 side of the head technique, how would that be
5 employed?
6   A. Basically, these holds, you never know
7 where the suspect is going to be, what position
8 you're going to be in with them. If he's laying on
9 his side, you can lay your arm straight out as his
10 head lays down on the side of it, because what you
11 need to employ a pressure point technique is
12 pressure and counterpressure. If you just push on
13 the pressure point without counterpressure, it does
14 no good, so you need the counterpressure.
15       If he's on a sofa and you've got the arm
16 of the chair, then you use the arm of the chair to
17 apply the counterpressure, that's all you need to
18 apply, and your arm would be straight out if their
19 head was down, and you apply counterpressure.
20   Q. So this head wrap technique is part of the
21 pressure point application?
22   A. Correct.
23   Q. Is it used independent of a pressure point
24 application?

Page 32

1   A. It can be, yes.
2   Q. And when these officers at the Cincinnati
3 Police Academy instructed you, did they tell you
4 that it could be used independent of a pressure
5 point application?
6   A. Yes.
7   Q. Now, I was asking you about the side of
8 the head. How -- how would you apply the side of
9 the head application of the --
10   A. You can use --
11   Q. -- head wrap technique?
12   A. -- your entire arm, you can use part of
13 your hand, you can use an inanimate object, anything
14 to stabilize the head to keep it from moving.
15   Q. And where along the side of the head would
16 you be applying either your hand or your arm?
17   A. From the ear up to the top of the hairline
18 (indicating).
19   Q. The third technique was the top of the
20 head?
21   A. Correct.
22   Q. I guess, counterpressure, how would that
23 be applied?
24   A. Well, with the under the chin, you use the

Page 33

1 fingers and palm of the hand to wrap the bottom part
2 of the chin. For the top of the head, your arm is
3 parallel, like his -- the ear would be here
4 (indicating), the top of the head would be here, and
5 the nose and eyes would be this way, and you cup and
6 wrap the top part of the head.
7   Q. And then what, pull down?
8   A. No. And then you apply pressure to
9 whatever pressure point it is that you're going to
10 be using.
11   Q. And the forehead technique?
12   A. Is pretty much the same. You wrap your
13 arm around, you put the suspect's forehead in the
14 pocket of your arm, again, to stabilize the arm, and
15 then manipulate whatever the pressure point is that
16 you're going to be using (indicating).
17   Q. And when you say the "pocket of your arm,"
18 are you referring to the joint where the elbow is?
19   A. Correct.
20   Q. On November 7th, 2000, did you employ
21 this, I think in your prior statements you referred
22 to it as a head wrap technique, did you employ a
23 head wrap technique?
24   A. Yes, I did.

Estate of Owensby vs. City of Cincinnati
October 14, 2003

Case 1:01-cv-00769-SAS   Document 89-11   Filed 02/02/2004   Page 7 of 17

ROBERT BLAINE JORG

Page 34

1  Q. And which one of the four that you've
2  described for me did you employ?
3  A. The forehead. The last one I
4  demonstrated.
5  Q. Was this in conjunction with a pressure
6  point technique or was it independent of a pressure
7  point technique?
8  A. It was with a pressure point.
9  Q. And the -- so when you applied the
10 forehead head wrap technique, it was in conjunction
11 with a pressure point technique?
12 A. Correct.
13 Q. And the pressure point technique that you
14 used was the mandibular angle pressure point; is
15 that right?
16 A. Correct.
17 Q. And that's where you press, I guess, your
18 thumb under the jaw?
19 A. No.
20 Q. Demonstrate for me just where you put --
21 A. The mandibular angle pressure point is
22 right behind the base of the ear (indicating).
23 Q. Okay. And so how -- how did you apply the
24 mandibular angle pressure technique on November 7,

Page 35

1  2000?
2  A. It's what's called the digital tip. It
3  basically is the tip of your finger. What I did is,
4  once I had Mr. Owensby stabilized with the head
5  wrap, I applied to -- what you're -- what you're
6  supposed to do with a pressure point is look for
7  compliance. You apply the pressure, give the
8  command, look for compliance. When a subject is
9  resisting as strongly as he was, the only way you
10 can overcome strength is with pain compliance
11 techniques.
12 Q. Okay. All I'm asking is how you employed
13 the pressure point technique at this point.
14 A. I had his head stabilized with my left
15 hand around his forehead here (indicating). I
16 brought in my right hand -- thumb, and applied it to
17 the mandibular angle, looking for compliance.
18 Q. So it was the thumb at the base of the ear
19 and the jaw bone?
20 A. At the base of the ear. The jaw bone's
21 down here (indicating).
22 Q. Oh, okay.
23 A. Down here where --
24 Q. Base of the ear?

Page 36

1  A. Yes.
2  Q. All right. How long did you have the
3  forehead -- I think you said forehead -- head wrap
4  technique before you employed the mandibular
5  pressure technique?
6  A. Almost immediately.
7  Q. And the reason you used the forehead head
8  wrap was in order to provide a counterpressure for
9  the pressure point?
10 A. Correct.
11 Q. That was the only reason?
12 A. Not 100 percent.
13 Q. Was there any other reason?
14 A. With the situation that was in, when the
15 altercation first started I was on my back and Mr.
16 Owensby was on top of me. As I rolled him over and
17 tried to gain compliance, that's when the other
18 officers had arrived.
19 Q. Okay. But my question is, was there any
20 other reason why you used this head wrap technique
21 other than to serve as counterpressure to the
22 pressure point?
23 A. To stabilize the head.
24 Q. And as I understand your testimony, you

Page 37

1  applied the head wrap technique almost
2  simultaneously with the application of the pressure
3  point?
4  A. That's correct.
5  Q. So it would have been a matter of one or
6  two seconds between the time the head wrap was
7  applied and the time the pressure point was applied?
8  A. Correct.
9  Q. And then, my follow-up is, was there any
10 other reason to apply the head wrap other than as a
11 counterpressure for the pressure point?
12 A. To stabilize the head. If you stabilize
13 the head, the rest of the body pretty much follows.
14 And in a struggling situation, if you can get the
15 feet or the head, top part of the body, it helps
16 stabilize the person so their resisting goes down
17 and there's fewer damage to the officers and the
18 suspect. I had the top part of the head, I stayed
19 with that.
20 Q. As to this -- well, let me ask you. Did
21 your arm ever drop to the area of Mr. Owensby's nose
22 and mouth?
23 A. I don't believe so, no.
24 Q. Did it ever drop to the area of Mr.

Estate of Owensby vs. City of Cincinnati
October 14, 2003
Case 1:01-cv-00769-SAS   Document 89-11   Filed 02/02/2004   Page 8 of 17
ROBERT BLAINE JORG

Page 38

1 Owensby's chin and throat?
2  A. No, it did not.
3  Q. Had you used this head wrap technique
4 before November 7, 2000?
5  A. Yes.
6  Q. On how many occasions?
7  A. Quite a few.
8  Q. Are we talking more than ten?
9  A. Probably, yes. It's been --
10  Q. More --
11  A. It's been a long time.
12  Q. More than twenty?
13  A. I don't think more than twenty.
14  Q. Somewhere between ten and twenty would be
15 fair?
16  A. Yes.
17  Q. Had you employed this head wrap technique
18 in the presence of other police officers?
19  A. Yes.
20  Q. Your partner at the time was Officer
21 Caton, correct?
22  A. Yes.
23  Q. Had you employed this technique in the
24 presence of Officer Caton in the past?

Page 39

1  A. I don't remember if I have or not.
2  Q. Can you identify to me who the other
3 officers were who observed you apply this head wrap
4 technique before November 7th, 2000?
5  A. The major one that stands in my mind is
6 Officer Dave Hunter. I trained a lot of recruits.
7 Which ones saw it, I'm not exactly sure.
8  Q. Where did you train recruits?
9  A. At D. Russell Lee vocational school in
10 Butler County.
11  Q. These are Cincinnati police officer
12 recruits?
13  A. No.
14  Q. What kind of recruits?
15  A. Multi-jurisdictional. They range from
16 just about every small department in Hamilton,
17 Butler, Warren, Clermont County.
18  Q. Did you ever train other Cincinnati Police
19 Officers?
20  A. Technically, yes.
21  Q. What do you mean by "technically, yes"?
22  A. I would give -- I trained recruits out of
23 the Academy that would ride with me for a period of
24 12 weeks. I would train during roll call, during

Page 40

1 certain times when something came up and I asked the
2 supervisors at the time, the lieutenants, if I could
3 share information. So yes, I've trained.
4  Q. Now, as I say to -- and those recruits
5 that would ride with you, would that be -- is that
6 called an FTO?
7  A. FTO program.
8  Q. Okay. In this training for Cincinnati
9 police officers, did you train them in this head
10 wrap technique?
11  A. No.
12  Q. Did you ever demonstrate the head wrap
13 technique to other officers, whether it be on a
14 scene or at District 4 or anywhere?
15  A. No.
16  Q. Did you ever demonstrate this technique to
17 any supervisors?
18  A. No.
19  Q. Did any supervisors ever indicate to you
20 verbally that using the head wrap technique was an
21 acceptable procedure for the City of Cincinnati
22 Police Department?
23  A. No.
24  Q. Did you ever ask?

Page 41

1  A. No.
2  Q. In the course of events on the evening of
3 November 7, 2000, at any time did you kneel on Mr.
4 Owensby's back?
5  A. Yes.
6  Q. When?
7  A. When handcuffing started to take place I
8 was able to relieve Mr. Owensby's left arm from
9 under his stomach. And as I brought his arm back, I
10 applied a light bit of pressure with my left knee
11 into the top part of his shoulder in order to get
12 leverage to pull it out of his stomach area and
13 bring it back to Officer Caton for handcuffing.
14  Q. That would be the scapular area --
15  A. Yes.
16  Q. -- of Mr. Owensby's back?
17  A. Yes.
18  Q. Was there ever a time when both your knees
19 were on his back?
20  A. No.
21  Q. Do you know of any officer who that
22 evening had both their knees on Mr. Owensby's back?
23  A. No.
24  Q. Do you know of any officer who also had

Case 1:01-cv-00769-SAS   Document 89-11   Filed 02/02/2004   Page 9 of 17
Estate of Owensby vs. City of Cincinnati                                 ROBERT BLAINE JORG
October 14, 2003

Page 42

1 his knee on Mr. Owensby's back?
2    A. No.
3    Q. You would be the only one?
4    A. As far as I'm aware, yes.
5    Q. Were you carrying a cell phone on the
6 evening of November 7, 2000?
7    A. No.
8    Q. Your partner, Officer Caton was, correct?
9    A. I believe Pat pretty much always had his
10 cell phone with him.
11   Q. Is this -- with respect to Officer Caton's
12 cell phone, is it a private cell phone or is it
13 something issued by the police department?
14   A. It's his.
15   Q. It's his cell phone. Do you know whether
16 or not Abe Lawson carried a cell phone that night?
17   A. No, I do not.
18   Q. You don't know one way or the other?
19   A. I don't know one way or the other.
20   Q. How about Jason Hodge?
21   A. No idea.
22   Q. Officer Hunter?
23   A. Don't know.
24   Q. Darren Sellers?

Page 43

1    A. I don't know.
2    Q. And forgive me if you've already asked --
3 answered this, but did you -- did you have a cell
4 phone?
5    A. No, I did not.
6    Q. On that evening do you know whether or not
7 Officer Caton used his cell phone?
8    A. I don't know.
9    Q. When you left the scene of the Sunoco
10 station on that evening, where was Mr. Owensby?
11   A. When I -- when I left?
12   Q. When you left.
13   A. I believe he was either in an ambulance in
14 route to the hospital or already at the hospital. I
15 don't know.
16   Q. Did you ever return to the scene, either
17 that evening or the next day?
18   A. No, I did not.
19   Q. On the evening of November 7, 2000, did
20 you call a lawyer?
21   A. No.
22   Q. Do you know if any of the other officers
23 involved in the arrest of Mr. Owensby called a
24 lawyer on the night of November 7, 2000?

Page 44

1    A. No.
2    Q. You don't know?
3    A. I don't know.
4    Q. Do you know if any lawyers were at the
5 scene of the Sunoco station on the evening of
6 November 7th, 2000?
7    A. I don't know.
8    Q. Do you know if any lawyers were at the
9 Sunoco station the morning of November -- or not the
10 morning, but on November 8, 2000?
11   A. No, I do not.
12   Q. Have you had -- between November 7, 2000
13 and March 2002, did you have any conversations with
14 Officer Spellen?
15   A. I believe I did.
16   Q. And when I say any conversations, I'm
17 limiting it to conversations about the events of
18 November 7th, 2000.
19   A. No, I did not.
20   Q. Okay. So the conversations you had with
21 Officer Spellen would be on other issues?
22   A. He was in court many a times. Since he
23 was a witness for the prosecution, I was not allowed
24 to talk to him. And that's basically what I said

Page 45

1 and walked away.
2    Q. I want to ask you about the first time
3 that you saw the person that was later identified to
4 you as LA. And I believe in your statement of
5 March 2002 you indicated it was a couple weeks
6 before November 7, 2000.
7    A. I -- it's been a long time. I don't know.
8    Q. Well, you understand the -- the period of
9 time that I'm referring to?
10   A. Yes.
11   Q. As I understand it from your statement you
12 were with Officer Hunter in, I believe your term is
13 "old clothes"; is that right?
14   A. Correct.
15   Q. Would you explain for us what old clothes
16 are?
17   A. Undercover work, surveillance, not in a
18 marked police unit or any outside appearance that
19 you are a police officer.
20   Q. Were you and Officer Hunter in a car?
21   A. Yes.
22   Q. What -- without going into any detail, can
23 you tell me what kind of car it was?
24   A. Very old, out of date, unsuspecting car.

Case 1:01-cv-00769-SAS   Document 89-11   Filed 02/02/2004   Page 10 of 17

Estate of Owensby vs. City of Cincinnati
October 14, 2003
ROBERT BLAINE JORG

Page 82

1 to worry about it.
2        If it's a general narcotic that you've
3 made an arrest, it depends on the person you've
4 arrested. If they're calm enough and you can
5 transport them back to the station, and while you're
6 sitting there filling out paperwork one of the
7 officers will fill out the property tag. The other
8 one will interview the suspect and get all paperwork
9 ready and take them down to booking.
10        If the person that you're arresting
11 happens to be severely agitated or you had to fight
12 or resist or ran or chase, you take them straight
13 down to the jail. You book him down there.
14        Now, depending on how busy the radio is,
15 if the radio's running you all over the place, you
16 don't have the time to get back to the property room
17 to log everything in, put it away. If the radio's
18 quiet that particular day you can go back to the
19 station, fill out your paperwork, have a boss sign
20 off on it, put it in the property room, and you're
21 done with it.
22        But if the radio's running you all over
23 the place, or several times Pat and I or Victor and
24 I or anybody and I would be the only car working the

Page 83

1 north end in the entire District 4. North of
2 Reading Road there'd be one person. It happened to
3 all of us. And you would run your butt off until
4 the end of the shift. And then you would have
5 stacks of property with ID cards and everything
6 else. And then you gotta go in and tag everything,
7 have the boss sign over it, stay over, and the whole
8 nine yards. So it would depend severely on the
9 situation.
10     Q. And in those situations where you were
11 busy with the property or drugs or whatever it is
12 that you had seized in the course of performing your
13 duties, would that be kept in the trunk of the car?
14     A. It depends on what it was. It depends if
15 heat affected it. It depends on if water affected
16 it. It depends on the property.
17        If it's just a basic sma-- let's just say
18 a small dime bag of marijuana, where the elements
19 are not going to affect it or a crack pipe or a bag
20 of crack, you put it into a property envelope, you
21 seal the envelope so you don't lose the property in
22 the back of your trunk. We had our riot bags and
23 our other bags in our -- the trunk of our car.
24 Riding with two people, you can't put the stuff up

Page 84

1 front.
2        You secure the property in the back, and
3 at the end of the day or whenever you get back to
4 the station, it's sealed, you know nothing's fallen
5 out, and you open it back up, you tag the property,
6 you weigh the property, you have the boss sign off
7 on it, and you put it in the locker.
8     Q. I want to direct your attention now to
9 November 7, 2000. Beginning at -- well, as I
10 understand it, you received a call. You and Officer
11 Caton received a call that Officer Sellers and
12 Officer Hasse needed some sort of book; is that
13 right?
14     A. Correct.
15     Q. What was the book that they needed?
16     A. I believe it was a book called an NTA
17 book, a Notice To Appear, a Misdemeanor Summons.
18     Q. Take me from the time you receive that
19 misdemeanor summons request, I guess over the radio,
20 what happens from there forward?
21     A. If I remember correctly, someone asked for
22 some paperwork up in the area of Sam's, either Pat
23 or I said, We'll take it up there, it's our beat
24 anyway. We respond up there. I believe Officer

Page 85

1 Hunter showed up on his own.
2        Hasse was talking with the person in the
3 back seat of his car. I don't remember if it was
4 Pat or I or both or whatever that handed him the
5 booklet to fill out his paperwork.
6        I don't know where Pat was. At the time I
7 know he was in the area. I was talking with Officer
8 Sellers about something completely unrelated.
9     Q. If I could stop you for a second. Where
10 were you and Officer Sellers located with respect to
11 Officer Hasse?
12     A. I believe Officer Hasse was sitting in the
13 front seat of his police car, and I was standing in
14 the front of his police car near the front bumper,
15 push bumpers.
16     Q. And Officer Sellers was standing in that
17 location with you?
18     A. Facing me with his back towards Seymour.
19     Q. Where was -- if you look at Exhibit 5 --
20 Tell you what, let me -- let me give you another
21 version of Exhibit 5, because that relates to the
22 September, October time frame. Let me get you a
23 clean one.
24

Case 1:01-cv-00769-SAS   Document 89-11   Filed 02/02/2004   Page 11 of 17

Estate of Owensby vs. City of Cincinnati                                    ROBERT BLAINE JORG
October 14, 2003

Page 86

(Plaintiffs' Exhibit 8 was marked for identification.)

Q. I'll give you what is marked as Exhibit 8.

MR. MARTINS: If it's okay with everybody I'll just wait until he's done marking on it, and then I'll make copies for everyone.

Q. On Exhibit 8, again, we have a sketch. Where were -- where was Officer Sellers' and Hasse's vehicle?

A. It's not able to be placed on this map.

Q. Okay. Because it's on the other side of Sam's?

A. On the other side of Sam's.

Q. Okay. But it was in the Sam's parking lot?

A. Correct.

Q. Was the front of the car facing Seymour?

A. I believe so, yes.

Q. Please continue. So what happens after -- you're talking with Officer Sellers.

A. I'm sorry. I was talking with Officer Sellers about off-duty stuff, and I vaguely hear Dave -- Officer Hunter -- sorry -- say, I believe it was to Officer Caton, "That's the guy that ran from

Page 87

me two weeks ago." Kind of sparked my attention from the conversation I was having with Officer Sellers.

Q. Now, all the officers here are uniformed, correct?

A. Correct.

Q. And there are three cruisers parked?

A. I probably assume so. Yeah, three.

Q. Well, there's yours, there's Sellers --

A. Mine, Sellers' --

Q. And Hunter's?

A. And Hunter's, yeah.

Q. Okay. Are all the cruisers facing Seymour?

A. I don't know.

Q. All right. Continue.

A. I made the comment to Darren, from what I understand, "If that's him, he has a lot of balls showing up here."

Q. What did you mean by that?

A. Well, it's -- it was made, at least obvious for me, to the people on the street that, you know, we don't just drive around and ask, hey, do you know who this guy is, do you know who this

Page 88

guy is. Not that it was anything serious, and it's not a homicide we're looking after him for, but to go right back to where the original foot pursuit ended with marked police officers being there, it just seemed a little gutsy. We didn't run into that a whole lot.

Q. Did you take that as a, in addition to being gutsy, being a bit of a, I guess, disrespect?

A. No.

Q. To the police officers?

A. No, I don't think so. It was just shocking. I -- you know, with the time that I've spent on the street, I haven't run into that before, so it was just a little -- a little odd. It was the first time I ran into that.

Q. Did you look over to see who the individual was that Officer Hunter was referring to?

A. Yes.

Q. And where was this person?

A. He was on the other side of the street at that point.

Q. The other side of Seymour?

A. The other side of Seymour. And it was dark enough, it wasn't very well lit, I couldn't

Page 89

make him out from anyone.

Q. Did you question Officer Hunter as to how he could make this person out if it was dark and he was across the street?

A. Not at that point.

Q. Okay. Please continue.

A. And the reason was, as I was making my comment I turned back to talk to Darren to let him know I was going over with Pat and Dave, because they had already started walking over to make an identification.

Q. Did you hear Officer Hunter say anything else to Officer Caton?

A. Not at that point.

Q. When you say they started walking over, which -- in which direction were they walking?

A. From what I remember they walked in front of Sam's. I don't know if they went over the guardrail, around the guardrail, what the situation was, or stepped over, and then started walking towards the side of Sunoco.

Q. I take it at this point in time the person that was across the street that you saw had somehow crossed Seymour Avenue?

Case 1:01-cv-00769-SAS   Document 89-11   Filed 02/02/2004   Page 12 of 17
Estate of Owensby vs. City of Cincinnati
October 14, 2003
ROBERT BLAINE JORG

Page 90

1  A. Yes, and was already in the store.
2  Q. Okay. Did you watch the person cross
3  Seymour Avenue?
4  A. No.
5  Q. Did you see the person cross or walk on
6  the sidewalk between your car and Seymour Avenue in
7  front of Sam's?
8  A. I looked once when the initial statement
9  was made. Like I said, I wouldn't have never been
10 able to identify him. And I went back to tell --
11 you know, I turned my concentration to Darren real
12 quick, told him I'd be back. Because at that point
13 Officer Hunter started walking over and Officer
14 Caton went with him.
15 Q. The -- on Exhibit 8 that you have before
16 you, are you -- can you identify where the person
17 was that was across the street when you first saw
18 the person?
19 A. Somewhere over here on the Seymour Avenue
20 side. I guess it would be, what, the west side --
21 Q. Okay.
22 A. -- of Seymour Avenue.
23 Q. Was the person even with Sam's or even
24 with the Sunoco station? Was he at the crossing?

Page 91

1  A. He was at a distance. Whatever distance
2  that was, it was a good distance away. I don't
3  remember exactly where he was at.
4  Q. As you faced Seymour Avenue was he to your
5  left?
6  A. Yes.
7  Q. Do you recall whether the person was
8  directly opposite the Sunoco station?
9  A. I don't know.
10 Q. Did you see that person cross Seymour
11 Avenue?
12 A. No.
13 Q. Did you see the person walking on the
14 sidewalk that runs along Sam's and the Sunoco?
15 A. On the side of the street I was standing
16 on?
17 Q. Yes, sir.
18 A. No, I did not.
19 Q. When you told Officer Sellers that you had
20 to go, because Officer Caton and Hunter had already
21 started walking, this person was out of your view?
22 A. Yes.
23 Q. Please continue.
24 A. I went back, first stopping at my police

Page 92

1  cruiser and picking up my night stick, which was
2  either in the door or in the screen of our car.
3  Jogged up to catch up to them. At which point I
4  believe they were probably five, ten feet away from
5  the side of the window on the Sunoco store. I stood
6  back, because I knew I couldn't identify him. And
7  Officer Hunter, I believe, made the statement to the
8  effect, "I believe that's him." And Officer Caton
9  asked, "Are you sure?" And something to the effect
10 of, "I can't tell from here, but I believe that's
11 him."
12 Q. Now, can you indicate on that chart,
13 Exhibit -- or sketch, Exhibit 8, where you, Officer
14 Hunter, and Officer Caton were located at this time,
15 when you're standing outside --
16 A. Somewhere --
17 Q. -- the convenience store.
18 A. -- on the side of Sunoco. On the
19 northwest side there is a window. I don't know
20 exactly where it is, if it's in the front of the
21 store, the middle of the store, the side. I don't
22 know. Wherever that window was, let's just say for
23 example it's right here (indicating).
24 Q. Okay. Mark that with the letter A.

Page 93

1  A. (Witness complies.)
2     Dave Hunter would be standing right in
3  front of the glass. I was standing, one foot on
4  the -- the -- it was either a curb or a parking
5  block, one foot up on that, one foot on the
6  pavement, directly back from him. Where Caton was,
7  I don't know. He was either behind him, in front of
8  him, or on the side of him.
9  Q. Okay. Can you mark with an H where
10 Officer Hunter was, with a J where you were, and I
11 guess, you don't know where Officer Caton was,
12 right?
13 A. (Witness complies.)
14    Don't remember.
15 Q. Okay. How long are the three of you
16 standing at the window?
17 A. Long enough to have the conversation that
18 I informed to you. Long enough for Dave to get a
19 view of Mr. Owensby.
20 Q. Could you see into the Sunoco station, the
21 convenience store?
22 A. Unfortunately, I'm tall enough, they had a
23 bunch of stuff blocking my way, that I could not see
24 clearly into the store. There was enough room for

Estate of Owensby vs. City of Cincinnati
October 14, 2003
Case 1:01-cv-00769-SAS    Document 89-11    Filed 02/02/2004    Page 13 of 17
ROBERT BLAINE JORG

Page 94

1 Dave and basically, from what I remember, one person
2 to look through.
3   Q. Did you try and crouch down to see in?
4   A. Dave wa-- I knew I couldn't identify, and
5 there was no reason for me to do that.
6   Q. So you did not?
7   A. No.
8   Q. Do you have any idea what, if anything,
9 Mr. Owensby purchased in the convenience store?
10 This would be at that time.
11   A. I knew -- from that time until I actually
12 had confronted him and started talking to him, I
13 knew he had a drink in his hand. That's the only
14 thing I can remember. Now, after the fact of people
15 telling me what he had and everything, sure, I know
16 some of the things he had. But at that time the
17 only thing I knew he had was the drink.
18   Q. And that's based on when you approached
19 him as he tried to leave the store?
20   A. Correct.
21   Q. Okay. So when the three of you were
22 standing there you have no idea if he's buying
23 anything or if he did, what he bought?
24   A. Exactly. Excuse me.

Page 95

1   (Discussion off the record.)
2   Q. Did you --
3   MR. HARDIN: I just want him to know that
4   he can take a break when he wants to if he
5   needs it.
6   MR. MARTINS: Sure. Do you want to take a
7   break?
8   THE WITNESS: I'm fine.
9   MR. MARTINS: Okay. And what we'll do is
10   maybe go another half-hour or so and then take
11   a break, unless -- unless you need a break
12   sooner, just say so.
13   THE WITNESS: (Nodding head.)
14 BY MR. MARTINS:
15   Q. All right. Before you left your car and
16 followed Officer Caton and Officer Hunter to the
17 convenience store at the Sunoco station, did you
18 advise the dispatcher or make any communications on
19 your radio concerning this?
20   A. I don't know if I did or not.
21   Q. Do you know if anyone did?
22   A. I'm sure it was probably done. By who, I
23 don't know.
24   Q. And Officer Sellers and Officer Hasse

Page 96

1 remained where they were parked?
2   A. I believe so, yes.
3   Q. Okay. So we're up to the point that you
4 and Officer Hunter and Officer Caton are standing
5 alongside the convenient store. Officer Hunter is
6 looking in the window, you're not sure where Officer
7 Caton is. What happens next?
8   A. It's decided that, you know, Dave really,
9 in my opinion, wasn't sure if it was the person that
10 ran from him or not. The only way to find out is we
11 can do a voluntary stop and see if he'll talk to us.
12 Since Dave was in old clothes and he may be used,
13 again, we wanted to keep Dave out of it as much as
14 we could.
15   Q. Well, Dave was in a uniform at this point?
16   A. Correct.
17   Q. Okay. And when I say Dave, I'm sorry, I
18 meant Officer Hunter. Right?
19   A. Yes.
20   Q. Okay. In your mind, at this point in time
21 you know that you're looking for an African
22 American, average height, average weight, nickname
23 of LA, correct?
24   A. Uh-huh.

Page 97

1   Q. Are there any other factors that you have
2 in your possession at this time as to the identity
3 of the person that you're looking for?
4   A. None.
5   Q. Did you hear anyone provide any
6 information before this point in time that the
7 person you were looking for was usually armed?
8   A. I've heard that, yes.
9   Q. But did you know -- at the time you're
10 standing outside the window, did you have any
11 knowledge of that?
12   A. Yes.
13   Q. Okay. How did you know or how did you
14 arrive at this information that the person you were
15 looking for was usually armed?
16   A. I don't know if "usually" was the exact
17 word. "Can be."
18   Q. Okay.
19   A. There was a teletype that was sent over
20 from one of the officers on third shift, I believe
21 it was, where the suspect -- or, I'm sorry, the
22 person that was shot at, there were two or three
23 drive-by shootings, and, I believe, the name LA was
24 mentioned on two of them. And that information is

Case 1:01-cv-00769-SAS   Document 89-11   Filed 02/02/2004   Page 14 of 17
Estate of Owensby vs. City of Cincinnati                    ROBERT BLAINE JORG
October 14, 2003

Page 98

1  what was relayed to me.
2     Q. Was this on November 7th?
3     A. Before.
4     Q. Do you know how much before?
5     A. No.
6     Q. So this is some report that you had
7  received that there was a drive-by shooting -- do
8  you know where the shooting took place?
9     A. Somewhere up in Huntington Meadows area.
10    Q. And that somebody involved in the shooting
11 had a nickname of LA?
12    A. Correct.
13    Q. Did you have any information that the
14 person doing the shooting was --
15    A. No.
16    Q. -- went by the name of LA?
17    A. No.
18    Q. All right. Please continue. So you're at
19 the window.
20    A. So we walked to the front, and like I
21 said, I grabbed my night stick out of the holder of
22 my car to catch up to him, I never put it away. I
23 walk in front of the store, put it in my holder, and
24 I'm standing there waiting for Mr. Owensby to step

Page 99

1  out so we can talk to him.
2         When he steps out, I ask him if he can
3  talk to -- to me for a minute. He's -- he complies.
4  I have him go ahead and put his drink down.
5     Q. Was that the only thing in his hands, the
6  drink?
7     A. I believe so.
8     Q. Okay.
9     A. That was the only thing in his hand.
10    Q. Where is Officer Caton and Officer Hunter
11 at this point?
12    A. I don't remember. That night, I don't
13 remember where exactly they were until I went to put
14 on handcuffs. But keep in mind, I have seen the
15 video, so some of that plays in on where they were
16 at.
17    Q. All right. Continue.
18    A. I asked him if we can talk to him for a
19 minute. He says sure. I ask him what his name is,
20 where he lives, typical first questions on
21 something.
22    Q. Well, let's take the first question, as
23 far as his name. Did he answer you?
24    A. Yes.

Page 100

1     Q. And what -- what did he say?
2     A. I believe he did say Roger Owensby. I
3  believe he did. I don't --
4     Q. And then -- sorry.
5     A. I don't exactly remember.
6     Q. And then, as to where does he live, did he
7  answer that question?
8     A. I think he said, "Not around here."
9     Q. Did he give any more -- did you follow up
10 and say, well, okay, if not around here, where?
11    A. I believe so. Like I said, it's been a
12 long time. I don't remember the exact question I
13 asked.
14    Q. And do you recall if he gave you any
15 further information, as far as where he lived?
16    A. No.
17    Q. Was he cooperative with you?
18    A. At first.
19    Q. Respectful?
20    A. Yes.
21    Q. Continue. What else happens?
22    A. I told him that we were looking for a
23 particular subject that ran from the police, and
24 that person has been known to carry a firearm. Was

Page 101

1  he armed? And he said no. And he starts to pull up
2  his shirt to show us that he's not carrying a
3  weapon. I told him to hold on. You know, there's a
4  way we do this. Do you mind if I pat you down? He
5  says no. I pat him down for weapons. I find none.
6  I continue my conversation with him.
7         The exact line of questions, who asked
8  what between me and Officer Caton, I don't recall
9  who asked what particular question.
10    Q. Do you recall, though, what questions were
11 asked?
12    A. Has he ever run from the police, has he
13 ever struck a police officer or something of that
14 nature.
15    Q. And what was his answer?
16    A. He did not. Ever having run from any
17 other police officer, no. He said he hasn't run in a
18 while -- I don't remember what exactly he responded,
19 and I don't want to --
20    Q. How about striking a police officer, did
21 he give you an answer to that?
22    A. I don't remember if he did or not.
23    Q. Please continue.
24    A. At some point in the interview either I or

Page 98 - Page 101

Page 102

1 Officer Caton asked Officer Hunter, "Is this him?"
2 Like I said, I know Pat wasn't there, he was off
3 that day. I knew I couldn't identify him. So I
4 deferred to the officer involved and said, "Is this
5 the guy?"
6    Q. Now, at this point in time am I correct in
7 understanding, at least in your mind, you have no
8 probable cause to arrest him?
9    A. I have probable cause to keep talking with
10 him, but for the assault on the officer and the
11 obstructing and everything else, no. In my opinion,
12 I had no clue that this was the guy.
13    Q. You believed you had a reasonable
14 suspicion in order to stop and talk to him?
15    A. Yes.
16    Q. And that's based on what factors?
17    A. Officer Hunter.
18    Q. Please continue.
19    A. As Dave steps into the spotlight and says,
20 "Yes, that's the man that ran," or "That's the guy,"
21 or whatever it was he said, I then reached down and
22 grabbed the, I believe it was the -- would have been
23 the left wrist of Mr. Owensby, as I reached with my
24 right hand to grab my handcuffs. At which time he

Page 103

1 broke and ran past Pat, past Dave. I somewhere lost
2 my night stick and my handcuffs in a short pursuit.
3    Q. Let me -- let me stop you there. When --
4 when you reached for your handcuffs you reached with
5 your right hand for your handcuffs?
6    A. Yes.
7    Q. And your handcuffs are located on the back
8 of your belt?
9    A. Yes.
10    Q. Did you open the pouch and pull the
11 handcuffs out?
12    A. I don't know.
13    Q. Up to this point in time, did you ask this
14 individual if he went by the nickname of LA?
15    A. Not at that point, yet.
16    Q. Did Officer Caton ask if he went by LA?
17    A. I don't think anybody asked him if he went
18 by LA.
19    Q. Yeah. And so Hunter did not either?
20    A. I don't know if he did or not. I don't
21 remember him saying that -- or asking that.
22    Q. To your recollection, no one asked this
23 person that you had stopped to talk to whether or
24 not he went by the nickname of LA?

Page 104

1    A. No.
2    Q. Correct?
3    A. Correct.
4    Q. There was another person near the scene by
5 the name of George Weaver. Do you know George
6 Weaver?
7    A. Nope.
8    Q. Were there other African American males in
9 the vicinity?
10    A. Based on what I've seen on the video, yes.
11    Q. Were these other African American males,
12 would you classify them of average height and
13 average build?
14    A. Sure.
15    Q. Generally the same as Mr. Owensby?
16    A. I would say, yes.
17    Q. On the pat-down, you had satisfied
18 yourself that he was unarmed, right?
19    A. Yes.
20    Q. And in fact, he had told you he was
21 unarmed?
22    A. Correct.
23    Q. As part of the pat-down you felt something
24 in his right pocket, correct?

Page 105

1    A. I don't remember which pocket it was in,
2 but --
3    Q. In a pants pocket?
4    A. In a pants pocket.
5    Q. What pocket?
6    A. I don't remember which pocket, both
7 pockets. I don't remember.
8    Q. And describe for me what you felt?
9    A. Based on my training and experience and
10 running the areas that I have with a lot of
11 narcotics possession, I felt what I believe was
12 marijuana in his pants.
13    Q. Large amount? Small am--
14    A. Large amount.
15    Q. I -- that's inaccurate for me. Could you
16 quantify the amount of marijuana that you thought
17 you felt in his pocket?
18    A. Hmm, about a decent size handful.
19    Q. Now, at this point in time you did not
20 know that he bought two cigars, right?
21    A. No.
22    Q. And you did not see any cigars when you
23 stopped him?
24    A. No, I didn't.

Case 1:01-cv-00769-SAS   Document 89-11   Filed 02/02/2004   Page 16 of 17
Estate of Owensby vs. City of Cincinnati
October 14, 2003
ROBERT BLAINE JORG

Page 106

1  Q. Do you know whether or not what you were
2  feeling in the pocket were two cigars?
3  A. Uh, if they'd been smashed apart and
4  dangling in his pocket, it could have been two
5  cigars.
6  Q. Did you feel anything else in the pocket?
7  A. Not that I can recall.
8  Q. You didn't feel anything that felt like
9  crack to you?
10 A. No.
11 Q. So let's go back. We're at the point
12 where Officer Hunter says, that's him, or some words
13 to that effect, correct?
14 A. Correct.
15 Q. And you reach with your right hand behind
16 to get your handcuffs while you're holding Mr.
17 Owensby's left wrist?
18 A. Correct.
19 Q. With your left hand?
20 A. (Nodding head.)
21 Q. What happens then?
22 A. He breaks and runs between Pat and Dave.
23 Q. Between Hunter?
24 A. Between Hunter and Caton. Goes, I guess

Page 107

1  it would have been like northwest, through the
2  parking lot, only managing to get maybe 20 feet when
3  I caught up to him, and unfortunately, we both
4  collided into a car there. And as I tried to take
5  him to the ground, we both kind of tripped and fell.
6  I landed on my back, and he landed on top of me, my
7  chest to his back.
8  Q. Do you know if Officer Caton also tackled
9  Mr. Owensby?
10 A. No. I was the only one that tackled him.
11 Q. The car that you hit --
12     (Plaintiffs' Exhibit 9
       was marked for identi-
13     fication.)
14 Q. Let me show you Exhibit 9. Is that the
15 car that you and Mr. Owensby ran into?
16 A. I don't know. If that's the one that was
17 parked at the lot that everybody marked out, then
18 that's the car. Is that the one? I don't know.
19 Q. Okay. Look back at Exhibit 8. Do you see
20 that there is a car parked just to the left of the
21 entrance as you're facing the entrance of the
22 convenience store?
23 A. Yes.
24 Q. Do you see that? And it's -- the

Page 108

1  passenger rear side of the car is almost over into
2  the area that's painted with diagonal stripes --
3  A. Yes.
4  Q. -- on the ground. Okay. Is that about
5  where you and Mr. Owensby collided with the car?
6  A. If that's the car that we ran into, then
7  yes, that would be it.
8  Q. Well, as far as distance from the door,
9  would that be about where you folks collided?
10 A. Yes.
11 Q. When you grabbed -- I guess you grabbed
12 Mr. Owensby from behind, correct?
13 A. Yes.
14 Q. Was it around the shoulders, the waist,
15 the hips?
16 A. As he was running I believe it was his
17 left arm is what I tried to trap as I grabbed his
18 shoulder.
19 Q. Okay. So your right hand is on his
20 shoulder?
21 A. Top of his shoulder.
22 Q. Your --
23 A. And as -- my left arm was going around his
24 arm and around his stomach.

Page 109

1  Q. Okay. And both of you hit this parked
2  car?
3  A. Yes.
4  Q. Where on the parked car did you hit?
5  A. I don't remember. It was towards the back
6  of the vehicle.
7  Q. What part of your body hit the parked car?
8  A. Well, he hit the car and I hit him. We
9  didn't actually both make contact with the vehicle,
10 but we both went into the vehicle, but he was
11 between me.
12 Q. Do you know what part of Mr. Owensby made
13 contact with the car?
14 A. I don't know. He was still standing up,
15 so it probably was midsection.
16 Q. Do you know if his head hit the car?
17 A. I don't know.
18 Q. Did Mr. -- between the time that Mr.
19 Owensby tried to run away from where you were
20 questioning him to the time that you tackled him at
21 the rear portion of the car, did Mr. Owensby stop
22 running?
23 A. No. He stutter stepped.
24 Q. Okay. And in the stutter step, where were

## AFFIDAVIT

- - -

STATE   OF   OHIO         :
                          : SS
COUNTY OF HAMILTON        :


I, Wendy Davies Welsh, Notary Public in and for the State of Ohio, do hereby state that the transcript of the deposition of Robert B. Jorg, deponent herein, having been submitted to said deponent for review and signature, has not been signed within the thirty (30) day period allowed under the Federal Rules; said deposition to now have the same force and effect as though signed.

_____
Wendy Davies Welsh, Court Reporter


Sworn to before me this _____ day of _____, 2004

_____
Thomas M. Bläsing
Notary Public - State of Ohio
My commission expires: May 4, 2004