Case 1:01-cv-00769-SAS   Document 89-12   Filed 02/02/2004   Page 1 of 18

Estate of Owensby vs. City of Cincinnati                                                    ROBERT BLAINE JORG
October 14, 2003

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - - -

ESTATE OF ROGER D.              :
OWENSBY JR., et al.,            :
                                :
        Plaintiffs,             :
   vs.                          :  Case No. 01-CV-769
                                :  (Judge S. A. Spiegel)
CITY OF CINCINNATI,             :
et al.,                         :
                                :
        Defendants.             :

- - - - - - - - - - - - - - -

Videotaped deposition of ROBERT BLAINE JORG, a defendant herein, called by the plaintiffs for cross-examination, pursuant to the Federal Rules of Civil Procedure, taken before me, Wendy Davies Welsh, a Registered Diplomate Reporter and Notary Public in and for the State of Ohio, at the offices of Helmer, Martins & Morgan Co. LPA, 1900 Fourth & Walnut Centre, 105 East Fourth Street, Cincinnati, Ohio, on Tuesday, October 14, 2003, at 10:12 a.m.

Case 1:01-cv-00769-SAS   Document 89-12   Filed 02/02/2004   Page 2 of 18

Estate of Owensby vs. City of Cincinnati
October 14, 2003
ROBERT BLAINE JORG

Page 2

1  APPEARANCES:

2  On behalf of the Plaintiffs:

3       Paul B. Martins, Esq.
        Don Stiens, Esq.
4       Helmer, Martins & Morgan Co. LPA
        Suite 1900, Fourth & Walnut Centre
5       105 East Fourth Street
        Cincinnati, Ohio  45202
6       Phone:  (513) 421-2400

7       John J. Helbling, Esq.
        The Helbling Law Firm, L.L.C.
8       3672 Springdale Road
        Cincinnati, Ohio  45251
9       Phone:  (513) 923-9740

10 On behalf of the Defendants City of Golf Manor,
   Stephen Tilley, Roby Heiland and Chris
11 Campbell:

12      Lynne Marie Longtin, Esq.
        Rendigs, Fry, Kiely & Dennis
13      900 Fourth & Vine Tower
        One West Fourth Street
14      Cincinnati, Ohio  45202-3688
        Phone:  (513) 381-9200
15
   On behalf of Defendants City of Cincinnati,
16 Darren Sellers, Jason Hodge:

17
        Geri Hernandez Geiler, Esq.
18      Assistant City Solicitor
              and
19      Julie F. Bissinger, Esq.
        Chief Counsel
20      Department of Law
        Room 214, City Hall
21      801 Plum Street
        Cincinnati, Ohio  45202
22      Phone:  (513) 352-3346

23

24

Page 3

1  APPEARANCES (Continued):

2      On behalf of the Defendants Robert B. Jorg,
       Patrick Caton, Jason Hodge, Victor Spellen and
3      Darren Sellers:

4          Donald E. Hardin, Esq.
           Hardin, Lefton, Lazarus & Marks, LLC
5          915 Cincinnati Club Building
           30 West Garfield Place
6          Cincinnati, Ohio  45202
           Phone: (513) 721-7300
7
   Also present:
8
   Richard W. Grubb, Videograher
9
   Lisa Damstrom, Law Clerk
10 Helmer, Martins & Morgan Co., L.P.A.

11 Wendy M. Weller, Paralegal
   Buckley King
12
   Mr. Roger Owensby
13 Mrs. Brenda Owensby
   Mr. Shawn Owensby
14
   Patrick Edmund Caton
15
   Victor Spellen
16

Page 4

1           S T I P U L A T I O N S

2      It is stipulated by and among counsel for the

3  respective parties that the deposition of ROBERT

4  BLAINE JORG, a defendant herein, called by the

5  plaintiffs for cross-examination, pursuant to the

6  Federal Rules of Civil Procedure, may be taken at

7  this time by the notary; that said deposition may be

8  reduced to writing in stenotype by the notary, whose

9  notes may then be transcribed out of the presence of

10 the witness; and that proof of the official

11 character and qualifications of the notary is

12 expressly waived.

                            - - -

Page 5

1                    I N D E X

2      Examination by:              Page

3      Mr. Martins . . . . . . . .     6

4      Ms. Longtin . . . . . . . .   227

5                    - - -

6            E X H I B I T S

7                                           Page
   Plaintiffs' Exhibit 1 . . . . . . . . . . . . . . . .  18
8  Plaintiffs' Exhibit 2 . . . . . . . . . . . . . . . .  25
   Plaintiffs' Exhibit 3 . . . . . . . . . . . . . . . .  48
9  Plaintiffs' Exhibit 4 . . . . . . . . . . . . . . . .  48
   Plaintiffs' Exhibit 5 . . . . . . . . . . . . . . . .  51
10 Plaintiffs' Exhibit 6 . . . . . . . . . . . . . . . .  58
   Plaintiffs' Exhibit 7 . . . . . . . . . . . . . . . .  72
11 Plaintiffs' Exhibit 8 . . . . . . . . . . . . . . . .  86
   Plaintiffs' Exhibit 9 . . . . . . . . . . . . . . . . 107
12 Plaintiffs' Exhibit 10 . . . . . . . . . . . . . . . 132
   Plaintiffs' Exhibit 11 . . . . . . . . . . . . . . . 161
13 Plaintiffs' Exhibit 12 . . . . . . . . . . . . . . . 165
   Plaintiffs' Exhibit 13 . . . . . . . . . . . . . . . 178
14 Plaintiffs' Exhibit 14 . . . . . . . . . . . . . . . 199
   Plaintiffs' Exhibit 15 . . . . . . . . . . . . . . . 201
15 Plaintiffs' Exhibit 16 . . . . . . . . . . . . . . . 206
   Plaintiffs' Exhibit 17 . . . . . . . . . . . . . . . 212

17                    - - -

Case 1:01-cv-00769-SAS  Document 89-12  Filed 02/02/2004  Page 3 of 18

Estate of Owensby vs. City of Cincinnati
October 14, 2003

ROBERT BLAINE JORG

Page 114

1 assistance" call?
2   A. Unfortunately, up until I actually heard
3 someone play that particular tape, I don't have any
4 recollection on my own of hearing anybody put out
5 the assistance. However, I know it was done, if
6 that makes --
7   Q. Because of what you've seen after the
8 fact?
9   A. Right.
10  Q. Okay.
11  A. It's one of those things, when you're a
12 police officer things happen so fast you have to pay
13 attention to everything that's done. Pat and I,
14 like I said, worked together for years, and I know
15 the minute, the second someone breaks and runs it's
16 advertised to the other officers in the area of
17 what's going on. And it's a safety issue. So I
18 know it was done. Do I remember seeing Pat grab his
19 radio and say, hey, we're in a tussle with this guy?
20 No, I do not.
21  Q. But the -- as I'm understanding your
22 testimony, the procedure is to do that as soon as
23 someone breaks and runs?
24  A. Yes. That's --

Page 115

1   Q. So am I correct in understanding that an
2 officer, a Cincinnati police officer is instructed
3 that whenever a suspect breaks and runs the officer
4 is to transmit an officer needs assistance call?
5   A. Well, it depends on the exact situation.
6 Keep in mind the distance here is probably not
7 greater than 10, 20 feet. He stutter steps. The
8 distance of the gap was closed quickly. Reacting to
9 what happens, we have many people that used to run
10 from us for whatever reason, and if it's -- as soon
11 as they break and run we can grab a coat, grab a
12 hood and solve the situation. No need to put out an
13 assistance run. If they break free of that grasp,
14 it's a foot pursuit. If we need cars, we need cars.
15 Whatever the situation may be.
16      There are some times, now that I've told
17 you the rules of how we react, there are some times
18 I've been in knockdown dragout Macing fights and
19 never had a chance to get to a radio to let anybody
20 know I was involved.
21  Q. Back in September or October did anyone
22 put out an officer needs assistance call when that
23 person ran away?
24  A. I don't know. It's printed up over there.

Page 116

1 I don't know --
2   Q. Yeah, I didn't see it there.
3   A. I -- I think there was.
4   Q. Do you have any recollection of that?
5   A. I believe somebody said he was running,
6 that they're in foot pursuit. Yep. Right here,
7 4242, "we're in foot pursuit," and then they give
8 the descriptions. Yeah, it was done.
9   Q. Well, that's different. "We're in foot
10 pursuit" is different than "officer needs
11 assistance," isn't it?
12  A. It can be.
13  Q. Well, isn't it?
14  A. Not necessarily.
15  Q. If you -- if you hear someone saying, I'm
16 in foot pursuit, do you drop everything and respond?
17  A. It depends on where I'm at.
18  Q. What do you mean?
19  A. Well, if someone's in foot pursuit on the
20 south side of the district and I'm up on the north
21 end where all the railroad tracks are, there's no
22 way I'm going to make it down there.
23  Q. Okay.
24  A. Even if it's an assistance run.

Page 117

1   Q. Well, And that's what I'm trying to
2 understand. Is there a difference in how officers
3 react when there is an officer needs assistance call
4 as opposed to a report that a suspect is in -- or
5 that the officer is in foot pursuit?
6   A. Every individual officer has to gauge the
7 risks of getting to a certain location versus the
8 damaging or hurting of the public.
9       Have I not gone to foot pursuits because
10 they were way too far away? Yeah. Have I not gone
11 to assistance runs because I knew I would never make
12 it there? Yes. Have I been involved in assistance
13 runs that have lasted for 30-plus minutes and we had
14 every div-- district there? Yes.
15      We have had -- we have had fights with
16 people on the side of an interstate where cars from
17 almost every jurisdiction of Hamilton County made it
18 to because it went that long.
19  Q. In that case --
20  A. So in answer to your question, the
21 individual officer has to gauge the risk versus the
22 outcome and make an educated decision. I can't
23 speak for what every officer does.
24  Q. You mean a decision on whether to respond

Page 114 - Page 117

Case 1:01-cv-00769-SAS   Document 89-12   Filed 02/02/2004   Page 4 of 18
Estate of Owensby vs. City of Cincinnati                    ROBERT BLAINE JORG
October 14, 2003

Page 122

1  A. No. I went through what I'm going through
2  right now and tried to give them case-by-case
3  stories, trying to give them examples of what
4  happened to me or what happened to other officers to
5  let them know. And then we'll walk them through
6  different situations and ask them, "When do you
7  think you need to call?"
8      Other -- some officers have a higher skill
9  level than others. Some officers are very good
10 schmoothers, have a very good mouth and can calm a
11 situation down no matter how bad it is. Other
12 officers can't do that. Other officers rely on
13 different things. I don't know.
14     Q. In this situation with Mr. Owensby did you
15 think that there should have been put out an officer
16 needs assistance call?
17     A. As soon as I wrapped him up and took him
18 to the ground, yes.
19     Q. Why?
20     A. He was a lot stronger than I was.
21     Q. On what do you base the -- your statement
22 that he was a lot stronger that you were?
23     A. Well, I'm trying to get his hand out from
24 under his -- his stomach, under his chest, and I

Page 123

1  couldn't pull it out.
2      Q. Tell me this: Now, when you're -- when
3  he's laying face down on the asphalt and you're off
4  on top of him and to his left, are his arms
5  underneath him?
6      A. Yes.
7      Q. Are they at his chest, are they at his
8  stomach, are his hands down by his crotch underneath
9  him?
10     A. I don't know. I can't see where his hands
11 are at.
12     Q. Could you tell from the position of his
13 elbows whether or not his arms were across his chest
14 or whether they were lower down?
15     A. His elbow was slightly bent where -- and
16 his -- he had, basically, an isosceles triangle
17 formed. Where his hands were at, I do not know. I
18 don't know if they were cupped. I don't know if
19 they were holding. I don't know if they were open.
20 I don't know what they were.
21     Q. Did Mr. Owensby say anything to you at
22 this time?
23     A. I never heard him say a word.
24     Q. Was anybody else on top of Mr. Owensby

Page 124

1  other than the portion of your body that you've
2  described?
3      A. At that particular point?
4      Q. Yes.
5      A. Or in general?
6      Q. No, at that point.
7      A. Once I got off to a side and I started
8  fighting for his left hand, I believe that's when
9  Officer Caton -- when I observed -- I don't know at
10 what point he got there, but I did see Officer Caton
11 at his -- the back portion of his body also.
12     Q. And he was to the back and to the right?
13     A. Yes.
14     Q. Where exactly on the body was Officer
15 Caton at this point?
16     A. I believe he, in my best recollection, he
17 was sitting either on the top part of his thigh or
18 the top part of his buttocks with his legs slightly
19 crossed, I think partially over one leg, I'm not
20 real sure.
21     Q. Was anybody on the left leg of Mr.
22 Owensby?
23     A. I don't believe so.
24     Q. Was Mr. Owensby kicking?

Page 125

1      A. I don't know.
2      Q. Did you ever see him kicking?
3      A. No.
4      Q. What do you recall Officer Caton doing?
5      A. He was mostly responsible for handcuffing.
6  When I got Mr. Owensby's left arm out, I remember
7  bringing it back. That's when I used my knee on his
8  shoulder and I'm bringing his arm back to Pat to
9  place the handcuffs on.
10     Q. Were you kneeling at this time?
11     A. Yes.
12     Q. So you had gotten up off of -- originally,
13 when we talked you had your head into his shoulder.
14 So you had pushed yourself up?
15     A. How -- so we don't get out of context
16 here, how it went: After we're on the ground, we
17 get rolled over, we're positioned differently. I'm
18 trying to get my arm out from under his body.
19 That's when I let go of his arm and I'm trying to
20 get my arm out. As I'm coming out, I tried to grab
21 his bicep and elbow and pull his arm out with me. I
22 can't get it to come out.
23         That's when I wrap his head and perform
24 the mandibular angle pressure point to try to gain

Case 1:01-cv-00769-SAS   Document 89-12   Filed 02/02/2004   Page 5 of 18
Estate of Owensby vs. City of Cincinnati
October 14, 2003
ROBERT BLAINE JORG

**Page 126**

1 compliance to overcome his strength by getting his
2 arm out. Just so we don't lose sight of that part.
3   At that point, as soon as I gave him the
4 commands, it was either twice or three times, his
5 arm and his elbow -- his elbow moves up, his wrist
6 starts to come up, I trap his wrist, I let go of the
7 head, I come up. I give the arm to Pat as the
8 handcuffing process is going on.
9   Q. When's the Macing?
10   A. I believe right, maybe the second before
11 his arm pops out or as it's popping out. Might have
12 been maybe a second before.
13   Q. Before the handcuffs are applied or after?
14   A. Before.
15   Q. At the time -- and -- and who applies the
16 Mace?
17   A. Officer Hunter.
18   Q. Did -- was Officer Hunter ever -- any part
19 of Officer Hunter's body in contact with Mr.
20 Owensby?
21   A. I don't know.
22   Q. At this point in time that you've
23 described, where you have Mr. Owensby's arm out
24 and -- left arm out, and you're giving it to Officer

**Page 127**

1 Caton for handcuffing, Officer Sellers and Officer
2 Hodge are present?
3   A. I believe so.
4   Q. Now, we don't --
5   A. Yes, they were. Yes, they were.
6   Q. I'm sorry?
7   A. Yes, they were.
8   Q. We know where Officer Sellers was. He was
9 on the other side of Sam's when you left him --
10   A. Uh-huh.
11   Q. -- correct? Do you know where Officer
12 Hodge was before you had physical contact with Mr.
13 Owensby?
14   A. Where he was responding from?
15   Q. Yes.
16   A. I believe he was waiting for us in
17 Roselawn Park.
18   Q. And Roselawn Park is how far away from
19 Sam's Carry Out?
20   A. 100 yards, 200 yards. Not a big distance
21 at all. At the end of Sam's, that's where the park
22 begins, so.
23   Q. And Officer Hodge was in plain clothes or
24 old clothes --

**Page 128**

1   A. Yes.
2   Q. -- correct? Along with Officer Larson?
3   A. Lawson.
4   Q. Lawson?
5   A. Yes.
6   Q. Did someone request the Macing?
7   A. I believe Officer Caton did.
8   Q. What do you recall, if -- if you recall,
9 what did he say?
10   A. I don't remember it at the time, but it
11 was referred to me by both Pat and the other people
12 that were there, "Mace this mother fucker."
13   Q. And Officer Hunter applied the Mace --
14   A. Correct.
15   Q. -- correct? How far was Officer Hunter
16 from Mr. Owensby?
17   A. I don't know.
18   Q. Did you raise Mr. Owensby's head so that
19 Officer Hunter could apply the Mace?
20   A. I believe that was my statement at
21 Internal, so I would have to say that was the most
22 accurate recollection of it, yes.
23   Q. Well, did you?
24   A. I don't remember.

**Page 129**

1   Q. When you raised Officer -- I'm sorry.
2 When you raised Mr. Owensby's head to be Maced, how
3 did you do that?
4   A. I really don't know. I don't know at what
5 point that happened, and I can't fully recall how it
6 was done, if it was done.
7   Q. Where were you when the Mace was applied?
8   A. In the same position I referred to you as
9 earlier. I was laying on the left side.
10   Q. Were you still kneeling on the shoulder?
11   A. No.
12   Q. Where were your -- were you in a kneeling
13 position?
14   A. I don't remember.
15   Q. What did Officer Hodge do to assist in the
16 arrest of Mr. Owensby?
17   A. The exact things, I'm -- I don't really
18 recall. You're going to have to ask Officer Hodge.
19 I do know he was helping with the right arm to come
20 over and handcuff him. Exactly what he did, I don't
21 know.
22   Q. Did he use a PR-24?
23   A. Uh, incorrectly, yes.
24   Q. Okay. But, I mean, there was a billy club

Case 1:01-cv-00769-SAS   Document 89-12   Filed 02/02/2004   Page 6 of 18

Estate of Owensby vs. City of Cincinnati
October 14, 2003
ROBERT BLAINE JORG

**Page 130**

1 or a PR-24 --
2  A. A PR-24 was --
3  Q. -- used in the arrest?
4  A. Yes.
5  Q. How -- to your recollection, how was it
6 used?
7  A. Well, when he first -- I don't know if
8 he -- where he got the PR-24, because he was in old
9 clothes and probably didn't have one with him. So
10 whose it was, I don't know.
11       He, from what I remember, was using it
12 incorrectly, and he was on top instead of
13 underneath. I took the PR-24 out of his hand and
14 slid it under the arm real quick so he could help
15 Pat bring the other hand over.
16  Q. Under the right arm?
17  A. Yes.
18  Q. So you're on the left-hand side, you reach
19 across, grab the PR-24, and insert it under the
20 right arm?
21  A. Yes.
22  Q. Is it inserted between the torso and the
23 elbow or from the outside through the elbow to the
24 torso?

**Page 131**

1  A. As I was handing it -- as I pulled the end
2 of it out and as I'm handing it back, I'm telling
3 him where to put it, how to put it, and I'm guiding
4 him through it.
5  Q. Did you position it or did he position it?
6  A. I did not position it.
7  Q. You did not?
8  A. No.
9  Q. What did you tell him to do?
10  A. What I just explained. It needs to go
11 under the arm and then on top of the tricep, not
12 vice versa. Otherwise, you have no -- well, I
13 didn't go through the long explanation of it. But
14 what I exactly said, I don't know.
15  Q. And -- and what did Officer Hodge do in
16 response?
17  A. He did exactly what I told him to do.
18  Q. So how did he place the PR-24?
19  A. From what I remember, under the right
20 forearm on top of the tricep, bicep area to apply
21 pressure/counterpressure to bring the arm completely
22 up for handcuffing.
23  Q. The bicep of Mr. Owensby is laying on the
24 ground, on the asphalt, right?

**Page 132**

1  A. Or up in the air. I don't know if it was
2 exactly on the ground. Remember that we're --
3  Q. It was the bottom side of the arm --
4  A. -- tussling a little bit.
5  Q. In this case?
6  A. Yes.
7  Q. Because he's face down, right?
8  A. (Nodding head.)
9  Q. The PR-24 is inserted from the outside,
10 the side closest to the car?
11  A. To be honest with you, I'm getting
12 confused in my head. I'm not exactly sure how it
13 was put in, but all I remember is, it was being used
14 wrong. I explained to him the proper way to put it
15 in as we were sitting there, and he got it up.
16            (Plaintiffs' Exhibit 10
16            was marked for identi-
17            fication.)
18  Q. Let me give you what's marked as
19 Exhibit 10. It's a generic sketch of the back of a
20 human body.
21       Place for me or draw where the PR-27 was
22 inserted. And you can use that just by a straight
23 line or draw a PR-27, however you want -- or 24, I'm
24 sorry. PR-24. However you want to do that.

**Page 133**

1  A. I'm not going to be able to.
2  Q. Why not?
3  A. Well, keep in mind, this is an
4 ever-evolving, ever-changing situation. Body parts
5 are moving. In a perfect world I could design you
6 exactly how a PR-24 needs to be used. However, if
7 Mr. Owensby is struggling with Officer Hodge at this
8 time, I'm trying to hold on to the left arm so I
9 don't lose control of it, and I'm trying to explain
10 to somebody how to put the arm in as it's bending
11 and moving and weaving. I am giving Officer Hodge,
12 telling him as fast as I possibly can, how to use
13 this implement as the situation is changing.
14 Exactly what was said, I don't remember, because,
15 again, it's constantly changing and moving and what
16 have you. You're going to have to ask Officer Hodge
17 how he did it, because I don't remember.
18  Q. I will. I will ask --
19  A. Okay.
20  Q. -- Officer Hodge.
21  A. I don't remember.
22  Q. My question is, from what you saw, where
23 was the PR-24 inserted?
24  A. Like I said, over one area, under the

Page 142

1   A. I don't remember.
2   Q. What about Officer Hunter?
3   A. I don't remember what he did.
4   Q. Is it fair to say that all of these --
5   that the -- these five officers, you, Officer Caton,
6   Officer Hodge, Officer Hunter and Officer Sellers
7   worked together in arresting Mr. Owensby?
8   A. Uh, not Webster, but it sounds like a
9   reasonable summation.
10  Q. Would you describe it as a team effort?
11  A. I guess.
12  Q. On the -- on that evening -- earlier that
13  evening, when you originally responded to Officer
14  Hasse and Sellers' car and there was a suspect in
15  the back seat, do you know why the suspect in the
16  back seat had been arrested?
17  A. Had to have been for a minor misdemeanor.
18  That's what they were missing was the minor
19  misdemeanor payout citation.
20  Q. Did you know what it was?
21  A. No.
22  Q. Did you ever talk to that person?
23  A. I don't remember if I did or not.
24  Q. Do you recall whether or not the person

Page 143

1   was arrested for marijuana possession?
2   A. Sounds familiar, but the exact arrest, I
3   don't know.
4   Q. Do you have any idea of how much marijuana
5   the person had on him?
6   A. Nope.
7   Q. Do you know who the person was that was
8   arrested?
9   A. (shaking head).
10  Q. No?
11  A. No.
12      MR. MARTINS: Why don't we take our break
13  now.
14      VIDEOGRAPHER: Off the record. The time
15  is 1:55. We're changing to videotape number 3.
16      (Lunch recess.)
17      VIDEOGRAPHER: Time is 2:43 and we're back
18  on the record. This is videotape number 3.
19  BY MR. MARTINS:
20  Q. Sir, when we were -- before we took the
21  lunch break, we were at the point where Mr. Owensby
22  had been handcuffed. What happened after that?
23  A. Officer Caton -- it was basically time to
24  get Mr. Owensby from the ground to the police car.

Page 144

1   At that point more cops started showing up. Golf
2   Manor was the closest vehicle to us. They were
3   asked if we could put Mr. Owensby in the back of
4   their police car, being the closest one to us. So
5   Officer Caton goes back down, attempts to pick Mr.
6   Owensby up by his pants, if I can remember
7   correctly. And with the spandex in them or whatever
8   elastic it was, it stretched and he didn't come up
9   off the ground.
10  Q. At this point in time was Mr. Owensby
11  moving?
12  A. Yes.
13  Q. How so?
14  A. Pretty much the typical person after
15  they've been Maced, kind of wincing the eyes and
16  trying to roll to their side. Typical response that
17  we've had.
18  Q. Did you see this?
19  A. Yes.
20  Q. You personally saw him wincing his eyes?
21  A. Yes, because he's rolling --
22  Q. Or blinking --
23  A. He's rolling up on --
24  Q. -- blinking his eyes?

Page 145

1   A. Yes. He's slightly kind of going on his
2   side, wincing the eyes. The typical response we
3   have with the --
4   Q. So then, you also saw that his head was
5   cut?
6   A. I saw a light bit of blood there, yes.
7   Q. You-- all right.
8   A. Kind of a road rash scenario.
9   Q. Where was he cut?
10  A. From what I saw, it looked like over the
11  left temple -- or not temple, temple's over here.
12  Left eyebrow.
13  Q. What about on the right side of the face?
14  A. Didn't see anything there.
15  Q. Did you notice any other cuts on him?
16  A. Not at that time, no.
17  Q. So you knew, at least at that point in
18  time, that Mr. Owensby had been Maced, and you knew
19  that he had been injured and that he had a cut on
20  his head, correct?
21  A. A minor one, yes.
22  Q. Did you do anything to administer any type
23  of first aid?
24  A. Not at that time, no.

Case 1:01-cv-00769-SAS   Document 89-12   Filed 02/02/2004   Page 8 of 18

Estate of Owensby vs. City of Cincinnati
October 14, 2003
ROBERT BLAINE JORG

### Page 150

1 officers -- when you have a subject that's still
2 resisting, not that violent anymore, but yet still
3 resisting and not cooperating, get them to the
4 closest car you can. And the closest car we had was
5 an undercover unit, didn't have a cage in the back
6 of the car. So Golf Manor was there, we put him
7 there.
8   Q. And you got permission from Golf Manor to
9 do that?
10   A. Yes.
11   Q. Who actually asked the Golf Manor officer
12 for permission?
13   A. I remember asking them, "Can we put him in
14 your car?" And from, again, from what I've heard,
15 other officers asked also. I don't remember which
16 ones they were.
17   Q. And do you recall the response that you
18 got?
19   A. Something to the effect of, sure, go
20 ahead.
21       THE REPORTER: Pardon me?
22       THE WITNESS: Sure, go ahead.
23   Q. And the officer you talked to from Golf
24 Manor was Officer Robert Heiland?

### Page 151

1   A. I don't know his name.
2   Q. You don't know?
3   A. I don't know his name.
4   Q. Did you -- when you went to retrieve your
5 PR-24 and handcuffs, I take it then you turned your
6 back on the officers that were taking Mr. Owensby to
7 the Golf Manor cruiser; is that correct?
8   A. Yes.
9   Q. So you did not see the actual transport of
10 Mr. Owensby to the cruiser?
11   A. Correct.
12   Q. When you asked -- strike that.
13       The marijuana that you believe you felt in
14 Mr. Owensby's pocket, that would have been a minor
15 misdemeanor?
16   A. Uh-huh.
17   Q. Correct?
18   A. To my assumption at that point, yes.
19   Q. Okay. If -- if it was, in fact, marijuana
20 it would have been a minor misdemeanor to your
21 understanding, correct?
22   A. Yes.
23   Q. And a minor misdemeanor you don't arrest
24 on, correct?

### Page 152

1   A. Hmm. Now you're getting into legal
2 technicalities. Yes, it's still considered an
3 arrest. What do you mean "you don't arrest on"?
4   Q. You don't handcuff.
5   A. Well, depends on the person.
6   Q. Well, in this situation, for Mr. Owensby,
7 if you knew that he had marijuana, that amount that
8 you had felt, your practice would not have been to
9 handcuff him; is that correct?
10   A. Dealing in hypotheticals, it's hard to
11 actually answer that question.
12   Q. Well, do you recall telling the IIS that
13 the marijuana possession would have been a minor
14 misdemeanor and that you would not have handcuffed
15 him?
16   A. Again, I don't quite understand where
17 you're going with the questioning. The fact that he
18 had the marijuana on him and was a minor misdemeanor
19 wasn't the priority at the time. You're looking at
20 a felony assault on a police officer. Marijuana, I
21 could pretty much care less about at that time. I
22 never got a chance to go further with it because of
23 what happened shortly thereafter when he was IDed.
24 Now, just a normal person on the street that we

### Page 153

1 would have encountered, no, he probably wouldn't
2 have been handcuffed.
3   Q. So he would have been given a citation and
4 that would be the end of it?
5   A. Pretty much.
6   Q. At any time do you recall Mr. Owensby
7 kicking?
8   A. Yes.
9   Q. When -- when was he kicking?
10   A. I felt the lower part of his body moving
11 in the beginning of the situation when we were first
12 on the ground and I was on my back. Of course, I --
13 I was able to turn him over fairly quickly. And as
14 I am trying to scoot around to the side of him, he
15 is still trying to get up. So, yes. After that, I
16 don't recall him much kicking after that, no.
17   Q. With respect to the initial time when you
18 fell to the ground, after you tackled him and you
19 fell to the ground on your back, him on top of you,
20 am I correct in understanding that it was almost
21 instantaneous, as you hit the ground, you flipped
22 him over so that he was face down on the asphalt and
23 you were on top of him?
24   A. Yes.

Case 1:01-cv-00769-SAS    Document 89-12    Filed 02/02/2004    Page 9 of 18
Estate of Owensby vs. City of Cincinnati
October 14, 2003
ROBERT BLAINE JORG

Page 154

1  Q. All right. And as to the second time when
2  you were on him and to his left, you say you felt
3  him kicking. Would it be his right leg or left leg?
4  A. I couldn't tell you which one it was. I
5  could feel the sensation, but I wasn't extremely
6  concentrating on watching what he was doing down
7  there.
8  Q. Do you know whether or not he was kicking
9  from -- since he's facing the ground and has his
10 arms underneath him, is he kicking with his leg
11 being raised from the hip or bending his knee back
12 and kicking?
13 A. I don't know.
14 Q. You testified -- or not testified, I'm
15 sorry. You stated in the IIS investigation that Mr.
16 Owensby, at one point, was using his head as a point
17 of, I guess, contact to try and raise himself. Do
18 you recall that?
19 A. Not really, no.
20 Q. Did Mr. Owensby, while you were on top of
21 him, did Mr. Owensby try to get up?
22 A. Define "try to get up."
23 Q. Try to raise himself off of the ground,
24 off of the asphalt?

Page 155

1  A. From what I can remember, no. He was more
2  intent on keeping his hands from being pulled out to
3  be handcuffed.
4  Q. Your -- when you were on top of Mr.
5  Owensby, your right hand was trying to get his left
6  arm out from under him, correct?
7  A. Uh-huh.
8  Q. And your left arm was around his head?
9  A. No.
10 Q. When did you put --
11 A. When I realized I couldn't get his arm out
12 from underneath him, that's when I disengaged and
13 went to a different technique.
14 Q. All right. Before disengaging, where was
15 your left arm?
16 A. Still underneath him, trying to pull the
17 bottom part of his bicep.
18 Q. So you finally -- you -- you get your --
19 your left arm out, and then is that when you bring
20 your left arm around to his head?
21 A. Not exactly. Yes, in theory, but not
22 exactly. As I'm pulling on the bicep, tricep, elbow
23 trying to get his arm out, I realize it's not
24 coming, I need to go to something else. And that's

Page 156

1  when I disengage, let go, change my body position
2  and then wrapped his head to perform the mandibular
3  angle.
4  Q. When you were tugging on his left arm to
5  try and get it out from under him, were you laying
6  on top of him?
7  A. No.
8  Q. Where were you?
9  A. On his -- if I can go back to --
10 Q. Sure.
11 A. -- the exhibit of -- the drawing. Kind of
12 a rough -- as I'm trying to -- keep in mind the arm
13 is not flat like this, it's kind of -- the elbow is
14 coming out this way (indicating).
15    I'm -- if I remember correctly, I was on
16 one knee trying to pull and trying to use my body
17 weight and leverage to pull that out. And when that
18 didn't work, that's when I repositioned myself to
19 perform the other maneuver.
20 Q. At -- at the time that you were doing
21 this, when you say you were on one knee, was the --
22 the down knee, if you will, was that on Mr. Owensby?
23 A. No.
24 Q. It was on the asphalt?

Page 157

1  A. On the asphalt.
2  Q. At that point then, after that, you go to
3  the -- to placing your left arm around Mr. Owensby's
4  head?
5  A. Around the forehead, yes.
6  Q. And which knee do you place on his
7  shoulder?
8  A. I didn't.
9  Q. At that point?
10 A. At that point I did not.
11 Q. Where are your knees at that point?
12 A. They're -- I'm pretty much laying down at
13 that point.
14 Q. Laying on top of him?
15 A. Laying next to him. The only part of me
16 that would have been touching him would have been my
17 right shoulder and top part of my chest reaching
18 across him to manipulate the mandibular angle.
19 Q. So your right shoulder is on Mr. Owensby's
20 left shoulder; is that right? Correct?
21 A. Yes.
22 Q. And your left arm is now coming around to
23 Mr. Owensby's head?
24 A. Correct.

Case 1:01-cv-00769-SAS   Document 89-12   Filed 02/02/2004   Page 10 of 18
Estate of Owensby vs. City of Cincinnati                                    ROBERT BLAINE JORG
October 14, 2003

Page 174

1  police procedures?
2      A. It would have been if that would have
3  happened. I was not there. I did not see that. I
4  told Dave Hunter if he saw something like that, he
5  should have reported it. Dave never did. And
6  regardless of any, quote/unquote --
7      Q. Sorry. Go ahead.
8          MR. HARDIN: Are you finished? Yeah.
9      A. One of the things that Pat and I prided
10 ourselves on is we don't believe in street justice.
11 There's no such thing. It does not apply to us.
12         For Pat to do something like that in the
13 back seat of a car would have been totally out of
14 Pat's character. The best way to get an explanation
15 of what happened back there is to ask Officer Caton.
16 I did not see it. I did not see if it happened or
17 if it did happen. I don't know.
18         By the time I got there, as I said, he was
19 closing the door and walking away. I advised
20 Officer Hunter, "If you saw Pat do something, then
21 you need to report it," and he never did.
22     Q. But there was street justice administered
23 on the night of November 7th, 2000, wasn't there?
24         MR. HARDIN: Objection.

Page 175

1          You may answer.
2          THE WITNESS: I'm sorry, what did you say?
3          MR. MARTINS: You may answer.
4          MR. HARDIN: Objection, but you may
5  answer.
6      A. No.
7      Q. Isn't it true that on the night of
8  November 7, 2000, you were indignant that this man
9  had the, in your words, "balls" to walk past you and
10 the other officers and the cruisers when you
11 believed that he was the person that fled from
12 Officer Hunter several weeks earlier; isn't that
13 true?
14     A. Not really.
15     Q. Isn't it true that you, Officer Caton, and
16 Officer Hunter then followed this person to the
17 convenience store with the idea of getting back at
18 this guy so that he would never run from you again?
19     A. No.
20     Q. Isn't it true that when you took him down
21 that you applied a hold to him and that you knelt on
22 his back to raise his head up so that he could be
23 Maced by Officer Hunter?
24     A. No.

Page 176

1      Q. Isn't it true that Officer Caton beat this
2  man in the back and in the arms with a closed fist
3  before and after he was handcuffed?
4      A. No.
5      Q. Isn't it true that when he was picked up,
6  he was near unconsciousness and could not walk?
7      A. No.
8      Q. Isn't it true that the reason he was
9  placed in the Golf Manor cruiser was because he
10 could not walk and the officers didn't want to carry
11 him back to the Cincinnati cruiser, and so they
12 looked for the fastest and easiest place to place
13 him, and that was the Golf Manor cruiser?
14     A. No.
15     Q. Isn't it true that Officer Hunter --
16 Officer Caton then beat this man when he was placed
17 in the cruiser, Maced and handcuffed?
18     A. No.
19     Q. Isn't it true that neither you nor any of
20 the other officers provided required medical
21 assistance to this officer -- to this victim while
22 he was in the back seat of the cruiser, despite the
23 fact that all of you knew he was cut, he was
24 bleeding, he had been Maced; isn't that true?

Page 177

1      A. Yes.
2      Q. Who was responsible, out of the five
3  officers, Jorg, Caton, Hunter, Hodge, Sellers, who
4  was responsible for the arrest of Roger Owensby Jr.
5  on the evening of November 7, 2000?
6      A. Officer David Hunter.
7      Q. Why?
8      A. It was his arrest. He was the one that
9  got run from. He was the one that made the
10 accusations of the situation that happened that no
11 one else saw. He was the one that identified Roger
12 Owensby. He was the one, from my understanding,
13 Off-- asked Officer Caton to go with him over to the
14 store. He was the one that identified him. It was
15 his arrest.
16     Q. You were the person that made the contact
17 with Mr. Owensby, correct?
18     A. Yes.
19     Q. You were the person that patted him down,
20 correct?
21     A. Yes.
22     Q. You were the one that attempted to
23 handcuff him, correct?
24     A. Yes.

Case 1:01-cv-00769-SAS   Document 89-12   Filed 02/02/2004   Page 11 of 18
Estate of Owensby vs. City of Cincinnati
October 14, 2003
ROBERT BLAINE JORG

Page 178

1  Q. And who actually fastened the handcuffs on
2  Mr. Owensby?
3  A. I believe it was Officer Caton.
4        (Plaintiffs' Exhibit 13 was marked for identi-
5        fication.)
6  Q. Let me show you what is marked as
7  Exhibit 13. 13. This is your handwriting?
8  A. Yes.
9  Q. It's entitled Police Officer's Notes.
10 A. Yes.
11 Q. What is the purpose of this?
12 A. If I remember correctly, any time you
13 either transport or have a situation involved in a
14 critical incident, whether law enforcement side or a
15 regular homicide, or -- of that situation, and you
16 go to CIS, like I said, to either drop somebody off
17 or whether you're involved, you have to fill one of
18 these forms out.
19 Q. Who did you give this form to?
20 A. I don't remember which investigator it
21 was.
22 Q. When did you prepare this form?
23 A. The night of the incident.
24 Q. The night of November 7th?

Page 179

1  A. Yes.
2  Q. Where were you when you prepared it?
3  A. At CIS.
4  Q. And you wrote out that, "I was the contact
5  officer in regards to the stop. After fire
6  responded I was advised to separate from any other
7  officer so I returned to my patrol car."
8  A. Yes.
9  Q. As a contact officer did you believe that
10 you had any responsibility for the well-being of Mr.
11 Owensby?
12 A. Contact officer is kind of a loose term in
13 regards to a technique that is used in law
14 enforcement.
15 Q. As the contact officer, did you believe
16 that you had any responsibility for the well-being
17 of Mr. Owensby?
18 A. No.
19 Q. As an officer involved in the arrest of
20 Mr. Owensby, did you believe that you had any
21 responsibility for the well-being of Mr. Owensby?
22 A. Per our sergeants, when involved in a
23 situation of this nature, we are not to have any
24 further contact with the subject. The officers

Page 180

1  responding on the scene are to take over. So, no.
2  Q. I'm asking about before Sergeant Watts
3  opened the door to the Golf Manor cruiser. As an
4  officer involved in the arrest of Mr. Owensby, did
5  you believe that you had a responsibility for the
6  well-being of Mr. Owensby?
7  A. It's not an easy yes-or-no answer. I'll
8  clarify that first. Yes, in a normal situation. In
9  this situation, when use has been forced -- use --
10 force has been used, the officers involved, whether
11 you use force or not, are to not have any further
12 contact with the arrested until you're down
13 processing paperwork. That's just the policy that's
14 been in -- set in the police division.
15 Q. What I'm asking about is, before any of
16 the officers arrive, any of the sergeants,
17 supervisors, arise -- arrive on the scene, you have
18 a person who you know is bleeding, you know has been
19 Maced, has been involved, even by your account, in a
20 severe struggle with five police officers and has
21 been placed in the back seat of a Golf Manor
22 cruiser, do you believe, as one of the officers
23 involved in that arrest, that you had a
24 responsibility for the well-being of that person?

Page 181

1  A. No.
2  Q. Do you believe that Officer Caton had a
3  responsibility for the well-being of that person?
4  A. No.
5  Q. Do you believe Officer Hunter had a
6  responsibility for the well-being of that person?
7  A. No.
8  Q. Do you believe Officer Sellers had a
9  responsibility for the well-being of that person?
10 A. No.
11 Q. Do you believe Officer Hodge had a
12 responsibility for the well-being of that person?
13 A. No.
14 Q. Is it your testimony that no Cincinnati
15 police officer had a responsibility for the
16 well-being of Roger Owensby while he was in the back
17 seat of the Golf Manor cruiser?
18 A. That's not what I said.
19 Q. What is your testimony? Who, if anyone,
20 was responsible for the well-being of Roger Owensby
21 while he sat -- I take that back -- while he was in
22 the back seat of the Golf Manor cruiser, bleeding
23 and having been Maced?
24 A. The first person that should have had

Page 182

1 responsibility is whose car that was, and that would
2 have been the Golf Manor Police Officer. Secondly,
3 any officer that was responding to the scene due to
4 an assistance run should have taken a responsibility
5 to make sure that things were done. Like I said,
6 I've been --
7    Q. I'm asking, before.
8       MR. HARDIN: Objection. He's not finished
9    with his answer yet.
10      MR. MARTINS: Well, just to clarify, I'm
11   asking -- I'm asking, before the sergeants --
12      MR. HARDIN: Now, wait a minute. I want
13   him to finish.
14      MR. MARTINS: Okay. All right.
15      MR. HARDIN: I want him to finish his
16   answer.
17      MR. MARTINS: All right.
18 BY MR. MARTINS:
19   Q. I'm asking, though, before any sergeants
20 respond. You can -- you can finish your answer.
21   A. At that point I've done this job quite a
22 while and I know what the sergeants are going to do.
23 I know how the sergeants want us to respond.
24      The officers that are involved in any use

Page 183

1 of force or an injury to a prisoner are not to have
2 contact with the arrested until you're down at the
3 justice center. That was the policy that was in
4 place by our supervisors. Officers responding to
5 the scene, Abe Lawson, people that were not involved
6 but were there, were responsible and should have
7 given care and aid.
8    Q. Such as Officer Brazile?
9    A. Yes.
10   Q. Officer Larson?
11   A. Lawson.
12   Q. Lawson? Is that right?
13   A. Yes.
14   Q. Is it your testimony that if you and
15 Officer Caton were involved in an altercation with a
16 suspect, and one of you or both of you shot the
17 suspect, that neither one of you could administer
18 aid to the suspect until the sergeants arrived? Is
19 that your testimony?
20   A. That's not what I said.
21   Q. What would you do in that circumstance?
22      MR. HARDIN: Objection.
23      You may answer.
24   A. Well, again, dealing in hypothetics, it's

Page 184

1 hard to give an exact clear answer. It depends on
2 the response time of other officers. I've been
3 involved in a shooting. Unfortunately, in this
4 situation, of which I really don't want to get
5 into -- when involved in a shooting, I have seen
6 officers wait until other officers have responded
7 for safety reasons. You don't know if the suspect
8 is down or if they're still alive, if they have
9 another weapon.
10      It is better to wait until the other
11 officers respond. So yes, we would probably wait
12 behind cover, concealment and wait until other
13 officers respond.
14   Q. But in this case there was no chance of
15 any harm to any officer in administering aid to Mr.
16 Owensby. He was handcuffed, he had been Maced, he's
17 in the back seat of a cruiser; is that correct?
18   A. That's correct. That's the position he
19 was in.
20   Q. All right. And is it your testimony that
21 given the facts of this situation, you still believe
22 that you and the other officers, the other four
23 officers involved in the arrest of Mr. Owensby, were
24 not to provide care and aid to Mr. Owensby?

Page 185

1    A. We had other officers on the scene --
2    Q. Now, that's not the question.
3    A. They were --
4    Q. That's not the question.
5    A. -- they should have responded in giving
6 the care.
7    Q. That's not the question. I'm asking
8 whether or not you and the other four officers
9 involved in the arrest, who had the best knowledge
10 of the injuries suffered by Mr. Owensby, whether or
11 not any of you had a responsibility to provide care
12 to Mr. Owensby before the sergeants arrived?
13      MR. HARDIN: Objection to the form of the
14   question.
15      You may answer.
16   A. Correct.
17      MR. MARTINS: Read back the question,
18   please.
19      (Record read.)
20   Q. And your answer is?
21      MR. HARDIN: There will be an objection
22   again, same objection.
23   A. The responsibility of the duty of care
24 should not necessarily be handled by the officers

Case 1:01-cv-00769-SAS   Document 89-12   Filed 02/02/2004   Page 13 of 18

Estate of Owensby vs. City of Cincinnati    ROBERT BLAINE JORG
October 14, 2003

Page 186

1 involved, but the officers that respond to the scene
2 well before the sergeants get there.
3    Q. Did you ask any of the other officers who
4 responded to the scene to provide care and medical
5 attention to Mr. Owensby?
6    A. No, I did not.
7    Q. To your knowledge, did Officer Caton ask
8 any of the other officers responding to the scene to
9 provide medical care to Mr. Owensby?
10   A. I don't know if he did or not.
11   Q. To your knowledge, did Officer Hodge ask
12 any of the officers responding to the scene to
13 provide medical care to Mr. Owensby?
14   A. I don't know if he did or not.
15   Q. To your knowledge, did Officer Sellers ask
16 any of the officers responding to the scene to
17 provide medical care to Mr. Owensby?
18   A. I don't know.
19   Q. To your knowledge did Officer Hunter ask
20 any of the officers responding to the scene to
21 provide medical care to Mr. Owensby?
22   A. I don't know.
23   Q. Do you undergo any training as to the
24 Cincinnati procedures, rules, and regulations?

Page 187

1    A. How do you mean?
2    Q. Any training? Does anybody make you aware
3 of the Cincinnati Police Department rules and
4 regulations?
5    A. If I remember correctly, when new
6 procedures came out, they have them in the staff
7 notes, and every officer gets a copy of the new
8 updated procedures.
9    Q. How about the manuals?
10   A. Probably the same way --
11   Q. Same way?
12   A. -- from what I can remember.
13   Q. Do they cover that at the police academy
14 when you are studying to become a police officer?
15   A. Briefly, yes.
16   Q. Did you cover in the police academy the
17 use of force and the rules and regulations and
18 manuals applicable to the use of force?
19   A. Yes.
20   Q. Did you study, after the police academy,
21 the Cincinnati Police Department manual and
22 procedures relating to the use of force?
23   A. I don't remember if I did or not, other
24 than an updating or in-service classes.

Page 188

1    Q. Well, do you recall any updating or
2 in-service classes with regard to Cincinnati Police
3 procedures and manuals concerning the use of force?
4    A. That was usually covered in in-service
5 training, yes.
6    Q. And do you have a recollection of that?
7    A. Not specifically, no.
8    Q. It had been some four to five years since
9 you had graduated from the police academy, correct?
10 Four years since you graduated from the police
11 academy?
12   A. For --
13   Q. You graduated from the police academy in
14 '96?
15   A. '96.
16   Q. All right then. So now it's November of
17 2000, correct?
18   A. Right. So it would be what, four and a
19 half years or so.
20   Q. Okay. In that four and a half years do
21 you have any recollection of having classes on the
22 use of force and the manuals and regulations
23 concerning the use of force?
24   A. I remember that we did have classes. The

Page 189

1 exacts, I am not sure of.
2    Q. Okay. You remember that there were
3 classes?
4    A. Yes.
5    Q. Do you remember that there were classes
6 covering this subject?
7    A. Yes.
8    Q. That is, the use of force?
9    A. Yes.
10   Q. Do you recall attending classes on the
11 care of, medical assistance for injured suspects in
12 your custody?
13   A. Not specifically.
14   Q. Do you know if the City of Cincinnati has
15 a policy concerning the use of cheek -- chokeholds?
16   A. Yes.
17   Q. What is the policy?
18   A. They are not to be used under a deadly
19 force encounter, and they are not to be used to
20 recover drugs from a suspect's mouth, or something
21 to that effect.
22   Q. Define for me what a chokehold is.
23   A. I chokehold would be restricting the
24 airflow and the throat to prevent the swallowing of

Case 1:01-cv-00769-SAS   Document 89-12   Filed 02/02/2004   Page 14 of 18
Estate of Owensby vs. City of Cincinnati                    ROBERT BLAINE JORG
October 14, 2003

**Page 214**

1  question again. I'm sorry.
2      Q. Sure. The sentence says "Arresting
3  officers must maintain control of prisoners until
4  relieved by a supervisor, Hamilton County Sheriff,
5  or other law enforcement agency." Do you see that?
6      A. Uh-huh.
7      Q. Okay. And what I'm asking is, who
8  relieved you and the other arresting officers of
9  control over the prisoner, being Mr. Owensby, on the
10 night of November 7, 2000?
11     A. Well, there were five officers involved,
12 and everybody's trying to do their part. If I'm not
13 taking the subject to the vehicle because I am
14 trying to recover property so it's not taken from
15 me, I relieved myself to secure my property.
16         When -- by the time I turn around, he's
17 secured. Even though I'm one of those officers,
18 from what I remember -- I don't remember who all was
19 at that police car. The way we were instructed, it
20 first goes down to whose arrest it was, which would
21 have been Officer Hunter's.
22         Then he gets put into a Golf Manor car.
23 The care, custody, and control, from my
24 understanding, goes to the officer whose vehicle it

**Page 215**

1  is. I know --
2      Q. The Golf Manor Officer?
3      A. Yes. I know what this says. But in
4  answer to your question, who relieved me from
5  responsibility, quote/unquote, would have been
6  myself, because I had other responsibilities there.
7         I did not think at the time Mr. Owensby
8  was in that much distress or in need of immediate
9  care. Chemical irritant affects people in different
10 ways. I advise you he had blood on his head, minor.
11 He did not seem to be in severe medical distress.
12         And it also says: Once the scene is
13 stabilized. I didn't know what else we had going
14 on. Like I said, we got so many things going on at
15 one time.
16         So who relieved my authority? At that
17 time it was myself. And then as soon as Sergeant
18 Watts shows up, I start informing him of exactly
19 what started to progress. Dave Hunter starts to
20 proceed. And before we can get the entire story
21 done, he goes, "Hold on guys. Let's go check on him
22 and see what he has to say and find out who he is."
23         Who pulled myself out? I did. Who's
24 responsible? I guess we all are. Every officer

**Page 216**

1  that was there. Every officer that's not even a
2  Cincinnati police officer, if that answers your
3  question.
4      Q. Okay. In your opinion, was the scene
5  stabilized once Mr. Owensby was handcuffed?
6      A. Not right away.
7      Q. Was the scene stabilized when Mr. Owensby
8  was placed in the back seat of the Golf Manor
9  cruiser?
10     A. No, because I still had property that was
11 outstanding.
12     Q. So the retrieval -- well, but you
13 retrieved your property while they were taking him
14 to the cruiser, right?
15     A. Oh, that's right. I'm sorry. I'm sorry.
16 Correct. Correct.
17     Q. Okay. So once he placed in the back of
18 the cruiser, you turn around -- you've retrieved
19 your property, you turn around and you see Officer
20 Caton closing the back --
21     A. Closing the door.
22     Q. -- driver's door of the Golf Manor
23 cruiser, correct?
24     A. Uh-huh.

**Page 217**

1      Q. At that point in time is the scene
2  stabilized?
3      A. Not necessarily. He's in a different
4  department's police car. We've got cars still
5  responding we have to disregard. We have
6  supervisors we need to talk to. We have to get our
7  cars over to the scene to transport Mr. Owensby from
8  the Golf Manor car to our car, so we can relieve the
9  Golf Manor's cars, thank them for coming, and send
10 them on the way.
11         No, the scene is not, quote/unquote,
12 stabilized. The way it was referred to me, the
13 scene is not stabilized until you're in your car and
14 either on your way to the station, on the way to the
15 hospital, on the way to the jail, on the way to
16 whatever. That's when the scene is stabilized.
17     Q. Go to the next page, page 3, subparagraph
18 A2. It says, "When necessary, handcuff physically
19 handicapped, injured, or pregnant prisoners in
20 front."
21     A. I'm sorry, I'm missing where you're at.
22     Q. Page 3.
23     A. Page 3.
24     Q. A. 2.

Case 1:01-cv-00769-SAS    Document 89-12    Filed 02/02/2004    Page 15 of 18
Estate of Owensby vs. City of Cincinnati                                                ROBERT BLAINE JORG
October 14, 2003

Page 218

1   A. Oh, I'm sorry.
2   Q. Do you have that?
3   A. Yes.
4   Q. Do you see, it says "When necessary,
5   handcuff physically handicapped, injured, or
6   pregnant prisoners in front." Mr. Owensby was never
7   handcuffed in front, correct?
8   A. Correct.
9   Q. And did you think that because of the
10  injuries that he had that there was any need to
11  handcuff him in front?
12  A. No.
13  Q. Right under paragraph 2 is a subparagraph
14  a., and it says, "Two officers will transport a
15  prisoner handcuffed in front of the body." Again,
16  there were no two officers to transport Mr. Owensby,
17  correct?
18  A. Well, no, we didn't have everything
19  stabilized yet. We never got to that point.
20  Q. Were you present when Mr. Owensby was
21  taken out of the Golf Manor cruiser?
22  A. Yes.
23  Q. Were you present when Officer Hasse and
24  Officer Caton attempted to administer CPR --

Page 219

1   A. Yes.
2   Q. -- to Mr. Owensby? At that time Mr.
3   Owensby -- Officer Caton and Officer Hasse left the
4   handcuffs on Mr. Owensby; is that right?
5   A. I don't remember if they did or not.
6   Q. Isn't it true -- were you there when the
7   EMS, the fire, I guess it was Golf Manor fire
8   people, showed up on the scene?
9   A. I was obviously there, but I don't think I
10  was at the actual scene, I don't think.
11  Q. Do you recall seeing that when the fire
12  and EMS people showed up on the scene, they
13  instructed the handcuffs to be removed from Mr.
14  Owensby?
15  A. I remember hearing that after the fact,
16  but I don't remember it from that night.
17  Q. Seeing that. You don't remember seeing
18  that?
19  A. No.
20  Q. In the time that you were at the scene on
21  November 7, 2000, are you aware of anyone searching
22  Mr. Owensby's person, other than the pat-down search
23  that you conducted?
24  A. None other than what happened in the

Page 220

1   hospital, and I wasn't privileged to that. I know
2   property was recovered, but I don't know who did it
3   or when.
4   Q. Do you know -- okay. That was going to be
5   my next question. Do you know who recovered
6   property at the hospital?
7   A. No.
8   Q. Obviously, you were not present?
9   A. Correct.
10  Q. If you look at page 9, you see that at the
11  bottom of the page is a section beginning D.
12  Transporting Prisoners. See that?
13  A. Uh-huh.
14      MR. HARDIN: Say yes.
15  A. I'm sorry, yes.
16  Q. Okay. And then there are a number of
17  different headings continuing on to page 10. And on
18  number 4 it says, "Two officers will transport
19  prisoners on stretchers. The second officer will
20  ride in the rear to monitor the prisoner and to give
21  or summon medical aid if necessary." Do you see
22  that?
23  A. Yes.
24  Q. Now, Mr. Owensby was not on a stretcher in

Page 221

1   the back seat of the cruiser, correct?
2   A. Correct.
3   Q. If we go to the next paragraph on page 11
4   at the top it says, "Whenever possible, officers
5   will place the prisoner on their back to avoid
6   positional asphyxiation and/or cocaine psychosis."
7   Do you recall whether or not you made any inquiry as
8   to how Mr. Owensby was positioned in the back seat
9   of the Golf Manor cruiser?
10  A. Not that night. Only when it became
11  important to find out for the defense of my trial.
12  Q. Yeah. No. I'm -- I'm just asking on the
13  night of November 7th.
14  A. No.
15  Q. Okay. Did you -- did you ever see Mr.
16  Owensby in the back seat of the cruiser, how he was
17  positioned, other than when you walked up with
18  officer Watts?
19  A. No.
20  Q. Do you see that paragraph 5 says, "Never
21  leave prisoners unattended inside vehicles."?
22  A. Uh huh. (Nodding head.)
23  Q. Do you believe that Mr. Owensby was left
24  unattended inside a vehicle?

Page 218 - Page 221

Case 1:01-cv-00769-SAS    Document 89-12    Filed 02/02/2004    Page 16 of 18

Estate of Owensby vs. City of Cincinnati                                    ROBERT BLAINE JORG
October 14, 2003

Page 222

1  A. No.
2  Q. Why not?
3  A. Well, he had a Golf Manor Officer that was
4  standing right at the driver's door of his car that
5  Mr. Owensby was in. And then, per other people's
6  statements, they were continually walking by the
7  vehicle to see who it was or what was needed.
8  Q. Do you own any property?
9  A. Yes.
10 Q. What property do you own?
11 A. Meaning land, personal property?
12 Q. Real property. I'm sorry.
13 A. Wheel property?
14 Q. Real property. Land. Real estate.
15 A. Yes.
16 Q. What property do you own?
17 A. I own 11 plus acres.
18 Q. Is it developed or undeveloped land?
19 A. Undeveloped.
20 Q. Where is it located?
21    MR. HARDIN: There's going to be an
22 objection to the address, but the general
23 location --
24    MR. MARTINS: No, I'm not -- I'm sorry.

Page 223

1     MR. HARDIN: Okay.
2  Q. Give me the county.
3  A. Brown County.
4  Q. Brown County, Ohio?
5  A. Ohio.
6  Q. Do you maintain an IRA or a 401(k)?
7  A. No.
8  Q. Do you own stocks or bonds?
9  A. No.
10 Q. Do you have a savings?
11 A. No.
12 Q. And I understand that you get disability
13 income, presently?
14 A. Yes. Unfortunately, it has not been
15 decided the actual amount of what I'm going to be
16 getting, so I don't know what that -- I haven't got
17 my first check yet. All I have is health insurance,
18 so far.
19 Q. And that's something that some
20 administrative agency will determine?
21 A. And they haven't given me a time frame on
22 when it's going to be answered.
23 Q. Do you agree that on November 7th, 2000,
24 when you approached Mr. Owensby and, thereafter,

Page 224

1  effectuated the arrest on Mr. Owensby, you were
2  acting in your capacity as a Cincinnati police
3  officer?
4  A. Yes.
5  Q. Do you agree that Mr. Owensby was
6  physically seized on November 7, 2000, that is, his
7  person was seized?
8  A. Yeah, I guess that would be -- without
9  exactly understanding where you're going, I guess
10 that would be a fair statement.
11 Q. In terms of a search and seizure, this was
12 a seizure, right?
13 A. Uh, no, it was an arrest. There's a
14 difference.
15 Q. In your mind, what's the difference?
16 A. A seizure is something, you know, when we
17 seize property, we stow it away in a particular
18 room, depending on what it is, and no one's allowed
19 to have access to it or something like that. If a
20 person is seized, that would be after any type of
21 court litigation when they would end up, be going to
22 prison or jail or something of that nature.
23    A seizure? I don't think it's a seizure.
24 It's an arrest. His liberty to leave is taken away.

Page 225

1  But I -- I don't know if a seizure actually fits on
2  that definition.
3  Q. Okay. And you agree with me that a person
4  should not arrest -- or an officer does not have
5  authority to arrest someone unless either the
6  officer has a warrant or the officer has probable
7  cause, correct?
8  A. I agree.
9  Q. Do you believe that the -- first of all,
10 you did not have a warrant for Mr. Owensby's arrest?
11 A. That's correct.
12 Q. Okay. So the arrest was based on probable
13 cause?
14 A. Yes.
15 Q. And I think you've already answered this,
16 but that was based on the indication by Officer
17 Hunter that, "That's him"?
18 A. Yes.
19 Q. Was there any use of any informant in
20 arriving at probable cause, in your mind?
21 A. Not that I was aware of.
22 Q. Was it your understanding that if you saw
23 a fellow officer using excessive force, that you had
24 a duty to step in and prevent that use of excessive

Case 1:01-cv-00769-SAS  Document 89-12  Filed 02/02/2004  Page 17 of 18
Estate of Owensby vs. City of Cincinnati
October 14, 2003
ROBERT BLAINE JORG

Page 226

1 force?
2   A. Yes.
3   Q. And if you could not prevent that use of
4 excessive force, that you had a duty to report that
5 use of excessive force?
6   A. Yes.
7     MR. MARTINS: Let's take a break.
8     VIDEOGRAPHER: Off the record.
9     (Recess taken: 4:41 p.m. - 4:46 p.m.)
10    VIDEOGRAPHER: Back on the record, Mr.
11 Martins.
12 BY MR. MARTINS:
13  Q. Sir, I want to ask you about the
14 microphones, the mikes that the officers wear. When
15 an officer wants to transmit, in this case, the call
16 for assistance, it's referred to as keying the mike;
17 is that right?
18  A. Yes.
19  Q. Would you explain to us what keying the
20 mike is?
21  A. Just what you said. When someone asks if
22 you have your mike keyed up or check your mikes or
23 something like that, it means actually depressing
24 the button on your microphone or on your portable

Page 227

1 radio to a point where a transmission can be sent.
2   Q. And once you release, you let go of the
3 mike, then the transmission stops?
4   A. I believe so. I'm not the technical
5 wizard on that, but I believe that's how it works.
6 I don't know if there's any overlap or not. I don't
7 know.
8   Q. So when -- so when you want to communicate
9 with someone, the dispatcher or someone, and you
10 must continue to depress the key on the mike in
11 order to transmit, and when you're done you let go,
12 and that disconnects the transmission?
13  A. Yes.
14    MR. MARTINS: Thank you, sir, I have no
15 further questions.
16    MS. LONGTIN: I have just a few.
17    MR. MARTINS: Wait. You're going to need
18 a mike.
19    MS. LONGTIN: I've got one.
20    MR. MARTINS: Oh, you have a mike? Okay.
21       EXAMINATION
22 BY MS. LONGTIN:
23  Q. Mr. Jorg, my name is Lynne Longtin. I
24 represent today the City of Golf Manor and Officers

Page 228

1 Stephen Tilley, Roby Heiland, and Chris Campbell. I
2 know you've testified a long time today, and I'll
3 try to be very brief. I don't have that many
4 questions.
5     I want to go back to what I believe you
6 testified to earlier. You made a statement that you
7 believed that the Golf Manor Officers had the first
8 responsibility to check on Mr. Owensby after he was
9 placed in the Golf Manor car. Is that correct?
10  A. I don't know if those are exactly my
11 words, but the gist, yes.
12  Q. Okay. Can you define what you mean, for
13 me, by the first responsibility?
14  A. Being that we did not have a Cincinnati
15 police car on that particular lot at that spot, we
16 needed to secure Mr. Owensby. Being they had a
17 police car, actually, I found out later, too, on the
18 lot, the closest and easiest way to secure Mr.
19 Owensby is to put him in the back of their vehicle.
20    It then becomes part their responsibility,
21 since he is in their vehicle, until we can go and
22 retrieve our vehicle and bring it back and then
23 transport so we can let them go, it is considered
24 their responsibility since he is, Mr. Owensby, is

Page 229

1 then in their vehicle.
2   Q. Okay. Maybe my question wasn't very
3 clear. I guess what I mean by the "first" is, do
4 you mean they had responsibility above and beyond
5 the Cincinnati police officers at the scene?
6   A. No, but he was at the vehicle the entire
7 time. The prisoner is in the back seat of his car.
8 It is his responsibility, being that it is his car.
9 Not to totally exclude the Cincinnati police
10 officers. That's not what I'm saying.
11    Officer Caton's going to get the vehicle,
12 the sergeant comes out, we're trying to do a lot of
13 different things at one time, hoping that soon as
14 Pat gets -- oh, I'm sorry -- Officer Caton gets back
15 with the vehicle, we'll finish up talking with the
16 boss. The boss will say, "Okay, transport him
17 over." We'll check for injuries, do everything we
18 need to do, and we can let Golf Manor go.
19 Unfortunately, we never got to that point.
20  Q. Okay. So you're not saying that they had
21 the most responsibility on the scene?
22  A. No, I'm not saying that.
23  Q. But you're saying they had some
24 responsibility on the scene?

Page 226 - Page 229

## AFFIDAVIT

- - -

STATE OF OHIO :
: SS
COUNTY OF HAMILTON :

I, Wendy Davies Welsh, Notary Public in and for the State of Ohio, do hereby state that the transcript of the deposition of Robert B. Jorg, deponent herein, having been submitted to said deponent for review and signature, has not been signed within the thirty (30) day period allowed under the Federal Rules; said deposition to now have the same force and effect as though signed.

_____
Wendy Davies Welsh, Court Reporter

Sworn to before me this _____ day of _____, 2004

_____
Thomas M. Blasing
Notary Public - State of Ohio
My commission expires: May 4, 2004