Case 1:01-cv-00769-SAS    Document 89-14    Filed 02/02/2004    Page 1 of 9

ensby, et al. vs. City of Cincinnati, et al.
bcr 21, 2003

DARREN VERESE SELLERS

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - - -

ESTATE OF ROGER D.               :
OWENSBY JR., et al.,             :
                                 :
         Plaintiffs,             :
    vs.                          :  Case No. 01-CV-769
                                 :  (Judge S. A. Spiegel)
CITY OF CINCINNATI,              :
et al.,                          :
                                 :
         Defendants.             :

- - - - - - - - - - - - - - -


        Videotaped deposition of DARREN VERESE

SELLERS, witness herein, called by the plaintiffs

for cross-examination, pursuant to the Federal Rules

of Civil Procedure, taken before me, Wendy Davies

Welsh, a Registered Diplomate Reporter and Notary

Public in and for the State of Ohio, at the offices

of Helmer, Martins & Morgan Co. LPA, 1900 Fourth &

Walnut Centre, 105 East Fourth Street, Cincinnati,

Ohio, on Tuesday, October 21, 2003, at 10:09 a.m.

Case 1:01-cv-00769-SAS    Document 89-14    Filed 02/02/2004    Page 2 of 9

Owensby, et al. vs. City of Cincinnati, et al.
October 21, 2003
DARREN VERESE SELLERS

Page 2

```
 1  APPEARANCES:

 2      On behalf of the Plaintiffs:

 3          Paul B. Martins, Esq.
            Don Stiens, Esq.
 4          Helmer, Martins & Morgan Co. LPA
            Suite 1900, Fourth & Walnut Centre
 5          105 East Fourth Street
            Cincinnati, Ohio 45202
 6          Phone: (513) 421-2400

 7          John J. Helbling, Esq.
            The Helbling Law Firm, L.L.C.
 8          3672 Springdale Road
            Cincinnati, Ohio 45251
 9          Phone: (513) 923-9740

10      On behalf of the Defendants City of Golf Manor,
        Stephen Tilley, Roby Heiland and Chris
11      Campbell:

12          Lynne Marie Longtin, Esq.
            Rendigs, Fry, Kiely & Dennis
13          900 Fourth & Vine Tower
            One West Fourth Street
14          Cincinnati, Ohio 45202-3688
            Phone: (513) 381-9200
15
        On behalf of Defendants City of Cincinnati,
16      Darren Sellers, Jason Hodge:

17
            Geri Hernandez Geiler, Esq.
18          Assistant City Solicitor
                and
19          Julie F. Bissinger, Esq.
            Chief Counsel
20          Department of Law
            Room 214, City Hall
21          801 Plum Street
            Cincinnati, Ohio 45202
22          Phone: (513) 352-3346
```

Page 3

```
 1  APPEARANCES (Continued):

 2      On behalf of the Defendants Robert B. Jorg,
        Patrick Caton, Jason Hodge, Victor Spellen and
 3      Darren Sellers:

 4          Donald E. Hardin, Esq.
            Hardin, Lefton, Lazarus & Marks, LLC
 5          915 Cincinnati Club Building
            30 Garfield Place
 6          Cincinnati, Ohio 45202
            Phone: (513) 721-7300
 7
     Also present:
 8
     Richard W. Grubb, Videographer
 9
     Lisa Damstrom, Law Clerk
10   Helmer, Martins & Morgan Co., L.P.A.

11   Mr. Roger Owensby

12   Mrs. Brenda Owensby

13   Mr. Shawn Owensby
```

Page 4

```
 1              S T I P U L A T I O N S

 2      It is stipulated by and among counsel for the

 3  respective parties that the deposition of DARREN

 4  VERESE SELLERS, witness herein, called by the

 5  plaintiffs for cross-examination, pursuant to the

 6  Federal Rules of Civil Procedure, may be taken at

 7  this time by the notary; that said deposition may be

 8  reduced to writing in stenotype by the notary, whose

 9  notes may then be transcribed out of the presence of

10  the witness; and that proof of the official

11  character and qualifications of the notary is

12  expressly waived.
```

Page 5

```
 1              I N D E X

 2      Examination by:              Page

 3      Mr. Martins . . . . . . . .   6

 4      Ms. Longtin . . . . . . . .  78

 5      Mr. Martins . . . . . . . .  80

 6              - - -

 7              E X H I B I T S

 8                                      Page
     Deposition Exhibit 37 . . . . . . . .  12
 9   Deposition Exhibit 38 . . . . . . . .  23
     Deposition Exhibit 39 . . . . . . . .  27
10   Deposition Exhibits 40, 41 & 42 . . .  41
     Deposition Exhibit 43 . . . . . . . .  43
11   Deposition Exhibit 44 . . . . . . . .  70
     Deposition Exhibit 45 . . . . . . . .  73
12   Deposition Exhibit 46 . . . . . . . .  74
```

Case 1:01-cv-00769-SAS   Document 89-14   Filed 02/02/2004   Page 3 of 9

Owensby, et al. vs. City of Cincinnati, et al.
October 21, 2003
DARREN VERESE SELLERS

Page 30

1  A. Uh-huh.
2  Q. All right. While you were at the scene
3  did you make any -- well, did you have a cell phone?
4  A. No.
5  Q. Do you know if Officer Hasse had a cell
6  phone?
7  A. Don't know.
8  Q. Do you recall seeing any officers making
9  calls on cell phones?
10 A. I don't recall seeing anybody making any
11 calls.
12 Q. While you were at the scene do you recall
13 whether or not any lawyers showed up on the scene?
14 A. I wouldn't know if they were lawyers
15 unless they told me, sir.
16 Q. I take it one of the things that -- one of
17 the first things officers would do on a scene such
18 as this would be to secure the perimeter?
19 A. Usually.
20 Q. Put up tape?
21 A. Usually.
22 Q. Was that done here?
23 A. It was tape put up. I was -- had my hand
24 in putting up that tape also.

Page 31

1  Q. And so once the tape is up, I take it no
2  one --
3  A. The scene is closed.
4  Q. -- no civilian should be allowed to cross
5  the tape?
6  A. No, they shouldn't.
7  Q. And in this case was that policy followed?
8  A. As far as I know it was.
9  Q. I want to now direct your attention back
10 to November 7th of 2000. If you look at Exhibit --
11 the sketch -- and I think that's 37.
12 A. Yes, sir.
13 Q. All right. We had talked through the
14 position of the cars that Officer Hunter, Officer
15 Jorg and Caton had responded with the NTA books or
16 in response to the NTA request.
17 A. Uh-huh.
18 Q. Would you, to the best of your
19 recollection now, recall what else happened while
20 the three cars were seated at that -- at that area
21 behind or in the drive-through area of the Sam's
22 Carry Out.
23 A. Like what, sir? Be -- can you be more
24 specific?

Page 32

1  Q. Well, we're to the point where they
2  arrive.
3  A. Right.
4  Q. What happens next?
5  A. They both get out. Like I said, I never
6  really -- I didn't know who they were. My -- Hasse,
7  he told me what their names were and everything,
8  so...
9  Q. When you say they both get out, that would
10 be Jorg and Caton?
11 A. Jorg and Caton. And then Hunter arrives.
12 Q. Okay.
13 A. And they're outside, and they're telling
14 me about some guy named LA, which I have no
15 recollection who he is or anything like that, but...
16 Q. Who was telling you about LA or --
17 A. It was Jorg who started the conversation.
18 Q. And do you recall what he said?
19 A. First thing he said was that, "We're
20 looking for a guy named LA." I said, "Okay. What
21 for?" Well, they didn't really tell me what they
22 were actually looking for him for. It was in -- in
23 relation to an investigation for something.
24     After that --

Page 33

1  Q. Let me stop you before you go on. Where
2  were you and where was Officer Jorg when he was
3  telling you this?
4  A. Okay. My back is turned -- my car is here
5  (indicating). So my back is actually to my car,
6  okay. So I'm looking --
7  Q. Across --
8  A. -- towards the -- towards the Sunoco,
9  okay. I'm in that direction looking towards the
10 Sunoco. Okay?
11 Q. So you're standing out by the, what, the
12 front driver's portion of the car?
13 A. I'm at the front of --
14 Q. Of your car?
15 A. -- my car. Right. I'm at the front of my
16 car.
17 Q. And you're looking down Seymour Avenue?
18 A. I'm -- right.
19 Q. Toward --
20 A. -- Langdon Farm.
21 Q. And --
22 A. That's Langdon Farm right there.
23 Q. And the Cincinnati Gardens?
24 A. Right. Right.

Case 1:01-cv-00769-SAS   Document 89-14   Filed 02/02/2004   Page 4 of 9

Owensby, et al. vs. City of Cincinnati, et al.
October 21, 2003
DARREN VERESE SELLERS

Page 34

1  Q. Okay.
2  A. Right. Jorg is -- has his back towards
3  the street. So I guess that's Seymour.
4  Q. Yes.
5  A. His back is towards the street here. All
6  right?
7  Q. Okay.
8  A. Hunter and Caton were both in this area
9  here. I don't know how they were turned or
10 anything, but my attention was brought to him,
11 because he's the one nearest me --
12 Q. Talking to you?
13 A. -- and he's the one doing all the talking.
14 Like I said, he started telling me about some guy
15 named LA, they were looking for him. And I kind of
16 like blew that off, because I don't know anybody
17 over there. I don't know who you're talking about,
18 so it's not a big concern to me.
19     That's when -- after they began talking
20 and saying -- after Jorg began talking and saying
21 stuff like -- all that stuff and everything, that's
22 when Hunter said to the effect, well, I think that's
23 him. That's him right there.
24 Q. Now, where was Hunter when he said that?

Page 35

1  A. Hunter was, like I said, he was in this
2  area over here. I don't know where -- which way he
3  was turned, but he was over in this area over here.
4  So then he said, "That's him right there." And I'm
5  like, okay. You know, it still --
6  Q. Right.
7  A. I mean, to me it -- it wasn't a big thing
8  to me at the time. I had to deal with what I had to
9  deal with right then and there. That's when Jorg
10 came out and said, "Well, he's got a lot of balls to
11 come out here and all these police officers and all
12 these cruisers out here."
13 Q. Did -- did you look over to whoever they
14 were referring to?
15 A. Well, as he was talking I could see like a
16 silhouette of a person. And you know, that's just
17 out of my peripheral vision.
18 Q. Wh--
19 A. Big deal.
20 Q. Where was the person?
21 A. The person I seen was walking down
22 Seymour, and he was about to cross the street coming
23 towards the Sunoco.
24 Q. So he was on the other side of the street?

Page 36

1  A. He was on the other side of the street.
2  Q. Was it -- was it light or dark or --
3  A. It was --
4  Q. -- or twighlight?
5  A. It was kind of -- it was kind of dark out
6  there. We had some -- it was a light in that
7  parking lot right there, right where we were
8  standing at. That's why I couldn't really -- I
9  couldn't make out what he even had on or anything or
10 if it was a he or a she. I just -- could see a body
11 or a person walking down the street.
12 Q. Okay. Please continue.
13 A. And that's when Hunter said, well "That's
14 him. Is that -- I think that's him. I think that's
15 him." And one of -- one of them said, "You sure?"
16 He's like, "I think so." So we began talking some
17 more. And then that's when Jorg said, "Well, we're
18 going to go over here and investigate and see who
19 this guy is."
20    Jorg, Caton, and Hunter, all three, walked
21 down Seymour towards the Sunoco. I went and got
22 back in the car with my partner. And the prisoner
23 we had in there, he wanted to tell where he had
24 gotten the marijuana from. That's why we had the

Page 37

1  under-- the plainclothes car come up there. And
2  they met us -- they -- they were at -- on station
3  at, I guess it was --
4  Q. Roselawn?
5  A. -- Roselawn Park. They were sitting there
6  waiting on us. Well, then the -- in between that
7  time, that's when the radio, we heard a whole bunch
8  of like -- it wasn't screaming, but it was a lot of
9  static and a lot -- you could hear a person on there
10 like they were struggling or something, on the
11 radio. And that's when the officer needs assistance
12 came out. I turned and looked at Hasse. Hasse
13 said, "That's them, go get them, go help them." So
14 I -- I sprinted from over here all the way down
15 towards the Sunoco to where I seen those -- those
16 guys at.
17 Q. Can you draw an arrow indicating the path
18 that you took from your car to the area where you
19 saw everyone.
20 A. Okay.
21 Q. Okay. Thank you.
22 A. Uh-huh.
23 Q. Let me ask you a few things. Had -- do
24 you know whether or not Officer Caton talked to your

Owensby, et al. vs. City of Cincinnati, et al.
October 21, 2003
Case 1:01-cv-00769-SAS    Document 89-14    Filed 02/02/2004    Page 5 of 9
DARREN VERESE SELLERS

Page 46

1 feet were. I wasn't even looking at his feet.
2    Q. Okay. Was he bent over, holding the arm?
3    A. He was bent over, holding his arm.
4    Q. He had both hands on --
5    A. Both hands on his wrist.
6    Q. And if you recall, where was Officer
7 Hunter?
8    A. Hunter was in this position up here
9 (indicating).
10    Q. Okay. Was Mr. -- was Officer Hodge at the
11 scene when you arrived?
12    A. I didn't know who Hodge was until later on
13 they told me that's who -- who he was. But Officer
14 Hodge was over in this area here when I was trying
15 to get -- get his left arm from up under him,
16 Officer Hodge was over here.
17    Q. Okay.
18    A. Helping me.
19    Q. But what I'm asking is just when you come
20 on the scene and you see Owensby face-down on the
21 asphalt --
22    A. Uh-huh.
23    Q. -- you've indicated where Jorg was.
24    A. Uh-huh.

Page 47

1    Q. Where Hunter was, where Caton was.
2    A. Uh-huh.
3    Q. Was Hodge standing where you're --
4    A. No. He wasn't there.
5    Q. So he hadn't arrived yet?
6    A. No. No. I was the fourth person on the
7 scene. I was the first -- fourth officer on scene.
8    Q. All right. And as I understand it, your
9 attention was directed to getting the handcuffs on
10 Mr. Owensby?
11    A. Right.
12    Q. Because in your mind that was the
13 important thing to do?
14    A. Right.
15    Q. Okay. Walk me through what you did as far
16 as applying handcuffs or any assistance you gave
17 in --
18    A. Okay.
19    Q. -- applying the handcuffs.
20    A. I came in this direction here, around on
21 this side here, and I was here (indicating).
22    Q. Now, you're indicating on the left side --
23
24    A. I'm on the left side of Mr. Owensby.

Page 48

1    Q. -- of Mr. Owensby?
2    A. Right.
3    Q. By his left knee?
4    A. By his left leg. I was on --
5    Q. Okay.
6    A. -- on -- by his leg.
7    Q. All right.
8    A. Okay. I went to go to my pouch to get
9 my -- my handcuffs. My handcuffs weren't in there,
10 because they were in the other guy that was in the
11 car that my partner had. That's why I went in
12 Caton's pouch, grabbed his cuff. I got one cuff
13 around the right wrist, okay. At that time I went
14 down to the ground to get the -- the left arm from
15 up under Mr. Owensby, and that's where I had my
16 problems at first.
17      As soon as I got that left arm up, I got
18 the left arm and I connected it with the other cuff,
19 and I put him in cuffs and I said, "He's handcuffed,
20 he's handcuffed."
21    Q. When you got the cuff on the -- on the
22 right wrist, the wrist that --
23    A. The first wrist.
24    Q. That's right, the --

Page 49

1    A. That Mr. Caton had.
2    Q. That Caton was working with?
3    A. Uh-huh. Uh-huh.
4    Q. Did you say something to indicate that the
5 cuff was on the right wrist?
6    A. I said, "I got a cuff on him."
7    Q. Okay.
8    A. "I got a cuff on him."
9    Q. Okay. And then you went down to get the
10 left arm out?
11    A. Right.
12    Q. And when you got the cuff on the left
13 arm --
14    A. I said, "He's cuffed."
15    Q. He's cuffed?
16    A. "He's cuffed."
17    Q. All right. While you were trying to get
18 the left arm out of Mr. Owensby, was Officer Caton
19 still trying to pull the right arm back so that it
20 would be in the small of the back, or the right
21 wrist?
22    A. I -- I -- Caton still had the arm. I
23 don't know exactly what he was doing with the arm,
24 but I know he still had his arm and he had the cuff

Case 1:01-cv-00769-SAS    Document 89-14    Filed 02/02/2004    Page 6 of 9
Owensby, et al. vs. City of Cincinnati, et al.
October 21, 2003
DARREN VERESE SELLERS

Page 50

1 in his hand.
2    Q. If he -- if -- if Mr. Owensby's laying
3 face-down?
4    A. Uh huh.
5    Q. And somebody is pulling on the right arm,
6 would -- do you recall whether or not that was
7 causing Mr. Owensby's body to rotate onto the left,
8 making getting the left shoulder out more difficult?
9    A. I don't know. I don't know.
10    Q. And as I understand it, when you arrived,
11 and from what you saw, Mr. Owensby was not moving?
12    A. No.
13    Q. No, he was not moving?
14    A. He was not moving.
15    Q. Okay. You were asked in Jorg's trial and
16 also at the grand jury whether or not the difficulty
17 you had in getting the arm out was because of
18 resistance or just body weight. Do you recall that?
19    A. Yes.
20    Q. Okay. And as I understand it, you don't
21 know if -- if it was active resistance or simply the
22 weight on the body?
23    A. I don't know.
24    Q. At the time that you were trying to get

Page 51

1 the left arm out of Mr. Owensby, was anybody
2 exerting any weight on Mr. Owensby?
3    A. No.
4    Q. Did you ever --
5    A. Caton was still back in this area here,
6 but --
7    Q. Okay.
8    A. -- that's all I can remember.
9    Q. Do you know if he was kneeling or -- or
10 sitting on Mr. Owensby?
11    A. Sitting, he wasn't. Kneeling, he may have
12 been. Yes, he --
13    Q. Okay.
14    A. -- was kneeling.
15    Q. And as to Officer Jorg, do you know where
16 Officer Jorg was when you were trying to pull the
17 left arm out?
18    A. No.
19    Q. You don't know?
20    A. Huh-uh.
21    Q. At any time did you see Officer Jorg
22 kneeling on any portion of Mr. Owensby?
23    A. No.
24    Q. As I understand your testimony, after Mr.

Page 52

1 Owensby was handcuffed you saw Officer Caton strike
2 Mr. Owensby in the lower part of the back
3 approximately three or four times?
4    A. Yes, sir.
5    Q. Was this an open -- was this a fist, was
6 it an open palm strike, do you know?
7    A. I don't know for sure if it was open palm
8 or if it was a fist, but he did hit him.
9    Q. Did you say anything in response?
10    A. To myself. I -- I kind of said it, but it
11 wasn't loud enough for everybody to hear, and I'm
12 like, "He's cuffed, what is -- what is -- the hell
13 is he doing?" You know, that's the kind of -- kind
14 of thing I said to myself.
15    Q. And after Mr. Owensby was cuffed, also you
16 heard Officer Caton say something to the effect of,
17 Mace this mother fucker?
18    A. "Mace this fucker."
19    Q. And in response to that, Mr. Owensby's
20 head was lifted up and he was Maced?
21    A. No.
22    Q. Was he Maced?
23    A. He was Maced.
24    Q. Did you see his head lifted up?

Page 53

1    A. No.
2    Q. Who Maced him?
3    A. Officer Hunter.
4    Q. How did Hunter, if -- if you know, do you
5 know how Officer Hunter Maced him if his face --
6 well, how his face was situated?
7    A. His face was situated in kind of this --
8 in this fashion here.
9    Q. Down?
10    A. Yes.
11    Q. Face-down?
12    A. Yeah.
13    Q. Okay. Do you know how Hunter Maced him if
14 his face was down?
15    A. Hunter -- do you mean in the method he did
16 or --
17    Q. Yes.
18    A. He just went across like this on the side
19 of his face here with one burst of -- of chemical
20 irritant and that was it.
21    Q. And as I recall from looking at your
22 testimony, there was -- you -- you did not observe
23 any reaction by Mr. Owensby?
24    A. No.

Case 1:01-cv-00769-SAS   Document 89-14   Filed 02/02/2004   Page 7 of 9
Owensby, et al. vs. City of Cincinnati, et al.
October 21, 2003
DARREN VERESE SELLERS

Page 54

1  Q. I think you also indicated that usually
2  when people are Maced, they cough or wheeze --
3  A. Right.
4  Q. -- or react in some fashion?
5  A. Yes, sir.
6  Q. And -- do you recall when Officer Hodge
7  arrived?
8  A. Time frame, no, but as I was trying to get
9  Mr. Owensby's left arm from up under him somebody
10 came to my left. I didn't know who he was at the
11 time. All I did was -- he was helping me trying to
12 get the arm out. And then later on I found out it
13 was Hodge.
14 Q. Did you see anybody use a PR-24?
15 A. No. Not that I can recall.
16 Q. I'm sorry?
17 A. Not that I can recall, no.
18 Q. Other than the five officers that you've
19 identified, that would be Jorg, Caton, Hunter, you,
20 and Hodge, were any other officers involved in the
21 physical arrest of Mr. Owensby?
22 A. No, sir.
23 Q. You then saw, as I understand it, Officer
24 Caton and Jorg pick up Mr. Owensby off of the

Page 55

1  ground?
2  A. Yes, sir.
3  Q. How did they do that?
4  A. His arms were in this fashion here
5  (indicating). They picked him up in between in here
6  where the bicep is and they picked him up. They
7  kind of put the arm in up under that, up under his
8  bicep in -- in between and held him up.
9  Q. At that point there was a Golf Manor
10 cruiser nearby?
11 A. Yes, sir.
12 Q. Is that right?
13 A. Yes, sir.
14 Q. And do you recall if any -- any of the
15 officers asked the Golf Manor officer if Mr. Owensby
16 could be placed in the Golf Manor cruiser?
17 A. Officer Jorg came over and said, "Can we
18 put him in your car?"
19 Q. And the officer he talked to said what at
20 this --
21 A. Yes.
22 Q. Do you know who he talked to?
23 A. I don't know the officer's name, no.
24 Q. What did you see after that?

Page 56

1  A. They picked him up and they started
2  escorting him to the car, or picked him up and -- to
3  put him in the car.
4  Q. Was he walking on his own power?
5  A. No, sir.
6  Q. His head, as I understand it, was -- was
7  hanging down?
8  A. Yes, sir.
9  Q. And you were behind Jorg and Caton?
10 A. Yes, sir.
11 Q. So you could see the back of his neck and
12 the --
13 A. Well, he had --
14 Q. The short dread locks?
15 A. He had long -- yeah. Right. So I
16 couldn't really see his neck, but I could see the
17 back of his head --
18 Q. Okay.
19 A. -- and his shoulders.
20 Q. Did you see any type of resistance by Mr.
21 Owensby while he was being escorted to the car?
22 A. No, sir.
23 Q. Did you watch them place him in the car?
24 A. Yes, sir.

Page 57

1  Q. What did you see?
2  A. Seen them put him face first, head first
3  into the car. They opened the door, face first, and
4  they slid him into the car.
5  Q. Did you ever see Officer Caton go around
6  to the driver's side back door and open that door?
7  A. No, sir.
8  Q. Once they started to put him into the car
9  face first, did you continue to watch or was your
10 attention directed --
11 A. I watched until they --
12 Q. -- elsewhere?
13 A. -- until he got -- until he was in the
14 car. And as -- as they were finishing putting him
15 in the car and the door was closed, and I turned and
16 I started walking away.
17 Q. So when you turned and walked away, where
18 was Officer Jorg?
19 A. Jorg and Caton were at that -- they were
20 on that -- on the passenger's side at that rear
21 door.
22 Q. All right. What did you do after that?
23 A. After that I walked over to the back of
24 the Sunoco, which was like the back and the side

Case 1:01-cv-00769-SAS   Document 89-14   Filed 02/02/2004   Page 8 of 9
Owensby, et al. vs. City of Cincinnati, et al.
October 21, 2003
DARREN VERESE SELLERS

Page 58

1 part of the Sunoco. That's where my partner,
2 Officer Hasse, had brought our car over to.
3     Q. So this would be the area between the
4 Sunoco convenience store and --
5     A. And the guardrail.
6     Q. -- the Sam's Carry Out?
7     A. Well the -- and the guardrail.
8     Q. And the guardrail?
9     A. Right. Right.
10    Q. Okay. What happened then?
11    A. Officer Hunter's car was not that far from
12 my car. He was really upset. And Hasse said, "What
13 happened?" I said, "I don't know." And then I sat
14 there at the car, tried to get myself together. I
15 got my hat, I don't know why I did that, but -- and
16 I turned my back to the car and I looked to the back
17 of the Sunoco. As I -- when I turned around I seen
18 Hasse walking over towards where they had Mr.
19 Owensby and the car at. And there was a sergeant
20 standing by that car.
21    Q. Cincinnati police sergeant?
22    A. Cincinnati police sergeant.
23    Q. And then what?
24    A. Next thing I know they were giving him

Page 59

1 CPR, and that's when I seen the -- the ambulance and
2 the fire department arrive.
3     Q. Officer Hasse is -- has CPR trai-- or EMT
4 training?
5     A. Yes, sir.
6     Q. Did you watch them administer CPR?
7     A. I watched for a little bit.
8     Q. Do you know if when they were giving him
9 CPR he, Mr. Owensby, was still handcuffed?
10    A. I don't know. I was -- it was -- it was
11 far enough away where I couldn't see all that. All
12 I could -- all the cars and everything that were
13 there, you could only see like the top part of his
14 body from where I was standing. And I seen Hasse
15 down there giving him CPR.
16    Q. Am I correct in understanding that when
17 you arrived on -- well, from the time you arrived on
18 the scene, when Mr. Owensby was face-down on the
19 asphalt, you never saw Officer Jorg applying or
20 having his arm around Mr. Owensby's head?
21    A. No, sir.
22    Q. Did you ever see, from the time that you
23 arrived on the scene to the time Mr. Owensby was
24 placed in the back seat of the Golf Manor cruiser,

Page 60

1 did you ever see Mr. Owensby's face?
2     A. No.
3     Q. I'll represent to you, sir, that we have
4 had -- there's been prior testimony given that
5 Officer Caton and your partner, Officer Hasse, had
6 an exchange when Officer Caton went back to get
7 their cruiser and bring it over. And that the -- in
8 the exchange Officer Caton said either, referring to
9 Mr. Owensby, "We kicked his ass" or "We beat the
10 shit out of him," depending on who you're talking
11 to, they say something else. Do you recall having
12 any conversation with Officer Hasse where he
13 discussed that exchange with you?
14    A. No. Huh-uh.
15    Q. The area where the Golf Manor car was
16 parked -- well, let me -- Officer Brazile showed up
17 on the scene, right?
18    A. (No audible response.)
19    Q. Oh, you don't know?
20    A. (Shaking head.)
21    Q. Okay. I'm going to show you a videotape
22 from an officer's car that drove up on the scene.
23 This is after Mr. Owensby's in the cruiser.
24    A. Okay.

Page 61

1     Q. But why don't we take a short break, let
2 you stretch your legs, and then I'll set it up.
3 Thanks.
4         VIDEOGRAPHER: Off the record.
5         (Recess taken: 11:13 a.m. - 11:29 a.m.)
6         VIDEOGRAPHER: We're back on the record.
7         MR. HARDIN: You had asked a question
8     regarding who was at the first interview that
9     Mr. Sellers had with -- with me. He indicated
10    no one else was present. If you want to re-ask
11    that question.
12        MR. MARTINS: Sure.
13 BY MR. MARTINS:
14    Q. Was -- was anyone else present when you
15 had the first meeting with Mr. Hardin?
16    A. She was (indicating).
17        MS. BISSINGER: Me, Julie Bissinger.
18    Q. Ms. Bissinger. Okay.
19    A. Yeah. She was.
20    Q. Is it your understanding that Ms.
21 Bissinger, in addition to Mr. Hardin, represents you
22 in this matter?
23    A. Yes.
24    Q. I want -- I -- I said at the break I was

Page 124

1  MS. GEILER: Thank you.
2  THE WITNESS: You're welcome.
3  BY MR. MARTINS:
4  Q. What happened once you saw Mr. Owensby
5  walking in the vicinity of Integrity Hall?
6  A. Noth-- I brought it to Jorg and Caton's
7  attention.
8  Q. What did you say to them?
9  A. I said, "That guy looked like the guy that
10 ran from me. Remember when we" -- well, then I was
11 talking to Officer Jorg. I said, "Remember when we
12 was working old clothes that day?"
13 Q. And what, if anything, did Jorg say in
14 response?
15 A. He asked me if I was sure if that was him.
16 I said, "Well, from this distance and in this light,
17 no, I can't be sure from here."
18 Q. Were you able to tell at -- at that point
19 in time whether or not Mr. Owensby had facial hair?
20 A. From that distance?
21 Q. From that distance.
22 A. No.
23 Q. What was it about the person that you saw
24 by Integrity Hall that made you think it looked like

Page 125

1  the person that had run from you on September 27th?
2  A. His height, size. And from where I was
3  standing, he was walking at an angle, and I could
4  get like a -- I could see like his face from a
5  distance as far as like, you know, he looked similar
6  to the person that ran from me at that time.
7  Q. What was his height?
8  A. I don't know his height.
9  Q. Would it be fair to say he was average
10 height?
11 A. Yeah. Medium build.
12 Q. Average height, medium build?
13 A. (Nodding head.)
14 Q. Okay.
15 A. Uh-huh.
16 Q. And if I understand you correctly, from
17 his -- from that distance you could not tell if he
18 had facial hair. Were there any other
19 distinguishing characteristics about him that caused
20 you to think that he was the person that ran from
21 you on September 27?
22 A. Like I say, he just -- he had the features
23 of the person that I remember that had ran from
24 me --

Page 126

1  Q. And what I'm --
2  A. -- previously.
3  Q. -- trying to understand is, what were
4  those features?
5  A. His -- his build, his height, his -- I
6  mean, just -- his stature. And like I said, it
7  wasn't light -- I mean, the sun wasn't up, but it
8  was -- it was like not completely dark either.
9  Q. Can you identify any other distinguishing
10 feature of the person that you saw by Integrity Hall
11 that caused you to think that that was the same
12 person that ran from you on September 27th?
13 A. No. Not -- I mean, no.
14 Q. The -- when you said -- pointed him out to
15 Officer Jorg, do you know whether or not Officer
16 Jorg said something to you to the effect, words to
17 the effect that that takes balls to walk past
18 cruisers and uniformed officers?
19 A. That sound familiar to me. That -- that
20 does sound familiar to me, but I can't recall.
21 Q. I'm -- I'm not sure I'm quoting it
22 direct -- correctly, but some -- words to that
23 effect.
24 A. I'm just saying I remember hearing

Page 127

1  something like that.
2  Q. Okay. Did Officer Caton say anything to
3  you?
4  A. I don't remember. I mean, I --
5  Q. When you were talking to Officer Jorg,
6  pointing out this person over by Integrity Hall, was
7  Officer Caton there also?
8  A. Yes.
9  Q. Did Officer Jorg explain or -- or did you
10 explain to Officer Caton who this person was that --
11 that you were referring to?
12 A. Well, he was standing there while me and
13 Jorg was talking, so he could just gather it from
14 that what we were talking about, because he knew
15 about the incident.
16 Q. And that's what I'm trying to understand,
17 is how did he know about the incident?
18 A. From Jorg, I'm sure.
19 Q. Did -- did -- did you hear Jorg talk to
20 him about the incident?
21 A. No, but me and Jorg was talking back and
22 forth about the incident.
23 Q. And Caton was there?
24 A. And Caton was there.