Case 1:01-cv-00769-SAS   Document 89-15   Filed 02/02/2004   Page 1 of 7

Owensby vs. City of Cincinnati, et al.                                    VICTOR N. SPELLER
October 15, 2003

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - - - -
ESTATE OF ROGER D.              :
OWENSBY JR., et al.,            :
                                :
        Plaintiffs,             :
    vs.                         : Case No. 01-CV-769
                                : (Judge S. A. Spiegel)
CITY OF CINCINNATI,             :
et al.,                         :
                                :
        Defendants.             :
- - - - - - - - - - - - - - - -

Videotaped deposition of VICTOR N. SPELLEN, a defendant herein, called by the plaintiffs for cross-examination, pursuant to the Federal Rules of Civil Procedure, taken before me, Wendy Davies Welsh, a Registered Diplomate Reporter and Notary Public in and for the State of Ohio, at the offices of Helmer, Martins & Morgan Co. LPA, 1900 Fourth & Walnut Centre, 105 East Fourth Street, Cincinnati, Ohio, on Wednesday, October 15, 2003, at 10:12 a.m.

Case 1:01-cv-00769-SAS    Document 89-15    Filed 02/02/2004    Page 2 of 7

Owensby vs. City of Cincinnati, et al.
October 15, 2003
VICTOR N. SPELLER

Page 2

1  APPEARANCES:

2      On behalf of the Plaintiffs:

3          Paul B. Martins, Esq.
           Don Stiens, Esq.
4          Helmer, Martins & Morgan Co. LPA
           Suite 1900, Fourth & Walnut Centre
5          105 East Fourth Street
           Cincinnati, Ohio 45202
6          Phone: (513) 421-2400

7          Mark T. Tillar, Esq.
           240 Clark Road
8          Cincinnati, Ohio 45202

9      On behalf of the Defendants City of Golf Manor,
       Stephen Tilley, Roby Heiland and Chris
10     Campbell:

11         Lynne Marie Longtin, Esq.
           Rendigs, Fry, Kiely & Dennis
12         900 Fourth & Vine Tower
           One West Fourth Street
13         Cincinnati, Ohio 45202-3688
           Phone: (513) 381-9200
14
       On behalf of Defendants City of Cincinnati,
15     Darren Sellers, Jason Hodge:

16         Geri Hernandez Geiler, Esq.
           Assistant City Solicitor
17         and
           Julie F. Bissinger, Esq.
18         Chief Counsel
           Department of Law
19         Room 214, City Hall
           801 Plum Street
20         Cincinnati, Ohio 45202
           Phone: (513) 352-3346

Page 3

1  APPEARANCES (Continued):

2      On behalf of the Defendants Robert B. Jorg,
       Patrick Caton, Jason Hodge, Victor Spellen and
3      Darren Sellers:

4          Donald E. Hardin, Esq.
           Hardin, Lefton, Lazarus & Marks, LLC
5          915 Cincinnati Club Building
           30 West Garfield Place
6          Cincinnati, Ohio 45202
           Phone: (513) 721-7300

7  Also present:

8  Richard W. Grubb, Videographer

9  Lisa Damstrom, Law Clerk
10 Helmer, Martins & Morgan Co., L.P.A.

11 Wendy M. Weller, Paralegal
   Buckley King
12
   Shawn Owensby
13
   Patrick Edmund Caton
14

15              - - -

16          S T I P U L A T I O N S
17
18     It is stipulated by and among counsel for the
19 respective parties that the deposition of VICTOR N.
20 SPELLEN, a defendant herein, called by the
21 plaintiffs for cross-examination, pursuant to the
22 Federal Rules of Civil Procedure, may be taken at
23 this time by the notary; that said deposition may be
24 reduced to writing in stenotype by the notary, whose

Page 4

1  notes may then be transcribed out of the presence of
2  the witness; and that proof of the official
3  character and qualifications of the notary is
4  expressly waived.

5              - - -

6

7              I N D E X

8  Examination by:                    Page

9  Mr. Martins . . . . . . .           5

10

11             - - -

12

13          E X H I B I T S

14                                     Page

15

16 Deposition Exhibit 18 . . . . . . . . . . . . . . . . . .   9
   Deposition Exhibit 19 . . . . . . . . . . . . . . . . . .  14
17 Deposition Exhibit 20 . . . . . . . . . . . . . . . . . .  44
   Deposition Exhibit 21 . . . . . . . . . . . . . . . . . .  44
18 Deposition Exhibit 22 . . . . . . . . . . . . . . . . . .  53
   Deposition Exhibit 23 . . . . . . . . . . . . . . . . . .  53
19 Deposition Exhibit 24 . . . . . . . . . . . . . . . . . .  61
   Deposition Exhibit 25 . . . . . . . . . . . . . . . . . .  65
20 Deposition Exhibit 26 . . . . . . . . . . . . . . . . . .  71
   Deposition Exhibit 27 . . . . . . . . . . . . . . . . . .  76

21

22

23             - - -

24

Page 5

1       VIDEOGRAPHER: The date is October the
2  15th. The year is 2003.
3       Would you please swear the witness, ma'am.
4       VICTOR N. SPELLEN
5  being by me first duly cautioned and sworn, deposes
6  and says as follows:
7       VIDEOGRAPHER: We're on the record, Mr.
8  Martins. Videotape number 1, sir.
9       CROSS-EXAMINATION
10 BY MR. MARTINS:
11     Q. Good morning, sir. Would you state for
12 the record your full name, please.
13     A. Victor Spellen.
14     Q. And your age?
15     A. 35.
16     Q. Date of birth?
17     A. 4/23/68.
18     Q. Have you ever had your deposition taken
19 before?
20     A. No, sir.
21     Q. Let me cover some ground rules for you.
22 You've been placed under oath. I will be asking you
23 questions. If you do not understand or did not hear
24 a question, feel free to ask for clarification or

Case 1:01-cv-00769-SAS    Document 89-15    Filed 02/02/2004    Page 3 of 7

Owensby vs. City of Cincinnati, et al.                          VICTOR N. SPELLER
October 15, 2003

Page 18

1 connection with the events of November 7, 2000?
2   A. Yes.
3   Q. Have you ever heard of a head wrap
4 technique as far as a law enforcement technique?
5   A. Not that I can remember, no.
6   Q. Have you ever heard of a neckhold
7 technique?
8   A. No.
9   Q. When you were -- let's see, you -- did you
10 graduate from the police academy in '99?
11   A. Correct.
12   Q. When you were at the police academy, was
13 the use of a head hold or a neckhold ever taught?
14   A. Not to my knowledge.
15   Q. And in the time that you were a police
16 officer with maybe seminars or updates, whatever
17 training classes that you would attend in the normal
18 course of your business, did anyone ever teach you
19 about a head wrap technique or a neckhold technique?
20   A. None that I can remember.
21   Q. Have you ever seen a Cincinnati police
22 officer use a head wrap technique or a neckhold
23 technique?
24   A. I have not, sir.

Page 19

1   Q. I understand that you, for a period of
2 about four months, rode with Officer Jorg. Is that
3 right?
4   A. Correct.
5   Q. He was your FTO?
6   A. Correct.
7   Q. And that's field training officer?
8   A. Yes, sir.
9       (Discussion off the stenographic record.)
10   Q. What's your understanding of the field
11 training officer program? How's that supposed to
12 work?
13   A. Basically on a supervisory type position
14 they're -- they're supposed to guide you in certain
15 things and teach you hands-on street type of work
16 and -- and rate your performance weekly.
17   Q. In the time that -- and -- and in this
18 four-month period I take it on a maybe almost daily
19 basis you were working with Officer Jorg?
20   A. Correct.
21   Q. In that time did you ever observe Officer
22 Jorg employ a head wrap technique or a neckhold
23 technique on a suspect?
24   A. I've never observed that, sir.

Page 20

1   Q. Never seen it?
2   A. No.
3   Q. And never seen any other police officer
4 employ such a either head wrap or neckhold
5 technique?
6   A. Not that I could remember.
7       MR. MARTINS: Thanks.
8 BY MR. HARDIN:
9   Q. If we could, sir, here's another, a new
10 and better, improved version of Exhibit 19, and
11 we'll just get rid of that one (indicating).
12       MR. MARTINS: And one for Mr. Hardin, for
13 other counsel.
14       Thank you.
15       MS. BISSINGER: Yes.
16   Q. Now, referring you to the page marked
17 C001702 in Exhibit 19, Personal History Statement,
18 is this your handwriting?
19   A. Correct.
20   Q. You graduated from high school in 1987 and
21 attended -- I -- I can't make out the name of the
22 college where you --
23   A. Baruch.
24   Q. Baruch, New York City?

Page 21

1   A. Correct.
2   Q. Okay. Other schooling or specialized
3 courses, EMT-D course at Queens City College?
4   A. Correct.
5   Q. New York City?
6   A. Yes, sir.
7   Q. What is an EM-- I -- well, what is an
8 EMT-D course?
9   A. It's advance training for EMTs.
10   Q. And is that your signature at the bottom
11 of the page?
12   A. Yes, sir.
13   Q. On the next page, 1703, is a Personal
14 History Statement, Employment Record, and am I
15 correct in understanding that you were an EMT for
16 Transcare New York?
17   A. Yes, sir.
18   Q. What is Transcare New York?
19   A. It's a -- a private run ambulance, medical
20 facility.
21   Q. Going to the page 1705, entitled Service
22 in U.S. Armed Forces, I see that you served in
23 the -- in the artiller-- Army artillery. Is that
24 right?

Case 1:01-cv-00769-SAS   Document 89-15   Filed 02/02/2004   Page 4 of 7

Owensby vs. City of Cincinnati, et al.
October 15, 2003
VICTOR N. SPELLER

Page 50

1  A. Well, I knew he was -- he'd been Maced, so
2  I figured the Mace was taking effect at this point.
3  Q. And when you looked in, what position was
4  Mr. Owensby in?
5  A. I basically saw an outline of a figure
6  somewhat slumped over in the back of a cruiser.
7  Q. Was he coughing or spitting or wheezing?
8  A. Not to my knowledge at the time.
9  Q. Did you see any movement?
10 A. Not that I can remember. I looked in
11 maybe a second or two.
12 Q. In your experience with people who had
13 been involved in a struggle with the police and had
14 been Maced, was that uncommon that the person would
15 not be moving after having been Maced?
16 A. It's not uncommon.
17 Q. It's not uncommon?
18 A. I mean, I -- people have been -- I -- I've
19 been Maced and it doesn't affect me. It doesn't
20 affect everyone.
21 Q. Okay.
22 A. It's not unusual.
23 Q. At the time on November 7, 2000 you had
24 EMT training, correct?

Page 51

1  A. Previous, correct.
2  Q. Previously?
3  A. Right.
4  Q. And so you were qualified for advance EMT
5  training -- or EMT medical care?
6  A. Correct.
7  Q. Did you feel that you should have
8  administered some sort of first aid to Mr. Owensby?
9  A. I had no reason to believe that I should
10 at that time.
11 Q. Well, you knew he had been Maced?
12 A. Correct.
13 Q. How did you know he had been Maced?
14 A. From the radio.
15 Q. What did you -- the radio transmission on
16 what we've just seen or something else?
17 A. I believe -- I believe so. Correct.
18 Q. Okay. Did you ever see Mr. Owensby's
19 face?
20 A. No, I did not.
21 Q. Do you know if Officer Brazile, when
22 Officer Brazile said to you -- when you said, "Looks
23 like he's ... hurting a little bit," and he said,
24 Brazile said, "Lot a bit," do you know if Officer

Page 52

1  Brazile had seen Mr. Owensby?
2  A. I did not know, sir.
3  Q. If all you saw was a silhouette, how did
4  you arrive at the judgment that "Looks like he's ...
5  hurting a little bit"?
6  A. Because I'm assuming the Mace took effect.
7  Q. What do you mean by "took effect"?
8  A. Well, when you Mace someone, it takes
9  effect and, like we discussed before, you know,
10 it -- it -- it gets into your nostrils, gets into
11 your eyes, gets into your --to your mouth, and
12 that's how it takes effect.
13 Q. And you're hurting?
14 A. Correct.
15 Q. If you're hurting, wouldn't you be moving?
16 A. I have --
17    MR. HARDIN: Objection.
18    You may answer.
19 A. I have no idea, sir. I don't know.
20 Q. From your observation, was Officer Caton
21 angry?
22 A. He didn't appear to be angry.
23 Q. You asked -- referring back to Exhibit 21
24 on the second page, you asked Officer Brazile

Page 53

1  whether or not the suspect was "fucked up." Did you
2  form an opinion as to whether or not he was?
3     MR. HARDIN: Objection.
4     You may answer.
5  A. No, sir.
6  Q. No, you had no opinion?
7  A. No.
         (Deposition Exhibit 22
8        was marked for identi-
9        fication.)
10 Q. Let me show you what is marked as
11 Exhibit 22. Exhibit 22 is a statement that you gave
12 to Cincinnati police investigators on November 10th,
13 2000, correct?
14 A. Correct.
15 Q. And this is one of the statements that
16 you've reviewed in preparation for the deposition?
17 A. Yes, sir.
18 Q. Is it accurate?
19 A. Yes, it is.
         (Deposition Exhibit 23
20       was marked for identi-
21       fication.)
22 Q. Let me show you what's marked as
23 Exhibit 23. Exhibit 23 is a statement that you gave
24 to Cincinnati police investigators on -- two days

Case 1:01-cv-00769-SAS   Document 89-15   Filed 02/02/2004   Page 5 of 7

Owensby vs. City of Cincinnati, et al.
October 15, 2003
VICTOR N. SPELLER

Page 78

1    MR. HARDIN: Keep going.
2    Go back one.
3    THE WITNESS: Oh.
4    A. Okay.
5    Q. Do you see that there is a specification
6  charge? Specification 1 is that you "demonstrated a
7  'neck hold' that Officer Jorg demonstrated to
8  Sergeant Watts. When Officer Spellen was summoned
9  to testify to what he observed at 2098 Seymour
10 Avenue on November 7, 2000, he demonstrated a
11 different hold. Officer Spellen admitted he
12 intentionally altered this hold in court in favor of
13 Officer Jorg."
14    Do you understand that that last sentence
15 I just read, intentionally altered this hold in
16 court to favor Officer Jorg, would be based on the
17 interview that we just looked at in Exhibit 25?
18    A. Yes, sir.
19    Q. And the rule, the Cincinnati Manual of
20 Rules and Regulations and Discipline Process
21 applicable here for this circumstance, is Rule 5.01,
22 which says "No member shall knowingly state, enter,
23 or cause to be entered on any official document, any
24 inaccurate, false, incomplete, misleading, or

Page 79

1  improper information." Do you see that?
2    A. Yes, I do.
3    Q. Okay. Specification 2 says that "Officer
4  Spellen observed a medical injury to Mr. Owensby and
5  rendered no appropriate first aid immediately once
6  the incident scene is stabilized" or sustained.
7    And there's a Rule 2.12 which states
8  "Members are responsible for ensuring the safety and
9  welfare of persons and their personal property when
10 transporting or having custody of persons who are
11 sick, injured, arrested or incapacitated in any
12 way."
13    You understood that this was the second
14 specification brought against you, correct?
15    A. Yes, sir.
16    Q. And there is a follow-up procedure
17 violation that's alleged on the next page, which
18 says, "Following any use of force resulting in a
19 citizen's injury, officers will ensure appropriate
20 first aid is rendered immediately once the incident
21 scene is stabilized." See that?
22    A. Yes.
23    Q. Okay. Now, setting aside the particular
24 facts of November 7, did you understand that as a

Page 80

1  Cincinnati police officer on November 7, 2002 you
2  were bound to follow these standards that I've just
3  read to you, Rule 5.1, Rule 2.12 and Procedure
4  12.545?
5    A. Yes, sir.
6    Q. When you arrived on the scene in your
7  cruiser, the -- the video that we saw today, was the
8  scene stabilized?
9    A. I don't believe so.
10   Q. Okay. What, if anything, do you believe
11 needed to be done to stabilize the scene?
12   A. Officers need -- I don't know. There were
13 people walking around, talking to each other. You
14 know, as soon as -- when I got there, I noticed that
15 there were two supervisors on the scene.
16   Q. You noticed what?
17   A. Two supervisors on the scene. I mean,
18 it's their job to stabilize a scene and -- and to
19 investigate an incident.
20   Q. What does stabilizing a scene mean?
21   A. Getting information, shutting it down,
22 protecting the perimeter, no one in or out,
23 gathering evidence.
24   Q. Okay. There's a tab B, if you just page

Page 81

1  in a couple pages. And that's followed by a
2  disciplinary hearing recommendation.
3    MR. HARDIN: Now there's going to be a
4    continuing objection. I have to pick it back
5    up some now that we're back to this again.
6    MR. MARTINS: Okay.
7    Q. And then there's an Exhibit C on the next
8  page. Do you see that?
9    A. Uh-huh.
10   Q. And that's followed by an Internal
11 Investigations Section report, case number 00248,
12 dated September 24 of 2002. See that?
13   A. Yes, sir.
14   Q. All right. I'm going to skip that report.
15 And it's rather lengthy. Go back, you're going to
16 find a tab D, D as in David.
17   A. Yes.
18   Q. That's followed by performance reports on
19 you, correct?
20   A. Yes, sir.
21   Q. And then there is a tab E as in echo?
22   A. Correct.
23   Q. Which is an evaluation supplement log?
24   A. Yes, sir.

Case 1:01-cv-00769-SAS   Document 89-15   Filed 02/02/2004   Page 6 of 7
Owensby vs. City of Cincinnati, et al.
October 15, 2003
VICTOR N. SPELLER

Page 86

1  him, that attorney, bringing this information to the
2  attention of the hearing officers?
3    A. I believe so, sir.
4    Q. Okay. Certainly -- well, okay. We'll
5  leave it at that.
6       On the next page, I think it's the next --
7  two pages from the end is a May 16, 2002 notice of
8  suspension of police powers. Do you see that?
9    A. Yes.
10   Q. And is that your signature at the bottom
11 acknowledging receipt on May 16th, 2002 of the
12 notice of suspension of police powers?
13   A. Correct.
14   Q. The last page is a May 16, 2002 document
15 to Police Chief Streicher from Captain Gregoire,
16 subject: Transfer of members -- member. And it
17 says, "Per your verbal order, Officer Victor
18 Spellen, badge 862, is transferred this date from
19 District 4 to Communications Section (Telephone
20 Crime Reporting Unit)." Were you, in fact,
21 transferred?
22   A. Yes, sir.
23   Q. And it was approved by, again, the
24 initials TH, looks like an S; is that right?

Page 87

1    A. Correct.
2    Q. Am I correct in understanding that you
3  then remained in the -- the Communications Section
4  from May 2002 until February 2003?
5    A. Yes, sir.
6    Q. What was going on between May of 2002 and
7  February 2003 with respect to the recommendation of
8  dismissal?
9    A. I was transferred, doing my work in
10 communications. I have no idea what anyone else was
11 doing.
12   Q. Did you have any involvement, were there
13 any other hearings that you attended or anything
14 like that?
15   A. No, sir.
16   Q. During this entire time period did you
17 have any conversations with any other police
18 officers concerning these disciplinary actions being
19 taken against you?
20   A. No, sir.
21   Q. When you drove up to the scene the night
22 of November 7, 2000 the first time, the time that we
23 saw the videotape, who, if anyone, did you believe
24 was responsible for providing medical care for Mr.

Page 88

1  Owensby, based on your training?
2    A. Whoever the arresting officer was at the
3  time.
4    Q. Would you explain to me what you mean by
5  an arresting officer. What -- what is it that an
6  officer either does or is identified by that makes
7  that person an -- an arresting officer?
8    A. Whoever -- whoever placed the suspect in
9  custody, whoever was looking for the suspect,
10 wherever -- whatever car the suspect's in, basically
11 has responsibility of the suspect.
12   Q. Now, in this case, if -- if you don't
13 already know, I'll tell you that there were five
14 police officers involved in arresting Mr. Owensby,
15 getting him down, placing the handcuffs on Mr.
16 Owensby. Given those facts, do you think that all
17 five officers are the arresting officers or -- or
18 does there have to only be one officer?
19   A. I have no idea, sir. I can't -- I can't
20 answer that.
21   Q. And based on your experience and your
22 training, if a suspect is placed in your car, in --
23 in your cruiser, then you have some level of
24 responsibility for that -- the care of that suspect

Page 89

1  in your cruiser?
2    A. I would believe so.
3    Q. Based -- based on your training and
4  experience?
5    A. Correct.
6    Q. On the night of November 7, 2000, were you
7  carrying a cell phone?
8    A. I believe I might have.
9    Q. Do you have like a personal cell phone?
10   A. Yes, sir, I do.
11   Q. On that night do you recall getting any
12 calls from anyone concerning the incidents involving
13 Mr. Owensby?
14   A. I don't remember if I had that.
15   Q. Do you recall making any calls on your
16 cell phone concerning the incident involving Mr.
17 Owensby?
18   A. No, sir, I don't remember making any
19 calls.
20   Q. Since that time have you made any calls on
21 your cell phone concerning Mr. Owensby?
22   A. Other than to my attorneys, no.
23   Q. And since that time have you received any
24 calls on your cell phone concerning Mr. Owensby?

99

| | | |
|---|---|---|
| 13:02:18 | 1 | THE WITNESS: Thank you, sir. |
| 13:02:20 | 2 | VIDEOGRAPHER: Sir, you have a right to |
| 13:02:22 | 3 | review this tape prior to its being shown to a |
| 13:02:24 | 4 | court. |
| 13:02:24 | 5 | MS. GEILER: I don't have any questions. |
| 13:02:24 | 6 | VIDEOGRAPHER: Will you waive that right? |
| 13:02:26 | 7 | MR. MARTINS: No. |
| 13:02:27 | 8 | THE WITNESS: No. |
| 13:02:28 | 9 | VIDEOGRAPHER: Thank you. |
| 13:02:29 | 10 | We're off the record. Time is 1:06. |
| 13:02:32 | 11 | |
| 13:02:32 | 12 | |
| 13:02:32 | 13 | _____ |
| | | VICTOR N. SPELLEN |
| 13:02:32 | 14 | |
| | | - - - |
| 13:02:32 | 15 | |
| 13:02:32 | 16 | (Deposition concluded.) |
| | 17 | |
| | | - - - |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |

Merit
602 Main Street, Suite 703, Cincinnati, OH 45202
(513) 381-8228 * (800) 578-1542 * www.merit-ls.com