UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| ESTATE OF | : | |
| ROGER D. OWENSBY JR., et al., | : | |
| | : | |
| | : | Case No. 01-CV-769 |
| Plaintiff, | : | |
| | : | Senior Judge S. Arthur Spiegel |
| v. | : | |
| | : | |
| CITY OF CINCINNATI, et al., | : | |
| | : | |
| | : | |
| Defendants. | : | |
| | : | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
THE MOTION FOR SUMMARY JUDGMENT BY
THE VILLAGE OF GOLF MANOR DEFENDANTS (doc. 85)**

Mark T. Tillar (0029898)
240 Clark Road
Cincinnati, Ohio 45202
Telephone: (513) 761-2958

John J. Helbling (0046727)
3672 Springdale Road
Cincinnati, Ohio 45251
Telephone: (513) 923-9740

James B. Helmer, Jr.  (0002878)
Paul B.  Martins (0007623)
Frederick M. Morgan, Jr.  (0027687)
HELMER, MARTINS & MORGAN CO., LPA
Fourth & Walnut Centre, Suite 1900
105 East Fourth Street
Cincinnati, Ohio 45202-4008
Telephone:     (513) 421-2400
Facsimile:     (513) 421-7902

*Trial Attorneys for Plaintiff*

## TABLE OF CONTENTS AND SUMMARY

**Page**

I.    **INTRODUCTION** ................................................... 1
Plaintiff and the Village of Golf Manor defendants have filed cross motions for summary judgment in this civil rights action arising out of the November 7, 2000 arrest, beating and death of Roger Owensby, Jr.

Plaintiff's motion seeks partial summary judgment against the Golf Manor defendants, as to 42 U.S.C. § 1983 liability, for failing to provide any medical care to Roger Owensby, Jr., as he lay handcuffed, bleeding, unconscious and dying in the back seat of a Golf Manor cruiser, in violation of a clearly-established constitutional duty.

The Golf Manor defendants seek summary judgment in an attempt to avoid all liability because they claim that they did not have "custody" of Mr. Owensby and that no "special relationship" existed between Golf Manor and Mr. Owensby giving rise to a constitutional duty to provide essential medical care, even though:  Golf Manor admits that it agreed to allow Cincinnati Police Officers to place the handcuffed, bleeding and unconscious Roger Owensby in a Golf Manor cruiser; Golf Manor admits that it's police cruiser served as a "temporary holding facility" for Mr. Owensby; it is undisputed that Cincinnati Police Officer Brian Brazile told the Golf Manor officers that it looked as though Mr. Owensby could not breathe; Golf Manor admits that it responded to the scene pursuant to a Mutual Aid Agreement with the City of Cincinnati; and, that Mutual Aid Agreement expressly imposes upon Golf Manor the same duties and responsibilities as the Cincinnati Police Officers.

II.    **FACTS** .......................................................... 2
Plaintiff incorporates the Statements of Fact from his motions for summary judgment against the Golf Manor defendants (Doc. 87) as well as the City of Cincinnati defendants (Doc. 88).  However, Plaintiff notes that several matters represented in Golf Manor's Statement of the Case are either inaccurate or incomplete.

A.    **September 27, 2000 Incident** .................................... 3
Plaintiff incorporates his statement of the events in Plaintiff's Motion for Summary Judgment against the Cincinnati defendants (Doc. 88, pp. 17-22) as described by Officer Hunter based upon his first-hand knowledge and encounter with an African-American man whose description admittedly did not match the man whom Officers Jorg, Hunter and Caton chose to assault on November 7, 2000.

B.    **November 7, 2000 Incident** ..................................... 5
In the early evening hours of November 7, 2000, at a Sunoco convenience store bordering Golf Manor, Cincinnati Police Officers Jorg, Caton and Hunter attempted to arrest Roger Owensby Jr., for the September 27 incident, even though they knew that he was unarmed and did not match the description of the person who ran from Officer Hunter.  When Mr. Owensby attempted to run, he was tackled to the asphalt pavement.  As he lay face down on the asphalt,

Mr. Owensby was beaten, choked and maced by a total of five Cincinnati police officers. Even after he was handcuffed and no longer offering any resistence, Mr. Owensby was beaten and maced.

Golf Manor admits that: (1) Officers Heiland (a trained EMT) and Campbell responded to the scene under the auspices of a Mutual Aid Agreement between Golf Manor and Cincinnati; (2) when Officers Heiland and Campbell arrived a handcuffed Mr. Owensby was being picked up off of the asphalt by Cincinnati officers; and (3) Officer Heiland opened the back door to his cruiser and gave the Cincinnati officers permission to place the handcuffed Mr. Owensby in the Golf Manor cruiser. The evidence of record also establishes that: both Golf Manor officers saw that Mr. Owensby had to be carried to the Golf Manor cruiser; both Golf Manor officers saw that Mr. Owensby's face was bleeding; Officer Heiland noted that the Cincinnati officers were breathing heavily and appeared "disheveled" but Mr. Owensby was not breathing heavily and, in fact, made no sound or movement; Mr. Owensby was placed in the Golf Manor cruiser head-first, indicating that he was unconscious.

Finally, while Mr. Owensby lay handcuffed, bleeding, unconscious and dying in the back of the Golf Manor cruiser, Cincinnati Officer Brian Brazile took his flashlight and looked in at Mr. Owensby. He then told both Golf Manor officers, "This looks f**ked up. Can he breathe? It don't look like he can from the way he's laying." In response, the two Golf Manor police officers shrugged their shoulders in indifference and did nothing. In fact, they never check on or provided any medical care to Mr. Owensby during the five to six minutes after they were told that he looked as though he could not breathe. These facts are uncontradicted by the Golf Manor officers who acknowledge the conversation but simply say that they cannot recall what Officer Brazile said to them.

When Mr. Owensby was finally removed from the Golf Manor cruiser, he had no pulse and was not breathing. He was never revived.

## III.    ARGUMENT ........................................................ 10

### A.    Claims Of Excessive Force ................................... 10

The Golf Manor Defendants' failure to provide critical medical care goes hand-in-glove with the excessive force used in effectuating the illegal arrest of Roger Owensby on November 7, 2000. In fact, the willful determination or deliberate indifference in failing to provide medical attention to Roger Owensby is part of the excessive force used against him.

### B.    The Constitutional Duty To Provide Medical Care .............. 11

The Golf Manor defendants argue that "[c]ustody of Owensby was not transferred from the Cincinnati officers to Golf Manor" and, therefore, they had no constitutional duty to provide medical care to Mr. Owensby while he lay handcuffed, bleeding and unconscious in the back seat of their cruiser. Defendants' argument fails because the undisputed facts and law establish that Mr. Owensby was in Golf Manor's custody, there was a "special relationship," and Golf Manor had a constitutional duty to provide medical care to Mr. Owernsby while he lay handcuffed in their police cruiser.

1.    **Roger Owensby was in the custody of Golf Manor when he was placed, in handcuffs, in the back seat of the Golf Manor cruiser** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

A person is objectively "in custody" "if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). The Golf Manor defendants admit that Mr. Owensby was: under arrest; in handcuffs; and placed in the back seat of the Golf Manor cruiser with the expressed consent of Golf Manor Officer Heiland. Any reasonable person would view himself as being "in custody" under these circumstances. *United States v. Richardson*, 949 F.2d 851, 856 (6th Cir. 1991); *United States v. McDonald*, 165 F.3d 1032, 1035 (6th Cir. 1999).

Golf Manor argues that Mr. Owensby was not in their custody because the Cincinnati police officers subjectively viewed the Golf Manor cruiser as a "temporary holding facility." However, holding a person in a "temporary holding facility," i.e., a jail cell, means that the jailor (Golf Manor) has a well established constitutional duty to provide medical care for its prisoners. *County of Sacramento v. Lewis*, 523 U.S. 833, 849-50 (1998).

Finally, Golf Manor argues that it should be excused from its obligation to provide medical care to Mr. Owensby because its officers did not have physical contact with Mr. Owensby. The constitutional duty to provide medical care exists even in a noncustodial setting. *Ewolski v. City of Brunswick*, 287 F.3d 492, 509 (6th Cir. 2002); *Gazette v. City of Pontiac*, 41 F.3d 1061, 1065 (6th Cir. 1994); *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982). Actual physical touching is not required for a Fourth Amendment seizure to exist. *California v. Hodari D.*, 499 U.S. 621, 626 (1991); *Gallo v. City of Philadelphia*, 161 F.3d 217, 223 (3rd Cir. 1998).

2.    **There existed a "special relationship" between Golf Manor and Mr. Owensby** . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Relying on *DeShaney v. Winnegago County Dept. Of Soc. Servs.*, 489 U.S. 189 (1989), the Golf Manor defendants argue that they had no duty to provide medical care to Mr. Owensby because no "special relationship" existed between Golf Manor and Mr. Owensby. However, *DeShaney* commands the state "to provide medical care to suspects in police custody who have been injured while being apprehended by the police." *Id.* at 198.

a.    **Golf Manor limited Roger Owensby's ability to care for himself** . . . . . . . . . . . . . . . . . . . . . . . 17

As a result of being handcuffed, unconscious and in the back seat of the Golf Manor police cruiser, Mr. Owensby could not care for himself or address his life-threatening injuries. This is doubly true when we consider the fact that both Golf Manor officers were provided with actual notice of Mr. Owensby's dire condition as he lay in their "temporary holding facility" when Officer Brazile told them that it looked as though Mr. Owensby could not breathe. Still they did nothing.

b.    **Golf Manor affirmatively placed Mr. Owensby in a position of danger** . . . . . . . . . . . . . . 18

This callous inaction and deliberate indifference, coupled with the willing confinement of

iii

Mr. Owensby in the Golf Manor cruiser, affirmatively placed Mr. Owensby in a position of danger—a danger that proved fatal. Unlike *DeShaney*, Golf Manor contributed to and created the danger that cost Mr. Owensby his life.

    **C.    The Mutual Aid Agreement Imposed Upon Golf Manor**
            **The Same Duties And Responsibilities For Mr. Owensby's**
            **Welfare As The Cincinnati Defendants** . . . . . . . . . . . . . . . . . . . . . . . . 19

The Mutual Aid Agreement establishes joint and several liability of all of the defendants—Golf Manor and Cincinnati—for their failure to provide medical care to Mr. Owensby. Specifically, the Mutual Aid Agreement empowers law enforcement agents from one jurisdiction (Golf Manor) to act under color of state law in another jurisdiction (Cincinnati). However, this same Agreement also imposes upon these officers the "same power, **duties**, rights and immunities as if taking action within the territory of their employing Agency. Exhibit 78, Mutual Aid Agreement, ¶ VI.C. (Emphasis supplied). These duties and responsibilities included providing medical care to an injured detainee like Mr. Owensby.

    **D.    The Individual Golf Manor Defendants Are Not Entitled**
            **To Qualified Immunity** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Qualified immunity is an affirmative defense shielding governmental officials from liability as long as their conduct does 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Bukowski v. City of Akron*, 326 F.3d 702, 708 (6th Cir. 2003). It is composed of two parts: (1) whether a constitutionally protected right has been violated; and, (2) whether the right is so clearly established that a reasonable official would understand that what he is doing violates that right. *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001); *Leisure v. City of Cincinnati*, 267 F. Supp. 2d 848, 851 (S.D. Ohio 2003).

    **1.    Officers Heiland and Campbell are not**
            **entitled to qualified immunity** . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Golf Manor Officers Heiland and Campbell are personally liable under § 1983 for their deliberate indifference and failure to provide medical care to Mr. Owensby as he lay on the back seat of the Golf Manor cruiser. Couple with this the fact that at least five critical minutes of medical indifference elapsed *after* Officer Brazile told both Officers Heiland and Campbell that it looked as though Mr. Owensby could not breathe. These acts of callous indifference, collectively and individually, are objectively unreasonable and a blatant violation of the well established constitutional duty to provide medical care.

    **2.    Police Chief Tilley is not entitled to**
            **qualified immunity** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Golf Manor Police Chief Stephen Tilley's liability is based upon his failure to train and supervise his Golf Manor officers in their duties and responsibilities when responding outside of their jurisdiction pursuant to the Mutual Aid Agreement. This utter failure of training and supervision, when Golf Manor and its Chief of Police knew that their officers would be operating under the terms of the Mutual Aid Agreement, constitutes deliberate indifference, as well as

willful, reckless action, resulting in the foreseeable result that Golf Manor officers would not understand their duties and responsibilities on the evening of November 7, 2000.

E.    **Vicarious Liability** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
Plaintiff asserts no § 1983 vicarious liability or respondeat superior claims against Golf Manor.

F.    **Ohio's Sovereign Immunity Statute** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

1.    **Ohio's Sovereign Immunity Act
      is unconstitutional** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
Plaintiff has asserted state claims against the Golf Manor defendants pursuant to Ohio's Wrongful Death and Survivor Statutes as well as claims at common law.  Golf Manor claims that it is immune from such liability pursuant to Ohio's Sovereign Immunity Act, Ohio Rev. Code § 2744.02.  Ohio's Sovereign Immunity Act is unconstitutional in violation of Sections 5 and 16 of Article I of the Ohio Constitution.  Doc. 52, Plaintiff's Memorandum in Opposition to Motion for Summary Judgment on Pendant and Ancillary State Tort Claims.  *Kammeyer v. City of Sharonville*, No. 1:01-CV-00649, Doc. 130, Order, pp. 10-15 (S.D. Ohio Dec. 16, 2003).

2.    **The Sovereign Immunity Act does not immunize the individual
      Golf Manor defendants because they acted with malicious
      purpose, in bad faith, or in a wanton or reckless manner** . . . 31
The Ohio Sovereign Immunity Act does not immunize a municipal employee if his "acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code § 2744.03(A)(6)(b).  As the uncontroverted evidence establishes, Golf Manor Officers Heiland and Campbell clearly acted "in a wanton or reckless manner" when they confined in their police cruiser a man who they knew was bleeding, handcuffed, and showed all the outward signs of being unconscious.  They also acted "with malicious purpose [or] bad faith" when they consciously refused to check on Mr. Owensby's health or provide any medical care to him for five to six critical minutes *after* being told that Mr. Owensby looked as though he could not breathe.

Likewise, Golf Manor and its Police Chief acted "in a wanton or reckless manner" when they failed to provide any training for their officers concerning their duties and responsibilities under the Mutual Aid Agreement, knowing full well that they were sending these officers into other jurisdictions, as occurred here, pursuant to that Agreement.

IV.    **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
The Golf Manor officers violated clearly established constitutional duties to provide medical care to Mr. Owesnby and Golf Manor and its Chief of Police violated clearly established constitutional duties to train their officers when responding under the Mutual Aid Agreement. As such Golf Manor's motion for summary judgment should be denied and Plaintiff's partial motion for summary judgment (Doc. 87) should be granted.

# TABLE OF AUTHORITIES

**CASES**                                                                          **Page**

*Alexander v. Beale Street Blues Co.*, 108 F. Supp. 2d 934 (W.D. Tenn. 1999) . . . . . . . . . . 11, 22

*Anderson v. Creighton*, 483 U.S. 635 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Bell v. Wolfish*, 441 U.S. 520 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11,22

*Bowers v. DeVito*, 686 F.2d 616 (7th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 25

*Bukowski v. City of Akron*, 326 F.3d 702 (6th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*California v. Hodari D.*, 499 U.S. 621 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*City of Canton v. Harris*, 489 U.S. 378 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 29

*City of Revere v. Massachusetts Gen. Hospital*, 463 U.S. 239 (1983) . . . . . . . . . . . . . . . . . 11, 22

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998) . . . . . . . . . . . . . . . . . . . . . . 12, 14, 15, 22, 25

*DeShaney v. Winnebago County Dept. Of Soc. Servs.*, 489 U.S. 189 (1989) 11, 12, 16, 17, 22, 25

*Estate of Phillips v. City of Milwaukee*, 123 F.3d 586 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . 11

*Estate of Stevens v. City of Green Bay*, 105 F.3d 1169 (7th Cir. 1997) . . . . . . . . . . . . . . 12, 13, 16

*Ewolski v. City of Brunswick*, 287 F.3d 492 (6th Cir. 2002) . . . . . . . . . . . . . . . . 12, 15, 21, 22, 25

*Fabrey v. McDonald Police Dept.*, 70 Ohio St. 3d 351, 639 N.E.2d 31 (1994) . . . . . . . . . . . . 32

*Gallo v. City of Philadelphia*, 161 F.3d 217 (3rd Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*Garrison v. Bobbitt*, 134 Ohio App. 3d 373, 731 N.E.2d 216 (1999) . . . . . . . . . . . . . . . . . . . . 32

*Gazette v. City of Pontiac*, 41 F.3d 1061 (6th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Hackathorn v. Preisse*, 104 Ohio App. 3d 768, 663 N.E.2d 384 (Summit Cty. 1995) . . . . . . . . 33

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Hawkins v. Ivy*, 50 Ohio St. 2d 114, 363 N.E.2d 367 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Horn v. Madison County Fiscal Court*, 22 F.3d 653 (6th Cir. 1994) . . . . . . . . . . . . . . . . . 11, 22

*Jackson v. Butler County Board of County Commissioners*, 76 Ohio App. 3d 448, 602 N.E.2d 363 (Butler Cty. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Kammeyer v. City of Sharonville*, No. 1:01-CV-00649 (S.D. Ohio Dec. 16, 2003) . . . . . . . . 31

*LaPointe v. UAW Local 600*, 103 F. 3d 485 (6th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . 10

*Leisure v. City of Cincinnati*, 267 F. Supp. 2d 848 (S.D. Ohio 2003) . . . . . . . . . . . . . . . 20, 21

*Monell v. New York City Dept. Of Soc. Servs.*, 436 U.S. 658 (1978) . . . . . . . . . . . . . . . . . 30

*Piro v. Franklin Township*, 102 Ohio App. 3d 130, 656 N.E.2d 1035 (Summit Cty. 1995) . . 33

*Roberts v. City of Troy*, 773 F. 2d 720 (6th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 22

*Saucier v. Katz*, 533 U.S. 194 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Stansbury v. California*, 511 U.S. 318 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Thompson v. McNeil*, 53 Ohio St. 3d 102, 104-03, 559 N.E.2d 705 (1990) . . . . . . . . . . . . . 33

*United States v. Belle*, 1978 U.S. App. LEXIS 10943 (3rd Cir. 1978) . . . . . . . . . . . . . . . . . 14

*United States v. Hollie*, 1999 U.S. App. LEXIS 29270 (6th Cir. Nov. 3, 1999) . . . . . . . . . . 12

*United States v. McDonald*, 165 F.3d 1032 (6th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Mendenhall*, 446 U.S. 544 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*United States v. Richardson*, 949 F.2d 851 (6th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Wooton v. Vogele*, 147 Ohio App. 3d 216, 769 N.E.2d 889 (Ham. Cty. 2001) . . . . . . . . . 32, 33

## Statutes

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Ohio Rev. Code § 2744 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
THE MOTION FOR SUMMARY JUDGMENT BY
THE VILLAGE OF GOLF MANOR DEFENDANTS (doc. 85)**

## I.    INTRODUCTION

Plaintiff and the Village of Golf Manor defendants[1] have filed cross motions for

summary judgment in this civil rights action arising out of the November 7, 2000 arrest, beating

and death of Roger Owensby, Jr.  Plaintiff's motion seeks partial summary judgment against the

Golf Manor defendants, as to 42 U.S.C. § 1983 liability, for failing to provide any medical care

to Roger Owensby, Jr., as he lay handcuffed, bleeding, unconscious and dying in the back seat

of a Golf Manor cruiser, in violation of a clearly-established constitutional duty.[2]

On the other hand, the Golf Manor defendants seek summary judgment in an attempt to

avoid all liability because they claim that they did not have "custody" of Mr. Owensby and that

no "special relationship" existed between Golf Manor and Mr. Owensby giving rise to a

constitutional duty to provide essential medical care, even though:

   •   Golf Manor admits that it agreed to allow Cincinnati Police Officers to place the
       handcuffed, bleeding and unconscious Roger Owensby in a Golf Manor cruiser;[3]

   •   Golf Manor admits that it's police cruiser served as a "temporary holding
       facility" for Mr. Owensby;[4]

   •   Golf Manor admits that its officers on the scene spoke to Cincinnati Police

---

[1]The "Golf Manor defendants" are: the Village of Golf Manor; its Police Chief, Stephen Tilley; Golf Manor Police Officer Robert Heiland; and Golf Manor Police Officer Christopher Campbell.  Doc. 85, Golf Manor's Motion for Summary Judgment ("Golf Manor MSJ"), p. 1.

[2]Doc. 87, Plaintiff's Motion for Partial Summary Judgment Against Defendants Village of Golf Manor, Its Police Chief And Its Individual Police Officers For Their Failure To Provide Critical Medical Care ("Plaintiff's MSJ").

[3]Doc. 85, Golf Manor MSJ, p. 6.

[4]*Id.* at 6-7.

Officer Brian Brazile and the uncontradicted testimony is that Officer Brazile told them that it did not look as though Mr. Owensby could breathe;[5]

•  Golf Manor admits that it responded to the scene pursuant to a Mutual Aid Agreement with the City of Cincinnati;[6] and,

•  The Mutual Aid Agreement expressly imposes upon Golf Manor the same duties and responsibilities as the Cincinnati Police Officers.[7]

These, and the other undisputed facts, establish that the Golf Manor defendants' summary judgment motion should be denied and judgment as to § 1983 liability should be granted in favor of Plaintiff against these Golf Manor defendants.

## II.     FACTS

Plaintiff incorporates the Statements of Fact from his motions for summary judgment against the Golf Manor defendants[8] as well as the City of Cincinnati defendants.[9]   However, Plaintiff notes that several matters represented in Golf Manor's Statement of the Case are either inaccurate or incomplete.

---

[5]*Id.* at 6; Doc. 87, Plaintiff's MSJ, p. 6; Brazile Depo., pp. 56:14-20, 64:13 - 68:8; Heiland Depo., pp. 29:14 -32:7; Campbell Depo., pp. 40:8 - 42:24; Exhibit 47, Brazile 11/13/00 Statement.  For consistency, Plaintiff retains the same numerical exhibit designations as used during depositions in this action.  Exhibits designated with letters were produced by Defendants in discovery but not used in depositions.

[6]Doc. 85, Golf Manor MSJ, pp. 6, 13.

[7]Exhibit 78, Mutual Aid Agreement, ¶ VI.C.; Doc. 87, Plaintiff's MSJ, pp. 22-23.

[8]Doc. 87, Plaintiff's MSJ, pp. 2-9.

[9]Doc. 88, Plaintiff's Motion for Partial Summary Judgment against Defendants City of Cincinnati, its Chief of Police and its Individual Police Officers for their Failure to Provide Critical Medical Care (Plaintiff's Cincinnati MSJ"), pp. 2-22.

2

### A.     September 27, 2000 Incident.

Golf Manor relies upon the testimony of Cincinnati Police Officer Robert Jorg in describing the events of September 27, 2000, when an unidentified African-American man ran from Officer Jorg's undercover partner, Officer David Hunter, while they were investigating suspected drug trafficking activity.[10]  However, much of Officer Jorg's testimony is incompetent hearsay based upon what he says Officer Hunter told him.  According to Golf Manor, Officer Jorg said that he and Officer Hunter "approached a group and identified themselves as police officers.  One in the group fled and was pursued by Hunter.  (P. 51, Jorg Depo.)."[11]  However, the very page of Officer Jorg's testimony cited by Golf Manor contains an admission that Officer Jorg did not see whether the person who ran from Officer Hunter was involved in any suspected drug activity, and is based entirely upon what Officer Hunter told Officer Jorg.[12]  In fact, later in Officer Jorg's deposition, he admits that Officer Hunter is the only reliable source of first hand knowledge of the relevant events of September 27, 2000.[13]  Officer Hunter has provided a much different account in his sworn testimony.

---

[10]Doc. 85, Golf Manor MSJ, p. 4.

[11]*Id.*

[12]Jorg Depo., p. 51:5-10.
> Q.   Did you see the person that ran actually make any kind of deal?
>
> A.   No.
>
> Q.   So you're basing that on what Officer Hunter told you?
>
> A.   Yes.

[13]Jorg Depo., p. 102:3-5 ("I knew I couldn't identify him [the person who ran from Officer Hunter].  So I deferred to the officer involved and said, "Is this the guy?").

According to Officer Hunter, on September 27, 2000, he observed through binoculars four individuals engaged in what he believed to be drug trafficking activity at a public phone located between Sam's Carryout (2092 Seymour Avenue) and the Sunoco service station (2098 Seymour Avenue). He called for uniformed backup as he and Officer Jorg moved in to make the arrest. As they approached, two of the four individuals started across Seymour Avenue heading toward the Huntington Meadows Apartment complex.[14]

Officer Hunter followed the two across Seymour Avenue while Officer Jorg apprehended the other two individuals at Sam's Carryout.[15] A uniformed Cincinnati police officer met the plains clothed Officer Hunter on Seymour Road. They then split up, with the uniformed officer going around a Huntington Meadows apartment building from one side while Officer Hunter followed the two around the building from the other side.[16]

As the two individuals began to leave Officer Hunter's view, a person happened upon them and said "The boys" or "Five-O."[17] Upon hearing this the two suspects ran off.[18]

Officer Hunter walked over to the man who he described as an African-American of average height and weight, clean shaven, with a short afro.[19] As they spoke, Officer Hunter pulled his badge out from under his shirt. The person—who was not involved in the suspected

---

[14] Hunter Depo., p. 54:12-24.

[15] Hunter Depo., pp. 55:1-11, 71:6-15.

[16] Hunter Depo., pp. 55:10-14, 72:5 - 73:14.

[17] Hunter Depo., pp. 74:13 - 75:7.

[18] Hunter Depo., pp. 55:14-19, 75:11-15.

[19] Hunter Depo., pp. 76:12 - 77:8, 86:13 - 87:1.

4

drug transaction—pulled away and ran.[20]

Officer Hunter, in plain clothes and with his sidearm pulled, chased the individual through the Huntington Meadows apartment complex, across Rhode Island Avenue, down Seymour Avenue but lost him when he veered back into the Huntington Meadows apartment complex and ran into one of the buildings.  In the course of the chase, Officer Hunter attempted unsuccessfully to mace the person and ended up macing himself.[21]

When Officer Hunter returned to his undercover partner, Officer Jorg, he then learned that the two individuals that Officer Jorg had arrested at Sam's Carryout had no drugs and no large sums of money that one would expect to find on a drug trafficker.[22]  The two individuals were charged with criminal trespass and one was charged with having an open container of beer.

The only police officer to have contact with the person Officer Hunter says he later identified as "LA" was Officer Hunter.  Officer Hunter admits that the person who ran from him on that day *was not* one of the individuals he suspected of drug activity.[23]

### B.     November 7, 2000 Incident.

In the early evening hours of November 7, 2000, Roger Owensby, Jr., walked up Seymour Avenue to a convenience store at a Sunoco station at the corner of Seymour and

---

[20] Hunter Depo., pp. 55:20 - 56:18, 76:20 - 78:17 (the conversation between Hunter and the individual was: "What's up?" "What's up" "You know, you can't be doing what you just did."  "What's that?"  "You can't be telling people – you can't be warning people that the police is here.  That's interfering with an investi...")

[21]Doc. 88, Plaintiff's Cincinnati MSJ, pp. 17-22.

[22] Hunter Depo., pp. 87:10 - 89:2; Exhibit 6, Arrest and Investigation Reports on Jaysen Hill and Jarvis Nixon.

[23] Hunter Depo., p. 76:12-19.

Langdon Farm Road.  Officer Hunter (in uniform this time) was present, along with four other uniformed Cincinnati Police Officers, including Officer Jorg and his partner, Officer Patrick Caton.  Although Mr. Owensby did not match the September 27 description, Officer Hunter told his follow officers that he believed that Mr. Owensby was "LA."[24]

In response, Officer Jorg, the senior officer on the scene with five years of service, said to the other officers, "If that's him, he has a lot of balls showing up here" or "Well, he's got a lot of balls to come out here and all these police officers and all these cruisers out here."[25]

Officers Jorg, Caton and Hunter then stopped Mr. Owensby as he attempted to leave the convenience store, conducted a pat-down search to verify that he was unarmed, and questioned him.  When the officers decided to arrest Mr. Owensby he attempted to run.  He only got 5 to 7 steps before being tackled into the side of a parked car by Officers Jorg and Caton.

An officer-needs-assistance call was issued by Officer Caton as a total of five Cincinnati police officers brutally beat and maced Mr. Owensby.  Even after he was handcuffed and no longer offering any resistence, Mr. Owensby was beaten and maced.[26]

The Golf Manor defendants admit that Golf Manor Police Officers Robert Heiland and Chris Campbell responded to the officer-needs-assistance call under the auspices of a Mutual Aid Agreement between Golf Manor and the City of Cincinnati.[27]  Golf Manor also admits that, when Officers Heiland and Campbell arrived, Mr. Owensby was handcuffed and being picked

---

[24] Caton Depo., p. 73:13-16.

[25] Sellers Depo., p. 35:9-12; Jorg Depo., p. 87:17-19; Hunter Depo., p. 126:14-20.

[26] Doc. 88, Plaintiff's Cincinnati MSJ, pp. 4-10.

[27] Doc. 85, Golf Manor MSJ, pp. 6, 9; Exhibit 78, Mutual Aid Agreement.

up off of the asphalt.[28]  Finally, Golf Manor admits that Officer Heiland gave Cincinnati Police Officers Jorg and Caton permission to place the handcuffed Mr. Owensby in the back seat of his Golf Manor cruiser.[29]  In fact, Officer Heiland opened the car door to assist Officers Jorg and Caton. However, Golf Manor's memorandum omits several salient facts.

First, Officer Heiland was a trained EMT.  He had previously worked at Good Samaritan Hospital as a health technician, at Eldercare as an EMT, and was trained as a combat medic at the Army Major Medical Center at Fort Sam Houston.[30]

Second, the statement of the Golf Manor defendants that neither Officers Heiland nor Campbell would have given permission to place Mr. Owensby in the Golf Manor cruiser had they known that he was unconscious[31] is belied by the facts.  Everything these officers saw told them that Mr. Owensby was injured and unconscious and in desperate need of medical care:

- •  Officer Heiland, a trained EMT, faced Mr. Owensby and watched as Officers Caton and Jorg carried Mr. Owensby to his cruiser.[32]

- •  Both officers saw that Mr. Owensby had to be carried to the Golf Manor cruiser.[33]

- •  Both officers saw that Mr. Owensby's face was bleeding.[34]

---

[28]Doc. 85, Golf Manor MSJ, p. 6.

[29]*Id.*

[30] Heiland Depo., pp. 14:1 - 15:22.

[31]Doc. 85, Golf Manor MSJ, p. 7.

[32] Heiland Depo., p. 44:1-12.

[33] Heiland Depo., p. 22:11-14; Campbell Depo., pp. 25:10-13, 31:9-12.

[34] Heiland Depo., pp. 74:23 - 75:1; Campbell Depo., p. 49:9-13.

- Officer Heiland saw that the Cincinnati police officers were breathing heavily and were "disheveled" but Mr. Owensby was not breathing heavily and, in fact, made no sounds and no movement.[35]

- Mr. Owensby had to be placed in the Golf Manor cruiser head-first.  Officer Heiland acknowledges that conscious suspects usually get in a car feet first.[36]

- Officers Heiland and Campbell saw that Mr. Owensby was laying, not sitting, on the back seat of the Golf Manor cruiser and was motionless and made no sounds.[37]

- Officer Campbell remembers seeing blood on Roger Owensby's face and on the back seat of the Golf Manor cruiser.  Officers Heiland and Campbell did nothing in response.[38]

- Officer Heiland never checked to determine whether the person being placed in his cruiser was conscious or unconscious.[39]

Third, while the Golf Manor defendants acknowledge that Cincinnati Police Officer Brian Brazile "made some type of inquiry about Owensby" they provide no other details.  The details are an indictment of their malicious disregard of the constitutional duty of the Golf Manor defendants to provide medical care for Mr. Owensby.  Officer Brazile has consistently and repeatedly testified that he looked at Mr. Owensby as he lay on the back seat of the Golf Manor cruiser and told Officers Heiland and Campbell, "This looks f**ked up.  Can he breathe?

---

[35] Heiland Depo., pp. 44:14 - 47:19, 89:21 - 90:9.

[36] Heiland Depo., pp. 48:19 - 49:5.

[37]Heiland Depo., pp. 47:2-19, 89:21 - 90:9; Campbell Depo., pp. 26:15 - 27:1.

[38] Heiland Depo., p. 27:17-24; Campbell Depo., p.p. 23:13-17, 26:15 - 27:1.; 43:10-14, 49:4-16.

[39] Heiland Depo., p. 89:14-20.

It don't look like he can from the way he's laying."[40]  In response, the two Golf Manor police officers shrugged their shoulders in indifference and did nothing.[41]  These facts are uncontradicted by the Golf Manor officers who acknowledge the conversation but simply say that they cannot recall what Officer Brazile said to them.[42]  Such a failure of recollection neither contradicts Officer Brazile's sworn testimony nor creates a genuine issue of material fact.

Finally, it is uncontested that no one checked on or provided any medical care to Mr. Owensby for over five to six minutes, as he lay handcuffed, bleeding, unconscious and dying on the back seat of the Golf Manor cruiser.[43]  Officer Heiland also acknowledges that, had he attempted to examine Mr. Owensby to determine whether he needed any first aid, he would have determined that Mr. Owensby was unconscious.[44]

Some time after Roger Owensby was placed in the Golf Manor cruiser and after Officer Brazile told Officers Heiland and Campbell that it didn't look as though Mr. Owensby was breathing,  Cincinnati police Officer Victor Spellen drove onto the scene in his police cruiser in response to the officer-needs-assistance call.  Officer Spellen's cruiser video camera continued to run for the 5 minutes that he was on the scene.  His car was parked next to Officer Heiland's Golf Manor cruiser in which Mr. Owensby lay.  *No one checked on or provided medical care to*

---

[40] Exhibit 47, Brazile 11/13/00 Statement; Brazile Depo., pp. 56:14-20, 64:13 - 68:8; Heiland Depo., pp. 29:14 -32:7; Campbell Depo., pp. 40:8 - 42:24.

[41] Brazile Depo., pp. 56:21 - 57:3.

[42] Doc. 85, Golf Manor MSJ, p. 6; Campbell Depo., pp. 39:22 - 40:7, 42:13-24; Heiland Depo., pp. 29:2 - 32:7.

[43] Heiland Depo., pp. 75:2-6, 87:10-15; Campbell Depo., p. 43:10-14.

[44] Heiland Depo., pp. 78:20-24; 87:16-23.

*Roger Owensby.*[45]

The record is clear that at least six minutes passed before anyone checked on Mr. Owensby as he lay handcuffed, bleeding, maced and unconscious in the back seat of the Golf Manor cruiser.[46] Eventually, Cincinnati Sergeant Watts checked on Mr. Owensby and noticed what Officer Brazile told the Golf Manor officers over five minutes earlier—that Mr. Owensby was not breathing.[47] At that point, Mr. Owensby was removed from the Golf Manor cruiser and attempts to resuscitate Mr. Owensby proved unsuccessful. By this time Mr. Owensby had no pulse. He was never revived.[48]

## III.     ARGUMENT

### A.     Claims Of Excessive Force.

The Golf Manor defendants argue that, because they had no physical contact with Mr. Owensby, no claim of excessive force can be sustained and summary judgment should be granted in their favor.[49] Defendants' argument is misplaced.

---

[45] Exhibit 20, Spellen cruiser video tape which includes a timer display that indicates elapsed time; Doc. 86, Notice of Filing Videotape Exhibits.

[46] Exhibit 20, Spellen cruiser videotape; Exhibit 21, City of Cincinnati transcript of Spellen cruiser videotape; Exhibit A, transcript of City of Cincinnati audio tape of police radio channel communications on November 7, 2000.

[47] Caton 10/17/03 Depo., p. 18:14-18.

[48] Caton 10/17/03 Depo., pp. 13:6 - 14:3, 140:14 - 141:11, 143:23 - 144:14.

[49] Doc. 85, Golf Manor MSJ, p. 8. The sole authority cited by Golf Manor for this argument is *LaPointe v. UAW Local 600*, with the incorrect citation of "103 F.3d 45 (6th Cir. 1996)." This is a miscite. The only 1996 Sixth Circuit decision bearing this caption is, *LaPointe v. UAW Local 600*, 103 F. 3d 485 (6th Cir. 1996). However, that case is inapplicable since it deals with an ADEA claim.

The Golf Manor Defendants' failure to provide critical medical care goes hand-in-glove with the excessive force used in effectuating the illegal arrest of Roger Owensby on November 7, 2000. In fact, the willful determination or deliberate indifference in failing to provide medical attention to Roger Owensby is part of the excessive force used against him.[50]

### B.    The Constitutional Duty To Provide Medical Care.

The Golf Manor defendants argue that "[c]ustody of Owensby was not transferred from the Cincinnati officers to Golf Manor."[51] Upon this faulty premise Golf Manor argues that there was no "special relationship" and, therefore, no constitutional duty to provide medical care to Mr. Owensby while he lay handcuffed, bleeding and unconscious in the back seat of their cruiser.[52] Defendants' argument fails because the undisputed facts and law establish that Mr. Owensby was in Golf Manor's custody, there was a "special relationship," and Golf Manor had a constitutional duty to provide medical care to Mr. Owernsby while he lay handcuffed in their police cruiser.

More than 20 years before Roger Owensby was placed in the Golf Manor cruiser, the Supreme Court established that police who act with deliberate indifference to the serious medical needs of pretrial detainees violate the constitutional rights of that citizen.[53]

---

[50]*Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 595 (7th Cir. 1997); *Alexander v. Beale Street Blues Co.*, 108 F. Supp. 2d 934, 944-45 (W.D. Tenn. 1999).

[51]Doc. 85, Golf Manor MSJ, pp. 9, 12, 13.

[52]*Id.* at 10-14.

[53] *Bell v. Wolfish*, 441 U.S. 520, 535 n. 16 (1979); *City of Revere v. Massachusetts Gen. Hospital*, 463 U.S. 239, 244 (1983); *DeShaney v. Winnebago County Dept. Of Soc. Servs.*, 489 U.S. 189, 198-200 (1989); *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998); *Roberts v. City of Troy*, 773 F. 2d 720, 723 (6th Cir. 1985); *Horn v. Madison County Fiscal Court*, 22 F.3d

> **[W]hen the State takes a person into its custody and holds him there against his will**, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, ***medical care***, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.[54]

### 1. Roger Owensby was in the custody of Golf Manor when he was placed, in handcuffs, in the back seat of the Golf Manor cruiser.

Defendants argue that Mr. Owensby was not in Golf Manor's custody because: (1) Golf Manor officers did not arrest him; (2) he was already handcuffed when they arrived and was placed in their car; and, (3) neither Officers Heiland nor Campbell had any physical contact with Mr. Owensby.[55] All of these facts are legally irrelevant to a "custody" determination. The fact that the handcuffed Mr. Owensby was placed, with Officer Heiland's knowing consent, in the back seat of his Golf Manor cruiser, is dispositive of and fatal to Golf Manor's argument.

A determination of when one is "seized" for purposes of a Fourth Amendment associated duty to provide medical care is based upon an objective "reasonableness" test.[56] Likewise, whether an individual is "in custody" requires an examination of "the objective circumstances of the situation using the perspective of a reasonable person in the suspect's

---

653, 660 (6th Cir. 1994); *Alexander v. Beale Street Blues Co.*, 108 F. Supp. 2d 934, 944 (W.D. Tenn. 1999).

[54] *DeShaney*, 489 U.S. at 200 (emphasis supplied); *Ewolski v. City of Brunswick*, 287 F.3d 492, 509 (6th Cir. 2002); *Lewis*, 523 U.S. at 851.

[55] Doc. 85, Golf Manor MSJ, p. 6.

[56] Doc. 87, Plaintiff's MSJ, pp. 10-17.

position."[57]  A person is objectively "in custody" "if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."[58]

Here, the Golf Manor defendants admit that Mr. Owensby was: under arrest;[59] in handcuffs;[60] and placed in the back seat of the Golf Manor cruiser with the expressed consent of Golf Manor Officer Heiland.[61]  Any reasonable person would view himself as being "in custody" under these circumstances.

In fact, the Sixth Circuit has unequivocally stated on more than one occasion that the placement of a handcuffed person in a police car results in that person being taken into custody.

> In the instant case, Richardson was approached by four officers and informed that he was the subject of a drug investigation.  The agents immediately asked for consent to search the automobile and the first storage locker.  When Richardson declined to consent to the search, he was placed in the back of an unmarked police car.  **In applying the objective standard for determining whether there has been a seizure of a person, we have no doubt that if after refusing to consent to a search, a reasonable person was placed in the back of a police car by law enforcement agents who had no intent to allow him to leave, that person would have believed that he was not free to leave.  Therefore, we conclude that when Richardson was placed in the police cruiser, he was seized within the meaning of the Fourth Amendment.**[62]

-------------------

[57]*Estate of Stevens v. City of Green Bay*, 105 F.3d 1169, 1175 (7th Cir. 1997); *Stansbury v. California*, 511 U.S. 318, 322 (1994); *United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *United States v. Hollie*, 1999 U.S. App. LEXIS 29270, *14 (6th Cir. Nov. 3, 1999).

[58]*Mendenhall*, 446 U.S. at 554; *Estate of Stevens*, 105 F.3d at 1175.

[59]Doc. 85, Golf Manor MSJ, p. 9.

[60]*Id.* at 5, 6.

[61]*Id.* at 6.

[62]*United States v. Richardson*, 949 F.2d 851, 856 (6th Cir. 1991) (emphasis supplied).

\*    \*    \*    \*    \*    \*

McDonald clearly had been handcuffed, read his *Miranda* rights, and placed in a patrol car. As the district court stated during the sentencing hearing, "If this man wasn't in custody, then I don't know what could constitute custody."[63]

This view is echoed by the Third Circuit:

Moreover, we think that any man in handcuffs in a police car who did not perceive that he had been taken into custody would have such faulty powers of perception as to bring his competency into question.[64]

Next, Golf Manor argues that Mr. Owensby was not in their custody because the Cincinnati police officers subjectively viewed the placement of Mr. Owensby in the Golf Manor cruiser as a "temporary holding facility" until such time as he could be transferred to a Cincinnati cruiser.[65] But if the Golf Manor cruiser is viewed as a "temporary holding facility," i.e., a jail cell, then the fact that Mr. Owensby was "in custody" is firmly established and the constitutional duty to provide medical care is beyond question.[66]

Finally, the Golf Manor defendants argue that they are excused from their duty to provide medical care for Mr. Owensby because the Golf Manor officers "had no physical contact with [Mr.] Owensby."[67] This argument fails as a matter of law.

---

[63]*United States v. McDonald*, 165 F.3d 1032, 1035 (6th Cir. 1999); *see also Gallo v. City of Philadelphia*, 161 F.3d 217, 224 (3rd Cir. 1998).

[64]*United States v. Belle*, 1978 U.S. App. LEXIS 10943, *13 (3rd Cir. 1978), *rev'd en banc on other grounds*, 593 F.3d 487 (3rd Cir. 1979) (attached).

[65]Doc. 85, Golf Manor MSJ, pp. 7, 9. The Court will note that there were, in fact, several Cincinnati cruisers already on the scene and more on the way. Exhibit 20, Spellen video. Mr. Owensby was never "transferred" to a Cincinnati cruiser.

[66]*Lewis*, 523 U.S. at 849-50.

[67]Doc. 85, Golf Manor MSJ, p. 9.

14

The constitutional duty of Golf Manor to provide medical care exists even in noncustodial settings.

> state officials may be subject to constitutional liability if they fail to provide protection for individuals in state custody....**Even in noncustodial settings, however, state officials may violate the Due Process Clause when their affirmative actions directly increase the vulnerability of citizens to danger or otherwise place citizens in harm's way.**[68]

Seizure of a person for Fourth Amendment purposes occurs when the exercise of state authority restrains the liberty of a citizen or there exists a "government termination of freedom of movement through means intentionally applied."[69] *Actual physical touching is not required.*[70] Thus, even pretrial bail restrictions on travel and the requirement of attendance at court hearings constitute a Fourth Amendment seizure.[71]

### 2. There existed a "special relationship" between Golf Manor and Mr. Owensby.

Relying on the Supreme Court's decision in *DeShaney v. Winnegago County Dept. Of Soc. Servs.*,[72] the Golf Manor defendants argue that they had no duty to provide medical care to Mr. Owensby while he lay handcuffed, bleeding, unconscious and dying in the back of their

---

[68]*Ewolski v. City of Brunswick*, 287 F.3d 492, 509 (6th Cir. 2002); *Gazette v. City of Pontiac*, 41 F.3d 1061, 1065 (6th Cir. 1994) ("A duty to protect can arise in a noncustodial setting if the state does anything to render an individual more vulnerable to danger."); *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982) ("If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit.").

[69]*Lewis*, 523 U.S. at 844; *Gallo*, 161 F.3d at 223.

[70]*California v. Hodari D.*, 499 U.S. 621, 626 (1991); *Gallo*, 161 F. 3d at 223.

[71]*Gallo*, 161 F.3d at 223-24.

[72]489 U.S. 189 (1989).

police cruiser because no "special relationship" existed between Golf Manor and Mr. Owensby.[73]  Golf Manor's argument fails because a "special relationship" constitutional duty is triggered only when the citizen is not in custody.  Here, the undisputed evidence of record establishes that Mr. Owensby was in Golf Manor's custody.  Moreover, the Supreme Court expressly defined a "special relationship" as including the circumstance that exists in this case.

In *DeShaney* a boy was beaten and permanently injured by his father.  A § 1983 action was brought against the social workers and other local officials who received complaints of the abuse but failed to remove the boy from his father's custody.  The plaintiff claimed that the failure to act deprived the boy of his liberty in violation of the Due Process Clause of the Fourteenth Amendment.[74]  The Supreme Court denied the § 1983 claim concluding, "that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."[75]

However, *DeShaney* then described "certain limited circumstances [in which] the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals."[76]  Those "special relationships," where an affirmative duty to protect and provide medical care exists, were defined as (1) custodial settings in which the state has limited the individual's ability to care for himself, and (2) when the state affirmatively places the

---

[73]Doc. 85, Golf Manor MSJ, p. 10.

[74]*DeShaney*, 489 U.S. at 191.

[75]*Id.* at 197.

[76]*Id.* at 198.

16

individual in a position of danger the individual would not have otherwise faced.[77] *DeShaney* specifically stated that the state is required "to provide medical care to suspects in police custody who have been injured while being apprehended by the police."[78]  Here, the undisputed evidence establishes that Golf Manor was in such a special relationship with Mr. Owensby.

<strong>a.    <u>Golf Manor limited Roger Owensby's ability to care for himself.</u></strong>

As established above, Mr. Owensby was in Golf Manor's custody when he was placed, in handcuffs, in the back seat of Officer Heiland's Golf Manor cruiser.  The resulting constitutional duty to protect and provide medical care arises "from the limitation which it [the state] has imposed on his freedom to act on his own behalf."[79]

Here, it is undisputed that:

- Golf Manor affirmatively consented to having Mr. Owensby placed in the Golf Manor cruiser.[80]

- Mr. Owensby was handcuffed when placed in the Golf Manor cruiser.[81]

- Officer Heiland opened the back door of the Golf Manor cruiser for the Cincinnati officers so that they could place Mr. Owensby in the cruiser.[82]

- the Golf Manor officers knew that Mr. Owensby's face was bleeding.[83]

---

[77]*Id.* at 199-202; *Estate of Stevens*, 105 F.3d at 1174.

[78]*DeShaney*, 489 U.S. at 198.

[79]*Id.* at 200.

[80]Heiland Depo., p. 22:3-11.

[81]Heiland Depo., p. 21:17-18; Campbell Depo., pp. 29:7 - 30:1.

[82]Heiland Depo., pp. 22:12-14, 118:12-18.

[83]Heiland Depo., pp. 74:23 - 75:1; Campbell Depo., p. 49:9-13.

17

- the windows to the Golf Manor cruiser were rolled up.[84]

- Mr. Owensby's lack of sound or movement, coupled with having to be placed head-first in the Golf Manor cruiser, strongly suggested that he was unconscious.[85]

These undisputed facts establish that Golf Manor knew that Mr. Owensby was in a custodial setting as he lay unconscious on the back seat of the Golf Manor cruiser. Further, as a result of being handcuffed, unconscious and in the back seat of the police cruiser, Mr. Owensby could not care for himself or address his life-threatening injuries. This is doubly true when we consider the fact that both Golf Manor officers were provided with actual notice of Mr. Owensby's dire condition as he lay in their "temporary holding facility" when they were told by Officer Brazile, "Can he breathe? It don't look like he can from the way he's laying."[86] Still they chose to do nothing.

### b.   Golf Manor affirmatively placed Mr. Owensby in a position of danger.

As a result of being handcuffed and unconscious, Mr. Owensby was unable to address his own medical care. Golf Manor compounded Mr. Owensby's predicament by placing him in the back seat of the Golf Manor cruiser, admitting that it served as a "temporary holding facility" and then failing to ever check on his medical condition. All of this despite actual notice that Mr. Owensby looked as if he could not breathe, that his face was bleeding, and that he exhibited the demeanor of an unconscious man. This callous inaction and deliberate

---

[84] Heiland Depo., pp. 32:21 - 33:7, 135:22 - 136:17.

[85] Heiland Depo., pp. 47:2-19, 89:21 - 90:9.

[86] Exhibit 47, Brazile 11/13/00 Statement; Brazile Depo., pp. 56:14-20, 64:13 - 68:8; Heiland Depo., pp. 29:14 -32:7; Campbell Depo., pp. 40:8 - 42:24.

indifference, coupled with the willing confinement of Mr. Owensby in the Golf Manor cruiser,

affirmatively placed Mr. Owensby in a position of danger—a danger that proved fatal.  Unlike

*DeShaney*, Golf Manor contributed to and created the danger that cost Mr. Owensby his life.

### C.    The Mutual Aid Agreement Imposed Upon Golf Manor The Same Duties And Responsibilities For Mr. Owensby's Welfare As The Cincinnati Defendants.

The defendants seek refuge in the Mutual Aid Agreement between Golf Manor and the

City of Cincinnati.  Because the Mutual Aid Agreement specifies that control of the crime scene

and arrested persons outside of Golf Manor's jurisdiction must be relinquished to the agency

that has jurisdiction (Cincinnati), Golf Manor asserts that it never had custody of Mr. Owensby,

even though he lay handcuffed, bleeding and unconscious in their cruiser.[87]  They also argue that

they were not responsible for Mr. Owensby's welfare while he lay in their police cruiser because

the Mutual Aid Agreement specifies that the Golf Manor officers were to be under the

"direction and authority of the commanding law enforcement officer of the agency to which they

are rendering assistance."[88]  Both arguments reflect a selective reading of the Mutual Aid

Agreement and are flawed.  When fully read, the Mutual Aid Agreement itself provides the duty

Golf Manor fails to acknowledge in the opinions of the Supreme Court and the Sixth Circuit

Court of Appeals.

The Mutual Aid Agreement establishes joint and several liability of all of the

defendants—Golf Manor and Cincinnati—for their failure to provide medical care to Mr.

Owensby.  The Mutual Aid Agreement provides:

---

[87]Doc. 85, Golf Manor MSJ, p. 13.

[88]*Id.*

19

> Whenever the law enforcement employees of one cooperating Agency are
> providing police services in or to another cooperating agency pursuant to the
> authority contained in this contract, other legislative authority or state law, such
> employee will have the ***same*** power, ***duties***, rights and immunities as if taking
> action within the territory of their employing Agency.[89]

Thus, the Mutual Aid Agreement which conferred upon Golf Manor and its officers the

authority to act under color of state law in Cincinnati's jurisdiction at the Sunoco station on the

evening of November 7, 2000 also imposed the same duties and responsibilities as if those Golf

Manor officers were acting within the jurisdiction of Golf Manor.[90]  As noted above, these

duties and responsibilities included providing medical care to an injured detainee.

### D.    The Individual Golf Manor Defendants Are Not Entitled To Qualified Immunity.

Golf Manor argues that its individual defendants are entitled to qualified immunity from

personal § 1983 liability.[91]

Qualified immunity is "an affirmative defense shielding governmental officials from

liability as long as their conduct does 'not violate clearly established statutory or constitutional

rights of which a reasonable person would have known.'"[92] The qualified immunity inquiry is

composed of two parts: (1) whether a constitutionally protected right has been violated; and, (2)

whether the right is so clearly established that a reasonable official would understand that what

---

[89]Exhibit 78, Mutual Aid Agreement, ¶ VI.C. (Emphasis supplied).

[90]*Id.*

[91]Doc. 85, Golf Manor MSJ, pp. 14 - 16.

[92] *Bukowski v. City of Akron*, 326 F.3d 702, 708 (6th Cir. 2003) *quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Leisure v. City of Cincinnati*, 267 F. Supp. 2d 848, 851 (S.D. Ohio 2003).

20

he is doing violates that right.[93]  For a right to be clearly established,

> The contours of the right must be sufficiently clear that a reasonable official
> would understand that what he is doing violates that right.  This is not to say that
> an official action is protected by qualified immunity unless the very action in
> question has previously been held unlawful, but it is to say that in the light of
> pre-existing law the unlawfulness must be apparent.[94]

Here, Golf Manor Officers Heiland and Campbell are not entitled to qualified immunity

because they violated a well established constitutional duty to provide medical care for Mr.

Owensby.  Also, qualified immunity does not apply to Golf Manor Police Chief Tilley because

he violated the well-established constitutional duty to train his officers in their duties and

responsibilities under the Mutual Aid Agreement, knowing full well that he was sending those

same officers into other jurisdictions pursuant to that Agreement.

### 1.    Officers Heiland and Campbell are not entitled to qualified immunity.

Golf Manor Officers Heiland and Campbell are personally liable under § 1983 for their

deliberate indifference and failure to provide medical care to Mr. Owensby as he lay on the back

seat of the Golf Manor cruiser for a crucial period of five to six minutes when they knew that he

was unresponsive, bleeding, not moving and making no sound.  Mr. Owensby's stillness and

silence, immediately after a significant physical altercation with five Cincinnati police officers

who themselves were breathing heavily, are all consistent with the fact that Mr. Owensby was

unconscious.  Moreover, Officer Heiland acknowledges that conscious prisoners do not

normally enter a police cruiser head-first.  It could not be clearer to this trained EMT that the

---

[93] *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001); *Bukowski*, 326 F.3d at 708; *Leisure*, 267 F. Supp. 2d at 851.

[94] *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Ewolski*, 287 F.3d at 501.

man whom he assisted in placing in his cruiser was unconscious and was in desperate need of medical attention.

Couple with this the fact that at least five critical minutes of medical indifference elapsed *after* Officer Brazile told both Officers Heiland and Campbell that, "It don't look like he can [breathe] from the way he's laying."[95]  Such actual notice of medical distress was met with shrugged shoulders and callous indifference.[96]

These actions, collectively and individually, are objectively unreasonable and a blatant violation of the well established constitutional duty to provide medical care.

This conduct violates a well established constitutional duty.  More than twenty years ago, the Supreme Court established the constitutional duty of police officers to provide medical care for pretrial detainees.[97]  Thus, these officers and their Golf Manor Police Department had twenty years of advance notice of a clearly established constitutional duty to care for any citizen who, because of the restraint imposed upon him by the police, was unable to provide for his own medical well-being.

Golf Manor's Policy 6-07 reflects Golf Manor's acknowledgment of this constitutional duty of care for restrained citizens:

---

[95] Exhibit 20, Spellen video; Exhibit 47, Brazile 11/13/00 Statement; Brazile Depo., pp. 56:14-20, 64:13 - 68:8, 95:14 - 97:1.  Shortly after this statement was made, Officer Spellen's cruiser video records the Cincinnati officers joking about how much Mr. Owensby was "hurting."  Recall that Officer Spellen's cruiser was parked next to Officer Heiland's Golf Manor cruiser.

[96] Brazile Depo., pp. 56:21 - 57:3.

[97] *Bell*, 441 U.S. at 535 n. 16; *City of Revere*, 463 U.S. at 244; *DeShaney*, 489 U.S. at 198-200; *Lewis*, 523 U.S. at 849; *Roberts*, 773 F. 2d at 723; *Horn*, 22 F.3d at 660; *Ewolski*, 287 F.3d at 509; *Alexander*, 108 F. Supp. 2d at 944.

22

- it is the policy of this department that EVERY prisoner transported in a police vehicle shall be searched and handcuffed by the transporting officer prior to being transported, unless specifically exempted under provisions of this procedure.[98]

Neither Officers Heiland nor Campbell searched Mr. Owensby on November 7 because they believed that they were not going to be transporting him.  Officer Heiland admits that he would have been in a better position to determine that Mr. Owensby was unconscious and needed prompt medical aid had he attempted to search him.[99]

- Every prisoner shall be placed in the Police vehicle and secured with seat belts.[100]

No one secured Mr. Owensby with a seat belt or even attempted to sit him up to place him in a seat belt.[101]  Again, had a trained EMT like Officer Heiland attempted to sit Mr. Owensby up to fasten a seat belt he would have determined Mr. Owensby's critical condition.

- Any prisoner who is sick or injured shall be examined by life squad personnel and offered treatment for their injury or illness prior to being transported to any jail or detention facility.[102]

No one attempted to determine whether Mr. Owensby was injured and needed treatment, even through both Officers Heiland and Campbell saw blood on his face.  Again, Officer Heiland admits that, had he attempted to ask Mr. Owensby whether he wanted treatment for the

---

[98] Exhibit 77, Golf Manor Policy 6-07, Prisoner Transportation, ¶ II.A. (Emphasis in original).

[99] Heiland Depo., pp. 77:16 - 79:7.

[100] Exhibit 77, ¶ II.D.

[101] Heiland Depo., p. 82:1-13.

[102] Exhibit 77, ¶ II.E.

cuts on his face, he would have been able to determine that he was not conscious.[103]

- Unconscious prisoners shall not be transported in a police vehicle, but shall be taken to a hospital or medical facility by ambulance.[104]

Even though everything they saw about Mr. Owensby suggested that he was unconscious, neither Officers Heiland nor Campbell checked to see if Mr. Owensby was unconscious. In fact, Officer Heiland testified that he received no training from Golf Manor on whether he should determine whether a prisoner is conscious *before* that prisoner, arrested by another police department, is placed in his vehicle pursuant to the Mutual Aid Agreement.[105]

Although promulgated to fulfill the constitutional duty of the police to care for injured citizens under arrest, neither Officers Heiland nor Campbell made any attempt to provide the medical care envisioned by these Golf Manor policies.

The only explanation provided for the failure of Officers Heiland and Campbell to comply with Golf Manor Policy 6-07 was that they did not think that they were going to transport Mr. Owensby. There are at least two flaws in this argument. First, no one ever told the Golf Manor officers that they were *not* going to be transporting Mr. Owensby.[106] Second, regardless of what the Golf Manor policies said or did not say, these officers had an affirmative duty to provide medical care for the handcuffed and unconscious Roger Owensby when he was

---

[103] Heiland Depo., pp. 86:5 - 87:23.

[104] Exhibit 77, ¶ II.E.5.

[105] Heiland Depo., pp. 89:9 - 90:24.

[106] Heiland Depo., pp. 85:19 - 86:4.

placed in their car, regardless of whether they had arrested him.[107]  Officer Heiland admitted as

much during his deposition.[108]

As such, neither of the defendant police officers can avoid § 1983 liability based upon

the affirmative defense of qualified immunity.

### 2.    Police Chief Tilley is not entitled to qualified immunity.

Golf Manor Police Chief Stephen Tilley's liability is based upon his failure to train and

supervise his Golf Manor officers in their duties and responsibilities when responding outside of

their jurisdiction pursuant to the Mutual Aid Agreement.  This utter failure of training and

supervision, when Golf Manor and its Chief of Police knew that their officers would be

operating under the terms of the Mutual Aid Agreement, constitutes deliberate indifference, as

---

[107] *DeShaney*, 489 U.S. at 200 ("The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basis human needs—e.g., ...medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause."); *Ewolski*, 287 F.3d at 509 ("**state officials may be subject to constitutional liability if they fail to provide protection for individuals in state custody....Even in noncustodial settings, however, state officials may violate the Due Process Clause when their affirmative actions directly increase the vulnerability of citizens to danger or otherwise place citizens in harm's way.**") (emphasis supplied); *Gazette*, 41 F.3d at 1065 ("A duty to protect can arise in a noncustodial setting if the state does anything to render an individual more vulnerable to danger."); *Bowers,* 686 F.2d at 618 ("If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit."); *Lewis*, 523 U.S. at 851.

[108] Heiland Depo., p. 74:17-22.

Q.    Regardless of who is technically responsible for the well-being of a prisoner, if you know that a prisoner is injured and needs medical attention, is it your understanding that you have a duty to provide medical attention?

A.    Yes.

well as willful, reckless action, resulting in the foreseeable result that Golf Manor officers

would not understand their duties and responsibilities on the evening of November 7, 2000.

Golf Manor admits that when its officers responded to the officer-needs-assistance call,

they did so pursuant to a Mutual Aid Agreement between Golf Manor and the City of

Cincinnati.[109]  This Mutual Aid Agreement expressly covered the situation that arose here—the

use of a Golf Manor cruiser in conjunction with a Cincinnati arrest.  However, having signed the

Mutual Aid Agreement and instructed its police force to work collaboratively with other

municipal police forces, Golf Manor's Police Chief failed to train his officers as to their

respective duties and responsibilities.[110]

Like the duty to provide medical care, the constitutional duty to train (especially in

connection with the use of force) is well established.  More than ten years before Mr.

Owensby's death, the Supreme Court established that a municipality like Golf Manor may be

held liable under § 1983 for constitutional violations arising from its failure to train its

employees.[111]  Inadequate training may serve as a basis for § 1983 liability where the failure to

train amounts to "deliberate indifference" to the constitutional rights of persons with whom the

police may come into contact.[112]  In adopting this standard the Supreme Court expressly stated

that the need to train its police force in the constitutional limitation on the exercise of deadly

---

[109] Exhibit 78, Mutual Aid Agreement for Law Enforcement; Heiland Depo., pp. 69:1-17, 97:13-18; Streicher Depo., pp. 347:22 - 356:9.

[110] Heiland Depo., p. 72:5-13.

[111] *City of Canton v. Harris*, 489 U.S. 378 (1989).

[112] *Id.* at 388.

force is "so obvious" that failure to do so could constitute "deliberate indifference" to constitutional rights.[113]

The Golf Manor defendants claim that they are entitled to summary judgment on the issue of the failure of Golf Manor to properly train its officers.[114]  With no citation to any specific training, Golf Manor asserts that Officer's Heiland and Campbell "each received training and graduated from police academies.  There is nothing before the Court to indicate that either officer was improperly trained."[115]  Defendants are gravely mistaken.

The issue of proper training is not satisfied by simply having a police officer graduate from a police academy—virtually every police officer has received basic training from a police academy.  Here, the issue centers around the failure of Golf Manor and its Police Chief to train Officers Heiland and Campbell in their duties and responsibilities when operating under the auspices of the Mutual Aid Agreement with the City of Cincinnati.  In this regard the undisputed evidence of record establishes that Golf Manor provided its police force with no training.

Golf Manor provided no classes to its officers on what their duties and responsibilities were when operating under the Mutual Aid Agreement.[116]  The officers were provided with no directives or memoranda.[117]  In fact they were provided with no instruction on which police department's policies, rules or regulations governed their conduct when they responded to a

---

[113] *Id.* at 390 n.10.

[114] Doc. 85, Golf Manor MSJ, pp. 16-17.

[115] *Id.* at 16.

[116] Heiland Depo., pp. 92:22 - 93:9.

[117] Heiland Depo., p. 93:10-13; Campbell Depo., pp. 43:24 - 44:4.

27

scene pursuant to the Mutual Aid Agreement.[118]

Golf Manor officers received no training concerning their duties or responsibilities when responding as a cooperating Agency.[119]  In fact, the nearest that Golf Manor came to training was to provide its officers with a copy of the Mutual Aid Agreement.  Beyond that, the officers were left to figure out their responsibilities and duties among themselves through on the job training.[120]  This practice left Officer Heiland with the following understanding:

> My understanding at that time is I would be responsible for my prisoners, anybody that was in my custody.  If somebody is not my prisoner, not in my custody, then on the assistance call if somebody puts their prisoner in the back of my car, they asked to put them in the back of my car and I'm there for assistance. It's their prisoner and it's in their custody.  So it's their responsibility.[121]

This failure to train on this most obvious and foreseeable situation is even more apparent with Golf Manor Officer Campbell:

> Q.    Had you received any training on this issue [a prisoner of another agency is placed in a Golf Manor cruiser] as far as what you were obligated to do and what you were not obligated to do?
>
> A.    I can't remember.
>
> Q.    Do you have any understanding that, regardless of whose prisoner it is, once a person is placed in your cruiser that you are responsible for that person's welfare?
>
>        Mr. Weisenfelder: Objection.  Go ahead.

---

[118] Heiland Depo., p. 72:5-13; Campbell Depo., p. 43:21-23.

[119] Heiland Depo., p. 97:8-12; Campbell Depo., p. 43:21-23.

[120] Heiland Depo., pp. 93:18 - 94:11.

[121] Heiland Depo., p. 73:4-11.  Compare this answer with Officer Heiland's subsequent testimony at footnote 108 where he admits that he did have "a duty to provide medical attention" regardless of who was technically responsible for the prisoner.  Heiland Depo., p. 74:17-22.

28

A.    No.

Q.    No?

A.    No.

Q.    Regardless of whose prisoner it is, if you know that a person is injured, as a Golf Manor police officer, do you believe that you have a duty to provide medical assistance to that person?

Mr. Weisenfelder: Objection.  Go ahead.

A.    Not me personally.[122]

Such conduct "amounts to deliberate indifference to the rights of persons with whom the police came into contact."[123]   The resulting foreseeable confusion cost Mr. Owensby his life.

As explained in our companion summary judgment motions, Golf Manor was not alone in this total failure to train.  Its Mutual Aid Agreement partner, the City of Cincinnati, also failed to provide any training to its officers.[124]  This resulted in each police force believing, or at least now arguing, that the other was responsible for the care of Mr. Owensby.  For example, Cincinnati Officer Brazile, who looked at Mr. Owensby handcuffed in the back seat of the Golf Manor cruiser and told the Golf Manor officers that Mr. Owensby did not appear to be breathing, did nothing else because he believed that Mr. Owensby's welfare was Golf Manor's responsibility.[125]

---

[122] Campbell Depo., p. 39:4-21.

[123] *City of Canton*, 489 U.S. at 388.

[124]Doc. 87, Plaintiff's MSJ, pp. 22-26; Doc. 88, Plaintiff's Cincinnati MSJ, pp. 39-41.

[125] Exhibit 47, Brazile 11/13/00 Statement; Brazile Depo., pp. 59:2-7 ("I told the people who I felt was responsible for the person in that car."), 50:11 - 74:4.

The fatal and all-too-foreseeable result was that none of the thirteen police officers, including Officer Heiland (a trained EMT) and two other Cincinnati police officers who had EMT training, did anything as Roger Owensby lay dying in the Golf Manor cruiser.

The utter failure to provide any guidance to its officers as to the probable and foreseeable consequences of violating the constitutional duty to provide medical attention to an injured citizen who has been subjected to the use of force—as evidenced by the confusion voiced by the officers on the scene—constitutes deliberate indifference to that use of force and results in § 1983 liability against Golf Manor and its Police Chief.

**E.    Vicarious Liability.**

The Golf Manor defendants correctly observe that there is no vicarious liability, i.e., respondeat superior liability, for claims asserted under § 1983.[126]  Plaintiff asserts no such § 1983 respondeat superior claims against Golf Manor.

**F.    Ohio's Sovereign Immunity Statute.**

**1.    Ohio's Sovereign Immunity Act is unconstitutional.**

Plaintiff has asserted state claims against the Golf Manor defendants pursuant to Ohio's Wrongful Death and Survivor Statutes as well as claims at common law.  Golf Manor claims that it is immune from such liability pursuant to Ohio's Sovereign Immunity Act, Ohio Rev. Code § 2744.02.[127]  Plaintiff fully addressed the unconstitutionality of the Sovereign Immunity Act in his September 2003 memorandum response to an identical argument asserted by the City

---

[126]Doc. 85, Golf Manor MSJ, p. 18; *Monell v. New York City Dept. Of Soc. Servs.*, 436 U.S. 658, 691 (1978).

[127]Doc. 85, Golf Manor MSJ, p. 18.

of Cincinnati, demonstrating that the Sovereign Immunity Act violated Sections 5 and 16 of Article I of the Ohio Constitution.[128]  Therefore, Plaintiff adopts his September 2003 memorandum response.

Moreover, since filing Plaintiff's challenge to the constitutionality of Ohio's Sovereign Immunity Act, this Court has ruled in another civil rights case that the Act is unconstitutional and violates Sections 5 and 16 of Article I of the Ohio Constitution.[129]  Therefore, Ohio's Sovereign Immunity Act is no refuge for Golf Manor or the City of Cincinnati.

### 2.    The Sovereign Immunity Act does not immunize the individual Golf Manor defendants because they acted with malicious purpose, in bad faith, or in a wanton or reckless manner.

It must also be noted that the Ohio Sovereign Immunity Act does not immunize a municipal employee if his  "acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner."[130]  The terms "malice," "bad faith," "wanton" and "reckless" suggest conduct more egregious than simple negligence.[131]  Within the context of the Sovereign Immunity Act, Ohio law defines these terms as follows:

Malice or malicious purpose means "the willful and intentional design to do

---

[128]Doc. 52, Plaintiff's Memorandum in Opposition to Motion for Summary Judgment on Pendant and Ancillary State Tort Claims.

[129]*Kammeyer v. City of Sharonville*, No. 1:01-CV-00649, Doc. 130, Order, pp. 10-15 (S.D. Ohio Dec. 16, 2003), attached.

[130]Ohio Rev. Code § 2744.03(A)(6)(b).

[131]*Jackson v. Butler County Board of County Commissioners*, 76 Ohio App. 3d 448, 454, 602 N.E.2d 363, 367 (Butler Cty. 1991).

injury."[132]

Bad faith means "'dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud. It also embraces actual intent to mislead or deceive another.'"[133]

Wanton misconduct means "the failure to exercise any care whatsoever....mere negligence is not converted into wanton misconduct unless the evidence establishes a disposition to perversity on the part of the tortfeasor. Such perversity requires that **the actor be conscious that his conduct will, in all likelihood, result in an injury**."[134]

Recklessness means **"an individual acts recklessly when he or she, bound by a duty, does an act or intentionally fails to do an act, knowing, or having reason to know of, facts that would lead a reasonable person to realize not only that there is an unreasonable risk of harm to another, but also that such risk is substantially greater than that which is necessary for**

---

[132] *Wooton v. Vogele*, 147 Ohio App. 3d, 216, 222, 769 N.E.2d 889, 894 (Ham. Cty. 2001) *citing Garrison v. Bobbitt*, 134 Ohio App. 3d 373, 384, 731 N.E.2d 216, 224 (Montgomery Cty.1999); Ohio Jury Instructions § 330.05 (Malice means "an attitude or state of mind that makes a person knowingly do an act for an improper or wrongful purpose. It includes a wrongful act, intentionally done and without probable cause. It also includes an intent to annoy or injure another, although ill will or personal hostility are not required.").

[133] *Wooton*, 147 Ohio App. 3d at 222, 769 N.E.2d at 894 *citing Garrison*, 134 Ohio App. 3d at 384, 731 N.E.2d at 224.

[134] *Wooton*, 147 Ohio App. 3d at 222, 769 N.E.2d at 894 *citing Fabrey v. McDonald Police Dept.*, 70 Ohio St. 3d 351, 356, 639 N.E.2d 31, 35 (1994) (emphasis supplied); The term "perversity" was dropped as a defining term for wanton behavior by the Ohio Supreme Court in 1997. *Hawkins v. Ivy*, 50 Ohio St. 2d 114, 117, 363 N.E.2d 367, 369 (1977) ("we consider further reliance upon that phrase [disposition to perversity] to be unnecessary to a workable definition of wanton misconduct....the talismanic exercise of also announcing the presence of a disposition to perversity is not required."). *See also* Ohio Jury Instructions § 7.90(2) ("Wanton misconduct must be under such surrounding circumstances and existing conditions that the party doing the act or failing to act must be aware, from his knowledge of such circumstances and conditions, that his conduct will probably result in injury. **Wanton misconduct implies a failure to use any care for the plaintiff and an indifference to the consequences, when the probability that harm would result from such failure is great, and such probability is known, or ought to have been known, to the defendant.")** (emphasis supplied).

negligence."[135]

As the uncontroverted evidence establishes, Golf Manor Officers Heiland and Campbell clearly acted "in a wanton or reckless manner" when they confined in their police cruiser a man who they knew was bleeding, handcuffed, and showed all the outward signs of being unconscious.  They also acted "with malicious purpose [or] bad faith" when they consciously refused to check on Mr. Owensby's health or provide any medical care to him for five to six critical minutes *after* being told that Mr. Owensby looked as though he could not breathe.

Likewise, Golf Manor and its Police Chief acted "in a wanton or reckless manner" when they failed to provide any training for their officers concerning their duties and responsibilities under the Mutual Aid Agreement, knowing full well that they were sending these officers into other jurisdictions, as occurred here, pursuant to that Agreement.

Thus, even if the Sovereign Immunity Act were constitutional, the Golf Manor defendants would still be liable for Plaintiff's wrongful death and survivor claims.

## IV.     CONCLUSION

The undisputed evidence of record establishes that:

- •     Golf Manor Officers Heiland and Campbell responded to an officer-needs-assistance call to the Sunoco convenience store pursuant to the Mutual Aid Agreement between Golf Manor and the City of Cincinnati;

- •     That Mutual Aid Agreement imposes upon the Golf Manor officers the same

---

[135]*Wooton*, 147 Ohio App. 3d at 222, 769 N.E.2d at 894 *citing Thompson v. McNeil*, 53 Ohio St. 3d 102, 104-03, 559 N.E.2d 705, 708 (1990) (emphasis supplied); *Piro v. Franklin Township*, 102 Ohio App. 3d 130, 139, 656 N.E.2d 1035, 1041 (Summit Cty. 1995); *Hackathorn v. Preisse*, 104 Ohio App. 3d 768, 771, 663 N.E.2d 384, 386 (Summit Cty. 1995); Ohio Jury Instructions § 219.03(4) ( "A person acts recklessly **when with heedless indifference to the consequences he perversely disregards a known risk that his conduct is likely to cause [injury].**") (emphasis supplied).

33

duties and responsibilities outside of Golf Manor's jurisdiction as exist when they act within their jurisdiction;

• Golf Manor and its Chief of Police failed to train its police officers in their duties and responsibilities when acting outside of their jurisdiction under the auspices of the Mutual Aid Agreement;

• As a result, Officers Heiland and Campbell believed that they were under no duty to provide any care for Mr. Owensby even though he lay handcuffed, bleeding, unconscious and dying in their Golf Manor cruiser;

• Officers Heiland and Campbell watched as the Cincinnati officers carried Mr. Owensby to the Golf Manor cruiser;

• Golf Manor expressly agreed to place Mr. Owensby in the back seat of the Golf Manor cruiser, even opening the door for the Cincinnati officers who were carrying Mr. Owensby;

• Golf Manor admits that its police cruiser served as a jail or "temporary holding facility" for Mr. Owensby;

• Both Officers Heiland and Campbell knew that Mr. Owensby's face was bleeding;

• Officer Heiland saw that the Cincinnati police officers were breathing heavily and were "disheveled" but Mr. Owensby was not breathing heavily and, in fact, made no sounds and no movement.

• Mr. Owensby had to be placed in the Golf Manor cruiser head-first.  Officer Heiland acknowledges that conscious suspects usually get in a car feet first.

• Officers Heiland and Campbell saw that Mr. Owensby was laying, not sitting, on the back seat of the Golf Manor cruiser and was motionless and made no sounds.

• Cincinnati Officer Brazile looked into the Golf Manor cruiser at Mr. Owensby and told both Officers Heiland and Campbell, "This looks f**ked up.  Can he breathe?  It don't look like he can from the way he's laying."

• Over five minutes elapsed after Officer Brazile told Officers Heiland and Campbell that it looked as if Mr. Owensby could not breathe.

• Neither Officer Heiland nor Officer Campbell ever checked to determine whether the person being placed in his cruiser was conscious or unconscious.

- Neither Officer Heiland nor Officer Campbell ever attempted to provide any medical care for Mr. Owensby.

Golf Manor argues that, as a matter of law, it and its officers and Chief are not liable for the death of a Cincinnati citizen placed with expressed permission in their police cruiser. But as long recognized by the Supreme Court, the Sixth Circuit Court of Appeals and Golf Manor's own policies, a citizen in need of medical attention in their custody has a constitutional right to medical care. As a matter of fact and a matter of law, Mr. Owensby was in the custody of Golf Manor.

While Golf Manor's officers say they did not see the beating of the handcuffed Mr. Owensby, they do admit to seeing the blood on Mr. Owensby's face and on the back seat of the Golf Manor cruiser. Officer Spellen's video camera from his Cincinnati police cruiser, parked next to the Golf Manor cruiser that held Mr. Owensby, demonstrates police officers joking about how much Mr. Owensby was hurting. Officer Brazile specifically told Golf Manor Officers Heiland and Campbell that it did not appear as though Mr. Owensby was breathing.

Officers Heiland and Campbell ignored their constitutional duty to provide medical care. They, in fact, literally looked the other way while this citizen died.

And while the Mutual Aid Agreement spells out that Officers Heiland and Campbell had the same duty as Cincinnati police officers—the duty to provide medical care—neither officer had been properly trained by Golf Manor or its Chief of Police to carry out this constitutional duty.

Neither of these officers nor their Chief are entitled to any qualified immunity. Nor are they entitled be cloaked with any sovereign immunity under the unconstitutional Ohio

Sovereign Immunity Act.  In short, the Golf Manor defendants are not entitled to summary

judgment.  Their motion should be denied and Plaintiff's partial motion for summary judgment

should be granted.

                                   Respectfully submitted,


                                   /s/Paul B. Martins
Mark T. Tillar (0029898)           James B. Helmer, Jr.  (0002878)
240 Clark Road                     Paul B.  Martins (0007623)
Cincinnati, Ohio  45202            Frederick M. Morgan, Jr.  (0027687)
Telephone: (513) 761-2958          HELMER, MARTINS & MORGAN CO., LPA
                                   Fourth & Walnut Centre, Suite 1900
John J. Helbling (0046727)         105 East Fourth Street
3672 Springdale Road               Cincinnati, Ohio 45202-4008
Cincinnati, Ohio 45251             Telephone:     (513) 421-2400
Telephone: (513) 923-9740          Facsimile:     (513) 421-7902

                                   *Trial Attorneys for Plaintiff*

36

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Plaintiff's Memorandum in Opposition To The Motion For Summary Judgment By The Village of Golf Manor Defendants (Doc. 85), was electronically filed on February 20, 2004.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

<u>/s/ Paul B. Martins</u>