593 F.2d 487; 1978 U.S. App. LEXIS 10943, *

LEXSEE 593 F.2D 487

UNITED STATES OF AMERICA *v.* BELLE, DONALD E.
DONALD BELLE, Appellant (D.C. Crim. No. 76-260-2)

No. 77-1903

UNITED STATES COURT OF APPEALS FOR THE THIRD
CIRCUIT

*593 F.2d 487; 1978 U.S. App. LEXIS 10943*

Submitted January 3, 1978
May 30, 1978, Filed

**PRIOR HISTORY: [*1]**

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF
PENNSYLVANIA

**LexisNexis (TM) HEADNOTES - Core
Concepts:**

**COUNSEL:**

VICTOR SHERMAN, Nasatir, Sherman
& Hirsch, 9911 W. Pico Blvd., Ste 1000,
Los Angeles, CA 90035 For Appellant
BELLE

DAVID W. MARSTON United States
Attorney

WALTER S. BATTY, JR. Assistant U.S.
Attorney Chief, Appellate Section

DOUGLAS B. RICHARDSON,

Assistant U.S. Attorney, 3310 U.S.
Courthouse, 601 Market Street,
Philadelphia, Pa. 19106

**OPINIONBY:**

GIBBONS

**OPINION:**

BEFORE: ADAMS, GIBBONS and
GARTH, Circuit Judges

GIBBONS, Circuit Judge

Donald E. Belle appeals from a
judgment of sentence following a jury
verdict finding him guilty of violating *21
U.S.C. § § 841* (a)(1) and 846. He
asserts six grounds for reversing the
judgment or for granting him a new trial,
including: (1) that the district court erred in
admitting evidence which was the fruit of
an illegal arrest, and(2) that the admission

593 F.2d 487; 1978 U.S. App. LEXIS 10943, *

of a statement of a co-defendant who did not take the stand violated the rule of *Bruton v. United States, 391 U.S. 123 (1968)*. Although we rejec the appellant's other contentions, we find merit in these two. Thus, we vacate the judgment and remand for a new trial. **[*2]**

I. FACTS

The circumstances of Belle's apprehension by the government agents are set out in great detail in the government's brief. With the exception of footnotes and transcript references, we quote directly from that brief.

B. Factual History

On April 30, 1976, at approximately 3:00 p.m., Agent Walter Wasyluk, Bureau of Alcohol, Tobacco and Firearms, was at the Hilton Inn Hotel in Trevose, Pennsylvania, on government business unrelated to this case. While in the parking lot, Agent Wasyluk observed the appellant Donald Belle and Joe C. Munford, appellant in No. 77-1902, seated in a late model white Lincoln Continental Mark IV, California license no. 727MPH. Agent Wasyluk then observed Munford approach the front desk and overheard him request a suite.When Munford was told that no suites were available, Agent Wasyluk overheard him rent a room with two beds in it. A short while later, Agent Wasyluk observed Belle come in with some luggage and join Munford. Then both individuals went to the elevator and went upstairs.

Based on the location of the Hilton Inn, the time of day, the way the defendants were dressed, and the fact of California plates, Agent Wasyluk became suspicious **[*3]** of the defendants and decided to run a registration check to ascertain to whom the vehicle belonged. Upon learning that the vehicle was registered to a Mr. Edward Keefe O'Neil, 1811 South Carmona Ave.,

Los Angeles, California, Agent Wasyluk called the Federal Narcotic Drug Enforcement Administration and relayed this information and his previous observations to Agent William Kean. Agent Wasyluk then went out into the parking lot and began a surveillance of the vehicle.

As a result of speaking with Agent Wasyluk, Agent Kean checked through his records for the name "Edward O'Neil", and discovered some information that he had received from a confidential informant in July and October, 1974. In a report dated July 26, 1974, the confidential informant had stated that an Edward O'Neil, living in Los Angeles, California, was capable of supplying pound quantities of heroin and that O'Neil frequently came to the east coast with large quantities of heroin concealed in a compartment under his late model Cadillac near the frame. The informant had said that when O'Neil came to the east coast, he usually drove and stopped in Chicago, Illinois, Cleveland, Ohio, Pittsburgh, Pennsylvania and **[*4]** then Bristol, Pennsylvania, where he used to live. The informant had been told that if he wanted more than four ounces, he could call O'Neil at (213) 934-3236 or (213) 935-6267, and O'Neil would probably fly in. The informant had stated that he could effect an undercover introduction to O'Neil, but it would require ordering a large amount of heroin. In another report, dated October 16, 1974, an individual identified as Eddie O'Neil arrived in the Bristol Township, Pennsylvania area, purportedly with 18 ounces of brown heroin which he had bought from Los Angeles, California, in a 1973 Cadillac, California license no. 862HXR. The informant had stated that his vehicle purportedly had a false bottom welded to the undercarriage in which the heroin was purportedly transported. The informant said that although the

593 F.2d 487; 1978 U.S. App. LEXIS 10943, *

confidential informant was not approached by O'Neil, other individuals had approached the informant and asked the informant if he wanted to purchase some heroin from O'Neil, who was in the area. He said that this heroin purportedly was capable of taking a five cut and sold for $1,500 an ounce, and that O'Neil purportedly stopped in several areas across the country enroute to [*5] Bristol, Pennsylvania, including Cincinnati, Ohio and Detroit, Michigan. O'Neil was described as a male Negro, 6 feet 2 inches tall, 40 to 42 years of age, approximately 210 pounds purportedly living in the Los Angeles, California area. The information contained in the October 16th report was obtained by the confidential informant through two individuals, one who was another informant and one who was not.

Based on this information and that received from Agent Wasyluk, Agent Kean suspected that the individuals observed at the Hilton Inn might be bringing heroin into the Philadelphia area and that surveillance of their movements should be continued. Agent Kean thereafter put a surveillance team together and proceeded to the Hilton Inn. At approximately 7:30 p.m., both Belle and Munford entered the Lincoln Continental, circled the parking lot approximately one and a half times, and then exited the parking lot and began heading in an easterly direction on Old Lincoln Highway.

The Lincoln proceeded across the intersection of Route 1, pulled into the parking lot of the "Krispy Kreme Donut Shop", and parked almost adjacent to a vehicle occupied by Agent Kean and Agent Stephen Hopson. [*6] Agent Hopson then observed Belle exist the Lincoln, walk toward Route 1, and make a hand signal to another vehicle on the other side of the highway. Belle then re-entered the Lincoln, which immediately left the parking

lot and proceeded westbound on Old Lincoln Highway, followed by a 1973 silver Cadillac, the vehicle that Belle had gestured to.

From the license plate of the Cadillac, Agent Kean recognized the vehicle as one on which he had previously conducted a motor vehicle check in connection with another investigation involving heroin. The check indicated that the vehicle was registered to a Mr. O'Neil Roberts or his steak shop. During this previous investigation of Roberts, Agent Kean had read some reports relating to Roberts' alleged illegal activities from the U.S. Attorney's Office. Agent Kean had also received information from informants that O'Neil Roberts was connected with drug offenses and that Roberts had become handicapped when he was shot in the back while involved in narcotics transactions. Agent Kean had also asked a Willingboro, New Jersey police officer to conduct a surveillance at Roberts' house in Willingboro, New Jersey, during November 1975. One of [*7] the vehicles that was observed at Roberts' residence was registered to a Patricia Carson, who was known to the New Jersey State Police to be involved in narcotics.

The agents followed both vehicles to the 2600 block of Buffalo Avenue, where the Lincoln pulled into a driveway adjacent to the residence at 2606 Buffalo Avenue. Agent Hopson existed the vehicle and set up a stationary surveillance at the corner of Buffalo Avenue and Somerton, where he observed the Lincoln Continental parked in the driveway and the Cadillac parked perpendicular to the Lincoln at the top of the driveway. He then observed Belle having a conversation with the driver of the Cadillac, after which Belle entered the passenger side of the Cadillac. The Cadillac then drove off and headed back toward Old Lincoln Highway, at which time

593 F.2d 487; 1978 U.S. App. LEXIS 10943, *

Agent Kean advised the other surveillance unit to follow the Cadillac.

After the Cadillac departed the area, Agents Kean and Hopson proceeded down Buffalo Avenue where they observed the Lincoln with its hood up and Munford standing on the right side of the vehicle, apparently working under the hood. The agents then made a U-turn and drove by the location, and the second time **[*8]** around they observed Munford pulling something from the hood. It appeared to be silver or grayish packets tied together with some string or nylon cord. The agents then made another U-turn and came by a third time, where they continued to observe Munford pulling packets from under the hood. Believing that the packets might contain heroin, Agent Kean instructed the surveillance unit that was following the Cadillac to stop it and identify the occupants.

Meanwhile, Agent Dennis Malloy stopped the Cadillac, ordered Belle out of the car [at gun point], frisked him, handcuffed him, and transported him back to Buffalo Avenue.

Upon the return of the agents with Belle and Roberts, Agents Kean and Hopson proceeded into the driveway adjacent to 2606 Buffalo Avenue for the purpose of detaining and questioning Munford. Agent Kean instructed Agent Hopson to detain Munford while he, Kean, secured the area. Agent Wasyluk, who had escorted Belle back to the Buffalo Avenue address, also went up the driveway and stopped next to the right-front door of the Lincoln and looked inside to ascertain whether or not anyone was inside. On the right-front passenger side of the floor, **[*9]** Agent Wasyluk observed an open brown paper bag with some packets covered with tape inside.Agent Wasyluk then called Agent Kean over to see what he, Wasyluk, had

found. As the packets inside the bag appeared similar to those which Agent Kean had previously observed being pulled from the vehicle by Munford, and as Agent Kean still suspected that these packets contained heroin, Agent Kean, with Agent Wasyluk, opened the packets and examined the contents. After Agent Kean conducted a field test on the brownish rock powdery substance found inside the packets, he advised the other agents to place Munford and Belle under arrest.

Agent Kean personally advised Munford that he was under arrest and of his constitutional rights. A few minutes later, Agent Kean was also advising a Mr. Burton Mayfield, the owner of the residence at 2606 Buffalo Avenue, of his constitutional rights when Munford stated that this individual had nothing to do with it, that the "stuff" was his. After Munford had been transported to the Bensalem Township Police Department and again warned of his constitutional rights, he was interviewed by Agent Hopson. Munford stated that approximately two or three times in the **[*10]** past, he had transported heroin into the same area, and that he had met with O'Neil Roberts on two previous occasions. Munford further stated that on this particular trip, he was going to deliver the heroin between 8:00 and 8:30 p.m. that evening to a trash can located near the "Krispy Kreme" Donut Shop. Munford also stated that while he was delivering the dope, people would be watching him to see that everything went according to plan.

Agent Wasyluk advised Belle of his constitutional rights while en route to the Bensalem Township Police Department. Agent Wasyluk then asked Belle what he was doing with O'Neil Roberts and Belle responded that he did not know this man, that he had been riding with Mr. Munford when this man beckoned him to come over to his car and asked whether or not he,

593 F.2d 487; 1978 U.S. App. LEXIS 10943, *

Belle, would be good enough to ride with him to a store so that he could run in and get something for him as he, Roberts, was crippled. To this, Agent Wasyluk stated, "You mean to tell me that here you are a stranger coming from California with another man or a person coming from California with another man and driving down a road, this stranger stops you and asks you to get in his car and go [*11] to the store for him because he is crippled and can't go himself and with this you just jumped in the car and you weren't worried about how you were going to get back or where you were or things to that effect?" Bell then replied, "Well, that's my story."

## II. THE ARREST CONTENTION

Belle contends that both the evidence of his conversation with Agent Wasyluk and the evidence of the heroin seized in the Lincoln Continental should have been excluded on the authority of *Wong Sun v. United States, 371 U.S. 471 (1963).* Belle urges that when Agent Malloy stopped the Cadillac, ordered him out at gun point, frisked him, and transported him from the place where he was stopped to the Buffalo Avenue location, Malloy effected an arrest. Moreover, Belle urges that when that arrest was made, the government agents did not have probable cause to believe that Belle was engaged in criminal activity. Absent probable cause, Belle argues, the arrest was unlawful and any evidence obtained as fruit of that arrest was inadmissible at trial against him.

The government's primary argument is not that there was probable cause to arrest Belle at the time that Malloy stopped and handcuffed [*12] him. Rather, the government argues that Belle was not arrested until the heroin was found in the Lincoln Continental.According to the government, Belle's apprehension, handcuffing, and transportation by Agents

Malloy and Wasyluk constituted not an arrest, but a mere investigatory stop permitted by *Terry v. Ohio, 392 U.S. 1 (1968),* and *Adams v. Williams, 407 U.S. 143 (1972).*

The district court accepted the government's characterization of Belle's detention as an investigatory stop. We cannot agree. The uncontradicted testimony at trial was that Agent Malloy, with gun in hand, ordered Belle out of the Cadillac, forcefully moved him to the front of that car, frisked and handcuffed him, and placed him, still handcuffed, in the car of another agent, Wasyluk. Moreover, Wasyluk himself testified that, had Belle tried to leave, Wasyluk would have prevented him from doing so. If the Terry rule were to be enlarged to include handcuffing, prolonged detention under threat of firearms, and transportation to a distant location, nothing would be left to the distinction between an investigatory stop and a full-scale arrest.

The government urges, however, that we [*13] should judge whether an arrest took place not by the indisputable fact that Belle was placed under the control of Agents Malloy and Wasyluk, but by the subjective intention of their supervisor, Agent Kean, who instructed them only to stop the vehicle and identify its occupants. The government claims that "[accordingly], there can have been no intention, either in the minds of the officers or perceived by Belle, to take him into custody." Government Brief at 19. But this argument ignores the unequivocal testimony of Agent Wasyluk that Belle was in fact detained. Moreover, we think that any man in handcuffs in a police car who did not perceive that he had been taken into custody would have such faulty powers of perception as to bring his competency into question. The occurrence of an arrest cannot be measured by the subjective

593 F.2d 487; 1978 U.S. App. LEXIS 10943, *

intention of a governmental agent who was not even at the scene. Rather, it must be measured objectively by the actions of the officers at the scene and by the perceptions of the person being detained. As Judge McLaughlin's opinion in *United States v. Lampkin, 464 F.2d 1093, 1095 (3d Cir. 1972)* stated:

[It] seems evident that, under the **[*14]** circumstances before us, the arrest was effectuated at the instant the agents, with guns drawn, halted appellant and informed him of who they were. At that instant he was under the control of the officers who had demonstrated an intention to take him into custody under their authority as government agents. There was absolute restraint of appellant which was abundantly clear to him. At that instant there was an intent by the officers to arrest accompanied by a seizure or detention of the person which was so understood by the person arrested. Thus the arrest which needs be examined for probable cause was made at that time...

See *United States v. Ramos-Zaragosa, 516 F.2d 141, 144 (9th Cir. 1975); United States v. Strickler, 490 F.2d 378, 380 (9th Cir. 1974).* But see *United States v. Richards, 500 F.2d 1025 (9th Cir. 1974),* cert. denied, *420 U.S. 924 (1975).*

The brief investigatory stop permitted by Terry was designed "to determine... identity or to maintain the status quo momentarily while obtaining more information." *Adams v. Williams, 407 U.S. 143, 146 (1972).* Here both the status quo and the situs quo were **[*15]** changed significantly. Belle was handcuffed despite the absence of any indication that he was armed or in any way dangerous to the two armed officers who stopped him. In addition to being absolutely restrained by the governmental agents, Belle was placed in their car and transported to a distant place. He was, in short, arrested.

That arrest was lawful only if it was supported by probable cause. Lawfulness of the arrest is determined in light of the facts and circumstances within the knowledge of the arresting officers. If a reasonably prudent person would have believed that at the time of his arrest Belle had committed or was committing a criminal offense, then the arrest was lawful.See *Beck v. Ohio, 379 U.S. 89, 91 (1964).*

At the time that Belle was arrested, the government agents had information from an informant that a Californian named O'Neil might have brought heroin to Pennsylvania from California in a Cadillac (license number 862-HXR). The agents had observed Belle in and around a Lincoln Continental (license number 727-MPH). They had seen Belle signal to a passing Cadillac to stop. The Cadillac was not registered to the Californian O'Neil, but to O'Neil **[*16]** Roberts, a New Jersey resident who might have been involved in prior narcotics transactions.In addition, the agents had seen Belle speak to the occupant of the Cadillac and then drive away from Buffalo Avenue in the Cadillac with the original occupant.

Belle's presence in the Lincoln Continental, his rendezvous with the Cadillac, and his driving off with the occupant of the Cadillac were all consistent with innocent behavior. The critical issue, then, is whether the background information could support a finding of probable cause to arrest Belle. In *Spinelli v. United States, 393 U.S. 410 (1969),* and *Aquilar v. Texas, 378 U.S. 108 (1964),* the Supreme Court held that in order for informant's information to establish probable cause sufficient to support a search warrant, there must be disclosed: (1) the underlying

593 F.2d 487; 1978 U.S. App. LEXIS 10943, *

circumstances from which the informant drew his conclusions, and (2) the underlying circumstances from which the police officer could conclude that the informant was credible or his information reliable. *378 U.S. at 114.* Although the Aquilar/Spinelli standards were articulated in the context of a search warrant, the requirements [*17] for probable cause are no less where the governmental agents have proceeded without a warrant. Here there was some evidence that the informant on O'Neil's activities had supplied other reliable information. But there was no showing of how that informant or the informant on Roberts' activities had obtained the information. Most importantly, the information with regard to O'Neil was two years old. Any reliability that the information once had certainly faded during the two years prior to Belle's arrest. Allowing such information to establish probable cause transgresses upon the privacy and liberty interests that underlie the probable cause requirement.

The government urges, however, that once the agents observed Munford pulling packets from underneath the hood of the Lincoln, probable cause existed to arrest Belle. n2 However, at the time that Belle was arrested, although the agents had observed Munford removing the packets, these agents did not know that the packets contained contraband of any sort. Moreover, even if the removal of the packets had incriminated Munford, it did not necessarily implicate Belle in any illegal activity. Since Belle had left the scene with Roberts, [*18] any connection at that time between Belle and the packets was extremely remote. The district court apparently did not believe that there was probable cause to arrest Belle, since it made no probable cause finding, but chose instead to justify his apprehension on a Terry rationale rather than on the rationale of an arrest upon probable cause. Absent a finding of probable cause, the arrest was unlawful. n3

n2 The argument appears in a single sentence in a part of the government's brief addressed to another issue:

Even if this Court should discount Agent Kean's and Agent Malloy's testimony concerning their intentions and find that the circumstances surrounding Munford's and Belle's detention constituted de facto arrests, the record demonstrates that there was in fact probable cause to arrest both defendants at the point Munford was seen pulling packets from underneath the hood of the Lincoln.

Government's Brief, at 21.

n3 Our discussion of the absence of a finding of probable cause to arrest Belle should not be construed as precluding such a finding if on retrial the government establishes it. Since the district court did not find such cause, we cannot, on this record, affirm without substituting our findings of fact for those which were not made. [*19]

Belle contends that the unlawful arrest should result in the suppression of all resulting evidence, which, he says, includes both his post-arrest conversation with Agent Wasyluk and the heroin found in the Lincoln Continental upon his return to Buffalo Avenue.

We agree that, in the absence of a probable cause finding, the court should have suppressed the evidence of Belle's conversations with Agent Wasyluk. In admitting evidence of the conversations, the district court focused primarily on the

593 F.2d 487; 1978 U.S. App. LEXIS 10943, *

fact that after heroin was discovered in the Lincoln Continental, Belle was formally advised that he was under arrest and was given Miranda warnings. The court reasoned that even if an arrest had taken place when Belle was apprehended and handcuffed, the Miranda warnings given after the discovery of contraband broke the Wong Sun connection between the initial arrest and the statement. See *Wong Sun v. United States, 371 U.S. 461, 488 (1963).* That reasoning, however, does not take account of the Supreme Court's holding in *Brown v. Illinois, 422 U.S. 590, 602 (1975),* that since the purpose of the Wong Sun rule is to discourage fourth amendment violations, the intervention [*20] of Miranda warnings following an illegal arrest is insufficient alone to attenuate the taint of an unlawful arrest. The Court explained that the Miranda warnings were but one factor to be considered by a court making the Wong Sun inquiry. Such a court should also consider the proximity in time between the statements and the illegal arrest, the purpose and flagrancy of the official misconduct, and the presence or absence of intervening events which might have indicated that the illegal arrest no longer operated upon the defendant's free will. *422 U.S. at 603-04.* Here Belle's statement was inextricably linked with the illegal arrest, for, had he been subjected to no more than a Terry stop, he would have gone on his way, would not have been present when the heroin was discovered in the Lincoln Continental, and would not have been interrogated by Agent Wasyluk as he was being transported from Buffalo Avenue to the Bensalem Township Police Station. The fact that the police subsequently obtained probable cause to support a later arrest does not alter this link and thus does not alter the need to deter the initial fourth amendment violation. The conversation with Agent Wasyluk, [*21] in which Belle gave an inherently improbable explanation for being in Robert's car, should, on this record, have been suppressed.

A separate analysis is required with respect to the heroin found in the Lincoln Continental, however. Its discovery and seizure were not the inevitable consequences of Belle's arrest. Thus, the admissibility of the heroin turns not on the fact that Belle was brought back to Buffalo Avenue while under an illegal arrest, but on whether its seizure was legal independent of that arrest. This in turn depends not on Belle's status relative to the seized heroin, but on the status of Belle's co-defendant Munford.

Up to the time that the agents actually observed contraband, they lacked probable cause to arrest either Belle or Munford. But they knew that Munford was driving a California automobile registered to a man whose name and Los Angeles address were possible links to heroin brought to the Bristol, Pennsylvania area from Los Angeles. They also knew that O'Neil Roberts had been involved in drug trafficking. They observed a rendezvous between the occupants of Roberts' car and the occupants of the suspected Lincoln Continental. When Belle and the occupant [*22] of the former car drove off in that car, the agents observed Munford removing packets, which could have contained heroin, from a place of concealment beneath the hood of the Lincoln Continental. These specifically articulable facts were sufficient to justify a limited Terry investigatory inquiry. See *Terry v. Ohio, 392 U.S. 1, 21 (1968).* While we reject the government's contention that whether an arrest or a Terry stop occurs depends upon the agents' subjective intention, we note that, on an objective standard, what occurred to Munford prior to the discovery of contraband was a

593 F.2d 487; 1978 U.S. App. LEXIS 10943, *

legitimate Terry inquiry. In contrast with Belle's arrest, prior to the discovery of contraband on the front seat of the Lincoln Continental, Munford was not subjected to any restraints upon his liberty.

Belle contends, however, that the officers' discovery of the heroin in the Lincoln Continental went beyond the limited search permitted by Terry once the initial stop was justified. We disagree. While the Terry inquiry was in progress, Munford was standing on the right side of the Lincoln Continental, and the passenger door on that side was ajar. The officers conducting the inquiry were [*23] justified in assuring themselves both that there was no other occupant of the car and that the car contained no weapons readily accessible to Munford. The standard we apply is that announced in Terry:

The sole justification of the search in the present situation is the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer.

*392 U.S. at 29.* While making an examination of the car through the window - an examination no more intrusive than Terry permits - Agent Wasyluk observed in plain view what appeared to be the familiar individual packets of heroin. Once these packets were observed in lawful plain view, their seizure was proper. See *Coolidge v. New Hampshire, 403 U.S. 443, 465-66 (1971).* It was only after this seizure that Munford was arrested. That arrest was lawful.

Belle raises two objections to the foregoing analysis of the seizure of the heroin. First, he contends that when Agent Wasyluk looked through the car window, he was actually making an investigatory search to [*24] discover incriminating evidence to justify Belle's unlawful arrest. The district court concluded otherwise, however, and that conclusion is not plainly erroneous. Secondly, Belle argues that Agent Wasyluk was present at the scene only because he was returning Belle to it. Thus, Belle claims, Wasyluk's seizure of the heroin was tainted by the unlawful custody being exerted over Belle. But the seizure of evidence did not occur because of Belle's arrest.Rather, the heroin was observed during a limited detention and inquiry of Munford. Wasyluk's prior commission of an unlawful arrest in no way tainted the observation of the heroin or its subsequent seizure. By that time Wasyluk was engaged in a separate police maneuver with other police officers. Therefore, we conclude that the Wong Sun rule does not apply to the heroin. The seizure of the heroin was lawful under *Coolidge v. New Hampshire, supra,* and its admission in evidence was not error.

III. THE BRUTON CONTENTION

Before trial the government furnished Belle's counsel with a copy of the report of Agent Hopson concerning statements made to him by defendant Munford. That report included the following:

Munford [*25] stated that he had delivered heroin on two occasions in the past to the Philadelphia area but declined to say to whom he had delivered it to. (sic).

Prior to trial Belle had made a motion for severance, which was granted. However, since the statement quoted above in no way incriminated Belle, the previously granted severance motion was withdrawn and Belle agreed to a joint trial.

During his trial testimony Agent Hopson was asked about his interrogation of Munford. He replied:

Mr. Munford stated that he had come

593 F.2d 487; 1978 U.S. App. LEXIS 10943, *

from California and that he was going to deliver the heroin between 8:00 and 8:30 P.M. that evening of April 30th to a trash can located near the Krispy Kreme Donut Shop at Route 1 on Old Lincoln Highway. He further stated that approximately two or three times in the past he had transported heroin into the same area and on two occasions had met with O'Neil Roberts.

This testimony significantly incriminated Belle, since other evidence placed him at the Krispy Kreme Donut Shop at the time referred to in the statement. The incriminating effect was increased by testimony that Belle had approached Roberts' car from the parking lot of the Donut Shop, had spoken to the [*26] occupant, and had later driven away from Buffalo Avenue in that car with the occupant, O'Neil Roberts.

At the conclusion of Agent Hopson's testimony Belle's counsel moved for a mistrial on the ground that, since Munford was unavailable for cross-examination, there had been a violation of *Bruton v. United States, 391 U.S. 123 (1968).* Belle's attorney pointed out that the statement which he had seen earlier did not mention that Munford had met with O'Neil Roberts on two prior occasions. Moreover, Belle's attorney argued that Hopson's testimony as to Munford's statement was the single most incriminating piece of evidence against Belle in the government's case. The trial court denied the motion for a mistrial. Thereafter the court permitted Belle's counsel to cross-examine Hopson out of the presence of the jury to determine whether Munford's statement about O'Neil Roberts had in fact been made. The district judge's accurate recollection was that O'Neil Roberts' name had been mentioned during Hopson's testimony at a pretrial suppression hearing. Since the court had already denied his mistrial motion, Belle's counsel requested the court

to instruct the jury at the completion [*27] of Hopson's cross-examination that the statement was inadmissible against Belle. Although the government had previously contended that Munford's statement was admissible against Belle, it voiced no objection to the limiting instruction requested by Belle's counsel. No such instruction was given at the end of Hopson's testimony, however. At the close of the next witness's testimony, the court instructed the jury as follows:

Members of the jury, it's my recollection Agent Hopson stated certain persons, specifically Mr. Munford, made certain statements to him, Mr. Hopson. Any statements that Mr. Munford made is to be considered by you only as evidence against Mr. Munford. In other words, anything Mr. Munford said to Mr. Hopson is only evidence against Mr. Munford. It is not evidence against Mr. Belle.

[Belle's Counsel]: I would just ask the Court to also indicate that in their deliberations they are not to consider any statement made by Mr. Munford against Mr. Belle in any manner, shape or form in their deliberations.

The Court: That's correct, any statement made by Mr. Munford to Mr. Hopson is not to be considered evidence against Mr. Belle as part of your deliberations. [*28]

Trial Transcript (Second Day), at 77-78.

The statement by Munford, who did not testify and thus could not be cross-examined by Belle's counsel, was a powerful link in the government's chain of wholly circumstantial evidence against Belle. That statement referred to two prior meetings with O'Neil Roberts, who was identified by other testimony as a drug trafficker. Taken in context, the references to the earlier meetings could only have been understood to mean that drug

593 F.2d 487; 1978 U.S. App. LEXIS 10943, *

trafficking was the subject of the meeting on the night of the arrest. Obviously, the district court understood the references in this way, since it gave the requested limiting instruction.

In *Bruton v. United States, supra,* the Supreme Court held that where a co-defendant did not testify and thus was unavailable for cross-examination, the admission of that co-defendant's statement incriminating the petitioner was error which could not be cured by a cautionary instruction. Relying on *United States v. Lipowitz, 407 F.2d 597, 602-03* (3d Cir.), cert. denied, *395 U.S. 946 (1960),* and *United States v. Alvarez, 519 F.2d 1052, 1054* (3d Cir.), cert. denied, *423 U.S. 914 (1975),* **[*29]** the government urges that, despite Bruton, a limiting instruction saves error unless the statement of the non-testifying co-defendant contains a direct accusation against the other defendant by name. Although the dissent seeks to distinguish Bruton on the ground that the statement in question did not name the co-defendant, the Bruton principle, both as stated by the Supreme Court and as a matter of logic, is not confined solely to that factual configuration. Rather, the Bruton rule applies with equal force to all statements that tend significantly to incriminate a co-defendant, whether or not he is actually named in the statement. Consequently, this case is indistinguishable in principle from Bruton. Nothing in Lipowitz or Alvarez suggests otherwise. The fact that the incrimination amounts to a link in a chain of circumstances rather than a direct accusation cannot dispose of the applicability of the Bruton rule.The Court in Bruton rested its holding primarily on the need for cross-examination. When, as here, the government's proof is circumstantial rather than direct, the need for cross-examination will often be greater.

The very ambiguity of the quoted statement in this case **[*30]** illustrates the problem. The language attributed to Munford ("and on two occasions met with O'Neil Roberts") might have been explained on cross-examination as a reference to meetings for quite innocent purposes. In the context in which the statement was placed, however, it was linked with heroin distribution.One simply cannot say that the inability of Belle to cross-examine Munford was an insignificant deprivation of Belle's constitutional right to confront and cross-examine adverse witnesses.

Nor can the Bruton violation be disregarded on the ground that the evidence against Belle was so overwhelming that the error was harmless beyond a reasonable doubt. The relationship between Munford, O'Neil Roberts, and Belle was critical to the government's case against Belle. We have already held that Belle's conversation with Agent Wasyluk, which included Belle's improbable explanation for being in O'Neil Roberts' company, should have been excluded. Taking away that conversation, the evidence against Belle, although sufficient to avoid a judgment of acquittal, was not very much stronger than that which in *United States v. Cooper, 567 F.2d 252 (3d Cir. 1977),* we held to **[*31]** be insufficient. Thus, in the circumstances here, where the statement in question is the core of the government's case and where the defendant, after making a pretrial motion for severance, was not informed that the government would seek to introduce the incriminating comment at trial and withdrew the severance motion after it was granted, it was error not to have granted Belle's motion for a mistrial once the Bruton violation had occurred in the course of Agent Hopson's testimony.

IV. OTHER CONTENTIONS

593 F.2d 487; 1978 U.S. App. LEXIS 10943, *

## A. Sufficiency of the Evidence

In *United States v. Cooper, supra,* the evidence showed that the defendant had ridden in a vehicle containing concealed contraband during a cross-country trip and had registered in a hotel room from which possibly conspiratorial telephone calls were made. We held that, in the absence of proof of the defendant's knowledge of the contraband, such evidence was insufficient to prevent the grant of a motion for judgment of acquittal. Belle contends that he falls within our holding in Cooper, since the government never established his knowledge of the presence of heroin in the Lincoln Continental.

In our opinion, while the evidence [*32] against Belle certainly was not overwhelming, that evidence was sufficient to defeat a motion for judgment of acquittal. At least three facts in the record differentiate this case from Cooper and thus suggest that Belle was aware of the presence of the contraband. First, the evidence showed that Belle signalled to O'Neil Roberts from the parking lot of the Donut Shop. In addition, Belle rode away with Roberts from the Buffalo Avenue meeting place under circumstances suggesting that a trip was being made to obtain funds for Roberts' purchase. Finally, at one point while the Lincoln Continental was at the Hilton Inn in Trevose, Pennsylvania, Belle was in exclusive possession of the car, which contained a very large and valuable heroin cargo. The jury could certainly have inferred that only a co-conspirator would have been entrusted with the custody of the car and its contents. These facts, coupled with the evidence that Munford and Belle had traveled together from California, sufficed to submit the case to the jury.

## B. Other Alleged Errors

Belle also urges that the district court unfairly summarized the evidence, that the prosecutor made improper and prejudicial remarks in [*33] his closing arguments to the jury, and that the court erred in admitting in evidence $1,300 found on O'Neil Roberts at the time of his arrest. None of these contentions would, on the record before us, warrant a new trial.

## V. CONCLUSION

The judgment appealed from will be reversed and the case remanded for a new trial.

## DISSENTBY:

GARTH

## DISSENT:

GARTH, Circuit Judge, dissenting

I must respectfully dissent from the majority's reversal of Belle's conviction.

While I agree with the majority that Belle was arrested, and was not merely subjected to an investigatory Terry stop, I cannot agree that the agents who arrested Belle lacked probable cause to do so.

I disagree as well with the majority opinion's Bruton analysis. Judge Gibbons, writing for the majority, has extended the Bruton doctrine far beyond the need for the Bruton concept, far beyond the boundaries established by the Supreme Court in Bruton itself, and far beyond the limit to which any other court has heretofore been willing to extend it. Indeed, the majority's unwarranted and unwise expansion of the Bruton rule inevitably must result in the de facto prohibition in this Circuit of joint criminal trials whenever any defendant [*34] has made an admission which the prosecution seeks to introduce into evidence. See *United States v. Mulligan,*

593 F.2d 487; 1978 U.S. App. LEXIS 10943, *

*488 F.2d 732 (9th Cir. 1973)*, cert. denied, *417 U.S. 930 (1974)*. Because of the importance of the Bruton issue in this case, I turn to it first.

I.

Belle contends that the admission into evidence of DEA agent Hopson's testimony as to Munford's inculpatory statements, made to Hopson during Hopson's interrogation of Munford, contravened the rule of *Bruton v. United States, 391 U.S. 123 (1968)*, and therefore violated Belle's sixth amendment right to confront witnesses against him, since Munford did not take the stand. Specifically, agent Hopson testified that:

Mr. Munford stated that he had come from California and that he was going to deliver the heroin between 8:00 and 8:30 p.m. that evening of April 30th to a trash can located near the Krispy Kreme Donut Shop at Route 1 on Old Lincoln Highway.

He further stated that approximately two or three times in the past he had transported heroin into the same area and on two occasions had met with O'Neil Roberts.

N.T. 46, Second Day.

After objecting to the admission of this [*35] evidence and moving for a mistrial which the court denied, Belle's counsel sought an instruction that the Munford admission be considered solely against Munford, n1 and not against Belle. The district court agreed to give such an instruction at the end of Hopson's cross-examination. N.T. 58, Second Day. The instruction was not given at the end of Hopson's cross-examination, n2 but it was given shortly thereafter, at the end of the redirect examination of the next Government witness. N.T. 77-78, Second Day. See also Dist. Ct. Op. at 22. The district court at that time charged the jury

that it should consider any statements made by Munford as evidence only against Munford, and not against Belle.

n1 Since Munford made the admission while in custody, it was not made in the course of and in furtherance of the conspiracy. Hence it was not admissible against Belle under the co-conspirator exception to the hearsay rule.

n2 Belle's attorney did not at this time renew his request for a limiting instruction or remind the court to give it. N.T. 66, Second Day.

Belle's contention is that Munford's reference to prior meetings with Roberts, made in the context of a statement that [*36] he, Munford, had twice or thrice transported heroin into the Bristol area, supports the inference that Belle himself had had prior drug dealings with Roberts. This, Belle argues, is highly incriminating as to him, because he was arrested in the company of Roberts and he (Belle) was associated with Munford. Thus, according to Belle, the jury would connect him to the prior drug transaction between Munford and Roberts. n3

n3 Belle also complains that Munford's testimony concerning prior contact with Roberts was a surprise which prejudiced him. He states that he did not insist on a severance because prior to trial he received a DEA agent's report which noted that "Munford stated that he had delivered heroin on two occasions in the past to the Philadelphia area but declined to say who he had delivered it to", but which contained no reference to Munford's prior meetings with Roberts.

593 F.2d 487; 1978 U.S. App. LEXIS 10943, *

I do not believe that Belle was prejudiced by the report. First, the report in question was prepared by agent Kean, not agent Hopson, and Hopson, in his pre-trial testimony, stated that not everything he told Kean was placed in the report. N.T. 51, Second Day. Moreover, in his pre-trial testimony, agent Hopson testified that Munford had said that he (Munford) had met with Roberts twice in the past. Transcript of Suppression Hearing, Third Day, at notes of Hopson's pre-trial testimony). Thus, Belle's counsel was aware before trial of the contents of Munford's admission to Hopson, as well as the fact that Kean's report was incomplete. [*37]

The majority agrees with Belle. Characterizing Hopson's testimony as to Munford's statement as a "powerful link" in the Government's chain of evidence implicating Belle, the majority holds that Munford's statement, though directly inculpating only Munford, was nevertheless incriminating as to Belle because of other evidence which connects Belle to Munford. Thus, according to the majority, even though Munford's statement makes no mention of Belle, and was admitted only as to Munford (with a limiting instruction), Bruton requires the reversal of Belle's conviction.

In other words, so long as some other evidence may connect the complaining defendant (in this case Belle) to the co-defendant (in this case Munford), the majority would expand Bruton to prohibit at a joint trial the introduction into evidence of the inculpatory statements of a non-testifying co-defendant (Munford) even where those statements make no reference to, and do not directly implicate the complaining defendant (Belle). I do not

believe that the Court in Bruton ever intended such a far-reaching result.

In Bruton two defendants - Evans and Bruton - were jointly tried.At trial, the district court admitted into [*38] evidence testimony by a postal inspector of Evans's oral confession. That confession named Bruton as an accomplice. An instruction limiting the jury's use of the confession as against Evans only was given by the district court, relying on *Delli Paoli v. United States, 352 U.S. 232 (1957)*. In overruling Delli Paoli, the Supreme Court, reversing Bruton's conviction, held that the Evans's extrajudicial statement - which made reference to co-defendant Bruton - was inadmissible as evidence at the joint trial, and could not be cured by a limiting instruction.

The key to Bruton was that the extrajudicial statement by the non-testifying co-defendant Evans was "powerfully incriminating" of Bruton in that it named Bruton as an accomplice. It was in such a circumstance - where the challenged statement (and I emphasize, the statement only) directly implicated the complaining defendant Bruton - that the Supreme Court held that the co-defendant's statement could not be admitted into evidence at a joint trial. See *United States v. DiGilio, 538 F.2d 972 (3d Cir. 1976)*.

When a co-defendant's extrajudicial statement does not directly implicate the defendant, however, [*39] the Bruton rule does not come into play. See *United States v. Gerry, 515 F.2d 130 (2d Cir. 1975); Nelson v. Follette, 430 F.2d 1055, 1057 (1970)*. For example, courts - ours included - have consistently approved the use at joint trials of co-defendants' confessions where all references to the complaining defendant have been redacted, at least if the redacted versions

593 F.2d 487; 1978 U.S. App. LEXIS 10943, *

do not explicitly suggest the participation n4 of the complaining defendant. E.g., *United States v. Alvarez, 519 F.2d 1052* (3d Cir.), cert. denied, *423 U.S. 914 (1975); United States v. Panepinto, 430 F.2d 613 (3d Cir. 1970); United States v. Lipowitz, 407 F.2d 597* (3d Cir.), cert. denied, *395 U.S. 946 (1969); United States v. Dady, 536 F.2d 675 (6th Cir. 1976)* (per curiam); *United States v. Wingate, 520 F.2d 309 (2d Cir. 1975).* See *United States v. DiGilio, supra, at 982.*

n4 See *Harrington v. California, 395 U.S. 250 (1969).* In Harrington a white defendant was tried with three black co-defendants. The defendant has made statements placing him at the scene of the crime. The confession of a non-testifying co-defendant, which did not name the defendant but which referred to the "white guy", was admitted. The Court assumed that this had the same effect as naming the defendant. The Court nonetheless found error to be harmless. [*40]

If a co-defendant's confession or admission is admissible at a joint trial when the names of other joint defendants have simply been redacted, it would seem that a fortiori an admission, such as the one here, which makes no reference whatsoever to any other defendant should be admissible as well. In *United States v. Wingate, supra,* a co-defendant's redacted statement had been admitted into evidence with cautionary instructions. The complaining defendant (Wingate) argued that the statement, read in light of other evidence connecting him (Wingate) to the co-defendant who made the statement, tended to identify him as a co-conspirator, and therefore its admission into evidence violated Bruton. The Second Circuit

disagreed, reasoning that the co-defendant's statement did not sufficiently incriminate Wingate inasmuch as "[only] when combined with considerable other evidence, which amply established Wingate's guilt, [did] the statement tend to implicate him." *502 F.2d at 314.* Thus the court held that the co-defendant's statement was not "powerfully incriminating" as to Wingate. In short, evidentiary linkage may not be utilized to convert a non-Bruton admissible [*41] statement into a Bruton inadmissible statement.

The situation in the case at bar is quite similar to that in Wingate. Belle argues that Munford's statement inculpates him (i.e. Belle). But if it does, it does so only insofar as other evidence may connect Belle to Munford and to O'Neil Roberts. In such a case, I do not believe that the statement can be said to be "powerfully incriminating" as to Belle, and thus inadmissible under Bruton. Other courts faced with similar claims have held that the admission of a co-defendant's extrajudicial statement did not violate Bruton. See *United States v. Mulligan, 488 F.2d 732 (9th Cir. 1973); Nelson v. Follette, 430 F.2d 1055 (2d Cir. 1970).*

In Nelson, a case with a fact pattern analogous to the one in this case, the complaining defendant Nelson and a co-defendant Biggins were jointly tried and convicted of felony murder in the course of a bar hold-up. Two confessions by Biggins were introduced into evidence, with an instruction that they be considered only with respect to Biggins. Biggins did not take the stand. Biggins' statements did not directly identify Nelson, but rather referred to an "Oliver" who had [*42] a physical description more or less fitting Nelson. Biggins had also stated that he ran into "Oliver" at another bar earlier in the evening of the murder, and that they had

593 F.2d 487; 1978 U.S. App. LEXIS 10943, *

proceeded together to the bar at which the murder took place. Nelson contended that these statements, when considered in light of testimony by the manager of the first bar to the effect that he had seen Nelson and Biggins together at his bar on the evening in question, "necessarily implicated" him (Nelson).

The court rejected Nelson's contention. It noted that "for the Bruton rule to apply, the challenged statements must be clearly inculpatory." *430 F.2d at 1057.* The court held that since the jury would have to make substantial inferences to implicate Nelson in the crime by virtue of the testimony as to his mere presence at the first bar, Biggins' statements were "not clearly inculpatory because they alone did not serve to connect Nelson with the crime." *Id. at 1058* (emphasis added). See *United States v. Lipowitz, supra, 407 F.2d at 602.*03. The court also noted that the "connecting testimony" (i.e. the bar manager's testimony) was subject to cross-examination. **[*43]**

In Mulligan, a defendant objected on Bruton grounds to the introduction of admissions by his two co-defendants (who did not take the stand). There had been a limiting instruction. The admissions did not directly implicate the complaining defendant. The court rejected this contention, stating:

Appellants argue that the admission of these statements violated *Bruton v. United States, 1968, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476.* In that case, the Court held that the introduction of an extrajudicial admission of one defendant that implicates or inculpates a co-defendant violates that co-defendant's sixth amendment right to confrontation. Appellants' reliance on Bruton is misplaced. Mulligan's statements inculpated only Mulligan. Dinsio's statements inculpated only Dinsio. Appellants ask us to extend the Bruton rule to exclude the admission of one defendant even though the admission does not directly implicate a co-defendant. We decline to do so.

There is little danger that a jury in a joint trial, in weighing the evidence against A, will consider against A an admission by B concerning only B's activities. Following the appellants' argument to its logical **[*44]** conclusion would require separate trials in every case where any defendant has made an admission. Such a holding is wholly unwarranted.

*488 F.2d at 737.*

I think the reasoning of Nelson and Mulligan applies equally in this case. Munford's admissions directly implicate only Munford. The challenged statements implicate Belle only to the extent that the jury may make inferences based on other, clearly admissible evidence which may tend to connect Belle to Munford and Roberts. Accordingly, I do not believe that Munford's statements can be said to be "clearly inculpatory" or "powerfully incriminating" as to Belle. n5 Moreover, all the "connecting testimony" was subject to cross-examination. Consequently, in my opinion the introduction into evidence of Munford's statement did not contravene Bruton or violate Belle's right to confront witnesses against him. n6

n5 In Bruton, one of the Court's concerns was the unreliability of statements by a co-defendant which tend to shift responsibility to an accomplice, especially when such evidence cannot be tested by cross-examination. *391 U.S. at 136.* In this case Munford's statements in no way shift blame to Belle or to anyone else, and there is consequently no

593 F.2d 487; 1978 U.S. App. LEXIS 10943, *

reason to suspect their reliability. Thus one of the principal concerns of the Court in Bruton is lacking in the situation presented by this case, where the co-defendant's statements do not directly implicate the defendant. See *Nelson v. Follette, supra, 430 F.2d at 1059.*

n6 It was of course necessary that the jury be instructed to consider Munford's statement as evidence against Munford only, and not against Belle. I do not believe that Belle was prejudiced by the fact that such an instruction was not given at the end of Hopson's testimony, but was rather given at the end of the testimony of the next Government witness (22 transcript pages later), especially since Belle's attorney did not renew his request for a limiting instruction at the end of Hopson's testimony. **[*45]**

Indeed, in Bruton the Supreme Court was fully aware of the problems presented by the joint trial of more than one defendant, and took pains to discuss in some detail the provisions of *Fed. R. Crim. P. 14,* which authorizes a severance, as that rule was implicated by the Bruton doctrine. *391 U.S. at 131-32.* In discussing the 1966 amendment to Rule 14, the Court pointed out that the amendment "[provided] expressly that '[in] ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection in camera any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial.'" Id, quoting *Fed. R. Crim. P. 14.*

It is highly significant that neither the federal rule examined by the Court, nor Mr. Justice Brennan's majority opinion, made

any reference to any judicial inspection of evidence other than the statements or confessions of the defendants. If linkage evidence was subsumed by the Court in its Bruton ruling, it is apparent that such linkage evidence would be required to be subjected to judicial scrutiny together with the defendants' statements **[*46]** or confessions. No such suggestion is even intimated by Bruton, and it is understandable to me why it was not. To require what the majority would require here would lead to the necessity for the Government to expose its entire case on a motion for severance. Indeed, whether or not a motion for severance is ever made, the result reached by the majority would require the trial judge to examine under a microscope all the prosecution's evidence in order to determine whether any extrajudicial statement made by a non-testifying co-defendant could be admitted as to that defendant, or whether it would have to be excluded because of the existence of independent "linkage" evidence which might connect another defendant to the statement. This result would necessarily lead to either a complete "minitrial" before the judge, or to the practical prohibition of joint trials. See page 22 supra; *United States v. Mulligan, supra.* The federal rules do not contemplate such a practice, see *Fed. R. Crim. P. 14;* Bruton itself never suggested such an astonishing result; and - other than the majority opinion in this case - no other court, to my knowledge, has construed Bruton in this unprecedented **[*47]** fashion.

I therefore dissent from the majority's Bruton holding. n7

n7 To mitigate somewhat the effect of its holding, the majority attempts to limit its Bruton extension

…

to the specific facts of this case saying "Thus, in the circumstances here, where the statement in question is the core of the government's case and where the defendant, after making a pre-trial motion for severance, was not informed that the government would seek to introduce the incriminating comment at trial and then withdrew the severance motion after it was granted, it was error not to grant Belle's motion for a mis-trial...." (Maj. Op. at 20).

First it should be observed that Hopson's statement can hardly be called the "core" of the government's case against Belle. But even if it is so characterized, it is very often the case that a defendant's statement, from which the names of his codefendants have been redacted, will be introduced in evidence in a multi-defendant prosecution. Under the expanded Bruton concept announced by the majority today, it may well be that in the future such redacted confessions and admissions must be excluded in joint trials.

Second, I know of no rule of law or practice that would require the government to inform the defendant that it intended to introduce particular evidence at trial once the defendant has been made aware of the existence of that evidence.

Lastly, as I have pointed out in note 3 supra of this dissent, Belle's counsel knew of Munford's statements about prior meetings with Roberts. Hopson testified to that effect at the suppression hearing. Belle's counsel also knew that it was Kean's and not Hopson's report that

was read during the pretrial severance proceeding, and that Hopson claimed to have told Kean more than that which appeared in the report. If, in light of Belle's successful severance motion, Belle nevertheless for his own undoubtedly tactical purposes withdrew his motion and did not retain the benefit of the court's order, it is hard to see why such circumstances justify extending Bruton beyond the limits established by the Supreme Court.

I am satisfied that, no matter how restricitively the majority intends its opinion to be read, its over-generous holding will inevitably lead to the dangers and problems which I have enumerated in the text of this dissent. [*48]

II

I agree with the majority that Belle was arrested by agents Malloy and Wasyluk, and that his apprehension was not a mere investigatory stop under *Terry v. Ohio, 392 U.S. 1 (1968).* Maj. Op. at 8-10. See *United States v. Lampkin, 464 F.2d 1093 (3d Cir. 1972).* I part company with the majority, however, insofar as they appear to conclude that probable cause did not exist for the arrest. The majority, noting that the district court had made no finding of probable cause because of its erroneous opinion that Belle's arrest was merely a Terry stop, has reversed for this as well as other reasons. But in so doing, the majority has held that the evidence challenged by Belle (agent Wasyluk's testimony as to Belle's post-arrest statement) must be excluded at his new trial. Maj. Op. at 13. While it is true that the majority has sought to temper this holding by its footnote 3 (Maj. Op. at 12), which would not preclude a finding of probable cause at a new trial, the entire

thrust of Part II of the majority opinion indicates the majority's view that the evidence could not support a finding of probable cause. I cannot agree with the majority's reading of the record. **[*49]** To me it is quite clear that the evidence shows the existence of probable cause which would warrant Belle's lawful arrest. That being so, the challenged evidence quite properly should not have been excluded.

It may be that the information contained in the Government's files, which had been obtained from informants, did not meet the standards of Aquilar and Spinelli. I cannot agree, however, that that is the "critical issue" with respect to a finding of probable cause in this case.

While the background information received by the agents about the owners of the Cadillac and Lincoln may not have risen to the Aquilar standard of reliability, and thus could not by itself support Belle's arrest, it did constitute evidence which could be considered by the agents. See *United States v. Harris, 403 U.S. 573 (1971).* It is true that the agents had no information about Belle himself.  But it seems, given the information contained in the DEA files, Belle's actions on the day of the arrest, as well as the actions of his associates, that the Government agents might well have reasonably believed that Belle was involved in a drug-related transaction. See *Whitely v. Warden, 401 U.S. 560, 567 (1971).* **[*50]**

In this case, Belle was a passenger in a car (the Lincoln) registered to a California drug dealer who was known previously to have transported heroin to the Bristol, Pennsylvania area. Belle was involved in a clandestine rendezvous with the driver of a car (the Cadillac).The Cadillac was registered in the name of another known drug trafficker. After this rendezvous the Cadillac followed the Lincoln to a Buffalo

Avenue location. At that point, Belle spoke with the occupant of the Cadillac, then got into the Cadillac and drove off. The driver of the Lincoln was then seen removing packets from a place of concealment underneath the hood of the Lincoln. These packets were of the type which the agents knew might well contain heroin. It was this final observation which triggered Belle's arrest.

The majority contends that "Belle's presence in the Lincoln Continental, his rendezvous with the Cadillac, and his driving off with the occupant of the Cadillac were all perfectly consistent with innocent behavior." Maj. Op. at 11. The majority, in so concluding, has chosen to review these facts out of context.  In particular, the majority downplays the most critical fact of all, viz, the **[*51]** probable possession of heroin by Belle's associate.  These actions on the part of Belle become more consistent with criminal than with innocent behavior when viewed in the context of the information which the agents had previously received, as well as their observation of Belle's companion, who was seen extracting suspicious packets (which more likely than not contained heroin) from a hiding place in the Lincoln.  It seems to me that it was quite reasonable for the agents to infer, based on prior information and the actions of Munford, Belle and Roberts, that all three were involved in a drug transaction. Indeed, this case seems akin to *United States v. Lampkin, 464 F.2d 1093 (3d Cir. 1972),*   where this court upheld the arrest of a person not yet identified, based upon his associations coupled with a behavior pattern which, as here, bespoke conspiracy.  n8  In my opinion, then, the DEA agents had probable cause - based on the reasonably trustworthy background information as to O'Neil (the Lincoln owner) and Roberts (the Cadillac owner), and based on Belle's

593 F.2d 487; 1978 U.S. App. LEXIS 10943, *

actions as well as those of Munford and Roberts - to arrest Belle. Cf. *Government of the Virgin Islands v. Hernandez*, 508 F.2d 712 **[*52]** (3d Cir.), cert. denied, *422 U.S. 1043 (1975)*.

n8 The court in Lampkin stated:

There were far too many interrelated factors to have been the result of pure coincidence. First of all, the former undercover agent recognized one of the occupants of the car and associated the car itself with his previous undercover narcotics work. Other pertinent elements were that the auto was registered to one whose name had previously been linked with wrongful narcotics activities; that those activities seemed to center between Pittsburgh and New York; that this suspect's flight was going to the New York area; and that he was interested in an immediate return. Appellant's outward journey actually ended in Harlem in close proximity to a store run by a man already suspected of drug trafficking between New York and Pittsburgh, and a return flight to Pittsburgh took place early that same day. A further reason for the agent's actions was the police report (which is now thought to have been seemingly erroneous) that there was a state warrant existing for Lampkin to whom the car was registered. Considering all these factors, it is obvious that each incident corroborated the existing belief of the agent. There were too many factors which "fell into place" and thus probable cause in such circumstances seems readily existent.

*464 F.2d at 1096.* **[*53]**

I therefore believe that the district court was correct - although perhaps for the wrong reason - in not suppressing the evidence of Belle's post-arrest statements made to agent Wasyluk. Cf. *PAAC v. Rizzo, 502 F.2d 306 (3d Cir. 1974).* Indeed, by suggesting that no probable cause existed in this case because of the fact that Belle's actions - taken out of context - were "consistent with innocent behavior", the majority has significantly curtailed the power of law enforcement officials to arrest conspirators who are not themselves observed committing a substantive offense.

III

While I believe that Belle's arrest was proper, I can also recognize that, on these facts, others could reasonably differ with this conclusion. Indeed, the majority seems to do so, but by so doing the majority's holding and opinion may have relatively little effect on the law of probable cause or on defendants other than Belle.

On the other hand, with respect to the Bruton issue, the majority's holding and opinion not only affects Belle, but it must necessarily affect fundamental trial processes and the course of future prosecutions in this Circuit. As I have indicated, I believe that **[*54]** the new Bruton doctrine fashioned by the majority is unprecedented, unwarranted and unwise. Nonetheless, if this Circuit is to adopt such a far-reaching doctrine and make such a basic change in the law, this course should be undertaken only after careful consideration by the entire court en banc.

For the reasons stated in this dissent, I would affirm Belle's conviction.

593 F.2d 487; 1978 U.S. App. LEXIS 10943, *