Case 1:01-cv-00769-SAS    Document 93-11    Filed 02/20/2004    Page 1 of 12

Owensby, et al. vs. City of Cincinnati  CHRISTOPHER CAMPBELL
December 3, 2003

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - - - - -
ESTATE OF ROGER D.                :
OWENSBY JR., et al.,              :
                                  :
        Plaintiffs,               :
   vs.                            :  Case No. 01-CV-769
                                  :  (Judge S. A. Spiegel)
CITY OF CINCINNATI,               :
et al.,                           :
                                  :
        Defendants.               :
- - - - - - - - - - - - - - - - -


        Deposition of CHRISTOPHER CAMPBELL,

defendant herein, called by the plaintiffs for

cross-examination, pursuant to the Federal Rules of

Civil Procedure, taken before me, Wendy Davies

Welsh, a Registered Diplomate Reporter and Notary

Public in and for the State of Ohio, at the offices

of Helmer, Martins & Morgan Co. LPA, 1900 Fourth &

Walnut Centre, 105 East Fourth Street, Cincinnati,

Ohio, on Wednesday, December 3, 2003, at 2:31 p.m.

Case 1:01-cv-00769-SAS   Document 93-11   Filed 02/20/2004   Page 2 of 12

Owensby, et al. vs. City of Cincinnati                                              CHRISTOPHER CAMPBELL
December 3, 2003

## Page 2

```
 1  APPEARANCES:

 2     On behalf of the Plaintiffs:

 3        Paul B. Martins, Esq.
          Helmer, Martins & Morgan Co. LPA
 4        Suite 1900, Fourth & Walnut Centre
          105 East Fourth Street
 5        Cincinnati, Ohio  45202
          Phone:  (513) 421-2400
 6
          John J. Helbling, Esq.
 7        The Helbling Law Firm, L.L.C.
          3672 Springdale Road
 8        Cincinnati, Ohio  45251
          Phone:  (513) 923-9740
 9
        On behalf of the Defendants City of Golf Manor,
10      Stephen Tilley, Roby Heiland and Chris
        Campbell:
11
          Wilson G. Weisenfelder Jr., Esq.
12        Rendigs, Fry, Kiely & Dennis
          900 Fourth & Vine Tower
13        One West Fourth Street
          Cincinnati, Ohio  45202-3688
14        Phone:  (513) 381-9200

15     On behalf of the Defendant City of Golf Manor:

16        Terrence M. Donnellon, Esq.
          Donnellon, Donnellon & Miller
17        9079 Montgomery Road
          Cincinnati, Ohio  45242
18        Phone:  (513) 891-7087
```

## Page 3

```
 1     On behalf of Defendants City of Cincinnati,
       Darren Sellers, Jason Hodge:
 2
          Geri Hernandez Geiler, Esq.
 3        Assistant City Solicitor
          Department of Law
 4        Room 214, City Hall
          801 Plum Street
 5        Cincinnati, Ohio  45202
          Phone:  (513) 352-3346
 6
       On behalf of the Defendants Robert B. Jorg,
 7     Patrick Caton, Jason Hodge, Victor Spellen and
       Darren Sellers:
 8
          Donald E. Hardin, Esq.
 9        Hardin, Lefton, Lazarus & Marks, LLC
          915 Cincinnati Club Building
10        30 Garfield Place
          Cincinnati, Ohio  45202
11        Phone: (513) 721-7300

12  Also present:

13  Chief Stephen Tilley

14  Lisa Damstrom, Law Clerk
    Helmer, Martins & Morgan Co., L.P.A.
```

## Page 4

```
 1              S T I P U L A T I O N S

 2     It is stipulated by and among counsel for the

 3  respective parties that the deposition of

 4  CHRISTOPHER CAMPBELL, defendant herein, called by

 5  the plaintiffs for cross-examination, pursuant to

 6  the Federal Rules of Civil Procedure, may be taken

 7  at this time by the notary; that said deposition may

 8  be reduced to writing in stenotype by the notary,

 9  whose notes may then be transcribed out of the

10  presence of the witness; and that proof of the

11  official character and qualifications of the notary

12  is expressly waived.

                              - - -
```

## Page 5

```
 1                   I N D E X

 2     Examination by:              Page

 3     Mr. Martins . . . . . . . .    6

 4     Mr. Hardin  . . . . . . . .   54

 5     Mr. Martins . . . . . . . .   81

 6     Mr. Hardin  . . . . . . . .   85

 7     Mr. Martins . . . . . . . .   89

 8                   - - -

 9              E X H I B I T S

10                                         Page
    Plaintiff's Exhibit 81 . . . . . . . .  10
11  Plaintiff's Exhibit 82 . . . . . . . .  27
    Plaintiff's Exhibit 83 . . . . . . . .  27
12  Plaintiff's Exhibit 84 . . . . . . . .  38

13                - - -
```

Case 1:01-cv-00769-SAS   Document 93-11   Filed 02/20/2004   Page 3 of 12

Owensby, et al. vs. City of Cincinnati
December 3, 2003

CHRISTOPHER CAMPBELL

Page 14

1  Q. Do you recall the year?
2  A. It was at the end of '95 and the beginning
3  of '96.
4  Q. In that training at Brown County Police
5  Academy did you receive any first aid or CPR
6  training?
7  A. We did receive first aid training.
8  Q. Any CPR training?
9  A. I can't recall.
10 Q. Do you have any CPR training?
11    MR. WEISENFELDER: Today?
12    MR. MARTINS: Today.
13 A. I don't have any certification in CPR,
14 today.
15 Q. On November 7th of 2000 did you have any
16 CPR training?
17 A. No.
18 Q. Any certifications at that time?
19 A. No.
20 Q. As you know, we are here today concerning
21 the death of Mr. Roger Owensby on November 7, 2000.
22 Am I correct in understanding that you never
23 provided any medical attention to Mr. Owensby; is
24 that right?

Page 15

1  A. That's right.
2  Q. When the Cincinnati police officers
3  removed him from Officer Heiland's Golf Manor
4  cruiser, did you provide them with a, I think it's
5  called a mask?
6  A. Yes, a CPR mask.
7  Q. CPR mask. Where did you obtain that?
8  A. It was in my duty bag inside of my
9  cruiser.
10 Q. Had you received training on how to use
11 that mask device?
12 A. I don't recall formal training.
13 Q. Any informal training?
14 A. Explanation of how it worked.
15 Q. From whom?
16 A. I can't recall.
17 Q. On the night of November 7, 2000, were
18 there any supervisors, Golf Manor supervisors
19 present at the police station?
20 A. No.
21 Q. Was it just you and Officer Heiland?
22 A. Yes.
23    (Discussion off the record.)
24 Q. As I understand it, on the night of

Page 16

1  November 7, 2000 you drove your Golf Manor cruiser
2  to the Sunoco station at the corner of Seymour
3  Avenue and Langdon Farm Road in response to an
4  officer needs assistance call; is that right?
5  A. Yes.
6  Q. Starting with that would you walk me
7  through what happened that evening.
8  A. After I arrived at the --
9  Q. No. From the time you hear an officer
10 needs assistance call, you're at the Golf Manor
11 station, police station, I guess. What happens at
12 that point?
13 A. I heard the broadcast, all-county
14 broadcast. I responded to that area to try to
15 render assistance to any officers.
16 Q. When you heard the broadcast how did you
17 hear it? Is it on your mike that's on your uniform
18 or is there some other radio or something?
19 A. It was on the radio that I carry on my
20 duty belt.
21 Q. Were you with Officer Heiland at the time?
22 A. He was in the room.
23 Q. So it was broadcast over both of your
24 radios?

Page 17

1  A. Yes.
2  Q. Please continue.
3  A. I responded to the parking lot. As I was
4  getting out I remember hearing a dispatcher tell us
5  to code 4, which means that the situation was over.
6  That was as I was exiting my vehicle. And it was at
7  that time I saw Cincinnati officers moving a suspect
8  towards Officer Heiland's car. And I advised -- I
9  hadn't had a chance to advise that I was in the lot
10 yet. And I advised I was clear on her information,
11 but would be remaining there, because Cincinnati was
12 putting their prisoner in one of our cars.
13 Q. When you say you advised her, who is the
14 "her" you're referring to?
15 A. The Hamilton County dispatcher.
16 Q. What happened next?
17 A. I can't recall the details. We basically
18 were waiting there for a Cincinnati officer to get
19 their prisoner out of our car.
20 Q. Did you see the Cincinnati police officers
21 physically put Mr. Owensby in Officer Heiland's car?
22 A. No, I didn't.
23 Q. Your attention was directed somewhere
24 else?

Case 1:01-cv-00769-SAS   Document 93-11   Filed 02/20/2004   Page 4 of 12
Owensby, et al. vs. City of Cincinnati
December 3, 2003
CHRISTOPHER CAMPBELL

Page 26

1 was conscious or unconscious at the time that they
2 were moving him toward the Golf Manor cruiser?
3   A. At the time I assumed he was conscious,
4 but looking back, I can't tell.
5   Q. Did it appear to you that the Cincinnati
6 police officers were struggling to move him toward
7 the cruiser?
8   A. Yes.
9   Q. Do you know whether or not that struggling
10 by the police officers was because he was
11 unconscious?
12   A. I don't.
13   Q. You don't know one way or the other?
14   A. No.
15   Q. Am I correct in understanding that in the
16 entire time that you saw Mr. Owensby that evening,
17 you never saw him move?
18     MR. WEISENFELDER: Objection as to the
19 form.
20     Go ahead.
21   A. No.
22   Q. The entire time that you saw Mr. Owensby
23 that evening you never saw him make any noise, any
24 sound?

Page 27

1   A. No. No.
2   Q. Let me show you a couple of documents
3 here.
      (Plaintiff's Exhibit 82
4     was marked for identi-
5     fication.)
6   Q. The first is your statement of that night,
7 November 7, 2000. It's marked as Exhibit 82.
8 That's for you. That's for counsel.
9   A. Okay.
10   Q. Is Exhibit 82 the statement that you gave
11 on November 7th at just about midnight on that day?
12   A. Yes.
13   Q. This is the statement or one of the
14 documents you reviewed in preparation for this
15 deposition?
16   A. Yes.
17   Q. I want to show you another document.
      (Plaintiff's Exhibit 83
18     was marked for identi-
19     fication.)
20     MR. MARTINS: Mark this as Exhibit 83.
21 Pass that over to Mr. Weisenfelder.
22     MR. WEISENFELDER: You don't want him to
23 read the whole thing, do you?
24     MR. MARTINS: No.

Page 28

1     MR. WEISENFELDER: Okay.
2 BY MR. MARTINS:
3   Q. This is a transcript of your testimony
4 before a grand jury on December 5 of 2000. Do you
5 recall testifying before a grand jury?
6   A. Yes.
7   Q. I want to direct you to some matters in
8 here. First start at page 48, bottom of the page,
9 beginning at line 23. The question is, "Again how
10 long did it take for you to get there once you heard
11 the call?" "There" being the Sunoco station.
12     And the answer is, "I would say one and a
13 half to two minutes."
14     Is that still your best recollection of
15 how long it took you to get there that evening?
16   A. Yes.
17   Q. There is a life squad also at the police
18 station, the Golf Manor police station; is that
19 right?
20   A. At the fire department.
21   Q. At the fire department? Is that next to
22 the police station?
23   A. Yes.
24   Q. Would it be your best estimate that if

Page 29

1 called, the life squad would take between a minute
2 and a half and two minutes to get to that location,
3 to the convenience store?
4     MR. WEISENFELDER: Objection.
5     Go ahead.
6   A. Yes. That would be driving time.
7   Q. Right. Look at page 50, please, next
8 page. Line 4, you say, "Once I saw that they had
9 somebody handcuffed and were putting him in the car
10 they had just got to where the, I don't know if they
11 were opening the back door or they were real close
12 to the car, I turned my attention towards the front
13 of the store because there was still a group of
14 people there. . ." Do you see that?
15   A. Yes.
16   Q. That's consistent with what you've
17 testified to today, right?
18   A. Yes.
19   Q. You say that, "I saw that they had
20 somebody handcuffed." Does that refresh your
21 recollection that you did know on that evening that
22 Mr. Owensby was, in fact, handcuffed?
23   A. That would be an assumption. I don't
24 remember seeing the handcuffs when they were moving

Case 1:01-cv-00769-SAS   Document 93-11   Filed 02/20/2004   Page 5 of 12

Owensby, et al. vs. City of Cincinnati
December 3, 2003
CHRISTOPHER CAMPBELL

Page 22

1 a suspect toward the Golf Manor cruiser did you
2 happen to notice whether or not he was handcuffed?
3    A. No. I -- no. I couldn't see the
4 handcuffs. There was a few people around him.
5    Q. When you look in, you see him laying on
6 his side, on his right side. Is his head behind the
7 driver's front seat or the passenger's front seat?
8    A. His head was behind the driver's front
9 seat.
10   Q. Was his face facing the trunk?
11   A. Yes.
12   Q. Do you know if his face was up against the
13 portion of the back seat where your back and
14 shoulders would rest if you're sitting in the seat?
15   A. I can't remember.
16   Q. Do you know if his head was against the
17 door, rear driver's side door?
18   A. No, I can't remember.
19   Q. What was the position of his head, other
20 than facing the trunk? Was it up, down, over to the
21 side?
22   A. I can't remember.
23   Q. Let me show you what previously has been
24 marked as Exhibit 67. Does Exhibit 67 look like the

Page 23

1 back seat of the Golf Manor cruiser?
2    A. Yes.
3    Q. In which Mr. Owensby was laying?
4    A. Yes.
5    Q. As you look at that photograph can you
6 tell whether or not the photograph is taken from the
7 driver's rear door or the passenger's rear door?
8    A. The driver's rear door.
9    Q. So as I understand your testimony, if Mr.
10 Owensby were laying on that seat his head would be
11 toward the open part of that door?
12   A. Yes.
13   Q. When you looked in did you see any
14 movement by Mr. Owensby?
15   A. No.
16   Q. Did you hear anything from Mr. Owensby?
17   A. No.
18   Q. What happened next?
19   A. I can't remember specifically, other than
20 waiting for Cincinnati to get their prisoner.
21   Q. Did you remain around the passenger rear
22 portion of Officer Heiland's cruiser?
23   A. I can't remember.
24   Q. Do you know a Cincinnati police officer by

Page 24

1 the name of Brazile?
2    A. Officer Heiland introduced me to him that
3 night.
4    Q. Do you recall that Brazile came over and
5 talked to you and Officer Heiland?
6    A. I recall getting introduced to him. I
7 can't remember if it was by the cruiser or not.
8    Q. Do you know whether or not Officer Brazile
9 looked in on Mr. Owensby?
10   A. I can't remember for certain.
11   Q. Do you recall whether or not Officer
12 Brazile said anything to you or Officer Heiland in
13 your presence?
14   A. I can't remember for certain.
15   Q. In answering my questions, you're saying,
16 "I can't remember for certain." Is there something
17 you can remember, but you're just --
18   A. I remember being introduced to him. At
19 that time, you know, in my mind, the incident was
20 pretty much over. So it was pretty much waiting for
21 the city to get the person out of the car.
22   Q. Did anyone tell you that the city was
23 going to get the person out of the car?
24   A. No.

Page 25

1    Q. In your experience had there been
2 situations where, as part of this cooperation
3 between police departments, not only did Golf Manor
4 have somebody in the car, but that Golf Manor
5 transported the person for the city?
6    A. Not in my experience.
7    Q. Either before or after November 7, 2000?
8    A. No.
9    Q. When you observed the police officers
10 moving Mr. Owensby toward Officer Heiland's cruiser
11 you saw one officer on each side carrying Mr.
12 Owensby by the arms; is that right?
13   A. I saw officers on both sides.
14   Q. How were they holding Mr. Owensby?
15   A. I -- I can't -- I didn't see -- there was
16 three or four officers around him.
17   Q. As the officers were moving Mr. Owensby
18 toward Officer Heiland's car do you recall whether
19 or not Mr. Owensby's head was erect, if it was down,
20 off to the side, back, what the position of the head
21 was?
22   A. I -- I was blocked by the officers. I
23 couldn't see.
24   Q. Could you tell whether or not Mr. Owensby

Case 1:01-cv-00769-SAS   Document 93-11   Filed 02/20/2004   Page 6 of 12

Owensby, et al. vs. City of Cincinnati
December 3, 2003
CHRISTOPHER CAMPBELL

Page 30

1  him towards the car.
2  Q. Take a look at page 53, please. At line 2
3  you say, "I don't know for sure. When I saw him he
4  wasn't vertical, you know, he looked like he was
5  being drug." Is that an accurate description of
6  what you saw as the officers were taking Mr. Owensby
7  to the Golf Manor cruiser?
8  A. Yes.
9  Q. When you say it "looked like he was being
10 drug," would you explain that or clarify that for
11 me.
12 A. There were three or four officers around
13 him and they had ahold of him and were moving him
14 towards the car.
15 Q. The question then is: "When you say he
16 wasn't vertical, can you describe it a little
17 further?
18     And you say: "He wasn't walking on his
19 own.
20     "Question: Was he slumped over?
21     "Answer: I can't remember if he was
22 slumped over. He was -- I mean the officers had him
23 under each arm. Somebody might have had a leg, I am
24 not, like I said I glanced at them for a few

Page 31

1  seconds, I can't say for sure. There was a group of
2  officers moving him towards the police car."
3      Is that still an accurate description of
4  what you saw?
5  A. Yeah.
6  Q. "The officers had him under each arm."
7  Would you describe for me precisely how they were
8  holding Mr. Owensby under each arm?
9  A. It appeared they were holding him up near
10 where the arm met the shoulder.
11 Q. The armpit?
12 A. Yes.
13 Q. How were their arms or hands situated in
14 relation to Mr. Owensby's arms or armpit?
15 A. I couldn't see. I can't remember.
16 Q. Go to page 57, please. Line 6, you say,
17 "The only thing I can remember is I think mace had
18 been used because one of the plain clothes officers
19 was coughing as he was walking back towards the
20 front of the store." Do you recall seeing that?
21 A. I recall seeing somebody coughing.
22 Q. Was the plainclothes officer to which
23 you're referring here, was that an African-American
24 or a white officer?

Page 32

1  A. I can't remember for certain.
2  Q. People cough without having been Maced.
3  What was it that led you to believe that this
4  coughing was the result of Mace being used?
5  A. I assumed so because of the fact that they
6  had to struggle with the suspect.
7  Q. When you say that they had to struggle
8  with the suspect, is that based on what you heard on
9  the radio in coming over or based on you seeing them
10 struggling to escort him to the vehicle?
11 A. What I heard on the radio.
12 Q. What do you recall hearing on the radio?
13 A. I can only remember a broadcast for
14 officer needs assistance.
15 Q. You took that to mean that if an officer
16 needs assistance a suspect is offering resistance
17 and there's a struggle?
18 A. Yeah. I can't remember what I heard.
19 Q. On page 63 beginning at line 3 there's a
20 question from a juror and then you say, "I mean I
21 didn't notice his feet. At the time I thought he
22 was struggling because the officers, you know, were,
23 you know, kind of adamant can we get him in your car
24 and they were moving him and a lot of people are

Page 33

1  sometimes still moving when they are handcuffed. I
2  don't know if he was unconscious or because he was
3  struggling." Do you see that?
4  A. Yes.
5  Q. Is that true today, that to your
6  recollection of the events of November 7, you
7  couldn't tell whether or not the problems the
8  officers were experiencing in getting him to the car
9  were because he was unconscious and it was dead
10 weight to carry or whether or not he was struggling
11 with them?
12 A. That's correct.
13 Q. Then further down at line 16 you say, "I
14 couldn't see his head." Do you see that?
15 A. Yes.
16 Q. That's consistent with what you told us
17 here today?
18 A. Yes.
19 Q. Go to the top of page 64, please. At
20 line 4 you say, "I have been on runs before where
21 Cincinnati has put prisoners in my car or Amberley
22 Village has put people in my car. If you are the
23 most convenient and you are the closest they will
24 secure the [prisoner] in there."

Case 1:01-cv-00769-SAS   Document 93-11   Filed 02/20/2004   Page 7 of 12

Owensby, et al. vs. City of Cincinnati
December 3, 2003
CHRISTOPHER CAMPBELL

### Page 18

1  A. Yes, it was.
2  Q. Where?
3  A. I saw that they had a suspect, appeared in
4  custody, at Officer Heiland's car. That was when I
5  turned my attention towards the front of the store
6  where there was still some people standing.
7  Q. You turn your attention to the front of
8  the store where some people are standing. What
9  happens next?
10  A. I can remember seeing some handcuffs on
11  the ground that had fallen, I'm guessing, out of an
12  officer's hands.
13      MR. WEISENFELDER: You don't guess. Tell
14  them what you saw.
15      THE WITNESS: Okay.
16  A. Some handcuffs were on the ground in the
17  parking lot. When I saw that there was no trouble
18  in front of the store I walked over towards the
19  cruiser.
20  Q. Let me ask you something. As to the
21  handcuffs, where were they located, the handcuffs on
22  the ground?
23  A. In the parking lot near a vehicle.
24  Q. Was it a vehicle near the door, the

### Page 19

1  entrance to the --
2  A. Yeah, it was near the front of the store.
3      MR. WEISENFELDER: I'm going to give you
4  another instruction. Let him finish his
5  question, okay. Then you get to answer. She
6  can't take down what both of you are saying at
7  the same time. Okay?
8      THE WITNESS: Okay.
9  BY MR. MARTINS:
10  Q. I'm going to show you Exhibit 9,
11  previously marked. Can you tell me whether or not
12  that's the vehicle that the handcuffs were near?
13  A. No, I can't remember.
14  Q. Did you see anyone pick up the handcuffs?
15  A. I don't remember.
16  Q. You just remember seeing the handcuffs on
17  the ground near a car?
18  A. Yes.
19  Q. Do you recall where it was in relation to
20  the car? Front, back, under, side?
21  A. Near the back.
22  Q. Do you know if it was on the passenger's
23  side or on the driver's side?
24  A. It was the passenger's side.

### Page 20

1  Q. Was it near the rear passenger tire?
2  A. It was near the back passenger's side
3  which would be near the tire.
4  Q. Do you know if it was in front of the tire
5  or behind the tire?
6  A. I can't remember.
7  Q. So your attention's directed around there,
8  and then what happens next?
9  A. I see that there appears to be no further
10  trouble that way. That's when I walked over towards
11  the Golf Manor cruiser.
12  Q. Where was Officer Heiland?
13  A. I can't remember.
14  Q. Was he with you when you walked over to
15  the cruiser?
16  A. I can't remember if he approached me or I
17  approached him.
18  Q. When you say the Golf Manor cruiser, are
19  you referring to Officer Heiland's cruiser?
20  A. Yes.
21  Q. What happened after that? You're walking
22  over toward the cruiser. What happens next?
23  A. Next I looked in the cruiser to see if I
24  recognized who was in there. And I also wanted to

### Page 21

1  make sure that there was no damage being done to the
2  cruiser.
3  Q. What did you see when you looked in?
4  A. I saw a subject in the back seat of the
5  cruiser.
6  Q. What window did you look in?
7  A. The back passenger's side window.
8  Q. Was the window up?
9  A. I can't remember.
10  Q. What was the position of the subject on
11  the back seat of the cruiser?
12  A. He was lying on his right side, facing the
13  back of the car.
14  Q. So on the right shoulder area?
15  A. Right. Yes.
16  Q. He was handcuffed with his hands behind
17  his back?
18  A. I can't remember.
19  Q. When you saw the Cincinnati police
20  officers pick him up and begin walking him toward
21  the Golf Manor car did you notice whether or not he
22  was handcuffed?
23  A. I didn't see them pick him up.
24  Q. When you noticed that officers were moving

Owensby, et al. vs. City of Cincinnati
December 3, 2003

CHRISTOPHER CAMPBELL

Page 26

1 was conscious or unconscious at the time that they
2 were moving him toward the Golf Manor cruiser?
3    A. At the time I assumed he was conscious,
4 but looking back, I can't tell.
5    Q. Did it appear to you that the Cincinnati
6 police officers were struggling to move him toward
7 the cruiser?
8    A. Yes.
9    Q. Do you know whether or not that struggling
10 by the police officers was because he was
11 unconscious?
12    A. I don't.
13    Q. You don't know one way or the other?
14    A. No.
15    Q. Am I correct in understanding that in the
16 entire time that you saw Mr. Owensby that evening,
17 you never saw him move?
18      MR. WEISENFELDER: Objection as to the
19 form.
20      Go ahead.
21    A. No.
22    Q. The entire time that you saw Mr. Owensby
23 that evening you never saw him make any noise, any
24 sound?

Page 27

1    A. No. No.
2    Q. Let me show you a couple of documents
3 here.
     (Plaintiff's Exhibit 82
4      was marked for identi-
5      fication.)
6    Q. The first is your statement of that night,
7 November 7, 2000. It's marked as Exhibit 82.
8 That's for you. That's for counsel.
9    A. Okay.
10    Q. Is Exhibit 82 the statement that you gave
11 on November 7th at just about midnight on that day?
12    A. Yes.
13    Q. This is the statement or one of the
14 documents you reviewed in preparation for this
15 deposition?
16    A. Yes.
17    Q. I want to show you another document.
     (Plaintiff's Exhibit 83
18      was marked for identi-
19      fication.)
20      MR. MARTINS: Mark this as Exhibit 83.
21 Pass that over to Mr. Weisenfelder.
22      MR. WEISENFELDER: You don't want him to
23 read the whole thing, do you?
24      MR. MARTINS: No.

Page 28

1      MR. WEISENFELDER: Okay.
2 BY MR. MARTINS:
3    Q. This is a transcript of your testimony
4 before a grand jury on December 5 of 2000. Do you
5 recall testifying before a grand jury?
6    A. Yes.
7    Q. I want to direct you to some matters in
8 here. First start at page 48, bottom of the page,
9 beginning at line 23. The question is, "Again how
10 long did it take for you to get there once you heard
11 the call?" "There" being the Sunoco station.
12      And the answer is, "I would say one and a
13 half to two minutes."
14      Is that still your best recollection of
15 how long it took you to get there that evening?
16    A. Yes.
17    Q. There is a life squad also at the police
18 station, the Golf Manor police station; is that
19 right?
20    A. At the fire department.
21    Q. At the fire department? Is that next to
22 the police station?
23    A. Yes.
24    Q. Would it be your best estimate that if

Page 29

1 called, the life squad would take between a minute
2 and a half and two minutes to get to that location,
3 to the convenience store?
4      MR. WEISENFELDER: Objection.
5      Go ahead.
6    A. Yes. That would be driving time.
7    Q. Right. Look at page 50, please, next
8 page. Line 4, you say, "Once I saw that they had
9 somebody handcuffed and were putting him in the car
10 they had just got to where the, I don't know if they
11 were opening the back door or they were real close
12 to the car, I turned my attention towards the front
13 of the store because there was still a group of
14 people there. . ." Do you see that?
15    A. Yes.
16    Q. That's consistent with what you've
17 testified to today, right?
18    A. Yes.
19    Q. You say that, "I saw that they had
20 somebody handcuffed." Does that refresh your
21 recollection that you did know on that evening that
22 Mr. Owensby was, in fact, handcuffed?
23    A. That would be an assumption. I don't
24 remember seeing the handcuffs when they were moving

Case 1:01-cv-00769-SAS   Document 93-11   Filed 02/20/2004   Page 9 of 12

Owensby, et al. vs. City of Cincinnati
December 3, 2003
CHRISTOPHER CAMPBELL

Page 38

1  Q. Is it your understanding that that is
2 being communicated also to the Cincinnati police
3 officers at the scene?
4  A. No. We were on separate channels.
5       (Plaintiff's Exhibit 84
         was marked for identi-
6       fication.)
7  Q. I'll show you one other document here
8 marked as Exhibit 84. Exhibit 84 is a transcript of
9 your testimony during the trial of Officer Caton.
10 Do you recall testifying at Officer Caton's trial?
11  A. Yes.
12  Q. As you sit here today, is there anything
13 in your mind, any testimony that you gave in either
14 the grand jury or Officer Caton's trial that you
15 would like to correct in some fashion?
16       MR. WEISENFELDER: Objection.
17       MR. HARDIN: I'll join in that objection.
18       MR. WEISENFELDER: Thank you.
19  A. No.
20  Q. As of November 7, 2000 had you received
21 any guidance from Golf Manor concerning the
22 situation, your duties and obligations when a
23 prisoner of another jurisdiction or another agency
24 is placed in a Golf Manor cruiser?

Page 39

1  A. It was always my understanding that when
2 you're in another jurisdiction you're there to
3 assist that department.
4  Q. Had you received any training on this
5 issue as far as what you were obligated to do and
6 what you were not obligated to do?
7  A. I can't remember.
8  Q. Do you have any understanding that,
9 regardless of whose prisoner it is, once a person is
10 placed in your cruiser that you are responsible for
11 that person's welfare?
12       MR. WEISENFELDER: Objection. Go ahead.
13  A. No.
14  Q. No?
15  A. No.
16  Q. Regardless of whose prisoner it is, if you
17 know that a person is injured, as a Golf Manor
18 police officer, do you believe that you have a duty
19 to provide medical assistance to that person?
20       MR. WEISENFELDER: Objection. Go ahead.
21  A. Not me personally.
22  Q. When Officer Brazile came over to the car
23 and you met Officer Brazile, do you recall whether
24 or not Officer Brazile advised Officer Heiland and

Page 40

1 you that he did not -- he was concerned that it
2 looked like Mr. Owensby could not breathe in the
3 back seat of the car?
4       MR. HARDIN: Objection.
5       MR. WEISENFELDER: Objection.
6       MR. HARDIN: Form.
7  A. I can't remember specific comments.
8  Q. In the pile of exhibits that you have
9 there over on the side, pull out Exhibit 71.
10  A. In here?
11  Q. Yes.
12       MR. MARTINS: Are you ready?
13       MR. WEISENFELDER: Yeah.
14       MR. MARTINS: I wasn't sure if you were
15 reviewing.
16  Q. I want to direct your attention to
17 page 54. This is the transcript of the deposition
18 of Officer Brazile.
19       Beginning at line 3 on page 54, the
20 question is: "Did you say anything to Officer
21 Heiland at that time, after seeing Mr. Owensby with
22 your flashlight?
23       "Answer: Yes.
24       "What did you say to Officer Heiland?

Page 41

1       "I walked around to the other side of the
2 vehicle."
3       "To the -- to the --
4       "To where they were.
5       "Question: -- rear of the passenger's side
6 of the vehicle?
7       "Where they were standing.
8       "Okay.
9       "Answer: And I asked him, I said, 'The
10 guy you have in your car, is he okay?' I said, 'Can
11 he breathe?' I said, 'He's in a' -- you know,
12 position that looked like he was in, it may have
13 been hard, so I asked him. I'm figuring he's their
14 prisoner. No one ever said whose he was. I figured
15 he was theirs, because he was in their car.
16       "And basically I was just trying to let
17 them know to check on him, just to see what's going
18 on with him or did they know or had they checked. I
19 don't know. I just had arrived.
20       "And basically when I told them, you know,
21 they basically just stood there and kind of like
22 shrugged their shoulders.
23       "Question: Both of them?
24       "Answer: From what I recall."

Case 1:01-cv-00769-SAS   Document 93-11   Filed 02/20/2004   Page 10 of 12
Owensby, et al. vs. City of Cincinnati
December 3, 2003
CHRISTOPHER CAMPBELL

Page 42

1  If you go down to line 12, the question
2  is: "Did Officer Heiland or the other officer,
3  Officer Campbell, say anything to you in response?
4     "Answer: No. No, sir."
5     Do you recall Officer Brazile saying
6  anything to the effect of, Can he breathe? The guy
7  in your car, is he okay?
8     A. I can't remember that.
9     Q. Do you recall, in response to something
10 Officer Brazile said, either you or Officer Heiland
11 shrugging your shoulders?
12    A. No.
13    Q. If you go to page 56, line 14, the
14 question is, "As I recall, your statement was
15 something along the lines of: This looks fucked up,
16 can he breathe, it don't look like he can from the
17 way he's laying.
18    "Answer: Uh-huh.
19    "Question: Is that accurate to your
20 recollection?
21    "Answer: Yes."
22    Do you recall those words being said to
23 you by Officer Brazile?
24    A. I can't remember what he said.

Page 43

1     Q. If Officer Brazile had said what I just
2  read to you from his deposition, based on your
3  training and your experience with Golf Manor, would
4  you feel that you had a duty to check on the
5  condition of Mr. Owensby?
6     MR. HARDIN: Objection.
7     MR. WEISENFELDER: Objection.
8     A. I would ask the city to check their
9  prisoner.
10    Q. In the time that you and Officer Heiland
11 were standing outside the car did either you or
12 Officer Heiland ever ask the city to check on the
13 prisoner?
14    A. No.
15    Q. Take a look at Exhibit 78, please.
16 Exhibit 78 is a mutual aid agreement between
17 Cincinnati and various municipalities in the greater
18 Cincinnati area. Have you had occasion to look at
19 that mutual aid agreement before today?
20    A. No.
21    Q. Have you ever received any instruction
22 from Golf Manor concerning the mutual aid agreement?
23    A. I can't remember specific instruction.
24    Q. Do you recall receiving any memos or any

Page 44

1  written direction concerning what your duties and
2  obligations would be under this mutual aid
3  agreement?
4     A. I can't remember any.
5     Q. I want to show you a video. It was taken
6  from the police camera in the car of one of the
7  Cincinnati police officers on the night of
8  November 7, 2000. I'm going to run it for you
9  straight through once so you can see the whole
10 thing. It's about five minutes. Then I'll come
11 back and ask you some questions. Okay?
12    A. Okay.
13    Q. The exhibit number is 20 on the video.
14    (Videotape played.)
15    Q. From what you've seen in Exhibit 20, the
16 video, do you recognize any of the police officers,
17 the Cincinnati police officers?
18    A. I recognized Jorg.
19    Q. Other than Officer Jorg, anyone else?
20    A. I'd have to see it again.
21    Q. You will.
22    MR. HARDIN: Asked and answered.
23 Objection.
24    This is only the 43rd time I've seen this.

Page 45

1     (General laughter.)
2     (Videotape playing.)
3     Q. We're at 11 seconds into the video.
4  There's a Golf Manor cruiser in the center of the
5  frame. Is that the car that you drove over?
6     A. Yes.
7     Q. We're at 17 seconds into the video. There
8  are two officers in the middle of the screen. Is
9  that you and Officer Heiland?
10    A. Yes.
11    Q. You are to the right as we face the
12 screen?
13    A. Yes.
14    Q. We're 27 seconds into the video. There's
15 a second Golf Manor cruiser with its top lights on.
16 Is that Officer Heiland's cruiser?
17    A. Yes.
18    Q. That's the cruiser in which Mr. Owensby
19 lay?
20    A. Yes.
21    Q. We are at 44 seconds into the video.
22 There is an officer, a Cincinnati police officer
23 walking directly in front of the car. Is that
24 Officer Jorg?

Case 1:01-cv-00769-SAS   Document 93-11   Filed 02/20/2004   Page 11 of 12

Owensby, et al. vs. City of Cincinnati
December 3, 2003

CHRISTOPHER CAMPBELL

Page 46

1  A. Yes.
2  Q. Just pausing it. If you see any police
3  officer that you know, just sound out.
4  A. I --
5  Q. Okay. Go ahead.
6  A. One looked like Caton.
7  Q. I'm stopping it at 50 seconds into the
8  video. Is the officer to the left of the screen as
9  you face it Officer Caton?
10 A. It looks like it.
11 Q. I'm at a minute 14 seconds into the video.
12 There's a plainclothes person that's just crossed
13 the screen. Do you know if that was the person that
14 you saw coughing?
15 A. No, I don't.
16 Q. You don't know?
17 A. (Shaking head.)
18 Q. We're at 2 minutes 11 seconds into the
19 video. There is a gentleman in plainclothes in the
20 middle of the screen. Do you know if he was the
21 person that was coughing from being Maced?
22 A. I can't remember.
23 Q. We're at 4 minutes 31 seconds into the
24 video. Again, the Golf Manor car that's in the

Page 47

1  center of the screen, that's your car, right?
2  A. Yes.
3  Q. Just so that we're clear, Mr. Owensby is
4  not in your car, correct?
5  A. Correct.
6  Q. No one is in your car?
7  A. Nobody's in my car.
8  Q. At some point in time Mr. Owensby was
9  taken out of Officer Heiland's cruiser, correct?
10 A. Yes.
11 Q. Did you see that?
12 A. Yes, I did.
13 Q. What did you see happen?
14 A. As I remember it, a sergeant was trying to
15 talk to him, find out his name, and he wasn't
16 responsive. He instructed some officers to get him
17 out of the car.
18 Q. What side of the car was the sergeant on?
19 A. The sergeant was on the driver's side.
20 Q. Do you recall whether or not the sergeant
21 asked Officer Heiland to roll down the window, the
22 back window?
23 A. I can't remember if he asked him.
24 Q. So the sergeant asks some other officers

Page 48

1  to remove him from the Golf Manor car and they do
2  that?
3  A. Yes.
4  Q. What happens next?
5  A. They laid him on the ground, and I can't
6  remember the details. I think one of them was going
7  to start CPR or thought CPR was necessary.
8  Q. Do you recall whether or not when they
9  laid him on the ground, whether or not Mr. Owensby's
10 hands were still behind his back?
11 A. I can't remember.
12 Q. Continue.
13 A. As they were starting CPR I told them I
14 had a mask in my car, I would get it for them.
15 Q. You did that?
16 A. Yes.
17 Q. Walked over to your car and came back?
18 A. Yes.
19 Q. What happened next?
20 A. They performed CPR, an ambulance arrived,
21 and Owensby was taken in the ambulance.
22 Q. When they were performing, when the
23 officers were performing CPR did you notice whether
24 or not any substance came out of his mouth, Mr.

Page 49

1  Owensby's mouth?
2  A. I don't remember seeing anything come out.
3  I remember seeing his face was bloody.
4  Q. Was this the first time that you noticed
5  that his face was bloody?
6  A. No.
7  Q. When was the first time that you noticed
8  his face was bloody?
9  A. When I first glanced in the car I saw that
10 there was blood on the seat.
11 Q. Did you notice there was blood on his face
12 also?
13 A. Yeah.
14 Q. When you saw that did you report that to
15 anybody?
16 A. No.
17 Q. Was there a Cincinnati, I guess, life
18 squad or EMT unit that arrived?
19 A. Yes.
20 Q. When they arrived were you present?
21 A. I was still at the scene.
22 Q. Do you recall whether or not anyone from
23 that Cincinnati life squad instructed the Cincinnati
24 officers to remove the handcuffs from Mr. Owensby?

# AFFIDAVIT

- - -

STATE OF OHIO : 
: SS
COUNTY OF HAMILTON :

I, Wendy L. Welsh, Notary Public in and for the State of Ohio, do hereby state that the transcript of the deposition of CHRISTOPHER CHAMPBELL, deponent herein, having been submitted to said deponent for review and signature, has not been signed within the thirty (30) day period allowed under the Federal Rules; said deposition to now have the same force and effect as though signed.

*[signature]*
Wendy L. Welsh, Court Reporter

Sworn to before me this 27th day of January, 2004.

*[signature]*

Thomas M. Blasing
Notary Public - State of Ohio

My commission expires:
May 4, 2004.