Case 1:01-cv-00769-SAS   Document 93-12   Filed 02/20/2004   Page 1 of 9

Estate of Roger Owensby vs. City of Cinti.
October 17, 2003

PATRICK E. CATON

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - - - -

ESTATE OF ROGER D.         :
OWENSBY JR., et al.,       :
                           :
        Plaintiffs,        :
   vs.                     :   Case No. 01-CV-769
                           :   (Judge S. A. Spiegel)
CITY OF CINCINNATI,        :
et al.,                    :
                           :
        Defendants.        :

- - - - - - - - - - - - - - - -

Videotaped deposition of PATRICK EDMUND CATON, a defendant herein, called by the plaintiffs for cross-examination, pursuant to the Federal Rules of Civil Procedure, taken before me, Wendy Davies Welsh, a Registered Diplomate Reporter and Notary Public in and for the State of Ohio, at the offices of Helmer, Martins & Morgan Co. LPA, 1900 Fourth & Walnut Centre, 105 East Fourth Street, Cincinnati, Ohio, on Friday, October 17, 2003, at     a.m.

Case 1:01-cv-00769-SAS   Document 93-12   Filed 02/20/2004   Page 2 of 9

Estate of Roger Owensby vs. City of Cinti.
October 17, 2003

PATRICK E. CATON

## Page 2

```
 1  APPEARANCES:
 2     On behalf of the Plaintiffs:
 3         Paul B. Martins, Esq.
            Don Stiens, Esq.
 4         Frederick M. Morgan, Jr. Esq.
            Helmer, Martins & Morgan Co. LPA
 5         Suite 1900, Fourth & Walnut Centre
            105 East Fourth Street
 6         Cincinnati, Ohio 45202
            Phone: (513) 421-2400
 7
            John J. Helbling, Esq.
 8         The Helbling Law Firm, L.L.C.
            3672 Springdale Road
 9         Cincinnati, Ohio 45251
            Phone: (513) 923-9740
10
       On behalf of the Defendants City of Golf Manor,
11     Stephen Tilley, Roby Heiland and Chris
       Campbell:
12
            Lynne Marie Longtin, Esq.
13         Rendigs, Fry, Kiely & Dennis
            900 Fourth & Vine Tower
14         One West Fourth Street
            Cincinnati, Ohio 45202-3688
15         Phone: (513) 381-9200
16     On behalf of Defendants City of Cincinnati,
       Darren Sellers, Jason Hodge:
17
            Geri Hernandez Geiler, Esq.
18         Assistant City Solicitor
                 and
19         Julie F. Bissinger, Esq.
            Chief Counsel
20         Department of Law
            Room 214, City Hall
21         801 Plum Street
            Cincinnati, Ohio 45202
22         Phone: (513) 352-3346
23
24
```

## Page 3

```
 1  APPEARANCES (Continued):
 2     On behalf of the Defendants Robert B. Jorg,
       Patrick Caton, Jason Hodge, Victor Spellen and
 3     Darren Sellers:
 4         Donald E. Hardin, Esq.
            Hardin, Lefton, Lazarus & Marks, LLC
 5         915 Cincinnati Club Building
            30 West Garfield Place
 6         Cincinnati, Ohio 45202
            Phone: (513) 721-7300
 7
    Also present:
 8
       Richard W. Grubb, Videograher
 9
       Lisa Damstrom, Law Clerk
10     Helmer, Martins & Morgan Co., L.P.A.
11     Wendy M. Weller, Paralegal
       Buckley, King & Bluso
12
       Mr. Roger Owensby
13
       Mrs. Brenda Owensby
14
       Mr. Shawn Owensby
15
       Victor N. Spellen
16
17                 - - -
18
19
20
21
22
23
24
```

## Page 4

```
 1              STIPULATIONS
 2     It is stipulated by and among counsel for the
 3  respective parties that the deposition of PATRICK
 4  EDMUND CATON, a defendant herein, called by the
 5  plaintiffs for cross-examination, pursuant to the
 6  Federal Rules of Civil Procedure, may be taken at
 7  this time by the notary; that said deposition may be
 8  reduced to writing in stenotype by the notary, whose
 9  notes may then be transcribed out of the presence of
10  the witness; and that proof of the official
11  character and qualifications of the notary is
12  expressly waived.
13
14                 - - -
```

## Page 5

```
                I N D E X

    Examination by:            Page

    Mr. Martins . . . . . . . . . 6

    Ms. Longtin . . . . . . . . 232

    Mr. Martins . . . . . . . . 239

                 - - -


                E X H I B I T S

                                   Page
    Deposition Exhibit 28 . . . . . .  22
    Deposition Exhibit 29 . . . . . .  30
    Deposition Exhibit 30 . . . . . .  43
    Deposition Exhibit 31 . . . . . .  65
    Deposition Exhibit 32 . . . . . . 115
    Deposition Exhibit 33 . . . . . . 186
    Deposition Exhibit 34 . . . . . . 191
    Deposition Exhibit 35 . . . . . . 194
    Deposition Exhibit 36 . . . . . . 207

                 - - -
```

Case 1:01-cv-00769-SAS   Document 93-12   Filed 02/20/2004   Page 3 of 9

Estate of Roger Owensby vs. City of Cinti.
October 17, 2003

PATRICK E. CATON

Page 10

1  Q. What do you recall?
2  A. It was a matter of a Terry stop with
3  regard to a drug investigation. Mr. Smiley was
4  asked to be seated on the ground. He refused. He
5  was told that he'd be placed under arrest if he
6  didn't sit down on the ground. He continued to
7  refuse. Officer George walked up to make contact
8  with him, at which time Mr. Smiley punched Officer
9  George in the face.
10  Q. What happened after that?
11  A. A struggle ensued. Mr. Smiley was placed
12  in custody and arrested and transported to 2020
13  Juvenile Hall.
14  Q. I'm sorry. I missed the last part.
15  Transported to?
16  A. 2020 Juvenile Hall.
17  Q. How old was Mr. Smiley?
18  A. I think at the time he was about 16 or 17
19  years of age.
20  Q. Where did this take place?
21  A. In Corryville.
22  Q. Do you know the streets or the location in
23  Corryville?
24  A. I believe it's the Van Street lot

Page 11

1  behind -- it's a group of businesses just east of on
2  Short Vine.
3  Q. Were you involved in the struggle that
4  ensued?
5  A. I was.
6  Q. And what, if anything, did you do in the
7  struggle?
8  A. I aided in handcuffing and I -- I think I
9  Maced him during the struggle.
10  Q. Did you strike him?
11  A. No.
12  Q. Was Mr. Smiley -- other than the Macing,
13  was he physically injured as a result of the arrest?
14  A. Not that I recall.
15  Q. Was he bleeding?
16  A. Not that I recall.
17  Q. Was there a Cincinnati Police Department
18  disciplinary proceeding as a result of this
19  incident?
20  A. No, there was not.
21  Q. Is Mr. Smiley an African American?
22  A. Yes, he is.
23  Q. Other than the deposition on Mr. Smiley's
24  case against the City of Cincinnati, have you had

Page 12

1  your deposition taken in any other case?
2  A. No, I have not.
3  Q. As you've probably heard me say with the
4  other people that have been deposed, I will be
5  asking you questions, such as we've been doing, and
6  if you have any questions or you haven't heard the
7  question, ask me to repeat or to clarify the
8  question. Do you understand that?
9  A. I understand.
10  Q. And if you give an answer to the question,
11  I'm going to assume that you heard the question and
12  understood the question.
13  A. I understand.
14  Q. Is that fair?
15  A. That's fair.
16  Q. All right. Are you under any physical or
17  mental impairment that would cause you not to
18  understand my questions or give truthful answers to
19  my questions?
20  A. No, I am not.
21  Q. Taking any medication?
22  A. No, I'm not.
23  Q. When did you first realize that Roger
24  Owensby Jr. was dead?

Page 13

1  A. When Sergeant Julie Shearer got into the
2  cruiser with me to transport me to CIS, I asked her
3  if this guy was going to make it. And her response
4  was, "I believe he's already two seven," indicating
5  that he had passed.
6  Q. You assisted in removing Mr. Owensby from
7  the Golf Manor cruiser, correct?
8  A. That is correct.
9  Q. And as a result of that, you and Officer
10  Hasse attempted to resuscitate Mr. Owensby, using
11  CPR?
12  A. That is correct.
13  Q. At the time that you and Officer Hasse
14  were employing CPR, Mr. Owensby was still
15  handcuffed, correct?
16  A. That is correct.
17  Q. And you did not remove the handcuffs at
18  that time?
19  A. No, not until Fire arrived.
20  Q. And you took or attempted to take his
21  pulse on his wrist; is that right?
22  A. No. I attempted to take his pulse at his
23  neck.
24  Q. At his neck?

Case 1:01-cv-00769-SAS   Document 93-12   Filed 02/20/2004   Page 4 of 9

Estate of Roger Owensby vs. City of Cinti.
October 17, 2003
PATRICK E. CATON

Page 14

1   A. That is correct.
2   Q. And was there a pulse?
3   A. I couldn't find one.
4   Q. Did Officer Hasse try to take his pulse at
5   his wrist?
6   A. I -- I don't think he could. No, I would
7   say no, because his hands were underneath him at --
8   at that point. Officer Hasse was also -- had to use
9   both hands to use the -- the rescue breathing mask
10  that was supplied by a Golf Manor officer.
11  Q. Did Officer Hasse say anything to you
12  concerning the condition of Mr. Owensby at that
13  time?
14  A. Well, while we were giving him CPR, like I
15  said, his hands had to be on the mask in order to
16  employ it. And I basically did all the manipulation
17  of Mr. Owensby to get him in the proper position,
18  and the chest compressions. During the -- and --
19  and periodically taking his pulse through the
20  incident.
21       At one point Officer Hasse, who is EMT
22  trained, said -- asked me if air was going into his
23  lungs or going into his stomach.
24       And I said, "How do you tell?"

Page 15

1        And he says, "Is his chest rising and
2   falling or is his stomach rising and falling?" And
3   when he gave two rescue breaths, I -- I observed his
4   stomach rising and falling.
5        He then said, "That means something's
6   blocking his throat," at which point I repositioned
7   Mr. Owensby's head with a chin tilt and attempted to
8   physically clear his airway. At that point I
9   couldn't find anything, and we began the rescue
10  breathing and CPR again.
11  Q. When you say "couldn't find anything,"
12  there was no obstruction as far as his --
13  A. I can only reach as deep as the back of
14  his mouth.
15  Q. Right. And you -- you found no
16  obstruction?
17  A. I -- I couldn't find an obstruction at --
18  from -- at that point.
19  Q. Had you --
20  A. Officer --
21  Q. I'm sorry.
22  A. I'm sorry. I was going to continue.
23  Officer Hasse believed that there was something
24  obstructing his airway at that point and called.

Page 16

1   When Fire arrived, he immediately -- I -- I can't
2   remember the technical term he used. It was -- he
3   referenced, "We need the suction device off the
4   truck to clear his airway."
5   Q. Had you received training as a Cincinnati
6   police officer in conducting CPR in circumstances
7   such as this?
8   A. Once.
9   Q. When?
10  A. Received about four hours of training at
11  the academy in 1997.
12  Q. No follow-up training?
13  A. No.
14  Q. Had anyone ever instructed you that in
15  order to do CPR, the handcuffs had to be removed
16  from the suspect so that his arms were not behind
17  his back?
18  A. No. What I was instructed is that his
19  back and shoulders must be flat on the ground in
20  order to do chest -- chest compressions correctly.
21  And I believed at that time they were.
22  Q. What has to be flat on the ground?
23  A. His back -- his back and shoulders.
24  Q. Now, when the fire rescue unit arrived --

Page 17

1   well, let me ask you, where were they from?
2   A. I don't know what fire unit responded.
3   Q. Okay. In any event, when they arrived,
4   one of the first things that you and Officer Hasse
5   were told to do was to remove the handcuffs from Mr.
6   Owensby, correct?
7   A. That's correct.
8   Q. Let me ask you, when did you first realize
9   that Roger Owensby was injured?
10  A. What -- what kind of injury are we talking
11  about?
12  Q. Any injury that requires some medical
13  attention.
14  A. Medical assistance. Okay. When Sergeant
15  Watts and I approached the cruiser afterwards to get
16  information from Mr. Owensby, Sergeant Watts opened
17  the cruiser door and made a statement to the effect
18  of, Pat, I don't think he's breathing.
19       And that's when I looked in, and he was in
20  a real awkward position at that point. And I looked
21  up, saw Officer Hasse standing on the other side of
22  the Golf Manor cruiser at that point. And realizing
23  that he's EMT trained, I said, "Have you got any
24  rubber gloves?"

Case 1:01-cv-00769-SAS   Document 93-12   Filed 02/20/2004   Page 5 of 9

Estate of Roger Owensby vs. City of Cinti.
October 17, 2003

PATRICK E. CATON

Page 18

1 He said, "Yeah."
2 We gloved up, and Sergeant Watts said,
3 "Get him out of the car." And Officer Hasse and I
4 removed him from the car.
5   Q. Is that the first time you realized that
6 Roger Owensby was injured?
7   A. That's correct.
8   Q. Well, you knew before you placed him in
9 the car that he had been Maced, right?
10   A. That's correct.
11   Q. And isn't it true that the standard for
12 care of someone who has been Maced is to provide
13 them with water and fresh air?
14   A. That is correct.
15   Q. And that was not provided?
16   A. I wouldn't consider that an injury.
17   Q. What do you consider someone having been
18 Maced?
19   A. An irri-- it's an irritation. It's a
20 device used to irritate and cause pain. It doesn't
21 cause injury.
22   Q. Okay. Well, in any event, you knew that
23 he had been Maced, you knew that the standards were
24 to provide water and fresh air, and you knew that

Page 19

1 water and fresh air were not provided, correct?
2   A. Well, it -- they're supposed to be
3 provided after the scene is stabilized. And the
4 scene, in my opinion, was never stabilized.
5   Q. At the time you placed Roger Owensby in
6 the back seat of the Golf Manor cruiser with the
7 windows up, he had not been provided with water or
8 fresh air, correct?
9   A. I thought there was plenty of fresh air
10 inside the cruiser.
11   Q. Had you provided him with water?
12   A. No, I had not.
13   Q. And when you placed him or walked him
14 toward the cruiser, you knew that he had several
15 lacerations on his face?
16   A. No, I did not.
17   Q. How far away were you from Mr. Owensby's
18 face as you escorted him to the cruiser?
19   A. I would put us at shoulder distance -- we
20 were shoulder to shoulder essentially, as I walked
21 him towards the cruiser.
22   Q. And while you were doing this, as I
23 understand your prior testimony, you were commanding
24 him to put his feet down, right?

Page 20

1   A. That's correct.
2   Q. And when you were doing that, were you
3 looking at him?
4   A. At his feet.
5   Q. Not at his face?
6   A. No.
7   Q. When you put him into the cruiser, as I
8 understand it, Officer Sellers put him in the
9 cruiser from the rear passenger door and you went
10 around to the driver passenger door and crawled in,
11 grabbed him by the shoulders and pulled him toward
12 you; is that right?
13   A. Well, that's a much shortened version of
14 it, but that's essentially correct.
15   Q. And when you pulled Mr. Owensby into the
16 cruiser toward you, weren't you face to face with
17 him?
18   A. No, I wouldn't say face to face. My head
19 was ducked and it was very dark inside the cruiser.
20 Mr. Owensby was a little more than a shadow to me at
21 that point.
22   Q. The cruiser was parked next to a gas
23 island?
24   A. That's correct.

Page 21

1   Q. And the gas island is illuminated by six
2 halogen lamps, correct?
3   A. That is correct.
4   Q. And the cruiser itself had its lights on?
5   A. I don't know if the lights were on or off.
6 They weren't -- the interior lights were not on.
7   Q. There was no dome light on; is that what
8 you're saying?
9   A. That's correct.
10   Q. But there were lights from the -- from the
11 top of the car that were on?
12   A. I don't recall if there were lights on or
13 off on top of the cruiser.
14     MR. MARTINS: Let me have the tape.
15   Q. I'm going to show you -- I'm going to show
16 you, sir, what has previously been marked as
17 Exhibit 20. This is the video of -- from Officer
18 Spellen's car.
19     (Videotaped played.)
20   Q. I'm pausing it here. You can see the gas
21 island with the halogen lamps at the top, correct?
22   A. That's correct, about 20 feet away.
23   Q. Well, we're not up to the car yet.
24   A. No.

Case 1:01-cv-00769-SAS   Document 93-12   Filed 02/20/2004   Page 6 of 9

Estate of Roger Owensby vs. City of Cinti.
October 17, 2003

PATRICK E. CATON

**Page 70**

1 looked at his ID and the conversation was along the
2 lines of I see you live in Reading; what brings you
3 down here?
4    And he said, "I bought -- this is where I
5 come to get my marijuana. And I'll show you where
6 if you'll let me go with a" -- what's referred to as
7 a weed ticket.
8    Q. What -- clarify, what's a weed ticket?
9    A. It's a $100 payout citation for a minor
10 misdemeanor, marijuana possession.
11   Q. Which is what he would have received
12 anyway?
13   A. Oh, I -- I'm not -- you're going to have
14 to speak with Officer Hasse with regard to the
15 charges. I think Officer Hasse originally also
16 wanted to charge him with criminal trespassing, but
17 I'm not sure.
18   Q. Okay.
19   A. I'm not sure.
20   Q. All right. Please continue.
21   A. So he was willing to show us where he'd
22 make a buy. I guess the -- the idea was we wanted
23 to see if police officers could make a buy, and
24 proceed with possibly a trafficking investigation,

**Page 71**

1 which was essentially out of my league. Uniformed
2 officers have a real difficult time walking up to a
3 drug house and trying buying drugs.
4    So I -- that's when I used my cell phone
5 to call our Mini-Tac Unit, and I spoke with Officer
6 Lawson, told him what we had. He spoke with his
7 partner, Officer Hodge. They indicated they were
8 interested in interviewing this suspect, they would
9 come up and -- they would come up and meet us and
10 talk to him.
11   Q. Let me ask you, is there a reason, a
12 tactical reason or otherwise, why you made that call
13 on your private phone as opposed to using the --
14 either the mike or the MDT in your car?
15   A. Well, it was a fairly extensive
16 conversation, and you want to use short
17 transmissions over your radio. You don't want to
18 tie up the radio with conversation --
19     The Mini-Tac Unit doesn't have an MDT,
20 because they are undercover officers and they work
21 in undercover cars. It was just more convenient
22 just to give them a call, District 4, for -- to
23 expedite the matter.
24   Q. All right. Continue.

**Page 72**

1    A. At that point Off-- I -- I told what
2 Offic-- Officer Jorg and Officer Sellers -- I
3 believe Officer Hunter had arrived at that -- at
4 that point also.
5    I said, "This is what we got. The
6 Mini-Tac Unit's interested in talking to these --
7 this guy. I guess we've just got to stand by and
8 wait for the continuing investigation."
9    At that point or at some point --
10   Q. Sorry. While you're waiting, had Officer
11 Hasse -- did you already hand him the NTA book?
12   A. Yes. He already had it.
13   Q. He had that. And had he -- if you recall,
14 had he already written out the citation?
15   A. I don't know.
16   Q. Okay. Sorry. Continue.
17   A. It's at that point Officer Hunter pointed
18 at an individual crossing Seymour Avenue, I'd say
19 about 50 yards away, roughly up here on the map.
20   Q. Would you draw on the map a line
21 indicating the path of the person across Seymour
22 Avenue, and putting the letter A next to that.
23   A. Again, I would have estimated the distance
24 at 50 yards. On this map I don't know what 50 yards

**Page 73**

1 would be, so...
2    Q. All right. But it's approximately half a
3 football field?
4    A. Approximately half a football field.
5    Q. And where were you at this time?
6    A. Basically here (indicating).
7    Q. Okay. Would you mark that with a C for
8 Caton.
9    A. (Witness complies.)
10   Q. Thank you. So you saw the person going
11 across the street. Did you think anything of it?
12   A. Well, he was -- to me he was little bit
13 more than a shadow. Again, it -- it -- it was dark
14 out there and the only light that I could see was
15 a -- a passing vehicle. And I got little more than
16 a silhouette of the individual.
17     I -- I could see that it was a medium-
18 sized man, I suspected, but that -- beyond that, it
19 wasn't until he got into the well-lit area of the
20 Sunoco lot that I could make out any details, and at
21 that point it really wasn't many more details.
22     Now, Officer Hunter had said, when he
23 commented, when he pointed at it -- at -- at -- at
24 him, he said, "I think that's LA."

Estate of Roger Owensby vs. City of Cinti.
October 17, 2003

PATRICK E. CATON

Page 138

1 you told him, We kicked his ass, or I guess his
2 version is, We beat the shit out of him. One of
3 those two statements was made?
4    A. That's right.
5    Q. Correct? After that statement was made,
6 what happened?
7    A. I got in my car and we returned back to
8 the scene, as you see me in the videotape rolling up
9 on the scene.
10   Q. Okay. Officer Hasse also gets in his car
11 and brings his car over?
12   A. That's correct.
13   Q. What happens after that?
14   A. Officer Hodge approaches me and asks me if
15 I had any alcohol rub in the cruiser or in my gear.
16 And I said, "Why?"
17      And he said, "Because Blaine has some
18 blood on him."
19      And I said, is he hurt, or something to
20 that effect.
21      And he said, "No, I -- we're not sure
22 where the blood came from."
23      And when he asked me for the alcohol rub,
24 that -- that's consistent with a ground struggle.

Page 139

1 You know, we quite fre-- I had scuffs on my hands,
2 and it was used to clean hands. I -- you see me go
3 back to the trunk of my car where I normally carry
4 it, open it up and check my seat out bag, which
5 is --
6    Q. I'm sorry?
7    A. The seat out bag. It's the gear bag that
8 police officers carry with all their equipment in
9 it.
10      And I didn't have any left, and that's
11 when I guess Officer Hodge went on to try to secure
12 some from some other officer.
13      At that point I realized Sergeant Watts
14 was on scene and I approached Sergeant Watts. This
15 would be after Victor had just driven away, Officer
16 Spellen had just driven away. And he was standing
17 on the opposite side of the Golf Manor car, on the
18 driver's side of the Golf Manor car.
19      And I walked up to him and I said, "Hey,
20 Sarge, I got to tell you what happened here." And I
21 began to tell him, "We approached this" -- tell the
22 story in chronological order. And he stopped me
23 after a few seconds and said, "Start at the
24 beginning. What's this guy's name?"

Page 140

1      And I said, "He said his name was Roger
2 something, but I can't recall."
3      He said, "Well, let's begin there." And
4 that's when we approached the Golf Manor cruiser.
5      And he looked in the passenger -- or the
6 driver's side rear door and realized that he wasn't
7 moving, and he opened -- he opened the door and
8 started to lean in.
9      And I stopped him. I said, "Sarge, be
10 careful. He might be playing possum," indicating
11 from experience when you have a violent prisoner
12 sometimes they'll try and lure you back in the car
13 so they can hurt you.
14      And he said "No, Pat, I don't think that
15 guy's breathing." And we shined the flashlight in
16 and we realized he was actually not breathing. And
17 that's when we began the process of getting him out
18 of the car.
19   Q. This is from the driver's side?
20   A. The driver's side.
21   Q. So his head would have been toward you and
22 his feet would have been away from you?
23   A. That's correct.
24   Q. Did -- okay. What -- what happened next?

Page 141

1    A. That's where we began today. That's when
2 I looked up. And the first person I saw was Officer
3 Hasse, where I -- I had known from talking to him
4 that he -- he was an EMT before he was a cop.
5      I said, "Do you have any rubber gloves?"
6      He said, "Yeah."
7      "You got an extra pair?"
8      "Yes."
9      "Glove up. Let's get this guy out of the
10 back seat of the car," and then we began the CPR
11 procedures on him.
12   Q. When you got him out of the back seat of
13 the car, did you take him out from the driver's side
14 or from the passenger's side?
15   A. From the passenger's.
16   Q. So you came around, opened the door?
17   A. Right.
18   Q. How was Mr. Owensby situated in the back
19 seat of the car?
20   A. His position had changed from when I saw
21 it last. When I came back and saw it now, he had
22 been -- he was rolled over on his back and his head
23 was pinned at like an angle between -- I want to say
24 between his shoulder and the back of the seat.

Case 1:01-cv-00769-SAS   Document 93-12   Filed 02/20/2004   Page 8 of 9

Estate of Roger Owensby vs. City of Cinti.
October 17, 2003

PATRICK E. CATON

Page 142

1  Q. When you left him, he was on his left
2  shoulder?
3  A. He was face down essentially, with his
4  head turned towards the front seat of the cruiser,
5  with one foot on the floor and one foot underneath
6  him.
7      And I'm -- I'm very specific about that,
8  because I truly thought all he would have to do is
9  put his left foot down on the floor and rock up into
10 a seated position. That's why I exited the car as
11 quickly as I could.
12 Q. So he -- excuse me. He was -- when you
13 first put him in the car, he was -- both of his
14 shoulders were down, he was face down with his face
15 to the right?
16 A. Essentially like this (demonstrating) with
17 his -- he would have been looking over his right
18 shoulder towards the front -- out the front of the
19 car.
20 Q. All right. And when you opened the door
21 with Sergeant Watts, how was he positioned?
22 A. He was rolled over on his back with his
23 head -- would have been on -- like his ear against
24 his right shoulder, with his head pressed into the

Page 143

1  back of the seat.
2  Q. So his -- was his right shoulder against
3  the back seat?
4  A. Yes.
5  Q. And his head was pressed toward the right?
6  A. It was off to the right, with the --
7  which -- the top of his head against the back of the
8  seat.
9  Q. Was the rest of his body -- was he laying
10 on his back at that time or was his body still --
11 A. I would say his shoulders --
12 Q. -- kind of twisted around?
13 A. It -- it -- it -- it was kind of twisted
14 around. I would say his shoulders were now flat
15 against the back of the seat, with his head twisted
16 and his -- and his -- his hands were underneath him.
17 Q. I think you said when you placed him in
18 the car, his right foot was on the floor?
19 A. Correct.
20 Q. Was his right foot still on the floor, if
21 you -- if you recall?
22 A. I don't -- I don't know.
23 Q. And then at that point you began CPR with
24 Officer Hasse, correct?

Page 144

1  A. That's correct.
2  Q. How much time elapsed before the fire
3  rescue unit showed up?
4  A. I don't know.
5  Q. When the fire rescue unit shows up, they
6  take over performing CPR, correct?
7  A. Yes.
8  Q. Were you the person that took off the
9  handcuffs?
10 A. Yes, I was.
11 Q. After you removed the handcuffs on Mr.
12 Owensby, did you have any other contact with Mr.
13 Owensby?
14 A. No, I did not.
15 Q. Where did you go after removing the
16 handcuffs?
17 A. Well, I -- I stayed in the immediate
18 vicinity, at that immediate -- immediate vicinity,
19 right around -- like I said, we witne-- I did
20 witness the material come out of his mouth.
21     And the supervisors, who took charge of
22 the scene by that point, were basically realizing
23 that this was becoming a critical incident. And the
24 procedure with regard to critical incidents is to

Page 145

1  separate all the officers and witnesses concerned.
2      So I was directed to -- basically Sarge
3  said, "Go ahead and climb in that cruiser. Just
4  wait until -- don't talk to anybody. Just wait
5  until we come -- come get you." And that cruiser,
6  it turned out to be Sergeant Julie Shearer's.
7  Q. Do you know how far the cruiser was from
8  where Mr. Owensby was?
9  A. The one that I was in?
10 Q. Yes.
11 A. As I recall, her cruiser was parked along
12 the side here of the store -- the Sunoco lot, and
13 Mr. Owensby was -- was somewhere in this vicinity
14 here where the fire engine was -- where the crew was
15 working on him (indicating).
16 Q. Draw a rectangle for what you -- where you
17 recall Sergeant Shearer's car being, on, I guess --
18    What exhibit is that, 32?
19 A. 31.
20 Q. 31. Okay. We'll just make another copy
21 of it.
22    And put, in the rectangle, SH for Shearer.
23 A. (Witness complies.)
24 Q. And then if you would draw a circle with

244

| | | |
|---|---|---|
| 17:00:39 | 1 | MR. HARDIN: Caton. |
| 17:00:39 | 2 | VIDEOGRAPHER: Sorry. Mr. Caton, you have |
| 17:00:39 | 3 | a right to review this videotape deposition |
| 17:00:39 | 4 | prior to its being shown to a court or jury. |
| 17:00:39 | 5 | Will you waive that right? |
| 17:00:39 | 6 | THE WITNESS: No. |
| 17:00:40 | 7 | VIDEOGRAPHER: We're off the record. The |
| 17:00:42 | 8 | time showing is 5:04 p.m. |
| 17:00:42 | 9 | MR. MARTINS: I take it you also want |
| 17:00:49 | 10 | signature on the deposition? |
| 17:00:51 | 11 | MR. HARDIN: Yes. Yes. |

*[signature]*
PATRICK EDMUND CATON

- - -

(Deposition concluded.)

- - -

Merit
602 Main Street, Suite 703, Cincinnati, OH 45202
(513) 381-8228 * (800) 578-1542 * www.merit-ls.com