Case 1:01-cv-00769-SAS    Document 93-14    Filed 02/20/2004    Page 1 of 11

Owensby, et al.vs. City of Cincinnati    DAVID WILLIAM HUNTER, JR.
November 6, 2003

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - - -

ESTATE OF ROGER D.             :
OWENSBY JR., et al.,           :
                               :
        Plaintiffs,            :  Case No. 01-CV-769
vs.                            :  (Judge S. A. Spiegel)
                               :
CITY OF CINCINNATI,            :        VOLUME I
et al.,                        :
                               :
        Defendants.            :
- - - - - - - - - - - - - - -


        Videotaped deposition of DAVID WILLIAM

HUNTER JR., a witness herein, called by the

plaintiffs for cross-examination, pursuant to the

Federal Rules of Civil Procedure, taken before me,

Wendy Davies Welsh, a Registered Diplomate Reporter

and Notary Public in and for the State of Ohio, at

the offices of Helmer, Martins & Morgan Co. LPA,

1900 Fourth & Walnut Centre, 105 East Fourth Street,

Cincinnati, Ohio, on Thursday, November 6, 2003, at

2:43 p.m.

**Owensby, et al.vs. City of Cincinnati**
**November 6, 2003**

DAVID WILLIAM HUNTER, JR.

Page 2

1   APPEARANCES:

2       On behalf of the Plaintiffs:

3           Paul B. Martins, Esq.
            Don Stiens, Esq.
4           Frederick M. Morgan Jr., Esq.
            Helmer, Martins & Morgan Co. LPA
5           Suite 1900, Fourth & Walnut Centre
            105 East Fourth Street
6           Cincinnati, Ohio  45202
            Phone:  (513) 421-2400
7
            John J. Helbling, Esq.
8           The Helbling Law Firm, L.L.C.
            3672 Springdale Road
9           Cincinnati, Ohio 45251
            Phone:  (513) 923-9740
10
        On behalf of the Defendants City of Golf Manor,
11   Stephen Tilley, Roby Heiland and Chris
     Campbell:
12
            Wilson G. Weisenfelder Jr.,  Esq..
13          Rendigs, Fry, Kiely & Dennis
            900 Fourth & Vine Tower
14          One West Fourth Street
            Cincinnati, Ohio  45202-3688
15          Phone:  (513) 381-9200

16       On behalf of the Defendants City of Cincinnati,
     Darren Sellers, Jason Hodge:
17
            Geri Hernandez Geiler, Esq.
18          Assistant City Solicitor
                and
19          Julie F. Bissinger, Esq.
            Chief Counsel
20          Department of Law
            Room 214, City Hall
21          801 Plum Street
            Cincinnati, Ohio 45202
22          Phone:  (513) 352-3346

23

24

Page 3

1   APPEARANCES (Continued):

2       On behalf of the Defendants Robert B. Jorg,
        Patrick Caton, Jason Hodge, Victor Spellen and
3   Darren Sellers:

4           Donald E. Hardin, Esq.
            Hardin, Lefton, Lazarus & Marks, LLC
5           915 Cincinnati Club Building
            30 Garfield Place
6           Cincinnati, Ohio 45202
            Phone: (513) 721-7300
7
        On behalf of the David William Hunter Jr.:
8
            Jay Clark, Esq.
9           114 East 8th Street
            Suite 400
10          Cincinnati, Ohio  45202
            Phone (513) 587-2887
11
     Also present:
12
     Richard W. Grubb, Videographer
13
     Lisa Damstrom, Law Clerk
14   Helmer, Martins & Morgan Co., L.P.A.

15   Mr. Roger Owensby

16   Mrs. Brenda Owensby

17

18                  - - -

19

20           S T I P U L A T I O N S

21       It is stipulated by and among counsel for the

22   respective parties that the deposition of DAVID

23   WILLIAM HUNTER JR., a witness herein, called by the

24   plaintiffs for cross-examination, pursuant to the

Page 4

1   Federal Rules of Civil Procedure, may be taken at

2   this time by the notary; that said deposition may be

3   reduced to writing in stenotype by the notary, whose

4   notes may then be transcribed out of the presence of

5   the witness; and that proof of the official

6   character and qualifications of the notary is

7   expressly waived.

8                  - - -

9

10                  I N D E X

11       Examination by:                Page

12       Mr. Martins . . . . . . .      5

13                  - - -

14

15              E X H I B I T S

16                               Page

17

18   Deposition Exhibit 6A ...................   89
     Deposition Exhibit 54 ..................   29
19   Deposition Exhibit 55 ..................   43
     Deposition Exhibit 56 ..................   62
20   Deposition Exhibit 57 ..................   64
     Deposition Exhibit 58 ..................   67
21

22                  - - -

23

24

Page 5

1        VIDEOGRAPHER:  Time is 2:43 p.m.  The date

2    is November the 6th.  The year is 2003.

3        If you'd please swear the witness, ma'am.

4        DAVID WILLIAM HUNTER JR.

5   being by me first duly cautioned and sworn, deposes

6   and says as follows:

7        VIDEOGRAPHER:  We're on the record, Mr.

8   Martins.  This is videotape number 1, sir.

9            CROSS-EXAMINATION

10  BY MR. MARTINS:

11       Q. Sir, would you state for the record your

12  full name, please.

13       A. David William Hunter Jr.

14       Q. And your age?

15       A. 36.

16       Q. Date of birth?

17       A. 5/20/67.

18       Q. What is your height?

19       A. 5' 7."

20       Q. And on November 7th of 2000 what was your

21  weight?

22       A. Approximately 175.

23       Q. Have you ever had your deposition taken

24  before?

(800) 578-1542 * MERIT * (513) 381-8228

Owensby, et al. vs. City of Cincinnati
November 6, 2003

Page 54

1 recollection of seeing Roger Owensby before
2 September of 2000?
3    A. N--
4    Q. Correct?
5    A. No. As far as what I just said.
6    Q. Right.
7    A. I know it's kind of confusing, but I'm
8 trying to answer as truthful as possible.
9    Q. Right. You have no recollection of seeing
10 Roger Owensby before September of 2000?
11    A. Right. Okay.
12    Q. Okay. Walk me through what happened in
13 September of 2000.
14    A. Me and Officer Jorg were working
15 plainclothes, old clothes, and we were doing an
16 investigation in front of the Sam's Drive Thru. It
17 was three to four individuals that we observed
18 making drug transactions. We wanted to stop those
19 individuals.
20    Officer Jorg stayed with -- with one or
21 two of the individuals and then two of the
22 individuals went across the street, across from
23 Sam's Drive Thru, across -- that would be Seymour,
24 in the direction of Huntington Meadows Apartment

Page 55

1 complex. So I responded across the street behind
2 them.
3    Another uniform car -- another uniform car
4 met me across the street, and that officer was
5 Officer Walker. I advised Officer Walker to go
6 around, because I wanted him to flank the two guys
7 we were trying to catch up to.
8    Because I could pretty much walk up to
9 them, because they probably wouldn't -- wouldn't
10 have taken me as being a police officer, but Officer
11 Walker was in uniform of the day.
12    After we had that discussion, I started in
13 one direction. Officer Walker started in another
14 direction. That's when Mr. Owensby alerted the
15 individuals that we were trying to catch up to to
16 apprehend that the police were coming and that we
17 were in the area. So they got away, because they
18 had a jump on us anyway, because -- and they're
19 already behind -- around the building.
20    So I walked up to Mr. Owensby and I put my
21 left hand on his shoulder. And I said, "What's up?"
22    And he replied, "What's up?"
23    And then I said, "You know, you can't be
24 doing what you just did."

Page 56

1    And he said, "What's that?" Or something
2 to that nature.
3    I said, "You can't be telling people" --
4 as I was saying this to him, I reached into my shirt
5 with my other hand. I was wearing my badge on a
6 chain around my neck. "You can't be telling --
7 you -- you can't be warning people that the -- the
8 police is here. That's -- and -- that's interfering
9 with an investi"--
10    As I was saying investigation or whatnot,
11 I flipped my badge out and it dropped down dangling
12 around my neck. When he saw my badge, he pushed me
13 off him, and I grabbed the back --
14    He had a hooded sweat shirt on. I grabbed
15 the back of his sweat shirt, and he tugged and
16 pulled and his sweat shirt ripped. And I was just
17 basically standing there holding his sweat shirt,
18 because he ripped right out of it.
19    At that point I -- I actually drew my
20 weapon. And I told him, "Don't move." You know,
21 "Freeze." He -- he kind of faked to the left, to
22 the right or whatever, and took off running. I had
23 no intention of shooting. I -- I didn't have the
24 authority to shoot him, and he probably knew that.

Page 57

1 That's why he probably took off running.
2    I gave chase. We ran through Huntington
3 Meadows, between the buildings, out onto Rhode
4 Island, into the intersection of Rhode Island and
5 Seymour.
6    Right there at the traffic light is a
7 crosswalk. There was a car stopped at a red light.
8 I was chasing Mr. Owensby around the car. We
9 actually went -- circled the car once or twice. And
10 then he proceeded toward -- in the direction -- on
11 Seymour in the direction of Reading Road down the
12 sidewalk.
13    At that point I was able to put my --
14 secure my weapon and I went to Mace, my chemical
15 spray. He was running down the sidewalk, and at
16 some point he tripped and fell on his own. And I
17 was trying to run up to him to Mace him, but I was
18 running and spraying at the same time. So some of
19 the chemical irritant sprayed back toward me.
20    He was on the ground. He managed to make
21 his way by using his hands and his feet, making his
22 way back to his feet. He then ran in between some
23 apartment buildings.
24    I continued to chase him. He ran into one

Owensby, et al.vs. City of Cincinnati
November 6, 2003

DAVID WILLIAM HUNTER, JR.

Page 70

1 up and we got out.

2    Q. Okay.

3    A. But I don't know. Because I don't recall

4 or remember exactly where we stopped and parked the

5 car, because we still had to try to get up to them

6 before they spotted the -- the Neon.

7    **Q. Right. Okay. So regardless of how you**

8 **got out of the car or -- or where you parked the**

9 **car, do you have a recollection of what side of**

10 **Sam's Carry Out you approached the individuals from?**

11    A. No. I -- I really can't remember. I'm

12 sorry. I can't remember exactly.

13    **Q. What is your best recollection of -- at --**

14 **at some point, though, the individuals -- well,**

15 **what --**

16    A. Two of the individuals started walking

17 across the street.

18    **Q. Okay. Toward Huntington Meadows?**

19    A. Huntington Meadows, yes.

20    **Q. All right. Would you draw with a pen, an**

21 **arrow, indicating the path that the two individuals**

22 **took from the phone booth to cross the street. And**

23 **you can do it on the -- probably on the aerial**

24 **photograph will probably be the easiest one.**

Page 71

1    A. (Witness complies.)

2    **Q. Okay. And then once they -- if you could**

3 **continue that across the street in which -- whatever**

4 **direction they walked.**

5    A. (Witness complies.)

6    **Q. Thank you. Now, at this point did you and**

7 **Officer Jorg approach the two individuals that**

8 **stayed?**

9    A. Yes. And then that's when Officer Jorg

10 said he had them. Because we had other cars coming

11 and in the area.

12    **Q. All right. So Officer Jorg stays --**

13    A. Uh-huh. And then I --

14    **Q. -- with those two?**

15    A. Right. And then I --

16    **Q. You --**

17    A. I go after the two, walking with Officer

18 Walker.

19    **Q. Okay. Officer Walker was there at the**

20 **time?**

21    A. He was just pulling up.

22    **Q. Okay. Where did Officer Walker pull his**

23 **car up?**

24    A. I don't remember if he parked it on the

Page 72

1 Sunoco side or the -- the side of the street where

2 Integrity Hall was at. I don't remember exactly

3 where. I just remember he met up with me on this

4 side of the street in the direction --

5    On the -- on the diagram, in the direction

6 that they were walking, he met up with me right

7 before you actually get to the -- the buildings of

8 the, you know, the apart-- where the apartment

9 buildings actually start, Huntington Meadows.

10    **Q. Okay. I'm going to ask you, on the aerial**

11 **photograph, draw first a circle around Integrity**

12 **Hall.**

13    A. (Witness complies.)

14    **Q. All right. And put an "I" in there.**

15    A. (Witness complies.)

16    **Q. Second thing is draw a W in a circle where**

17 **Officer Walker met up with you.**

18    A. Hmm-hmm. (Witness complies.)

19    **Q. And at that -- am I correct in**

20 **understanding from what you've told me at that point**

21 **you and Officer Walker decided to split up to flank**

22 **the two people that were walking away?**

23    A. Yes. Our -- our intention was -- if he

24 made it around there, they see him, he would flush

Page 73

1 them to me, but if they -- or vice versa. If they

2 identify me or assume that I'm a police officer,

3 because, you know, they look back and notice that

4 Jorg was standing there with the two guys detained,

5 that I would flush him to Curtis, to Officer Walker.

6    **Q. Now, the building -- the building that you**

7 **and Officer Walker were going to do this flanking**

8 **maneuver around, was that a Huntington Meadows**

9 **apartment?**

10    A. Yes. Because we were -- we were like --

11 it's like right there, right -- right -- right where

12 they -- they -- the actual buildings start. And

13 then to the left I think it -- it was not, but to

14 the right it was Huntington Meadows buildings.

15    **Q. Can you identify that building on this**

16 **aerial photograph?**

17    A. Oh, boy. Maybe. I'm thinking this one --

18    **Q. Just draw a circle around it.**

19    A. -- here.

20    **Q. Put the letter H in there.**

21    A. H.

22    **Q. Okay. So that's the building that you and**

23 **Officer Walker are going to do this flanking**

24 **maneuver around?**

(800) 578-1542 * MERIT * (513) 381-8228

Case 1:01-cv-00769-SAS    Document 93-14    Filed 02/20/2004    Page 5 of 11
Owensby, et al.vs. City of Cincinnati                    DAVID WILLIAM HUNTER, JR.
November 6, 2003

Page 74

1    A. Well --
2    Q. Did you want to say something?
3    A. It was not -- it was not a set -- like
4 a -- like a -- just one building. It was like
5 buildings. It was --
6    Q. Okay.
7    A. You know, it was -- it was like two or
8 three like together, but you can go through the
9 courtyard and then you can come around, and there's
10 like a building here on the right (indicating).
11 That's the way Curtis went, Officer Walker. And
12 then I was going to cut through.
13    Q. All right. At some point, then, you
14 folk-- you and Officer Walker split up and you start
15 to go your way and he goes his, right?
16    A. Yes.
17    Q. At that point someone says something to
18 warn the two individuals; is that right?
19    A. Yes.
20    Q. That's the next thing that happens?
21    A. Yes.
22    Q. Okay. And that person, if I'm
23 understanding you correctly, was Mr. Owensby?
24    A. Yes.

Page 75

1    Q. Are you sure of that?
2    A. Yes.
3    Q. What is the best of your recollection of
4 what Mr. Owensby said?
5    A. It was, The boys or Five-oh.
6    Q. Say that again.
7    A. It was either, The boys or Five-oh.
8    Q. And in response to what -- could you see
9 the two individuals at the time Mr. Owensby said
10 this?
11    A. They would -- they were just -- as he said
12 it, they were just leaving out of my view.
13    Q. Did you see -- so then you could not see
14 what, if anything, they did in response?
15    A. Oh. Ran.
16    Q. You did see that?
17    A. Yes. Uh-huh.
18    Q. Okay. Do you know if Mr. Owensby said
19 that toward them or was saying it to someone else?
20    A. He's saying it toward them, because he
21 turned to them and said it, in their direction.
22    Q. Do you know where Officer Walker was at
23 the time?
24    A. No.

Page 76

1    Q. Do you know if the individuals started
2 running because of what Mr. Owensby said or because
3 they saw a uniformed officer?
4    A. Beca--
5       MR. HARDIN: Objection.
6       You may answer.
7    A. Because of what Mr. Owensby said. Because
8 when that happened, Officer Walker didn't have
9 enough time to get around. So they -- they had --
10 they had -- they -- they couldn't have possibly even
11 seen him yet.
12    Q. But as I understand it, Mr. Owensby was
13 not one of the four individuals that you and Officer
14 Jorg had observed conducting drug activity at the
15 phone booth?
16    A. That's correct.
17    Q. He was just somebody that you happened
18 upon as you were going around the building?
19    A. Yes.
20    Q. At that point, as I understand it, you
21 walk up to Mr. Owensby and put your left hand on his
22 shoulder?
23    A. Yes.
24    Q. What shoulder did you put it on?

Page 77

1    A. On his left shoulder.
2    Q. Were you facing him face to face or did
3 you come up from behind?
4    A. Walking to his right, right beside him.
5    Q. So you put your left arm -- you're --
6 you're to his -- his right and you put your left
7 hand on his left shoulder?
8    A. Yes.
9    Q. And you say "What's up?" And he says,
10 "What's up?" And you say, you know, You can't be
11 doing that, or something like that, right?
12    A. Yes.
13    Q. And he said, What do you -- What do you
14 mean or what. And you said, What you just did. Is
15 that right?
16    A. Yes.
17    Q. And then you started to reach in your
18 shirt to pull your badge out, which was hanging on a
19 chain around your neck?
20    A. Yes.
21    Q. Do you know whether or not you got the
22 badge all the way out before Mr. Owensby started to
23 run?
24    A. Yes, I got it out.

Page 74 - Page 77

Case 1:01-cv-00769-SAS    Document 93-14    Filed 02/20/2004    Page 6 of 11

Owensby, et al. vs. City of Cincinnati
November 6, 2003

DAVID WILLIAM HUNTER, JR.

Page 78

1    Q. You got it all the way out?

2    A. Yes.

3    Q. And at that point you said he pushed off,

4  or how -- what -- what happened then?

5    A. He pushed off.

6    Q. Okay.

7      MS. GEILER: I'm sorry. What was that?

8      THE WITNESS: Pushed off. I'm sorry.

9      MS. GEILER: Okay.

10    Q. And you grabbed the hood of his sweat

11  shirt?

12    A. Yes.

13    Q. And it -- it ripped and he wiggled out of

14  or got out of the sweat shirt and took off running?

15    A. Yes.

16    Q. What did you do with the sweat shirt?

17    A. Dropped it.

18    Q. After --

19      MR. HARDIN: I'm sorry. I couldn't hear

20  the answer.

21      THE WITNESS: Dropped it. Let it go.

22    Q. After the incident did you return to get

23  the sweat shirt?

24    A. After the incident, to the best of my

Page 79

1  knowledge, Officer Jorg recovered the sweat shirt

2  and there was some plastic Baggies. There weren't

3  anything in them. They were just little small

4  plastic Baggies in that same area where the -- that

5  actually fell out of -- fell out of his pocket or

6  off of his person when that happened, when the sweat

7  shirt ripped.

8    Q. Did you see them fall out of his pocket or

9  off of his person?

10    A. I saw something fall, but I didn't know

11  what it was. When I came back, it was -- you know,

12  Officer Jorg had picked up the sweat shirt and the

13  Baggies.

14    Q. Were you within the eyesight of Officer

15  Jorg at that time?

16    A. No.

17    Q. So he could not see what was going on?

18    A. See what?

19    Q. Between you and Mr. Owensby and the sweat

20  shirt.

21    A. No.

22    Q. How did he know --

23    A. I told him. I told him what happened.

24    Q. -- to come to the area to collect the

Page 80

1  sweat shirt?

2    A. I told him what happened and where it

3  happened. Because after it happened I -- me

4  personally, I went back to in between the first set

5  of buildings where I was chasing him, because I had

6  my cell phone while I was chasing him and it fell.

7  I went to go find my cell phone.

8    Q. If you know, what happened to the sweat

9  shirt and the plastic bags?

10    A. After that do I know what happened to

11  them?

12    Q. Yeah. You said Officer Jorg picked it up.

13    A. Uh-huh.

14    Q. What happened to it after that?

15    A. I -- I don't know. I assumed he tagged

16  them or whatever. I don't know. I -- I don't know

17  what happened to them after that.

18    Q. You've never seen them since?

19    A. No.

20    Q. Did you ever fill out a property receipt

21  or -- or some property chain of custody document on

22  it?

23    A. Nope. I didn't -- I didn't have the

24  property.

Page 81

1    Q. Did you see -- well, he was your partner.

2  Did -- did you see Officer Jorg fill out a property

3  receipt?

4    A. No. Huh-uh.

5    Q. Did you see him put it in the car?

6    A. No.

7    Q. After Mr. Owensby wiggled out of the sweat

8  shirt, you drew your weapon?

9    A. Yes.

10    Q. He ran away; there was a chase down to

11  Rhode Island where Rhode Island intersects Seymour.

12  Do you see that on the Exhibit 57, the aerial

13  photograph?

14    A. Yes.

15    Q. And would you mark with the letter R in a

16  circle where the intersection of Rhode Island and

17  Seymour is.

18    A. Circle it?

19    Q. An R in a circle.

20    A. Okay.

21    Q. And I take it at -- at that point, if I'm

22  understanding you correctly, you and Mr. Owensby ran

23  around a car?

24    A. Yes. It was a female --

Case 1:01-cv-00769-SAS    Document 93-14    Filed 02/20/2004    Page 7 of 11

Owensby, et al. vs. City of Cincinnati                    DAVID WILLIAM HUNTER, JR.
November 6, 2003

Page 86

1 letting them know that we were there.

2    Q. How -- how far was he from you when he

3 said that?

4    A. About, hmm, maybe from here to that wall

5 (indicating).

6    Q. What, ten feet?

7    A. Oh, more than that.

8    Q. More?

9    A. Maybe --

10   Q. 20 feet?

11   A. Maybe. Maybe 20 feet. I don't know

12 exactly.

13   Q. All right. When you had walked up to Mr.

14 Owensby, put your arm -- your left hand on his left

15 shoulder, around him, when you were talking to him,

16 were you looking at him?

17   A. Directly at him, yes.

18   Q. Did you notice if he had any facial hair?

19   A. If he did, it was like real light. I

20 don't remember having like a full beard or full

21 mustache or anything.

22   Q. Did he have the -- did he have -- how was

23 his hair? Was it in dreadlocks, was it short-cut?

24 How -- how was it?

Page 87

1    A. Like a short afro.

2    Q. At that point, as I understand your

3 testimony, you then return to Officer Jorg, tell him

4 what happened, right?

5    A. Uh-huh. Yes.

6    Q. And maybe -- maybe you've already answered

7 this, but do you recall whether or not Officer

8 Walker joined you and Officer Jorg?

9    A. I don't recall if he came back over there.

10   Q. Do you recall who of the two people that

11 were arrested, who was cited, their -- their names?

12   A. I don't remember their names.

13   Q. Let me show you -- let me show you what's

14 previously been marked as Exhibit 6. These are

15 two -- Exhibit 6 are two arrest and investigation

16 reports. The first one is for a Jaysen Hill and the

17 second is for a Jarvis Nixon.

18      You see the arrest location is the Sam's

19 Carry Out address of 2092 Seymour Avenue and the

20 arresting officer is Jorg, with your name also

21 listed. Do you see that?

22   A. Yes.

23   Q. Are these the two individuals that Officer

24 Jorg arrested --

Page 88

1    A. Yes.

2    Q. -- on that day?

3    A. Yes.

4    Q. Do you see that with respect to Jaysen

5 Hill he is charged with criminal trespass and an

6 open container?

7    A. Yes.

8    Q. Is there any reason why there's no charge

9 of trafficking --

10   A. Yes.

11   Q. -- or any kind of drug activity?

12   A. Yes.

13   Q. Why?

14   A. Because we didn't recover the drugs.

15   Q. Did you recover any money, any large sums

16 of money on these people out of these drug deals?

17   A. I didn't.

18      THE REPORTER: I'm sorry?

19      THE WITNESS: I did not.

20   Q. Do you know whether Officer Jorg did?

21   A. Not to my knowledge he didn't.

22   Q. So based on what you found on these

23 individuals -- well, let's talk about the second

24 one. Mr. Nixon is cited with criminal trespass.

Page 89

1 Same thing, there were no -- no drugs and no large

2 sums of money found, correct?

3    A.  That's correct.

4    Q.  Based on what you found at the scene when

5 you got there, there was no evidence of drug

6 activity taking place, was there?

7    A.  Are you talking about after the fact?

8    Q.  When -- when you're -- based on the arrest

9 and what you found on the person of these

10 individuals.

11   A.  Okay. What we observed to put us there

12 went with the two that got away.

13   Q.  Okay. That's what you believe?

14   A.  That's what I believe.

15   Q.  Let me show you what I'm going to mark as

16 Exhibit 6A.

17          (Deposition Exhibit 6A
          was marked for identi-

18              fication.)

19   Q.  You see Exhibit 6A is an arrest and

20 investigation report for one Dominic Peterson, same

21 location, same date, same time. And the person is

22 searched by Officer Walker, and this person is

23 charged with criminal trespass. Was Mr. Peterson

24 also involved in this?

107

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - - -

ESTATE OF ROGER D.            :
OWENSBY JR., et al.,          :
                              :
         Plaintiffs,          :   Case No. 01-CV-769
vs.                           :   (Judge S. A. Spiegel)
                              :
CITY OF CINCINNATI,           :        VOLUME II
et al.,                       :
                              :
         Defendants.          :

- - - - - - - - - - - - - - -


          Continued videotaped deposition of DAVID

WILLIAM HUNTER JR., a witness herein, called by the

plaintiffs for cross-examination, pursuant to the

Federal Rules of Civil Procedure, taken before me,

Wendy Davies Welsh, a Registered Diplomate Reporter

and Notary Public in and for the State of Ohio, at

the offices of Helmer, Martins & Morgan Co. LPA,

1900 Fourth & Walnut Centre, 105 East Fourth Street,

Cincinnati, Ohio, on Thursday, December 4, 2003, at

10:11 a.m.


                              Pages:  107 - 282

**Estate of Roger D. Owensby, Jr.**
**December 4, 2003**

**DAVID WILLIAM HUNTER, JR.**
**VOLUME II**

---

Page 108

```
1  APPEARANCES:

2       On behalf of the Plaintiffs:

3           Paul B. Martins, Esq.
            Don Stiens, Esq.
4           Helmer, Martins & Morgan Co. LPA
            Suite 1900, Fourth & Walnut Centre
5           105 East Fourth Street
            Cincinnati, Ohio  45202
6           Phone: (513) 421-2400

7           John J. Helbling, Esq.
            The Helbling Law Firm, L.L.C.
8           3672 Springdale Road
            Cincinnati, Ohio  45251
9           Phone: (513) 923-9740

10      On behalf of the Defendants City of Golf Manor,
        Stephen Tilley, Roby Heiland and Chris
11      Campbell:

12          Wilson G. Weisenfelder Jr.,  Esq.
            Rendigs, Fry, Kiely & Dennis
13          900 Fourth & Vine Tower
            One West Fourth Street
14          Cincinnati, Ohio  45202-3688
            Phone: (513) 381-9200
15
        On behalf of the Defendants City of Cincinnati,
16      Darren Sellers, and Jason Hodge:

17          Geri Hernandez Geiler, Esq.
            Assistant City Solicitor
18          Department of Law
            Room 214, City Hall
19          801 Plum Street
            Cincinnati, Ohio  45202
20          Phone: (513) 352-3346

21

22

23

24
```

---

Page 109

```
1  APPEARANCES (Continued):

2       On behalf of the Defendants Robert B. Jorg,
        Patrick Caton, Jason Hodge, Victor Spellen and
3       Darren Sellers:

4           Donald E. Hardin, Esq.
            Hardin, Lefton, Lazarus & Marks, LLC
5           915 Cincinnati Club Building
            30 Garfield Place
6           Cincinnati, Ohio  45202
            Phone: (513) 721-7300
7
        On behalf of David William Hunter Jr.:
8
            Jay Clark, Esq.
9           114 East 8th Street
            Suite 400
10          Cincinnati, Ohio  45202
            Phone (513) 587-2887
11
   Also present:
12
   Richard W. Grubb, Videographer
13
   Lisa Damstrom, Law Clerk
14 Helmer, Martins & Morgan Co., L.P.A.

15 Roger Owensby Senior

16 Brenda Owensby

17 Shawn Owensby

18                  - - -

19
             S T I P U L A T I O N S
20
21      It is stipulated by and among counsel for the

22 respective parties that the deposition of DAVID

23 WILLIAM HUNTER JR., a witness herein, called by the

24 plaintiffs for cross-examination, pursuant to the
```

---

Page 110

```
1  Federal Rules of Civil Procedure, may be taken at

2  this time by the notary; that said deposition may be

3  reduced to writing in stenotype by the notary, whose

4  notes may then be transcribed out of the presence of

5  the witness; and that proof of the official

6  character and qualifications of the notary is

7  expressly waived.

8                I N D E X

9       Examination by:                    Page

10      Mr. Martins . . . . . . . .  111, 277

11      Mr. Hardin. . . . . . . . .      258

12            - - -

13          E X H I B I T S

14                                        Page
   Deposition Exhibit 85 ................... 120
15 Deposition Exhibit 86 ................... 131
   Deposition Exhibit 87 ................... 152
16 Deposition Exhibit 88 ................... 219
   Deposition Exhibit 89 ................... 221
17 Deposition Exhibit 90 ................... 234
   Deposition Exhibit 91 ................... 236
18 Deposition Exhibit 92 ................... 238
   Deposition Exhibit 93 ................... 244
19 Deposition Exhibit 94 ................... 244
   Deposition Exhibit 95 ................... 245
20 Deposition Exhibit 96 ................... 250

21            - - -

22

23

24
```

---

Page 111

```
1           DAVID WILLIAM HUNTER JR.
2  being by me previously duly cautioned and sworn,
3  deposes and says as follows:
4       VIDEOGRAPHER: Time is 10:11 a.m.  The
5  date is December the 4th.  The year is 2003.
6       We're on the record, sir.
7       CONTINUED CROSS-EXAMINATION
8  BY MR. MARTINS:
9       Q. Officer Hunter, we're picking up where we
10 left off after November 6, your first couple hours
11 of your deposition.  Remind you that you are still
12 under oath.  Okay?
13      A. Yes, sir.
14      Q. All right.  Have you talked with anyone
15 about your deposition on November 6th between
16 November 6th and today?
17      A. No, besides my attorney.
18      Q. Okay.  Have you discussed the facts of the
19 Owensby case with anyone between November 6th and
20 today?
21      A. No.
22      Q. I want to direct your attention now to
23 November 7, 2000.  I understand in the -- sometime
24 on that day you received an MTD message request for
```

Page 124

1      MS. GEILER:  Thank you.

2      THE WITNESS:  You're welcome.

3   BY MR. MARTINS:

4      Q. What happened once you saw Mr. Owensby

5   walking in the vicinity of Integrity Hall?

6      A. Noth-- I brought it to Jorg and Caton's

7   attention.

8      Q. What did you say to them?

9      A. I said, "That guy looked like the guy that

10  ran from me.  Remember when we" -- well, then I was

11  talking to Officer Jorg.  I said, "Remember when we

12  was working old clothes that day?"

13     Q. And what, if anything, did Jorg say in

14  response?

15     A. He asked me if I was sure if that was him.

16  I said, "Well, from this distance and in this light,

17  no, I can't be sure from here."

18     Q. Were you able to tell at -- at that point

19  in time whether or not Mr. Owensby had facial hair?

20     A. From that distance?

21     Q. From that distance.

22     A. No.

23     Q. What was it about the person that you saw

24  by Integrity Hall that made you think it looked like

Page 125

1   the person that had run from you on September 27th?

2      A. His height, size.  And from where I was

3   standing, he was walking at an angle, and I could

4   get like a -- I could see like his face from a

5   distance as far as like, you know, he looked similar

6   to the person that ran from me at that time.

7      Q. What was his height?

8      A. I don't know his height.

9      Q. Would it be fair to say he was average

10  height?

11     A. Yeah.  Medium build.

12     Q. Average height, medium build?

13     A. (Nodding head.)

14     Q. Okay.

15     A. Uh-huh.

16     Q. And if I understand you correctly, from

17  his -- from that distance you could not tell if he

18  had facial hair.  Were there any other

19  distinguishing characteristics about him that caused

20  you to think that he was the person that ran from

21  you on September 27?

22     A. Like I say, he just -- he had the features

23  of the person that I remember that had ran from

24  me --

Page 126

1      Q. And what I'm --

2      A. -- previously.

3      Q. -- trying to understand is, what were

4   those features?

5      A. His -- his build, his height, his -- I

6   mean, just -- his stature.  And like I said, it

7   wasn't light -- I mean, the sun wasn't up, but it

8   was -- it was like not completely dark either.

9      Q. Can you identify any other distinguishing

10  feature of the person that you saw by Integrity Hall

11  that caused you to think that that was the same

12  person that ran from you on September 27th?

13     A. No.  Not -- I mean, no.

14     Q. The -- when you said -- pointed him out to

15  Officer Jorg, do you know whether or not Officer

16  Jorg said something to you to the effect, words to

17  the effect that that takes balls to walk past

18  cruisers and uniformed officers?

19     A. That sound familiar to me.  That -- that

20  does sound familiar to me, but I can't recall.

21     Q. I'm -- I'm not sure I'm quoting it

22  direct -- correctly, but some -- words to that

23  effect.

24     A. I'm just saying I remember hearing

Page 127

1   something like that.

2      Q. Okay.  Did Officer Caton say anything to

3   you?

4      A. I don't remember.  I mean, I --

5      Q. When you were talking to Officer Jorg,

6   pointing out this person over by Integrity Hall, was

7   Officer Caton there also?

8      A. Yes.

9      Q. Did Officer Jorg explain or -- or did you

10  explain to Officer Caton who this person was that --

11  that you were referring to?

12     A. Well, he was standing there while me and

13  Jorg was talking, so he could just gather it from

14  that what we were talking about, because he knew

15  about the incident.

16     Q. And that's what I'm trying to understand,

17  is how did he know about the incident?

18     A. From Jorg, I'm sure.

19     Q. Did -- did -- did you hear Jorg talk to

20  him about the incident?

21     A. No, but me and Jorg was talking back and

22  forth about the incident.

23     Q. And Caton was there?

24     A. And Caton was there.

## _A F F I D A V I T_

- - -

STATE    OF    OHIO        :
                           :      SS
COUNTY OF HAMILTON         :


I, Wendy L. Welsh, Notary Public in and for the

State of Ohio, do hereby state that the transcript of the

deposition of DAVID WILLIAM HUNTER, JR., deponent

herein, having been submitted to said deponent for review

and signature, has not been signed within the thirty (30)

day period allowed under the Federal Rules; said deposition

to now have the same force and effect as though signed.


_____
Wendy L. Welsh, Court Reporter


Sworn to before me this 27th day of _____, 2004.


_____
Thomas M. Blasing
Notary Public - State of Ohio

My commission expires:
May 4, 2004.