Case 1:01-cv-00769-SAS    Document 93-15    Filed 02/20/2004    Page 1 of 6

Estate of Owensby vs. City of Cincinnati
October 14, 2003
ROBERT BLAINE JORG

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - -

ESTATE OF ROGER D.           :
OWENSBY JR., et al.,         :
                             :
        Plaintiffs,          :
   vs.                       :  Case No. 01-CV-769
                             :  (Judge S. A. Spiegel)
CITY OF CINCINNATI,          :
et al.,                      :
                             :
        Defendants.          :

- - - - - - - - - - - - - -

Videotaped deposition of ROBERT BLAINE JORG, a defendant herein, called by the plaintiffs for cross-examination, pursuant to the Federal Rules of Civil Procedure, taken before me, Wendy Davies Welsh, a Registered Diplomate Reporter and Notary Public in and for the State of Ohio, at the offices of Helmer, Martins & Morgan Co. LPA, 1900 Fourth & Walnut Centre, 105 East Fourth Street, Cincinnati, Ohio, on Tuesday, October 14, 2003, at 10:12 a.m.

Case 1:01-cv-00769-SAS    Document 93-15    Filed 02/20/2004    Page 2 of 6

Estate of Owensby vs. City of Cincinnati
October 14, 2003

ROBERT BLAINE JORG

Page 2

1  APPEARANCES:

2     On behalf of the Plaintiffs:

3        Paul B. Martins, Esq.
         Don Stiens, Esq.
4        Helmer, Martins & Morgan Co. LPA
         Suite 1900, Fourth & Walnut Centre
5        105 East Fourth Street
         Cincinnati, Ohio 45202
6        Phone: (513) 421-2400

7        John J. Helbling, Esq.
         The Helbling Law Firm, L.L.C.
8        3672 Springdale Road
         Cincinnati, Ohio 45251
9        Phone: (513) 923-9740

10    On behalf of the Defendants City of Golf Manor,
      Stephen Tilley, Roby Heiland and Chris
11    Campbell:

12       Lynne Marie Longtin, Esq.
         Rendigs, Fry, Kiely & Dennis
13       900 Fourth & Vine Tower
         One West Fourth Street
14       Cincinnati, Ohio 45202-3688
         Phone: (513) 381-9200
15
      On behalf of Defendants City of Cincinnati,
16    Darren Sellers, Jason Hodge:

17
         Geri Hernandez Geiler, Esq.
18       Assistant City Solicitor
                and
19       Julie F. Bissinger, Esq.
         Chief Counsel
20       Department of Law
         Room 214, City Hall
21       801 Plum Street
         Cincinnati, Ohio 45202
22       Phone: (513) 352-3346

Page 3

1  APPEARANCES (Continued):

2     On behalf of the Defendants Robert B. Jorg,
      Patrick Caton, Jason Hodge, Victor Spellen and
3     Darren Sellers:

4        Donald E. Hardin, Esq.
         Hardin, Lefton, Lazarus & Marks, LLC
5        915 Cincinnati Club Building
         30 West Garfield Place
6        Cincinnati, Ohio 45202
         Phone: (513) 721-7300
7
   Also present:
8
   Richard W. Grubb, Videograher
9
   Lisa Damstrom, Law Clerk
10 Helmer, Martins & Morgan Co., L.P.A.

11 Wendy M. Weller, Paralegal
   Buckley King
12
   Mr. Roger Owensby
13 Mrs. Brenda Owensby
   Mr. Shawn Owensby
14
   Patrick Edmund Caton
15
   Victor Spellen

Page 4

1          S T I P U L A T I O N S

2     It is stipulated by and among counsel for the

3  respective parties that the deposition of ROBERT

4  BLAINE JORG, a defendant herein, called by the

5  plaintiffs for cross-examination, pursuant to the

6  Federal Rules of Civil Procedure, may be taken at

7  this time by the notary; that said deposition may be

8  reduced to writing in stenotype by the notary, whose

9  notes may then be transcribed out of the presence of

10 the witness; and that proof of the official

11 character and qualifications of the notary is

12 expressly waived.

                        - - -

Page 5

                    I N D E X

Examination by:                              Page

Mr. Martins . . . . . . . .  6

Ms. Longtin . . . . . . . . 227

                    - - -

                  E X H I B I T S

                                             Page
Plaintiffs' Exhibit 1  ...................  18
Plaintiffs' Exhibit 2  ...................  25
Plaintiffs' Exhibit 3  ...................  48
Plaintiffs' Exhibit 4  ...................  48
Plaintiffs' Exhibit 5  ...................  51
Plaintiffs' Exhibit 6  ...................  58
Plaintiffs' Exhibit 7  ...................  72
Plaintiffs' Exhibit 8  ...................  86
Plaintiffs' Exhibit 9  ................... 107
Plaintiffs' Exhibit 10 ................... 132
Plaintiffs' Exhibit 11 ................... 161
Plaintiffs' Exhibit 12 ................... 165
Plaintiffs' Exhibit 13 ................... 178
Plaintiffs' Exhibit 14 ................... 199
Plaintiffs' Exhibit 15 ................... 201
Plaintiffs' Exhibit 16 ................... 206
Plaintiffs' Exhibit 17 ................... 212

                    - - -

Case 1:01-cv-00769-SAS   Document 93-15   Filed 02/20/2004   Page 3 of 6

Estate of Owensby vs. City of Cincinnati
October 14, 2003
ROBERT BLAINE JORG

Page 50

1 where the individuals were located.
2   A. I believe that's right. It's hard to tell
3 without buildings.
4       MR. MARTINS: Can you make copies? We're
5 going to make copies of that for everyone
6 before we go on. Thank you.
7   Q. When you observed -- after you observed
8 this, what did you do?
9   A. I'm sorry, the -- the day with Officer
10 Hunter?
11   Q. Yes. You and Officer Hunter are sitting
12 in the car. You're in the driver's seat, he's in
13 the passenger's seat. He has the binoculars. He
14 observes what he believes to be some drug activity.
15 He hands the binoculars to you to see if you can
16 identify any of the individuals. You look. You
17 cannot identify the individuals. What happens next?
18   A. One of us got on the radio to request an
19 additional car for a stop that's going to be made in
20 the area. I don't remember exactly how we left the
21 lot. I believe we circled around and went down
22 Langdon Farm -- or not Langdon Farm. What road is
23 that? Seymour, I guess.
24       We pulled into the lot and identified

Page 51

1 ourselves as police officers, and that's when one of
2 the subjects ran, who allegedly was making the
3 actual deal. Officer Hunter proceeded to chase him,
4 and I had the other two sit down by the pay phone.
5   Q.  Did you see the person that ran actually
6 make any kind of deal?
7   A.  No.
8   Q.  So you're basing that on what Officer
9 Hunter told you?
10   A.  Yes.
11   Q.  And as I understand it, that person runs
12 and Officer Hunter takes off after him?
13   A.  Correct.
14   Q.  How did you identify yourselves to these
15 individuals?
16   A.  As police officers, as we're pulling out
17 our chains with our badges on them. They may have
18 even been out before we stepped out of the car. I
19 don't remember.
20       (Plaintiffs' Exhibit 5
          was marked for identi-
21            fication.)
22   Q.  Show you Exhibit 5.
23       MR. MARTINS: Let me distribute -- this is
24 Exhibit 3 we made copies of.

Page 52

1       MS. GEILER: Should we throw away our
2 other Exhibit 3?
3       MR. MARTINS: Yeah.
4       Where is the original of Exhibit 4?
5   (Discussion off the stenographic record.)
6       MR. MARTINS: This is a copy of Exhibit 4.
7 BY MR. MARTINS:
8   Q. And now I've handed you Exhibit 5. You've
9 seen this sketch before, correct?
10   A. Yes.
11   Q. And for purposes of our discussion right
12 now, we're talking about the first time you ran into
13 this person that was identified as LA. On this
14 sketch, would you indicate with the letter B where
15 the individuals were that you saw.
16   A. Can I --
17   Q. Where the activity was taking place.
18   A. I'm sor-- B as in boy?
19   Q. B as in boy, so that it corresponds with 3
20 and 4. 3 and 4 I asked you to identify with the
21 letter B where the individuals were. Do you recall
22 that?
23   A. No. Letter B was where I was sitting with
24 Officer Hunter.

Page 53

1   Q. Oh, I'm sorry. Okay. C, where the
2 individuals were. Put on with the letter C, on
3 Exhibit 5, where those individuals were.
4   A. Unfortunately, the map is not quite big
5 enough of the area.
6   Q. Okay. So they were in the Sam's --
7   A. They ranged --
8   Q. -- area?
9   A. -- from across the street in the Liberty
10 Hall area.
11   Q. Oh, no. I -- forgive me. What I'm asking
12 is where they were when you were sitting in the car
13 observing them with the binoculars.
14   A. Exactly.
15   Q. Oh, okay.
16   A. The map is not quite big enough.
17   Q. All right. Were any of the people in the
18 area where the map is?
19   A. Yes.
20   Q. Okay. Who was in the area where the map
21 covers, Exhibit 5?
22   A. I don't remember exactly who was there.
23   Q. Was it one of the people that ran --
24   A. There --

Case 1:01-cv-00769-SAS  Document 93-15  Filed 02/20/2004  Page 4 of 6

Estate of Owensby vs. City of Cincinnati
October 14, 2003
ROBERT BLAINE JORG

**Page 86**

(Plaintiffs' Exhibit 8 was marked for identification.)

Q. I'll give you what is marked as Exhibit 8.

MR. MARTINS: If it's okay with everybody I'll just wait until he's done marking on it, and then I'll make copies for everyone.

Q. On Exhibit 8, again, we have a sketch. Where were -- where was Officer Sellers' and Hasse's vehicle?

A. It's not able to be placed on this map.

Q. Okay. Because it's on the other side of Sam's?

A. On the other side of Sam's.

Q. Okay. But it was in the Sam's parking lot?

A. Correct.

Q. Was the front of the car facing Seymour?

A. I believe so, yes.

Q. Please continue. So what happens after -- you're talking with Officer Sellers.

A. I'm sorry. I was talking with Officer Sellers about off-duty stuff, and I vaguely hear Dave -- Officer Hunter -- sorry -- say, I believe it was to Officer Caton, "That's the guy that ran from

**Page 87**

me two weeks ago." Kind of sparked my attention from the conversation I was having with Officer Sellers.

Q. Now, all the officers here are uniformed, correct?

A. Correct.

Q. And there are three cruisers parked?

A. I probably assume so. Yeah, three.

Q. Well, there's yours, there's Sellers --

A. Mine, Sellers' --

Q. And Hunter's?

A. And Hunter's, yeah.

Q. Okay. Are all the cruisers facing Seymour?

A. I don't know.

Q. All right. Continue.

A. I made the comment to Darren, from what I understand, "If that's him, he has a lot of balls showing up here."

Q. What did you mean by that?

A. Well, it's -- it was made, at least obvious for me, to the people on the street that, you know, we don't just drive around and ask, hey, do you know who this guy is, do you know who this

**Page 88**

guy is. Not that it was anything serious, and it's not a homicide we're looking after him for, but to go right back to where the original foot pursuit ended with marked police officers being there, it just seemed a little gutsy. We didn't run into that a whole lot.

Q. Did you take that as a, in addition to being gutsy, being a bit of a, I guess, disrespect?

A. No.

Q. To the police officers?

A. No, I don't think so. It was just shocking. I -- you know, with the time that I've spent on the street, I haven't run into that before, so it was just a little -- a little odd. It was the first time I ran into that.

Q. Did you look over to see who the individual was that Officer Hunter was referring to?

A. Yes.

Q. And where was this person?

A. He was on the other side of the street at that point.

Q. The other side of Seymour?

A. The other side of Seymour. And it was dark enough, it wasn't very well lit, I couldn't

**Page 89**

make him out from anyone.

Q. Did you question Officer Hunter as to how he could make this person out if it was dark and he was across the street?

A. Not at that point.

Q. Okay. Please continue.

A. And the reason was, as I was making my comment I turned back to talk to Darren to let him know I was going over with Pat and Dave, because they had already started walking over to make an identification.

Q. Did you hear Officer Hunter say anything else to Officer Caton?

A. Not at that point.

Q. When you say they started walking over, which -- in which direction were they walking?

A. From what I remember they walked in front of Sam's. I don't know if they went over the guardrail, around the guardrail, what the situation was, or stepped over, and then started walking towards the side of Sunoco.

Q. I take it at this point in time the person that was across the street that you saw had somehow crossed Seymour Avenue?

Case 1:01-cv-00769-SAS   Document 93-15   Filed 02/20/2004   Page 5 of 6

Estate of Owensby vs. City of Cincinnati
October 14, 2003

ROBERT BLAINE JORG

### Page 102

1  Officer Caton asked Officer Hunter, "Is this him?"
2  Like I said, I know Pat wasn't there, he was off
3  that day. I knew I couldn't identify him. So I
4  deferred to the officer involved and said, "Is this
5  the guy?"
6    Q. Now, at this point in time am I correct in
7  understanding, at least in your mind, you have no
8  probable cause to arrest him?
9    A. I have probable cause to keep talking with
10 him, but for the assault on the officer and the
11 obstructing and everything else, no. In my opinion,
12 I had no clue that this was the guy.
13   Q. You believed you had a reasonable
14 suspicion in order to stop and talk to him?
15   A. Yes.
16   Q. And that's based on what factors?
17   A. Officer Hunter.
18   Q. Please continue.
19   A. As Dave steps into the spotlight and says,
20 "Yes, that's the man that ran," or "That's the guy,"
21 or whatever it was he said, I then reached down and
22 grabbed the, I believe it was the -- would have been
23 the left wrist of Mr. Owensby, as I reached with my
24 right hand to grab my handcuffs. At which time he

### Page 103

1  broke and ran past Pat, past Dave. I somewhere lost
2  my night stick and my handcuffs in a short pursuit.
3    Q. Let me -- let me stop you there. When --
4  when you reached for your handcuffs you reached with
5  your right hand for your handcuffs?
6    A. Yes.
7    Q. And your handcuffs are located on the back
8  of your belt?
9    A. Yes.
10   Q. Did you open the pouch and pull the
11 handcuffs out?
12   A. I don't know.
13   Q. Up to this point in time, did you ask this
14 individual if he went by the nickname of LA?
15   A. Not at that point, yet.
16   Q. Did Officer Caton ask if he went by LA?
17   A. I don't think anybody asked him if he went
18 by LA.
19   Q. Yeah. And so Hunter did not either?
20   A. I don't know if he did or not. I don't
21 remember him saying that -- or asking that.
22   Q. To your recollection, no one asked this
23 person that you had stopped to talk to whether or
24 not he went by the nickname of LA?

### Page 104

1    A. No.
2    Q. Correct?
3    A. Correct.
4    Q. There was another person near the scene by
5  the name of George Weaver. Do you know George
6  Weaver?
7    A. Nope.
8    Q. Were there other African American males in
9  the vicinity?
10   A. Based on what I've seen on the video, yes.
11   Q. Were these other African American males,
12 would you classify them of average height and
13 average build?
14   A. Sure.
15   Q. Generally the same as Mr. Owensby?
16   A. I would say, yes.
17   Q. On the pat-down, you had satisfied
18 yourself that he was unarmed, right?
19   A. Yes.
20   Q. And in fact, he had told you he was
21 unarmed?
22   A. Correct.
23   Q. As part of the pat-down you felt something
24 in his right pocket, correct?

### Page 105

1    A. I don't remember which pocket it was in,
2  but --
3    Q. In a pants pocket?
4    A. In a pants pocket.
5    Q. What pocket?
6    A. I don't remember which pocket, both
7  pockets. I don't remember.
8    Q. And describe for me what you felt?
9    A. Based on my training and experience and
10 running the areas that I have with a lot of
11 narcotics possession, I felt what I believe was
12 marijuana in his pants.
13   Q. Large amount? Small am--
14   A. Large amount.
15   Q. I -- that's inaccurate for me. Could you
16 quantify the amount of marijuana that you thought
17 you felt in his pocket?
18   A. Hmm, about a decent size handful.
19   Q. Now, at this point in time you did not
20 know that he bought two cigars, right?
21   A. No.
22   Q. And you did not see any cigars when you
23 stopped him?
24   A. No, I didn't.

## AFFIDAVIT

- - -

STATE    OF    OHIO          :
                             : SS
COUNTY OF HAMILTON           :

I, Wendy Davies Welsh, Notary Public in and for the State of Ohio, do hereby state that the transcript of the deposition of Robert B. Jorg, deponent herein, having been submitted to said deponent for review and signature, has not been signed within the thirty (30) day period allowed under the Federal Rules; said deposition to now have the same force and effect as though signed.

_____
Wendy Davies Welsh, Court Reporter

Sworn to before me this _____ day of _____, 2004

_____
Thomas M. Bläsing
Notary Public - State of Ohio
My commission expires: May 4, 2004