UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| THE ESTATE OF ROGER D. OWENSBY, JR., BY AND THROUGH ROGER D. OWENSBY, | : : : : | Case No. C-1-01-769 |
| | | Judge Spiegel |
| Plaintiff, | : : | |
| v. | : : | |
| CITY OF CINCINNATI, et al., | : : : | **THE "GOLF MANOR" DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR** |
| Defendants. | : | **PARTIAL SUMMARY JUDGMENT** |

## I.      INTRODUCTION.

Plaintiff's Motion for Partial Summary Judgment is directed to the Golf Manor Defendants' alleged failure to render "critical medical care" to Owensby. This Motion is made despite the fact Owensby was never in the custody of Golf Manor and, in fact, it was never the intention of the arresting Cincinnati officers to relinquish custody of Owensby to Golf Manor. In the alternative, Plaintiff argues even if Owensby was not in the custody of Golf Manor, liability still rests with these Defendants for their failure to render medical care. Plaintiff's alternative positions are not supported by the applicable facts nor the applicable law. Rather, these Defendants are entitled to summary judgment in their favor for the reasons which follow as well as the arguments and authorities cited in their previously filed Motion for Summary Judgment.

## II.   SUPPLEMENTAL FACTS.

Plaintiff's argument is premised on an assertion Owensby was in the custody or control of Golf Manor while in the back seat of the Golf Manor cruiser.  (Plaintiff's Motion at Pp. 12, 15)  These assertions are conclusions not statements of fact.  As the undisputed facts make clear, the only connection between Owensby and Golf Manor was the request by the Cincinnati officers to place Owensby in the Golf Manor car.  There was never any physical contact between the Golf Manor officers and Owensby.  (*See*, Heiland and Campbell Affidavits, Exhibits A and B)  It must remembered Heiland and Campbell arrived after Owensby had been subdued, maced and handcuffed.   They did not witness the physical confrontation between Owensby and the Cincinnati officers.  (P. 17, Campbell Depo.; P. 21, Heiland Depo.)  The Cincinnati officers who asked for permission to place Owensby in the Golf Manor car never intended to transfer custody of Owensby.  Officer Caton testified:

> (Pp. 175-176, Caton Depo.)
>
> Q.   If that were the case, why didn't you walk him to your cruiser?
>
> A.   Because my cruiser was over 100 yards away, over a guarder that you had to climb over to get to it.  And as violently as he resisted, I didn't want to give him that much more time to recover and begin resisting again.  I wanted to secure him as quickly as possible.
>
> The Golf Manor cruiser was the only cruiser on scene, and it was there.  It was my intention to use it as a temporary holding facility until we could bring a cruiser over and transfer him to a Cincinnati cruiser.

Defendant, Jorg similarly testified Golf Manor's cruiser was the closest vehicle available. (P. 144, Jorg Depo.)  Jorg explained his intention with regard to the use of the Golf Manor car.

> (P. 217, Jorg Depo.)
>
> Q.      At that point in time is the scene stabilized?
>
> A.      Not necessarily.  He's in a different department's police car.  We've got cars still responding we have to disregard.  We have supervisors we need to talk to. We have to get our cars over to the scene to transport Mr. Owensby from the Golf Manor car to our car, so we can relieve the Golf Manor's <u>cars</u>, thank them for coming, and send them on the way.

Plaintiff attempts to cast Heiland and Campbell in a light indicative they knew of Owensby's injuries and/or that they were going to transport Owensby.  Neither assertion is correct.

Neither Heiland nor Campbell knew to what extent, if any, Owensby had been injured.  They had not witnessed the physical confrontation between Owensby and the Cincinnati officers.  Heiland did not believe Owensby was unconscious.  (Pp. 95, 128, 129, Heiland Depo.; P. 43, Campbell Depo.)

Heiland was never asked and never held any belief he was going to transport Owensby.  (P. 128, Heiland Depo.)

Similarly, Campbell would have asked the Cincinnati officers to check on the prisoner if he believed something was wrong.  (P. 43, Campbell Depo.)

Cincinnati Officer Brazile did not know who had arrested Owensby when he arrived at the scene.  (P. 90, B. Brazile Depo.)  In fact, the only reason he thought Owensby was Golf Manor's prisoner was due to the fact Owensby was in the Golf Manor car.  (P. 54, B.

Brazile Depo.)  Brazile went so far as to shine a flashlight on Owensby in the back seat,

yet he did not ask Heiland to call for medical aid nor did he.  (Pp. 71, 72, B. Brazile Depo.)

Brazile's testimony adds nothing in support of the claim Owensby was in the custody of

Golf Manor.  In fact, Brazile didn't know why Golf Manor was on the scene and readily

acknowledges the Cincinnati officers were in charge and exercising control over the

situation.  (Pp. 116-118, B. Brazile Depo.)

Plaintiff tries to characterize Heiland's shrugging of his shoulders as some form of

indifference towards Owensby.  Heiland's testimony dispels any basis for such an assertion

as does Brazile's.  Specifically, Brazile testified he doesn't know what Heiland meant when

he shrugged his shoulders.  (P. 128, B. Brazile Depo.)

Regardless of the characterization of the facts by Plaintiff, these facts remain

unrebutted:

> (1)  The Golf Manor officers did not handcuff, mace, arrest
> or have any physical contact with Roger Owensby;
>
> (2)  The confrontation with Roger Owensby occurred in
> Cincinnati with Cincinnati officers;
>
> (3)  The Cincinnati officers, having subdued Owensby,
> asked Golf Manor for permission to place him in the
> Golf Manor car;
>
> (4)  No one ever transferred custody of Owensby from
> Cincinnati to Golf Manor;
>
> (5)  Cincinnati officers placed Owensby in the Golf Manor
> cruiser;
>
> (6)  No Cincinnati officer ever asked Golf Manor to transport
> Owensby;
>
> (7)  The arresting Cincinnati officers only wanted to use the
> Golf Manor car temporarily until a Cincinnati car arrived;

(8)     Neither Heiland nor Campbell witnessed the physical encounter between the Cincinnati officers and Owensby;

(9)     Neither Heiland nor Campbell ever touched Owensby;

(10)    Neither Heiland nor Campbell knew Owensby was injured;

(11)    The Cincinnati officers removed Owensby from the Golf Manor car;

(12)    Pursuant to the Mutual Aid Agreement, Cincinnati had custody over Owensby.

These facts construed in the context of the applicable law demonstrate two things.  First, Plaintiff is not entitled to summary judgment against these Defendants and second, these Defendants are entitled to summary judgment.

## III.    ARGUMENT.

### A.    Golf Manor Was Not under a Constitutional Duty to Provide Medical Care to Owensby.

Plaintiff argues Owensby had a Constitutional right to have the Golf Manor officers provide medical assistance to him.  In support of this claim, Plaintiff cites several Supreme Court decisions, including *DeShaney v. Winnebago*, 289 U.S. 189 (1989), yet those decisions fail to establish the right Plaintiff is claiming.  In an apparent concession that "custody" or "special relationship" is a prerequisite to the claimed Constitutional right, Plaintiff argues the Defendants had custody of Owensby.  Plaintiff erroneously asserts Owensby was in the custody of Golf Manor, the Mutual Aid Agreement somehow made

Golf Manor responsible for Owensby and "twenty years of clearly established Sixth Circuit law" imposed a duty on Golf Manor to provide medical care for Owensby. (P. 12, Plaintiff's Motion for Partial Summary Judgment - Golf Manor)  These statements are simply incorrect.

The Court in *DeShaney v. Winnebago*, 489 U.S. 189 (1989) made clear what has to exist, in a Constitutional sense, for a right to medical treatment, etc. to exist. Recognizing when this duty arises:

> The affirmative duty to protect arises not from the state's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.
>
> * * *
>
> In the substantive due process analysis, it is the state's <u>affirmative act of restraining</u> the individual's freedom to act on his own behalf - through incarceration, institutionalization or other similar restraint of personal liberty - which is the "deprivation of liberty" triggering the protections of the due process clause, not its failure to protect his liberty interest against harms inflicted by other means. *Id.* at 201. (Emphasis added)

Stated somewhat differently, the Court in *City of Revere v. Massachusetts General Hospital*, 463 U.S. 239 (1983) established the responsibility:

> The due process clause, however, does require the responsible government or governmental agency to provide medical care to persons, such as Kivlin, who have been injured while being apprehended by the police. *Id.* at 244.

*DeShaney* and *Revere* read together demonstrate the fallacy of Plaintiff's argument.  The right Plaintiff claims does not arise until there is an <u>affirmative</u> act restraining one's liberty or an act by the entity apprehending an individual which results in an injury.  Golf Manor

did neither.  There is no affirmative act on the part of Golf Manor restraining Owensby's

liberty interest nor did they cause any alleged injury to Owensby.

Recent decisions from the Sixth Circuit have further defined the term "custodial" in

determining whether the *DeShaney* "special relationship" exists.  In *Cartwright v. City of*

*Marine City*, 336 F.3d 487 (6th Cir. 2003), the Court defined custody.  Specifically:

> . . . custody as the intentional application of physical force and
> show of authority made with the intent of acquiring physical
> control.  *Id.* at 491.  (*See also, Ewolski v. City of Brunswick*,
> 287 F.3d 492 (6th Cir. 2002))

The *DeShaney* "special relationship" only arises where the state restrains an individual.

*Sargi v. Kent City Bd. of Ed.*, 70 F.3d 907, 911 (6th Cir. 1995)

These cases clearly establish there was no "special relationship" between Owensby

and Golf Manor therefore Golf Manor owed no constitutional duty to Owensby.

Plaintiff makes a passing reference to a constitutional duty in a non-custodial

setting.  However, that argument too misses the mark.  In *Cartwright, supra*, the Court set

forth the elements of what must be established to create a duty in a non-custodial setting

consistent with the teaching of *DeShaney*.  These elements include:

> (1)    An affirmative act by the state actor which either
>        created or increased the risk that the plaintiff would be
>        exposed to an act of violence by a third party;
>
> (2)    A specific danger to the plaintiff wherein the state's
>        actions placed the plaintiff specifically at risk; and
>
> (3)    The state knew or should have known that its actions
>        specifically endangered the plaintiff.

The state-created danger theory requires an affirmative act.  A failure to act does not

amount to an affirmative act.  *Cartwright* at 493.

There was no constitutional duty on the part of Golf Manor to Owensby. This is true when judged from either the custodial or non-custodial context. Simply, Owensby was never in custody of Golf Manor and the non-custodial exception does not apply in that there was no affirmative act on the part of Golf Manor. Simply, there was never a "special relationship" between Golf Manor and Owensby.

**B.      The Substantive Due Process Clause Is the Applicable Standard for Determining Whether a Constitutional Violation Has Occurred for Failure to Provide Medical Care.**

Plaintiff argues the Fourth Amendment and its "objective reasonableness" standard should be the gauge to evaluate the conduct of the Golf Manor Defendants as opposed to the deliberate indifference standard of the substantive due process clause of the Fourteenth Amendment. However, Plaintiff blurs the two standards in advancing his argument. He first speaks in terms of the Fourth Amendment's "objective reasonableness" standard and then refers to the conduct of the Golf Manor Defendants as "deliberate indifference". (P. 13, Plaintiff's Motion for Partial Summary Judgment)

While there is support for the proposition that at times failure to provide medical care to persons seized by officers should be viewed under the Fourth Amendment standard such is not the case in the matter *sub judice*.

It bears repeating the Golf Manor officers had no physical contact with Owensby nor did they witness the physical confrontation between Owensby and the Cincinnati officers. When Heiland and Campbell arrived the Cincinnati officers had Owensby on the ground and apparently handcuffed. It was shortly after that point the Cincinnati officers asked if they could put Owensby in Heiland's cruiser. (Pp. 21, 22, Heiland Depo.; P. 17, Campbell Depo.) Further, these Defendants maintain they were under no Constitutional obligation

to provide medical care to Owensby.  Owensby was not in the custody of the Golf Manor officers nor did the officers know Owensby was seriously injured.

These Defendants do not dispute the holding in *Graham v. Connor*, 490 U.S. 386 (1989), wherein the Court recognized all claims of excessive force in the course of an arrest, investigatory stop or other "seizure" must be analyzed under the Fourth Amendment and its "reasonableness" standard.  However, the Fourth Amendment standard has no application to the Golf Manor officers.  The language in the *Graham* decision explicitly relates to physical force used by an officer in detaining a free citizen.  Under Plaintiff's theory any state actor who subsequently came in contact with the detainee could be subject to a claim for damages stemming from excessive force notwithstanding the fact they had no role whatsoever in the physical arrest.  It cannot be asserted the intent of the *Graham* decision was to reach officers in the position of Heiland and Campbell.  In fact, one of the decisions upon which Plaintiff relies, *Estate of Phillips, III v. City of Milwaukee*, 123 F.3d 586 (7th Cir. 1997), recognizes there are limitations as to the extent of applicability of *Graham*.  In *Phillips* the Court observed:

> . . . It is true that at some point after a person is arrested, the question whether his continued confinement or prosecution is unconstitutional passes over from the Fourth Amendment to the due process clause . . . *Id.* at 596.

While little guidance is provided as to at what point the officer's actions are to be judged under the Fourteenth Amendment as opposed to the Fourth Amendment, the facts of this case clearly require examination under the Fourteenth Amendment and not the Fourth.

The Fifth Circuit in *Wagner v. Bay City*, 227 F.3d 316 (5th Cir. 2000) was confronted with a set of facts nearly identical to those in the case now before the Court.  Ultimately, the Court entered summary judgment on behalf of all of the officers.

In *Wagner* the officers encountered an individual at a restaurant who became violent.  The officers ended up in a struggle with the assailant who was dragged outside by the officers and sprayed with pepper spray.  The individual was placed face down on the pavement and was handcuffed.  One of the officers had his knee in the assailant's back and kept pushing the assailant's neck and head to the ground with a stick.  After the assailant was handcuffed, three additional officers arrived on the scene.  Upon their arrival, the assailant was on his stomach and no longer struggling.  The officers carried him to the police car since he could not walk on his own.  He was placed headfirst into the car and, in fact, one of the other officers had to go to the other side of the car to pull him into the vehicle.

When the assailant arrived at the jail it was observed he was not breathing, the handcuffs were removed and CPR was begun.  He was subsequently transported to the hospital where he ultimately died.

The two primary claims asserted related to excessive force and failure to respond to the assailant's medical needs.  The excessive force claims as to the officers who arrived subsequent to the handcuffing were dismissed since they arrived following the altercation.

The *Wagner* Court recognized the issue with regard to medical care should be judged from the substantive due process guarantee of the Fourteenth Amendment.  As the *Wagner* Court observed:

> A pre-trial detainee's Constitutional right to medical care, whether in prison or custody, flows from the procedural and substantive due process guarantees of the Fourteenth Amendment.  Liability for failing to provide such care attaches if the plaintiff can show that a state official acted with deliberate indifference to a substantial risk of serious medical

> harm and that injuries resulted. Deliberate indifference
> requires that the official has subjective knowledge of the risk of
> harm. Mere negligence will not suffice, and deliberate
> indifference, *i.e.*, the subjective intent to cause harm, cannot
> be inferred from a failure to act reasonably. *Id.* at 324.

Where, as here, Heiland and Campbell had nothing whatsoever to do with the arrest

of Owensby and did not arrive on the scene until he had been subdued, there is no

legitimate basis to judge their actions under the Fourth Amendment. Rather, their actions

must be judged under the substantive due process portion of the Fourteenth Amendment.[1]

## C. Claims Against Heiland and Campbell in Their Individual Capacities and Affirmative Defense of Qualified Immunity.

These Defendants certainly deny they are liable in any capacity to Plaintiff.

However, the arguments addressing qualified immunity as it relates to the officers in their

individual capacities has been addressed in these Defendants' Motion for Summary

Judgment and will be further addressed in their Reply Memorandum in Support of

Summary Judgment. In order to avoid duplication of efforts, these Defendants' arguments

in support of summary judgment related to qualified immunity and as set forth in their

Motion for Summary Judgment and Reply Memorandum in Support of Summary Judgment

are adopted and incorporated herein as if fully rewritten.

## D. Plaintiff's Claim of Municipal Liability Against Golf Manor must Fail.

Plaintiff argues Golf Manor is liable to him for an alleged failure to properly train/

supervise its officers. Plaintiff characterizes this failure to train as "deliberate indifference".

*Canton v. Harris*, 489 U.S. 378 (1989).

---

[1] The inquiry never advances to this stage since Heiland and Campbell owed no duty to Owensby.

Plaintiff's argument must fail for two reasons.  First, the officers did not violate the Constitutional right of Owensby or in the alternative are entitled to qualified immunity.  In either case liability does not attach to the municipality.  *Brown v. Shaner*, 172 F.3d 927 (6th Cir. 1999); *Bukowski v. City of Akron*, 326 F.3d 702 (6th Cir. 2003; *Ewolski v. City of Brunswick*, 287 F.3d 492 (6th Cir. 2002).

Notwithstanding a claim against the individual officers, there is nothing to suggest the training on the part of Golf Manor rose to the level of "deliberate indifference".

Plaintiff's entire argument is predicated upon the Mutual Aid Agreement which, in no uncertain terms, makes clear Mr. Owensby was the prisoner of Cincinnati and not Golf Manor.

The testimony of Heiland and Campbell demonstrates the training afforded them by the Village of Golf Manor did not rise to the level of deliberate indifference.  Quite the contrary.

In the first instance, Heiland did not know the physical condition of Owensby when he was placed in his car.  (P. 47, Heiland Depo.)  Heiland testified concerning his understanding of the Mutual Aid Agreement.

> (Pp. 69-71, Heiland Depo.)
>
> Q.    That was this Mutual Aid Agreement that was signed by the various police departments in the Greater Cincinnati area?
>
> A.    Correct.
>
> Q.    Other than knowing that you could assist other police departments, do you know whether or not there was any policy or guidance or custom in place at Golf Manor to address what an officer's duties and responsibilities were where another police department asks him to place their prisoner in his car?

A.    When we would respond to a scene to assist another department we would be under their command, no matter what the rank.  If you pull up on the scene you assist them in how they need you to assist.

Q.    In responding to this assistance call, did you understand that you would be subject to the rules, policies and customs of the Cincinnati Police Department or the Golf Manor Police Department?

A.    My understanding was I would be there at the scene to assist them how they needed me to.

Q.    Do you recall receiving any instruction or guidance concerning what rules a Golf Manor officer had to follow when he was in this situation of assisting another police department?

A.    Through working with other officers in field training and go to other scenes in other departments, I just understood that we were under their direction for as long as they needed assistance and that was it.

Heiland also testified that when another jurisdiction placed a prisoner in his car that person was the other jurisdiction's responsibility.  (Pp. 73, 74, Heiland Depo.)

Campbell testified he believed Owensby was Cincinnati's prisoner.  (P. 35, Campbell Depo.)  Further, Campbell if he had thought there was something wrong he would have asked the City to check on their prisoner.  (P. 43, Campbell Depo.)

The Mutual Aid Agreement makes clear Owensby was under the control of Cincinnati.  Paragraph I(A) provides in pertinent part:

> Control of any arrested person, evidence in a crime scene shall be relinquished to the first available officer from the jurisdiction within which the crime took place.  The arresting officer may immediately transport or relocate any arrested persons or evidence if the officer determines that remaining at the crime scene could endanger himself or others or threaten the preservation of any evidence.

Clearly, Owensby was arrested by Cincinnati officers in Cincinnati and control was never relinquished to Golf Manor. The very terms of the Mutual Aid Agreement vested control of Owensby with Cincinnati.

In light of that Agreement, Heiland's testimony and Campbell's testimony makes clear Cincinnati was responsible for Owensby. This understanding of the Agreement does not reflect a lack of training rising to the level of deliberate indifference. Further, any issue of training on their part concerning the Mutual Aid Agreement is irrelevant since Owensby was in the custody of Cincinnati.

The actions of Heiland and Campbell as highlighted by Plaintiff do not reflect deliberate indifference on the part of Golf Manor with regard to their training.

## IV.   CONCLUSION.

Based on the foregoing as well as the arguments and authorities cited in these Defendants' Motion for Summary Judgment, Plaintiff's Motion for Partial Summary Judgment must be overruled and these Defendants' Motion for Summary Judgment must be granted.

Respectfully submitted,

/s/      Wilson G. Weisenfelder, Jr.
Wilson G. Weisenfelder, Jr. (0030179)
RENDIGS, FRY, KIELY & DENNIS, L.L.P.
One West Fourth Street, Suite 900
Cincinnati, OH  45202-3688
(513) 381-9292
(513) 381-9206 - Facsimile
wgw@rendigs.com
Trial Attorney for Defendants, Village of Golf Manor, Stephen Tilley, Robert Heiland and John Doe #7 n/k/a Chris Campbell

## CERTIFICATE OF SERVICE

I hereby certify that on February 24, 2004, I electronically filed the foregoing

Memorandum in Opposition with the Clerk of the Court using the CM/ECF system which

will send notification of such filing to the following:

James B. Helmer, Jr., Esq.
Paul B. Martins, Esq.
Frederick M. Morgan, Jr., Esq.
HELMER, MARTINS & MORGAN
Fourth & Walnut Centre, Suite 1900
105 E. 4th Street
Cincinnati, OH 45202-4008

John J. Helbling, Esq.
3672 Springdale Road
Cincinnati, OH  45251

Mark T. Tillar, Esq.
240 Clark Road
Cincinnati, OH 45215

Donald E. Hardin, Esq.
HARDIN, LEFTON, LAZARUS & MARKS
915 Cincinnati Club Building
30 Garfield Place
Cincinnati, OH  45202-4322

Dale A. Stalf, Esq.
BUCKLEY, KING & BLUSO
1420 PNC Center
201 East Fifth Street
Cincinnati, OH  45202

Geri H. Geiler, Esq.
Julie Bissinger, Esq.
Assistant City Solicitors
Room 214 City Hall
801 Plum Street
Cincinnati, OH  45202

Neil F. Freund, Esq.
FREUND, FREEZE & ARNOLD
One Dayton Centre, Suite 1800
1 South Main Street
Dayton, OH 45402-2017.

Ravert J. Clark, Esq.
114 E. 8th St., Suite 400
Cincinnati, OH 45202

/s/    Wilson G. Weisenfelder, Jr.
Wilson G. Weisenfelder, Jr.