UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - - - -
ESTATE OF ROGER D.                :
OWENSBY JR., et al.,              :
                                  :
       Plaintiffs,                :
   vs.                            :   Case No. 01-CV-769
                                  :   (Judge S. A. Spiegel)
CITY OF CINCINNATI,               :
et al.,                           :
                                  :
       Defendants.                :
- - - - - - - - - - - - - - - -

Videotaped deposition of BRIAN ANTHONY BRAZILE, a witness herein, called by the plaintiffs for cross-examination, pursuant to the Federal Rules of Civil Procedure, taken before me, Wendy Davies Welsh, a Registered Diplomate Reporter and Notary Public in and for the State of Ohio, at the offices of Helmer, Martins & Morgan Co. LPA, 1900 Fourth & Walnut Centre, 105 East Fourth Street, Cincinnati, Ohio, on Thursday, November 6, 2003, at 11:02 a.m.



COPY

1   A.   It was sort of like fetal sort of
2 position.
3   Q.   Did you say anything to Officer Heiland at
4 that time, after seeing Mr. Owensby with your
5 flashlight?
6   A.   Yes.
7   Q.   What did you say to Officer Heiland?
8   A.   I walked around to the other side of the
9 vehicle.
10   Q.   To the -- to the --
11   A.   To where they were.
12   Q.   -- rear of the passenger's side of the
13 vehicle?
14   A.   Where they were standing.
15   Q.   Okay.
16   A.   And I asked him, I said, "The guy you have
17 in your car, is he okay?" I said, "Can he breathe?"
18 I said, "He's in a" -- you know, position that
19 looked like he was in, it may have been hard, so I
20 asked him. I'm figuring he's their prisoner. No
21 one ever said whose he was. I figured he was
22 theirs, because he was in their car.
23       And basically I was just trying to let
24 them know to check on him, just to see what's going

1 like you had a serious question as to whether or not
2 he could breathe; is that right?
3    A.   It was just a question.
4    Q.   A question that you posed to the -- to
5 Officer Heiland?
6    A.   Correct.
7    Q.   And the reason you posed that is because
8 from what you saw you had a question as to whether
9 or not he could breathe or he was breathing?
10      MR. HARDIN:  Objection.
11    Q.   Correct?
12      MR. HARDIN:  You may answer.
13    A.   Uh-huh.  I wanted him to check to see if
14 his prisoner was okay.
15    Q.   Right.  And as I understand your
16 testimony, other than the statement that we've just
17 covered that you gave to Officer Heiland, you did
18 not repeat those concerns to any other Cincinnati
19 police officers at the scene, correct?
20    A.   That's correct.
21    Q.   Did you at any time that evening ask
22 Officer Heiland to make a call for medical
23 assistance?
24    A.   Did I ask him to?

```
 1      Q.   Yes.
 2      A.   No, I did not.
 3      Q.   And I take it you did not call for medical
 4 assistance?
 5      A.   No.
 6      Q.   You then walk -- after you talk to Officer
 7 Heiland, you walk back to your car to get your hat.
 8 Why did you need to get your hat?
 9      A.   Well, any time supervisors show up on the
10 run, basically you're supposed to be in your full
11 uniform.  Things like that get written up sometimes.
12 If you're on something and you don't have your hat
13 on, it -- it -- it's a big deal.
14      Q.   Look at Exhibit 4 -- I'm sorry, 47 that
15 you have before you, on page 4, the next page.  At
16 about halfway down the page you're asked about
17 Sergeant Browner.  You say, "I believe Sergeant
18 Browner, cause she parked next to my scout car" --
19 car -- "in the CDOP van."  Do you see that?
20      A.   Okay.  Yes.
21      Q.   What is a CDOP van?
22      A.   It actually is CDOP, civil disturbance
23 operations procedure van.
24      Q.   Is it -- all right.  And then further down
```

90

```
 1            We're on the record with videotape
 2       number two, Mr. Martins.
 3            MR. MARTINS:  Thank you.
 4  BY MR. MARTINS:
 5       Q.   Sir, I want to ask you, are -- you
 6  indicated earlier this morning that you had
 7  reviewed, I believe you said grand jury testimony
 8  that you had given.  Is -- is that accurate, that
 9  you ga-- you testified to the Hamilton County grand
10  jury?
11       A.   Correct.
12       Q.   You did?
13       A.   Yes.
14            MR. HARDIN:  You'll have to speak up.
15            THE WITNESS:  Yeah.
16            MR. HARDIN:  Okay.
17       Q.   At the time that you were at the scene did
18  you have an understanding of who had arrested Mr.
19  Owensby?
20       A.   No, I did not.
21       Q.   I want to -- you -- you may have already
22  testified that you've seen this before, but I want
23  to play for you the video of the cruiser camera from
24  Officer Spellen's car.
```

116

1    A.    Right.

2    Q.    Okay.  You arrived at the scene and you
3  saw at some point a Golf Manor car; is that right?

4    A.    Right.

5    Q.    Okay.  Did you know why Golf Manor was
6  there?

7    A.    Not at the time.  I figured --

8    Q.    Okay.  So you don't know why -- you didn't
9  know why --

10   A.    Well, I know when assistance came out,
11 everybody comes on an assistance run, but --

12   Q.    Okay.  Okay.  That's fine.  And did you
13 know or do you know today as to whether or not there
14 was a mutual aid pact between the City of Cincinnati
15 and Golf Manor?

16   A.    I'm -- thought -- I'm thinking so, yes.

17   Q.    Okay.  And your testimony a minute ago is
18 that when there's an all-county broadcast for an
19 officer needs assistance, everyone responds or
20 everyone within the general vicinity responds; is
21 that true?

22   A.    Yes.

23   Q.    Okay.  Now, in this particular case, since
24 the Sam's where the incident was occurring was

Case 1:01-cv-00769-SAS    Document 97-8    Filed 02/24/2004    Page 7 of 9

117

1  within the city, city of Cincinnati, is that the --
2  that was the City's scene, so to speak; is that
3  right?
4              MR. HARDIN:  Objection to the form of the
5      question.
6              MR. MARTINS:  Objection.
7      Q.   Go ahead.
8              MR. HARDIN:  Go ahead.
9      A.   The property, yes.
10     Q.   Okay.  And City of Cincinnati police
11 officers, would they have been in charge of that
12 scene?
13             MR. HARDIN:  Objection.
14             You may answer.
15     A.   You say would they have been?
16     Q.   Correct.
17     A.   I'm thinking so.
18     Q.   Okay.  And everything that you observed
19 that evening, from the time you arrived until you
20 left, there's no doubt in your mind that, in fact,
21 the City of Cincinnati Police Department was
22 exercising jurisdiction or control over that scene,
23 true?
24     A.   With the supervisors responding and stuff

602 Main Street, Suite 703, Cincinnati, OH  45202
(513) 381-8228 * (800) 578-1542 * www.merit-ls.com

```
 1  like that?
 2       Q.   Correct.
 3       A.   Yeah.
 4       Q.   I mean, that was all consistent with --
 5  everything that you observed that eve-- that evening
 6  was consistent with the City of Cincinnati Police
 7  Department being in control of that scene?
 8            MR. HARDIN:  Objection.
 9            You may answer.
10       A.   Except for one thing.
11       Q.   Well -- okay.  Answer it and then explain
12  your one thing.
13       A.   Okay.  And the one thing was, you know,
14  why would the prisoner be in a Golf Manor car if
15  this was a Cincinnati incident?
16       Q.   Okay.  Other than that one thing,
17  everything appeared to be to you -- everything
18  appeared to you as though the City of Cincinnati
19  police were in charge of that scene?
20            MR. HARDIN:  Objection.
21            You may answer.
22       A.   At that point in time, yes.
23       Q.   Okay.  Now, when you arrived, Mr. Owensby
24  was already in the Golf Manor car; is that true?
```

Case 1:01-cv-00769-SAS    Document 97-8    Filed 02/24/2004    Page 9 of 9

128

```
 1  descriptive?
 2       A.    That's the best action I can show, because
 3  it was mostly done with bodily, you know, functions.
 4       Q.    Okay.  He -- he raised his shoulders
 5  and --
 6       A.    Kind of raised them and --
 7       Q.    He raised his shoulders?
 8       A.    -- kind of -- kind of shook the head a
 9  little bit and -- you know.
10       Q.    Okay.  I think a minute --
11       A.    I don't know what it's called.
12       Q.    Okay.  And a minute ago you said, "Who
13  knows what that means?"
14       A.    Right.
15       Q.    Okay.  So when he did that, that would be
16  subject to a number of different interpretations,
17  couldn't it be, as to what he meant?
18       A.    Could have been, yes.  Very subjective.
19       Q.    It could have meant that he didn't know?
20             MR. MARTINS:  Objection.
21             MR. HARDIN:  Objection.
22       Q.    Is that true?
23       A.    Could have been.
24       Q.    Okay.  Other than that contact with
```

Merit
602 Main Street, Suite 703, Cincinnati, OH 45202
(513) 381-8228 * (800) 578-1542 * www.merit-ls.com