## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **ESTATE OF ROGER D. OWENSBY,** | : | **CASE NO. C-1-01-769** |
| **Plaintiff** | : | **(Judge S. Arthur Spiegel)** |
| **vs.** | : | **DEFENDANTS CITY OF CINCINNATI AND POLICE CHIEF THOMAS STREICHER, JR.'S RESPONSE CONTRA MOTION FOR PARTIAL SUMMARY JUDGMENT ON FAILURE TO PROVIDE MEDICAL CARE** |
| **CITY OF CINCINNATI, et al.** | : | |
| **Defendants.** | : | |

Defendants, City of Cincinnati and Police Chief Thomas Streicher, Jr., by and through counsel, hereby request this Court overrule the Plaintiffs' motion for partial summary judgment on the issue of alleged failure to provide medical care to decedent Roger Owensby on November 7, 2000, pursuant to Federal Rule of Civil Procedure 56.

Construing all the facts and inferences in the Defendants' favor, genuine issues of material fact exist upon which reasonable minds could differ including:

1) that the decedent died from a sudden cardiac arrest and not from mechanical asphyxiation;

2) after the decedent provoked a violent struggle with police and resisted arrest, he did not exhibit any outward, obvious signs of sudden cardiac arrest to prompt more immediate medical attention. Further, more prompt CPR could not have saved decedent after he experienced a sudden cardiac arrest;

3) reasonable minds would conclude Cincinnati's Section 12.545 "Use of Force," Section 12.600 "Prisoner's: Securing, Handling, and Transporting," "Manual of Rules and Regulations and Disciplinary Process for the Cincinnati Police Division," and Hamilton County Local Government Mutual Aid Agreement for Law Enforcement" policies properly and adequately protected the civil rights of citizens and do not establish "deliberate indifference" of these Defendants;

4) reasonable minds would conclude decedent's death from sudden cardiac arrest, after decedent resisted arrest and provoked a violent struggle, could not have been avoided had different police policies and procedures been in place;

i

5) reasonable minds would conclude Cincinnati properly trained its police officers in "use of force" situations.

This Request is more fully supported by the accompanying Memorandum, the affidavit of Police Chief Streicher which authenticates the accompanying Cincinnati police policies, attached as Exhibit A, and the affidavit of medical expert Tom S. Neuman, M.D., attached as Exhibit B.

Respectfully submitted,

JULIA L. McNEIL (0043535)
City Solicitor

**s: Neil F. Freund**
Neil F. Freund (0012183)
Vaseem S. Hadi (#0075617)
FREUND, FREEZE & ARNOLD
One Dayton Centre
1 South Main Street, Suite 1800
Dayton, OH 45402-2017
(937) 222-2424
email: nfreund@ffalaw.com

**s: Geri Hernandez Geiler**
Geri Hernandez Geiler (0042081)
Sr. Assistant City Solicitor
Room 214, City Hall
801 Plum Street
Cincinnati, OH 45202
(513) 352-3338
email:geri.Geiler@cincinnati-oh.gov
Trial Attorneys for Defendants

ii

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| ESTATE OF ROGER D. OWENSBY, | : | CASE NO. C-1-01-769 |
| **Plaintiff** | : | (Judge S. Arthur Spiegel) |
| **vs.** | : | **DEFENDANTS CITY OF CINCINNATI AND POLICE CHIEF THOMAS STREICHER, JR.'S RESPONSE CONTRA MOTION FOR PARTIAL SUMMARY JUDGMENT ON FAILURE TO PROVIDE MEDICAL CARE** |
| CITY OF CINCINNATI, et al. | : | |
| **Defendants.** | : | |

Defendants, City of Cincinnati and Police Chief Thomas Streicher, Jr., by and through counsel, hereby request this Court overrule the Plaintiffs' motion for partial summary judgment on the issue of alleged failure to provide medical care to decedent Roger Owensby on November 7, 2000, pursuant to Federal Rule of Civil Procedure 56.

Construing all the facts and inferences in the Defendants' favor, genuine issues of material fact exist upon which reasonable minds could differ including:

1) that the decedent died from a sudden cardiac arrest and not from mechanical asphyxiation;

2) after the decedent provoked a violent struggle with police and resisted arrest, he did not exhibit any outward, obvious signs of sudden cardiac arrest to prompt more immediate medical attention. Further, more prompt CPR could not have saved decedent after he experienced a sudden cardiac arrest;

3) reasonable minds would conclude Cincinnati's Section 12.545 "Use of Force," Section 12.600 "Prisoner's: Securing, Handling, and Transporting," "Manual of Rules and Regulations and Disciplinary Process for the Cincinnati Police Division," and Hamilton County Local Government Mutual Aid Agreement for Law Enforcement" policies properly and adequately protected the civil rights of citizens and do not establish "deliberate indifference" of these Defendants;

4) reasonable minds would conclude decedent's death from sudden cardiac arrest, after decedent resisted arrest and provoked a violent struggle, could not have been avoided had different police policies and procedures been in place;

5) reasonable minds would conclude Cincinnati properly trained its police officers
in "use of force" situations.

This Request is more fully supported by the accompanying Memorandum, the affidavit of
Police Chief Streicher which authenticates the accompanying Cincinnati police policies, attached
as Exhibit A, and the affidavit of medical expert Tom S. Neuman, M.D., attached as Exhibit B.

Respectfully submitted,

JULIA L. McNEIL (0043535)
City Solicitor

**s: Neil F. Freund**
Neil F. Freund (0012183)
Vaseem S. Hadi (#0075617)
FREUND, FREEZE & ARNOLD
One Dayton Centre
1 South Main Street, Suite 1800
Dayton, OH 45402-2017
(937) 222-2424
email: nfreund@ffalaw.com

**s: Geri Hernandez Geiler**
Geri Hernandez Geiler (0042081)
Sr. Assistant City Solicitor
Room 214, City Hall
801 Plum Street
Cincinnati, OH 45202
(513) 352-3338
email:geri.Geiler@cincinnati-oh.gov
Trial Attorneys for Defendants

ii

## MEMORANDUM

### I.    STATEMENT OF FACTS

This case involves the November 7, 2000 arrest of decedent Roger Owensby after Cincinnati police officers positively identified decedent as a suspect and the decedent actively resisted arrest by attempting to flee and physically resisting arrest.   During the events at issue, Cincinnati employed several written police policies and guidelines designed specifically to protect the civil rights of criminals and detainees.  The Section 12.545 "Use of Force" Policy states:

> When officers have a right to make an arrest, they may use whatever force is reasonably necessary to apprehend the offender or effect the arrest, and no more. They must avoid using unnecessary violence.   Their privilege to use force is not limited to that amount of force necessary to protect themselves, but extends to that amount reasonably necessary to enable them to perform their duty.

(Sec. 12.545 Policy at 2, attached to Streicher Aff.)(emphasis added).  The "Use of Force" Policy further contains procedures for arresting injured persons and providing medical care as follows:

> Following any use of force resulting in a citizen's injury, officers will ensure appropriate first aid is rendered immediately once the incident scene is stabilized.

(Id. at 3).  This Policy requires officers to document and report injuries to prisoners in a force situation.  (Id. at 8.)  When using chemical irritants, exposed individuals must receive fresh air and clear, cool water.  (Id. at 9.)    Finally, Section 12.545 requires officers to modify the level of force used depending on how the suspect resists and whether they have injuries.  Section 12.545 cites to and relies upon U.S. Supreme Court precedent at the very beginning of the section.  (Id. at 1 (citing Graham v. Conner, 490 U.S. 386 (1989); Tennessee v. Garner, 471 U.S. 1 (1985)).

Next, the Section 12.600 "Prisoners: Securing, Handling, and Transporting" Policy provides guidelines on how persons should be handcuffed.  (Section 12.600 Policy at 3.)  Handcuffs may be removed if the suspect is seriously injured and/or requires medical treatment.  (Id.)  Strip and cavity

searches are permissible only when there is "probable cause" to believe the prisoner is concealing evidence, contraband or weapons. (Id. at 4.) This Policy contains guidelines for transporting prisoners to appropriate facilities. (Id. at 9-13.) All prisoner injuries, whether they result from the Section 12.545 Use of Force procedure or occurring before police control, must be documented. (Id. at 13.) Officers must "immediately seek medical attention" if a prisoner becomes sick or injured after the arrest. (Id. at 17.) These steps may include direct transport to University Hospital or calling EMT or paramedics. (Id.) Finally, officers transporting physically or mentally disabled prisoners must use appropriate vehicles to provide the necessary care. (Id.)

The "Manual of Rules and Regulations and Disciplinary Process for the Cincinnati Police Division" allows the City to discipline officers who violate the public trust or police policies. Section One of this Policy requires officers to not intentionally or negligently "fail to carry out any rule, regulation, procedure, directive, or order of the Division, which may lead to risk of physical injury to another ... " (Manual at 6.) Moreover, officers shall not "physically mistreat persons who are in custody and shall protect them from mistreatment by others. **Members shall handle persons in accordance with law and Division procedure."** (Id. at 8-9)(emphasis added). Disciplinary action for violating these guidelines may include temporary relief from duty, suspension or dismissal.

The "Hamilton County Local Government Mutual Aid Agreement for Law Enforcement" subjected co-defendant Village of Golf Manor and its police officers to the same written policies discussed earlier as follows:

General Terms and Procedures

D. Whenever the law enforcement employees of one cooperating Agency are providing police services upon request to another cooperating Agency they will be under the lawful direction and authority of the commanding law enforcement

> officer of the Agency to which they are rendering assistance. **Officers shall be**
> **subject to the code of ethics, policies, and rules and regulations of their**
> **employing Agency at all times.**

(Mut. Aid Agree. at 7-8.) As such, Cincinnati's Section 12.545 "Use of Force" Policy, Section

12.600 "Prisoners: Securing, Handling and Transporting" Policy, "Manual of Rules and Regulations

and Disciplinary Process for the Cincinnati Police Division" Policy were in place and controlled

during the underlying events. (Affidavit of Cincinnati Police Chief Thomas Streicher, Jr.)

On September 27, 2000, co-defendant, Officer David Hunter, attempted to arrest an African

American suspect across the street from Sam's Drive Thru, near the Huntington Meadows

Apartment Complex. (Hunter depo at 54-55.) Officer Hunter came face-to-face with the suspect.

(Id. at 77.) He placed his left hand on the suspect's shoulder. (Id.) Office Hunter looked "directly

at" the suspect. (Id. at 86.) After a brief dialogue, Officer Hunter showed the suspect his badge.

(Id. at 77-78.) The suspect "pushed off" Officer Hunter and fled. (Id. at 56-57; 78.) Officer Hunter

chased the suspect on foot through traffic unsuccessfully. (Id. at 57.)

A few weeks later, on November 7, 2000, Officers Hunter, Jorg and Caton parked their

cruisers in the Sam's parking lot. (Jorg Depo. at 86.) The officers wore their uniforms. (Id. at 87.)

Officer Hunter positively identified the decedent as the earlier suspect who evaded arrest. (Id. at

86-87.) Upon viewing the decedent, Officer Hunter stated, "Yes, that's the man that ran ... [t]hat's

the guy." (Id. at 102.) After the decedent exited the store, Officer Jorg tried to handcuff the

decedent, but the decedent ran. (Id. at 103.) Decedent's actions forced the officers to employ

use of force to facilitate the arrest. (Officer Caton depo at 94-98; Officer Jorg depo. At 102-107.)

The decedent resisted violently and kicked at the officers. (Officer Caton depo at 103). The

decedent was maced. (Officer Hunter depo. at 166.) Pursuant to the Mutual Aid Agreement with

Cincinnati, co-defendant Village of Golf Manor sent officers to the scene. Eventually, the arrest

officer of the Agency to which they are rendering assistance. **Officers shall be subject to the code of ethics, policies, and rules and regulations of their employing Agency at all times.**

(Mut. Aid Agree. at 7-8.) As such, Cincinnati's Section 12.545 "Use of Force" Policy, Section 12.600 "Prisoners: Securing, Handling and Transporting" Policy, "Manual of Rules and Regulations and Disciplinary Process for the Cincinnati Police Division" Policy were in place and controlled during the underlying events. (Affidavit of Cincinnati Police Chief Thomas Streicher, Jr.)

On September 27, 2000, co-defendant, Officer David Hunter, attempted to arrest an African American suspect across the street from Sam's Drive Thru, near the Huntington Meadows Apartment Complex. (Hunter depo at 54-55.) Officer Hunter came face-to-face with the suspect. (Id. at 77.) He placed his left hand on the suspect's shoulder. (Id.) Office Hunter looked "directly at" the suspect. (Id. at 86.) After a brief dialogue, Officer Hunter showed the suspect his badge. (Id. at 77-78.) The suspect "pushed off" Officer Hunter and fled. (Id. at 56-57; 78.) Officer Hunter chased the suspect on foot through traffic unsuccessfully. (Id. at 57.)

A few weeks later, on November 7, 2000, Officers Hunter, Jorg and Caton parked their cruisers in the Sam's parking lot. (Jorg Depo. at 86.) The officers wore their uniforms. (Id. at 87.) Officer Hunter positively identified the decedent as the earlier suspect who evaded arrest. (Id. at 86-87.) Upon viewing the decedent, Officer Hunter stated, "Yes, that's the man that ran ... [t]hat's the guy." (Id. at 102.) After the decedent exited the store, Officer Jorg tried to handcuff the decedent, but the decedent ran. (Id. at 103.) Decedent's actions forced the officers to employ use of force to facilitate the arrest. (Officer Caton depo at 94-98; Officer Jorg depo. At 102-107.) The decedent resisted violently and kicked at the officers. (Officer Caton depo at 103.) The decedent was maced. (Officer Hunter depo. at 166.) Pursuant to the Mutual Aid Agreement with Cincinnati, co-defendant Village of Golf Manor sent officers to the scene. Eventually, the arrest was completed and decedent was placed in the back of a

of a Golf Manor cruiser. (Officer Hunter depo. at 175; Officer Sellers depo at 54-55.)

A few short minutes later, Seargent Watts discovered the decedent was not moving. (Officer Caton depo. At 18.) The decedent was removed from the cruiser immediately. The officers called the EMT and Fire Rescue for assistance. Officers Caton and Hasse administered CPR. (Officer Caton depo. At 140-41.) The decedent was pronounced dead at University Hospital shortly thereafter. The Coroner identified cause of death as "mechanical asphyxiation." (Dr. Schultz depo. At 51.)

Despite the coroner's findings, the evidence shows that it is impossible the decedent died from mechanical asphyxiation. Instead, Emergency Medicine Specialist Tom S. Neuman, M.D. opined to a reasonable degree of medical probability that the decedent sustained a sudden cardiac arrest. (Affidavit of Tom S. Neuman, M.D., ¶18, 21, attached as Exhibit B.) Death from asphyixiation takes a "considerable period of time to occur." (Id. ¶ 13.) Once the oxygen supply is interrupted, the heart continues to beat even though the individual loses consciousness. (Id.) The body relies upon significant oxygen stores, which allow organs to function when the person is not breathing. (Id. ¶14.) This ability allows people to hold their breath for limited periods of time without sustaining organ damage. (Id.) Generally, death from asphyxiation takes longer than five minutes. (Id.)

In this case, the timing of events establishes it is "highly unlikely" the decedent died from mechanical asphyxiation. (Id. ¶15.) It is not possible that a two minute struggle with police completely cutoff oxygen supply, resulting in death. (Id.) Instead, the underlying facts, circumstances and medical records indicate decedent died from a sudden cardiac arrest, related to the decedent's enlarged heart. (Id. ¶18.) More prompt CPR would not have saved the decedent's life. (Id. ¶¶ 20-21.)

The Plaintiffs filed a lawsuit asserting a 42 U.S.C. §1983 claim, alleging that the City and Chief Streicher implemented deficient police and training policies.  On February 2, 2004, Plaintiffs filed a motion for partial summary judgment against Cincinnati and Chief Streicher as well as individual defendant police officers Robert Jorg, Patrick Caton, David Hunter, Darren Sellers and Victor Spellen, solely on the issue of alleged failure to provide medical care under 42 U.S.C. § 1983.  No other claims were addressed in Plaintiff's motion.  Plaintiffs specifically excluded other individual defendants, such as officer Jason Hodge and the John Doe individuals identified in the Complaint, from their motion for partial summary judgment. Cincinnati and Police Chief Streicher now request the Court overrule plaintiffs' motion for partial summary judgment for reasons discussed below.[1]

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment should be granted with caution.  Lupo v. Voinovich, 235 F.Supp. 2d 782, 788 (S.D. Ohio 2002)(citing Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  Federal Rule of Civil Procedure 56 states:

> Summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c).  "Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable juror could return a verdict for the non-moving party." Lupo, supra (quoting Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986).

Like the standard for directed verdicts, summary judgment should be denied when the

---

[1] Individual officers Robert Jorg, Patrick Caton, David Hunter, Darren Sellers, and Victor Spellen are expected to file a separate memorandum contra Motion for Partial Summary Judgment on their behalf.

evidence presents a "sufficient disagreement to require submission to a jury ..." Anderson, 477 U.S.
at 251-52. The moving party bears the burden of showing the absence of any genuine issue of
material fact; all evidence "must be viewed in the light most favorable to the opposing party."
Lupo, supra (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)). For reasons
discussed below, summary judgment should be denied because the evidence shows the existence of
genuine issues of material fact.

III.    **LAW AND ARGUMENT**

  **A. NO CONSTITUTION RIGHT HAS BEEN VIOLATED.**

   42 U.S.C. §1983 is not itself a source of substantive rights, but merely provides a method for
vindicating federal rights elsewhere conferred. §1983 requires direct liability. In Monell V. Dept.
of Soc. Serv. of the City of New York, 436 U.S. 658, 692 (1978), the Supreme Court held that no
respondeat superior liability applied to §1983.

> We conclude therefore, that a local government may not be sued under §1983 for an injury
> inflicted solely by its employees or agents. Instead it is when execution of a government's
> policy or custom, whether made by its lawmakers or by those whose edicts or acts may
> fairly be said to represent official policy, inflicts the injury that the government as an entity
> is responsible under §1983.

The government action at issue must be the "moving force" behind the constitutional violation.
Polk County v. Dodson, 454 U.S. 312, 326 (1981). The Supreme Court has also instructed that
there must be a direct causal link between the policy and the violation. City of Canton v. Harris,
489 U.S. 378, 395 (1989).

   The first question in the §1983 analysis in this case is whether a constitutional violation
occurred. Albright v. Oliver, 510 U.S. 266, 114 S.Ct. 807 (1994); Baker v. McCollon, 443 U.S.
137, 140, 144, n.3 (1979); Graham v. Connor, 490 U.S. 386, 394, 109 S.Ct. 1865, 1870 (1989).
Plaintiff bears the burden of proving both:

(1) that a constitutional right was violated and;

(2) that the deprivation was caused by the City's deliberate indifference to its known or obvious consequences.

City of Canton at footnote 8. Plaintiff can prove neither. Since the answer to whether there was any constitutional right violated is "no," that is where the Court's analysis should stop. Plaintiff argues in the Motion for Summary Judgment that the decedent was deprived of his constitutional right to medical care. Plaintiff then incorrectly proceeds to analyze the alleged deprivation of medical care under a Fourth Amendment framework. The Fourteenth Amendment "deliberate indifference" test, rather than the Fourth Amendment "objective reasonableness test" is the appropriate analysis for the general right to medical care.

Plaintiff, citing Spurlock v. Satterfield, 167 F.3d 995, n.19 (6th Cir. 1999), states "[t]he Sixth Circuit has addressed this issue and definitively ruled that a Fourteenth Amendment right does not preclude a finding that the right is clearly established when analyzed under the Fourth Amendment." (Plaintiff's Motion for Partial Summary Judgment, Doc. 88, p. 25). At best, Plaintiff's assertion is an extreme leap. A closer examination of Spurlock is necessary.

Spurlock involved charges that defendant officers and the prosecutor wrongfully investigated, prosecuted, convicted, and incarcerated the plaintiff. Specifically, one defendant was charged with fabricating evidence and probable cause, and conspiring to maliciously prosecute and convict. Citing Smith v. Williams, No. 9406306, 1996 WL 99329 (6th Cir. Mar. 6, 1996), Judge Nathanial R. Jones stated that the right to be free from malicious prosecution was clearly established under the Fourth Amendment. Id. "Prior to January 1994, however, this circuit analyzed that right as accruing under the Fourteenth rather than the Fourth Amendment." Spurlock at 1007. Footnote 19, cited by Plaintiff, states "[t]he right [to be free from malicious prosecution] must be asserted according to the Fourth Amendment because the Supreme Court, in Allbright v.

-8-

Oliver, 510 U.S. 266. . . held that there was no such substantive due process right." Id.  Plaintiff

now attempts to stretch the court's application of the Fourth Amendment to malicious prosecution

claims to claims for failure to provide medical care.  Judge Jones' opinion in Spurlock does not

support Plaintiff's attempt to force the right to medical care under the rubric of the Fourth

Amendment.[1]

      The Supreme Court established a constitutional right to medical care for pretrial detainees

under the Fourteenth Amendment due process clause in Bell v. Wolfish, 441 U.S. 520, 535 n. 16

(1979).  See also, City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983).  The Sixth Circuit

has followed this precedent in  Roberts v. City of Troy, 773 F.2d 720, 722 (6th Cir. 1985) and Rich

v. Mayfield Heights, 955 F.2d 1092, 1096 (6th Cir. 1992).  See also,  Fitzke v. Shappell, 468 F.2d

1072, 1076 (6th Cir. 1972); Danese v. Asman, 875 F.2d 1239 (6th Cir. 1989).  A general right of

prisoners to receive medical care was established in Estelle v. Gamble, 429 U.S. 97, 104 (1976).

      The right to medical care is only violated by "deliberate indifference to serious medical

needs of prisoners."  Estelle, at 104; Roberts v. City of Troy, 773 F.2d 720, 722 (6th Cir. 1985).

Objectively, the medical need at issue must be "sufficiently serious." Farmer v. Brennan, 511 U.S.

825, 834 (1994).

      The Sixth Circuit addressed the issue of medical care stating that "where the circumstances

are clearly sufficient to indicate the need of medical attention for injury or illness anyone who is

incarcerated . . . has the due process right to adequate medical care." Fitzke v. Shappell, 468 F.2d

1072, 1076 (6th Cir. 1972); see also Roberts, 773 F.2d at 723; Danese v. Asman, 875 F.2d 1239 (6th

Cir. 1989); Rich v. Mayfield Heights, 955 F.2d 1092, 1096 (6th Cir. 1992).

---

[1] Alexander v. Beale Street Blues Co., 108 F. Supp. 2d 934 (W.D. Tenn. 1999), cited by Plaintiff, is factually distinguishable from the case at bar.  Moreover, the Alexander court lumped together the reasonable seizure and right to medical care issues under the Fourth Amendment analysis.  Id. at 940.  The court does not cite any Sixth Circuit precedent nor is the case binding precedent on this Court.

Plaintiff's claim of right to medical care is addressed separately under a motion for partial summary judgment. Therefore, the issue is properly addressed as it was originally established, under the Fourteenth Amendment due process. The reason Plaintiff asserts a Fourth Amendment analysis is because the claim fails under the proper Fourteenth Amendment anaylsis.

In Farmer, supra, the Supreme Court specifically addressed "deliberate indifference" and articulated a subjective test for determining whether the right to medical care has been violated. Id. at 838. The official must actually know of the risk and disregard it. "An official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." Id. The Supreme Court has set forth an extremely high burden which Plaintiff herein cannot overcome.

First, Plaintiff has not demonstrated that the officers had actual knowledge of a serious need for medical care. See Farmer, at 834. The decedent had no broken or fractured bones. (Schultz Depo. p. 90). The only visible signs of trauma that would have been apparent to the officers that night were facial abrasions and possibly abrasions to the left forearm. (Id. at 148). Those abrasions were consistent with the decedent's resisting arrest. (Id.). "The injuries to his face are markers of trauma and they themselves are not injuries that need immediate attention." (Id.)

Officer Jorg saw a "light bit of blood," "road rash," and a minor cut. (Jorg Depo. p.145). Officer Caton did not see blood on Mr. Owensby's face. (Caton Depo. p. 129, 23, 19). He did not know that the decedent even had any lacerations on his face, instead; Officer Caton's attention was forced by the decedent to be focused on his feet as he began passively resisting by lifting his feet from the ground and nearly causing the trio to fall over. (Id. at 19-20, 123-124). When he assisted the decedent into the cruiser, it was too dark for Officer Caton to see that the decedent had any blood on his face and likewise, Officer Caton did not notice any blood that he had gotten on his own

-10-

shirt. (Id. at 22-23, 128-129). He first realized the decedent required medical assistance when Sergeant Watts looked into the cruiser. (Caton Depo. p.17). Upon the realization that the decedent was in need of medical attention, Officer Caton immediately began assisting another officer with CPR. (Id. at 17-18).

Officer Spellen, having come on the scene after Mr. Owensby was already inside the cruiser, did not see Mr. Owensby's face. (Spellen Depo. p. 51). From what he did see, he described Mr. Owensby as "hurting a little bit," but he believed it was a reaction to the mace. (Id. at 50). The simple fact that the decedent was maced was not any reason for the officers to believe that immediate medical attention was needed as mace was considered an irritant and not an injury producing product. (Caton depo, pp. 17-18). Fresh air was naturally provided to the decedent, obviously while being escorted to the cruiser, but also within the cruiser and more being anticipated during the drive to the justice center. (Id. at 180). Water being placed on the face of a suspect recently maced will only cause more irritation and pain. (Id. at 179). The decedent, having struggled with Officer Caton on the way to the cruiser and while being placed into the cruiser, showed no indication of needing immediate medical care. (Id. at 181, 125).

Officer Sellers stated that he did not know Mr. Owensby was injured. (Sellers Depo. p. 8). Golf Manor Officer Heiland stated that he would not have allowed the Cincinnati Police to place Mr. Owensby in his cruiser if he was unconscious or seriously injured. (Heiland Depo. p. 129). Officer Brazile stated that, having come on the scene after Mr. Owensby was already inside the Golf Manor cruiser, he believed Mr. Owensby to be in the custody of the Golf Manor officers. (Brazile depo. pp. 7, 54). Even so, Officer Brazile did let the Golf Manor officers know to check on who he considered to be their prisoner. (Id. at 54-55).

-11-

Viewing the facts in favor of the non-moving party, Plaintiff has not demonstrated that any of the officers actually knew of the decedent's injuries which required immediate medical attention, but then disregarded the need. As soon as decedent's condition was apparent, CPR was started and emergency medical care was summoned. (Caton depo. p. 17). The only delay resulted from the reasonable, yet mistaken belief that Mr. Owensby was not seriously injured. According to the Supreme Court in Farmer, supra, an officer's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot be condemned as the infliction of a constitutional violation. See Id. at 838. Having failed to prove that the Defendant Officers actually knew of the decedent's need for medical care, Plaintiff has failed to demonstrate that any constitutional right was violated.

Second, Plaintiffs state that the time Mr. Owensby was in the cruiser was crucial. However, the coroner is unable to state when Mr. Owensby died. Dr. Schultz has stated that it is "likely" that Mr. Owensby was dead on the ground. (Schultz depo. p. 199). Dr. Neuman addressed both scenarios concerning the time of death: whether Mr. Owensby died on the ground or in the cruiser. (Affidavit of Dr. Neuman, ¶12). In either scenario, Dr. Neuman opines that the decedent died of a sudden cardiac arrest. (Id. at ¶18). He bases his opinion on the weight of the decedent's heart and the amount of time recorded that the struggle occurred within. (Id. at ¶¶15, 18).

Regardless of when Mr. Owensby died, any medical care, regardless of when it was instituted, would not have mattered: "[f]urthermore, CPR, regardless of when it would have been instituted, would not, to a reasonable degree of medical probability, have made it more likely than not that he would have survived." (Affidavit of Dr. Neuman, ¶20, 21). There is no authority suggesting that the due process clause establishes an affirmative duty on the part of police officers to render CPR in any and all circumstances. Due process requires that police officers seek the

necessary medical attention for a detainee when he or she has been injured while being apprehended by either promptly summoning the necessary medical help or by taking the injuried detainee to a hospital. Rich, supra at _____, citing City of Revere, 463 U.S. at 244-45. Therefore, there would have been no constitutional right to medical care. Having failed to prove that any medical care would have prevented the decedent's death, Plaintiff has failed to demonstrate that any constitutional right was violated.

**B.    THE CITY'S TRAINING AND POLICIES DID NOT PROXIMATELY CAUSE A CONSTITUTIONAL VIOLATION.**

As stated above, §1983 does not impose vicarious liability on a municipality for the constitutional torts of its employees. Stemler v. City of Florence, 126 F.3d 856, 865 (6th Cir. 1997)(citing Monell v. Dept. of Soc. Servs. of the City of New York, 436 U.S. 658, 692 (1978)). Instead, the plaintiff asserting a §1983 claim must show his injury resulted from an unconstitutional policy or custom of the municipality. Stemler, 126 F.3d at 865. When the identified policy of the municipality is facially lawful, the plaintiff "must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences - a showing of "simple or even heightened negligence will not suffice." Id. (quoting Board of County Comm. of Bryan County v. Brown, 137 L.Ed.2d 626, 117 S.Ct. 1382, 1390 (1997)(quoting City of Canton v.Harris, 489 U.S. 378, 388 (1989)); see also, Brown v. Shaner, 172 F.3d 927 (6th Cir. 1999.)

"Deliberate indifference" is a stringent standard, requiring proof that a municipal actor "disregarded a known or obvious consequence of his action." Stemler, 126 F.3d at 865 (quoting Brown, 117 S.Ct. at 1391.) Stated differently, the risk of constitutional violations related to alleged inadequate municipal policies must be "plainly obvious." Stemler, 126 F.3d at 865 (quoting Brown, 117 S.Ct. at 1393.) When the identified policy involves police officer training, mere allegations that a city's existing training program for police officers represents a policy for which the city is

-13-

responsible, is insufficient under §1983.  City of Canton v. Harris, 489 U.S. 378, 389-90 (1989).
Instead, the issue is whether that police training program is adequate.  Id. at 390.  The focus must be
on adequacy of the training program in relation to the tasks the particular officers must perform.  Id.

**"That a particular officer may be unsatisfactorily trained will not alone suffice to
fasten liability on the city, for the officer's shortcomings may have resulted from factors other
than a faulty training program."**  Id. at 390-91 (citing Springfield v. Kibbe, 480 U.S. at 268
(O'Connor, J., dissenting); Oklahoma City v. Tuttle, 471 U.S. at 821(emphasis added).  "Only
where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality - a policy as
defined by our prior cases - can a city be liable for such a failure under §1983."  Brown v. Shaner,
172 F.3d 927, 930 (6th Cir. 1999)(quoting City of Canton, supra at 389.)

For example, an otherwise "sound program" has occasionally been negligently administered
does not establish "deliberate indifference," as a matter of law.  City of Canton, *supra* at 391.
Moreover, it is insufficient to prove that an injury or accident could have been avoided if an officer
had had better or more training, sufficient to equip him to avoid the particular injury-causing
conduct.  Id.  Without such a strict burden, a plaintiff could make such a claim about almost any
encounter resulting in injury, yet not condemn the adequacy of the training program to enable
officers to respond properly to the usual and recurring situations with which they must deal.  Id.
"And plainly, adequately trained officers occasionally make mistakes; the fact that they do says
little about the training program or the legal basis for holding the city liable."  Id.

If inadequate, the question becomes "whether such inadequate training can justifiably be
said to represent 'city policy.'"  Id.  at 390.  Two types of situations justify a conclusion of
deliberate indifference in the failure to train police officers including: 1) failure to provide adequate
training in light of foreseeable circumstances that could result from the lack of instruction; and 2)

-14-

where the city <u>fails to act in response to repeated complaints</u> of constitutional violations by its

officers. <u>Brown v. Shaner,</u> 172 F.3d 927, 931 (6th Cir. 1999)(citing <u>City of Canton,</u> supra at 390.)

If this criteria is met, the plaintiff still must show the alleged deficiency in the city's training

program is "closely related" to the ultimate injury. <u>City of Canton,</u> *supra* at 390 (stating the plaintiff

had the burden of proving the police officer training deficiencies actually caused the defendant

officers' indifference to the plaintiff's medical needs.")   The causation issue focuses on whether the

injury would have been avoided had the police officer-employee been trained under a different

program that was not deficient in the identified respect. <u>Id.</u>

The Supreme Court consciously enacted an extremely high burden of proof for §1983 claims

against municipalities. <u>City of Canton, Brown, Stemler,</u> *supra.*    Otherwise, "[i]n virtually every

instance where a person has had his or her constitutional rights violated by a city employee, a

[section] 1983 plaintiff will be able to point to something the city 'could have done' to prevent

the unfortunate incident." <u>City of Canton,</u> 489 U.S. 378, 392 (citing <u>Oklahoma City v. Tuttle,</u> 471

U.S. at 823.)   In turn, the existence of a lesser standard of proof would result in *de facto respondent*

*superior* liability of municipalities - a result the Supreme Court has considered and rejected. <u>City of</u>

<u>Canton,</u> *supra* at 392 (citing <u>Monell,</u> 436 U.S. at 693-94.)   A strict burden of proof must exist to

prevent subjecting federal courts to an "endless exercise of second-guessing municipal employee-

training programs" ... an exercise federal courts are "ill-suited to undertake" and that would raise

questions regarding federalism. <u>City of Canton,</u> *supra* at 392 (citing <u>Rizzo v. Goode,</u> 423 U.S. 362,

378-80 (1976)).

Finally, the fact-intensive "deliberate indifference" issue should be submitted to the jury,

and not adjudicated in a pre-trial motion,  as inferred from the following U.S. Supreme Court

passage:

> Predicting how a hypothetically well-trained officer would have acted under the circumstances may not be an easy task for the fact-finder, particularly since matters of judgment may be involved, and since officers who are well trained are not free from error and perhaps might react very much like the untrained officer in similar circumstances. But judge and jury, doing their respective jobs, will be adequate to the task.

Id. at 391.

In the case at bar, Plaintiffs' §1983 claims against Cincinnati and Police Chief Streicher amount only to vicarious liability and de facto respondent superior allegations for the defendant officers' conduct. Allegations of deliberate indifference of either Cincinnati or Chief Streicher lack any evidentiary support and constitute a genuine issue for the jury to decide. First, reasonable minds would conclude the applicable training policies Plaintiff identified are "facially lawful." Brown, City of Canton, Stemler, *supra*. The attached Police Procedure 12.545 "Use of Force" policy opens by citing U.S. Supreme Court precedent the City relied upon in drafting this policy. This policy addresses reasonable and appropriate ways for officers to arrest resisting individuals, use chemical irritants, as well as assessing and treating potential injuries. This policy lacks any text, which might imply that Cincinnati officers could unconstitutionally violate the rights of citizens for any reason. Thus, the "Use of Force" policy is facially lawful.

Similarly, the "Mutual Aid Agreement" lacks any unlawful test as well. Instead, it provides that the co-defendant Golf Manor officers are held to the exact same Cincinnati police policies, which are properly protect the civil rights of arrested persons for reasons discussed earlier. Plaintiff never points to any specific provision in the Mutual Aid Agreement to suggest it is unlawful on its face. Moreover, two other written policies, Section 12.600 "Prisoners: Securing, Handling and Transporting;" and "Manual of Rules and Regulations and Disciplinary Process for the Cincinnati Police Division," require officers to conform to the law and minimize personal injuries of detainees at all costs. The attached affidavit of Police Chief Thomas Streicher, Jr. establishes these written

-16-

hopes to recover a financial windfall, their motion for partial summary judgment should be denied.

Assuming arguendo that the training policies at issue were deficient, Plaintiffs never established that such policies were the sole and proximate cause of their alleged injuries. City of Canton, *supra* at 391. Again, the alleged deficient policies "must be closely related" to the decedent's death in this case. Specifically, the plaintiffs must show Cincinnati's alleged deficient policies, procedures and training on providing medical care to detainees is the one and only reason the individual officers might have been "deliberately indifferent" to the decedent. Id. In this case, proximate cause cannot be established because genuine issues of fact exist regarding the cause of death and exactly when, during the underlying arrest, the decedent experienced the fatal condition.

The attached affidavit of Emergency Medicine and Pulmonary Disease Specialist Dr. Tom Neuman states the decedent died from cardiac arrest and not from mechanical asphyxiation, as plaintiffs argued in their motion for partial summary judgment. (Exhibit B). Since two completely different, competing and mutually exclusive potential fatal conditions exist in this case, the finder of fact must evaluate all medical and expert evidence at trial. Since cause of death is uncertain, it further remains unclear when the precise moment during the decedent's arrest his fatal conditions onset, what symptoms he might have experienced, if any, which might have alerted the officers that medical attention was needed, and the exact amount of time the officers would have had to request such attention. In plaintiffs' motion for partial summary judgment, they vehemently argue the decedent asphyxiated in the Golf Manor cruiser and that the defendant officers consciously ignored this condition for a long time period. In contrast, Dr. Neuman's affidavit completely contradicts this theory, by suggesting the decedent experienced a sudden cardiac arrest and died within such a short time period that more prompt medical attention would not have made a difference. Dr. Neuman's opinions preclude the plaintiffs from establishing proximate cause on their claims against

-18-

Cincinnati and Chief Streicher.

Also, the medical records as identified in Dr. Neuman's affidavit shows the decedent had an enlarged heart, which made him more susceptible to cardiac arrest. Consequently, it follows the decedent's chances of sustaining a sudden cardiac episode were heightened after he decided to flee from police and violently resist arrest. During these events, undoubtedly the decedent's blood pressure skyrocketed, causing his heart to beat faster and aggravating his enlarged heart condition.

Construing these facts and inferences in the Defendants' favor, the decedent's chances of experiencing a sudden cardiac arrest, pursuant to Dr. Neuman's affidavit, increased regardless of what municipal police policies and training programs were in place after he decided to flee and provoke a violent struggle. In turn, the plaintiffs have not established the decedent would have lived had different police policies and training been in place that did not contain the alleged deficiencies. City of Canton, *supra* at 390 (stating the plaintiffs asserting a Section 1983 claim against a municipality for deficient police policies and training must show the alleged injuries would have been avoided had the police officer-employees been trained under a different program that was not deficient in the identified respect.) In short, summary judgment should be denied because the jury must weigh all expert and medical evidence at trial to resolve genuine issues of fact created by Dr. Neuman's affidavit including: 1) the cause of death; 2) when and where decedent was when the fatal condition onset; 3) whether medical attention was requested within a reasonable period of time after the officers knew or should have known medical attention was needed; and 4) whether the decedent could have been saved to a reasonable degree of medical probability had more prompt medical attention occurred.

Finally, even if cause of death was not in issue, the plaintiffs noticeably fail to explain why reasonable minds could not conclude any alleged delay in providing medical care resulted from the

defendant officers' human error, and not deliberate indifference, after all facts and inferences are construed in Cincinnati and Chief Streicher's favor. As the Supreme Court in City of Canton pointed out, these significant, factual issues will be extremely difficult for the jury to weigh and decide upon, which makes summary judgment all the more inappropriate in this case. The plaintiffs noticeably fail to cite one case where any court decided these highly complex, fact-intensive issues in a §1983 claim against a municipality and its police officers on summary judgment, thereby removing the case from the jury. For these reasons, summary judgment is inappropriate as the plaintiffs have failed to sustain their extremely high burden of proof under U.S. Supreme Court and Sixth Circuit authority when all facts and inferences are construed in the Defendants' favor. City of Canton, Monell, Oklahoma City, Springfield, Brown, Stemler, *supra.*

### CONCLUSION

Plaintiff cannot meet either requirement necessary to prove a §1983 claim. There was no constitutional violation which was proximately caused by the City's training or policies. For the foregoing reasons, Defendants City of Cincinnati and Police Chief Thomas J. Streicher, Jr. respectfully request the Court overrule plaintiffs' motion for partial summary judgment for failure to provide critical medical care.

Respectfully submitted,

JULIA L. McNEIL (#0043535)
City Solicitor

s: Neil F. Freund
Neil F. Freund (0012183)
Vaseem S. Hadi (#0075617)
FREUND, FREEZE & ARNOLD
One Dayton Centre
1 South Main Street, Suite 1800
Dayton, OH 45402-2017
(937) 222-2424

-20-

<u>s: **Geri Hernandez Geiler**</u>
Geri Hernandez Geiler (0042081)
Sr. Assistant City Solicitor
Room 214, City Hall
801 Plum Street
Cincinnati, OH 45202
(513) 352-3338
*Trial Attorneys for Defendants*
*City of Cincinnati and Police Chief Thomas*
*Streicher, Jr.*

## PROOF OF SERVICE

This will certify that a copy of the foregoing was served upon counsel of record by regular U.S. mail this 26th day of February, 2004:

Mark T. Tillar (0029898)
240 Clark Road
Cincinnati, OH 45202
(513) 761-2958
Attorney for Plaintiff

John Helbling (0046727)
3672 Springdale Road
Cincinnati, OH 45251
513-923-9740
Attorney for Plaintiff

Paul B. Martins
HELMER, MARTINS & MORGAN CO.
Fourth & Walnut Centre, Suite 1800
105 East 4th Street Cincinnati, Ohio 45202-4008
(513) 421-7902
Attorney for Plaintiff

Donald E. Hardin (0022095)
HARDIN, LEFTON, LAZARUS &
MARKS, LLC
915 Cincinnati Club Building
30 Garfield Place
Cincinnati, OH 45202
513-721-7300
Special Counsel for Defendants
Robert Blaine Jorg, Patrick Caton,
Darren Sellers, Jason Hodge, and
Victor Spellen

-21-

Wilson G. Weisenfelder, Jr. (0030179)
RENDIGS, FRY, KIELY & DENNIS, LLP
900 Fourth & Vine Tower
Cincinnati, OH 45202
513-381-9200
Attorney for Defendants
Village of Golf Manor,
Chief Stephen Tilley,
Officer Robert Heiland, and
John Doe #7 nka Chris Campbell

Dale A. Stalf (0000471)
BUCKLEY, KING & BLUSO
1320 PNC Center
201 East Fifth Street
Cincinnati, OH 45202
(513) 412-5400
Attorney for Huntington Meadows, LTD

Ravert J. Clark
114 East 8th Street
Suite 400
Cincinnati, OH 45202
(513) 587-2887
Attorney for Defendant
Cincinnati Police Officer
David Hunter

                                        s: Neil F. Freund
                                        Neil F. Freund (0012183)