UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| THE ESTATE OF ROGER D. OWENSBY, JR., BY AND THROUGH ROGER D. OWENSBY, | : : : : | Case No. C-1-01-769 |
| | : | Judge Spiegel |
| Plaintiff, | : : | |
| v. | : : | |
| | : | **THE "GOLF MANOR" DEFENDANTS'** |
| CITY OF CINCINNATI, et al., | : : | **REPLY MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT** |
| Defendants. | : | |

**I.     INTRODUCTION.**

Plaintiff takes issue with these Defendants' rendition of the facts related to the incident of September 27, 2000. There is absolutely no need to debate the finer points of what transpired on that evening since those events are totally irrelevant to Golf Manor's involvement in this case. Suffice it to say, the only reason the September 27, 2000 incident was even mentioned in these Defendants' Motion for Summary Judgment was to simply assist the Court in understanding the entire sequence of events. Golf Manor had no role in the September 27, 2000 incident and as such those facts are not germane to any issues before the Court involving Golf Manor.

Plaintiff has yet to establish any fact or any legal authority establishing Owensby was, at any time, in the custody of Golf Manor. There was never a "special relationship" between Owensby and Golf Manor and as a result no constitutional duty arose on the part of Golf Manor to Owensby. There is not a single act to which Plaintiff can point indicating Owensby was ever in the custody of Golf Manor. Golf Manor did not participate in

subduing Mr. Owensby. Golf Manor did not handcuff Mr. Owensby. Golf Manor did not mace Mr. Owensby. Golf Manor did not place Mr. Owensby in the Golf Manor cruiser. Golf Manor did not remove Mr. Owensby from the cruiser. The simple fact is Golf Manor's only connection with Mr. Owensby was permission to allow the Cincinnati officers to place Owensby in the Golf Manor cruiser. Golf Manor did not arrest Mr. Owensby. Accordingly, any issues related to the facts and circumstances or reasons for Owensby's arrest are simply irrelevant concerning Golf Manor's involvement.

These Defendants reassert they are entitled to judgment as a matter of law and, in addition, Plaintiff's Motion for Partial Summary Judgment against them must be overruled.

## II.    SUPPLEMENTAL FACTS.

Plaintiff fails to comprehend the role Golf Manor was fulfilling when its officers arrived at the scene on November 7, 2000. There is no dispute Heiland and Campbell did not participate in the arrest of Owensby nor were they present during the physical confrontation between the Cincinnati officers and Owensby. (P. 17, Campbell Depo.; P. 21, Heiland Depo.) Aside from Heiland opening the door to the cruiser at the request of a Cincinnati officer, there is no other involvement of Golf Manor in the events of November 7, 2000.

Plaintiff makes an assertion that no one told Golf Manor they (Golf Manor) were not going to transport Owensby. (P. 24, Plaintiff's Memorandum in Opposition to Summary Judgment) This statement rises to the level of absurdity for two reasons. First, there is absolutely no testimony <u>anyone</u> ever requested Golf Manor to transport Owensby.

Second, the testimony of the arresting Cincinnati officers in no uncertain terms contradicts Plaintiff's contention. Officer Caton testified:

> (Pp. 175-176, Caton Depo.)
>
> Q. If that were the case, why didn't you walk with him to your cruiser?
>
> A. Because my cruiser was over 100 yards away, over a guarder that you had to climb over to get to it. And as violently as he resisted, I didn't want to give him that much more time to recover and begin resisting again. I wanted to secure him as quickly as possible.
>
> The Golf Manor cruiser was the only cruiser on scene, and it was there. It was my intention to use it as a temporary holding facility until we could bring a cruiser over and transfer him to a Cincinnati cruiser.

Officer Jorg also testified:

> (P. 217, Jorg Depo.)
>
> Q. At that point in time is the scene stabilized?
>
> A. Not necessarily. He's in a different department's police car. We've got cars still responding we have to disregard. We have supervisors we need to talk to. We have to get our cars over to the scene to transport Mr. Owensby from the Golf Manor car to our car, so we can relieve the Golf Manor's cars, thank them for coming, and send them on the way.

These two excerpts make clear there was never _any_ intention of the arresting Cincinnati officers to have Golf Manor transport Owensby. What is clear, the Cincinnati officers needed the Golf Manor cruiser as a temporary holding facility until a Cincinnati car could arrive on the scene and Owensby be transferred to the Cincinnati car.

Plaintiff also points to a portion of Cincinnati Officer Brazile's testimony concerning the lack of medical treatment rendered to Owensby. Brazile's testimony concerning his

opinion the thing looked "fucked up" meant to the entire situation not the fact Owensby was in the rear of the Golf Manor car. (P. 67, B. Brazile Depo.) Brazile readily concedes he did not ask Officer Heiland to call for medical help nor did he call for medical assistance. (Pp. 71, 72, B. Brazile Depo.)

Further, Brazile did not ask anyone to open the rear door of the Golf Manor car to get a better look at Owensby. Brazile recalls seeing scrapes and cuts and a little bit of blood by his nostrils but nothing else. (P. 125, B. Brazile Depo.) Brazile recalls Heiland shrugging his shoulders but he does not know what this meant. (P. 128, B. Brazile Depo.)

Brazile is of the opinion the Cincinnati officers were in charge of the scene and that in fact, the Cincinnati officers were exercising control over the situation. (Pp. 117, 118, B. Brazile Depo.)

Aside from the lack of any evidence of Golf Manor's physical participation in this matter, as Brazile's testimony makes clear, Golf Manor was not directing any of the other officers on the scene or attempting to control any aspect of the situation.

### III.   ARGUMENT.

#### A.   Golf Manor Owed No Constitutional Duty To Owensby.

Plaintiff half-heartedly asserts the claims of excessive force against the Golf Manor Defendants are viable notwithstanding the fact they had absolutely no physical contact with Mr. Owensby. Plaintiff's argument apparently is predicated upon the notion the alleged failure to provide medical care goes "hand-in-glove" with the use of excessive force. In this particular case, such a contention is erroneous.

Conceding that at times failure to provide medical care may in fact be judged as a use of excessive force under the Fourth Amendment's "reasonable" standard, such is not the case here. As the Court in *Estate of Phillips, III, v. City of Milwaukee*, 123 F.3d 586 (7th Cir. 1997) observed:

> . . . It is true that at some point after a person is arrested the question whether his continued confinement or prosecution is unconstitutional passes over from the Fourth Amendment to the due process clause . . . *Id.* at 596.

More recently, the Fifth Circuit also had an opportunity to consider the same issue in *Wagner v. Bay City*, 227 F.3d 316 (5th Cir. 2000). In discussing the decedent's right to medical care and the appropriate standard, the *Wagner* Court observed:

> A pre-trial detainee's constitutional right to medical care, whether in prison or custody, flows from the procedural and substantive due process guarantees of the Fourteenth Amendment. Liability for failing to provide such care attaches if the plaintiff can show that a state official acted with deliberate indifference to a substantial risk of serious medical harm and that injuries resulted. Deliberate indifference requires that the official has subjective knowledge of the risk of harm. Mere negligence will not suffice, and deliberate indifference, *i.e.*, the subjective intent to cause harm, cannot be inferred from a failure to act reasonably. *Id.* at 324.

Clearly, the facts of this case are such that there is no basis for a claim of excessive force against these officers.

**B.   Golf Manor Was Not Under A Constitutional Duty To Provide Medical Care To Owensby.**

Plaintiff apparently concedes that absent a "special relationship" between Owensby and Golf Manor, no constitutional duty existed on the part of Golf Manor to Owensby.

There is apparently a mistake in Plaintiff's opposing Memorandum in that Plaintiff first argues that a "special relationship" constitutional duty is triggered only when a citizen

is not in custody and then argues the special relationship exists in custodial settings and where the state affirmatively places the individual in a position of danger that the individual otherwise would not have faced. (P. 16, Plaintiff's Memorandum in Opposition to Summary Judgment) The decision by the Court in *DeShaney v. Winnebago*, 489 U.S. 189 (1989), clearly sets forth that custody by the state of an individual does in fact create a "special relationship".

Plaintiff cites numerous cases concerning what constitutes custody of an individual. What Plaintiff fails to appreciate is the concept of "whose" custody Owensby was subjected to. The argument is not whether Owensby was in custody but rather the fact he was not in the "custody" of Golf Manor. Plaintiff has not set forth a single case nor a single fact which would even infer Owensby was in the custody of Golf Manor. This is particularly true not only from a pragmatic standpoint but from the Sixth Circuit's definition of custody. In *Cartwright v. City of Marine City*, 336 F.3d 487 (6th Cir. 2003), the Court defined custody. Specifically:

> . . . Custody is the intentional application of physical force and show of authority made with the intent of acquiring physical control. *Id.* at 491. (*See also, Ewolski v. City of Brunswick*, 287 F.3d 492 (6th Cir. 2002))

There is not a single act attributable to either officer from Golf Manor which could be construed as the intentional application of physical force nor any act with the intent of acquiring physical control over Owensby.

Accordingly, the "special relationship" by acquiring custody did not arise on the part of Golf Manor in this case.

The non-custodial basis for establishing a "special relationship" exists in this case.

In *Cartwright, supra*, the Court set forth the elements of what must be established in order to create a duty in a non-custodial setting in accordance with *DeShaney*. These elements include:

> (1) an affirmative act by the state actor which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a specific danger to the plaintiff wherein the state's actions place the plaintiff specifically at risk; and (3) the state knew or should have known that its action specifically endangered the plaintiff.

As set forth by the Court in *Cartwright*, a failure to act does not amount to an affirmative act. *Cartwright* at 493.

The only act attributable to Golf Manor was agreeing to let the Cincinnati officers place Owensby in the Golf Manor car. Clearly, this act cannot be made out to be an "affirmative act" as required by *Cartwright, supra*.

While these Defendants do not argue Owensby was not in custody, they maintain Owensby was not in their custody. The intentional application of "physical force" was not applied by Golf Manor. Nor was there an affirmative act to satisfy the non-custodial aspect of the "special relationship". Consequently, there was no "special relationship" between Owensby and Golf Manor and hence no constitutional duty on the part of Golf Manor to render medical attention to Owensby.

### C. The Mutual Aid Agreement Did Not Confer Custody Of Owensby To Golf Manor.

Plaintiff suggests the Mutual Aid Agreement somehow created a constitutional duty owing from Golf Manor to Owensby. While this may be wishful thinking, logic defies such an interpretation. As has previously been set forth, the constitutional duty stemming from a "special relationship" can occur in one of two methods. There is nothing in the Mutual

Aid Agreement indicative of custody being transferred from Cincinnati to Golf Manor. In fact, such an argument flies in the face of the Agreement and the opposite is true. Cincinnati was never divested of custody of Owensby by virtue of the Mutual Aid Agreement or otherwise. Simply, the Mutual Aid Agreement does not create a constitutional right. However, it does define the basis for custody in a situation such as this.

Instead of creating a constitutional duty on the part of the Golf Manor officers, the Mutual Aid Agreement makes clear there was no constitutional duty on the part of Golf Manor since custody of Owensby remained vested with Cincinnati.

### D. Heiland, Campbell And Tilley Are Entitled To Qualified Immunity.

Plaintiff argues Heiland, Campbell and Tilley are not entitled to qualified immunity. The argument reflects a lack of understanding as to what necessarily constitutes a "clearly established right". In *Saucier v. Katz*, 533 U.S. 194 (2001), the Court emphasized the nature of the inquiry concerning a "clearly established right". Specifically:

> If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' admissions, the next, sequential step is to ask whether the right was clearly established. This inquiry, it is vital to note, must be undertaken in light of a specific context of a case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable . . .
>
> As we explained in *Anderson* the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established. *Id.* at 201, 202.

Plaintiff argues Owensby's alleged right to medical care was clearly established at the time of this incident. That assertion is set forth in very general terms without reference to the specific context of this case. As the Supreme Court has cautioned, the inquiry must be made within the "specific context" of the case. The fact specific inquiry in this case is a police officer responds to an all-county broadcast that an officer in another jurisdiction needs assistance and arrives on the scene and is asked by the arresting officers of the other jurisdiction whether they can place a prisoner in the responding officer's car. Does the prisoner placed in the car have a right to receive medical care from the responding officer from another jurisdiction who did not participate in the arrest and was asked to do nothing more than to have the prisoner placed in his car?

While these Defendants maintain no such constitutional right existed as of November 7, 2000, Plaintiff has failed to set forth any authority establishing such a right.

Absent a clearly established right in the context of *Saucier*, *supra*, the individual officers are entitled to qualified immunity.

Plaintiff's argument that Chief Tilley is not entitled to qualified immunity for his alleged failure to properly train his officers also fails. Needless to say, if no constitutional violation occurred or if Officers Heiland and Campbell are entitled to qualified immunity, the issue with regard to Chief Tilley is never addressed.

It is unclear whether Plaintiff is asserting Chief Tilley's alleged failure to train is being made in his individual or official capacity. The Complaint indicates the claims are made against the Defendants in their individual and official capacities. The failure to train claim is more akin to an official capacity suit which is therefore essentially a claim against the Village. *Kentucky v. Graham*, 473 U.S. 159 (1985). The Court in *Sova v. City of Mt.*

*Pleasant*, 142 F.3d 898 (1998), explained what must be demonstrated in order to establish municipal liability in the context of an alleged failure to train. Specifically:

> When the damage was inflicted by municipal employees, such as police officers, the city can be held liable for failing to train its employees adequately. Yet, in this situation a plaintiff can establish liability only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants. *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). In other words, a municipality can be liable under §1983 only where its policies are the "moving force" behind the constitutional violation. Allegations that a particular officer was improperly trained are insufficient to prove liability, as are claims that a particular injury could have been avoided with better training. Moreover, to establish a valid claim for improper supervision against the city's police chief, the plaintiff must show that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it. *Id.* at 904.

There can be no claim against Chief Tilley either in an official or individual capacity. Clearly, there is no basis for the failure to train claim nor any type of claim that Chief Tilley encouraged or participated in any of the alleged acts.

Plaintiff next claims Officers Heiland and Campbell's alleged failure to comply with Golf Manor's policy results in an alleged constitutional deprivation. Plaintiff's analytical approach in terms of determining whether a constitutional duty exists is flawed. In the first instance, as has been previously noted, no one ever asked Golf Manor to transport Owensby. Heiland has testified to this fact and no one has contradicted Heiland's testimony. In fact, as previously referenced, the arresting Cincinnati officers had no intention of having Golf Manor transport Owensby. For that reason alone, Plaintiff's reference to Golf Manor's policy 6-07 is simply misplaced.

Plaintiff also argues Heiland and Campbell did not search Mr. Owensby. Again, the policy applies to prisoners being transported as opposed to those placed in the car by another jurisdiction temporarily until the other jurisdiction has a car on scene.

Notwithstanding the obvious reasons for the inapplicability of the cited Golf Manor policy, the policy cannot be used to establish a constitutional duty. This was recognized by the Court in *Smith v. Freland*, 954 F.2d 343 (6th Cir. 1992). In that case, an attempt was made to establish a constitutional violation because an officer violated a departmental policy. Rejecting the violation as a basis to establish a constitutional violation, the Court observed:

> Furthermore, the fact that Officer Schulcz's actions may have violated Springdale's policies regarding police use of force does not require a different result. Under §1983, the issue is whether Officer Schulcz violated the Constitution, not whether he should be disciplined by the local police force. A city can certainly choose to hold its officers to a higher standard than that required by the Constitution without being subjected to increased liability under §1983. To hold that cities with strict policies commit more constitutional violations than those with lax policies would be an unwarranted extension of the law, as well as a violation of common sense. Ms. Smith's position, if adopted, would encourage all governments to adopt the least restrictive policies possible. *Id.* at 347, 348.

Accordingly, Plaintiff's attempt to state a constitutional violation based upon the Golf Manor policy must also fail.

### E.    Ohio's Political Subdivision Tort Liability Act.

This Court on December 16, 2003, in *Kammeyer, et al. v. The City of Sharonville, et al.*, issued an order wherein it declared Ohio's Political Subdivision Tort Liability Act unconstitutional. This decision was predicated upon the Ohio Supreme Court decision in *Butler v. Jordan*, 92 Ohio St.3d 354 (2001). That case was decided nearly three years ago.

In that case, the plurality decision took issue with the constitutionality of §2744.01, *et seq.* of the Revised Code yet failed to definitively rule on its constitutionality.

In like fashion, the concurring opinion of Justice Cook indicated until the constitutional issues are directly before the Court, they should not be addressed. As of this date, the Ohio Supreme Court has yet to hold Ohio's Political Subdivision Tort Liability Act unconstitutional.

While Plaintiff has not alleged in his Complaint a constitutional challenge to the Political Subdivision Tort Liability Act, it appears the first challenge in this case was made in Plaintiff's Memorandum in Opposition to the City of Cincinnati's Motion for Summary Judgment. Since the filing of that Motion, this Court decided *Kammeyer v. The City of Sharonville*, 1:01-cv-00649, on December 16, 2003.

This Court's analysis in *Kammeyer* (essentially began with seeking direction from the decision in *Kirk v. Haynes Corp.*, 16 F.2d 705 [1994]) *Kirk* stands for the proposition a federal district court sitting in diversity is to apply the same law that would be applied by the state court. If the state's highest court has spoken to an issue then the federal district court is bound by that decision unless convinced the state's highest court, given the opportunity, would have overruled that decision if presented with similar facts. The *Kirk* Court also recognized that on issues where the state's highest court has yet to rule, the district court should treat appellate decisions on the same issue as authoritative absent an indication the state Supreme Court would rule differently. More recently, in *Kurczi v. Eli Lilly & Co.*, 113 F.3d 1426 (1997), the Court recognized the federal courts must usually follow an intermediate appellate decision absent a strong showing that the highest court would decide otherwise.

This Court relied upon dicta in the decision in *Butler v. Jordan,* 92 Ohio St.3d 354 (2001), to hold Ohio's Political Subdivision Tort Liability Act unconstitutional.  It has been nearly three years since the *Butler* decision and the Supreme Court has yet to hold the Ohio Political Subdivision Tort Liability Act unconstitutional.  In fact, the Ohio Supreme Court in *Fabrey v. McDonald Police Dept.*, 70 Ohio St.3d 351 (1994), upheld the constitutionality of the Ohio Political Subdivision Tort Liability Act.  The Court noted in *Fabrey*:

> The General Assembly in enacting R.C. Chapter 2744 has used that power to create a scheme for immunity and liability of political subdivisions.  Because the General Assembly has the power to define the contours of the state's liability, within the constraints of equal protection and due process, the right to sue the state is not fundamental.  *Id.* at 355.

The *Fabrey* Court upheld the constitutionality of the statute.

Two recent Ohio appellate decisions have also upheld the constitutionality of R.C. 2744.01, *et seq.*  In *Bundy v. Five River Metro Parks*, 152 Ohio App.3d 426 (2003), the Court rejected arguments in favor of finding the statute unconstitutional as espoused by Justice Doglas in *Butler*.  The Court in *Bundy* recognized what must be demonstrated in order to find a legislative enactment unconstitutional.  Specifically:

> A regularly enacted statute of Ohio is presumed to be constitutional and is therefore entitled to the benefit of every presumption in favor of its constitutionality.  To overcome this presumption, the challenger must establish that a statute is "clearly unconstitutional beyond a reasonable doubt."  Before a court may declare the statute unconstitutional, it must appear beyond a reasonable doubt that the legislation and constitutional provision are currently incapable of coexisting.  This presumption, which can be overcome only in the most extreme cases, works to protect the domain of the legislature from encroachment by the judiciary.  *Id.* at 432.

Given the opportunity to declare the statute unconstitutional by virtue of the reasons set forth by Justice Doglas, the Court declined that invitation and upheld the constitutionality of the Ohio Political Subdivision Tort Liability Act.

The same result was reached in *Thorp v. Strigari*, 155 Ohio App.3d 245 (2003). The Court held:

> We hold that R.C. Chapter 2744, which provides that, as employees of a political subdivision, public defenders are immune from claims of negligence, is constitutional and that Strigari is immune from Thorp's malpractice claims. *Id.* at 247.

In *Colbert v. Cleveland*, 99 Ohio St.3d 215 (2003), the Court construed certain provisions of the Ohio Political Subdivision Tort Liability Act without addressing the issue of constitutionality. However, Justice Pfeifer, in a dissenting opinion, observed that while he believes the statute to be unconstitutional he recognized a majority of that court does not agree with him. *Colbert* at 219.

There has been no holding by the Ohio Supreme Court the statute is unconstitutional. Rather, the constitutional challenges to the statute have been dismissed and Justice Pfeifer recently recognized the majority of the Ohio Supreme Court does not believe the statute is unconstitutional.

These decisions make clear there is no clear indication a majority of the Ohio Supreme Court would hold the statute unconstitutional. As such, this Court is bound by the appellate decisions holding the constitutionality of the Political Subdivision Tort Liability Act. For these reasons, Plaintiff's argument the statute is unconstitutional must fail.

Aside from Plaintiff's constitutional challenge to immunity afforded under §2744.01, *et seq.* of the Revised Code, he also argues Heiland and Campbell are not entitled to

immunity since their actions fall outside the scope of the immunity arguing their acts were with malicious purpose, in bad faith or in a wanton or reckless manner.

There is nothing before the Court to suggest or even infer the acts of the individual Golf Manor Defendants rose to the level of the enumerated exceptions to immunity under the statute. Plaintiff's characterization of their respective acts is baseless. There is absolutely no evidence the individual officers' conduct satisfy the definitions of bad faith, wanton misconduct or recklessness. Using the definitions supplied by Plaintiff results in the conclusion the individual officers' actions do not fall within any of those definitions.

As an aside, Plaintiff does not allege the acts of the Defendants were willful, wanton or with malicious purpose. Rather, he simply alleges the actions of all aforementioned Defendants constitute negligence. (¶ 42, Plaintiff's Complaint)

For these reasons as well as the arguments and authorities cited in these Defendants' Motion for Summary Judgment, each of these Defendants is entitled to immunity under §2744.01, *et seq.* of the Revised Code.

## IV.    CONCLUSION.

Based on the foregoing, as well as the arguments and authorities cited in these Defendants' Motion for Summary Judgment, these Defendants are entitled to judgment as a matter of law in that there is no genuine issue as to any material fact.

Respectfully submitted,

/s/     Wilson G. Weisenfelder, Jr.
Wilson G. Weisenfelder, Jr. (0030179)
RENDIGS, FRY, KIELY & DENNIS, L.L.P.
One West Fourth Street, Suite 900
Cincinnati, OH  45202-3688
(513) 381-9292
(513) 381-9206 - Facsimile
wgw@rendigs.com
Trial Attorney for Defendants, Village of Golf Manor, Stephen Tilley, Robert Heiland and John Doe #7 n/k/a Chris Campbell

# CERTIFICATE OF SERVICE

I hereby certify that on March 2, 2004, I electronically filed the foregoing Memorandum in Opposition with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

James B. Helmer, Jr., Esq.
Paul B. Martins, Esq.
Frederick M. Morgan, Jr., Esq.
HELMER, MARTINS & MORGAN
Fourth & Walnut Centre, Suite 1900
105 E. 4th Street
Cincinnati, OH 45202-4008

John J. Helbling, Esq.
3672 Springdale Road
Cincinnati, OH  45251

Mark T. Tillar, Esq.
240 Clark Road
Cincinnati, OH 45215

Donald E. Hardin, Esq.
HARDIN, LEFTON, LAZARUS & MARKS
915 Cincinnati Club Building
30 Garfield Place
Cincinnati, OH  45202-4322

Dale A. Stalf, Esq.
BUCKLEY, KING & BLUSO
1420 PNC Center
201 East Fifth Street
Cincinnati, OH  45202

Geri H. Geiler, Esq.
Julie Bissinger, Esq.
Assistant City Solicitors
Room 214 City Hall
801 Plum Street
Cincinnati, OH  45202

Neil F. Freund, Esq.
FREUND, FREEZE & ARNOLD
One Dayton Centre, Suite 1800
1 South Main Street
Dayton, OH 45402-2017.

Ravert J. Clark, Esq.
114 E. 8th St., Suite 400
Cincinnati, OH 45202

           /s/    Wilson G. Weisenfelder, Jr.
           Wilson G. Weisenfelder, Jr.