UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

```
- - - - - - - - - - - - - - -
ESTATE OF ROGER D.            :
OWENSBY JR., et al.,          :
                              :
          Plaintiffs,         :
    vs.                       :   Case No. 01-CV-769
                              :   (Judge S. A. Spiegel)
CITY OF CINCINNATI,           :
et al.,                       :
                              :
          Defendants.         :
- - - - - - - - - - - - - - -
```

        Videotaped deposition of BRIAN ANTHONY BRAZILE, a witness herein, called by the plaintiffs for cross-examination, pursuant to the Federal Rules of Civil Procedure, taken before me, Wendy Davies Welsh, a Registered Diplomate Reporter and Notary Public in and for the State of Ohio, at the offices of Helmer, Martins & Morgan Co. LPA, 1900 Fourth & Walnut Centre, 105 East Fourth Street, Cincinnati, Ohio, on Thursday, November 6, 2003, at 11:02 a.m.



```
 1      Q.   Now, you were saying?
 2      A.   In the case where it says --
 3           MR. WEISENFELDER:  What page?
 4           THE WITNESS:  I'm sorry.  I think it's 3.
 5      A.   Okay.  Where it -- right under where it
    says, "What did you say" right in the middle where
    you started at --
 8      Q.   Yes?
 9      A.   -- "I told 'em it looked fucked up," no, I
    didn't say "it."  I said "this."
11      Q.   "This looks fucked up?"
12      A.   Yes.
13      Q.   All right.
14      A.   That's meaning the whole incident.  I
    didn't say "he" or -- I'm sorry, or "it."  I -- I
    was talking about the situation as a whole.
17      Q.   Anything else?
18      A.   No.  That's it.
19      Q.   So with respect to -- and later on, I
    guess, he says -- further down there's a question
    that says, "You said, 'This looks fucked up.'"  I
    guess that's -- that's accurate, right?
23      A.   Okay.
24      Q.   Is that correct?
```

1  like you had a serious question as to whether or not
2  he could breathe; is that right?
3      A.   It was just a question.
4      Q.   A question that you posed to the -- to
5  Officer Heiland?
6      A.   Correct.
7      Q.   And the reason you posed that is because
8  from what you saw you had a question as to whether
9  or not he could breathe or he was breathing?
10          MR. HARDIN: Objection.
11     Q.   Correct?
12          MR. HARDIN: You may answer.
13     A.   Uh-huh.  I wanted him to check to see if
14  his prisoner was okay.
15     Q.   Right.  And as I understand your
16  testimony, other than the statement that we've just
17  covered that you gave to Officer Heiland, you did
18  not repeat those concerns to any other Cincinnati
19  police officers at the scene, correct?
20     A.   That's correct.
21     Q.   Did you at any time that evening ask
22  Officer Heiland to make a call for medical
23  assistance?
24     A.   Did I ask him to?

1    Q.    Yes.

2    A.    No, I did not.

3    Q.    And I take it you did not call for medical
4 assistance?

5    A.    No.

6    Q.    You then walk -- after you talk to Officer
7 Heiland, you walk back to your car to get your hat.
8 Why did you need to get your hat?

9    A.    Well, any time supervisors show up on the
10 run, basically you're supposed to be in your full
11 uniform.  Things like that get written up sometimes.
12 If you're on something and you don't have your hat
13 on, it -- it -- it's a big deal.

14    Q.    Look at Exhibit 4 -- I'm sorry, 47 that
15 you have before you, on page 4, the next page.  At
16 about halfway down the page you're asked about
17 Sergeant Browner.  You say, "I believe Sergeant
18 Browner, cause she parked next to my scout car" --
19 car -- "in the CDOP van."  Do you see that?

20    A.    Okay.  Yes.

21    Q.    What is a CDOP van?

22    A.    It actually is CDOP, civil disturbance
23 operations procedure van.

24    Q.    Is it -- all right.  And then further down

```
 1  within the city, city of Cincinnati, is that the --
 2  that was the City's scene, so to speak; is that
 3  right?
 4          MR. HARDIN:  Objection to the form of the
 5      question.
 6          MR. MARTINS:  Objection.
 7    Q.  Go ahead.
 8          MR. HARDIN:  Go ahead.
 9    A.  The property, yes.
10    Q.  Okay.  And City of Cincinnati police
11  officers, would they have been in charge of that
12  scene?
13          MR. HARDIN:  Objection.
14          You may answer.
15    A.  You say would they have been?
16    Q.  Correct.
17    A.  I'm thinking so.
18    Q.  Okay.  And everything that you observed
19  that evening, from the time you arrived until you
20  left, there's no doubt in your mind that, in fact,
21  the City of Cincinnati Police Department was
22  exercising jurisdiction or control over that scene,
23  true?
24    A.  With the supervisors responding and stuff
```

1  like that?

2      Q.   Correct.

3      A.   Yeah.

4      Q.   I mean, that was all consistent with --
5  everything that you observed that eve-- that evening
6  was consistent with the City of Cincinnati Police
7  Department being in control of that scene?

8           MR. HARDIN:   Objection.

9           You may answer.

10     A.   Except for one thing.

11     Q.   Well -- okay.  Answer it and then explain
12 your one thing.

13     A.   Okay.  And the one thing was, you know,
14 why would the prisoner be in a Golf Manor car if
15 this was a Cincinnati incident?

16     Q.   Okay.  Other than that one thing,
17 everything appeared to be to you -- everything
18 appeared to you as though the City of Cincinnati
19 police were in charge of that scene?

20          MR. HARDIN:   Objection.

21          You may answer.

22     A.   At that point in time, yes.

23     Q.   Okay.  Now, when you arrived, Mr. Owensby
24 was already in the Golf Manor car; is that true?

1  could get a better look?
2     A.   No.
3     Q.   Aside from the scrapes or cuts that you
4  described earlier on the face of Mr. Owensby, could
5  you detect any other physical injuries?
6     A.   Looked like he had a little bit of blood
7  by his nostrils right here (indicating).
8     Q.   Okay.  Were the windows to the cruiser all
9  the way up, all the way down or somewhere in
10 between?
11    A.   I believe they were up.
12    Q.   Did you hear any sounds from Mr. Owensby?
13    A.   No.
14    Q.   Now, at that point when you observed Mr.
15 Owensby did you know why he was in the Golf Manor
16 car?
17    A.   No, I didn't know why.
18    Q.   At that point when you first observed him
19 did you know he'd been Maced?
20    A.   Well, from hearing a transmission on
21 the -- on the radio.
22    Q.   Okay.  Did you subsequently learn that it
23 was a Cincinnati officer that asked one of the Golf
24 Manor officers if they could place Mr. Owensby in

Case 1:01-cv-00769-SAS    Document 101-6    Filed 03/02/2004    Page 8 of 8

128

1  descriptive?
2      A.   That's the best action I can show, because
3  it was mostly done with bodily, you know, functions.
4      Q.   Okay.  He -- he raised his shoulders
5  and --
6      A.   Kind of raised them and --
7      Q.   He raised his shoulders?
8      A.   -- kind of -- kind of shook the head a
9  little bit and -- you know.
10     Q.   Okay.  I think a minute --
11     A.   I don't know what it's called.
12     Q.   Okay.  And a minute ago you said, "Who
13 knows what that means?"
14     A.   Right.
15     Q.   Okay.  So when he did that, that would be
16 subject to a number of different interpretations,
17 couldn't it be, as to what he meant?
18     A.   Could have been, yes.  Very subjective.
19     Q.   It could have meant that he didn't know?
20          MR. MARTINS:  Objection.
21          MR. HARDIN:  Objection.
22     Q.   Is that true?
23     A.   Could have been.
24     Q.   Okay.  Other than that contact with

Merit
602 Main Street, Suite 703, Cincinnati, OH 45202
(513) 381-8228 * (800) 578-1542 * www.merit-ls.com