UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| The Estate of Roger D. Owensby Jr., | : | Case No. 01-CV-769 |
| Plaintiff | : | (Judge Speigel) |
| v. | : | DEFENDANTS' CATON, JORG, SELLERS AND SPELLEN MEMORANDUM |
| City of Cincinnati, et al., | : | IN OPPOSITION TO PARTIAL SUMMARY JUDGMENT |
| Defendant | : | |

## I. INTRODUCTION

Plaintiff's Motion for Partial Summary Judgment on the alleged failure to provide medical care to Roger Owensby against Officers Patrick Caton, Robert Blaine Jorg, Darren Sellers, and Victor Spellen[1], in both their official and individual capacities, should be denied. Genuine issues of material fact exist as to whether a constitutional right to medical care was violated. The supporting facts and argument are set forth in the following memorandum.

Respectfully submitted,

/s/ Donald E. Hardin
Donald E. Hardin (0022095)
HARDIN, LEFTON, LAZARUS & MARKS
915 Cincinnati Club Building; 30 Garfield Place
Cincinnati, OH 45202-4322
Telephone:   (513) 721-7300
Facsimile:   (513) 721-7008

Trial Attorney for Defendants Patrick Caton, Robert
Blaine Jorg, Jason Hodge, Darren Sellers
and Victor Spellen in their individual and/or official
capacities

---

[1] In deference to the Servicemembers Civil Relief Act, 50 U.S.C. app. §§ 501-594, Plaintiff did not include defendant Officer Jason Hodge in this Motion for Partial Summary Judgment. Officer Hodge is serving in the military in Iraq.

1

**MEMORANDUM**

## II. STATEMENT OF FACTS

On November 7, 2000, Roger Owensby, Jr., was identified by Officer Hunter as a suspect. (Hunter Depo. p.131) When Officer Jorg attempted to handcuff Mr. Owensby he ran. (Jorg Depo. p. 103) Officers Jorg and Caton believed that Mr. Owensby was wanted for an assault against Officer Hunter. (Jorg Depo. p. 75; Caton Depo. p. 75) When Mr. Owensby was caught he strongly resisted arrest. (Jorg Depo. p. 35, 153; Caton Depo. p. 103; Hunter Depo. p. 274) Officer Caton called for additional assistance to subdue Mr. Owensby. (Caton Depo. p. 99) Officers Hodge and Sellers responded and assisted in the arrest. (Sellers Depo. p. 37, 46; Jorg Depo. p. 142)

During the struggle, Mr. Owensby was kicking. (Caton Depo. p.103-4; Hunter Depo. pp.154-5; Jorg Depo. p. 153) He refused to allow the officers to handcuff him. (Jorg Depo. p. 125-6; Caton Depo. p.109) Officers Jorg and Caton stated that Mr. Owensby was stronger than they were. (Jorg Depo. p. 122; Caton Depo. p.107) It was necessary for these officers to use force to subdue the strong, violently resisting suspect. Officer Jorg used a head wrap to stabilize Mr. Owensby's head in order to apply a mandibular angle pressure point pain compliance technique to gain control. (Jorg Depo. p. 35) Officer Caton applied two pain compliance strikes to the lower back and three to the forearm attempting to gain control. (Caton Depo. pp. 105-6, 112) Officer Hodge used a PR-24 attempting to pry one of Mr. Owensby's arms out. (Id. at 113; Jorg Depo. p. 129) When these efforts were unsuccessful in subduing Mr. Owensby, Officer Hunter applied mace and within a minute *after the mace was applied* Mr. Owensby was handcuffed. (Hunter Depo. p. 169; Jorg Depo. p. 126; Caton Depo. p. 110) Mr.

2

Owensby was placed in a Golf Manor cruiser because it was nearby. (Jorg Depo. p. 150; Caton Depo. p. 123)  Golf Manor Officer Heiland authorized the use of his cruiser and opened the door as he observed the Cincinnati officers escort Mr. Owensby to the cruiser. (Heiland Depo. pp. 126,129)

Although Plaintiff stated that "[b]oth Mr. Owensby's arms were pinned under his chest by the combined nearly 500 pounds of weight of the two Cincinnati police officers," (Doc. #88, p. 7) there is no evidence that both Officer Caton and Officer Jorg were on top of Mr. Owensby's back or chest. Officer Jorg grabbed Mr. Owensby near the shoulders and Officer Caton had his legs during the initial take down. (Jorg Depo. p. 107-8; Caton Depo. p. 99)  Officer Jorg was laid out prone next to Mr. Owensby, lying off to his side. (Hunter Depo. p. 158-9; Jorg Depo. p.111)  Officer Sellers did not see Officer Jorg on top of Mr. Owensby at any time. (Sellers Depo. p. 44)

Plaintiff also states "[d]espite seeing Officer Caton punching Mr. Owensby in the head, Officer Hunter did not walk over to check on the health of Mr. Owensby or attempt to stop Officer Caton's assault on the defenseless suspect." (Doc. #88, p.11)  Contrary to the Plaintiff's assertion of an "alleged beating' in the backseat of the Golf Manor car, no one has testified to such a beating.  Officer Caton did not strike Mr. Owensby after he was placed in the Golf Manor cruiser. (Caton Depo. p. 174)  Officer Hunter is the *only* witness who states that he saw Officer Caton delivering blows to Mr. Owensby's body after the handcuffing, both on the ground and in the Golf Manor car.  Officer Hunter also testified that Mr. Owensby was dragged to the Golf Manor car. (Hunter Depo. p. 177)  If Officer Hunter is to be believed, then *he* had a duty to call for immediate medical

3

attention.  Plaintiff attempts to transfer Hunter's knowledge to *all* of the Cincinnati police officers on the scene. (Id.)

Shortly after arriving on scene and within minutes of the struggle, Sergeant Watts discovered that Mr. Owensby was not moving and called for EMT and Fire Rescue. (Caton Depo. p.18) Officers Caton and Hasse immediately removed Mr. Owensby from the cruiser and began CPR. (Id. at 140-41) Mr. Owensby was transported to University Hospital and was later pronounced dead.  The coroner listed the cause of death as "mechanical asphyxiation." (Dr. Schultz Depo. p. 51)

However, Emergency Medicine expert witness Tom S. Neuman, M.D. has reviewed the coroner's report and stated that it is "highly unlikely" that Mr. Owensby died from mechanical asphyxiation. (Doc. #100 ¶ 15) "It defies logic to believe that in a struggle with several police officers that Mr. Owensby was not able to breathe at all. But even if he were not able to breathe at all, two minutes is simply not enough time to asphyxiate to death." (Id.)  Dr. Neuman has opined to a reasonable degree of medical probability that given the circumstances and Mr. Owensby's enlarged heart, sudden cardiac arrest is the most likely cause of death. (Id. at ¶ 18,21)  "Furthermore, CPR regardless of when it would have been instituted, would not, to a reasonable degree of medical probability have made it more likely than not that he would have survived." (Id.)

## III.    SUMMARY JUDGMENT STANDARD

Summary judgment is only appropriate where " the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact is

based on the substantive law of the case and exists if the evidence would allow a reasonable jury to find for either side. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmoving party must "make a showing sufficient to establish the existence of an element essential to his case and on which he will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court must view the factual evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In the present case, there are several genuine issues of material fact in dispute. Therefore, summary judgment should be denied.

### IV. ARGUMENT

#### A. SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE OFFICERS PATRICK CATON, ROBERT JORG, DARREN SELLERS AND VICTOR SPELLEN DID NOT ACT WITH DELIBERATE INDIFFERENCE AS TO ROGER OWENSBY'S MEDICAL CARE.

A general right of prisoners to receive medical care was established in *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The Supreme Court has held that under the due process clause of the Fourteenth Amendment, pretrial detainees have a constitutional right to medical care. *Bell v. Wolfish*, 441 U.S. 520, 535 n. 16 (1979); *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). This right is violated by "deliberate indifference to serious medical needs of prisoners." *Estelle*, at 104; *Roberts v. City of Troy*, 773 F.2d 720, 722 (6th Cir. 1985). Objectively, the medical need at issue must be "sufficiently serious" to actually raise awareness in a person's custodians of the existence of a medical condition. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The Sixth Circuit addressed the issue of medical care, stating that "where the circumstances are clearly

sufficient to indicate the need of medical attention for injury or illness" constitutional due process requires providing such care. *Fitzke v. Shappell*, 468 F.2d 1072, 1076 (6th Cir. 1972); see also *Roberts*, 773 F.2d at 723; *Danese v. Asman*, 875 F.2d 1239 (6th Cir. 1989); *Rich v. Mayfield Heights*, 955 F.2d 1092, 1096 (6th Cir. 1992).

In *Farmer*, the Court specifically addressed "deliberate indifference" and articulated a subjective test for determining whether the right to medical care has been violated. *Id.* at 838. The official must *actually know* of the risk and *disregard it*. "An official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id.* See also, *Watkins v. City of Battle Creek*, 273 F.3d 682 (6th Cir. 2002)(It is not enough to show what a police officer should have known; plaintiff must show actual knowledge.); *Weaver v. Shadoan*, 340 F.3d 398 (6th Cir. 2003).

Plaintiff has not shown that the officers had actual knowledge of a serious need for medical care. According to Daniel L. Schultz, M.D., Deputy Coroner, Hamilton County, Ohio, who performed the autopsy on Roger Owensby, the only visible signs of trauma that would have been apparent to the officers that night were facial abrasions and possibly abrasions to the left forearm. (Schultz Depo. at 148). "The injuries to his face are markers of trauma and they themselves are not injuries that need immediate attention." (Id.)

Officer Jorg saw a "light bit of blood," "road rash," and a minor cut. (Jorg Depo. p.145) Officer Caton did not see blood on Mr. Owensby's face. (Caton Depo. p. 129, 23) He first realized Mr. Owensby required medical assistance when Sargent Watts looked into the cruiser. (Caton Depo. p.17) Officer Spellen described Mr. Owensby, as "hurting

6

a little bit," but he believed it was a reaction to the mace. (Spellen Depo. p. 50). Officer Sellers stated that he did not know Mr. Owensby was injured. (Sellers Depo. p. 8). Golf Manor Officer Heiland stated that he would not have allowed the Cincinnati Police to place Mr. Owensby in his cruiser if he saw that Mr. Owensby was unconscious or seriously injured. (Heiland Depo. p. 129). Officer Heiland was facing Mr. Owensby and opened the door to the Golf Manor cruiser for the Cincinnati officers. (Id. at 126).

Viewing the facts in favor of the non-moving party, there were no visible signs of serious injury. Although the coroner believes Mr. Owensby died on the ground, there is conflicting testimony that he was struggling on the way to the Golf Manor cruiser. Officer Caton stated that Mr. Owensby was passively resisting. (Caton Depo. p. 123; Schultz Depo. p. 177, 199) "At one point he [Owensby] raised his legs up off the ground to keep us from walking towards the cruiser, and we almost all pitched forward back to the ground at that point. And somebody said, 'Put your feet down and walk,' and he did." (Id.) When the officers attempted to put Mr. Owensby into the cruiser, he straightened up and made himself bigger to make it difficult to place him in the vehicle. (Caton Depo. at 125). There are also statements that Mr. Owensby's feet were dragging on the way to the cruiser. (Hunter Depo. p. 177) However, results from the Official Crime Laboratory Report conducted on Mr. Owensby's shoes "revealed no obvious scuff marks consistent with dragging." (Schultz Depo. /Exhibit 133)

In the present case, genuine issues of material fact exist as to the actual knowledge of the defendant police officers. These officers should not be required to diagnose Mr. Owensby's serious medical condition based on the only "obvious" injuries: facial abrasions. See *Farmer*, 511 U.S. at 834. They did not have the requisite mental

state to have violated a constitutional right to medical care. Specifically, a jury reasonably could find that they did not have actual knowledge of any serious medical needs that would require immediate medical care.

"[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844. Plaintiff does not cite any case law that requires *immediate* medical care, particularly for perceived minor injuries. Mr. Owensby was given medical care within six to seven minutes after he was subdued. The amount of time elapsed is not unreasonable under the circumstances. The "officer needs assistance" call went out at 7:47:50 pm., followed by the "in custody" call at 7:49:40 pm. Also at 7:49:40 pm., a supervisor was requested to report the macing. At 7:49:50 pm. Sergeant Watts responded, "I'm seconds away." Paramedics were requested at 7:55:10 pm. (Doc. #88, Exhibit A)

Most importantly, as soon as Sergeant Watts, Officer Caton and Officer Hasse became aware of the seriousness of Mr. Owensby's condition, CPR was initiated.

There is testimony that Officer Brazile reported his observations to the Golf Manor officers about Mr. Owensby's condition. (Brazile Depo. p. 54) However, Officer Brazile arrived on scene after Mr. Owensby was in the Golf Manor cruiser. (Id. at 7). He mistakenly, but reasonably believed Mr. Owensby was Golf Manor's prisoner and therefore, did not again report his concerns to any of the defendant Cincinnati police officers. (Id.)

Plaintiff also addresses the issue of officer training on when to provide first aid. Cincinnati Police Procedure 12.545 states: "Following any use of force resulting in a

citizen's injury, officers will ensure appropriate first aid is rendered immediately once the incident scene is stabilized." (Exhibit 60, p. 3). There are different interpretations as to when the *"incident scene is stabilized"* and a significant lack of training. Specifically, Officers Jorg, Caton, Brazile and Spellen stated that the scene was not stabilized that night. (Jorg Depo. pp. 216-217; Brazile Depo. p. 24; Spellen Depo. p. 80; Caton Depo. p. 197) In his deposition, Officer Hunter stated that he thought the scene was stabilized when Mr. Owensby was placed in the Golf Manor cruiser. (Hunter Depo. p. 20) However, Officer Hunter previously believed that the scene was not stabilized. (Id. at 276) This lack of training may have led to a delay in treating Mr. Owensby's *visible injuries*, facial abrasions.

> Q. Is it - - is it your understanding that until all of the procedures that you've just described in securing the scene takes place, the officers are under no duty to provide any medical care to the suspect?
> A. If they perceive a medical emergency, I would say they're - - they're required to act on it, but I don't think anybody perceived one.
> Q. Is there - -
> A. I certainly didn't
> (Caton Depo. p. 181)

Deliberate indifference requires actual knowledge. A jury clearly could find that Officers Jorg, Caton, Sellers and Spellen did not have actual knowledge, therefore, summary judgment is not appropriate.

### B. THE FOURTEENTH AMENDMENT IS THE APPROPRIATE ANALYSIS FOR THE GENERAL RIGHT TO MEDICAL CARE.

The Supreme Court established a constitutional right to medical care for pretrial detainees under the Fourteenth Amendment due process clause. *Bell, supra*; *Revere, supra*. The Sixth Circuit has followed this precedent. *Weaver, supra*; *Watkins, supra*;

9

*Roberts, supra; Rich, supra; Danese, supra; Fitzke, supra* (this case analyzed the right to medical care under due process prior to Bell). Plaintiff states "[t]he Sixth Circuit has addressed this issue and definitively ruled that a Fourteenth Amendment right does not preclude a finding that the right is clearly established when analyzed under the Fourth Amendment," (Plaintiff's motion for partial summary judgment p. 25) citing *Spurlock v. Satterfield*, 167 F.3d 995, n.19 (6th Cir. 1999). *Spurlock* did not address the right to medical care. The case involved malicious prosecution, a constitutional right the Supreme Court established under the Fourth Amendment. *Id.*

The Supreme Court does not want to unnecessarily expand the substantive right of due process. *County of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998); *Collins v. Harker Heights*, 502 U.S. 115, 125 (1992). "Where a particular amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Graham v. Connor*, 490 U.S. 386, 395 (1989).

In the present case the Supreme Court established the right to medical care using the Fourteenth Amendment due process analysis and the Sixth Circuit has followed. There is no textual Fourth Amendment right to medical care. The Fourteenth Amendment certainly does not preclude finding a right under the Fourth Amendment. However, the right in this case was clearly established under the Fourteenth Amendment where the right in *Spurlock* was never established as a substantive due process right.

Plaintiff cites a Tennessee district court case that is clearly distinguishable. *Alexander v. Beale Street Blues Co.*, 108 F. Supp. 2d 934 (W.D. Tenn. 1999). The Court

combined the issues of whether the seizure was reasonable with the right to medical care and addressed both at the same time. *Id.* at 940. More importantly, the Court did not cite Sixth Circuit precedent.

In the present case the right to medical care is addressed separately under a motion for partial summary judgment. Therefore, the issue is properly addressed as it was originally established, under the Fourteenth Amendment due process. Thus as a matter of the law which applies to this case, summary judgment is not appropriate.

    C.    **OFFICERS CATON, JORG, SELLERS AND SPELLEN ARE ENTITLED TO QUALIFIED IMMUNITY BECAUSE THEY DID NOT KNOWINGLY VIOLATE ANY PARTICULARIZED CONSTITUTIONAL RIGHT.**

Qualified immunity is an affirmative defense where "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 US 800, 816-18 (1982). In *Malley v. Briggs*, 475 US 335, 341 (1986), the Court extended *Harlow* to hold that police officers are entitled to qualified immunity unless, "on an objective basis, it is obvious that no reasonably competent officer would have concluded that [the conduct was lawful]; but if officers of reasonable competence could disagree on this issue, immunity should be recognized."

Defining the right that is violated is important. "Our cases establish that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). The right must be

11

analyzed within the specific circumstances of the case. *Id.*; *Russo v. City of Cinti.*, 953 F.2d 1036, 1043 (6th Cir. 1992)(without binding Supreme Court precedent as to a constitutional right, a district court must find evidence that "leaves no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting.").

Qualified immunity is analyzed in a two-step process. The first step is to determine if a constitutional right was violated, based on the facts alleged. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). If a violation is found, the second step is that an examination of whether the right was clearly established must be "undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* at 201.

In *Saucier*, the Court reconciled an apparent conflict between the "objective reasonableness standard" set forth in *Graham v. Conner*, 490 U.S. 386 (1989) for analyzing Fourth Amendment excessive use of force claims and the qualified immunity analysis in *Anderson*. Under *Graham* "the reasonableness of the officer's belief as to the appropriate use of force should be judged from that on-scene perspective." *Id.* at 395. The Court cautioned against "20/20 vision of hindsight" urging deference to officers in the field making split-decisions in difficult situations. *Id.*

The respondents in *Saucier* asserted that the excessive force analysis made the qualified immunity analysis "superfluous and inappropriate." 533 U.S. at 206. The Court stated:

> [E]ven if a court were to hold that the officer violated the Fourth Amendment by conducting an unreasonable, warrantless search, Anderson still operates to grant officers immunity for reasonable mistakes as to the legality of their actions. The same analysis is applicable in excessive force cases, where in addition to the deference officers receive on the underlying constitutional claim,

12

>qualified immunity can apply in the event the mistaken belief was reasonable.
>*Id.*

Thus, qualified immunity protects officers from reasonable mistakes as to the legality of their actions. *See, e.g., Malley,* 475 U.S. at 341(qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law); *Mitchell v. Forsyth,* 472 U.S. 511, 528 (1985)(officials are immune unless "the law clearly proscribed the actions" they took); *Anderson,* 483 U.S. at 641(even law enforcement officials who "reasonably but mistakenly conclude that probable cause is present are entitled to immunity")

In *Danese,* the Court specifically addressed the factual differences in *Estelle* and *Fitzke* where the prisoner actually *requested* medical care. "It is one thing to ignore someone who has a serious injury and is asking for medical help; it is another to be required to screen prisoners correctly to find out if they need help." *Danese,* 875 F.2d at 1244. The Court found that a reasonable officer who did not realize his prisoner needed medical care did not violate that prisoner's constitutional rights. *Id.*

Furthermore, pursuant to Cincinnati Police Procedure 12.545, "appropriate first aid is rendered immediately once the *incident scene is stabilized.*" As described above, there was total confusion as to when and if the incident scene was ever stabilized. Officers Caton, Jorg, Sellers and Spellen certainly could not have known they were violating a constitutional right when they were simply following a procedure about which they had received no little or training. As a result, nearly every officer had a different view as to exactly when and if the scene was stabilized. (Jorg Depo. pp. 215-17, Brazile Depo. pp. 23-24, Spellen Depo. p. 80, Caton Depo. pp. 197, 234-35, Hasse pp. 23-25, Hunter pp. 19-20, 276)

13

Plaintiffs do not specify a "particularized right" other than the general right to medical care. Officers Caton, Jorg, Sellers and Spellen reasonably believed that Mr. Owensby was not in serious need of medical care. The visible injuries were not life threatening. (Schultz Depo. at 148). The amount of time Mr. Owensby was in the cruiser prior to receiving medical care was not clearly unreasonable. Most importantly, as soon as Mr. Owensby's serious condition was apparent, CPR was started and emergency medical care was summoned. The only delay resulted from the reasonable, yet mistaken belief that Mr. Owensby was not seriously injured.

Plaintiffs state that the time Mr. Owensby was in the cruiser was crucial. However, the coroner is unable to state when Mr. Owensby died. Dr. Schultz stated that it is "likely" that Mr. Owensby was dead on the ground. (Id. at 199). If Mr. Owensby died on the ground, any medical care *regardless* of the time it was administered would not have mattered. There would have been no constitutional right to medical care.

There is no clearly established particularized right that was violated. A reasonable officer in the circumstances of November 7, 2000 would not have known that a six to seven minute period of time would be grounds for a constitutional claim.

## V.   CONCLUSION

As set forth above, genuine issues of material fact exist as to the officers' knowledge of Mr. Owensby's serious condition, the cause of death and whether CPR would have been successful at all. A reasonable jury could find that Officers Caton, Jorg, Sellers and Spellen in their individual and official capacities did not violate a constitutional right to medical care. Therefore, defendants Patrick Caton, Robert Blaine

Jorg, Darren Sellers and Victor Spellen respectfully request this Court to deny Plaintiff's Motion for Partial Summary Judgment.

Respectfully submitted,

/s/ Donald E. Hardin
Donald E. Hardin (0022095)
HARDIN, LEFTON, LAZARUS & MARKS
915 Cincinnati Club Building
30 Garfield Place
Cincinnati, OH 45202-4322
Telephone:   (513) 721-7300
Facsimile:    (513) 721-7008

Trial Attorney for Defendants Patrick Caton,
Robert Blaine Jorg, Jason Hodge, Darren Sellers
and Victor Spellen in their individual and/or
official capacities

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Memorandum in Opposition was electronically filed with the Clerk of the Court on March 3, 2004. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

| | |
|---|---|
| James B. Helmer, Jr., Esq.<br>Paul B. Martins, Esq.<br>Frederick M. Morgan, Jr., Esq.<br>Robert M. Rice, Esq.<br>HELMER, MARTINS & MORGAN CO., L.P.A.<br>Fourth & Walnut Centre, Suite 1900<br>105 East Fourth Street<br>Cincinnati, Ohio 45202<br>Trial Attorneys for Plaintiff | Neil F. Freund, Esq.<br>Vaseem S. Hadi, Esq.<br>FREUND, FREEZE & ARNOLD<br>One Dayton Centre<br>One South Main Street, Suite 1800<br>Dayton, Ohio 45402-2017<br>Trial Counsel for Defendants City of<br>Cincinnati, John Shirey,<br>Kent A. Ryan, S. Gregory Baker,<br>Thomas Streicher, Jr.,<br>Darren Sellers, Jason Hodge |

Geri H. Geiler, Esq.
Assistant City Solicitor
Room 214, City Hall
801 Plum Street
Cincinnati, Ohio 45202
Trial Attorney for Defendants
John Shirey, Kent A. Ryan, S. Gregory Baker, Thomas Streicher, Jr., Robert B. Jorg, Patrick Caton

Mark T. Tillar, Esq.
240 Clark Road
Cincinnati, Ohio 45215
Trial Attorney for Plaintiff

John J. Helbling, Esq.
3672 Springdale Road
Cincinnati, Ohio 45251
Trial Attorney for Plaintiff

Wilson G. Weisenfelder, Jr., Esq.
RENDIGS, FRY, KIELY & DENNIS, LLP
900 Fourth & Vine Tower
Cincinnati, Ohio 45202
Trial Attorney for Defendants City of Golf Manor, Stephen Tilley, Roby Heiland, and Chris Campbell

Dale A. Stalf, Esq.
BUCKLEY, KING & BLUSO
1320 PNC Center
201 East Fifth Street
Cincinnati, Ohio 45202
Counsel for Defendants Huntington Meadows, LTD, and Bryan Menefee

Ravert J. Clark, Esq.
114 East Eighth Street
Suite 400
Cincinnati, Ohio 45202
Trial Attorney for Defendant David Hunter

/s/ Donald E. Hardin
Donald E. Hardin            (0022095)