UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| ESTATE OF | : | |
| ROGER D. OWENSBY JR., et al., | : | |
| | : | |
| | : | Case No. 01-CV-769 |
| Plaintiff, | : | |
| | : | Senior Judge S. Arthur Spiegel |
| v. | : | |
| | : | |
| CITY OF CINCINNATI, et al., | : | |
| | : | |
| | : | |
| Defendants. | : | |
| | : | |

**PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF HIS
MOTION FOR PARTIAL SUMMARY JUDGMENT
AGAINST DEFENDANTS VILLAGE OF GOLF MANOR, ITS POLICE CHIEF
AND ITS INDIVIDUAL POLICE OFFICERS
FOR THEIR FAILURE TO PROVIDE CRITICAL MEDICAL CARE (doc. 87)**

In opposing Plaintiff's partial summary judgment motion, the Golf Manor defendants argue that they did not violate Roger Owensby's constitutional rights when they provided no medical care to him as he lay handcuffed, bleeding, unconscious and dying on the back seat of their police cruiser. In making this argument the Golf Manor defendants assert that they were mere bystanders who played no part in Mr. Owensby's arrest, and, after opening the back door to the Golf Manor cruiser, only watched as Mr. Owensby was placed head-first in the car. Upon this premise, Golf Manor stubbornly maintains that the handcuffed Mr. Owensby laying on the back seat of their cruiser was not in their custody and, therefore, they owed him no constitutional duty of medical care.

The Golf Manor defendants are wrong on a number of levels. First, the facts establish

that Roger Owensby was in Golf Manor's custody while he lay handcuffed in their car.  Second, commensurate with the power society confers upon the police to use force is the corresponding duty to protect.  As such, police officers, unlike civilians, cannot be idle bystanders to clearly established constitutional violations without incurring § 1983 liability.  Third, the Golf Manor defendants violated a clearly established Fourth Amendment right in failing to provide medical care to Mr. Owensby as he lay in the Golf Manor cruiser at the scene of his arrest.  Fourth, the defendants are not entitled to qualified immunity.  Fifth, the Village of Golf Manor and its Chief of Police are liable for their total failure to train their police officers who responded to this scene.

## I.    DEFENDANTS' INCORRECT SUPPLEMENTAL FACTS

The Golf Manor defendants proffer several "supplemental" facts in their Memorandum in Opposition that are not accurate.

First, they state that "the <u>only</u> connection between Owensby and Golf Manor was the request by the Cincinnati officer to place Owensby in the Golf Manor car."[1]  The UNDISPUTED evidence of record establishes several other connections between Mr. Owensby and Golf Manor: (1) Golf Manor not only agreed to have Mr. Owensby placed in their police cruiser, its Officer Heiland assisted the Cincinnati officers by opening the cruiser door; (2) the handcuffed, bleeding and unconscious Mr. Owensby was placed in Golf Manor's cruiser, to which Officer Heiland at all times maintained the keys; (3) the Golf Manor officer saw that Mr. Owensby's face was bleeding, that he made no sound or movement and that he had to be carried to the Golf Manor cruiser; (4) Golf Manor's police officers were expressly told that it looked like Mr. Owensby could not breathe as he lay handcuffed on the back seat of the Golf Manor cruiser; and, (5) Golf

---

[1]Doc. 97, Golf Manor Memo Contra, p. 2.

Manor *never* provide any medical care, or even attempted to determine whether medical care was required, during the entire five to six minutes that Mr. Owensby lay dying in the Golf Manor cruiser.

Second, Golf Manor incorrectly states that Officer "Heiland did not believe Owensby was unconscious."[2]  In fact, Officer Heiland (a trained EMT[3]) testified that, while he did not *know* whether Mr. Owensby was unconscious (because he never checked),[4] everything he saw indicated that Mr. Owensby was unconscious when placed in their police cruiser—he had to be carried to the car,[5] he was not breathing heavily but the police officers involved in his arrest were disheveled and breathing heavily,[6] he was placed head-first in the car,[7] he did not move, and he made no sound.[8]

Third, Golf Manor incorrectly states that "[n]either Heiland nor Campbell knew Owensby was injured."[9]  In addition to the above facts, both officers saw that Mr. Owensby's face was

---

[2]Doc. 97, Golf Manor Memo Contra, p. 3.

[3]Heiland Depo., pp. 14:1 - 15:22.  Officer Heiland previously worked at Good Samaritan Hospital as a health technician, at Eldercare as an EMT, and was trained as a combat medic at the Army's Major Medical Center at Fort Sam Houston.

[4]Heiland Depo., p. 47:2-19.

[5]Heiland Depo., p. 22:11-14.

[6]Heiland Depo., pp. 44:14 - 47:1.

[7]Heiland Depo., pp. 22:11-14, 48:16 - 49:5.

[8]Heiland Depo., pp. 47:2-19, 89:21 - 90:9.

[9]Doc. 97, Golf Manor Memo Contra, p. 5.

bleeding.[10]  Also, both officers saw that Mr. Owensby was laying, not sitting, on the back seat of

the Golf Manor cruiser and was motionless and made no sounds.[11]  Finally, the uncontested

evidence establishes that both officers were expressly told by Cincinnati Police Officer Brazile,

as he looked at Mr. Owensby in the back seat of the Golf Manor cruiser, "This looks f**ked up.

Can he breathe?  It don't look like he can from the way he's laying."[12]  Both Golf Manor officers

knew that Mr. Owensby was seriously injured and in dire need of immediate medical care.

## II.     BYSTANDER LIABILITY

The core of Golf Manor's argument is that they are not liable for failing to provide

medical care to Mr. Owensby because they did not touch him and were not involved in his

physical arrest and beating.[13]  In effect, Golf Manor claims that its officers were mere bystanders.

Their premise is faulty because the same authority that confers upon these police officers the

right to act for the state also imposes upon them the duty to act when they know that someone

has been injured by another police officer.  They cannot hide behind the label of innocent

bystander.  "One who is given the badge of authority of a police officer may not ignore the duty

imposed by his office and fail to stop other officers who summarily punish a third person in his

---

[10]Heiland Depo., pp. 74:23 - 75:1; Campbell Depo., p. 49:9-13.

[11]Heiland Depo., pp. 47:2-19, 89:21 - 90:9; Campbell Depo., pp. 26:15 - 27:1.

[12]Exhibit 47, Brazile 11/13/00 Statement; Brazile Depo., pp. 56:14-20, 64:13 - 68:8.  The
Golf Manor officers acknowledge the conversation with Officer Brazile but say they cannot
recall what was said.  Heiland Depo., pp. 29:14 -32:7; Campbell Depo., pp. 40:8 - 42:24.  They
do not deny Officer Brazile's sworn testimony, so there exists no genuine issue of material fact
that the Golf Manor officers were given actual notice that the suspect held in their vehicle was in
great need of medical help.

[13]Doc. 97, Golf Manor Memo Contra, p.2.

presence or otherwise with his knowledge."[14]

Over twenty years ago the Sixth Circuit held that § 1983 liability exists for police officers at the scene of a constitutional violation who fail to act, even if they did not participate in or physically cause the harm. In *Bruner v. Dunaway*, the defendants (Knoxville police, a reserve police officer, and an explorer scout acting as a reserve police officer) were present when a citizen was beaten.[15] As we have here with Golf Manor, the *Bruener* defendants admitted their presence at the scene but denied striking the plaintiff.[16] In overturning the dismissal of several defendants, the Sixth Circuit adopted language from an earlier decision in ruling:

> "...a law enforcement officer can be liable under § 1983 when by his inaction he fails to perform a statutorily imposed duty to enforce the laws equally and fairly, and thereby denies equal protection to persons legitimately exercising rights guaranteed them under state or federal law. **Acts of omission are actionable in this context to the same extent as are acts of commission." The foregoing authority clearly counsels that it is not necessary, in order to hold a police officer liable under § 1983, to demonstrate that the officer actively participated in striking a plaintiff.**[17]

Likewise, in *Grooms v. Dockter*, the plaintiff was manacled with handcuffs that were too tight. Although he complained, he was then left handcuffed in the patrol car for fifteen minutes, resulting in long term damage to his wrists.[18] The Sixth Circuit denied qualified immunity to the

---

[14]*Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972); *Bruner v. Dunaway*, 684 F.2d 422, 426 (6th Cir. 1982); *Durham v. Nu'Man*, 97 F.3d 862, 867 (6th Cir. 1996).

[15]*Bruener v. Dunaway*, 684 F.2d 422, 424 (6th Cir. 1982).

[16]*Id.*

[17]*Id.* at 426, *quoting Smith v. Ross*, 482 F.2d 33 (6th Cir. 1973) (emphasis supplied).

[18]*Grooms v. Dockter*, 1996 U.S. App. LEXIS 3444, *3-4 (6th Cir. Jan. 23, 2996), attached.

partner of the police officer who fastened the handcuffs as he watched and did nothing while the

plaintiff sat in the police cruiser.[19]  In so ruling the Sixth Circuit found that the bystander officer

> watched the initiation of an application of potentially excessive force in
> handcuffing by his partner, and then failed to intervene as that application of force
> *continued* in his presence for over thirty minutes.  Suemnick therefore was more
> involved in the alleged constitutional deprivation, and had a better opportunity to
> stop it...."[20]

Such bystander liability for § 1983 violations has also been applied to hospital security

guards and nurses who stood idly by while police officers used excessive force on a patient.[21]

Here, the Golf Manor officers opened the door to the Golf Manor cruiser and watched as

a bleeding and unconscious Roger Owensby was placed head-first into their cruiser.  They then

failed to intervene as Mr. Owensby lay dying in the back seat of their cruiser as Cincinnati

officers joked in their presence about how much Mr. Owensby was "hurting."[22]  What is more,

they failed to act despite being told by Officer Brazile that Mr. Owensby looked like he could not

breathe.[23]  In ignoring their constitutional duty to provide medical care and standing by as Mr.

Owensby died, the Golf Manor defendants are just as liable as the Cincinnati defendants.

## III.    ROGER OWENSBY WAS IN GOLF MANOR'S CUSTODY

Ignoring the undisputed fact that Roger Owensby was in their police cruiser, Golf Manor

continues to assert that he was not in their custody.  This matter was fully addressed in Plaintiff's

---

[19]*Id.* at *7-8.

[20]*Id.* at *8.

[21]*Durham v. Nu'Man*, 97 F.3d 862, 866-68 (6th Cir. 1996)

[22]Exhibit 21, Transcript of Spellen police cruiser video, p. 4.

[23]*See* Footnote 12, *supra.*

Memorandum in Opposition to Golf Manor's Motion for Summary Judgment.[24]

Whether an individual is "in custody" requires an examination of "the objective circumstances of the situation using the perspective of a reasonable person in the suspect's position."[25]  A person is objectively "in custody" "if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."[26]

Here, the Golf Manor defendants admit that Mr. Owensby was: under arrest;[27] in handcuffs;[28] and placed in the back seat of the Golf Manor cruiser with the expressed consent and assistance of Golf Manor.[29]  The Sixth Circuit has unequivocally stated that the placement of a handcuffed person in a police car results in that person being taken into custody.[30]

---

[24]Doc. 93, Plaintiff's Memo Contra Golf Manor's MSJ, pp. 12-18.

[25]*Estate of Stevens v. City of Green Bay*, 105 F.3d 1169, 1175 (7th Cir. 1997); *Stansbury v. California*, 511 U.S. 318, 322 (1994); *United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *United States v. Hollie*, 1999 U.S. App. LEXIS 29270, *14 (6th Cir. Nov. 3, 1999).

[26]*Mendenhall*, 446 U.S. at 554; *Estate of Stevens*, 105 F.3d at 1175.

[27]Doc. 97, Golf Manor Memo Contra, p. 4; Doc. 85, Golf Manor MSJ, p. 9.

[28]*Id.*; Doc. 85, Golf Manor MSJ, at 5, 6.

[29]*Id.*; Doc. 85, Golf Manor MSJ, at 6.

[30]*United States v. Richardson*, 949 F.2d 851, 856 (6th Cir. 1991) ("In applying the objective standard for determining whether there has been a seizure of a person, we have no doubt that if after refusing to consent to a search, a reasonable person was placed in the back of a police car by law enforcement agents who had no intent to allow him to leave, that person would have believed that he was not free to leave.  Therefore, we conclude that when Richardson was placed in the police cruiser, he was seized within the meaning of the Fourth Amendment**"**); *United States v. McDonald*, 165 F.3d 1032, 1035 (6th Cir. 1999) ("McDonald clearly had been handcuffed, read his *Miranda* rights, and placed in a patrol car.  As the district court stated during the sentencing hearing, 'If this man wasn't in custody, then I don't know what could constitute custody'"); *see also Gallo v. City of Philadelphia*, 161 F.3d 217, 224 (3rd Cir. 1998).

Golf Manor attempts to claim that Mr. Owensby was somehow in Cincinnati's custody while in Golf Manor's cruiser because Cincinnati officers made the arrest and Golf Manor's cruiser was just a "temporary holding facility." Such an argument hardly helps Golf Manor. A "temporary holding facility" is a jail. And it is undisputed that it was Golf Manor's jail, owned by Golf Manor, marked as such, and controlled and operated by its officers. While in Golf Manor's jail, Roger Owensby was in Golf Manor's custody.

The Golf Manor defendants admit that a duty to provide medical care arises when "there is an <u>affirmative</u> act restraining one's liberty or an act by the entity apprehending an individual which results in injury."[31] However, Golf Manor asserts that they took no affirmative act in this case. Not true. Golf Manor's duty to provide for Mr. Owensby's medical care was triggered when Golf Manor <u>affirmatively</u> agreed to have the handcuffed and bleeding Roger Owensby placed in the Golf Manor cruiser, thereby, performing an affirmative act of restraining Mr. Owensby's liberty. Further, in <u>continuing</u> to hold Mr. Owensby in the back of the cruiser for over five minutes, while refusing to provide any medical care, despite actual notice from Officer Brazile that he looked as though he could not breathe, Golf Manor's <u>affirmatively</u> contributed to the injury and death of Mr. Owensby.

Finally, the defendants rely upon *Cartwright v. City of Marine City*, 336 F.3d 487 (6th Cir. 2003) for the proposition that there is no duty to provide medical care in a non-custodial setting unless: (1) the state affirmatively acts to either create or increase the risk of harm; (2) the state's actions place the plaintiff specifically at risk; and (3) the state knew or should have known

---

[31]Doc. 97, Golf Manor Memo Contra, p. 6.

8

that its actions specifically endangered the plaintiff.[32]   As the undisputed facts establish, Golf

Manor meets the *Cartwright* criteria since it affirmatively acted by agreeing to place Mr.

Owensby in its cruiser and opening the door to help the Cincinnati officers place him in the back

seat of the cruiser.  Golf Manor then left the handcuffed, bleeding, and unconscious Mr.

Owensby in a prone position on the back seat of the cruiser, thereby creating a specific danger to

Mr. Owensby, i.e., asphyxiation and death.  Finally, Golf Manor knew that its actions in leaving

Mr. Owensby unattended in the back seat of the cruiser specifically endangered Mr. Owensby

when Officer Brazile told both Golf Manor Officers Heiland and Campbell, "This looks f**ked

up.  Can he breathe?  It don't look like he can from the way he's laying."[33]

The Supreme Court, as well as the Sixth Circuit, has made it abundantly clear that the

duty to provide medical care exists even in non-custodial settings.[34]  The test is not who has

technical custody of the detainee.  Rather, as stated by the Supreme Court, the test is whether the

---

[32]*Id.* at 7.

[33]*See* Footnote 12, *supra.*

[34]*County of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998) ("Nor does any substantial contervailing interest excuse the State from making provision for the decent care and protection of those it locks up"); *Ewolski v. City of Brunswick*, 287 F.3d 492, 509 (6th Cir. 2002) ("state officials may be subject to constitutional liability if they fail to provide protection for individuals in state custody....Even in noncustodial settings, however, state officials may violate the Due Process Clause when their affirmative actions directly increase the vulnerability of citizens to danger or otherwise place citizens in harm's way"); *Gazette v. City of Pontiac*, 41 F.3d 1061, 1065 (6th Cir. 1994) ("A duty to protect can arise in a noncustodial setting if the state does anything to render an individual more vulnerable to danger"); *Bowers v. DeVito,* 686 F.2d 616, 618 (7th Cir. 1982) ("If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit").

state has provided "for the decent care and protection of those it locks up."[35]  Mr. Owensby was

"locked up" in the back seat of the Golf Manor cruiser.  Golf Manor had a constitutional duty to

provide for his care.

## IV.    THE FACT THAT ROGER OWENSBY WAS HANDCUFFED IN GOLF MANOR'S POLICE CRUISER CREATES A "SPECIAL RELATIONSHIP" THAT IMPOSES A DUTY TO PROVIDE MEDICAL CARE

Relying on the Supreme Court decision of *DeShaney v. Winnebago County Dept. Of Soc.

Servs.*, 489 U.S. 189, 198-200 (1989), Golf Manor asserts that a "special relationship" must exist

before there is a duty to provide medical assistance to a detainee.[36]  Golf Manor's argument fails

because those *DeShaney* "special relationships" were defined by the Supreme Court as (1)

custodial settings in which the state has limited the individual's ability to care for himself, and

(2) [in non-custodial setting] when the state affirmatively places the individual in a position of

danger the individual would not have otherwise faced.[37]  *DeShaney* specifically stated that the

state is required "to provide medical care to suspects in police custody who have been injured

while being apprehended by the police."[38]  Thus, the undisputed evidence establishes that Golf

Manor was in such a special relationship with Mr. Owensby.\

---

[35]*Lewis*, 523 U.S. at 851 ("Nor does any substantial contervailing interest excuse the State from making provision for the decent care and protection of those it locks up").

[36]Doc. 97, Golf Manor Memo Contra, pp. 6-8.

[37]*DeShaney*, 489 U.S. at 199-202; *Estate of Stevens*, 105 F.3d at 1174.

[38]*DeShaney*, 489 U.S. at 198.

V.    **THE FOURTH AMENDMENT "OBJECTIVE REASONABLENESS" TEST IS APPLICABLE TO THE FAILURE TO PROVIDE MEDICAL CARE—NOT THE FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS CLAUSE**

Golf Manor asserts that the failure to provide medical care to Mr. Owensby should be evaluated under the Fourteenth Amendment substantive due process standard of "deliberate indifference" as opposed to the Fourth Amendment "objective reasonableness" test.[39] Defendants are mistaken. The law on this subject establishes a continuum of applicable constitutional Amendments that prescribe medical care duties depending upon the stage of confinement. At the scene of the arrest, the failure to provide medical care to the detainee is governed by the Fourth Amendment "objective reasonableness" test.[40] Later, while the prisoner awaits trial, the failure to provide medical care is governed by the Fourteenth Amendment substantive due process "deliberate indifference" standard.[41] Finally, after trial, the convict's right to medical care is examined under the Eighth Amendment's Cruel and Unusual Punishment standard.[42]

The Supreme Court has specifically cautioned against Fourteenth Amendment substantive due process analysis of constitutional violations where the offending behavior may be governed by another constitutional provision.

---

[39]Doc. 97, Golf Manor Memo Contra, pp. 8-11.

[40]*Graham v. Connor*, 490 U.S. 386, 395 (1989); *Cox v. Treadway*, 75 F.3d 230, 234 (6th Cir. 1996); *Alexander v. Beale Street Blues Co., Inc.*, 108 F. Supp. 2d 934 (W.D. Tenn. 1999); *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586 (7th Cir. 1997).

[41]*City of Revere v. Massachusetts Gen.* Hospital, 463 U.S. 239, 244 (1983); *DeShaney*, 489 U.S. at 198-200; *Lewis*, 523 U.S. at 849.

[42]*Estelle v. Gamble*, 429 U.S. 97 (1976); *Ingram v. Wright*, 430 U.S. 651 (1977); *Bell v. Wolfish*, 441 U.S. 520 (1979).

[B]ecause we have always been reluctant to expand the concept of substantive due process, we held in *Graham v. Connor* that where a particular amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.[43]

The Supreme Court also stated unequivocally that:

If a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim **must be analyzed** under the standard appropriate to that specific provision, not under the rubric of substantive due process.[44]

The Sixth Circuit has also echoed the Supreme Court in this regard in ruling that the Fourth Amendment "objective reasonableness" standard applies, not only to the arrest, but also to "post-restraint" constitutional violations when the suspect is "securely under the control of the police, and who is not attempting to escape."[45]

This precise issue was addressed in *Alexander v. Beale Street Blues Co., Inc.*[46]  There, a patron of a Memphis nightclub was thrown to the floor while several nightclub employees held him down with their body weight.[47]  Memphis police arrived to find the patron in obvious need of medical attention.  Nevertheless, the officers assisted nightclub employees in handcuffing the now-motionless patron, carrying him outside of the club and placing him behind the police cruiser "in a contorted position" creating a risk of death by positional asphyxia.  The patron was

---

[43]*Lewis*, 523 U.S. at 842 *citing Graham*, 490 U.S. at 395.

[44]*Id.* at 843 *quoting United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997)  (emphasis supplied).

[45]*Cox v. Treadway*, 75 F.3d 230, 234 (6th Cir. 1996).

[46]108 F. Supp. 2d 934, 944-45 (W.D. Tenn. 1999).

[47]*Alexander*, 108 F. Supp. 2d at 939.

taken to the hospital by ambulance and later died as a result of traumatic asphyxia.  The plaintiff filed a § 1983 action claiming a failure to provide timely medical treatment.[48]

*Alexander* determined that the Fourth Amendment objective reasonableness analysis was appropriate.[49]  Specifically, *Alexander* ruled that, "Plaintiffs' medical indifference claim will be examined under the framework of the Fourth Amendment to determine whether the officers' alleged denial of medical care was reasonable under the circumstances."[50]  *Alexander* also acknowledged that:

> Although the right to medical care will most often be cited in the context of the Eighth or Fourteenth Amendments, in this case the court must determine whether the officers' conduct with respect to medical care was objectively reasonable under the Fourth Amendment.[51]

Likewise, in *Estate of Phillips v. City of Milwaukee*,[52] the Seventh Circuit analyzed a § 1983 claim of failure to provide medical care under the Fourth Amendment objective reasonableness test where a man died after he was handcuffed face down on the floor with his hands behind his back.[53]  *Estate of Phillips* acknowledges that "it is somewhat awkward to conceptualize such an act or failure to act [failure to provide medical care] as 'excessive force;' indeed, the duty to render medical aid is more often thought of as one arising under the Due

---

[48]*Id.*

[49]*Id.* at 940-43.

[50]*Id.* at 941.

[51]*Id.* at 944 n. 10.

[52]*Estate of Phillips v. City of Milwaukee*, 123 F.3d 586 (7th Cir. 1997).

[53]*Id.* at 590.

Process Clause or the Eight Amendment."[54]  However, the Seventh Circuit concluded that Fourth

Amendment objective reasonableness analysis was proper because "the complained-of police

actions occurred during the course of Mr. Phillips' seizure."[55]  Thus, the Fourth Amendment

"requires that seizures be reasonable under all the circumstances; and we do think that it would

be objectively unreasonable in certain circumstances to deny needed medical attention to an

individual placed in custody who cannot help himself."[56]

In response, Golf Manor offers this court an incomplete quote from *Estate of Phillips* in

an attempt to cobble a Fourteenth Amendment argument.[57]  However, when the entire quote is

examined (bold portion omitted by Golf Manor), the fallacy of Golf Manor's argument is

revealed:

> **Therefore, although** "it is true that at some point after a person is arrested, the question whether his continued confinement or prosecution is unconstitutional passes over from the Fourth Amendment to the due process clause **(and after conviction to the Eighth Amendment's cruel and unusual punishment clause...),"** <u>Jones v. City of Chicago, 856 F.2d 985, 994 (7th Cir. 1988),</u> **that point was not crossed in this case, and the Fourth Amendment's reasonableness standard remains the sole standard by which to measure the officers' actions.**[58]

Golf Manor also relies upon *Wagner v. Bay City*, 227 F.3d 316 (5th Cir. 2000).[59]  *Wagner*

---

[54]*Id.* at 595 *citing DeShaney*, 489 U.S. at 200.

[55]*Id.* at 596 *citing Graham*, 490 U.S. at 389-90.

[56]*Id.*

[57]Doc. 97, Golf Manor Memo Contra, p. 9.

[58]*Estate of Phillips*, 123 F.3d at 596.

[59]Doc. 97, Golf Manor Memo Contra, pp. 9-11.

is inapplicable for two reasons.

First, the facts of *Wagner* are markedly distinguishable from those in this case. In *Wagner* the decedent, Mr. Gutierrez, was arrested by Officers Hadash and Mirelez.[60] After being handcuffed he was placed in the arresting officer's cruiser (Officer Hadash) and transported to the police station.[61] Other officers who arrived on the scene (Sergeant Garcia and Officers Hempel and Sherrill) did not participate in the arrest *and did not have the suspect in their cars.*[62] At the police station, the suspect was removed from the arresting officer's cruiser by two jailers who carried him into the jail. Once in the jail, the arresting officer noticed that "it appeared that Gutierrez was not breathing."[63] CPR was administered, the suspect was revived and taken to the hospital. At the hospital the suspect "slipped into a coma and eventually died."[64] In our case, Mr. Owensby died in the Golf Manor car at the scene.

Second, the failure to provide medical care in *Wagner* traverses the Fourth Amendment standard for actions at the scene of the arrest and the Fourteenth Amendment standard for actions at the jail. Even so, *Wagner* employs a Fourth Amendment objective reasonableness standard.

> Because the risk of harm from asphyxiation, of which Wagner alleges defendants should have been aware, primarily was the result of Gutierrez's being handcuffed and placed on his chest in the back of the patrol car, *Gutierrez [v. City of San Antonio*, 139 F.3d 441 (5th Cir. 1998)] again informs our analysis as to the

---

[60]*Wagner*, 227 F.3d at 319.

[61]*Id.*

[62]*Id.*

[63]*Id.*

[64]*Id.*

**objective reasonableness** of the officers' actions.[65]

Thus, *Wagner* supports the Fourth Amendment objective reasonableness test, even under distinctly different facts from those *sub judice*.

Finally, under the facts of this case, the distinction between "objective reasonableness" and "deliberate indifference" is irrelevant because of the outrageous actions of the Golf Manor police officers. Golf Manor and its officers unequivocally violated Mr. Owensby's constitutional right to medical care when (1) they failed to check on his medical condition as they accepted him into the Golf Manor cruiser and then (2) refused to provide any medical care to him while he lay handcuffed, bleeding and unconscious on the back seat of the Golf Manor cruiser. This refusal to provide medical care occurred for a critical five to six minutes *after* Golf Manor's officers were told "It don't look like he can [breathe] from the way he's laying."[66] Golf Manor officers did not bother to check on Mr. Owensby after receiving such an alert from a brother officer. It is hard to imagine how such conduct could not be described as "deliberate indifference." Such callous disregard for someone "locked up" in a Golf Manor cruiser violates every applicable constitutional standard—objective reasonableness as well as deliberate indifference.

## VI.    THE INDIVIDUAL GOLF MANOR OFFICERS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

Defendants assert that they are entitled to qualified immunity by adopting their arguments from their Motion for Summary Judgment.[67] Therefore, Plaintiff likewise adopts his arguments

---

[65]*Id.* at 324-25 (emphasis supplied).

[66]*See* Footnote 12, *supra*.

[67]Doc. 97, Golf Manor Memo Contra., p. 11.

16

on this topic from his Motion for Summary Judgment[68] and Memorandum in Opposition to Golf

Manor's Motion for Summary Judgment.[69]

## VII.    GOLF MANOR AND ITS POLICE CHIEF ARE LIABLE FOR THEIR FAILURE TO TRAIN THEIR OFFICERS

Golf Manor argues that municipal liability under § 1983 does not exist because "there is

nothing to suggest the training on the part of Golf Manor rose to the level of 'deliberate

indifference.'"[70]  Golf Manor's memorandum is noteworthy for what it does not say.  Golf Manor

does not contest the testimony of Officers Heiland and Campbell that they received NO training

on their responsibilities or duties when acting with another police agency under the Mutual Aid

Agreement.[71]  Specifically, Golf Manor provided no classes to its officers;[72]  no directives or

memoranda;[73] and no instruction on which police department's policies, rules or regulations

governed their conduct when they responded to a scene pursuant to the Mutual Aid Agreement.[74]

Thus, having signed the Mutual Aid Agreement and instructed its police force to work

collaboratively with other municipal police forces, Golf Manor and its Police Chief failed to

---

[68]Doc. 87, Plaintiff's Golf Manor MSJ, pp. 18-22.

[69]Doc. 93, Plaintiff's Memo Contra Golf Manor MSJ, pp. 20-30.

[70]Doc. 97, Golf Manor Memo Contra, p. 12.

[71]Doc. 87, Plaintiff's Golf Manor MSJ, pp. 22-26; Heiland Depo., p. 97:8-12; Campbell Depo., p. 43:21-23.

[72]Heiland Depo., pp. 92:22 - 93:9.

[73]Heiland Depo., p. 93:10-13; Campbell Depo., pp. 43:24 - 44:4.

[74]Heiland Depo., p. 72:5-13; Campbell Depo., p. 43:21-23.

provide any training for its officers concerning their respective duties and responsibilities.[75]  Such

conduct by Golf Manor "amounts to deliberate indifference to the rights of persons with whom

the police came into contact."[76]   The resulting foreseeable ignorance by Golf Manor officers

concerning their duty to provide medical care to Roger Owensby in such a collaborative action

cost him his life.

     The failure to train left Officer Heiland with the following faulty impression:

> My understanding at that time is I would be responsible for my prisoners, anybody
> that was in my custody.  If somebody is not my prisoner, not in my custody, then
> on the assistance call if somebody puts their prisoner in the back of my car, they
> asked to put them in the back of my car and I'm there for assistance.  It's their
> prisoner and it's in their custody.  So it's their responsibility.

     The Mutual Aid Agreement contradicts such understanding by providing that the Golf

Manor officers were subject to the same duties as the Cincinnati officers.

> Whenever the law enforcement employees of one cooperating Agency are
> providing police services in or to another cooperating agency pursuant to the
> authority contained in this contract, other legislative authority or state law, such
> employee will have the ***same*** power, ***duties***, rights and immunities as if taking
> action within the territory of their employing Agency.[77]

     In fact, Defendant City of Cincinnati and its Police Chief have stated that this Mutual Aid

Agreement "subjected co-defendant Golf Manor and its officers to the same written policies

discussed earlier."[78]   The referenced "written policies" are Cincinnati's Police Department

Manual of Rules and Regulations as well as Cincinnati's Use of Force Policy 12.545 which

---

[75]Heiland Depo., p. 72:5-13.

[76]*City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

[77]Exhibit 78, ¶ VI.C. (Emphasis supplied).

[78]Doc. 99, Cincinnati Memo Contra Plaintiff's MSJ, p.2.

requires "immediate medical attention" for all prisoner injuries once the scene is stabilized as well as requiring that the victim of mace be provided with "fresh air" and "clear, cool water."[79]

Defendants also argue that the following term of the Mutual Aid Agreement demonstrates that "control [of Mr. Owensby] was never relinquished to Golf Manor."

> Control of any arrested person, evidence in a crime scene shall be relinquished to the first available officer from the jurisdiction within which the crime took place. The arresting officer may immediately transport or relocate any arrested persons or evidence if the officer determines that remaining at the crime scene could endanger himself or others or threaten the preservation of any evidence.[80]

This provision provides no cover for Golf Manor. The first sentence, commanding that control of the arrested person be relinquished to the first available officer from the jurisdiction in which the crime occurred (Cincinnati), means that Golf Manor was prohibited from taking Mr. Owensby into its police cruiser since there were Cincinnati police officers all around the scene. Likewise, the second sentence is irrelevant to Golf Manor since it concerns Cincinnati's option of transporting Mr. Owensby from the scene.

The undisputed evidence is that Golf Manor and its Chief of Police failed to provide any training to its officers concerning their duties and responsibilities under the Mutual Aid Agreement. Nevertheless, Golf Manor sent its officers into other jurisdictions with no training. The foreseeable failure to provide constitutional medical care by Golf Manor's officers during

---

[79]*Id.* at 1-2. While some Cincinnati officers now question whether the scene of the Owensby homicide was ever "stabilized," it is undisputed that the officer-needs-assistance call was quickly cancelled, that Cincinnati officers felt sufficiently "stabilized" to seek their uniform hats, joke about how much Mr. Owensby was hurting, and all officers felt the situation was sufficiently "stabilized" that no one needed to bother monitoring their dying prisoner. Exhibit 20, Spellen cruiser video of scene, filed at Doc. 86; Exhibit 21, Transcript of Spellen cruiser video.

[80]Doc. 97, Golf Manor Memo Contra, p. 13-14, quoting Exhibit 78, ¶ I(A).

the critical five to six minute time period, despite actual notice that Roger Owensby was not breathing, resulted in Mr. Owensby's death.

## VII.    CONCLUSION

Golf Manor and its individual police officers are liable under § 1983 for their failure to provide Mr. Owensby critical medical care during the five to six minutes as he lay handcuffed, bleeding, unconscious and dying on the back seat of a Golf Manor cruiser. Golf Manor cannot avoid this liability by claiming that it was an innocent bystander. Nor can it claim that the dying, handcuffed man in their cruiser was not in Golf Manor's custody. In light of the actual knowledge of the Golf Manor police officers that Mr. Owensby was injured when placed in the Golf Manor cruiser and could not breathe as in lay handcuffed in their car, liability exists under both the Fourth Amendment "objective reasonableness" standard as well as the Fourteenth Amendment "deliberate indifference" standard. The Golf Manor police officers are not entitled to qualified immunity under these facts. And the Village of Golf Manor and its Chief of Police are liable for their undisputed complete failure to train their officers in their respective duties when acting collaboratively with the City of Cincinnati under the auspices of the Mutual Aid Agreement.

Therefore, Plaintiff's Partial Motion for Summary Judgment against these Golf Manor defendants (doc. 87) should be granted and the cross motion of the Golf Manor defendants (doc. 85) should be denied.

Respectfully submitted,

/s/Paul B. Martins

Mark T. Tillar (0029898)            James B. Helmer, Jr.  (0002878)
240 Clark Road                      Paul B.  Martins (0007623)
Cincinnati, Ohio  45202             Frederick M. Morgan, Jr.  (0027687)
Telephone: (513) 761-2958           HELMER, MARTINS & MORGAN CO., LPA
                                    Fourth & Walnut Centre, Suite 1900
John J. Helbling (0046727)          105 East Fourth Street
3672 Springdale Road                Cincinnati, Ohio 45202-4008
Cincinnati, Ohio 45251              Telephone:    (513) 421-2400
Telephone: (513) 923-9740           Facsimile:     (513) 421-7902

                                    *Trial Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Plaintiff's Reply Memorandum In Support Of His Motion For Partial Summary Judgment Against The Village of Golf Manor, Its Police Chief And Its Individual Police Officer For Their Failure To Provide Critical Medical Care (Doc. 87), was electronically filed on March 5, 2004.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.


<u>/s/ Paul B. Martins</u>