Case 1:01-cv-00769-SAS   Document 105-6   Filed 03/05/2004   Page 1 of 7

CHRISTOPHER CAMPBELL

Owensby, et al. vs. City of Cincinnati
December 3, 2003

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - - -

| | |
|---|---|
| ESTATE OF ROGER D. OWENSBY JR., et al., | : : : |
| Plaintiffs, vs. | : : Case No. 01-CV-769 : (Judge S. A. Spiegel) |
| CITY OF CINCINNATI, et al., | : : : |
| Defendants. | : |

- - - - - - - - - - - - - - -

Deposition of CHRISTOPHER CAMPBELL, defendant herein, called by the plaintiffs for cross-examination, pursuant to the Federal Rules of Civil Procedure, taken before me, Wendy Davies Welsh, a Registered Diplomate Reporter and Notary Public in and for the State of Ohio, at the offices of Helmer, Martins & Morgan Co. LPA, 1900 Fourth & Walnut Centre, 105 East Fourth Street, Cincinnati, Ohio, on Wednesday, December 3, 2003, at 2:31 p.m.

Case 1:01-cv-00769-SAS   Document 105-6   Filed 03/05/2004   Page 2 of 7

Owensby, et al. vs. City of Cincinnati  
December 3, 2003

CHRISTOPHER CAMPBELL

Page 2

1  APPEARANCES:

2  On behalf of the Plaintiffs:

3  Paul B. Martins, Esq.  
   Helmer, Martins & Morgan Co. LPA  
4  Suite 1900, Fourth & Walnut Centre  
   105 East Fourth Street  
5  Cincinnati, Ohio 45202  
   Phone: (513) 421-2400  
6  
   John J. Helbling, Esq.  
7  The Helbling Law Firm, L.L.C.  
   3672 Springdale Road  
8  Cincinnati, Ohio 45251  
   Phone: (513) 923-9740  
9  
   On behalf of the Defendants City of Golf Manor,  
10 Stephen Tilley, Roby Heiland and Chris  
   Campbell:  
11  
   Wilson G. Weisenfelder Jr., Esq.  
12 Rendigs, Fry, Kiely & Dennis  
   900 Fourth & Vine Tower  
13 One West Fourth Street  
   Cincinnati, Ohio 45202-3688  
14 Phone: (513) 381-9200

15 On behalf of the Defendant City of Golf Manor:

16 Terrence M. Donnellon, Esq.  
   Donnellon, Donnellon & Miller  
17 9079 Montgomery Road  
   Cincinnati, Ohio 45242  
18 Phone: (513) 891-7087

Page 3

1  On behalf of Defendants City of Cincinnati,  
   Darren Sellers, Jason Hodge:  
2  
   Geri Hernandez Geiler, Esq.  
3  Assistant City Solicitor  
   Department of Law  
4  Room 214, City Hall  
   801 Plum Street  
5  Cincinnati, Ohio 45202  
   Phone: (513) 352-3346  
6  
   On behalf of the Defendants Robert B. Jorg,  
7  Patrick Caton, Jason Hodge, Victor Spellen and  
   Darren Sellers:  
8  
   Donald E. Hardin, Esq.  
9  Hardin, Lefton, Lazarus & Marks, LLC  
   915 Cincinnati Club Building  
10 30 Garfield Place  
   Cincinnati, Ohio 45202  
11 Phone: (513) 721-7300

12 Also present:

13 Chief Stephen Tilley

14 Lisa Damstrom, Law Clerk  
   Helmer, Martins & Morgan Co., L.P.A.

Page 4

1          S T I P U L A T I O N S

2  It is stipulated by and among counsel for the

3  respective parties that the deposition of

4  CHRISTOPHER CAMPBELL, defendant herein, called by

5  the plaintiffs for cross-examination, pursuant to

6  the Federal Rules of Civil Procedure, may be taken

7  at this time by the notary; that said deposition may

8  be reduced to writing in stenotype by the notary,

9  whose notes may then be transcribed out of the

10 presence of the witness; and that proof of the

11 official character and qualifications of the notary

12 is expressly waived.

           - - -

Page 5

1                I N D E X

2  Examination by:          Page

3  Mr. Martins . . . . . . . .  6

4  Mr. Hardin  . . . . . . . . 54

5  Mr. Martins . . . . . . . . 81

6  Mr. Hardin  . . . . . . . . 85

7  Mr. Martins . . . . . . . . 89

           - - -

9           E X H I B I T S

                                    Page
10 Plaintiff's Exhibit 81 ..............  10
11 Plaintiff's Exhibit 82 ..............  27
   Plaintiff's Exhibit 83 ..............  27
12 Plaintiff's Exhibit 84 ..............  38

           - - -

Case 1:01-cv-00769-SAS    Document 105-6    Filed 03/05/2004    Page 3 of 7

Owensby, et al. vs. City of Cincinnati                                    CHRISTOPHER CAMPBELL
December 3, 2003

**Page 26**

1  was conscious or unconscious at the time that they
2  were moving him toward the Golf Manor cruiser?
3     A. At the time I assumed he was conscious,
4  but looking back, I can't tell.
5     Q. Did it appear to you that the Cincinnati
6  police officers were struggling to move him toward
7  the cruiser?
8     A. Yes.
9     Q. Do you know whether or not that struggling
10 by the police officers was because he was
11 unconscious?
12    A. I don't.
13    Q. You don't know one way or the other?
14    A. No.
15    Q. Am I correct in understanding that in the
16 entire time that you saw Mr. Owensby that evening,
17 you never saw him move?
18      MR. WEISENFELDER: Objection as to the
19 form.
20      Go ahead.
21    A. No.
22    Q. The entire time that you saw Mr. Owensby
23 that evening you never saw him make any noise, any
24 sound?

**Page 27**

1     A. No. No.
2     Q. Let me show you a couple of documents
3  here.
4       (Plaintiff's Exhibit 82
5       was marked for identification.)
6     Q. The first is your statement of that night,
7  November 7, 2000. It's marked as Exhibit 82.
8  That's for you. That's for counsel.
9     A. Okay.
10    Q. Is Exhibit 82 the statement that you gave
11 on November 7th at just about midnight on that day?
12    A. Yes.
13    Q. This is the statement or one of the
14 documents you reviewed in preparation for this
15 deposition?
16    A. Yes.
17    Q. I want to show you another document.
18      (Plaintiff's Exhibit 83
19      was marked for identification.)
20      MR. MARTINS: Mark this as Exhibit 83.
21 Pass that over to Mr. Weisenfelder.
22      MR. WEISENFELDER: You don't want him to
23 read the whole thing, do you?
24      MR. MARTINS: No.

**Page 28**

1       MR. WEISENFELDER: Okay.
2  BY MR. MARTINS:
3     Q. This is a transcript of your testimony
4  before a grand jury on December 5 of 2000. Do you
5  recall testifying before a grand jury?
6     A. Yes.
7     Q. I want to direct you to some matters in
8  here. First start at page 48, bottom of the page,
9  beginning at line 23. The question is, "Again how
10 long did it take for you to get there once you heard
11 the call?" "There" being the Sunoco station.
12      And the answer is, "I would say one and a
13 half to two minutes."
14      Is that still your best recollection of
15 how long it took you to get there that evening?
16    A. Yes.
17    Q. There is a life squad also at the police
18 station, the Golf Manor police station; is that
19 right?
20    A. At the fire department.
21    Q. At the fire department? Is that next to
22 the police station?
23    A. Yes.
24    Q. Would it be your best estimate that if

**Page 29**

1  called, the life squad would take between a minute
2  and a half and two minutes to get to that location,
3  to the convenience store?
4       MR. WEISENFELDER: Objection.
5       Go ahead.
6     A. Yes. That would be driving time.
7     Q. Right. Look at page 50, please, next
8  page. Line 4, you say, "Once I saw that they had
9  somebody handcuffed and were putting him in the car
10 they had just got to where the, I don't know if they
11 were opening the back door or they were real close
12 to the car, I turned my attention towards the front
13 of the store because there was still a group of
14 people there. . ." Do you see that?
15    A. Yes.
16    Q. That's consistent with what you've
17 testified to today, right?
18    A. Yes.
19    Q. You say that, "I saw that they had
20 somebody handcuffed." Does that refresh your
21 recollection that you did know on that evening that
22 Mr. Owensby was, in fact, handcuffed?
23    A. That would be an assumption. I don't
24 remember seeing the handcuffs when they were moving

Case 1:01-cv-00769-SAS   Document 105-6   Filed 03/05/2004   Page 4 of 7

Owensby, et al. vs. City of Cincinnati  
December 3, 2003

CHRISTOPHER CAMPBELL

Page 38

1  Q. Is it your understanding that that is
2  being communicated also to the Cincinnati police
3  officers at the scene?
4  A. No. We were on separate channels.
5  (Plaintiff's Exhibit 84 was marked for identi-
6  fication.)
7  Q. I'll show you one other document here
8  marked as Exhibit 84. Exhibit 84 is a transcript of
9  your testimony during the trial of Officer Caton.
10 Do you recall testifying at Officer Caton's trial?
11 A. Yes.
12 Q. As you sit here today, is there anything
13 in your mind, any testimony that you gave in either
14 the grand jury or Officer Caton's trial that you
15 would like to correct in some fashion?
16     MR. WEISENFELDER: Objection.
17     MR. HARDIN: I'll join in that objection.
18     MR. WEISENFELDER: Thank you.
19 A. No.
20 Q. As of November 7, 2000 had you received
21 any guidance from Golf Manor concerning the
22 situation, your duties and obligations when a
23 prisoner of another jurisdiction or another agency
24 is placed in a Golf Manor cruiser?

Page 39

1  A. It was always my understanding that when
2  you're in another jurisdiction you're there to
3  assist that department.
4  Q. Had you received any training on this
5  issue as far as what you were obligated to do and
6  what you were not obligated to do?
7  A. I can't remember.
8  Q. Do you have any understanding that,
9  regardless of whose prisoner it is, once a person is
10 placed in your cruiser that you are responsible for
11 that person's welfare?
12     MR. WEISENFELDER: Objection. Go ahead.
13 A. No.
14 Q. No?
15 A. No.
16 Q. Regardless of whose prisoner it is, if you
17 know that a person is injured, as a Golf Manor
18 police officer, do you believe that you have a duty
19 to provide medical assistance to that person?
20     MR. WEISENFELDER: Objection. Go ahead.
21 A. Not me personally.
22 Q. When Officer Brazile came over to the car
23 and you met Officer Brazile, do you recall whether
24 or not Officer Brazile advised Officer Heiland and

Page 40

1  you that he did not -- he was concerned that it
2  looked like Mr. Owensby could not breathe in the
3  back seat of the car?
4      MR. HARDIN: Objection.
5      MR. WEISENFELDER: Objection.
6      MR. HARDIN: Form.
7  A. I can't remember specific comments.
8  Q. In the pile of exhibits that you have
9  there over on the side, pull out Exhibit 71.
10 A. In here?
11 Q. Yes.
12     MR. MARTINS: Are you ready?
13     MR. WEISENFELDER: Yeah.
14     MR. MARTINS: I wasn't sure if you were
15 reviewing.
16 Q. I want to direct your attention to
17 page 54. This is the transcript of the deposition
18 of Officer Brazile.
19     Beginning at line 3 on page 54, the
20 question is: "Did you say anything to Officer
21 Heiland at that time, after seeing Mr. Owensby with
22 your flashlight?
23     "Answer: Yes.
24     "What did you say to Officer Heiland?

Page 41

1  "I walked around to the other side of the
2  vehicle."
3  "To the -- to the --"
4  "To where they were.
5  "Question: -- rear of the passenger's side
6  of the vehicle?
7  "Where they were standing.
8  "Okay.
9  "Answer: And I asked him, I said, 'The
10 guy you have in your car, is he okay?' I said, 'Can
11 he breathe?' I said, 'He's in a' -- you know,
12 position that looked like he was in, it may have
13 been hard, so I asked him. I'm figuring he's their
14 prisoner. No one ever said whose he was. I figured
15 he was theirs, because he was in their car.
16     "And basically I was just trying to let
17 them know to check on him, just to see what's going
18 on with him or did they know or had they checked. I
19 don't know. I just had arrived.
20     "And basically when I told them, you know,
21 they basically just stood there and kind of like
22 shrugged their shoulders.
23     "Question: Both of them?
24     "Answer: From what I recall."

Page 38 - Page 41

Case 1:01-cv-00769-SAS   Document 105-6   Filed 03/05/2004   Page 5 of 7

Owensby, et al. vs. City of Cincinnati
December 3, 2003

CHRISTOPHER CAMPBELL

Page 42

1    If you go down to line 12, the question
2  is: "Did Officer Heiland or the other officer,
3  Officer Campbell, say anything to you in response?
4    "Answer: No. No, sir."
5    Do you recall Officer Brazile saying
6  anything to the effect of, Can he breathe? The guy
7  in your car, is he okay?
8    A. I can't remember that.
9    Q. Do you recall, in response to something
10 Officer Brazile said, either you or Officer Heiland
11 shrugging your shoulders?
12   A. No.
13   Q. If you go to page 56, line 14, the
14 question is, "As I recall, your statement was
15 something along the lines of: This looks fucked up,
16 can he breathe, it don't look like he can from the
17 way he's laying.
18   "Answer: Uh-huh.
19   "Question: Is that accurate to your
20 recollection?
21   "Answer: Yes."
22   Do you recall those words being said to
23 you by Officer Brazile?
24   A. I can't remember what he said.

Page 43

1    Q. If Officer Brazile had said what I just
2  read to you from his deposition, based on your
3  training and your experience with Golf Manor, would
4  you feel that you had a duty to check on the
5  condition of Mr. Owensby?
6    MR. HARDIN: Objection.
7    MR. WEISENFELDER: Objection.
8    A. I would ask the city to check their
9  prisoner.
10   Q. In the time that you and Officer Heiland
11 were standing outside the car did either you or
12 Officer Heiland ever ask the city to check on the
13 prisoner?
14   A. No.
15   Q. Take a look at Exhibit 78, please.
16 Exhibit 78 is a mutual aid agreement between
17 Cincinnati and various municipalities in the greater
18 Cincinnati area. Have you had occasion to look at
19 that mutual aid agreement before today?
20   A. No.
21   Q. Have you ever received any instruction
22 from Golf Manor concerning the mutual aid agreement?
23   A. I can't remember specific instruction.
24   Q. Do you recall receiving any memos or any

Page 44

1  written direction concerning what your duties and
2  obligations would be under this mutual aid
3  agreement?
4    A. I can't remember any.
5    Q. I want to show you a video. It was taken
6  from the police camera in the car of one of the
7  Cincinnati police officers on the night of
8  November 7, 2000. I'm going to run it for you
9  straight through once so you can see the whole
10 thing. It's about five minutes. Then I'll come
11 back and ask you some questions. Okay?
12   A. Okay.
13   Q. The exhibit number is 20 on the video.
14     (Videotape played.)
15   Q. From what you've seen in Exhibit 20, the
16 video, do you recognize any of the police officers,
17 the Cincinnati police officers?
18   A. I recognized Jorg.
19   Q. Other than Officer Jorg, anyone else?
20   A. I'd have to see it again.
21   Q. You will.
22     MR. HARDIN: Asked and answered.
23 Objection.
24     This is only the 43rd time I've seen this.

Page 45

1     (General laughter.)
2     (Videotape playing.)
3    Q. We're at 11 seconds into the video.
4  There's a Golf Manor cruiser in the center of the
5  frame. Is that the car that you drove over?
6    A. Yes.
7    Q. We're at 17 seconds into the video. There
8  are two officers in the middle of the screen. Is
9  that you and Officer Heiland?
10   A. Yes.
11   Q. You are to the right as we face the
12 screen?
13   A. Yes.
14   Q. We're 27 seconds into the video. There's
15 a second Golf Manor cruiser with its top lights on.
16 Is that Officer Heiland's cruiser?
17   A. Yes.
18   Q. That's the cruiser in which Mr. Owensby
19 lay?
20   A. Yes.
21   Q. We are at 44 seconds into the video.
22 There is an officer, a Cincinnati police officer
23 walking directly in front of the car. Is that
24 Officer Jorg?

Owensby, et al. vs. City of Cincinnati
December 3, 2003

CHRISTOPHER CAMPBELL

Page 46

1  A. Yes.
2  Q. Just pausing it. If you see any police
3  officer that you know, just sound out.
4  A. I --
5  Q. Okay. Go ahead.
6  A. One looked like Caton.
7  Q. I'm stopping it at 50 seconds into the
8  video. Is the officer to the left of the screen as
9  you face it Officer Caton?
10 A. It looks like it.
11 Q. I'm at a minute 14 seconds into the video.
12 There's a plainclothes person that's just crossed
13 the screen. Do you know if that was the person that
14 you saw coughing?
15 A. No, I don't.
16 Q. You don't know?
17 A. (Shaking head.)
18 Q. We're at 2 minutes 11 seconds into the
19 video. There is a gentleman in plainclothes in the
20 middle of the screen. Do you know if he was the
21 person that was coughing from being Maced?
22 A. I can't remember.
23 Q. We're at 4 minutes 31 seconds into the
24 video. Again, the Golf Manor car that's in the

Page 47

1  center of the screen, that's your car, right?
2  A. Yes.
3  Q. Just so that we're clear, Mr. Owensby is
4  not in your car, correct?
5  A. Correct.
6  Q. No one is in your car?
7  A. Nobody's in my car.
8  Q. At some point in time Mr. Owensby was
9  taken out of Officer Heiland's cruiser, correct?
10 A. Yes.
11 Q. Did you see that?
12 A. Yes, I did.
13 Q. What did you see happen?
14 A. As I remember it, a sergeant was trying to
15 talk to him, find out his name, and he wasn't
16 responsive. He instructed some officers to get him
17 out of the car.
18 Q. What side of the car was the sergeant on?
19 A. The sergeant was on the driver's side.
20 Q. Do you recall whether or not the sergeant
21 asked Officer Heiland to roll down the window, the
22 back window?
23 A. I can't remember if he asked him.
24 Q. So the sergeant asks some other officers

Page 48

1  to remove him from the Golf Manor car and they do
2  that?
3  A. Yes.
4  Q. What happens next?
5  A. They laid him on the ground, and I can't
6  remember the details. I think one of them was going
7  to start CPR or thought CPR was necessary.
8  Q. Do you recall whether or not when they
9  laid him on the ground, whether or not Mr. Owensby's
10 hands were still behind his back?
11 A. I can't remember.
12 Q. Continue.
13 A. As they were starting CPR I told them I
14 had a mask in my car, I would get it for them.
15 Q. You did that?
16 A. Yes.
17 Q. Walked over to your car and came back?
18 A. Yes.
19 Q. What happened next?
20 A. They performed CPR, an ambulance arrived,
21 and Owensby was taken in the ambulance.
22 Q. When they were performing, when the
23 officers were performing CPR did you notice whether
24 or not any substance came out of his mouth, Mr.

Page 49

1  Owensby's mouth?
2  A. I don't remember seeing anything come out.
3  I remember seeing his face was bloody.
4  Q. Was this the first time that you noticed
5  that his face was bloody?
6  A. No.
7  Q. When was the first time that you noticed
8  his face was bloody?
9  A. When I first glanced in the car I saw that
10 there was blood on the seat.
11 Q. Did you notice there was blood on his face
12 also?
13 A. Yeah.
14 Q. When you saw that did you report that to
15 anybody?
16 A. No.
17 Q. Was there a Cincinnati, I guess, life
18 squad or EMT unit that arrived?
19 A. Yes.
20 Q. When they arrived were you present?
21 A. I was still at the scene.
22 Q. Do you recall whether or not anyone from
23 that Cincinnati life squad instructed the Cincinnati
24 officers to remove the handcuffs from Mr. Owensby?

(800) 578-1542 * MERIT * (513) 381-8228

Page 46 - Page 49

# AFFIDAVIT

- - -

STATE OF OHIO        :
                     :   SS
COUNTY OF HAMILTON   :

I, Wendy L. Welsh, Notary Public in and for the State of Ohio, do hereby state that the transcript of the deposition of CHRISTOPHER CHAMPBELL, deponent herein, having been submitted to said deponent for review and signature, has not been signed within the thirty (30) day period allowed under the Federal Rules; said deposition to now have the same force and effect as though signed.

_____
Wendy L. Welsh, Court Reporter

Sworn to before me this 27th day of January, 2004.

_____
Thomas M. Blasing
Notary Public - State of Ohio

My commission expires:
May 4, 2004.