UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ESTATE OF                                :
ROGER D. OWENSBY JR., et al.,            :
                                         :
                                         :    Case No. 01-CV-769
            Plaintiff,                   :
                                         :    Senior Judge S. Arthur Spiegel
v.                                       :
                                         :
CITY OF CINCINNATI, et al.,              :
                                         :
                                         :
            Defendants.                  :
                                         :


**PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF HIS
MOTION FOR PARTIAL SUMMARY JUDGMENT
AGAINST DEFENDANTS CITY OF CINCINNATI, ITS POLICE CHIEF
AND ITS INDIVIDUAL POLICE OFFICERS
FOR THEIR FAILURE TO PROVIDE CRITICAL MEDICAL CARE (doc. 88)**

Mark T. Tillar (0029898)              James B. Helmer, Jr.  (0002878)
240 Clark Road                        Paul B.  Martins (0007623)
Cincinnati, Ohio  45202               Frederick M. Morgan, Jr.  (0027687)
                                      HELMER, MARTINS & MORGAN CO., LPA
                                      Fourth & Walnut Centre, Suite 1900
John J. Helbling (0046727)            105 East Fourth Street
3672 Springdale Road                  Cincinnati, Ohio 45202-4008
Cincinnati, Ohio 45251                Telephone:    (513) 421-2400
                                      Facsimile:    (513) 421-7902


*Trial Attorneys for Plaintiff*

**TABLE OF CONTENTS AND SUMMARY**

Page

**I.    INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

This is a consolidated Reply to the memoranda in opposition to Plaintiff's Motion for Partial Summary Judgment filed by the City of Cincinnati and its Police Chief (Doc. 99), defendant Cincinnati Police Officer Hunter (Doc. 102), and defendant Cincinnati Police Officers Jorg, Caton, Sellers and Spellen (Doc. 103).  Summary Judgment under 42 U.S.C. § 1983 is appropriate here against these "Cincinnati defendants" for the failure to provide any critical medical care to Roger Owensby Jr., as he lay handcuffed, bleeding, unconscious and dying in a police cruiser for the reasons set forth in Plaintiff's initial Motion for Partial Summary Judgment (Doc. 88).  Further, the arguments of the Cincinnati defendants are meritless and should be rejected because:

(1) they are barred by Ohio statute and judicial estoppel from now attempting to assert that Mr. Owensby died of "sudden cardiac arrest" when for the past three years they have asserted publicly and in administrative proceedings the finding of the Hamilton County Coroner that Mr. Owensby's death was a "homicide (police intervention: asphyxiation during restraint attempts.);"

(2) immediate CPR for Mr. Owensby by any of the eleven Cincinnati police officers at the scene would have saved Mr. Owensby's life;

(3) the City and its Police Chief provided no training whatsoever to its police officers on when a scene is "stabilized" so that "immediate" medical care must be provided to an injured citizen under Cincinnati's Use of Force Procedure 12.545, and no training whatsoever to its police officers on their duties and responsibilities when working with another police force pursuant to the Mutual Aid Agreement executed by Cincinnati and Golf Manor;

(4) the City and its Police Chief are guilty of "deliberate indifference" for their failure to train their officers on these use-of-force standards; and,

(5) the individual Cincinnati police officer defendants are guilty of "deliberate indifference" for their knowing refusal to provide medical care to Roger Owensby.

**II.   FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Summary judgment is appropriate on Plaintiff's § 1983 claim of failing to provide constitutionally-required medical care because the duty of the state to provide medical care to pretrial detainees is a well established constitutional right and because a number of the key facts (identified in this section) are uncontested by the City defendants.

**III.  THE FOURTH AMENDMENT "OBJECTIVE REASONABLENESS" TEST
      APPLIES TO THE FAILURE TO PROVIDE MEDICAL CARE TO MR.
      OWENSBY AT THE SCENE OF HIS ARREST** . . . . . . . . . . . . . . . . . . . . . . . . . . 8

All of the Cincinnati defendants assert that the failure to provide medical care to Mr. Owensby should be evaluated under the Fourteenth Amendment substantive due process standard of "deliberate indifference" as opposed to the Fourth Amendment "objective reasonableness"

i

test. The law on this subject establishes a continuum of applicable constitutional Amendments that prescribe medical care duties depending upon the stage of confinement. At the scene of the arrest (where Mr. Owensby desperately needed medical help) the failure to provide medical care to the detainee is governed by the Fourth Amendment "objective reasonableness" test. *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Cox v. Treadway*, 75 F.3d 230, 234 (6th Cir. 1996); *Alexander v. Beale Street Blues Co., Inc.*, 108 F. Supp. 2d 934 (W.D. Tenn. 1999); *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586 (7th Cir. 1997). Later, while the prisoner awaits trial, the failure to provide medical care is governed by the Fourteenth Amendment substantive due process "deliberate indifference" standard. *City of Revere v. Massachusetts Gen.* Hospital, 463 U.S. 239, 244 (1983); *DeShaney v. Winnebago County Dept. Of Soc. Servs.*, 489 U.S. 189, 198-200 (1989); *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998). Finally, after trial, the convict's right to medical care is examined under the Eighth Amendment's Cruel and Unusual Punishment standard. *Estelle v. Gamble*, 429 U.S. 97 (1976); *Ingram v. Wright*, 430 U.S. 651 (1977); *Bell v. Wolfish*, 441 U.S. 520 (1979).

Here, the distinction between "objective reasonableness" and "deliberate indifference" is irrelevant because of the outrageous actions of the Cincinnati police officers and the utter failure of training by the City and its Police Chief. The Cincinnati defendants clearly violated Mr. Owensby's constitutional right to medical care when they failed to even check on his medical condition after beating and crushing him into unconsciousness.

**IV.    THE CITY OF CINCINNATI AND ITS POLICE CHIEF (doc. 99)** . . . . . . . . . . . 13

    **A.    Sudden Cardiac Arrest** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        **1.    The report of Dr. Tom Neuman submitted by the City should not be considered at all because the City is statutorily prohibited and judicially estopped from denying that Mr. Owensby's death was the result of mechanical asphyxiation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

On November 30, 2000, the Hamilton County Coroner's Office ruled Mr. Owensby's death a homicide by mechanical asphyxiation as a result of police restraint attempts. Exhibits 103 and 134. The City, in mid-2002, through its Office of Municipal Investigations, hired Allegheny County, Pennsylvania Coroner Cyril Wecht, who reviewed and agreed with the findings of the Hamilton County Coroner. Exhibit 108. Dr. Wecht also testified to a reasonable degree of medical certainty that, had medical attention been provided to Mr. Owensby within a few minutes of his becoming unconscious, he would be alive today. Within days of receiving Dr. Wecht's report, the City initiated formal administrative disciplinary proceedings against the police officers who killed Mr. Owensby. As a result, one defendant officer (Patrick Caton) was terminated, and others were disciplined.

After taking *and winning* the position that the conduct of the officers engaged in conduct which "le[d] to serious injury to another"—Mr. Owensby—the City now wants to do an about-face in this Court. It asserts that the officers did nothing which was related to the death of Mr. Owensby. Rather, the City claims that Mr. Owensby died unavoidably of a heart attack, and that nothing the officers might have done—had they complied with City policy and human decency by providing him with medical attention— would have made a bit of difference.

ii

2.      **The City is precluded by Ohio law from contesting the Coroner's decision in this Court, and any evidence to the contrary is therefore incompetent** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Under Ohio Rev. Code Ann. § 313.19, the finding of the Hamilton County Coroner as to the manner and cause of death of Roger Owensby is binding unless and until it is set aside by the Hamilton County Court of Common Pleas.  No defendant has challenged the Coroner's findings in the common pleas court.  *Vargo v. Travelers Insurance Company*, 34 Ohio St. 3d 27, 29 (1987); *Estate of Severt v. Wood, Coroner,* 107 Ohio App.3d 123, 126 (Wood App. 1995); *Perez v. Cleveland, Coroner*, 78 Ohio St.3d 376, 377 (1997).   Therefore, neither the City, nor its police officers may contend that Mr. Owensby died of an instantaneous, untreatable heart attack.

3.      **The doctrine of judicial estoppel prevents parties from playing "fast and loose" with the courts by switching positions** . . . . . . . . . . . . . . . 18

Even if the Ohio Revised Code did not dispose of the City's blatant side-switching, the courts are not without power to prevent those who appear before them from deploying one theory against a litigant, prevailing on that theory, and then deploying a wholly-inconsistent theory against another.  Here, the City and its Police Chief are judicially estopped from now asserting that Mr. Owensby died of "sudden cardiac arrest."  *State of New Hampshire V. State of Maine*, 532 U.S. 742, 749-50 (2001); *Teledyne Industries, Inc. v. NLRB*, 911 F.2d 1214, 1217-18 (6th Cir. 1990); *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 598 (6th Cir. 1982); 18 Moore's Federal Practice § 134.30, p. 134-62 (3d ed. 2000).

Judicial  estoppel applies with full force where the prior proceeding was a quasi-judicial, administrative proceeding like we have in this case.  *Smith v. Montgomery*, 388 F.2d 291 (6th Cir. 1968).  This exact issue was addressed in *Czajkowski v. City of Chicago*, 810 F. Supp. 1428 (N.D. Ill. 1993), where the court held that the City was judicially estopped, in a civil rights action under 42 U.S.C. § 1983,  from denying that a police officer scratched the plaintiff's chest, because it had taken that position in administrative disciplinary proceedings against the officer. In the opinion, the court considers a blizzard of supposed policy concerns the City raised against application of judicial estoppel and rejected each of them: "*The City prevailed on the scratched chest issue in the Police Board issue so the requirement of prevailing on the issue in the prior proceeding is satisfied.*"  *Id.* at 1444.

4.      **Application of judicial estoppel to this case** . . . . . . . . . . . . . . . . . . . . . 20

In the administrative proceedings, the City of Cincinnati took the position that defendants Caton and Jorg violated Police Division procedures by failing to carry out a procedure which "leads to serious injury to another"—"Never leave prisoners unattended inside cars."  Officer Jorg resigned rather than go through the disciplinary process.  Officer Caton went to hearing before a designated Administrative Hearing Officer.  He was represented by the same able counsel that he has in this case, and had the opportunity to call witnesses.  The charge was sustained and he was fired.  Caton took no steps to pursue the matter through grievance proceedings or litigation.  The City took the position, in other words, that Caton's conduct "led to serious injury to another"—and prevailed on that position.

The City's current position is diametrically opposed to the position on which it prevailed

in its administrative charges against Officer Caton. The doctrine of judicial estoppel plainly bars the City and Officer Caton from arguing that Mr. Owensby died from "sudden cardiac arrest."

**B.    Dr. Neuman's Purported Opinion Regarding The Efficacy of Medical Treatment Does Not Raise a Material Question of Fact Regarding The Causal Relationship Between the Failure to Provide Medical Care and the Death of Mr. Owensby** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

The defendants assert that the Rule 56(f) Affidavit of Tom Neuman, M.D. raises a material question of fact with respect to whether the failure of its officers to provide necessary medical care (a failure the City really does not even contest) was causally related to any deprivation of Mr. Owensby's civil rights. Because the medical evidence on this subject is so overwhelming, such a baseless assertion does not constitute a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Williams v. Ford Motor Company*, 187 F.3d 533, 543 (6th Cir. 1999), *quoting Merit Motors, Inc. v. Chrysler Corp.*, 187 U.S. App. D.C. 11, 569 F.2d 666, 673 (D.C.Cir. 1977). Summary Judgment is appropriate where such inherently unreliable "expert" testimony is proffered. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *Karen L. Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965 (10th Cir. 2004).

**C.    The City Of Cincinnati's Complete Failure To Train Its Officers As To The Terms And Operation Of Its <u>Use of Force</u> Procedure 12.545 And The Mutual Aid Agreement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Inadequate training is a basis for § 1983 liability where the failure to train amounts to "deliberate indifference" to the constitutional rights of persons with whom the police may come into contact. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). In adopting this standard the Supreme Court expressly stated that the need to train its police force in the constitutional limitation on the exercise of deadly force is "so obvious" that failure to do so could constitute "deliberate indifference" to constitutional rights. *Id.* at 390 n.10. Here, The City and its Police Chief do not contest that they failed to provide *any* training to their police officers concerning their duties and responsibilities when working with another police department like Golf Manor under the Mutual Aid Agreement. Additionally, they do not contest that their police officers received no training whatsoever concerning the phrase "once the incident scene is stabilized," as it appears in their <u>Use of Force</u> Procedure 12.545, with the requirement to "ensure appropriate first aid is rendered immediately."

The undisputed evidence is that there were at least eleven Cincinnati police officers at the scene on November 7, 2000. *None of the eleven officers* were trained to provide immediate medical care to Roger Owensby during the six critical minutes that he lay dying in the Golf Manor cruiser. *None of the eleven officers* (two of whom were trained EMTs) even checked on Mr. Owensby's medical condition during this time. When a supervisor finally did check it was too late and Mr. Owensby was dead. Such a failure to train in a use-of-force situation constitutes § 1983 deliberate indifference.

**D.      Incorrect Factual Statements** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Defendants make two false statement that warrant a response.  First, the undisputed medical facts establish that Roger Owensby had a normal heart, not an enlarged heart.  Second, there is no medical evidence to support defendant's assertion that Mr. Owensby was "dead on the ground."

**V.    CINCINNATI POLICE OFFICER HUNTER (doc. 102)** . . . . . . . . . . . . . . . . . . . . . 34

Officer Hunter admits that the City of Cincinnati's use-of-force training was inadequate as to police officer duties and responsibilities:  (1) under <u>Use of Force</u> Procedure 12.545 which requires "immediate" medical care for injured citizens "once the scene is stabilized;" and (2) under the Mutual Aid Agreement when Cincinnati police are acting collaboratively with other police departments.  He then seeks refuge behind this training failure by claiming that his failure to provide medical care to Mr. Owensby was the result of "confused beliefs" resulting "not from deliberate indifference, but clearly from the officers' improper training."[1]  However, the undisputed facts establish that Officer Hunter knew that the scene was "stabilized" once Mr. Owensby was placed in the Golf Manor cruiser yet he chose not to provide any medical care to Mr. Owensby over the critical six-minute period, despite knowing that:  he had maced Mr. Owensby and knew that he was required to provide him with water to rinse his face; he knew that Mr. Owensby's face was bleeding; and, knowing that Mr. Owensby had been beaten by Officer Caton in the area of his head while he lay handcuffed on the back seat of the Golf Manor cruiser.  Such callous disregard constitutes "deliberate indifference" justifying § 1983 liability.

**VI.    CINCINNATI POLICE OFFICERS JORG, CATON, SELLERS AND SPELLEN**
**(doc. 103)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Individual § 1983 liability for these officers is proper because, in failing to provide medical care to Mr. Owensby, they disregarded a known risk.  *Farmer v. Brennan*, 511 U.S. 825, 838 (1994).  First, all of the officers knew that Mr. Owensby had been maced.  They knew that they were all required by the Cincinnati <u>Use of Force</u> Procedure 12.545 to provide fresh air and water to rinse his face.  Yet all of these defendants chose to do nothing.  Second, Officers Jorg, Caton and Sellers knew Mr. Owensby had been severely beaten.  Officer Jorg and Caton administered the beating and Mr. Owensby's blood was plainly visible on their shirt sleeves.  Nevertheless, none of these officers even attempted to provide any medical care to Mr. Owensby as he lay in the Golf Manor cruiser.  Third, Officer Spellen knew that Mr. Owensby had been maced and joked about how much he was "hurting."  Still, he did nothing.  Thus, all of the Cincinnati police officer defendants chose to disregard this know risk of injury to Mr. Owesnby.  Because they were all deliberately indifferent to Mr. Owensby's medical care, under *Farmer*, they are all individually liable under § 1983 for their failure to provide medical care.

**VII.    CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Plaintiff's Motion for Partial Summary Judgement as to § 1983 liability should be granted against the Cincinnati defendants for their failure to provide medical care to Mr. Owensby.

---

[1] *Id*. at 8.

**PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF HIS
MOTION FOR PARTIAL SUMMARY JUDGMENT
AGAINST DEFENDANTS CITY OF CINCINNATI, ITS POLICE CHIEF
AND ITS INDIVIDUAL POLICE OFFICERS
FOR THEIR FAILURE TO PROVIDE CRITICAL MEDICAL CARE (doc. 88)**

## I.    INTRODUCTION.

Plaintiff has moved for partial summary judgment under 42 U.S.C. § 1983 against

defendants City of Cincinnati, its Chief of Police and it individual Police Officers Robert Jorg,

Patrick Caton, David Hunter, Darren Sellers and Victor Spellen for their failure to provide

critical medical care to Roger Owensby, Jr., on November 7, 2000.[2]  This failure to provide

medical care cost Mr. Owensby his life.  Three memoranda have been filed in opposition to

Plaintiff's motion for partial summary judgment by: the City of Cincinnati and its Police Chief

(Doc. 99); Officer Hunter (Doc. 102); and the remaining individual Police Officers Jorg, Caton,

Sellers and Spellen (Doc. 103).

The City of Cincinnati and its Police Chief argue that they should be allowed to avoid

summary judgment because (1) an emergency medicine doctor opines that Mr. Owensby died of

sudden cardiac arrest instead of the mechanical asphyxiation found by the Deputy Coroner who

performed the autopsy on Mr. Owensby and by the forensic pathologist previously hired by the

City in 2002; (2) Mr. Owensby's death by sudden cardiac arrest could not have been avoided and

CPR would have been useless; (3) the Cincinnati Police Department Rules and Procedures

adequately protected the civil rights of citizens; and, (4) Plaintiff has failed to establish

"deliberate indifference" on the part of the City or its police officers.  As established in this

Reply, summary judgment is appropriate because (1) the City and its police officer defendants

---

[2] Doc. 88, Plaintiff's Cincinnati MSJ.

are judicially barred by Ohio statute as well as the doctrine of judicial estoppel from now attempting to challenge the findings of the Hamilton County Coroner that Roger Owensby died of mechanical asphyxiation as a result of restraint efforts by its police officers; (2) immediate CPR would have saved Mr. Owensby's life; (3) having Rules and Procedures without training to implement those use-of-force standards is a § 1983 violation; and (4) the City and its Police Chief are guilty of "deliberate indifference" in failing to provide *any* training to their police force as to when they were required to provide medical care in a use of force situation, and as to their duties and responsibilities when acting in conjunction with another police force.

All of the Cincinnati police officer defendants admit that they did not receive proper training as to when they were required to provide medical care in a use of force situation, and as to their duties and responsibilities when acting in conjunction with another police force. However, they try to avoid summary judgment by claiming that they lacked the requisite "deliberate indifference." Not true. The undisputed evidence establishes that they knew Mr. Owensby was seriously injured, they knew they were required to provide first aid, and they consciously chose to leave him handcuffed, bleeding and unconscious on the back seat of the Golf Manor cruiser for approximately six minutes, where he died.

This reply memorandum addresses all three opposition memoranda and establishes that Plaintiff's motion for summary judgment should be granted because no genuine issues of material fact exist.

## II.    FACTS

At approximately 7:47 p.m. on November 7, 2000, five Cincinnati police officers brutally beat and maced Roger Owensby, Jr., over approximately a two minute period so that, when they

2

finished, he was unconscious and suffering from asphyxia.[3]  They even beat him and (according to one officer) maced him *after* he was handcuffed.[4]  The Hamilton County Coroner documented a plethora of cuts, abrasions, deep muscle hemorrhages and hemorrhages in both eyes as a result of this beating.[5]

The undisputed evidence establishes that the Cincinnati officers then placed the handcuffed, bleeding and unconscious Roger Owensby in the back of the Golf Manor cruiser, never checked on his physical condition, and left him there for approximately six minutes while he died.[6]  Pure and simple, this was police street justice in revenge against a person who one officer believed ran from him some five weeks earlier on September 27, 2000.[7]  Beyond the obvious problem that such brutality is constitutionally reprehensible, at trial we will show that the officers had the wrong man.  Roger Owensby was not the person who ran from Officer Hunter on September 27.  His death was the result of a mistake in identity.

Summary judgment is appropriate on Plaintiff's § 1983 claim the defendants failed to provide

---

[3] Doc. 88, Plaintiff's Cincinnati MSJ, pp. 2-10.

[4] Hunter Depo., pp 171:16 - 172:5; Sellers Depo., p. 51:24 - 52:23.

[5] Exhibit 103, Postmortem Examination of Roger Owensby, Jr., documents: 1 1/4 inch in diameter collection of red abrasions above the left eyebrow; 1 ½ inch linear red abrasion near the left eyebrow; 3/8 inch abrasion on the forehead; vertical red abrasions on the right front scalp; a collection of red abrasions on the right cheek; swollen upper lip; a 1/16 laceration to the lower lip; right eye scleral and conjunctival hemorrhages; right eye petechiae; left eye petechiae; left eye sclera hemorrhage; left shoulder 1/4 inch red abrasion; chest abrasions; abrasions to the arms; large 3 to 4 inch in diameter deep muscle contusions over the right and left scapulae; extremely congested lungs with edema fluid; and, a hemorrhagic bite mark on the tongue.

[6] Doc. 88, Plaintiff Cincinnati MSJ, pp. 10-17.

[7] *Id*. at 17-22.

3

constitutionally-required medical care because the duty of the state to provide medical care to pretrial detainees is a well established constitutional right and because a number of the key facts are uncontested by the City of Cincinnati, its Police Chief and the individual Cincinnati police officer defendants ("Cincinnati defendants").  For instance, the Cincinnati defendants do not contest the fact that:

- Roger Owensby (in dreadlocks and a beard) did not match the description of the person Officer Hunter was looking for (short afro and clean shaven);[8]

- Five Cincinnati police officers, working jointly as a team, used physical force upon Mr. Owensby;[9]

- Both Officers Hunter and Sellers testified that Officer Caton repeatedly punched Mr. Owensby *after* he was handcuffed and not resisting;[10]

- Officer Sellers testified that Officer Hunter maced Mr. Owensby *after* he was handcuffed and not resisting;[11]

- Officer Hunter maced Mr. Owensby in the face from a distance of 6 inches when the Cincinnati Procedure 12.545 states that victims should be maced from a distance of 5 to 10 feet;[12]

- Officer Hunter testified that Officer Caton repeatedly punched Mr. Owensby in the area of the head *after* he was handcuffed, as he lay unconscious on the back seat of the Golf Manor cruiser;[13]

---

[8] *Compare* Hunter Depo., pp. 86:22 - 87:1, and Exhibit C, Mugshot of Roger Owensby.

[9] Jorg Depo., p. 142:4-11.

[10] Sellers Depo., pp. 51:24 - 52:14; Hunter Depo., pp. 171:16 - 172:5.

[11] Sellers Depo., p. 52:15-23.

[12] Hunter Depo., p. 166:5-17; Exhibit 60, Use of Force Procedure 12.545, p. 9, ¶ C.4.

[13] Hunter Depo., p. 179:14-22.

- Officers Jorg, Caton, Hunter, Sellers and Spellen all knew that Mr. Owensby had been maced;[14]

- Officers Jorg and Caton had Mr. Owensby's blood all over the sleeves of their shirts;[15]

- All of the officers knew that Cincinnati Procedure 12.545 requires that mace victims be provided with fresh air and "cool, clear water" to rinse their faces, yet none of the officers even attempted to provide Mr. Owensby with either fresh air or water;[16]

- All of the officers knew that Cincinnati Procedure 12.545 required that immediate medical care be provided to any injured suspect once the scene was stabilized, yet none of the officer even attempted to provide Mr. Owensby with any medical care during the five to six minutes that he lay handcuffed, bleeding and dying in the back seat of the Golf Manor cruiser;[17]

- The actions of the Cincinnati and Golf Manor police officers were governed by the Mutual Aid Agreement executed between the two municipalities;[18]

- Neither Cincinnati nor Golf Manor provided *any* training for its officers as to their respective duties and responsibilities when acting collaboratively under the Mutual Aid Agreement;[19]

- Cincinnati provided no training for its officers as to their obligation under

---

[14] Jorg Depo., p. 126:9-17; Caton Depo., pp. 110:4-111:6; Sellers Depo., p. 52:15-23; Spellen Depo., p. 50:1-2.

[15] Doc. 88, Plaintiff's Cincinnati MSJ, pp. 7-10.

[16] Exhibit 60, Use of Force Procedure 12.545; Caton Depo, p. 18:11-14; Spellen Depo., pp. 27:3-10, 79:23 - 80:5; Exhibit 45, Administrative Finding against Officer Sellers; Exhibit 27, Administrative Findings against Officer Spellen; Exhibit 35, Administrative Findings against Officer Caton.

[17] Exhibits 20, Spellen Cruiser Video; Exhibit 60, Use of Force Procedure 12.545; Hunter Depo., pp. 185:20 - 186:4.

[18] Exhibit 78, Mutual Aid Agreement; Streicher Depo., pp. 347:22 - 356:9.

[19] Doc. 87, Plaintiff's Golf Manor MSJ, pp, pp. 22-26; Doc. 88, Plaintiff's Cincinnati MSJ, pp. 39-40.

Cincinnati Procedure 12.545 to "ensure [that] appropriate first aid is rendered immediately once the incident scene is stabilized;"[20]

• The scene was sufficiently "stabilized" once the handcuffed and unconscious Mr. Owensby was placed in the Golf Manor cruiser for the officer-needs-assistance call to be cancelled and the dispatcher to broadcast that no more cars were needed at the scene, for the officers to joke with each other as to how much Mr. Owensby was "hurting," and for the officers to greet each other, drive their cars over and get their hats;[21]

• Cincinnati Officer Brian Brazile looked at Mr. Owensby as he lay handcuffed on the back seat of the Golf Manor cruiser and told Golf Manor Officers Heiland and Campbell that "This looks f**ked up. Can he breathe? It don't look like he can from the way he's laying." When the Golf Manor officers shrugged their shoulders in indifference, Officer Brazile went to get his hat;[22]

• None of the eleven Cincinnati police officers on the scene (including two trained EMTs) offered or provided any medical care to Mr. Owensby during the five to six minutes while he lay handcuffed, bleeding and dying in the back seat of the Golf Manor cruiser;[23]

• The Hamilton County Deputy Coroner, Dr. Daniel Schultz, has ruled that Roger Owensby's death was a "homicide (police intervention: asphyxiation during restraint attempts)" and that the cause of death was "mechanical asphyxiation."[24]

• Officer Jorg admits that he had his left knee on Mr. Owensby's back in the area of the left scapula (shoulder blade) and that he had his left arm around Mr. Owensby's head in a "head wrap" while applying "mandibular angle pressure" pain compliance with his right hand just below Mr. Owensby's left ear;[25]

---

[20] Exhibit 60.

[21] Exhibit 20, Spellen Cruiser Video, filed with this Court at Doc. 86; Exhibit 21, Transcript of Spellen Cruiser Video.

[22] Exhibit 47, Brazile 11/13/00 Statement; Brazile Depo., pp. 56:14 - 57:6, 64:13 - 68:8.

[23] Exhibit 20, Spellen Cruiser Video.

[24] Exhibit 103.

[25] Doc. 88, Plaintiff's Cincinnati MSJ, p. 8.

6

- Dr. Schultz found two bilateral deep muscle contusions to the back muscles of Mr. Owensby, just over the shoulder blades, that are the result of heavy pressure and grinding and are consistent with the pressure exerted by a knee or an elbow.[26]

- Officer Caton straddled Mr. Owensby's buttocks as he struck at his back and right arm;[27]

- In uniform, Officers Jorg and Caton weighed approximately 470 pounds as they knelt on and straddled Mr. Owensby as he lay face down on the asphalt;[28]

- The City of Cincinnati hired Dr. Cyril Wecht, a nationally-renowned forensic pathologist, to review the case and to assess the findings of the Hamilton County Coroner's Office and that Dr. Wecht found that Mr. Owensby died of mechanical asphyxia as a result of the pressure placed on his back by Officer Jorg and contributed to by the beating administered by Officer Caton and the macing by Officer Hunter.[29]

- The City of Cincinnati embraced and published the findings of Dr. Wecht and Dr. Schultz that Mr. Owensby died of mechanical asphyxia in administratively terminating Officer Caton and taking administrative disciplinary action against Officers Hunter, Sellers and Spellen.[30]  In fact, the City continues to publish and embrace Dr. Wecht's report on its web page to this day while it now posits to this Court that Dr. Wecht's and Dr. Schultz's findings of death by asphyxiation by its police officers should not be believed.[31]

---

[26] Exhibit 103.

[27] Doc. 88, Plaintiff's Cincinnati MSJ, pp. 7-8.

[28] *Id.* at 16.

[29] Exhibit 108, Wecht Report.

[30] Exhibit 45, Administrative Finding against Officer Sellers; Exhibit 27, Administrative Findings against Officer Spellen; Exhibit 35, Administrative Findings against Officer Caton.

[31] *Compare,* http://city-egov.rcc.org/BASIS/fyi/public/fyi_docs/DDD/280.pdf with Doc. 99, Cincinnati Memo Contra, pp. i, 5-6, 12-13, 18-20.

III.    **THE FOURTH AMENDMENT "OBJECTIVE REASONABLENESS" TEST
       APPLIES TO THE FAILURE TO PROVIDE MEDICAL CARE TO MR.
       OWENSBY AT THE SCENE OF HIS ARREST**

All of the Cincinnati defendants assert that the failure to provide medical care to Mr.

Owensby should be evaluated under the Fourteenth Amendment substantive due process standard

of "deliberate indifference" as opposed to the Fourth Amendment "objective reasonableness"

test.[32]  Defendants are mistaken.  The law on this subject establishes a continuum of applicable

constitutional Amendments that prescribe medical care duties depending upon the stage of

confinement.  At the scene of the arrest (where Mr. Owensby desperately needed medical help)

the failure to provide medical care to the detainee is governed by the Fourth Amendment

"objective reasonableness" test.[33]  Later, while the prisoner awaits trial, the failure to provide

medical care is governed by the Fourteenth Amendment substantive due process "deliberate

indifference" standard.[34]  Finally, after trial, the convict's right to medical care is examined under

the Eighth Amendment's Cruel and Unusual Punishment standard.[35]

The Supreme Court has specifically cautioned against using Fourteenth Amendment

substantive due process analysis of constitutional violations where the offending behavior may be

---

[32] Doc. 99, Cincinnati Memo Contra, pp. 8-10; Doc. 102, Hunter Memo Contra, pp. 5-6;
Doc. 103, Jorg, Caton, Sellers and Spellen Memo Contra, pp. 9-11.

[33] *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Cox v. Treadway*, 75 F.3d 230, 234 (6th
Cir. 1996); *Alexander v. Beale Street Blues Co., Inc.*, 108 F. Supp. 2d 934 (W.D. Tenn. 1999);
*Estate of Phillips v. City of Milwaukee*, 123 F.3d 586 (7th Cir. 1997).

[34] *City of Revere v. Massachusetts Gen. Hospital*, 463 U.S. 239, 244 (1983); *DeShaney v.
Winnebago County Dept. Of Soc. Servs.*, 489 U.S. 189, 198-200 (1989); *County of Sacramento v.
Lewis*, 523 U.S. 833, 849 (1998).

[35] *Estelle v. Gamble*, 429 U.S. 97 (1976); *Ingram v. Wright*, 430 U.S. 651 (1977); *Bell v.
Wolfish*, 441 U.S. 520 (1979).

governed by another constitutional provision.

> [B]ecause we have always been reluctant to expand the concept of substantive due process, we held in *Graham v. Connor* that where a particular amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.[36]

The Supreme Court also stated unequivocally that:

> If a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim **must be analyzed** under the standard appropriate to that specific provision, not under the rubric of substantive due process.[37]

The Sixth Circuit has also echoed the Supreme Court, ruling that the Fourth Amendment "objective reasonableness" standard applies, not only to the arrest, but also to "post-restraint" constitutional violations when the suspect is "securely under the control of the police, and who is not attempting to escape."[38]

This precise issue was addressed in *Alexander v. Beale Street Blues Co., Inc.*[39]  There, a patron of a Memphis nightclub was thrown to the floor while several nightclub employees held him down with their body weight.[40]  Memphis police arrived to find the patron in obvious need of medical attention.  Nevertheless, the officers assisted nightclub employees in handcuffing the

---

[36] *County of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) *citing Graham*, 490 U.S. at 395.

[37] *Id.* at 843 *quoting United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997)  (emphasis supplied).

[38] *Cox v. Treadway*, 75 F.3d 230, 234 (6th Cir. 1996).

[39] 108 F. Supp. 2d 934, 944-45 (W.D. Tenn. 1999).

[40] *Alexander*, 108 F. Supp. 2d at 939.

now-motionless patron, carrying him outside of the club and placing him behind the police cruiser "in a contorted position" creating a risk of death by positional asphyxia. The patron was taken to the hospital by ambulance and later died as a result of traumatic asphyxia. The plaintiff filed a § 1983 action claiming a failure to provide timely medical treatment.[41]

*Alexander* determined that the Fourth Amendment objective reasonableness analysis was appropriate.[42] Specifically, *Alexander* ruled that, "Plaintiffs' medical indifference claim will be examined under the framework of the Fourth Amendment to determine whether the officers' alleged denial of medical care was reasonable under the circumstances."[43] *Alexander* also acknowledged that:

> Although the right to medical care will most often be cited in the context of the Eighth or Fourteenth Amendments, in this case the court must determine whether the officers' conduct with respect to medical care was objectively reasonable under the Fourth Amendment.[44]

Likewise, in *Estate of Phillips v. City of Milwaukee*,[45] the Seventh Circuit analyzed a § 1983 claim of failure to provide medical care under the Fourth Amendment objective reasonableness test where a man died after he was handcuffed face down on the floor with his hands behind his back.[46] *Estate of Phillips* acknowledges that "it is somewhat awkward to

---

[41] *Id.*

[42] *Id.* at 940-43.

[43] *Id.* at 941.

[44] *Id.* at 944 n. 10, *citing Spurlock v. Satterfield*, 167 F.3d 995, 1006 n. 19 (6th Cir. 1999).

[45] *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586 (7th Cir. 1997).

[46] *Id.* at 590.

conceptualize such an act or failure to act [failure to provide medical care] as 'excessive force;' indeed, the duty to render medical aid is more often thought of as one arising under the Due Process Clause or the Eight Amendment."[47]  However, the Seventh Circuit concluded that Fourth Amendment objective reasonableness analysis was proper because "the complained-of police actions occurred during the course of Mr. Phillips' seizure."[48]  Thus, the Fourth Amendment "requires that seizures be reasonable under all the circumstances; and we do think that it would be objectively unreasonable in certain circumstances to deny needed medical attention to an individual placed in custody who cannot help himself."[49]

Here, the distinction between "objective reasonableness" and "deliberate indifference" is irrelevant because of the outrageous actions of the Cincinnati police officers and the utter failure of training by the City and its Police Chief.  The Cincinnati defendants clearly violated Mr. Owensby's constitutional right to medical care when they failed to even check on his medical condition after beating and crushing him into unconsciousness.

The officers knew that Mr. Owensby had been maced because they were present when he was maced.  They also knew that Cincinnati Procedure 12.545 requires that they provide the victim with "plenty of clear, cool water" to rinse his face and expose the victim to fresh air.[50]

---

[47] *Id.* at 595 *citing DeShaney*, 489 U.S. at 200.

[48] *Id.* at 596 *citing Graham*, 490 U.S. at 389-90.

[49] *Id.*

[50] The City's and the Police Chief's assertion that Mr. Owensby was provided with fresh air as the officers carried his unconscious body to the Golf Manor cruiser and while he lay in the cruiser is ridiculous and demonstrates the desperation of the defendants to justify their actions. Clearly, Procedure 12.545's requirement of fresh air did not envision that it be contrasted to "any air" or a vacuum.  Further, defendants argument that they anticipated providing Mr. Owensby

11

Still they chose to do nothing for Mr. Owensby as he lay handcuffed in the Golf Manor car.

The officers knew that Mr. Owensby was bleeding. Mr. Owensby's blood was on the shirt sleeves of Officers Jorg and Caton. As documented in the Coroner's postmortem examination, Mr. Owensby's face was covered with cuts and abrasions.[51] Still they chose to do nothing for Mr. Owensby as he lay handcuffed in the Golf Manor car.

Officers Hunter and Sellers knew that Mr. Owensby was unresponsive, making no sounds or movements as he was carried to the Golf Manor cruiser. They also knew that everyone else was breathing heavily after their struggle, while Mr. Owensby was not breathing heavily. Still they chose to do nothing for Mr. Owensby as he lay handcuffed in the Golf Manor car.

Officer Spellen looked in on Mr. Owensby as he lay handcuffed in the Golf Manor cruiser. He knew that Mr. Owensby was injured because he joked about how much Mr. Owensby was "hurting" with Officer Brazile[52]—the same person who, approximately five minutes earlier, had looked at Mr. Owensby and told the Golf Manor officers "This looks f**ked up. Can he breathe? It don't look like he can from the way he's laying."[53] Still nothing was

---

with fresh air "during the drive to the justice center" suggests that mace victims hang their heads out the back window of police cruisers like dogs. It is preposterous and not worthy of further comment.

[51] *See* Footnote 4, *supra*.; Defendants' attempt to trivialize Mr. Owensby's facial condition as "road rash," a "light bit of blood" and a minor cut (Doc. 99, p.10) is belied by the morgue photo of Mr. Owensby's face, Exhibit 28.

[52] Doc. 21, Transcript of Spellen Cruiser Video, p. 4:
  P.O. Spellen:  Looks like he's uh, hurting a little bit.
  P.O. Brazile:  Yeah.  Lot of bit.
  P.O. Spellen:  Yeah.

[53] Exhibit 47, Brazile 11/13/00 Statement; Brazile Depo., pp. 56:14-20, 64:13 - 68:8.

done for Mr. Owensby as he lay handcuffed in the Golf Manor car.

Such callous disregard violates every applicable constitutional standard—objective

reasonableness as well as deliberate indifference.

## IV.    THE CITY OF CINCINNATI AND ITS POLICE CHIEF (doc. 99)

### A.    Sudden Cardiac Arrest.

Having first solicited, embraced, published and relied upon the mechanical asphyxiation

findings of Dr. Wecht in disciplining the Cincinnati police officers at the scene of Mr. Owensy's

death, the City of Cincinnati and its Police Chief now want to build their defense in this action

upon a new theory—that Mr. Owensby died of "sudden cardiac arrest."[54]

> **1.    <u>The report of Dr. Tom Neuman submitted by the City should not be
> considered at all because the City is statutorily prohibited and
> judicially estopped from denying that Mr. Owensby's death was the
> result of mechanical asphyxiation</u>**.

On November 30, 2000, the Hamilton County Coroner's Office ruled Mr. Owensby's

death a homicide by mechanical asphyxiation.  That finding is embodied both in the Coroner's

Report signed by Deputy Coroner Daniel L. Schultz, M.D.,[55] and on Mr. Owensby's Death

Certificate, signed by the Coroner, Carl L. Parrott.[56]   After those rulings, the City, in mid-2002,

through its Office of Municipal Investigations, hired Allegheny County, Pennsylvania Coroner

Cyril Wecht to backstop findings of Drs. Parrott and Schultz.[57]  Dr. Wecht did so, in a report

---

[54] Doc. 99, Cincinnati Memo Contra, pp. I, 5-6, 12-13, 18-20.

[55] Exhibit 103.

[56] Exhibit 134.

[57] The City has filed a liminal motion, to which Plaintiffs will timely respond, to prevent
Plaintiffs from calling Dr. Wecht as a witness, arguing that his report and testimony are its work

which the City vigorously publicized and which, in addition to being an exhibit in this case, is available for this Court's review on the City's Internet website.[58]  In his report, which he has since reaffirmed in a five-hour deposition, Dr. Wecht found conclusive evidence that Mr. Owensby died as the result of the actions of the defendant police officers, and provided extensive detail, based on review of the evidence, as to which officers contributed and in what ways.  At deposition, Dr. Wecht testified to a reasonable degree of medical certainty that had medical attention been provided to Mr. Owensby within a few minutes of his becoming unconscious, he would be alive today.[59]

Within days of receiving Dr. Wecht's report, the City initiated formal administrative disciplinary proceedings against the police officers who killed Mr. Owensby.[60]  Those proceedings were initiated by formal charges in which the City Manager and Chief of Police asserted that the involved officers failed to attend to Mr. Owensby's medical needs, and that their failure to do so "led to serious injury to another, by leaving a prisoner unattended inside a police

---

product.  Because the City distributed the report to the press and public after it was received and made it available on its Internet website to anyone who cares to type in http://city-egov.rcc.org/BASIS/fyi/public/fyi_docs/DDD/280.pdf, the City's work-product position is absurd.  *Cf. Tri-County Paving, Inc. v. Ashe County*, 2000 U.S. Dist. LEXIS 19563 (W.D.N.C. 2000) (attached), holding that where a political subdivision distributes work product to the public it waives all protection.

[58] Dr. Wecht's report, Exhibit 108,  is published by the City and available on the Worldwide Web at http://city-egov.rcc.org/BASIS/fyi/public/fyi_docs/DDD/280.pdf, where it apparently has resided since September 11, 2002—the day after it was received by the Office of Municipal Investigations.

[59] Wecht Depo., pp. 59:21 - 61:14.

[60] Exhibit 122, October 14, 2002 Memorandum from City Manager to Chief of Police titled "Roger Owensby, Jr.—Disciplinary Hearing Recommendations."

14

vehicle."[61]  An Administrative Hearing Officer conducted disciplinary proceedings, at which the

affected employees were permitted to bring witnesses on their behalf, and were represented by

counsel.[62]  The Hearing Officer sustained the charge that the conduct of the officers "led to

serious injury to another."[63]  On the basis of that finding, one defendant officer (Patrick Caton)

was terminated, and others were disciplined.  No appeals were taken.

    After taking *and winning* the position that the conduct of the officers engaged in conduct

which "le[d] to serious injury to another"—Mr. Owensby—the City now wants to do an about-

face in this Court.  It asserts that the officers did nothing which was related to the death of Mr.

Owensby.  Rather, the City claims that Mr. Owensby died unavoidably of a heart attack, and that

nothing the officers might have done—had they complied with City policy and human decency

by providing him with medical attention—would have made a bit of difference.

    Later in this Memorandum, we demonstrate that the medical opinions on which the City

relies for that assertion are not credible, and so do not raise a material issue of fact with respect to

whether Mr. Owensby might have benefitted from medical care.[64]  Of equal importance,

however, is the fact that the City is barred as a matter of law, under both Ohio law and the

_____

[61] Exhibit 35, February 25, 2003 Memorandum from City Manager to Chief of Police ordering dismissal of Patrick Caton for causing serious injury to Mr. Owensby.

[62] *Id.*; Exhibit 122, Charges against Officer Caton.

[63] Exhibit 35, Hearing Officer Andrew G. Raabe's Pre-Disciplinary Hearing Summary sustaining charges against Patrick Caton.  The relevant charge is Specification III, which is detailed at pp. 2-3 and ruled SUSTAINED at p. 6-7.

[64] Plaintiffs will file a motion to strike the expert testimony of both of the City's physician witnesses prior to trial on the basis that it is statutorily barred and judicially estopped from adducing their testimony at all, an issue which is beyond the scope of the motion at bar.

15

doctrine of judicial estoppel, from taking a position in this case which is both contrary to the

Coroner's findings and diametrically opposed to the position it took, and prevailed upon, in firing

and disciplining its police officers.

> **2.      The City is precluded by Ohio law from contesting the Coroner's decisions as to cause, manner, and mode of death in this Court, and any evidence contradicting that decision  is therefore inadmissible as a matter of law.**

Under Ohio Rev. Code Ann. § 313.19 (Page's 2003), the Hamilton County Coroner's

finding is binding unless and until it is set aside by the Hamilton County Court of Common

Pleas:

> The cause of death and the manner and mode in which the death occurred, as delivered by the coroner and incorporated in the coroner's verdict and in the death certificate filed with the division of vital statistics, *shall be the legally accepted manner and mode in which such death occurred, and the legally accepted cause of death*, unless the court of common pleas of the county in which the death occurred, after a hearing, directs the coroner to change his decision as to such cause and manner and mode of death.

Here, the Coroner found the manner of death to be "homicide (police intervention:

asphyxiation during restraint attempts)" and the cause of death to be "mechanical

asphyxiation."[65]

The Ohio Supreme Court has held that this statute creates a rebuttable presumption as to

the manner and mode of death—*"and the legally accepted cause of death"*—which can be

rebutted only in the appropriate common pleas court: "the coroner's factual determinations *shall

be accepted unless, following a hearing, the common pleas court directs the coroner to change*

---

[65]Exhibit 103, Exhibit 134.

16

*such determination*."[66]  The proper means by which a party can challenge the Coroner's finding is by a statutory proceeding initiated in the relevant Common Pleas Court.[67]

The Ohio Supreme Court made this clear in a case involving the same coroner as this case, holding that the statute "outlines a special statutory procedure allowing judicial review of a coroner's verdict" over which "[j]urisdiction and venue . . . *are exclusively vested in the common pleas court of the county in which the death occurred*."[68]

Here, the City of Cincinnati obviously is aware of the statutes of the State of Ohio with respect to coroner's findings, and it has had many years to bring the appropriate special statutory action in the Hamilton County Court of Common Pleas.  It has not done so.  The City embraced the coroner's findings in disciplining the police officers who killed Mr. Owensby, hired a renowned forensic pathologist to confirm those finding, and distributed his report to the community, the press and the entire Internet-using world.  The City cannot now be permitted to use this Court as a vehicle to work an end-run around Ohio law by asking the Court to permit it to encourage the Jury to simply disregard Coroner's finding that Mr. Owensby's homicide resulted from mechanical asphyxiation at the hands of the defendants.

Because Ohio law on this subject is crystal-clear, and because the City has failed to follow it, the City is not privileged to contend in this Court that Mr. Owensby died of an instantaneous, untreatable heart attack.  The Cincinnati police officer defendants are likewise

---

[66]  *Vargo v. Travelers Insurance Company*, 34 Ohio St. 3d 27, 29, 516 N.E.2d 226, 229 (1987) (emphasis supplied).

[67] *Estate of Severt v. Wood, Coroner,* 107 Ohio App.3d 123, 126, 667 N.E.2d 1250, 1252 (Wood App. 1995) (citing cases).

[68] *Perez v. Cleveland, Coroner*, 78 Ohio St.3d 376, 377, 678 N.E.2d 537 (1997).

17

statutorily precluded from now contesting the findings of the Hamilton County Coroner.

    **3.**    **The City's failure to follow Ohio law is not the only reason its expert's opinions should be disregarded: the doctrine of judicial estoppel prevents parties from playing "fast and loose" with the courts by switching positions.**

Even if the Ohio Revised Code did not dispose of the City's blatant side-switching, the courts are not without power to prevent those who appear before them from deploying one theory against a litigant, prevailing on that theory, and then deploying a wholly-inconsistent theory against another.

"The doctrine of judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding."[69]  It is an "equitable doctrine which preserves the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship, achieving success on one position, then arguing the opposite to suit an exigency of the moment."[70]  Judicial estoppel "applies to a party who has successfully and unequivocally asserted a position in a prior proceeding; he is estopped from asserting an inconsistent position in a subsequent proceeding."[71]

The Supreme Court had recent occasion to summarize and apply the doctrine:

    Although we have not had occasion to discuss the [judicial estoppel] doctrine elaborately, other courts have uniformly recognized that its purpose is 'to protect the integrity of the judicial process,' *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 598 (CA6 1982), by 'prohibiting parties from deliberately changing positions according to the exigencies of the moment,' *United States v. McCaskey*, 9 F.3d 368, 378 (CA51993). See *In re Cassidy*, 892 F.2d 637, 641 (CA7 1990)

---

[69] 18 Moore's Federal Practice § 134.30, p. 134-62 (3d ed. 2000).

[70] *Teledyne Industries, Inc. v. NLRB*, 911 F.2d 1214, 1217-18 (6th Cir. 1990).

[71] *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 598 (6th Cir. 1982).

('Judicial estoppel is a doctrine intended to prevent the perversion of the judicial process'); *Allen v. Zurich Ins. Co.*, 667 F.2d 1162, 1166 (CA4 1982) (judicial estoppel 'protects the essential integrity of the judicial process'); *Scarano v. Central R. Co.*, 203 F.2d 510, 513 (CA3 1953) (judicial estoppel prevents parties from 'playing 'fast and loose with the courts'' (quoting *Stretch v. Watson*, 6 N.J. Super. 456, 469, 69 A.2d 596, 603 (1949))). Because the rule is intended to prevent 'improper use of judicial machinery,' *Konstantinidis v. Chen*, 200 U.S. App. D.C. 69, 626 F.2d 933, 938 (CADC 1980), judicial estoppel 'is an equitable doctrine invoked by a court at its discretion,' *Russell v. Rolfs*, 893 F.2d 1033, 1037 (CA9 1990) (citation omitted).[72]

"'[T]he circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle.'"[73] This Court has noted that "the doctrine of judicial estoppel is equally applicable to both plaintiffs and defendants."[74]

Judicial estoppel does not apply just to proceedings in court. It also applies with full force where the prior proceeding was a quasi-judicial, administrative proceeding.[75] In this regard, we particularly commend to the Court's attention the decision in *Czajkowski v. City of Chicago*, 810 F. Supp. 1428 (N.D. Ill. 1993), where the court held that the City was judicially estopped, in a civil rights action under 42 U.S.C. § 1983, from denying that a police officer scratched the plaintiff's chest with a key, because it had taken the position that he had committed

---

[72] *State of New Hampshire v. State of Maine*, 532 U.S. 742, 749-50 (2001) (in boundary dispute, New Hampshire judicially estopped, by prior successful assertion that state line ran down middle of river, from asserting that it was on the Maine shore). Many of the judicial estoppel cases assert that an "element" is that the side-switching party have taken the first position "under oath." *E.g.*, *Teledyne*, 911 F.2d at 1218. However, the City of Cincinnati is not a party capable of taking an oath. It is noteworthy in this context that the words "under oath" do not appear in the Supreme Court's decision in *New Hampshire v. Maine*.

[73] *Id.*, quoting *Allen*, 667 F.2d at 1166.

[74] *Day v. NLO*, 811 F. Supp. 1271, 1280 n.9 (S.D. Ohio 1992) (Spiegel, J.).

[75] *Smith v. Montgomery*, 388 F.2d 291 (6th Cir. 1968).

the assault in administrative disciplinary proceedings against the officer.  In the opinion, the court considers a blizzard of supposed policy concerns the City raised against application of judicial estoppel and rejected each of them: "*The City prevailed on the scratched chest issue in the Police Board issue so the requirement of prevailing on the issue in the prior proceeding is satisfied.*"[76]

### 4.    Application of judicial estoppel to this case.

*Czajkowski* lends powerful support to the conclusion that the City of Cincinnati, having prevailed on the assertion that its officers caused serious injury to Mr. Owensby, is now precluded from denying it.

In the administrative proceedings, the City of Cincinnati took the position that defendants Caton and Jorg violated Police Division procedures by failing to carry out a procedure which "leads to serious injury to another"—"Never leave prisoners unattended inside cars."[77]  Officer Jorg resigned rather than go through the disciplinary process.  Officer Caton went to hearing before a designated Administrative Hearing Officer.  He was represented by the same able counsel that he has in this case, and had the opportunity to call witnesses.  The charge was sustained and he was fired.  Caton took no steps to pursue the matter through grievance proceedings or litigation.  The City took the position, in other words, that Caton's conduct "led to serious injury to another"—and prevailed on that position.

On the City's new theory of Mr. Owensby's death, nothing Officer Caton did or did not do could have "[led] to serious injury to another" because, according to the newly-minted City position, Mr. Owensby died of an instantaneous heart attack and no medical care could have

---

[76] *Id.* at 1444 (emphasis supplied).

[77] Exhibit 35 at 2-3, Specification III.

20

helped him.[78]

The City's current position is diametrically opposed to the position on which it prevailed in its administrative charges against Officer Caton.  It is gaming the system---"abusing the judicial process through cynical gamesmanship, achieving success on one position, then arguing the opposite to suit an exigency of the moment."

The doctrine of judicial estoppel plainly bars the City and Officer Caton from arguing that Mr. Owensby died from "sudden cardiac arrest."[79]

**B.    Dr. Neuman's Purported Opinion Regarding The Efficacy of Medical Treatment Does Not Raise a Material Question of Fact Regarding The Causal Relationship Between the Failure to Provide Medical Care and the Death of Mr. Owensby**

The defendants assert that the Rule 56(f) Affidavit of Tom Neuman, M.D. raises a material question of fact with respect to whether the failure of its officers to provide necessary medical care (a failure the City really does not even contest) was causally related to any deprivation of Mr. Owensby's civil rights.  As demonstrated above, the Court should not consider Dr. Neuman's revisionist history of Mr. Owensby's death at all, as neither the City nor any of its police officers have even initiated a proceeding in the Court of Common Pleas to challenge the Coroner's conclusions and because the City and Officer Caton are in any event judicially estopped from denying that Mr. Owensby died of mechanical asphyxiation at the hands and knees of Cincinnati police officers.

---

[78]Doc. 99, Cincinnati Memo Contra, pp. I, 5-6, 12-13, 18-20.

[79]As explained earlier, the other Cincinnati police officer defendants are statutorily barred from challenging the Coroner's mechanical asphyxiation findings here by Ohio Rev. Code 313.19.

On its merits, however, Dr. Neuman's Affidavit also must be ignored to the extent it asserts, contrary to an overwhelming mass of evidence to the contrary, that Mr. Owensby would have died even if he had received immediate, appropriate medical attention. While Plaintiffs will later seek to have Dr. Neuman struck as an expert, as relevant here, his purported opinion that medical care would have been unavailing fails to satisfy the minimum requirements necessary for an expert's opinion to get through the Daubert gate, and so is no obstacle to summary judgment. The reason is simple: Crediting for the moment *arguendo* Dr. Neuman's outlier opinion that Mr. Owensby underwent Sudden Cardiac Death, had the trained officers on the scene followed City policy, affording Mr. Owensby prompt CPR and calling an ambulance, the CPR would have maintained blood flow and he would have received timely defibrillation and likely would have survived.

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."[80] "The evidentiary rules regarding expert testimony at trial were 'not intended . . . to make summary judgment impossible whenever a party has produced an expert to support its position.'"[81] "[I]n order to defeat a motion for summary judgment an expert opinion must be more than a conclusory assertion about ultimate legal issues."[82]

To determine the reliability of expert testimony, courts assess "whether the reasoning or

---

[80] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

[81] *Williams v. Ford Motor Company*, 187 F.3d 533, 543 (6th Cir. 1999), *quoting Merit Motors, Inc. v. Chrysler Corp.*, 187 U.S. App. D.C. 11, 569 F.2d 666, 673 (D.C.Cir. 1977).

[82] *Hayes v. Douglas Dynamics, Inc.*, 8 F.3d 88, 92 (1st Cir. 1993).

methodology underlying the testimony is scientifically valid."[83]   In *Daubert*, the Court listed four factors that, while not an exclusive list of considerations for a trial court, will often be important in making this assessment: (1) whether the opinion has been subjected to testing or is susceptible of such testing; (2) whether the opinion has been subjected to publication and peer review; (3) whether the methodology used has standards controlling its use and known rate of error; (4) whether the theory has been accepted in the scientific community.[84]

The objective of a district judge's "gatekeeping" task under *Daubert* and Rule 702 is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[85]

Plaintiff firmly embraces the proposition that—absent other legal grounds for judicial resolution, such as a controlling statute—genuine scientific or technical disputes are properly placed before the trier of fact.  However, undertaking *Daubert* questions in the context of summary judgment motions, without separate briefing and proceedings, is procedurally sound.[86]

Viewed in the context of these authorities, we now demonstrate that Dr. Neuman's affidavit is not sufficiently reliable on the question whether, had medical care been provided as required by City policy, Mr. Owensby likely would be alive today.

---

[83] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993).

[84] *Id.* at 590.

[85] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

[86] E.g., *Karen L. Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965 (10th Cir. 2004).

The relevant portion of Dr. Neuman's Affidavit—a single paragraph which, defendants claim, is in and of itself sufficient to warrant denial of Plaintiff's Motion for Summary Judgment—asserts as follows:

> Finally, I address the issue of whether more prompt CPR would have resulted in Mr. Owensby's survival. This is an extremely easy question to answer from an epidemiological point of view. Not withstanding [sic] the expectations of the public, cardiac arrest is still a highly lethal event. Depending upon the exact paper one reads there are varying survival rates; however, with the exception of a few small series and other series in which only a selected subset of victims are examined, the general survival rate from cardiac arrest (i.e. discharge from the hospital neurologically intact), remains very poor. Thus regardless of whether CPR was given, it is more likely than not, to a reasonable degree of medical probability, that Mr. Owensby would have died.[87]

This conclusion is hogwash. The reasons:

- Dr. Neuman is not an epidemiologist. Rather, he is an emergency room physician. There is nothing in his Affidavit which gives any credence to his ability to evaluate or interpret Mr. Owensby's chance of survival "from an epidemiological point of view."

- Nor is Dr. Neuman a cardiologist.

- Nothing in Dr. Neuman's lengthy curriculum vitae indicates any expertise in the survivability of heart attacks with proper, immediate treatment.

- The Affidavit fails to identify a single one of the "papers one reads" regarding the survival of sudden heart attacks.

- The Affidavit apparently concedes that, "in a few small series" and other studies "of a selected subset of victims," survival is expected.

- Dr. Neuman defines "survival" as " discharge from the hospital neurologically intact." Plaintiff, on the other hand, defines "survival" as his son being alive, rather than dead. We respectfully submit that Dr. Neuman's definition of "survival" is medically incompetent and legally farcical.

- Dr. Neuman's opinion completely ignores the fact that immediate medical

---

[87] Doc. 100, Neuman Affidavit at ¶ 20.

24

attention would have included an emergency call for a Cincinnati or Golf Manor rescue squad, leading to prompt defibrillation and a high likelihood of survival: All Cincinnati ambulances fire trucks have been so-equipped for many years.[88]

•    As shown in the following paragraphs, Dr. Neuman's conclusory statements are dramatically out of step with the medical community.

As against the conclusory, undocumented, and incomprehensible language in the Neuman

Affidavit, we commend the Court's attention to the following facts:

•    The Cleveland Clinic Heart Center, in a document entitled "Sudden Cardiac Death (SCD),"[89] asserts that "[S]udden cardiac death can be treated and reversed, but emergency action must take place almost immediately. Survival can be as high as 90 percent if treatment is initiated within the first minutes after SCD. The rate decreases by about 10 percent each minute longer. Death follows unless emergency treatment is begun immediately." (Emphasis supplied).

•    The American Heart Association has published the "Chain of Survival" for sudden cardiac death. The first step in the Chain of Survival is early access to care. The second is early cardiopulmonary resuscitation (CPR): "If performed properly, CPR can help save a life, as the procedure keeps blood and oxygen circulating through the body until emergency medical help arrives."[90]

•    The American Heart Association's "Statistical Fact Sheet" entitled "Sudden Deaths From Cardiac Arrest"[91] reports that "[B]rain damage can start to occur in just 4 to 6 minutes after the heart stops pumping blood. Death may be prevented if the sudden cardiac arrest victim receives immediate bystander cardiopulmonary resuscitation (CPR) and defibrillation within a few minutes after collapse." (Emphasis supplied).

---

[88] Exhibit G, Cincinnati Fire/Rescue Media Releases, December 1997. Ironically, a headlined item on the second page begins, "[e]quipped with heart defibrillators, Cincinnati Fire Fighters recently shocked a man's heart back to a normal rhythm, saving his life" and notes that "[p]aramedics have been using defibrillators for some time[.]" *Id*. at 2.

[89] Exhibit H, available online at: http://www.clevelandclinic.org/heartcenter/pub/guide/disease/electric/scd.htm.

[90] Additional information on the Chain of Survival is available online at www.chainofsurvival.com.

[91] Exhibit I, available online at: http://www.americanheart.org/downloadable/heart/1046245460533FS23SDCA3.pdf.

Next, the American Heart Association has published a document entitled "Statement on the Chain of Survival," identified as "A Statement for Health Professionals from the Advanced Cardiac Life Support Subcommittee and the Emergency Cardiac Care Committee, American Heart Association."[92]  In its Statement, the Advanced Cardiac Life Support Committee states, in connection with the "CPR" link in the Chain of Survival, that "Basic CPR should be started immediately after cardiac arrest is recognized and should coincide with efforts to gain access to and activate the EMS system."[93]  The Committee further observes that

_____

[92] Exhibit J.  The principal writer of the document is Dr. Richard O. Cummins, Md., M.P.H., M.Sc., Professor of Medicine at the University of Seattle Medical Center.  His resume' is attached as Exhibit K.

The second author, Dr. Joseph P. Ornato, M.D., is

Professor of Internal Medicine (Cardiology) and Emergency Medicine, and Chairman, Department of Emergency Medicine, Virginia Commonwealth University/Medical College of Virginia, in Richmond. Dr. Ornato received his AB and MD from Boston University's Six-Year Medical Program. He served his internship and residency at Mount Sinai Hospital in New York, and his fellowship in cardiology at the New York Hospital of Cornell University Medical Center. Dr. Ornato is an active researcher in the field of cardiopulmonary resuscitation, and is American Editor of the journal Resuscitation. He is triple board certified in Internal Medicine, Cardiology, and Emergency Medicine.

http://igr.medsite.com/source/editorbiographypage.asp?contid=46.

The third author is not a physician; the fourth is Dr. Paul E. Pepe, M.D., M.P.H., F.A.C.E.P., FCCM, who occupies the Riggs Family Chair in Emergency Medicine and is Professor and Chairman of Emergency Medicine at the University of Texas Southwestern Medical Center at Dallas. http://www8.utsouthwestern.edu/UTSW/FacDir/CDA/FindAFaculty/Results/FacDir_FacSearchPro/0,2356,43741,00.html

[93] *Id.* at 3.

For almost 3 decades the chest compressions and positive pressure ventilations of standard CPR have helped return pulseless, nonbreathing patients to spontaneous respiration and cardiac perfusion. The value of early CPR is that it can buy time for the primary cardiac arrest patient by producing enough blood flow to the central nervous system and the myocardium to maintain temporary viability. **To do so, however, basic CPR must be started early, and the earlier the better.**[94]

The Committee report also includes a table entitled "Controlled Studies of Survival (Discharged Alive) From Out-of-Hospital Cardiac Arrest: Bystander Cardiopulmonary Resuscitation Compared With Late Cariopulmonary Resuscitation."[95] That table demonstrates that in 17 studies, the survival rate for those who received early CPR ranged from 10% to 86%, while the survival rate for those who did not receive timely CPR varied from 2% to 50%.

Finally, in an article entitled "31st Bethesda Conference, Emergency Cardiac Care (1999)," the Journal of the American College of Cardiology stated that there is "now clear evidence showing that bystander CPR significantly increases neurologically intact survival from cardiac arrest" and includes a report from the Cardiac Arrest Task Force which finds that CPR by bystanders—much less trained EMT police officers—"has proven to be lifesaving."[96]

As the foregoing makes obvious, Dr. Neuman's remarkable opinion that immediate CPR would have had no impact on Mr. Owensby's chance of surviving the fictitious heart attack he inadmissibly posits is bizarrely out of step with the medical community expert in the

---

[94] *Id.* (Emphasis supplied).

[95] *Id.* at 5-6.

[96] Exhibit L, 35 <u>Journal of the American College of Cardiology</u> 825, "31st Bethesda Conference, Emergency Cardiac Care (1999)," at 830, 832.

survivability of heart attacks. The complete lack of supporting data, articles, or principles set out

in his Affidavit render it wholly bankrupt from a summary-judgment perspective.

Here, Dr. Neuman's opinion is so internally inconsistent (in defining "survival" as

walking out of the hospital) and demonstrably unreliable (because it is inconsistent with

compelling, common-sense, readily-available, and up-to-date references) as to be—rather than

the honest identification of justiciable issues—nothing more than another cynical attempt to

thwart the litigation process. Dr. Neuman's opinion that Mr. Owensby's death was inevitable is

not credible, and must be disregarded by this Court.

**C.    The City Of Cincinnati's Complete Failure To Train Its Officers As To The Terms And Operation Of Its <u>Use of Force</u> Procedure 12.545 And The Mutual Aid Agreement.**

More than ten years before Mr. Owensby's arrest and death, the Supreme Court

established that a municipality like the City of Cincinnati may be held liable under § 1983 for

constitutional violations arising from it failure to train its employees.[97]  Inadequate training is a

basis for § 1983 liability where the failure to train amounts to "deliberate indifference" to the

constitutional rights of persons with whom the police may come into contact.[98]  In adopting this

standard the Supreme Court expressly stated that the need to train its police force in the

constitutional limitation on the exercise of deadly force is "so obvious" that failure to do so could

constitute "deliberate indifference" to constitutional rights.[99]

---

[97] *City of Canton v. Harris*, 489 U.S. 378 (1989).

[98] *Id.* at 388.

[99] *Id.* at 390 n.10 ("For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the

Here, The City and its Police Chief do not claim that they provided *any* training to their police officers concerning their duties and responsibilities when working with another police department like Golf Manor under the Mutual Aid Agreement. Additionally, they do not assert that their police officers received any training concerning the phrase "once the incident scene is stabilized," as it appears in their Use of Force Procedure 12.545, with the requirement to "ensure appropriate first aid is rendered immediately."

Instead, the City and its Police Chief argue that Plaintiff has not proved that the failure to train does not constitute deliberate indifference to a known or obvious consequence.[100] They attempt to avoid § 1983 liability by arguing that "adequately trained officer occasionally make mistakes" or an otherwise "sound program" may be negligently administered.[101] Whether these statements are legally accurate is irrelevant for purposes of our analysis. This is not about an occasional mistake by a single adequately trained officer or about a sound program that was negligently administered. This case involves the *utter failure to provide any training* on the relevant issues of medical care arising out of the use of force.

The undisputed evidence is that there were at least eleven Cincinnati police officers at the

---

constitutional limitations on the use of deadly force, *see Tennessee v. Garner*, 471 U.S. 1, 85 L. Ed 2d 1, 105 S. Ct. 1694 (1985), can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights. It could also be that the police, in exercising their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers, who, nevertheless, are 'deliberately indifferent' to the need.").

[100] Doc.99, Cincinnati Memo Contra, pp. 13-14.

[101] Doc. 99, Cincinnati Memo Contra, p. 14 *quoting City of Canton v. Harris*, 489 U.S. at 391.

scene on November 7, 2000.[102]  *None of the eleven officers* were trained to provide immediate medical care to Roger Owensby during the six critical minutes that he lay dying in the Golf Manor cruiser.  *None of the eleven officers* (two of whom were trained EMTs) even checked on Mr. Owensby's medical condition during this time.  When a supervisor finally did check it was too late and Mr. Owensby was dead.

The City, its Police Chief as well as individual Cincinnati Officers Jorg, Caton, Sellers and Spellen attempt to minimize these six minutes by characterizing it as "a few short minutes" and "within minutes of the struggle"[103]  While it may be a few minutes to these defendants, it was, in fact, a lifetime for Roger Owensby.

The City and its Police Chief concede that a failure to train can constitute deliberate indifference if the resulting injury was a foreseeable consequence.[104]  Here, it was entirely foreseeable that the failure to train the police force in their duties and responsibilities to provide medical care in a use-of-force situation would result in injury or death for the citizen in custody.  Specifically, it was entirely foreseeable that injury or death may arise from the complete failure to train the police force concerning when a scene was "stabilized" so that "immediate" medical care would be provided under the City's Use of Force Procedure 12.545.  Such a danger resulting from the failure of use of force training is "so obvious" as to constitute a § 1983 violation.[105]

---

[102] Doc. 88, Plaintiff's Cincinnati MSJ, p. 12.

[103] *Id.* at 5; Doc. 103, Jorg, Caton, Sellers, Spellen Memo Contra, p. 4.

[104] Doc. 99, Cincinnati Memo Contra, p. 14.

[105] *City of Canton*, 489 U.S. at 390 n. 10.

Likewise, the evidence is undisputed that the City of Cincinnati and its Police Chief failed to provide any training to their police force concerning their responsibilities and duties when acting in conjunction with another municipal police force pursuant to the Mutual Aid Agreement.[106]  Again, it was entirely foreseeable that officers working together under such a Mutual Aid Agreement would likely be acting in a use-of-force situation.  This is precisely what happened when Golf Manor responded to Officer Caton's officer-needs-assistance call on the evening of November 7.  The failure to provide *any* training on the Mutual Aid Agreement predictably resulted in each police officer from Golf Manor as well as Cincinnati using the Mutual Aid Agreement as an excuse for failing to provide any medical care to Roger Owensby.

Finally, defendants argue that summary judgment is inappropriate because "deliberate indifference" is too fact intensive.[107]  Perhaps this may be the case when one is concerned with a mistake by an adequately trained officer or negligence in an "otherwise sound" program.  However, here there was *no training whatsoever* on the duties and responsibilities of the police officers when acting under the auspices of the Mutual Aid Agreement or in knowing when the scene is "stabilized" so that "immediate" medical care is provided under Cincinnati's Use of Force Procedure 12.545.  The fact that Cincinnati's Chief of Police could not define when the Owensby scene was "stabilized" within the meaning of Use of Force Procedure 12.545, dramatically illustrates this utter lack of training in this regard.[108]  The resulting injury and death,

---

[106] Exhibit 78; Doc. 88, Plaintiff's Cincinnati MSJ, pp. 39-40.

[107] Doc. 99, Cincinnati Memo Contra, p. 15-16.

[108] Streicher Depo., pp. 128-142; Doc. 88, Plaintiff's Cincinnati MSJ, pp. 38-39.

like that which we have in this case, was palpably foreseeable and constitutes deliberate indifference. Such a complete failure of training justifies summary judgment, especially in this use-of-force situation.

### D. Incorrect Factual Statements.

The City of Cincinnati and its Police Chief make several incorrect factual statements that warrant correction.

First, defendants incorrectly report that Roger Owensby suffered from an enlarged heart.[109] This is the City's counsel's wishful thinking because no medical professional says this. The undisputed evidence is that Mr. Owensby's heart was within normal limits. It was not enlarged. Dr. Schultz, the Hamilton County Deputy Coroner who performed the autopsy on Mr. Owensby verified that Mr. Owensby's heart weighed 395 grams, which he stated was at the high end of normal. Specifically, Dr. Schultz stated that Mr. Owensby's heart was <u>not</u> enlarged.[110] Moreover, now that the City has switched sides, its expert, Dr. Neuman, concedes that Mr. Owensby's heart was "**at the upper limit of normalcy** if not frankly, abnormal."[111] Thus, there is no factual basis for claiming that Mr. Owensby, a 29 year-old man in excellent physical condition, had an enlarged heart.

Second, defendants' statement that "Dr. Schultz has stated that it is 'likely' that Mr. Owensby was dead on the ground" is, at best, a half truth. Dr. Schultz's statement was originally

---

[109] Doc. 99, Cincinnati Memo Contra, pp. 5, 19.

[110] Schultz Depo., pp. 188:15 - 189:9.

[111] Doc. 100, Neuman Affidavit, ¶19 (emphasis supplied).

given in response to the medically-impossible testimony of Officers Caton and Jorg that Mr.

Owensby walked to the Golf Manor cruiser under his own power.  Mechanical asphyxiation

makes this impossible.  After the statement of Dr. Schultz cited by the defendants, the Deputy

Coroner explained the following medically certain facts:  Mr. Owensby died of mechanical

asphyxiation as a result of the force used on him by the police officers while he lay face down on

the asphalt; death by mechanical asphyxiation takes minutes to culminate in death; we do not

know the exact time when the onset of mechanical asphyxiation took place and Mr. Owensby

became unconscious, however, he was definitely unconscious or in the agonal stages of death

when taken to and placed in the Golf Manor cruiser.[112]   Since we know that mechanical

asphyxiation takes minutes to result in death[113] and we do not know when the process of

mechanical asphyxiation started, Dr. Schultz has testified to a reasonable degree of medical

certainty that he cannot say whether Mr. Owensby was dead or merely unconscious when placed

in the Golf Manor cruiser.[114]

Dr. Cyril Wecht, the forensic pathologist originally hired and relied upon by the City, also

verifies that Mr. Owensby died of mechanical asphyxiation and that, because of the amount of

time that it takes for mechanical asphyxiation death to occur, Mr. Owensby died within minutes

of being placed in the Golf Manor cruiser.[115]

---

[112] Schultz Depo., pp. 70:20 - 72:19, 198:13 - 199:8.

[113] Schultz Depo., pp. 64:14 - 65:3, 170:8 - 174:4.

[114] Schultz Depo., pp. 71:6-17, 198:13 -199:8.

[115] Exh. 108, Wecht 9/10/02 Report; Wecht Depo., pp. 59:10 - 61:14.

Since the autopsy Plaintiff has obtained time records from various defense sources and we can now say with some degree of certainty that Mr. Owensby was on the asphalt for approximately two minutes.[116]  He was then placed in the Golf Manor cruiser.  We can also say with some degree of certainty that Mr. Owensby then was left without medical care in the cruiser for five to six minutes.[117]  According to defendants' own proffered expert, Dr. Neuman, asphyxiation death takes at least five minutes.[118]  Neither the City nor Dr. Neuman explain why, if Mr. Owensby died on the ground, Cincinnati police officers would take him to the back seat of the Golf Manor cruiser.  Therefore, by admission of defendants own expert, Mr. Owensby had to die in the Golf Manor cruiser.  Defendants' statement that Mr. Owensby was dead while on the ground is medically impossible.

## V.    CINCINNATI POLICE OFFICER HUNTER (doc. 102)

Officer Hunter's summary rendition of the facts, while not necessarily inaccurate, lacks the detail necessary to fully understand the events of November 7, 2000.  Therefore, Plaintiff adopts and incorporates his statement of facts from his motion for partial summary judgment.[119]

Officer Hunter admits that the City of Cincinnati's use-of-force training was inadequate as to police officer duties and responsibilities:  (1) under Use of Force Procedure 12.545 which requires "immediate" medical care for injured citizens "once the scene is stabilized;" and (2)

---

[116] Doc. 88, Plaintiff's Cincinnati MSJ, p. 7; Exhibit A, Transcript of Police Channel.

[117] Doc. 88, Plaintiff's Cincinnati MSJ, p. 12; Exhibit 20, Spellen Cruiser Video (with elapsed time indicated).

[118] Doc. 100, Neuman Affidavit, ¶ 13.

[119] Doc. 88, Plaintiff's Cincinnati MSJ, pp. 2-22.

under the Mutual Aid Agreement when Cincinnati police are acting collaboratively with other police departments.[120]  He then seeks refuge behind this training failure by claiming that his failure to provide medical care to Mr. Owensby was the result of "confused beliefs" resulting "not from deliberate indifference, but clearly from the officers' improper training."[121]  However, the undisputed facts tell a different story.

On November 7, 2000 Officer Hunter knew that Cincinnati's Use of Force Procedure 12.545 required that he provide fresh air and water to anyone he maced.[122]  Despite this knowledge, he chose not to provide this medical care for Mr. Owensby.  Had he attempted to provide Mr. Owensby  with water to rinse the mace from his battered face while Mr. Owensby lay handcuffed in the Golf Manor cruiser, he would have discovered that Mr. Owensby was unconscious.[123]  There was no "confused belief" over the requirement of medical care for Mr. Owensby as a result of the mace administered by Officer Hunter.  There was simply deliberate indifference, or worse, malicious purpose.

Further, it is undisputed that Officer Hunter knew on November 7 that he was required by Cincinnati's Use of Force Procedure 12.545 to provide immediate medical care to any injured citizen like Mr. Owensby "once the scene was stabilized."  Officer Hunter has testified that he considered the scene "stabilized" once the handcuffed Roger Owensby was placed in the Golf

---

[120]  Doc. 102, Hunter Memo Contra, pp. 7-10.

[121]  *Id*. at 8.

[122]  Hunter Depo., pp. 252:4-8; 254:12 - 255:18.

[123]  *Id*. at 255:7-18.

Manor cruiser.[124]  He had seen Officer Caton beat the handcuffed Mr. Owensby while he lay

defenseless on the asphalt and again in the back seat of the Golf Manor cruiser.[125]  Still, he chose

not to check on or provide any medical care to Mr. Owensby during the critical five to six

minutes when Mr. Owensby lay dying in the Golf Manor cruise.

As the arresting officer who identified (incorrectly) Mr. Owensby as the man who ran

from him some five weeks earlier, Officer Hunter, like all the other Cincinnati police officers on

the scene, had a duty to provide immediate medical care to Mr. Owensby or at least check to see

if he was conscious, in light of the injuries known to have been sustained, e.g., abrasions,

macing, beating, unconscious behavior.  Instead, he, like the other Cincinnati police defendants,

chose to do nothing.  To paraphrase the Supreme Court's *Farmer* decision cited by Officer

Hunter, he chose to disregard a known risk.[126]  Thus, Officer Hunter is individually liable under §

1983 for his deliberate indifference in failing to attend to the medical needs of Roger Owensby

on November 7, 2000 as he lay handcuffed and dying in the Golf Manor cruiser.

## VI.    CINCINNATI POLICE OFFICERS JORG, CATON, SELLERS AND SPELLEN (doc. 103)

These defendants rely on the report of Dr. Neuman to also posit that Mr. Owensby died of

sudden cardiac arrest.  However, as established earlier, these defendants are statutorily barred in

now attempting to challenge the cause of death findings of the Hamilton County Coroner in this

---

[124] *Id*. at 252:13 - 254:9.

[125] *Id*. at 171:16 - 174:8-14; 178:1 - 182:18; Doc. 88, Plaintiff's Cincinnati MSJ, pp. 10-11.

[126] Doc. 102, Hunter Memo Contra, p. 6, *citing Farmer v. Brennan*, 511 U.S. 825, 838 (1994).

proceeding. Further, like the City and its Chief of Police, Officer Caton, who was fired for his role in failing to provide medical care to Mr. Owensby, is judicially estopped from now asserting a different cause of death.[127]

Like Officer Hunter, these Cincinnati police officers rely on the Supreme Court's *Farmer* decision to argue that their individual § 1983 liability for failing to provide medical care to Mr. Owensby must be based upon their disregard of a known risk of injury to Mr. Owensby.[128] This argument should meet with the same fate as Officer Hunter's mirror argument. The undisputed facts establish that these officers chose to disregard a known risk of injury to Mr. Owensby.

First, all of the officers knew that Mr. Owensby had been maced.[129] All knew that they were required by the Cincinnati Use of Force Procedure 12.545 to provide Mr. Owensby with fresh air and "cool, clear water" to rinse the mace from his face, in fact, all were administratively disciplined (except for Officer Jorg who quit) for not following the Use of Force Procedure.[130] None of the officer chose to do anything. Again, had they even attempted to rinse Mr. Owensby's face as he lay in the Golf Manor cruiser, they would have seen that he was unconscious.

Second, Officers Jorg, Caton and Sellers knew Mr. Owensby had been severely beaten. Officer Jorg and Caton administered the beating and Mr. Owensby's blood was plainly visible on

---

[127] *See* Section IV, *supra.*

[128]   Doc. 103, Jorg, Caton, Sellers, Spellen Memo Contra, p. 6.

[129]   Jorg Depo., p. 126:9-17; Caton Depo., pp. 110:4-111:6; Sellers Depo., p. 52:15-23; Spellen Depo., p. 50:1-2.

[130]   Caton Depo, p. 18:11-14; Spellen Depo., pp. 27:3-10, 79:23 - 80:5; Exhibit 45, Administrative Finding against Officer Sellers; Exhibit 27, Administrative Findings against Officer Spellen; Exhibit 35, Administrative Findings against Officer Caton.

their shirt sleeves.[131]  Also, Officer Sellers saw Officer Caton beating Mr. Owensby after he was

handcuffed as he lay defenseless on the asphalt.[132]

Third, Officer Spellen knew that Mr. Owensby had been maced and he saw Mr. Owensby

slumped over and motionless on the Golf Manor cruiser back seat.[133]  Still Officer Spellen did

nothing.  Instead, he joked with Officer Sellers about how much Mr. Owensby was "hurting."[134]

Thus, all of these officers knew that Mr. Owensby was injured.  All of them chose to

disregard this known risk of injury to Mr. Owesnby.  Because they were all deliberately

indifferent to Mr. Owensby's medical care, under *Farmer*, they are all individually liable under §

1983 for their failure to provide medical care to Mr. Owensby.

## VII.   CONCLUSION

The City's brief lists, on page 19,  four supposed questions of disputed, material fact.

The foregoing demonstrates that, to the contrary, there are none.

*First*, the City argues that "the cause of death"is a fact in material dispute.  It is wrong:

This question is resolved as a matter of law and as to all defendants, because Ohio law prevents

the City from contending in this proceeding that the cause of death was not as found by the

Coroner.  Moreover, the City and Caton are in any event judicially estopped from denying

homicide by mechanical asphyxiation.

*Second*, the City says there is a material dispute as to "when and where decedent was

---

[131] Doc. 88, Plaintiff's Cincinnati MSJ, pp. 7-10.

[132] Sellers Depo., pp. 51:24 - 52:14

[133] Spellen Depo., p. 50:1-9.

[134] Exhibit 21, Transcript of Spellen cruiser video, p. 4.

when the fatal condition onset." There is not. Roger Owensby died in the joint custody of these defendants and the Golf Manor defendants. Because death was as a matter of law the result of asphyxia, the fatal condition *a fortiori* had its onset while the defendant officers knelt on him, maced him, punched him, screamed at him, and set in motion the pathophysiology which killed him. Even on the spurious "sudden cardiac arrest" thesis, however, there is no question that Mr. Owensby was entitled to medical care given his obvious injuries from the moment his confinement was stabilized.

*Third,* the City says there is a material question of fact "whether medical attention was requested within a reasonable period of time after the officers knew or should have known" it was needed. The City is judicially estopped from denying that its officers acted appropriately by its successful assertions to the contrary in disciplinary proceedings against defendant Caton, and defendant Caton is similarly estopped. More fundamentally, however, there is no credible basis for the assertion that medical attention was not necessary at the time Mr. Owensby was first secured. Dr. Wecht says to a reasonable degree of medical certainty that, with such attention, Roger Owensby would be alive today. While Dr. Neuman's inadmissible affidavit attempts to discredit CPR, he makes no attempt to discredit the other care a paramedic or EMT could have provided Mr. Owensby.

*Fourth,* the City contends there is a material question "whether the decedent could have been saved . . . had more prompt medical attention occurred." At the outset, we are not aware of authority for the proposition that the standard is "saving" Mr. Owensby. Even if he would only have lived an extra 10 minutes, he was denied those minutes while the officers stood around and shrugged their shoulders. But the City is precluded by law from denying death from mechanical

asphyxia, and is estopped from contending that the immediate medical attention was required—*and* that the *denial* of immediate medical attention *caused serious harm to another.* Moreover, Dr. Neuman's opinion that death was inevitable is insufficient to justify the assertion that there is a question of fact on this point.

Finally, the individual defendants, Officers Jorg, Caton, Sellers, Spellen and Hunter are liable under § 1983 for their deliberate indifference to Mr. Owensby's medical care. The undisputed evidence establishes that they chose to ignore this known risk of harm to Mr. Owensby as they left him to die in the Golf Manor cruiser.

Therefore, this Court should grant Plaintiff's Motion for Partial Summary Judgment against the Cincinnati defendants (Doc. 88) under 42 U.S.C. § 1983 for their failure to provide constitutionally required medical care to Roger Owensby on November 7, 2000.

Respectfully submitted,

/s/Paul B. Martins

| | |
|---|---|
| Mark T. Tillar (0029898) | James B. Helmer, Jr. (0002878) |
| 240 Clark Road | Paul B. Martins (0007623) |
| Cincinnati, Ohio 45202 | Frederick M. Morgan, Jr. (0027687) |
| Telephone: (513) 761-2958 | HELMER, MARTINS & MORGAN CO., LPA |
| | Fourth & Walnut Centre, Suite 1900 |
| John J. Helbling (0046727) | 105 East Fourth Street |
| 3672 Springdale Road | Cincinnati, Ohio 45202-4008 |
| Cincinnati, Ohio 45251 | Telephone:    (513) 421-2400 |
| Telephone: (513) 923-9740 | Facsimile:    (513) 421-7902 |

*Trial Attorneys for Plaintiff*

40

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing Plaintiff's Reply Memorandum in Support of Hi8s Motion for Partial Summary Judgment Against Defendants City of Cincinnati, Its Chief of Police And Its Individual Police Officers For Their Failure To Provide Critical Medical Care (doc. 88), was electronically filed on March 11, 2004. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.


/s/ Paul B. Martins