18

injured. Sergeant Watts discovered Mr. Owensby to be unresponsive and immediately summoned medical aid and began securing the scene.

### Sergeant Shirley Browner, Badge S188, District Four

On November 7, 2000, at 1949 Hours, Sergeant Browner responded to 2098 Seymour Avenue to assist Sergeant Watt with a macing report. Sergeant Browner had contact with officers involved in the arrest of Mr. Owensby and officers who responded after Mr. Owensby was secured in the patrol car. However, no officer reported a use of force to her, nor did any officer report that Mr. Owensby was injured. Sergeant Watts directed Sergeant Browner to contact CFD for medical aid and to secure the scene.

### Police Officer Robert Heiland, City of Golf Manor Police Department

*Note: (Officer Heiland's summary is derived from his Homicide Unit interview and his Court of Common Pleas trial testimony. After consulting with the City of Golf Manor's legal counsel, Police Chief Stephen Tilley declined to allow Officer Heiland to be interviewed by IIS.)*

On November 7, 2000, Officer Heiland was assigned to uniformed patrol for the City of Golf Manor. At approximately 1945 Hours, Officer Heiland responded to 2098 Seymour to assist CPD units with an assistance broadcast.

Officer Heiland parked his car westbound in the northwest corner of 2098 Seymour Avenue. As Officer Heiland exited his car he observed two CPD officers " not necessarily standing but kneeling down over a suspect."[25]

Officer Heiland started to approach the officers when a Huntington Meadows Security officer disregarded him.[26] Officer Heiland stopped at the front of his car. Officer Heiland observed two CPD officers pick Mr. Owensby from the ground.[27] As the officers faced Officer Heiland, Officer Jorg was on Mr. Owensby's right side and Officer Caton was on Mr. Owensby's left side. One of the officers requested Officer Heiland allow them to put Mr. Owensby in his car. He consented. The officers were "And it wasn't like, you know, they were just, had their arms, you know, their hands on his arms. It was underneath of him and they were bringing him to the car, and they were unable to walk, you know, without difficulty. So that's why I say they were having some difficulty."

Officer Heiland opened the right rear door of his car for the officers. The officers put Mr. Owensby in the car head first. The officers were unable to get Mr. Owensby totally in the car. Officer Caton went to the driver's side and pulled Mr. Owensby into the car. After Mr. Owensby was put in the car Officer Heiland walked a few feet away.

---

[25] Trial testimony transcript, Hamilton County Court of Common Pleas, November 25, 2001. The suspect has been identified as Mr. Roger D. Owensby, Jr.
[26] Officer Heiland never identified the security officer.
[27] Officer Heiland identified Officer Jorg and Officer Caton as the officers who escorted Mr. Owensby to the Golf Manor patrol car.

19

Eventually, Sergeant Watts summoned Officer Heiland back to his car to roll down the driver's side window, allowing Sergeant Watts to have better contact with Mr. Owensby. Mr. Owensby was non-responsive and was removed from the car.

**Police Officer Christopher Campbell, City of Golf Manor Police Department**

*Note: (Officer Campbell's summary is derived from his Homicide Unit interviews and his Hamilton County Municipal Court testimony. After consulting with the City of Golf Manor's legal counsel, Police Chief Stephen Tilley declined to allow Officer Campbell to be interviewed by IIS.)*

Officer Campbell responded to 2098 Seymour Avenue for the "Officer needs assistance" broadcast and arrived after Officer Heiland. When he pulled into the parking lot Mr. Owensby was on the ground, handcuffed. Officer Campbell's attention was drawn to the crowd that gathered in front of the store. Officer Campbell stated he observed two unknown Cincinnati police officers take Mr. Owensby to Officer Heiland's car, but could not determine if Mr. Owensby was "escorted or dragged" by the officers.

Mr. Owensby was placed in the rear of the Golf Manor patrol car on his right side in a prone position facing the trunk. Mr. Owensby's head was placed near the rear driver's side door. Officer Campbell remained in close proximity to Officer Heiland's car, but did not hear or see Mr. Owensby move while in the car. Officer Campbell did not see any police officer punch, strike, or apply any type of neck restraint to Mr. Owensby.

**Mr. Steven Williams, Black, Male, 21 years of age, 15 Drummond Court, Cincinnati, Ohio, 45218, (513) 648-0492**

*Note: (Mr. Williams's summary was derived from his IIS interview.)*

Mr. Williams was at 2092 Seymour Avenue when Officer Sellers asked to talk to him. As Officer Sellers was approaching, Mr. Williams placed his hand inside his coat in an attempt to hide his bag of marijuana. Officer Sellers asked him why he placed his hand in his jacket. Mr. Williams then allowed him to retrieve the bag of marijuana from the inside of his jacket. Officer Sellers then handcuffed him and placed him in the rear of the patrol car.

Mr. Williams informed Officer Sellers that he would give him information in regard to drug dealers in the area in lieu of going to jail. Mr. Williams heard the "Officer needs assistance" broadcast over Officer Seller's radio. Mr. Williams remained in the rear of patrol car while Officer Hasse did paperwork.

Mr. Williams did not witness the struggle between Mr. Owensby and the officers.[28] A few minutes after the "Officer needs assistance" broadcast, Officer Hasse drove him to 2098

---

[28] Officer Hasse's car was parked on the west side of the Sam's Drive-Thru. The building would have obstructed Mr. Williams' view of the location of the struggle.

Seymour Avenue. He was given a minor misdemeanor citation for the marijuana and was released from the patrol car by an unknown officer.

### Ms. Aerial St. Clair, Black, Female, 19 years of age, 3445 McHenry Avenue, Apartment #15, Cincinnati, Ohio 45225, telephone number (513) 481-4928

*Note: (Ms. St. Clair's summary is comprised of her Homicide Unit interviews and her testimony in Hamilton County Common Pleas Court and Municipal Court.)*

On November 7, 2000, Ms. St. Clair was standing at a phone booth in the parking lot of Sam's Telecom when she noticed Cincinnati police officers approach her friend, Mr. Owensby. She had purchased marijuana from Mr. Owensby in the past. Ms. St. Clair stated she was being "nosy" and walked down to Sam's Telecom store to see the interaction between the officers and Mr. Owensby.

Mr. Owensby attempted to escape from the officers but the officers tackled him into a parked car. Mr. Owensby and the officers landed next to the car with Mr. Owensby's face striking the pavement. The officers were yelling at Mr. Owensby to stop resisting, but he continued to struggle with the officers. Approximately five officers were fighting with him and they were kicking and punching him.[29]

At some point during the struggle, one of the officers placed his knees into Mr. Owensby's upper back and put his left forearm across Mr. Owensby's throat.[30] It appeared that the officer was choking Mr. Owensby.[31] She also heard one of the officers yell. "Mace the mother fucker!" Ms. St. Clair stated the struggle lasted approximately 10 minutes. When the officers picked Mr. Owensby up off the ground he was not moving his feet and his body was limp. The officers dragged Mr. Owensby to the car.

Ms. St. Clair did not believe the officers were trying to injure Mr. Owensby and the entire incident could have been an "accident." Ms. St. Clair could only identify Officer Sellers from the Homicide Unit's lineups. Ms. St. Clair did not witness Officer Caton strike Mr. Owensby.

### Dr. Daniel L. Schultz, M.D., Senior Forensic Pathologist, Hamilton County Coroner's Office

*Note: (Dr. Schultz's summary is derived from his autopsy report, his Court of Common Pleas trial testimony and his IIS interview.)*

Dr. Schultz performed the post mortem examination of Mr. Owensby. Dr. Schultz's court testimony corroborates his medical report. Dr. Schultz determined Mr. Owensby died as a result of Mechanical Asphyxiation. Dr. Schultz determined Mr. Owensby was deceased at

---

[29] Ms. St. Clair's Homicide Unit interviews and court testimony were not consistent in regard to the officers striking Mr. Owensby.
[30] Ms. St. Clair could not identify Officer Jorg in a photo line-up. However, she stated the officer who placed Mr. Owensby in the chokehold and drug him to the car, was the officer with the cut off shirt sleeve.
[31] Ms. St. Clair did not make a statement in regard to the chokehold until the second Homicide Unit interview on Nov. 12, 2000.

the time he was lifted from the ground. Dr. Schulz found no medical evidence to indicate Mr. Owensby died of other means. Given previous medical findings and additional circumstances it is possible for death by mechanical asphyxia to occur within 30 seconds. Any preexisting medical condition Mr. Owensby had would not have been severe enough to cause his death.[32] The resource and information used by Dr. Schultz in explaining and determining mechanical asphyxiation is as follows:

> **Mechanical Asphyxia:**[33]
>
> *"Here, pressure on the outside of the body prevents respiration. Examples of mechanical asphyxia are traumatic asphyxia, positional asphyxia, and riot crush or "human pile" deaths."*

### Police Specialist Todd Bruner, Badge PS332, Training Section Physical Fitness/Defense Tactics Instructor

*Note: (Specialist Bruner's summary is derived from his Internal Investigations Section interview and his Hamilton County Court of Common Pleas testimony.)*

The Mandibular Angle Pressure Point[34] described by Officer Jorg is a prisoner control technique taught at the Cincinnati Police Academy. Officer Jorg received instruction in this particular maneuver during his recruit training as required by the Ohio Peace Officers Training Council. Application of the Mandibular Angle Pressure Point is as follows: pressure is placed behind the base of the ear (mandibular area) using either a finger tip or knuckle, and the pressure is applied until compliance is achieved. Counter pressure is applied to the opposite side of the subject's head, with the hand, in order to stabilize it as pressure is applied at the mandibular point.

Utilization of the Mandibular Angle Pressure Point is within Department standards when confronted with non-compliant suspects. The maneuver is reasonable when the duration is limited to that time required to gain the desired compliance.

### Dr. Cyril H. Wecht, M.D., J.D., Coroner, Allegheny County, Pennsylvania

The City of Cincinnati Office of Municipal Investigations (OMI) consulted Dr. Wecht reference the in-custody death of Mr. Roger Owensby. OMI provided Dr. Wecht with microscopic pathology slides, photographs from the Hamilton County Coroner's Office, a copy of Mr. Owensby's autopsy report, OMI and IIS interviews, court transcripts and specific photographs of Officer Jorg's shirtsleeve.

---

[32] Mr. Owensby's preexisting medical conditions are noted the Hamilton County Coroner's Office Post Mortem Examination #H-660-00.
[33] Definition from "Forensic Pathology" by Dominic and Vincent DiMaio
[34] "OPOTC Defensive Tactics/Suspect Control Techniques, Unit XI: Lesson Plan #1, SOP #17", used during academy class that started January 14, 1996. A copy of the lesson plan will be maintained in the IIS case file.

22

After reviewing the supplied information, Doctor Wecht reported he concurred with Dr. Schultz's findings that Mr. Owensby died of Mechanical Asphyxia resulting from a combination of factors.[35]

## IIS Monitoring of Homicide Unit Investigation

Members of the IIS responded to the area of 2098 Seymour Avenue and monitored the investigation of the Criminal Investigation Section (CIS). Criminalistic Squad personnel photographed the crime scene, collected and catalogued evidence and subsequently submitted to the Hamilton County Coroner's Lab for analysis. Uniformed officers were assigned to provide perimeter security of the crime scene. The scene was properly secured with evidence tape and unauthorized persons were not allowed to enter.

The Homicide Unit conducted interviews of the witnesses, involved officers, and officers arriving on the scene immediately following the incident regarding the in-custody death of Mr. Owensby.

## Physical Evidence

The Criminalistic Squad gathered evidence and photographed the scene at 2098 Seymour Avenue. The Traffic Unit used the "Total Station Diagram"[36] to make scale diagrams of the scene. The evidence was marked and numbered.

Specifically, the Criminalistic Squad secured Mr. Owensby's clothing and contents, including one plastic bag of marijuana, two plastic bags of crack cocaine, one empty plastic bag and one cigar. Officers Jorg, Caton and Sellers uniform shirts contained bloodstains and were gathered and photographed and submitted to the Hamilton County Coroner's Laboratory. Mr. Owensby's shoes were also photographed and submitted to the Hamilton County Coroner's Laboratory.

Mr. Owensby's body was photographed at University Hospital depicting injuries to his knees, face, chest and left arm. Officers Caton and Jorg injuries from the struggle were also photographed.[37] The Criminalistic Squad photographed Officer Jorg's uniform pants depicting damage to the knee area of his pants.

## Conclusion:

On November 7, 2000, at approximately 1905 hours, District Four Officers Darren Sellers and Alexander Hasse, Unit 4251 initiated a directed patrol at Sam's Drive-Thru located at 2092 Seymour Avenue. Officers Hasse and Sellers subsequently cited an individual[38] for minor misdemeanor marijuana possession.

---

[35] On August 14, 2002, at 1430 hours, IIS and OMI met with Dr. Wecht at the Allegheny County, Pa. Coroner's Office.
[36] "Total Station Diagram" – a computer generated forensic map of a crime scene.
[37] Officer Caton had minor scrapes on his left knee and Officer Jorg had minor scrapes to his right elbow and left upper arm.
[38] Mr. Steven Williams was charged with 2925.11, O.R.C., Drug Abuse.

Officers Caton and Jorg (Unit 4252) and Officer Hunter (Unit 4256) responded to the area of 2092 Seymour Avenue to assist Officers Hasse and Sellers with the directed patrol.

Officer Caton telephoned District Four and spoke to Officer Abraham Lawson, Unit 4566, and Officer Hodge, Unit 4564, District Four Mini-Tactical Unit. Officer Caton requested Officers Hodge and Lawson respond to his location to interview Mr. Williams regarding his knowledge of drug sales in the area. Officers Lawson and Hodge informed Officers Hasse and Sellers they would meet them at Roselawn Park instead of Sam's Drive-Thru to maintain their covert status.

On November 7, 2000, at approximately 1935 hours, Mr. Owensby walked eastbound from the area of Integrity Hall, 2081 Seymour Avenue, to Sam's Telecom store located at 2098 Seymour Avenue. Officer Hunter recognized this individual as possibly being the suspect who ran from Officer Hunter and ultimately eluded arrest during a drug investigation on September 27, 2000 (CAD P002711060).

During the September 27 incident, Officers Jorg and Hunter were partners, working an undercover drug investigation in the area of 2081 Seymour Avenue. The officers had the authority to detain and investigate Mr. Owensby for his involvement in drug activity. In the process of the investigation, Mr. Owensby fled, hampering the officers' investigation.

Officer Hunter informed Officers Jorg and Caton of his observation. Officers Hunter, Jorg and Caton subsequently followed Mr. Owensby to Sam's Telecom store. Officer Hasse and Sellers remained with Mr. Williams, at Sam's Drive-Thru.

After buying items at the store, Mr. Owensby exited the front doors and was immediately detained by Officers Caton, Jorg, and Hunter.[39] Officer Jorg asked Mr. Owensby his name, address, and if he had ever run from the police. In addition, Officer Jorg conducted a pat down of Mr. Owensby's outer garments. Officer Caton and Jorg held Mr. Owensby's arms while Officer Hunter monitored the situation.

During the detention the decision was made to arrest Mr. Owensby for Obstruction of Official Business, resulting from the September 27, 2000 incident. As the officers were attempting to effect his arrest, Mr. Owensby ran. Mr. Owensby was seized after a five to seven yard foot pursuit. Mr. Owensby was dragged to the ground and a struggle ensued. During the struggle Mr. Owensby received visible abrasions to his head. In addition, Mr. Owensby sustained abrasions to his chest, arms and knees. Officer Hunter applied a short burst of chemical irritant to Mr. Owensby.

Officer Caton radioed PCS with an ""Officer needs assistance"" broadcast. Officer Sellers responded on foot from 2092 Seymour Avenue while Officer Hasse remained with Mr. Williams. Within two minutes of the assistance broadcast Mr. Owensby was handcuffed. Golf Manor police officers responded to the assistance broadcast.

---

[39] This action was videotaped from Sam's Telecom security camera.

Officers Hodge and Lawson responded from Roselawn Park to 2092 Seymour Avenue. Upon arrival, Officers Hodge and Lawson were redirected to 2098 Seymour Avenue. Officer Hodge exited the passenger side of his unmarked police vehicle and ran to 2098 Seymour Avenue. Officer Hodge took an active role in the arrest of Mr. Owensby. Officer Lawson drove to 2098 Seymour Avenue, exited the vehicle but did not take an active role in the incident. Golf Manor police officers did not take an active role in the arrest.

Officers Jorg, Caton, Hunter, Sellers, and Hodge subdued and handcuffed Mr. Owensby. Officers Caton and Jorg carried Mr. Owensby to the nearest police vehicle, a Golf Manor Police patrol car. Officer Caton advised PCS that Mr. Owensby had been sprayed with chemical irritant and a supervisor needed to respond to the scene[40].

Sergeant William Watts, Unit 4240, arrived on the scene at 1949 hours. Sergeant Shirley Browner, Unit 4250, arrived at approximately 1951 hours. After gathering preliminary information from the officers, Sergeant Watts responded to the car to observe and interview Mr. Owensby. Sergeant Watts discovered Mr. Owensby was unresponsive and not breathing. Sergeant Watts ordered him to be removed from the car and directed CPR to be initiated. Officers Hasse and Caton initiated CPR while Sergeants Watts and Browner summoned medical aid, at 1956 hours, secured the scene, and began the appropriate notifications. Mr. Owensby was transported to University Hospital where he was pronounced dead at 2047 Hours.

Civilian witnesses, Golf Manor police officers, and the involved and responding CPD officers were transported to CIS, 824 Broadway, for interviews. After consulting with their legal representative, Officers Jorg, Hunter, Sellers, Caton and Hodge invoked their 5th Amendment Right to remain silent.[41]

The Homicide Unit conducted an investigation into the circumstances surrounding Mr. Owensby's death. The results of the investigation were provided to Mr. Michael K. Allen, Hamilton County Prosecutor. On January 3, 2001, a Hamilton County Grand Jury returned two indictments against Officer Jorg, one (1) count of Involuntary Manslaughter, 2903.04, O.R.C., and one (1) count of Assault, 2903.13, O.R.C.. The Grand Jury returned an indictment for Assault, 2903.13, O.R.C on Officer Caton. Officers Jorg and Caton were each found "Not Guilty" of assault in their criminal trials. The jury in Officer Jorg's manslaughter trial was unable to reach a verdict, resulting in a "hung jury".

Mr. Owensby was unresponsive as he was transported to the patrol car. Mr. Owensby was under the control of Officers Jorg and Caton when he was put in the rear of the car. According to Dr. Schultz, if Mr. Owensby was conscious when he was put in the car, the chances of him dying from positional asphyxia would be unlikely. Officers Jorg and Caton transported Mr. Owensby approximately 30-40 feet to the car. This would have provided ample time for him to regain consciousness. Neither Officer Jorg nor Officer Caton checked on the condition of Mr. Owensby after they put him in the car.

---

[40] Officer Caton notified PCS at 1949 Hours.
[41] The Homicide Unit interviewed Officer Hodge on November 20, 2002, after he waived his right to remain silent.

Dr. Schultz determined Mr. Owensby's death did not result from a blow, strike, kick or punch. Dr. Schultz determined Mr. Owensby's death was caused by mechanical asphyxia. It is Dr. Schultz's medical opinion that Mr. Owensby was dead before he was lifted from the ground. According to Dr. Schultz, if Mr. Owensby was alive at the time he was put in the car, he was brain dead, due to oxygen deprivation.

Mr. Owensby's Death Record lists the cause of death as Mechanical Asphyxia. Autopsy findings indicate Mr. Owensby suffered bilateral deep back musculature contusions (scapular), facial abrasions, left forearm abrasions, bilateral knee abrasions and shoulder abrasions.

**Findings:**

1. **On January 3, 2001, Hamilton County Prosecutor Michael K. Allen announced that the Grand Jury indicted Officer Jorg for Involuntary Manslaughter and Assault and Officer Caton for Assault.**

   - On October 30, 2001, a Hamilton County Common Pleas Court jury, before Judge Thomas C. Nurre, failed to reach a verdict on the charge of Involuntary Manslaughter against Officer Jorg.

   Rule 1.02 of the Manual of Rules and Regulations and Disciplinary Process for the Cincinnati Police Division[42], states:

   Rule 1.02 Members shall obey all laws and ordinances.

       C. Members shall obey all felony traffic and felony criminal laws.

   Based on the jury's inability to reach a verdict, IIS recommends this portion of the investigation be closed **UNFOUNDED**.

   - On October 30, 2001, a Hamilton County Common Pleas Court jury, before Judge Thomas C. Nurre, reached a verdict of "Not Guilty" of the charge of Assault against Officer Jorg.

   Rule 1.02 of the Manual of Rules and Regulations and Disciplinary Process for the Cincinnati Police Division, states:

   Rule 1.02 Members shall obey all laws and ordinances.

       B. Members shall obey all 1st through 4th degree misdemeanor traffic offenses and all 1st through 4th degree criminal laws.

   Based on the jury's "Not Guilty" verdict, IIS recommends this portion of the investigation be closed **UNFOUNDED**.

---

[42] At the time of this incident, the Police Department was the Police Division.

- On November 2, 2001, a Hamilton County Municipal Court jury, before Judge Guy C. Gukenberger, found Officer Caton "Not Guilty" of the charge of Assault.

Rule 1.02 of the Manual of Rules and Regulations and Disciplinary Process for the Cincinnati Police Division, states:

Rule 1.02 Members shall obey all laws and ordinances.

> B. Members shall obey all 1st through 4th degree misdemeanor traffic offenses and all 1st through 4th degree criminal laws.

Based on the jury's "Not Guilty" verdict, IIS recommends this portion of the investigation be closed **UNFOUNDED**.

2. **Officers Jorg, Caton, Hunter, Spellen, Lawson, Hodge, Sellers and Brazile failed to provide due care to Mr. Owensby after his arrest.**

   - Officer Jorg and Officer Caton were aware of the use of chemical irritant. Officer Jorg and Officer Caton carried Mr. Owensby to the patrol car and failed to provide him with fresh air and/or water.

Officers Jorg and Caton's actions are in violation of Rule 1.01 (C) of the Manual of Rules and Regulations and Disciplinary Process for the Cincinnati Police Division, which states:

Rule 1.01 Members shall not commit any acts or omit any act which constitute a violation of any of the rules, regulations, procedures, directives, or orders of the Division.

> A. Members shall not negligently fail to carry out any rule, regulation, procedure, directive, or order of the Division, which may lead to risk of physical injury to another or financial loss to the Division. To wit;

> Procedure 12.545 <u>Use of Force</u>:

> C. Use of Chemical Irritant (In part);

> 5. Expose individuals sprayed with chemical irritant to fresh air. Give them an opportunity to rinse their face with plenty of clear, cool water.

Based on the IIS investigation, IIS recommends this portion of the investigation be closed **SUSTAINED**.

- Officers Jorg, Caton, Hodge, Hunter, Spellen, Brazile, Sellers, and Lawson were aware Mr. Owensby was injured. The officers failed to tend to or seek medical aid for Mr. Owensby's injuries.

Officers Jorg, Caton, Hodge, Hunter, Spellen, Brazile, Sellers, and Lawson's actions are in violation of Rule 1.01 (C) of the Manual of Rules and Regulations and Disciplinary Process for the Cincinnati Police Division, which states:

1.01 Members shall not commit any acts or omit any act which constitute a violation of any of the rules, regulations, procedures, directives, or orders of the Division.

    C. Members shall not negligently fail to carry out any rule, regulation, procedure, directive, or order of the Division, which leads to physical injury to another or financial loss to the Division. To wit;

    Procedure 12.545 <u>Use of Force</u>:

        Policy (In part);

            Following any use of force resulting in the citizen's injury, officers will ensure appropriate first aid is rendered immediately once the incident scene is stabilized.

Based on the IIS investigation, IIS recommends this portion of the investigation be closed **SUSTAINED**.

- Officers Jorg and Caton transported Mr. Owensby to the patrol car. Officers Jorg and Caton left Mr. Owensby, unattended, in the patrol car.

Officers Jorg and Caton's actions are in violation of Rule 1.01 (E) of the Manual of Rules and Regulations and Disciplinary Process for the Cincinnati Police Division, which states:

Rule 1.01 Members shall not commit any acts or omit any act which constitute a violation of any of the rules, regulations, procedures, directives, or orders of the Division.

    E. Members shall not intentionally fail to carry out any rule, regulation, procedure, directive, or order of the Division, which leads to serious injury to another. To wit;

    Procedure 12.600 (In part)

        D. Transporting Prisoners:

            5. Never leave prisoners unattended inside cars.