Case 1:01-cv-00769-SAS   Document 108-33   Filed 03/11/2004   Page 1 of 12

Owensby, et al. vs. City of Cincinnati          DAVID WILLIAM HUNTER, JR.
November 6, 2003

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - - - -

ESTATE OF ROGER D.              :
OWENSBY JR., et al.,            :
                                :
        Plaintiffs,             :  Case No. 01-CV-769
vs.                             :  (Judge S. A. Spiegel)
                                :
CITY OF CINCINNATI,             :     VOLUME I
et al.,                         :
                                :
        Defendants.             :

- - - - - - - - - - - - - - - -

         Videotaped deposition of DAVID WILLIAM

HUNTER JR., a witness herein, called by the

plaintiffs for cross-examination, pursuant to the

Federal Rules of Civil Procedure, taken before me,

Wendy Davies Welsh, a Registered Diplomate Reporter

and Notary Public in and for the State of Ohio, at

the offices of Helmer, Martins & Morgan Co. LPA,

1900 Fourth & Walnut Centre, 105 East Fourth Street,

Cincinnati, Ohio, on Thursday, November 6, 2003, at

2:43 p.m.

Case 1:01-cv-00769-SAS    Document 108-33    Filed 03/11/2004    Page 2 of 12

Owensby, et al.vs. City of Cincinnati					DAVID WILLIAM HUNTER, JR.
November 6, 2003

Page 2

```
 1  APPEARANCES:
 2      On behalf of the Plaintiffs:
 3          Paul B. Martins, Esq.
            Don Stiens, Esq.
 4          Frederick M. Morgan Jr., Esq.
            Helmer, Martins & Morgan Co. LPA
 5          Suite 1900, Fourth & Walnut Centre
            105 East Fourth Street
 6          Cincinnati, Ohio 45202
            Phone: (513) 421-2400
 7
            John J. Helbling, Esq.
 8          The Helbling Law Firm, L.L.C.
            3672 Springdale Road
 9          Cincinnati, Ohio 45251
            Phone: (513) 923-9740
10
        On behalf of the Defendants City of Golf Manor,
11      Stephen Tilley, Roby Heiland and Chris
        Campbell:
12
            Wilson G. Weisenfelder Jr., Esq.,
13          Rendigs, Fry, Kiely & Dennis
            900 Fourth & Vine Tower
14          One West Fourth Street
            Cincinnati, Ohio 45202-3688
15          Phone: (513) 381-9200
16      On behalf of the Defendants City of Cincinnati,
        Darren Sellers, Jason Hodge:
17
            Geri Hernandez Geiler, Esq.
18          Assistant City Solicitor
            and
19          Julie F. Bissinger, Esq.
            Chief Counsel
20          Department of Law
            Room 214, City Hall
21          801 Plum Street
            Cincinnati, Ohio 45202
22          Phone: (513) 352-3346
23
24
```

Page 3

```
 1  APPEARANCES (Continued):
 2      On behalf of the Defendants Robert B. Jorg,
        Patrick Caton, Jason Hodge, Victor Spellen and
 3      Darren Sellers:
 4          Donald E. Hardin, Esq.
            Hardin, Lefton, Lazarus & Marks, LLC
 5          915 Cincinnati Club Building
            30 Garfield Place
 6          Cincinnati, Ohio 45202
            Phone: (513) 721-7300
 7
        On behalf of the David William Hunter Jr.:
 8
            Jay Clark, Esq.
 9          114 East 8th Street
            Suite 400
10          Cincinnati, Ohio 45202
            Phone (513) 587-2887
11
    Also present:
12
    Richard W. Grubb, Videographer
13
    Lisa Damstrom, Law Clerk
14  Helmer, Martins & Morgan Co., L.P.A.
15  Mr. Roger Owensby
16  Mrs. Brenda Owensby
17
18              - - -
19          S T I P U L A T I O N S
20
21      It is stipulated by and among counsel for the
22  respective parties that the deposition of DAVID
23  WILLIAM HUNTER JR., a witness herein, called by the
24  plaintiffs for cross-examination, pursuant to the
```

Page 4

```
 1  Federal Rules of Civil Procedure, may be taken at
 2  this time by the notary; that said deposition may be
 3  reduced to writing in stenotype by the notary, whose
 4  notes may then be transcribed out of the presence of
 5  the witness; and that proof of the official
 6  character and qualifications of the notary is
 7  expressly waived.
 8
                - - -
 9
10              I N D E X
11      Examination by:            Page
12      Mr. Martins . . . . . . .    5
13              - - -
14
15          E X H I B I T S
16                                 Page
17
18  Deposition Exhibit 6A . . . . . . . . . . . . . . . . .  89
    Deposition Exhibit 54 . . . . . . . . . . . . . . . . .  29
19  Deposition Exhibit 55 . . . . . . . . . . . . . . . . .  43
    Deposition Exhibit 56 . . . . . . . . . . . . . . . . .  62
20  Deposition Exhibit 57 . . . . . . . . . . . . . . . . .  64
    Deposition Exhibit 58 . . . . . . . . . . . . . . . . .  67
21
22              - - -
23
24
```

Page 5

1  VIDEOGRAPHER: Time is 2:43 p.m. The date
2  is November the 6th. The year is 2003.
3      If you'd please swear the witness, ma'am.
4      DAVID WILLIAM HUNTER JR.
5  being by me first duly cautioned and sworn, deposes
6  and says as follows:
7      VIDEOGRAPHER: We're on the record, Mr.
8  Martins. This is videotape number 1, sir.
9      CROSS-EXAMINATION
10 BY MR. MARTINS:
11   Q. Sir, would you state for the record your
12 full name, please.
13   A. David William Hunter Jr.
14   Q. And your age?
15   A. 36.
16   Q. Date of birth?
17   A. 5/20/67.
18   Q. What is your height?
19   A. 5' 7."
20   Q. And on November 7th of 2000 what was your
21 weight?
22   A. Approximately 175.
23   Q. Have you ever had your deposition taken
24 before?

Case 1:01-cv-00769-SAS   Document 108-33   Filed 03/11/2004   Page 3 of 12

Owensby, et al. vs. City of Cincinnati  
November 6, 2003

DAVID WILLIAM HUNTER, JR.

Page 86

1 letting them know that we were there.
2   Q. How -- how far was he from you when he
3 said that?
4   A. About, hmm, maybe from here to that wall
5 (indicating).
6   Q. What, ten feet?
7   A. Oh, more than that.
8   Q. More?
9   A. Maybe --
10  Q. 20 feet?
11  A. Maybe. Maybe 20 feet. I don't know
12 exactly.
13  Q. All right. When you had walked up to Mr.
14 Owensby, put your arm -- your left hand on his left
15 shoulder, around him, when you were talking to him,
16 were you looking at him?
17  A. Directly at him, yes.
18  Q. Did you notice if he had any facial hair?
19  A. If he did, it was like real light. I
20 don't remember having like a full beard or full
21 mustache or anything.
22  Q. Did he have the -- did he have -- how was
23 his hair? Was it in dreadlocks, was it short-cut?
24 How -- how was it?

Page 87

1   A. Like a short afro.
2   Q. At that point, as I understand your
3 testimony, you then return to Officer Jorg, tell him
4 what happened, right?
5   A. Uh-huh. Yes.
6   Q. And maybe -- maybe you've already answered
7 this, but do you recall whether or not Officer
8 Walker joined you and Officer Jorg?
9   A. I don't recall if he came back over there.
10  Q. Do you recall who of the two people that
11 were arrested, who was cited, their -- their names?
12  A. I don't remember their names.
13  Q. Let me show you -- let me show you what's
14 previously been marked as Exhibit 6. These are
15 two -- Exhibit 6 are two arrest and investigation
16 reports. The first one is for a Jaysen Hill and the
17 second is for a Jarvis Nixon.
18     You see the arrest location is the Sam's
19 Carry Out address of 2092 Seymour Avenue and the
20 arresting officer is Jorg, with your name also
21 listed. Do you see that?
22  A. Yes.
23  Q. Are these the two individuals that Officer
24 Jorg arrested --

Page 88

1   A. Yes.
2   Q. -- on that day?
3   A. Yes.
4   Q. Do you see that with respect to Jaysen
5 Hill he is charged with criminal trespass and an
6 open container?
7   A. Yes.
8   Q. Is there any reason why there's no charge
9 of trafficking --
10  A. Yes.
11  Q. -- or any kind of drug activity?
12  A. Yes.
13  Q. Why?
14  A. Because we didn't recover the drugs.
15  Q. Did you recover any money, any large sums
16 of money on these people out of these drug deals?
17  A. I didn't.
18     THE REPORTER: I'm sorry?
19     THE WITNESS: I did not.
20  Q. Do you know whether Officer Jorg did?
21  A. Not to my knowledge he didn't.
22  Q. So based on what you found on these
23 individuals -- well, let's talk about the second
24 one. Mr. Nixon is cited with criminal trespass.

Page 89

1 Same thing, there were no -- no drugs and no large
2 sums of money found, correct?
3   A. That's correct.
4   Q. Based on what you found at the scene when
5 you got there, there was no evidence of drug
6 activity taking place, was there?
7   A. Are you talking about after the fact?
8   Q. When -- when you're -- based on the arrest
9 and what you found on the person of these
10 individuals.
11  A. Okay. What we observed to put us there
12 went with the two that got away.
13  Q. Okay. That's what you believe?
14  A. That's what I believe.
15  Q. Let me show you what I'm going to mark as
16 Exhibit 6A.
17         (Deposition Exhibit 6A
18         was marked for identi-
18         fication.)
19  Q. You see Exhibit 6A is an arrest and
20 investigation report for one Dominic Peterson, same
21 location, same date, same time. And the person is
22 searched by Officer Walker, and this person is
23 charged with criminal trespass. Was Mr. Peterson
24 also involved in this?

107

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - - - -

ESTATE OF ROGER D.              :
OWENSBY JR., et al.,            :
                                :
          Plaintiffs,           :  Case No. 01-CV-769
vs.                             :  (Judge S. A. Spiegel)
                                :
CITY OF CINCINNATI,             :     VOLUME II
et al.,                         :
                                :
          Defendants.           :

- - - - - - - - - - - - - - - -

Continued videotaped deposition of DAVID WILLIAM HUNTER JR., a witness herein, called by the plaintiffs for cross-examination, pursuant to the Federal Rules of Civil Procedure, taken before me, Wendy Davies Welsh, a Registered Diplomate Reporter and Notary Public in and for the State of Ohio, at the offices of Helmer, Martins & Morgan Co. LPA, 1900 Fourth & Walnut Centre, 105 East Fourth Street, Cincinnati, Ohio, on Thursday, December 4, 2003, at 10:11 a.m.

Pages:  107 - 282

(800) 578-1542 * MERIT * (513) 381-8228

Page 108

1  APPEARANCES:

2     On behalf of the Plaintiffs:

3        Paul B. Martins, Esq.
         Don Stiens, Esq.
4        Helmer, Martins & Morgan Co. LPA
         Suite 1900, Fourth & Walnut Centre
5        105 East Fourth Street
         Cincinnati, Ohio 45202
6        Phone: (513) 421-2400

7        John J. Helbling, Esq.
         The Helbling Law Firm, L.L.C.
8        3672 Springdale Road
         Cincinnati, Ohio 45251
9        Phone: (513) 923-9740

10    On behalf of the Defendants City of Golf Manor,
      Stephen Tilley, Roby Heiland and Chris
11    Campbell:

12       Wilson G. Weisenfelder Jr., Esq.
         Rendigs, Fry, Kiely & Dennis
13       900 Fourth & Vine Tower
         One West Fourth Street
14       Cincinnati, Ohio 45202-3688
         Phone: (513) 381-9200

15    On behalf of the Defendants City of Cincinnati,
16    Darren Sellers, and Jason Hodge:

17       Geri Hernandez Geiler, Esq.
         Assistant City Solicitor
18       Department of Law
         Room 214, City Hall
19       801 Plum Street
         Cincinnati, Ohio 45202
20       Phone: (513) 352-3346

Page 109

1  APPEARANCES (Continued):

2     On behalf of the Defendants Robert B. Jorg,
      Patrick Caton, Jason Hodge, Victor Spellen and
3     Darren Sellers:

4        Donald E. Hardin, Esq.
         Hardin, Lefton, Lazarus & Marks, LLC
5        915 Cincinnati Club Building
         30 Garfield Place
6        Cincinnati, Ohio 45202
         Phone: (513) 721-7300

7     On behalf of David William Hunter Jr.:

8        Jay Clark, Esq.
9        114 East 8th Street
         Suite 400
10       Cincinnati, Ohio 45202
         Phone (513) 587-2887

11 Also present:
12
   Richard W. Grubb, Videographer
13
   Lisa Damstrom, Law Clerk
14 Helmer, Martins & Morgan Co., L.P.A.

15 Roger Owensby Senior

16 Brenda Owensby

17 Shawn Owensby

18          - - -

19        STIPULATIONS

20

21    It is stipulated by and among counsel for the

22 respective parties that the deposition of DAVID

23 WILLIAM HUNTER JR., a witness herein, called by the

24 plaintiffs for cross-examination, pursuant to the

Page 110

1  Federal Rules of Civil Procedure, may be taken at

2  this time by the notary; that said deposition may be

3  reduced to writing in stenotype by the notary, whose

4  notes may then be transcribed out of the presence of

5  the witness; and that proof of the official

6  character and qualifications of the notary is

7  expressly waived.

8              I N D E X

9     Examination by:              Page

10    Mr. Martins . . . . . . . . 111, 277

11    Mr. Hardin. . . . . . . . .   258

12          - - -

13         E X H I B I T S

14                                   Page
   Deposition Exhibit 85 . . . . . . . . . . 120
15 Deposition Exhibit 86 . . . . . . . . . . 131
   Deposition Exhibit 87 . . . . . . . . . . 152
16 Deposition Exhibit 88 . . . . . . . . . . 219
   Deposition Exhibit 89 . . . . . . . . . . 221
17 Deposition Exhibit 90 . . . . . . . . . . 234
   Deposition Exhibit 91 . . . . . . . . . . 236
18 Deposition Exhibit 92 . . . . . . . . . . 238
   Deposition Exhibit 93 . . . . . . . . . . 244
19 Deposition Exhibit 94 . . . . . . . . . . 244
   Deposition Exhibit 95 . . . . . . . . . . 245
20 Deposition Exhibit 96 . . . . . . . . . . 250

21          - - -

Page 111

1        DAVID WILLIAM HUNTER JR.

2  being by me previously duly cautioned and sworn,

3  deposes and says as follows:

4        VIDEOGRAPHER: Time is 10:11 a.m. The

5  date is December the 4th. The year is 2003.

6        We're on the record, sir.

7        CONTINUED CROSS-EXAMINATION

8  BY MR. MARTINS:

9     Q. Officer Hunter, we're picking up where we

10 left off after November 6, your first couple hours

11 of your deposition. Remind you that you are still

12 under oath. Okay?

13    A. Yes, sir.

14    Q. All right. Have you talked with anyone

15 about your deposition on November 6th between

16 November 6th and today?

17    A. No, besides my attorney.

18    Q. Okay. Have you discussed the facts of the

19 Owensby case with anyone between November 6th and

20 today?

21    A. No.

22    Q. I want to direct your attention now to

23 November 7, 2000. I understand in the -- sometime

24 on that day you received an MTD message request for

Page 164

1  length of Officer Jorg's arm was the middle of Mr.
2  Owensby's forehead?
3     A. Probably right -- probably right about,
4  yeah, I guess, the elbow.
5     Q. In the -- in the elbow?
6     A. In the elbow part.
7     Q. So Officer Jorg leans back, and in leaning
8  back, then he's pulling Mr. Owensby's head back
9  also.
10    A. Yes.
11    Q. Correct?
12    A. Uh-huh.
13    Q. Did Mr. Owensby say anything in response,
14 when Officer Jorg is leaning back and pulling his
15 head back?
16    A. No.
17    Q. Did Officer -- did Mr. Owensby make any
18 sound? Regardless of whether he said something, was
19 there a groan or a -- an exhale or anything like
20 that?
21    A. When I sprayed him with the Mace, he
22 groaned.
23    Q. I'm talking -- okay.
24    A. Oh. I'm sorry.

Page 165

1     Q. I'm talking before.
2     A. Before that? No.
3     Q. When -- when -- when Jorg leans back and
4  pulls his head back, did -- did Mr. Owensby make any
5  sound?
6     A. No, not that I remember. No. I don't
7  remember that.
8     Q. Now, while this is going on, officers are
9  still yelling at him to give them his arms and --
10    A. Right.
11    Q. -- and things like that, right?
12    A. And at that point Caton started punching
13 him.
14    Q. Okay. But --
15    A. Or striking him. I --
16    Q. Right.
17    A. I can't say punch. He -- he was striking
18 him. How, I don't know, but he was swinging.
19    Q. Okay. But my question is when -- when
20 Jorg is pulling Mr. Owensby's head back with his
21 arm, other officers are -- are yelling at Mr.
22 Owensby; is that right?
23    A. Uh-huh.
24    Q. You have to say yes or no.

Page 166

1     A. I'm sorry. Yes.
2     Q. Okay. So Officer Jorg pulls his head
3  back. You have your Mace. What do you do?
4     A. I sprayed him.
5     Q. How far were you from Mr. Owensby when you
6  administered the Mace?
7     A. I was point blank, right there in his
8  face. Right --
9     Q. Okay.
10    A. I mean, right there.
11    Q. The distance of -- of the canister from
12 his eyes?
13    A. Six inches maybe.
14    Q. And did you spray once, more than once?
15    A. Hmm. Hmm. I think twice.
16    Q. What area of his face did you spray?
17    A. The eyes and the nose.
18    Q. At that point did you -- were you looking
19 when you were spraying it?
20    A. Yes.
21    Q. Did you notice whether or not Mr. Owensby
22 was bleeding?
23    A. Hmm. I think he was. I think he was.
24    Q. Where was he bleeding?

Page 167

1     A. I think it was like wet like around the
2  nose and on the forehead. I -- I -- it was
3  something wet on his forehead and the no-- around
4  the nose area.
5     Q. How could you see the forehead if Officer
6  Jorg's arm was around his forehead?
7     A. The part that I could see. When he had
8  him like this (demonstrating), when I sprayed him
9  and he moved back his arm, you know, just kind of --
10 it on-- it didn't stay like right there the whole
11 time.
12       Like when he moved just like, you know,
13 just -- I didn't see the whole forehead, but like
14 you can just see like just a little bit of this or a
15 little of this right here like above the brow.
16    Q. All right.
17    A. And I said I didn't see the whole -- you
18 know, to see if he had a laceration or anything like
19 that.
20    Q. Once you sprayed Mr. Owensby, was there
21 any -- did Mr. Owensby make any sounds in response?
22    A. I don't remember him making no sound.
23 Only thing I remember is he made like a grimace
24 like, you know, like a -- like -- that's the only

Estate of Roger D. Owensby, Jr.  
December 4, 2003

DAVID WILLIAM HUNTER, JR.  
VOLUME II

Page 168

1 reaction to the -- to the Mace that I remember him
2 doing.
3   Q. You noticed no coughing?
4   A. No.
5   Q. No groan or -- or any -- any sound from
6 him?
7   A. Not that I remember. Like I said, the
8 only thing I remember him doing is just making a
9 face. I don't remember any -- any noise.
10  Q. Once you finished administering the Mace
11 to Mr. Owensby, what happened next?
12  A. I went back down.
13  Q. To his arm?
14  A. To his arm.
15  Q. And were you then able to get his arm out?
16  A. Eventually, yes.
17  Q. How did you get it out?
18  A. Doing the same thing I was doing before.
19  Q. Which was?
20  A. Just pulling and tugging.
21  Q. At that point do you know whether or not
22 Officer Caton was able to get Mr. Owensby's left arm
23 out from under him?
24  A. Yes. At some point, yeah, he did, because

Page 169

1 we eventually got him handcuffed.
2   Q. How much time elapsed from after you had
3 sprayed Mr. Owensby with the Mace to the time that
4 you got his right arm out?
5   A. A matter of maybe -- maybe a minute or
6 less.
7   Q. How much time was this entire procedure
8 from the time that Mr. Owensby ran between you and
9 the other officers to the time the handcuffs were
10 put on?
11  A. I did know the answer to that, because I
12 saw it, but right now I don't remember even reading
13 it. I honestly, you know, saw from the incident the
14 exact time. But when it happened, it seemed like
15 it -- maybe three and a half minutes, four minutes,
16 something like that.
17  Q. The -- you get his right arm out. Officer
18 Caton, I guess, gets the left arm out?
19  A. Yes.
20  Q. What happens next?
21  A. He was cuffed.
22  Q. Who cuffed him?
23  A. I don't remember.
24  Q. Did Officer Caton ever leave -- well,

Page 170

1 while this is all going on, did Officer Caton ever
2 change his position?
3   A. Okay. When you say that, you mean as far
4 as in the act of getting him cuffed?
5   Q. Before getting him cuffed.
6   A. Okay.
7   Q. While -- while you are -- were on the
8 right side of Mr. Owensby --
9   A. Okay.
10  Q. -- then you went up to the head to
11 administer the Mace, in that time period was Officer
12 Caton still on the left side of Mr. Owensby?
13  A. He was on the left side of Mr. Owensby,
14 but I think at some point he went down to his legs
15 and then came back up.
16  Q. All right. Would you draw --
17  A. But I don't -- I don't -- I can't say that
18 for sure, because like I said, when I was moving up
19 here, from here to here, I wasn't really paying
20 attention to what he was doing.
21  Q. Okay. What leads you to believe at some
22 point he went down to the legs and then came back
23 up?
24  A. Because when -- hold on. Let me -- let me

Page 171

1 try to think about this for a second, because it's
2 been a little while.
3       I think it was. I think, now. I think
4 it was Hodge who asked for my PR-24 to try to do the
5 pain compliance. But he wasn't in position, he
6 wasn't in good position to do it. And if I'm not
7 mistaken, I think Caton had moved down and he ended
8 up with my PR-24, trying to get the pain compliance
9 with the legs, using my PR-24.
10  Q. When you got Mr. Owensby's right arm out
11 and put around to his back, were -- where was
12 Officer Caton?
13  A. He was back up on the left side.
14  Q. On the left side?
15  A. Yes.
16  Q. Officer -- I'm sorry. Mr. Owensby is then
17 handcuffed?
18  A. Yes.
19  Q. What happens then?
20  A. Officer Caton straddles him, with both
21 knees on either side of Mr. Owensby, and he started
22 punching him in the lower back.
23  Q. Was it above or below Mr. Owensby's
24 handcuffed arms?

Page 168 - Page 171

Estate of Roger D. Owensby, Jr.
December 4, 2003

DAVID WILLIAM HUNTER, JR.
VOLUME II

Page 172

1  A. Above.
2  Q. Hands?
3  A. Above.
4  Q. Above?
5  A. Yes.
6  Q. Was -- when Officer Caton was straddling
7  him, was Mr. Owensby's handcuffed wrists in front of
8  Officer Caton? In other words, was he sitting on
9  the handcuffs, or were the handcuffs in front of his
10 crotch?
11    A. I don't remember. I don't know if he was
12 sitting on them or not.
13    Q. Where in the back was Officer Caton
14 striking Mr. Owensby?
15    A. I just said the lower -- to me it looked
16 like the lower back.
17    Q. All right. Would you draw a circle of the
18 area and put an S.
19    A. (Witness complies.)
20    Q. How many times did Officer Caton strike
21 Mr. Owensby after he was handcuffed?
22    A. About at least four to five times.
23    Q. Were these punches, fist closed?
24    A. Yes. I believe they were.

Page 173

1  Q. Where were you when this was happening?
2  A. I was standing up off to the right side,
3  maybe about here (indicating).
4  Q. Okay. Would you indicate that with a
5  circle and an H in the middle.
6  A. (Witness complies.    )
7  Q. Did Mr. Owensby react in any way to these
8  four or five punches in the small of his back?
9  A. No. I couldn't see his face, but as far
10 as --
11    Q. Did you -- did you hear anything?
12    A. No.
13    Q. Other than his body moving to the -- to
14 the punches, did he move his body in any way in
15 response to the punches?
16    A. Not that I remember, because when -- when
17 all this was taking place at this point, it's like
18 in my mind it's supposed to be over. Okay? So
19 to -- to see Caton punching him after he was
20 handcuffed, that was like a shock. So I -- I mean,
21 it was like --
22    I was like, "What the hell is he doing?"
23 I mean, I said that before, and that's -- because I
24 said it out loud. I said, "What the hell is he

Page 174

1  doing?" And then, you know, he stopped.
2  Q. Was Caton saying anything while he was
3  punching Mr. Owensby in the back after he was
4  handcuffed?
5  A. Yes.
6  Q. What was he saying?
7  A. "Stop resisting."
8  Q. Was he resisting?
9  A. No.
10    Q. Because he was handcuffed?
11    A. Yes.
12    Q. And he wasn't moving or -- or saying
13 anything?
14    A. No.
15    Q. Where was Officer Jorg while Officer Caton
16 was punching Mr. Owensby in the back after he was
17 handcuffed?
18    A. Standing up.
19    Q. Where?
20    A. Up here by the head.
21    Q. Okay.
22    A. Or just -- like I said, I was looking at
23 this guy (indicating) and -- but Jorg was here and
24 he got up. I know he got up. He stood up when I

Page 175

1  stood up.
2  Q. All right.
3  A. Or somewhere about.
4  Q. Do you know -- do you know if Officer Jorg
5  was standing either to the right or to the left of
6  Mr. Owensby?
7  A. I don't -- I can't recall where, exactly
8  where he was standing, because I was watching -- I
9  was looking at this person (indicating).
10    Q. But Officer Jorg was standing somewhere
11 around the head area?
12    A. He was standing somewhere in close
13 proximity to where he just got up from. So he was
14 in -- in this area somewhere (indicating).
15    Q. Did anyone else say anything to Officer
16 Caton in response to seeing him punching Mr. Owensby
17 in the small of the back after he was handcuffed?
18       MR. HARDIN: Objection to the form of the
19    question.
20    A. I don't recall anybody saying anything
21 directly to Caton about it.
22    Q. What happened next?
23    A. Caton and Jorg, they got Mr. Owensby up.
24 Well, they -- as they were getting him up, it was a

Page 176

1  Golf Manor officer near, his car was near. Caton
2  yelled to the Golf Manor officer, "Can we put him in
3  your car?" And the Golf Manor officer said yes.
4      Caton and Jorg took Mr. Owensby over to
5  the car, and I was still standing around picking up,
6  you know, I picked up my Mace, and then checking my
7  belt to make sure I had everything.
8      And they -- as they took him over to the
9  car --
10  Q. Let --
11  A. -- I walked over to the -- okay. Go
12  ahead.
13  Q. Now let -- let me stop you. How did they
14  pick up Mr. Owensby?
15  A. By the arms.
16  Q. Okay. So he's handcuffed and they -- they
17  pick him up. Who is on the right side, who's on the
18  left side, if you know?
19  A. I don't know for sure, but I think Caton,
20  for the most part, he was on the left side. So I'm
21  going to assume that he stayed on the left side when
22  he -- when they picked him up and then Officer Jorg
23  was on the right. They picked him up and then they
24  took him to the car.

Page 177

1  Q. Did you see -- could you tell whether or
2  not Mr. Owensby was able to walk to the car?
3  A. Yes, I can tell.
4  Q. And what -- what did you see?
5  A. No.
6  Q. He could not walk?
7  A. No. He -- we -- he --
8  Q. How --
9  A. I don't -- if he could or couldn't, he was
10  not walking. He did not walk to the car.
11  Q. He was being carried?
12  A. Yes.
13  Q. His -- his feet were dangling?
14  A. Dragging.
15  Q. Okay. And the -- Officer Jorg and Caton
16  had Mr. Owensby by the arms?
17  A. Yes.
18  Q. Did anyone else assist in taking Mr.
19  Owensby to the Golf Manor cruiser?
20  A. There might have been another person over
21  there, but like I said, I didn't actually watch them
22  place him all the way in the car. So I don't know
23  if anybody might have got any hands on to help pull
24  him in or get him situated in the back of that car.

Page 178

1  Q. All right. What happens next?
2  A. I was still standing -- I -- I was --
3  after they get him over to the car, I walked toward
4  the car. And there was no need for me to be over
5  there, really, so I walked back over, same thing,
6  into the area, just looking down on the ground or
7  whatever, around the area where this just happened.
8      And I looked up and I looked across over
9  toward the Golf Manor police car and I saw the back
10  door open and I saw Officer Caton swinging.
11  Q. Now, what side of the Golf Manor car was
12  Officer Caton on?
13  A. Oh. The -- oh, God. I -- whichever side
14  Mr. Owensby's head was at, because that's the
15  side -- that -- the back door. He was at -- he was
16  standing at the back door where --
17      Because they had Mr. Owensby laying across
18  the back seat. And the side where his head was
19  nearest to the door, that door was open and that's
20  the door -- that's where Officer Caton was standing.
21  Q. Was the other door open?
22  A. No.
23  Q. Do you know if the car was in -- from
24  where you were and where Officer Caton was, was the

Page 179

1  car between you two? In other words, were you
2  looking toward Officer Caton's face or were you
3  looking toward his back?
4  A. Hmm. Hmm. Right this minute I can't say
5  for -- for sure, but I do know that from where I was
6  standing, what I saw was the door was open and I can
7  see Caton making swinging motions. But the door was
8  between my vision and Mr. Owensby, so I could not
9  see him making contact, but I can see him swinging.
10  Q. When you say he was swinging, would you
11  either demonstrate or describe for me what you saw.
12  A. Him -- I'll demonstrate.
13  Q. Okay.
14  A. He was leaning in the doorway. He was
15  between the door and the inside of the car. He was
16  leaning in, and I could see him drawing back and
17  coming down, drawing back, coming down, throwing
18  either punches or open hand, I can't say, but he was
19  throwing blows. He was delivering blows. And
20  Mr. -- and the only thing he -- he could eith-- he
21  could have been punching Mr. Owensby or he could
22  have been punching the back seat.
23  Q. And do you know how many blows Officer
24  Caton administered?

Page 184

1 they --
2   Q. And so that -- and that was your decision
3 at that point?
4   A. At that point when I found out that Mr.
5 Owensby health had deteriorated, yes.
6      Well, actually, wait a minute. Let me
7 back up. When -- when that happened and then they
8 took me off of my crowd control post and told me to
9 sit in my car and don't talk to anybody, that's when
10 I knew I was going down to be interviewed.
11     So once we got down to CIS to be
12 interviewed that night, or earlier that morning,
13 into the morning, had they 2.26'ed me, I'd have told
14 them everything.
15  Q. What's that?
16  A. That's where -- that's where they give us
17 a 2.26, the department, where we're ordered to tell
18 what happened but it's not used against us
19 criminally.
20     So I was waiting to be 2.26'ed when I got
21 in --
22     MR. WEISENFELDER: I'm sorry, to be what?
23     THE WITNESS: 2.26'ed.
24     MR. WEISENFELDER: What do you mean,

Page 185

1 2.26'ed?
2   A. So when I got called in to be interviewed,
3 they didn't 2.26 me; they read me my rights. So
4 after talking to FOP-appointed lawyers, I had
5 told -- I told them everything, the whole story,
6 the -- in the car, out the car, on the ground,
7 handcuffed, getting punched. I told them
8 everything. I was advised by FOP attorneys to
9 invoke my Fifth Amendment right and remain silent.
10  Q. Which you did?
11  A. Yes.
12  Q. Now, going back to the scene, after
13 Officer -- you saw Officer Caton punching Mr.
14 Owensby in the back seat of the Golf Manor cruiser,
15 did you go over to check on the health of Mr.
16 Owensby?
17     MR. HARDIN: Objection to the form of the
18     question.
19  A. No.
20  Q. How much time elapsed, to your best
21 recollection, between the time that you saw Officer
22 Caton striking Mr. Owensby in the back seat of the
23 cruiser to the time that someone pulled Mr. Owensby
24 out of the Golf Manor cruiser?

Page 186

1     MR. HARDIN: Objection to the form of the
2     question on putting information in that is not
3     in evidence.
4   A. I think it's about five to six minutes.
5   Q. And during that time period what were you
6 doing, in that five -- five-minute period?
7   A. Of him being taken out of the car?
8   Q. During the time period between you saw
9 Officer Caton at -- at the car --
10  A. Uh-huh.
11  Q. -- and the time that Officer -- the time
12 that Mr. Owensby was -- was taken out of the car.
13  A. Okay. That's when it's -- I ended up on
14 the post, just hold-- keeping the crowd back,
15 because it was turning into a crime scene.
16  Q. Were you present when Mr. Owensby was
17 taken out of the Golf Manor cruiser?
18  A. No.
19  Q. When did you first know that Mr. Owensby
20 was taken out of the Golf Manor cruiser?
21  A. When I looked over and seen -- it was one
22 of the officers, I think it was Hesse (sic), trying
23 to administer -- it was either Hesse (sic) or Caton.
24 It was a white officer. They were trying to

Page 187

1 administer CPR.
2   Q. Was this on the asphalt parking lot of the
3 Sunoco station next to the Golf Manor car?
4   A. Yes.
5   Q. Do you know whether or not Mr. Owensby was
6 still handcuffed?
7   A. I don't know.
8   Q. What happened then? After you saw the
9 officer trying to administer CPR, what happened
10 next?
11  A. Fire was -- Fire had been called and they
12 responded. And then from that point it was like I
13 was either on the crowd control post until I was
14 told by a supervisor to get in my car and just stay
15 there until I was escorted down to CIS.
16  Q. Do you know what time you were escorted
17 down to CIS?
18  A. About 11:30, something like that, maybe --
19 might have been closer to midnight. I'm not sure.
20  Q. Did you know any of the fire/rescue people
21 that came out to the scene?
22  A. No.
23  Q. Did you see or hear them say anything,
24 the -- the fire and rescue people, when they arrived

### Page 252

1 the third page in from the end is relevant in
2 explaining what a 2.26 is, as referenced by
3 Officer Hunter.
4   Q. I want to show you, sir, what's previously
5 marked as Exhibit 60. This is the Cincinnati Police
6 Department use of force policy that was in effect in
7 November of 2000, correct?
8   A. Yes.
9   Q. And I want to direct your attention to
10 page 3, please. You see in bold there is a word
11 "Procedure" about a third of the way down the page?
12   A. Yes.
13   Q. Okay. Paragraph right above that says,
14 "Following any use of force resulting in a citizen's
15 injury, officers will ensure appropriate first aid
16 is rendered immediately once the incident scene is
17 stabilized."
18       Now, we covered in -- in the first part of
19 your deposition on November 6 that, in your opinion,
20 the scene was stabilized once Officer -- once Mr.
21 Owensby was handcuffed and placed in the back seat
22 of the cruiser; is that right?
23   A. Yes.
24   Q. Okay. Am I correct in understanding that

### Page 253

1 no Cincinnati police officers immediately provided
2 appropriate first aid for Mr. Owensby while he lay
3 in the back seat of that cruiser; is that right?
4   A. Yes.
5   Q. It wasn't until Sergeant Watts, five
6 minutes or -- or later, ordered him removed from the
7 cruiser that anyone began to consider first aid for
8 Mr. Owensby, right?
9   A. Yes.
10   Q. Go to page 9 of that document, Exhibit 60.
11 At paragraph C on that page it says Use of Chemical
12 Irritant. And at number 4 under letter C it says,
13 "When spraying chemical irritant, if possible spray
14 five to ten feet" from the -- "from an individual.
15 The target should be" the "individual's eyes, nose,
16 and mouth."
17       This was the -- remember I asked you
18 earlier today the standard for the distance that an
19 officer should apply chemical irritant. This was
20 the standard that was in place on November 7, 2000;
21 is that right?
22   A. Yes.
23   Q. And you did not spray the irritant from
24 five to ten feet but, rather, from approximately

### Page 254

1 six inches?
2   A. Yes.
3   Q. Is there a reason for that?
4   A. Yes.
5   Q. What was the reason?
6   A. The reason was we was trying to get him to
7 comply, and for me to spray him and not hit Officer
8 Jorg with overspray, I had to be as close as I could
9 to him. That was my reason. I ain't saying it's --
10 it's not -- it's obvious that it wasn't procedurally
11 correct, but that was my reason.
12   Q. Number 5 says Exposed individuals sprayed
13 with chemical irritant" -- or "Expose individuals
14 sprayed with chemical irritant to fresh air. Give
15 them an opportunity to rinse their face with plenty
16 of clear, cool water." That was never provided to
17 Mr. Owensby, was it?
18   A. No. And water was never provided to us.
19   Q. Well, nobody else was Maced, were they?
20   A. No. Not us meaning us as far as if we got
21 Maced on a scene. I mean, we didn't carry water
22 around in our cruisers.
23   Q. Okay. But you were at a convenience
24 store?

### Page 255

1   A. Right.
2   Q. There was water there, right?
3   A. Yes, uh-huh.
4   Q. There was -- there was bottled water in
5 the refrigerators at the convenience store?
6   A. Yes, uh-huh.
7   Q. And no one ever went to try to offer Mr.
8 Owensby any clear, cool water?
9   A. No.
10   Q. Had that been done once he was handcuffed,
11 do you believe that officers would have immediately
12 been able to determine that he was unconscious?
13   A. Yes.
14   Q. And if officers had immediately determined
15 that he was unconscious, then the officers would
16 have also then had an obligation to administer first
17 aid?
18   A. Yes.
19   Q. Officer Hasse, who was present once Mr.
20 Owensby was placed in the back seat of the cruiser,
21 Officer Hasse was a trained EMT, was he not?
22   A. I don't --
23   Q. You don't know?
24   A. I don't know.

## AFFIDAVIT

- - -

STATE   OF   OHIO    :
                     :  SS
COUNTY OF HAMILTON   :

I, Wendy L. Welsh, Notary Public in and for the State of Ohio, do hereby state that the transcript of the deposition of DAVID WILLIAM HUNTER, JR., deponent herein, having been submitted to said deponent for review and signature, has not been signed within the thirty (30) day period allowed under the Federal Rules; said deposition to now have the same force and effect as though signed.

_____
Wendy L. Welsh, Court Reporter

Sworn to before me this 27th day of January, 2004.

_____
Thomas M. Blasing
Notary Public - State of Ohio

My commission expires:
May 4, 2004.