Case 1:01-cv-00769-SAS   Document 108-35   Filed 03/11/2004   Page 1 of 10

Owensby vs. City of Cincinnati, et al.                                    DANIEL L. SCHULTZ, M.D.
December 17, 2003

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - - -
ESTATE OF ROGER D.           :
OWENSBY JR., et al.,         :
                             :
         Plaintiffs,         :
     vs.                     :  Case No. 01-CV-769
                             :  (Judge S. A. Spiegel)
CITY OF CINCINNATI,          :
et al.,                      :
                             :
         Defendants.         :
- - - - - - - - - - - - - - -


VOLUME I


         Deposition of DANIEL L. SCHULTZ, M.D., a

witness herein, called by the plaintiffs for

cross-examination, pursuant to the Federal Rules of

Civil Procedure, taken before me, Wendy Davies

Welsh, a Registered Diplomate Reporter and Notary

Public in and for the State of Ohio, at the Frank P.

Cleveland, M.D. Institute of Forensic Medicine,

Toxicology and Criminalistics, 3159 Eden Avenue,

Cincinnati, Ohio, on Wednesday, December 17, 2003,

at 11:57 a.m.

Owensby vs. City of Cincinnati, et al.
December 17, 2003

DANIEL L. SCHULTZ, M.D.

Page 2

1  APPEARANCES:

2      On behalf of the Plaintiffs:

3          Paul B. Martins, Esq.
           Helmer, Martins & Morgan Co. LPA
4          Suite 1900, Fourth & Walnut Centre
           105 East Fourth Street
5          Cincinnati, Ohio 45202
           Phone: (513) 421-2400
6
           John J. Helbling, Esq.
7          The Helbling Law Firm, L.L.C.
           3672 Springdale Road
8          Cincinnati, Ohio 45251
           Phone: (513) 923-9740
9
       On behalf of the Defendants City of Golf Manor,
10     Stephen Tilley, Roby Heiland and Chris
       Campbell:
11
           Wilson G. Weisenfelder, Jr., Esq.
12         Rendigs, Fry, Kiely & Dennis
           900 Fourth & Vine Tower
13         One West Fourth Street
           Cincinnati, Ohio 45202-3688
14         Phone: (513) 381-9200

15     On behalf of Defendants City of Cincinnati,
       Darren Sellers, Jason Hodge:
16
17         Geri Hernandez Geiler, Esq.
           Assistant City Solicitor
18         Department of Law
           Room 214, City Hall
19         801 Plum Street
           Cincinnati, Ohio 45202
20         Phone: (513) 352-3346

21         Neil F. Freund, Esq.
           Freund, Freeze & Arnold
22         One Dayton Centre
           1 South Main Street, Suite
23         1800 Dayton, Ohio 45402
           Phone: (937) 222-2424
24

Page 3

1  APPEARANCES (Continued):

2      On behalf of the Defendants Robert B. Jorg,
       Patrick Caton, Jason Hodge, Victor Spellen and
3      Darren Sellers:

4          Donald E. Hardin, Esq.
           Hardin, Lefton, Lazarus & Marks, LLC
5          915 Cincinnati Club Building
           30 Garfield Place
6          Cincinnati, Ohio 45202
           Phone: (513) 721-7300

Page 4

1               STIPULATIONS

2      It is stipulated by and among counsel for the

3  respective parties that the deposition of DANIEL L.

4  SCHULTZ, M.D., a witness herein, called by the

5  plaintiffs for cross-examination, pursuant to the

6  Federal Rules of Civil Procedure, may be taken at

7  this time by the notary; that said deposition may be

8  reduced to writing in stenotype by the notary, whose

9  notes may then be transcribed out of the presence of

10 the witness; and that proof of the official

11 character and qualifications of the notary is

12 expressly waived.

Page 5

1               I N D E X

2      Examination by:              Page

3      Mr. Martins . . . . . . . .  6

4      Mr. Freund  . . . . . . . . 74, 121

5      Mr. Weisenfelder  . . .    105

7               E X H I B I T S

8                                  Page

10 Plaintiff's Exhibit 101 . . . . . . . . . .  6
   Plaintiff's Exhibit 102 . . . . . . . . . . 15
11 Plaintiff's Exhibit 103 . . . . . . . . . . 19
   Plaintiff's Exhibit 104 . . . . . . . . . . 19
12 Plaintiff's Exhibit 105 . . . . . . . . . . 20
   Plaintiff's Exhibit 106 . . . . . . . . . . 57
13 Plaintiff's Exhibit 107 . . . . . . . . . . 73
   Plaintiff's Exhibit 108 . . . . . . . . . . 73
14 Plaintiff's Exhibit 108-A . . . . . . . . . 81

Case 1:01-cv-00769-SAS    Document 108-35    Filed 03/11/2004    Page 3 of 10

Owensby vs. City of Cincinnati, et al.
December 17, 2003
DANIEL L. SCHULTZ, M.D.

Page 62

1  Q. 255?
2  A. 255 shows a very faint pattern -- not a
3  pattern, faint abrasion of the chest, below the left
4  breast area. I say "not a pattern" because it
5  doesn't have anything that strikes me as being due
6  to a specific object.
7  Q. 256?
8  A. 256 is viewed from the right side of Mr.
9  Owensby's head. You can see the right cheek with
10 abrasions. You can see the upper lip. Note, the
11 right aspect of the upper lip has been shaved. I
12 shave the mustache away in order to show the
13 abrasion to the right aspect of the upper lip. And
14 then you also see the abrasions of the forehead.
15 Q. 257?
16 A. 257 is viewed from the left side of Mr.
17 Owensby's head, and it shows the abrasions to the
18 forehead.
19 Q. And 258?
20 A. 258 is a view of Mr. Owensby from the
21 front showing the abrasions to the forehead, showing
22 the mustache which has been shaved, showing the
23 abrasions to the right aspect of the upper lip,
24 showing a slight amount of this emesis material in

Page 63

1  the nostrils. And that's about it.
2  Q. With respect to the finding of the deep
3  musculature contusions in the area of the shoulder
4  blades, would those contusions be consistent with a
5  person weighing approximately, with equipment,
6  270 pounds, kneeling on Mr. Owensby's back?
7      MR. HARDIN: Objection.
8      MS. GEILER: Objection.
9  A. It could be, yes.
10 Q. It could be consistent with that?
11 A. Right. It's not inconsistent. It's
12 consistent.
13 Q. If that person had their arms or arm
14 around the head of Mr. Owensby and were pulling the
15 head back while kneeling on the back, would these
16 injuries be consistent with that also?
17     MR. HARDIN: Objection.
18     MR. FREUND: Objection.
19 A. They are consistent.
20 Q. I take it from the analysis of the blood,
21 the blood analysis, you found, with the exception of
22 the traces of marijuana, you found no presence of
23 any other drugs?
24 A. Correct.

Page 64

1  Q. And no traces of alcohol?
2  A. Correct.
3  Q. Since conducting your post-mortem exam,
4  you have testified in two trials, one of officer
5  Jorg and one of Officer Caton. As a result of
6  either reviewing documents in preparation for those
7  trials or since those trials, have you seen anything
8  to alter the opinions that you gave in your report
9  here that we've examined today?
10     MR. FREUND: Objection.
11 A. No.
12 Q. Cause you to change your opinions?
13 A. No.
14 Q. In this kind of death, a mechanical
15 asphyxiation death, does it occur immediately or
16 does it take a period of time to occur?
17 A. It takes minutes.
18 Q. In the case of Mr. Owensby, with a
19 mechanical asphyxia death, then can you say within a
20 reasonable degree of medical certainty in the field
21 of pathology that his death would have taken a
22 number of minutes?
23 A. Yes.
24 Q. Are you able to quantify either the range

Page 65

1  of minutes or how many minutes would have been
2  involved?
3  A. No.
4  Q. Can you describe for us, beginning with
5  the compression that starts this asphyxia through
6  the time of death, what the body would experience?
7  A. Well --
8      MR. FREUND: Object.
9  A. Aside from the struggle, the first thing
10 that happens is the person loses consciousness.
11     MR. MARTINS: Hold on a second.
12     MR. FREUND: He answered the question.
13 That was the point of my objection. The way
14 you asked the question, the patient -- the
15 person could have been unconscious.
16     MR. MARTINS: Okay.
17 Q. Describe the process, from when the
18 compression first starts through death, what happens
19 to the person's body? What processes come into
20 play?
21     MR. FREUND: Objection as to the form of
22 that question.
23 A. Well, all I can say is with this type of
24 death there are, of course, attempts to breathe.

Case 1:01-cv-00769-SAS   Document 108-35   Filed 03/11/2004   Page 4 of 10

Estate of Roger Owensby, Jr, et al. vs. City Cincinnati, et al.
February 6, 2004
DANIEL L. SCHULTZ, M.D.

124

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - - -

ESTATE OF ROGER D.                  :
OWENSBY JR., et al.,                :
                                    :
        Plaintiffs,                 :
    vs.                             : Case No. 01-CV-769
                                    : (Judge S. A. Spiegel)
CITY OF CINCINNATI,                 :
et al.,                             :
                                    :
        Defendants.                 :

- - - - - - - - - - - - - - -


VOLUME II


        Continued deposition of DANIEL L. SCHULTZ,

M.D., a witness herein, called by the plaintiffs for

cross-examination, pursuant to the Federal Rules of

Civil Procedure, taken before me, Wendy Davies

Welsh, a Registered Diplomate Reporter and Notary

Public in and for the State of Ohio, at the Frank P.

Cleveland, M.D. Institute of Forensic Medicine,

Toxicology and Criminalistics, 3159 Eden Avenue,

Cincinnati, Ohio, on Friday, February 6, 2004, at

1:02 p.m.

Case 1:01-cv-00769-SAS   Document 108-35   Filed 03/11/2004   Page 5 of 10

Estate of Roger Owensby, Jr, et al. vs. City Cincinnati, et al.
February 6, 2004

DANIEL L. SCHULTZ, M.D.

Page 125

1  APPEARANCES:

2    On behalf of the Plaintiffs:

3        Paul B. Martins, Esq.
         Helmer, Martins & Morgan Co. LPA
4        Suite 1900, Fourth & Walnut Centre
         105 East Fourth Street
5        Cincinnati, Ohio  45202
         Phone:  (513) 421-2400
6
     On behalf of the Defendants City of Golf Manor,
7    Stephen Tilley, Roby Heiland and Chris
     Campbell:
8
         Wilson G. Weisenfelder, Jr., Esq.
9        Rendigs, Fry, Kiely & Dennis
         900 Fourth & Vine Tower
10       One West Fourth Street
         Cincinnati, Ohio  45202-3688
11       Phone:  (513) 381-9200

12   On behalf of Defendants City of Cincinnati,
     Darren Sellers, Jason Hodge:
13
         Neil F. Freund, Esq.
14       Freund, Freeze & Arnold
         One Dayton Centre
15       1 South Main Street, Suite
         1800 Dayton, Ohio  45402
16       Phone:  (937) 222-2424

17   On behalf of the Defendants Robert B. Jorg,
     Patrick Caton, Jason Hodge, Victor Spellen and
18   Darren Sellers:

19       Donald E. Hardin, Esq.
         Hardin, Lefton, Lazarus & Marks, LLC
20       915 Cincinnati Club Building
         30 Garfield Place
21       Cincinnati, Ohio  45202
         Phone: (513) 721-7300
22

23             - - -

24

Page 126

1          STIPULATIONS

2    It is stipulated by and among counsel for the

3  respective parties that the deposition of DANIEL L.

4  SCHULTZ, M.D., a witness herein, called by the

5  plaintiffs for cross-examination, pursuant to the

6  Federal Rules of Civil Procedure, may be taken at

7  this time by the notary; that said deposition may be

8  reduced to writing in stenotype by the notary, whose

9  notes may then be transcribed out of the presence of

10 the witness; and that proof of the official

11 character and qualifications of the notary is

12 expressly waived.

13             - - -

Page 127

1              I N D E X

2    Examination by:              Page

3
     Mr. Hardin ............................ 128
4    Mr. Martins ........................... 164
     Mr. Freund ............................ 165
5    Mr. Martins ........................... 196
     Mr. Hardin ............................ 199
6    Mr. Martins ........................... 201
     Mr. Freund ............................ 204
7
8              - - -

              E X H I B I T S
9
10                                          Page

11 Exhibit 103-A ........................... 128
   Exhibit 132 ............................. 129
12 Exhibit 133 ............................. 142
   Exhibit 134 ............................. 143
13 Exhibit 135 ............................. 145
   Exhibit 136 ............................. 149
14 Exhibit 137 ............................. 150
   Exhibit 138 ............................. 151
15 Exhibit 139 ............................. 154

               - - -

Page 128

1           DANIEL L. SCHULTZ, M.D.
2  being previously cautioned and sworn, deposes and
3  says as follows:
4       MR. MARTINS: Dr. Schultz, you're still
5  under oath. And we have one housekeeping
6  matter before we start. At the end of the last
7  deposition we had marked and copied your file.
8  It was marked as Exhibit 108-A. By agreement
9  of the parties, we're going to redesignate that
10 as 103-A so that it goes hand in glove with
11 your report, which is 103.
12        (Plaintiff's Exhibit
          108-A was re-marked as
          Plaintiff's Exhibit
13        103-A.)
14
15      MR. MARTINS: I believe it was Wil
16 Weisenfelder or -- it was Don Hardin's
17 questions.
18          CROSS-EXAMINATION
19 BY MR. HARDIN:
20      Q.  How are you, Doctor?
21      A.  Good.
22      Q.  We were just talking about the file that
23 you had, and the contents were made available to all
24 of us so we could prepare for this part of the

Case 1:01-cv-00769-SAS    Document 108-35    Filed 03/11/2004    Page 6 of 10

Estate of Roger Owensby, Jr, et al. vs. City Cincinnati, et al.
February 6, 2004

DANIEL L. SCHULTZ, M.D.

Page 169

1 these deep hemorrhages on autopsy, how much pressure
2 it would take to prevent someone to breathe at all?
3    A. No, I have not.
4    Q. Do you have any opinion on how much
5 pressure it would take to somebody's back in order
6 that he or she could not breathe at all?
7       MR. MARTINS: Objection.
8    A. No.
9    Q. Can you tell us how much breathing has to
10 be interfered with before someone becomes
11 asphyxiated?
12   A. Well, I don't know how to answer that
13 question, because the point is if they're
14 asphyxiated, breathing stops. So the answer is
15 breathing stops when you asphyxiate. That's the
16 answer.
17   Q. How much volume must an individual -- how
18 much decrease in volume must there be before
19 somebody stops breathing?
20   A. It depends.
21   Q. On what?
22   A. Their underlying medical condition.
23   Q. Could you give me ranges on how much
24 breathing by way of volume has to be diminished

Page 170

1 before a healthy person the same or similar to Mr.
2 Owensby would become asphyxiated?
3    A. No.
4    Q. Any estimate at all that you can give me?
5       MR. MARTINS: Objection. Asked and
6    answered.
7    A. No.
8    Q. Tell me for how long of a period an
9 individual like Mr. Owensby, who has no breathing,
10 would become unconscious.
11   A. Minutes.
12   Q. How many?
13   A. Don't know.
14   Q. Give me an outside by way of minutes.
15   A. Can't.
16   Q. Can you give me a range in any way, shape
17 or form?
18   A. That's why I say minutes.
19   Q. Well, is it --
20   A. Let's put it this way: It's not 10 or 15
21 minutes. It's minutes less than 10.
22   Q. Less than 10 minutes?
23   A. Sure.
24   Q. So --

Page 171

1    A. And it depends on the individual.
2    Q. Have you done any research into the length
3 of time that an individual the same or similar to
4 Mr. Owensby could go without oxygen from the
5 mechanical asphyxiation which you describe in your
6 report, could go without him becoming unconscious?
7    A. No.
8    Q. And you can't give me the maximum amount
9 of time; is that correct?
10   A. No, I can't give you a number. I can tell
11 you "minutes."
12   Q. Minutes?
13   A. Correct.
14   Q. Would it be less than an hour?
15   A. I said less than 10.
16   Q. All right. So less than 10. More than
17 one?
18   A. It depends on how winded the person is.
19 It depends on their condition, how winded they are,
20 how tired they are prior to the event. There are
21 many variables. So it would be unreasonable for me
22 to give you a number.
23   Q. Do you have any opinion on the length of
24 time that this individual had, if there was, in

Page 172

1 fact, mechanical asphyxiation like you opined,
2 before he would be considered medically dead?
3    A. Well, let's put it this way: If, as you
4 say, he is asphyxiated, he is dead. So it's instant
5 if you're asphyxiated.
6    Q. At what point in time then, Doctor, would
7 the individual no longer be subject to
8 resuscitation?
9    A. Again, it's a matter of minutes.
10   Q. Can you give me the minimum amount of
11 time?
12   A. No.
13   Q. Can you give me a maximum amount of time?
14   A. No.
15   Q. Are there any studies which have been done
16 which would give us estimates on minimum and maximum
17 amounts of time before somebody would become
18 unconscious from mechanical asphyxiation and before
19 somebody would be considered clinically dead?
20   A. None that I'm aware of, but there may be
21 some.
22   Q. As you sit here today, can you tell me how
23 long it takes a person to die from not breathing?
24   A. Minutes.

Case 1:01-cv-00769-SAS  Document 108-35  Filed 03/11/2004  Page 7 of 10

Estate of Roger Owensby, Jr, et al. vs. City Cincinnati, et al.
February 6, 2004
DANIEL L. SCHULTZ, M.D

Page 173

1  Q. Again, no maximum amount of minutes or
2 minimum?
3  A. I won't venture a guess in something I
4 don't know. So I'll only tell you what I do know,
5 and that is minutes.
6  Q. So if you'd say minimum amount of minutes,
7 you'd be guessing?
8  A. Look, if I said two minutes, three
9 minutes, four minutes, yes, it would be absolutely a
10 guess, but I do know that it is within the realm of
11 minutes. It's not seconds. And I did say I can
12 comfortably say it's under 10 minutes, but I cannot
13 tell you an exact number of minutes.
14  Q. So are you saying that it's possible that
15 these officers, if it was, in fact, the mechanical
16 asphyxiation that you're suggesting, may have cut
17 off his breathing totally for a period of 10 minutes
18 before he became unconscious?
19     MR. MARTINS: Objection.
20  A. No, I'm not saying that. You asked for a
21 range --
22  Q. Right.
23  A. -- on something that I didn't know.
24 Except my point is that I'm comfortable that if a

Page 174

1 person does not breathe, if they stop breathing for
2 10 minutes, they are doomed. Okay? I did not say
3 anything about how long they are on him or anything.
4 That's a different issue.
5  Q. Do you know if a knee on one side of the
6 back would prevent an individual from breathing at
7 all?
8  A. It might.
9  Q. Do you know in this case whether or not
10 anybody was on this individual's back for any length
11 of time?
12  A. I don't.
13  Q. Do you know how the compression was
14 applied to Mr. Owensby in this case, again, assuming
15 that your opinion is correct that it was mechanical
16 asphyxiation?
17  A. Do I know how the force was applied?
18  Q. Yes.
19  A. My opinion is that it's a deep grinding
20 motion. The force is put on the skin, and
21 subsequently the subcutaneous fat is able to slide
22 back and forth with motion on the skin, producing
23 that. That's my opinion. That's my most reasonable
24 thought as to how those hemorrhages came.

Page 175

1  Q. And Mr. Owensby did have a shirt on; is
2 that right?
3  A. Not when I went to the scene. I should
4 say when I went to the hospital I did not see a
5 shirt.
6  Q. Is it your understanding that he had a
7 shirt on at the scene?
8  A. I don't recall.
9  Q. Was it important for your opinions whether
10 or not he was clothed on the top?
11  A. Well, I can tell you in retrospect in
12 looking at this case, no. I mean, I always want to
13 find out as much as I can. I noted that there was
14 no shirt at the hospital. But in retrospect, does
15 it matter? No.
16  Q. All right. If we would look at an exhibit
17 that was just shown to you, 135. You have it in
18 front of you there.
19  A. Okay.
20  Q. If we look at 135 and look at the back,
21 did you note any marks at all in the back where you
22 found the deep hemorrhages?
23     MR. MARTINS: Objection.
24  A. I told you I was in the emergency room by

Page 176

1 myself and I couldn't move his body and, in fact, I
2 would defer that to the next day, because I couldn't
3 move his body.
4  Q. All right. Did you?
5  A. No, I didn't look at his back in the
6 emergency room.
7  Q. No. Did you look at it during your
8 autopsy?
9  A. Absolutely.
10  Q. What did you find in the area that you
11 found the deep hemorrhages, externally?
12  A. Well, I saw nothing.
13  Q. Nothing?
14  A. Right. I don't note anything.
15  Q. So you're saying that there would be no
16 markings on the back, assuming that somebody wa
17 putting force of sufficient -- or there would be
18 sufficient force to cause an individual not to
19 breathe, you wouldn't see any marks externally?
20  A. You may not.
21  Q. And you wouldn't expect the clothes to be
22 ground into the top layers of the skin as they're
23 grinding into the body?
24  A. No. I've never seen that on clothes,

Case 1:01-cv-00769-SAS   Document 108-35   Filed 03/11/2004   Page 8 of 10

Estate of Roger Owensby, Jr, et al. vs. City Cincinnati, et al.
February 6, 2004

DANIEL L. SCHULTZ, M.D.

Page 185

1  Q. All right. Did you examine the sphenoid
2  sinus?
3  A. No, I did not.
4  Q. Would you expect to have seen any
5  petechiae on the sphenoid sinus with mechanical
6  asphyxiation?
7  A. I don't need to look there, because I can
8  see them on his face and in his eyes. So no, I
9  would not look in his sphenoid sinus.
10  Q. My question was, would you expect to see
11  petechiae on his sphenoid sinus if, in fact, it was
12  mechanical asphyxiation?
13  A. I would not expect to see it. It may be
14  there; it may not be.
15  Q. Did you examine the lymph nodes?
16  A. I looked for lymphadenopathy, namely, did
17  he have underlying pathologic processes in his lymph
18  nodes. No, he did not.
19  Q. Did you examine the lymph nodes to see if
20  there were any petechiae?
21  A. I did not appreciate any petechiae, and
22  I'm not aware of any --
23  Q. Did you examine the lymph nodes?
24  A. Sure. Well, my point is he did not have

Page 186

1  any lymphadenopathy. He had otherwise normal-
2  appearing lymph nodes and I did not appreciate any
3  petechiae.
4  Q. Did you examine the lymph nodes for
5  petechiae? That's my question.
6  A. My answer is I looked at the lymph nodes.
7  They looked normal. In fact, whether they had or
8  did not have petechiae means nothing to me.
9  Q. Did you examine his tonsils?
10  A. I don't recall.
11  Q. Would it be significant that if he had
12  tonsils, that his tonsils would indicate petechiae
13  or no petechiae?
14  A. No.
15  Q. Why not?
16  A. Well, first of all, if he has petechiae
17  there, in light of the fact that he has petechiae on
18  his face, in his eyes, I'm seeing the same thing.
19  If he doesn't have petechiae on his tonsils or on
20  his lymph nodes and he has it on his face, how does
21  that help me? It doesn't help me. It's just
22  another place where there are petechiae. But I've
23  already seen the petechiae.
24  Q. And you took the best photographs you

Page 187

1  could possibly take to describe the petechiae for
2  all of us who are going to examine this; is that
3  right?
4  A. Not only did I take photographs which I
5  thought were going to be good, I also had other
6  pathologists come down and look at it because it was
7  so striking.
8  Q. Well, you would certainly want to preserve
9  that evidence not by other pathologists coming and
10  taking a look at it, but you'd want to preserve it
11  with pictures; isn't that true?
12  A. Absolutely.
13  Q. All right. And you did the best you
14  could; you got the best shots of this petechiae and
15  scleral hemorrhaging that you could possibly get?
16  A. Best I can get. Have you ever taken a
17  picture that your wife didn't like? That's what
18  happens. Sometimes they don't always come out as
19  good as you'd like, but I thought they came out
20  good.
21  Q. There comes a period of time with
22  mechanical asphyxiation when a person no longer can
23  be resuscitated; is that correct?
24  MR. MARTINS: Objection. Asked and

Page 188

1  answered.
2  A. Sure.
3  Q. At what point in time did that happen in
4  this case?
5  A. I have no idea. I say minutes.
6  Q. Again, you wouldn't give me an inside,
7  outside?
8  A. No. I would be misleading you if I did
9  that.
10  Q. Okay. What, with the weight and size of
11  Mr. Owensby, would you expect a normal heart size to
12  be?
13  A. Generally speaking, below 370, and this is
14  borderline.
15  Q. And his heart was 395 grams, right?
16  A. Yeah.
17  Q. Would you consider Mr. Owensby to have an
18  enlarged heart?
19  A. Actually, no. That's why I didn't
20  diagnose hypertensive heart disease. Because
21  generally speaking, if it's not above 400 grams, I
22  don't consider it enlarged.
23  The rule of thumb is that it's twice the
24  body weight, but I only apply it if in general it's

Case 1:01-cv-00769-SAS    Document 108-35    Filed 03/11/2004    Page 9 of 10

Estate of Roger Owensby, Jr, et al. vs. City Cincinnati, et al.
February 6, 2004
DANIEL L. SCHULTZ, M.D.

**Page 189**

1 above 400 grams. So this I did not consider to be a
2 particularly enlarged heart.
3   Q. So you wouldn't say that this individual
4 had cardiomegaly; is that right?
5   A. No. Because -- in fact, I didn't say
6 that.
7   Q. In other words, you're of the opinion this
8 individual did not have cardiomegaly?
9   A. That's my opinion.
10   Q. When you began your autopsy, did you have
11 or go through a differential as what may have been
12 the causes for death in this case?
13   A. All the way along.
14   Q. What differential causes did you go
15 through before you came to your conclusion?
16   A. My differential diagnosis included
17 underlying natural conditions, heart disease,
18 pulmonary emboli, asthma, intracranial injuries,
19 chest and abdominal injuries, drugs, which would
20 include cocaine, various illicit drugs. Those are
21 just a few of the differential diagnoses that I'm
22 looking to exclude during the case.
23   Q. Did you have in your differential sudden
24 cardiac death --

**Page 190**

1   A. Did I not mention the heart?
2   Q. -- resulting from exertion?
3   A. Well, yes, the differential does include a
4 person dying from being overly exerted. But he has
5 petechiae on his face and he has a history of
6 individuals either on him or with -- possibly around
7 his neck. And so, again, that would not be a
8 reasonable conclusion in light of the circumstances.
9   Q. All right. So if a person died from
10 sudden cardiac death, he could not have petechiae on
11 his face; is that your testimony?
12   A. No, I'm not saying he can't have petechiae
13 on his face. I'm saying that -- I'm saying that
14 this individual who has evidence of facial
15 abrasions, he's in a face-down position, the type of
16 patterns that one sees from a rough surface such as
17 the ground, who has petechiae, who has no other
18 reason to be dead, who has a history of individuals
19 on him or something wrapped around his neck, it
20 would be unreasonable to opine sudden cardiac death
21 due to overexertion. That is what I'm saying. I'm
22 not saying I didn't include things like that in my
23 diagnosis list. I'm saying I excluded everything
24 reasonable.

**Page 191**

1   Q. I'll drop this in a second, but I just
2 want to ask you a couple more questions on how you
3 ruled out sudden cardiac death as a result of
4 exertion. You would agree with me that somebody can
5 have petechiae the same or similar as Mr. Owensby
6 resulting from sudden cardiac death from exertion;
7 is that correct?
8   A. Sure.
9   Q. Then how did you rule it out?
10   A. Because I take into account the
11 circumstances that are given to me as well as the
12 fact that I've ruled out other reasonable causes.
13 It would be unreasonable to say that he died of
14 sudden cardiac death due to only exertion. It would
15 be akin to saying a person died from sudden cardiac
16 death due to exertion who was in a room that had no
17 oxygen.
18       They would have the same autopsy perhaps,
19 but the fact is I know that they have no oxygen in
20 the room, so I would not choose sudden cardiac death
21 due to exertion. It's a similar circumstance in
22 that I have circumstances, I have findings.
23   Q. How did you determine in this case that at
24 any time he was not able to breathe?

**Page 192**

1   A. Because I ruled out other reasonable
2 causes of death and I have what is very compelling,
3 that is, namely, abrasions that fit him in a
4 face-down position, florid petechiae, the
5 hemorrhages in his back, the history of individuals
6 on him and/or possibly putting an armhold around his
7 neck.
8       Because I can't exclude either of those
9 two scenarios but I've excluded all other reasonable
10 medical causes of death, his cause of death is due
11 to mechanical asphyxia.
12   Q. You told me last time, and I don't think
13 you're arguing with me, you don't attribute his
14 death to asphyxiation resulting from an arm around
15 his neck or whatever, do you?
16       MR. MARTINS: Objection.
17   A. Do I attribute it?
18   Q. Yes.
19   A. I'm saying I can't exclude it. I'm saying
20 it's mechanical asphyxia. If that's one of the
21 scenarios you present, I will not argue that. It's
22 one of the possibilities.
23   Q. I think last time, and this is on page 51,
24 line 1, you told me the cause of death in this case

Case 1:01-cv-00769-SAS    Document 108-35    Filed 03/11/2004    Page 10 of 10

Estate of Roger Owensby, Jr, et al. vs. City Cincinnati, et al.
February 6, 2004
DANIEL L. SCHULTZ, M.D.

Page 197

1  Q. Right. So whatever Officer Jorg did or
2  did not do played no effect in your arriving at your
3  opinions?
4  A. Not at all.
5  Q. All right. The second thing I want to do,
6  if you take a look at your deposition, Doctor, at
7  the bottom of page 69, beginning at line 19, I'm
8  asking you, I say, "Can you say whether or not, when
9  the officers picked up Mr. Owensby off of the ground
10 and took him to the Golf Manor cruiser and placed
11 him in the cruiser, whether or not he was
12 unconscious or dead? Can you make a distinction
13 between the two based on your examination of the
14 body?"
15    There were objections, and you gave an
16 answer. You say "That distinction is made based on
17 the autopsy examination, post-mortem examination,
18 and details from the scene. Although, the autopsy
19 examination is very compelling, in that all other
20 reasonable causes of his asphyxia, his death for
21 that matter, have been excluded.
22    "So since I don't have an intoxicated
23 individual in the vehicle, I don't have -- I can't
24 get him to that vehicle in a conscious state and

Page 198

1  then suddenly die in the car. That doesn't make
2  reasonable medical sense. What makes sense, since I
3  know that that isn't going to -- can't happen, is
4  that he died on the ground. That's my opinion."
5    And my question then in follow-up is, "Can
6  you tell me to a reasonable degree of medical
7  certainty whether or not, when they pick him up off
8  the ground, whether he is dead or whether he is
9  unconscious at that point?"
10   And your answer is "He is either deceased
11 or in very agonal phases where there's just a faint
12 rhythm, but he is not moving to his own accord."
13   I then ask the next question, "The
14 distinction I'm trying to make is, was he
15 unconscious or can you say, based on a reasonable
16 degree of medical certainty in the field of
17 pathology, whether or not, when they pick him up,
18 whether he is dead or whether he is unconscious?"
19   And you say, "I can't fully distinguish
20 between that. I can simply say that he's either
21 totally deceased or he is in the agonal, unconscious
22 phases before death. But he isn't just dying after
23 being placed, just sitting in the car and dying.
24 That's my point."

Page 199

1    Do you still stand by that testimony?
2  A. Yes.
3  Q. And I take it in reference -- this is in
4  the context of your addressing whether or not Mr.
5  Owensby, based on your medical opinion, could have
6  walked on his own power to the Golf Manor car; is
7  that right?
8  A. Yes.
9    MR. MARTINS: I have no further questions.
10   MR. HARDIN: I just have a couple.
11       FURTHER CROSS-EXAMINATION
12 BY MR. HARDIN:
13 Q. You've indicated that you thought that he
14 was dead at the time he was picked up off the
15 ground; is that right?
16   MR. MARTINS: Objection. Asked and
17   answered.
18 A. Likely.
19 Q. Today. Today.
20 A. Likely, yeah.
21 Q. Do you know at what point he died while he
22 was on the ground?
23 A. Since I don't know the exact time interval
24 when he was picked up, I don't personally know that.

Page 200

1  No, I don't know the exact point in time. I do not.
2  Q. So that if you feel that he was dead on
3  the ground before he was picked up --
4    MR. MARTINS: Objection.
5  Q. -- then anything that happened to him
6  subsequent of that, any physical force that was used
7  would have nothing to do with his death; is that
8  right?
9    MR. MARTINS: Objection.
10 A. I agree.
11 Q. You didn't notice any bruising to the
12 lower back?
13 A. I did not notice any bruising.
14 Q. If any force had been utilized by anyone
15 to the lower back, do you feel that would have
16 resulted in his death?
17 A. It depends on when that phase is. If it's
18 when he's on the ground and he's in restraint,
19 absolutely. I mean --
20 Q. Explain that to me.
21 A. Well, the point is if he had weight -- if
22 he had weight on his lower back, which you may or
23 may not have physical evidence at autopsy of that
24 weight being on the back, it's not going to help. I