Case 1:01-cv-00769-SAS    Document 108-37    Filed 03/11/2004    Page 1 of 5

Owensby vs. City of Cincinnati, et al.                          VICTOR N. SPELLER
October 15, 2003

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - -

ESTATE OF ROGER D.            :
OWENSBY JR., et al.,          :
                              :
        Plaintiffs,           :
    vs.                       :  Case No. 01-CV-769
                              :  (Judge S. A. Spiegel)
CITY OF CINCINNATI,           :
et al.,                       :
                              :
        Defendants.           :

- - - - - - - - - - - - - -

Videotaped deposition of VICTOR N. SPELLEN, a defendant herein, called by the plaintiffs for cross-examination, pursuant to the Federal Rules of Civil Procedure, taken before me, Wendy Davies Welsh, a Registered Diplomate Reporter and Notary Public in and for the State of Ohio, at the offices of Helmer, Martins & Morgan Co. LPA, 1900 Fourth & Walnut Centre, 105 East Fourth Street, Cincinnati, Ohio, on Wednesday, October 15, 2003, at 10:12 a.m.

Case 1:01-cv-00769-SAS    Document 108-37    Filed 03/11/2004    Page 2 of 5

Owensby vs. City of Cincinnati, et al.  VICTOR N. SPELLER
October 15, 2003

Page 26

1  A. Correct.
2  Q. Have you been one of the officers trying
3  to restrain someone where -- where another officer
4  has applied the Mace?
5  A. Correct.
6  Q. Does -- to your recollection, does the
7  City of Cincinnati Police Department have standards
8  for how an officer is to apply Mace to a suspect?
9  A. Yes, somewhat.
10 Q. And do you recall what those standards
11 are?
12 A. Basically two to three bursts and -- and
13 being at a certain distance.
14 Q. Do you recall what the distance is?
15 A. Not right now, no.
16 Q. In the field, when you were either
17 applying Mace or helping another officer apply Mace,
18 in general, how far was the officer from the suspect
19 when he employed the Mace, he or she employed the
20 Mace?
21 A. Well, things happen in the field that you
22 can't really, you know, you can't really go by the
23 book of being certain feet. I mean --
24 Q. No, I mean, in general, what was the

Page 27

1  distance?
2  A. Maybe an arm's length. Maybe closer.
3  Q. Okay. Do you recall receiving any
4  instruction on how to care for someone who has been
5  Maced once they've been secured, that is, either
6  handcuffed or in some other fashion restrained?
7  A. Somewhat.
8  Q. What do you recall about that?
9  A. I think maybe you should -- should apply
10 cold water on the face. Simple.
11 Q. Have you ever been Maced?
12 A. Yes, sir.
13 Q. What's it feel like?
14 A. It depends. I -- I've -- I've gotten to a
15 point where it doesn't affect me anymore.
16 Q. Okay. The first time you were Maced.
17 A. It was not good.
18 Q. Can you describe it?
19 A. It burns your face, it burns your --
20 inside of your nostrils, your nose, your eyes. You
21 know, it feels like you're on fire almost.
22 Q. Your throat?
23 A. Correct.
24 Q. Did you have trouble breathing?

Page 28

1  A. I didn't, no.
2  Q. And do you have any knowledge as to what
3  it feels like if it is applied and you're cut?
4  A. I have never experienced that, no.
5  Q. I take it your nose runs?
6  A. Yes, sir.
7  Q. What happens with your eye-- do your
8  eyes -- your eyes burn?
9  A. Yes, sir.
10 Q. Do they swell up?
11 A. You just -- your -- your vision gets
12 blurry and they burn.
13 Q. In addition to water, are you instructed
14 to try and have the person face like into the wind
15 or get some air into their face?
16 A. I -- I remember something like that, yes.
17 Q. Do you recall any instruction concerning a
18 person who has just been Maced should not be placed
19 into a confined space where there is no air
20 circulation?
21 A. No, sir.
22 Q. You don't recall that?
23 A. No.
24 Q. In your experience do you recall any

Page 29

1  instruction, either at the academy or instruction
2  received after leaving the academy, that authorized
3  an officer to strike a suspect after the suspect had
4  been handcuffed?
5  A. No, sir.
6  Q. Do you recall any instruction as to the
7  responsibility of an officer once the suspect has
8  been handcuffed, if the -- if the suspect is injured
9  in some way, to care for the injuries sustained by
10 the suspect?
11 A. Yes, sir.
12 Q. What do you recall about that?
13 A. If that's your prisoner, you're to get him
14 medical attention right away.
15     MS. GEILER: Can you speak up, please.
16 Q. Just try to keep your voice up a little
17 bit. The mike's fine, but that's for the people
18 here in the room, if you could.
19     As I understand it, you said that if it's
20 your prisoner you have to get medical attention for
21 the person right away?
22 A. Correct.
23 Q. Okay. In September or October of 2000, in
24 the two months before November 7, did you from time

Case 1:01-cv-00769-SAS    Document 108-37    Filed 03/11/2004    Page 3 of 5

Owensby vs. City of Cincinnati, et al.                                    VICTOR N. SPELLER
October 15, 2003

Page 50

1   A. Well, I knew he was -- he'd been Maced, so
2   I figured the Mace was taking effect at this point.
3   Q. And when you looked in, what position was
4   Mr. Owensby in?
5   A. I basically saw an outline of a figure
6   somewhat slumped over in the back of a cruiser.
7   Q. Was he coughing or spitting or wheezing?
8   A. Not to my knowledge at the time.
9   Q. Did you see any movement?
10  A. Not that I can remember. I looked in
11  maybe a second or two.
12  Q. In your experience with people who had
13  been involved in a struggle with the police and had
14  been Maced, was that uncommon that the person would
15  not be moving after having been Maced?
16  A. It's not uncommon.
17  Q. It's not uncommon?
18  A. I mean, I -- people have been -- I -- I've
19  been Maced and it doesn't affect me. It doesn't
20  affect everyone.
21  Q. Okay.
22  A. It's not unusual.
23  Q. At the time on November 7, 2000 you had
24  EMT training, correct?

Page 51

1   A. Previous, correct.
2   Q. Previously?
3   A. Right.
4   Q. And so you were qualified for advance EMT
5   training -- or EMT medical care?
6   A. Correct.
7   Q. Did you feel that you should have
8   administered some sort of first aid to Mr. Owensby?
9   A. I had no reason to believe that I should
10  at that time.
11  Q. Well, you knew he had been Maced?
12  A. Correct.
13  Q. How did you know he had been Maced?
14  A. From the radio.
15  Q. What did you -- the radio transmission on
16  what we've just seen or something else?
17  A. I believe -- I believe so. Correct.
18  Q. Okay. Did you ever see Mr. Owensby's
19  face?
20  A. No, I did not.
21  Q. Do you know if Officer Brazile, when
22  Officer Brazile said to you -- when you said, "Looks
23  like he's ... hurting a little bit," and he said,
24  Brazile said, "Lot a bit," do you know if Officer

Page 52

1   Brazile had seen Mr. Owensby?
2   A. I did not know, sir.
3   Q. If all you saw was a silhouette, how did
4   you arrive at the judgment that "Looks like he's ...
5   hurting a little bit"?
6   A. Because I'm assuming the Mace took effect.
7   Q. What do you mean by "took effect"?
8   A. Well, when you Mace someone, it takes
9   effect and, like we discussed before, you know,
10  it -- it -- it gets into your nostrils, gets into
11  your eyes, gets into your --to your mouth, and
12  that's how it takes effect.
13  Q. And you're hurting?
14  A. Correct.
15  Q. If you're hurting, wouldn't you be moving?
16  A. I have --
17      MR. HARDIN: Objection.
18      You may answer.
19  A. I have no idea, sir. I don't know.
20  Q. From your observation, was Officer Caton
21  angry?
22  A. He didn't appear to be angry.
23  Q. You asked -- referring back to Exhibit 21
24  on the second page, you asked Officer Brazile

Page 53

1   whether or not the suspect was "fucked up." Did you
2   form an opinion as to whether or not he was?
3       MR. HARDIN: Objection.
4       You may answer.
5   A. No, sir.
6   Q. No, you had no opinion?
7   A. No.
8           (Deposition Exhibit 22
9           was marked for identi-
            fication.)
10  Q. Let me show you what is marked as
11  Exhibit 22. Exhibit 22 is a statement that you gave
12  to Cincinnati police investigators on November 10th,
13  2000, correct?
14  A. Correct.
15  Q. And this is one of the statements that
16  you've reviewed in preparation for the deposition?
17  A. Yes, sir.
18  Q. Is it accurate?
19  A. Yes, it is.
20          (Deposition Exhibit 23
            was marked for identi-
21          fication.)
22  Q. Let me show you what's marked as
23  Exhibit 23. Exhibit 23 is a statement that you gave
24  to Cincinnati police investigators on -- two days

Case 1:01-cv-00769-SAS    Document 108-37    Filed 03/11/2004    Page 4 of 5

Owensby vs. City of Cincinnati, et al.                                    VICTOR N. SPELLER
October 15, 2003

Page 78

1      MR. HARDIN: Keep going.
2      Go back one.
3      THE WITNESS: Oh.
4   A. Okay.
5   Q. Do you see that there is a specification
6   charge? Specification 1 is that you "demonstrated a
7   'neck hold' that Officer Jorg demonstrated to
8   Sergeant Watts. When Officer Spellen was summoned
9   to testify to what he observed at 2098 Seymour
10  Avenue on November 7, 2000, he demonstrated a
11  different hold. Officer Spellen admitted he
12  intentionally altered this hold in court in favor of
13  Officer Jorg."
14      Do you understand that that last sentence
15  I just read, intentionally altered this hold in
16  court to favor Officer Jorg, would be based on the
17  interview that we just looked at in Exhibit 25?
18  A. Yes, sir.
19  Q. And the rule, the Cincinnati Manual of
20  Rules and Regulations and Discipline Process
21  applicable here for this circumstance, is Rule 5.01,
22  which says "No member shall knowingly state, enter,
23  or cause to be entered on any official document, any
24  inaccurate, false, incomplete, misleading, or

Page 79

1   improper information." Do you see that?
2   A. Yes, I do.
3   Q. Okay. Specification 2 says that "Officer
4   Spellen observed a medical injury to Mr. Owensby and
5   rendered no appropriate first aid immediately once
6   the incident scene is stabilized" or sustained.
7      And there's a Rule 2.12 which states
8   "Members are responsible for ensuring the safety and
9   welfare of persons and their personal property when
10  transporting or having custody of persons who are
11  sick, injured, arrested or incapacitated in any
12  way."
13      You understood that this was the second
14  specification brought against you, correct?
15  A. Yes, sir.
16  Q. And there is a follow-up procedure
17  violation that's alleged on the next page, which
18  says, "Following any use of force resulting in a
19  citizen's injury, officers will ensure appropriate
20  first aid is rendered immediately once the incident
21  scene is stabilized." See that?
22  A. Yes.
23  Q. Okay. Now, setting aside the particular
24  facts of November 7, did you understand that as a

Page 80

1   Cincinnati police officer on November 7, 2002 you
2   were bound to follow these standards that I've just
3   read to you, Rule 5.1, Rule 2.12 and Procedure
4   12.545?
5   A. Yes, sir.
6   Q. When you arrived on the scene in your
7   cruiser, the -- the video that we saw today, was the
8   scene stabilized?
9   A. I don't believe so.
10  Q. Okay. What, if anything, do you believe
11  needed to be done to stabilize the scene?
12  A. Officers need -- I don't know. There were
13  people walking around, talking to each other. You
14  know, as soon as -- when I got there, I noticed that
15  there were two supervisors on the scene.
16  Q. You noticed what?
17  A. Two supervisors on the scene. I mean,
18  it's their job to stabilize a scene and -- and to
19  investigate an incident.
20  Q. What does stabilizing a scene mean?
21  A. Getting information, shutting it down,
22  protecting the perimeter, no one in or out,
23  gathering evidence.
24  Q. Okay. There's a tab B, if you just page

Page 81

1   in a couple pages. And that's followed by a
2   disciplinary hearing recommendation.
3      MR. HARDIN: Now there's going to be a
4      continuing objection. I have to pick it back
5      up some now that we're back to this again.
6      MR. MARTINS: Okay.
7   Q. And then there's an Exhibit C on the next
8   page. Do you see that?
9   A. Uh-huh.
10  Q. And that's followed by an Internal
11  Investigations Section report, case number 00248,
12  dated September 24 of 2002. See that?
13  A. Yes, sir.
14  Q. All right. I'm going to skip that report.
15  And it's rather lengthy. Go back, you're going to
16  find a tab D, D as in David.
17  A. Yes.
18  Q. That's followed by performance reports on
19  you, correct?
20  A. Yes, sir.
21  Q. And then there is a tab E as in echo?
22  A. Correct.
23  Q. Which is an evaluation supplement log?
24  A. Yes, sir.

Page 78 - Page 81

99

| | | |
|---|---|---|
| 13:02:18 | 1 | THE WITNESS: Thank you, sir. |
| 13:02:20 | 2 | VIDEOGRAPHER: Sir, you have a right to |
| 13:02:22 | 3 | review this tape prior to its being shown to a |
| 13:02:24 | 4 | court. |
| 13:02:24 | 5 | MS. GEILER: I don't have any questions. |
| 13:02:24 | 6 | VIDEOGRAPHER: Will you waive that right? |
| 13:02:26 | 7 | MR. MARTINS: No. |
| 13:02:27 | 8 | THE WITNESS: No. |
| 13:02:28 | 9 | VIDEOGRAPHER: Thank you. |
| 13:02:29 | 10 | We're off the record. Time is 1:06. |
| 13:02:32 | 11 | |
| 13:02:32 | 12 | |
| 13:02:32 | 13 | _____ |
| | | VICTOR N. SPELLEN |
| 13:02:32 | 14 | |
| 13:02:32 | 15 | - - - |
| 13:02:32 | 16 | (Deposition concluded.) |
| | 17 | - - - |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |