Case 1:01-cv-00769-SAS    Document 108-38    Filed 03/11/2004    Page 1 of 11

Estate of Owensby, Jr. vs. City of Cincinnati, et al.  THOMAS HENRY STREICHER, JR.
December 22, 2003

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - - -
ESTATE OF ROGER D.                :
OWENSBY JR., et al.,              :
                                  :
        Plaintiffs,               :
   vs.                            :  Case No. 01-CV-769
                                  :  (Judge S. A. Spiegel)
CITY OF CINCINNATI,               :
et al.,                           :
                                  :
        Defendants.               :
- - - - - - - - - - - - - - -

Videotaped deposition of THOMAS HENRY

STREICHER JR., a witness herein, called by the

plaintiffs for cross-examination, pursuant to the

Federal Rules of Civil Procedure, taken before me,

Wendy Davies Welsh, a Registered Diplomate Reporter

and Notary Public in and for the State of Ohio, at

the offices of Helmer, Martins & Morgan Co. LPA,

1900 Fourth & Walnut Centre, 105 East Fourth Street,

Cincinnati, Ohio, on Monday, December 22, 2003, at

9:06 a.m.

Case 1:01-cv-00769-SAS    Document 108-38    Filed 03/11/2004    Page 2 of 11

Estate of Ownesby, Jr. vs. City of Cincinnati, et al.　　THOMAS HENRY STREICHER, JR.
December 22, 2003

Page 2

```
 1  APPEARANCES:

 2      On behalf of the Plaintiffs:

 3          Frederick M. Morgan Jr., Esq.
            Paul B. Martins, Esq.
 4          Don Stiens, Esq.
            Helmer, Martins & Morgan Co. LPA
 5          Suite 1900, Fourth & Walnut Centre
            105 East Fourth Street
 6          Cincinnati, Ohio  45202
            Phone:  (513) 421-2400
 7
            John J. Helbling, Esq.
 8          The Helbling Law Firm, L.L.C.
            3672 Springdale Road
 9          Cincinnati, Ohio  45251
            Phone:  (513) 923-9740
10
            Mark T. Tillar, Esq.
11          224 Clark Road
            Cincinnati, Ohio  45215
12
        On behalf of the Defendants City of Golf Manor,
13      Stephen Tilley, Roby Heiland and Chris
        Campbell:
14
            Wilson G. Weisenfelder Jr., Esq.
15          Rendigs, Fry, Kiely & Dennis
            900 Fourth & Vine Tower
16          One West Fourth Street
            Cincinnati, Ohio  45202-3688
17          Phone:  (513) 381-9200

18

19

20

21

22

23

24
```

Page 3

```
 1  APPEARANCES (Continued)

 2      On behalf of Defendants City of Cincinnati,
        Darren Sellers, Jason Hodge:
 3
            Geri Hernandez Geiler, Esq.
 4          Assistant City Solicitor
            Department of Law
 5          Room 214, City Hall
            801 Plum Street
 6          Cincinnati, Ohio  45202
            Phone:  (513) 352-3346
 7
            Neil F. Freund, Esq.
 8          Freund, Freeze & Arnold
            One Dayton Centre
 9          1 South Main Street, Suite
            1800 Dayton, Ohio  45402
10          Phone:  (937) 222-2424

11      On behalf of the Defendants Robert B. Jorg,
        Patrick Caton, Jason Hodge, Victor Spellen and
12      Darren Sellers:

13          Donald E. Hardin, Esq.
            Hardin, Lefton, Lazarus & Marks, LLC
14          915 Cincinnati Club Building
            30 Garfield Place
15          Cincinnati, Ohio  45202
            Phone:  (513) 721-7300
16

17  Also present:

18  Richard W. Grubb, Videograher

19  Lisa Damstrom, Law Clerk
    Helmer, Martins & Morgan Co., L.P.A.
20
    Mr. Roger Owensby
21
    Mr. Shawn Owensby
22                  - - -

23

24
```

Page 4

```
 1              STIPULATIONS

 2      It is stipulated by and among counsel for the

 3  respective parties that the deposition of THOMAS

 4  HENRY STREICHER JR., a witness herein, called by the

 5  plaintiffs for cross-examination, pursuant to the

 6  Federal Rules of Civil Procedure, may be taken at

 7  this time by the notary; that said deposition may be

 8  reduced to writing in stenotype by the notary, whose

 9  notes may then be transcribed out of the presence of

10  the witness; and that proof of the official

11  character and qualifications of the notary is

12  expressly waived.

13                  - - -
```

Page 5

```
 1              I N D E X

 2      Examination by:              Page

 3      Mr. Morgan . . . . . . . .6, 354

 4      Mr. Weisenfelder . . . .334, 356

 5                  - - -

 6              E X H I B I T S

 7                                     Page
    Plaintiff Exhibit 117 . . . . . . . . . . . 156
 8  Plaintiff Exhibit 118 . . . . . . . . . . . 169
    Plaintiff Exhibit 119 . . . . . . . . . . . 176
 9  Plaintiff Exhibit 120 . . . . . . . . . . . 176
    Plaintiff Exhibit 121 . . . . . . . . . . . 187
10  Plaintiff Exhibit 122 . . . . . . . . . . . 226
    Plaintiff Exhibit 123 . . . . . . . . . . . 252
11  Plaintiff Exhibit 124 . . . . . . . . . . . 256
    Plaintiff Exhibit 125 . . . . . . . . . . . 258
12  Plaintiff Exhibit 126 . . . . . . . . . . . 262
    Plaintiff Exhibit 127 . . . . . . . . . . . 264
13  Plaintiff Exhibit 128 . . . . . . . . . . . 268
    Plaintiff Exhibit 129 . . . . . . . . . . . 279
14  Plaintiff Exhibit 130 . . . . . . . . . . . 291
    Plaintiff Exhibit 131 . . . . . . . . . . . 309
15
16                  - - -
```

Case 1:01-cv-00769-SAS   Document 108-38   Filed 03/11/2004   Page 3 of 11

Estate of Ownesby, Jr. vs. City of Cincinnati, et al.   THOMAS HENRY STREICHER, JR.
December 22, 2003

Page 126

1 litigation?
2  A. Oh, yes.
3  Q. Bringing us here today?
4  A. Yes, sir.
5  Q. Did you or, to your knowledge, did anyone
6 else in a managerial position in the department
7 issue instructions that any documents that pertain
8 to that investigation be maintained because there
9 was a civil lawsuit pending?
10  A. I don't know specifically that I did. I
11 may have or someone may have. I'm sure -- when the
12 notification comes out of -- of pending litigation
13 or that litigation is filed, that generally is the
14 practice -- that is the practice that we do that.
15  Q. Okay. Is it a practice of yours to
16 communicate with the -- with the line, with the rank
17 and file through e-mail?
18  A. Sometimes. Sometimes I do.
19  Q. Does -- does --
20  A. Actually -- well, okay.
21  Q. Go ahead.
22  A. I -- I don't usually e-mail very much any
23 more at all. Because I sent a message as a joke one
24 time and it was twisted very much so and used in

Page 127

1 litigation against me.
2     And so I -- it's a rarity for me to
3 discuss anything on e-mail because of -- because
4 what I think was a very unfair and inappropriate use
5 of a message I sent one time. And I accept
6 responsibility for it. It was part of a joke and
7 wound up to be something very distasteful.
8  Q. Okay. The e-mail was or the --
9  A. No, the use of it was.
10  Q. What was the subject of it?
11  A. Very inappropriate. Pardon me?
12  Q. What was the subject of --
13     MR. FREUND: I object.
14  Q. -- that e-mail?
15     MR. FREUND: Let me just consult with my
16 client.
17     MR. MORGAN: Okay.
18     MR. FREUND: We can -- we can -- yeah.
19     (Discussion off the record.)
20  Q. I think there was a pending question, but
21 I'm not sure what it was. I'll just ask you this.
22 Did the e-mail that -- in question -- have anything
23 to do with the police division or was it -- did it
24 have to do with things outside of the police

Page 128

1 division?
2  A. Had to do with a Golf trip that I was on
3 with other police officers, and it has been twisted
4 and presented as though it occur-- it deals with
5 something inside the police department.
6  Q. Okay.
7  A. Misrepresented tremendously.
8  Q. And to whom was it addressed?
9  A. Jeff Butler.
10  Q. Okay. I'm going to hand you what's
11 previously been marked as Exhibit 60.
12  A. Okay.
13  Q. We'll --
14     Do you recognize this as a version of the
15 Cincinnati Police Department use of force policy?
16  A. Yes, sir.
17  Q. You see at the bottom it says revised
18 7/00, replaces 5/00?
19  A. Yes, sir.
20  Q. Is it -- in -- in your experience is it
21 common that the use of force policy would be revised
22 that often? That is, I mean, this is a two-month
23 span here. Did that happen pretty regularly or --
24  A. It can. Depends on whether or not

Page 129

1 something -- something is going to be added or
2 deleted or whether or not there was some type of
3 court decision that affects --
4  Q. Okay.
5  A. -- the policy and procedure.
6  Q. Would -- would you have any reason, as you
7 sit here, to believe that the July '00 version of
8 the policy was not in effect in November '00?
9  A. I -- I don't know whether it was --
10  Q. I understand.
11  A. -- or it wasn't. It -- I -- I don't
12 recall any massive change to it --
13  Q. Okay.
14  A. -- back then.
15  Q. If you'd turn to the second page, which
16 for some reason is numbered 3. Do you see the bold
17 word Procedure?
18  A. Yes, sir.
19  Q. Right above that, would you read allowed
20 the paragraph beginning with, "Following"?
21  A. Yes, sir. "Following any use of force
22 resulting in a citizen's injury, officers will
23 ensure appropriate first aid is rendered immediately
24 once the incident scene is stabilized."

Estate of Ownesby, Jr. vs. City of Cincinnati, et al.
December 22, 2003

THOMAS HENRY STREICHER, JR.

### Page 130

1    MR. WEISENFELDER: Rick, just for the
2  record, the copy of the exhibit that I have has
3  a page 2. The second -- my second page is not
4  page 3.
5    MR. MORGAN: Let's see. I just don't
6  have -- don't have page 1 is why. So I'm not
7  -- what I'm going to do, I'll cover this right
8  now and I will provide the Chief with a
9  complete exhibit.
10    MR. WEISENFELDER: Just wanted to let you
11  know.
12    MR. MORGAN: I appreciate that, Wil,
13  thanks.
14    MR. WEISENFELDER: Yeah.
15  BY MR. MORGAN:
16    Q. Would you agree that the events
17  surrounding the Owensby homicide constituted a use
18  of force resulting a citizen's injury?
19    A. Yes.
20    Q. I -- I'd like to focus on the words "once
21  the incident scene is stabilized" in this sent-- in
22  this paragraph, in this sentence. What do those
23  words mean to you?
24    A. It depends on the situation that you're

### Page 131

1  looking at.
2    Q. Okay.
3    A. "Stabilized" can be a use of force
4  situation and all the people that are involved in it
5  brought under the control of someone who's now
6  charged with a responsibility of maintaining that
7  scene. It -- it can be a disaster scene, an area
8  stabilized. It can -- there's just a lot of
9  different connotations to it.
10    Q. In your conversations with Colonel Biehl,
11  Mr. Carter, and the others, did you discuss whether
12  the incident scene there at Sam's Carry Out had been
13  stabilized within the meaning of this policy at any
14  point in time?
15    A. Yes.
16    Q. And what --
17    A. Yes.
18    Q. -- did you conclude?
19    A. Much -- much disagreement over that issue,
20  because of -- of exactly what does "stabilized"
21  mean? And a lot of different perceptions from
22  people that were there, a lot of different
23  discussion about it.
24    Q. What were the -- what was the span of --

### Page 132

1  what was the spectrum?
2    A. Every-- everywhere from the incident scene
3  itself was stabilized enough to be able to provide
4  medical care or request medical care for Mr.
5  Owensby, up to a point where it was not stabilized
6  at all. In fact, there was still a lot of work to
7  be done because of witnesses being gathered. Was
8  there evidence still on the scene? Who all was
9  here? Who's in charge?
10    Q. Well, could --
11    A. What supervisor?
12    Q. Could "stabilize" extend to interviewing
13  witnesses?
14    A. Sure. It could.
15    Q. Uh --
16    A. It could.
17    Q. So a -- the -- the chief of police, an
18  assistant chief of police and the staff of the
19  internal investigations decision were unable to
20  agree on the meaning of the policy statement that
21  medical care must be rendered immediately once the
22  incident scene is stabilized, correct?
23    MR. FREUND: Objection.
24    A. No.

### Page 133

1    THE WITNESS: I'm sorry?
2    MR. FREUND: You've got to take your time.
3    THE WITNESS: I'm sorry.
4    MR. FREUND: He answered over -- before I
5  objected.
6    So go ahead.
7    A. No. No, that's not --
8    Q. You did agree?
9    A. Pardon me?
10    Q. You did agree?
11    A. We came --
12    Q. You all agreed?
13    A. -- to a conclusion.
14    Q. And what was your conclusion?
15    A. Came to a conclusion that the care and
16  concern for an individual who was in need of
17  advanced medical care overrides the need to consider
18  all the other things that we discussed about whether
19  or not a scene is stabilized.
20    Q. Okay. And in order to reach that
21  conclusion you had to debate it?
22    A. No. No, not to debate it. Just -- just
23  to discuss the fact that there were differences --
24  differences of opinions and different explanations

Case 1:01-cv-00769-SAS   Document 108-38   Filed 03/11/2004   Page 5 of 11

Estate of Ownesby, Jr. vs. City of Cincinnati, et al.  THOMAS HENRY STREICHER, JR.
December 22, 2003

Page 134

1 that had been brought forward. And we were all of
2 the same opinion.
3    Q. Okay. So --
4    A. I think, what we were -- in -- in this
5 discussion where this occurred, my recollection, my
6 best recollection is that these different opinions
7 or these different ideas had been brought to the
8 surface during questioning of various people.
9    Q. So the Internal Investigations team had --
10 had -- were -- were bubbling up what they had
11 learned from talking to the officers who had been at
12 the scene?
13   A. Right.
14   Q. So the officers who'd -- who had been at
15 the scene had a variety of opinions or
16 understandings of the policy regarding what a
17 stabilized incident scene consisted of?
18   A. I don't know that they do or don't have
19 different opinions of it. I believe that those
20 different things were discussed and brought up.
21   Q. Okay. What training is provided, what
22 guidance is provided in -- in training at the
23 academy or in-service regarding, for purposes of
24 this policy, when an incident scene is stabilized?

Page 135

1    A. The same as I've said in the other ones.
2 In-service train-- or I'm sorry, it starts with
3 recruit training, reemphasized during in-service
4 training, during roll call training, and during
5 specific instruction between supervisor and
6 subordinate, and also amongst colleagues.
7    Q. But what is the guidance?
8    A. That --
9    Q. What -- what --
10   A. -- medical care -- medical care takes
11 precedent over all other issues.
12   Q. And that's -- has that always been the
13 policy?
14   A. Since I've been here.
15   Q. Why is that --
16   A. That's how I was instructed when I came on
17 and I still believe that.
18   Q. Why is that not in the written policy?
19   A. In this policy itself?
20   Q. Yes, sir.
21   A. Because this is about use of force.
22   Q. Are you aware of any policy, printed
23 policy, of the Cincinnati Police Division which
24 states that where there is a need for serious

Page 136

1 medical attention, that takes precedence over other
2 concerns?
3    A. I don't know specifically where it is, but
4 I know it's there.
5    Q. You know it's in writing?
6    A. Uh-huh. Because I've seen it in writing
7 in the past. Now, I -- and I may be -- I may be
8 remembering -- it's probably one of the dangers of
9 having been here for 33 years, but I may be
10 remembering back when, all the way back to when our
11 police department had primary responsibility for
12 responding to medical emergencies.
13      At some point -- I don't even remember,
14 it's been a long time, but at some point that
15 responsibility shifted over to the fire department,
16 and -- and our role changed dramatically. And I may
17 be remembering all the way back to that, because I
18 ran a scout car, which was basically our version of
19 an ambulance. And that was very definitive and
20 structured at that time.
21   Q. Okay.
22   A. And I've always carried that with me.
23   Q. Okay. Do you -- do you know one way or
24 the other whether the policies and procedures, the

Page 137

1 written policies and procedures, that were in effect
2 in November of 2000 included a printed statement
3 that serious medical need took precedence over other
4 considerations?
5    A. I don't -- I don't know. I don't know
6 where that is in writing.
7    Q. Okay.
8    A. Just off the top of my head, I don't know.
9    Q. But you think it's there somewhere?
10   A. Uh-huh.
11   Q. Okay. Why is it appropriate or necessary
12 to have any discussion of medical needs in a use of
13 force policy?
14   A. Because when force is used there is a
15 possibility, in fact, a probability in some
16 situations, where a person may be injured during
17 that use of force. And that once the use of force
18 situation or the need for using force is over with,
19 then the people that are in custody, the person that
20 is in custody of an officer, that officer has a duty
21 to care for that person and to provide medical
22 assistance as best they can if a person is in need.
23   Q. Do you perceive any tension or
24 discontinuity between the statement that an officer

Case 1:01-cv-00769-SAS   Document 108-38   Filed 03/11/2004   Page 6 of 11

Estate of Ownesby, Jr. vs. City of Cincinnati, et al.
December 22, 2003

THOMAS HENRY STREICHER, JR.

Page 138

1  will ensure first aid, quote, "once the incident
2  scene is stabilized," unquote, and a policy that a
3  serious medical need takes precedence over other
4  considerations?
5     A. Do I see a --
6     Q. Do you see any disconnect there?
7     A. No, not at all.
8     Q. Okay.
9     A. No.
10    Q. Would this statement be more accurate,
11 more complete rather, if it included, that is on
12 page 3 of Exhibit 60, if it included the statement
13 that a serious medical need takes precedence over
14 scene stabilization?
15        MR. FREUND: Objection.
16        Go ahead and answer.
17    A. No.
18    Q. Why not?
19    A. Because I don't.
20    Q. You don't think that would be a more
21 complete iteration of the department's policy?
22    A. No, I don't.
23    Q. Do you think that a line officer could be
24 led to believe by this language in the use of force

Page 139

1  policy that her only responsibility with respect to
2  providing medical care would be to provide it after
3  the scene was stabilized?
4        MR. FREUND: Objection.
5        Go ahead.
6     A. No.
7     Q. Why not?
8     A. Because officers know what that means.
9  And "stabilize" very simply means once the need for
10 using force is over with, your duty immediately
11 changes to one of providing care for a person --
12    Q. How do they --
13    A. -- immediately.
14    Q. How do they know?
15    A. It immediately changes.
16    Q. How do they know that?
17    A. That's what we're taught. That's what
18 we're taught. And I -- the other stuff that comes
19 up, I hope you don't take this personally, but it's
20 as a result of situations like this, people
21 immediately start thinking right away about down the
22 road. So all these different theories come out.
23        And I would offer to you, and I hope none
24 of you take offense to this, but it comes from

Page 140

1  lawyers. And that's -- that's where the cops start
2  spitting out those different things. That's where
3  everybody that's involved starts spitting it --
4  spitting it out, because they're all --
5        MR. FREUND: Let's try to stay focused on
6     questions that are asked.
7        THE WITNESS: Okay. I'm trying to provide
8     that.
9        MR. FREUND: I know you are.
10    A. I mean, I feel that you're going
11 someplace, and I'm trying to tell you we know what
12 this means. We know exactly what it means. I know
13 what it means. But as I've said to you before in
14 the other situation, if things get twisted, it gets
15 twisted. That's what causes all of this.
16    Q. So your perception is that the line
17 officers knew full well what the policy meant, but
18 gave statements to the Internal Investigations
19 and -- team indicating that maybe it meant something
20 different?
21        MR. FREUND: Objection. That's --
22    A. No.
23    Q. Well, where was the debate on whether or
24 not scene stabilization took precedence over an

Page 141

1  urgent medical need? Who -- who --
2     A. There's not --
3     Q. -- questioned?
4     A. There's not a debate over it.
5     Q. Okay.
6     A. I'm just saying -- said to you, all of
7  this -- all of these things were brought forward,
8  all of these things were brought forward in
9  anticipation of a discussion just like what you and
10 I are having right here. And I'm here to tell you
11 "stabilize" means when use of force is finished, if
12 a person needs care, I give that person care.
13    Q. Use of force is finished in Mr. Owensby's
14 case when he's handcuffed, correct?
15        MR. FREUND: Objection.
16        You can answer.
17    A. Not necessarily.
18    Q. When -- when was use of force finished in
19 Mr. Owensby's case?
20        MR. FREUND: Objection.
21        If you know, you can answer.
22    Q. That is, appropriate use of force?
23    A. I don't know that exactly.
24    Q. When was there an obligation on the part

Case 1:01-cv-00769-SAS   Document 108-38   Filed 03/11/2004   Page 7 of 11

Estate of Ownesby, Jr. vs. City of Cincinnati, et al.   THOMAS HENRY STREICHER, JR.
December 22, 2003

Page 142

1 of the police officers on the scene to provide him
2 with medical care?
3     MR. FREUND: Objection.
4     You can answer if you know.
5  A. When the situation was stabilized and the
6 officers were able to do so.
7  Q. When was that?
8  A. When they --
9     MR. FREUND: Objection.
10     Go ahead.
11     THE WITNESS: I'm sorry.
12     MR. FREUND: Go ahead.
13  A. When they realized that he needed it.
14  Q. So they had no obligation to provide him
15 medical care until they realized that he needed
16 medical care?
17  A. Sure. Exactly.
18  Q. They didn't realize that for a number of
19 minutes after he was placed in the back of the Golf
20 Manor car, correct?
21     MR. FREUND: Objection.
22     Go ahead and answer.
23  Q. As far as you know?
24  A. I don't know.

Page 143

1  Q. You don't know --
2  A. I don't know that. The -- I can't answer
3 for when a person knows something or doesn't know
4 something.
5  Q. So you don't know when the Cincinnati
6 police officers on the scene concluded that Mr.
7 Owensby needed medical care?
8  A. There's a variety of different times,
9 depending on which officer you're talking about.
10  Q. Okay. While we're on the subject of the
11 use of force policies, are you aware of the finding
12 that Officer, then Officer Caton had -- had used his
13 fist to -- to punch Mr. Owensby in the back while he
14 was on the ground handcuffed?
15     MR. HARDIN: Objection to the form of the
16     question.
17  Q. Do you remember that?
18     MR. FREUND: You can answer.
19  A. That was reported by two officers, as I
20 recall.
21  Q. And did you ultimately conclude that that
22 allegation was sustained, you personally?
23  A. Yes, I did.
24  Q. Was that an appropriate use of force under

Page 144

1 the Cincinnati Police Division policies?
2  A. As described by the officers, no, it was
3 not.
4  Q. As described by the officers and as
5 sustained by you personally, correct?
6  A. Exactly.
7  Q. So do you have any -- strike that.
8     When you are reviewing a report, for
9 example, an OMI report or an I -- II -- IIS report,
10 you know, to -- to initial off on it or in -- in the
11 case of a termination, to take the action, what
12 standard do you apply to whether something is or is
13 not sustained? Is it reasonable doubt, is it
14 preponderance?
15  A. Preponderance.
16  Q. Okay. So you agree then that the
17 preponderance of the evidence is that officer --
18 then Officer Caton, in fact, did strike Mr. Owensby
19 several times as he lay handcuffed in the parking
20 lot, correct?
21     MR. HARDIN: Objection.
22     MR. FREUND: I object to that.
23     Go ahead and answer.
24  A. Based on what the officers said, yes.

Page 145

1  Q. Well, you -- you found that that was the
2 preponderance of the evidence, correct?
3  A. That's right.
4  Q. You personally? Was the scene stabilized
5 as Mr. Owensby lay in the parking lot and was
6 pummeled by Officer Caton?
7     MR. HARDIN: Objection.
8     MR. FREUND: Objection.
9     You can answer if you know.
10  A. I don't know.
11  Q. Okay. Was the scene stabilized -- strike
12 that.
13     Have you had the opportunity to review the
14 cruiser cam video out from the rolling unit that
15 arrived at the scene after Mr. Caton was in -- after
16 Mr. Owensby was in the back of the car?
17  A. I don't know that I've looked at every one
18 of them, but some of them I have, yes.
19  Q. Okay. At least one you've seen?
20  A. Yes.
21  Q. Did you -- have -- have you seen it --
22 strike that.
23     When you looked at it, did you look at it
24 back and forth? I mean, did you look at it to

Estate of Ownesby, Jr. vs. City of Cincinnati, et al.
December 22, 2003

THOMAS HENRY STREICHER, JR.

Page 346

1 relinquished to the Cincinnati -- first Cincinnati
2 officer on the scene, is that --
3   MR. HARDIN: Objection.
4   MR. MORGAN: Object to the form.
5 A. I'm -- I'm not with you.
6 Q. Okay.
7 A. You're losing me here.
8 Q. Well, okay. Well, let's back up.
9   MR. FREUND: Isn't -- isn't that a -- a
10 legal question?
11   MR. WEISENFELDER: Well, it's a policy.
12 And whether or not they followed the policy
13 involves --
14   MR. FREUND: I'll let you ask it, but I
15 think it's a --
16   MR. WEISENFELDER: Well, it may be.
17   MR. HARDIN: It's legal --
18   MR. WEISENFELDER: Well --
19   MR. HARDIN: -- and I'll be objecting.
20   MR. MORGAN: How come you're so much nicer
21 to him than you were to me?
22   MR. FREUND: Because --
23   MS. GEILER: Don't answer that, Neil.
24   MR. FREUND: Because I want to be.

Page 347

1   MR. HARDIN: I'll -- I'll object to the
2 reference that this is a policy.
3   MR. FREUND: Yeah. I -- I just think that
4 you're asking him a -- a legal question.
5   MR. WEISENFELDER: Well, if he's --
6   MR. FREUND: And -- and not a factual
7 question.
8   MR. WEISENFELDER: That's fine. Okay.
9   MR. FREUND: So that's the basis for my --
10   MR. WEISENFELDER: All right. Well, let
11 me --
12   MR. FREUND: -- objection.
13   MR. WEISENFELDER: Let me go back and
14 make --
15   MR. FREUND: And I -- and -- and that's
16 the last time I'm going to be nice to you also.
17   MR. WEISENFELDER: Okay. That's fair
18 enough.
19   MR. FREUND: All right.
20   MR. WEISENFELDER: All right.
21 BY MR. WEISENFELDER
22 Q. Chief Streicher, what was marked as
23 Exhibit 78, the Mutual Aid Agreement For Law
24 Enforcement, that was an agreement that was in

Page 348

1 effect as of November 7th, 2000?
2 A. I don't see this dated anyplace, but I
3 guess we can assume that it was.
4 Q. Well, I don't want anybody to assume
5 anything.
6 A. Okay.
7 Q. There's a date on the transmittal page to
8 you from Sergeant Jeffrey Butler dated October 30th
9 of 2000.
10 A. Okay.
11 Q. Okay. And that transmittal memo lists the
12 participating agencies within Hamilton County,
13 correct?
14 A. Correct.
15   MR. MORGAN: Object to the form.
16 Q. Okay. And Cincinnati is -- well, is
17 Cincinnati part of that agreement?
18 A. Yes.
19 Q. Okay. As is Golf Manor?
20 A. Yes.
21 Q. Okay. Well, let's go back to page 2 then.
22 A. Okay.
23 Q. All right. "Control of any arrested
24 person, evidence and the crime scene shall be

Page 349

1 relinquished to the first available officer from the
2 jurisdiction within which the crime took place."
3 What's your understanding of that sentence?
4 A. That if an officer --
5   MR. MORGAN: Asked and answered.
6   THE WITNESS: I'm sorry.
7   MR. FREUND: Go ahead.
8 A. If an officer is on duty and has probable
9 cause to believe that a criminal offense occurred
10 outside of their own jurisdiction but in the
11 jurisdiction of one of these cooperating agencies,
12 that officer can make an arrest --
13 Q. And --
14 A. -- for that situation and do whatever's
15 necessary according -- according to the law.
16 Q. And what --
17 A. And then when a --
18 Q. Wait --
19 A. -- respondent --
20 Q. I'm --
21 A. -- if -- if -- if the -- if the -- when an
22 officer from the jurisdiction where that offense
23 occurred arrived there, that that person should
24 relinquish custody and control of that person to the

Page 346 - Page 349

Case 1:01-cv-00769-SAS   Document 108-38   Filed 03/11/2004   Page 9 of 11

Estate of Ownesby, Jr. vs. City of Cincinnati, et al.
December 22, 2003

THOMAS HENRY STREICHER, JR.

Page 350

1 officer in the jurisdiction where it occurred.
2  Q. Whose own -- whose jurisdiction where the
3 offense occurred, correct?
4  A. Right. Exactly.
5  Q. Okay. Let's turn to page 7.
6  A. Okay.
7  Q. Paragraph VI C. Do you want to take a
8 minute to read it?
9  A. C? Sure.
10  Q. Pardon me. No. I'm sorry, VI D.
11  A. What is it?
12  Q. VI D on the bottom of page 7.
13  A. Oh, okay. D, okay.
14  Q. Okay. Have you had an opportunity to read
15 that?
16  A. Yes, sir.
17  Q. For the record, VI D of the -- what was
18 marked as Exhibit 78 states, "Whenever the law
19 enforcement employees of one cooperating Agency are
20 providing police services upon request to another
21 cooperating Agency they will be under the lawful
22 direction and authority of the commanding law
23 enforcement officer of the Agency to which they are
24 rendering assistance."

Page 351

1  Chief, would you agree with me that in
2 this instance, the Owensby matter, that when the
3 Golf Manor officers responded to the Cincinnati
4 jurisdiction they were under the control or
5 direction of the Cincinnati officers?
6   MR. HARDIN: Objection.
7   MR. MORGAN: Foundation, conclusion of
8   law, speculation.
9  A. Umm --
10  Q. Based upon this agreement.
11   MR. MORGAN: Same objections.
12  A. I guess I have to ask you in what matters?
13 I mean, I don't understand what you mean by --
14  Q. Well, I -- I -- I didn't write the
15 agreement. I'm asking based upon what you know of
16 the incident involving Mr. Owensby, knowing how the
17 Golf off-- Golf Manor officers responded to the
18 scene as well as what's contained in paragraph VI D,
19 whether, in your opinion, the Golf Manor -- Golf
20 Manor officers were under the control or direction
21 of Cincinnati?
22   MR. HARDIN: Objection.
23   MR. MORGAN: Same objections.
24  A. No.

Page 352

1  Q. And why not?
2  A. Because I don't know that any supervisor
3 from -- or any commanding officer from Cincinnati
4 gave them any direction.
5  Q. But it does-- it doesn't say they have to,
6 does it?
7   MR. HARDIN: Object.
8  Q. Doesn't it say they shall be?
9   MR. HARDIN: Objection. Argumentative.
10   MR. MORGAN: Join.
11  A. "They will be under the lawful direction
12 and authority." I don't know that any direction was
13 given to them.
14  Q. Okay. So you're not aware of any
15 Cincinnati officer, in fact, directing them or
16 asking them to do anything as it relates to Mr.
17 Owensby?
18  A. I don't recall anything at all --
19  Q. Okay.
20  A. -- about -- along that.
21  Q. Are you aware of anyone from Cincinnati --
22 when I say Cincinnati, I mean the Cincinnati Police
23 Department.
24  A. Okay.

Page 353

1  Q. Asking either of the Golf Manor officers
2 to do something that was not done?
3   MR. MORGAN: Foundation.
4  A. I don't recall that --
5  Q. Okay.
6  A. -- no, sir.
7  Q. You're not aware of anything?
8  A. I -- I --
9  Q. Correct?
10  A. -- simply don't recall.
11  Q. Okay. Are you aware of any of the
12 Cincinnati officers requesting either Golf Manor
13 officer to summon or request the fire department or
14 any other type of medical assistance for Mr.
15 Owensby?
16   MR. MORGAN: Foundation.
17  A. I don't recall that.
18  Q. Okay. Chief Streicher, would you agree
19 that the officers who participated in subduing
20 the -- or the physical arrest of Mr. Owensby or the
21 Macing of Mr. Owensby or placing Mr. Owensby in the
22 back of a Golf Manor police cruiser were in a better
23 position than the Golf Manor officers to assess Mr.
24 Owensby's physical condition or need for medical

Case 1:01-cv-00769-SAS   Document 108-38   Filed 03/11/2004   Page 10 of 11

Estate of Ownesby, Jr. vs. City of Cincinnati, et al.   THOMAS HENRY STREICHER, JR.
December 22, 2003

## Page 354

1 care?
2      MR. FREUND: Objection.
3      MR. HARDIN: Objection.
4      MR. MORGAN: Foundation, speculation.
5   A. I don't know that that's accurate.
6   Q. Okay.
7   A. I -- I -- wouldn't -- certainly wouldn't
8 agree that that's accurate.
9   Q. The fact of the matter is, as you sit here
10 today, you're not certain or don't have specific
11 facts as to what either of the Golf Manor officers
12 saw or ability to see as it related to Mr. Owensby's
13 condition; is that true?
14  A. That's correct.
15     MR. MORGAN: Leading.
16  Q. Okay.
17     MR. WEISENFELDER: I have nothing further.
18     MR. FREUND: Are you -- are you going to
19 have any further questions?
20     MR. MORGAN: I may have one. I need to
21 parse this just a second. Yeah, I think one.
22         FURTHER CROSS-EXAMINATION
23 BY MR. MORGAN:
24  Q. Chief, when -- talking about paragraph D

## Page 355

1 on page 7 of the compact, when you said -- it's my
2 understanding that the reason you discounted
3 reliance on this paragraph was because you weren't
4 aware of there having been a request from the City
5 to Golf Manor to come and provide assistance; is
6 that right?
7   A. Well, there was an all-- no, there's a --
8 there's a --
9      MR. HARDIN: There's going to be an
10     objection on misstatement, but go ahead.
11  A. There's a request. It's an all--
12 all-county broadcast goes out --
13  Q. Okay.
14  A. -- for assistance for officers. That goes
15 out. I read this as -- as if officers arrived there
16 and they have to take action, say to arrest
17 somebody, they could be acting with authority of
18 our -- of our jurisdiction.
19     The direction -- it -- it also provides
20 our officers, our commanders with the ability, Golf
21 Manor responds, Addyston responds, whoever, "Take a
22 traffic post, I want you to do this, this and this,"
23 while they're there under the conditions.
24     It's a very broad, very broad statement

## Page 356

1 that -- that tries to allow some flexibility because
2 of the large number of incidents that can occur
3 where we cross jurisdictional lines.
4   Q. Do me a favor, Chief. Read aloud the last
5 two lines of paragraph D which are actually on the
6 next page. That sentence.
7   A. "Officers shall be subject to the code of
8 ethics, policies, and rules and regulations of their
9 employing Agency at all times."
10     MR. MORGAN: I have nothing further.
11 Thank you, Chief.
12     THE WITNESS: Okay.
13     MR. WEISENFELDER: Chief, I have one more.
14     THE WITNESS: Okay.
15         FURTHER CROSS-EXAMINATION
16 BY MR. WEISENFELDER:
17  Q. Do you know who drafted the --
18     MR. WEISENFELDER: Well, I -- you know, I
19     misspoke. I have more than one question. And
20     Neil's going to get upset, aren't you, Neil?
21     MR. FREUND: No. No. I don't -- I don't
22     easily get upset.
23     MR. WEISENFELDER: Good.
24 BY MR. WEISENFELDER:

## Page 357

1   Q. Chief, do you know who drafted this
2 document?
3      MR. MORGAN: Asked and answered.
4   A. No.
5   Q. Okay.
6   A. I don't know who specifically wrote that.
7   Q. Did you have any role in drafting this --
8 this document?
9   A. No.
10  Q. Okay. Prior to today though, you had seen
11 it and you were familiar with it?
12  A. Oh, yes, sir.
13  Q. Okay. And you've had an opportunity to
14 read, I think, probably at least three times
15 paragraph VI D; is that right?
16  A. Yes.
17  Q. Okay. Would you agree that the reason for
18 that paragraph is that when you have a number -- or
19 potentially a number of other jurisdictions
20 responding to another jurisdiction, that someone has
21 to be in control? They all can't be in control?
22 Someone has to assume control and responsibility for
23 the officers that are responding to -- to direct
24 whatever needs to be done, whether it be traffic,

## AFFIDAVIT

- - -

STATE OF OHIO : 
: SS
COUNTY OF HAMILTON :

I, Wendy L. Welsh, Notary Public in and for the State of Ohio, do hereby state that the transcript of the deposition of THOMAS HENRY STREICHER, JR., deponent herein, having been submitted to said deponent for review and signature, has not been signed within the thirty (30) day period allowed under the Federal Rules; said deposition to now have the same force and effect as though signed.

_____
Wendy L. Welsh, Court Reporter

Sworn to before me this 26th day of February, 2004.

_____
Thomas M. Blasing
Notary Public - State of Ohio

My commission expires:
May 4, 2004.