Service: Get by LEXSEE®
Citation: 92 ohio st.3d 354

*92 Ohio St. 3d 354, \*; 2001 Ohio 204;*
*750 N.E.2d 554, \*\*; 2001 Ohio LEXIS 1889, \*\*\**

BUTLER, APPELLEE, v. JORDAN ET AL.; CUYAHOGA COUNTY DEPARTMENT OF HUMAN
SERVICES, APPELLANT.

No. 99-1816

SUPREME COURT OF OHIO

92 Ohio St. 3d 354; 2001 Ohio 204; 750 N.E.2d 554; 2001 Ohio LEXIS 1889

September 12, 2000, Submitted
July 25, 2001, Decided

**PRIOR HISTORY:** **[\*\*\*1]** APPEAL from the Court of Appeals for Cuyahoga County, No.
74509.

**DISPOSITION:** The judgment of the court of appeals is reversed and the judgment of the
trial court is reinstated.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Appellant Cuyahoga County Department of Human Services
(DHS) sought review of a judgment from the Court of Appeals of Cuyahoga County that
reversed the judgment of the trial court granting the DHS's motion to dismiss the
appellee mother's claim against it.

**OVERVIEW:** The mother's child was killed in a daycare certified by the DHS. The mother
alleged that the DHS was negligent and/or reckless in the licensing and certification of
the daycare, and that its negligence or recklessness was the proximate cause of the
child's death. The trial court granted the DHS's motion to dismiss and the appellate court
reversed the judgment. Upon review, the supreme court reinstated the decision of the
trial court. Within the meaning of Ohio Rev. Code Ann. § 2744.02(B)(5), Ohio Rev. Code
Ann. § 5104.11 did not expressly impose liability on the DHS for failure to inspect or for
the negligent certification of a type-B family day-care home even where it completely
ignored the obligations imposed upon it by the statute. In addition, no other section of
the Ohio Revised Code expressly imposed liability on the DHS for failure to inspect or for
the negligent certification of a type-B family day-care home. Therefore, based upon Ohio
Rev. Code Ann. § 2744.02(B)(5), the DHS was immune from liability for failure to
inspect or for the negligent certification of a type-B family day-care home because there
was no statute expressly imposing liability.

**OUTCOME:** The judgment of the appellate court was reversed and the judgment of the
trial court was reinstated.

**CORE TERMS:** political subdivision, immunity, sovereign immunity, day-care, municipal,
right to trial, inspect, certification, immune, duty, sovereign, municipality, judicially created,
motion to dismiss, tort liability, common law, bridge, water, impose liability, jury trial,
sovereignty, common-law, certify, driver, maxim, human services, Political Subdivision Tort
Liability Act, court of appeals, swimming pool, motor vehicle

## LexisNexis (TM) HEADNOTES - Core Concepts - ◆ Hide Concepts

Governments > State & Territorial Governments > Licenses 🔲
**HN1**⬇See Ohio Rev. Code Ann. § 5104.01(RR).

Governments > State & Territorial Governments > Licenses 🔲
**HN2**⬇Ohio Rev. Code Ann. ch. 5104 provides the procedures for licensing, inspecting, and certifying publicly funded child day-care centers, type-A day-care homes, and type-B family day-care homes. Each facility has its own certification procedures. In the case of type-B family day-care homes, former Ohio Rev. Code Ann. § 5104.11 (A) required a county department of human services, not the state, to inspect and certify type-B family day-care homes. More Like This Headnote

Governments > State & Territorial Governments > Licenses 🔲
**HN3**⬇See former Ohio Rev. Code Ann. § 5104.11(A).

Governments > State & Territorial Governments > Licenses 🔲
**HN4**⬇See former Ohio Rev. Code Ann. § 5104.013(A)(2).

Governments > State & Territorial Governments > Licenses 🔲
**HN5**⬇In Ohio Rev. Code Ann. §§ 5104.11(A), 5104.013(A)(2), the county director of human services is now designated as the "county director of job and family services" or the "director of a county department of job and family services." There have been no other substantive changes in the quoted portions of the statutes. More Like This Headnote

Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action 🔲
**HN6**⬇A review of a motion to dismiss pursuant to Ohio R. Civ. P. 12(B)(6) assumes all the allegations of the complaint to be true and is confined to the pleadings. More Like This Headnote

Torts > Public Entity Liability > Immunity 🔲
**HN7**⬇Ohio Rev. Code Ann. § 2744.02(A)(1) provides immunity to political subdivisions and their employees for torts caused by any act or omission of a political subdivision or its employee. Ohio Rev. Code Ann. § 2744.02(B) sets forth exceptions to that grant of immunity. More Like This Headnote

Torts > Public Entity Liability > Liability 🔲
**HN8**⬇See Ohio Rev. Code Ann. § 2744.02(B)(5).

Torts > Public Entity Liability > Immunity 🔲
**HN9**⬇In order to determine the immunity of a political subdivision pursuant to the Political Subdivision Tort Liability Act, Ohio Rev. Code Ann. ch. 2744, a three-tiered analysis of Ohio Rev. Code Ann. ch. 2744 is required. More Like This Headnote

Torts > Public Entity Liability > Liability 🔲
**HN10**⬇Within the meaning of Ohio Rev. Code Ann. § 2744.02(B)(5), the term "liability" refers to either criminal or civil liability. However, unlike Ohio Rev. Code Ann. ch. 2151, Ohio Rev. Code Ann. ch. 5104 provides no penalties for violation of statutory duties. Ohio Rev. Code Ann. § 5104.99 does impose penalties for violations of Ohio Rev. Code Ann. §§ 5104.02, 5104.09(B), 5104.09(C), but none of these sections deals with the duty of a political subdivision to inspect or certify a type-B family day-care home. More Like This Headnote

Torts > Public Entity Liability > Liability

Governments > State & Territorial Governments > Licenses

HN11 Within the meaning of Ohio Rev. Code Ann. § 2744.02(B)(5), Ohio Rev. Code Ann. § 5104.11 does not expressly impose liability on a political subdivision for failure to inspect or for the negligent certification of a type-B family day-care home even where the political subdivision has completely ignored the obligations imposed upon it by the statute. Within the meaning of Ohio Rev. Code Ann. § 2744.02(B) (5), no other section of the Ohio Revised Code expressly imposes liability on a political subdivision for failure to inspect or for the negligent certification of a type-B family day-care home. More Like This Headnote

Torts > Public Entity Liability > Liability

HN12 Neither Ohio Rev. Code Ann. §§ 5104.11, 5104.99, nor any other section of the Ohio Revised Code expressly imposes liability upon a political subdivision for failure to inspect or for negligent certification of a type-B family day-care home. More Like This Headnote

Constitutional Law > The Judiciary > Case or Controversy > Constitutionality of Legislation

HN13 Reference to a statute in a footnote is not the procedurally proper way to raise the constitutionality of the statute. More Like This Headnote

Torts > Public Entity Liability > Liability

HN14 Political subdivisions are liable like individuals, for injuries done, although the act was not beyond their lawful powers. More Like This Headnote

Torts > Public Entity Liability > Liability

HN15 An action sounding in tort, will lie against a municipal corporation by name, for an act done within the powers granted by its charter. A political subdivision will be held liable to the party injured, to make good his loss. More Like This Headnote

Torts > Public Entity Liability > Liability

HN16 A political subdivision may be liable for acts through its agents, within the scope of its authority, and without malice or negligence. More Like This Headnote

Governments > Local Governments > Claims By & Against

HN17 The judicially created doctrine of sovereign immunity is a legal anachronism that denies recovery to injured individuals without regard to the municipality's culpability or the individual's need for compensation. Because Ohio's sovereign immunity for municipalities was judicially created, it can be judicially abolished. More Like This Headnote

Constitutional Law > Trial by Jury in Civil Actions

HN18 See Ohio Const. art. I, § 5.

Torts > Public Entity Liability > Liability

HN19 A municipal corporation, unless immune by statute, is liable for its negligence in the performance or nonperformance of its acts. More Like This Headnote

Constitutional Law > Trial by Jury in Civil Actions

HN20 Ohio Const. art. I, § 5 does not guarantee a jury trial in all cases. Rather, Ohio Const. art. I, § 5 only guarantees the right of trial by jury in those cases where it existed previous to its adoption. More Like This Headnote

Governments > Local Governments

HN21 Corporate political subdivisions of the state are not sovereign powers. More Like This Headnote

Governments > Local Governments

HN22 A "sovereign" is a person, body, or state vested with independent and supreme authority. "Sovereignty" means the supreme political authority of an independent state. In this regard, a political subdivision of a state government cannot by any stretch of the imagination be considered a sovereign power. More Like This Headnote

Governments > State & Territorial Governments

HN23 See Ohio Rev. Code Ann. § 2744.01(H).

Governments > State & Territorial Governments

HN24 See Ohio Rev. Code Ann. § 2743.01(A).

Governments > Local Governments

HN25 See Ohio Rev. Code Ann. § 2743.01(B).

Governments > State & Territorial Governments > Claims By & Against

HN26 See Ohio Const. art. I, § 16.

Governments > State & Territorial Governments > Claims By & Against

HN27 See Ohio Rev. Code Ann. § 2743.02(A)(1).

Governments > State & Territorial Governments > Claims By & Against

HN28 Pursuant to Ohio Rev. Code Ann. § 2743.02(A)(1), Ohio has waived sovereign immunity and, accordingly, there is no sovereign immunity to attach to political subdivisions, pursuant to Ohio Rev. Code Ann. § 2743.01(B). This includes, of course, "political subdivisions" as defined in Ohio Rev. Code Ann. § 2743.01 (B). More Like This Headnote

✦ Show Headnotes

**SYLLABUS:** Syllabus of the Court

1. Within the meaning of R.C. 2744.02(B)(5), R.C. 5104.11 does not expressly impose liability on a political subdivision for failure to inspect or for the negligent certification of a type-B family day-care home even where the political subdivision has completely ignored the obligations imposed upon it by the statute.

2. Within the meaning of R.C. 2744.02(B)(5), no other section of the Revised Code expressly imposes liability on a political subdivision for failure to inspect or for the negligent certification of a type-B family day-care home.

**COUNSEL:** William D. Mason, Cuyahoga County Prosecuting Attorney, Sandra Curtis-Patrick and Arline M. Zehe, Assistant Prosecuting Attorneys, for appellant.

Novak, Robenalt, Pavlik & Scharf, L.L.P., William J. Novak, Thomas D. Robenalt and David W. Skall, for appellee.

**JUDGES:** DOUGLAS, J. F. [***2] E. SWEENEY and PFEIFER, JJ., concur. MOYER, C.J., and BROWN, J., concur in syllabus and judgment. COOK and LUNDBERG STRATTON, JJ.,

separately concur in syllabus and judgment. SUSAN BROWN, J., of the Tenth Appellate District, sitting for RESNICK, J.

**OPINIONBY:** DOUGLAS

**OPINION:** [**555] [*354]

**DOUGLAS, J.** According to appellee's complaint, Geraldine Jordan was the operator and primary care giver at Guardian Angel Day Care ("Guardian Angel"). Guardian Angel was a type-B day-care home certified by the Cuyahoga County Department of Human Services ("CCDHS"). n1

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 *HN1* R.C. 5104.01(RR) (formerly [E]) defines "type B family day-care home" and "type B home" as "a permanent residence of the provider in which child day-care is provided for one to six children at one time and in which no more than three children are under two years of age at one time."

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

On the morning of April 6, 1995, Venisha Butler, appellee, placed her eight-month-old son, Aaron, and two-year-old son, Sam, in the care of Jordan and Guardian [***3] Angel. At approximately 3:15 p.m., that same day, [**556] Butler returned to [*355] Guardian Angel to pick up her children. When Jordan brought Aaron out to his mother, Aaron was not breathing and his body was cold. Butler noticed that there was a sticky substance around Aaron's nose and mouth. When Aaron failed to respond to CPR, an ambulance was called. Aaron could not be revived and was pronounced dead on arrival at University Hospitals Rainbow Babies and Children's Hospital. The sticky substance on Aaron's face was the residue of tape that had been placed over Aaron's nose and mouth.

On January 22, 1997, Butler filed a complaint in the Common Pleas Court of Cuyahoga County, naming Jordan, Guardian Angel, and CCDHS as defendants. The complaint alleged that CCDHS, appellant, was negligent and/or reckless in the licensing and certification of Guardian Angel, and that its negligence or recklessness was the proximate cause of Aaron's death. On May 16, 1997, CCDHS filed a Civ.R. 12(B)(6) motion to dismiss Butler's claims. CCDHS contended that it was immune from civil liability pursuant to R.C. 2744.02. On April 15, 1998, the trial court granted CCDHS's motion to dismiss. [***4] Butler appealed.

The Court of Appeals for Cuyahoga County reversed the judgment of the trial court. The court of appeals held that R.C. 5104.11 imposed a duty upon appellant to inspect and license n2 type-B day-care homes and that the failure to carry out that duty qualified as an exception to immunity under R.C. 2744.02(B)(5). The case is now before this court upon our allowance of a discretionary appeal.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 More properly the duty to inspect and certify. R.C. 5104.11 required the county director of human services to inspect and certify type-B family day-care homes. It is the Ohio Department of Job and Family Services that *licenses* day-care homes pursuant to R.C. 5104.03.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -R.C. Chapter 5104

*HN2*

R.C. Chapter 5104 provides the procedures for licensing, inspecting, and certifying publicly funded child day-care centers, type-A day-care homes, and type-B family day-care homes. Each facility has its own **[\*\*\*5]** certification procedures. In the case of type-B family day-care homes, R.C. 5104.11(A) required a county department of human services, not the state, to inspect and certify type-B family day-care homes.

*HN3*Former R.C. 5104.11(A) provided:

> "After receipt of an application for certification from a type-B family day-care home, the county director of human services *shall* inspect and, if it complies with this chapter and any applicable rules adopted under this chapter, certify the type-B family day-care home to provide publicly funded child day-care pursuant to this chapter and any rules adopted under it." (Emphasis added.) Sub.H.B. No. 155, 144 Ohio Laws, Part III, 3317.

**[\*356]**

*HN4*Former R.C. 5104.013(A)(2) provided:

> "The director of a county department of human services, as part of the process of certification of type-B family day-care homes, *shall* request the superintendent of the bureau of criminal identification and investigation to conduct a criminal records check with respect to any authorized provider of a certified type-B family day-care home and any person eighteen years of age or older who **[\*\*\*6]** resides in a certified type-B family day-care home." n3 (Emphasis **[\*\*557]** added.) Am.Sub.H.B. No. 687, 145 Ohio Laws, Part IV, 6949.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n3 *HN5*In R.C. 5104.11(A) and 5104.013(A)(2), the county director of human services is now designated as the "county director of job and family services" or the "director of a county department of job and family services." There have been no other substantive changes in the quoted portions of the statutes.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Butler alleged in her complaint that CCDHS "was negligent and/or reckless in licensing and certifying Defendant Guardian Angel to provide day care services to infants." In support of her complaint, Butler argues that Guardian Angel was a certified type-B family day-care home subject to inspections by CCDHS and that CCDHS failed to perform the mandatory criminal background checks on Guardian Angel's day-care providers. n4

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n4 In this case, Butler alleges that CCDHS "was negligent and/or reckless in licensing and certifying Defendant Guardian Angel to provide day care services to infants." In her response to CCDHS's motion to dismiss, Butler expanded on some of her allegations of negligence against CCDHS. Among allegations discussed in her response to CCDHS's motion to dismiss, Butler claims that CCDHS failed to perform mandatory background checks on Guardian Angel's employees. *HN6*⚓A review of a motion to dismiss pursuant to Civ.R. 12(B)(6) assumes all the allegations of the complaint to be true and is confined to the pleadings. Nevertheless, it is appropriate to consider explanations in Butler's response to CCDHS's motion to dismiss in order to interpret the allegations of the complaint.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[***7]**

R.C. Chapter 2744
*HN7*⚓
R.C. 2744.02(A)(1) provides immunity to political subdivisions and their employees for torts caused by any act or omission of a political subdivision or its employee. R.C. 2744.02(B) sets forth exceptions to that grant of immunity. *HN8*⚓Specifically, R.C. 2744.02(B)(5) provides:

> "In addition to the circumstances described in divisions (B)(1) to (4) of this section, a political subdivision is liable for injury, death, or loss to persons or property when liability is expressly imposed upon the political subdivision by a section of the Revised Code * * *. Liability shall not be construed to exist under another section of the Revised Code merely because a responsibility is imposed upon a political subdivision or because of a general authorization that a political subdivision may sue and be sued."

**[*357]**

Appellant argues that within the meaning of R.C. 2744.02(B)(5), R.C. 5104.11 does not expressly impose liability upon a political subdivision for failure to inspect and for negligent certification of type-B family homes. We agree.

*HN9*⚓In **[***8]** order to determine the immunity of a political subdivision pursuant to the Political Subdivision Tort Liability Act, a three-tiered analysis of R.C. Chapter 2744 is required. We set forth that analysis in *Cater v. Cleveland* (1998), 83 Ohio St. 3d 24, 28, 697 N.E.2d 610, 614, and in *Campbell v. Burton* (2001), 92 Ohio St. 3d 336, 750 N.E.2d 539, 2001 Ohio LEXIS 1890. We will not repeat that discussion here. After applying the three-tiered analysis we hold that the exception to political subdivision immunity found in R.C. 2744.02(B)(5) does not apply.

*HN10*⚓Within the meaning of R.C. 2744.02(B)(5), the term "liability" refers to either criminal or civil liability. *Campbell v. Burton*, *supra*. However, unlike R.C. Chapter 2151, which we reviewed in *Campbell*, R.C. Chapter 5104 provides no penalties for violation of statutory duties. R.C. 5104.99 does impose penalties for violations of R.C. 5104.02, 5104.09(B), and 5104.09(C), but none of these sections deals with the duty of a political subdivision to inspect or certify a type-B family day-care home. Accordingly, **[***9]** we hold that *HN11* ⚓within the meaning of R.C. 2744.02(B)(5), R.C. 5104.11 does not expressly impose liability

on a political subdivision for failure to inspect or for the negligent certification of a type-B family day-care home even where the political subdivision has completely ignored the obligations imposed upon it by the statute. Further, after an extensive review of pertinent sections of [**558] the Revised Code, we also find that within the meaning of R.C. 2744.02(B)(5), no other section of the Revised Code expressly imposes liability on a political subdivision for failure to inspect or for the negligent certification of a type-B family day-care home.

Appellee, like the court of appeals, relies upon *Globe Am. Cas. Co. v. Cleveland* (1994), 99 Ohio App. 3d 674, 679, 651 N.E.2d 1015, 1018, to support the proposition that a statute, by imposing an express duty, also imposes express liability. However, R.C. 2744.02(B)(5) specifically provides to the contrary. "Expressly" means "in direct or unmistakable terms: in an express manner: *explicitly, definitely, directly*." (Emphasis [***10] added.) Webster's Third New International Dictionary (1986) 803. Clearly, *HN12* neither R.C. 5104.11 nor 5104.99, nor any other section of the Revised Code, expressly imposes liability upon a political subdivision for failure to inspect or for negligent certification of a type-B family day-care home. Accordingly, based upon R.C. 2744.02(B)(5), strange as it may seem, CCDHS is immune from liability for failure to inspect or for the negligent certification of a type-B family day-care home because there is no statute expressly imposing liability.

The tragedy of this case is that appellant is able to shuck its clear duties and responsibilities, as are other political subdivisions, on the sole basis of the [*358] doctrine of sovereign immunity. What is this doctrine that permits the government to injure its citizens with impunity? How can a government be immune from liability for an act for which that same government would impose liability upon one of its citizens? The answer is that "government," whoever that may be, has accorded itself the right to negligently injure its citizens with immunity, all in disregard of constitutional protections reserved [***11] by its citizens to themselves.

The Doctrine of Sovereign Immunity

Appellee did not raise the constitutionality of R.C. Chapter 2744 generally or R.C. 2744.02(B) (5) specifically in the courts below. Appellee does, at footnote two of her brief here, urge the court to consider the constitutionality of R.C. 2744.02(B)(5). *HN13* Such a reference is not the procedurally proper way to raise the constitutionality of a statute. See *Cicco v. Stockmaster* (2000), 89 Ohio St. 3d 95, 728 N.E.2d 1066, and R.C. 2721.12.

However, given the allegations of this case, that a child was placed in the care of a person and her facility, that the facility was to be inspected and approved by the Cuyahoga County Department of Human Services, that the background of the care givers was to be checked, that the political subdivision entirely failed to comply with these statutory mandates before the facility was certified, and that when returned to his mother at the end of the work day, the child was dead, having been smothered with duct tape, it does seem that serious questions arise. This is especially true given the [***12] allegation that even though the political subdivision entirely failed to carry out its statutorily mandated duties, the political subdivision is found not to be liable, on the basis that it pleads that it is immune, pursuant to the doctrine of sovereign immunity. It does, indeed, seem fair to ask, "How can this be the law?"

History

The history of sovereign immunity and how we find ourselves where we do in Ohio today is most interesting. The history of the doctrine in this country is associated with the English common-law concept that "the king can do no wrong." See *Haas v. Hayslip* (1977), 51 Ohio St. 2d 135, 140, 5 Ohio Op. 3d 110, 113, 364 N.E.2d 1376, 1379 [**559] (William B. Brown, J., dissenting). n5 That concept evolved from the personal prerogatives of the King of

England, who was considered the fount of justice and equity in the English common-law. In the English feudal system, the lord of the manor was not subject to suit in his own courts. See 1 Pollock & Maitland, The History of English Law Before the Time of Edward I (2 Ed.1968) 518. The king, as highest feudal lord, enjoyed this protection on the theory that **[*359]** no court was above him. *Id.* Further, the king **[***13]** was considered the supreme power and was, thus, infallible. His person was considered sacred, and the law ascribed to him the attribute of sovereignty. Therefore, it was his personal royal prerogative not to be subjected to suit in his own courts. See, generally, Borchard, Government Liability in Tort (1924), 34 Yale L.J. 1, 4. Accordingly, the king could do no wrong.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n5 *Haas v. Hayslip* (1977), 51 Ohio St. 2d 135, 5 Ohio Op. 3d 110, 364 N.E.2d 1376, was overruled by *Haverlack v. Portage Homes, Inc.* (1982), 2 Ohio St. 3d 26, 2 Ohio B. Rep. 572, 442 N.E.2d 749.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Although the notion of sovereign immunity is best suited to a government of royal power, American courts nonetheless accepted the doctrine in the early days of the republic. See Prosser & Keeton, Law of Torts (5 Ed.1984) 1033. However, courts and commentators have remained mystified *why* the doctrine was ever accepted in this country. Borchard expressed his bafflement this way:

"Nothing seems more clear than that **[***14]** this immunity of the King from the jurisdiction of the King's courts was purely personal. How it came to be applied in the United States of America, where the [royal] prerogative is unknown, is one of the mysteries of legal evolution. Admitting its application to the sovereign and its illogical ascription as an attribute of sovereignty generally, it is not easy to appreciate its application to the United States, where the location of sovereignty--undivided sovereignty, as orthodox theory demands--is a difficult undertaking. It is beyond doubt that the Executive in the United States is not historically the sovereign, and the legislature, which is perhaps the depository of the widest powers, is restrained by constitutional limitations. The federal government is one of delegated powers and the states are not sovereign, according to the Constitution, as demonstrated forcibly by the Civil War and the resulting Amendments. That brings us to the only remaining alternative, that sovereignty resides in the American electorate or the people." (Footnotes omitted.) Borchard, Government Liability in Tort, 34 Yale L.J. at 4-5. See, also, *Muskopf v. Corning Hosp. Dist.* (1961), 55 Cal. 2d 211, 214-216, 11 Cal. Rptr. 89, 90-92, 359 P.2d 457, 458-460. **[***15]**

Indeed, the Declaration of Independence is an expression of why this country chose to sever ties with English rule. In the strongest terms the forefathers of this country stated that we are endowed with "certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness. That to secure these rights, Governments are instituted among Men, deriving their just powers *from the consent of the governed*." (Emphasis added.) Declaration of Independence, July 4, 1776. The rights and powers of governmental entities in this country are *derived* from its citizens.

In his dissenting opinion in *Haas, supra*, 51 Ohio St. 2d at 140, 5 Ohio Op. 3d at 113, 364 N.E.2d at 1379, Justice William B. Brown summed up the entire matter by stating, "It is something of an anomaly that the common-law doctrine of sovereign immunity **[\*\*560]** which is based on the concept that 'the king can do no wrong' was **[\*360]** ever adopted by the American courts." (Footnote omitted.) Further, the United States Supreme Court has also indicated that there is no rational justification in American jurisprudence for the English legal maxim "the King can do no wrong." Specifically, in *Langford v. United States* (1879), 101 U.S. 341, 343, 25 L. Ed. 1010, 1011, **[\*\*\*16]** the court stated, "We do not understand that either in reference to the government of the United States, or of the several States, or of any of their officers, the English maxim has an existence in this country."

The rule of county or local district immunity did not originate with the concept of sovereign immunity. Indeed, legal authorities agree that the concept of local governmental immunity can be traced to the English case of *Russell v. Men of Devon* (K.B.1788), 100 Eng.Rep. 359, and the misapplication of *Russell* by a Massachusetts court in 1812.

In *Russell*, the plaintiffs' wagon was damaged as a consequence of a bridge being out of repair. The plaintiffs sued the inhabitants of the unincorporated county for trespass on the case. However, the court denied recovery on the basis that the inhabitants were not incorporated and, thus, there was no fund from which a judgment could have been paid. In support of the holding, one member of the court said that "it is better that an individual should sustain an injury than that the public should suffer an inconvenience." *Id.* at 362.

The rule of *Russell* was first introduced into this country **[\*\*\*17]** in *Mower v. Inhabitants of Leicester* (1812), 9 Mass. 247, 1812 WL 927. In *Mower*, a stagecoach belonging to the plaintiff, Ephraim Mower, was traveling through the town of Leicester when one of his horses was fatally injured as a consequence of a bridge being out of repair. The plaintiff sued the inhabitants of Leicester, and a verdict was returned in his favor. In contrast to the county in *Russell*, the town of Leicester was incorporated and had a public treasury out of which any judgment could have been paid. However, ignoring the fact that Leicester was incorporated and that *Mower* was thus clearly distinguishable from *Russell*, the Massachusetts court held that no recovery could be had against the townspeople unless the recovery was authorized by statute. *Mower*, 9 Mass. at 250. *This rule of local government immunity then became the general American rule.* See Borchard, Government Liability in Tort, 34 Yale L.J. at 41-42; and *Muskopf, supra*, 55 Cal. 2d 211, 11 Cal. Rptr. 89, 359 P.2d 457. However, a reading of *Mower* demonstrates that there existed no logical reason in that case for recovery to have **[\*\*\*18]** been denied. In the words of Justice William B. Brown, "the common-law precedent for municipal immunity ( *Russell v. Devon* [1788], 100 Eng.Rep. 359), denied recovery because of the absence of a 'corporation fund' from which satisfaction could be made. Since the *Mower* case did not deal with a lack of a corporate fund, it was essentially decided on the grounds of which party should **[\*361]** bear the loss." *Haas*, 51 Ohio St. 2d at 140, 5 Ohio Op. 3d at 113, 364 N.E.2d at 1380, fn. 3 (William B. Brown, J., dissenting).

Ohio courts in the early 1800s did not share the view that local government units were immune from liability. Rather, "during the period immediately following *Mower* and, indeed, throughout the early 1800's, Ohio courts favored imposition of liability on local government units. Concerned primarily with establishing a rule that promoted 'substantial justice,' Ohio courts considered municipal corporations and individuals equally responsible in tort. Justice was considered served only by spreading the losses inflicted upon private **[\*\*561]** individuals through the execution of governmental activity upon everyone who had shared a benefit from such activity. **[\*\*\*19]** " (Footnotes omitted.) Note, Municipal Immunity in Ohio--How Much Wrong Can a Municipality Do? (1984), 15 U.Tol.L.Rev. 1559, 1566. See, also, Comment, The Ohio Political Subdivision Tort Liability Act: A Legislative Response to the Judicial Abolishment of Sovereign Immunity (1986), 55 U.Cin.L.Rev. 501, 502 (the Ohio Supreme Court first introduced the doctrine of municipal sovereign immunity in 1854 and,

prior to that time, courts treated Ohio municipalities the same as private individuals when imposing liability for wrongful acts or injuries); Comment, Can Municipal Immunity in Ohio be Resurrected from the Sewers after *Haverlack v. Portage Homes, Inc.?* (1983), 13 Cap.U.L.Rev. 41, 42 ("The early Ohio cases which dealt with municipal tort liability did not recognize immunity"); and Celebrezze & Hull, The Rise and Fall of Sovereign Immunity in Ohio (1984), 32 Cleve.St.L.Rev. 367, 367-368 ("Municipal corporations have not always been protected by sovereign immunity in Ohio. Instead, early cases held municipalities subject to action in tort as a matter of basic justice").

The doctrine of sovereign immunity was first applied in Ohio in 1840 in **[***20]** *State v. Franklin Bank of Columbus* (1840), 10 Ohio 91, 1840 WL 18. See Celebrezze & Hull, The Rise and Fall of Sovereign Immunity in Ohio, *supra*, 32 Cleve.St.L.Rev. at 369. However, *Franklin Bank of Columbus* involved the liability of the state of Ohio--not a political subdivision of the state. It was not until the 1854 case of *Dayton v. Pease* (1854), 4 Ohio St. 80, 1854 WL 63, that the doctrine of sovereign immunity was expanded to include political subdivisions (municipal corporations) of the state. See Celebrezze & Hull, The Rise and Fall of Sovereign Immunity in Ohio, *supra*, 32 Cleve.St.L.Rev. at 370. See, also, Comment, The Ohio Political Subdivision Tort Liability Act, *supra*, 55 U.Cin.L.Rev. at 502. Prior to our 1854 decision in *Pease*, Ohio courts had imposed tort liability on municipal corporations as a matter of basic justice. See Celebrezze & Hull, The Rise and Fall of Sovereign Immunity in Ohio, *supra*, 32 Cleve.St.L.Rev. at 367-369; Comment, The Ohio Political Subdivision Tort Liability Act, *supra*, 55 U.Cin.L.Rev. at 502; and Note, Municipal Immunity in Ohio, *supra*, 15 U.Tol.L.Rev. at 1566. **[***21]** For example, in the several cases discussed below, spanning the period from 1831 to **[*362]** 1849, this court recognized the right to recover against political subdivisions (municipal corporations) of the state for injuries inflicted upon private individuals.

In the first of these, *Goodloe v. Cincinnati* (1831), 4 Ohio 500, 1831 WL 35, the defendant, Cincinnati, performed street repairs that included the excavation of the existing street that abutted the plaintiff's house and paved alleyway. The plaintiff brought an action alleging that the defendant, while grading an adjacent street, maliciously damaged his walls and basement. While the allegation of malice suggests some form of intentional act, the facts support nothing more than a claim of simple negligence. The trial court found in favor of the plaintiff; however, on appeal the court of appeals reversed. On appeal, this court reinstated the trial court's judgment, holding, "When a corporation acts illegally or maliciously, we conceive it ought to be made directly responsible. Such is the plain dictate of justice, and we see no technical rule of law that forbids us to act upon it." *Id.* at 514. In reaching **[***22]** our conclusion we reasoned that municipal corporations in this country were performing all manner of operations for their own benefit and that "whatever may have been the ancient doctrines, with regard to **[**562]** liability of corporations, for wrongs done by their agents, courts have gradually departed from them, and adopted principles more congenial to the state and condition of the world." *Id.* at 513.

*Smith v. Cincinnati* (1831), 4 Ohio 514, 1831 WL 36, was decided on the same basis as *Goodloe*. However, in contrast to the decision in *Goodloe,* this court in *Smith* noted that the plaintiff did not allege that the actions of the city were malicious. Thus, in order to succeed on a claim sounding in negligence, a plaintiff did not have to establish that a political subdivision's actions were malicious.

In *Rhodes v. Cleveland* (1840), 10 Ohio 159, 1840 WL 31, this court further clarified the law with regard to the liability of political subdivisions. *Rhodes* involved a political subdivision digging drainage ditches that later flooded the plaintiff's land. This court reversed a verdict in favor of the political subdivision, where **[***23]** the jury was charged that the plaintiff could sustain his claim only if he showed that the defendant acted illegally or, if within its authority, acted maliciously. We forthrightly held that [HN14]"corporations [political subdivisions] are liable like individuals, for injuries done, although the act was not beyond

their lawful powers." *Id.* at 161. Thus, the court no longer confined its determinations of political subdivision liability to instances where the political subdivision had acted beyond the scope of its authority or had acted maliciously.

*Rhodes* also stated that it did "not look so much for precedents as to the following out of incontestable principles; for the current of decisions, for a long time, has been to increase the liabilities of corporations." *Id.* The court further reasoned that "justice and good morals require that a corporation should repair a consequential injury which ensues from the exercise of its functions." *Id.* at 161. **[\*363]** Chief Justice Lane wrote, "Every year furnishes new examples, of the *extension of remedies against them*, where injury is done, and remedies are applicable. It does not, therefore, appear to me **[\*\*\*24]** to be a sufficient reason, against sustaining this suit, that in other states the remedy is not extended so far." (Emphasis added.) *Id.*

In *McCombs v. Town Council of Akron* (1846), 15 Ohio 474, 1846 WL 120, the plaintiff alleged that the political subdivision, while grading a street, damaged the plaintiff's house and property. As in *Goodloe*, the facts of this case reflect nothing more than what we refer to today as simple negligence. The plaintiff asked the trial court to charge the jury that if the political subdivision caused injury to the plaintiff's property, the plaintiff could recover *even if* the political subdivision acted strictly within its authority with no intent to injure the plaintiff's property. The trial court refused to make this instruction to the jury. On appeal, the trial court's judgment was affirmed.

On appeal to the Supreme Court en banc, the court reversed, relying on *Rhodes*, and held that a political subdivision is liable for injuries resulting to the property of others from its act, though strictly within its corporate authority. In reaching its conclusion, *McCombs* questioned the genesis of corporate immunity and stated, **[\*\*\*25]** "A sort of transcendentalism which enveloped both the courts and the profession in a mist growing out of the airy nothingness of the subject matter, enabled corporations, like pestilence which walketh unseen, to do their mischief and escape the responsibility." *Id.* at 480. This court further declared, " 'That the rights of one should be so used as not to impair the rights of another, is a principle of morals which, from very remote ages, has been recognized as a maxim of law.' " *Id.*, quoting **[\*\*563]** *Rhodes*, 10 Ohio at 160. The case was remanded to the trial court.

Upon remand, the trial court issued jury instructions in accordance with the law set forth by this court, and the jury returned a verdict in favor of the plaintiff. Three years after the case was remanded it was appealed once again to this court. In *Town Council of Akron v. McComb* (1849), 18 Ohio 229, 1849 Ohio LEXIS 105, the political subdivision claimed that the first decision in *McCombs v. Town Council of Akron* (1846), 15 Ohio 474, 1846 WL 120, had introduced a new doctrine of "doubtful propriety." *Id.*, 18 Ohio at 230. In response, this **[\*\*\*26]** court restated its reliance upon *Rhodes* as being the first decision in this state which recognized that *HN15* an action "sounding in tort, would lie against a municipal corporation by name, for an act done within the powers granted by its charter." 18 Ohio at 231. This court held once again that the political subdivision "will be held liable to the party injured, to make good his loss." 18 Ohio at 232.

The cases of *Goodloe* and *Smith* were ultimately tried before juries. See *Smith v. Cincinnati* (1831), 4 Ohio 514, 1831 WL 36, Reporter's Note. *Rhodes* and **[\*364]** *McCombs*, too, were tried before juries. Each case involved an action sounding in negligence or, more particularly, an action for trespass on the case. It was not until *Dayton v. Pease* (1854), 4 Ohio St. 80, 1854 WL 63, that political subdivision immunity was discussed as a defense to the negligent acts of political subdivisions.

In *Pease*, the defendant political subdivision, pursuant to a plan provided by the city engineer, began constructing a bridge over a canal. During the construction the bridge collapsed into the canal and blocked the water flow of **[\*\*\*27]** the canal. The plaintiff

owned a mill upstream from the fallen bridge, whose operation was prevented first by rising water, then by diversion of water upstream of the mill so that the wreckage could be cleared. The plaintiff sued the defendant for "wrongfully and injuriously" constructing a bridge that was so inartfully constructed that it fell into the canal and dammed up the water preventing the plaintiff from the use of his mill. In essence, the plaintiff claimed negligence. This court found that the political subdivision was liable for injuries resulting from the negligent acts of its agents, who were authorized and directed by the political subdivision.

*Pease* distinguished *Rhodes* and both *McCombs* cases as holding that [HN16] a political subdivision may be liable for acts through its agents, within the scope of its authority, *and without malice or negligence*. *Pease*, 4 Ohio St. at 94. *Pease* uses the term negligence to represent the carelessness of the city engineer in carrying out a task established by the political subdivision. The court in *Pease* distinguished *Rhodes* and both *McCombs* cases on the basis that, in *Pease*, the employee **[***28]** did not carry out the task carefully and skillfully, whereas in *Rhodes* and both *McCombs* cases, there were no allegations that the employees deviated from any directives placed upon them by the political subdivision, and, thus, the damages were not attributable to negligence. However, the facts as alleged in *Pease*, *Rhodes*, and both *McCombs* cases, if viewed today, would all be treated as supporting negligence actions. Thus, the distinctions made by *Pease* are of no import today.

Additionally, and contrary to the assertions in *Pease*, *Rhodes* did not predicate a political subdivision's liability upon a finding of negligence, maliciousness, or lack of authority. *Rhodes* held only that "corporations are liable like individuals, for injuries done, although the act was not beyond their lawful powers." *Rhodes*, 10 Ohio at 161. As a result of this discussion, it is **[**564]** clear that *Pease* failed to appreciably distinguish *Rhodes* and both *McCombs* cases, and did not even address *Goodloe* and *Smith*. Furthermore, *Pease* misused *Rhodes* to apply limitations on political subdivision liability that were clearly not intended.

*Pease*, **[***29]** as a basis for reinvestigating the doctrines upon which *Rhodes* and *McCombs* were founded, had to distinguish those cases. *Pease*, 4 Ohio St. at 94. **[*365]** In furtherance of this, *Pease* discussed a number of New York cases that developed theories of political subdivision immunity and exceptions thereto, including governmental versus proprietary functions and ministerial versus discretionary acts. Yet in its discussion of these theories, *Pease* disregards the clear intention of *Rhodes*, which did not place any limitations on political subdivision liability beyond that which would apply to an individual. Finally, despite its discussions of political subdivision immunity, *Pease* ultimately found that the political subdivision was liable for the collapse of the bridge. *Pease*, 4 Ohio St. at 100-101.

In addition to *Goodloe*, *Smith*, *Rhodes*, and *McCombs*, there is some evidence that the common law of this country at the time the Ohio Constitution was adopted in 1851 actually recognized no impediments to recovery against a corporate political subdivision of the state. In *Hack v. Salem* (1963), 174 Ohio St. 383, 392, 23 Ohio Op. 2d 34, 38, 189 N.E.2d 857, 862, **[***30]** Justice Gibson stated in a concurring opinion, "In the early reported American cases it apparently was assumed, without argument and as a matter of basic justice, that municipal corporations were subject to actions for torts." Professor Barnett has said, "The earliest reported American case coming to attention that recognized the tort liability of a municipal corporation is *Hooe v. Alexandria* [(1802), 1 Cranch C.C. 90, 12 F. Cas. 461, No. 6666], decided in 1802, in which no distinction was made between the tort liability of public and private corporations, and the city was held liable [in a jury trial], simply as 'a corporation.' " Barnett, The Foundations of the Distinction Between Public and Private Functions in Respect to the Common-Law Tort Liability of Municipal Corporations (1937), 16 Ore.L.Rev. 250, 259. Furthermore, Justice Gibson's concurrence in *Hack* makes clear that the early cases in Ohio took the same approach as to tort liability of municipal corporations. *Hack*, 174 Ohio St. at 392, 23 Ohio Op. 2d at 39, 189 N.E.2d at 863.

Further, even if Ohio courts recognized immunity for corporate political subdivisions

at [***31] the time of the adoption of the 1851 Ohio Constitution, such immunity apparently originated as an extension of the concept that "the King can do no wrong." However, as shown above, it appears that the historic justification for that English maxim never existed in this country. Therefore, it follows that the common law of this country should never have recognized such an impediment to an action against a political subdivision. Alternatively, county or local district immunity could have been predicated on the 1788 case of *Russell v. Men of Devon*, 100 Eng.Rep. 359. If so, any grant of immunity might have been the product of an enormous judicial mistake. *Russell* does not stand for the proposition that there exists county or local district immunity from liability for negligence. Indeed, just the opposite is true. That is, a careful reading of *Russell* indicates that recovery most likely would have been allowed had the [*366] defendants in the action been an incorporated governmental entity with a public treasury from which a judgment could have been paid. Therefore, the common law of this country actually recognizes no rational justification for extending immunity to political [***32] subdivisions of the state. [**565]

Thus, the doctrine of sovereign immunity for political subdivisions was judicially created. As such, the doctrine could be judicially abolished. This court did so in *Haverlack v. Portage Homes, Inc.* (1982), 2 Ohio St. 3d 26, 2 Ohio B. Rep. 572, 442 N.E.2d 749. In *Haverlack* we recognized that sovereign or governmental immunity was judicially created and, thus, could be judicially abolished:

"As aptly stated by Justice William B. Brown in *Haas*, *supra* [51 Ohio St. 2d 135, 145, 5 Ohio Op. 3d 110, 116, 364 N.E.2d 1376, 1382], [HN17] 'the judicially created doctrine of sovereign immunity is a legal anachronism which denies recovery to injured individuals without regard to the municipality's culpability or the individual's need for compensation.' * * * Because Ohio's sovereign immunity for municipalities was judicially created (see *State v. Franklin Bank of Columbus* [1840], 10 Ohio 91; *Western College of Homeopathic Medicine v. Cleveland* [1861], 12 Ohio St. 375 [1861 WL 41]; and *Thacker v. Bd. of Trustees of Ohio State Univ.* [1973], 35 Ohio St. 2d 49, 67-68 [64 Ohio Op. 2d 28, 38, 298 N.E.2d 542, 552-553] [***33] [William B. Brown, J., dissenting]), it can be judicially abolished. * * * When we considered sovereign immunity last year, we noted that only six other states adhered to the traditional common law immunity doctrines. *Schenkolewski v. [Cleveland] Metroparks System* (1981), 67 Ohio St. 2d 31, 38 [21 Ohio Op. 3d 19, 24, 426 N.E.2d 784, 788-789]. *Stare decisis* alone is not a sufficient reason to retain the doctrine which serves no purpose and produces such harsh results. Therefore, we join with the other states in abrogating the doctrine." *Haverlack*, 2 Ohio St. 3d at 30, 2 Ohio B. Rep. at 575, 442 N.E.2d at 752.

*Haverlack* implies that sovereign immunity for municipalities was accepted in this state by 1840 in *Franklin Bank of Columbus*, *supra*, 10 Ohio 91. However, *Franklin Bank of Columbus* actually says that no suit can be brought against the *state*--not a *political subdivision* of the state. The other early case cited by the *Haverlack* court as creating sovereign immunity for municipalities was *W. College of Homeopathic Medicine v. Cleveland* (1861), 12 Ohio St. 375, 1861 WL 41, which did involve the liability of a political [***34] subdivision of the state, but which was decided after the adoption of Section 5, Article I of the Ohio Constitution. n6 It is also important to recognize that *Haverlack* adopted the historical analysis of sovereign or governmental immunity set forth in Justice William B. Brown's [*367] dissent in *Haas*, 51 Ohio St. 2d at 140-145, 5 Ohio Op. 3d at 113-116, 364 N.E.2d at 1379-1382, and the analysis of Justice Gibson's concurrence in *Hack*, 174 Ohio St. at 391-402, 23 Ohio Op. 2d at 38-45, 189 N.E.2d at 862-869, wherein it was essentially argued that municipal immunity has no rational justification in the common law of this country.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n6 [HN18] Section 5, Article I of the Ohio Constitution provides, "The right to trial by jury shall be inviolate, except that, in civil cases, laws may be passed to authorize the rendering of a

verdict by a concurrence of not less than three-fourths of the jury." See discussion regarding the right to trial by jury, *supra*.


- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Although the court found no justification **[\*\*\*35]** for sovereign immunity for municipalities, it went on to state, "We hold that the defense of sovereign immunity is not available, *in the absence of a statute providing immunity*, to a municipal corporation in an action for damages alleged to be caused by the negligent operation of a sewage treatment plant. *HN19*A municipal corporation, *unless immune by statute*, is liable for its negligence in the performance or nonperformance of its acts." (Emphasis added.) *Haverlack*, 2 Ohio St. 3d at 30, 2 Ohio B. Rep. at 575, 442 N.E.2d at 752; see, **[\*\*566]** also, paragraph two of the syllabus. These statements, however, were made without citation to any authority and without consideration of Section 5, Article I of the Ohio Constitution.

The abolishment of "sovereign immunity" by this court set in motion activity by the General Assembly. In 1985, the General Assembly enacted R.C. Chapter 2744, the Political Subdivision Tort Liability Act. Included in that Act, in addition to other types of political subdivision immunity, is R.C. 2744.02(B)(5), the section of the Revised Code at issue in the case at bar.

Since the enactment of R.C. Chapter 2744, this court and courts all **[\*\*\*36]** across the state have been called upon, time and time again, to unravel what that law provides as applied to a myriad of fact patterns. Often we have been referred to *Menefee v. Queen City Metro* (1990), 49 Ohio St. 3d 27, 550 N.E.2d 181, *Fabrey v. McDonald Village Police Dept.* (1994), 70 Ohio St. 3d 351, 639 N.E.2d 31, and *Fahnbulleh v. Strahan* (1995), 73 Ohio St. 3d 666, 653 N.E.2d 1186, for the propositions that the right to sue a political subdivision is not a fundamental right and that immunity existed at common law and thus there is no right to a jury trial. The last two of these cases rely on the *second sentence* of Section 16, Article I, which is inapplicable to political subdivisions because that section applies only to the state.

Accordingly, the only cases that are pertinent for discussion on political subdivision tort liability are those which interpret R.C. Chapter 2744. In trying to arrive at equitable as well as law-based decisions, courts, one after another, have found it necessary, when interpreting various sections of R.C. Chapter 2744, to stretch the statute beyond its parameters. This occurs because courts are having **[\*\*\*37]** to make equitable decisions in an inherently inequitable system.

Thus, as recently as March of this year, this court decided *Muenchenbach v. Preble Cty.* (2001), 91 Ohio St. 3d 141, 742 N.E.2d 1128, holding that a four-wheeled tractor equipped with a street-sweeping brush on the front and a scraper **[\*368]** blade on the back, and being used in construction work, might be a motor vehicle "employed in general highway transportation." In writing for the court, Justice Resnick said that "for purposes of R.C. 2744.02(B)(1), a 'use standard' is an appropriate test for determining whether a vehicle is excepted from the definition" of motor vehicle found in R.C. 4511.01(B). *Id.* at 148, 742 N.E.2d at 1133. The *Muenchenbach* court, quoting the Court of Appeals for Cuyahoga County in *Putka v. Parma* (1993), 90 Ohio App. 3d 647, 652, 630 N.E.2d 380, 383, stated that where a backhoe, customarily used in construction work, " 'is operated on the public road like any other vehicle, it cannot be exempt as a *matter of law* from being classified as a "motor vehicle" on the pretext that it traveled a short **[\*\*\*38]** distance.' " (Emphasis added.) *Muenchenbach*, 91 Ohio St. 3d at 144, 742 N.E.2d at 1130.

In 1999, this court decided *Perkins v. Norwood City Schools* (1999), 85 Ohio St. 3d 191, 707 N.E.2d 868, with Chief Justice Moyer writing for the court. There we held that a school district was not entitled to immunity, pursuant to R.C. 2744.03(A)(5), where a student in the

school fell and injured himself as a result of water on the floor, which was there from a leaking drinking fountain.

In *Cater v. Cleveland* (1998), 83 Ohio St. 3d 24, 697 N.E.2d 610, syllabus, we held, "The operation of a municipal swimming pool, although defined as a governmental function in R.C. 2744.01(C)(2)(u), is subject to the exceptions to immunity set forth in former R.C. 2744.02 (B) * * *." In so holding, Justice Francis Sweeney found that glare caused by sunlight reflecting off **[\*\*567]** a glass-paneled wall along the side of the pool was a nuisance, and, accordingly, the city could be liable for the drowning death of a twelve-year-old boy.

In *Garrett v. Sandusky* (1994), 68 Ohio St. 3d 139, 624 N.E.2d 704, **[\*\*\*39]** a nearly unanimous court found that a wave pool is not a swimming pool: "In the present case, the Surf's Up Aquatic Center operated by the city was not merely a 'swimming pool.' The wave activation device at this facility materially transformed the pool from a placid body of water, commonly known as a swimming pool, to a potentially hazardous body of churning water. A wave pool is more akin to an amusement ride, which is not an immunized municipal function according to R.C. Chapter 2744." 68 Ohio St. 3d at 140, 624 N.E.2d at 706. In concurring in judgment only, Justice Pfeifer discussed Section 16, Article I of the Constitution of Ohio. While that section of the Constitution applies to suits against the state and not a political subdivision (the governmental entity we had in *Garrett*), nevertheless what was said is important and makes the point. Justice Pfeifer said, "The true intent of the amendment to Section 16, Article I *was to abolish sovereign immunity in its entirety.* * * * Governmental immunity, *including municipal immunity,* is contrary to the clear meaning and mandate of the Ohio Constitution." (Emphasis added.) 68 Ohio St. 3d at 144, 624 N.E.2d at 708. **[\*\*\*40]** **[\*369]**

In 1997, *Hill v. Urbana* (1997), 79 Ohio St. 3d 130, 679 N.E.2d 1109, was decided. Therein, an independent contractor was hired to assist Urbana in improving its water distribution system. The project was under the supervision of Urbana's Water Department supervisor. Hill, an employee of the independent contractor, was injured when the water pressure blew the valve off the pipe being worked on by Hill. The water was turned on prior to Hill's completion of his task, contrary to his specific requests. We held that because maintenance and operation of a municipal corporation water supply system is a proprietary function of a political subdivision under R.C. 2744.01(G)(2)(c), the political subdivision was not immune to suit for its negligence under R.C. 2744.02(B)(2).

The forgoing sample listing of cases is by no means all-inclusive. There have been, and continue to be, many more. We have not, of course, been alone in this struggle. Courts of appeals all across this state continue to confront fact patterns presenting claims of sovereign immunity when the results of so finding would be inequitable at best and disastrous **[\*\*\*41]** at worst.

In *Groves v. Dayton Pub. Schools* (1999), 132 Ohio App. 3d 566, 725 N.E.2d 734, a disabled student sued a school district seeking damages for injuries she suffered as a result of a district bus driver's alleged negligence in failing to secure her in her wheelchair when helping her off the bus. The statute being construed, R.C. 2744.02(B)(1), provided an exception to immunity where injuries were caused by the negligent operation on public roads of any motor vehicle by an employee of a political subdivision acting within the scope of his employment. The Second District Court of Appeals affirmed the trial court's denial of the political subdivision's motion to dismiss, holding that it could be inferred from the complaint that the driver's actions were part of his duties and that it could be found that the driver was operating the school bus at the time of the student's injury. *Id.* at 570, 725 N.E.2d at 737.

In *Hunsche v. Loveland* (1999), 133 Ohio App. 3d 535, 729 N.E.2d 393, a political subdivision owned a park outside its corporate limits. On this land the city deposited a large pile of dirt. The city **[\*\*\*42]** failed to maintain effective erosion-control measures, thus

dramatically increasing the amount of water and sediment draining **[\*\*568]** from the park into the pond of neighboring property owners. The First District Court of Appeals upheld the trial court's determination that the political subdivision was not immune from suit and that the city engaged in willful, wanton, and reckless conduct. *Id.* at 542, 729 N.E.2d at 397-398.

As recently as December of last year, the Tenth District Court of Appeals decided *Hunter v. Columbus* (2000), 139 Ohio App. 3d 962, 746 N.E.2d 246, discretionary appeal denied (2001), 91 Ohio St. 3d 1493, 745 N.E.2d 439. For purposes of summary judgment there was evidence that a driver of an emergency vehicle, driving sixty-one m.p.h. in a thirty-five m.p.h. speed zone and driving left **[\*370]** of center, crashed into a vehicle operated by plaintiff's decedent, thereby causing the death of plaintiff's decedent. The court held that the city was not entitled to immunity, because the driver's conduct could be found to be willful and wanton misconduct under R.C. 2744.02(B)(1)(c).

Once again, the foregoing examples **[\*\*\*43]** are just that--examples. n7 They are but a few examples of necessity being the mother of invention and resulting in judicially created exceptions to sovereign immunity. The danger is best described by the legal maxim *nil agit exemplum litem quod lite resovit*. A precedent accomplishes nothing if it settles one dispute by raising another. So many of these sovereign immunity cases do just that. In retrospect, they present more questions than the single question they answer.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n7 For some further cases involving judicially created exceptions to sovereign immunity, see *Harp v. Cleveland Hts.* (2000), 87 Ohio St. 3d 506, 721 N.E.2d 1020; *Greene Cty. Agricultural Soc. v. Liming* (2000), 89 Ohio St. 3d 551, 733 N.E.2d 1141; *Mfr's. Natl. Bank of Detroit v. Erie Cty. Rd. Comm.* (1992), 63 Ohio St. 3d 318, 587 N.E.2d 819; *Doe v. Dayton City School Dist. Bd. of Edn.* (1999), 137 Ohio App. 3d 166, 738 N.E.2d 390; *Globe Am. Cas. Co. v. Cleveland* (1994), 99 Ohio App. 3d 674, 651 N.E.2d 1015; *Putka v. Parma* (1993), 90 Ohio App. 3d 647, 630 N.E.2d 380; *Starling v. MetroHealth Ctr. Skilled Nursing*, 1999 Ohio App. LEXIS 4109 (Sept. 2, 1999), Cuyahoga App. No. 75554, unreported, 1999 WL 685641; and *Reed v. Perry Cty. Children's Serv.*, 1993 Ohio App. LEXIS 2982 (June 8, 1993), Perry App. No. CA-437, unreported, 1993 WL 221260.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[\*\*\*44]**

A review of these cases indicates that the exceptions to the rule of sovereign immunity are so numerous as to threaten to subsume the rule itself. The reason should be clear. This usually happens when a rule itself is faulty, *i.e.*, is not soundly based in legal history or the law. That is the case of the concept of sovereign immunity for political subdivisions. We have already reviewed, above, the legal history of the doctrine. That leaves yet to be discussed why the doctrine is also faulty when the Ohio Constitution (the law) is examined.

Trial by Jury

The right to trial by jury derives from the Magna Carta. It is reasserted in both the Constitution of the United States and the Constitution of the state of Ohio. Even before the adoption of a state constitution, the first laws governing the territory of Ohio provided for the right to a trial by jury, stating, "No man shall be deprived of his liberty or property, *but by the judgment of his peers*, or by the law of the land * * *." (Emphasis added.) Article 2, Ordinance of July 13, 1787. For centuries, the right to a jury trial has been held to be a fundamental constitutional right. See *Cleveland Ry. Co. v. Halliday* (1933), 127 Ohio St. 278, 284, 188 N.E. 1, 3. **[\*\*\*45]** It is a substantive right, not a mere procedural privilege. See *id.* at paragraph one of the syllabus, and *Kneisley v. Lattimer-Stevens Co.* (1988), 40 Ohio

St. 3d 354, 356, 533 N.E.2d 743, 746. **[\*371]**

The right to trial by jury is one of the most fundamentally democratic institutions **[\*\*569]** in the history of the human race. Throughout history, the right to trial by jury has been considered the crown jewel of our liberty. "For 500 years, trial by jury has been praised as the most cherished institution of free and intelligent government that the world has ever seen and as the best institution for the administration of justice ever devised by the mind of man." 1 Few, In Defense of Trial by Jury (1993) 74.

The founders of this great nation held the right to trial by jury in very high esteem. Prior to the ratification of our nation's Constitution, in a letter to James Madison, Thomas Jefferson expressed concern regarding the omission of a right to trial by jury in the proposed bill of rights. The Writings of Thomas Jefferson (Padover Ed.1967) 312. In particular, Jefferson recognized that several states had been "so incautious as to dispense" with the right to trial by jury and that **[\*\*\*46]** to go forward without the right would reduce the more prudent states to the same level of "calamity" as those states that had dispensed with it. *Id*. Jefferson considered the exclusion of the right by other states and found it "much more just and wise to have concluded the other way, that as most of the States had preserved with jealousy this sacred palladium of liberty, those who had wandered, should be brought back to it; and to have established a general right rather than a general wrong." *Id*. Following the ratification of our nation's Constitution, while presenting the proposed Bill of Rights to the House of Representatives, James Madison stated that the civil jury is "one of the best securities of the rights of the people [which] ought to remain inviolate." 1 Few, In Defense of Trial by Jury (1993) 74. Thomas Jefferson lauded the right to a jury trial as among the principles that "the wisdom of our sages and blood of our heroes" had been devoted to attain. He urged, "Should we wander from them in moments of error or alarm, let us hasten to retrace our steps and to regain the road which alone leads to peace, liberty, and safety." The Writings of Thomas Jefferson (Padover **[\*\*\*47]** Ed.1967) 274. Our forefathers were willing to sacrifice their very lives to preserve for the people of the United States of America the inestimable right to trial by jury.

In the words of United States Supreme Court Justice (now Chief Justice) William J. Rehnquist, "The founders of our Nation considered the right of trial by jury in civil cases an important bulwark against tyranny and corruption, a safeguard too precious to be left to the whim of the sovereign, or, it might be added, to that of the judiciary. * * * Trial by a jury of laymen rather than by the sovereign's judges was important to the founders because juries represent the layman's common sense * * * and thus keep the administration of law in accord with the wishes and feelings of the community." *Parklane Hosiery Co., Inc. v. Shore* (1979), 439 U.S. 322, 343-344, 99 S. Ct. 645, 657-658, 58 L. Ed. 2d 552, 570 (Rehnquist, J., dissenting). **[\*372]**

The Ohio Constitution recognizes the fundamental right to trial by jury in Section 5, Article I, which states:

> "The right of trial by jury shall be *inviolate*, except that, in civil cases, laws may be passed to authorize the rendering of a verdict by the concurrence **[\*\*\*48]** of not less than three-fourths of the jury." (Emphasis added.)

It is difficult to imagine a more forceful way of saying that the right to trial by jury should in no way be infringed.

R.C. 2744.02(B)(5) operates to restrict Butler's right to hold appellant, CCDHS, and its employee liable for their negligence in ignoring the duty to inspect Guardian Angel before certifying it as a type-B day-care home. However, if Butler had a constitutionally **[\*\*570]** protected right to a trial by jury in her action against CCDHS, then any application of R.C. 2744.02(B)(5) that restricts her right to a trial by jury would be constitutionally impermissible.

*HN20* Section 5, Article I of the Ohio Constitution does not guarantee a jury trial in all cases. Rather, "Section 5 of Article I of the Constitution of Ohio only guarantees the right of trial by jury in those cases where it existed previous to its adoption." *Belding v. State ex rel. Heifner* (1929), 121 Ohio St. 393, 169 N.E. 301, paragraph one of the syllabus. See, also, *Sorrell v. Thevenir* (1994), 69 Ohio St. 3d 415, 421, 633 N.E.2d 504, 510.

Here, Butler asserted an action **[\*\*\*49]** for negligence against CCDHS, a political subdivision of the state. Negligence actions evolved from the common-law action of trespass on the case, and there is no question that the right to trial by jury existed in such actions at the time the Ohio Constitution was adopted. Moreover, a right to trial by jury in a negligence action against a *political subdivision* existed at the time the Ohio Constitution was adopted, as we have set forth previously in discussing *Goodloe*, *Smith*, *Rhodes*, and *McCombs I and II*. Thus, Butler had a constitutionally protected right to trial by jury against CCDHS, and, accordingly, R.C. 2744.02(B)(5) should not be applied to negate any negligence of CCDHS, since doing so would violate Section 5, Article I of the Ohio Constitution.

Additionally, the concept of sovereign immunity is applicable in this country (if at all) to the federal and state governments--not to the political subdivisions of the state. See, generally, Prosser & Keeton, Law of Torts (5 Ed.1984) 1033, 1043 and 1051, Section 131. *HN21* Corporate political subdivisions of the state are not sovereign powers. By definition, *HN22* a "sovereign" is "[a] person, **[\*\*\*50]** body, or state vested with independent and supreme authority." Black's Law Dictionary (7 Ed.1999) 1401. "Sovereignty" means "the supreme political authority of an independent state." *Id.* at 1402. In this regard, a political subdivision of a state government cannot by any stretch of the imagination be considered a sovereign power. **[\*373]**

Finally, a review of the constitutional and statutory provisions with respect to sovereign immunity is instructive. *HN23* R.C. 2744.01(H) of the Political Subdivision Tort Liability Act provides, " 'State' means the state of Ohio * * *. 'State' does not include political subdivisions." *HN24* R.C. 2743.01(A) of the Court of Claims Act reads the same: " 'State' means the state of Ohio * * *. 'State' does not include political subdivisions."

*HN25* R.C. 2743.01(B) provides, " 'Political subdivisions' means municipal corporations * * * and all other bodies corporate and politic responsible for governmental activities * * * *to which the sovereign immunity of the state attaches*." (Emphasis added.) *HN26* The second sentence of Section 16, Article I, Ohio Constitution provides, "Suits may be brought against **[\*\*\*51]** the state, in such courts and in such manner, as may be provided by law." This provision was placed in our Constitution, by a vote of the people of Ohio, as a product of the Constitutional Convention of 1912. In furtherance of this provision, the General Assembly passed the Court of Claims Act and R.C. 2743.02, effective in 1975. In R.C. 2743.02, the General Assembly purported to waive the immunity of the state, an immunity, of course, that did not exist, given the waiver in Section 16, Article I, Ohio Constitution and the common law. *HN27* R.C. 2743.02(A)(1) very specifically provides, "The state hereby waives its immunity from liability and consents to be sued, and have its liability determined, in the court of claims created in this chapter in accordance with the same rules of law **[\*\*571]** applicable to suits between private parties * * *."

Therefore, *HN28* pursuant to R.C. 2743.02(A)(1), the state has waived sovereign immunity



and, accordingly, there is no sovereign immunity to attach to political subdivisions, pursuant to R.C. 2743.01(B). This includes, of course, "political [***52] subdivisions" as defined in R.C. 2743.01(B). Thus, for all of the foregoing reasons, "sovereign immunity" never was nor should it ever have been a viable legal doctrine according to which government can injure its citizens with immunity when the same injury is redressable if caused by one of the government's citizens.

Conclusion

The facts of this case are tragic. Nevertheless, unless R.C. Chapter 2744 in general or any of its specific provisions in particular are found to be unconstitutional as violating either Section 5, Article I (jury trial) or the first sentence of Section 16, Article I (right to remedy), n8 R.C. Chapter 2744 remains the law and [*374] must be interpreted and applied (albeit with many exceptions as noted) as written.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


n8 The first sentence of Section 16, Article I, Ohio Constitution provides: "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay."


- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - [***53]

We leave this subject for now with three additional thoughts. First, we do not say, and we do not mean to say, that CCDHS was negligent or did anything wrong in this case. The case was dismissed on a Civ.R. 12(B)(6) motion which, of course, requires us to view all of the allegations of the complaint as true. The only issue before us is whether CCDHS is statutorily immune regardless of any negligence on its part.

Second, a finding that the concept of sovereign immunity is anathema to the thoughts of the founding fathers of our republic or is unconstitutional on the basis of the right to trial by jury or the right to remedy would not be the end of the world. If a political subdivision has an array of reasonable rules and regulations for dealing with its citizens in the performance of its duties, and it and its employees follow those rules, then actions they take that cause injury would not be negligence and, accordingly, there would be no liability--and no need for immunity. If the rules are ignored and negligence ensues and injury results, then the political subdivision can (and most now do) insure itself to compensate those who have suffered as a result of the negligence. This is [***54] no different from what, in many instances, the political subdivision requires of its citizens.

Third, and maybe most important, applying such broad immunity to governmental wrongdoers gives no encouragement to do right, and no liability or penalty for doing wrong. When there is no accountability for failure, failure is sure to follow. n9

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


n9 For comparison to another statute that imposes a duty but does not expressly impose liability, see *Marshall v. Montgomery Cty. Children Serv. Bd.* (2001), 92 Ohio St. 3d 348, 750 N.E.2d 549, 2001 Ohio LEXIS 1891.


- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Socrates once said: "What is in conformity with justice should also be in conformity to the laws." The International Dictionary of Thoughts (1969) 416. Maybe that is why John Fitzgerald Kennedy said: "The achievement of justice is an endless process." *Id.* at 415.

The judgment of the court of appeals is reversed and the judgment of the trial court is reinstated.

*Judgment accordingly.*

F.E. SWEENEY and PFEIFER, JJ., concur.  **[**572]**

MOYER, C.J.,  **[***55]** and BROWN, J., concur in syllabus and judgment.  **[*375]**

COOK and LUNDBERG STRATTON, JJ., separately concur in syllabus and judgment.

SUSAN BROWN, J., of the Tenth Appellate District, sitting for RESNICK, J.

**CONCURBY:** COOK

**CONCUR:**

**COOK, J., concurring in judgment.** Because I agree that R.C. 5104.11 does not expressly impose liability upon a political subdivision within the meaning of R.C. 2744.02(B)(5), I join today's syllabus and judgment. While doing so, I continue to adhere to the views expressed in my dissenting opinion in *Campbell v. Burton* (2001), 92 Ohio St. 3d 336, 750 N.E.2d 539, 2001 Ohio LEXIS 1890. I write separately to respond to the plurality opinion's dicta addressing the constitutionality of R.C. Chapter 2744 and the history of political subdivision immunity.

The constitutionality of R.C. Chapter 2744 is not at issue in this case. The plurality opinion ultimately recognizes this fact and accordingly decides this case on grounds of statutory interpretation alone. Nevertheless, the plurality opinion devotes several pages of the Ohio Official Reports to its not so subtle hint that R.C. Chapter 2744 violates Sections 5 and 16, **[***56]** Article I of the Ohio Constitution. Until these constitutional issues are directly presented to this court again, however, we should refrain from addressing them even in dicta.

The plurality also undertakes a detailed analysis of the history of political subdivision immunity in order to show that the doctrine is "faulty." As the plurality observes, political subdivision immunity was a judicially created doctrine that this court ultimately abolished in the early 1980s. See *Haverlack v. Portage Homes, Inc.* (1982), 2 Ohio St. 3d 26, 2 Ohio B. Rep. 572, 442 N.E.2d 749; *Enghauser Mfg. Co. v. Eriksson Eng. Ltd.* (1983), 6 Ohio St. 3d 31, 33, 6 Ohio B. Rep. 53, 54, 451 N.E.2d 228, 230, and paragraph one of the syllabus; *Zents v. Summit Cty. Bd. of Commrs.* (1984), 9 Ohio St. 3d 204, 9 Ohio B. Rep. 516, 459 N.E.2d 881, syllabus. In abolishing the immunity held by local governments, this court questioned the historical underpinnings of the immunity doctrine in much the same way that the plurality opinion does today. See *Enghauser Mfg. Co.*, 6 Ohio St. 3d at 33-34, 6 Ohio B. Rep. at 54-55, 451 N.E.2d at 230-231. n10

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n10 This court's abolishment of political subdivision immunity was *not* complete. This court made clear that political subdivisions remained immune from liability "for those acts or omissions involving the exercise of a legislative or judicial function or the exercise of an

executive or planning function involving the making of a basic policy decision which is characterized by the exercise of a high degree of official judgment or discretion." *Enghauser Mfg. Co.*, paragraph two of the syllabus; see, also, *Zents*, syllabus. This court thus recognized that local governments remained immune from liability for "certain acts which go to the essence of governing," *i.e.*, conduct characterized by a high degree of discretion and judgment in making public policy choices. *Enghauser Mfg. Co.*, 6 Ohio St. 3d at 35, 6 Ohio B. Rep. at 56, 451 N.E.2d at 232. Accord *Whitney v. Worcester* (1977), 373 Mass. 208, 218-219, 366 N.E.2d 1210, 1216; *Muskopf v. Corning Hosp. Dist.* (1961), 55 Cal. 2d 211, 220-221, 359 P.2d 457, 462-463, 11 Cal. Rptr. 89, 94-95.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[\*\*\*57]   [\*376]**

As instructive and important as the history of political subdivision immunity may be, however, it is of diminished significance when assessing the continued viability of the doctrine today. The General Assembly responded to *Haverlack, Enghauser Mfg.*, and *Zents* by enacting the Political Subdivision Tort Liability Act, declaring that political subdivisions would be liable in tort only as set forth in R.C. Chapter 2744. The legislature has therefore deemed political subdivision immunity to be desirable as the public policy of this **[\*\*573]** state. Thus, any concern this court may have about the wisdom of political subdivision immunity or whether the doctrine is "soundly based in legal history or the law" is largely beside the point. Questions concerning the wisdom of legislation are "for the legislature, and whether the court agrees with it in that particular or not is of no consequence. \* \* \* If the legislature has the constitutional power to enact a law, no matter whether the law be wise or otherwise it is no concern of the court." *State Bd. of Health v. Greenville* (1912), 86 Ohio St. 1, 20, 98 N.E. 1019, 1021. If and when this court is called upon to assess the **[\*\*\*58]** validity of R.C. Chapter 2744, and the plurality's belief that political subdivision immunity is a "faulty" rule should play no part in deciding the issue.

LUNDBERG STRATTON, J., concurs in the foregoing opinion.

        Service: **Get by LEXSEE®**
       Citation: **92 ohio st.3d 354**
          View: Full
    Date/Time: Monday, March 29, 2004 - 6:21 PM EST

\* Signal Legend:
⬤ - Warning: Negative treatment is indicated
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
Ⓘ - Citation information available
\* Click on any *Shepard's* signal to *Shepardize®* that case.

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Get a Document - by Citation - 92 Ohio St. 3d 348    Page 1 of 7
Case 1:01-cv-00769-SAS    Document 118-2    Filed 03/31/2004    Page 23 of 42

12

Service: **Get by LEXSEE®**
Citation: **92 Ohio St. 3d 348 at 353**

*92 Ohio St. 3d 348, *; 2001 Ohio 209;*
*750 N.E.2d 549, **; 2001 Ohio LEXIS 1891, ****

MARSHALL, APPELLANT, v. MONTGOMERY COUNTY CHILDREN SERVICES BOARD, APPELLEE,
ET AL.

No. 00-865

SUPREME COURT OF OHIO

92 Ohio St. 3d 348; 2001 Ohio 209; 750 N.E.2d 549; 2001 Ohio LEXIS 1891

December 13, 2000, Submitted
July 25, 2001, Decided

**PRIOR HISTORY:**  **[\*\*\*1]** CERTIFIED by the Court of Appeals for Montgomery County,
No. 17856.

**DISPOSITION:** Judgment affirmed.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Appellant estate administrator filed a wrongful death action
against the appellees, the child services board (CSB), its director, the county, the city,
and a city police officer. The trial court granted the county's, the CSB's, the director's,
and the city's motions for summary judgment. The Court of Appeals for Montgomery
County (Ohio) affirmed the judgment and certified a conflict between its judgment in
favor of the CSB and other decisions.

**OVERVIEW:** A child was killed after his mother hit him on the head. The mother had a
history of previous acts of violence against her children. The estate administrator alleged
that the CSB knew or should have known about the mother's previous acts of violence
against her children, that the CSB negligently failed to investigate and negligently failed
to remove the child from the mother's custody, and that its negligence was the
proximate cause of the child's death. The appellate court certified the question of
whether, for the purposes of immunity exceptions in Ohio Rev. Code Ann. §§ 2744.02(B)
(5), 2744.03(A)(6)(c), Ohio Rev. Code Ann. § 2151.421 expressly imposed liability of
political subdivisions and their employees for failure to investigate child abuse. The
supreme court answered the question in the negative. Ohio Rev. Code Ann. § 2151.99
did not impose a penalty for failure to investigate, pursuant to § 2151.421(F)(1), reports
of child abuse or neglect. Therefore, within the meaning of §§ 2744.02(B)(5), 2744.03
(A)(6)(c), § 2151.421 did not expressly impose liability for failure to investigate reports
of child abuse.

**OUTCOME:** The judgment was affirmed.

**CORE TERMS:** caseworker, political subdivision, child abuse, failure to investigate, impose
liability, endangering, custody, twenty-four, assigned, neglect, investigate, pregnant, alcohol,
suspected child abuse, failure to report, duty, negligently failed, domestic violence, child
neglect, time period, level-three, requesting, birth, box, sovereign immunity, summary
judgment, immunity, children services, certified question, substance abuse

### LexisNexis (TM) HEADNOTES - Core Concepts - ◆ Hide Concepts

Family Law > Family Protection & Welfare > Children
**HN1** ± The duty to investigate reported child abuse or neglect is required by Ohio Rev. Code Ann. § 2151.421(F)(1). More Like This Headnote

Family Law > Family Protection & Welfare > Children
**HN2** ± See Ohio Rev. Code Ann. § 2151.421(F)(1).

Torts > Public Entity Liability > Liability
**HN3** ± In order to determine the liability of a political subdivision pursuant to the Political Subdivision Tort Liability Act, Ohio Rev. Code Ann. ch. 2744, a three-tiered analysis of Ohio Rev. Code Ann. ch. 2744 is required. More Like This Headnote

Torts > Public Entity Liability > Liability
**HN4** ± See Ohio Rev. Code Ann. § 2744.02(B)(5).

Torts > Public Entity Liability > Immunity
**HN5** ± Ohio Rev. Code Ann. § 2744.03(A)(6)(c) provides that an employee of a political subdivision is immune from liability unless liability is expressly imposed upon the employee by a section of the Ohio Revised Code. More Like This Headnote

Family Law > Family Protection & Welfare > Children
Torts > Public Entity Liability > Liability
**HN6** ± Within the meaning of Ohio Rev. Code Ann. §§ 2744.02(B)(5), 2744.03(A)(6)(c), Ohio Rev. Code Ann. § 2151.421 does not expressly impose liability for failure to investigate allegations of abuse. More Like This Headnote

Family Law > Family Protection & Welfare > Children
Torts > Public Entity Liability > Liability
**HN7** ± Ohio Rev. Code Ann. § 2151.99 imposes a criminal penalty for failure to report, pursuant to Ohio Rev. Code Ann. § 2151.421(A)(1), known or suspected child abuse. Within the meaning of Ohio Rev. Code Ann. §§ 2744.02(B)(5), 2744.03(A)(6)(c), the term "liability" refers to either civil or criminal liability. However, in contrast to its imposition of a penalty for failure to report, Ohio Rev. Code Ann. § 2151.99 does not impose a penalty for failure to investigate, pursuant to Ohio Rev. Code Ann. § 2151.421(F)(1), reports of child abuse or neglect. Therefore, within the meaning of Ohio Rev. Code Ann. §§ 2744.02(B)(5), 2744.03(A)(6)(c), Ohio Rev. Code Ann. § 2151.421 does not expressly impose liability for failure to investigate reports of child abuse. More Like This Headnote

◆ Show Headnotes

**SYLLABUS:** Syllabus of the Court

Within the meaning of R.C. 2744.02(B)(5) and 2744.03(A)(6)(c), R.C. 2151.421 does not expressly impose liability for failure to investigate reports of child abuse.

**COUNSEL:** D.K. Wehner and Thomas J. Replogle, for appellant.

Mathias H. Heck, Jr., Montgomery County Prosecuting Attorney, and Marcell N. Dezarn, Assistant Prosecuting Attorney, for appellee.

**JUDGES:** DOUGLAS, J. MOYER, C.J., RESNICK, F.E. SWEENEY, PFEIFER and LUNDBERG STRATTON, JJ., concur. MOYER, C.J., COOK and LUNDBERG STRATTON, JJ., concur separately in judgment.

**OPINIONBY:** DOUGLAS

**OPINION: [**550] [*348]**

**DOUGLAS, J.** On October 2, 1996, Rozanne Perkins beat her two-and-a-half-year-old son Davon on the head. He died of his injuries the next day. Prior to the murder of her son, Perkins had a substantial history of abusing her children beginning in 1985. From 1985 to 1995, Perkins had four other children in addition to Davon. During the same time period, but prior to the birth of Davon, Montgomery County Children Services Board ("CSB") responded to numerous complaints regarding Perkins's **[***2]** abuse of her children. Perkins was alcohol- and drug-dependent. CSB ultimately removed all four of Perkins's children from her custody and control. **[*349]**

CSB received the first report of abuse of the Perkins's children in 1985, when it was alleged that Perkins was slapping her three-month-old child, Ebony. In 1987, a report was made to CSB alleging that Perkins had abandoned and physically abused two of her children, Ebony and Gary. However, CSB was unable to substantiate the claims. In 1988, CSB once again received allegations that Perkins had abandoned her children; however, CSB has no record of any charges of abuse then. CSB assisted the paternal grandmother, Doris Harris, to obtain custody of Ebony and Gary. Perkins did not appear at the hearing to contest custody.

In August 1992, Perkins was once again referred to CSB, this time for beating her son Dorian with a belt and striking him in the eye. CSB then assigned a caseworker to the Perkins family on an ongoing basis. Perkins admitted to the CSB caseworker that she had beaten the child with the belt but stated that she "wouldn't do it anymore as long as the child didn't cry anymore." Due to the severity of the abuse, CSB removed Dorian **[***3]** from his mother's custody to the custody of his aunt, Ruby Perkins. CSB determined that in order to regain custody of her children, Perkins must attend parenting and chemical dependency classes and submit to a psychological review. Perkins failed to comply with the requirements of the chemical-dependency program. **[**551]**

CSB continued to work with Perkins over a fourteen-month period, during which Perkins gave birth to yet another child, Darian. A toxicology screen performed shortly after Darian's birth indicated that the child was born alcohol-dependent and also tested positive for narcotics. CSB concluded that Darian had been heavily exposed to a variety of drugs and alcohol prior to his birth. As a result, CSB removed Darian from Perkins's custody and placed him with Robin Marshall, Darian's paternal aunt. None of Perkins's children was returned to her.

During this time period, CSB had a policy of closing all cases where no child remained in the home, even if CSB was aware that the mother was pregnant with another child. Prior to closing the case file, CSB became aware that Perkins was pregnant with a fifth child. Because no children remained in Perkins's home, CSB closed the file even **[***4]** though Perkins was pregnant, had a history of abusing her children, and Perkins was suspected of still being dependent on alcohol and drugs. On October 14, 1993, Perkins's caseworker pointed out in her final report that Perkins was "approximately 4-5 months pregnant." In addition the caseworker reported, "I would not be surprised in the least if the Agency receives a referral on her for a drug exposed infant when she delivers in February or March."

Also during this time, CSB had a classification system for the cases that were reported. The priorities were listed as levels one through four. A level-one **[*350]** priority was the most critical and level four was the least critical. A level-one priority required CSB to make contact with the child within one hour of the report. A level-two priority required CSB to make

contact with the child within twenty-four hours. A level-three priority required CSB to initiate a case within twenty-four hours and make contact with someone familiar with the case, not necessarily the parent or child victim. CSB established no minimum response time for a level-four priority, and the priority level could change depending upon the information gathered. The levels **[***5]** CSB assigned to cases could be altered once a review of any existing record indicated that based upon an existing history, the case required a higher level of priority.

Perkins gave birth to her fifth child, Davon, on February 2, 1994. CSB received no reports from the hospital that Davon was alcohol- or drug-dependent. On October 24, 1994, CSB received a report from Danny McLemore, Perkins's boyfriend and Davon's father, requesting that CSB check on the child due to the mother's substance-abuse problem. CSB assigned the case as a level-three priority, which required that contact be made with someone familiar with the case within twenty-four hours. The caseworker assigned to the case reviewed the records that CSB maintained regarding Perkins and was aware that Perkins had a history of substance abuse and that four of her children had been removed from her home. Despite Perkins's history, CSB made no changes to the level of priority of the McLemore complaint concerning Davon.

The CSB caseworker assigned to investigate the complaint concerning Davon attempted to contact Perkins through an unannounced home visit on October 25, 1994. However, no one was home, and a contact letter was **[***6]** left requesting that Perkins contact CSB. The caseworker made additional attempts to contact Perkins on November 14, and December 1, 1994, and January 10, 1995, each time leaving a note requesting Perkins to contact CSB. Perkins failed to respond. Contrary to the requirements of a level-three priority, the **[**552]** caseworker did not attempt to contact any other persons during this time period.

On April 19, 1995, nearly six months after McLemore's complaint, CSB made contact with Perkins. The caseworker's report indicated that Perkins denied any substance abuse. The caseworker also found that Perkins's house was clean and that Davon did not appear to be neglected. Based upon the caseworker's home visit the case was closed.

On October 6, 1995, the Dayton Police Department arrested Perkins for domestic violence. Perkins attempted to stab McLemore while he was driving, forcing him to pull the car off the road in order to disarm Perkins. Davon was a passenger in the rear seat of the car during this altercation. Perkins was later charged with child endangering as a result of this incident. **[*351]**

During this time, CSB and the Dayton Police Department ("DPD") had an agreement that DPD would report to **[***7]** CSB all complaints that DPD received of child abuse, child neglect, and child endangering. DPD placed all of the reports that it received into a box located in the detective section of DPD. Every morning a CSB employee would retrieve the reports that DPD had placed in the box. CSB immediately investigated all criminal charges of child endangering that were received. Due to her altercation with McLemore, Perkins was arrested and charged with domestic violence and child endangering. However, contrary to the agreement between DPD and CBS, DPD did not place any reports of Perkins's arrest for child endangering in the box for CSB retrieval.

CSB had no further referrals of this case until October 2, 1996, the day that Davon was beaten to death by his mother.

On October 1, 1997, Marshall, Davon's paternal aunt and administrator of his estate, appellant, filed a wrongful death action against CSB, Helen Jones, Director of CSB, Montgomery County, the city of Dayton, and an unnamed Dayton police officer. The complaint alleged that CSB, appellee, knew or should have known about the previous acts of violence perpetrated by Perkins against her children. The complaint further alleged that

appellee **[***8]** negligently failed to investigate and negligently failed to remove Davon from Perkins's custody and that its negligence was the proximate cause of Davon's death. In addition, the complaint alleged that the city of Dayton, through DPD and its unnamed police officer, negligently failed to report the arrest of Perkins for domestic violence and child endangering.

Appellee, Montgomery County, Jones, and Dayton filed motions for summary judgment, which were granted June 10, 1999. Appellant appealed the summary judgment in favor of CSB and Dayton. The Court of Appeals for Montgomery County affirmed the trial court's decision. In response to appellant's motion to certify a conflict, the court of appeals certified a conflict between its judgment in favor of CSB and *Rich v. Erie Cty. Dept. of Human Resources* (1995), 106 Ohio App. 3d 88, 665 N.E.2d 278; *Crago v. Lorain Cty. Commrs.* (1990), 69 Ohio App. 3d 24, 590 N.E.2d 15; *Sprouse v. Lucas Cty. Bd. of Edn.*, 1999 Ohio App. LEXIS 870 (Mar. 12, 1999), Lucas App. No. L-98-1098, unreported, 1999 WL 128636; *Reed v. Perry Cty. Children's Serv.*, 1993 Ohio App. LEXIS 3408 (June 29, 1993), Perry App. No. CA-429, unreported, 1993 WL 274299. **[***9]**  This cause is now before this court upon our determination that a conflict exists.

The certified question is:

"For the purposes of the immunity exceptions in R.C. 2744.02(B)(5) and R.C. 2744.03(A)(6)(c), does R.C. 2151.421 expressly impose liability on political subdivisions **[**553]** and their employees for failure to investigate child abuse?"

 **[*352]**

We answer the certified question in the negative. While the statutes at issue in this case are the same as those interpreted in *Campbell v. Burton* (2001), 92 Ohio St. 3d 336, 750 N.E.2d 539, 2001 Ohio LEXIS 1890, the issue is whether R.C. 2151.421 expressly imposes liability for a failure to *investigate* as opposed to a failure to *report* as in *Campbell*. *HN1*⚓The duty to investigate reported child abuse or neglect is required by R.C. 2151.421(F)(1), which states:

*HN2*⚓"Except as provided in section 2151.422 of the Revised Code, the public children services agency shall investigate, within twenty-four hours, each report of known or suspected child abuse or child neglect and of a known or **[***10]** suspected threat of child abuse or child neglect that is referred to it under this section to determine the circumstances surrounding the injuries, abuse, or neglect or threat of injury, abuse, or neglect, the cause of the injuries, abuse, neglect, or threat, and the person or persons responsible. * * * The public children services agency shall submit a report of its investigation, in writing to the law enforcement agency." It is clear that CSB had a duty pursuant to R.C. 2151.421 to investigate reports of known or suspected child abuse within twenty-four hours.

*HN3*⚓In order to determine the liability of a political subdivision pursuant to the Political Subdivision Tort Liability Act, a three-tiered analysis of R.C. Chapter 2744 is required. We have set forth this analysis in *Cater v. Cleveland* (1998), 83 Ohio St. 3d 24, 28, 697 N.E.2d

610, 614, and in *Campbell v. Burton* (2001), 92 Ohio St. 3d 336, 750 N.E.2d 539, 2001 Ohio LEXIS 1890. We will not repeat that discussion here.

*HN4* R.C. 2744.02(B)(5) provides:

> "In addition to the circumstances described in divisions (B)(1) to (4) of this section, a political subdivision **[***11]** is liable for injury, death, or loss to persons or property when liability is expressly imposed upon the political subdivision by a section of the Revised Code * * *. Liability shall not be construed to exist under another section of the Revised Code merely because a responsibility is imposed upon a political subdivision or because of a general authorization that a political subdivision may sue and be sued."

Similar to the exception to political subdivision immunity found in R.C. 2744.02(B)(5), *HN5* R.C. 2744.03(A)(6)(c) provides that an employee of a political subdivision is immune from liability unless "liability is expressly imposed upon the employee by a section of the Revised Code."

The court of appeals found that *HN6* within the meaning of R.C. 2744.02(B)(5) and 2744.03 (A)(6)(c), R.C. 2151.421 does not expressly impose liability for failure to *investigate* allegations of abuse. We agree with the court of appeals but arrive at our conclusions by way of a slightly different analytical approach.

In *Campbell, supra,* we held that *HN7* R.C. 2151.99 **[***12]** imposes a criminal penalty for failure to report, pursuant to R.C. 2151.421(A)(1), known or suspected child **[*353]** abuse. We determined that within the meaning of R.C. 2744.02(B)(5) and 2744.03(A)(6)(c), the term "liability" refers to either civil or criminal liability. However, in contrast to its imposition of a penalty for failure to report, R.C. 2151.99 does not impose a penalty for failure to investigate, pursuant to R.C. 2151.421(F)(1), reports of child abuse or neglect. Therefore, within the meaning of R.C. 2744.02(B)(5) and 2744.03(A)(6)(c), R.C. 2151.421 does not expressly impose liability for failure to investigate reports of child abuse. Accordingly, even if it failed to investigate a report, **[**554]** appellee is insulated from liability by sovereign immunity.

We find this troubling in light of the potential for a political subdivision to entirely disregard affirmative duties and yet avoid liability under the cloak of sovereign immunity. n1 However, we are confined to review the law based upon the issues presented in this appeal. **[***13]**

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n1 For comparison to another statute that imposes a duty but does not impose liability, see **Butler v. Jordan (2001), 92 Ohio St. 3d 354, 750 N.E.2d 554, 2001 Ohio LEXIS 1889.**

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The judgment of the court of appeals is affirmed.

*Judgment affirmed.*

MOYER, C.J., RESNICK, F.E. SWEENEY, PFEIFER and LUNDBERG STRATTON, JJ., concur.

MOYER, C.J., COOK and LUNDBERG STRATTON, JJ., concur separately in judgment.

**CONCURBY:** COOK

**CONCUR:**

**COOK, J., concurring in judgment.** R.C. 2151.421 does not expressly impose liability upon a political subdivision or its employee, within the meaning of R.C. 2744.02(B)(5) and 2744.03(A)(6)(c), for failure to investigate reports of child abuse. I therefore join the syllabus and judgment of the majority. While doing so, I continue to adhere to the views expressed in my dissenting opinion in *Campbell v. Burton* (2001), 92 Ohio St. 3d 336, 750 N.E.2d 539, 2001 Ohio LEXIS 1890.

MOYER, C.J., and LUNDBERG STRATTON, J., concur in the foregoing **[\*\*\*14]** opinion.

Service: **Get by LEXSEE®**
Citation: **92 Ohio St. 3d 348 at 353**
   View: Full
Date/Time: Monday, March 29, 2004 - 6:27 PM EST

* Signal Legend:
● - Warning: Negative treatment is indicated
△ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
Ⓘ - Citation information available

* Click on any *Shepard's* signal to *Shepardize®* that case.

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Service: Get by LEXSEE®
Citation: 2001 Ohio LEXIS 1890

*92 Ohio St. 3d 336, *; 2001 Ohio 206;*
*750 N.E.2d 539, **; 2001 Ohio LEXIS 1890, ***

CAMPBELL ET AL., APPELLANTS, v. BURTON; CLIFTON ET AL., APPELLEES.

Nos. 99-1838 and 99-2106

SUPREME COURT OF OHIO

92 Ohio St. 3d 336; 2001 Ohio 206; 750 N.E.2d 539; 2001 Ohio LEXIS 1890

September 12, 2000, Submitted
July 25, 2001, Decided

**PRIOR HISTORY:** **[***1]** APPEAL from and CERTIFIED by the Court of Appeals for
Greene County, No. 99CA12.

**DISPOSITION:** Judgment reversed and cause remanded.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Appellants, student and parents, sued defendant male friend,
and appellees, superintendent, board of education, and teacher, alleging that appellees
failed to report sexual abuse pursuant to Ohio Rev. Code Ann. § 2151.421. The Greene
County Court of Appeals (Ohio) affirmed the trial court's summary judgment ruling in
appellees' favor. The state supreme court allowed appellants an appeal on a certified
question regarding immunity.

**OVERVIEW:** The student told the teacher that a male friend of her family had tried to
touch and kiss her in ways that made her uncomfortable. The teacher did not inform
anyone of these claims, but told the student to tell her mother about the male friend.
The trial court and the court of appeals found that appellees had immunity. The state
supreme court allowed the appeal to resolve a conflict among Ohio appellate courts as to
whether, for purposes of activating the immunity exceptions of Ohio Rev. Code Ann. §§
2744.02(B)(5), .03(A)(6)(c), § 2151.421 expressly imposed liability on political
subdivisions and their employees for failing to report suspected child abuse. Ohio Rev.
Code Ann. § 2151.421(A)(1)(a) required teachers and school officials to report suspected
child abuse. The state supreme court held that § 2151.421, through its penalty statute,
Ohio Rev. Code Ann. § 2151.99, which imposed criminal penalties for not reporting
abuse, expressly imposed liability on political subdivisions and their employees for not
reporting abuse. Thus, appellees could not claim sovereign immunity and granting them
summary judgment on that basis was an error.

**OUTCOME:** The state supreme court answered the certified question in the affirmative,
reversed the judgment of the court of appeals, and remanded the matter to the trial
court for further proceedings consistent with the state supreme court's opinion.

**CORE TERMS:** political subdivision, immunity, suspected child abuse, failure to report,
mediation, civil liability, immune, imposition of liability, impose liability, duty, civil action,
criminal penalty, duty to report, criminal liability, reporting, omission, failure to perform,
court of appeals, statutory duty, misdemeanor, neglect, uncomfortable, sex, failure to
perform duty, potential liability, summary judgment, fourth-degree, suspected, teacher,

touch

## LexisNexis (TM) HEADNOTES - Core Concepts - ◆ Hide Concepts

Torts > Public Entity Liability > Immunity
*HN1* Ohio Rev. Code Ann. § 2151.421, through its penalty statute, Ohio Rev. Code Ann. § 2151.99, expressly imposes liability, within the meaning of Ohio Rev. Code Ann. § 2744.02(B)(5) and Ohio Rev. Code Ann. § 2744.03(A)(6)(c), on political subdivisions and their employees for failure to report suspected child abuse.   More Like This Headnote

Torts > Public Entity Liability > Immunity
*HN2* See Ohio Rev. Code Ann. § 2744.02(A)(1).

Torts > Public Entity Liability > Liability
*HN3* See Ohio Rev. Code Ann. § 2744.02(B).

Torts > Public Entity Liability > Liability
*HN4* See Ohio Rev. Code Ann. § 2744.02(B)(5).

Torts > Public Entity Liability > Immunity
*HN5* Ohio Rev. Code Ann. § 2744.03(A)(6) provides immunity to an employee of a political subdivision unless an exception found within Ohio Rev. Code Ann. § 2744.03(A)(6)(a)-(c) applies.   More Like This Headnote

Torts > Public Entity Liability > Liability
*HN6* Ohio Rev. Code Ann. § 2744.03(A)(6)(c) provides that an employee of a political subdivision may be liable for injury, death, or loss to persons or property if liability is expressly imposed upon the employee by a section of the Ohio Revised Code.   More Like This Headnote

Torts > Public Entity Liability > Liability
*HN7* As stated in the exceptions to immunity set forth in Ohio Rev. Code Ann. § 2744.02 (B)(5) and Ohio Rev. Code Ann. § 2744.03(A)(6)(c), an express imposition of liability in another section of the Ohio Revised Code negates immunity.   More Like This Headnote

Family Law > Family Protection & Welfare > Children
*HN8* See Ohio Rev. Code Ann. § 2151.421(A)(1)(a).

Family Law > Family Protection & Welfare > Children
*HN9* Ohio Rev. Code Ann. § 2151.421(A)(1)(b) lists school teachers, school employees, school authorities, and other professionals as persons required to report any known or suspected abuse or neglect.   More Like This Headnote

Family Law > Family Protection & Welfare > Children
Torts > Public Entity Liability > Immunity
*HN10* With respect to an alleged failure to report, pursuant to Ohio Rev. Code Ann. § 2151.421, known or suspected child abuse, the public-duty doctrine may not be raised as a defense for failure of an agency to comply with such statutory requirements.   More Like This Headnote

Criminal Law & Procedure > Criminal Offenses > Miscellaneous Offenses

Family Law > Family Protection & Welfare > Children 🔍
*HN11* ⬧ See Ohio Rev. Code Ann. § 2151.99.

Criminal Law & Procedure > Criminal Offenses > Miscellaneous Offenses
Family Law > Family Protection & Welfare > Children 🔍
*HN12* ⬧ Anyone who is required by Ohio Rev. Code Ann. § 2151.421 to report known or suspected child abuse but fails to report such abuse is guilty of a fourth-degree misdemeanor. More Like This Headnote

Torts > Public Entity Liability > Liability 🔍
Governments > Legislation > Interpretation 🔍
*HN13* ⬧ "Liability" is the quality or state of being legally obligated or accountable; legal responsibility to another or to society, enforceable by civil remedy or criminal punishment. In Ohio Rev. Code Ann. § 2744.02(B)(5) and Ohio Rev. Code Ann. § 2744.03(A)(6)(c), the term "liability" is not modified by the words "civil" or "criminal." Therefore, by its very definition, "liability" refers to either a criminal or civil penalty. In reviewing these provisions of the statute it is the duty of the court to give effect to the words used, not to delete words used or insert words not used. More Like This Headnote

Torts > Public Entity Liability > Liability 🔍
*HN14* ⬧ The term "liability" as set forth in Ohio Rev. Code Ann. § 2744.02(B)(5) means liability that is expressly imposed upon the political subdivision by a section of the Ohio Revised Code. It is evident from a plain reading of § 2744.02(B)(5) that the Ohio Legislature is using the term "liability" as set forth in other chapters of the Ohio Revised Code, and not within the context of Ohio Rev. Code Ann. § 2744.02 (A)(1). More Like This Headnote

Torts > Public Entity Liability > Immunity 🔍
*HN15* ⬧ Pursuant to Ohio Rev. Code Ann. § 2744.02(A)(1), a political subdivision is immune from liability for its acts or omissions or the acts or omissions of its employees, unless one of the exceptions set forth in Ohio Rev. Code Ann. § 2744.02(B) applies. More Like This Headnote

Torts > Public Entity Liability > Liability 🔍
*HN16* ⬧ Pursuant to Ohio Rev. Code Ann. § 2744.02(B)(5), a political subdivision may be held liable for failure to perform a duty expressly imposed on its employee by Ohio Rev. Code Ann. § 2151.421. More Like This Headnote

Torts > Public Entity Liability > Liability 🔍
*HN17* ⬧ The immunity provided to employees of a political subdivision by Ohio Rev. Code Ann. § 2744.03(A)(6) is subject to exceptions provided by Ohio Rev. Code Ann. § 2744.03(A)(6)(a)-(c). Ohio Rev. Code Ann. § 2744.03(A)(6)(c) tracks the language of Ohio Rev. Code Ann. § 2744.02(B)(5) and denies immunity if liability is expressly imposed upon the employee by a section of the Ohio Revised Code. More Like This Headnote

Torts > Public Entity Liability > Liability 🔍
*HN18* ⬧ Ohio Rev. Code Ann. § 2744.03(A)(6)(c), like Ohio Rev. Code Ann. § 2744.02(B)(5), provides an exception to immunity where a section of the Ohio Revised Code expressly imposes liability. Pursuant to Ohio Rev. Code Ann. § 2744.03(A)(6)(c), an employee of a political subdivision may be held liable for failure to perform a duty expressly imposed by Ohio Rev. Code Ann. § 2151.421. More Like This Headnote

✦ Show Headnotes

**SYLLABUS:** Syllabus of the Court

1. Within the meaning of R.C. 2744.02(B)(5) and 2744.03(A)(6)(c), R.C. 2151.421 expressly imposes liability for failure to perform the duty to report known or suspected child abuse.

2. Pursuant to R.C. 2744.02(B)(5), a political subdivision may be held liable for failure to perform a duty expressly imposed by R.C. 2151.421.

3. Pursuant to R.C. 2744.03(A)(6)(c), an employee of a political subdivision may be held liable for failure to perform a duty expressly imposed by R.C. 2151.421.

**COUNSEL:** Gary J. Leppla and Jennifer L. Hill, for appellants.

Law Offices of Nicholas E. Subashi, Nicholas E. Subashi and David J. Arens, for appellees.

Issac, Brant, Ledman & Teetor, Mark Landes and Barbara Kozar Letcher, **[***2]** urging affirmance for amici curiae County Commissioners Association of Ohio and Public Children's Service Association of Ohio.

Cloppert, Portman, Sauter, Lantanick & Foley and Frederick G. Cloppert, Jr., urging affirmance for amicus curiae Ohio Education Association.

**JUDGES:** ,J. RESNICK, F.E. SWEENEY and PFEIFER, JJ., concur. MOYER, C.J., COOK and LUNDBERG STRATTON, JJ., dissent.

**OPINIONBY:** DOUGLAS

**OPINION: [**540] [*337]**

**DOUGLAS, J.** This case is before the court for the purpose of resolving a conflict among the **[**541]** courts of appeals for the Second, Fifth, Sixth, and Ninth District Courts of Appeals with regard to whether, within the meaning of R.C. 2744.02(B)(5) and 2744.03(A)(6)(c), R.C. 2151.421 expressly imposes liability for failure to perform the duty to report known or suspected child abuse.

Amber Campbell was an eighth-grade student at Baker Junior High, Fairborn City Schools ("Fairborn"), during the 1995 to 1996 school year. During the same time period Fairborn conducted a peer mediation program. The peer mediation program involved students as mediators and was designed to resolve disputes between students. Debra Mallonee was a teacher **[***3]** working for Fairborn from 1977 to 1997. In addition to teaching, Mallonee was the peer mediation coordinator.

From January to August 1996, Mallonee was on sabbatical pursuing her Ph.D. at Ohio State University. During her sabbatical, Mallonee was authorized by the school to conduct mediations requested by teachers and administration.

In March 1996, Campbell participated in two mediations as a disputant with another student, Amanda Adkins, regarding a disagreement over a male classmate. In the first mediation, Campbell, Adkins, and Mallonee were present. The mediation concluded with Campbell and Adkins entering into a written **[*338]** agreement. When their dispute resumed shortly thereafter, Adkins sought another mediation with Campbell.

According to Campbell, during the second mediation she told Mallonee that there was a male

friend of the family, David Burton, who hugged her and made her feel uncomfortable. Relating an incident in which Burton picked her up from Saturday school in his car, Campbell stated, "He told me to kiss him and slapped me on the butt and touched my necklace and went down to my breasts and crotch area." Campbell described another incident in which Campbell sat on Burton's **[***4]** lap while sledding. In addition, Campbell stated in her deposition that she told Mallonee that Burton would call her and ask her to go over to his house when no one else was home. Specifically, Mallonee recounted in her deposition that Campbell told her that Burton would try to touch her and kiss her and that this made her uncomfortable. n1

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


n1 While there is considerable disagreement in the testimony regarding the detail of the information that was provided by Campbell to Mallonee, the testimony of the parties is consistent on the fact that Burton at least tried to touch and kiss Campbell and made her feel uncomfortable.


- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

In addition to the information regarding Burton, Campbell said she also told Mallonee a story about Campbell having sex with the brother of one of her friends. Campbell claimed that Mallonee did not pay attention to what she had said about Burton, so Campbell made up the story about having sex with the friend's brother in order to get Mallonee's attention. Mallonee recalled the incident differently, **[***5]** stating that Campbell first told the story about having sex with the brother of a friend and then described the incidents with Burton. Mallonee believed that the story about Burton was simply an attempt by Campbell to change the subject from the initial discussion about having sex with the brother of her friend.

At the close of the mediation, Mallonee instructed Campbell to tell her mother about Burton and to stay away from him if he made her feel uncomfortable. Mallonee did not report Campbell's concerns regarding Burton to anyone. Campbell alleges that after her conversation with Mallonee, Burton continued to hug her, touch her **[\*\*542]** buttocks, and on one occasion "french kissed" her.

On March 21, 1997, Campbell, through her mother and next friend, Sharon Campbell, and father, Carl W. Campbell, appellants, filed an action against Steven Clifton, who is the Superintendent of Fairborn City Schools, and the Board of Education of the Fairborn City Schools (also "Fairborn"), appellees, and Burton. On March 23, 1998, appellants filed an action against Mallonee, who is also an appellee. The two complaints allege that appellees failed to report, pursuant to R.C. 2151.421, **[***6]** the alleged abuse. As a result of Mallonee's failure to report Campbell's concerns, appellants contend, Campbell suffered psychological and other permanent injury. The court consolidated the two cases. **[\*339]**

On January 27, 1999, the trial court granted summary judgment in favor of Clifton and Mallonee on the basis that they were immune from liability pursuant to R.C. 2744.03(A)(6). The trial court also granted summary judgment in favor of Fairborn on the grounds that it was immune from liability pursuant to R.C. 2744.02(A)(1).

Appellants appealed the trial court's decision to the Greene County Court of Appeals. The court of appeals affirmed, holding that within the meaning of R.C. 2744.02(B)(5) and 2744.03(A)(6)(c), R.C. 2151.421 did not expressly impose liability. Appellants then moved the court of appeals to certify a conflict in this case. The court of appeals granted the motion with respect to the following cases: *Rich v. Erie Cty. Dept. of Human Resources* (1995), 106 Ohio App. 3d 88, 665 N.E.2d 278; *Crago v. Lorain Cty. Commrs.* (1990), 69 Ohio App. 3d 24,

590 N.E.2d 15; **[\*\*\*7]** *Sprouse v. Lucas Cty. Bd. of Edn.*, 1999 Ohio App. LEXIS 870 (Mar. 12, 1999), Lucas App. No. L-98-1098, unreported, 1999 WL 128636; *Reed v. Perry Cty. Children's Serv.*, 1993 Ohio App. LEXIS 3408 (June 29, 1993), Perry App. No. CA-429, unreported, 1993 WL 274299. This cause is now before this court upon our determination that a conflict exists (case No. 99-2106), and pursuant to the allowance of a discretionary appeal (case No. 99-1838).

The certified question presented to this court on appeal from the Second Appellate district is:

"For the purposes of the immunity exceptions in R.C. 2744.02(B)(5) and R.C. 2744.03(A)(6)(c), does R.C. 2151.421 expressly impose liability on political subdivisions and their employees for failure to report child abuse?"

We answer the certified question in the affirmative. R.C. 2151.421, *HN1* through its penalty statute, R.C. 2151.99, expressly imposes liability, within the meaning of R.C. 2744.02(B)(5) and 2744.03(A)(6)(c), on political subdivisions and their employees for failure to report suspected child abuse. Accordingly, **[\*\*\*8]** we reverse the judgment of the court of appeals and remand this matter to the trial court for further proceedings consistent with this opinion.

The issues raised by the parties concern sovereign immunity pursuant to the Political Subdivision Tort Liability Act and the exceptions to immunity set forth in R.C. 2744.02 and 2744.03. n2 In order to determine immunities set forth in the chapter, a three-tiered analysis of R.C. Chapter 2744 is required. *Cater v. Cleveland* (1998), 83 Ohio St. 3d 24, 28, 697 N.E.2d 610, 614. First, we analyze R.C. 2744.02(A)(1), which provides:

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n2 This case is governed by R.C. 2744.02 and 2744.03 as amended by Am.Sub.S.B. No. 221, 145 Ohio Laws, Part II, 2211, 2215-2218, eff. Sept. 28, 1994.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

*HN2* "Except as provided in division (B) of this section, a political subdivision is not liable in damages in a civil action for injury, **[\*\*543]** death, or loss to persons or property **[\*340]** allegedly caused by any act or **[\*\*\*9]** omission of the political subdivision or an employee of the political subdivision \* \* \*."

Second, we analyze R.C. 2744.02(B), which provides: *HN3* "Subject to sections 2744.03 and 2744.05 of the Revised Code, a political subdivision is liable in damages in a civil action for injury, death, or loss to persons or property allegedly caused by an act or omission of the political subdivision or of any of its employees \* \* \* as follows." These exceptions to immunity are set forth in R.C. 2744.02(B)(1) through (5). For the purposes of the present case, only R.C. 2744.02(B)(5) applies. It provides:

*HN4* "In addition to the circumstances described in divisions (B)(1) to (4) of this section, a political subdivision is liable for injury, death, or loss to persons or property when liability is expressly imposed upon the political subdivision by a section of the Revised Code \* \* \*. Liability shall not be construed to exist under another section of the Revised Code merely because a responsibility is imposed upon a political subdivision or because of a general authorization that a political subdivision may sue and be sued."

The **[\*\*\*10]** third and final tier of analysis requires review of R.C. 2744.03 and 2744.05.

R.C. 2744.05, which restricts damage awards, is not applicable here. R.C. 2744.03, which provides defenses and immunities to political subdivisions, is applicable. For the purposes of our review, only R.C. 2744.03(A)(6) applies. *HN5*It provides immunity to an employee of a political subdivision unless an exception found within R.C. 2744.03(A)(6)(a) through (c) applies. Only R.C. 2744.03(A)(6)(c) is pertinent. *HN6* R.C. 2744.03(A)(6)(c) provides that an employee may be liable if "liability is expressly imposed upon the employee by a section of the Revised Code."

*HN7*As stated in the exceptions to immunity set forth in R.C. 2744.02(B)(5) and R.C. 2744.03(A)(6)(c), an express imposition of liability in another section of the Revised Code negates immunity. Accordingly, we direct our attention to R.C. 2151.421, which mandates the reporting of known or suspected child [***11] abuse. We must further determine whether R.C. 2151.421 expressly imposes liability within the meaning of R.C. 2744.02(B)(5) and R.C. 2744.03(A)(6)(c).

R.C. 2151.421(A)(1)(a) n3 states:

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -



n3 Both parties cite the current version of R.C. 2151.421, which was not in effect at the time of Mallonee's alleged failure to report the suspected abuse. However, for the purposes of this cause of action there is no substantive difference between the current and former versions of the statute, and, accordingly, there is no need to distinguish the two versions. See Am.Sub.H.B. No. 154, 144 Ohio Laws, Part II, 3198, 3213.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

*HN8*"No person described in division (A)(1)(b) of this section who is acting in an official or professional capacity and knows or suspects that a child under eighteen years of age or a mentally retarded, developmentally disabled, or physically [*341] impaired child under twenty-one years [***12] of age has suffered or faces a threat of suffering any physical or mental wound, injury, disability, or condition of a nature that reasonably indicates abuse or neglect of the child, shall fail to immediately report that knowledge or suspicion to the public children services agency or a municipal or county peace officer * * *."

*HN9* R.C. 2151.421(A)(1)(b) lists "school teacher; school employee; school authority" and other professionals as persons required to report any known or suspected abuse or neglect. In *Brodie v. Summit Cty. Children Serv. Bd.* (1990), 51 Ohio St. 3d 112, 119, 554 N.E.2d 1301, 1308, we found that the General Assembly enacted [**544] R.C. 2151.421 to safeguard children from abuse. In many instances, only the state and its political subdivisions can protect children from abuse. *Id*. Additionally, we found that children services agencies must protect children from abuse and eliminate the source of any such abuse. *Id*. n4 Thus, it is clear that the concern of the General Assembly in enacting R.C. 2151.421 was not political subdivisions or their employees, but the protection of [***13] children from abuse and neglect.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n4 In *Brodie v. Summit Cty. Children Serv. Bd.* (1990), 51 Ohio St. 3d 112, 554 N.E.2d 1301, paragraph two of the syllabus, we held *HN10*with respect to alleged failure to report pursuant to R.C. 2151.421, known or suspected child abuse, that the public-duty doctrine may not be raised as a defense for failure of an agency to comply with such statutory

requirements. We specifically stated that the analysis of *Sawicki v. Ottawa Hills* (1988), 37 Ohio St. 3d 222, 525 N.E.2d 468, did not apply.

FREUND FREEZE & ARNOLD
A LEGAL PROFESSIONAL ASSOCIATION

| www.ffalaw.com | One Dayton Centre | Fourth & Walnut Centre |
| | 1 South Main Street | 105 East Fourth Street |
| - - - - - - - - - - - - End Footnotes- - - - - - - - - - | Suite 1800 | Suite 1400 |
| | Dayton, OH 45402-2017 | Cincinnati, OH 45202-4035 |
| | (937) 222-2424 | (513) 665-3500 |

Appellees argue that R.C. 2151.421 does not expressly impose liability. We disagree. R.C. 2151.421(A) requires that certain persons report known or suspected child abuse. R.C. 2151.99 provides, *HN11* "Whoever violates * * * division (A)(1) * * * of section 2151.421 of the Revised Code is guilty of a misdemeanor of the fourth degree." Thus, *HN12* [***14] anyone who is required by R.C. 2151.421 to report known or suspected child abuse but fails to report such abuse is guilty of a fourth-degree misdemeanor.

Appellees argue that a criminal sanction is not an express imposition of liability within the meaning of R.C. 2744.02(B)(5) and 2744.03(A)(6)(c). Interestingly, appellees cite a definition of *HN13* "liability" that states, "The quality or state of being legally obligated or accountable; legal responsibility to another or to society, enforceable by civil remedy or criminal punishment." Black's Law Dictionary (7 Ed.1999) 925. We find this definition compelling.

In R.C. 2744.02(B)(5) and 2744.03(A)(6)(c), the term "liability" is not modified by the words "civil" or "criminal." Therefore, by its very definition, "liability" refers to either a criminal or civil penalty. In reviewing these provisions of the statute "it is the duty of this court to give effect to the words used, not to delete words used or insert words not used." *Cleveland Elec. Illum. Co. v. Cleveland* (1988), 37 Ohio St. 3d 50, 524 N.E.2d 441, paragraph three of the syllabus, citing [***15]  [*342] *Columbus-Suburban Coach Lines v. Pub. Util. Comm.* (1969), 20 Ohio St. 2d 125, 127, 49 Ohio Op. 2d 445, 446, 254 N.E.2d 8, 9.

Appellees also contend that the word "liability" as used in R.C. 2744.02(B)(5) and 2744.03 (A)(6)(c) can only be interpreted as referring to civil liability, since the general immunity provision of R.C. 2744.02(A)(1) provides for civil immunity. Contrary to appellees' arguments, *HN14* the term "liability" as set forth in R.C. 2744.02(B)(5) means liability that "is expressly imposed upon the political subdivision by a section of the Revised Code." It is evident from a plain reading of R.C. 2744.02(B)(5) that the legislature is using the term "liability" as set forth in *other* chapters of the Revised Code, and not within the context of R.C. 2744.02(A)(1). In addition, it is instructive to compare and contrast the actual language of each section of the code. Specifically, R.C. 2744.02(A)(1) provides for immunity from *civil liability*. In contrast, R.C. 2744.02(B)(5) is [***16] not as narrowly drawn. All it requires is express imposition of "liability" by another section of the Revised Code. When that exists the exception to immunity is satisfied. Accordingly, had the legislature intended to restrict the exception [**545] to immunity in R.C. 2744.02(B)(5) to *civil* liability, it certainly knew how to do so. See, also, R.C. 2151.421(G)(1), where the General Assembly used both the words "civil" and "criminal" in conjunction with the word "liability."

The General Assembly enacted R.C. 2151.421 to provide special protection to children from abuse and neglect. In order to achieve this goal, the General Assembly had to encourage those with special relationships with children, such as doctors and teachers, to report known or suspected child abuse. R.C. 2151.99 imposes a criminal penalty for failure to report. Furthermore, the General Assembly encouraged reporting by providing immunity from both civil and criminal liability to the persons whose duty it is to report. R.C. 2151.421(G)(1). n5 Thus, the General Assembly clearly encouraged reporting [***17] and specifically discouraged the failure to report by imposing a criminal penalty pursuant to R.C. 2151.99. We disagree with appellees' contention that in the absence of the word "liability" from R.C. 2151.99 they are entitled to immunity. To the contrary, we can imagine no stronger intent than to *actually impose* liability through R.C. 2151.99, as the General Assembly has done.

FREUND FREEZE & ARNOLD
A LEGAL PROFESSIONAL ASSOCIATION
www.ffalaw.com

One Dayton Centre
1 South Main Street
Suite 1800
Dayton, OH 45402-2017
(937) 222-2424
Fax (937) 222-5369

Fourth & Walnut Centre
105 East Fourth Street
Suite 1400
Cincinnati, OH 45202-4035
(513) 665-3500
Fax (513) 665-3503

Footnotes

n5 R.C. 2151.421(G)(1), now R.C. 2151.421(G)(1)(a)(i).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Accordingly, we hold that within the meaning of R.C. 2744.02(B)(5) and 2744.03(A)(6)(c), R.C. 2151.421 expressly imposes liability for failure to perform the duty to report known or suspected child abuse.

I. Liability of Fairborn

In order to determine the potential liability of Fairborn, we now apply the three-tiered analysis of R.C. Chapter 2744 as set forth above. Again, HN15⊤pursuant to [*343] R.C. 2744.02(A)(1), [***18] a political subdivision is immune from liability for its acts or omissions or the acts or omissions of its employees, unless one of the exceptions set forth in R.C. 2744.02(B) applies. Accordingly, under the first tier of analysis, Fairborn is generally immune for Mallonee's alleged failure to report.

Next we determine whether one of the R.C. 2744.02(B) exceptions applies. The only pertinent exception is found in R.C. 2744.02(B)(5), which states that "a political subdivision is liable * * * when liability is expressly imposed upon the political subdivision by a section of the Revised Code * * *." As explained above, R.C. 2151.421 expressly imposes liability for the failure to report known or suspected child abuse. Thus, if Fairborn had a duty to report, then immunity pursuant to R.C. 2744.02(B)(5) is not available to Fairborn.

Finally, we are required to review R.C. 2744.03, which gives defenses and immunities to subdivisions and subdivision employees, and R.C. 2744.05, which limits damages. It is clear [***19] that nothing in R.C. 2744.03 or 2744.05 applies in the case before us. Therefore, we hold that, pursuant to R.C. 2744.02(B)(5), Fairborn is not immune from liability.

Based upon the foregoing analysis, we find that HN16⊤pursuant to R.C. 2744.02(B)(5), a political subdivision may be held liable for failure to perform a duty expressly imposed on its employee by R.C. 2151.421.

II. Liability of Clifton and Mallonee

Clifton and Mallonee claim immunity pursuant to R.C. 2744.03(A)(6). However, HN17⊤the immunity provided to employees of a political subdivision by R.C. 2744.03(A)(6) is subject to exceptions provided by subsections (a) through (c). R.C. 2744.03(A)(6)(c) tracks the language of R.C. 2744.02(B)(5) and denies immunity if [**546] "liability is expressly imposed upon the employee by a section of the Revised Code."

Since HN18⊤ R.C. 2744.03(A)(6)(c), like R.C. 2744.02(B)(5), provides an exception to immunity where a section of the Revised [***20] Code expressly imposes liability, we reach the same conclusion with respect to the liability of Clifton and Mallonee as we did with Fairborn. We hold that pursuant to R.C. 2744.03(A)(6)(c), an employee of a political subdivision may be held liable for failure to perform a duty expressly imposed by R.C. 2151.421.

While we hold that liability may be imposed, we make no determination of appellees' liability.

The only determination we make is that the claim of *sovereign immunity* n6 is not available to appellees. The evidence provided by **[\*344]** appellants at trial may or may not be sufficient to support the contention that appellees should have reported Campbell's concerns pursuant to R.C. 2151.421.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - -

n6 For comparison to statutes that impose a duty but do not expressly impose liability, see *Marshall v. Montgomery Cty. Children Serv. Bd.* (2001), 92 Ohio St. 3d 348, 750 N.E.2d 549, 2001 Ohio LEXIS 1891, and ***Butler v. Jordan* (2001), 92 Ohio St. 3d 354, 750 N.E.2d 554, 2001 Ohio LEXIS 1889.**

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[\*\*\*21]**

The judgment of the court of appeals is reversed, and this cause is remanded to the trial court.

*Judgment reversed and cause remanded.*

RESNICK, F.E. SWEENEY and PFEIFER, JJ., concur.

MOYER, C.J., COOK and LUNDBERG STRATTON, JJ., dissent.

**DISSENTBY:** COOK

**DISSENT:**

**COOK, J., dissenting.** By virtue of R.C. 2151.99's *criminal* penalty for a failure to report suspected child abuse, the majority holds that R.C. 2151.421 "expressly imposes" *civil* liability on political subdivisions and their employees within the meaning of R.C. 2744.02(B)(5) and 2744.03(A)(6)(c). Because the majority strains to so interpret these statutes, I respectfully dissent.

Fairborn City Schools ("Fairborn") is a political subdivision, as defined in R.C. 2744.01(F), and is therefore entitled to immunity from tort liability as provided in R.C. Chapter 2744. R.C. 2744.02(A)(1) cloaks a political subdivision with a general grant of immunity, subject to the exceptions enumerated in R.C. 2744.02(B). See *Greene Cty. Agricultural Soc. v. Liming* (2000), 89 Ohio St. 3d 551, 556-557, 733 N.E.2d 1141, 1146. **[\*\*\*22]** The exception relevant here, R.C. 2744.02(B)(5), states:

"[A] political subdivision is liable for injury, death, or loss to persons or property when liability is *expressly imposed upon the political subdivision* by a section of the Revised Code, including, but not limited to, sections 2743.02 and 5591.37 of the Revised Code. Liability shall not be construed to exist under another section of the Revised Code merely because a responsibility is imposed upon a political subdivision or because of a general authorization that a political subdivision may sue or be sued." (Emphasis added.)

As individual employees of Fairborn, Mallonee and Clifton were also entitled to qualified immunity under R.C. 2744.03(A)(6). Much like the immunity granted to political subdivisions, R.C. 2744.03(A)(6) generally immunizes employees from liability so long as none of the enumerated exceptions applies. The exception relevant here, R.C. 2744.03(A)(6)(c), removes an employee's immunity if liability "is expressly imposed upon the employee by a section of the Revised Code." **[\*\*547]**

When interpreting statutes, [***23] we must give words their ordinary and natural meaning unless a different intention appears in the statute. *Layman v. Woo* (1997), 78 Ohio St. 3d 485, 487, 678 N.E.2d 1217, 1218. The ordinary definition of [*345] "expressly" is "in direct or unmistakable terms * * *: explicitly, definitely, directly" (Emphasis added.) Webster's Third New International Dictionary (1971), 803. Thus, the relevant inquiry is whether R.C. 2151.421 unmistakably and explicitly states that a political subdivision or its employee will be liable in tort for a failure to report suspected child abuse.

As the majority notes, R.C. 2151.421(A) requires "that certain persons report known or suspected child abuse." The statute does not, however, explicitly declare "in direct or unmistakable terms" that either a political subdivision or its employee will be liable for failure to comply with R.C. 2151.421(A). n7 Without an explicit statement that liability will follow from an employee's failure to report abuse, we are left to *infer* the existence of liability for the employee's breach of the statutory duty. That we must [***24] *infer* liability necessarily means that the statute does not *expressly* impose it. Because it contains no explicit declaration that the political subdivision or its employee can be held liable in a civil action for damages, R.C. 2151.421, standing alone, cannot trigger the R.C. 2744.02(B)(5) and 2744.03(A)(6)(c) exceptions to immunity. See *Colling v. Franklin Cty. Children Serv.* (1993), 89 Ohio App. 3d 245, 253, 624 N.E.2d 230, 236 (noting that courts should not stretch statutes beyond their ordinary meaning in order to impose liability under R.C. 2744.02[B][5]), citing *Farra v. Dayton* (1989), 62 Ohio App. 3d 487, 496, 576 N.E.2d 807, 812-813. n8

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n7 R.C. 2744.02(B)(5) instructs us *not* to find liability to exist merely because another section of the Revised Code imposes a responsibility. Though R.C. 2744.03(A)(6)(c) does not include a similar statement, it does not follow that we must construe a statutory duty as an express imposition of liability under R.C. 2744.03(A)(6)(c). Liability does not automatically follow from the breach of a statutory duty. *Agnew v. Porter* (1970), 23 Ohio St. 2d 18, 23, 52 Ohio Op. 2d 79, 81-82, 260 N.E.2d 830, 833. Even when a duty exists, an immunity defense (if applicable) is still available. See *id*, Cf. *Sikora v. Wenzel* (2000), 88 Ohio St. 3d 493, 496-497, 727 N.E.2d 1277, 1281 (even if violation of specific statutory duty might be negligence *per se*, a valid excuse may nonetheless preclude liability). [***25]

n8 R.C. 2744.02(B)(5) is itself instructive concerning what will constitute an express imposition of liability. It cites R.C. 2743.02 and 5591.37 as examples of statutes that expressly impose liability upon a political subdivision. R.C. 2743.02(B) "*waives the immunity from liability* of all hospitals owned or operated by one or more political subdivisions and consents for them to be sued, *and to have their liability determined*." (Emphasis added.) Similarly, R.C. 5591.37 provides that "failure to comply with section 5591.36 of the Revised Code *shall render the county liable*" for damages. (Emphasis added.) Unlike R.C. 2151.421, these statutes declare in no uncertain terms that a political subdivision will be liable in a civil action for damages.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The majority solves this analytic problem by invoking R.C. 2151.99, which imposes criminal liability on any person who fails to comply with his or her reporting [***26] duty under R.C. 2151.421(A). Because any person who fails to report known or suspected child abuse as required by R.C. 2151.421 is guilty of a fourth-degree misdemeanor, the majority concludes that R.C. 2151.421 expressly imposes [*346] liability within the meaning of R.C. 2744.02

(B)(5) and 2744.03(A)(6)(c). In other words, the majority has determined that R.C. 2151.99's criminal penalty transforms R.C. 2151.421(A)'s duty to report into an express imposition of liability on both the political subdivision and its employee. **[*548]**

As applied to Fairborn's potential liability, however, the majority's interpretation is at odds with the plain language of R.C. 2744.02(B)(5). By its very terms, the R.C. 2744.02(B)(5) immunity exception applies only when "liability is *expressly imposed upon the political subdivision* by a section of the Revised Code." (Emphasis added.) Neither R.C. 2151.421 nor 2151.99, whether read individually or together, does this. The only persons **[***27]** who may be guilty of a fourth-degree misdemeanor under R.C. 2151.99 are those specified in R.C. 2151.421(A) as having a duty to report. Nowhere in R.C. 2151.421(A), however, does it say that a *political subdivision* has a duty to report. And nowhere in R.C. 2151.99 does it say that a political subdivision, or any other entity for that matter, may be held criminally responsible for an employee's failure to report suspected child abuse.

I therefore cannot agree with the majority's holding that R.C. 2151.421, by virtue of R.C. 2151.99's criminal penalty, expressly imposes liability upon Fairborn within the meaning of the R.C. 2744.02(B)(5) immunity exception. The majority's holding not only opens the door to civil liability but is also tantamount to a decree that a political subdivision can be *criminally prosecuted* for a person's failure to report suspected abuse. This is a remarkable proposition for which there is no statutory support, and one that would surely come as a surprise to the myriad **[***28]** political subdivisions that employ persons to whom the R.C. 2151.421(A) reporting duty applies.

The majority's rationale is more defensible as applied to the potential liability of Mallonee and Clifton. As school district employees, both are included among the persons required to report suspected child abuse under R.C. 2151.421(A). Thus, they were theoretically subject to criminal liability under R.C. 2151.99 if they failed to discharge a duty to report. But even as applied to these individual defendants, the majority's analysis ultimately collapses under the weight of the statutory language.

Because neither R.C. 2744.02(B)(5) nor 2744.03(A)(6)(c) modifies the word "liability" with the word "civil" or "criminal," the majority surmises that the term "liability" refers to *either* civil or criminal consequences. The majority thus equates R.C. 2151.99's express imposition of *criminal* liability with the type of "expressly imposed" liability required by R.C. 2744.03(A)(6)(c)'s immunity exception. But this view takes the word **[***29]** "liability" out of context. When viewed in the proper context, it becomes evident that the term "liability" as used in R.C. 2744.03(A)(6)(c) refers to *civil* liability and nothing more. **[*347]**

R.C. 2744.03(A)(1) through (A)(7) contain various "defenses or immunities" that political subdivisions or their employees may raise in a civil action for damages. R.C. 2744.03(A). The paragraph introducing these "defenses or immunities" states:

"In a *civil action* brought against a political subdivision or an employee of a political subdivision to recover damages * * * caused by any act or omission in connection with a governmental or proprietary function, the following defenses or immunities may be asserted to establish *nonliability*." (Emphasis added.)

This introductory paragraph specifies that the "defenses or immunities" contained in R.C. 2744.03(A)(1) through (A)(7) are relevant in determining whether a political subdivision or its employee will be liable in a civil action for damages. Accordingly, when R.C. 2744.03(A)(6)(c) provides that a political subdivision **[***30]** employee "is immune from liability unless * * * liability is expressly imposed upon the employee by a section of the Revised Code," the statute means that the employee is immune from *civil* liability unless that liability **[**549]** is expressly imposed by another Revised Code section. This is the only interpretation that harmonizes the various references to "liability" throughout R.C. Chapter

2744. Cf. *Saraie v. Kent City Bd. of Edn.* (C.A.6, 1995), 70 F.3d 907, 913 (refusing to construe R.C. 4511.76's criminal penalty as an express imposition of liability for violation of R.C. 4511.76). Accepting the majority's interpretation would require us to conclude that the unmodified term "liability" in the clause granting immunity (*i.e.*, "the employee is immune from liability unless one of the following applies") means civil liability. Whereas that same unmodified term "liability" in the clause providing an exception (*i.e.*, "liability is expressly imposed upon the employee by a section of the Revised Code") means either civil *or* criminal liability. It seems highly unlikely, however, that the General Assembly intended the **[***31]** same word to have different meanings within the same division of a statute. Nonetheless, the majority adopts this doubtful interpretation despite the lack of statutory language to support it.

If the legislature had truly intended to subject a political subdivision and its employees to tort liability for a violation of R.C. 2151.421, it would have expressly done so. Absent an express imposition of liability, the trial court correctly granted summary judgment for Fairborn, Mallonee, and Clifton based on R.C. Chapter 2744 immunity. I would therefore affirm the judgment of the court of appeals.

MOYER, C.J., and LUNDBERG STRATTON, J., concur in the foregoing dissenting opinion.

Service:  **Get by LEXSEE®**
Citation:  **2001 Ohio LEXIS 1890**
View:  **Full**
Date/Time:  Monday, March 29, 2004 - 6:32 PM EST

* Signal Legend:
● - Warning: Negative treatment is indicated
▲ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
Ⓘ - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.