character] credit only, but may be to affect his particular credit, [*13] that is, his credit [due to bias or interest] in the particular cause. Thus, the general credit of a witness for the prosecution may be unassailable; he may be hostile to the prisoner, and on cross-examination may deny that he is so; in such case, who can doubt the right of the prisoner to prove the hostility?

3A Wigmore, Evidence § 943 (Chadbourn Rev. 1970) (bracketed material in treatise).

Mr. Ward's less-than-stellar history with the Dayton Police Department, including his self-imposed removal from field duty, would not be relevant to attack his general character for truthfulness, but does appear to be relevant to his credibility in this case. While any officer would naturally have an interest in the outcome of an excessive force suit brought against him or her, the stakes for this particular officer, it might well be argued (as posited below), would be higher than those that would be present in a case against an officer with an unblemished record.

In United States v. Garrett, 542 F.2d 23 (6th Cir. 1976), the Sixth Circuit Court of Appeals had occasion to apply the above-described distinction between matters of general and specific credibility. [*14] In Garrett, the chief witness against a defendant in a drug prosecution case was a police officer (Lehman) who had been suspended from duty for refusing to submit to a urinalysis. Garrett, 542 F.2d at 24. The trial court allowed the fact and length of the suspension to come before the jury, but refused to allow the defendant to cross-examine the police officer as to the nature of or reason for the suspension. Id.

On appeal, the defendant argued that counsel should have been permitted to elicit testimony from Lehman concerning the reason for the suspension (i.e., possible drug abuse). The Government argued that what was sought was impermissible credibility evidence. n5 The Court of Appeals rejected that argument, noting that, "there is a difference between general credibility and answers which might possibly establish untruthfulness with respect to the specific events of the crime charged." Id. at 26 (citing United States v. Cardillo, 316 F.2d 606, 613 (2nd Cir.) cert. denied, 375 U.S. 822, 11 L. Ed. 2d 55, 84 S. Ct. 60 (1963)). The court held that evidence n6 as to the nature of or reason for the suspension [*15] should have been allowed, as possibly showing the bias or interest of a key witness. Id.

n5 The arguments in Garrett were made without specific reference to the Federal Rules of Evidence. The case was argued before the Court of Appeals in June of 1976, and it appears to be possible that the original trial may have taken place before the Federal Rules of Evidence became effective in mid-1975.

n6 The decision in Garrett focused only on the permissibility of cross-examination of the witness as to the nature of and reason for the suspension, and did not consider the question of the admissibility of extrinsic evidence on that subject. However, it cannot be doubted that, as the court viewed said cross-examination as seeking to elicit evidence of a potential bias, extrinsic evidence of the nature of and reason for the suspension would have been admissible in addition to the answers provided upon cross-examination. See 3 Weinstein's Evidence P 607[03].

In finding that the evidence concerning [*16] the suspension might have tended to show bias or interest on the part of the witness, the Garrett court reasoned that, "Lehman might well have looked upon a successful prosecution of Garrett as a means of having his suspension lifted and being returned to full duty as a police officer." Id. In this case, Mr. Ward might well have a point of view not unlike the point of view attributed to Lehman by the Garrett court. That is to say, Lehman might have thought that he could be returned to duty by a successful prosecution, and Mr. Ward might well believe that a jury finding that he

used excessive force would, in conjunction with his prior history with the police department, place his livelihood in grave jeopardy. Accordingly, the observation of the Garrett court, that the evidence of the nature of and reason for Lehman's suspension would be relevant to a question of interest or bias, supports this Court's finding that evidence of Mr. Ward's history with the police department is relevant to potential bias or interest on his part in this specific litigation.

Mr. Ward is not simply the chief witness to the events that gave rise to this action, he is the only one. Upon [*17] his credibility will rise and fall the entirety of this case. The centrality of his credibility increases the importance of permitting Mr. Kelly to attack that credibility through the permissible use of evidence of bias or interest.

Preliminarily, the Court finds that the probative value of this bias or interest evidence is not substantially outweighed by the danger of unfair prejudice to Mr. Ward, even in a bifurcated action. Fed. R. Evid. 403. However, the Court is not unaware of the potential for unfair prejudice. Specifically, there is a real danger that a jury might take the evidence not for its impeachment purpose, but for the purpose prohibited by Rule 404(b) (as evidence of Mr. Ward's character to prove action in conformity therewith during the events in question in the case) and/or Rule 608(b) (to attack Mr. Ward's general character for truthfulness). Accordingly, limiting instructions will be liberally employed, and the Court will remain (and will expect counsel to remain) vigilant to prevent the misuse or mispresentation of this evidence. Excessive reference to and evidence of the history of psychological and disciplinary problems may tend to become cumulative and [*18] prejudicial, which development is prohibited by Rule 403. The Court will be prepared to limit cumulative testimony.

Prior psychological problems as well as incidents of discipline of the Defendant Ward by the police department may both be inquired into and proved (in a non-cumulative fashion, subject to proper limiting instructions) by extrinsic evidence, regardless of the answers given by Defendant Ward on cross-examination.

This preliminary evidentiary ruling is not dispositive of the entirety of the question of whether bifurcation is appropriate in this case. The Court will proceed to discuss additional aspects of the bifurcation question.

The Court admits to having an amount of uncertainty regarding the nature of the Plaintiff's "official policy" claim. In the final pretrial order, the Plaintiff's claim is phrased as follows:

> The Plaintiff claims liability of Defendant City of Dayton for the constitutional deprivation inflicted upon the Plaintiff by Defendant Ward; the Plaintiff claims that the Defendant City, by the application and implementation of its customs, policies and procedures in connection with hiring and retention of employees, retained Defendant Ward in [*19] its employ in spite of specifically expressed difficulties and fear by Ward of misuse of his weapon on the public and the City, despite its specific knowledge, failed to require or provide any treatment, training or supervision of this specific Defendant; the wrongful activity of Defendant City was the moving force behind the eventual misuse of the weapon by Defendant Ward and the deprivation of the Plaintiff's constitutional rights.

Amended and Supplemental Final Pretrial Order at 3 - 4.

Thus, it might appear that the Plaintiff is making a claim that only specific actions by specific municipal policymakers with regard to the employ of this specific officer are in question in this matter. That is to say, the question in the case might be simply and specifically whether a series of decisions by municipal policymakers placed in field duty an officer those policymakers should have known

Case 1:01-cv-00769-SAS    Document 126-5    Filed 04/09/2004    Page 3 of 5

Page 7
1994 U.S. Dist. LEXIS 21511, *

to be unfit for such duty.

A municipality may be liable for a specific act or series of acts by a municipal policymaker. The Supreme Court, in Jett v. Dallas Independent School District, 491 U.S. 701, 105 L. Ed. 2d 598, 109 S. Ct. 2702 (1989), explained the manner in which such [*20] liability could be determined.

> Reviewing the relevant legal materials, including state and local positive law, as well as "'custom or usage' having the force of law," . . . the trial judge must identify those officials or governmental bodies who speak with final policymaking authority for the local government actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue. Once those officials who have the power to make official policy on a particular issue have been identified, it is for the jury to determine whether their decisions have caused the deprivation of rights at issue[.]

Id. at 737 (citations omitted)(emphasis in original). See also Feliciano v. City of Cleveland, 988 F.2d 649 (6th Cir. 1993) (court, analyzing state and local law, finds that chief of police did not have final policymaking authority with regard to drug testing of cadets).

To establish such liability in this case, the Plaintiff in this case would be required to: (1) identify the final policymaking official(s) for the retention or assignment to field duty of Dayton police officers in general; (2) identify [*21] the official(s) responsible for the retention and/or assignment to field duty of Defendant Ward, showing that the official(s) so identified is/are the same as the official(s) identified in part (1); and (3) show that the decision to retain and or assign to field duty Defendant Ward was the moving force behind the Plaintiff's injuries.

That analysis, however, assumes that the Plaintiff intends only to put before the jury the issue of Defendant Ward's fitness for duty. If, on the other hand, the Plaintiff intends to establish that there is no policy for dealing with stress-impaired police officers, the question is a different one. Although Plaintiff has stated in memoranda and in the final pretrial order that he intends to introduce no evidence of the manner in which the City dealt with the psychological problems of other officers, he has stated in at least one other memorandum that,

> The claim of "official policy" against the City is that the City had "no policy" concerning the care and treatment of officers with emotional and psychological problems which could present significant dangers to the general public and, in this case, with emotional and psychological problems [*22] specifically relating to the ability to perform as a regular officer on the street who feels himself to be a threat to the public through use of his gun.

Doc. # 24 at 5 (emphasis added). Such a claim is a more classic Monell n7 issue, and would require proof of a general policy or custom which would, in turn, require the introduction of evidence of cases other than that of Defendant Ward.

    n7 Monell v. New York City Dept. of Social Services, 436 U.S. 658, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978).

In such cases, involving proof of a general policy, this Court has tended in the past to favor bifurcation of such claims. If a single trial were held on all of the claims in such a case, evidence offered against the municipal defendant, regarding incidents of alleged misconduct by or in relation to other municipal employees, unrelated to the incident in question in a particular case but relevant to the question of municipal liability for a policy or practice, would be highly prejudicial [*23] to individual defendants. The questions regarding the liability of individual defendants should be

decided by the jury only on the facts of the particular events on which a particular case is based. That is to say, individual defendants cannot be made to bear the burden of answering for all of the alleged misdeeds of every past and current municipal employee, or for all of the alleged misdeeds of the municipality in its dealings with other municipal employees. A jury must be allowed to consider the evidence regarding a particular incident, and that incident alone, with its focus on that evidence unimpaired.

For those reasons, the Court would tend to favor bifurcation in this case, should it be the Plaintiff's intent to demonstrate a flaw in some general policy of the Defendant City, as opposed simply to a claim made as to the misdeeds of municipal policymakers in their handling of the retention and/or assignment to field duty of Defendant Ward solely in the context of the relationship between the Defendant City and the Defendant Ward.

Given that the Court would certainly bifurcate this case if it were the Plaintiff's object to show a general policy flaw, the Court will assume for [*24] present purposes, as a "best case scenario," that the Plaintiff intends his claim against the Defendant City to be one based solely upon the actions of final policymakers with respect to Defendant Ward's retention and/or assignment to field duty. Even under that assumption, however, it appears that bifurcation would be appropriate. Although evidence of the psychological and disciplinary problems of Mr. Ward will be admissible against him, there is a significant difference between the amount and kind of such evidence that will be admissible against him and the amount and kind of such evidence admissible against the City. It is the opinion of this Court that this difference is significant enough to raise the specter of unfair prejudice. n8

> n8 Plaintiff has also argued that he is entitled to a separate element of damages, which damages he would not be able to recover in the first stage of a bifurcated action in which he would proceed solely against Mr. Ward. Namely, the Plaintiff seeks damages for the special emotional anguish he has suffered due to his knowledge that the City was the moving force that caused his injuries. Resolution of the viability of this claim for additional damages will await the trial; the viability or non-viability of this claim does not affect the concerns regarding prejudice upon which the Court bases its decision to bifurcate this litigation.

[*25]

After reviewing the amended final pretrial order, the Court has some concerns as to the possible prejudicial or cumulative nature, as against Defendant Ward, of the psychological problem testimony that the Plaintiff intends to offer against the Defendant City. There appear to be 34 testimony synopses on the Plaintiff's witness list, and it appears that 14 of those synopses indicate that the witness will testify as to Defendant Ward's psychological problems.

Simply by sheer numbers, this appears to go far beyond the amount of testimony that would be needed to establish Defendant Ward's incremental interest in the outcome of the case for purposes of impeaching his specific (as opposed to general) credibility. For the purposes of the policy question, testimony as to widespread knowledge of Defendant Ward's problems might be relevant for demonstrating a mishandling of his case by the City, and therefore admissible against the municipality. However, from the witness list, it appears that testimony as to Defendant Ward's psychological difficulties may come dangerously close to becoming the focal point of the case. That focal point should be, at the threshold, what the circumstances were [*26] that led to the shooting, and whether Defendant Ward acted in an objectively reasonable manner under those circumstances. For the initial determination of liability, the psychological problem testimony is relevant only to his credibility on the factual question as to the actual circumstances, and should not be, at that stage, the primary focus of the jury's attention.

To try the City's liability for an "official policy," alongside Mr. Ward's liability for a specific incidence of conduct would create serious problems under Rule 403, as the amount and kind of evidence that would be admissible against the City concerning Mr. Ward's history of psychological and disciplinary problems might well be prejudicial and cumulative as against Mr. Ward. At the same time, an attempt to limit the use of such evidence, in a non-bifurcated proceeding, might be prejudicial to the Plaintiff, as it would tend to unfairly diminish his case against the City. n9

> n9 Plaintiff argues that bifurcation of this action would lead to the inescapable conclusion that no Monell claim could ever be tried against a municipal defendant. Doc. # 24 at 15 - 16. The Court disagrees. This decision has been based upon the unique facts and circumstances of this case. Nothing that the Court has stated herein should be construed as an inflexible rule that bifurcation will always be appropriate in an action in which a plaintiff has sued, in a § 1983 civil rights action, both an individual defendant and his or her municipal employer. In addition, an action might be maintained against a municipality as sole defendant where the action of an individual municipal employee is alleged to have caused injury. In such a case, questions of prejudice would be dramatically decreased in significance, as there would be no individual co-defendant who might suffer from such prejudice, even though it would still be incumbent upon the plaintiff to prove the infliction of a constitutional tort upon him or her by the individual employee, prior to the consideration of imposing liability upon the defendant municipal employer.

[*27]

Accordingly, the Court would rule preliminarily that evidence of Defendant Ward's history of psychological and disciplinary difficulties will be admissible against him to impeach his credibility with regard to this case, subject to the limitations placed on excessively cumulative or unfairly prejudicial evidence by Rule 403. The Court does also find, however, that the amount of such evidence admissible against the City is so much greater than the amount of such evidence that would be admissible to impeach Mr. Ward, that to try both Defendants together would create significant prejudice to Mr. Ward due to the cumulative nature, as against Mr. Ward, of the evidence admissible against the City.

Pursuant to Rule 42(b), this Court does order the separation of the trials of Defendant Ward and the Defendant City, in order to avoid prejudice to Defendant Ward and in furtherance of convenience and the expeditious and economical resolution of this controversy.

July 6, 1994

WALTER HERBERT RICE

UNITED STATES DISTRICT JUDGE