Case 1:01-cv-00769-SAS    Document 130-2    Filed 04/16/2004    Page 1 of 17

Get a Document - by Citation - 2003 U.S. Dist. LEXIS 7105                                Page 1 of 17

EXHIBIT "A"

*2003 U.S. Dist. LEXIS 7105, ***

Elsie Carpenter, Administratrix of the Estate of Michael Carpenter, Plaintiff v. City of Cincinnati et al., Defendants

Case No. C-1-99-227

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO, WESTERN DIVISION

2003 U.S. Dist. LEXIS 7105

April 17, 2003, Decided

**DISPOSITION:** [*1] Defendants' motion for summary judgment, Defendants' motions to strike, and Defendants' motion to exclude testimony denied.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Defendants, a city and two police officers, moved for summary judgment pursuant to Fed. R. Civ. P. 56(c) in a 42 U.S.C.S. § 1983 action filed by plaintiff, the mother of the decedent, on behalf of the decedent's estate, herself, her husband, and the decedent's child.

**OVERVIEW:** The decedent was shot by two police officers during a traffic stop. The officers claimed that they were attempting to remove the decedent from his running vehicle, and that he appeared to be reaching for a weapon. However, the decedent was unarmed. In his mother's § 1983 action against defendants, the court held that neither officer was entitled to summary judgment based on qualified immunity, because they violated his U.S. Const. amend. IV rights. Because the decedent was unarmed and was not violent, the officers shot him with no more justification than his commission of a misdemeanor, which was a well-established violation of U.S. Const. amend. IV. Nor was the city entitled to summary judgment, as the evidence created a dispute as to whether the city's police department had policies of not asking subjects of traffic stops to put their cars in park and turn off the engines and dealing with obstinate subjects by pulling them out of their cars. The officers were not entitled to immunity under Ohio Rev. Code Ann. § 2744.03 on the wrongful death claim because it appeared that they may have acted in a reckless manner given that the decedent posed no immediate threat of harm.

**OUTCOME:** Defendants' motion for summary judgment was denied in the mother's action seeking to enforce the decedent's civil rights.

**CORE TERMS:** shot, summary judgment, shooting, fired, bullet, traffic stop, favorable, curriculum, train, engine, misdemeanor, qualified immunity, traffic, weapon, failure to train, park, municipality, state law, excessive force, police officer, declaration, license, driver's, window, front, genuine issue of material fact, reasonable officer, moving party, hearsay rule, immunity

**LexisNexis (TM) HEADNOTES - Core Concepts -** Hide Concepts

Evidence > Hearsay Rule & Exceptions > Public Records & Vital Statistics
*HN1* Fed. R. Evid. 803(8)(C) provides that, in a civil case, records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth factual findings resulting from an investigation made pursuant to authority granted by law

Case 1:01-cv-00769-SAS   Document 130-2   Filed 04/16/2004   Page 2 of 17

Get a Document - by Citation - 2003 U.S. Dist. LEXIS 7105                          Page 2 of 17

are excepted from the hearsay rule unless the sources of information or other circumstances indicate lack of trustworthiness. More Like This Headnote

Evidence > Hearsay Rule & Exceptions > Public Records & Vital Statistics
HN2 Investigative reports contemplated by Fed. R. Evid. 803(8)(C) are seldom created by persons having direct knowledge of the facts contained therein, and yet, despite Fed. R. Evid. 602, Fed. R. Evid. 803(8)(C) creates an exception for investigative reports where the sources of the reports' information are "trustworthy." More Like This Headnote

Civil Procedure > Summary Judgment > Burdens of Production & Proof
Civil Procedure > Summary Judgment > Summary Judgment Standard
HN3 Fed. R. Civ. P. 56 governs motions for summary judgment. Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). On a motion for summary judgment, the movant has the burden of showing that there exists no genuine issue of material fact, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion. The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. On those issues for which it shoulders the burden of proof, the moving party must make a showing that is sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party. For those issues on which the moving party will not have the burden of proof at trial, the movant must point out to the district court that there is an absence of evidence to support the nonmoving party's case. More Like This Headnote

Civil Procedure > Summary Judgment > Burdens of Production & Proof
HN4 In responding to a summary judgment motion, a nonmoving party may not rest upon the pleadings, but must go beyond the pleadings and present affirmative evidence in order to defeat a properly supported motion for summary judgment. The nonmoving party must set forth specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56(e). More Like This Headnote

Civil Procedure > Summary Judgment > Summary Judgment Standard
HN5 Although the mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient to overcome a summary judgment motion, a court should not grant summary judgment merely because the nonmovant's case appears weak. The task of the court is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. A genuine issue for trial exists when there is sufficient evidence on which the jury could reasonably find for the plaintiff. More Like This Headnote

Constitutional Law > Civil Rights Enforcement > Immunity > Public Officials
HN6 The doctrine of qualified immunity provides that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. To determine if qualified immunity attaches, the court follows a sequential analysis. First, the court examines whether the facts alleged, taken in the light most favorable to the party asserting the injury, show that the government official's conduct violated a constitutional right. If the alleged facts would not establish a constitutional right of the complainant, then the officer is entitled to qualified immunity. If a violation of a constitutional right could be made out on the allegations when taken in the light

Get a Document - by Citation - 2003 U.S. Dist. LEXIS 7105

Case 1:01-cv-00769-SAS    Document 130-2    Filed 04/16/2004    Page 3 of 17

Page 3 of 17

most favorable to the plaintiff, however, the court next inquires whether the right was clearly established. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition. In order for a right to be "clearly established," it must be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. More Like This Headnote

Constitutional Law > Civil Rights Enforcement > Immunity > Public Officials
HN7 ± A police officer may be entitled to qualified immunity even if he did in fact violate the plaintiff's rights, if he acted under a mistaken understanding as to what the law allowed and that mistake was reasonable. More Like This Headnote

Constitutional Law > Search & Seizure > Scope of Protection
HN8 ± Claims of excessive force in the context of an arrest or investigatory stop are analyzed under the Fourth Amendment and its "reasonableness" standard. The relevant factors in determining whether the force used in a particular case was reasonable include the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. The inquiry is an objective one, however; the actual intent or motivation of the officer in question is not relevant. More Like This Headnote

Constitutional Law > Search & Seizure > Scope of Protection
HN9 ± It is axiomatic that the Fourth Amendment has been made applicable to the states through the Fourteenth Amendment. More Like This Headnote

Constitutional Law > Search & Seizure > Scope of Protection
HN10 ± An officer violates the Fourth Amendment by shooting an unarmed, non-dangerous misdemeanor suspect. More Like This Headnote

Constitutional Law > Search & Seizure > Scope of Protection
HN11 ± For Fourth Amendment purposes, a seizure of a person is effectuated only when the officer applies physical force or the subject submits to a show of force. More Like This Headnote

Constitutional Law > Civil Rights Enforcement > Immunity > Local Governments
HN12 ± A municipality cannot be held liable under 42 U.S.C.S. § 1983 under a respondeat superior theory, i.e., simply because it employs a tortfeasor. However, a municipality may be held directly liable under § 1983 if, in committing the constitutional violation, the employee implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. In order for the policy to be actionable, it must be a "moving force" behind the employee's constitutional violation. The municipality may be liable even if that official policy has not received formal approval through the body's official decisionmaking channels. In fact, a municipality may have a constitutionally pristine policy and still face liability. Where the municipality's policy is constitutional, the municipality may be liable for inadequately training its employees where in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In such a case, the failure to train its employees itself amounts to an unconstitutional policy. More Like This Headnote

Get a Document - by Citation - 2003 U.S. Dist. LEXIS 7105

Case 1:01-cv-00769-SAS   Document 130-2   Filed 04/16/2004   Page 4 of 17

Page 4 of 17

Constitutional Law > Civil Rights Enforcement > Immunity > Local Governments

HN13⁺ Just as a policy must be a "moving force" behind an employee's constitutional violation to be actionable, a municipality's failure to train must be "closely related to" or "actually cause" the plaintiff's injury. More Like This Headnote

Constitutional Law > Civil Rights Enforcement > Immunity > Public Officials

HN14⁺ Ohio. Rev. Code Ann. § 2744.03 provides immunity for employees of a political subdivision from whom damages for injury, death, or loss to persons or property allegedly caused by any act or omission in connection with a government or proprietary function are sought. Ohio Rev. Code Ann. § 2744.03(A). This immunity does not extend to those employees whose acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner. Ohio Rev. Code Ann. § 2744.03(A)(6)(b). More Like This Headnote

Constitutional Law > Civil Rights Enforcement > Immunity > Public Officials

HN15⁺ A police officer is an employee of a political subdivision and, as such, is generally protected by the statutory immunity granted by Ohio Rev. Code Ann. § 2744.03. A plaintiff bears the burden of demonstrating that the officers' actions fall within one of the three exceptions set forth in Ohio Rev. Code Ann. § 2744.03(A)(6). "Recklessness," which precludes immunity under Ohio Rev. Code Ann. § 2744.03 (A)(6)(b), refers to an act done while knowing or having reason to know of facts that would lead a reasonable person to believe that the conduct creates an unreasonable risk of harm and that this risk is substantially greater than that necessary to make the conduct negligent. The issue of whether an officer's actions were reckless is usually a question for the trier of fact. More Like This Headnote

**COUNSEL:** For ELSIE CARPENTER, plaintiff: Kenneth L Lawson, Lawson & Associates, Cincinnati, OH.

For CINCINNATI CITY OF, MICHAEL B MILLER, II, BRENT MCCURLEY, defendants: Neil Frank Freund, Freund Freeze & Arnold, Dayton, OH.

For CINCINNATI CITY OF, MICHAEL B MILLER, II, BRENT MCCURLEY, defendants: Donald Edson Hardin, Hardin Lefton Lazarus & Marks LLC, Richard Ganulin, Assistant City Solicitor, Geri H Geiler, Cincinnati, OH.

**JUDGES:** Susan J. Dlott, United States District Judge.

**OPINIONBY:** Susan J. Dlott

**OPINION:** ORDER

This matter comes before the Court on Defendants' Motion for Summary Judgment (doc. # 112), Defendants' Motion to Strike Incompetent and Otherwise Inadmissible Materials and Motion to Strike the "Failure to Train" Claim (doc. # 122), and Defendants' Motion to Exclude the Testimony of Wilson Seay (doc. # 110). n1 For the following reasons, the Court **DENIES** Defendants' motions.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 There are two other motions pending in this case: Defendants' Motion for Separate Trials (doc. # 128) and Plaintiff's Motion to Add Survival Claim Under State Law (doc. # 130). Because the issues addressed therein are not germane to Defendants' motion for summary

Get a Document - by Citation - 2003 U.S. Dist. LEXIS 7105
Case 1:01-cv-00769-SAS   Document 130-2   Filed 04/16/2004   Page 5 of 17
Page 3 of 17

disposition, the Court will address those motions in a separate order.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*2]

## I. FACTUAL BACKGROUND

This lawsuit stems from an incident in which Defendants Officer Brent McCurley and Officer Michael Miller of the Cincinnati Police Department shot and killed Michael Carpenter during a traffic stop. Officers McCurley and Miller say that when they shot at Michael Carpenter they believed he threatened their safety, but it is now undisputed that Michael Carpenter was not armed. Michael Carpenter's mother, Plaintiff Elsie Carpenter, brought this action on behalf of the estate of Michael Carpenter, herself, her husband and Michael Carpenter's minor child against Officers Miller and McCurley and the City of Cincinnati ("the City"). The Complaint contained three counts: 1) claims against all Defendants under 42 U.S.C. § 1983 for violations of the Fourth and Fourteenth Amendments; 2) state law wrongful death claims against Officers Miller and McCurley; and 3) a state law negligent hiring claim against the City. (See doc. # 1 at 7.) On a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6), United States District Judge Herman J. Weber dismissed the negligent hiring claim. (See doc. # 92.) In setting [*3] forth the facts relevant to this case, the Court begins on the night of March 18, 1999, the night on which Michael Carpenter was shot.

1. The Stop and Shooting of Michael Carpenter

Around 10 p.m. that night, Michael Carpenter went to the home of Keith Harris and asked to borrow Mr. Harris' car. Mr. Harris told Mr. Carpenter that he could borrow the car for a few hours but warned him that the car's temporary license plate had recently expired. It is unclear what Mr. Carpenter did in the hours that followed, but shortly after 1 a.m. on March 19, Mr. Carpenter entered a Circle K convenience store in the Northside neighborhood of Cincinnati. Officers Miller and McCurley were on duty in the area, and about that time they approached the store, seeking restrooms, beverages and a telephone. Officer Miller had been out of the Cincinnati Police Academy approximately three months, and Officer McCurley was his field training officer. They noticed Mr. Carpenter through the store's windows, patting his pockets. As they entered the store, Mr. Carpenter exited without making a purchase but went to Mr. Harris' car to retrieve additional change needed to make a purchase. It is not clear whether the [*4] officers noticed Mr. Carpenter return into the store or the transaction that followed. Still a penny short, Mr. Carpenter asked the store cashier James Clark if he could buy a quart of oil or transmission fluid for one cent less than the listed price, and Mr. Clark relented. Mr. Clark told Officer Miller that Mr. Carpenter had asked him for money, and either Mr. Clark or Officer Miller remarked that Mr. Carpenter looked suspicious. The officers exited the store and noticed Mr. Carpenter standing by Mr. Harris' car in the store's parking lot, apparently performing some maintenance under the hood.

The officers entered their cruiser and drove across the street to a gas station parking lot. They ran a computer check of Mr. Harris' temporary tag and discovered that it had expired. When Mr. Carpenter drove the car out of the Circle K parking lot and onto Chase Avenue, Officers McCurley and Miller followed him in their cruiser, engaging their emergency lights. Officer McCurley called in a traffic stop to police communications at 1:24 a.m. Mr. Carpenter did not stop on Chase but put on his turn signal and turned onto Pitts Avenue, where he pulled over between two cars parked on the side of [*5] the street. The officers parked behind and to the left of Mr. Carpenter and engaged their cruiser's high beams. Before exiting the cruiser, the officers learned that there were no outstanding warrants associated with Mr. Harris' vehicle. Officer Miller approached the driver's side window of Mr. Harris' car, shone a flashlight into the car, and noted that the driver's side window was rolled about a

Get a Document - by Citation - 2003 U.S. Dist. LEXIS 7105    Page 6 of 17

Case 1:01-cv-00769-SAS    Document 130-2    Filed 04/16/2004    Page 6 of 17

quarter of the way down and that Mr. Carpenter was wearing a seat belt. The car was still running. n2 Officer McCurley approached the passenger's side of the car.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 Officer McCurley testified in his deposition that he did not instruct Officer Miller to tell Mr. Carpenter to put the car in park or turn off the engine because he trusted Officer Miller's judgment.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

Officer Miller asked Mr. Carpenter to produce a driver's license and roll down his window. Mr. Carpenter replied, "O.K.," rolled down his window, and began shuffling papers in the glove compartment. Officer Miller then asked for proof of insurance. Mr. Carpenter [*6] replied, "O.K." and continued to look in the glove box. When Mr. Carpenter did not produce a license or proof of insurance, Officer Miller asked him if he had a license. Mr. Carpenter replied that he did and continued to search. After this back and forth had continued for about forty to forty-five seconds, Officer Miller asked Mr. Carpenter if he had his license with him, and Mr. Carpenter replied that he had a license. At that point, Officer Miller asked Mr. Carpenter to step out of the vehicle.

Mr. Carpenter unlatched his seat belt and opened the car door but did not get out of the vehicle. The officers say that Mr. Carpenter then suddenly turned his whole body towards the passenger's side door and reached down towards the passenger's seat area. Officer McCurley moved from the passenger's side door to the rear bumper area on the passenger's side. At this point, it became difficult for Officer McCurley to see Mr. Carpenter's hands. At 1:26 a.m., Officer McCurley called on his radio for back up. Officer Miller yelled for Mr. Carpenter to get out of the car and holstered his flashlight. He opened the door more completely and grabbed Mr. Carpenter by the left elbow. Officer Miller attempted [*7] to pull Mr. Carpenter out of the car by the arm, and Mr. Carpenter pulled back towards the passenger's side. Mr. Carpenter thrust his elbow back towards Officer Miller but did not strike Officer Miller, whose body was largely outside the car. Officer Miller drew his pistol. Officer Miller says that he could not see into the passenger's side of the car and could not see Mr. Carpenter's hands.

The officers say that they then heard the car "rev," whereupon the car moved forward and struck the van in front of it. After the incident the van showed no signs of damage. Officer Miller says that he was "dragged" along by the car ten to fifteen feet, though his feet did not come out from under him. In his initial statement to homicide investigators the morning of the incident, Officer McCurley stated that the car could only have moved one or two feet before hitting the car in front of it. In a statement given to investigators for the City's Office of Municipal Investigation ("OMI") a few weeks later, he said that it traveled less than ten feet. Officer McCurley says that Officer Miller then stepped back from the car. Officer McCurley says he then saw the reverse lights of the car come on and [*8] the car start to back up towards him. However, neither officer recalls seeing Mr. Carpenter change gears. Also, Daniel Jones, a criminalist for the Cincinnati Police Division who examined the car shortly after the incident, found the engine of the car running and the gear shift in a forward gear. Officer McCurley says that he was eight to ten feet behind the vehicle when it began coming towards him.

Sixteen seconds after calling for back up, Officer McCurley radioed in that shots had been fired. Officer McCurley says that he began firing almost immediately after he saw the car begin to back up. He fired several shots. Linda Showes, who lived on Pitts Avenue on March 19, 1999, says that she awoke just before 1:30 a.m. that day to the sound of one shot, heard someone say, "you shot me, you [motherfucker]" or something to that effect, and then

Get a Document - by Citation - 2003 U.S. Dist. LEXIS 2105

Case 1:01-cv-00769-SAS   Document 130-2   Filed 04/16/2004   Page 7 of 17

Page 7 of 17

heard several more shots. Officer McCurley says that when he fired Officer Miller may have had his arm inside the car. Officer Miller says that he heard the sound of gunfire but assumed that it was Mr. Carpenter who was doing the shooting. However, Officer Miller says that he saw no flashes of light as from the muzzle of a gun. Officer Miller [*9] took cover by another vehicle. Mr. Carpenter emerged from the car. The officers say that they could not see Mr. Carpenter's right hand as he came out of the car. They say that once they saw his hand they could not see what, if anything, was in his clenched right hand. Officer McCurley continued to shoot, and Officer Miller also fired a shot at Mr. Carpenter. Mr. Carpenter lowered himself to the ground and laid down. Paramedics took Mr. Carpenter to a hospital, and he was declared dead shortly after arriving there.

Three bullets were found on Mr. Carpenter's body; one of the bullets did not penetrate his skin. A rather cryptic coroner's report appears to indicate that only bullets from Officer McCurley's gun reached Mr. Carpenter's body and that the lone bullet that Officer Miller fired missed Mr. Carpenter and hit the car. n3 One bullet was found in Mr. Carpenter's head and the other in his right arm. The coroner deemed the bullet to the head to be the cause of Mr. Carpenter's death. As for the bullet to the arm, the wound it caused has been a source of some dispute. The officers have stated that Mr. Carpenter never raised his hands in a show of surrender. However, Plaintiff's forensic [*10] firearms expert Mickey French found that the bullet wound found in Mr. Carpenter's right upper arm suggested that the bullet traveled from front to back, left to right, and slightly downward. Mr. French says that this indicates that Mr. Carpenter received this wound while seated in the car with his arm up and turned directly backwards between the seats of the car, or while exiting the vehicle heading towards the rear of the vehicle.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n3 The OMI and the Cincinnati Police Division Criminal Investigation Section both concluded that no bullet from Officer Miller's gun hit Mr. Carpenter. However, in seeking summary judgment Officer Miller has made no reference to evidence that his shot missed Mr. Carpenter, and the Plaintiff never conceded as much in her brief. In fact, Defendants' brief in support of its motion for summary judgment never explicitly acknowledges that Michael Carpenter died as a result of the events of March 19, 1999. Plaintiff's brief, on the other hand, is vague on the issue of whose bullet caused Mr. Carpenter's death, stating simply that the defendant officers shot Mr. Carpenter as he exited the vehicle.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - [*11]

2. The Relevant City Policies and Customs

All parties agree that in March of 1999 the City trained its officers at the Police Academy on the proper procedure for traffic stops, using the Ohio Peace Officer Basic Training Curriculum ("the Curriculum"). The Curriculum divides traffic stops into three categories of risk: unknown, low and high, though it does not define the three categories. Under the Curriculum, officers are to advise the suspect to turn off his car's engine and control the suspect's hands and provide security. Officers are to tell the suspect why he is being stopped. The Curriculum instructs officers engaged in a high-risk traffic stop to "slow everything down," as "time is on your side."

In her brief opposing summary judgment, Plaintiff makes note of several other rules for officers that she says are "official city policy." (Doc. # 121 at 7-8.) While Defendants do not dispute Plaintiff's statements in this regard, the source of this information is unclear from the record. Plaintiff says that in the case of a two-officer stop, official City policy was for one officer (the "contact" officer) to approach the driver's side and the other officer (the "cover"

officer) [*12] to approach the passenger's side. The cover officer is to have all contact with the suspect, and the cover officer is to watch the suspect's hands and movements and provide security. Official Cincinnati policy also prohibits officers from shooting at a moving vehicle, according to Plaintiff's brief.

Plaintiff says that various evidence indicates that the Cincinnati Police Department had customs inconsistent with the Curriculum and official policy and gives its officers wide latitude in disregarding the teachings of the Curriculum and official policy. She notes Officer Miller's testimony that while he had been trained to tell suspects to put their cars in park at high-risk traffic stops, he was not instructed to ensure that a suspect's car was in park at a low-risk stop. Plaintiff also points the Court to the report of the Civilian Police Review Panel ("CPRP") on the shooting of Timothy Blair by a Cincinnati police officer in November 1998. According to that report, Cincinnati Police Chief Thomas Streicher told the CPRP that the Cincinnati Police Department had no policy on, in the words of the CPRP, "disabling an automobile in the course of a non-routine traffic stop." In the Timothy [*13] Blair incident, Cincinnati police officer Daniel Carder approached Mr. Blair, a shoplifting suspect who had locked himself in his car. While the engine was running, the officer broke the car door window, maced Mr. Blair, and grabbed Mr. Blair in an attempt to extract him from the vehicle. The car began moving, and the officer shot Mr. Blair while the car was moving. The officer told investigators that he shot Mr. Blair because his hand became ensnared in Mr. Blair's jacket and he needed to free himself. Officer Carder also told the CPRP that previously he had been commended for successfully extracting an individual from an automobile.

## II. MOTION TO STRIKE CERTAIN EVIDENCE

Defendants move to strike what they say are "incompetent and otherwise inadmissible materials" submitted with Plaintiff's opposition to Defendants' Motion for Summary Judgment or referenced therein. (Doc. # 122 at 1.) Specifically, Defendants argue that the Court should not consider: 1) the CPRP report on the shooting of Michael Carpenter; 2) the OMI report on the shooting of Michael Carpenter; 3) the declaration of Plaintiff's policing expert, Dr. George Kirkham; 4) the report of the CPRP on the shooting [*14] of Timothy Blair; and 5) reference to a newspaper article about an incident in September, 2000 involving a Cincinnati police officer. Defendants' motion to strike these materials and any references to them is **DENIED.**

1. CPRP and OMI Reports

Plaintiff initially sought admission of the CPRP and OMI reports pursuant to the business records exceptions to the hearsay rule. See Fed. R. Evid. 803(6). Since Defendants argued in their motion to strike that this is not the applicable rule, Plaintiffs have pointed the Court to the more helpful public records and reports exception. See Fed. R. Evid. 803(8). Defendants argue that the records are inadmissible because they contain double and triple hearsay -- that is, the panels creating the documents had neither direct knowledge of the information noted in the reports nor was all the information contained therein reported to the panels by someone having first-hand knowledge -- and thus are not admissible under the personal knowledge requirement of Federal Rule of Evidence 602.

HN1 Federal Rule of Evidence 803(8)(C) provides that in a civil case "records, reports, statements, or data compilations, in any form, of public offices or agencies, [*15] setting forth ... factual findings resulting from an investigation made pursuant to authority granted by law" are excepted from the hearsay rule "unless the sources of information or other circumstances indicate lack of trustworthiness." The CPRP and OMI reports are admissible under Rule 803(8)(C). See, e.g., Combs v. Wilkinson, 315 F.3d 548, 554-56 (6th Cir. 2002) (corrections use of force committee's report prepared pursuant to state administrative code admissible under Fed. R. Evid. 803(8). The CPRP and OMI prepare their reports pursuant to the Cincinnati Municipal Code and are authorized to and do interview witnesses directly. See

Get a Document - by Citation - 2003 U.S. Dist. LEXIS 2105

Case 1:01-cv-00769-SAS Document 130-2 Filed 04/16/2004 Page 9 of 17

Cincinnati Municipal Code, Administrative Code §§ 13, 20. Rule 602 does not render these reports inadmissible, because $^{HN2}$investigative reports contemplated by 803(8)(C) are seldom created by persons having direct knowledge of the facts contained therein, and yet, despite Rule 602, Rule 803(8)(C) creates an exception for investigative reports where the sources of the reports' information are "trustworthy." See Combs, 315 F.3d at 555. Here, the CPRP and OMI based their reports largely on other documents, interviews, and [*16] reports also excepted from the hearsay rule by 803(8)(C). To the extent that these other sources of information are not so exempted from the hearsay rule or are otherwise untrustworthy, the Court will, of course, disregard them.

Defendants have also moved to strike the CPRP report on the shooting of Timothy Blair as irrelevant. To the extent that it sheds light on the policies and customs of the Cincinnati Police Department, the report is relevant to Plaintiff's claim against the City. The Court is mindful, though, that the report may be of limited relevance, especially since the incident examined therein occurred after the incident that is the subject of this lawsuit. However, the Court will not strike the document.

2. Declaration of Dr. George Kirkham

Defendants also ask the Court to strike a February 18, 2003 declaration of Plaintiff's policing expert, Dr. George Kirkham, and any references to that declaration found in Plaintiff's brief opposing Defendants' motion for summary judgment. Defendants say that Dr. Kirkham is "incompetent to address the practices of the Cincinnati Police Department" because, among other reasons, he testified at his deposition that he was not familiar [*17] with the particular regulations or training practices of the Cincinnati police. (Doc. # 122 at 6.) First, the Court cannot strike any references to Dr. Kirkham's declaration found in Plaintiff's brief, as there are none. As Plaintiff found it unnecessary to rely on Dr. Kirkham's declaration in responding to Defendants' motion for summary judgment, the Court finds it unnecessary to rely on that declaration in considering Defendants' motion. Any lingering concerns regarding Dr. Kirkham's qualification to testify at trial as an expert in this case may be addressed through a motion in limine.

3. Newspaper Article

Finally, Defendants ask the Court to strike from Plaintiff's opposition reference to a newspaper article describing an incident where Cincinnati police officers shot a minor driving a vehicle. There is no exception to the hearsay rule that allows the Court to consider the article as evidence of the truth of the matters described therein. However, the Court notes that the only reference to this article in Plaintiff's brief is contained in a short footnote that gives context to an otherwise unexplained reference to the incident contained in the admissible CPRP report on the death [*18] of Timothy Blair. Therefore, the Court sees no reason to strike reference to the news article from Plaintiff's pleading. The Court notes that it will not consider the article itself in ruling on Defendants' motion for summary judgment.

### III. MOTION TO STRIKE THE "FAILURE TO TRAIN" CLAIM

The City moves the Court "to strike the materials and text submitted by the plaintiff in support of an alleged 'failure to train' claim against the City." (Doc. # 122 at 6.) In her complaint, Plaintiff alleged three counts: first, constitutional claims under the Fourth and Fourteenth Amendment against the officers and the City; second, a state law wrongful death action against the officers; and third, a state law negligent hiring action against the City. The Defendants moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Adopting a Report and Recommendation issued by Magistrate Judge Jack Sherman, Jr., Judge Weber dismissed Plaintiff's negligent hiring claim but denied Defendants' motion to dismiss as to the remaining claims. (See doc. # 92.) The City notes that in the Report and Recommendation, Judge Sherman stated, in response to Defendants' argument [*19] that

Get a Document - by Citation - 2003 U.S. Dist. LEXIS 2105
Case 1:01-cv-00769-SAS Document 130-2 Filed 04/16/2004 Page 10 of 17
Page 10 of 17

Plaintiff's "failure to train" claim was insufficiently pled, that "no such claim was pled in the complaint." (Doc. # 9 at 2 n.1.) However, Plaintiff's Fourth and Fourteenth Amendment claims against the City unquestionably survived Judge Weber's order. Thus, to the extent that any evidence that the City failed to train its employees is relevant to Plaintiff's Fourth and Fourteenth Amendment claims against the City, Plaintiff may present that evidence. Defendants' motion to strike the "failure to train" claim is **DENIED.**

### IV. MOTION TO EXCLUDE TESTIMONY OF WILSON SEAY

In October 2002, Defendants filed a motion seeking an order to "exclude" the testimony of Wilson Seay, a third-party witness identified by Plaintiff. (Doc. # 110.) As grounds for exclusion, Defendants noted that Mr. Seay twice failed to appear for his deposition. Since filing their motion, however, Defendants have taken Mr. Seay's deposition and filed it with the Court. Therefore, the Court **DENIES** Defendants' motion seeking an order excluding the testimony of Mr. Seay.

### V. MOTION FOR SUMMARY JUDGMENT

1. Standard for Summary Judgment

HN3 Federal Rule of Civil Procedure 56 governs motions for [*20] summary judgment. Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c). **On a motion for summary judgment, the movant has the burden of showing that there exists no genuine issue of material fact, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).**

The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 324, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). On those issues for which it shoulders the burden of proof, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." Calderone v. United States, 799 F.2d 254, 259 (6th Cir. 1986) (emphasis and citation omitted). [*21] For those issues on which the moving party will not have the burden of proof at trial, the movant must "point[] out to the district court ... that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.

HN4 In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings, but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). The nonmoving party "must set forth specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

HN5 Although "the mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient" to overcome a summary judgment motion, Anderson, 477 U.S. at 252, a court should not grant summary judgment merely because the nonmovant's case appears weak. The task of the Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. A genuine issue for trial exists when [*22] there is sufficient "evidence on which the jury could reasonably find for the plaintiff." Id. at 252.

2. Constitutional Claims Against Officers McCurley and Miller

Get a Document - by Citation - 2003 U.S. Dist. LEXIS 7105

Case 1:01-cv-00769-SAS Document 130-2 Filed 04/16/2004 Page 11 of 17

Plaintiff demands relief against Officers McCurley and Miller under 42 U.S.C. § 1983, alleging that they violated Mr. Carpenter's Fourth and Fourteenth Amendment rights. The officers seeks summary judgment on this claim, arguing that they did not violate Mr. Carpenter's constitutional rights and are qualifiedly immune from suit. HN6 The doctrine of qualified immunity provides "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982). To determine if qualified immunity attaches, the Court follows the sequential analysis set forth in Saucier v. Katz, 533 U.S. 194, 150 L. Ed. 2d 272, 121 S. Ct. 2151 (2001). See Greene v. Barber, 310 F.3d 889, 894 (6th Cir. 2002). First, the Court examines whether the facts alleged, taken in [*23] the light most favorable to the party asserting the injury, show that the government official's conduct violated a constitutional right. See Saucier, 533 U.S. at 201. If the alleged facts would not establish a constitutional right of the complainant, then the officer is entitled to qualified immunity. See id. If a violation of a constitutional right could be made out on the allegations when taken in the light most favorable to the plaintiff, however, the Court next inquires whether the right was clearly established. See id. This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." Id. In order for a right to be "clearly established," it must be "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 202 (citing Wilson v. Layne, 526 U.S. 603, 615, 143 L. Ed. 2d 818, 119 S. Ct. 1692 (1999)). HN7 A police officer may be entitled to qualified immunity even if he did in fact violate the plaintiff's rights, if he acted under a mistaken understanding as to what the law allowed and that mistake was reasonable. See id. at 205.

Here, Plaintiff alleges that the officers [*24] violated her son's Fourth and Fourteenth Amendment rights not to be subjected to excessive force. HN8 Claims of excessive force in the context of an arrest or investigatory stop are analyzed under the Fourth Amendment and its "reasonableness" standard. See Graham v. Connor, 490 U.S. 386, 395, 104 L. Ed. 2d 443, 109 S. Ct. 1865 (1989). n4 The relevant factors in determining whether the force used in a particular case was reasonable include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. (citing Terry v. Ohio, 392 U.S. 1, 20-22, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968)). The inquiry is an objective one, however; the actual intent or motivation of the officer in question is not relevant. See id. at 397.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n4 Defendants make much of the fact that Plaintiff does not specifically reference Mr. Carpenter's Fourteenth Amendment claim, as separate from his Fourth Amendment claim. Defendants are correct that excessive force claims are properly analyzed under the Fourth Amendment, without reference to the substantive due process right embodied in the Fourteenth Amendment. See Graham v. Connor, 490 U.S. 386, 395, 104 L. Ed. 2d 443, 109 S. Ct. 1865 (1989). However, it would be inaccurate to say that Plaintiff has no Fourteenth Amendment claim. HN9 It is axiomatic that the Fourth Amendment has been made applicable to the states through the Fourteenth Amendment. See, e.g., Mapp v. Ohio, 367 U.S. 643, 6 L. Ed. 2d 1081, 81 S. Ct. 1684, 86 Ohio Law Abs. 513 (1961). For clarity, of course, we refer to claims brought pursuant to this incorporation as "Fourth Amendment claims," but they might also be characterized as "Fourteenth Amendment claims."

Get a Document - by Citation - 2003 U.S. Dist. LEXIS 4105

Case 1:01-cv-00769-SAS  Document 130-2  Filed 04/16/2004  Page 12 of 17

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - [*25]

1. Officer McCurley

The Court finds that the facts, when examined in the light most favorable to Plaintiff, show that Officer McCurley violated Mr. Carpenter's Fourth Amendment rights. The officers stopped Mr. Carpenter for driving with expired plates -- a misdemeanor -- and Mr. Carpenter failed to produce a driver's license or proof of insurance -- also misdemeanors. The officers say that Mr. Carpenter drove Mr. Harris' car forward, dragging Officer Miller, and then backward, towards Officer McCurley. However, Plaintiff has put forth sufficient evidence to raise issues of material facts as to whether the car ever moved during the stop. Specifically, the van in front of Mr. Harris' car showed no signs of having been rear-ended, witnesses investigating the scene after the shooting found Mr. Harris' car in drive, and neither officer recalls seeing Mr. Carpenter change gears. The officers also claim that Mr. Carpenter turned to the passenger's side of the car and appeared to be searching for something. They say that they believed that something to be a weapon. Similarly, they say that when Mr. Carpenter began to get out of the car, they could not see his right hand at first and when [*26] they did they could not see what was in his clenched fist. They say that they assumed he was holding a weapon. However, it is undisputed that Mr. Carpenter had no weapon. That fact alone raises a question of fact as to whether Mr. Carpenter actually turned to the side and leaned over searching for something and whether Mr. Carpenter actually clenched his fist as he emerged from the car. Taking the evidence in the light most favorable to Plaintiff, Officer McCurley shot Mr. Carpenter with no more justification than Mr. Carpenter's commission of minor misdemeanors. Undoubtedly, this would be a violation of Mr. Carpenter's Fourth Amendment right to be free of excessive force. n5

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n5 This is not to say that the officers' version of events could not support an action for violation of Mr. Carpenter's Fourth Amendment rights. Officer Miller testified even as he was dragged he did not lose his footing or fall to the ground. There is no testimony that Mr. Carpenter grabbed onto Officer Miller or that Officer Miller was otherwise ensnared with the car or Mr. Carpenter after the car began to move. Rather, Officer McCurley testified that Officer Miller stepped back from the car after it hit the van in front of it and drew his pistol. Also, according to his own testimony, Officer McCurley was at least eight to ten feet behind Mr. Harris' vehicle when it became moving towards him. On these facts, a jury could find that a reasonable officer standing in Officer McCurley's shoes could not conclude that Mr. Carpenter posed a threat to the officers of such an immediate nature that use of deadly force was appropriate. Even if Mr. Carpenter's movements would suggest to a reasonable officer that Mr. Carpenter had a weapon, Officer McCurley might have deferred to, or at least communicated with, his partner, who was in the better position to see what Mr. Carpenter was doing and who was able to step back and train his firearm on Mr. Carpenter. When Mr. Harris' car began backing towards him, Officer McCurley might have taken the less drastic, and equally if not more effective, step of jumping out of the way. On his own testimony, he may have been far enough away from the car that he could have protected himself more than adequately in this manner.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - [*27]

Having concluded that the allegations establish that Officer McCurley violated a Fourth Amendment right, the Court must next consider whether that right was clearly established such that a reasonable officer would have known that Officer McCurley's response to the particular situation he confronted was clearly unlawful. The Court finds that it was. At the

Get a Document - by Citation - 2003 U.S. Dist. LEXIS 2105

Case 1:01-cv-00769-SAS Document 130-2 Filed 04/16/2004 Page 13 of 17

time Officer McCurley shot Mr. Carpenter, it was well-established that $^{HN10}$ an officer violates the Fourth Amendment by shooting an unarmed, nondangerous misdemeanor suspect. See Tennessee v. Garner, 471 U.S. 1, 9-11, 85 L. Ed. 2d 1, 105 S. Ct. 1694 (1985) ("The intrusiveness of a seizure by means of deadly force is unmatched. The suspect's fundamental interest in his own life need not be elaborated upon."). The Court is mindful of Saucier's charge that the inquiry into whether the right was clearly established must be undertaken in light of the specific context of the case. However, taking the facts in the light most favorable to Plaintiff, none of the factual nuances that might make shooting a misdemeanor suspect reasonable under the Fourth Amendment have been established, and this is a simple case: Mr. Carpenter committed minor misdemeanors, and Officer [*28] McCurley shot him. Thus, the qualified immunity defense is not available to Officer McCurley. His motion for summary judgment on Plaintiff's § 1983 claim against him is **DENIED**.

2. Officer Miller

Officer Miller also seeks dismissal from Plaintiff's lawsuit on the grounds of qualified immunity. Plaintiff claims that Officer Miller violated Mr. Carpenter's Fourth Amendment right by pulling on him while he was sitting in a car with a running engine and by shooting at him. With respect to the use of deadly force, the qualified immunity analysis is essentially the same as with respect to Officer McCurley's use of force, with two wrinkles. First, Defendants argue that Officer Miller's use of force was reasonable because it occurred after Officer McCurley fired his weapon and Officer Miller reasonably concluded that the shots were fired by Mr. Carpenter. Second, although not raised by Defendants, the Court notes that it appears that Officer Miller's lone shot missed Mr. Carpenter.

As for Officer Miller's stated conclusion that at he time he fired at Mr. Carpenter he thought Mr. Carpenter, and not Officer McCurley, was shooting, several pieces of evidence, viewed in the light most [*29] favorable to the Plaintiff, suggest that neither he nor any officer in his shoes could possibly have so concluded. First, Officer Miller has stated that when he heard the shots while he was leaning into Mr. Harris' dark car, he did not see any flashes of light as from the muzzle of a gun. Second, while Officer Miller has maintained that he could not see Officer McCurley when he fired his weapon and thus thought Officer McCurley might have been shot, in his statement to OMI on the morning of the incident Officer Miller said that he heard Officer McCurley on the police radio saying, "shots fired," thus giving some indication of his partner's safety. n6 Third, Linda Showes testified that she heard one shot fired, heard Mr. Carpenter say that he had been shot, and then heard several more shots fired. Based on that testimony, either Officer Miller fired the first shot, in which case his argument that he fired because he heard gunfire is untenable, or before Officer Miller fired a shot he knew that someone other than Mr. Carpenter was doing the shooting. On this evidence, taken in the light most favorable to Plaintiff, then, Officer Miller's decision to shoot Mr. Carpenter would be no more [*30] reasonable than Officer McCurley's, and the qualified immunity analysis is equally simple: Mr. Carpenter was an unarmed, nonviolent misdemeanor suspect, and Officer Miller shot at him. When he did so, the law was clearly established that such action violated Mr. Carpenter's Fourth Amendment rights.

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n6 It is unclear from his statement whether he means to say that he heard this call by his partner before or after Officer Miller took a shot. At summary judgment stage, the Court must assume the former.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

However, the Court will pause and consider the relevance of evidence that Officer Miller's

Get a Document - by Citation - 2003 U.S. Dist. LEXIS 2105

Case 1:01-cv-00769-SAS Document 130-2 Filed 04/16/2004 Page 14 of 17

bullet never hit Mr. Carpenter. n7 The Supreme Court held in California v. Hodari D., 499 U.S. 621, 113 L. Ed. 2d 690, 111 S. Ct. 1547 (1991), that [HN11] for Fourth Amendment purposes a seizure of a person is effectuated only when the officer applies physical force or the subject submits to a show of force. See 499 U.S. at 626. The dissenters opined that in so holding, "the Court assumes, without acknowledging, that a police officer [*31] may now fire his weapon at an innocent citizen and not implicate the Fourth Amendment -- as long as he misses his target"). Id. at 630 (Stevens, J., dissenting). See also Hoffman v. Ruesch, 1991 U.S. App. LEXIS 13701, No. 90-1371, 1991 WL 110387, at **5 n.2 (6th Cir. June 24, 1991) ("seizing someone by a show of force -- which is all shooting *at* someone amounts to -- only takes place when the person being seized actually submits to the authority of the police") (emphasis in original). However, here Mr. Carpenter did not dodge Officer Miller's bullet, ignore the show of force, and then keep running. He, by all accounts, slumped to the ground immediately after Officer Miller fired. Presumably, he did so because Officer McCurley had just shot him in the head. Nevertheless, Mr. Carpenter certainly submitted to the officers shortly after Officer Miller shot in his direction. Thus, Plaintiff may recover against Officer Miller for his use of excessive force against Mr. Carpenter. n8 Officer Miller's motion for summary judgment on Plaintiff's § 1983 claim against him is **DENIED.**

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n7 The record being somewhat unclear on this issue, the Court will assume without deciding that Officer Miller in fact missed Mr. Carpenter when he shot at him. [*32]

n8 Officer Miller's actions in grabbing a nonviolent misdemeanor suspect without giving him further opportunity to produce the requested document or step out of the car on his own power may also give rise to a Fourth Amendment violation. However, given the Court's conclusion that Officer Miller is not immune from suit based on the discharge of his weapon, the Court need not decide whether Officer Miller violated clearly established Fourth Amendment law in grabbing Mr. Carpenter.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

### C. Constitutional Claim Against the City

Plaintiff also brings a § 1983 claim against the City, alleging a violation of her son's Fourth and Fourteenth Amendment rights. [HN12] A municipality cannot be held liable under § 1983 under a *respondeat superior* theory, i.e., simply because it employs a tortfeasor. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978). However, a municipality may be held directly liable under § 1983 if, in committing the constitutional violation, the employee "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and [*33] promulgated by that body's officers." Id. at 690. In order for the policy to be actionable, it must be a "moving force" behind the employee's constitutional violation. Id. at 694. The municipality may be liable even if that official policy "has not received formal approval through the body's official decisionmaking channels." Id. at 691. In fact, a municipality may have a constitutionally pristine policy and still face liability. See City of Canton v. Harris, 489 U.S. 378, 386-87, 103 L. Ed. 2d 412, 109 S. Ct. 1197 (1989). Where the municipality's policy is constitutional, the municipality may be liable for inadequately training its employees where "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." Id. at 390. In such a case, the failure to train its employees itself amounts to an

unconstitutional policy. Of course, <sup>HN13</sup> just as a policy must be a "moving force" behind an employee's [*34] constitutional violation to be actionable, a municipality's failure to train must be "closely related to" or "actually cause[]" the plaintiff's injury. See id. at 390; Berry v. City of Detroit, 25 F.3d 1342, 1346 (6th Cir. 1994) (citations omitted).

In arguing that the City is liable under § 1983, Plaintiff argues both that the City has unconstitutional policies regarding traffic stops and that it fails to properly train its officers on how to handle such stops. In support, Plaintiff largely points to various tenets of the Curriculum and policing textbooks -- e.g., always tell a suspect why he is being stopped; call for back up and take cover when things escalate; communicate with your partner; slow things down; do not shoot at a moving vehicle -- and notes that Officers Miller and McCurley broke all of these rules. Plaintiff also points to another incident, the Timothy Blair shooting, where Cincinnati police broke these rules and similarly tragic events followed. However, the shootings of Michael Carpenter and Timothy Blair alone are of minimal probative value as to the question of whether the City in fact has policy that contravenes the dictates [*35] of the Curriculum and policing textbooks or fails to teach its recruits those dictates. To find the City liable on this evidence alone would create municipal liability every time an officer violates another's constitutional rights. But, as explained, § 1983 does not provide for what would effectively be *respondeat superior* liability.

Plaintiff's evidence creates a dispute of material fact, however, as to whether the City's police department had policies of 1) not asking subjects of traffic stops to put their cars in park and turn off the engines and 2) dealing with obstinate subjects by pulling them out of their cars, even when their engines are running. At the very least, the evidence raises an issue as to whether the City failed to train its officers with respect to disabling cars and reaching into cars during traffic stops. During CPRP's investigation of the Timothy Blair incident, Chief Streicher told CPRP that the City had no policy on disabling automobiles at traffic stops. Yet, the Curriculum that the City purports to follow instructs that officers tell every subject of a traffic stop to turn off his engine. Also, Officer Miller testified that the City never trained him [*36] to ask a suspect to put the car in park during a routine traffic stop, and Officer McCurley, Officer Miller's field training officer, testified that he never told Officer Miller to ask Mr. Carpenter to turn the engine off or put the car in park because he trusted Officer Miller's judgment. These statements together suggest that, despite the dictates of the official curriculum, the official custom of the City's police department was not to train officers to disable automobiles at the beginning of every traffic stop but to give them wide latitude on this front. In addition, Officer Carder's statement to the CPRP during its investigation of the Timothy Blair shooting that he had once been commended by the City for an extraction similar to that which he attempted on Mr. Blair raises an issue of fact as to whether the City's official policy was for officers to try to yank suspects out of running cars during traffic stops.

This analysis all begs the question of whether such policies would create liability for the City under § 1983. If the City failed to train Officer Miller to ask the subject of a traffic stop to put his car in park and turn off the engine and had a policy whereby officers [*37] were to reach into running cars to extricate recalcitrant suspects, this might have been a moving force behind a constitutional violation -- the use of deadly force against Mr. Carpenter. If the officers shot Mr. Carpenter dead because his car moved forward or backward, then the City's failure to train Officer Miller regarding the proper disabling of a car during a traffic stop was a proximate cause and, thus, a "moving force" behind the deadly excessive force violation. Surely it would be foreseeable to the City that if it did not train its officers to disable vehicles at the beginning of a traffic stop and did not train their officers to refrain from reaching in to those running vehicles, officers would reach into moving vehicles, struggles would ensue, drivers would lose control of their vehicles, and officers would feel compelled to escalate their use of force in response. A failure to train its officers on easy ways to avoid such tragic events would evince "deliberate indifference" on the part of the City. The City's motion for summary judgment on Plaintiff's § 1983 claim against the City is **DENIED**.

Get a Document - by Citation - 2003 U.S. Dist. LEXIS 7105

Case 1:01-cv-00769-SAS Document 130-2 Filed 04/16/2004 Page 16 of 17

Page 16 of 17

4. Wrongful Death Claims Against the Officers

Plaintiff also brings wrongful [*38] death claims against Officers McCurley and Miller under Ohio Revised Code section 2125.01. Defendants do not argue that Plaintiff does not satisfy the requirements of section 2125.01 but instead argue that they are immune under HN14 section 2744.03 of the Ohio Revised Code, which provides immunity for employees of a political subdivision from whom "damages for injury, death, or loss to persons or property allegedly caused by any act or omission in connection with a government or proprietary function" are sought. Ohio Rev. Code § 2744.03(A). This immunity does not extend to those employees whose "acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code § 2744.03(A)(6)(b).

HN15 A police officer is an employee of a political subdivision and, as such, is generally protected by the statutory immunity granted by Ohio Revised Code section 2744.03. See Mayes v. City of Columbus, 105 Ohio App. 3d 728, 664 N.E.2d 1340, 1348 (Ohio Ct. App. 1995). The Court thus begins with the presumption of immunity. See Cook v. City of Cincinnati, 103 Ohio App. 3d 80, 658 N.E.2d 814, 821 (Ohio Ct. App. 1995). Plaintiff bears the burden of demonstrating that the officers' [*39] actions fall within one of the three exceptions set forth in section 2744.03(A)(6). "Recklessness," which precludes immunity under 2744.03(A)(6)(b), refers to an act done while knowing or having reason to know of facts that would lead a reasonable person to believe that the conduct creates an unreasonable risk of harm and that this risk is substantially greater than that necessary to make the conduct negligent. See Thompson v. McNeill, 53 Ohio St. 3d 102, 559 N.E.2d 705, 708 (Ohio 1990) (citing Restatement (Second) of Torts § 500 (1965)). The issue of whether an officer's actions were reckless is usually a question for the trier of fact. See Fabrey v. McDonald Village Police Dep't, 70 Ohio St. 3d 351, 1994 Ohio 368, 639 N.E.2d 31, 35 (Ohio 1994) ("the issue of wanton misconduct is normally a jury question"); Potter v. City of Troy, 78 Ohio App. 3d 372, 604 N.E.2d 828, 837-38 (Ohio Ct. App. 1992) (finding that the lower court erred in granting summary judgment on immunity grounds where there was a genuine issue of material fact as to whether city employees acted with malicious purpose, in bad faith, or in a wanton or reckless manner).

The Court finds that Plaintiff has raised a genuine issue of material fact [*40] with respect to whether the exception to statutory immunity set forth in Ohio Revised Code section 2744.03(A)(6)(b) applies to Officers Miller and McCurley. When the facts are viewed in the light most favorable to Plaintiff, it appears that Defendants may have acted in a reckless manner. On the version of the facts most favorable to Plaintiff, Officer Miller reached into a running car to grab an unarmed, nonviolent misdemeanor suspect, without checking to see if the car was in park. Surely, a jury could conclude that such actions created an unreasonable risk of harm that this would cause injury to Mr. Carpenter or those around the car that was substantially greater than the risk of harm necessary to make the conduct negligent. Plaintiff has also raised a dispute of fact as to the recklessness of Officer McCurley shooting into the car. Undoubtedly, if the trier of fact were to find that Mr. Carpenter posed no immediate threat of harm to anyone else, Officer McCurley's actions were reckless at best. Of course, at trial, a jury may instead conclude that the Defendants' version of events is correct and that the officers acted reasonably. However, a genuine issue of material fact exists [*41] on this issue. Under these circumstances, the trier of fact must resolve this issue.

Defendants also cite Ohio Revised Code section 2744.02(A) as a source of immunity from Plaintiff's state law claims. This subsection provides that political subdivisions are immune from liability in certain circumstances. However, Officers Miller and McCurley are not political subdivisions. Judge Weber already dismissed Plaintiff's state law claim against the only defendant in this case that is a political subdivision. The defendant officers can find no safe harbor in section 2744.02(A). Therefore, the Court **DENIES** the Defendants' motion for summary judgment with respect to Plaintiff's state law claims of wrongful death.

Get a Document - by Citation - 2003 U.S. Dist. LEXIS 7105                    Page 17 of 17

Case 1:01-cv-00769-SAS    Document 130-2    Filed 04/16/2004    Page 17 of 17

## VI. CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendants' Motion for Summary Judgment (doc. # 112), Defendants' Motion to Strike Incompetent and Otherwise Inadmissible Materials and Motion to Strike the "Failure to Train" Claim (doc. # 122), and Defendants' Motion to Exclude the Testimony of Wilson Seay (doc. # 110).

IT IS SO ORDERED.

4-17-03

Susan J. Dlott

United [*42] States District Judge

Service: Get by LEXSEE®
Citation: 2003 us dist lexis 7105
View: Full
Date/Time: Monday, March 29, 2004 - 8:18 PM EST

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.