Case 1:01-cv-00769-SAS    Document 131-22    Filed 04/16/2004    Page 1 of 9

Owensby vs. City of Cincinnati, et al.
December 17, 2003

DANIEL L. SCHULTZ, M.D.

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - - -

ESTATE OF ROGER D.           :
OWENSBY JR., et al.,         :
                             :
        Plaintiffs,          :
   vs.                       :  Case No. 01-CV-769
                             :  (Judge S. A. Spiegel)
CITY OF CINCINNATI,          :
et al.,                      :
                             :
        Defendants.          :

- - - - - - - - - - - - - - -

VOLUME I

Deposition of DANIEL L. SCHULTZ, M.D., a witness herein, called by the plaintiffs for cross-examination, pursuant to the Federal Rules of Civil Procedure, taken before me, Wendy Davies Welsh, a Registered Diplomate Reporter and Notary Public in and for the State of Ohio, at the Frank P. Cleveland, M.D. Institute of Forensic Medicine, Toxicology and Criminalistics, 3159 Eden Avenue, Cincinnati, Ohio, on Wednesday, December 17, 2003, at 11:57 a.m.

Case 1:01-cv-00769-SAS   Document 131-22   Filed 04/16/2004   Page 2 of 9

Owensby vs. City of Cincinnati, et al.
December 17, 2003

DANIEL L. SCHULTZ, M.D.

Page 2

1  APPEARANCES:

2    On behalf of the Plaintiffs:

3       Paul B. Martins, Esq.
        Helmer, Martins & Morgan Co. LPA
4       Suite 1900, Fourth & Walnut Centre
        105 East Fourth Street
5       Cincinnati, Ohio 45202
        Phone: (513) 421-2400
6
        John J. Helbling, Esq.
7       The Helbling Law Firm, L.L.C.
        3672 Springdale Road
8       Cincinnati, Ohio 45251
        Phone: (513) 923-9740
9
   On behalf of the Defendants City of Golf Manor,
10 Stephen Tilley, Roby Heiland and Chris
   Campbell:
11
        Wilson G. Weisenfelder, Jr., Esq.
12      Rendigs, Fry, Kiely & Dennis
        900 Fourth & Vine Tower
13      One West Fourth Street
        Cincinnati, Ohio 45202-3688
14      Phone: (513) 381-9200

15 On behalf of Defendants City of Cincinnati,
   Darren Sellers, Jason Hodge:
16

17      Geri Hernandez Geiler, Esq.
        Assistant City Solicitor
18      Department of Law
        Room 214, City Hall
19      801 Plum Street
        Cincinnati, Ohio 45202
20      Phone: (513) 352-3346

21      Neil F. Freund, Esq.
        Freund, Freeze & Arnold
22      One Dayton Centre
        1 South Main Street, Suite
23      1800 Dayton, Ohio 45402
        Phone: (937) 222-2424
24

Page 3

1  APPEARANCES (Continued):

2    On behalf of the Defendants Robert B. Jorg,
     Patrick Caton, Jason Hodge, Victor Spellen and
3    Darren Sellers:

4       Donald E. Hardin, Esq.
        Hardin, Lefton, Lazarus & Marks, LLC
5       915 Cincinnati Club Building
        30 Garfield Place
6       Cincinnati, Ohio 45202
        Phone: (513) 721-7300

Page 4

                    STIPULATIONS

    It is stipulated by and among counsel for the
respective parties that the deposition of DANIEL L.
SCHULTZ, M.D., a witness herein, called by the
plaintiffs for cross-examination, pursuant to the
Federal Rules of Civil Procedure, may be taken at
this time by the notary; that said deposition may be
reduced to writing in stenotype by the notary, whose
notes may then be transcribed out of the presence of
the witness; and that proof of the official
character and qualifications of the notary is
expressly waived.

                        - - -

Page 5

                      I N D E X

    Examination by:              Page

    Mr. Martins . . . . . . . .    6

    Mr. Freund . . . . . . . .  74, 121

    Mr. Weisenfelder . . .       105

                        - - -

                    E X H I B I T S

                                    Page

    Plaintiff's Exhibit 101 . . . . . . . .    6
    Plaintiff's Exhibit 102 . . . . . . . .   15
    Plaintiff's Exhibit 103 . . . . . . . .   19
    Plaintiff's Exhibit 104 . . . . . . . .   19
    Plaintiff's Exhibit 105 . . . . . . . .   20
    Plaintiff's Exhibit 106 . . . . . . . .   57
    Plaintiff's Exhibit 107 . . . . . . . .   73
    Plaintiff's Exhibit 108 . . . . . . . .   73
    Plaintiff's Exhibit 108-A . . . . . . .   81

                        - - -

Owensby vs. City of Cincinnati, et al.
December 17, 2003

DANIEL L. SCHULTZ, M.D.

Page 30

1  A. I made an inverted T-shaped incision
2  extending from the back of the head down below the
3  shoulder blades to look for any hemorrhage or
4  injury. And when I did that, in the, basically, the
5  rhomboid muscles which are between the scapul--
6  overlie the scapulae, there were hemorrhages.
7      Now, there weren't any bruises or
8  abrasions noted on the skin of the back, and there
9  wasn't any significant appreciable hemorrhage in the
10 fatty tissues of the back, but it was localized
11 fairly symmetrically within those deep muscular
12 tissues over the scapulae.
13     So my interpretation of that is a deep
14 injury to the muscles, causing tearing of blood
15 vessels in those muscle groups resulting in the
16 hemorrhage. Because I don't have any pattern
17 injuries, marks, abrasions, contusions on the skin
18 overlying these deep muscular injuries, my
19 interpretation is that they're more likely due to a
20 localized pressure and like a grinding or localized
21 pressure placed on those muscle groups rather than
22 an impact, a direct impact.
23     Q. If it was a direct impact, say by a
24 nightstick or a punch, would you expect to find

Page 31

1  contusions in the skin or the subcutaneous level of
2  the skin above those deep muscle bruises?
3      A. I would expect to see any one of these
4  combinations: Either some abrasion to the skin,
5  some bruising to the outside of the skin, some
6  bruising, hemorrhage in the subcutaneous fat.
7      Because in light of the magnitude of the
8  hemorrhage in those muscle groups, it's not a
9  trivial injury there, and it's remarkable to me that
10 I don't see anything overlying it. So that is why I
11 favor that those injuries to the muscle groups are
12 not due to a blow or blows.
13     Q. Did you document this finding in the
14 photographs that you took?
15     A. Yes.
16     Q. Would you point those out for us? You can
17 just refer to the last three digits.
18     A. Yeah. 265 through 270 all document
19 various portions of the neck dissection and back
20 dissection. The hemorrhages in the muscle groups
21 are shown in 265, 266, 267, 268, and 269. 270 shows
22 an extension of that incision to look for further
23 hemorrhage in the lower aspect of the back, which I
24 did not appreciate.

Page 32

1      Q. If we look at 267, am I correct in
2  understanding that the blackened or darkened
3  portions in the area of the shoulder blades on
4  either side are the contusions?
5      A. Yes.
6      Q. You measured these and they were between
7  three and four inches in diameter?
8      A. Yes.
9      Q. Your findings, and in this respect do you
10 make those findings within a reasonable degree of
11 medical certainty in the field of pathology?
12     A. Yes.
13     Q. Let's move on. You then, in your report
14 on page 3, you talk about the lungs being "extremely
15 congested and edematous." Do you see that? It's
16 after the first paragraph. It's one line on page 3.
17     A. Are we in the respiratory system?
18     Q. No. Up above where it says --
19     A. Body cavities?
20     Q. You have a heading of Upper and Lower
21 Extremities, and then right above that.
22     A. Oh. Yes.
23     Q. Would you explain that for us?
24     A. The reason it's listed in that area,

Page 33

1  although heavy lungs, congested lungs, are
2  technically a nonspecific finding, meaning you can
3  see it with other things, he doesn't have any other
4  things to explain it. Meaning, he doesn't have --
5  he didn't die from heart disease, he didn't die from
6  pneumonia, he didn't die from drug intoxication,
7  which all can cause heavy edematous lungs.
8      But the only thing he has in the
9  constellation of the findings are petechiae,
10 evidence of compression of his back, evidence of an
11 asphyxial death. The lungs in asphyxia typically
12 become congested and edematous. And so that is why
13 that is listed in that area, because it's
14 technically -- it's an associated finding. That's
15 why it's listed there.
16     Q. Where are the lungs in relation to the
17 deep muscle hemorrhages that you found?
18     A. Well, they're in the chest cavities.
19 They're not directly -- it's not because they're
20 contiguous with that area.
21     It's just when a person dies from an
22 asphyxial death, meaning they're not getting
23 adequate oxygen supplied to their brain and their
24 organs, the heart works faster, blood is pumped to

Page 30 - Page 33

(800) 578-1542 * MERIT * (513) 381-8228

Case 1:01-cv-00769-SAS    Document 131-22    Filed 04/16/2004    Page 4 of 9

Owensby vs. City of Cincinnati, et al.  
December 17, 2003

DANIEL L. SCHULTZ, M.D.

Page 34

1 the lungs, there's an attempt by the body to have,
2 in response to this, increased oxygen exchange and
3 more flow to the lungs. Subsequently, that flow
4 leads to swelling and edema, which is water on the
5 lung, essentially. They're heavy.
6    Q. We then have your examination of the body
7 cavity on the internal examination. Is there
8 anything remarkable in that paragraph there about
9 the body cavity concerning these findings?
10    A. Well, there were a few rare petechiae, and
11 those are nonspecific, on the heart, the surface of
12 the heart. You can see those in a lot of things.
13 So those are specifically listed in that area
14 because I consider them not -- nonspecific.
15       He was congested. That's, again,
16 nonspecific. But in light of what the big picture
17 is, it's consistent with what he died from, which is
18 an asphyxial event.
19    Q. You then examined the cardiovascular
20 system. The heart weighed 395 grams. Is that what
21 you would expect for a normal heart of a person this
22 age?
23    A. Yes.
24    Q. Why is it that in conducting an autopsy

Page 35

1 the various organs are weighed?
2    A. Well, the organs are weighed because we
3 look at reference values or we have certain
4 reference values that we have known to come to
5 accept as reasonable weights for various organs.
6       Probably the most important organ to weigh
7 is the heart. The other organs -- and the lungs.
8 The other organs probably don't matter so much. But
9 it's just another element of documentation that we
10 use to describe a body.
11    Q. If the organ is outside of the expected
12 weight, is that some sort of signal to investigate
13 further?
14    A. Well, if, for example, I -- I had found,
15 for example, that there was an enlarged heart and/or
16 coronary artery disease of significant degree that
17 would explain his death and the circumstances then,
18 depending on how the circumstances pan out, then
19 opinions might change.
20       So every organ is looked at individually
21 and in light of the total body exam, and then I make
22 an opinion overall as to the terms of the cause of
23 death. But no one organ stands alone, generally.
24 You interpret them in light of everything else.

Page 36

1    Q. In the paragraph on the cardiovascular
2 system examination you talk about the descending
3 coronary artery having a 50 percent obstructive
4 plaque situated in the mid portion. Do you see
5 that?
6    A. Yes.
7    Q. In your opinion, to a reasonable degree of
8 medical certainty in the field of forensic
9 pathology, did that play any part in causing the
10 death of Mr. Owensby?
11    A. No.
12    Q. Why not?
13    A. Because the 50 percent obstructive --
14 first of all, I have never had anyone die from a
15 lesion of 50 percent, okay.
16       Second of all, most forensic pathologists,
17 certainly that I have worked with, trained with,
18 they like to see lesions above 75, roughly 70,
19 75 percent obstructed before they would even
20 consider that as a cause of death. And if you were
21 to have that kind of lesion, you would then take
22 that in context of the circumstances. But his
23 doesn't even come close to that level.
24       I did put a section in microscopically,

Page 37

1 which, you know, when we look at things
2 microscopically you take something you see with your
3 naked eye that, as you look at it, you say it's 50
4 percent. Subsequently, an histologist takes that,
5 cuts little pieces off to look at it on a slide and
6 it never gets worse than what you see with your
7 naked eye, but sometimes it gets better. Meaning
8 the lesion sometimes looks less obstructive. And
9 that's not surprising.
10       So typically what I say when I look at
11 cases like that is I always know what my gross
12 impression is, which is my naked eye. I will either
13 say it's consistent with, or if it comes out and
14 there's nothing on there, I'll put another section
15 in or I'll figure out why.
16       But in his case, his histology was
17 consistent with what I saw, namely, he did have an
18 atherosclerotic plaque, but it certainly wasn't more
19 than 50 percent obstructive.
20    Q. Is there anything else about the
21 cardiovascular system, any findings one way or the
22 other that are worth, or contribute to your opinion
23 in this case?
24    A. Grossly and microscopically on examination

Case 1:01-cv-00769-SAS   Document 131-22   Filed 04/16/2004   Page 5 of 9

Owensby vs. City of Cincinnati, et al.
December 17, 2003

DANIEL L. SCHULTZ, M.D.

Page 38

1  of his heart, cardiovascular system, I did not find
2  anything that would have caused or contributed to
3  his death.
4      Q. Let's move on to the respiratory system,
5  which we already talked about with the lungs being
6  congested. You said that the lungs weighed
7  860 grams and 765 grams respectively, the right and
8  left lungs. Is that above what you would normally
9  expect a lung to weigh?
10     A. Yes.
11     Q. What is the normal weight or range of
12  weights?
13     A. There is no one normal weight, but I can
14  tell you that generally, normal lungs that aren't
15  congested weigh roughly around two to 400 grams,
16  roughly.
17     I don't really pay attention to charts
18  where I say, "Oh, I" -- this is clearly well above.
19  This is just very heavy. From my standpoint and
20  experience it's very evident that they're heavy.
21     Q. You then talk about a maroon-purple
22  congested appearance. If the lungs were not
23  congested, a normal healthy lung, what would you
24  expect the color to be of the lungs?

Page 39

1      A. If it's a person who is not a smoker I
2  would expect them to look pink-tan in color. If
3  they're a smoker I would expect them to look
4  pink-tan with some black and green soot in the
5  lungs.
6      I didn't appreciate soot in his lungs, but
7  they were very purple and congested, and it's
8  entirely possible there had been evidence of that as
9  well, but I couldn't see it.
10     Q. Do you know what causes the maroon-purple
11  color in the lungs?
12     A. Blood.
13     Q. So it's blood leaching or --
14     A. Well, it's not -- certainly there can
15  be -- let me refer to my micro so I speak -- okay.
16     The purple color, maroon coloration, is
17  due to a combination of things. It's due to the
18  vessels that supply what are called the septae of
19  the lungs. Because there are air sacs. And those
20  air sacs are surrounded by septae, which is where
21  the vessels come in to supply the blood. Those
22  vessels become intensely congested and they're
23  distended and dilated with red blood cells.
24     Now, in a person who doesn't have a

Page 40

1  congested pulmonary vascular circuit their lungs
2  look tan-pink because their vessels aren't
3  distended. When they become distended with blood
4  cells the whole lung or whatever area's involved
5  will have a maroon-purple color.
6      In addition, there's some additional
7  coloration changes, because there's some hemorrhage
8  in the alveolar air spaces. And that's due to the
9  increased pressure, and it actually leaks from those
10 capillaries into the air sacs of the lungs.
11     Q. So in a case such as this with asphyxia,
12  the heart is pumping more blood into the lungs to
13  try and get more oxygen for the body?
14     A. Yeah, it's trying to get -- the body as a
15  response to the hypoxia, or the lack of oxygen, is
16  to try to pump more blood through the heart and pick
17  up more oxygen and transport it to the rest of the
18  body.
19     Q. If the lungs can't expand to provide that
20  oxygen then the blood keeps coming into the lungs,
21  and is that where you have the edema and the --
22  resulting in the maroon-purple color?
23     MR. FREUND: Object.
24     A. Yes.

Page 41

1      MR. FREUND: I guess, I never did ask you.
2  Is this supposed to be for purposes of trial?
3  If it is, you're leading the witness.
4      MR. MARTINS: Okay. I'll rephrase it.
5  BY MR. MARTINS:
6      Q. Could you explain to us the process, the
7  physiological process, that's going on that results
8  in the maroon-purple color?
9      A. Well, as I said earlier, in response to
10  the low oxygen, the hypoxia, the cardiovascular
11  system shunts blood to the lungs. Blood is pumped
12  through the lungs in an attempt to pick up more
13  oxygen. The lungs become congested. They may also
14  leak some red cells and/or fluid, edema fluid, into
15  the lungs, and that is the reason for this
16  occurrence.
17     Q. Is there anything else in the respiratory
18  system examination that is worth noting in respect
19  to your ultimate findings here?
20     A. Pertinent negatives are that I did not see
21  any emboli, which are, like thromboemboli, which are
22  blood clots that may come from the legs, which are
23  referred to as pulmonary emboli. I did not see any
24  of that. It's another possible natural cause of

Case 1:01-cv-00769-SAS   Document 131-22   Filed 04/16/2004   Page 6 of 9

Owensby vs. City of Cincinnati, et al.
December 17, 2003
DANIEL L. SCHULTZ, M.D.

Page 46

1  you describe to us what number 271 is.
2      A. On 271, this is an image of the tongue.
3  Now, the tongue has been cut in what's called a
4  coronal plane, meaning if I were to run a plane
5  through my body it would be running from -- let's
6  see, parallel to my chest plate, you know. That's a
7  coronal plane. It would run like this, as I'm
8  showing with my hands, I'm sorry.
9         But through the tongue it would be in the
10 same plane, going -- slicing downward through the
11 tongue. When I do that I look at the tongue and I
12 see hemorrhage in the left side of the tongue, which
13 I document with the photograph.
14     Q. You have, the next thing on your report is
15 the head and central nervous system. Is there
16 anything remarkable about your examination about the
17 head and the central nervous system, CNS?
18     A. No.
19     Q. Move to the later brain examination after
20 fixation. You indicate that there was a
21 Neuropathology Conference held on November 15, 2000.
22 Would you explain what that is?
23     A. Well, because of the circumstances, and I
24 wanted to exclude any possible other reason for his

Page 47

1  death, the brain was saved for examination with the
2  benefit of a neuropathologist, Dr. Balko, namely.
3         Also pathologists from this office are at
4  this meeting, and the individuals are listed. That
5  would be the sum total of individuals present during
6  the exam: Dr. Balko, Dr. Pfalzgraf, Dr. Utz, Dr.
7  Tobias, who was our fellow at the time, and myself.
8  It was unremarkable.
9      Q. In this conference I guess everybody
10 examines some aspect of the tissue or weighs in on,
11 exchanges ideas?
12     A. What happens is Dr. Balko -- we all look
13 at the brain. I've already looked at it once before
14 it was even put in the fixative, and I at first saw
15 nothing, initially.
16        Then Dr. Balko takes that brain and then
17 he takes -- slices through the brain in that
18 coronal, C-O-R-O-N-A-L, plane, much like a CAT scan,
19 the same kind of, similar orientation to a CAT scan,
20 to look for any hemorrhages, tumors, injuries, which
21 there were none.
22        And we watch, and we comment if we see
23 something or we point something out. I don't recall
24 any comments there, because it was essentially a

Page 48

1  negative brain exam.
2      Q. Then we have the microscopic examination
3  that you set out in your report. Is there anything
4  remarkable about the microscopic examination that
5  contributed to your findings?
6      A. Well, I noted that there was -- I
7  confirmed there was hemorrhage in the trapezius
8  muscle, which was no new news -- it was no news, I
9  just documented it. There was no inflammatory
10 reaction, which is consistent with this happening
11 within minutes of his death, okay. Seconds to
12 minutes for that matter, but minutes at the most,
13 not hours.
14        His heart was sectioned for microscopic
15 examination, and they were unremarkable. The
16 coronary artery that we referred to earlier was
17 examined and, as I said, it confirmed my gross
18 impression of a 50 percent obstructed eccentric
19 atherosclerotic plaque. But otherwise, the heart is
20 unremarkable.
21        The lung sections showed some occasional
22 foci, or collections of aspirated loose mucoid
23 material, and some bacterial flora, which is like we
24 see in the mouth, consistent with some element of

Page 49

1  aspiration, little tiny bits. But no inflammatory
2  reaction was present. Of course that takes minutes,
3  many, many, many minutes to hours to see
4  inflammatory reaction. So this is a terminal type
5  of event.
6         No -- I had already known from the gross
7  exam that there were no airways that were, quote,
8  "chock-full" of food. It's very thin in the
9  airways. I noted some patchy areas of intraalveolar
10 hemorrhage as well as congestion, as I had already
11 known.
12        I polarized the lungs as well with a
13 polarizing filter in order to determine if he had
14 any evidence of crystals in the lungs. Now, at the
15 time -- I do this very frequently on cases if I have
16 any inkling that the person may have been doing, or
17 using, drugs, specifically intravenous drugs or
18 cocaine.
19        I look at the lungs, I rotate these
20 filters. And if I see crystals in the lungs, then I
21 know, I can say, for example, that they're an IV
22 drug abuser or that they had inhaled or insufflated
23 various drugs. He didn't have any evidence of that
24 in his lungs.

Owensby vs. City of Cincinnati, et al.
December 17, 2003

DANIEL L. SCHULTZ, M.D.

Page 50

1  The tongue section was taken and it
2 confirmed my gross impression. There was hemorrhage
3 in the tongue, no inflammatory reaction. It was a
4 bite mark to the tongue, hemorrhagic bite mark to
5 the tongue.
6    Q. On the last page are some laboratory
7 results. Again, I guess, confirming what you've
8 already said, that there was no cocaine or you have
9 metabolites. What are metabolites?
10    A. Well, metabolites are what happens to a
11 drug or a chemical after the body has metabolized
12 it. So it's, after metabolism, it's what the drug
13 becomes.
14    Q. Cannabinoids, that would be the marijuana?
15    A. Yes.
16    Q. As I understand it, the finding on the
17 marijuana was 16 thousandths of a milligram per
18 liter?
19    A. Correct.
20    Q. Am I reading that correctly?
21    A. Yes.
22    Q. As a result of this, did you reach an
23 opinion as to the cause of death of Mr. Owensby?
24    A. Yes.

Page 51

1    Q. What was your opinion to a reasonable
2 degree of medical certainty in the field of forensic
3 pathology, as to the cause of death of Mr. Owensby?
4    A. Cause of death, mechanical asphyxia.
5    Q. Would you explain to us what mechanical
6 asphyxia is?
7    A. Well, it is a form of asphyxia that is due
8 to physical compression of the chest. And
9 although -- I use it in a rather broad form.
10 Although I recognize that I could be seeing this
11 constellation of symptoms from, or findings from,
12 compression of the chest, I can also see it from
13 compression of the neck.
14    Now, I use the broad term "mechanical
15 asphyxia." You will find that there is varying
16 definitions of this term. My definition is, it's
17 from a compression of the body in some locale,
18 whether it's chest or neck, resulting in asphyxia.
19    I don't think either of those scenarios
20 are mutually exclusive. Both or one of those two
21 certainly could have taken place. But in any event,
22 it's still a mechanical pressure applied, resulting
23 in asphyxia.
24    So, you know, I hope that my term is more

Page 52

1 descriptive.
2    Q. On Exhibit 103, the first page, where your
3 opinion is listed, under mechanical asphyxia you
4 have listed three sub-headings. Did you mean those
5 to, I guess, explain how you arrived at your
6 mechanical asphyxia opinion?
7    A. I list those there because I think those
8 are part and parcel to the criteria that I might use
9 to bolster my opinion that this is, in fact, a
10 mechanical asphyxia.
11    Q. That would be the hemorrhages found in the
12 eyes?
13    A. Right, the conjunctival petechiae with the
14 scleral hemorrhages, terminal emesis or terminal
15 vomiting. Very commonly seen when a person is
16 hypoxic, they may vomit. In fact, that's very
17 common. And the hemorrhagic bite mark, whether
18 that's from a seizure or whether that's from biting
19 his tongue during the process of the restraint, I
20 don't know. But I list it in that area as well,
21 because it's part of the terminal events, I feel.
22    Q. Does the congestion of the lungs also
23 support the finding of mechanical asphyxia?
24    A. Sure.

Page 53

1    Q. How so?
2    A. Because, as I said, with an asphyxial
3 death one expects the lungs would be rather
4 congested. It's -- well, in terms of what I decide
5 to actually list under that heading, I probably
6 could list more or less. It's the art of listing
7 these things on the diagnosis list. It certainly
8 could have been listed there as well.
9    Q. Let me ask you, did you see anything that
10 was inconsistent with mechanical asphyxia?
11    A. No.
12    Q. You also list several other items under
13 diagnosis, which I believe we've already talked
14 about, the abrasions, the deep back muscular
15 contusions, the facial abrasions and knees and
16 forearm. And then the cause of death you list is
17 mechanical asphyxia. You also have a heading of
18 Manner of death. Would you explain to us the
19 difference between a cause of death and a manner of
20 death?
21    A. Manner of death is how the cause came
22 about.
23    Q. Here you wrote, "Homicide," and then in
24 parenthetical phrase,"(police intervention:

Case 1:01-cv-00769-SAS   Document 131-22   Filed 04/16/2004   Page 8 of 9

Owensby vs. City of Cincinnati, et al.
December 17, 2003
DANIEL L. SCHULTZ, M.D.

Page 90

1  A. No.
2  Q. He had abrasions of his legs and he had
3  abrasions of his arms; is that right?
4  A. Yes.
5  Q. No fractures of any bones?
6  A. Correct.
7  Q. As a forensic pathologist you give
8  opinions as to what you believe caused the death;
9  that's basically your job, is that fair?
10 A. Yes.
11 Q. But it is not your job to, for example,
12 come in and say that Mr. Owensby did or did not
13 resist arrest, true?
14 A. I can't speak for that event. I can say
15 he has abrasions that are consistent with such.
16 Everything else is historical.
17 Q. Okay. Nor is it your job to come in and
18 say whether or not the officers did or did not use
19 reasonable force; is that true?
20 A. True.
21 Q. From your autopsy were you able to
22 determine the length of time that there was
23 compression to the chest?
24 A. Minutes.

Page 91

1       MR. WEISENFELDER: I'm sorry?
2       THE WITNESS: Minutes.
3  Q. That's based upon your opinion. Do you
4  know how long there was compression to the chest, if
5  there was compression to the chest?
6  A. Minutes.
7       MR. MARTINS: Objection. Asked and
8       answered.
9  Q. When you say "minutes," could you explain
10 to me how you know that.
11 A. I know that because he has no natural
12 disease, no drug toxin causing his death. His death
13 is a consequence of mechanical asphyxia. That takes
14 minutes. The chest --
15 Q. So it's kind of reverse engineering?
16 A. Absolutely. It's by exclusion. Sometimes
17 we work backwards.
18 Q. Okay. Do --
19      MR. MARTINS: Wait. I don't think the
20      witness is finished giving his answer.
21 Q. You can finish.
22 A. So my point is, he died from mechanical
23 asphyxia.
24 Q. That's your opinion?

Page 92

1  A. Absolutely. But now -- because
2  everything's been excluded completely.
3  Q. In your opinion?
4  A. Absolutely. Absolutely.
5  Q. Are you ever wrong?
6  A. Am I ever wrong?
7  Q. Yes.
8  A. Yes.
9  Q. Talk to me about Sudden Cardiac Death.
10 A. Sudden Cardiac Death is when a person dies
11 due to a sudden cardiac event.
12 Q. Especially in young people, there can be
13 no known etiology or cause for that event; is that
14 correct?
15 A. Sometimes. Yes, it can happen that
16 there's no known cause.
17 Q. Sometimes the cause for a Sudden Cardiac
18 Death can be extreme physical exertion; is that
19 correct?
20 A. If there's an underlying natural disease
21 present.
22 Q. Am I also correct that there does not have
23 to be an underlying natural disease process in order
24 for someone to suffer from Sudden Cardiac Death?

Page 93

1  A. That's incorrect.
2  Q. In your opinion, in your opinion, there
3  always has to be some underlying cause; is that
4  correct?
5       MR. MARTINS: Objection.
6  A. Yes. There is a cause. There has to be a
7  cause.
8  Q. Is there always a cause, a physical cause,
9  for cardiac arrhythmias?
10 A. Well, since you used the term "physical
11 cause," are you meaning due to a physical blow or
12 are you referring to a chemical or are you referring
13 to -- what are you referring to?
14 Q. I'm referring to an underlying etiology.
15 A. There's always a cause.
16 Q. Can you do an autopsy on someone who
17 suffers a Sudden Cardiac Death without any findings?
18 A. It's very rare. And then I don't have
19 other circumstances that would suggest otherwise.
20 Q. Have you ever done an autopsy on someone
21 who's suffered from Sudden Cardiac Death?
22 A. Yes.
23 Q. Have you ever done an autopsy on someone
24 who has suffered from Sudden Cardiac Death, without

Case 1:01-cv-00769-SAS    Document 131-22    Filed 04/16/2004    Page 9 of 9
Owensby vs. City of Cincinnati, et al.                          DANIEL L. SCHULTZ, M.D.
December 17, 2003

Page 94

1 any specific findings, other than the fact that the
2 person is dead?
3    A. Not on an adult.
4    Q. Not on an adult?
5    A. Correct.
6    Q. How about young people and children?
7    A. We call that SIDS.
8    Q. I'm not talking about -- how about
9 teenagers engaged in sports?
10    A. No.
11    Q. How about --
12    A. I've done autopsies, but I've never had a
13 death that was Sudden Cardiac Death that I did not
14 explain by some reasonable means.
15    Q. How many of those have you done?
16    A. Well, I've done over two thousands cases.
17    Q. No. How many Sudden Cardiac Deaths have
18 you had where the person was not suffering from
19 heart disease?
20    A. Hundreds.
21    Q. If the person is not suffering from heart
22 disease and dies from a cardiac arrhythmia, what
23 have been the causes, in your experience?
24    A. If they die from an arrhythmia, it could

Page 95

1 be due to cocaine, it could be due to toxins, such
2 as cocaine. It could be due to -- another reason
3 for Sudden Cardiac Death is something like a blood
4 clot, like a pulmonary embolism.
5       That's not heart disease, per se, but that
6 causes sudden cardiac standstill and death. So
7 there are other, as I said, there are other things
8 that can cause it.
9    Q. What besides cocaine, and what was the
10 other one you said?
11    A. Well, cocaine and pulmonary embolism is a
12 possibility.
13    Q. What other possibilities are there?
14    A. Well, in an otherwise apparently healthy
15 person, it's pretty much heart causing sudden death
16 or brain.
17    Q. Have you ever written on the subject?
18    A. On Sudden Cardiac Death?
19    Q. Yes.
20    A. No.
21    Q. Do you know who Barry Maron is?
22    A. No.
23    Q. Did you ever hear of him?
24    A. No.

Page 96

1    Q. All of the external manifestations of his
2 injuries, the abrasions and the contusions and
3 things like that, that is all consistent with
4 resisting arrest, would you agree with that?
5    A. Yes.
6    Q. They surely didn't kill him? In other
7 words, he didn't die from those abrasions and the
8 things that we can see externally, would you agree
9 with that?
10    A. Well, let's back up. Your entire
11 statement was, "They didn't kill him. . . " these --
12 okay. Yes, they did. That's why he's dead.
13    Q. You said in your court testimony that you
14 can't say that he died from those abrasions or
15 impacts, they are just the results of a struggle?
16    A. Right.
17    Q. That's what you said in your prior
18 testimony?
19    A. Correct. That's the same thing. Those
20 are markers of the struggle.
21    Q. You agree with that?
22    A. Yes.
23    Q. You agree that he didn't die from hitting
24 his head on the ground or from the blows that he may

Page 97

1 have received from the officers when they were
2 trying to restrain him?
3    A. Correct.
4    Q. You cannot say that Mr. Owensby died
5 because somebody put a chokehold on him; is that
6 correct?
7    A. Correct.
8    Q. You were asked a leading question by
9 counsel regarding the definition of homicide. All
10 that "homicide" means is a death caused by an
11 outside source; isn't that true?
12    A. No.
13    Q. All right.
14    A. Would you call it a homicide if you get
15 struck by lightening?
16    Q. I don't know. What would you call that?
17    A. I would call that an accident.
18    Q. Okay. Can a homicide result from somebody
19 resisting arrest?
20    A. Yes.
21    Q. Can that be an accident, if somebody dies
22 when he is resisting arrest and, unfortunately,
23 becomes deceased?
24       MR. MARTINS: Objection.