UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| ESTATE OF : | |
| ROGER D. OWENSBY JR., et al., : | |
| : | Case No. 01-CV-769 |
| Plaintiff, : | |
| : | Senior Judge S. Arthur Spiegel |
| v. : | |
| : | |
| CITY OF CINCINNATI, et al., : | |
| : | |
| : | |
| Defendants. : | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION IN LIMINE TO EXCLUDE THE TESTIMONY OF JOHN F. BURKE, JR., Ph.D. (Doc. 117)**

Defendants City of Cincinnati and Thomas Streicher, Jr. have filed a Motion *In Limine* to prevent Plaintiff from calling economist John F. Burke, Jr., Ph.D as a witness in this case to testify regarding the economic damages resulting from the death of Roger Owensby, Jr. Doc. 117. The defendants argue: (1) Dr. Burke's testimony is not scientific, technical or otherwise specialized and will therefore not assist the jury; (2) Dr. Burke's calculation of damages for loss of enjoyment of life, no matter what it may be, is inadmissible; and (3) Dr. Burke's testimony will "cause confusion of the issues." Motion at 1. These objections should be overruled.

Though aimed at Dr. Burke, this motion actually has very little to do with him. The defendants do not challenge or even mention Dr. Burke's qualifications as a well-respected economist who has been qualified and accepted as an expert in numerous courts. Nor do they challenge or even mention Dr. Burke's methodology in calculating damages regarding Mr. Owensby's loss of future wages, loss of household services or loss of enjoyment of life. In fact,

the defendants consider Dr. Burke's qualifications and economic valuations so inconsequential that they didn't even bother attaching his reports to their motion.

Instead, the defendants' first and third objections concern the sufficiency of the evidence to be presented at trial, which the defendants say will not be—in their partisan estimation—supportive of Dr. Burke's economic conclusions as to lost wages and household services. The defendants are twice wrong. First, Dr. Burke's opinions are well-supported by plenty of evidence developed during discovery, and his specialized knowledge in the field of economics will assuredly assist the jury. Second, and more to the current point, the defendants' arguments are obviously premature. As the trial unfolds, the defendants will have every opportunity to challenge the facts and cross-examine our witnesses to try and minimize the jury's determination of the damages done to Mr. Owensby. Wholesale exclusion of large categories of relevant evidence before trial even begins would inappropriately undermine the jury's role in this case.

As to Dr. Burke's calculation of damages resulting from Mr. Owensby's loss of enjoyment of life, the defendants say—based solely on an unpublished, *per curiam* opinion from the Sixth Circuit—that such loss of enjoyment of life or "hedonic" damages are not admissible in this 42 U.S.C. § 1983 civil rights action. What the defendants fail to consider, and what the Sixth Circuit failed to consider, is that the Constitutional violations at issue in this case *caused the death of the victim*. Absent damages for Mr. Owensby's lost life, these defendants will have achieved a windfall because they killed, rather than injured, their victim. We demonstrate below that this circumstance runs contrary to the principles embodied in § 1983, and should therefore not be allowed by this Court.

I.  **DR. BURKE'S OPINIONS REGARDING LOST WAGES AND HOUSEHOLD SERVICES ARE SUPPORTED BY THE EVIDENCE, AND HIS SPECIALIZED KNOWLEDGE WILL ASSIST THE JURY IN DETERMINING DAMAGES.**

    A.  **Dr. Burke's Opinions Are Supported By The Facts Of The Case.**

John F. Burke, Jr., Ph.D has been a respected economist for over 40 years, and his qualifications to give expert opinions are clear. As established by his resume, Dr. Burke has taught at the University of Notre Dame, Indiana University, Eastern Illinois University, Cleveland State University, and (currently) John Carroll University.[1] A veteran of the United States Navy, Dr. Burke has lectured, written and testified on scores of occasions regarding all manner of economic topics, including those that he will address to the jury at trial. Dr. Burke has also served as an economic advisor to the Ohio Attorney General and has been called upon to testify on economic issues before the United States Congress as well as the Ohio Senate. He most certainly has specialized, technical knowledge in the field of economics—a fact the defendants pointedly do not challenge.

Dr. Burke has authored two expert reports concerning the economic damages resulting from the death of Roger Owensby, Jr. The first (Exhibit A) concerns the loss of Mr. Owensby's future earnings and the replacement costs for his household services, while the second (Exhibit B, which we address in the following section) quantifies the loss of Mr. Owensby's enjoyment of life. As to lost future earnings, Dr. Burke provides alternative analyses based upon whether Mr. Owensby would have relied on his high school diploma to earn a living, or whether he would have continued his pursuit of college-level education and earned more as a result. Both analyses

---

[1] Dr. Burke's Curriculum Vitae is appended to his first expert report, which is attached hereto at Exhibit A.

are supported by the evidence discovered in this case and provided to Dr. Burke.

Mr. Owensby's mother testified that Roger, Jr. was, in fact, a high school graduate.[2] Both of Mr. Ownesby's parents testified that he had already taken college courses at Southern Ohio College, and while he had to suspend that education for financial reasons, he was planning to eventually continue.[3] In 1998, after getting out of the Army, Roger Owensby, Jr., lived at home with his mother, father and brother. He and his brother also struck out on their own for a time, renting apartments around Cincinnati. He worked at several temporary jobs in construction and at a factory in Springfield.[4]

Likewise, Dr. Burke's determination that Mr. Owensby would have provided $57,046 worth of household services is properly grounded in the testimony. Roger's father testified that Roger had a good relationship with his daughter, Myiesha, regularly spending time with her taking her to movies, to the zoo and even had a birthday party for her.[5] He also provided financial support for Myiesha while in the Army and, to the extent possible, after he got out of the Army.[6] By providing a damage figure for Mr. Ownesby's lost household services, Dr. Burke did not, as the defendants say, "admit[] that the decedent may not have worked at any job earning an income[.]"[7] Household services are provided by those who work outside the house, too.

---

[2] Exhibit C, Brenda Owensby Depo. at 40-41.

[3] Exhibit D, Roger Owensby Depo. at 27-28; Ex. C, Brenda Owensby Depo. at 47-49.

[4] Ex. D, Roger Owensby Depo. at 15-19.

[5] Ex. D, Roger Owensby Depo. at 22-24.

[6] Ex. D, Roger Owensby Depo. at 22, 62; Ex. C, Brenda Owensby Depo. at 60.

[7] Motion at 5. This statement shows a fundamental misconception of the role Dr. Burke will play at trial. He is an expert who will help the jury with economic calculations based upon

The defendants are also incorrect when they claim Dr. Burke "guessed" at factors such as wage amounts, fringe benefits and retirement age. Motion at 4-5. As made clear by Dr. Burke, all such figures are taken from a searching statistical analysis of the American workforce, from which Dr. Burke arrives at averages that he applies to this case.[8] The defendants do not address these aspects of Dr. Burke's report, but instead waste time "proving" the unremarkable fact that Dr. Burke's report is not and cannot be based on what Roger Owensby, Jr. *actually did* for the remainder of his life. Such a calculation would not, of course, require expert analysis at all. But the presence of uncertainty is precisely why an expert evaluation, to a reasonable degree of economic certainty based upon the existing facts, is necessary and proper.

**B.   Dr. Burke's Opinions Regarding Loss Of Future Earnings And Household Services Are Both Reliable And Relevant And Should Not Be Precluded.**

As the defendants note, the admissibility of Dr. Burke's testimony is governed by Rule 702, Fed. R. Evid., which requires that he have "scientific, technical, or other specialized knowledge[,]" based on his "knowledge, skill, experience, training, or education," and that his opinions will "assist the trier of fact to understand the evidence or to determine a fact in issue[.]" In the words of the Supreme Court, the requirements of Rule 702 ensure "that an expert's

---

their factual findings; he will *not* be asked to weigh evidence and decide Mr. Owensby's professional future and household contributions. The jury makes those decisions based on all the evidence presented. Instead, Dr. Burke will assist the jury with economic calculations and damages to a reasonable degree of economic certainty, which the jury, in turn, may apply to the underlying facts as it finds them.

[8] Exhibit A, Burke Report. Curiously, the defendants attack Dr. Burke's figures as "not accurate[,]" since some are based on the 1980 census. Motion at 5. Actually, this doesn't make the figures inaccurate, just (as Dr. Burke notes) conservatively low. Having so complained, we assume the defendants will not object if Dr. Burke updates his figures based on a later census.

testimony both rests on a reliable foundation and is relevant to the task at hand."[9]

The defendants do not claim that Dr. Burke lacks the requisite knowledge and experience to opine on economic matters. The defendants say instead that Dr. Burke's opinions are unreliable—and therefore not scientific or based on specialized knowledge—because they are based on "uncertainties" in the evidence. Motion at 5. But this is a matter of the *weight* that the jury will accord Dr. Burke's testimony, not an issue involving the *admissibility* of such evidence. The Supreme Court has made this distinction clear: "In this regard respondent seems to us to be overly pessimistic about the capabilities of the jury and of the adversary system generally. Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[10]

Likewise, the Sixth Circuit has found that "[t]he assessment of the validity and reliability of the conclusions drawn by the expert is a jury question; the judge may only examine whether the principles and methodology are scientifically valid and generally accepted."[11] Since the defendants in this case have not argued that Dr. Burke's methodology is unscientific or not

---

[9] Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993). *Accord* Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999) (extending Daubert beyond "scientific" testimony to all expert testimony).

[10] Daubert, 509 U.S. at 596, *citing* Rock v. Arkansas, 483 U.S. 44, 61, 97 L. Ed. 2d 37, 107 S. Ct. 2704 (1987).

[11] United States v. Bonds, 12 F.3d 540, 563 (6th Cir. 1993). *Accord* International Adhesive Coating Co., Inc. v. Bolton Emerson Int'l, Inc., 851 F.2d 540, 545 (1st Cir. 1998) (citations omitted) ("Moreover, the fact that an expert's opinion may be tentative or even speculative does not mean that the testimony must be excluded so long as opposing counsel has an opportunity to attack the expert's credibility. When the factual underpinning of an expert's opinion is weak, it is a matter affecting the weight and credibility of the testimony -- a question to be resolved by the jury.")

generally accepted, it is clear that his opinions are appropriate for the jury to consider.[12]

Here, Dr. Burke has conducted two economic analyses regarding Mr. Owensby's lost future wages. Exhibit A. The first calculation is based upon Mr. Owensby's income based solely upon graduating from high school—a fact established by the testimony. The second calculation is based upon the testimony that Mr. Owensby had some amount of college education. Both analyses are traditional economic calculations to a reasonable degree of economic certainty that are accepted in death cases in courts across the United States every day.

Thus, the jury will decide whether economic damages should be based upon Mr. Owensby's completed high school education or upon the fact that Mr. Owensby had some amount of college education at Southern Ohio College and, according to the testimony of his parents, planned to continue with his college education.[13] Dr. Burke offers both economic calculations to the jury to a reasonable degree of economic certainty in deference to the jury's fact finding role and to assist the jury in their task, in keeping with the Supreme Court's guidance and in keeping with Evidence Rule 702. As such, Dr. Burke's opinions are reliable, reasonable and admissible.

**II.    LOSS OF ENJOYMENT OF LIFE DAMAGES ARE APPROPRIATE.**

In this § 1983 action for the death of Roger Owensby at the hands of Cincinnati and Golf Manor police, the jury will be asked to assess a value for the loss of the most basic of

---

[12] Even where an expert's opinion is precluded because it is not sufficiently supported by the evidence, that determination is made during trial. See Lewis v. Parish of Terrebonne, 894 F.2d 142, 146 (5th Cir. 1990) (citation omitted) ("The trial judge's determination that there was not enough evidence that the deceased had an earnings history to justify the testimony of a professional economist was not an abuse of discretion. An expert's opinion must be preceded by facts in evidence and cannot be the basis of speculation or conjecture.")

[13] Ex. D, Roger Owensby Depo. at 27-28; Ex. C, Brenda Owensby Depo. at 49-50.

Constitutional rights—the Fourteenth Amendment right that the State shall not "deprive any person of life...without due process of law." In assessing this loss of life, Plaintiff offers the assistance of Dr. Burke who has conducted an economic analysis of the value of human life based upon years of government studies. Such an economic evaluation is but one tool offered to assist the jury in their task of fashioning a damages verdict.

These defendants challenge Dr. Burke's opinion (Exhibit B) regarding the loss of enjoyment of life damages suffered by Mr. Owensby. Relying exclusively on a few paragraphs lifted nearly verbatim (including internal citations) from the Sixth Circuit's unpublished, *per curiam* decision in Tinch v. City of Dayton, 1996 U.S. App. LEXIS 5716 (6th Cir. 1996) (attached to defendants' Motion at Exhibit A), the defendants claim that this Court must preclude damages for loss of enjoyment of life or loss of life damages (sometimes also referred to as "hedonic damages") because: "The Sixth Circuit has concluded that the award of damages for decedent's loss of enjoyment of life is improper." Motion at 7-8.[14] The defendants are wrong. The unpublished Tinch decision is not binding on this Court.[15]

---

[14] Notably, the defendants have failed to challenge any aspect of Dr. Burke's actual calculation of Mr. Owensby's loss-of-enjoyment-of-life damages. Nor do they challenge Dr. Burke's scientific and specialized knowledge in this regard. Thus, should this Court determine that loss-of-enjoyment-of-life damages are appropriate in this case, Dr. Burke's opinions will clearly be admissible at trial to assist the jury in deciding on the proper amount of such damages.

[15] Displayed in the Tinch caption is the following Notice: "NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 24 LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 24 BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED." Former Sixth Circuit Rule 24 is now Sixth Circuit Rule 28(g), which provides: "Citation of unpublished decisions in briefs and oral arguments in this court and in the district courts within this Circuit is disfavored, except for the purpose of establishing res judicata, estoppel, or the law of the case." Defendants cite Tinch in this case for none of the Sixth Circuit's excepted reasons. Thus, it is of no precedential value and is not binding on this

Nor, we respectfully submit, is Tinch even persuasive authority.  The reason is simple enough.  By seeming to categorically disallow loss-of-life damages, Tinch actually creates the following perverse incentive that does real violence to the Congressional policies embodied in § 1983:  **Those who violate the Constitutional rights of citizens would actually be rewarded for killing, rather than merely injuring, their victims.**  This is clear from the very facts of Tinch, where the victim was shot by a Dayton police officer and died almost instantly.[16]  The jury in that § 1983 action awarded decedent's Estate $111,000—$25,000 for the victim's conscious pain and suffering prior to his death, and the remaining $86,000 for loss of enjoyment of life.  The Tinch panel rejected the latter amount.  In other words, *solely because the victim was killed*, the amount of his damages was dramatically reduced by over 75 per cent.[17]

In reaching its conclusion, Tinch at least recognized the proper framework for deciding appropriate damages in a § 1983 case.  Noting first that "[i]t is well settled that federal standards govern determination of damages under civil rights statutes[,]"[18] the court then found that "[i]t is equally well settled that § 1983 does not provide adequate guidance to determine the measure of

---

Court.  Sheets v. Moore, 97 F.3d 164, 167 (6th Cir. 1996) ("However, as noted, these decisions are unpublished and therefore carry no precedential weight. They have no binding effect on anyone other than the parties to the action.")

[16] Tinch, 1996 U.S. App. LEXIS 5716 at *8.

[17] Perhaps because of this flawed logic, Tinch has been all but ignored in the many years since it was decided.  Of the reported decisions since 1996, exactly one has cited Tinch regarding loss-of-life damages, and then only to adopt Tinch without analysis.  Alexander v. Beale St. Blues Co., 108 F. Supp.2d 934, 950 (W.D. Tenn. 1999).

[18] Tinch at *5, *citing* 42 U.S.C. § 1988; Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 238-40 (1969); and Gordon v. Norman, 788 F.2d 1194, 1199 (6th Cir. 1986).

damages available in an action for a violation of a claimant's civil rights."[19]  Thus, pursuant to 42 U.S.C. § 1988, courts must look "to the common law of the forum state, in this case Ohio, to fill in the interstices in the federal framework."[20]  With these statements we do not disagree, save one important clarification: 42 U.S.C. § 1988 mandates application of Ohio common law to set damages in a § 1983 case if, and only if, the allowable damages are "*not inconsistent with the Constitution and laws of the United States*[.]"[21]

Turning then to Ohio law, Tinch held that the § 1983 action survived the victim's death pursuant to Ohio's survival statute (O.R.C. § 2305.21), and personal injury damages were recoverable under Ohio common law for the decedent's "conscious pain and suffering" prior to death.[22]  However, the court found Ohio law did not support damages for the decedent's loss of enjoyment of life because he "died virtually instantaneously and thus was not cognizant of that loss."[23]  In other words, the Tinch court recognized that loss of enjoyment of life damages are recoverable in Ohio—it is, after all, syllabus law in Ohio that such damages are accepted[24]—but

---

[19] Tinch at *5, *citing* Bell v. Milwaukee, 746 F.2d 1205, 1232 (7th Cir. 1984).

[20] Tinch at *5.

[21] 42 U.S.C. § 1988 (emphasis supplied).

[22] Tinch at *8, *citing* Flory v. New York Central Rd. Co., 170 Ohio St. 185, 189 163 N.E.2d 902, 905 (1959) and Jones v. Wittenburg University, 534 F.2d 1203, 1213 (6th Cir. 1976).

[23] Tinch at *8, *citing* Flory, 163 N.E.2d at 905; Jones, 534 F.2d at 1213, and Ramos v. Kuzas, 65 Ohio St.3d 42, 43-44, 600 N.E.2d 241, 242-43 (1992), *rehearing denied*, 65 Ohio St.3d 1459, 602 N.E.2d 254 (1992).  The Tinch court never says how the decedent could be "conscious" of $25,000 worth of pain and suffering, yet simultaneously not "cognizant" of any loss of enjoyment of life.

[24] Fantozzi v. Sandusky Cement Products Co., 64 Ohio St.3d 601, 603 (1992), paragraph 2 of the syllabus.  *See also Id*. at 614 ("As reflected in Section 23.01 of [Ohio Jury Instructions],

found they are not appropriate *after someone dies*.

The ultimate question, then, is whether this gap in Ohio's common law is, under § 1988, "inconsistent" with the policies of § 1983. Though the Tinch court took barely a paragraph to find in the negative, the appropriate answer is "Yes." Loss-of-enjoyment-of-life damages must be recoverable in this case as the only way to satisfy the twin goals of § 1983—which are to compensate victims of Constitutional violations and to deter State actors from committing such acts.[25]

This is the exact result reached by the only published Circuit Court opinion to squarely address the issue. Bell v. Milwaukee, 746 F.2d 1205, 1234-1241 (7th Cir. 1984) involved the shooting and instantaneous death of a young African-American male by two Milwaukee police officers. In a lengthy analysis, the Seventh Circuit affirmed a jury verdict for loss-of-life damages by examining both the important Congressional purposes behind § 1983 as well as related Supreme Court precedent. After noting that § 1983 means to compensate victims and deter "unconstitutional acts committed under state law[,]" Bell explains: "The legislative history behind Section 1983 expresses an unequivocal concern for protecting life."[26] Where death results from a Constitutional violation, the policies behind § 1983 can only be served if loss-of-life damages are allowed. On this score, we quote Bell at some length:

But since in the instant case the killing is the unconstitutional act, there would result more

---

juries in Ohio are already permitted to award damages for what generally has been referred to as 'loss of enjoyment of life.' Therefore, it is not necessary to create a new and additional element of damage here that would encompass this claimed loss and resulting damage.")

[25] Jaco v. Bloechle, 739 F.2d 239, 244 (6th Cir. 1984), *citing* Robertson v. Wegmann, 436 U.S. 584, 590-592 (1978).

[26] Bell, 746 F.2d at 1239.

than a marginal loss of influence on potentially unconstitutional actors and therefore on the ability of Section 1983 to deter official lawlessness if the victim's estate could not bring suit to recover for loss of life. **Moreover, if Section 1983 did not allow recovery for loss of life notwithstanding inhospitable state law, deterrence would be further subverted since it would be more advantageous to the unlawful actor to kill rather than injure.** As the Supreme Court observed in *Carey v. Piphus*, 435 U.S. 247, 258, 55 L. Ed.2d 252, 98 S.Ct. 1042, "it is not clear . . . that common-law tort rules of damages will provide a complete solution to the damages issue in every § 1983 case." Therefore it is appropriate, as the Supreme Court has noted in regard to Section 1983 damage issues, to fashion "a federal rule responsive to the need whenever a federal right is impaired." *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 240, 24 L. Ed. 2d 386, 90 S. Ct. 400.[27]

This is the true fallacy of Tinch—its failure to appropriately address damages in a § 1983 case *where death results from the Constitutional violation*. Indeed, when the Tinch panel justified denying loss-of-life damages as "not inconsistent" with § 1983, it cited two cases that did not involve Constitutional violations that caused death or even bodily injury, for that matter.[28] As the Seventh Circuit in Bell and the Supreme Court in Carey and Sullivan make clear, the nature of the injury suffered as a result of a Constitutional violation must be considered in

---

[27] Bell, 746 F.2d at 1239 (emphasis added). *Accord* Guyton v. Phillips, 532 F. Supp. 1154, 1167-1168 (N.D. Cal. 1981) ("A remedy must obtain by reason of the actual deprivation-in this case the greatest of deprivations, loss of life. . . . Cases where the wrongful acts, which are the gravamen of a § 1983 claim, caused the death of the wronged person are particularly susceptible to this interpretation and give rise to presumed damages. The decedent's loss of life, which is the deprivation here, is a compensable injury that survives and is recoverable by his estate."); *See also Sherrod v. Berry*, 827 F.2d 195, 206 (7th Cir. 1987) ("The testimony of expert economist Stanley Smith was invaluable to the jury in enabling it to perform its function of determining the most accurate and probable estimate of the damages recoverable for the hedonic value of Ronald's life. The trial court committed no error by admitting that testimony.").

[28] Tinch at *9-10, *citing* Carey v. Piphus, 435 U.S. 247 (1978) (involving "damages" done to students who were suspended from public school without procedural due process) and Memphis Community School Dist. v. Stachura, 477 U.S. 299 (involving "damages" to public school teacher who was suspended without due process of law and in violation of the First Amendment.) We do note that Tinch was aware of the Seventh Circuit's Bell decision, having cited it earlier in the opinion. Tinch at *5. Inexplicably, though Bell was the only case directly on point, Tinch simply ignored it on the loss-of-life issue.

deciding whether allowable damages under State law are "inconsistent" with § 1983. By failing to do this, Tinch quite effectively and inappropriately weakened the value of § 1983—though the potential negative impact from that decision has thus far been avoided.

In fact, Tinch is even at odds with an earlier published Sixth Circuit § 1983 decision on which it relies. In Jaco v. Bloechle, 739 F.2d 239 (6th Cir. 1984), the district court dismissed a § 1983 action involving a victim who was shot and instantly killed by police, reasoning that Ohio's survival statute did not allow actions for personal injury in cases of instantaneous death. While the Sixth Circuit agreed with this assessment of Ohio law, the court still reversed because Ohio law was repugnant to the purposes embodied in § 1983:

> In contrast, in the case at bar, strict adherence to the relevant state law eviscerates the civil rights claim. Under Ohio's survival statute, this decedent's civil rights cause of action *would* have survived if his death had not been instantaneous; in light of the sweeping language of the enactment, **to suggest that the Congress had intended that a civil rights infringement be cognizable only when the victim encounters pain and suffering before his demise, is absurd. The § 1983 objective of protecting individual civil liberties by providing compensation to the victim for an illegal deprivation of constitutional entitlements by state officers cannot be advanced, and is only undermined, by deferring to a state law which decrees abatement under circumstances where, as here, asserted constitutional infringements resulting from action taken under color of law caused instant death.** Surely, § 1983's further purpose to discourage official constitutional infringement would be threatened if Jaco were not permitted to champion her dead son's civil rights.[29]

This broad approach to § 1983 was never addressed by the later unpublished *per curiam* Tinch panel, which instead adopted an irreconcilable narrower view.

While no other Circuits beyond the Sixth and Seventh have directly confronted the propriety of loss-of-life damages in a § 1983 case, two Circuit Court decisions in § 1983 cases bear mentioning. Both deal with victims who died as a result of the Constitutional violations.

---

[29] Jaco, 739 F.2d at 244-245 (emphasis added).

First, in Westcott v. Crinklaw, 133 F.3d 658 (8th Cir. 1998), the decedent's wife appealed the district court's refusal to separately instruct the jury on damages for loss of life. The Eighth Circuit recognized that loss-of-life damages were appropriate, but found no error because "the district court did not prohibit Westcott's estate from recovering damages for loss of life, the court only refused a separate jury instruction providing for such damages."[30]

Second, the Second Circuit long ago held, in allowing punitive damages in a § 1983 case despite a New York law extinguishing such claims upon death, that "we have no doubt that limitations in a state survival statute have no application to a section 1983 suit brought to redress a denial of rights that caused the decedent's death."[31]

Finally, and most recently, relying on McFadden, Bell, Jaco and others, the district court in Banks v. Yokemick, 177 F. Supp.2d 239, 249-251 (S.D.N.Y. 2001), found that loss-of-enjoyment-of-life damages must be allowed in § 1983 cases that cause the victim's death: "For, implicit in the legislative history and philosophy of § 1983 is that the life interest the statute protects is not just the private economic interest of the injured person himself to enjoy his own life, but the much more fundamental public interest of the rest of society in that the life of any individual not be ended by the lawless conduct of state agents."

In sum, the Tinch unpublished opinion is an anomaly, with no support in the cases decided before or since, or even in the cases upon which that opinion relies. The clearly more appropriate application of § 1983 in cases where the victim dies, and the only one which will serve to deter the most egregious deprivations of Constitutional rights, is to allow for damages

---

[30] Westcott, 133 F.3d at 661, citing Bell, 746 F.2d at 1235-36, 1240.

[31] McFadden v. Sanchez, 710 F.2d 907, 911 (2d Cir. 1983) (citations omitted).

for loss of enjoyment of life.

### III.    CONCLUSION.

Defendants' Motion to exclude the testimony of Dr. Burke is neither supported by the facts nor the law. Economics has long been recognized as an acceptable discipline for expert testimony. Defendants do not challenge Dr. Burke's qualifications and ability to offer testimony that will assist the trier of fact in this technical arena. Moreover, Dr. Burke's testimony concerning his economic calculations for the loss of earning capacity and replacement cost of services for Roger Owensby (Exhibit A) is supported by the testimonial record.

Additionally, Dr. Burke's economic testimony concerning the loss of enjoyment of life damages resulting from the death of Roger Owensby at the hands of the Cincinnati and Golf Manor police (Exhibit B) is consistent with the policies and purpose of 42 U.S.C. § 1983. In fact, the failure to allow the assessment of such loss of life damages in this action for the violation of Constitutional rights would result in the perverse incentive of rewarding the state for the death of a victim. The unpublished, *per curiam* decision cited by the Defendants is of no precedential value and should be viewed by this Court in the same fashion as other courts—as an anomaly. In fashioning a damages verdict for the loss of Mr. Owensby's life, the jury should be allowed to consider Dr. Burke's economic analysis.

Therefore, Defendants' Motion *in limine* to exclude the expert economic testimony of Dr. Burke should be denied.

Respectfully submitted,

/s/ Paul B. Martins
James B. Helmer, Jr.  (0002878)
Paul B.  Martins (0007623
Frederick M. Morgan, Jr.  (0027687)
HELMER, MARTINS & MORGAN CO., LPA
Fourth & Walnut Centre
Suite 1900
105 East Fourth Street
Cincinnati, Ohio 45202-4008
Telephone:	(513) 421-2400
Facsimile:	(513) 421-7902

*Trial Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

      I hereby certify that a copy of the foregoing Plaintiff's Memorandum in Opposition to Defendants' Motion *In Limine* To Exclude The Testimony Of John F. Burke, Jr., Ph.D. (Doc. 117) was electronically filed on April 26, 2004. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

                                                            /s/ Paul B. Martins