UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ESTATE OF                              :
ROGER D. OWENSBY JR., et al.,          :
                                       :    Case No. 01-CV-769
            Plaintiff,                 :
                                       :    Senior Judge S. Arthur Spiegel
v.                                     :
                                       :    Magistrate Judge Timothy S. Black
CITY OF CINCINNATI, et al.,            :
                                       :
            Defendants.                :

## MOTION TO EXCLUDE EVIDENCE OF ILLEGAL DRUGS ALLEGEDLY FOUND ON OR NEAR ROGER OWENSBY JR. ON NOVEMBER 7, 2000

Plaintiff moves the Court for an order precluding the defendants from presenting at trial any argument or evidence that baggies of marijuana or crack cocaine were allegedly found on or near Roger Owensby, Jr. an hour after he was killed.  The reason is simple and undisputed:  No Cincinnati or Golf Manor police officer involved in beating Mr. Owensby or leaving him to die in the back seat of a Golf Manor cruiser acted because they thought he had illegal drugs in his pocket.  Mr. Owensby was not being arrested for drug possession or even suspected drug possession, and had already consented to a pat-down search during which no drugs were found.  The officers involved in the physical arrest of Mr. Owensby are unanimous on this point: The *only reason* he was being arrested was because defendant Officer Hunter thought Mr. Owensby had run from him several weeks earlier.

Only much later, when Mr. Owensby lay dead at University of Cincinnati Hospital, were baggies of drugs supposedly and fortuitously "found" on or near his body.  Eyewitness accounts and Cincinnati's own documentation are inconsistent on how this discovery actually happened—whether the baggies suddenly "dropped out" of Mr.

Owensby's pants or were carefully removed by the emergency room nurse.  There is no chain of custody evidence for the period between Mr. Owensby's homicide at the hands of several Cincinnati police officers at 2098 Seymour Avenue and when the drugs were "found" miles away at the hospital.  Moreover, there is no dispute that Mr. Owensby's fingerprints were not found on any of the baggies.  And the Hamilton County Coroner confirmed that Mr. Owensby had no cocaine and only a trace amount of marijuana in his system, and that drugs played no role in his mechanical asphyxiation death as a result of police restrain attempts.

The mysterious emergency-room baggies—even if the jury somehow believed they actually belonged to Mr. Owensby—are therefore a patently irrelevant, highly inflamatory sideshow.  By the time the baggies were "found," Mr. Owensby had already been beaten and killed by officers whose behavior was not influenced one iota by thoughts that Mr. Owensby might have illegal drugs. The drugs are thus inadmissible under Evidence Rules 401, 402 and 403, and they should not be presented or even mentioned to the jury.

A memorandum in support is attached hereto.

Respectfully submitted,

/s/Paul B. Martins
James B. Helmer, Jr.  (0002878)
Paul B.  Martins (0007623
Frederick M. Morgan, Jr.  (0027687)
HELMER, MARTINS & MORGAN CO., LPA
Fourth & Walnut Centre, Suite 1900
105 East Fourth Street
Cincinnati, Ohio 45202-4008
Telephone:   (513) 421-2400
Facsimile:    (513) 421-7902

*Trial Attorneys for Plaintiff*

-2-

**MEMORANDUM IN SUPPORT**

**I.    INTRODUCTION.**

On November 7, 2000, a group of five Cincinnati police officers beat Roger

Owensby, Jr., choked him, handcuffed him, beat and maced him after he was

handcuffed, and left him to die in the back seat of a Golf Manor police cruiser.  Those

same officers, along with other Cincinnati police officers and Golf Manor police officers

on the scene, failed to provide prompt medical attention for Mr. Owensby's injuries.

This lawsuit, brought by Mr. Owensby's father and estate administrator, alleges

violations of constitutionally-guaranteed civil rights afforded to all United States citizens

under 42 U.S.C. § 1983 as well as state tort claims for the wrongful death of his son at

the hands of these defendants.  Doc. 1, Complaint.

Defendant City of Cincinnati has produced documents in this case suggesting

that a baggie of marijuana and two baggies of crack cocaine were found in Mr.

Owensby's pants pocket (or somewhere near there) long after he was killed.  The City

has also indicated in the proposed Joint Final Pretrial Order that it intends to litigate the

question of drugs allegedly in Mr. Owensby's possession.  But these documents, along

with any related testimony or argument, should not be presented to the jury because

such "evidence" is irrelevant.  Drugs played no role in the decision to arrest Mr.

Owensby; no role in the beating he took; and no role in the failure to provide the critical

medical care that he so obviously needed.  In short, no allegation or defense in this

action involves drugs allegedly "found" on Mr. Owensby after the fact.

Moreover, there is scant evidence linking the baggies to Mr. Owensby.  Despite

repeated fingerprint examinations, Mr. Owensby's prints were never found on the

baggies.  Except for minute traces of marijuana that had no bearing on his death, Mr.

Owensby had no drugs or alcohol in his system when he died.  And even the

eyewitnesses differ on exactly how, when, where and by whom the drugs were "found."

The issue of baggies of illegal drugs is simply not relevant to this case, and any

"evidence" or argument regarding them should not be presented to the jury.

## II.    FACTS.[1]

### A.    The Scene: No Illegal Drugs Found On Mr. Owensby.

At dusk on November 7, five uniformed Cincinnati police officers (defendants

Jorg, Caton, Hunter, Sellers and Hasse), and their three marked police cruisers, were

parked conspicuously at Sam's Carryout located at 2092 Seymour Avenue.  These

officers claim they were all there to deliver a Notice-To-Appear ticket book to help

Officers Sellers and Hasse write one ticket (for minor-misdemeanor marijuana

possession) for a suspect who was sitting cooperative and secured in the back of

Officer Hasse's cruiser.

While standing near their respective cruisers, the officers were discussing a prior

incident in the area where an African-American male ran from Officer Hunter and was

never found.[2]  This male had not assaulted Officer Hunter, but in his flight from Officer

Hunter—who while in plain clothes had pulled a gun on the male—had jaywalked near

a traffic light.  In this previous pursuit, Officer Hunter had managed to mace himself

---

[1] A complete description of the brutal events of November 7, 2000 have been set forth in Plaintiff's summary judgment papers (Docs. 88, 105 and 131).  Only those facts necessary to the Court's determination of this motion will be set forth below.

[2] Exhibit A, Hunter Depo., pp. 124:4 - 126:13; Exhibit B, Sellers Depo., pp. 32:11 - 34:23; Exhibit C, Jorg Depo., pp. 86:24 - 87:1, 96:20 - 97:4.

after he put his pistol away.[3]

During the conversation on the evening of November 7, Officer Hunter pointed to an African-American male walking on the other side of Seymour Avenue, approximately 50 yards away, in the dark, saying, "I think that's him."[4]  In response, Officer Jorg said to the other officers, "If that's him, he has a lot of balls showing up here" or "Well, he's got a lot of balls to come out here and all these police officers and all these cruisers out here."[5]  Officer Caton admitted that such behavior—walking on a sidewalk in front of uniformed officers—was entirely innocent for someone who had done nothing wrong and had nothing to hide or fear.[6]  Officers Jorg, Caton and Hunter decided to approach the man, who, by this time, had crossed the street and entered the Sunoco convenience store next door at 2098 Seymour Avenue.[7]

The three officers stood outside the convenience store watching several African-American men purchasing items.  Roger Owensby, Jr. was one of these men.  He purchased two cigars and an energy drink.[8]  According to Officer Hunter, he positively identified Mr. Owensby as the person who ran from him previously.[9]  However, Officers

---

[3] Ex. A, Hunter Depo., pp. 54:12 - 58:10.

[4] Ex. B, Sellers Depo., pp. 34:13-23, 36:13-19; Ex. A, Hunter Depo., p. 124:9-17; Exhibit D, Caton Depo., p. 72:17-19; Ex. C, Jorg Depo., pp. 86:23 - 87:1, 91:1-3.

[5] Ex. B, Sellers Depo., p. 35:9-12; Ex. C, Jorg Depo., p. 87:17-19; Ex. A, Hunter Depo., p. 126:14-20.

[6] Ex. D, Caton Depo., p. 81:2-4.

[7] Ex. C, Jorg Depo., pp. 89:22 - 90:1.

[8] Ex. D, Caton Depo., p. 88:5-16.

[9] Ex. A, Hunter Depo., pp. 131:21 - 132:3.

Jorg and Caton contradict this, saying that Officer Hunter still was not positive that Mr. Owensby was the person who ran.[10]  Despite this confusion, Officers Jorg and Caton stopped Mr. Owensby at the entrance to the Sunoco convenience store and began to question him.[11]

Mr. Owensby was asked to place his drink on the ground next to him, and he did. Officer Jorg asked for his name, where he lived and why he was in the area.  Mr. Owensby identified himself, said that he lived in North College Hill, and explained that he had a girlfriend in the area.[12]  By Officer Jorg's own admission, Mr. Owensby was cooperative and respectful.[13]  Mr. Owensby even agreed to allow the officers to conduct a thorough pat-down of his person, which Officer Jorg did.[14]  No weapons or illegal drugs were found.  Though Officer Jorg now says he "believed" he felt marijuana in Mr. Owensby's front pants pocket, none was confiscated from Mr. Owensby.  Officer Jorg did not mention his "belief" to anyone, and no further drug-related inquiry was conducted.  **Officer Jorg specifically stated that he did not feel anything during the pat-down search that he thought might be crack cocaine in Mr. Owensby's pockets.**[15]  The search is captured in the Sunoco video camera (Doc. 88, Ex. B).

---

[10] Ex. C, Jorg Depo., p. 96:8-11; Ex. D, Caton Depo., p. 86:1-8.

[11] Ex. C, Jorg Depo., pp. 98:20 - 99:1.

[12] Ex. C, Jorg Depo., p. 99:2 - 100:13; Ex. D, Caton Depo., p. 90:7 - 91:15.

[13] Ex. C, Jorg Depo., p. 100:17-20.

[14] Ex. C, Jorg Depo., p. 101:3-6; Ex. D, Caton Depo., pp. 90:17 - 91:7.

[15] Ex. C, Jorg Depo., pp. 104:23 - 106:10.

At this point—after detaining and frisking Mr. Owensby—neither Officer Jorg nor Officer Caton believed there was probable cause for an arrest. It was not until Officer Hunter approached, got into Mr. Owensby's personal space and said "That's the guy"[16] that Officers Jorg and Caton felt probable cause existed.[17] This confrontation triggered a "flight response" from Mr. Owensby.[18] There ensued a horrific beating of Mr. Owensby, after which he was left to die in the back seat of the Golf Manor cruiser. No drugs fell out of Mr. Owensby's pocket during this violent confrontation.

Over five minutes later, Mr. Owensby was finally pulled from the Golf Manor car, and Officers Caton and Hasse began CPR efforts—pausing first to put on the rubber latex gloves that all police officers carry.[19] Mr. Owensby never regains consciousness, and the resuscitation efforts fail.[20] Again, no drugs fell out of Mr. Owensby's pockets or were retrieved during the handling of his body by several officers.

At some point during the failed CPR efforts, Officer Hodge (an undercover narcotics unit officer who was watching but not participating in the CPR activity) claims he saw "yellowish white flakes" around Mr. Owensby's mouth, which he says "looked like" flakes of crack cocaine.[21] In the midst of the confusion and commotion of the scene, Officer Hodge put on his latex gloves, approached Mr. Owensby, stooped to

---

[16] Ex. C, Jorg Depo., p. 102:20; Ex. D, Caton Depo., pp. 94:10-15, 95:22.

[17] Ex. C, Jorg Depo., pp. 11:11 - 12:2; Ex. D, Caton Depo., p. 23:3 - 11.

[18] Ex. D, Caton Depo., pp. 95:5-7, 98:8-10.

[19] Ex. D, Caton Depo, p. 141:1-11; Exhibit E, Hasse Depo., pp. 85:6 - 88:18.

[20] Ex. E, Hasse Depo., p. 88:7-11.

[21] Exhibit F, Hodge Depo., p. 90:14-22.

collect these "flakes," put them in a manila evidence envelope, and eventually stepped away from Mr. Owensby and gave the envelope to Officer Hasse.[22]

The "flakes" were tested the following day and found not to be the suspected crack cocaine.[23]  Instead, the "flakes" were merely vomit expelled as a result of the resuscitation efforts.

At the Sunoco station scene, though, after Mr. Owensby's body was transported to the hospital, the word quickly spread among the police that Mr. Owensby "might have swallowed crack or something."[24]  This false assumption soon became "consensus," according to Officer Hasse: "Officer Hodge believed it.  I think it was the general consensus on the scene that it could very well be crack cocaine."[25]  Officer Hodge even used this speculation to "console" Officer Jorg, saying "I don't think, I don't think this is your fault.  I think the guy might have swallowed crack or something."[26]  In other words, if there were drugs involved, the officers just might be off the hook.

But despite such "consensus," it is undisputed that no drugs were found either on Mr. Owensby at the homicide scene or in the back of the Golf Manor cruiser by any of the nearly one dozen officers and supervisors present.  An autopsy performed within

---

[22] Ex. F, Hodge Depo., pp. 90:14 - 92:11.

[23] Exhibit G, 11/8/00 Official Crime Laboratory Report from Hamilton County Coroner Carl L. Parrott (specimen Q-1 is the manila envelope containing the "flakes").

[24] Ex. F, Hodge Depo., p. 106:17-21.

[25] Ex. E, Hasse Depo., p. 44:5-7.

[26] Ex. F, Hodge Depo., p. 106:11-14.

hours confirmed that there was no cocaine or alcohol in Mr. Owensby's system.[27]  Thus, except for Officer Jorg's after-the-fact, secret and unverified "suspicion" that Mr. Owensby might have had marijuana in his pocket—as opposed to the two cigars that he indisputably had just purchased—nobody who was about to beat Mr. Owensby had any inkling that he might have drugs of any kind in his pocket.

**B.    The Emergency Room: Baggies Of Illegal Drugs Suddenly "Found" On Mr. Owensby.**

The foregoing discussion, which establishes that illegal drugs played no part whatsoever in the beating death of Mr. Owensby, naturally begs the question: How did illegal drugs even become an issue?  The answer involves sketchy events that are far removed, both in time and place, from the parking lot of the Sunoco convenience store where Mr. Owensby was killed.  Though we briefly describe this history, we believe that this Court can and should exclude any reference to the baggies of drugs based on the undisputed fact that nobody involved in Mr. Owensby's death acted as they did because illegal drugs were supposedly in his pocket.

By the time Mr. Owensby arrived in the emergency room of University Hospital, he had been thoroughly searched, violently beaten, maced, carried and placed into the Golf Manor cruiser, dragged out of the Golf Manor cruiser, laid prone to receive CPR and other medical aid aimed at resuscitation, lifted onto a gurney, put into an ambulance, transported to the hospital, taken out of the ambulance, wheeled into an examination room, and lifted onto an emergency room bed.  His body had been

---

[27] Exhibit H, Schultz Depo., pp. 45:11-16; 50:14-19; 63:20 - 64:2.  While the Coroner did find trace amounts of marijuana in Mr. Owensby's system, he confirmed that this played no part in Mr. Owensby's death.  *Id.* at 45:11-16.

touched dozens of times by an unknown but large number of persons.  And even though several officers were already speculating about drug involvement, no baggies of drugs were seen on or about Mr. Owensby during this time.

After all this, a Cincinnati Police Department "Investigative Log" records that at some unidentified point, the following event occurs: "Recovered plastic baggie of marijuana, crack cocaine and a cigar <u>dropped out</u> of the victim's pants while in the emergency room."[28]  The Log then says that emergency room Nurse Sue Flottemesch "recovered the drugs" and gave them to Cincinnati Detective Mary Turner.  This event marks the starting point for the many-paged "chain-of-custody" documents produced by the City regarding these drugs.  But the "Investigative Log" is the only document linking the "found" drugs to Mr. Owensby.

Nurse Flottemesch disputes the events recorded on the Log.  According to the statement she gave police about three weeks later, nothing "dropped out" of Mr. Owensby's pants.  Nurse Flottemesch says that after Mr. Ownesby's pants were cut off, she personally found the baggies when she "went through his pants pockets."[29]  She then says she left the baggies on an emergency-room cabinet, and eventually gave them to three unknown Cincinnati police officers.[30]  The chain of custody has so many broken links at this point that it is useless.

---

[28] Exhibit I, Investigative Log, Case # 00-0D-91 (emphasis added).

[29] Exhibit J, 11/29/00 Flottemesch Statement, at 2.  Nurse Flottemesch gave a brief deposition in this case and adopted the substance of her earlier statement without meaningful clarification or change.  Exhibit K, Flottemesch Depo., pp. 16:16 - 28:24.

[30] Ex. J, Flottemesch Statement, at 4.

Paramedic Craig Coburn, who assisted with resuscitation efforts at the Sunoco station and then transported Mr. Owensby to the hospital, provides a slightly different perspective.  According to his statement, given only one week after Mr. Owensby's death, Mr. Coburn remained in the emergency room as doctors tried to revive Mr. Owensby and then for a short time afterwards to complete his paperwork.  He saw the following: "And there was another uh uh policeman from homicide that came in.  And uh he entered, going through [Mr. Owensby's] clothes and taking his clothes off, and all that kind of stuff."[31]  Mr. Coburn soon leaves the emergency room, but while he is there, he does not remember seeing anyone else enter Mr. Owensby's room—not the three other Cincinnati police officers later described by Nurse Flottemesch, the one female detective listed on the Investigative Log, or anyone else.[32]

While the statements given by Nurse Flottemesch and Mr. Coburn are not entirely clear on how and when Mr. Owensby's pants were removed, these eyewitnesses are obviously describing two different times when the Cincinnati police entered Mr. Owensby's emergency room.  And since Mr. Coburn leaves without seeing the three officers to whom Nurse Flottemesch surrendered the baggies she says she recovered from Mr. Owensby's pants, the lone unidentified male officer observed by Mr. Coburn—who entered the room and proceeded "going through" Mr. Owensby's clothes—obviously came *before* the three officers described by Nurse Flottemesch.

---

[31] Exhibit L, 11/14/00 Coburn Statement, at 3.  Mr. Coburn also gave a brief deposition and also adopted the substance of his earlier statement without meaningful clarification or change.  Exhibit M, Coburn Depo., pp. 43:4 - 50:12.

[32] Ex. M, Coburn Depo., p. 47:1-4.

Since the night of November 7, 2000, multiple fingerprint examinations have been conducted on the baggies to determine if they actually belonged to Mr. Owensby. His fingerprints were never found.  First, according to a notation on the evidence envelope that held the baggies in the Cincinnati Police Department property room, Cincinnati Police Officer Vogel opened the envelope for one hour "to test for prints" on November 27, 2000—less than three weeks after Mr. Owensby was killed.[33]  Curiously, the City claims it cannot find the results of that test, nor can the City provide any explanation for this failure despite being directed to do so by this Court.[34]  If the baggies were checked for fingerprints, where is the report?  If the baggies were not so checked, what happened to them during the time they were taken from the evidence room?

Second, both Plaintiff and the City hired latent fingerprint examiners in this litigation to examine the baggies and determine if there were any fingerprints on them. Both experts agreed that there were no discernable prints.[35]  And, contrary to the November 27, 2000 entry on the evidence envelope, the baggies containing the drugs showed no signs that they had ever been dusted for fingerprints.[36]  In other words, there

---

[33] Exhibit N.

[34] *See* Doc. 112,  Report to Court re: Court's Order to Counsel to Investigate Fingerprint Exam Results.

[35] Exhibit O (report of Plaintiff's expert Michael J. Sinke) and Exhibit P (report of defendants' expert John H. Olenik).  Expert Mr. Sinke also notes that anyone handling the baggies while wearing rubber gloves would not leave any fingerprints.  As noted above, all Cincinnati police officers carry such gloves, and at least Officers Hodge, Hasse and Caton were wearing them while working on or near Mr. Owensby on November 7, 2000.  No rubber gloves were found in Mr. Owensby's possession.

[36] Ex. O, Sinke report.

is no evidence that Mr. Owensby ever touched the baggies that were conveniently "found" in (or "dropped out" of) his pants later on the night he was killed.  In fact, the physical evidence from the Hamilton County Coroner suggests just the opposite.  No cocaine was found in Mr. Owensby's system.[37]

## III.    ARGUMENT: EVIDENCE AND ARGUMENT THAT BAGGIES OF DRUGS WERE ALLEGEDLY "FOUND" ON OR NEAR ROGER OWENSBY, JR. IS IRRELEVANT AND THEREFORE SHOULD BE PRECLUDED.

Under Rule 402, Fed. R. Evid., only "relevant evidence" is admissible at trial, which is defined by Rule 401 as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  The supposed "evidence" that baggies of illegal drugs were "found" on Roger Owensby, Jr. on the night he was killed does not satisfy this definition because the presence (or not) of the baggies in Mr. Owensby's pants pocket is not a "fact that is of consequence" to any claim or defense in this case.  Again, no police officer involved in the killing of Mr. Owensby acted because they thought illegal drugs were in his pockets.

Thus, the contents of Mr. Owensby's pockets on November 7, 2000 are as irrelevant to this action as the contents of his pockets on any other day of his life.  This is clear based on a review of the claims made in this case, and the facts that *are* of consequence to the outcome.

_____

[37] Ex. H, Schultz Depo., pp. 45:11-16.  We also note that, before entering the Sunoco convenience store just prior to his death, Mr. Owensby walked right past five uniformed police officers standing next to three marked police cruisers—behavior that simply is not consistent with someone having baggies of illegal drugs in his pocket, or who had previously run from the police.

As set forth in the Complaint and the Joint Final Pretrial Order, Plaintiffs have brought five Counts in this lawsuit. None will require plaintiff to prove a negative—that Mr. Ownesby did *not* have illegal drugs in his pockets—because, put simply, evidence that the baggies were allegedly found on him is irrelevant to our claims. Just as certain, even if the baggies did belong to Mr. Owensby, that "fact" could not possibly provide any legally cognizable defense (or even mitigation) to any defendant in this case.

Count One asserts constitutional violations of the Fourth and Fourteenth Amendments under 42 U.S.C. § 1983 and violations of Ohio's Constitution based upon the excessive use of force in restraining Roger Owensby, Jr. as well as for failing to provide medical care to Mr. Owensby for his fatal injuries resulting from the excessive use of force.[38] It is undisputed, as outlined above, that the excessive force used by the officers against Mr. Owensby, and the subsequent failure to provide critical medical care to him, had nothing to do with thoughts that Mr. Owensby did or might have baggies of illegal drugs in his pocket. The only "probable cause" for attempting to arrest Mr. Owensby, which precipitated the constitutional violations at issue in this case, was Officer Hunter's apparent belief that Mr. Owensby had run from him several weeks earlier—an event in which Officer Hunter admits the person who ran from him had no role in suspected drug activity.[39]

---

[38] In Count One, Plaintiff also alleges that the conduct of these individual police officers was the result of policies, practices and customs of the City of Cincinnati and the Village of Golf Manor, and that these defendants (as well as their respective Police Chiefs) failed to establish adequate policies and procedures to properly train and/or supervise their respective police officers, in violation of constitutionally protected rights.

[39] Ex. A, Hunter Depo., p. 76:12-16.

Counts Two through Five assert various pendent state claims related to the constitutional violations set forth in Count One—including proximate damages resulting from the negligence of these defendants in departing from their professional responsibilities to timely provide medical care to Mr. Owensby (Count Two); for assault and battery and negligence without justification against the Cincinnati police officers for their excessive use of physical force against Mr. Owensby (Count Three); for vicarious liability against defendants Cincinnati and Golf Manor for the state claims arising out of the actions against their respective officers (Count Four); and wrongful death under Ohio law (Count Five). As with Count One, the contents of Mr. Owensby's pockets are irrelevant to the claims and defenses associated with these Counts.

In addition to being irrelevant, the "evidence" of the baggies lacks any probative value because of the hopelessly broken chain of custody. There are no documents linking the baggies to Mr. Owensby prior to death, or even to the Sunoco parking lot where he was killed. No witness will testify that any baggies were on or about Mr. Owensby at the scene. The accounts of how the baggies were miraculously "found" in the hospital emergency room are likewise woefully inadequate to tie them to Mr. Owensby. Multiple fingerprint examinations were performed, and Mr. Owensby's prints are never found on the baggies. And, in perhaps the starkest break in the chain, the baggies were basically lost for at least an hour on November 27, 2000 while Cincinnati police apparently performed an undocumented, unverifiable fingerprint exam—the details of which the City refuses to explain.[40]

---

[40] Doc. 112. There is also undisputed evidence that Cincinnati police have in the past planted illegal drugs on a suspect. Exhibit Q.

-13-

Faced with such evidentiary problems, the defendants have announced their intention of consuming literal days of the five-day trial trying to piece together a coherent chain of custody that might link the baggies to Mr. Owensby.  In the Joint Final Pretrial Order recently submitted to the Court, the City of Cincinnati and the individual Cincinnati police officers have identified at least 11 fact witnesses, one expert witness, and over a dozen exhibits that they intend to present to the jury on this single non-issue.  This entire time-consuming exercise, though, cannot and will not make the baggies of drugs any more relevant to the constitutional violations at issue in this case.

Finally, even should this Court find that the "evidence" regarding the baggies has some potential probative value in this case, it should be excluded under Rule 403, Fed. R. Evid., because that value would be "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury[.]" This issues in this case involve whether the defendants used excessive force and failed to provide medical care—not whether Mr. Owensby had illegal contraband in his pocket.  Evidence or argument regarding the latter would simply confuse the evidence and argument regarding the former.  Likewise, evidence or argument regarding the baggies could mislead the jury into believing that Mr. Owensby was being investigated or arrested for drug possession when, in a fact admitted by all concerned, drugs had nothing whatsoever to do with his detention, arrest and death.

## IV.    CONCLUSION.

The baggies of marijuana and crack cocaine "found" on or perhaps simply near Mr. Owensby an hour after he died on November 7, 2000 are irrelevant to this case.  No Cincinnati or Golf Manor police officer knew or cared about the contents of Mr.

-14-

Owensby's pockets as they beat him and left him to die in the back of the Golf Manor cruiser. Thus, even if the defendants could somehow overcome the gapping holes in the "evidence" tying the baggies to Mr. Owensby, obvious questions remain: Is there any legal significance to this "evidence"? Are the constitutional violations at issue in this case excused or affected in the least because drugs were later "found" in the dead victim's pocket or near his body?

The answer to these questions is clear: No. There is no relevance to what was later "found" in (or near) Mr. Owensby, since the conduct of the defendants in this case was not influenced and cannot be excused by such "evidence."

In view of the circumstances of how and when the contraband was "found," the breaks in the chain of custody including the baggies being checked out of the evidence room for one hour and the City's unwillingness to explain that hour's disappearance, the lack of decedent's fingerprints on the baggies and the undisputed evidence that Cincinnati police have in the past planted drugs on a suspect will all be presented in this case if the defendants are permitted to discuss drugs "found" on or near Mr. Owensby. The jury in this case will be presented with enough difficult questions without having to consider such issues.

Plaintiff therefore respectfully requests an order precluding any defendant from arguing or presenting any evidence at trial relating to the baggies of marijuana and crack cocaine allegedly recovered from Mr. Owensby on November 7, 2000.

-15-

Respectfully submitted,

/s/Paul B. Martins
James B. Helmer, Jr.  (0002878)
Paul B.  Martins (0007623
Frederick M. Morgan, Jr.  (0027687)
HELMER, MARTINS & MORGAN CO., LPA
Fourth & Walnut Centre
Suite 1900
105 East Fourth Street
Cincinnati, Ohio 45202-4008
Telephone:   (513) 421-2400
Facsimile:     (513) 421-7902

*Trial Attorneys for Plaintiff*

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing **Motion To Exclude Evidence Of Illegal Drugs Allegedly Found On Or Near Roger Owensby, Jr. On November 7, 2000** was electronically filed on May 12, 2004.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ Paul B. Martins