Case 1:01-cv-00769-SAS     Document 146-2     Filed 05/12/2004     Page 1 of 13

Owensby, et al. vs. City of Cincinnati                              DAVID WILLIAM HUNTER, JR.
November 6, 2003

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - - -

ESTATE OF ROGER D.            :
OWENSBY JR., et al.,          :
                              :
        Plaintiffs,           :   Case No. 01-CV-769
vs.                           :   (Judge S. A. Spiegel)
                              :
CITY OF CINCINNATI,           :   VOLUME I
et al.,                       :
                              :
        Defendants.           :

- - - - - - - - - - - - - - -

Videotaped deposition of DAVID WILLIAM HUNTER JR., a witness herein, called by the plaintiffs for cross-examination, pursuant to the Federal Rules of Civil Procedure, taken before me, Wendy Davies Welsh, a Registered Diplomate Reporter and Notary Public in and for the State of Ohio, at the offices of Helmer, Martins & Morgan Co. LPA, 1900 Fourth & Walnut Centre, 105 East Fourth Street, Cincinnati, Ohio, on Thursday, November 6, 2003, at 2:43 p.m.

Case 1:01-cv-00769-SAS   Document 146-2   Filed 05/12/2004   Page 2 of 13

Owensby, et al. vs. City of Cincinnati
November 6, 2003

DAVID WILLIAM HUNTER, JR.

Page 2

1  APPEARANCES:

2    On behalf of the Plaintiffs:

3        Paul B. Martins, Esq.
         Don Stiens, Esq.
4        Frederick M. Morgan Jr., Esq.
         Helmer, Martins & Morgan Co. LPA
5        Suite 1900, Fourth & Walnut Centre
         105 East Fourth Street
6        Cincinnati, Ohio 45202
         Phone: (513) 421-2400
7
         John J. Helbling, Esq.
8        The Helbling Law Firm, L.L.C.
         3672 Springdale Road
9        Cincinnati, Ohio 45251
         Phone: (513) 923-9740
10
    On behalf of the Defendants City of Golf Manor,
11  Stephen Tilley, Roby Heiland and Chris
    Campbell:
12
         Wilson G. Weisenfelder Jr., Esq..
13       Rendigs, Fry, Kiely & Dennis
         900 Fourth & Vine Tower
14       One West Fourth Street
         Cincinnati, Ohio 45202-3688
15       Phone: (513) 381-9200

16  On behalf of the Defendants City of Cincinnati,
    Darren Sellers, Jason Hodge:
17
         Geri Hernandez Geiler, Esq.
18       Assistant City Solicitor
                  and
19       Julie F. Bissinger, Esq.
         Chief Counsel
20       Department of Law
         Room 214, City Hall
21       801 Plum Street
         Cincinnati, Ohio 45202
22       Phone: (513) 352-3346

23

24

Page 3

1  APPEARANCES (Continued):

2    On behalf of the Defendants Robert B. Jorg,
     Patrick Caton, Jason Hodge, Victor Spellen and
3    Darren Sellers:

4        Donald E. Hardin, Esq.
         Hardin, Lefton, Lazarus & Marks, LLC
5        915 Cincinnati Club Building
         30 Garfield Place
6        Cincinnati, Ohio 45202
         Phone: (513) 721-7300
7
    On behalf of the David William Hunter Jr.:
8
         Jay Clark, Esq.
9        114 East 9th Street
         Suite 400
10       Cincinnati, Ohio 45202
         Phone (513) 587-2887
11
    Also present:
12
    Richard W. Grubb, Videographer
13
    Lisa Damstrom, Law Clerk
14  Helmer, Martins & Morgan Co., L.P.A.

15  Mr. Roger Owensby

16  Mrs. Brenda Owensby

17

18            - - -

19
              S T I P U L A T I O N S
20
21       It is stipulated by and among counsel for the

22  respective parties that the deposition of DAVID

23  WILLIAM HUNTER JR., a witness herein, called by the

24  plaintiffs for cross-examination, pursuant to the

Page 4

1  Federal Rules of Civil Procedure, may be taken at

2  this time by the notary; that said deposition may be

3  reduced to writing in stenotype by the notary, whose

4  notes may then be transcribed out of the presence of

5  the witness; and that proof of the official

6  character and qualifications of the notary is

7  expressly waived.

8
                - - -
9
10              I N D E X

11    Examination by:              Page

12    Mr. Martins . . . . . . .      5

13              - - -

14

15            E X H I B I T S

16                                  Page

17

18  Deposition Exhibit 6A .................... 89
    Deposition Exhibit 54 .................... 29
19  Deposition Exhibit 55 .................... 43
    Deposition Exhibit 56 .................... 62
20  Deposition Exhibit 57 .................... 64
    Deposition Exhibit 58 .................... 67
21

22              - - -

23

24

Page 5

1        VIDEOGRAPHER: Time is 2:43 p.m. The date
2   is November the 6th. The year is 2003.
3        If you'd please swear the witness, ma'am.
4        DAVID WILLIAM HUNTER JR.
5   being by me first duly cautioned and sworn, deposes
6   and says as follows:
7        VIDEOGRAPHER: We're on the record, Mr.
8   Martins. This is videotape number 1, sir.
9            CROSS-EXAMINATION
10  BY MR. MARTINS:
11       Q. Sir, would you state for the record your
12  full name, please.
13       A. David William Hunter Jr.
14       Q. And your age?
15       A. 36.
16       Q. Date of birth?
17       A. 5/20/67.
18       Q. What is your height?
19       A. 5' 7."
20       Q. And on November 7th of 2000 what was your
21  weight?
22       A. Approximately 175.
23       Q. Have you ever had your deposition taken
24  before?

Case 1:01-cv-00769-SAS  Document 146-2  Filed 05/12/2004  Page 3 of 13

Owensby, et al. vs. City of Cincinnati  
November 6, 2003

DAVID WILLIAM HUNTER, JR.

Page 54

1 recollection of seeing Roger Owensby before
2 September of 2000?
3    A. N--
4    Q. Correct?
5    A. No. As far as what I just said.
6    Q. Right.
7    A. I know it's kind of confusing, but I'm
8 trying to answer as truthful as possible.
9    Q. Right. You have no recollection of seeing
10 Roger Owensby before September of 2000?
11    A. Right. Okay.
12    Q. Okay. Walk me through what happened in
13 September of 2000.
14    A. Me and Officer Jorg were working
15 plainclothes, old clothes, and we were doing an
16 investigation in front of the Sam's Drive Thru. It
17 was three to four individuals that we observed
18 making drug transactions. We wanted to stop those
19 individuals.
20       Officer Jorg stayed with -- with one or
21 two of the individuals and then two of the
22 individuals went across the street, across from
23 Sam's Drive Thru, across -- that would be Seymour,
24 in the direction of Huntington Meadows Apartment

Page 55

1 complex. So I responded across the street behind
2 them.
3       Another uniform car -- another uniform car
4 met me across the street, and that officer was
5 Officer Walker. I advised Officer Walker to go
6 around, because I wanted him to flank the two guys
7 we were trying to catch up to.
8       Because I could pretty much walk up to
9 them, because they probably wouldn't -- wouldn't
10 have taken me as being a police officer, but Officer
11 Walker was in uniform of the day.
12       After we had that discussion, I started in
13 one direction. Officer Walker started in another
14 direction. That's when Mr. Owensby alerted the
15 individuals that we were trying to catch up to to
16 apprehend that the police were coming and that we
17 were in the area. So they got away, because they
18 had a jump on us anyway, because -- and they're
19 already behind -- around the building.
20       So I walked up to Mr. Owensby and I put my
21 left hand on his shoulder. And I said, "What's up?"
22       And he replied, "What's up?"
23       And then I said, "You know, you can't be
24 doing what you just did."

Page 56

1       And he said, "What's that?" Or something
2 to that nature.
3       I said, "You can't be telling people" --
4 as I was saying this to him, I reached into my shirt
5 with my other hand. I was wearing my badge on a
6 chain around my neck. "You can't be telling --
7 you -- you can't be warning people that the -- the
8 police is here. That's -- and -- that's interfering
9 with an investi"--
10       As I was saying investigation or whatnot,
11 I flipped my badge out and it dropped down dangling
12 around my neck. When he saw my badge, he pushed me
13 off him, and I grabbed the back --
14       He had a hooded sweat shirt on. I grabbed
15 the back of his sweat shirt, and he tugged and
16 pulled and his sweat shirt ripped. And I was just
17 basically standing there holding his sweat shirt,
18 because he ripped right out of it.
19       At that point I -- I actually drew my
20 weapon. And I told him, "Don't move." You know,
21 "Freeze." He -- he kind of faked to the left, to
22 the right or whatever, and took off running. I had
23 no intention of shooting. I -- I didn't have the
24 authority to shoot him, and he probably knew that.

Page 57

1 That's why he probably took off running.
2       I gave chase. We ran through Huntington
3 Meadows, between the buildings, out onto Rhode
4 Island, into the intersection of Rhode Island and
5 Seymour.
6       Right there at the traffic light is a
7 crosswalk. There was a car stopped at a red light.
8 I was chasing Mr. Owensby around the car. We
9 actually went -- circled the car once or twice. And
10 then he proceeded toward -- in the direction -- on
11 Seymour in the direction of Reading Road down the
12 sidewalk.
13       At that point I was able to put my --
14 secure my weapon and I went to Mace, my chemical
15 spray. He was running down the sidewalk, and at
16 some point he tripped and fell on his own. And I
17 was trying to run up to him to Mace him, but I was
18 running and spraying at the same time. So some of
19 the chemical irritant sprayed back toward me.
20       He was on the ground. He managed to make
21 his way by using his hands and his feet, making his
22 way back to his feet. He then ran in between some
23 apartment buildings.
24       I continued to chase him. He ran into one

Case 1:01-cv-00769-SAS    Document 146-2    Filed 05/12/2004    Page 4 of 13

Owensby, et al.vs. City of Cincinnati
November 6, 2003
DAVID WILLIAM HUNTER, JR.

### Page 58

1 of the apartment buildings, into the hall. And I
2 stopped. I called out exactly where I was at and
3 requested another car meet me there, so we can go
4 and check the hallway.
5     When another car -- when another officer
6 responded to my location, we went inside and we just
7 assumed that he went inside one of the apartment
8 buildings. Or he may have made it out the back, I
9 don't know, because I did not go -- I did not follow
10 him in.
11    Q. Anything else?
12    A. After that happened, went back to the two
13 guys that we did have under arrest. We questioned
14 the one individual if he knew the -- the guy --
15 the -- the first guys that we were actually after.
16     And then later on, and this kind of -- I
17 can't remember exactly how it came up, but we got
18 the nickname of LA from one of the suspects. Well,
19 actually, one of the people that we arrested. And
20 they -- they stated that that was the individual
21 that ran from me.
22     And -- and that's all we knew at that
23 particular time as far as any kind of
24 identification. His name is -- his -- his nickname

### Page 59

1 was LA and he stayed or be up in the Huntington
2 Meadows area.
3    Q. Okay. The -- the people that were -- that
4 gave you the information of the nickname of LA was
5 one of the two people that Officer Jorg had
6 arrested?
7    A. I -- I think it was.
8    Q. You didn't arrest anyone?
9    A. No.
10   Q. Right?
11   A. Huh-uh.
12   Q. Did Officer Walker arrest anyone?
13   A. I can't really remember exactly. I -- I
14 just know that when I came back, there was two
15 people. And I don't know exactly who -- who
16 arrested them or, you know, but it was a total of
17 four that we wanted altogether.
18   Q. When you came back --
19   A. And two got away.
20   Q. I'm sorry.
21   A. I'm sorry.
22   Q. When you came back, the two people were
23 with Officer Jorg?
24   A. From -- yeah. From what I remember, yes.

### Page 60

1    Q. Where was Officer Walker?
2    A. I don't know at that time.
3    Q. Okay.
4    A. I don't know.
5    Q. You and he had split up?
6    A. Yes.
7    Q. When was the next time you saw Officer
8 Walker?
9    A. Hmm. When I was standing outside the
10 apartment building where the suspect had ran into,
11 where I lost him.
12   Q. Where you were waiting for backup?
13   A. Yes.
14   Q. And when Officer Walker showed up, did he
15 have anyone in custody?
16   A. No, not when he showed up.
17   Q. Okay. At the time when Officer Walker
18 showed up, did -- did you and he then enter the
19 apartment building?
20   A. I remember going to the -- to the -- yeah,
21 just -- I mean, just like right through the door and
22 that's it. I mean, that was as far as we went -- I
23 went. I don't remember if he stepped in or not.
24   Q. Okay. But at that point is it fair to say

### Page 61

1 that you determined that you weren't going to start
2 knocking on doors of apartments or you were -- you
3 were calling off your pursuit of this person?
4    A. Yes.
5    Q. Okay. And did you say something to that
6 effect to Officer Walker?
7    A. I told Officer Walker that "Don't worry
8 about it. We'll get him next time."
9    Q. At that point then you walked back to join
10 Officer Jorg?
11   A. Yes.
12   Q. Do you know what Officer Walker did? Did
13 he accompany you?
14   A. I don't recall.
15       (Ms. Geiler returned to the deposition
16       hearing room.)
17   Q. And I take it the time that Officer Walker
18 was with you at the apartment building Officer
19 Walker did not have anyone in custody?
20   A. Not to my knowledge, but I don't know.
21   Q. Where were you and Officer Jorg located --
22 where were you and Officer Jorg located when you
23 first observed, I think you said drug transactions,
24 going on?

Case 1:01-cv-00769-SAS   Document 146-2   Filed 05/12/2004   Page 5 of 13

Owensby, et al. vs. City of Cincinnati
November 6, 2003
DAVID WILLIAM HUNTER, JR.

Page 74

1  A. Well --
2  Q. Did you want to say something?
3  A. It was not -- it was not a set -- like
4  a -- like a -- just one building. It was like
5  buildings. It was --
6  Q. Okay.
7  A. You know, it was -- it was like two or
8  three like together, but you can go through the
9  courtyard and then you can come around, and there's
10 like a building here on the right (indicating).
11 That's the way Curtis went, Officer Walker. And
12 then I was going to cut through.
13  Q. All right. At some point, then, you
14 folk-- you and Officer Walker split up and you start
15 to go your way and he goes his, right?
16  A. Yes.
17  Q. At that point someone says something to
18 warn the two individuals; is that right?
19  A. Yes.
20  Q. That's the next thing that happens?
21  A. Yes.
22  Q. Okay. And that person, if I'm
23 understanding you correctly, was Mr. Owensby?
24  A. Yes.

Page 75

1  Q. Are you sure of that?
2  A. Yes.
3  Q. What is the best of your recollection of
4 what Mr. Owensby said?
5  A. It was, The boys or Five-oh.
6  Q. Say that again.
7  A. It was either, The boys or Five-oh.
8  Q. And in response to what -- could you see
9 the two individuals at the time Mr. Owensby said
10 this?
11  A. They would -- they were just -- as he said
12 it, they were just leaving out of my view.
13  Q. Did you see -- so then you could not see
14 what, if anything, they did in response?
15  A. Oh. Ran.
16  Q. You did see that?
17  A. Yes. Uh-huh.
18  Q. Okay. Do you know if Mr. Owensby said
19 that toward them or was saying it to someone else?
20  A. He's saying it toward them, because he
21 turned to them and said it, in their direction.
22  Q. Do you know where Officer Walker was at
23 the time?
24  A. No.

Page 76

1  Q. Do you know if the individuals started
2 running because of what Mr. Owensby said or because
3 they saw a uniformed officer?
4  A. Beca--
5    MR. HARDIN: Objection.
6    You may answer.
7  A. Because of what Mr. Owensby said. Because
8 when that happened, Officer Walker didn't have
9 enough time to get around. So they -- they had --
10 they had -- they -- they couldn't have possibly even
11 seen him yet.
12  Q. But as I understand it, Mr. Owensby was
13 not one of the four individuals that you and Officer
14 Jorg had observed conducting drug activity at the
15 phone booth?
16  A. That's correct.
17  Q. He was just somebody that you happened
18 upon as you were going around the building?
19  A. Yes.
20  Q. At that point, as I understand it, you
21 walk up to Mr. Owensby and put your left hand on his
22 shoulder?
23  A. Yes.
24  Q. What shoulder did you put it on?

Page 77

1  A. On his left shoulder.
2  Q. Were you facing him face to face or did
3 you come up from behind?
4  A. Walking to his right, right beside him.
5  Q. So you put your left arm -- you're --
6 you're to his -- his right and you put your left
7 hand on his left shoulder?
8  A. Yes.
9  Q. And you say "What's up?" And he says,
10 "What's up?" And you say, you know, You can't be
11 doing that, or something like that, right?
12  A. Yes.
13  Q. And he said, What do you -- What do you
14 mean or what. And you said, What you just did. Is
15 that right?
16  A. Yes.
17  Q. And then you started to reach in your
18 shirt to pull your badge out, which was hanging on a
19 chain around your neck?
20  A. Yes.
21  Q. Do you know whether or not you got the
22 badge all the way out before Mr. Owensby started to
23 run?
24  A. Yes, I got it out.

## AFFIDAVIT

- - -

STATE OF OHIO          :
                       :  SS
COUNTY OF HAMILTON     :

I, Wendy L. Welsh, Notary Public in and for the State of Ohio, do hereby state that the transcript of the deposition of DAVID WILLIAM HUNTER, JR., deponent herein, having been submitted to said deponent for review and signature, has not been signed within the thirty (30) day period allowed under the Federal Rules; said deposition to now have the same force and effect as though signed.

_____
Wendy L. Welsh, Court Reporter

Sworn to before me this 27th day of January, 2004.

_____
Thomas M. Blasing
Notary Public - State of Ohio

My commission expires:
May 4, 2004.

Case 1:01-cv-00769-SAS   Document 146-2   Filed 05/12/2004   Page 7 of 13

Estate of Roger D. Owensby, Jr.
December 4, 2003

DAVID WILLIAM HUNTER, JR.
VOLUME II

107

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - - -

| | |
|---|---|
| ESTATE OF ROGER D. OWENSBY JR., et al., | : |
| | : |
| Plaintiffs, | : Case No. 01-CV-769 |
| vs. | : (Judge S. A. Spiegel) |
| | : |
| CITY OF CINCINNATI, et al., | : VOLUME II |
| | : |
| Defendants. | : |

- - - - - - - - - - - - - - -

Continued videotaped deposition of DAVID WILLIAM HUNTER JR., a witness herein, called by the plaintiffs for cross-examination, pursuant to the Federal Rules of Civil Procedure, taken before me, Wendy Davies Welsh, a Registered Diplomate Reporter and Notary Public in and for the State of Ohio, at the offices of Helmer, Martins & Morgan Co. LPA, 1900 Fourth & Walnut Centre, 105 East Fourth Street, Cincinnati, Ohio, on Thursday, December 4, 2003, at 10:11 a.m.

Pages:  107 - 282

**Page 108**

```
 1  APPEARANCES:

 2      On behalf of the Plaintiffs:

 3          Paul B. Martins, Esq.
            Don Stiens, Esq.
 4          Helmer, Martins & Morgan Co. LPA
            Suite 1900, Fourth & Walnut Centre
 5          105 East Fourth Street
            Cincinnati, Ohio  45202
 6          Phone:  (513) 421-2400

 7          John J. Helbling, Esq.
            The Helbling Law Firm, L.L.C.
 8          3672 Springdale Road
            Cincinnati, Ohio  45251
 9          Phone:  (513) 923-9740

10      On behalf of the Defendants City of Golf Manor,
        Stephen Tilley, Roby Heiland and Chris
11      Campbell:

12          Wilson G. Weisenfelder Jr.,  Esq.
            Rendigs, Fry, Kiely & Dennis
13          900 Fourth & Vine Tower
            One West Fourth Street
14          Cincinnati, Ohio  45202-3688
            Phone:  (513) 381-9200
15
        On behalf of the Defendants City of Cincinnati,
16      Darren Sellers, and Jason Hodge:

17          Geri Hernandez Geiler, Esq.
            Assistant City Solicitor
18          Department of Law
            Room 214, City Hall
19          801 Plum Street
            Cincinnati, Ohio  45202
20          Phone:  (513) 352-3346

21

22

23

24
```

**Page 109**

```
 1  APPEARANCES (Continued):

 2      On behalf of the Defendants Robert B. Jorg,
        Patrick Caton, Jason Hodge, Victor Spellen and
 3      Darren Sellers:

 4          Donald E. Hardin, Esq.
            Hardin, Lefton, Lazarus & Marks, LLC
 5          915 Cincinnati Club Building
            30 Garfield Place
 6          Cincinnati, Ohio  45202
            Phone:  (513) 721-7300
 7
        On behalf of David William Hunter Jr.:
 8
            Jay Clark, Esq.
 9          114 East 9th Street
            Suite 400
10          Cincinnati, Ohio  45202
            Phone (513) 587-2887
11
    Also present:
12
        Richard W. Grubb, Videographer
13
        Lisa Damstrom, Law Clerk
14      Helmer, Martins & Morgan Co., L.P.A.

15      Roger Owensby Senior

16      Brenda Owensby

17      Shawn Owensby

18                   - - -

19              S T I P U L A T I O N S
20
21      It is stipulated by and among counsel for the

22  respective parties that the deposition of DAVID

23  WILLIAM HUNTER JR., a witness herein, called by the

24  plaintiffs for cross-examination, pursuant to the
```

**Page 110**

```
 1  Federal Rules of Civil Procedure, may be taken at

 2  this time by the notary; that said deposition may be

 3  reduced to writing in stenotype by the notary, whose

 4  notes may then be transcribed out of the presence of

 5  the witness; and that proof of the official

 6  character and qualifications of the notary is

 7  expressly waived.

 8              I N D E X

 9      Examination by:              Page

10      Mr. Martins . . . . . . .  111, 277

11      Mr. Hardin. . . . . . . .    258

12              - - -

13          E X H I B I T S

14                                   Page
    Deposition Exhibit 85 ................. 120
15  Deposition Exhibit 86 ................. 131
    Deposition Exhibit 87 ................. 152
16  Deposition Exhibit 88 ................. 219
    Deposition Exhibit 89 ................. 221
17  Deposition Exhibit 90 ................. 234
    Deposition Exhibit 91 ................. 236
18  Deposition Exhibit 92 ................. 238
    Deposition Exhibit 93 ................. 244
19  Deposition Exhibit 94 ................. 244
    Deposition Exhibit 95 ................. 245
20  Deposition Exhibit 96 ................. 250

21              - - -

22

23

24
```

**Page 111**

1           DAVID WILLIAM HUNTER JR.

2  being by me previously duly cautioned and sworn,

3  deposes and says as follows:

4           VIDEOGRAPHER: Time is 10:11 a.m. The

5   date is December the 4th. The year is 2003.

6           We're on the record, sir.

7           CONTINUED CROSS-EXAMINATION

8  BY MR. MARTINS:

9       Q. Officer Hunter, we're picking up where we

10  left off after November 6, your first couple hours

11  of your deposition. Remind you that you are still

12  under oath. Okay?

13      A. Yes, sir.

14      Q. All right. Have you talked with anyone

15  about your deposition on November 6th between

16  November 6th and today?

17      A. No, besides my attorney.

18      Q. Okay. Have you discussed the facts of the

19  Owensby case with anyone between November 6th and

20  today?

21      A. No.

22      Q. I want to direct your attention now to

23  November 7, 2000. I understand in the -- sometime

24  on that day you received an MTD message request for

Estate of Roger D. Owensby, Jr.  
December 4, 2003

DAVID WILLIAM HUNTER, JR.  
VOLUME II

Page 124

1  MS. GEILER: Thank you.
2  THE WITNESS: You're welcome.
3  BY MR. MARTINS:
4  Q. What happened once you saw Mr. Owensby
5  walking in the vicinity of Integrity Hall?
6  A. Noth-- I brought it to Jorg and Caton's
7  attention.
8  Q. What did you say to them?
9  A. I said, "That guy looked like the guy that
10 ran from me. Remember when we" -- well, then I was
11 talking to Officer Jorg. I said, "Remember when we
12 was working old clothes that day?"
13 Q. And what, if anything, did Jorg say in
14 response?
15 A. He asked me if I was sure if that was him.
16 I said, "Well, from this distance and in this light,
17 no, I can't be sure from here."
18 Q. Were you able to tell at -- at that point
19 in time whether or not Mr. Owensby had facial hair?
20 A. From that distance?
21 Q. From that distance.
22 A. No.
23 Q. What was it about the person that you saw
24 by Integrity Hall that made you think it looked like

Page 125

1  the person that had run from you on September 27th?
2  A. His height, size. And from where I was
3  standing, he was walking at an angle, and I could
4  get like a -- I could see like his face from a
5  distance as far as like, you know, he looked similar
6  to the person that ran from me at that time.
7  Q. What was his height?
8  A. I don't know his height.
9  Q. Would it be fair to say he was average
10 height?
11 A. Yeah. Medium build.
12 Q. Average height, medium build?
13 A. (Nodding head.)
14 Q. Okay.
15 A. Uh-huh.
16 Q. And if I understand you correctly, from
17 his -- from that distance you could not tell if he
18 had facial hair. Were there any other
19 distinguishing characteristics about him that caused
20 you to think that he was the person that ran from
21 you on September 27?
22 A. Like I say, he just -- he had the features
23 of the person that I remember that had ran from
24 me --

Page 126

1  Q. And what I'm --
2  A. -- previously.
3  Q. -- trying to understand is, what were
4  those features?
5  A. His -- his build, his height, his -- I
6  mean, just -- his stature. And like I said, it
7  wasn't light -- I mean, the sun wasn't up, but it
8  was -- it was like not completely dark either.
9  Q. Can you identify any other distinguishing
10 feature of the person that you saw by Integrity Hall
11 that caused you to think that that was the same
12 person that ran from you on September 27th?
13 A. No. Not -- I mean, no.
14 Q. The -- when you said -- pointed him out to
15 Officer Jorg, do you know whether or not Officer
16 Jorg said something to you to the effect, words to
17 the effect that that takes balls to walk past
18 cruisers and uniformed officers?
19 A. That sound familiar to me. That -- that
20 does sound familiar to me, but I can't recall.
21 Q. I'm -- I'm not sure I'm quoting it
22 direct -- correctly, but some -- words to that
23 effect.
24 A. I'm just saying I remember hearing

Page 127

1  something like that.
2  Q. Okay. Did Officer Caton say anything to
3  you?
4  A. I don't remember. I mean, I --
5  Q. When you were talking to Officer Jorg,
6  pointing out this person over by Integrity Hall, was
7  Officer Caton there also?
8  A. Yes.
9  Q. Did Officer Jorg explain or -- or did you
10 explain to Officer Caton who this person was that --
11 that you were referring to?
12 A. Well, he was standing there while me and
13 Jorg was talking, so he could just gather it from
14 that what we were talking about, because he knew
15 about the incident.
16 Q. And that's what I'm trying to understand,
17 is how did he know about the incident?
18 A. From Jorg, I'm sure.
19 Q. Did -- did -- did you hear Jorg talk to
20 him about the incident?
21 A. No, but me and Jorg was talking back and
22 forth about the incident.
23 Q. And Caton was there?
24 A. And Caton was there.

Page 124 - Page 127

**Page 128**

1 Q. And what you were telling Officer Jorg,
2 was that reminding him about the incident on
3 September 27th when the guy ran away from you, you
4 had grabbed the hood of the sweat shirt?
5 A. Yes.
6 Q. What happened next?
7 A. I asked Officers Jorg and Caton to walk
8 over to the Sunoco lot with me, because I wanted to
9 get a closer look to see if that was -- if I can
10 identify him, positively identify this individual.
11     So we walked over to the Sunoco lot -- me,
12 Officer Caton and Officer Jorg -- and I looked at --
13     Was you about to say something?
14 Q. I was going to stop you --
15 A. Oh.
16 Q. -- just to ask you some -- some questions
17 there. Did you -- before you, Officer Jorg and
18 Officer Caton started to head over to the Sunoco
19 lot, did you mention to Jorg and Caton that the
20 person you were looking for was known as LA?
21 A. Yes.
22 Q. And did either Jorg or Caton make any
23 attempt to go to see if the person that was in the
24 back seat of Hasse's cruiser knew who this LA person

**Page 129**

1 was?
2 A. I don't know if they had done that or not,
3 but from the time I asked them to walk over to the
4 lot with me, we just walked over. At that time they
5 did not, but I don't know if they had previously
6 asked about that or -- you know.
7     Because when I was up there on the scene,
8 I might have -- I remember saying something to
9 either Hasse or to Sellers. Because when they said
10 they had -- when I said we was just standing around
11 talking, I asked one of those officers if the person
12 they had in the back of the car, if he knew LA or if
13 he bought his, whatever he -- this marijuana that he
14 had, from an individual known as LA, nickname LA.
15 Q. And did they -- whoever you told this to,
16 did they go and ask the person?
17 A. I believe they did.
18 Q. And did they come back with an answer?
19 A. I don't remember if they -- at that time
20 if they came back and said anything or not.
21 Q. And this would have been before you saw
22 Mr. Owensby walking --
23 A. Yes, that would be before I saw him
24 walking.

**Page 130**

1 Q. Okay. The person that they had in the
2 back seat of the car had been arrested for
3 possession of marijuana, right?
4 A. Yes.
5 Q. And it was less than 100 grams, so it was
6 a minor misdemeanor?
7 A. Yes.
8 Q. Did you see the bag of marijuana?
9 A. No, I don't remember seeing it.
10 Q. Do you know whether or not there was one
11 bag, two bags that they had --
12 A. I don't --
13 Q. -- charged the person with?
14 A. I don't know.
15 Q. As you and Jorg and Caton walked over to
16 the Sunoco station, did anyone mention a concern
17 that this person LA was known to be armed, carry a
18 firearm?
19 A. No.
20 Q. As you walked to the station, did -- at
21 that point in time, had anyone told you that LA is
22 known to be carrying a firearm?
23 A. No.
24 Q. Let's continue, then. You get -- you get

**Page 131**

1 to the Sunoco station. What happens at that point?
2 A. I walk up and I looked in the window,
3 which the window I looked in, it's directly behind
4 the cash register and the clerk would be standing
5 right in front, you know, right there with his back
6 to that window. And then people making purchases
7 would be facing that -- that direction.
8 Q. Let me give you what I'm going to mark as
9 Exhibit 86, and it is a drawing of the Sunoco
10 station.
11     (Deposition Exhibit 86
         was marked for identi-
12          fication.)
13 Q. If you would just indicate with a circle
14 and the number 1 where you were located, the -- the
15 window that you were looking through.
16 A. (Witness complies.)
17 Q. Thank you. Were -- were Jorg and Caton
18 standing at that window with you?
19 A. They were standing just behind me.
20 Q. All right. What happens at that point?
21 A. I look in the window. The -- the person,
22 Mr. Owensby, he steps to the counter to pay for his
23 drink. And I step back and I tell Caton and Jorg,
24 That's him.

Page 132

1  Q. At that point did you feel that you had
2  made a positive identification?
3  A. Yes.
4  Q. Did you think that at that point you had
5  probable cause to arrest him?
6  A. Yes.
7  Q. And what would the charge be?
8  A. Obstructing and jaywalking.
9  Q. The obstructing refers to what?
10 A. Our investigation, our original
11 investigation where he warned other individuals that
12 we are trying to apprehend that we were coming.
13 Q. And that, you're referring there back to
14 the September 27th incident?
15 A. Yes.
16 Q. At that incident, and we covered this the
17 last time that we met, as I understand it, there
18 were four individuals that you and Officer Jorg were
19 observing. As you approached Sam's, two individuals
20 crossed the street and headed toward Huntington
21 Meadows, which you followed, and Officer Jorg
22 arrested the two individuals that remained at the
23 Sam's telephone booth area; is that right?
24 A. That's the -- that's what I remember.

Page 133

1  That's --
2  Q. Okay. And as a result of that, two
3  individuals -- the two individuals that Officer Jorg
4  arrested had no drugs on them, no large sums of
5  money, correct?
6  A. I don't know about the money, but as far
7  as drugs, they weren't charged. So I assume that
8  they didn't have any on them.
9  Q. And in fact, they were charged with
10 criminal trespass, right?
11 A. Yes.
12 Q. And I think one person was charged with an
13 open container of Budweiser; is that right?
14 A. I don't remember that.
15 Q. Let me show you -- this has previously
16 been marked as Exhibit 6. Exhibit 6 is comprised of
17 two tickets or arrests, investigation -- I'm sorry,
18 two arrest and investigation reports, the first one
19 for a Jaysen Hill, arrested on September 27th. The
20 time was about 5:10 and -- or 5:00, and the
21 arresting officer was Officer Jorg. And you see
22 that for Mr. Hill he's charged with trespass and an
23 open -- open container. See that?
24 A. Yes.

Page 134

1  Q. Okay. And then the second person --
2  Mr. Nixon --
3  MR. HARDIN: I'm just going to object on
4  asked and answered already.
5  Go ahead.
6  Q. The second person, Mr. Nixon, is charged
7  with criminal trespass?
8  A. Yes.
9  Q. All right. So as of November 7th you had
10 no -- no evidence that there was any drug activity,
11 any sale of drugs going on on the afternoon or
12 evening of September 27th.
13 MR. HARDIN: Objection.
14 Q. Right?
15 MR. HARDIN: The form of the question.
16 A. On September 27th?
17 Q. No, no. On the day we're talking about,
18 November 7th --
19 A. Okay.
20 Q. -- you said that you were going to arrest
21 Mr. Owensby for obstructing. And the obstructing
22 was --
23 A. Was the previous.
24 Q. -- was in relation --

Page 135

1  A. Right.
2  Q. -- to September 27?
3  A. That's correct.
4  Q. And what I'm saying is on November 7th
5  now --
6  A. Okay.
7  Q. -- you know that you had no evidence of
8  any drug activity on September 27, because the two
9  people you arrested you found no drugs on, no large
10 sums of money, correct?
11 MR. HARDIN: Objection.
12 A. Yeah. On that day our investigation was
13 incomplete because of his obstructing, because of
14 the two people that got away. Those two people, you
15 know, as far as evidence, the -- if the question is
16 did we have physical evidence, no, because they got
17 away.
18 Q. Did you have any evidence that -- that the
19 two people that ran away were dealing in drugs?
20 A. Nothing but the observations that we made
21 before we moved in.
22 Q. And the observations that you had made
23 were based on four people acting in concert,
24 correct?

# AFFIDAVIT

- - -

STATE OF OHIO       :
                    :  SS
COUNTY OF HAMILTON  :

I, Wendy L. Welsh, Notary Public in and for the State of Ohio, do hereby state that the transcript of the deposition of DAVID WILLIAM HUNTER, JR., deponent herein, having been submitted to said deponent for review and signature, has not been signed within the thirty (30) day period allowed under the Federal Rules; said deposition to now have the same force and effect as though signed.

_____
Wendy L. Welsh, Court Reporter

Sworn to before me this 27th day of January, 2004.

_____
Thomas M. Blasing
Notary Public - State of Ohio

My commission expires:
May 4, 2004.

# *AFFIDAVIT*

- - -

STATE   OF   OHIO      :
                       :   SS
COUNTY OF HAMILTON     :

I, Wendy L. Welsh, Notary Public in and for the State of Ohio, do hereby state that the transcript of the deposition of DAVID WILLIAM HUNTER, JR., deponent herein, having been submitted to said deponent for review and signature, has not been signed within the thirty (30) day period allowed under the Federal Rules; said deposition to now have the same force and effect as though signed.

_____
Wendy L. Welsh, Court Reporter

Sworn to before me this 27th day of January, 2004.

_____
Thomas M. Blasing
Notary Public - State of Ohio

My commission expires:
May 4, 2004.