Case 1:01-cv-00769-SAS    Document 146-4    Filed 05/12/2004    Page 1 of 10

Estate of Owensby vs. City of Cincinnati
October 14, 2003
ROBERT BLAINE JORG

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - - -

ESTATE OF ROGER D.              :
OWENSBY JR., et al.,            :
                                :
        Plaintiffs,             :
    vs.                         :   Case No. 01-CV-769
                                :   (Judge S. A. Spiegel)
CITY OF CINCINNATI,             :
et al.,                         :
                                :
        Defendants.             :

- - - - - - - - - - - - - - -

      Videotaped deposition of ROBERT BLAINE JORG, a defendant herein, called by the plaintiffs for cross-examination, pursuant to the Federal Rules of Civil Procedure, taken before me, Wendy Davies Welsh, a Registered Diplomate Reporter and Notary Public in and for the State of Ohio, at the offices of Helmer, Martins & Morgan Co. LPA, 1900 Fourth & Walnut Centre, 105 East Fourth Street, Cincinnati, Ohio, on Tuesday, October 14, 2003, at 10:12 a.m.

Case 1:01-cv-00769-SAS   Document 146-4   Filed 05/12/2004   Page 2 of 10
Estate of Owensby vs. City of Cincinnati
October 14, 2003
ROBERT BLAINE JORG

Page 2

1 APPEARANCES:

2    On behalf of the Plaintiffs:

3       Paul B. Martins, Esq.
      Don Stiens, Esq.
4       Helmer, Martins & Morgan Co. LPA
      Suite 1900, Fourth & Walnut Centre
5       105 East Fourth Street
      Cincinnati, Ohio 45202
6       Phone: (513) 421-2400

7       John J. Helbling, Esq.
      The Helbling Law Firm, L.L.C.
8       3672 Springdale Road
      Cincinnati, Ohio 45251
9       Phone: (513) 923-9740

10   On behalf of the Defendants City of Golf Manor,
    Stephen Tilley, Roby Heiland and Chris
11   Campbell:

12      Lynne Marie Longtin, Esq.
      Rendigs, Fry, Kiely & Dennis
13      900 Fourth & Vine Tower
      One West Fourth Street
14      Cincinnati, Ohio 45202-3688
      Phone: (513) 381-9200
15
    On behalf of Defendants City of Cincinnati,
16   Darren Sellers, Jason Hodge:

17

18      Geri Hernandez Geiler, Esq.
      Assistant City Solicitor
        and
19      Julie F. Bissinger, Esq.
      Chief Counsel
20      Department of Law
      Room 214, City Hall
21      801 Plum Street
      Cincinnati, Ohio 45202
22      Phone: (513) 352-3346

Page 3

1 APPEARANCES (Continued):

2   On behalf of the Defendants Robert B. Jorg,
    Patrick Caton, Jason Hodge, Victor Spellen and
3   Darren Sellers:

4      Donald E. Hardin, Esq.
      Hardin, Lefton, Lazarus & Marks, LLC
5      915 Cincinnati Club Building
      30 West Garfield Place
6      Cincinnati, Ohio 45202
      Phone: (513) 721-7300
7
   Also present:
8
   Richard W. Grubb, Videograher
9
   Lisa Damstrom, Law Clerk
10 Helmer, Martins & Morgan Co., L.P.A.

11 Wendy M. Weller, Paralegal
   Buckley King
12
   Mr. Roger Owensby
13 Mrs. Brenda Owensby
   Mr. Shawn Owensby
14
   Patrick Edmund Caton
15
   Victor Spellen

Page 4

1          S T I P U L A T I O N S

2     It is stipulated by and among counsel for the

3 respective parties that the deposition of ROBERT

4 BLAINE JORG, a defendant herein, called by the

5 plaintiffs for cross-examination, pursuant to the

6 Federal Rules of Civil Procedure, may be taken at

7 this time by the notary; that said deposition may be

8 reduced to writing in stenotype by the notary, whose

9 notes may then be transcribed out of the presence of

10 the witness; and that proof of the official

11 character and qualifications of the notary is

12 expressly waived.

               - - -

Page 5

1             I N D E X

2    Examination by:      Page

3    Mr. Martins . . . . . . . .  6

4    Ms. Longtin . . . . . . . . 227

               - - -

6         E X H I B I T S

7                                  Page
   Plaintiffs' Exhibit 1 . . . . . . . . . . . . . 18
8  Plaintiffs' Exhibit 2 . . . . . . . . . . . . . 25
   Plaintiffs' Exhibit 3 . . . . . . . . . . . . . 48
9  Plaintiffs' Exhibit 4 . . . . . . . . . . . . . 48
   Plaintiffs' Exhibit 5 . . . . . . . . . . . . . 51
10 Plaintiffs' Exhibit 6 . . . . . . . . . . . . . 58
   Plaintiffs' Exhibit 7 . . . . . . . . . . . . . 72
11 Plaintiffs' Exhibit 8 . . . . . . . . . . . . . 96
   Plaintiffs' Exhibit 9 . . . . . . . . . . . . . 107
12 Plaintiffs' Exhibit 10 . . . . . . . . . . . . . 132
   Plaintiffs' Exhibit 11 . . . . . . . . . . . . . 161
13 Plaintiffs' Exhibit 12 . . . . . . . . . . . . . 165
   Plaintiffs' Exhibit 13 . . . . . . . . . . . . . 178
14 Plaintiffs' Exhibit 14 . . . . . . . . . . . . . 199
   Plaintiffs' Exhibit 15 . . . . . . . . . . . . . 201
15 Plaintiffs' Exhibit 16 . . . . . . . . . . . . . 206
   Plaintiffs' Exhibit 17 . . . . . . . . . . . . . 212

Case 1:01-cv-00769-SAS    Document 146-4    Filed 05/12/2004    Page 3 of 10

Estate of Owensby vs. City of Cincinnati
October 14, 2003
ROBERT BLAINE JORG

**Page 10**

1  A. Yes.
2  Q. Approximately what time was it?
3  A. After 8:00, before ten, I do believe.
4  Q. What do you recall Lieutenant Luebbe
5  telling you?
6  A. He had his radio on in the police car. A
7  broadcast came over informing him in police jargon,
8  basically, that the suspect at the scene has passed.
9  Q. What was the police jargon?
10  A. I -- if I remember correctly, I believe
11  they said that the suspect was 27 remainder.
12  Q. 27 --
13  A. 27 remainder.
14  Q. Did you say anything to Lieutenant Luebbe
15  in response to what you heard over the radio?
16  A. No.
17  Q. Did Lieutenant Luebbe say anything to you
18  in response to what was heard over the radio?
19  A. I don't remember his exact words. He
20  talked for a little bit, but I'm pretty much -- I
21  don't remember what he said to me.
22  Q. Do you recall the import or the, in
23  general, what was said to you by Lieutenant Luebbe?
24  A. No.

**Page 11**

1  Q. When did you first realize that Roger
2  Owensby Jr. was injured?
3  A. When I went with Sergeant Watts to the
4  police vehicle.
5  Q. When you say "the police vehicle," are you
6  referring to the Golf Manor cruiser?
7  A. Yes.
8  Q. Before that time, are you testifying that
9  you did not know that Mr. Owensby was injured?
10  A. Correct.
11  Q. When did you first think that you had
12  probable cause to arrest Roger Owensby Jr.?
13  A. When Officer Hunter stepped in the
14  investigation that myself and Officer Caton were
15  conducting and identified Mr. Owensby as a suspect
16  that had run from him in previous time.
17  Q. That was the first time that you thought
18  you had probable cause?
19  A. That's correct.
20  Q. To arrest?
21  A. (Nodding head.)
22  Q. Was there, other than Officer Hunter's
23  statement, was there anything else that, in your
24  mind, gave you probable cause to arrest Roger

**Page 12**

1  Owensby Jr.?
2  A. No.
3  Q. And to the best of your recollection, what
4  exactly did Officer Hunter say?
5  A. Based on the questions that we were asking
6  Mr. Owensby on the last time he ran from the police
7  department or an officer, with a line of questioning
8  that we gave when Officer Hunter was cued to see if
9  this was, in fact, the person that ran from him on
10  the previous occasion, and he came up and said,
11  "That's the guy," that's when I started to reach for
12  my handcuffs and started to inform Mr. Owensby he
13  was under arrest.
14  Q. Did you actually tell Mr. Owensby that he
15  was under arrest?
16  A. I never got the chance to.
17  Q. So you never said anything to Mr. Owensby?
18  A. Correct.
19  Q. When was the first time that you ever saw
20  Roger Owensby Jr.?
21  A. The first time I ever saw him would have
22  been the day he ran from Dave Hunter, through
23  binoculars.
24  Q. Are you sure that the person who ran from

**Page 13**

1  Dave Hunter on that date was the same person that
2  you arrested on November 7, 2000?
3  A. I'm not sure if it was or not.
4  Q. But you believe that that's the same
5  person, because Officer Hunter said, "That's the
6  guy"?
7  A. That's correct.
8  Q. Prior to that incident, where this person
9  ran from Officer Hunter, you had never seen Roger
10  Owensby Jr., correct?
11  A. That's correct.
12  Q. In preparation for this deposition, did
13  you review any documents?
14  A. I started to.
15  Q. What documents did you review?
16  A. I started to review the statement I gave
17  at Internal and I started to review testimony from
18  the grand jury.
19  Q. When you say "started to," what do --
20  would you explain that for me.
21  A. Basically, I'm under psychological care
22  for posttraumatic stress disorder and major
23  depression. In order to review and familiarize
24  myself again with this case, I started to review the

Case 1:01-cv-00769-SAS   Document 146-4   Filed 05/12/2004   Page 4 of 10
Estate of Owensby vs. City of Cincinnati
October 14, 2003
ROBERT BLAINE JORG

Page 86

(Plaintiffs' Exhibit 8 was marked for identification.)

Q. I'll give you what is marked as Exhibit 8.

MR. MARTINS: If it's okay with everybody I'll just wait until he's done marking on it, and then I'll make copies for everyone.

Q. On Exhibit 8, again, we have a sketch. Where were -- where was Officer Sellers' and Hasse's vehicle?

A. It's not able to be placed on this map.

Q. Okay. Because it's on the other side of Sam's?

A. On the other side of Sam's.

Q. Okay. But it was in the Sam's parking lot?

A. Correct.

Q. Was the front of the car facing Seymour?

A. I believe so, yes.

Q. Please continue. So what happens after -- you're talking with Officer Sellers.

A. I'm sorry. I was talking with Officer Sellers about off-duty stuff, and I vaguely hear Dave -- Officer Hunter -- sorry -- say, I believe it was to Officer Caton, "That's the guy that ran from

Page 87

me two weeks ago." Kind of sparked my attention from the conversation I was having with Officer Sellers.

Q. Now, all the officers here are uniformed, correct?

A. Correct.

Q. And there are three cruisers parked?

A. I probably assume so. Yeah, three.

Q. Well, there's yours, there's Sellers --

A. Mine, Sellers' --

Q. And Hunter's?

A. And Hunter's, yeah.

Q. Okay. Are all the cruisers facing Seymour?

A. I don't know.

Q. All right. Continue.

A. I made the comment to Darren, from what I understand, "If that's him, he has a lot of balls showing up here."

Q. What did you mean by that?

A. Well, it's -- it was made, at least obvious for me, to the people on the street that, you know, we don't just drive around and ask, hey, do you know who this guy is, do you know who this

Page 88

guy is. Not that it was anything serious, and it's not a homicide we're looking after him for, but to go right back to where the original foot pursuit ended with marked police officers being there, it just seemed a little gutsy. We didn't run into that a whole lot.

Q. Did you take that as a, in addition to being gutsy, being a bit of a, I guess, disrespect?

A. No.

Q. To the police officers?

A. No, I don't think so. It was just shocking. I -- you know, with the time that I've spent on the street, I haven't run into that before, so it was just a little -- a little odd. It was the first time I ran into that.

Q. Did you look over to see who the individual was that Officer Hunter was referring to?

A. Yes.

Q. And where was this person?

A. He was on the other side of the street at that point.

Q. The other side of Seymour?

A. The other side of Seymour. And it was dark enough, it wasn't very well lit, I couldn't

Page 89

make him out from anyone.

Q. Did you question Officer Hunter as to how he could make this person out if it was dark and he was across the street?

A. Not at that point.

Q. Okay. Please continue.

A. And the reason was, as I was making my comment I turned back to talk to Darren to let him know I was going over with Pat and Dave, because they had already started walking over to make an identification.

Q. Did you hear Officer Hunter say anything else to Officer Caton?

A. Not at that point.

Q. When you say they started walking over, which -- in which direction were they walking?

A. From what I remember they walked in front of Sam's. I don't know if they went over the guardrail, around the guardrail, what the situation was, or stepped over, and then started walking towards the side of Sunoco.

Q. I take it at this point in time the person that was across the street that you saw had somehow crossed Seymour Avenue?

Case 1:01-cv-00769-SAS   Document 146-4   Filed 05/12/2004   Page 5 of 10

Estate of Owensby vs. City of Cincinnati
October 14, 2003

ROBERT BLAINE JORG

Page 90

1   A. Yes, and was already in the store.
2   Q. Okay. Did you watch the person cross
3 Seymour Avenue?
4   A. No.
5   Q. Did you see the person cross or walk on
6 the sidewalk between your car and Seymour Avenue in
7 front of Sam's?
8   A. I looked once when the initial statement
9 was made. Like I said, I wouldn't have never been
10 able to identify him. And I went back to tell --
11 you know, I turned my concentration to Darren real
12 quick, told him I'd be back. Because at that point
13 Officer Hunter started walking over and Officer
14 Caton went with him.
15   Q. The -- on Exhibit 8 that you have before
16 you, are you -- can you identify where the person
17 was that was across the street when you first saw
18 the person?
19   A. Somewhere over here on the Seymour Avenue
20 side. I guess it would be, what, the west side --
21   Q. Okay.
22   A. -- of Seymour Avenue.
23   Q. Was the person even with Sam's or even
24 with the Sunoco station? Was he at the crossing?

Page 91

1   A. He was at a distance. Whatever distance
2 that was, it was a good distance away. I don't
3 remember exactly where he was at.
4   Q. As you faced Seymour Avenue was he to your
5 left?
6   A. Yes.
7   Q. Do you recall whether the person was
8 directly opposite the Sunoco station?
9   A. I don't know.
10   Q. Did you see that person cross Seymour
11 Avenue?
12   A. No.
13   Q. Did you see the person walking on the
14 sidewalk that runs along Sam's and the Sunoco?
15   A. On the side of the street I was standing
16 on?
17   Q. Yes, sir.
18   A. No, I did not.
19   Q. When you told Officer Sellers that you had
20 to go, because Officer Caton and Hunter had already
21 started walking, this person was out of your view?
22   A. Yes.
23   Q. Please continue.
24   A. I went back, first stopping at my police

Page 92

1 cruiser and picking up my night stick, which was
2 either in the door or in the screen of our car.
3 Jogged up to catch up to them. At which point I
4 believe they were probably five, ten feet away from
5 the side of the window on the Sunoco store. I stood
6 back, because I knew I couldn't identify him. And
7 Officer Hunter, I believe, made the statement to the
8 effect, "I believe that's him." And Officer Caton
9 asked, "Are you sure?" And something to the effect
10 of, "I can't tell from here, but I believe that's
11 him."
12   Q. Now, can you indicate on that chart,
13 Exhibit -- or sketch, Exhibit 8, where you, Officer
14 Hunter, and Officer Caton were located at this time,
15 when you're standing outside --
16   A. Somewhere --
17   Q. -- the convenience store.
18   A. -- on the side of Sunoco. On the
19 northwest side there is a window. I don't know
20 exactly where it is, if it's in the front of the
21 store, the middle of the store, the side. I don't
22 know. Wherever that window was, let's just say for
23 example it's right here (indicating).
24   Q. Okay. Mark that with the letter A.

Page 93

1   A. (Witness complies.)
2       Dave Hunter would be standing right in
3 front of the glass. I was standing, one foot on
4 the -- the -- it was either a curb or a parking
5 block, one foot up on that, one foot on the
6 pavement, directly back from him. Where Caton was,
7 I don't know. He was either behind him, in front of
8 him, or on the side of him.
9   Q. Okay. Can you mark with an H where
10 Officer Hunter was, with a J where you were, and I
11 guess, you don't know where Officer Caton was,
12 right?
13   A. (Witness complies.)
14       Don't remember.
15   Q. Okay. How long are the three of you
16 standing at the window?
17   A. Long enough to have the conversation that
18 I informed to you. Long enough for Dave to get a
19 view of Mr. Owensby.
20   Q. Could you see into the Sunoco station, the
21 convenience store?
22   A. Unfortunately, I'm tall enough, they had a
23 bunch of stuff blocking my way, that I could not see
24 clearly into the store. There was enough room for

Case 1:01-cv-00769-SAS    Document 146-4    Filed 05/12/2004    Page 6 of 10

Estate of Owensby vs. City of Cincinnati
October 14, 2003
ROBERT BLAINE JORG

Page 94

1 Dave and basically, from what I remember, one person
2 to look through.
3   Q. Did you try and crouch down to see in?
4   A. Dave wa-- I knew I couldn't identify, and
5 there was no reason for me to do that.
6   Q. So you did not?
7   A. No.
8   Q. Do you have any idea what, if anything,
9 Mr. Owensby purchased in the convenience store?
10 This would be at that time.
11   A. I knew -- from that time until I actually
12 had confronted him and started talking to him, I
13 knew he had a drink in his hand. That's the only
14 thing I can remember. Now, after the fact of people
15 telling me what he had and everything, sure, I know
16 some of the things he had. But at that time the
17 only thing I knew he had was the drink.
18   Q. And that's based on when you approached
19 him as he tried to leave the store?
20   A. Correct.
21   Q. Okay. So when the three of you were
22 standing there you have no idea if he's buying
23 anything or if he did, what he bought?
24   A. Exactly. Excuse me.

Page 95

1     (Discussion off the record.)
2   Q. Did you --
3     MR. HARDIN: I just want him to know that
4   he can take a break when he wants to if he
5   needs it.
6     MR. MARTINS: Sure. Do you want to take a
7   break?
8     THE WITNESS: I'm fine.
9     MR. MARTINS: Okay. And what we'll do is
10  maybe go another half-hour or so and then take
11  a break, unless -- unless you need a break
12  sooner, just say so.
13    THE WITNESS: (Nodding head.)
14 BY MR. MARTINS:
15   Q. All right. Before you left your car and
16 followed Officer Caton and Officer Hunter to the
17 convenience store at the Sunoco station, did you
18 advise the dispatcher or make any communications on
19 your radio concerning this?
20   A. I don't know if I did or not.
21   Q. Do you know if anyone did?
22   A. I'm sure it was probably done. By who, I
23 don't know.
24   Q. And Officer Sellers and Officer Hasse

Page 96

1 remained where they were parked?
2   A. I believe so, yes.
3   Q. Okay. So we're up to the point that you
4 and Officer Hunter and Officer Caton are standing
5 alongside the convenient store. Officer Hunter is
6 looking in the window, you're not sure where Officer
7 Caton is. What happens next?
8   A. It's decided that, you know, Dave really,
9 in my opinion, wasn't sure if it was the person that
10 ran from him or not. The only way to find out is we
11 can do a voluntary stop and see if he'll talk to us.
12 Since Dave was in old clothes and he may be used,
13 again, we wanted to keep Dave out of it as much as
14 we could.
15   Q. Well, Dave was in a uniform at this point?
16   A. Correct.
17   Q. Okay. And when I say Dave, I'm sorry, I
18 meant Officer Hunter. Right?
19   A. Yes.
20   Q. Okay. In your mind, at this point in time
21 you know that you're looking for an African
22 American, average height, average weight, nickname
23 of LA, correct?
24   A. Uh-huh.

Page 97

1   Q. Are there any other factors that you have
2 in your possession at this time as to the identity
3 of the person that you're looking for?
4   A. None.
5   Q. Did you hear anyone provide any
6 information before this point in time that the
7 person you were looking for was usually armed?
8   A. I've heard that, yes.
9   Q. But did you know -- at the time you're
10 standing outside the window, did you have any
11 knowledge of that?
12   A. Yes.
13   Q. Okay. How did you know or how did you
14 arrive at this information that the person you were
15 looking for was usually armed?
16   A. I don't know if "usually" was the exact
17 word. "Can be."
18   Q. Okay.
19   A. There was a teletype that was sent over
20 from one of the officers on third shift, I believe
21 it was, where the suspect -- or, I'm sorry, the
22 person that was shot at, there were two or three
23 drive-by shootings, and, I believe, the name LA was
24 mentioned on two of them. And that information is

Case 1:01-cv-00769-SAS   Document 146-4   Filed 05/12/2004   Page 7 of 10

Estate of Owensby vs. City of Cincinnati
October 14, 2003
ROBERT BLAINE JORG

Page 98

1 what was relayed to me.
2  Q. Was this on November 7th?
3  A. Before.
4  Q. Do you know how much before?
5  A. No.
6  Q. So this is some report that you had
7 received that there was a drive-by shooting -- do
8 you know where the shooting took place?
9  A. Somewhere up in Huntington Meadows area.
10  Q. And that somebody involved in the shooting
11 had a nickname of LA?
12  A. Correct.
13  Q. Did you have any information that the
14 person doing the shooting was --
15  A. No.
16  Q. -- went by the name of LA?
17  A. No.
18  Q. All right. Please continue. So you're at
19 the window.
20  A. So we walked to the front, and like I
21 said, I grabbed my night stick out of the holder of
22 my car to catch up to him, I never put it away. I
23 walk in front of the store, put it in my holder, and
24 I'm standing there waiting for Mr. Owensby to step

Page 99

1 out so we can talk to him.
2       When he steps out, I ask him if he can
3 talk to -- to me for a minute. He's -- he complies.
4 I have him go ahead and put his drink down.
5  Q. Was that the only thing in his hands, the
6 drink?
7  A. I believe so.
8  Q. Okay.
9  A. That was the only thing in his hand.
10  Q. Where is Officer Caton and Officer Hunter
11 at this point?
12  A. I don't remember. That night, I don't
13 remember where exactly they were until I went to put
14 on handcuffs. But keep in mind, I have seen the
15 video, so some of that plays in on where they were
16 at.
17  Q. All right. Continue.
18  A. I asked him if we can talk to him for a
19 minute. He says sure. I ask him what his name is,
20 where he lives, typical first questions on
21 something.
22  Q. Well, let's take the first question, as
23 far as his name. Did he answer you?
24  A. Yes.

Page 100

1  Q. And what -- what did he say?
2  A. I believe he did say Roger Owensby. I
3 believe he did. I don't --
4  Q. And then -- sorry.
5  A. I don't exactly remember.
6  Q. And then, as to where does he live, did he
7 answer that question?
8  A. I think he said, "Not around here."
9  Q. Did he give any more -- did you follow up
10 and say, well, okay, if not around here, where?
11  A. I believe so. Like I said, it's been a
12 long time. I don't remember the exact question I
13 asked.
14  Q. And do you recall if he gave you any
15 further information, as far as where he lived?
16  A. No.
17  Q. Was he cooperative with you?
18  A. At first.
19  Q. Respectful?
20  A. Yes.
21  Q. Continue. What else happens?
22  A. I told him that we were looking for a
23 particular subject that ran from the police, and
24 that person has been known to carry a firearm. Was

Page 101

1 he armed? And he said no. And he starts to pull up
2 his shirt to show us that he's not carrying a
3 weapon. I told him to hold on. You know, there's a
4 way we do this. Do you mind if I pat you down? He
5 says no. I pat him down for weapons. I find none.
6 I continue my conversation with him.
7       The exact line of questions, who asked
8 what between me and Officer Caton, I don't recall
9 who asked what particular question.
10  Q. Do you recall, though, what questions were
11 asked?
12  A. Has he ever run from the police, has he
13 ever struck a police officer or something of that
14 nature.
15  Q. And what was his answer?
16  A. He did not. Ever having run from any
17 other police officer, no. He said he hasn't run in a
18 while -- I don't remember what exactly he responded,
19 and I don't want to --
20  Q. How about striking a police officer, did
21 he give you an answer to that?
22  A. I don't remember if he did or not.
23  Q. Please continue.
24  A. At some point in the interview either I or

Page 98 - Page 101

Case 1:01-cv-00769-SAS   Document 146-4   Filed 05/12/2004   Page 8 of 10
Estate of Owensby vs. City of Cincinnati                     ROBERT BLAINE JORG
October 14, 2003

Page 102

1  Officer Caton asked Officer Hunter, "Is this him?"
2  Like I said, I know Pat wasn't there, he was off
3  that day. I knew I couldn't identify him. So I
4  deferred to the officer involved and said, "Is this
5  the guy?"
6     Q. Now, at this point in time am I correct in
7  understanding, at least in your mind, you have no
8  probable cause to arrest him?
9     A. I have probable cause to keep talking with
10 him, but for the assault on the officer and the
11 obstructing and everything else, no. In my opinion,
12 I had no clue that this was the guy.
13    Q. You believed you had a reasonable
14 suspicion in order to stop and talk to him?
15    A. Yes.
16    Q. And that's based on what factors?
17    A. Officer Hunter.
18    Q. Please continue.
19    A. As Dave steps into the spotlight and says,
20 "Yes, that's the man that ran," or "That's the guy,"
21 or whatever it was he said, I then reached down and
22 grabbed the, I believe it was the -- would have been
23 the left wrist of Mr. Owensby, as I reached with my
24 right hand to grab my handcuffs. At which time he

Page 103

1  broke and ran past Pat, past Dave. I somewhere lost
2  my night stick and my handcuffs in a short pursuit.
3     Q. Let me -- let me stop you there. When --
4  when you reached for your handcuffs you reached with
5  your right hand for your handcuffs?
6     A. Yes.
7     Q. And your handcuffs are located on the back
8  of your belt?
9     A. Yes.
10    Q. Did you open the pouch and pull the
11 handcuffs out?
12    A. I don't know.
13    Q. Up to this point in time, did you ask this
14 individual if he went by the nickname of LA?
15    A. Not at that point, yet.
16    Q. Did Officer Caton ask if he went by LA?
17    A. I don't think anybody asked him if he went
18 by LA.
19    Q. Yeah. And so Hunter did not either?
20    A. I don't know if he did or not. I don't
21 remember him saying that -- or asking that.
22    Q. To your recollection, no one asked this
23 person that you had stopped to talk to whether or
24 not he went by the nickname of LA?

Page 104

1     A. No.
2     Q. Correct?
3     A. Correct.
4     Q. There was another person near the scene by
5  the name of George Weaver. Do you know George
6  Weaver?
7     A. Nope.
8     Q. Were there other African American males in
9  the vicinity?
10    A. Based on what I've seen on the video, yes.
11    Q. Were these other African American males,
12 would you classify them of average height and
13 average build?
14    A. Sure.
15    Q. Generally the same as Mr. Owensby?
16    A. I would say, yes.
17    Q. On the pat-down, you had satisfied
18 yourself that he was unarmed, right?
19    A. Yes.
20    Q. And in fact, he had told you he was
21 unarmed?
22    A. Correct.
23    Q. As part of the pat-down you felt something
24 in his right pocket, correct?

Page 105

1     A. I don't remember which pocket it was in,
2  but --
3     Q. In a pants pocket?
4     A. In a pants pocket.
5     Q. What pocket?
6     A. I don't remember which pocket, both
7  pockets. I don't remember.
8     Q. And describe for me what you felt?
9     A. Based on my training and experience and
10 running the areas that I have with a lot of
11 narcotics possession, I felt what I believe was
12 marijuana in his pants.
13    Q. Large amount? Small am--
14    A. Large amount.
15    Q. I -- that's inaccurate for me. Could you
16 quantify the amount of marijuana that you thought
17 you felt in his pocket?
18    A. Hmm, about a decent size handful.
19    Q. Now, at this point in time you did not
20 know that he bought two cigars, right?
21    A. No.
22    Q. And you did not see any cigars when you
23 stopped him?
24    A. No, I didn't.

Page 102 - Page 105

Case 1:01-cv-00769-SAS   Document 146-4   Filed 05/12/2004   Page 9 of 10
Estate of Owensby vs. City of Cincinnati
October 14, 2003
ROBERT BLAINE JORG

**Page 106**

1   Q. Do you know whether or not what you were
2 feeling in the pocket were two cigars?
3   A. Uh, if they'd been smashed apart and
4 dangling in his pocket, it could have been two
5 cigars.
6   Q. Did you feel anything else in the pocket?
7   A. Not that I can recall.
8   Q. You didn't feel anything that felt like
9 crack to you?
10   A. No.
11   Q. So let's go back. We're at the point
12 where Officer Hunter says, that's him, or some words
13 to that effect, correct?
14   A. Correct.
15   Q. And you reach with your right hand behind
16 to get your handcuffs while you're holding Mr.
17 Owensby's left wrist?
18   A. Correct.
19   Q. With your left hand?
20   A. (Nodding head.)
21   Q. What happens then?
22   A. He breaks and runs between Pat and Dave.
23   Q. Between Hunter?
24   A. Between Hunter and Caton. Goes, I guess

**Page 107**

1 it would have been like northwest, through the
2 parking lot, only managing to get maybe 20 feet when
3 I caught up to him, and unfortunately, we both
4 collided into a car there. And as I tried to take
5 him to the ground, we both kind of tripped and fell.
6 I landed on my back, and he landed on top of me, my
7 chest to his back.
8   Q. Do you know if Officer Caton also tackled
9 Mr. Owensby?
10   A. No. I was the only one that tackled him.
11   Q. The car that you hit --
12         (Plaintiffs' Exhibit 9
             was marked for identi-
13         fication.)
14   Q. Let me show you Exhibit 9. Is that the
15 car that you and Mr. Owensby ran into?
16   A. I don't know. If that's the one that was
17 parked at the lot that everybody marked out, then
18 that's the car. Is that the one? I don't know.
19   Q. Okay. Look back at Exhibit 8. Do you see
20 that there is a car parked just to the left of the
21 entrance as you're facing the entrance of the
22 convenience store?
23   A. Yes.
24   Q. Do you see that? And it's -- the

**Page 108**

1 passenger rear side of the car is almost over into
2 the area that's painted with diagonal stripes --
3   A. Yes.
4   Q. -- on the ground. Okay. Is that about
5 where you and Mr. Owensby collided with the car?
6   A. If that's the car that we ran into, then
7 yes, that would be it.
8   Q. Well, as far as distance from the door,
9 would that be about where you folks collided?
10   A. Yes.
11   Q. When you grabbed -- I guess you grabbed
12 Mr. Owensby from behind, correct?
13   A. Yes.
14   Q. Was it around the shoulders, the waist,
15 the hips?
16   A. As he was running I believe it was his
17 left arm is what I tried to trap as I grabbed his
18 shoulder.
19   Q. Okay. So your right hand is on his
20 shoulder?
21   A. Top of his shoulder.
22   Q. Your --
23   A. And as -- my left arm was going around his
24 arm and around his stomach.

**Page 109**

1   Q. Okay. And both of you hit this parked
2 car?
3   A. Yes.
4   Q. Where on the parked car did you hit?
5   A. I don't remember. It was towards the back
6 of the vehicle.
7   Q. What part of your body hit the parked car?
8   A. Well, he hit the car and I hit him. We
9 didn't actually both make contact with the vehicle,
10 but we both went into the vehicle, but he was
11 between me.
12   Q. Do you know what part of Mr. Owensby made
13 contact with the car?
14   A. I don't know. He was still standing up,
15 so it probably was midsection.
16   Q. Do you know if his head hit the car?
17   A. I don't know.
18   Q. Did Mr. -- between the time that Mr.
19 Owensby tried to run away from where you were
20 questioning him to the time that you tackled him at
21 the rear portion of the car, did Mr. Owensby stop
22 running?
23   A. No. He stutter stepped.
24   Q. Okay. And in the stutter step, where were

## AFFIDAVIT

- - -

STATE   OF   OHIO        :
                         : SS
COUNTY OF HAMILTON       :

I, Wendy Davies Welsh, Notary Public in and for the State of Ohio, do hereby state that the transcript of the deposition of Robert B. Jorg, deponent herein, having been submitted to said deponent for review and signature, has not been signed within the thirty (30) day period allowed under the Federal Rules; said deposition to now have the same force and effect as though signed.

_____
Wendy Davies Welsh, Court Reporter

Sworn to before me this _____ day of _____, 2004

_____
Thomas M. Blasing
Notary Public - State of Ohio
My commission expires: May 4, 2004