Case 1:01-cv-00769-SAS   Document 146-5   Filed 05/12/2004   Page 1 of 11

Estate of Roger Owensby vs. City of Cinti.                PATRICK E. CATON
October 17, 2003

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - - - -

ESTATE OF ROGER D.                :
OWENSBY JR., et al.,              :
                                  :
         Plaintiffs,              :
   vs.                            :  Case No. 01-CV-769
                                  :  (Judge S. A. Spiegel)
CITY OF CINCINNATI,               :
et al.,                           :
                                  :
         Defendants.              :

- - - - - - - - - - - - - - - -


        Videotaped deposition of PATRICK EDMUND

CATON, a defendant herein, called by the plaintiffs

for cross-examination, pursuant to the Federal Rules

of Civil Procedure, taken before me, Wendy Davies

Welsh, a Registered Diplomate Reporter and Notary

Public in and for the State of Ohio, at the offices

of Helmer, Martins & Morgan Co. LPA, 1900 Fourth &

Walnut Centre, 105 East Fourth Street, Cincinnati,

Ohio, on Friday, October 17, 2003, at   a.m.

Case 1:01-cv-00769-SAS     Document 146-5     Filed 05/12/2004     Page 2 of 11

Estate of Roger Owensby vs. City of Cinti.                                    PATRICK E. CATON
October 17, 2003

Page 2

1 APPEARANCES:

2    On behalf of the Plaintiffs:

3       Paul B. Martins, Esq.
      Don Stiens, Esq.
4       Frederick M. Morgan, Jr. Esq.
      Helmer, Martins & Morgan Co. LPA
5       Suite 1900, Fourth & Walnut Centre
      105 East Fourth Street
6       Cincinnati, Ohio 45202
      Phone: (513) 421-2400
7
      John J. Helbling, Esq.
8       The Helbling Law Firm, L.L.C.
      3672 Springdale Road
9       Cincinnati, Ohio 45251
      Phone: (513) 923-9740
10
   On behalf of the Defendants City of Golf Manor,
11 Stephen Tilley, Roby Heiland and Chris
   Campbell:
12
      Lynne Marie Longtin, Esq.
13       Rendigs, Fry, Kiely & Dennis
      900 Fourth & Vine Tower
14       One West Fourth Street
      Cincinnati, Ohio 45202-3688
15       Phone: (513) 381-9200

16    On behalf of Defendants City of Cincinnati,
   Darren Sellers, Jason Hodge:
17
      Geri Hernandez Geiler, Esq.
18       Assistant City Solicitor
      and
19       Julie F. Bissinger, Esq.
      Chief Counsel
20       Department of Law
      Room 214, City Hall
21       801 Plum Street
      Cincinnati, Ohio 45202
22       Phone: (513) 352-3346

Page 3

1 APPEARANCES (Continued):

2    On behalf of the Defendants Robert B. Jorg,
   Patrick Caton, Jason Hodge, Victor Spellen and
3    Darren Sellers:

4       Donald E. Hardin, Esq.
      Hardin, Lefton, Lazarus & Marks, LLC
5       915 Cincinnati Club Building
      30 West Garfield Place
6       Cincinnati, Ohio 45202
      Phone: (513) 721-7300

7

8 Also present:

9 Richard W. Grubb, Videograher

10 Lisa Damstrom, Law Clerk
   Helmer, Martins & Morgan Co., L.P.A.

11 Wendy M. Weller, Paralegal
   Buckley, King & Bluso
12
   Mr. Roger Owensby
13
   Mrs. Brenda Owensby
14
   Mr. Shawn Owensby
15
   Victor N. Spellen

Page 4

1             S T I P U L A T I O N S

2    It is stipulated by and among counsel for the

3 respective parties that the deposition of PATRICK

4 EDMUND CATON, a defendant herein, called by the

5 plaintiffs for cross-examination, pursuant to the

6 Federal Rules of Civil Procedure, may be taken at

7 this time by the notary; that said deposition may be

8 reduced to writing in stenotype by the notary, whose

9 notes may then be transcribed out of the presence of

10 the witness; and that proof of the official

11 character and qualifications of the notary is

12 expressly waived.

Page 5

1               I N D E X

2    Examination by:         Page

3    Mr. Martins . . . . . . . . 6

4    Ms. Longtin . . . . . . . 232

5    Mr. Martins. . . . . . . .238

8               E X H I B I T S

9                                             Page
   Deposition Exhibit 28 . . . . . . . . . . . . . . . . . . 22
10 Deposition Exhibit 29 . . . . . . . . . . . . . . . . . . 30
   Deposition Exhibit 30 . . . . . . . . . . . . . . . . . . 43
11 Deposition Exhibit 31 . . . . . . . . . . . . . . . . . . 65
   Deposition Exhibit 32 . . . . . . . . . . . . . . . . . 115
12 Deposition Exhibit 33 . . . . . . . . . . . . . . . . . 186
   Deposition Exhibit 34 . . . . . . . . . . . . . . . . . 191
13 Deposition Exhibit 35 . . . . . . . . . . . . . . . . . 194
   Deposition Exhibit 36 . . . . . . . . . . . . . . . . . 207

Case 1:01-cv-00769-SAS   Document 146-5   Filed 05/12/2004   Page 3 of 11

Estate of Roger Owensby vs. City of Cinti.
October 17, 2003

PATRICK E. CATON

**Page 22**

1  Q. That's the Golf Manor cruiser in which Mr.
2  Owensby was placed, correct?
3  A. I believe so, yes.
4  Q. Okay. And you notice that the top light
5  bar on the car is on?
6  A. Yes.
7  (Video played.)
8  Q. Your testimony is that it was too dark for
9  you to see Mr. Owensby's face when you pulled him
10 into the car?
11 A. Yes. That light bar does not illuminate
12 the interior of the cruiser.
13 (Deposition Exhibit 28 was marked for identi-
14 fication.)
15 Q. I'll show you what is marked as
16 Exhibit 28. Exhibit 28 is a photograph of Mr.
17 Owensby's head and torso, correct?
18 A. Correct.
19 Q. And you can see in the photograph the
20 various cuts and bleeding from his forehead,
21 correct?
22 A. That is correct.
23 Q. Is it your testimony that you never saw
24 that as you escorted Mr. Owensby to the car or when

**Page 23**

1  you pulled him into the car?
2  A. Yes, that's my testimony.
3  Q. When did you believe that you had probable
4  cause to arrest Roger Owensby Jr.?
5  A. When Officer Hunter identified him as
6  being the suspect who had assaulted him.
7  Q. But for Officer Hunter's statement of
8  "That's him," or words to that effect, you would --
9  is it your belief that you would not have had
10 probable cause to arrest Mr. Owensby?
11 A. That is correct.
12 Q. And as I understand it, on November 7,
13 2000 that was the first time that you have ever --
14 had ever seen Roger Owensby Jr., correct?
15 A. That's correct.
16 Q. You had no prior contact with him?
17 A. No, I had not.
18 Q. You were at the Sunoco station on the
19 evening of November 7, 2000 to deliver a -- is it
20 NTA?
21 A. Notice to appear, yes, that's correct.
22 Q. And that's a ticket book?
23 A. Yes.
24 Q. And that was being delivered to Officer

**Page 24**

1  Hasse and Sellers, correct?
2  A. That's right.
3  Q. They had made a request that someone
4  deliver such an NTA book at some point before you
5  went there, correct?
6  A. Yes. They sent me an MDT message while we
7  were at District 4.
8  Q. An MDT means the mobile --
9  A. -- data transmitter.
10 Q. Transmitter. That's the little computer
11 that the police officers have in their cars?
12 A. That's correct.
13 Q. Do you recall at approximately what time
14 you received that message?
15 A. I'm guessing. I'd be guessing. I don't
16 recall the -- I would guess that it was about 45
17 minutes, 30 to 45 minutes prior to us responding up
18 there. That's an estimate. I don't really recall
19 the time.
20 Q. 30 to 45 minutes before you actually got
21 there?
22 A. Yes.
23 Q. Or -- or --
24 A. Before we actually arrived on scene with

**Page 25**

1  the NTA book. Again, that is a guess. I really
2  don't recall.
3  Q. Once you got to the scene and delivered
4  the NTA book, what's your best estimate of the
5  amount of time that transpired between arriving at
6  Sam's Carry Out and the time when you arrested Roger
7  Owensby?
8  A. I -- I couldn't recall. I couldn't. I'd
9  be guessing if I did.
10 Q. Would an hour have transpired? Would it
11 have been longer than an hour?
12 A. I -- no, I don't believe so.
13 Q. Okay. So sometime less than an hour?
14 A. Less than an hour from when to when?
15 Q. From when -- from when you and Officer
16 Jorg pulled into the parking lot at Sam's Carry Out.
17 A. Yes.
18 Q. Gave the NTD -- NTA book to Hasse and
19 Sellers.
20 A. Yes.
21 Q. To the time where you folks arrested Roger
22 Owensby.
23 A. I would say it was less than an hour. I
24 think that's a fair statement, but I think -- I

Estate of Roger Owensby vs. City of Cinti.  
October 17, 2003

PATRICK E. CATON

Page 70

1 looked at his ID and the conversation was along the
2 lines of I see you live in Reading; what brings you
3 down here?
4     And he said, "I bought -- this is where I
5 come to get my marijuana. And I'll show you where
6 if you'll let me go with a" -- what's referred to as
7 a weed ticket.
8     Q. What -- clarify, what's a weed ticket?
9     A. It's a $100 payout citation for a minor
10 misdemeanor, marijuana possession.
11    Q. Which is what he would have received
12 anyway?
13    A. Oh, I -- I'm not -- you're going to have
14 to speak with Officer Hasse with regard to the
15 charges. I think Officer Hasse originally also
16 wanted to charge him with criminal trespassing, but
17 I'm not sure.
18    Q. Okay.
19    A. I'm not sure.
20    Q. All right. Please continue.
21    A. So he was willing to show us where he'd
22 make a buy. I guess the -- the idea was we wanted
23 to see if police officers could make a buy, and
24 proceed with possibly a trafficking investigation,

Page 71

1 which was essentially out of my league. Uniformed
2 officers have a real difficult time walking up to a
3 drug house and trying buying drugs.
4     So I -- that's when I used my cell phone
5 to call our Mini-Tac Unit, and I spoke with Officer
6 Lawson, told him what we had. He spoke with his
7 partner, Officer Hodge. They indicated they were
8 interested in interviewing this suspect, they would
9 come up and -- they would come up and meet us and
10 talk to him.
11    Q. Let me ask you, is there a reason, a
12 tactical reason or otherwise, why you made that call
13 on your private phone as opposed to using the --
14 either the mike or the MDT in your car?
15    A. Well, it was a fairly extensive
16 conversation, and you want to use short
17 transmissions over your radio. You don't want to
18 tie up the radio with conversation --
19    The Mini-Tac Unit doesn't have an MDT,
20 because they are undercover officers and they work
21 in undercover cars. It was just more convenient
22 just to give them a call, District 4, for -- to
23 expedite the matter.
24    Q. All right. Continue.

Page 72

1     A. At that point Off-- I -- I told what
2 Offic-- Officer Jorg and Officer Sellers -- I
3 believe Officer Hunter had arrived at that -- at
4 that point also.
5     I said, "This is what we got. The
6 Mini-Tac Unit's interested in talking to these --
7 this guy. I guess we've just got to stand by and
8 wait for the continuing investigation."
9     At that point or at some point --
10    Q. Sorry. While you're waiting, had Officer
11 Hasse -- did you already hand him the NTA book?
12    A. Yes. He already had it.
13    Q. He had that. And had he -- if you recall,
14 had he already written out the citation?
15    A. I don't know.
16    Q. Okay. Sorry. Continue.
17    A. It's at that point Officer Hunter pointed
18 at an individual crossing Seymour Avenue, I'd say
19 about 50 yards away, roughly up here on the map.
20    Q. Would you draw on the map a line
21 indicating the path of the person across Seymour
22 Avenue, and putting the letter A next to that.
23    A. Again, I would have estimated the distance
24 at 50 yards. On this map I don't know what 50 yards

Page 73

1 would be, so...
2     Q. All right. But it's approximately half a
3 football field?
4     A. Approximately half a football field.
5     Q. And where were you at this time?
6     A. Basically here (indicating).
7     Q. Okay. Would you mark that with a C for
8 Caton.
9     A. (Witness complies.)
10    Q. Thank you. So you saw the person going
11 across the street. Did you think anything of it?
12    A. Well, he was -- to me he was little bit
13 more than a shadow. Again, it -- it -- it was dark
14 out there and the only light that I could see was
15 a -- a passing vehicle. And I got little more than
16 a silhouette of the individual.
17    I -- I could see that it was a medium-
18 sized man, I suspected, but that -- beyond that, it
19 wasn't until he got into the well-lit area of the
20 Sunoco lot that I could make out any details, and at
21 that point it really wasn't many more details.
22    Now, Officer Hunter had said, when he
23 commented, when he pointed at it -- at -- at -- at
24 him, he said, "I think that's LA."

Page 70 - Page 73

Case 1:01-cv-00769-SAS   Document 146-5   Filed 05/12/2004   Page 5 of 11

Estate of Roger Owensby vs. City of Cinti.
October 17, 2003
PATRICK E. CATON

Page 78

1 would have been difficult for him to hear this
2 conversation.
3    Q. Now, when you were having this
4 conversation with the person in the back seat,
5 the -- the arrestee in the back seat, this was the
6 first time that you had had any contact with this
7 person, right?
8    A. Yes.
9    Q. So you had no idea if he was telling you
10 the truth or lying to you?
11    A. No.
12    Q. You -- you had no understanding of his
13 veracity or truthfulness?
14    A. No, I do not.
15    Q. Okay. Continue.
16    A. At that point I relayed the information to
17 Officer Hunter and Officer Jorg, and it was decided
18 that we would approach Sam's Carry Out. I -- I --
19 let me back up a little bit more.
20       When -- when the subject that we
21 approached walked across the street into the
22 well-lit part of Sam -- the Sunoco lot, I could then
23 see that there was -- he was --
24       He was still at a fairly good distance.

Page 79

1 It was then I could identify him as a male, black,
2 about medium size, medium height. I could make out
3 the silhouette of dreads and a light-color shirt,
4 and that's about it.
5       I then --
6    Q. What -- what --
7    A. Skipping ahead.
8    Q. -- color pants?
9    A. I don't recall what color of pants.
10    Q. Okay. Go ahead.
11    A. And then we then proceed, Officer Hunter
12 and Officer Jorg and I, then proceeded towards the
13 Sunoco lot. And as I recall it, Officer Jorg
14 returned to the car momentarily for something and
15 then caught back up to us as we were approaching the
16 Sunoco lot in --
17    Q. Let me ask you, before you approached the
18 Sunoco lot in response to Officer Hunter saying "I
19 think that's LA," did you hear Officer Jorg say
20 anything?
21    A. Again, I don't recall who suggested that
22 this guy might know who LA is, but -- I don't know
23 if that was Officer Jorg or Officer Hunter or
24 Officer Hasse or anybody, but it was at the

Page 80

1 suggestion of somebody else on that scene, and
2 that's when I went back to talk to him.
3    Q. Do you recall Officer Jorg saying
4 something to the effect of, if that's him, he's got
5 balls to be walking by us?
6    A. Let me -- I -- actually, I'd like to
7 address that comment. He -- he never made a comment
8 like that. And I think what he meant by balls
9 was -- I -- and I saw everybody stiffen up when he
10 said that. I think what he was trying to express is
11 this is fairly odd behavior for somebody who was
12 engaged in criminal behavior.
13       It's not normal for a criminal to walk in
14 such close proximity of uniformed police officers.
15 And common sense dictates that when a uniform car
16 enters an area, or my experience, rather, would
17 dictate when a uniform car enters an area where
18 there's criminal activity going on, the criminal
19 activity usually ceases and the parties depart until
20 we leave the area.
21       For somebody engaged in criminal activity
22 to walk -- engage in behavior where he walks in such
23 close proximity to uniform cars, I -- it struck me
24 as odd, but I've seen much weirder things done by

Page 81

1 criminals before.
2    Q. But it wouldn't be odd for an innocent
3 person to walk past police officers or police cars?
4    A. That's correct.
5    Q. Okay. Do you know if these citation
6 tickets that you delivered, the NTAs, are
7 sequentially numbered?
8    A. Yes, they are.
9    Q. And they were already prenumbered?
10    A. Yes, they are.
11    Q. In the -- in the booklet?
12    A. Yes.
13    Q. Okay. I'm sorry. Continue.
14       Oh. Oh, wait.
15    A. Yeah.
16    Q. I wanted to ask you, on the -- the
17 comment, I'm still unclear. Did Officer Jorg make
18 the comment?
19    A. No. He never made a comment like that.
20    Q. So he didn't say that?
21    A. No, nothing along that lines. Blaine --
22 Blaine wouldn't make a comment along that line.
23    Q. So do you believe he was mistaken
24 concerning --

Case 1:01-cv-00769-SAS   Document 146-5   Filed 05/12/2004   Page 6 of 11

Estate of Roger Owensby vs. City of Cinti.   PATRICK E. CATON
October 17, 2003

Page 86

1    And Officer Hunter's comment to me was, he
2 didn't have all that facial hair, but I think that's
3 him or I'm almost sure that's him or I'm 90 percent
4 sure that's him. It was something along that lines.
5 And what it indicated to me was even though we've
6 got a perfect look at this -- at this guy, he's
7 still not sure that this is the guy that assaulted
8 him, I guess the 27th of September.
9    Q. Did Officer Hunter ever explain what the
10 assault was?
11   A. I don't recall the details of the assault,
12 but I think the word he used was "tussle" and he got
13 punched at some point during the tussle.
14   Q. All right. Continue.
15   A. Well, it was decided at that point that
16 Officer Jorg and I would approach the suspect as he
17 exited the store and engage him in conversation, and
18 if Officer Hunter was capable of identifying him at
19 that point, he should indicate to us that that's him
20 in some subtle, I was hoping in some subtle way.
21       If he couldn't, the plan was to see if he
22 would voluntarily come back to one of our cruisers
23 to be run, at which point he might be able to be
24 identified as LA by the individual in the cruiser.

Page 87

1    So that's what we began to do. And when
2 we approached this individual as he exited the
3 store, Officer Jorg initially engaged him in
4 conversation and we both back and forth engaged him
5 in conversation.
6    Q. Now, at this point in time am I correct in
7 understanding, based on what you've told me, that
8 you, Officer Jorg, as well as Officer Hunter, are
9 going to talk to a person that you believe may be
10 someone who had previously assaulted a police
11 officer, had punched a police officer?
12   A. Possibility.
13   Q. And had then run away or escaped
14 apprehension from that police officer?
15   A. That's correct.
16   Q. Okay. Continue.
17   A. He came out of the store holding a bottle
18 in his hand. I think the first part of the
19 conversation was something to the effect of, sir,
20 can we speak with you for a moment.
21       He was cooperative at that point. We
22 indicated to him, "Please put the bottle down,"
23 because we didn't want it to be used as a weapon
24 against us. He complied with that.

Page 88

1    Q. When you --
2    A. He --
3    Q. I'm sorry.
4    A. Go ahead.
5    Q. When you and Officer Hunter and Officer
6 Jorg were at the window watching him, did you happen
7 to notice what he was purchasing?
8    A. As a matter of fact, I did. He had, I
9 beli-- it was a bot-- it was a drink. I can't
10 remember -- the bottle was a drink. I can't
11 remember what it was. And I believe he also
12 purchased two blunts.
13   Q. Blunts. Explain that.
14   A. It's a --
15   Q. Cigars?
16   A. -- cigar.
17   Q. All right. When he came out of the store
18 and you and Officer Jorg approached him, he had the
19 bottle in his hand. Do you know where the cigars
20 were?
21   A. No, I don't.
22   Q. He didn't have them in his hand?
23   A. He could have. I don't recall.
24   Q. All right. Please continue.

Page 89

1    A. We engaged him in conversation. We asked
2 him -- well, actually we explained to him -- he
3 asked what -- he asked what this was all about. We
4 explained that we had a victim of an assault who has
5 given a description of his assailant, and you match
6 that description.
7       He was -- I think he objected to that in
8 some way to the effect of I -- I didn't assault
9 anybody.
10      And I said, "Well, at this point it's just
11 an investigation. Do you have any identification on
12 you?"
13      And he said no. And identification was
14 later found on his person. He -- I think he
15 actually said at one point, "My name's Roger
16 Owensby. You can run me on computer and see I'm not
17 wanted for anything."
18   Q. He also give you his address, or at least
19 where, what part of town?
20   A. Well, that was later in the conversation.
21   Q. I'm sorry. I'm --
22   A. That was later --
23   Q. Go ahead, then.
24   A. -- in the conversation.

Case 1:01-cv-00769-SAS   Document 146-5   Filed 05/12/2004   Page 7 of 11

Estate of Roger Owensby vs. City of Cinti.                PATRICK E. CATON
October 17, 2003

**Page 90**

1  It -- this was a conversation that was
2  kind of seesawing back and forth between Officer
3  Jorg and I and Mr. Owensby. As I -- as I recall the
4  conversation going, he gave us his name, and -- and
5  we asked him what part of town he was from. He said
6  he was from Northside.
7       He then -- we asked him what brought him
8  to the Roselawn-Bond Hill area. He said he had a
9  girlfriend. And he -- I -- I don't recall if he
10 said Yorktown or Huntington Meadows, but essentially
11 somewhere in the area of the apartments, of the
12 Huntington Meadows apartments.
13      He asked us what this was all about, and
14 we explained the circumstances. And he again said,
15 Well, I don't -- something to the effect I -- I
16 don't appreciate you coming at me this way.
17      We explained to him the person we're
18 looking for is, our understanding, is possibly
19 dangerous and possibly carrying a gun, at which
20 point he reaches for his shirt and starts to lift it
21 up to show us that he wasn't carrying a gun.
22      And we stop him real quick, because we
23 don't want him making any overt movements at this
24 point, and we explain to him, "We understand you're

**Page 91**

1  not carrying any weapons. Do you mind if we pat you
2  down to ensure you're not carrying any weapons?"
3       And he was reluctant at first, but he
4  agreed to, and I think I -- I made the comment, "If
5  you don't have a weapon on you, you don't have
6  anything to worry about."
7       And he said, "Okay." And --
8       Q. When -- when he -- when you asked him or
9  either you or Officer Jorg asked him what part of
10 town he was from, I think you said Northside.
11      A. Uh-huh.
12      Q. Do you recall whether or not he said North
13 College Hill?
14      A. He might have said North College Hill
15 instead of Northside. I -- I remember North.
16      Q. Okay.
17      A. That's all I remember.
18      Q. All right. So we're up to the point of
19 the pat-down. What -- what happened?
20      A. Officer George -- Officer Jorg conducted
21 the pat-down. Since Officer Jorg didn't place him
22 in custody at that point, or any indication to me
23 that he had reason to place him in custody, I felt
24 that he -- I was satisfied that Owensby wasn't

**Page 92**

1  carrying any weapons. Again, this was only a
2  pat-down of his outer garments for weapons.
3       At that point --
4       Q. And based on your training, at this point
5  you weren't permitted to do anything else, right?
6       A. No. He was not under arrest at this
7  point.
8       Q. Because he was not under arrest and at
9  least at this point there was no probable cause to
10 arrest him?
11      A. In my opinion, that's correct.
12      Q. Okay. Continue.
13      A. Anyhow, the -- I'm trying to remember
14 where I left off. The -- when he -- after the
15 pat-down of Mr. Owensby, he became a little bit more
16 verbal, became a little bit more loud. He said,
17 "You know, I really don't appreciate you coming at
18 me this way."
19      And I said, "Well" -- and I explained to
20 him again, "Well, the person we're looking for is
21 known to carry a firearm. He's dangerous. He
22 fights and he runs from the police."
23      He -- he became a little bit more
24 assertive and said, "Well, it's been a long time

**Page 93**

1  since I ran from the police."
2       Q. Now, at this point in time you knew that
3  he was not carrying a firearm?
4       A. That's correct.
5       Q. And you knew that Officer Hunter had told
6  you he didn't remember the person that he was
7  looking for as having facial hair, correct?
8       A. That's right.
9       Q. Okay. Continue.
10      A. The -- again, the indication -- we were
11 trying to get him to go voluntarily to the car, and
12 he -- he -- he also said, you know, "Run me" -- I
13 think he stated his name one more time. He said,
14 "Go ahead and run it through the computer. You'll
15 see I don't have any warrants on me."
16      I said, "Well" -- let me back up. I do
17 recall now something I did say. "Well, if you have
18 ID, we don't have to go all the way over to our
19 cars. I can do it over the radio."
20      And that's when he said he didn't have any
21 identification, so we do -- we did have to proceed
22 to our cars so I could do a computer search.
23      Q. At this point did anyone ask this person
24 whether or not he went by the nickname of LA?

Case 1:01-cv-00769-SAS    Document 146-5    Filed 05/12/2004    Page 8 of 11

Estate of Roger Owensby vs. City of Cinti.                         PATRICK E. CATON
October 17, 2003

**Page 94**

1  A. No.
2  Q. Continue.
3  A. So, again, when he said, "My name is
4  Roger" -- he made the comment, "It's been a long
5  time since I ran from the police," at which point
6  Officer Hunter approached him, was face to face with
7  Mr. Owensby about this close (indicating), and said,
8  "Really? When's the last time you ran from the
9  police?"
10  Q. Now, at this point did you feel
11  uncomfortable with Officer Hunter being that close
12  to this person?
13  A. Yes, very -- very uncomfortable.
14  Q. Did the person feel uncomfortable having a
15  police officer that close to -- to them?
16  A. Based on his reaction -- his eyes got real
17  wide. He started to get, in my opinion, nervous.
18  He started looking left and right, basically for an
19  avenue of escape.
20  Q. That's how you took it?
21  A. That's -- that's what I -- well, that
22  might be 20/20 hindsight, based on what happened.
23  Q. All right.
24  A. But that's -- and, again, this whole thing

**Page 95**

1  went down (snapping fingers) about that fast.
2  Q. Did -- did either you or Officer Jorg try
3  to push Officer Hunter back maybe an arm's length
4  from Mr. Owensby?
5  A. We didn't have time. We didn't have time.
6  As soon as he did that, he triggered a flight
7  response.
8  Q. So we have Officer Hunter comes, as you
9  indicated, maybe six inches from --
10  A. I would say he was standing about this far
11  from him (indicating). He was face to face. And if
12  you watch the videotape from the store camera,
13  you'll see it.
14  Q. All right. And -- and you're
15  demonstrating between, say, six and eight inches?
16  Would that be fair?
17  A. Well, I --
18  Q. Or -- or maybe --
19  A. My arm's not long enough. In my opinion,
20  he was in --
21  Q. Maybe -- maybe a foot?
22  A. He was in his personal space was --
23  Q. Okay.
24  A. That would describe it.

**Page 96**

1  Q. All right. And as I understand your
2  testimony, neither you nor Officer Jorg could back
3  Officer Hunter up, because there just wasn't enough
4  time between him doing that and Mr. Owensby then
5  trying to take off?
6  A. In -- in that whole instant, Officer
7  Hunter indicated to Officer Jorg that that's him.
8  Officer Jorg reached for his handcuffs and I think
9  reached for Owensby. And actually, I -- I didn't
10  see that. I know that because I've seen the tape
11  now, but --
12  And before any-- anybody could move, it
13  became a blur of activity at that point. There was
14  an -- an explosion of movement, the best way I can
15  describe it. Suddenly Dave Hunter wasn't there
16  anymore, Owensby wasn't there anymore, my partner's
17  running across, and I'm realizing we're now engaged
18  in a foot pursuit.
19  I start running. Blaine stayed about step
20  for step with Owensby. I don't know where Dave
21  went. I can only conclude he got knocked down or
22  punched at that point.
23  I reach up -- I start running and reach up
24  to key up my mike to put out a foot pursuit. Before

**Page 97**

1  I can actually say it, Blaine catches Owensby around
2  the top of the shoulders and they run into a parked
3  car, I believe the car that you have marked here on
4  the Sunoco lot. It was probably a five- to
5  seven-step run.
6  Q. Do you know if, when Mr. Owensby started
7  to move away, whether or not Officer Jorg had any --
8  his arm or his wrist in his hand?
9  A. I don't know.
10  Q. Okay. And going back to -- I had asked
11  you a question. I'm not sure we got a clear answer
12  on this. The reason neither you nor Officer Jorg
13  moved Officer Hunter back a little bit from Mr. -- I
14  think you termed it Mr. Owensby's personal space,
15  was because the events that then happened were in
16  such rapid succession that neither one of you would
17  have had the time to do that?
18  A. Well, I'll be honest with you, I was kind
19  of shocked at Officer Hunter's reaction and I -- I
20  couldn't believe he was doing -- if -- if he rec--
21  when -- when we have -- when we indicate that
22  somebody --
23  It's my experience and what we do in the
24  field, when we indicate that we're about to arrest

Case 1:01-cv-00769-SAS    Document 146-5    Filed 05/12/2004    Page 9 of 11

Estate of Roger Owensby vs. City of Cinti.                          PATRICK E. CATON
October 17, 2003

**Page 98**

1 somebody and you want to communicate that to the
2 other officers, you do it in some subtle fashion.
3 You don't want to let the arrestee know that he's
4 about to be arrested, especially in a situation that
5 could be potentially dangerous.
6    I mean, Hunter is saying that, This is the
7 guy who assaulted me, this is a very dangerous
8 situation at this point. And to in a sense tip your
9 hand, for lack of a better term, created the flight
10 response, in my opinion.
11    Q. Right. Let me show you an exhibit that
12 was previously marked.
13    MR. MARTINS: In the binder.
14    Q. This was previously marked as Exhibit 9.
15 Is that the car that Officer Jorg, Mr. Owensby --
16 where -- where Officer Jorg caught up with Mr.
17 Owensby?
18    A. I can't remember the car, but based on
19 this exhibit I would suspect that this is the car
20 that they ran into. My concentration was --
21    Q. You just know that --
22    A. There was a car there.
23    Q. You just know that they hit a car?
24    A. They hit a car, and this looks, yeah --

**Page 99**

1 I'm -- I'm willing to bet this is the car they hit,
2 but I -- I can't recall the actual car.
3    Q. Okay. All right. At the time that
4 Officer -- I think you indicated Officer Jorg had
5 tackled Mr. Owensby high, grabbed him around the
6 shoulders.
7    A. That's correct.
8    Q. Is that right? Did you tackle Mr. Owensby
9 also?
10    A. As I approached Jorg and Owensby, they
11 were already halfway to the ground, and the only
12 exposed part of Owensby that I could see were his
13 legs. So I dropped low and started to go in to take
14 him at the legs to take him to the ground.
15    Now, I don't know if my impact caused the
16 fall to the ground. I don't know if they were
17 already onto the ground or -- all I know is that,
18 like I said, it was a blur of activity. I've got
19 faint moments of pictures in my mind as to what
20 happened.
21    When we were on the ground and now
22 struggling with Owensby, I had essentially ahold of
23 his right foot. At some point I keyed up my mike
24 and started screaming, "Sunoco lot. Sunoco lot.

**Page 100**

1 Give us some cars."
2    Q. Did you say: officer needs assistance?
3    A. I didn't. No, I didn't use those words.
4 Those -- those words are actually very rarely used
5 to get an officer needs assistance broadcast.
6    Q. So the -- so the -- the get us some cars,
7 in your mind, was the equivalent of officer needs
8 assistance?
9    A. That's -- yes, that's fair. That's fair.
10    Q. Do you know what part of your body -- in
11 the initial contact that you had with Mr. Owensby,
12 do you know what part of your body came in contact
13 with what part of his body?
14    A. I -- I don't remember.
15    Q. You don't know?
16    A. (Shaking head.)
17    Q. Have you played football?
18    A. Not -- not -- not since grade school.
19    Q. Okay. All right.
20    A. I mean, in actually trained or just Flag
21 Football, yeah. I --
22    Q. I mean, I'm -- I'm asking, was this like a
23 tackle where someone goes around the waist --
24    A. I was --

**Page 101**

1    Q. -- and tries to grab the person?
2    A. I was trying to actually get in towards
3 his legs, to confine his legs to keep him from
4 running. But like I said, I don't know if my
5 contact caused the fall to the ground or they were
6 already on the ground. When -- when we all ended up
7 on the ground, I had him around his right ankle is
8 the best way I can describe it.
9    Q. Was this before or after Officer Jorg says
10 that initially when they landed, Mr. Owensby was on
11 top of him and he swept him over, and then Mr.
12 Owensby was face down on the asphalt and Officer
13 Jorg was on top?
14    A. I don't recall that happening. I'm not
15 saying it didn't happen, but I -- I just don't
16 recall. Again, this was a flurry of movement.
17 The -- I don't recall seeing where Officer Jorg
18 landed and how. And -- and I -- I just remember
19 that essentially this was a tackle going to the
20 ground and I ended up in it.
21    Q. And your recollection is that you're
22 holding onto Mr. Owensby's right foot or calf?
23 Would that be --
24    A. Roughly around the calf-ankle.

Case 1:01-cv-00769-SAS  Document 146-5  Filed 05/12/2004  Page 10 of 11

Estate of Roger Owensby vs. City of Cinti.
October 17, 2003
PATRICK E. CATON

Page 138

1 you told him, We kicked his ass, or I guess his
2 version is, We beat the shit out of him. One of
3 those two statements was made?
4    A. That's right.
5    Q. Correct? After that statement was made,
6 what happened?
7    A. I got in my car and we returned back to
8 the scene, as you see me in the videotape rolling up
9 on the scene.
10    Q. Okay. Officer Hasse also gets in his car
11 and brings his car over?
12    A. That's correct.
13    Q. What happens after that?
14    A. Officer Hodge approaches me and asks me if
15 I had any alcohol rub in the cruiser or in my gear.
16 And I said, "Why?"
17        And he said, "Because Blaine has some
18 blood on him."
19        And I said, is he hurt, or something to
20 that effect.
21        And he said, "No, I -- we're not sure
22 where the blood came from."
23        And when he asked me for the alcohol rub,
24 that -- that's consistent with a ground struggle.

Page 139

1 You know, we quite fre-- I had scuffs on my hands,
2 and it was used to clean hands. I -- you see me go
3 back to the trunk of my car where I normally carry
4 it, open it up and check my seat out bag, which
5 is --
6    Q. I'm sorry?
7    A. The seat out bag. It's the gear bag that
8 police officers carry with all their equipment in
9 it.
10        And I didn't have any left, and that's
11 when I guess Officer Hodge went on to try to secure
12 some from some other officer.
13        At that point I realized Sergeant Watts
14 was on scene and I approached Sergeant Watts. This
15 would be after Victor had just driven away, Officer
16 Spellen had just driven away. And he was standing
17 on the opposite side of the Golf Manor car, on the
18 driver's side of the Golf Manor car.
19        And I walked up to him and I said, "Hey,
20 Sarge, I got to tell you what happened here." And I
21 began to tell him, "We approached this" -- tell the
22 story in chronological order. And he stopped me
23 after a few seconds and said, "Start at the
24 beginning. What's this guy's name?"

Page 140

1        And I said, "He said his name was Roger
2 something, but I can't recall."
3        He said, "Well, let's begin there." And
4 that's when we approached the Golf Manor cruiser.
5        And he looked in the passenger -- or the
6 driver's side rear door and realized that he wasn't
7 moving, and he opened -- he opened the door and
8 started to lean in.
9        And I stopped him. I said, "Sarge, be
10 careful. He might be playing possum," indicating
11 from experience when you have a violent prisoner
12 sometimes they'll try and lure you back in the car
13 so they can hurt you.
14        And he said "No, Pat, I don't think that
15 guy's breathing." And we shined the flashlight in
16 and we realized he was actually not breathing. And
17 that's when we began the process of getting him out
18 of the car.
19    Q. This is from the driver's side?
20    A. The driver's side.
21    Q. So his head would have been toward you and
22 his feet would have been away from you?
23    A. That's correct.
24    Q. Did -- okay. What -- what happened next?

Page 141

1    A. That's where we began today. That's when
2 I looked up. And the first person I saw was Officer
3 Hasse, where I -- I had known from talking to him
4 that he -- he was an EMT before he was a cop.
5        I said, "Do you have any rubber gloves?"
6        He said, "Yeah."
7        "You got an extra pair?"
8        "Yes."
9        "Glove up. Let's get this guy out of the
10 back seat of the car," and then we began the CPR
11 procedures on him.
12    Q. When you got him out of the back seat of
13 the car, did you take him out from the driver's side
14 or from the passenger's side?
15    A. From the passenger's.
16    Q. So you came around, opened the door?
17    A. Right.
18    Q. How was Mr. Owensby situated in the back
19 seat of the car?
20    A. His position had changed from when I saw
21 it last. When I came back and saw it now, he had
22 been -- he was rolled over on his back and his head
23 was pinned at like an angle between -- I want to say
24 between his shoulder and the back of the seat.

Page 138 - Page 141

```
                                                              244

17:00:39   1       MR. HARDIN:  Caton.
17:00:39   2       VIDEOGRAPHER:  Sorry.  Mr. Caton, you have
17:00:39   3   a right to review this videotape deposition
17:00:39   4   prior to its being shown to a court or jury.
17:00:39   5   Will you waive that right?
17:00:39   6       THE WITNESS:  No.
17:00:40   7       VIDEOGRAPHER:  We're off the record.  The
17:00:42   8   time showing is 5:04 p.m.
17:00:42   9       MR. MARTINS:  I take it you also want
17:00:49  10   signature on the deposition?
17:00:51  11       MR. HARDIN:  Yes.  Yes.
17:00:52  12
17:00:52
17:00:52  13                          _____
17:00:52
17:00:52  14                          PATRICK EDMUND CATON
17:00:52
17:00:52  15
17:00:52
17:00:52  16                      - - -
17:00:52
17:00:52  17              (Deposition concluded.)
17:00:52
          18                      - - -
          19
          20
          21
          22
          23
          24
```