Case 1:01-cv-00769-SAS    Document 146-6    Filed 05/12/2004    Page 1 of 6
Owensby, et al vs. City of Cincinnati, et al.                    ALEXANDER HASSE
November 19, 2003

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - - -
ESTATE OF ROGER D.            :
OWENSBY JR., et al.,          :
                             :
          Plaintiffs,        :
     vs.                     :  Case No. 01-CV-769
                             :  (Judge S. A. Spiegel)
CITY OF CINCINNATI,          :
et al.,                      :
                             :
          Defendants.        :
- - - - - - - - - - - - - - -


          Deposition of ALEXANDER HASSE, a witness

herein, called by the plaintiffs for examination,

pursuant to the Federal Rules of Civil Procedure,

taken before me, Wendy Davies Welsh, a Registered

Diplomate Reporter and Notary Public in and for the

State of Ohio, at the offices of Helmer, Martins &

Morgan Co. LPA, 1900 Fourth & Walnut Centre, 105

East Fourth Street, Cincinnati, Ohio, on Wednesday,

November 19, 2003, at 10:12 a.m.

Owensby, et al vs. City of Cincinnati, et al.                    ALEXANDER HASSE
November 19, 2003

---

Page 2

```
1  APPEARANCES:

2      On behalf of the Plaintiffs:

3          Paul B. Martins, Esq.
           Don Stiens, Esq.
4          Helmer, Martins & Morgan Co. LPA
           Suite 1900, Fourth & Walnut Centre
5          105 East Fourth Street
           Cincinnati, Ohio 45202
6          Phone: (513) 421-2400

7          John J. Helbling, Esq.
           The Helbling Law Firm, L.L.C.
8          3672 Springdale Road
           Cincinnati, Ohio 45251
9          Phone: (513) 923-9740

10     On behalf of the Defendants City of Golf Manor,
       Stephen Tilley, Roby Heiland and Chris
11     Campbell:

12         Richard T. Lauer, Esq.
           Rendigs, Fry, Kiely & Dennis
13         900 Fourth & Vine Tower
           One West Fourth Street
14         Cincinnati, Ohio 45202-3688
           Phone: (513) 381-9200
15
       On behalf of Defendants City of Cincinnati,
16     Darren Sellers, Jason Hodge:

17         Geri Hernandez Geiler, Esq.
           Assistant City Solicitor
18         Department of Law
           Room 214, City Hall
19         801 Plum Street
           Cincinnati, Ohio 45202
20         Phone: (513) 352-2346

21

22

23

24
```

Page 4

```
1              I N D E X

2      Examination by:          Page

3      Mr. Martins . . . . . . . .   5
       Mr. Lauer . . . . . . . . . 111
4      Mr. Hardin . . . . . . . . 116
       Mr. Martins . . . . . . . . 117
5      Mr. Lauer . . . . . . . . . 119

6                - - -

7           E X H I B I T S

8                                Page
   Deposition Exhibit 59 . . . . . . . . . . .  15
9  Deposition Exhibit 60 . . . . . . . . . . .  23
   Deposition Exhibit 61 . . . . . . . . . . .  68
10 Deposition Exhibit 62 . . . . . . . . . . .  93
   Deposition Exhibit 63 . . . . . . . . . . .  94
11 Deposition Exhibit 64 . . . . . . . . . . .  95
   Deposition Exhibit 65 . . . . . . . . . . .  97
12 Deposition Exhibit 66 . . . . . . . . . . .  99
   Deposition Exhibit 67 . . . . . . . . . . . 102
13 Deposition Exhibit 68 . . . . . . . . . . . 104

14

15               - - -

16

17

18

19

20

21

22

23

24
```

---

Page 3

```
1  APPEARANCES (Continued):

2      On behalf of Alexander Hasse and the Defendants
       Robert B. Jorg, Patrick Caton, Jason Hodge,
3      Victor Spellen and Darren Sellers:

4          Donald E. Hardin, Esq.
           Hardin, Lefton, Lazarus & Marks, LLC
5          915 Cincinnati Club Building
           30 Garfield Place
6          Cincinnati, Ohio 45202
           Phone: (513) 721-7300

7

8                - - -

9          S T I P U L A T I O N S

10     It is stipulated by and among counsel for the

11 respective parties that the deposition of ALEXANDER

12 HASSE, a witness herein, called by the plaintiffs

13 for examination, pursuant to the Federal Rules of

14 Civil Procedure, may be taken at this time by the

15 notary; that said deposition may be reduced to

16 writing in stenotype by the notary, whose notes may

17 then be transcribed out of the presence of the

18 witness; and that proof of the official character

19 and qualifications of the notary is expressly

20 waived.

21

22               - - -

23

24
```

Page 5

1              ALEXANDER HASSE
2  being by me first duly cautioned and sworn, deposes
3  and says as follows:
4              EXAMINATION
5  BY MR. MARTINS:
6      Q. Would you state for the record, sir, your
7  name.
8      A. Alexander Hasse, H-A-S-S-E.
9      Q. And your age?
10     A. 29.
11     Q. Date of birth?
12     A. 11/9/74.
13     Q. Have you ever had your deposition taken
14 before?
15     A. No.
16     Q. Let me cover some ground rules for you.
17 As you know, as you've just seen, the court reporter
18 has placed you under oath and will take down
19 everything that you say, so try to keep your answers
20 audible. Try to avoid saying uh-huh or huh-uh,
21 things like that which can be confusing on the
22 transcript.
23     I will ask you questions, and if you don't
24 understand a question or you haven't heard the

Page 2 - Page 5

Owensby, et al vs. City of Cincinnati, et al.                                    **ALEXANDER HASSE**
November 19, 2003

|  |  |
|---|---|
| Page 42 | Page 44 |

Page 42

1 or asked, I have no clue.  I may not have even asked
2 her any questions.  I honestly don't remember.
3      Q.  Am I correct in understanding that you
4 transported her somewhere?
5      A.  Yes.  I believe I took her down to CIS.
6      Q.  Any other conversations you had with
7 anyone after Mr. Owensby was transported off the
8 scene?
9      A.  None that I recall.
10      Q.  When you arrived at the Sunoco station,
11 did you have any conversation with Officer Hodge or
12 Lawson?
13      A.  At the Sunoco site, you said?
14      Q.  Yes, sir.
15      A.  I remember Officer Hodge stating, and at
16 what point this conversation was, I don't remember,
17 but stating that he had to use a PR-24 to try to
18 wedge Mr. Owensby's arm out from underneath him.
19 And then we also discussed the white substance that
20 was on Mr. Owensby's mouth and chin, and Hodge and I
21 removed that.
22      Q.  That was, as I understand it, a white
23 substance that came up in the course of the
24 resuscitation efforts by the fire department

Page 43

1 personnel, right?
2      A.  Correct.
3      Q.  They were using some sort of suction
4 device?
5      A.  Correct.  When an airway's obstructed by
6 whatever means, they use a suction to clear that out
7 so that air can move --
8      Q.  And the suction removed blood as well as
9 this white substance; is that right?
10      A.  Correct.
11      Q.  Did you believe that that white substance
12 that was being extracted through this suction device
13 was anything in particular?
14      A.  I believed it was crack cocaine.
15      Q.  Why did you believe that?
16      A.  Because it's not uncommon when trying to
17 arrest someone or even speak to someone when they're
18 getting away, that if they have contraband on them,
19 it's not uncommon for them to try to swallow it so
20 they're not caught with it.
21      Q.  Did you have personal experience as to
22 this, before this time?
23      A.  Yes.
24      Q.  Did anyone else share your belief that the

Page 44

1 white substance that was being extracted through
2 this suction technique was crack cocaine?
3      A.  Yes.
4      Q.  Who? ·
5      A.  Officer Hodge believed it.  I think it was
6 the general consensus on the scene that it could
7 very well be crack cocaine.  So that's why we got a
8 sample.
9      Q.  Your basis for saying Officer Hodge
10 believed it is because Officer Hodge said something
11 to you indicating that he thought it was crack
12 cocaine?
13      A.  No.  It just -- it looked like it could
14 be, so we all just kind of reached the same
15 conclusion.
16      Q.  My question is, how did you believe that
17 everyone else had the same conclusion?  There must
18 have been something that was said or in some way
19 indicated that that might be crack cocaine.  I'm
20 trying to understand how you arrived at that
21 conclusion.
22      A.  As far as specifically, I don't recall.
23      Q.  Do you recall whether somebody said
24 something to the effect, Get a sample of that,

Page 45

1 that's probably crack, or something along those
2 lines?
3      A.  Something along those lines, yes.  It
4 could have been me, Let's get a sample of this, and
5 there was agreement all around.
6      Q.  When had your duty day started on
7 November 7?
8      A.  I believe 3:00 p.m.
9      Q.  This arrest that you made at Sam's Carry
10 Out, was that the first arrest that you had made
11 that day?
12      A.  I don't recall.
13      Q.  Do you recall whether you and Officer
14 Sellers had made any other drug arrests that day?
15      A.  I don't recall.
16      Q.  Officer Hodge and Lawson were in what's
17 called the Mini-Tac Unit; is that right?
18      A.  Correct.
19      Q.  Mini-Tac, as I understand it, is like an
20 undercover drug investigation unit?
21      A.  Yes.
22      Q.  They were in Roselawn Park, right?
23      A.  Correct.
24      Q.  Do you know if they had made any drug

(800) 578-1542 * MERIT * (513) 381-8228

Owensby, et al vs. City of Cincinnati, et al.
November 19, 2003                                ALEXANDER HASSE

Page 82

1    Q. And those were lit?
2    A. Yes.
3    Q. Did that give you sufficient light to look
4 in and see Mr. Owensby?
5    A. Yes.
6    Q. What did you see as far as Mr. Owensby's
7 condition?
8    A. He was lying in the back seat on his --
9 prone, on his stomach, with his handcuffs behind
10 him.
11   Q. So his arms are behind his back,
12 handcuffed?
13   A. Correct.
14   Q. Laying on the seat. Describe his position
15 on the seat.
16   A. His feet were on the passenger's side
17 towards me. So his head would have been on the
18 driver's side of the vehicle. And he was --
19 basically his head would be turned to the left, so
20 he's kind of lying on his right cheek looking
21 towards the rear of the vehicle.
22   Q. Is he laying on his stomach?
23   A. Yes.
24   Q. Is his head in contact with the rear door?

Page 83

1    A. I don't recall that.
2    Q. Do you know whether or not his chin was
3 down on his chest or whether it was up?
4    A. I believe his chin was more up.
5    Q. Did you notice any blood on him?
6    A. No.
7    Q. After you looked in and saw him, what
8 happened next?
9    A. I recall Sergeant Watts on the driver's
10 side of the vehicle. As I walked up, he was trying
11 to talk to the individual.
12   Q. Was the door open?
13   A. No, I think it was closed. I think the
14 window was down.
15   Q. Did you see someone put the window down?
16   A. No.
17   Q. Do you know whether or not the window was
18 down?
19   A. No, not for sure.
20   Q. In any event, you saw Sergeant Watts
21 talking to Mr. Owensby. The rear door -- well, all
22 doors are closed?
23   A. Correct.
24   Q. What was Sergeant Watts saying?

Page 84

1    A. He was just trying to get Mr. Owensby's
2 attention, saying, Sir, sir.
3    Q. Who, if anyone, was near Sergeant Watts?
4    A. There were several officers around. I
5 don't remember specific faces.
6    Q. Are they Cincinnati police officers?
7    A. Yes.
8    Q. Were there Golf Manor officers around
9 also?
10   A. I can't say for sure.
11   Q. On your side of the car do you know
12 whether or not there were either Cincinnati or Golf
13 Manor officers around you?
14   A. No. I don't recall. I was looking in the
15 window.
16   Q. So Sergeant Watts is saying, Sir, sir.
17 And I take it there's no response from Mr. Owensby?
18   A. Correct.
19   Q. What happens next?
20   A. Either Sarge says or I said or we -- it
21 was just, I think, Sergeant Watts said, Let's get
22 him out of the car.
23   Q. And at that point what did Sergeant Watts
24 do?

Page 85

1    A. He told us to get him out of the vehicle.
2    Q. When you say "us," who are you referring
3 to?
4    A. Just the officers that are standing there.
5    Q. What did you do in response?
6    A. I opened the car door and put a pair of
7 latex gloves on, gave a pair --
8       By this time, I don't know if he had been
9 standing there, Officer Caton was behind me or
10 beside me.
11      -- gave a pair of gloves to Officer Caton,
12 and we pulled him out of the vehicle.
13   Q. Where did you get the gloves?
14   A. The glove pouch on my gun belt.
15   Q. So you and Officer Caton removed
16 Mr. Owensby from the back seat of the Golf Manor
17 cruiser?
18   A. Correct.
19   Q. From the passenger's side?
20   A. Correct.
21   Q. Did anyone open the door on the driver's
22 side?
23   A. I don't recall.
24   Q. When you removed him from the cruiser, did

Owensby, et al vs. City of Cincinnati, et al.                    ALEXANDER HASSE
November 19, 2003

Page 86

1 you notice whether or not the back seat had any
2 blood on it?
3    A. No, I did not.
4    Q. What happens next?
5    A. We placed him on the ground on his back.
6 I positioned his head in a manner to stabilize -- or
7 to open his airway. And I looked, listened and felt
8 for any breath. I checked his pupils. And I
9 checked for a pulse, and there was none. There was
10 no breath. There was no pulse.
11    Q. What were the condition of Mr. Owensby's
12 pupils?
13    A. They appeared to be dilated.
14    Q. Were they fixed?
15    A. Yes.
16    Q. Was he still handcuffed at this time?
17    A. I believe so, yes.
18    Q. What happened next?
19    A. After I felt no pulse, I started doing
20 chest compressions. Golf Manor, one of the officers
21 from Golf Manor said, "I have a CPR mask in the
22 car." He brought it back.
23       I was doing chest compressions. I stopped
24 and assembled the mask and placed it on Mr.

Page 87

1 Owensby's face, and Officer Caton did the chest
2 compressions while I did the breaths.
3    Q. Do you know who the Golf Manor officer was
4 that got the CPR mask?
5    A. No, I don't.
6    Q. Can you describe the officer?
7    A. Male, white.
8    Q. Hair, color hair, any hair?
9    A. Do not recall.
10    Q. Explain to me what you had to do to
11 assemble the mask.
12    A. Open the case it was in, and there's --
13 the larger face piece that fits over the victim's
14 face kind of comes down to a funnel. Then there's
15 another plastic, clear plastic mouthpiece that fits
16 onto that. So you take it out of the case. There's
17 two pieces. You kind of -- it's a press fit onto
18 the little tube, and that's it as far as assembly.
19    Q. Then how is that used?
20    A. You place the larger portion of the mask,
21 it's kind of a soft rubber, over the individual's
22 nose and mouth, and basically blow into the tube on
23 top.
24    Q. While you're doing this, Officer Caton is

Page 88

1 doing the chest compression?
2    A. Correct.
3    Q. How long do you do this?
4    A. Until the fire department got there.
5    Q. Do you know how much time transpired?
6    A. No.
7    Q. What happened once the fire department --
8 well, let me back up.
9       Did you get any indication of
10 resuscitation while you were doing this CPR?
11    A. No.
12    Q. When the fire department arrived, was Mr.
13 Owensby still handcuffed with his hands behind his
14 back?
15    A. I believe so.
16    Q. What happens once the fire department
17 arrives?
18    A. They basically took over CPR.
19    Q. Do you know who from the fire department
20 took over the CPR?
21    A. No.
22    Q. Do you know, when the fire department took
23 over doing CPR, whether or not the handcuffs were
24 removed from Mr. Owensby?

Page 89

1    A. I don't recall.
2    Q. Do you know whether or not anyone from the
3 fire department instructed someone to remove the
4 handcuffs?
5    A. I don't recall that.
6    Q. In your training as an EMT or any training
7 that you receive, has anyone instructed you that in
8 order to do the CPR that you were performing that
9 the handcuffs should have been removed?
10    A. No.
11    Q. Was it your understanding that in doing
12 CPR that the victim should be laying flat on their
13 back?
14    A. Yes.
15    Q. Is it your understanding that by having
16 his arms handcuffed behind his back that he was not
17 laying flat on his back?
18    A. Not at that time. I just was trying to
19 get some blood flowing and some breath into his
20 body.
21    Q. Do you recall ever receiving any training
22 from either Cincinnati or any other place that
23 handcuffs should be removed before administering CPR
24 for someone who is in distress?

# A F F I D A V I T

- - -

STATE    OF    OHIO      :
                         :      SS
COUNTY OF HAMILTON       :


I, Wendy L. Welsh, Notary Public in and for the

State of Ohio, do hereby state that the transcript of the

deposition of ALEXANDER HASSE, deponent herein, having

been submitted to said deponent for review and signature,

has not been signed within the thirty (30) day period

allowed under the Federal Rules; said deposition to now

have the same force and effect as though signed.


_____
Wendy L. Welsh, Court Reporter


Sworn to before me this 27ᵗʰ day of _January_, 2004.


_____
Thomas M. Blasing
Notary Public - State of Ohio

My commission expires:
May 4, 2004.