Owensby vs. City of Cincinnati, et al.                    DANIEL L. SCHULTZ, M.D.
December 17, 2003

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - - -
ESTATE OF ROGER D.          :
OWENSBY JR., et al.,        :
                            :
          Plaintiffs,       :
     vs.                    :   Case No. 01-CV-769
                            :  (Judge S. A. Spiegel)
CITY OF CINCINNATI,         :
et al.,                     :
                            :
          Defendants.       :
- - - - - - - - - - - - - - -

VOLUME I


          Deposition of DANIEL L. SCHULTZ, M.D., a

witness herein, called by the plaintiffs for

cross-examination, pursuant to the Federal Rules of

Civil Procedure, taken before me, Wendy Davies

Welsh, a Registered Diplomate Reporter and Notary

Public in and for the State of Ohio, at the Frank P.

Cleveland, M.D. Institute of Forensic Medicine,

Toxicology and Criminalistics, 3159 Eden Avenue,

Cincinnati, Ohio, on Wednesday, December 17, 2003,

at 11:57 a.m.

(800) 578-1542 * MERIT * (513) 381-8228

Owensby vs. City of Cincinnati, et al.
December 17, 2003

DANIEL L. SCHULTZ, M.D.

Page 2

1  APPEARANCES:

2      On behalf of the Plaintiffs:

3      Paul B. Martins, Esq.
       Helmer, Martins & Morgan Co. LPA
4      Suite 1900, Fourth & Walnut Centre
       105 East Fourth Street
5      Cincinnati, Ohio  45202
       Phone:  (513) 421-2400

6
       John J. Helbling, Esq.
7      The Helbling Law Firm, L.L.C.
       3672 Springdale Road
8      Cincinnati, Ohio  45251
       Phone:  (513) 923-9740

9
       On behalf of the Defendants City of Golf Manor,
10     Stephen Tilley, Roby Holland and Chris
       Campbell:

11
       Wilson G. Weisenfelder, Jr., Esq.
12     Rendigs, Fry, Kiely & Dennis
       900 Fourth & Vine Tower
13     One West Fourth Street
       Cincinnati, Ohio  45202-3688
14     Phone:  (513) 381-9200

15     On behalf of Defendants City of Cincinnati,
       Darren Sellers, Jason Hodge:

16
17     Geri Hernandez Geiler, Esq.
       Assistant City Solicitor
18     Department of Law
       Room 214, City Hall
19     801 Plum Street
       Cincinnati, Ohio  45202
20     Phone:  (513) 352-3346

21     Neil F. Freund, Esq.
       Freund, Freeze & Arnold
22     One Dayton Centre
       1 South Main Street, Suite
23     1800 Dayton, Ohio  45402
       Phone:  (937) 222-2424

24

Page 3

1  APPEARANCES (Continued):

2      On behalf of the Defendants Robert B. Jorg,
       Patrick Caton, Jason Hodge, Victor Spellen and
3      Darren Sellers:

4      Donald E. Hardin, Esq.
       Hardin, Lefton, Lazarus & Marks, LLC
5      915 Cincinnati Club Building
       30 Garfield Place
6      Cincinnati, Ohio  45202
       Phone:  (513) 721-7300

7

8                - - -

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1                S T I P U L A T I O N S

2      It is stipulated by and among counsel for the

3  respective parties that the deposition of DANIEL L.

4  SCHULTZ, M.D., a witness herein, called by the

5  plaintiffs for cross-examination, pursuant to the

6  Federal Rules of Civil Procedure, may be taken at

7  this time by the notary; that said deposition may be

8  reduced to writing in stenotype by the notary, whose

9  notes may then be transcribed out of the presence of

10  the witness; and that proof of the official

11  character and qualifications of the notary is

12  expressly waived.

13                - - -
14
15
16
17
18
19
20
21
22
23
24

Page 5

1                I N D E X

2  Examination by:              Page

3  Mr. Martins  . . . . . . . .  6

4  Mr. Freund . . . . . . . . . 74, 121

5  Mr. Weisenfelder . . . 105

6

7                E X H I B I T S

8                             Page

10  Plaintiff's Exhibit 101 . . . . .  . . . . . .   6
    Plaintiff's Exhibit 102 . . . . . . . . . . . .  15
11  Plaintiff's Exhibit 103 . . . . . . . . . . . .  19
    Plaintiff's Exhibit 104 . . . . . . . . . . . .  19
12  Plaintiff's Exhibit 105 . . . . . . . . . . . .  57
    Plaintiff's Exhibit 106 . . . . . . . . . . . .  57
13  Plaintiff's Exhibit 107 . . . . . . . . . . . .  73
    Plaintiff's Exhibit 108 . . . . . . . . . . . .  73
14  Plaintiff's Exhibit 108-A . . . . . . . . . . .  81

15
16                - - -
17
18
19
20
21
22
23
24

(800) 578-1542 • MERIT • (513) 381-8228

Owensby vs. City of Cincinnati, et al.
December 17, 2003

DANIEL L. SCHULTZ, M.D.

Page 42

1 death.
2       I didn't see any infarcs, which would be
3 basically dead lung tissue from such a thing like a
4 clot. I did not see any tumors. I did not see any
5 evidence of asthma, which would be hyper expanded
6 lungs. Mucus plugging of the airways, I did not see
7 any of that. All I found were congested lungs.
8       Q. You then examined the liver. Did you find
9 anything of note in the liver?
10      A. No.
11      Q. Then you looked at the endocrine system,
12 the adrenal glands. Anything of note there, the
13 pituitary gland?
14      A. No.
15      Q. We then get to the gastrointestinal
16 system. Tell us what you found there.
17      A. Well, I didn't find any underlying natural
18 disease. I noted that he had, I measured 300
19 milliliters of tan-white, soft, slightly starchy
20 material, which was consistent with what I had seen
21 in his nose and oropharynx.
22      I didn't see any pills in his stomach. I
23 opened the entire, well, the small and large
24 intestines to look for any evidence of pills or

Page 43

1 packages or things that might have been swallowed,
2 which can happen in custody situations. And I did
3 not find anything of that sort.
4       Q. You also -- maybe you just said that and I
5 missed it, but you also examined the intestines?
6       A. Yes.
7       Q. And found no evidence of pills or packages
8 of any kind?
9       A. Correct.
10      Q. Examination of the kidneys, anything of
11 note in your examination of the kidneys?
12      A. No.
13      Q. The spleen, anything of note there?
14      A. No.
15      Q. The musculoskeletal system, other than
16 what you've already noted on the, as far as
17 abrasions or things like that, but as far as
18 musculoskeletal, was there anything of note there?
19      A. No. Aside from what I've mentioned, I did
20 not find any additional injuries or fractures.
21      Q. Now we get to the neck. Would you explain
22 your examination of the neck?
23      A. Well, the neck was examined from the front
24 and the back. From the front, I look and I describe

Page 44

1 the strap muscles of the neck, which are the muscles
2 that go from the clavicle up to the tongue and from
3 the clavicle to the various bones and cartilages of
4 the neck. Those strap muscles of the neck did not
5 have any visible hemorrhages.
6       The epiglottis, which is that valve in the
7 back of the throat going between the trachea and the
8 esophagus that prevents food from going down, was
9 not swollen, which can also cause an asphyxial death
10 if it's swollen or a person has an allergic
11 reaction, for example. He did not have that.
12      The cervical vertebrae were examined from
13 the front and the back, and there were no fractures.
14 There were no dislocations of the neck.
15      Forced posterior neck was done, and the
16 hemorrhage that I described is really in the back.
17 The neck, per se, didn't have any visible
18 hemorrhages from the posterior aspect.
19      So as far as the neck was concerned,
20 externally, internally, no hemorrhages were found,
21 no injuries were identified.
22      Q. You talk about, at the top of page 5 of
23 your report, that the tongue has a hemorrhagic bite
24 mark situated in the posterior left aspect.

Page 45

1       A. Right.
2       Q. Does that hold any significance to you in
3 conducting the autopsy?
4       A. Well, it means he bit his tongue. And
5 that can be for a variety of reasons. One situation
6 that we see bite marks in the tongue are in people
7 who have seizures. He doesn't have a seizure
8 history. He could have terminally had a seizure,
9 but if he did, it would be from the events, such as
10 an hypoxia episode.
11      Or at the time I'm doing the autopsy I'm
12 thinking of all kinds of things like cocaine or
13 other drugs that potentially can cause seizures. Of
14 course, that did not turn out to be present. There
15 was no cocaine. No illicit drugs were found. He
16 did have some marijuana, which was not contributory.
17      But he has evidence of biting his tongue.
18 Whether that happened while he was hypoxic and
19 subsequently may have had a seizure or versus just
20 biting his tongue, I don't know. I just know he has
21 a hemorrhagic bite mark of his tongue.
22      Q. Let me direct you, Doctor, on the
23 photographs to the, I believe it's the last
24 photograph, number 271. This is Exhibit 105. Would

Owensby vs. City of Cincinnati, et al.                    DANIEL L. SCHULTZ, M.D.
December 17, 2003

---

Page 46

1 you describe to us what number 271 is.
2    A. On 271, this is an image of the tongue.
3 Now, the tongue has been cut in what's called a
4 coronal plane, meaning if I were to run a plane
5 through my body it would be running from -- let's
6 see, parallel to my chest plate, you know. That's a
7 coronal plane. It would run like this, as I'm
8 showing with my hands, I'm sorry.
9       But through the tongue it would be in the
10 same plane, going -- slicing downward through the
11 tongue. When I do that I look at the tongue and I
12 see hemorrhage in the left side of the tongue, which
13 I document with the photograph.
14    Q. You have, the next thing on your report is
15 the head and central nervous system. Is there
16 anything remarkable about your examination about the
17 head and the central nervous system, CNS?
18    A. No.
19    Q. Move to the later brain examination after
20 fixation. You indicate that there was a
21 Neuropathology Conference held on November 15, 2000.
22 Would you explain what that is?
23    A. Well, because of the circumstances, and I
24 wanted to exclude any possible other reason for his

---

Page 47

1 death, the brain was saved for examination with the
2 benefit of a neuropathologist, Dr. Balko, namely.
3       Also pathologists from this office are at
4 this meeting, and the individuals are listed. That
5 would be the sum total of individuals present during
6 the exam: Dr. Balko, Dr. Pfalzgraf, Dr. Utz, Dr.
7 Tobias, who was our fellow at the time, and myself.
8 It was unremarkable.
9    Q. In this conference I guess everybody
10 examines some aspect of the tissue or weighs in on,
11 exchanges ideas?
12    A. What happens is Dr. Balko -- we all look
13 at the brain. I've already looked at it once before
14 it was even put in the fixative, and I at first saw
15 nothing, initially.
16       Then Dr. Balko takes that brain and then
17 he takes -- slices through the brain in that
18 coronal, C-O-R-O-N-A-L, plane, much like a CAT scan,
19 the same kind of, similar orientation to a CAT scan,
20 to look for any hemorrhages, tumors, injuries, which
21 there were none.
22       And we watch, and we comment if we see
23 something or we point something out. I don't recall
24 any comments there, because it was essentially a

---

Page 48

1 negative brain exam.
2    Q. Then we have the microscopic examination
3 that you set out in your report. Is there anything
4 remarkable about the microscopic examination that
5 contributed to your findings?
6    A. Well, I noted that there was -- I
7 confirmed there was hemorrhage in the trapezius
8 muscle, which was no new news -- it was no news, I
9 just documented it. There was no inflammatory
10 reaction, which is consistent with this happening
11 within minutes of his death, okay. Seconds to
12 minutes for that matter, but minutes at the most,
13 not hours.
14       His heart was sectioned for microscopic
15 examination, and they were unremarkable. The
16 coronary artery that we referred to earlier was
17 examined and, as I said, it confirmed my gross
18 impression of a 50 percent obstructed eccentric
19 atherosclerotic plaque. But otherwise, the heart is
20 unremarkable.
21       The lung sections showed some occasional
22 foci, or collections of aspirated loose mucoid
23 material, and some bacterial flora, which is like we
24 see in the mouth, consistent with some element of

---

Page 49

1 aspiration, little tiny bits. But no inflammatory
2 reaction was present. Of course that takes minutes,
3 many, many, many minutes to hours to see
4 inflammatory reaction. So this is a terminal type
5 of event.
6       No -- I had already known from the gross
7 exam that there were no airways that were, quote,
8 "chock-full" of food. It's very thin in the
9 airways. I noted some patchy areas of intraalveolar
10 hemorrhage as well as congestion, as I had already
11 known.
12       I polarized the lungs as well with a
13 polarizing filter in order to determine if he had
14 any evidence of crystals in the lungs. Now, at the
15 time -- I do this very frequently on cases if I have
16 any inkling that the person may have been doing, or
17 using, drugs, specifically intravenous drugs or
18 cocaine.
19       I look at the lungs, I rotate these
20 filters. And if I see crystals in the lungs, then I
21 know, I can say, for example, that they're an IV
22 drug abuser or that they had inhaled or insufflated
23 various drugs. He didn't have any evidence of that
24 in his lungs.

Page 46 - Page 49

Owensby vs. City of Cincinnati, et al.                    DANIEL L. SCHULTZ, M.D.
December 17, 2003

Page 50

1    The tongue section was taken and it
2 confirmed my gross impression. There was hemorrhage
3 in the tongue, no inflammatory reaction. It was a
4 bite mark to the tongue, hemorrhagic bite mark to
5 the tongue.
6    Q. On the last page are some laboratory
7 results. Again, I guess, confirming what you've
8 already said, that there was no cocaine or you have
9 metabolites. What are metabolites?
10    A. Well, metabolites are what happens to a
11 drug or a chemical after the body has metabolized
12 it. So it's, after metabolism, it's what the drug
13 becomes.
14    Q. Cannabinoids, that would be the marijuana?
15    A. Yes.
16    Q. As I understand it, the finding on the
17 marijuana was 16 thousandths of a milligram per
18 liter?
19    A. Correct.
20    Q. Am I reading that correctly?
21    A. Yes.
22    Q. As a result of this, did you reach an
23 opinion as to the cause of death of Mr. Owensby?
24    A. Yes.

Page 51

1    Q. What was your opinion to a reasonable
2 degree of medical certainty in the field of forensic
3 pathology, as to the cause of death of Mr. Owensby?
4    A. Cause of death, mechanical asphyxia.
5    Q. Would you explain to us what mechanical
6 asphyxia is?
7    A. Well, it is a form of asphyxia that is due
8 to physical compression of the chest. And
9 although -- I use it in a rather broad form.
10 Although I recognize that I could be seeing this
11 constellation of symptoms from, or findings from,
12 compression of the chest, I can also see it from
13 compression of the neck.
14    Now, I use the broad term "mechanical
15 asphyxia." You will find that there is varying
16 definitions of this term. My definition is, it's
17 from a compression of the body in some locale,
18 whether it's chest or neck, resulting in asphyxia.
19    I don't think either of those scenarios
20 are mutually exclusive. Both or one of those two
21 certainly could have taken place. But in any event,
22 it's still a mechanical pressure applied, resulting
23 in asphyxia.
24    So, you know, I hope that my term is more

Page 52

1 descriptive.
2    Q. On Exhibit 103, the first page, where your
3 opinion is listed, under mechanical asphyxia you
4 have listed three sub-headings. Did you mean those
5 to, I guess, explain how you arrived at your
6 mechanical asphyxia opinion?
7    A. I list those there because I think those
8 are part and parcel to the criteria that I might use
9 to bolster my opinion that this is, in fact, a
10 mechanical asphyxia.
11    Q. That would be the hemorrhages found in the
12 eyes?
13    A. Right, the conjunctival petechiae with the
14 scleral hemorrhages, terminal emesis or terminal
15 vomiting. Very commonly seen when a person is
16 hypoxic, they may vomit. In fact, that's very
17 common. And the hemorrhagic bite mark, whether
18 that's from a seizure or whether that's from biting
19 his tongue during the process of the restraint, I
20 don't know. But I list it in that area as well,
21 because it's part of the terminal events, I feel.
22    Q. Does the congestion of the lungs also
23 support the finding of mechanical asphyxia?
24    A. Sure.

Page 53

1    Q. How so?
2    A. Because, as I said, with an asphyxial
3 death one expects the lungs would be rather
4 congested. It's -- well, in terms of what I decide
5 to actually list under that heading, I probably
6 could list more or less. It's the art of listing
7 these things on the diagnosis list. It certainly
8 could have been listed there as well.
9    Q. Let me ask you, did you see anything that
10 was inconsistent with mechanical asphyxia?
11    A. No.
12    Q. You also list several other items under
13 diagnosis, which I believe we've already talked
14 about, the abrasions, the deep back muscular
15 contusions, the facial abrasions and knees and
16 forearm. And then the cause of death you list is
17 mechanical asphyxia. You also have a heading of
18 Manner of death. Would you explain to us the
19 difference between a cause of death and a manner of
20 death?
21    A. Manner of death is how the cause came
22 about.
23    Q. Here you wrote, "Homicide," and then in
24 parenthetical phrase,"(police intervention:

Owensby vs. City of Cincinnati, et al.
December 17, 2003

DANIEL L. SCHULTZ, M.D.

Page 62

1  Q. 255?
2  A. 255 shows a very faint pattern -- not a
3 pattern, faint abrasion of the chest, below the left
4 breast area. I say "not a pattern" because it
5 doesn't have anything that strikes me as being due
6 to a specific object.
7  Q. 256?
8  A. 256 is viewed from the right side of Mr.
9 Owensby's head. You can see the right cheek with
10 abrasions. You can see the upper lip. Note, the
11 right aspect of the upper lip has been shaved. I
12 shave the mustache away in order to show the
13 abrasion to the right aspect of the upper lip. And
14 then you also see the abrasions of the forehead.
15  Q. 257?
16  A. 257 is viewed from the left side of Mr.
17 Owensby's head, and it shows the abrasions to the
18 forehead.
19  Q. And 258?
20  A. 258 is a view of Mr. Owensby from the
21 front showing the abrasions to the forehead, showing
22 the mustache which has been shaved, showing the
23 abrasions to the right aspect of the upper lip,
24 showing a slight amount of this emesis material in

Page 63

1 the nostrils. And that's about it.
2  Q. With respect to the finding of the deep
3 musculature contusions in the area of the shoulder
4 blades, would those contusions be consistent with a
5 person weighing approximately, with equipment,
6 270 pounds, kneeling on Mr. Owensby's back?
7  MR. HARDIN: Objection.
8  MS. GEILER: Objection.
9  A. It could be, yes.
10  Q. It could be consistent with that?
11  A. Right. It's not inconsistent. It's
12 consistent.
13  Q. If that person had their arms or arm
14 around the head of Mr. Owensby and were pulling the
15 head back while kneeling on the back, would these
16 injuries be consistent with that also?
17  MR. HARDIN: Objection.
18  MR. FREUND: Objection.
19  A. They are consistent.
20  Q. I take it from the analysis of the blood,
21 the blood analysis, you found, with the exception of
22 the traces of marijuana, you found no presence of
23 any other drugs?
24  A. Correct.

Page 64

1  Q. And no traces of alcohol?
2  A. Correct.
3  Q. Since conducting your post-mortem exam,
4 you have testified in two trials, one of officer
5 Jorg and one of Officer Caton. As a result of
6 either reviewing documents in preparation for those
7 trials or since those trials, have you seen anything
8 to alter the opinions that you gave in your report
9 here that we've examined today?
10  MR. FREUND: Objection.
11  A. No.
12  Q. Cause you to change your opinions?
13  A. No.
14  Q. In this kind of death, a mechanical
15 asphyxiation death, does it occur immediately or
16 does it take a period of time to occur?
17  A. It takes minutes.
18  Q. In the case of Mr. Owensby, with a
19 mechanical asphyxia death, then can you say within a
20 reasonable degree of medical certainty in the field
21 of pathology that his death would have taken a
22 number of minutes?
23  A. Yes.
24  Q. Are you able to quantify either the range

Page 65

1 of minutes or how many minutes would have been
2 involved?
3  A. No.
4  Q. Can you describe for us, beginning with
5 the compression that starts this asphyxia through
6 the time of death, what the body would experience?
7  A. Well --
8  MR. FREUND: Object.
9  A. Aside from the struggle, the first thing
10 that happens is the person loses consciousness.
11  MR. MARTINS: Hold on a second.
12  MR. FREUND: He answered the question.
13  That was the point of my objection. The way
14  you asked the question, the patient -- the
15  person could have been unconscious.
16  MR. MARTINS: Okay.
17  Q. Describe the process, from when the
18 compression first starts through death, what happens
19 to the person's body? What processes come into
20 play?
21  MR. FREUND: Objection as to the form of
22  that question.
23  A. Well, all I can say is with this type of
24 death there are, of course, attempts to breathe.

Page 62 - Page 65

(800) 578-1542 * MERIT * (513) 381-8228

206

1  around his neck, and he has other consistent

2  physical findings that go along with that.  Other

3  natural disease processes have been ruled out.  So

4  it would be unreasonable to say that he was acidotic

5  while he was just standing around or running.

6      Q.   I didn't say standing around.  I said

7  while he was fighting the police, standing.

8      A.   No, I don't believe he was standing.

9  That's why.  I believe that his -- if he became

10  acidotic and he asphyxiated, it's during the events

11  that happened while he was on the ground.  I mean, I

12  have no contradiction to that story from any source

13  that I'm aware of.

14          MR. FREUND:  Thank you.  I don't have any

15      further questions.

16          MR. MARTINS:  Thank you, Doctor.

17

18

19                    (Signature waived.)
                      DANIEL L. SCHULTZ, M.D.
20

21                    - - -

22
            (Deposition concluded at 2:39 p.m.)
23

24                    - - -