Case 1:01-cv-00769-SAS   Document 146-12   Filed 05/12/2004   Page 1 of 7

Owensby, et al. vs. City of Cincinnati, et al.                    SUZANNE A. FLOTTEMESCH
December 19, 2003

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - - - -

ESTATE OF ROGER D.            :
OWENSBY JR., et al.,          :
                              :
          Plaintiffs,         :
     vs.                      :  Case No. 01-CV-769
                              :  (Judge S. A. Spiegel)
CITY OF CINCINNATI,           :
et al.,                       :
                              :
          Defendants.         :

- - - - - - - - - - - - - - - -

          Deposition of SUZANNE A. FLOTTEMESCH,

witness herein, called by the plaintiff for

cross-examination, pursuant to the Federal Rules of

Civil Procedure, taken before me, Wendy Davies

Welsh, a Registered Diplomate Reporter and Notary

Public in and for the State of Ohio, at the offices

of Helmer, Martins & Morgan Co. LPA, 1900 Fourth &

Walnut Centre, 105 East Fourth Street, Cincinnati,

Ohio, on Friday, December 19, 2003, at 1:57 a.m.

Case 1:01-cv-00769-SAS   Document 146-12   Filed 05/12/2004   Page 2 of 7

Owensby, et al. vs. City of Cincinnati, et al.
December 19, 2003

SUZANNE A. FLOTTEMESCH

Page 2

1  APPEARANCES:
2     On behalf of the Plaintiffs:
3        Paul B. Martins, Esq.
         Don Stiens, Esq.
4        Helmer, Martins & Morgan Co. LPA
         Suite 1900, Fourth & Walnut Centre
5        105 East Fourth Street
         Cincinnati, Ohio 45202
6        Phone: (513) 421-2400
7     On behalf of the Defendants City of Golf Manor,
      Stephen Tilley, Roby Heiland and Chris
8     Campbell:
9        Lynne Marie Longtin, Esq.
         Rendigs, Fry, Kiely & Dennis
10       900 Fourth & Vine Tower
         One West Fourth Street
11       Cincinnati, Ohio 45202-3688
         Phone: (513) 381-9200
12
      On behalf of Defendants City of Cincinnati,
13    Darren Sellers, Jason Hodge:
14
         Thomas Harris, Esq.
15       Department of Law
         Room 214, City Hall
16       801 Plum Street
         Cincinnati, Ohio 45202
17       Phone: (513) 352-3346
18               - - -

Page 3

1            S T I P U L A T I O N S
2     It is stipulated by and among counsel for the
3  respective parties that the deposition of SUZANNE A.
4  FLOTTEMESCH, witness herein, called by the plaintiff
5  for cross-examination, pursuant to the Federal Rules
6  of Civil Procedure, may be taken at this time by the
7  notary; that said deposition may be reduced to
8  writing in stenotype by the notary, whose notes may
9  then be transcribed out of the presence of the
10 witness; and that proof of the official character
11 and qualifications of the notary is expressly
12 waived.
13               - - -

Page 4

1                I N D E X
2  Examination by:              Page
3  Mr. Martins . . . . . . . .   5
4                - - -
5
6              E X H I B I T S
7                              Page
8
9  Plaintiff's Exhibit 115 . . . . . . . . . . .   5
   Plaintiff's Exhibit 116 . . . . . . . . . . .  11
10              - - -

Page 5

2          SUZANNE A. FLOTTEMESCH
3  being by me first duly cautioned and sworn, deposes
4  and says as follows:
5              CROSS-EXAMINATION
6  BY MR. MARTINS:
7     Q.  Ma'am, would you state for the record your
8  full name, please.
9     A.  Suzanne A. Flottemesch.
10         (Plaintiff's Exhibit
           115 was marked for
11         identification.)
12    Q.  Let me show you what has been marked as
13 Exhibit 115. This is a copy of a subpoena that you
14 were served with, correct?
15    A.  Correct.
16    Q.  Have you ever had your deposition taken
17 before?
18    A.  I've given a deposition before.
19    Q.  You have? Okay. Was it in connection
20 with being a nurse or was it in a personal matter?
21    A.  It was with being a nurse.
22    Q.  So you know some of what goes on in a
23 deposition?
24    A.  Not really. It was very informal. It was

Case 1:01-cv-00769-SAS   Document 146-12   Filed 05/12/2004   Page 3 of 7

Owensby, et al. vs. City of Cincinnati, et al.
December 19, 2003

SUZANNE A. FLOTTEMESCH

Page 14

1 that, we would clean the patient up and make it
2 presentable to view.
3    Q. Did you have any contact with the family
4 that evening?
5    A. No.
6    Q. Do you know of any other members of the
7 staff, the emergency room staff, who had contact
8 with the parents?
9    A. I wouldn't know that answer.
10   Q. Or the family?
11   A. I wouldn't know.
12   Q. Do you know a Cincinnati paramedic by the
13 name of Craig Coburn, C-O-B-U-R-N?
14   A. No, I do not.
15   Q. Do you know a male nurse by the name of
16 Mike McNamara?
17   A. Yes, I do.
18   Q. What does Mr. McNamara do at UC?
19   A. He's a registered nurse.
20   Q. Do you know whether or not Mr. McNamara
21 was involved as part of the staff on the evening of
22 November 7th?
23   A. He was in the room with me.
24   Q. What role, if any, did Mr. McNamara play

Page 15

1 in the resuscitation efforts?
2    A. I believe he was just the charter. The
3 charter, we usually have one person that will chart
4 for us, because you don't have time to record what's
5 going on and, obviously, do the things required.
6    Q. Do you know if Mr. McNamara assisted in
7 removing any of the clothes from Mr. Owensby?
8    A. I don't remember.
9    Q. Do you recall the names of any other
10 people who were involved, besides Mr. McNamara,
11 involved in the resuscitation effort of Mr. Owensby?
12   A. No, I don't.
13   Q. I'm not just limiting it to doctors. Any
14 staff or --
15   A. I know there probably had to be other
16 people in the room, but I couldn't tell you who it
17 was.
18   Q. What's the procedure? When there's a
19 death such as this, before the family views the
20 body, is there some sort of social worker or person
21 who talks to the family first to prepare them?
22   A. The social worker is always involved.
23 That's their main job. They take the family when
24 they get to the emergency room and they will take

Page 16

1 them to a quiet place. They will explain the best
2 they can what is happening to their family member
3 until the doctor can come and talk to them. So
4 they're pretty much in charge all the time of taking
5 care of the family.
6    Q. I see. Do you know who the social worker
7 was?
8    A. I'm sorry, I don't remember.
9    Q. Do you happen to know who the social
10 worker or social workers were back in November of
11 2000?
12   A. If I saw their faces, but I could not put
13 names.
14   Q. So you don't remember names right now?
15   A. I don't remember names, no.
16   Q. Once Mr. Owensby was pronounced, do you
17 know whether or not anyone stayed with the body?
18   A. "Anyone" meaning?
19   Q. Any UC staff person.
20   A. Do you mean just stayed with the body,
21 to --
22   Q. Yes.
23   A. No, I don't -- I don't remember anybody
24 specifically staying. I think it was pretty quick,

Page 17

1 as far as getting the body ready for the family to
2 view and taking the patient to the viewing area.
3    Q. Is the viewing area a separate room from
4 the area where the resuscitation effort takes place?
5    A. Yes, it is.
6    Q. Describe for me what the viewing area is.
7    A. At that time it was just a small room
8 adjacent to the trauma rooms where he was
9 resuscitated.
10   Q. I want to review your statement with you,
11 Exhibit 116. You'll notice on each page there is a
12 typewritten number starting with C on the pages.
13   A. Okay.
14   Q. Those are referred to as Bates numbers.
15 So I may direct you to a page by referring to that.
16 In this case it would be C 1594.
17   A. Okay.
18   Q. On that page, about halfway down the page
19 there is an answer that you gave that says, "Uh, the
20 patient was brought into the Emergency Department,
21 he was in cardiac arrest at the time. . . at that
22 time we basically continued the resuscitation. . . I
23 was part of taking his clothes off and, during the
24 resuscitation, and emptying his pocket during that

Case 1:01-cv-00769-SAS   Document 146-12   Filed 05/12/2004   Page 4 of 7

Owensby, et al. vs. City of Cincinnati, et al.
December 19, 2003
SUZANNE A. FLOTTEMESCH

Page 18

1 time."
2      When you say you were part of taking his
3 clothes off, were others involved in taking his
4 clothes off?
5    A. Sometimes what we'll do is one person's on
6 one side of the bed and another person is on the
7 other side. What we'll do is one person will go up
8 one side cutting their clothes off. The other
9 person on the other side doing the same thing
10 simultaneously, and then we take the clothes off
11 together.
12   Q. Do you recall who the other person would
13 have been?
14   A. I don't remember.
15   Q. If we go further down, about four lines
16 down there's a question that says, "when you went
17 through his. . . belongings, tell me about that.
18 You went through his pants pockets. Is that
19 correct?"
20      And your answer is, "We went through his
21 pants pockets."
22      Do you know who the "we" refers to?
23   A. It definitely indicates two people, but I
24 could not tell you who the "we" is.

Page 19

1    Q. At this time, when this is happening that
2 we've just covered, do you know whether or not there
3 were police officers present?
4    A. At that particular moment? I wouldn't be
5 able to tell you.
6    Q. While the resuscitation effort was
7 ongoing, do you know if police officers were
8 present?
9    A. I don't know.
10   Q. Your statement then continues. You say,
11 "Um, I remember he had money with him and I had an
12 empty bag, empty plastic baggie, a baggie that
13 appeared to have marijuana in it, and a baggie that
14 had some white substance in it."
15      Do you recall these baggies?
16   A. Do I recall them?
17   Q. Yes.
18   A. I remember taking things -- I remember
19 taking them out of his pocket.
20   Q. That was going to be my question. Did you
21 personally take them from his pocket or did the
22 other person involved in removing his clothes take
23 them from his pocket?
24   A. The statement says I did. I must have

Page 20

1 taken them then from his pocket. This was three
2 years ago. I would say yes.
3    Q. Do you have any recollection of a police
4 officer handing you these baggies and asking you in
5 turn to hand them to a police officer?
6    A. No.
7    Q. You then describe the baggies on page 2
8 going over to page 3, 1594, 1595, "white substance
9 in a separate bag," and then the question is, "how
10 many of those were there?"
11      And you said, "I believe there was two of
12 them."
13      "Two smaller baggies?
14      "Two smaller baggies.
15      ". . .were they inside the big baggie? Do
16 you remember?"
17      You say, "No, they were not.
18      "They were separate from that?
19      "Yes.
20      "Were they inside the baggie with the
21 marijuana?"
22      "No.
23      ". . . so they were separate from that?
24      "Answer: Yes."

Page 21

1      Do you recall anything else about the
2 baggies beyond what's said here?
3    A. No.
4    Q. As far as describing them?
5    A. No.
6    Q. When you removed the baggies, I presume
7 you have gloves on?
8    A. Correct.
9    Q. In fact, I guess everybody in the
10 emergency room would have gloves on?
11   A. Yes.
12   Q. The question is then, "he was not wearing
13 his pants at the time? Do you remember, is he. . .
14 still wearing the pants when you recovered this
15 property or had they been removed from him?"
16      And you said, "We had cut them off."
17      So that's the procedure you just described
18 where you and another person on the other side of
19 the table cut the pants off; is that right?
20   A. Correct.
21   Q. Then on the next page, page 4, which has a
22 Bates number of 1596, you talk about there being a
23 "gray writing cabinet." Would you describe that for
24 me a little bit more.

Case 1:01-cv-00769-SAS   Document 146-12   Filed 05/12/2004   Page 5 of 7

Owensby, et al. vs. City of Cincinnati, et al.
December 19, 2003

SUZANNE A. FLOTTEMESCH

Page 22

1  A. It's a metal cabinet that, the height
2  is -- that's where we keep our charts. And it has a
3  writing desk area, and then it has a place on top of
4  it, like a -- I don't know what you call it, a
5  stand. And there's shelves in the stand that we put
6  different items in, and then the top of the cabinet,
7  we put a lot of things up there.
8  Q. How tall is this cabinet?
9  A. Well, you stand and write on it, so it's a
10 fairly tall cabinet.
11 Q. We have a cart over there on the side that
12 has some drinks on it. About that size?
13 A. Yeah, it's about that size, yes.
14 Q. This is in the room where the
15 resuscitation effort took place, right?
16 A. Correct.
17 Q. This would not be in the viewing room?
18 A. No.
19 Q. So they were placed on the cabinet. That
20 would be the clothes as well as the property found
21 in the clothes?
22 A. Property is usually placed on the cabinet.
23 Clothes are usually put inside a bag.
24 Q. A plastic bag?

Page 23

1  A. A plastic bag.
2  Q. Was the plastic bag with the clothes put
3  on the cabinet?
4  A. I don't remember. I would say it would be
5  too big to put on the cabinet, but I don't remember.
6  Q. But do you remember that the property, the
7  money and the baggies were put on the cabinet?
8  A. Smaller items are put on the cabinet.
9  Q. After they were put on the cabinet then,
10 did you remain with the items?
11 A. I was in the room and I continued working
12 with whatever we were doing with the patient.
13 Q. During the resuscitation effort?
14 A. Correct.
15 Q. Once he was pronounced, did you remain in
16 the room?
17 A. I was in the room, yes.
18 Q. After he was pronounced?
19 A. To get him ready to go to the viewing
20 room.
21 Q. So you prepared him for the viewing?
22 A. No.
23 Q. Did you take his body to the viewing room?
24 A. No.

Page 24

1  Q. Who would have done that?
2  A. Most likely would have been one of the
3  technicians, the medical assistants.
4  Q. When he is taken to the viewing room is he
5  just covered with a sheet?
6  A. Correct.
7  Q. After he was taken out of the room and
8  placed in the viewing room, where were you?
9  A. After he was taken I -- I would have
10 stayed in the room to clean up the room.
11 Q. This would be the resuscitation room?
12 A. Right.
13 Q. Did you remain in the presence of the
14 property that was on the cabinet until someone else
15 came to take the property?
16 A. My statement says that I did, yes.
17 Q. Where does it say that?
18 A. It says -- I don't know what page it was.
19 It asked about the police taking the things that I
20 found.
21 Q. If you look at page 4, the middle of the
22 page, there's a question that says, "After you put
23 those on this, this cabinet. . . did those ever
24 leave your view?"

Page 25

1     And you say, "At that point when we leave
2  it on the cabinet we either call our security to
3  come and lock things like that up or we um leave it
4  there until we can lock valuables up with
5  registration so they set on the cabinet until
6  somebody came to recover those."
7     Then the question is, who came to recover?
8     And my question is: Do you recall whether
9  or not you remained with the items until some
10 Cincinnati police officers came to recover the
11 items?
12 A. I don't remember.
13 Q. In any event, three police officers came.
14 One was a black, male, uniformed officer, one was
15 an, I guess, white, female, plainclothes officer and
16 one was a white, male, plainclothes officer; is that
17 right?
18 A. That's what I said, yes.
19 Q. Do you have any independent recollection
20 of these three officers?
21 A. I can vaguely picture them.
22 Q. How did you know that the plainclothes
23 people were officers?
24 A. I believe they introduced themselves as

Case 1:01-cv-00769-SAS    Document 146-12    Filed 05/12/2004    Page 6 of 7

Owensby, et al. vs. City of Cincinnati, et al.
December 19, 2003

SUZANNE A. FLOTTEMESCH

Page 26

1 police officers.
2    Q. Who among those three actually took
3 physical custody of the items, the property on the
4 cabinet?
5    A. I wouldn't be able to tell you that. I
6 don't know.
7    Q. After Mr. Owensby was pronounced, do you
8 know whether or not he was moved, cleaned up and
9 moved into the viewing room quickly in time, or was
10 there some point of time where he remained in the
11 resuscitation room?
12    A. We do everything pretty quickly there,
13 because we never know when something else is going
14 to come in. So I would have to say that, I couldn't
15 tell you a certain amount of time, but if I remember
16 correctly, it was pretty much he was pronounced, he
17 was cleaned up, he was taken to the viewing room.
18    Q. Did you ever go into the viewing room?
19    A. I never went in there.
20    Q. Do you know whether or not any of the
21 paramedics were in the viewing room?
22    A. I don't know.
23    Q. If I understand your statement correctly,
24 the officers didn't arrive until he had already been

Page 27

1 pronounced; is that right?
2    A. That's correct.
3    Q. I want to show you a photograph that's
4 previously been admitted. I don't have copies for
5 everybody. It's, for identification, Exhibit 100.
6 If you know, is that a photograph of the property
7 removed from Mr. Owensby?
8    A. I have no idea.
9    Q. You can't recall whether or not that
10 was --
11    A. If that's exactly what it looked like?
12    Q. Yes.
13    A. No. I couldn't say specifically that this
14 picture is Mr. Owensby's possessions.
15    Q. Okay. Earlier this week, I'll make this
16 representation to you subject to any objection
17 counsel may have, but earlier this week we took a
18 deposition of a paramedic. And the paramedic said
19 that after Mr. Owensby was pronounced he remained in
20 a room with the body doing some paperwork that he
21 needed to fill out. And that in the course of
22 sitting there doing the paperwork a plainclothes
23 police officer entered the room to go through Mr.
24 Owensby's pockets and remove his clothes. Can you

Page 28

1 shed any light on how I can reconcile what the
2 paramedic said and what you have in the statement
3 and what we've talked about here today?
4    A. I can tell you what I said is the truth.
5 And I can tell you that what he says doesn't really
6 follow our standard procedure of how we do things.
7    Q. Is there any way that there would be some
8 clothing put back on Mr. Owensby after the
9 resuscitation effort?
10    A. No.
11    Q. You don't have any recollection of that?
12    A. No. Why would you?
13    Q. I don't know. That's why I'm asking the
14 questions. Do you know who entered the viewing room
15 to see the body once it was moved in there?
16    A. Once the body left the resuscitation
17 rooms, I have no idea about anything.
18    Q. To your knowledge, is there any record
19 kept of who goes in and out of the room?
20    A. There wouldn't be.
21    Q. When the police officers picked up the
22 property off of the cabinet, did they have you sign
23 anything?
24    A. No, they didn't.

Page 29

1    MR. MARTINS: Thank you very much. I have
2 no further questions.
3    MS. LONGTIN: I have nothing.
4    MR. HARRIS: No questions. Thank you for
5 your time.
6    MR. MARTINS: Thank you, ma'am. We're
7 done.

11    SUZANNE A. FLOTTEMESCH
12    ---

14    (Deposition concluded at 2:31 p.m.)
15    ---

29

14:31:01  1       MR. MARTINS:  Thank you very much.  I have
14:31:02  2   no further questions.
14:31:04  3       MS. LONGTIN:  I have nothing.
14:31:06  4       MR. HARRIS:  No questions.  Thank you for
14:31:07  5   your time.
14:31:08  6       MR. MARTINS:  Thank you, ma'am.  We're
14:31:11  7   done.
14:31:11  8
14:31:11
14:31:11  9
14:31:11
14:31:11 10                    _____
14:31:11                       SUZANNE A. FLOTTEMESCH
14:31:11 11
14:31:11
14:31:11 12                    - - -
14:31:11
14:31:11 13
14:31:11
14:31:11 14      (Deposition concluded at 2:31 p.m.)
14:31:11
         15                    - - -
         16
         17
         18
         19
         20
         21
         22
         23
         24