Case 1:01-cv-00769-SAS   Document 146-14   Filed 05/12/2004   Page 1 of 6

Estate of R.Owensby, Jr. vs. City of Cinti.
December 15, 2003

CRAIG R. COBURN

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - -

ESTATE OF ROGER D.          :
OWENSBY JR., et al.,        :
                            :
         Plaintiffs,        :
                            :  Case No. 01-CV-769
    vs.                     :  (Judge S. A. Spiegel)
                            :
CITY OF CINCINNATI,         :
et al.,                     :
                            :
         Defendants.        :

- - - - - - - - - - - - - -

Deposition of CRAIG RICHARD COBURN, a witness herein, called by the plaintiffs for cross-examination, pursuant to the Federal Rules of Civil Procedure, taken before me, Wendy Davies Welsh, a Registered Diplomate Reporter and Notary Public in and for the State of Ohio, at the offices of Helmer, Martins & Morgan Co. LPA, 1900 Fourth & Walnut Centre, 105 East Fourth Street, Cincinnati, Ohio, on Monday, December 15, 2003, at 10:01 a.m.

Case 1:01-cv-00769-SAS   Document 146-14   Filed 05/12/2004   Page 2 of 6

Estate of R. Owensby, Jr. vs. City of Cinti.
December 15, 2003

CRAIG R. COBURN

Page 2

```
1  APPEARANCES:
2      On behalf of the Plaintiffs:
3          Paul B. Martins, Esq.
           Helmer, Martins & Morgan Co. LPA
4          Suite 1900, Fourth & Walnut Centre
           105 East Fourth Street
5          Cincinnati, Ohio 45202
           Phone: (513) 421-2400
6
           John J. Helbling, Esq.
7          The Helbling Law Firm, L.L.C.
           3672 Springdale Road
8          Cincinnati, Ohio 45251
           Phone: (513) 923-9740
9
       On behalf of the Defendants City of Golf Manor,
10     Stephen Tilley, Roby Heiland and Chris
       Campbell:
11
           Lynne Marie Longtin, Esq.
12         Rendigs, Fry, Kiely & Dennis
           900 Fourth & Vine Tower
13         One West Fourth Street
           Cincinnati, Ohio 45202-3688
14         Phone: (513) 381-9200
15     On behalf of Defendants City of Cincinnati,
       Darren Sellers, Jason Hodge:
16
17         Geri Hernandez Geiler, Esq.
           Assistant City Solicitor
18         Department of Law
           Room 214, City Hall
19         801 Plum Street
           Cincinnati, Ohio 45202
20         Phone: (513) 352-3346
21
22
23
24
```

Page 3

```
1  APPEARANCES (Continued):
2      On behalf of the Defendants Robert B. Jorg,
       Patrick Caton, Jason Hodge, Victor Spellen and
3      Darren Sellers:
4          Donald E. Hardin, Esq.
           Hardin, Lefton, Lazarus & Marks, LLC
5          915 Cincinnati Club Building
           30 Garfield Place
6          Cincinnati, Ohio 45202
           Phone: (513) 721-7300
7
8              - - -
```

Page 4

```
1                STIPULATIONS
2      It is stipulated by and among counsel for the
3  respective parties that the deposition of CRAIG
4  RICHARD COBURN, a witness herein, called by the
5  plaintiff for cross-examination, pursuant to the
6  Federal Rules of Civil Procedure, may be taken at
7  this time by the notary; that said deposition may be
8  reduced to writing in stenotype by the notary, whose
9  notes may then be transcribed out of the presence of
10 the witness; and that proof of the official
11 character and qualifications of the notary is
12 expressly waived.
13             - - -
```

Page 5

```
1                  I N D E X
2      Examination by:              Page
3      Mr. Martins . . . . . . . .   6
4              - - -
5
6            E X H I B I T S
7                                   Page
8
9  Plaintiff's Exhibits 98 & 99 . . . . . . .   8
   Plaintiff's Exhibit 100 . . . . . . . . .   48
10             - - -
```

Case 1:01-cv-00769-SAS   Document 146-14   Filed 05/12/2004   Page 3 of 6

Estate of R. Owensby, Jr. vs. City of Cinti.
December 15, 2003

CRAIG R. COBURN

## Page 42

1    I don't see where it says anything in here
2 about me being at the hospital or not.
3    Q. I think if you look at page 3.
4    A. Okay.
5    Q. About halfway down the page you say, "once
6 we got him to the hospital. . ."
7    A. Yeah.
8    Q. Take a look at that.
9    A. Yes.
10   Q. Let me ask you some basic questions. Do
11 you know who the UC personnel were that worked on
12 Mr. Owensby?
13   A. No, sir, I do not recall.
14   Q. Do you know how many, either doctors or
15 nurses, were involved in working on Mr. Owensby?
16   A. No, sir, I don't recall.
17   Q. In any event, you say that they worked on
18 him for about 20 to 25 minutes. Do you see that?
19   A. Yes.
20   Q. Do you recall what they did?
21   A. No, I don't recall.
22   Q. Was there anything that you recall them
23 doing that struck you as something that you folks
24 had not done?

## Page 43

1    A. I don't recall.
2    Q. Or anything out of the ordinary?
3    A. I don't recall.
4    Q. You then say, "I stayed in the room and
5 filled out the report after they pronounced him
6 dead, and talked with the doctors and stuff." What
7 room are you talking about?
8    A. It's the resuscitation room.
9    Q. So you were in the room with Mr. Owensby?
10   A. Yes, sir.
11   Q. You say you talked with the doctors and
12 stuff. Do you know what doctors you talked to at
13 that point?
14   A. No, sir.
15       (Mr. Helbling entered the deposition
16 hearing room.)
17   Q. Do you know if you talked to any nurses?
18   A. I don't recall.
19   Q. When you say "and stuff," that's what I'm
20 trying to find out. What's the "and stuff"?
21   A. We have a pretty good rapport and working
22 relationship with the doctors and nurses. I mean,
23 it might have been not even about the patient. It
24 might have been, "How's the family? What's new?"

## Page 44

1    Q. Do you know a nurse by the name of
2 Flottemesch, Sue Flottemesch?
3    A. Not offhand, I do not, no.
4    Q. Do you know a male nurse by the name of
5 McNamara?
6    A. Not offhand, no.
7    Q. You then say, the next sentence says, "And
8 there was another. . . policeman from homicide that
9 came in." Do you know who that is?
10   A. No, sir.
11   Q. When you say "came in," I guess, came into
12 that resuscitation room?
13   A. Yes, sir. I would assume that.
14   Q. What did that officer do?
15   A. It says here, "he entered, going through
16 his clothes and taking his clothes off, and all that
17 kind of stuff."
18   Q. Do you know whether or not the officer who
19 took off Mr. Owensby's clothes and went through his
20 clothes removed anything?
21   A. I do not recall.
22   Q. Do you know if he removed any drugs that
23 were found on Mr. Owensby?
24   A. I do not recall. Sir, I do not recall.

## Page 45

1    Q. Do you know, besides you and this officer,
2 if anybody else was in the resuscitation room at the
3 time that the officer was removing clothes and going
4 through clothes?
5    A. I do not recall.
6    Q. How do you know the officer was from
7 Homicide?
8    A. I do not know. The only thing I would
9 assume is that he had his badge on or his Cincinnati
10 Police jacket or whatever. I don't know if he was
11 from Homicide, I just --
12   Q. That's what I'm asking you. I'm assuming
13 you would.
14   A. From what I remember he had some sort of
15 identification that I would have known that he was a
16 police officer. And he would have had to have --
17 that person would have had to have clearance to come
18 in that room from the hospital.
19   Q. So you saw a person come in in a uniform
20 that you understood to be a Cincinnati Police
21 Department uniform?
22   A. Yes, sir.
23   Q. What I'm trying to ask is, how do you
24 know, or do you know whether or not that person was

Case 1:01-cv-00769-SAS   Document 146-14   Filed 05/12/2004   Page 4 of 6

Estate of R. Owensby, Jr. vs. City of Cinti.                                CRAIG R. COBURN
December 15, 2003

Page 46

1 from Homicide or some other division?
2   A. I don't know. The only reason I was going
3 to assume it was from Homicide was probably because
4 he was like in plainclothes with his, maybe his name
5 tag or his badge or a jacket that on the back said
6 Cincinnati Police Homicide or something along those
7 lines, but I don't recall.
8   Q. Let me back up then. Do you recall
9 whether or not the person who came into the room was
10 in a police uniform or whether he was in
11 plainclothes?
12   A. I don't recall. I believe he was
13 plainclothes.
14   Q. Do you recall talking with this person?
15   A. No, sir.
16   Q. You indicated you don't recall anyone else
17 or whether or not anyone else was in the room?
18   A. I do not remember.
19   Q. How long did you stay in the room after
20 this police officer removed the clothes, went
21 through the clothes?
22   A. I do not remember.
23      MR. HARDIN: Objection to the form of the
24 question.

Page 47

1   Q. Do you recall whether anyone else came
2 into the room while you were there, other than this
3 person you describe as a policeman?
4   A. I do not remember.
5   Q. When the doctors or doctor pronounced Mr.
6 Owensby dead, did the doctor then leave the room?
7   A. I do not remember.
8   Q. Were you present when they pronounced him
9 dead?
10   A. I do not remember. It doesn't clearly
11 state here, but I assume that I -- well, I usually
12 stick around -- once I deliver a patient, I usually
13 stay there until whatever happens happens.
14   Q. After they pronounced him dead, do you
15 have a recollection of how long you remained in the
16 room?
17   A. No, sir, I don't remember.
18   Q. Where was your partner while you were in
19 this room?
20   A. I don't remember. Probably cleaning out
21 the ambulance and restocking the supplies.
22   Q. Do you recall the officer saying anything
23 to indicate to you that -- let me back up.
24      Was the officer male or female?

Page 48

1      MR. HARDIN: Do you mean the Homicide
2 officer?
3      MR. MARTINS: The policeman described on
4 page 3.
5   Q. Was the policeman male or --
6   A. I don't recall.
7   Q. Do you have any recollection of the
8 policeman saying anything to you indicating that
9 something was found in Mr. Owensby's pockets?
10   A. I don't recall.
11   Q. Let me rephrase the question. Saying
12 anything that something was found in the pockets --
13 may not have been said to you, but --
14   A. I don't recall.
15           (Plaintiff's Exhibit
               100 was marked for
16           identification.)
17   Q. Let me show you what's marked as
18 Exhibit 100. Do you recall seeing any of the items
19 pictured in Exhibit 100 at any time on the night of
20 November 7th?
21   A. I do not remember.
22   Q. You don't remember seeing any officer,
23 police officer, remove any such items?
24      MS. GEILER: Objection. Asked and

Page 49

1 answered.
2   A. Yeah. I don't remember.
3   Q. Do you recall where Mr. Owensby was when
4 you left UC hospital?
5   A. From what I remember, he was still in the
6 resuscitation room.
7   Q. When you left do you recall if anybody was
8 with him?
9   A. I do not remember.
10   Q. Do you know whether or not this policeman
11 that you identify on page 3 of Exhibit 98 was with
12 Mr. Owensby when you left?
13   A. I don't remember.
14   Q. Did you see any family members when you
15 stepped out of the resuscitation room?
16   A. No, sir, not that I recall.
17   Q. Did you see -- were you around when the
18 doctors told the family --
19   A. No, sir.
20   Q. -- that Mr. Owensby was dead?
21   A. No, sir.
22   Q. Do you recall whether or not the doctor
23 made any assessment of the cause of death, other
24 than obviously, his heart wasn't beating?

Case 1:01-cv-00769-SAS   Document 146-14   Filed 05/12/2004   Page 5 of 6

Estate of R. Owensby, Jr. vs. City of Cinti.
December 15, 2003
CRAIG R. COBURN

## Page 50

1  A. No, sir.
2  Q. Do you know who Dr. Schultz is, Daniel
3  Schultz, deputy coroner?
4  A. No, sir.
5  Q. So I take it you wouldn't know if he
6  arrived on the scene while you were there?
7  A. No, I would not know that.
8  Q. I take it you do not recall whether
9  anyone, other than this police officer identified on
10 page 3 of Exhibit 98, were ever with the body of Mr.
11 Owensby, obviously, other than you?
12 A. Yeah. I don't know.
13 Q. Have you performed CPR on individuals?
14 A. Yes, sir.
15 Q. Based on your experience and training on
16 performing CPR, should the individual be laying flat
17 on the ground?
18 A. Yes, sir.
19 Q. That's so that you have an area to push on
20 the chest?
21 A. Yes, sir. Specifically, the upper half of
22 the chest should be on a flat surface.
23      MR. MARTINS: Let's take a short break.
24      (Recess taken: 11:07 a.m. - 11:11 a.m.)

## Page 51

1  BY MR. MARTINS:
2  Q. Do you happen to know any of the personnel
3  that were on the scene at Seymour Avenue and Langdon
4  Farm from Engine 8?
5  A. From what I recall, Greg Phelia was there.
6  I know who the guys on Engine 8 were, but I can't
7  say exactly who -- I just don't remember exactly who
8  was there that night.
9  Q. Mr. Phelia was doing what?
10 A. When we arrived he was attempting to start
11 the IV.
12 Q. Other than Mr. Phelia, I take it you can't
13 recall the identities of any of the Engine 8
14 personnel?
15 A. No, sir, not offhand.
16 Q. What about Engine 2, can you identify any
17 Engine 2 personnel?
18 A. Yeah. Engine 2, it was Ron Killion, and I
19 remember Leah Weddle. I don't remember who the
20 other two personnel were that were there.
21 Q. How do you spell that?
22 A. Leah is L-E-A-H. And her last name is
23 W-E-D-D-L-E.
24 Q. Is Leah Weddle a paramedic?

## Page 52

1  A. No, sir, she's a firefighter/EMT.
2  Q. Do you know whether or not Ms. Weddle was
3  performing any medical services at the time?
4  A. I don't recall exactly when she was doing
5  when we pulled up. All I know is, from what I
6  remember, she's the one that drove us to the
7  hospital in the ambulance.
8  Q. Say that again?
9  A. She drove the ambulance to the hospital.
10 Q. Did you go to the hospital in your rescue
11 unit?
12 A. Yes.
13 Q. So she drove?
14 A. Yes. So my partner and I could ride in
15 back.
16 Q. Do you know what she did once you got to
17 the hospital?
18 A. I do not know.
19 Q. Do you know how she got back to Engine 2?
20 A. Yes, sir. We took her back to Engine 2.
21 Q. So when you eventually came out of the
22 resuscitation room you hooked up with your partner
23 and Ms. Weddle and you drove back, or one of you
24 drove back?

## Page 53

1  A. Yeah. I don't remember who drove back.
2  Q. Do you have a recollection of when you got
3  back to your home base?
4  A. I don't recall. I don't remember what
5  time it was.
6  Q. Do you recall if it was before midnight or
7  after midnight?
8  A. I'm -- I would say, yeah, it would have
9  been before midnight.
10 Q. Based on your recollection, I know you
11 can't give me the exact time that you left UC
12 hospital, but can you give me an idea of how much
13 time you spent at UC hospital? Are we talking a
14 half-hour, are we talking an hour?
15 A. I would say probably at least a half-hour.
16 Because I remember reading, it said that they had
17 worked on him for 20 to 25 minutes. And I was there
18 until after they pronounced him. So during that
19 time, and give or take another five or ten minutes.
20 Q. Would it be fair to say somewhere between
21 a half-hour and an hour?
22 A. Yes, sir.
23 Q. As I understand your statement, while you
24 are in the resuscitation room, is that when you're

## AFFIDAVIT

- - -

STATE   OF   OHIO     :
                      :   SS
COUNTY OF HAMILTON    :

I, Wendy L. Welsh, Notary Public in and for the State of Ohio, do hereby state that the transcript of the deposition of CRAIG RICHARD COBURN, deponent herein, having been submitted to said deponent for review and signature, has not been signed within the twenty-eight (28) day period allowed under the Federal Rules; said deposition to now have the same force and effect as though signed.

_____
Wendy L. Welsh, Court Reporter


Sworn to before me this _10th_ day of _February_, 2004.

_____
Thomas M. Blasing
Notary Public - State of Ohio

My commission expires:
May 4, 2004.