UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ESTATE OF ROGER D. OWENSBY,  :
    JR.,                    :   NO. 1:01-CV-00769
                           :
        Plaintiff,     :
                           :   **ORDER**
                           :
    v.                 :
                           :
                           :
CITY OF CINCINNATI, <u>et al</u>.,  :
                           :
        Defendants.

On November 6, 2001, Roger Owensby, Jr.'s Estate (the "Estate") filed a Complaint against the City of Cincinnati ("Cincinnati" or the "City"), the City of Golf Manor, and Huntington Meadows, as well as numerous police and security officers these Defendants either employed or currently employ (doc. 1), raising claims arising from the death of Roger Owensby, Jr. ("Owensby") while in police custody.[1]  The severity of the allegations are underscored by the flurry of motions filed by the parties in the instant case.  Currently ripe and pending before the Court are the following motions:

    1.   Defendants City of Cincinnati and Police Chief Thomas Streicher, Jr.'s Motion to Bifurcate Claims From the

---

[1] Three other Cincinnati officials were originally named as Defendants in the Complaint: former City Manager John Shirey, Kent Ryan, and S. Gregory Baker, all sued in their individual capacities.  They have since been voluntarily dismissed from the suit.  Furthermore, all of the Huntington Meadows Defendants have reached a settlement with the Plaintiff and have been voluntarily dismissed as well.

Claims Against the Individual Police Officer Defendants (doc. 57);

2.    Motion for Summary Judgment On Behalf of Defendants, The Village of Golf Manor, Chief Stephen Tilley, Robert Heiland, and John Doe #7 N/K/A Chris Campbell (doc. 85);

3.    Plaintiff's Motion for Partial Summary Judgment Against Defendants Village of Golf Manor, Its Police Chief and Its Individual Police Officers For Their Failure to Provide Critical Medical Care (doc. 87);

4.    Plaintiff's Motion for Partial Summary Judgment Against Defendants City of Cincinnati, Its Chief of Police and Its Individual Police Officers For Their Failure to Provide Critical Medical Care (doc. 88);

5.    Defendants City of Cincinnati and Police Chief Thomas Streicher, Jr.'s Motion for Reconsideration of March 25, 2004 Order Overruling Summary Judgment on Sovereign Immunity; Request to Certify Question to Ohio Supreme Court Regarding Revised Code 2744's Constitutionality; Alternative Motion to Certify Conflict to Sixth Circuit Court of Appeals (doc. 118).

Also pending are a number of liminal motions filed by the parties in an effort to exclude various testimonial sources and other evidence at trial.  The Court will consider each of these motions in turn.

I.    **MOTION FOR RECONSIDERATION**

In its March 25, 2004 Order (doc. 113), this Court denied the City and its police officers statutory immunity from Plaintiff's state-law claims of wrongful death, negligence, assault, and battery pursuant to Ohio Rev. Code §§ 2744.02 and 2744.03, respectively.  The Court found, based upon the recent Ohio Supreme Court precedent Butler v. Jordan, 92 Ohio St.3d 354 (2001)

and consistent with its prior decisions, that these statutory
immunity provisions violate the Ohio Constitution and, as a result,
that they are unavailable to the Defendants in this case.  The City
seeks reconsideration of this determination or, in the alternative,
certification of the question of their constitutionality to either
the Ohio Supreme Court or the United States Court of Appeals for
the Sixth Circuit for review (doc. 118).[2]

In its motion, the City contends that this Court erred in
its holding that recent pronouncements of the Ohio Supreme Court
imply that the Ohio court would conclude the statutes were
unconstitutional if it were actually presented with the issue for
review.  In support, it invokes a number of cases decided
contemporaneously with or subsequent to <u>Butler</u> that it purports
necessarily imply that the Ohio Supreme Court has, in fact,
accepted the constitutionality of these provisions.  For example,
the City's motion advances the following contention:

---

[2] The Court held a telephonic conference on this motion on
April 1, 2004, during which the City requested an immediate
certification.  The Court rejected this request, given that the
Plaintiff has not yet enjoyed the opportunity to respond to the
City's motion.  Despite the implicit acknowledgment in the City's
motion for reconsideration that certification by this Court was
required before the City could effect interlocutory review of
this issue pursuant to 28 U.S.C. § 1292 , the City nonetheless
filed an appeal of this Court's March 25, 2004 Order on April 5,
2004 (doc. 122) absent certification.  On April 28, 2004, the
Sixth Circuit dismissed the appeal for lack of jurisdiction (doc.
139).  In the meantime, however, the Plaintiff responded (doc.
123) and the City replied (doc. 127); the motion is now ripe for
decision.

For example, on June 19, 2002, eleven months after its <u>Butler</u> decision, the Ohio Supreme Court decided <u>Ryll v. Columbus Fireworks Display, Co., Inc</u>., which set forth a three-tier analysis in adjudicating Revised Code §2744 immunity.  (2002), 95 Ohio St.3d 467, 469-70.  The [Ohio] Supreme Court in <u>Ryll,</u> expressly stated that it was not entertaining any constitutional challenge to Chapter 24 Sovereign Immunity. (<u>Id.</u> at 468.)  Instead, "the general rule of R.C. Chapter 2744 'political subdivisions are not liable in damages' is applicable." (<u>Id.</u> at 469)(quoting <u>Greene Cty. Agricultural Society v. Liming</u> (2000), 89 Ohio St.3d 551, 556-57). Therefore, the Supreme Court employed its three-tier analysis to determine whether the general rule immunized defendant City of Reynoldsburg from liability.  <u>Ryll</u>, 95 Ohio St.3d at 469-70....

While the <u>Ryll</u> Court ultimately held Reynoldsburg was not entitled to immunity because it was not engaged in a "governmental function" under the test's first prong, the Supreme Court in <u>Ryll</u> never held Chapter 2744 Sovereign Immunity was unconstitutional.  If this were true, the Court would have stated the same before engaging in its three-part analysis to determine if the general immunity rule applied.  More importantly, if Chapter 2744 Sovereign Immunity was struck down as unconstitutional in the <u>Butler</u> Decision, decided eleven months earlier, it follows the Supreme Court in <u>Ryll</u> would have immediately dismissed Reynoldsburg's sovereign immunity claims and cited <u>Butler</u>.  Stated differently, the <u>Ryll</u> Court's three-tier sovereign immunity analysis coupled with its failure to state that its earlier <u>Butler</u> Decision might have invalidated sovereign immunity as unconstitutional, displaces any view that the <u>Butler</u> Decision supports plaintiffs' Owensby's view.

(doc. 118)(all errors in original).

The City simply misstates the holding of the <u>Butler</u>

-4-

decision, this Court's interpretation and application of the <u>Butler</u> decision, and the general framework this Court must follow when attempting to ascertain the status of state law. None of the cases the City cites directly hold that the statutory immunity provisions at issue are constitutional; simply put, this issue was never before the Ohio Supreme Court in any of these cases. As the Ohio Supreme Court noted in <u>Ryll</u>:

> The issue before this court is whether Reynoldsburg and Truro Township are immune from liability. Some members of this court are on record as believing sovereign immunity to be an unconstitutional infringement of Section 16, Article I of the Ohio Constitution. See Garrett v. Sandusky (1994), 68 Ohio St.3d 139, 141, 624 N.E.2d 704 (Pfeifer, J., concurring). Today, however, we resolve the issue before us in favor of the appellant <u>without addressing the constitutional issue</u>.

<u>Ryll</u>, 95 Ohio St.3d at 468 (emphasis added). Contrary to the City's assertion, this Court does not find it unusual that the Ohio Supreme Court would decide the proper application of a statute – as it does in the cases the City advances – when the constitutionality of the statute is not challenged in that case or upon review. Far more important for our purposes, a review of Ohio Supreme Court caselaw fails to reveal any case where the constitutionality of the immunity statutes at issue has been expressly decided in the recent past.

When faced with the need to resolve an undecided question of state law, a federal court must make the "best prediction, even

in the absence of direct state precedent, of what the [state] Supreme Court would do if confronted with [the] question." Combs v. International Ins. Co., 354 F.3d 568, 577 (6th Cir. 2004)(addressing issue in diversity action); see also Welsh v. U.S., 844 F.2d 1239, 1245 (6th Cir. 1983)(addressing issue in Federal Tort Claims Act case).  In performing this inquiry, the Court "may rely upon analogous cases and relevant dicta in the decisional law of the State's highest court, opinions of the State's intermediate appellate courts to the extent that they are persuasive indicia of State Supreme Court direction, and persuasive opinions from other jurisdictions, including the 'majority rule.'" Welsh, 844 F.2d at 1245 (emphasis added); see also generally Erie R.R. v. Tompkins, 304 U.S. 64 (1938).  Significantly, whether this Court would find this rule advisable or fair is immaterial and is of no weight in the analysis.  See Combs, 354 F.3d at 577; Kurczi v. Eli Lilly & Co., 113 F.3d 1426, 1429 (6th Cir. 1997).

In invoking and analyzing Butler to conclude that the Ohio Supreme Court would find the statutory provisions at issue unconstitutional, the Court followed this rule.  Inarguably, Butler provides the most thorough discussion of this issue of any recent Ohio Supreme Court decision.  While this discussion may properly be characterized as "dicta," and while it may indeed be true that the "constitutionality of R. C. Chapter 2744 is not at issue in" Butler, these acknowledgments in no way detract from the reality

that it is the most through, thoughtful – and only – discussion of the constitutionality of these provisions yet articulated by the Ohio Supreme Court.  <u>Butler</u>, 92 Ohio St. 3d at 375 (Cook, J.)(concurring in judgment).  It remains the best "prediction...of what the [Ohio] Supreme Court would do" if presented with the question.  <u>Managed Health Care Assoc., Inc. v. Kethan</u>, 209 F.3d 923, 927 (6th Cir. 2000).  None of the cases presented by the City hold to the contrary: they simply fail to address or discuss this issue at all.  As a result, the Court finds no grounds upon which to reverse or otherwise reconsider its earlier determination.

Furthermore, in light of the disposition of the pending summary judgment motions <u>infra</u>, the Court does not find that the interests of the instant litigation or judicial efficiency would be advanced by either certification of this question the Ohio Supreme Court or a grant of interlocutory appeal to and review by the Sixth Circuit.  Accordingly, the City's motion for reconsideration and/or certification will be denied.

## II. FACTUAL BACKGROUND

This Order will resolve a number of different pending motions for summary judgment presented by the parties.  Obviously, the parties purportedly dispute certain facts at issue in the case; the Court must determine whether any such disputes actually exist and, if so, whether they are sufficiently material to the determination of issues in the action to warrant trial before a

jury.  A thorough presentation of the facts, however, followed by focused discussion of specific disputes at relevant points later infra, may prove the most effective way to frame the facts upon which the instant motions must be decided.

The first of the incidents relevant to the instant dispute occurred on or about September 27, 2000.  On that day, Cincinnati Police Officers Robert Blaine Jorg ("Jorg") and David William Hunter, Jr. ("Hunter") were working undercover ("plain clothes") duty in the area encompassing the 2000 block of Seymour Avenue.  During the course of this shift, they observed what they suspected was a drug sale among four individuals at a public phone booth on Seymour Avenue between Sam's Carryout and a Sunoco gasoline station.  After requesting uniformed backup, they began to approach the four suspects; two of them, however, crossed Seymour Avenue in the direction of the Huntington Meadows Apartment complex. At this, the two officers separated as well; Hunter began pursuing the two suspects who had crossed Seymour Avenue, while Jorg approached the two individuals who remained in front of Sam's Carryout.

As Hunter closed in on the suspects, however, an unknown third party apparently loitering in the area[3] alerted them to his pursuit by calling out "Five-O" or some similar sentiment, inciting

---

[3] It is undisputed that this third party had no involvement with the suspected drug transaction at issue.

-8-

them to flee.  Hunter did not chase the two suspects but instead approached the man who had intervened and placed his arm around him.  As he began to display his badge and inform him that his announcement was an improper interference with a police investigation, this unknown man began to flee as well.  Officer Hunter attempted to stop him by grabbing his hooded sweatshirt, but it ripped as the man gave flight.  Hunter's subsequent efforts at drawing his weapon and instructing the individual to freeze were equally ineffective.[4]  Ultimately, despite chasing the man down Seymour Avenue and into the Huntington Meadows apartment complex, this suspect eluded Hunter's capture as well.

Hunter returned to Sam's Carryout and to his partner, Officer Jorg, who had arrested the two individuals who remained at the Carryout without incident.  Neither, however, possessed any drugs or large sums of money they aver would typically be found on individuals engaged in illicit drug transactions. Ultimately, both of the suspects apprehended at Sam's Carryout were charged with criminal trespass, and one of them was also charged with an open container violation.  In the course of the arrest, however, the officers attempted to gain information on who the unknown man who announced his presence to the other two officers might have been. Although the testimony of Hunter and Jorg are inconsistent as to

---

[4] Testimony indicates that Hunter also attempted to mace this individual during the pursuit but inadvertently subjected himself to the chemical irritant instead.

whether Jorg saw the individual in question, it appears undisputed that Hunter did not know the individual and that Jorg was unable to identify him in any instance. Purportedly, the two detainees indicated that the person believed to have run from him went by the nickname of "LA". Accordingly, much of the testimony surrounding the incident in question contends that Hunter and Jorg were seeking an individual who went by the name "LA" in conjunction with this incident. Officer Hunter described him as a clean-shaven African-American male of average height and weight, possessing a short "afro" and known by the alias of "LA."[5]

---

[5] A records request revealed that Cincinnati database records contained one African-American male, Larry Antonio Fields, who was known by the alias "LA." His criminal history reveals that he was convicted of seventeen misdemeanor violations, 12 traffic violations, and four felonies, including drug trafficking in 1994 and cocaine trafficking in 2002. He also had DUI convictions in 1993 and 2002 and a disorderly conduct violation in 2002.

Rather inexplicably, however, approximately one month after the September 27 incident, on October 25 at 11:29 p.m., Officer Hasse solicited information from the police database on Roger Owensby, including his address, Social Security number, and the license plate of his vehicle. Officer Hasse, however, was unable to explain during his deposition why he made the inquiry occurring less than two weeks before Owensby's death. In any case, a review of Owensby's criminal record reveals that he had no known aliases.

Deposition testimony by one Ms. Hinton, a friend of Jorg from the police academy, lends further confusion to this story. She related that she spoke with him in December 2000, approximately one month after Owensby's death. She asked about the incident, and claimed that he seemed very angry as he declared that:

> He said a week prior his partner got beat up by Mr. Owensby. And I asked him—and he started to proceed on and tell me what happened. He said

On November 7, 2000, Cincinnati Police Officers Darren Sellers ("Sellers") and Alexander Hasse ("Hasse") arrested an individual on a minor misdemeanor charge of marijuana possession in front of Sam's Carryout, the same location where Hunter and Jorg had witnessed the suspected drug transaction weeks earlier. Purportedly, however, they lacked a "Notice to Appear" ("NTA") ticket book with which to effect the citation. At 7:17 p.m.,[6] they broadcast a restricted request for a NTA book to only two other police cruisers operating in the same district: The first was manned by Jorg and fellow Cincinnati Police Officer Patrick Caton ("Caton"), while the second was manned by Hunter. Accordingly, both of the officers who were involved in the earlier incident with "LA" at or about this same location were on the scene by 7:30 p.m.,

---

they was looking for him and they was angry, because he got away.

But his demeanor, when he was telling the story he was-his body language changed. I don't know. He was like he was there telling me the story, but he had hand motioned at the time when he was telling the story, like, "We was mad, he got away, we was looking for him," and that's what he stated to me. I said, "How you know he was up there?" He said, "I got a call that he was there."

(doc. 89).

[6] A number of standard documentary sources, including the date and time stamps of the radio communications occurring on this evening and the surveillance video of Spellen's cruiser, provide fairly accurate and uncontestable documentary evidence of the timeframes involved in the subsequent incident.

accompanied by three of their fellow officers.

For some reason, Jorg began relating the events of the prior incident to the other officers present. At some point during the conversation, Hunter identified an African-American male walking on the opposite side of the street as possibly being "LA." At the time, however, this individual was approximately 50 yards away; in their depositions, the other officers indicated that they could, at best, simply make out the silhouette of an individual across the street. Jorg, the senior officer on the scene, decided they would investigate; however, by this time, the individual in question had entered the Sunoco gas station convenience store next door. At 7:44 p.m., Caton and Hunter began walking to the convenience store; after retrieving his "PR-24" baton from his cruiser, Jorg joined them in waiting outside the convenience store while the subject of their surveillance - the decedent, Roger Owensby, Jr. - purchased two cigars and an energy drink.

Although the testimonial evidence is somewhat inconsistent as to whether Hunter was convinced at this point that the decedent was "LA,"[7] it is undisputed that Jorg confronted and stopped Owensby as he attempted to leave the convenience store, and, pursuant to his consent, the officers began interrogating him.

---

[7] It is undisputed that although Owensby was an African-American male of average height and weight, he had a beard and wore dreadlocks. Furthermore, it is also undisputed that none of the officers ever asked Owensby whether he went by the alias "LA."

-12-

It is uncontested that he complied with their request and answered all their questions, including truthfully identifying himself as Roger Owensby; Jorg conceded that Owensby was cooperative and respectful during this time.  Jorg informed Owensby they were looking for a person guilty of assault and who is known to carry a firearm.  In response, Owensby informed them that he was unarmed; not only did he lift his shirt to demonstrate that fact, but he also allowed Jorg to conduct a thorough "pat-down" search of his person, during which no weapon or suspicious item of any kind was found.  Owensby also informed Jorg and Caton that he was not wanted by authorities for any matter and that they could confirm this if they liked.

At some point during the continuing interrogation, Owensby complained about the treatment he received: "I don't appreciate you coming at me this way."  When asked whether he had ever assaulted or run from a police officer, he indicated that he had not.  At that moment, Hunter, who had been observing Owensby, approached very close to him and said, "Really?  When's the last time you ran from the police?" followed by,  "That's the guy."  At this point, Owensby attempted to slip past Officers Hunter and Caton and through the exit.  He was immediately tackled by Officers Jorg and Caton, however, during which he was forced into a parked car and, ultimately, facedown in the parking lot outside the Sunoco convenience store.  Jorg pinned him in a prone position with his

arms under his chest while Officer Caton rested on his legs. At this point – 7:47 p.m. – Caton issued an "officer needs assistance" call, and the officers began struggling with Owensby in an attempt to purportedly handcuff him. Caton straddled Owensby's thighs and buttocks while trying to extract his right arm from underneath his body, while Jorg lay across his shoulders and attempted to extract his left arm. It is undisputed that Caton struck Owensby in his lower back and right arm and that he also used his baton to strike Owensby on his legs as an attempt to exact "pain compliance" with his instructions.

Jorg quickly progressed to placing Owensby in a "head wrap," a technique that required him to lie across Owensby's shoulders and place his left arm around Mr. Owensby's head, placing the crease in his elbow at the center of Owensby's head. While so holding his head, Jorg employed a "mandibular angle pressure point pain compliance technique" by exerting pressure at the base of Owensby's right ear with his right hand. He also placed his knee on Mr. Owensby's left shoulder in the area of his left scapula.

Shortly thereafter, Cincinnati and neighboring Golf Manor police officers began responding to Caton's "officer needs assistance" call. Officer Sellers, waiting next door at the Sam's Carryout parking lot, left his partner Hesse with the minor misdemeanor marijuana arrestee and ran to assist. He testified in his deposition that upon arriving on the scene, Owensby was not

moving.   He also testified that it was impossible to discern
whether the difficulty the officers were experiencing in
extracting Owensby's arms from underneath him was the result of
Owensby's resistance or the consequence of the combined weight of
the officers and Owensby.[8]  Eventually, Sellers was able to pull
Owensby's left arm out from under him; Cincinnati Police Officer
Jason Hodge, also responding to the scene, used his baton to pry
Owensby's right arm out as well.  As a result, Sellers was able to
handcuff Owensby's right and left wrists together behind his back,
at which point he announced, "He's cuffed."  Despite this, however,
Caton allegedly demanded Hunter "Mace this motherfucker."  Hunter
instructed Jorg to lift Owensby's head so that he could mace him
directly in the face; in response, according to one witness to the
arrest, Jorg pulled Owensby's head up, turned his own head away,

---

[8] Based upon the uncontroverted deposition testimony of
various officers, the Plaintiff draws some basic conclusions
about the amount of weight they placed on Owensby during their
efforts to subdue him.  Hunter testified that various equipment
Cincinnati police officers are required to wear adds
approximately 28 pounds to an officer's weight.  On the day in
issue, including equipment, each of the officers weighed
approximately the following: Jorg, 250 pounds; Caton, 218 pounds;
Sellers, 215 pounds; Hunter, 205 pounds; and Hodge, 225 pounds.
In sum, Plaintiff contends that Jorg and Caton placed almost 500
pounds of weight on the prone Owensby and that, ultimately, the
five arresting officers purportedly subduing him weighed over
1000 pounds.  In their responses, the Defendants dispute this
assertion, stating that "there is no evidence that both Officer
Caton and Officer Jorg were on top of Owensby's back or chest"
(doc. 103).  It is uncontested, however, that Dr. Schultz found
two bilateral deep muscle contusions on Owensby's back, just
above the shoulder blades, resulting from heavy, sharp pressure
on his back (doc. 108).

and drove his knees into Owensby's back, according to a witness to the arrest.[9]  Despite the requirement articulated in the Cincinnati Police Use of Force Policy 12.545 that officers must, if possible, "spray[] chemical irritant...five to ten feet from an individual," Hunter sprayed Mace into Owensby's eyes and nose from a distance of six inches – twice (doc 88).[10]  In response, however, Owensby only grimaced, making no cry sound or cough.  Furthermore, despite Owensby's purported failure to offer any resistance, Officers Sellers and Hunter testified that they saw Caton repeatedly strike Owensby in the back after he was handcuffed.  According to their testimony, he only ceased doing so after Hunter exclaimed, "What the hell is he doing!"

At this point, all five of the Cincinnati police officers present on the scene – Jorg, Caton, Sellers, Hodge, and Hunter – stood up over the prone Owensby and picked him up off the ground. It is undisputed that Owensby's face was cut and bleeding and that

_____

[9] While it is uncontested that Owensby was repeatedly maced, the officers dispute whether the macings occurred before or after he was handcuffed.

[10] This policy also prescribes the treatment that individuals sprayed with mace or similar chemical irritants are to receive following exposure.  It provides, in relevant part:

> Expose individuals sprayed with chemical irritant to fresh air.  Give them an opportunity to rinse their face with plenty of clear, cold water.  Individuals should not rub or hold their faces, or use any oils, creams, or ointments [on their faces].

(doc. 98).

-16-

both Jorg and Caton had Owensby's blood on the sleeves of their shirts.

According to testimony, the cruiser nearest the arrest scene at this point in time belonged to two Golf Manor officers also responding to the request for assistance, Defendants Robert Heiland and Chris Campbell (collectively, with Golf Manor, the "Golf Manor Defendnats"). Jorg and Caton received permission from Heiland to place Owensby in the back of his cruiser and, after carrying him to the cruiser, placed him, handcuffed and unconscious, on the backseat of the Golf Manor cruiser.[11]  Caton proceeded to the other side of the cruiser and assisted in dragging Mr. Owensby headfirst into the rear of the automobile.  In his deposition, Hunter testified that Caton continued to beat Owensby even after he had been placed, handcuffed, in the back of the cruiser.[12]  What is not disputed, however, is that none of the

---

[11] Owensby's condition and method of transport to the cruiser is in active dispute, discussed more fully <u>infra</u>.  Some of the officers claimed he was still resisting arrest, whereas others testified that he was completely unresponsive and had to be carried.  Furthermore, Caton contends that Owensby shifted his position in the back of the cruiser and that, therefore, he was conscious or at least responsive at the time.

[12] As Hunter recalled during his deposition,

[Caton] was leaning in the doorway.  He was between the door and the inside of the car.  He was leaning in, and I could see him drawing back and coming down, drawing back, coming down, throwing either punches or open hand, I can't say, but he was throwing blows.  He was delivering blows.  And Mr. – the only thing he – he could eith – he could have been punching Mr. Owensby or

officers on the scene, either employed by Cincinnati or Golf Manor, ever attempted to provide Owensby with any medical care from the injuries resulting from this encounter to this point or during any of the subsequent six minutes.

At about this time, Cincinnati police officer Brian Brazile also arrived at the scene in response to the call. He was aware that Owensby had been maced and, upon inquiring about the source of blood on Jorg's sleeve, was told, "That's from the bad guy." At that point, he walked over to the cruiser and, utilizing his flashlight, observed Owensby laying in the back of the Golf Manor cruiser. Noting that Owensby was bleeding and that it didn't appear he could breathe, he told Heiland and Campbell, who were standing near the back door of the cruiser, "This looks fucked up. Can he breathe? It don't look like he can from the way he's laying." In response, the Golf Manor officers allegedly shrugged their shoulders in indifference; in any case, it is undisputed that they did not investigate or provide Owensby with any medical care.[13]

---

he could have been punching the back seat.

(doc. 89).

[13] In their motion for summary judgment, Golf Manor Police Officers Heiland and Campbell aver that they never had any physical contact with Owensby and that he "was never in [their] custody or control" (doc. 85). In sum, Heiland contends that he was asked by the Cincinnati officers if they would allow Owensby to be placed in the back of their cruiser: "I indicated they could and opened the door for them" (Id.). They claim that they have no responsibility or liability for anything that occurred, given that they were under the control of Cincinnati officers and

Furthermore, despite his observations, Officer Brazile made no further investigation, comment, or effort to aid Owensby, and he walked away.

Within a minute thereafter, Cincinnati Police Officer Victor Spellen arrived at the scene in his own police cruiser. He parked his car next to the Golf Manor cruiser in which Owensby lay, and his cruiser's video camera recorded all of the subsequent activity around the Golf Manor cruiser. Despite having at least eleven Cincinnati police officers and two Golf Manor officers on the general scene or in the immediate vicinity at this time – three of whom were trained Emergency Medical Technicians ("EMTs")[14] – no officer provided any medical care to Roger Owensby. Instead,

---

that they had "no input with respect to any medical care, if any, rendered to Mr. Owensby by City of Cincinnati police officers" (Id.). Heiland is a trained EMT, previously employed at Good Samaritan Hospital as a health technician, Eldercare as an EMT, and was trained as combat medic at the Army Major Medical Center at Fort Sam Houston.

[14] Two of the officers on the scene, Spellen and Heiland, had substantial experience and training as EMTs. Spellen, who parked next to the Golf Manor cruiser and was one of the officers who actually looked at Mr. Owensby, had received advanced EMT training from Queens college in New York and worked as an EMT for an ambulance service there. Heiland, operator of the Golf Manor cruiser in which Owensby was held, had worked at Good Samaritan Hospital as a health technician, at Eldercare as an EMT, and was a trained combat medic via his training at the Army Major Medical Center at Fort Sam, Houston, Texas. The third officer, Cincinnati Police Officer Hasse, was also a trained Army medic and had worked as an EMT in the West Chester Fire Department. He, however, had remained at Sam's Carryout with the misdemeanor marijuana suspect and, as such, was not on the scene. He testified in his deposition, however, that he could have been on the scene to offer assistance in less than 10 seconds.

testimony seems uncontroverted that the officers greeted each other, secured items that might have been dropped during Owensby's apprehension, and prepared for the arrival of their supervisors by making sure that their complete uniform was employed. Only Officers Spellen and Officer Brazile, looked at Owensby; yet, despite the fact it was getting dark, both commented on his appearance and noted that he appeared to be hurting a great deal.[15]

Approximately six minutes later, Cincinnati Sergeant Watts asked Heiland to roll down his window so that he could check on Owensby. When he did so, he promptly discovered that Owensby was not breathing. Owensby was immediately removed from the cruiser, and Caton and Hasse administered CPR; Owensby's hands, however, were kept handcuffed behind his back during the resuscitation attempts. An officer called the EMTs of the local fire rescue department at 7:56 p.m., and the first responding unit arrived four minutes later at 8:00 p.m. Despite the response, Owensby was never successfully resuscitated. He was transported to

---

[15] The VHS tape from Officer Spellen's cruiser, recording the Golf Manor cruiser in which Owensby lay, captured the following exchange between the two officers:

P.O. Spellen:  Looks like he's uh, hurting a little bit.

P.O. Brazile:  Yeah.  Lot a bit.

P.O. Spellen:  Yeah.

(doc. 88).

the University of Cincinnati hospital emergency room where a team of doctors and nurses attempted to revive him; however, he was pronounced dead at 8:47 p.m. that evening.

The coroner, after conducting a thorough investigation and autopsy, ruled Owensby's death a "homicide," resulting from "police intervention: asphyxiation during restraint attempts."[16] The autopsy also revealed petechia, or small hemorrhages of the blood vessels in the eye, consistent with compression of the chest or the veins in the neck, and both the autopsy report and autopsy photograph reveal numerous cuts and abrasions to Owensby's face. The Plaintiff's proffered medical testimony avers that that mechanical asphyxiation requires minutes to cause death, but the City of Cincinnati contends that its medical expert, Dr. Tom Neuman, has concluded that Owensby probably died instantly of a massive heart attack. The facts supporting the parties respective positions are hotly disputed; for example, those on the scene dispute whether Owensby walked to the Golf Manor cruiser at least

---

[16] Deputy Coroner Daniel M. Schultz, M.D., performed the autopsy report, and its findings were reflected on the decedent's death certificate, signed by Coroner Carl L. Parrott, M.D. According to Dr. Schultz, mechanical asphyxia of the type purportedly found results from the compression of the lungs and chest and/or neck such that vital organs, including the brain, are deprived of oxygen. This may result due to compression of the lungs and/or chest such that lungs cannot sufficiently expand to provide adequate oxygen for the bloodstream. When the heart pumps more quickly in an attempt to get more oxygen to the brain, the lungs become congested and fill with edema, ultimately resulting in death.

somewhat under his own power or whether he was unconscious and physically placed in the cruiser by the officers. Plaintiff does concede, however, that it is medically impossible to determine, in any case, whether Owensby was dead or merely unconscious when placed in the Golf Manor cruiser.[17]

<u>Applicable Police Department Procedures and Agreements</u>

The Cincinnati Police Department and the Golf Manor Police Department have both implemented various guidelines and policies that they aver serve to guide their officers as to how to respond to circumstances like those presented in the instant case. Cincinnati Police Procedure Manual § 12.545, the City's "Use of Force" Policy, provides that:

> When officers have a right to make an arrest, they may use whatever force is reasonably necessary to apprehend the offender or to effect the arrest, and no more. They must avoid using unnecessary violence. Their privilege to use force is not limited to that amount of force necessary to protect themselves, but extends to that amount reasonably necessary to enable them to perform

---

[17] The expert testimony surrounding the cause of Owensby's death has become the grounds of a substantial evidentiary fight between the Plaintiff and the Cincinnati Defendants. Not only has this dispute been waged in briefing the Plaintiff's motion for summary judgment (docs. 99, 102, 103, 108, 129, 130, 131, and 137), but Dr. Wecht's testimony has been the subject of a liminal motion before the Court as well (doc. 96). As the Court finds <u>infra</u> that Owensby's cause of death has little or no effect on the determination of the Defendants' liability for failure to provide medical care, the Court will not explore these opinions further. The Court suspects that these opinions will play a larger role in the proper determination and jury resolution of Plaintiff's excessive force claims.

their duty.
...
The use of deadly force to present escape of
felony suspects is constitutionally
unreasonable except where the escape presents
an immediate risk of death or serious physical
harm to the officer or another. Where the
suspect poses no immediate threat of death or
serious physical harm to others, the harm
resulting from failing to apprehend the
suspect does not justify the use of deadly
force to do so.
...
The courts could consider a choke hold or
other similar type hold as deadly force.
Choke holds should only be used with this in
mind.
...
Following any use of force resulting in a
citizen's injury, <u>officers will ensure
appropriate first aid is rendered immediately
once the incident scene is stabilized</u>.

(doc. 99)(emphasis added).[18] Nowhere in this document, however, is

the term "stabilized" defined or otherwise delineated. A few

sections later, § 12.600 of this Manual, entitled "Prisoners:

Securing, Handling, and Transporting," establishes certain

expectations for the treatment and transportation of injured

arrestees, including requirements that officers seek medical

attention for arrestees "immediately" if an arrestee becomes sick

or injured after the arrest, including summoning paramedics or

providing direct transport to the University of Cincinnati Hospital

---

[18] The policy also details how uses of force must be
reported and how a number of other situations must be handled.
For example, individuals exposed to chemical irritants—as Owensby
irrefutably was—must be "[e]xposed to fresh air" and provided an
"opportunity to rinse their face with plenty of cool, clear
water" (doc. 98).

-23-

(doc. 98).   The Manual of Rules and Regulations and Disciplinary Process for the Cincinnati Police Division exposes officers to disciplinary action for failing to abide by these policies and guidelines (Id.).   Golf Manor has similar policies, but they are not germane to the determination of the instant motion.

Finally, an agreement between Cincinnati and Golf Manor (and among other law enforcement entities located in and around Hamilton County) is implicated in this case.   Both are signatories to the "Hamilton County Local Government Mutual Aid Agreement for Law Enforcement."   Pursuant to provisions of the Ohio Revised Code, the parties executed the agreement "for the purpose of providing reciprocal police services across jurisdictional lines to enhance the capabilities of law enforcement to protect citizens and property throughout Hamilton County" (Id.).   This "assistance" may be provided in a number of circumstances and both with and without request, including the need to investigate crimes and to respond to requests for assistance.   Subdivision VI of this agreement provides some "General Terms and Procedures" that apply to support rendered thereunder. In particular, it provides that:

> Whenever the law enforcement employees of one cooperating Agency are providing police services upon request to another cooperating Agency they will be under the lawful direction and authority of the commanding law enforcement officer of the Agency to which they are rendering assistance.  Officers shall be subject to the code of ethics, policies, and rules and regulations of their employing Agency at all times.

-24-

Id.

## III.    SUMMARY JUDGMENT STANDARD

Although a grant of summary judgment pursuant to Fed. R. Civ. P. 56 is not a substitute for trial, it is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Id.; see also, e.g., Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464 (1962); LaPointe v. United Autoworkers Local 600, 8 F.3d 376, 378 (6th Cir.1993); Osborn v. Ashland County Bd. of Alcohol, Drug Addiction and Mental Health Servs., 979 F.2d 1131, 1133 (6th Cir.1992)(per curiam).   In reviewing the instant motion, "this Court must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Patton v. Bearden, 8 F.3d 343, 346 (6th Cir.1993), quoting in part Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)(internal quotation marks omitted).

The process of moving for and evaluating a motion for summary judgment and the respective burdens it imposes upon the movant and the non-movant are well settled.  First, "a party seeking summary judgment ... bears the initial responsibility of informing the district court of the basis for its motion, and

identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact[.]" <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>see also</u> <u>LaPointe</u>, 8 F.3d at 378; <u>Guarino v. Brookfield Township Trustees</u>, 980 F.2d 399, 405 (6th Cir.1992); <u>Street v. J.C. Bradford & Co.</u>, 886 F.2d 1472, 1479 (6th Cir. 1989). The movant may do so by merely identifying that the non-moving party lacks evidence to support an essential element of its case. <u>See</u> <u>Barnhart v. Pickrel,</u> <u>Schaeffer & Ebeling Co., L.P.A.</u>, 12 F.3d 1382, 1389 (6th Cir. 1993).

Faced with such a motion, the non-movant, after completion of sufficient discovery, must submit evidence in support of any material element of a claim or defense at issue in the motion on which it would bear the burden of proof at trial, even if the moving party has not submitted evidence to negate the existence of that material fact. <u>See</u> <u>Celotex</u>, 477 U.S. 317; <u>Anderson v.</u> <u>Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986). As the "requirement [of the Rule] is that there be no genuine issue of <u>material</u> fact," an "alleged factual dispute between the parties" as to some ancillary matter "will not defeat an otherwise properly supported motion for summary judgment." <u>Anderson</u>, 477 U.S. at 247-48 (emphasis added); <u>see</u> <u>generally</u> <u>Booker v. Brown & Williamson Tobacco Co., Inc.</u>, 879 F.2d 1304, 1310 (6th Cir. 1989). Furthermore, "[t]he mere existence of a scintilla of evidence in support of the [non-

movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 252; see also Gregory v. Hunt, 24 F.3d 781, 784 (6th Cir.1994). Accordingly, the non-movant must present "significant probative evidence" demonstrating that "there is [more than] some metaphysical doubt as to the material facts" to survive summary judgment and proceed to trial on the merits. Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 339-40 (6th Cir.1993); see also Celotex, 477 U.S. at 324; Guarino, 980 F.2d at 405.

Although the non-movant need not cite specific page numbers of the record in support of its claims or defenses, "the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the non-moving party relies." Guarino, 980 F.2d at 405, quoting Inter-Royal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir.1989)(internal quotation marks omitted). In contrast, mere conclusory allegations are patently insufficient to defeat a motion for summary judgment. See McDonald v. Union Camp Corp., 898 F .2d 1155, 1162 (6th Cir.1990). The Court must view all submitted evidence, facts, and reasonable inferences in a light most favorable to the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970); United States v. Diebold, Inc., 369 U.S. 654 (1962). Furthermore, the district court may not weigh

evidence or assess the credibility of witnesses in deciding the motion. See Adams v. Metiva, 31 F.3d 375, 378 (6th Cir. 1994).

Ultimately, the movant bears the burden of demonstrating that no material facts are in dispute. See Matsushita, 475 U.S. at 587. The fact that the non-moving party fails to respond to the motion does not lessen the burden on either the moving party or the Court to demonstrate that summary judgment is appropriate. See Guarino, 980 F.2d at 410; Carver v. Bunch, 946 F.2d 451, 454-55 (6th Cir.1991).

The primary claims placed at issue by the summary judgment motions currently before the Court are Plaintiff's constitutional deprivations for denial of medical care and excessive force, both brought pursuant to 42 U.S.C. § 1983. This statute provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983. Accordingly, before it is entitled to relief,

-28-

the Plaintiff must establish that Owensby was (1) deprived of a right secured by either the Constitution or laws of the United States (2) by the conduct of a person acting under color of state law. See, e.g., American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 50-51 (1999); Adickes v. H.S. Kress & Co., 398 U.S. 144, 151 (1970); Alkire v. Irving, 330 F.3d 802, 813 (6th Cir. 2003). Before the municipality may be held liable for the violation, the Estate must prove that "(1) a constitutional violated occurred; and (2) that the [City] is responsible for that violation." Graham ex rel. Estate of Graham v. County of Washtenaw, 358 F.3d 377, 382 (6th Cir. 2004), quoting in part Doe v. Clairborne Cty., 103 F.3d 495, 505-06 (6th Cir. 1996)(internal quotations omitted). There is no dispute among the parties that the officers of both Defendant municipal police departments were acting under color of state law in their official capacities at the times that the incidents forming the basis of this lawsuit occurred. Unsurprisingly, much of the summary judgment briefing therefore debates whether Owensby was deprived of a constitutional right by the officers and, perhaps in turn, the municipal Defendants. The Court will begin by addressing the Plaintiff's motions for summary judgment.[19]

**IV.    PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST**

---

[19] Plaintiffs' motions involve many of the same issues as the Golf Manor Defendants' motion for summary judgment, addressed later infra.  Accordingly, the Court will endeavor to present its analysis and discussions in the least repetitive manner possible by cross-referencing different portions of the Order.

-29-

THE CINCINNATI DEFENDANTS'

Plaintiff seeks summary judgment in its favor against the City of Cincinnati, Police Chief Streicher, and the individual Cincinnati Police Officers Jorg, Caton, Hunter, Sellers, and Spellen (collectively, the "Cincinnati Defendants")[20] as to its claim for the unconstitutional denial of medical care to Owensby on November 7, 2000. The Cincinnati Defendants contend that, at best, numerous questions of fact exist precluding the requested grant of summary judgment, including the cause of decedent's death and whether the existing policies and procedures and the training afforded the officers were sufficient to protect Owensby's constitutional rights. Upon consideration, however, the Court finds that reasonable jurors could only conclude that at least some of the Cincinnati Defendants violated Owensby's constitutional right to receive medical care on the night of his arrest and that, as a result, the Plaintiff is entitled to summary judgment in its favor as to this claim.

A. Applicable Legal Standard For Plaintiff's Failure To Provide Medical Care Claims

As a threshold matter, the Court must determine the

_____

[20] Plaintiffs also named Cincinnati Police Officer Jason Hodge as a Defendant in the instant action. Hodge, however, has been serving as a member of the United States military in Iraq. Understandably, he has been unable to participate in discovery and, in any case, is protected against default judgment and other procedural defaults by the Servicemembers Civil Relief Act, 50 App. U.S.C. §§ 501-594. Appropriately, Plaintiffs do not seek summary judgment against Hodge in their instant motion.

appropriate standard by which to assess the Cincinnati Defendants'
failure to provide medical care (and, indeed, by which to assess
the identical claims against the Golf Manor Defendants as well).
In its motion, the Plaintiff acknowledges that "[c]ourts often
analyze the constitutional duty to provide medical care for
pretrial detainees as a Fourteenth Amendment substantive due
process violation;" it contends, however, that on the facts of this
case the Fourth Amendment controls and that, as a result, the
officer's conduct must be evaluated by a "reasonableness" standard.
In response, the Cincinnati Defendants aver that a long line of
caselaw conclusively establishes that Owensby's rights in the
complained-of circumstances were governed by the Fourteenth
Amendment and that the "deliberate indifference" standard therefore
applies.

At the fore, it is undisputed by the parties and well
established by decades of constitutional jurisprudence that the
Fourth Amendment governs the rights that citizens enjoy in being
secure from "unreasonable searches and seizures." U.S. CONST.
AMEND. VI. Accordingly, a plaintiff advancing excessive force
claims against public officials or servants must prove that the
official action was, under the factual circumstances of the
particular case, objectively unreasonable. See Graham v. Connor,
490 U.S. 386, 394-97 (1989); Tennessee v. Garner, 471 U.S. 1, 7-9
(1985); Phelps v. Coy, 286 F.3d 295 (6th Cir. 2002); Scott v. Clay

-31-

County, Tenn., 205 F.3d 867, 876 (6th Cir. 2000).[21]

Plaintiff, however, invokes another element of the Graham holding: The Supreme Court has long held that the notion of substantive due process is not to be extended to secure protection of rights already protected by other, more specific Amendments. In Graham, the Supreme Court was required to determine the proper standard to be applied in assessing a plaintiff's claims for excessive force. The Court concluded that "[b]ecause the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide" for analyzing the excessive force claim. Id., 490 U.S. at 395. As the Plaintiff notes, the Supreme Court recently reaffirmed this principle in County of Sacramento v. Lewis, 523 U.S. 833 (1998):

> Because we have always been reluctant to expand the concept of substantive due process, we held in Graham v. Connor that [w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.

_____

[21] The merits of the excessive force claim against the Cincinnati Defendants are not before the Court on Plaintiff's motion. Based upon the evidence filed to date in the instant action, it appears as though a bona fide dispute of fact exists as to this issue, rendering it necessary to have the issue tried to a jury.

Id., 523 U.S. at 842, quoting in part Albright v. Oliver, 510 U.S. 266, 273 (1994)(plurality opinion of Rehnquist, C.J.)(internal quotation marks and citations omitted).

Noting the Fourth Amendment standard and invoking the Graham principle requiring that substantive due process rights be narrowly construed, the Plaintiff contends that because all of the events at issue in the instant case arise from "the conduct of police officers in stopping and seizing Roger Owensby, Jr.," all of the instant claims for failure to provide medical care should be "evaluated...under the rubric of a Fourth Amendment violation" (doc. 88).[22]   In support, it cites two primary cases where the deciding courts utilized such a standard; upon analysis, however, these cases lend little substantive aid.   The first, Estate of Phillips v. Milwaukee, 123 F.3d 586, 595 (7th Cir. 1997), involved the death of an arrestee who died after being handcuffed and placed

_____

[22] Although not directly stated, the Court assumes that the Plaintiff seeks to impose this standard, at least in part, on the grounds that the "seizure" of Ownesby was improper under the Fourth Amendment.   In its motion, it makes much of the fact that Owensby – if he were indeed the man who fled from Hunter on September 27 – could not have been charged for any crime save jaywalking, "a minor misdemeanor traffic ticket offense that would not even justify physical arrest" (doc. 88).   Furthermore, it notes that he "posed no immediate threat to the safety of the officers or to anyone else," and that he "offered no resistance [sic] to the[] officers who continued to beat and mace him" (Id.).   Given that the legality of the seizure would be premised on the Fourth Amendment, the Plaintiff apparently seeks to have the denial of medical care flowing from the "wrongful" seizure analyzed under the same standard.

in a prone position on the floor.[23]  Fundamentally different from
the instant case, the issue in <u>Estate of Phillips</u> is whether

_____

    [23] The court described the cause and facts surrounding his
death as follows:

> Dr. Steven Kream diagnosed Mr. Phillips' [the decedent]
> condition as involving cardiac arrest, anoxic
> encephalopathy/probable brain death, thyroid storm,
> Graves' disease and schizophrenia. Dr. Kream explained
> that these were contributing factors leading to Mr.
> Phillips' death. Dr. Kream opined that brain death can
> occur within three to four minutes of low oxygen to the
> brain and that brain death can occur even sooner in a
> person like Mr. Phillips who has suffered from disease.
> A thyroid storm results in extreme overactivity; a
> person with that condition may experience sweating,
> rapid breathing, a rapid pulse, and an active nervous
> system and heart. According to Dr. Kream, the
> manifestations of a thyroid storm are not necessarily
> observable.
>
> Dr. Jeffrey Jentzen performed an autopsy on Mr.
> Phillips on May 8. He determined that Mr. Phillips was
> an extremely obese individual[,] and [he] explained
> that, when an obese person is placed on the floor in a
> prone position, his ability to breathe is inhibited....
> He found that Mr. Phillips' heart was moderately
> enlarged and that Mr. Phillips' thyroid gland was
> extremely enlarged and almost wrapped completely around
> Mr. Phillips' trachea. Dr. Jentzen opined that a
> reasonable individual or police officer would not have
> been able to detect Mr. Phillips' heart and thyroid
> problems upon observation.  The autopsy revealed some
> minor abrasions on Mr. Phillips' body, but there were
> no external injuries to the head, scalp or neck region.
> Nor did the doctor observe any hemorrhaging in body
> cavities to suggest trauma. The death certificate says
> that the cause of death was "[s]udden unexpected death
> associated with law enforcement restraint...." He
> explained that placing Mr. Phillips in a prone position
> with his hands behind his back may have been a
> contributing factor to Mr. Phillips' death.

<u>Id</u>., 123 F.3d at 590.

placing and maintaining the decedent in the prone position, absent any notice that he was suffering from conditions that might more easily render him in distress in such a position, constituted "excessive force." As the court noted,

> Our holding that it was reasonable to place Mr. Phillips on the floor in a prone position necessarily implies that the officers did not use "deadly" force to restrain Mr. Phillips.... For a particular application of force to be classified as "deadly," it must at least "carry with it a substantial risk of causing death or serious bodily harm."... Under this standard, restraining a person in a prone position, with constant monitoring, cannot be characterized, in itself, as "deadly" force. Here, the officers did not hog- tie, choke or transport Mr. Phillips. Nor were his medical conditions (an enlarged heart, an enlarged thyroid, Graves' disease and a thyroid storm), which were contributing factors to Mr. Phillips' death, observable to the untrained eye.... The officers placed Mr. Phillips in a face down position to restrain him from injuring himself and others. That force, it turned out, when combined with Mr. Phillips' other health problems, resulted in Mr. Phillips' death. But the question is not whether the officers' actions aggravated an undiscovered injury or condition, but whether their actions were objectively reasonable under the circumstances. Placing Mr. Phillips in a prone position was reasonable under the circumstances and therefore comported with the Fourth Amendment.

Id., 123 F.3d at 593-94 (internal citations omitted).

To draw this distinction, it is important to note that the plaintiff in Estate of Phillips did not raise a claim for

denial of medical care claim in the suit.[24]  Almost in passing, the
Seventh Circuit noted that it had been "assuming that the police
officers had a duty to provide medical attention (and not to cut
off medical aid" upon the decedent's seizure as it performed its
analysis.  Id., 123 F.3d at 595.  It then, however, pronounced that
"it is somewhat awkward to conceptualize such an act or failure to
act as 'excessive force;' indeed, the duty to render medical aid is
more often thought of as one arising under the Due Process Clause
or the Eighth Amendment."  Id.  It then noted that the plaintiff
had advanced such an argument in briefing, citing DeShaney, but
then abandoned it at oral argument.  It ultimately concluded,
largely because the case involved excessive force claims, that "the
Due Process Clause is inapplicable to the instant case."  Id., 123
F.3d at 596.

    To be sure, there is some language in the opinion that
could be read to support this approach; the Seventh Circuit readily
acknowledges that "it is sometimes difficult to determine when an
arrest has ended" for purposes of the transition from Fourth
Amendment to Fourteenth Amendment protections and that it "think[s]
that it would be objectively unreasonable in certain circumstances

---

[24] Indeed, the facts pertinent to this case are
fundamentally different.  It was undisputed that the  defendant
officers in Estate of Phillips called for medical assistance
immediately after the arrest, and they remained by the decedent's
side and monitored his condition to some extent during the entire
time period at issue.

to deny needed medical attention to an individual placed in custody who cannot help himself." Id.  The Court finds, however, that when the case is presented against the factual and legal background of this case, this language is unpersuasive.

The second cited case, Alexander v. Beale Street Blues Co., 108 F. Supp. 2d 934 (W.D. Tenn. 1999), found a similarly bound and prone arrestee sharing an equally unfortunate demise.  His parents brought claims for denial of medical care under the Fourteenth Amendment.  The court, however, citing Estate of Phillips, struck all such claims, finding that these claims were governed by the Fourth Amendment:

> The court also finds that all of plaintiffs' allegations arising under the Fourteenth Amendment should be stricken as being immaterial. All of plaintiffs' allegations share the common nucleus that they are based on the officers' alleged conduct in seizing Alexander and their failure to provide medical attention during the seizure. Such claims are more appropriately analyzed under the reasonableness standard of the Fourth Amendment rather than under a substantive due process approach.... Plaintiffs' medical indifference claim will be examined under the framework of the Fourth Amendment to determine whether the officers' alleged denial of medical care was reasonable under the circumstances.

Id., 108 F. Supp. 2d at 940-41.  Although it certainly stands for the proposition for which Plaintiff invokes it, there is no real analysis in the decision justifying this determination.  In fact, the case appears to be somewhat of an aberration in the law.  The

same district court, in deciding a case a little over a year later and citing <u>Alexander</u> as precedent, nonetheless utilized a Fourteenth Amendment "deliberate indifference" standard in evaluating the plaintiff's claim for denial of medical care. <u>See</u> <u>Davenport v. Simmons</u>, 192 F. Supp. 2d 812, 822 (W.D. Tenn. 2001).

Despite Plaintiff's assertions to the contrary, the doctrine of constitutional interpretation established in <u>Graham</u> and followed since – while inarguably accurate – does not inevitably lead to the application of the Fourth Amendment in this context. Indeed, it is worth noting that the Supreme Court, applying the <u>Graham</u> rationale, found that the <u>Sacramento</u> plaintiff did not enjoy a protected right under the Fourth Amendment. The Court appropriately turns to an analysis of the genesis and constitutional foundation for an arrestee's right to medical care in reaching a decision on this issue.

The Supreme Court first held that denial of medical care to prisoners constituted a constitutionally cognizable injury in <u>Estelle v. Gamble</u>, 429 U.S. 97 (1976). Recognizing that the Eighth Amendment has come to proscribe punishments "incompatible with the evolving standards of decency that mark the progress of a maturing society," the Court concluded that

> deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain...proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's

> needs or by prison guards in intentionally
> denying or delaying access to medical care or
> intentionally interfering with the treatment
> once prescribed. Regardless of how evidenced,
> deliberate indifference to a prisoner's
> serious illness or injury states a cause of
> action under § 1983.

Estelle, 429 U.S. at 104-105 (internal quotation marks and citations omitted). The Eighth Amendment, however, applies only to those who have been convicted of a crime; "[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law." Ingraham v. Wright, 430 U.S. 651, 671-72 (1977). Accordingly, the Eighth Amendment has no application to pretrial detainees, and it provides them no constitutional protection from denial of medical care. See id., 430 U.S. at 671 & n. 40; see also City of Revere v. Massachusetts General Hosp., 463 U.S. 239, 244 (1983).

Three years later, the Supreme Court delineated the general contours of a pretrial detainee's constitutional rights in Bell v. Wolfish, 441 U.S. 520 (1979). In considering the plaintiffs' challenges to a number of their conditions of confinement, such as overcrowding and improper searches, the Court held that courts reviewing such claims "must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." Id., 441 U.S. at 538. In applying the test, the Court found that

> if a particular condition or restriction of
> pretrial detention is reasonably related to a
> legitimate governmental objective, it does
> not, without more, amount to "punishment."
> Conversely, if a restriction or condition is
> not reasonably related to a legitimate
> goal--if it is arbitrary or purposeless--a
> court permissibly may infer that the purpose
> of the governmental action is punishment that
> may not constitutionally be inflicted upon
> detainees qua detainees.

Id., 441 U.S. at 539 (emphasis in original).  The Supreme Court has

since used this test in evaluating the constitutionality of a

number of restrictions placed on pretrial detainees.  See, e.g.,

United States v. Salerno, 481 U.S. 739, 746-47 (1987)(evaluating

Bail Reform Act's authorization of pretrial detention); Block v.

Rutherford, 458 U.S. 571, 588-92 (1984)(evaluating policy

prohibiting contact visits for pretrial detainees).

    In City of Revere, the Court first directly considered

the protection of a pretrial detainee's right to medical care.

Although the Court concluded that although Eighth Amendment

protection was unavailable, it held that the "Due Process Clause

[of the Fourteenth Amendment]...does require the responsible

government or governmental agency to provide medical care to

persons...who have been injured while being apprehended by the

police."  Id., 463 U.S. at 244.[25]  Although it did not articulate

---

[25] The fact that the Supreme Court saw fit to analyze this
obligation under the Fourteenth Amendment as opposed to the
Fourth Amendment lends support to the conclusion that the
Fourteenth Amendment standard is applicable in the instant case.

a particular standard, the Court concluded that "the due process rights of a [pretrial detainee] are at least as great as the Eighth Amendment protections available to a convicted prisoner." Id. (emphasis added); see also Roberts v. City of Troy, 773 F.2d 720, 723 (6th Cir.1985). In the case before it, however, the Court found that the defendant municipality "fulfilled its constitutional obligation by seeing that [the plaintiff] was taken promptly to a hospital that provided the treatment necessary for his injury." Id., 463 U.S. at 245.

The pertinent question not yet directly addressed by the Supreme Court, and the issue raised by the Plaintiff, is what constitutional protection and standard is most applicable in such circumstances. See, e.g., Spencer v. Knapheide Truck Equipment Co., 183 F.3d 902, 906 (8th Cir. 1999)("The standard to be applied in assessing a pretrial detainee's claim of due process violations, such as this one, is not entirely clear."); Patten v. Nichols, 274 F.3d 829, 834 (4th Cir. 2001)(noting that "the Supreme Court has yet to decide what standard should govern"). Clearly, the Eighth Amendment's "deliberate indifference" standard is the minimum threshold permissible under Revere; however, a reasonable argument can certainly be made that pretrial detainees should be entitled to greater protection. While the Eighth Amendment forbids convicted prisoners from receiving "cruel and unusual punishments," pretrial detainees – not yet either charged or convicted of any crime – may

not be subjected to any punishment at all.  <u>See</u> <u>Revere</u>, 463 U.S. at 244; <u>Ingraham</u>, 430 U.S. at 671-72; <u>Bell v. Wolfish</u>, 441 U.S. 520, 539 (1979).

In fact, the Supreme Court has expressly held that, in other circumstances, individuals "involuntarily" held by the state who are not yet convicted of any crime have been afforded greater rights to medical care.  In <u>Youngblood v. Romeo</u>, 457 U.S. 307, 321-322 (1982), the Supreme Court held that a developmentally disabled individual committed involuntarily to a state hospital retains constitutionally protected liberty interests under the Fourteenth Amendment.  "Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish."  <u>Id</u>., 457 U.S. at 321-22.  Although the question of medical care was not before the Court, it generally held that decisions regarding the institutionalized person's care be subject to professional judgment, and it found that liability could be established "only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment."  <u>Id</u>., 457 U.S. at 323.  In sum, the Supreme Court mandated essentially slightly heightened malpractice standard on such care. The Sixth Circuit has expressly recognized and adopted this

-42-

approach, allowing plaintiffs to prevail on violations of their substantive due process rights if the defendants "committed a substantial departure from accepted professional judgment." Terrance v. Northville Regional Pscyhiatric Hosp., 286 F.3d 834, 850 (6th Cir. 2002).

Although the Courts are somewhat split on the proper approach, a strong majority seems to have adopted the Eighth Amendment's "deliberate indifference" standard in assessing whether the rights of pretrial detainees to medical care under the Fourteenth Amendment have been violated. See, e.g., Lolli v. County of Orange, 351 F.3d 410, 418-419 (9th Cir. 2003)(utilizing "deliberate indifference standard); Brown v. Harris, 240 F.3d 383, 388 (4th Cir. 2001)(utilizing "deliberate indifference" standard); Taylor v. Adams, 221 F.3d 1254, 1258 (11th Cir. 2000); Barrie v. Grand County, Utah, 119 F.3d 862, 868-69 (10th Cir. 1997); Murphy v. Walker, 51 F.3d 714, 717 (7th Cir. 1995)("utilizing "deliberate indifference" standard); Hare v. City of Corinth, Miss., 74 F.3d 633, 649 (5th Cir. 1996)(en banc)(utilizing "deliberate indifference" standard). Most significant, the Sixth Circuit has adopted and repeatedly reaffirmed this standard as well. In light of the interpreting caselaw, the Court finds no justification for imposing a lower "reasonableness" threshold of liability in this

case.[26]  The Court will, however, interpret and apply the applicable Sixth Circuit cases in light of all of the substantive precedent, including the Bell and Revere decisions.

In order to succeed on its motion for summary judgment as to the denial of medical care against the City of Cincinnati and its Defendant officers, the Plaintiff must demonstrate that they acted with "deliberate indifference to [Owensby's] serious medical needs." Estelle, 429 U.S. at 104.  The Supreme Court concluded that this standard contains both an objective and a subjective component.  See Wilson v. Seiter, 501 U.S. 294, 298-99 (1991).  Under the objective component, the plaintiff must prove that the medical need was "sufficiently serious." Farmer v. Brennan, 511 U.S. 825, 834 (1994); Watkins v. City of Battle Creek, 273 F.3d 682, 687 (6th Cir. 2001).  The subjective component, by comparison, requires that the defendant have a "sufficiently culpable state of mind." Farmer, 511 U.S. at 834.

As the Sixth Circuit has repeatedly noted, "[d]eliberate indifference is not mere negligence;" it is not sufficient that the officer should have objectively known of an obvious risk or risks to the Plaintiff's well-being. Watkins, 273 F.3d at 686; see also Weaver v. Shadoan, 340 F.3d 398, 410 (6th Cir. 2003).  Rather, a

---

[26] Of course, if the Court finds that the Plaintiff is entitled to judgment on the higher "subjective indifference" standard, it would certainly be entitled to judgment on the Fourth Amendment "reasonableness" standard as well.

defendant must both "know[] of and disregard[] an excessive risk to [a plaintiff's] health or safety." Farmer, 511 U.S. at 834. Accordingly, culpable defendants must both "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." Id.; see also Watkins, 273 F.3d at 687. Accordingly, "[k]nowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs...is essential to a finding of deliberate indifference." Horn, 22 F.3d at 660. It is not necessary, however, to demonstrate that the officials had a conscious intent to inflict pain upon the Plaintiff in this case. See Horn by Parks v. Madison County Fiscal Court, 22 F.3d 653, 660 (6th Cir. 1994)(noting that willful blindness to risks may suffice); Molton v. City of Cleveland, 839 F.2d 240, 243 (6th Cir. 1988). Furthermore, demonstration of the fact that the official actually drew the required inference may be demonstrated through circumstantial evidence or by showing that the risk was "obvious." Farmer, 511 U.S. at 842 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, ... and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."); Watkins, 273 F.3d at 687-88; Horn, 22 F.3d at 660.

B. <u>Application of the "Deliberate Indifference" Standard to the Actions of the Defendant Cincinnati Officers</u>

There appears to be no bona fide dispute among the parties that, viewed objectively, Owensby's medical need was "sufficiently serious."  To the extent that such a dispute does exist, however, the Court finds this prong satisfied as a matter of law.  Regardless of whether Owensby's condition was the result of injuries suffered during the struggle with the Cincinnati police officers or his own physical condition – or a combination thereof – a cessation of breathing and an arrested heart are "serious medical needs" worthy of immediate care.  <u>Estelle</u>, 429 U.S. at 104. All of the officers, however, dispute that they were subjectively aware of Owensby's distress and that, accordingly, summary judgment against them is inappropriate.  The Court turns to evaluate the actions of each of the individual Cincinnati officers to determine whether their behavior satisfied the "subjective" prong of the "deliberate indifference" standard for failure to provide Owensby with medical care.

**1. Officer Spellen**

Officer Spellen, a trained EMT, was one of the few officers who actually observed Owensby in the rear of the car prior to Sergeant Watts's announcement that Owensby was not breathing. Although he arrived at the scene after Owensby had been subdued and placed in the back of the Golf Manor cruiser, he was aware that

-46-

Owensby had been maced.[27]  Furthermore, and far more significant,

he specifically agreed with Brazile – the officer who had commented

that it appeared as though Owensby could not breathe – that he was

"hurting a ... lot a bit" (doc. 88).[28]    Furthermore, the Court

---

[27] The Plaintiffs contend that this knowledge, at least in
part, gives rise to actual knowledge on behalf of the individual
Cincinnati Defendants that Owensby required medical care.  All of
the officers admit being aware of the fact that Owensby had been
maced during his submission by police, and they all agree that
they were aware of the provision in the department's Use of Force
Policy § 12.545 that required them to provide Owensby with fresh
air and water after being exposed thereto.  The Court does not
agree, however, that this lends support to the Plaintiff's claim
for denial of medical care.  Nowhere do any of the parties
suggest or otherwise submit proof that being maced with chemical
irritant gives rise to an "excessive risk" to Owensby's "health
or safety."  Clearly, some of the testimony surrounding their
failure to provide him with the required relief is questionable
at best.  Arguably, willfully failing to provide him relief from
the pain associated with the mace could constitute brutal,
sadistic treatment that "shocks the conscience," giving rise to a
substantive due process violation in its own right. See, e.g.,
County of Sacramento v. Lewis, 523 U.S. 833, 848 (1998) ; Rochin
v. California, 342 U.S. 165 (1952).  Furthermore, it is certainly
possible that had they pursued providing him this relief with
more vigor, someone willing to act might have discovered him
unresponsive more quickly.  Nonetheless, the failure to provide
him with this relief cannot constitute part of their deliberate
indifference to his medical needs.

[28] Purportedly, Spellen thought that this was the result of
the mace; therefore, he found it unnecessary to take any remedial
action.  It does not follow, however, that the Court's
determination that the lack of treatment for mace exposure leads
to the conclusion that Spellen's conclusion justified any denial
of care.  First, the Court notes that Owensby suffered other
injuries warranting care that Spellen may be presumed to have
seen upon observing him. Second, and more significant, the Court
held that the Cincinnati officers could not be held liable for
denial of medical care simply because they did not provide the
assistance outlined in the City's Use of Force Policy and,
therefore, would have noticed that he needed additional
assistance.  In this case, however, Spellen actually saw his

finds it indisputable, based upon the medical testimony at issue
and Owensby's autopsy photos, that he suffered substantial physical
injury to his face, resulting in blood that would have been readily
visible to someone observing him.  In light of these circumstances,
and his own subjective comment that Owensby was "hurting," it can
be concluded, as a matter of law, that Spellen was subjectively
aware of the risk to Owensby's well-being that his condition posed
and that, despite this knowledge, he did nothing to summon any
medical care.

**2. Officer Sellers**

Officer Sellers's testimony differs somewhat from some of
his fellow officers; for purposes of deciding this portion of the
motion, it is unnecessary to reconcile the differences in the
various accounts.  As noted <u>supra</u>, it is Sellers's <u>subjective</u>
assessment of the events at issue that drives the Court's
determination of whether this prong of the "deliberate
indifference" standard is satisfied.  Even if Sellers has a

---

condition and acknowledged to Brazile that Owensby was
"hurting...lot a bit."  Faced with this knowledge, he had the
obligation to provide Owensby with medical treatment, yet
declined to do so.  Furthermore – although the Court does not
rely upon this fact – Spellen was the only other officer besides
Brazile to physically observe Owensby in the rear of the car.
Given that Brazile drew the conclusion that Owensby appeared
unable to breathe and that Spellen acknowledged, in conversation
with Brazile, that Owensby appeared to be ailing, there is, at
least, a strong inference that Spellen either drew the same
conclusion or was faced with facts such that it was actionable he
did not.

different recollection of the events at issue from everyone else who was present at the scene, his subjective assessment of the facts and Owensby's condition is all that is relevant in this analysis.

Officer Sellers participated in the arrest; however, his testimony almost uniformly reveals that he viewed Owensby as a man in distress. In his deposition, he began by noting that he could not ascertain whether Owensby's "resistance" to the attempts to handcuff him was due to his active resistance or merely a consequence of the weight placed upon him by Officers Jorg and Caton. He claims that Hunter maced Owensby twice, at close range, after he had already been handcuffed by the officers, yet remained motionless and silent. He testified that Caton repeatedly punched Owensby in the back after he had been handcuffed and was not resisting. Finally, he notes that Jorg and Caton had to slide Owensby into the rear seat of the police car prone and head first.

On these facts, the Court finds, as a matter of law, that a reasonable jury could only conclude that Officer Sellers was subjectively aware of a substantial risk of serious harm to Owensby, yet did nothing to aid him by summoning appropriate medical care. The circumstances of this case "clearly indicat[e] the existence of such needs;" the fact that Sellers enumerated them in his deposition renders it indisputable that he was actually aware of them. Farmer, 511 U.S. at 834. No reasonable jury could

find to the contrary, making summary judgment in the Plaintiff's favor appropriate.

### 3. Officer Hunter

Officer Hunter's testimony is rather similar to that of Officer Sellers; for example, he recalls seeing Owensby dragged to the Golf Manor car.[29]  He, however, recalls seeing Caton punch Owensby repeatedly not only while he lay handcuffed on the ground but also after he had been placed in the Golf Manor cruiser, handcuffed and defenseless.  Again, when these facts are viewed in a light most favorable to Hunter and the disputed facts are also noted, no reasonable jury could conclude that Hunter did not subjectively recognize that Owensby faced a substantial risk of serious harm and still failed to summon or otherwise provide appropriate medical care for his condition.

### 4. Officers Jorg and Caton

Unlike the other three Cincinnati officers, the Court remains unconvinced that the Plaintiff is entitled to summary judgment against these two officers on its claim for denial of medical care.  To be sure, Jorg and Caton are, by all accounts of the officers involved, accused of inflicting most of the physical harm on Owensby, although the extent of such harm is in great dispute.  As these Defendants dispute these assertions, however,

---

[29] Officer Hunter disputes, however, macing Owensby after he was handcuffed.

-50-

and maintain that Owensby was largely responsive and combative during the events in question, there is no evidence indicating that Jorg or Caton made any subjective assessment of any risk of serious harm to Owensby.  Although Jorg and Caton had blood from Mr. Owensby on their shirts, this blood – standing alone – is insufficient to establish as a matter of law "circumstances clearly indicating the existence of" Owensby's serious medical needs. Horn, 22 F.3d at 660.  Accordingly, the Court finds that a question of fact exists as to whether these two officers violated Owensby's right to medical care, and the Plaintiff's motion for summary judgment will be denied as to these two officers as a result.

C. Defensive Responses

        In addition to contending that the facts do not satisfy the "deliberate indifference" standard, already addressed supra, the Cincinnati Defendants advance two additional defenses.  First, all of the Cincinnati Defendants contend that, based upon the testimony of their expert witness Dr. Neuman, that it is likely Owensby died instantly from physical ailments, not the treatment of the officers.  They insist that this raises a question of fact as to whether any effort to obtain medical aid on his behalf would have been futile and, Defendant argues, his constitutional claim for deprivation of medical care is eliminated as a result. Second, the Cincinnati police officers – Jorg, Caton, Sellers, Spellen, and Hunter – contend that they are entitled to qualified immunity from

suit on Plaintiff's denial of medical care claims.  The Court addresses these contentions seriatim.

## 1. Futility

Based upon Dr. Neuman's testimony that Owensby died of a sudden cardiac arrest and that "CPR, regardless of when it would have been instituted, would not, to a reasonable degree of medical probability, have made it more likely than not that he would have survived," the City and Chief Streicher contend that "any medical care, regardless of when it was instituted, would not have mattered" (doc. 99).  As a result, they aver that because the Plaintiff has "failed to prove that any medical care would have prevented the decedent's death, Plaintiff has failed to demonstrate that any constitutional right was violated" (doc. 99).

This conclusion is admittedly confusing because, in between these two statements in its memorandum, the City and Chief Streicher make the following admission: "Due process requires that police officers seek the necessary medical attention for a detainee when he or she has been injured while being apprehended by either promptly summoning the necessary medical help or by taking the injured detainee to a hospital" (Id.).  This is, indeed, an accurate summary of their obligation in this circumstance, as established by the Supreme Court.  See City of Revere, 463 U.S. at 244-45; see also Rich v. City of Mayfield Heights, 955 F.2d 1092, 1097 (6th Cir. 1992).  However, unlike the Rich case, the officers

in this instance did <u>not</u> promptly summon medical care, despite the reality, as the Court has found <u>supra</u>, that three of the Defendant officers either subjectively recognized Owensby's distressed condition or were faced with facts so patently reflective of it that no reasonable jury could conclude that they were not deliberately indifferent to his serious need for medical care. Put simply, while <u>Rich</u> may accurately state the contours of the law, the facts of this case render <u>Rich</u> fundamentally distinguishable. Furthermore, the City and Chief Streicher's attempt to somehow excuse the officer's conduct by citing <u>Rich</u>'s proposition that officers are not obligated "to render CPR in any and all circumstances" ignores the fact that this "concession" is necessarily tied to their concomitant obligation to summon medical assistance on their behalf or otherwise provide it to them.  <u>Rich</u>, 955 F.2d at 1097, <u>quoting</u> <u>Maddox v. City of Los Angeles</u>, 792 F.2d 1408, 1415 (9th Cir. 1986).  Indeed, a few pages earlier in its response, the City notes that the Sixth Circuit held as early as 1972 that "where the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness, the <u>denial of such aid</u> constitutes the deprivation of constitutional due process."  <u>Fitzke v. Shappell</u>, 468 F.2d 1072, 1076 (6th Cir. 1972).[30]  While the officer may not be constitutionally obligated

---

[30] This case, of course, precedes <u>Estelle</u> and the subsequent progeny of caselaw interpreting and applying the "deliberately indifferent" standard.  While some of the principles and

-53-

to provide the physical assistance himself, he is obligated to ensure that the assistance is otherwise summoned or provided to avoid constitutional liability.  This the officers did not do; accordingly, this is no defense.

Admittedly, however, no case cited by the City and Streicher explains or supports their proposition that absent proof the sought medical care would have prevented Owensby's death, the Plaintiff cannot prove violation of his constitutional rights.[31]

_____

requirements implied in this ruling have been effectively undermined as a result, this fundamental holding of the case remains undiminished.

[31] To be sure, there is some caselaw – not discussed by either party – that requires a plaintiff seeking recovery for deprivations of medical care to prove that the delay gave rise to specific ill effects.  Significantly, however, these cases involve claims for <u>delay</u> in receiving medical care, not <u>denial</u> in receiving care.  For example, in <u>Napier v. Madison County, Ky.</u>, 238 F.3d 739, 742 (6th Cir. 2001), the Sixth Circuit adopted the requirement that "[a]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed."  Such an approach is sound judicially and constitutionally; not all delays in providing medical care (such as an hour delay in receiving an antibiotic prescription, for example) rise to the level of constitutional deprivations.  Accordingly, requiring such proof "will often afford the court with the best available evidence on the question of whether the alleged deprivation is sufficiently serious, and whether the inmate is incarcerated under conditions posing a substantial risk of serious harm." <u>Id.</u>, <u>quoting</u> <u>in</u> <u>part</u> <u>Brown v. Bargery</u>, 207 F.3d 863, 867 (6th Cir. 2000)(internal quotation marks and other citations omitted); <u>see</u> <u>also</u> <u>Joseph ex</u> <u>rel. Estate of Harbin v. City of Detroit</u>, 289 F.Supp.2d 863 (E.D. Mich. 2003).  The fundamental difference with these cases is that the plaintiff received medical care at some point and, at most, died a substantial time thereafter.  In this case, however, Owensby was already in arrest before the first attempts at medical care were ever attempted.  Accordingly, he was denied

An unbroken line of caselaw spanning decades focuses, as does Rich, on the need to provide medical care to a prisoner or pretrial detainee, rather than any purported requirement that it be optimally efficacious.   In Estelle, the seminal case, the Court established "the government's obligation to provide medical care for those whom it is punishing by incarceration." Id., 429 U.S. at 103 (emphasis added).   The same case, however, found the Court rejecting mere medical malpractice – an unacceptable end result rooted in professional misjudgment – from within constitutional purview and, indeed, establishing the standard as "deliberate indifference."   See id.   The very phrasing of the standard emphasizes that it is the failure to respond to known needs that is fundamentally objectionable, rather than the undesired results that may ultimately accrue; subsequent caselaw recognizes this fact. Accordingly, the City's and Chief Streicher's contention that Plaintiff's failure to prove that medical care would have prevented his death somehow undermines or precludes his constitutional claim for denial of medical care is without merit.

## 2. Qualified Immunity

Cincinnati Police Officers Caton, Jorg, Sellers, Spellen,

---

medical care rather than merely receiving a delay, and the Plaintiff is not required to establish the effects of the delay. See Vaughn v. City of Lebanon, 18 Fed.Appx. 252 (6th Cir. 2001)(distinguishing two types of claims).  Of course, even if it were required to do so, Owensby's death would likely suffice as a "sufficiently serious" medical need.

and Hunter all aver that even if a constitutional violation occurred in denying Owensby medical care, they are entitled to qualified immunity from suit.[32]   The Court disagrees.

---

[32] In their response (doc. 103), these four individual defendants raise qualified immunity as a defense to Plaintiff's motion for summary judgment.  Some of the argument in this section is expressly directed toward excessive force claims; it may be that it was included because the Plaintiff urged the Court to accept a Fourth Amendment "reasonableness" standard in determining liability for the failure to provide medical care. To the extent, however, that they sought to raise it as a defense as to Plaintiff's excessive force claims, however, it is untimely and improper.  First, Plaintiff's motion does not address or seek judgment on its excessive force claims; the response is unresponsive to the extent it seeks to address them.  Second, it is untimely.  Because qualified immunity provides "immunity from suit rather than a mere defense to liability," the Supreme Court has noted that it is an "issue [that] should be [resolved] early in the proceedings."  Saucier v. Katz, 533 U.S. 194, 200-201 (2001); see also Crawford-El v. Britton, 523 U.S. 574 (1998)(finding qualified immunity a "defense [that] should be resolved as early as possible" in the proceedings); English v. Dyke, 23 F.3d 1086, 1090 (6th Cir. 1994).  Apparently, had the Plaintiff not filed a motion for summary judgment in its favor, these individual Defendants were either content to abandon the defense entirely as to all claims or, at best, to raise it as a defense at trial.

   This Circuit recognizes that qualified immunity may be raised at various point in the progression of litigation. See, e.g., English, 23 F.3d at 1090.  However, this Court also enjoys discretion to find a waiver "if a defendant fails to assert the defense within time limits set by the court or if the court otherwise finds that a defendant has failed to exercise due diligence or has asserted the defense for dilatory purposes." English, 23 F.3d at 1090; see also Brown v. Crowley, 312 F.3d 782, 787-88 (6th Cir. 2002).  Out of an interest of judicial efficiency, the Court finds that these four defendants raised the defense appropriately as to Plaintiff's demand for summary judgment on the medical care issue.  As to the claim for excessive force, however, the Court finds that these Defendants have waived qualified immunity as a defense for the purposes of summary judgment proceedings.  See English, 23 F.3d at 1090; Brown, 312 F.3d at 787-88.  They are free, of course, to raise it again as a defense at trial, but they may not raise it as grounds

Qualified immunity is a long-standing doctrine that provides officials "immunity from [the indignities of] suit rather than a mere defense to liability." <u>Saucier v. Katz</u>, 533 U.S. 194, 200-201 (2001). In sum, it protects officials from being held liable for constitutional violations they may have been committed but that, due to a lack of previous pronouncement by a court recognizing the particular right in question, they had no reason to know they were doing so. Under Supreme Court precedent, determining whether a police officer is entitled to qualified immunity is a two-step process. First, the Court must ascertain whether the officer's alleged conduct violated a constitutional right. <u>See</u> <u>Chavez v. Martinez</u>, 538 U.S. 760, 766 (2003); <u>Saucier</u>, 533 U.S. at 201. In other words, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" <u>Saucier</u>, 533 U.S. at 201. If it does not, then the inquiry is at an end: the officer is entitled to qualified immunity from suit. <u>See</u> <u>Chavez</u>, 538 U.S. at 766; <u>Saucier</u>, 533 U.S. at 201 ("If no

---

for interlocutory appeal. <u>See</u> <u>id</u>.

    Finally, it is worth noting that Officer Hunter did not explicitly raise qualified immunity as a defense in his response. Instead, he raised a "good faith immunity defense" pursuant to some uncited case quotation. He clearly avers, however, that he is "not liable in his individual capacity because he was acting pursuant to his understanding of Police Division policy and procedure" (doc. 102); in substance, this defense sounds in qualified immunity, and it raises the same contentions as those advanced by the other individual Cincinnati officers in their claim thereof. Accordingly, the Court will treat it as such.

constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.") If, however, the complained-of conduct would violate one or more of the plaintiff's constitutional rights, a second inquiry is required: The Court must ascertain whether the particular right allegedly violated was clearly established at the time the violation occurred. Saucier, 533 U.S. at 201. The Supreme Court has, however, circumscribed the scope of the review of this issue:

> This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable.
>
> [W]e emphasized in Anderson "that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.

Saucier, 533 U.S. at 201-202 (citations omitted); see also Wilson v. Layne, 526 U.S. 603, 615 (1999)("[A]s we explained in Anderson, the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly

-58-

established").

The bulk of the moving officers' arguments supporting their claim of entitlement to qualified immunity is rooted in their contention that Owensby was not deprived of a constitutional right. The Court has already concluded supra, however, that three of the officers seeking qualified immunity unconstitutionally deprived Owensby of his Fourteenth Amendment right to medical care, and it also held that, on the basis of this same precedent, a question of fact remains as to the liability of the remaining two officers. Accordingly, the Court has already found the first prong satisfied, either as part of its determination that a violation actually occurred or, viewing the facts "in the light most favorable to the party asserting the injury," as part of its conclusion that the "he facts alleged show the officer's conduct violated a constitutional right." Saucier, 533 U.S. at 201. These determinations necessarily dispose of most of the officers' objections.

Turning to the second prong – the requirement that the right in question be "clearly established" – the Court can safely say that the caselaw explored in substantial depth supra holds that the decedent's right to medical care was clearly established as of November 7, 2000. Even if the precedent is read narrowly, the right of pretrial detainees to receive medical care was established by the Supreme Court's 1983 holding in Revere, and a wealth of caselaw since this holding has placed this proposition beyond

refutation. <u>See</u>, <u>e.g.</u>, <u>Sanderfer v. Nichols</u>, 62 F.3d 151 (6th Cir. 1995); <u>Horn by Parks v. Madison County Fiscal Court</u>, 22 F.3d 653 (1994); <u>Roberts v. City of Troy</u>, 773 F.2d 720 (6th Cir. 1985); <u>see also</u> <u>Scicluna v. Wells</u>, 345 F.3d 441, 446 (6th Cir. 2003)("Deliberate indifference to a prisoner's serious medical condition was known to be a violation of the Eighth Amendment's right to be free from cruel and unusual punishment long before 1992.")

In contending that the second prong has not been satisfied, however, the moving officers apparently insist that the uncertainty in and/or lack of training regarding Cincinnati Police Procedure Manual § 12.545, noted <u>supra</u>, established such a different factual background as to render them unable to "know[] they were violating a constitutional right when they were simply following a procedure" (doc. 103). Even though it is undisputed that many of the officers on the scene held different conceptions as to when a scene is "stabilized" under the provision and that some argued that the Owensby scene was not yet so stabilized, this fact is utterly ineffectual to endow these defendants with qualified immunity.[33]

_____

[33] It is worth noting that although some of the officers contended that the scene had not been sufficiently "stabilized" so as to "activate" their responsibility to provide medical care, there is virtually no evidence submitted justifying such a finding. Assuming, as the Court must, that "stabilized" enjoys an ordinary meaning in this context, it is difficult to see what remained insecure at the scene even arguably justifying denial of

As noted, the obligation to provide Owensby with medical care is constitutional in nature; it cannot be minimized or otherwise restricted by a police procedure. Indeed, the test for whether an official is entitled to qualified immunity includes no inquiry as to state or local procedures; were this a relevant consideration, municipal police department procedures could, at least until applicable precedent was developed, insulate officers from liability for virtually any constitutional deprivation. While the officers might have been entitled to rely on this procedure if the right had not yet been clearly defined, see, e.g., Flagner v. Wilkinson, 241 F.3d 475, 483 (6th Cir. 2001), the fact that the right has been conclusively established for two decades renders any reliance on a procedure requiring the officer to take actions to the contrary patently unjustified. The fact that the policy might have served as a source of confusion for the officers in no way

_____

Owensby's necessary medical care. None of the officers were injured in the scuffle. There were no other suspects who required pursuit, arrest, or submission. There was no crime that had occurred that required "investigation;" Owensby was confronted regarding a violation alleged to have occurred some weeks earlier. Indeed, the testimony seems to reveal that the only issues to be addressed were the retrieval of some dropped items (including ammunition, a bona fide concern), the retrieval of each of the officers' hats so as to comply with uniform and equipment protocol, movement of some of the cruisers, and detailing of the incidents to supervisors. As a matter of law, the Court finds that none of these "exigencies" could have served to justify ignoring Owensby's medical needs in light of the fact that there were at least thirteen officers of various municipalities on the scene before and at the time Owensby was discovered to be in distress.

excuses the deprivation; indeed, the individual defendants cite no authority for such a proposition.

Similarly, Officer Hunter contends that the Mutual Aid Agreement between the two municipalities caused similar confusion among the responding officers, giving rise "to a material question of fact as to whose responsibility it was to provide medical care to Mr. Owensby once he was placed in the Golf Manor cruiser" (doc. 102). While, again, it is uncontested that the officers on the scene expressed completely contradictory opinions as to who was obligated to provide care under the agreement, the Court finds this fact immaterial in the face of controlling, well-established Supreme Court precedent. In sum, Hunter contends – much as the Golf Manor do in their motion for summary judgment and response to the Plaintiff's motion for same – that the concept of the term "custody" giving rise to an obligation to provide medical care is a narrow one. This reading, however, is wholly unjustified by either the terms applicable case law or the guiding principles expressed therein.

In general, the caselaw establishing the responsibility of the officers to provide medical care for "detainees" or "arrestees" in no way limit their holdings by the express terms of custody. Rather, the guiding cases continuously express the overarching concern and policy that state officials who have restrained a particular individual and thereby prevented them from

otherwise obtaining medical care on their own bear the responsibility for providing such care to him.

In deciding <u>Estelle</u> and concluding that prisoners enjoy constitutional rights obligating the state to provide them with necessary medical care, the Court was obviously as concerned about the relationship between the prisoner and the state as it was about the literal Eighth Amendment prohibitions on imposing cruel and unusual punishments:

> These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration. <u>An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met</u>. In the worst cases, such a failure may actually produce physical torture or a lingering death, the evils of most immediate concern to the drafters of the Amendment. In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose. The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency as manifested in modern legislation codifying the common-law view that [i]t is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself.

<u>Estelle</u>, 429 U.S. at 103-104 (internal citations and quotation marks omitted)(emphasis added).  In <u>Revere</u>, the most influential decision regarding the instant issue facing the Court, the Supreme Court was careful not to limit its holding solely to pretrial detainees: upon finding the right existed, the Court noted that it "need not define, in this case, Revere's due process obligation <u>to</u>

pretrial detainees or to other persons in its care who require medical attention." Revere, 463 U.S. at 244 (emphasis added). The Court reached a similar policy conclusion in Youngblood, although the nature of psychiatric commitment, appropriately enough, gave rise to different standards. See id., 457 U.S. at 317 ("When a person is institutionalized--and wholly dependent on the State[,] ... a duty to provide certain services and care does exist")(emphasis added).

All of these holdings, of course, are in accordance with the Supreme Court's most direct and comprehensive statement of the duty a state owes to those within its care. In Deshaney v. Winnebago County Dept. of Social Services, 489 U.S. 189 (1989), the Court drew the common principle out of its prior holdings, including Estelle and Youngblood, and made the following pronouncement:

> Taken together, [these cases] stand only for
> the proposition that when the State takes a
> person into its custody and holds him there
> against his will, the Constitution imposes
> upon it a corresponding duty to assume some
> responsibility for his safety and general
> well-being. The rationale for this principle
> is simple enough: when the State by the
> affirmative exercise of its power so restrains
> an individual's liberty that it renders him
> unable to care for himself, and at the same
> time fails to provide for his basic human
> needs--e.g., food, clothing, shelter, medical
> care, and reasonable safety--it transgresses
> the substantive limits on state action set by
> the Eighth Amendment and the Due Process
> Clause. The affirmative duty to protect arises
> not from the State's knowledge of the

-64-

individual's predicament or from its expressions of intent to help him, <u>but from the limitation which it has imposed on his freedom to act on his own behalf</u>. In the substantive due process analysis, <u>it is the State's affirmative act of restraining the individual's freedom to act on his own behalf--through incarceration, institutionalization, or other similar restraint of personal liberty--which is the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.</u>

<u>DeShaney</u>, 489 U.S. at 199-200 (internal citations, footnotes, and quotation marks omitted)(emphasis added).  The concept is clear: The duty to provide certain fundamental support to individuals, including medical care, is not dependent upon any talismanic word or particular expression; rather, it is based on a generalized "restraint of personal liberty" such that the person cannot provide this fundamental support to himself.  <u>Id.</u>, 489 U.S. at 200.[34]

---

[34] Furthermore, to the extent that interpretation of the Mutual Aid Agreement is necessary, the Court concludes that both parties were responsible for Owensby's medical care under the terms of the Agreement and under the facts of this case.  The Agreement itself clearly establishes that the Golf Manor officers, in responding to Cincinnati's call for assistance, were "under the lawful direction and authority" of the Cincinnati officers.  Of course, such an obligation does not relieve Golf Manor of discharging constitutional duties it owes to those within its control and restraint, regardless of what the Cincinnati procedures might otherwise entail.  The Agreement expressly provides for such a discrepancy by recognizing that the Golf Manor officers will still be "subject to the code of ethics, policies, and rules and regulations of their employing Agency at all times."

Although Golf Manor officers might have held Owensby in their cruiser, it is undisputed that the Cincinnati officers were

Additionally, it must be noted that the possibility that these procedures interject some arguably novel facts distinguishing this case from the facts contained in the controlling precedent does not entitle the officers to qualified immunity.  The Supreme Court has noted that its precedent "makes clear that officials can still be on notice that their conduct violates established law even in novel factual circumstances." Hope v. Pelzer, 536 U.S. 730, 741 (2002).  "A right can be clearly established even if there is no case involving fundamentally similar or materially similar facts if the premise of a prior case alerts officials to the clear applicability of the legal principle to a subsequent set of facts." Scicluna v. Wells, 345 F.3d 441, 446 (6th Cir. 2003)(internal citations and quotation marks omitted).  The long history of the legal principle at issue in this case and the broad obligation it

---

the only officers who actively sought to arrest Owensby for a violation and who, indeed, subdued him.  Golf Manor's response to a Cincinnati officer's request for assistance effectively rendered them, pursuant to the terms of the Agreement, agents on the Cincinnati officers' behalf, operating under the control and direction of the Cincinnati officers.  Finally, it is undisputed in the record that Cincinnati officers were to be the only force bringing charges against him for the events that allegedly occurred on November 7, 2000.  There is no evidence in the record that would justify the conclusion that Owensby was anything other than Cincinnati's arrestee.

Yet, the Golf Manor officers irrefutably also maintained physical control of Owensby separate and apart from that exerted by the Cincinnati officers.  They maintained sole control over the vehicle in which he was placed.  Presumably, they would have attempted to keep him from escaping had he been so able and attempted to do so.  As such, he was clearly within the "custody" of both agencies for the purpose of establishing their obligation to provide him with medical care for his serious medical needs.

imposes on officials places its "clear applicability" to the instant facts beyond question.[35] Id. Accordingly, the Court finds that Officers Jorg, Caton, Sellers, Spellen, and Hunter are not entitled to qualified immunity in the instant case.

C. Liability of the City of Cincinnati and Chief Streicher For Failure to Train and Supervise Their Officers

Finally, Plaintiff contends that the municipal Cincinnati Defendants' "failure...to properly train and supervise their officers" renders them liable for their constitutional violations (doc. 34).[36] The Supreme Court's most recent pronouncement on imposing municipal liability under 42 U.S.C. § 1983 for failure to train municipal officials is City of Canton, Ohio v. Harris, 489 U.S. 378 (1989). Canton involved, appropriately enough, a claim that the City of Canton violated the plaintiff's rights to receive necessary medical care while in police custody under the Fourteenth

---

[35] Some of the Sixth Circuit cases analyzing whether qualified immunity applies in a given case impose a third requirement: "whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." Feathers v. Aey, 319 F.3d 843, 848 (6th Cir. 2003), quoting in part Williams v. Mehra, 186 F.3d 685, 691 (6th Cir. 1999)(en banc). To the extent such a showing is required, the Court concludes that the egregious conduct surrounding the events at issue and the wealth of information available that would have alerted the officers as to Owensby's condition constitute "sufficient facts" to indicate the officers' conduct was "objectively unreasonable in light of the clearly established constitutional rights. Williams, 186 F.3d at 691.

[36] The Plaintiff does not appear to contend, in its motion, that the "Use of Force" provisions themselves are facially unconstitutional.

Amendment.   The  Supreme  Court  found  that  such  a  claim  was
cognizable under § 1983, but holding that the "inadequacy of police
training may serve as the basis for § 1983 liability only where the
failure to train amounts to deliberate indifference to the rights
of persons with whom the police come into contact." See id., 489
U.S. at 380, 388-89.  In such circumstances, the "failure to train
reflects  a  deliberate  or  conscious  choice  by  a  municipality – a
'policy' as defined by...prior [Supreme Court] cases" – sufficient
to  impose  liability  on  the  municipality  for  the  failure  of  its
officers.   See  id.,  489  U.S.  at  389  (some  internal  quotation  marks
omitted).[37]  The Canton Court then proceeded to define what sort of
circumstances might justify such a finding:

> The issue in a case like this one, however, is
> whether that training program is adequate; and
> if  it  is  not,  the  question  becomes  whether
> such  inadequate  training  can  justifiably  be
> said to represent "city policy." It may seem
> contrary  to  common  sense  to  assert  that  a
> municipality  will  actually  have  a  policy  of
> not  taking  reasonable  steps  to  train  its
> employees. But it may happen that in light of
> the duties assigned to specific officers or
> employees  the  need  for  more  or  different

---

[37] It is also necessary that the actions of one of the
individual Cincinnati Defendants in this case rose to the level
of a constitutional violation for deprivation of Owensby's
medical care.  "If no constitutional violation by the
[individual] defendants is established, the municipal defendants
cannot be held liable under § 1983."  Watkins v. City of Battle
Creek, 273 F.3d 682, 687 (6th Cir. 2002), citing City of Los
Angeles v. Heller, 475 U.S. 796, 799 (1986); see also Bowman v.
Corrections Corp. of America, 350 F.3d 537, 546 (6th Cir. 2003).
This threshold predicate has been established in this case
against both municipal defendants, supra.

<u>training is so obvious, and the inadequacy so
likely to result in the violation of
constitutional rights, that the policymakers
of the city can reasonably be said to have
been deliberately indifferent to the need</u>. In
that event, the failure to provide proper
training may fairly be said to represent a
policy for which the city is responsible, and
for which the city may be held liable if it
actually causes injury.

In resolving the issue of a city's liability,
the focus must be on adequacy of the training
program in relation to the tasks the
particular officers must perform. That a
particular officer may be unsatisfactorily
trained will not alone suffice to fasten
liability on the city, for the officer's
shortcomings may have resulted from factors
other than a faulty training program. It may
be, for example, that an otherwise sound
program has occasionally been negligently
administered. Neither will it suffice to prove
that an injury or accident could have been
avoided if an officer had had better or more
training, sufficient to equip him to avoid the
particular injury-causing conduct. Such a
claim could be made about almost any encounter
resulting in injury, yet not condemn the
adequacy of the program to enable officers to
respond properly to the usual and recurring
situations with which they must deal. And
plainly, adequately trained officers
occasionally make mistakes; the fact that they
do says little about the training program or
the legal basis for holding the city liable.

Moreover, for liability to attach in this
circumstance the identified deficiency in a
city's training program must be closely
related to the ultimate injury. Thus in the
case at hand, respondent must still prove that
the deficiency in training actually caused the
police officers' indifference to her medical
needs.

<u>Canton</u>, U.S. at 389-91 (emphasis added). In sum, then, to

establish liability, "the [P]laintiff must prove...that the training program at issue is inadequate to the tasks that officers must perform; that the inadequacy is the result of the city's deliberate indifference; and that the inadequacy is closely related to or actually caused the plaintiff's injury." <u>Russo v. City of Cincinnati</u>, 953 F.2d 1036, 1045, (6th Cir. 1992), <u>quoting</u> <u>Hill v. McIntyre</u>, 884 F.2d 271, 275 (6th Cir.1989).

Much of this Order has been spent detailing the nature of the alleged violations for denial of Owensby's medical care, the well-established right that detainees and arrestees enjoy to medical care under the Fourteenth Amendment, and, as a result, the liability as a matter of law of some of the individual officer Defendants for denial of this right. It is undisputed among the officers that the ambiguity in the Mutual Aid Agreement and the Cincinnati Police Department's "Use of Force" and the lack of training as to their interpretation and application rendered the individual officers confused and unable to discern who was responsible for providing care to Owensby in the circumstances of this case.

To be sure, the City and Chief Streicher contend that the policies at issue are "lawful on their face," lacking any provisions "which might imply that Cincinnati officers could unconstitutionally [violate] the rights of citizens for any reason" (doc. 99). They note that the Use of Force provision begins with

citations to controlling Supreme Court precedent, and they aver that the City relied upon these authorities in drafting this policy, establishing "reasonable and appropriate ways for officers to... assess[] and treat[] potential injuries" (Id.). The controlling issue, however, is whether the municipal Cincinnati Defendants' failure to train the individual Defendant officers on the proper meaning and application of these policies arises to the level of "deliberate indifference." On these facts, the Court concludes that they do, and that they were "closely related" to the ultimate injury Owensby suffered from the resulting denial of medical care.

Fairly stated, the "Use Of Force" provision at issue describing when officers were obligated or "free" to provide medical care to detainees are not neutral. Rather, on their face, they specifically instruct officers that they need not provide constitutionally-required medical assistance to arrestees or detainees until a particular scene is "stabilized." Yet, in placing specific proscriptions on when officers can fulfill this obligation, the municipal Defendants offer absolutely no clarification of the term "stabilized" anywhere in the document, and there is absolutely no evidence in the record whatsoever indicating that they provided the officers with any training or other clarification as to when a scene would be considered "stabilized" under this provision. Far from an "otherwise sound

-71-

[training] program...negligently administered," the municipality offered no such insight to the officers at all as to the interpretation of this provision. "Self-serving" as the Defendant officers' testimony might arguably be in this case, it remains entirely unopposed and supported by the remainder of the record, and the testimony of the officers makes it clear that this shortcoming was at least closely related to the harm Owensby suffered. In fact, the chief policymaker of the Cincinnati Police Department, Chief Streicher, conceded during his deposition that he could not define precisely when a particular scene was "stabilized" for the purpose of this provision. Where the provision, on its face, serves to require the delay of the provision of constitutionally-required medical care, the Court finds it so "obvious" that the municipal Defendants needed "to train officers in the constitutional application of this policy" that their failure to do so can "properly be characterized as deliberate indifference to constitutional rights" as a matter of law. <u>Canton</u>, 489 U.S. at 390 n.10

Similarly, is undisputed that the municipal Cincinnati Defendants offered no training whatsoever as to the Detainees are obligation or something under the Mutual Aid agreement, and it is equally undisputed, as discussed more fully <u>supra</u>, that all of the officers on the scene were in conflict as to who suffered the responsibility to provide Owensby with medical care as a result.

The same result is reached, therefore, with respect to municipal Defendants' failure to train the officers as to the proper interpretation and implementation of this provision: it constitutes a failure to train violation as a matter of law.

The Court realizes that it is a rare case where a plaintiff will be entitled to summary judgment in its favor on constitutional claims for failure to provide medical care claims against the offending officers and, by extension, summary judgment against the sponsoring municipality on its failure to train claims. Upon careful, lengthy consideration, however, the Court is confident that this is, indeed, such a case. The facts in this case are particularly egregious, and a reasonable jury, hearing all of the evidence, could only determine that the majority of the Cincinnati Defendants collectively failed to satisfy their respective constitutional obligations to ensure Owensby was provided with necessary medical care. Accordingly, summary judgment in the Plaintiff's favor on its claims for denial of medical care, at least as to five of the seven Cincinnati Defendants, is warranted.

## V. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST THE GOLF MANOR DEFENDANTS

As with the previous motion, Plaintiff also seeks summary judgment against the Village of Golf Manor, Golf Manor Police Chief Stephen Tilley, and Golf Manor Police Officers Robert Heiland and John Doe #7, subsequently identified as Chris Campbell

(collectively, the "Golf Manor Defendants") on its denial of medical care claim.  Much of what was discussed in the prior section regarding the Cincinnati Defendants is equally applicable as to the Gulf Manor Defendants, including the controlling legal standard.  Furthermore, although the Golf Manor Defendants do raise a few unique contentions or defenses in opposition to Plaintiff's motion, the Court finds that they are without merit.  Accordingly, the Court finds that, on these facts, summary judgment against the Golf Manor Defendants as to this claim is equally appropriate.  The Court addresses the relevant differences and their resolution in turn.

A. <u>Denial of Medical Care Claim</u>

The Golf Manor Defendants raise much the same grounds as the Cincinnati Defendants in seeking summary judgment on this claim or, minimally, denial of Plaintiff's motion for partial summary judgment as to this claim.  Accordingly, the guiding caselaw is the same, as is the result.

Although Owensby was already handcuffed when Heiland and Campbell arrived on the scene, they made a number of subjective observations regarding his condition after Heiland gave the Cincinnati officers permission to place him in his car.  Heiland, a trained EMT, noted Owensby was bleeding from the nose and mouth, was silent, and was making no movement.  Heiland opened his cruiser's rear door so that Jorg and Caton could put him in the

back seat and then walked away from the cruiser; when he returned, the doors to the car were physically closed and Owensby was lying down in the seat. Both officers looked in the car on at least one occasion and noted that Owensby was lying on the seat facing the trunk, motionless and silent. Campbell also recalls seeing blood on Owensby's face and on the back seat of Heiland's cruiser when he did so. Perhaps most significant, Officer Brazile contends that he told both of the Golf Manor officers that it did not appear as though Owensby could breathe. Although Heiland and Campbell concede that Brazile talked to them at the time, neither can recall what he said. It is undisputed that neither of them checked to see whether he required assistance or provided any such assistance.

As with the three Cincinnati officers found liable <u>supra</u>, the Court finds, on this uncontested evidence, that a reasonable jury could only conclude that both Heiland and Campbell were subjectively aware of a substantial risk of serious harm to Owensby, yet did nothing to aid him by summoning appropriate medical care. The circumstances of this case "clearly indicat[e] the existence of such needs;" the fact that they, again, enumerated them in their depositions places it beyond question that they were actually aware of them. <u>Farmer</u>, 511 U.S. at 834. Summary judgment in the Plaintiff's favor as to this claim against both individual Golf Manor Defendants is warranted.

In contending that they do not, however, enjoy an

obligation to provide medical care, the Golf Manor Defendants raise an additional issue that demands consideration.  In refuting that DeShaney establishes that Owensby was within their control for the purpose of evaluating their obligation to provide him with medical care, the Golf Manor Defendants advance the case of Cartwright v. City of Marine City, 336 F.3d 487 (6th Cir. 2003), contending that the Sixth Circuit's concept of "custody" in this case precludes a finding that they enjoyed any relationship that required them to provide Owensby with medical care.  In the context of Cartwright, the Sixth Circuit defines "custody" as"intentional application of physical force and show of authority made with the intent of acquiring physical control."  Id. 336 F.3d at 492, quoting Ewolski v. City of Brunswick, 287 F.3d 492, 506 (6th Cir. 2002).  The individual Golf Manor Defendants contend that their grant of permission to place him in the back of a Golf Manor cruiser neither utilized "physical force" over Owensby nor constituted an "act [performed] with the intent of acquiring physical control" over him.  Id.  Alternatively, these Defendants contend that the circumstances of the instant case fail to satisfy the "state-created danger" theory in Cartwright, because – again – they contend they took no affirmative act to "create[] or increase[] the risk" to Owensby.  Accordingly, they claim that he was not in their custody and, by extension, that they enjoyed no obligation to provide him with medical care.

Although the application of the "state-created danger" test to the facts of the instant case seems strained in any case, it seems obvious to the Court that, applying the definition of "custody" used in Cartwright, Owensby was clearly in in the custody of the Golf Manor officers. As noted above, he was held within their vehicle, to which they enjoyed sole access and control. It is uncontested that he was not free to leave – unlike the plaintiff in Cartwright, whom the officers had merely provided transportation to a convenience store – regardless of which municipality's officers enjoyed ultimate authority over his release. Plaintiff's contention that this type of restraint does not utilize "physical force" or constitute an "act [performed] with the intent of acquiring physical control" seems nonsensical; if the Defendants' contention were true, prisoners would not be within the "custody" of the prisons housing them.[38]    Furthermore, this narrow construction is unwarranted given the Supreme Court precedent cited supra conclusively establishing a broader consideration of "control" in this context.    Cartwright is, quite simply, a case with very different facts.

---

[38] Furthermore, the prison analogy also reinforces the relationship between these parties. The federal government often leases prison space from local jails or state institutions to house federal prisoners. Although it is clear that the authority under which they are held is that of the federal government, there is also no question that the state authorities possess control of them for the purpose of establishing that they enjoy an obligation to provide them with medical care.

The Court has already addressed the remainder of Golf Manor's arguments _supra_, including how their obligations under the Mutual Aid Agreement impact this analysis.  As a result, in sum, the Golf Manor Defendants' contention that it did not enjoy a relationship to Owensby giving rise to the obligation to provide him with medical care is without merit.  Similarly, their claimed entitlement to qualified immunity fails for precisely the same reasons as those articulated in response to the Cincinnati Defendants' claim _supra_.

C. _Liability of the Golf Manor and Chief Tilley For Failure to Train the Individual Officer Defendants_

The facts and discussion _supra_ exploring the application of _City of Canton_ to establish liability on the municipal Cincinnati Defendants as a matter of law applies with equal force to the municipality of Golf Manor.  It is undisputed that the individual Golf Manor Defendants testified that they thought, under the Mutual Aid Agreement, that Cincinnati officers were responsible for the medical care of Owensby.  This is fully supported by the facts of this case, including the apparent refusal of the Golf Manor officers to lend any assistance to Owensby in the face of an announcement that it was required.  In response to the Plaintiff's motion for summary judgment on this issue, the municipal Defendants aver only that the two officers in issue graduated from a police academy, without explaining how such an experience or education could have informed them as to the details and proper

interpretation of the Mutual Aid Agreement.  Accordingly, on these facts, the Court finds that the required "deliberate indifference" standard under <u>City of Canton</u> is satisfied as a matter of law, and Plaintiff's motion for summary judgment as to the Village of Golf Manor and its Police Chief Stephen Tilley will be granted.

VI.        **GOLF MANOR DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Golf Manor has moved for summary judgment in its favor as to all claims.  In particular, Golf Manor contends that it is entitled to summary judgment in its favor as to Plaintiff's excessive force claim and that both it and its officers are entitled to statutory immunity on Plaintiff's state tort claims, as well as any associated punitive damage award.[39]  The Court will address each of these issues in turn.

A. Excessive Force Claim

The Golf Manor Defendants insist that they are not liable on Plaintiff's allegations that they utilized unconstitutionally excessive force in effecting Owensby's arrest.  The briefing on this issue by both parties is rather scant.  The Golf Manor

_____

[39] The Golf Manor Defendants also contend that they are entitled to summary judgment in their favor as to the Plaintiff's claim for failure to provide medical care and that, in any case, they are entitled to qualified immunity on all such claims.  As the Court, however, has concluded <u>supra</u> that Plaintiff is entitled to summary judgment on this claim in its favor and that qualified immunity is not available to shield these Defendants from liability on this claim, it is unnecessary for the Court to revisit this issue in the context of the Golf Manor Defendants' motion.

Defendants' argument, in sum, contends that

> [t]here is no evidence before the Court either
> of the Golf Manor officers, Heiland or
> Campbell, ever touched Owensby. There is no
> dispute the Golf Manor officers did not
> participate in the arrest, handcuffing, or
> macing of Owensby. In fact, both Heiland and
> Campbell have asserted that they have no
> physical contact with Owensby. In the absence
> of evidence Heiland and Campbell had any
> physical contact with Owensby, claims against
> them of [sic] excessive force cannot be
> sustained and summary judgment is appropriate.

(doc. 85). In support, however, they provide the citation <u>Lapointe</u>

<u>v. UAW Local 600</u>, 103 F.3d 485 (6th Cir. 1996), which, as Plaintiff

notes, appears to have little or no applicability to the instant

case other than perhaps reiterating the summary judgment standard.

In response, however, Plaintiff contends, in sum:

> The Golf Manor Defendants' failure to provide
> critical medical care goes hand-in-glove with
> the excessive force used in effectuating the
> illegal arrest of Roger Owensby on November 7,
> 200. In fact, the willful determination or
> deliberate indifference in failing to provide
> medical attention to Roger Owensby is part of
> the excessive force used against him.

(doc. 93). Plaintiff cites to <u>Estate of Phillips</u> and <u>Alexander</u>,

discussed <u>supra</u>, as support for this conclusion. The fact remains,

however, that neither of these cases lend any support to the

Plaintiff's insistence that liability for excessive force can arise

despite the fact that the defendant officers had no physical

contact with the deceased.

Upon review of the applicable caselaw, the Court has

little difficulty concluding that the Plaintiff fails to state a claim for excessive force against the Golf Manor Defendants. As noted, the record is undisputed that the Golf Manor officers had absolutely no involvement in Owensby's physical submission. To be sure, excessive force claims do not need to advance allegations of assault excessive physical damage or disfigurement before they are constitutionally cognizable. See, e.g., Ingram v. City of Columbus, 195 F.3d 579, 597 (6th Cir. 1999); Holmes v. City of Massillon, 78 F.3d 1041, 1048 (6th Cir. 1996)(upholding claim premised on allegation that excessive force was used in removing plaintiff's wedding ring). All of the Sixth Circuit cases elucidating and evaluating whether Fourth Amendment claims exist, however, clearly involve some element of physical contact, even if it is arguably de minimis. See, e.g., Burchett v. Keifer, 310 F.3d 937 (6th Cir. 2002)(involving excessively tight handcuffs); Phelps v. Coy, 286 F.3d 295 (6th Cir. 2002)(involving striking arrestee); Kostrezewa v. City of Troy, 247 F.3d 633 (6th Cir. 2001)(involving use of excessively tight handcuffs); Darrah v. City of Oak Park, 255 F.3d 301, 305 (6th Cir. 2001)(involving striking of plaintiff); Bass v. Robinson, 167 F.3d 1041, 1045 (6th Cir. 1999)(involving officer's use of force to arrest suspect).

Indeed, it seems axiomatic that an excessive force claim may not lie against those who did not use excessive force in violation of the Fourth Amendment. See Claybrook v. Birchwell, 199

F.3d 350, 359 (6th Cir. 2000)(noting that a Fourth Amendment claim focuses on "the means used to detain the suspect"); Haverstick Enterprises, Inc. v. Financial Federal Credit, Inc., 32 F.3d 989, 996 (6th Cir. 1994)(finding that "essential element" of a constitutional violation was absent where, in part, "[n]o force, let alone excessive force, was used").  Even if this Court were to adopt the premise advanced in Estate of Phillips that a denial of medical care can, in this context, be viewed under the same standard of "excessive force" under the Fourth Amendment, it by no means allows the predicate facts of one constitutional claim to be transformed into the predicate facts of another.  Any claims that Plaintiff enjoys against the Defendants for denial of medical care properly lie under the Fourteenth Amendment, and the same predicate acts – absent a more direct physical involvement in the arrest and submission – may not be extended to form the basis for a Fourth Amendment excessive force claim as well.  Accordingly, the Golf Manor Defendants' motion for summary judgment as to this claim will be granted.

B. Statutory Immunity

        The Golf Manor Defendants, as with the Cincinnati Defendants earlier in these proceedings (docs. 49, 118), aver that they are entitled to statutory immunity from state tort claims pursuant to Ohio Rev. Code §§ 2744.02(A)(1) and (A)(6).  The Court has already fully considered this issue in issuing its earlier

Order finding these provisions unconstitutional (doc. 113) and in considering the Cincinnati Defendants' subsequent request for reconsideration of this holding, supra. The Golf Manor Defendants advance no novel arguments in support of their contention that the statutes are constitutional, and the Court is accordingly unpersuaded to reverse its prior decision. The Court therefore finds, as before, that these provisions violate the Ohio Constitution and that, accordingly, the Golf Manor Defendants are not entitled to the immunity they purportedly provide. Their motion for summary judgment on this ground will be denied.

## C. Vicarious Liability

Finally, Golf Manor avers that it is entitled to summary judgment in its favor on to all of Plaintiff's 42 U.S.C. § 1983 constitutional claims premised solely on vicarious liability. It is clearly correct that, under the holding of Monell v. Dept. of Soc. Serv's, 436 U.S. 658 (1978) and a long, unbroken line of subsequent authority, the Plaintiff may not impose liability on Golf Manor under the theory of respondeat superior. To the extent that the Plaintiff seeks to do so, summary judgment in Golf Manor's favor is indeed proper. A careful reading of the Plaintiff's Complaint (doc. 1) and subsequent briefing, however, reveals that it has neither pleaded nor subsequently attempted to impose vicarious liability on Golf Manor for any of its 42 U.S.C. § 1983 claims. Although Golf Manor's point is well taken, it is of no aid

in obtaining summary judgment on any of the remaining claims.

**VII. CITY OF CINCINNATI'S MOTION TO BIFURCATE TRIAL**

The last remaining motion presents the City's request to bifurcate the trial of this case. It contends that any liability accruing to the City or Chief Streicher can only be found if the finder of fact first establishes that the individual officers of the City committed an underlying constitutional violation. Accordingly, the City contends that bifurcation will "promote convenience and avoid prejudice" that might accrue to the City if it and Chief Streicher were forced to participate in a shared proceeding.

Bifurcation of trials is both sanctioned and governed by Fed. R. Civ. P. 42(b). It provides, in relevant part:

> **(b) Separate Trials.** The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third- party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues, always preserving inviolate the right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States.

Fed. R. Civ. P. 42(b)(emphasis in original). As a general rule, any decision ordering or denying bifurcation is "dependent on the facts and circumstances of each case." Saxion v. Titan-C-Manufacturing, Inc., 86 F.3d 553, 556 (6th Cir. 1996). Furthermore, while only one of the criteria enumerated in the Rule need be

satisfied to justify bifurcation of the case, it is undeniable that the "language of Rule 42(b) places the decision to bifurcate within the discretion of the district court." <u>Saxion v. Titan-C-Manufacturing, Inc</u>., 86 F.3d 553, 556 (6th Cir. 1996); <u>see</u> <u>also</u> <u>Yung v. Raymark Indust., Inc</u>., 789 F.2d 397, 400 (6th Cir. 1986); <u>Kosters v. Seven-Up Co</u>., 595 F.2d 347 (6th Cir. 1979).

The City contends that the facts of the instant case, applied to the framework established by the rule and interpreting court decisions, justify bifurcation of the trial of the City and Chief Streicher from the trial of the individual officers. It contends – largely correctly – that the City cannot be held liable under 42 U.S.C. § 1983 for its alleged failure to train and/or implementation of flawed policies unless it is first determined that the police officers on the scene violated Owensby's constitutional or federal rights. Proceeding to trial against the officers alone would therefore limit the issues and defendants before the jury; if the officers are found to have committed no violation, then the Plaintiff will have no remaining constitutional claims against the City and Chief Streicher, obviating the need to present any information related to training or policies to the jury. Furthermore, the City argues that allowing the individual defendants to proceed to trial on the underlying constitutional violations, as the Sixth Circuit sanctioned in <u>Tinch v. city of Dayton</u>, 77 F.3d 483 (6th Cir. Feb. 20, 1996, unpublished), 1996 WL

77445, would "serve to avoid prejudice to the individual defendants, which would result if all issues and claims are tried simultaneously" (doc. 57).   The City argues that presenting information on the City's policies and training would deprive the officers of a fair trial by potentially "taint[ing] the jurors' minds and cloud[ing] their determination[] of that issue attributable to the individual officers; namely whether their actions on November 7, 2000 caused any constitutional depravation to...Owensby" (Id.).

Careful consideration of the contours of the instant case and the briefs filed by the parties, however, leads to the conclusion that much, if not all, of the efficiency the City purports will accrue if the trial is bifurcated will not be realized in fact.  First, the City's motion was likely premised upon its assumption that the Court would grant its motion for summary judgment on all of the Plaintiff's state tort claims against it and Chief Streicher (doc. 49), given that the motion to bifurcate only addresses the 42 U.S.C. § 1983 constitutional claims.  On March 25, 2004, however, the Court denied the City's motion, allowing all such claims to proceed (doc. 113).  The Monell liability analysis requiring a predicate finding of officer liability is inapplicable to the state tort law claims.  Given the fact that trial on all such claims would properly proceed against all of the Defendants simultaneously, bifurcation of the

constitutional claims would further complicate the proceedings, rather than simplify them.

Furthermore, the City's protestations of fairness for the individual officers might well be overstated. In opposition to the Plaintiff's motion for partial summary judgment on the claims of failure to provide medical care, all of the individual officers aver that they were following proper procedure at the time that the alleged constitutional violations occurred and/or that any malfeasance that occurred as a result of improper training by the municipal Defendants (docs. 102, 103). It can only be assumed that they would assert similar defenses at trial. As a result, all of the evidence regarding the City's policies and training would be brought before the jury. If the second trial against the municipal Defendants were then necessary, the Court would be obligated to introduce this material before a jury twice, rather than merely once. It is difficult to see how this proposed arrangement, in practice, yields any benefit to judicial efficiency or resources. See In re Beverly Hills Fire Litigation, 695 F.2d 207, 216 (6th Cir. 1982).

Furthermore, it is worth noting that there is a strong countervailing consideration involved in any bifurcation. "There is a danger that bifurcation may deprive plaintiffs of their legitimate right to place before the jury the circumstances and atmosphere of the entire cause of action which they have brought

into the court, replacing it with a sterile or laboratory atmosphere...." In re Beverly Hills Fire Litigation, 695 F.2d at 217 (discussing bifurcation of causation from liability and damages). The Court is particularly concerned with the specter of such deprivation in the instant case; indeed, the City's own protestations in its motion bring this concern to the fore. It notes, in closing, that the second phase of the bifurcated trial against the municipal defendants "is almost never necessary since municipalities almost always will consent that it is responsible in the event of an adverse verdict against the officers" (doc. 57).[40] Furthermore, the jury will reach a damage award for the Plaintiff's constitutional deprivation in the first proceeding, rendering "a second trial...futile because damages will have been established already" (Id.). The Court must consider the fairness of the proceeding to all parties, Plaintiff as well as Defendants. While the City argues convenience and fairness in theory, in practice it may only serve – by its own admission – to prevent the City from

---

[40] This contention is somewhat disingenuous. By letter and in its response, the Plaintiffs offered to agree to bifurcation if the City would agree to stipulate to the jury that the City would be pay any adverse judgment offered against the individual officers, in accordance with the City's declaration in its motion (doc. 61). However, in its reply, the City contends that the proposed stipulation is unacceptable because it would require the City to pay punitive and exemplary damages–an obligation forbidden by the Ohio Revised Code (Id.). Yet, one page later in its reply, the City still contends that the proffered stipulation "is wholly unnecessary because it would impose the exact same obligations" the City already suffers under the Ohio Revised Code and the common law (Id.)

ever standing trial for any purported constitutional violation and from suffering a concomitant award of damages for its role in the cumulative malfeasance.[41]

In sum, on these facts, the Court finds that judicial convenience and fairness to the parties will not be served by bifurcation of the instant case. Accordingly, the City's motion for bifurcation will be denied.

## VII. LIMINAL MOTIONS

Finally, the Court notes that the parties have filed a number of motions raising evidentiary disputes and seeking to have certain evidence excluded at trial (docs. 96, 109, 117, 121, 128, 136, 146). The Court appreciates the parties' efforts to brief these matters for its review. However, it is the Court's practice to resolve motions in limine at the time of trial, where the evidence at issue, the purpose(s) for which it is proffered, and the potential impact it may have on the proceedings can be best determined. Accordingly, the Court reserves decision on these motions until trial.

---

[41] There exists the very real possibility that submission of evidence regarding the City's failure to adequately train and/or provide adequate policies to address the issues presented in this case in a bifurcated case could persuade the jury to find the officers absolved from any resulting liability. If this resulted in the jury's declaration that no constitutional deprivation occurred, the Plaintiff would be forever barred from seeking compensation for the City's malfeasance. Although this is a pragmatic consideration, it is nonetheless very real. The Court feels very strongly that the Plaintiff is entitled – as is any plaintiff – to have its meritorious claims heard by a jury.

## VIII. CONCLUSION

For the foregoing reasons, Defendants City Of Cincinnati and Police Chief Thomas Streicher, Jr.'s Motion For Reconsideration Of March 25, 2004 Order Overruling Summary Judgment On Sovereign Immunity; Request To Certify Question To Ohio Supreme Court Regarding Revised Code 2744's Constitutionality; Alternative Motion to Certify Conflict to Sixth Circuit Court of Appeals (doc. 118) is DENIED.  The Motion For Summary Judgment On Behalf Of Defendants, The Village Of Golf Manor, Chief Stephen Tilley, Robert Heiland, and John Doe #7 N/K/A Chris Campbell (doc. 85) is GRANTED IN PART AND DENIED IN PART, to wit: the motion for summary judgment as to Plaintiff's excessive force claim is GRANTED, and the remainder of the motion seeking dismissal of all other claims is DENIED. Plaintiff's Motion For Partial Summary Judgment Against Defendants Village Of Golf Manor, Its Police Chief and Its Individual Police Officers For Their Failure To Provide Critical Medical Care (doc. 87) is GRANTED.  Plaintiff's Motion For Partial Summary Judgment Against Defendants City Of Cincinnati, Its Chief Of Police and Its Individual Police Officers For Their Failure To Provide Critical Medical Care (doc.  88) is GRANTED IN PART AND DENIED IN PART, to wit: Plaintiff's motion as to the City of Cincinnati, Chief Streicher, and Officers Hunter, Spellen, and Sellers is GRANTED, and Plaintiff's motion as to Officers Jorg and Caton is DENIED. Defendants City Of Cincinnati and Police Chief Thomas Streicher,

Jr.'s Motion To Bifurcate Claims From the Claims Against the Individual Police Officer Defendants (doc. 57) is DENIED.  The City of Cincinnati and Police Chief Thomas Streicher, Jr.'s Motion to Strike Plaintiffs' April 16, 2004 Surreply In Support of Summary Judgment; Motion To Strike Affidavit of Frederick Morgan, Jr. (doc. 137) is DENIED AS MOOT.

        SO ORDERED.


Dated: <u>May 19, 2004</u>         <u>s/S. Arthur Spiegel</u>
                            S. Arthur Spiegel
                            United States Senior District Judge