## Michael D. Lyman, Ph.D.

1001 Rogers Street • Columbia, MO . 65216 • (573) 875-7472 • FAX: (573) 875-7209

.

**EXPERT REPORT OF MICHAEL D. LYMAN, PH.D.**

RE: *Estate of Roger D. Owensby, Jr. v. City of Cincinnati, et al., Case No. 01-CV-769 (S.D. Ohio)*

February 2, 2004

# EXPERT REPORT OF MICHAEL D. LYMAN, PH.D.

## Introduction

The opinions set forth in this report are based on my analysis of documents and testimony provided to me in this case and as informed by my formal training, education, independent research, and experience gained over a collective 30 years as a law enforcement agent, criminal investigator, police trainer and educator.

I have been a college professor teaching and researching in the area of policing for 16 years. I have also authored numerous articles and books dealing with different aspects of police operations for the last 18 years. In the latter capacity, I have become nationally recognized in the areas of police procedure, criminal investigation, drug enforcement and related areas. Prior to becoming an educator, I was a certified generalist police instructor for three years, training police officers and police officer candidates in various police techniques.

Before entering the field of higher education, I was employed as a special agent/criminal investigator working in both Kansas and Oklahoma for a collective period of eleven years. In that capacity, I conducted criminal investigations, made misdemeanor and felony arrests, conducted interviews of suspects, testified in state and federal criminal courts and had considerable experience in the development of police policy and procedure.

The documents and testimony from this case, upon which my opinions are based, include police reports, court records, interrogatories, training records, professional articles, books and policy-based research in the area of police procedure.

## Qualifications

My formal education includes an undergraduate and master's degree from Wichita State University in the Administration of Justice. In 1992, I received a Ph.D. from the University of Missouri-Columbia in Higher and Adult Education. My previous police training includes basic police academies certified through the Council on Law Enforcement Education Training (CLEET) in Oklahoma City, Oklahoma, and the Kansas Law Enforcement Training Academy in Hutchinson, Kansas (KLETA).

During my years as a criminal investigator, I accumulated in excess of 2000 hours of formal, in-service, police training. This training was sponsored by organizations which include the Federal Bureau of Investigation (FBI), Drug Enforcement Administration (DEA), the United States Customs Service, and numerous state and local law-enforcement organizations.

I am currently employed as a tenured faculty member of the Columbia College Department of Criminal Justice and Social Work in Columbia, Missouri, and have been on the faculty since August 1989. My rank is that of Full Professor. I also serve as the Director for Graduate Studies for the Master of Science in Criminal Justice degree program and the advisor for the Bachelor of Science in Forensic Science degree program.

Between August 1989 and November 2000, I served as the department chairman overseeing a faculty of seven in a Department representing over 250 criminal justice majors. Between 1985 and 1994 I was a Visiting Professor for the University of Oklahoma teaching on a part-time basis during the summer and winter intercessions. In 1985 and 1986 I taught graduate classes at the University of Central Oklahoma.

Since 1987, I have authored seven books dealing with various areas of policing. These have been published by both nationally and internationally recognized publishing houses which include Prentice Hall (Upper Saddle River, NJ), Anderson Publishing (Cincinnati, OH), CRC Press (Boca Raton, FL), and Charles Thomas Publishing (Springfield, IL). The research required for these books necessitates a close working relationship with law-enforcement Officers on local, state, and federal levels as well as a working knowledge of the available literature on policing.

My investigative experience includes an appointment as a Special Agent assigned to the Special Services Division of the Kansas Bureau of Investigation. This unit functioned as the special investigations unit for the State of Kansas and its members are involved in criminal investigations involving drug trafficking, organized crime and related offenses.

I have also been employed as a Senior Agent in Oklahoma, assigned to the Enforcement Division and the Intelligence Division of the Oklahoma Bureau of Narcotics and Dangerous Drugs Control (OBNDDC). In each of these units my responsibilities were to conduct intelligence, criminal and internal affairs investigations. In this capacity I also served on numerous hiring, shooting and disciplinary boards. While employed with the OBNDDC, I wrote the Standard Operating Procedure Manual for Conducting Wire Taps for the Bureau.

My responsibilities in both Kansas and Oklahoma required me to conduct criminal investigations, internal affairs investigations, assist in the establishment of agency policy and procedures in numerous areas, provide training, work closely with other law enforcement agencies on all levels and work closely with other public safety organizations as they related to my duties.

I currently maintain professional affiliations with The Academy of Criminal Justice Sciences (ACJS); the American Society of Criminology (ASC); the Textbook Author's Association; the Police Executive Research Forum (PERF); the

International Association of Chief's of Police (IACP); the American Academy of Forensic Science (AAFS) and the International Association for the Study of Organized Crime (IASOC).                    :

## Summary of Opinions

**OPINION 1**
Under well-established standards and police procedures, arrests made by law enforcement authorities must be conducted professionally and in accordance with established legal principles. That is, when law enforcement authorities undertake to arrest an individual, they must have probable cause to do so and their efforts to affect the arrest must be tempered with what is reasonable at the time. In this case, the physical arrest of Roger Owensby Jr. was unnecessary and was a gross abuse of this standard of care.

**OPINION 2**
Under well-established requirements and police procedures, the police in any arrest situation may use only that level of force that is objectively reasonable to bring an incident under control. In this case, the amount of force used by Defendants in the arrest of Roger Owensby, Jr. was unreasonable and excessive and constituted a failure to observe nationally recognized standards of police procedure.

**OPINION 3**
Under well-established requirements and police procedures, after police place a suspect under arrest, they are obligated to provide medical attention for that person if necessary. The actions on the part of the Defendants in this case demonstrated deliberate indifference by failure to provide Mr. Owensby with needed medical care while he was in police custody.

**OPINION 4**
Under well-established requirements and police procedures, police officers must be held accountable for carrying out their duties properly and know what is expected of them. Accordingly, command personnel have a responsibility to develop departmental policy that must be clearly communicated to each officer. In this case, deficiencies in departmental policies and officer training resulted in the mishandling of Roger Owensby, Jr. during and after his arrest, resulting in his death.

## Facts and Background

I have been asked by the law firm of Helmer, Martins & Morgan Co., L.P.A. to review the case of *Estate of Roger D. Owensby, Jr. v. City of Cincinnati, et al.* The following is a brief overview of my conclusions regarding the above referenced case as of the date of this report. These conclusions are based on the documents provided to me in this case to date as well as my training, education,

experience and research in the field of policing. I reserve the right to modify my opinions in the event I am provided any new material in this case.

On September 27, 2000, Cincinnati Police Officers Robert Jorg and David Hunter were assigned to an undercover ("old clothes") detail working narcotics in the area of Sam's Carry Out parking lot located at 2092 Seymour Avenue.[1] It was then that Officer Hunter observed "three or four individuals" involved in what he thought was a drug violation. The two officers attempted to arrest the individuals as two of them ran across the street in the direction of the Huntington Meadows Apartments with Officer Hunter in pursuit. Officer Jorg remained at the parking lot with the other two parties and Officer Curtis Walker responded to assist Officer Hunter.

As Officer Hunter pursued the suspects, he overheard one call to the other, "the boys" or "five-0" in an effort to alert his companions that the police were on the scene. Officer Hunter, because he was in plainclothes at the time, was able to walk up to one suspect and attempt an arrest by grabbing the subject's dark colored sweatshirt. But the individual broke away and escaped by ripping out of his sweatshirt. Officer Hunter stated that he was left standing there holding the suspect's sweatshirt, which he never placed into evidence and in fact, discarded. Hunter stated that he was unsure what happened to the sweatshirt after this incident.

Officer Hunter, with his weapon drawn, then took off running after the suspect. During the course of the case, Officer Hunter re-holstered his firearm and removed his mace. While still running, he attempted to spray the suspect, only to inadvertently spray himself instead.[2] The foot pursuit failed to produce the suspect.[3] Officer Hunter returned to meet with Officer Jorg at the Sam's parking lot.[4]

Officer Jorg questioned the other individuals who remained in the parking lot and they identified the person that ran from Officer Hunter only as "L.A." Even though Officer Hunter expressed his desire to identify and arrest the individual who escaped, he failed to document the suspect's physical description or file a John Doe warrant regarding the escaped suspect.[5]

Almost five weeks later, on November 2, 2000, at about 7:30 p.m. Officer Hunter was asked to deliver "NTA" (notice to appear) documents to Officers Darren Sellers and Alexander Hasse who had a suspect in custody for a minor marijuana charge at the Sam's location. Officers Jorg and Caton also arrived at the Sam's location and began conversing with the other officers.

As they congregated, Officer Hunter noticed a person walking across the street toward the Sunoco station. Officer Hunter commented to Officer Jorg that

---

[1] Officer Hunter stated that he and Officer Jorg were possibly at the Cincinnati Gardens parking lot using binoculars to spot drug deals (Hunter deposition, p. 66).
[2] Officer Hunter stated that he did not file a report after discharging his mace (Hunter deposition, p. 96).
[3] Officer Hunter stated that the only charge he would have charged the suspect with was obstruction and jaywalking (opposed to drug trafficking); "obstruction for warning the individuals to our presence and jaywalking because I chased him through a crosswalk," (Hunter deposition, p. 94); Officer Hunter also stated, "I wasn't under the impression that he was trying to harm [me]." (p. 95)…"He was just trying basically [to] get away…he wasn't trying to hurt me," (p. 96).
[4] Note that the other two suspects (Hill & Nixon) detained by Officer Jorg were not charged with drug violations but rather, criminal trespass and (in one case) open container, (Hunters' deposition, p. 133).
[5] Officer Hunter informed Officer Jorg that he was going to locate "LA."

the person might be the one who resisted his arrest five weeks earlier, on September 27, 2000. The individual, Roger Owensby, Jr. was crossing Seymour Avenue about 50 yards away from Officer Hunter.                    :

Officer Hunter commented to Jorg that Mr. Owensby was possibly the one who ran from him five weeks earlier. Officer Jorg asked if he was sure. Officer Hunter replied, "From this distance and in this light, no I can't be sure that is him."[6] Officer Hunter later stated that Mr. Owensby was the same height, build and stature, but could not make out any specific features.[7]

Officer Hunter then asked Officers Jorg and Caton to walk with him over to the Sunoco Station to see if he could identify Mr. Owensby as the same suspect who ran from him five weeks earlier. The three officers, without first establishing any operational plan or discussing possible scenarios, walked toward the convenience store after seeing Mr. Owensby enter.[8]

In an effort to identify him, all three officers then stood outside the store's window and observed Mr. Owensby, who was purchasing a drink and some cigars. Officer Hunter then stated that he was able to positively identify Mr. Owensby as the person who ran from him earlier, and that he thought he had probable cause to arrest Mr. Owensby for "obstruction and jaywalking," both misdemeanor violations.[9]

The officers waited for Mr. Owensby to complete his purchase at the cashier and then as he began to exit the store approached him. Instead of simply issuing him a citation for the minor infractions, Officers Jorg, Caton and Hunter confronted Mr. Owensby as Officer Jorg asked him to put his drink down and asked if he could pat him down for weapons.

Officer Caton asked Mr. Owensby if he had a weapon as he replied he was not armed and began to lift up his shirt to show officers that he was not armed. Officer Caton then continued to escalate the situation by grabbing Mr. Owensby's arm and telling him not to reach toward his pant line, and "Don't reach for anything." In fact, Officer Jorg recalled Mr. Owensby saying, "Sure, everything's cool."

Mr. Owensby complied and agreed to be searched, revealing that he was unarmed.[10] It should be noted that Officer Jorg characterized this stop as a "consensual stop" and that Mr. Owensby could leave at any time of his choosing.[11] Mr. Owensby was cooperative and even commented, "You can run me through the computer…you'll see I'm not wanted." He continued to explain. that he lived on North College Hill and was in the area to see his girlfriend who lived on Yorktown Street.

After the pat-down search, Mr. Owensby inquired as to why the officers were stopping him. Officer Caton then explained that they were looking for

---

[6] Hunter deposition, p. 124.
[7] Ibid, p. 126.
[8] Jorg stated that "The only mistake we made is we didn't have a plan.
[9] Hunter's deposition, p. 132.
[10] Note that even though the pat-down search resulted in no weapons being located, Hunter stated that he was not satisfied Mr. Owensby was not armed (Hunter deposition, p. 146).
[11] Jorg deposition, P. 112

someone who had committed an assault and was known to carry a weapon.[12] He also asked if Mr. Owensby had ever fought the police. At no time, however, was Mr. Owensby asked if he went by the nickname of "L.A." nor was he advised that he was under arrest.

Officer Hunter then stepped up from behind Caton and asked Mr. Owensby when the last time was that he ran from the police. Officer Hunter then stated that it was then that Mr. Owensby "broke for the door."[13] At this point, it should be noted that Mr. Owensby did not push or assault any of the officers as he was trying to exit the store. Furthermore, Mr. Owensby had not been placed under arrest at this time.[14]

Mr. Owensby proceeded approximately 6 ft. past the door and then hesitated. Even through officers had determined that Mr. Owensby was unarmed officers ran after him as Officer Jorg struck him from behind and tackled him after they both hit the rear of a parked car. Officer Hunter stated that at this point the officers were trying to handcuff Mr. Owensby, even through he posed no threat, had not assaulted any officers, was unarmed and, at best, was only guilty of minor violations of jaywalking and trespassing.

Officer Jorg stated that Mr. Owensby was initially on his back but then but Jorg flipped him on his stomach and which time Officer Hunter positioned himself on Mr. Owensby's right with Officer Caton on the left. Hunter specified that Officer Jorg was holding Mr. Owensby with one arm around the forehead and the other around the neck and shoulder area.[15] Sellers and Hodge then joined in the struggle making a total of five officers involved in the arrest of Mr. Owensby, who weighed only 185 lbs. Officer Lawson, who was in plainclothes, also responded.

Mr. Owensby and the five officers struggled in the parking lot as he remained on his stomach. During the course of the struggle, a number of significant events transpired. These included, (1) Officer Caton said "mace this motherfucker," as Jorg raised his own head out of the way as he raised Mr. Owensby's head to permit Officer Hunter to mace him in the face;[16] (2) Officer Hunter sprayed Mr. Owensby in the face with chemical irritant; (3) Officer Jorg applied pressure point techniques which involved reaching around Mr. Owensby's head, trapping it and holding it; (4) Officer Jorg placed his knee in Mr. Owensby's shoulder and back; and (5) Officer Caton straddled Mr. Owensby and physically punched him in his back.[17] Mr. Owensby was finally handcuffed in the presence of all five officers: Jorg, Hunter, Caton, Sellers and Hodge.

After the handcuffs were in place, additional officers began to arrive on the scene. Officer Jorg noticed that Mr. Owensby was still moving at that time,

---

[12] Note that it was not determined as fact that the suspect known as "LA" carried a weapon, nor was it determined that Roger Owensby Jr. was "LA.".
[13] Hunter deposition, p. 143.
[14] In *Illinois v. Wardlow*, U.S. Supreme Court Justice Stevens pointed out that among some citizens, particularly minorities and those residing in high-crime areas, there is the possibility that the fleeing person is entirely innocent, but, with or without justification, believes that contact with the police can be dangerous, apart from any criminal activity associated with the officer's presence. For such a person, unprovoked flight is neither "aberrant" nor "abnormal" (IACP Training Key 517: Suspects who Run: Supreme Court Expands Terry Rule, p. 1-5.
[15] Hunter deposition, p. 154.
[16] Jorg's deposition, p. 128.
[17] Hunter's deposition, p. 165.

"wincing his eyes" and was bleeding from the head.[18] Rather than call for medical help for Mr. Owensby or attempt to render first aid, Officers Jorg and Caton picked Mr. Owensby up and moved him to a Golf Manor police vehicle.

Still handcuffed, Mr. Owensby was then placed in the back seat of the car.[19] Officer Hunter stated that at that time he observed Caton swinging at the area of Mr. Owensby's head, even through he was handcuffed, had been "maced", was injured, and incapacitated.[20] Caton's violent actions against Mr. Owensby clearly demonstrate the unreasonable and punitive nature of his arrest.[21] The officers then left Mr. Owensby in the back of the police car alone without summoning medical aid for him.

Mr. Owensby's injuries were obvious to the officers on the scene, which was evidenced by blood visibly present on both Officer Jorg and Caton's uniforms. In fact, Jorg asked Officer Hodge remove his left sleeve by cutting it off and placing it into the trunk of his patrol car. Due to the obvious evidence of physical injuries suffered by Mr. Owensby, it would have been reasonable, at this point, for officers to assume that Mr. Owensby was in need of medical assistance, but none was offered by any officers on the scene.

Officer Brian Brazile, after arriving on the scene approached the police vehicle and shined his flashlight on Mr. Owensby to see if he could recognize him. He commented to an Officer Robert Heiland, "The guy you have in your car, is he okay...can he breathe?" "I figured he was their (Golf Manor's) prisoner. No one ever said whose he was. I figured that he was theirs because he was in their car."[22] Brazile also noted that he saw blood on Officer Jorg's shirt and that Jorg stated, "That's not from me, that's from the bad guy."[23] It should be noted that Officer Brazile, who provided no medical assistance to Mr. Owensby, was driving what he called a "Scout car" which was "basically a Suburban" that was equipped with medical and first aid equipment.[24]

As a result of the initial decision by Officers Jorg, Hunter and Caton to confront Mr. Owensby at the Sunoco store, coupled with confusion over responsibilities, unclear policies and a clear lack of proper training on the crime scene on November 7, 2000, Mr. Owensby died due to his injuries.

## Opinion 1
Under well-established standards and police procedures, arrests made by law enforcement authorities must be conducted professionally and in accordance with established legal principles. That is, when law enforcement authorities undertake to arrest an individual, they must have probable cause to do so and their efforts to affect the arrest must be tempered with what is reasonable at the

---

[18] By that time at Golf Manor officers had arrived on the scene to assist.
[19] The reason Office Jorg stated as to why officers placed Roger in a Golf Manor police vehicle rather than City of Cincinnati police vehicle is be cause it was closer – "right there.", OMI report, p. 9.
[20] Hunter's deposition, p. 178.
[21] Jorg deposition, p. 173. "Hunter made the allegation that Caton was striking Roger in the back of the police car and there was no need for it. Mr. Owensby was complying at that point and once he got in the car there was no need for it."
[22] Brazile deposition, p. 54.
[23] Ibid, p. 47.
[24] Ibid, p. 10.

time. In this case, the physical arrest of Roger Owensby, Jr. was unnecessary and was a gross abuse of this standard of care.

See for example: International Association of Chief's of Police (IACP), <u>Arrest: Model Policy</u>, January 2003; International Association of Chief's of Police (IACP), <u>Arrests: Concepts and Issues Paper</u>, February 2003.

1. <u>It was unnecessary for Defendants in this case to attempt the physical arrest of Roger Owensby, Jr. because:</u>

   A. Defendant Hunter was unsure as to the identity of Mr. Owensby.

   B. The only violations of the law for which Defendant Hunter acknowledged were two misdemeanor violations: jaywalking and trespassing. Each of these alleged violations could and should have been dealt with via citation and not physical arrest.[25]

   C. Defendant Hunter failed to develop any probable cause that Mr. Owensby had committed a felony or was capable of violence against the officers or the public.[26]

   D. Mr. Owensby had already been checked for weapons and Defendants determined that he was unarmed.

2. <u>Defendants escalated the seriousness of the situation by running after Mr. Owensby and attempting to take him into physical custody for minor violations because:</u>

   A. Rather than simply approach Mr. Owensby and write him a citation for the two minor violations Officer Hunter claimed to have observed on September 27, 2000, Defendants were confrontational with Mr. Owensby and needlessly escalated the situation.

   B. It was unnecessary for officers to pursue a suspect in a public area, for only minor violations for which questionable probable cause existed.

   C. Even after Mr. Owensby was patted down for weapons (a widely accepted protective procedure) and none were found, Officer Hunter stated he was not satisfied with the pat-down. This demonstrates that Officer Hunter had preconceived notions of the dangerousness of Mr. Owensby that were unfounded.

---

[25] This is the manner in which Sellers and Hasse handled suspects Hill and Nixon for the minor crimes of Trespassing and open container on Sept. 27th.
[26] Hunter's deposition, p. 139.

3.  Defendants failed to establish an operational plan prior to approaching Roger Owensby, Jr. for a field interview.

   A.    Defendant Hunter stated that officers had no plan, only "Nothing more than to go over there....to walk over with me to identify him, and then once the identification was made, then we would effect the arrest."[27]

   B.  Officer Hunter admitted that there was no agreed to plan of action between himself, or Officers Jorg and Caton as to what they were going to do once they approached Mr. Owensby at the Sunoco Convenience Store.[28]

   C.  Officer Jorg also admitted that the officers should have had a better plan, and that was their fault. [29]

It is my professional opinion, based upon a reasonable degree of certainty that the physical arrest of Roger Owensby, Jr. by Defendants in this case was unnecessary and unreasonable.

**Opinion 2**
Under well-established requirements and police procedures, the police in any arrest situation may use only that level of force that is objectively reasonable to bring an incident under control. In this case, the amount of force used by Defendants in the arrest of Roger Owensby, Jr. was unreasonable and excessive and constituted a failure to observe nationally recognized standards of police procedure.

See for example: International Association of Chief's of Police (IACP), Use of Force: Model Policy, August, 2001; International Association of Chief's of Police (IACP), Use of Force: Concepts and Issues Paper: Originally published: February 1989; Revised: December 1995.

The probable cause Defendant Hunter had developed for the arrest of Roger Owensby, Jr. extended only to misdemeanor violations, which should have been dealt with by issuing a citation opposed to a physical arrest.  The level of force used by Defendants in this case breached well-established standards and police procedures by failing to observe the nationally recognized "objective reasonableness" standard. [30]

---

[27] Hunter's deposition on 11/6/03. p. 23
[28] Hunter's deposition on 11/6/03. p. 24
[29] OMI report, p.5.
[30] Under *Graham v. Connor, 490 U.S. 386 (1989)* "reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.
; Ross, D. L. (2003). Civil Liability in Criminal Justice, Third Edition. Cincinnati: Anderson Publishing

1. <u>The use of force by Defendants in this case was excessive and unreasonable because.</u>

   A. A total of five officers were physically attempting to arrest of Mr. Owensby who was face down on the pavement and who weighed only 185 pounds.

   B. Defendants had already determined that Mr. Owensby was unarmed and posed no threat to them or the community, therefore it was unreasonable for them to chase after Mr. Owensby.

   C. Officer Caton admitted striking Mr. Owensby when he was face down on the ground.

   D. Officer Jorg admitted to placing his weight on Mr. Owensby's back after he was lying down on the pavement.

   E. Officer Caton was seen by Officer Hunter striking Mr. Owensby when he was in police custody, in handcuffs and incapacitated in the back of the Golf Manor police car.

   F. Officer Jorg admitted that he placed his knee in Mr. Owensby's back during the arrest (two separate forensic examinations determined that pressure on Mr. Owensby's back was a contributing cause of death).

   G. In his statement to the OMI, Officer Jorg admitted that his actions were not consistent with police policies and procedures and that some of the "things that were supposed be doing weren't followed…[like] making sure the guy's windows were open; making sure he could breathe; making sure that if he needed some water; making sure he was OK; to see if he's injured; if he got wounds - obviously we've got blood… all these things. "[31] Officer Jorg stated that none of this was done.

It is my professional opinion, based upon a reasonable degree of certainty that the amount of force used against Roger Owensby, Jr. by Defendants in this case was excessive and unreasonable.

**Opinion 3**
Under well-established requirements and police procedures, after police place a suspect under arrest, they are obligated to provide medical attention for that person if necessary. The actions on the part of the Defendants in this case demonstrated deliberate indifference by failure to provide Mr. Owensby with needed medical care while he was in police custody.

---

[31] OMI Report, p. 11.

After Mr. Owensby was carried to the Golf Manor police vehicle by Officers Caton and Jorg, he was beaten, abandoned in the back seat, handcuffed, "maced" and unconscious with no attention to his medical needs.

1.  <u>In this case, Defendants clearly ignored the medical needs of Mr. Owensby because:</u>

    A.  It was obvious that Mr. Owensby was in need of medical assistance as he lay in the back of the Golf Manor police vehicle.

    B.  Mr. Owensby was bleeding from the head and was unconscious.

    C.  Blood from Mr. Owensby was on the shirtsleeve of Officer Jorg.

    D.  Blood from Mr. Owensby was on Officer Caton's uniform.

    E.  Officer Brazile examined Mr. Owensby and commented that he looked like he couldn't breathe.

Chief Streicher stated, "Medical care takes precedence over all other issues...that has always been the policy.[32] But this policy was not followed by Defendants on the Owensby homicide crime scene.

2.  <u>Medical assistance was available on the crime scene because:</u>

    A.  There was clear evidence that Mr. Owensby required medical attention: (1) he was bleeding from the head; (2) he was unconscious; (3) Officer Jorg had Mr. Owensby's blood on his sleeve; (4) Brazile examined Mr. Owensby and commented that he looked like he couldn't breathe. Officer Caton also had blood on his shirt. (5) Mr. Owensby had been maced.

    B.  No officer offered first aid, even though three officers on the scene were trained EMT's (Hasse, Spellen and Heiland).  However, as Mr. Owensby lay dying, officers ignored their moral and professional responsibility for Mr. Owensby's welfare. For example:

        •   Officer Hunter admitted that medical care should have been given Mr. Owensby was he lay in the back seat of the Golf Manor Police Car.[33]

        •   Officer Jorg, the most senior officer on the scene, stated that he had no responsibility for Mr. Owensby after he was placed in the

---

[32] Streicher deposition, p. 129.
[33] Hunter deposition, p. 26.

Golf Manor police car.[34] Officer Jorg further stated that he was unsure whose responsibility it was to check on the status of Mr. Owensby.

- Officer Caton admitted that he had a responsibility for caring for Mr. Owensby after he had been injured and placed in the Golf Manor Police car and that that same duty extended to all officers on the scene.[35]

- Officer Spellen stated that it was his understanding that if a prisoner is injured, "you're to get him medical attention right away."[36]

- The Golf Manor Fire Station was only .08 miles from the Sunoco Station and would have taken less than a minute travel time for medical technicians to respond, if notified.

It is my professional opinion, based upon a reasonable degree of certainty that Defendants in this case failed to provide a reasonable level of medical care to Roger Owensby, Jr. after his arrest and placement in the Golf Manor police vehicle.

## Opinion 4
Under well-established requirements and police procedures, police officers must be held accountable for carrying out their duties properly and know what is expected of them. Accordingly, command personnel have a responsibility to develop departmental policy that must be clearly communicated to each officer. In this case, deficiencies in departmental policies and officer training resulted in the mishandling of Roger Owensby, Jr. during and after his arrest, resulting in his death.

Deficient training and unclear policies resulted in the confusion that led to the homicide of Mr. Owensby while he was in police custody. Examples of unclear departmental policies in this case include:

1. Deliberate indifference for the safety of Mr. Owensby by failing to summon medical assistance for Mr. Owensby after his arrest and after the scene was stabilized.[37]

   A. In this case, Defendants ignored departmental policy that states, "Following any use of force resulting in a citizen's injury, officers will

---

[34] Jorg deposition, p. 179.
[35] Caton deposition, p. 177-178.
[36] Spellen deposition, p. 29.
[37] Cincinnati Procedure 12.545 states, "Following any use of force resulting in a citizen's injury, officers will ensure appropriate first aid is rendered immediately once the scene ... is stabilized."

michaellyman@mac.com

ensure appropriate first aid is rendered immediately once the incident scene is stabilized."[38]

It should be noted that Chief Streicher was unable to state exactly what it means to have a scene stabilized and admitted that "there is much disagreement over that issue... that there have been a lot of different discussions about it...umm."[39]

B. Officer Jorg, as senior officer on the scene stated that he understood that he was prohibited from having any contact.[40] This demonstrates that officer training in this area was grossly deficient.

C. Officer Hunter stated that on or before November 7, 2000 he did not receive any training from the Cincinnati Police Department concerning when an officer should call for outside medical assistance, whether it be an EMT, fire department, ambulance.[41]

D. Officer Hasse said [with regard to maced suspects] they were only obligated to provide fresh air / water if the person requested it. In this case it was obvious that Mr. Owensby was unconscious and therefore unable to request assistance. This demonstrates a serious need for officer training in the use of mace and chemical irritants and treatment of suspects exposed to it.

E. The video camera positioned on a patrol cruiser on the scene which documented officers congregating in the Sunoco parking lot rather than providing Mr. Owensby help and first aid. To this evaluator, this demonstrates the officers' lack of concern for Mr. Owensby's well-being.

F. It was obvious that Mr. Owensby was injured after his arrest because Officer Jorg had a visible amount of blood on his uniform shirtsleeve.

G. Officer Jorg admitted that neither he nor any of the other officers provided required medical assistance to Mr. Owensby while he was in the back seat of the Golf Manor cruiser, despite the fact that all of the officers involved knew he was cut and bleeding.[42] This denial of medical attention for Mr. Owensby while in police custody was intentional, reckless and a serious breach of accepted police practice.

H. Officer Jorg stated that none of the five arresting officers (including himself, Officers Caton, Hunter, Sellers or Hodge) had a responsibility to

---

[38] Streicher deposition, p. 124.
[39] Streicher deposition, p. 126.
[40] Jorg deposition, p. 180-186.
[41] Hunter deposition, p. 32.
[42] Jorg deposition, p. 176.

provide care for Mr. Owensby after he was beaten, handcuffed, maced and was bleeding in the back seat of the Golf Manor patrol vehicle. Rather, Officer Jorg states that officers who were "not" part of the arrest and only responding, such as Larson and Brazile were responsible for caring for Mr. Owensby.[43] This clearly shows a lack of training and demonstrates that policy for care of arrested persons was deficient and unclear.

   I.  Chief Streicher stated that officers on any crime scene have a duty to report the unattended prisoners. [44]

Officers failed to appropriately render first aid to Mr. Owensby after his arrest because they were unclear as to their responsibilities.

2. A failure to adequately train its officers with regard to what constitutes a stabilized crime scene.

   A.  The current policy is not clear as to the meaning of "scene stabilization" – this speaks to the inadequacy of the city's policy. A clearer policy is needed.

   B.  CPD policy lacks an operational definition" of "scene stabilization" and therefore officers on the scene were unsure of their responsibilities.

   C.  Chief Streicher testified that everyone knows that medical care should be afforded to prisoners. However, even Chief Streicher was unable to define the meaning of scene stabilization.[45] Scene stabilization should be considered a foreseeable circumstance in police work with two conflicting standards – medical care vs. scene stabilization. The ambiguity of this issue points out that deliberate police training is required to clarify responsibilities of officers on a crime scene.

Because "scene stabilization" is a routine and recurring task, the inability of the Cincinnati Police Commanders to agree and clarify its meaning clearly demonstrates a serious administrative and training deficiency which left CPD officers on the Owensby homicide crime scene unsure of their responsibilities regarding medical care for persons in custody.

3. A failure to adequately train its officers with regard to the use of chemical irritant and care of those who have been subjected to it.

   A.  Officer Hunter stated that in September 2000 as he was pursuing a individual he removed his mace and was "running and spraying at the

[43] Jorg deposition, p. 180-181; 183; 185.
[44] Streicher deposition, p. 116.
[45] Streicher deposition, p. 126.

same time," (even though the suspect was running ahead of him by "a good three or four steps"), resulting in him spraying himself. [46] This demonstrates inadequate training as to the appropriate manner in which to utilize chemical irritant.

- Hunter also stated that even though it was policy to do so, he did not file a required report, stating his use of mace in this incident.[47]

B. Officer Hunter stated that it was his understanding that the policy for the Cincinnati Police Department as to care for someone who's been maced or subjected to a chemical irritant was to make sure that they have fresh air and to provide some type of face wash if they wish to wash their face. However, Officer Hunter also stated that such care was not afforded to Mr. Owensby on the night of November 7, 2000.

C. Officer Hunter stated that when he sprayed Mr. Owensby with mace on November 7, 2000, "I was point blank, right there in his face...I mean, right there... [a distance of] six inches maybe." Officer Hunter stated that he sprayed Mr. Owensby twice in the area of the "the eyes and the nose."[48]

- The IACP Model Policy on Use of Chemical Irritant states, "[mace] should not be directed at the suspect's face, rather, a single one second burst at the suspect's nose and mouth, for effectiveness and because of the risk of injury."

Officer Hunter's actions with regard to use of chemical irritate demonstrates a pattern of inadequate training and unfamiliarity with CPD policy requirements.

4. A failure to adequately train its officers with regard to the "use of force continuum" which provides officers direction and guidance regarding their application of force.

The command staff of the Cincinnati Police Department abandoned the nationally recognized and universally adopted "use of force continuum." Doing so was a gross abuse of established standards governing the application of force.

A. In October 2001, US Department of Justice recommended that CPD "revise its policies to clarify terms, and to ensure that force is only used in appropriate circumstances; and that:

"The CPD should adopt a use of force continuum...because it provides a useful tool in training officers to consider lower levels of

---

[46] Hunter deposition, p. 57.
[47] Hunter deposition, p. 97
[48] Hunter deposition, p. 166.

force first, which protects the safety of both the officer and the civilian."[49]

5. A failure to adequately train its officers with regard to the Mutual Aid Agreement[50] between the City of Cincinnati and Golf Manor with regard to:

A. Responding to assist officers in neighboring jurisdictions.

- For example, when Officer Heiland was asked what rules governed his conduct after he arrived on the Sunoco scene (Cincinnati or Golf Manor) he replied, "I don't know." Officer Heiland further stated that he had no training concerning how to operate under the mutual aid agreement.[51] This shows a serious deficiency in officer training with regard to emergency circumstances and caring for injured prisoners.

B. This training deficiency resulted in CPD officers stating that the Golf Manor police were responsible for the welfare of Mr. Owensby and visa versa. As a result of poorly constructed policies and inadequate training, it was unclear to officers on the Owensby homicide scene as to which jurisdiction was responsible for rendering medical assistance to Mr. Owensby.

It is my professional opinion, based upon a reasonable degree of certainty that the homicide of Roger Owensby, Jr. was due to a failure to properly train officers and a failure to adopt necessary policies and procedures with regard to care for persons in their custody.

---

[49] USDOJ Letter dated October 23, 2001 p. 3 (C-004206)
[50] Hamilton County Mutual Aid Agreement for Law Enforcement
[51] Heiland deposition, p. 92.

**Fees and Previous Experience**

This report contains the opinions I am prepared to express at trial in this matter. My fees in this case are at the rate of $200 per hour and an initial retainer of $2500. I charge $2000 per day plus expenses for work conducted out of town.

I have testified as an expert witness in a civil action on eight occasions. Those involved depositions and the cases are listed in Appendix #3. I have testified in a hearing in a criminal matter on one occasion. That case is also identified in Appendix #3. I have testified in one jury trial in the past four years. That was in federal court in Columbia, Tennessee on September 11, 2003.

Respectfully submitted,

Michael D. Lyman, Ph.D.
February 2, 2004

## APPENDIX #1 – MATERIALS REVIEWED

1. Report to Mark A. Gissiner from Forensic Pathologist;Cyril H. Wecht, M.D., J.D. "Opinion" Section dated September 10, 2002.
2. Written opinion by Daniel L. Schultz, M.D. dated November 30, 2000 (C000042).
3. Aerial photograph of Seymour Avenue and Langdon farm Road area.
4. Thomas Streicher Jr. Deposition (12-22-03)
5. Caton's deposition
6. Jorg's deposition
7. Hunter's deposition
8. Heiland's deposition
9. Schultz's deposition
10. USDOJ, Civil Rights Division letter dated October 23, 2001.
11. Regional Crime Information Center printout of suspect L.A., dated 11-26-03.
12. Cincinnati City Beat article by Lesley blade "Tale of the Tape."
13. Cincinnati Post article by Kevin Osborne, "Tape of officer may be enhanced."
14. e-mail from Paul Martin's regarding hotel accommodations at Westin hotel.
15. Flight itinerary for trip to Cincinnati.
16. Transcript of videotaped deposition of Robert Jorg.
17. Transcript of video deposition of Patrick Caton.
18. City of Cincinnati office of municipal investigation report dated October 2, 2002.
19. Transcript of proceedings: October 26th, 2001 (case #: B- 0009502), Vol. 7.
20. Cincinnati.com "The Enquirer" article: "This "N Word" May Not be the One Some Think.
21. Transcript of proceedings dated October 24th, 2001 morning session (#B-0009502), Vol. 3.
22. Surveillance video (VHS) of convenience store depicting Terry stop and pat down of Roger Owensby, Jr.
23. Videotaped of police cruiser camera and audio of Officer Victor Spellen depicting crime scene after Roger Owensby, Jr. displaced in the Golf Manor Police vehicle.
24. The cover letter from Paul B. Martin's dated January 13, 2004.
25. Cover letter from Frederick M. Morgan, Jr., dated October 28, 2003.
26. Transcript of videotaped deposition of Victor Spellen.
27. Transcript of videotaped deposition of Darren Sellers.
28. Transcript of a videotaped deposition of David Hunter Jr..
29. Transcript of videotaped deposition of Brian Brazile.
30. Deposition of Alexander Hasse.
31. Deposition of Brenda Owensby.
32. Deposition of Donna Marie Todd.
33. Deposition of Roger Owensby Sr.
34. Deposition of Shawn Owensby.
35. Deposition of Rene Louise Hinton.
36. Deposition of Robert B. Heiland Jr.

37. Deposition of Christopher Campbell.
38. Transcript of continued videotaped deposition of David Hunter Jr.
39. Deposition of Craig Richard Coburn.
40. Deposition of Daniel L. Schulz, MD.
41. Deposition of Alan J. Goldschmidt.
42. Deposition of Suzanne A. Flottemesch.
43. IACP Training Key 517, v. 28: *Suspects who Run: Supreme Court Expands Terry Rule*, p. 1-5.
44. IACP Training Key 462, V. 23: *Use of Pepper Aerosol Restraint Spray*, p. 31-35.
45. IACP Training Key 296, V. 13: *Written Directive System*, p. 43-47.

## APPENDIX #2 - <u>INTERNET SEARCHES</u>

Web sites for:

1. Academy of Criminal Justice Sciences
2. Community Policing Consortium
3. FBI Law Enforcement Bulletin
4. International Association of Chiefs of Police
5. Police Executive Research Forum
6. The FBI
7. U.S. Department of Justice
8. Academy of Criminal Justice Sciences
9. American Society of Criminology
10. Lexis Nexus

## APPENDIX #3 - DEPOSITIONS GIVEN

Depositions given during the past four years:

1. Frenzen, et al. vs. Grady County, et al. (retained by defendant)
   U.S. District Court – Western District Case No. CIV-00-1089-A
   (August, 2001)

2. Helen Eves vs. Anaconda-Deer Lodge County (retained by defendant)
   U. S. District Court – District of Montana, Butte Division Case No. CV-00-17-
   BU-CCL (October, 2002)

3. Aiels v. City of Cedar Rapids; Havlicek; and Keiller (retained by plaintiff)
   (March, 2003). U.S. District Court for the Northern District of Iowa Cedar
   Rapids Division, Case No. C01-76MJM (March, 2003)

4. Ernesto Acevedo Guerra vs. Montgomery County, Maryland, et al. (retained
   by plaintiff) No. AW-02-CV-1995 (March 2003)

5. Debra Smith, et al., vs. James Allen Barber, et al. (retained by plaintiff) No.
   01-2179-CM (*April, 2003*)

6. Mary Jane Blossom vs. Jeff Yarbrough et al. (retained by plaintiff) Northern
   Oklahoma U.S. District Court Case 2002-CV-373 *(June, 2003)*

7. Richard Molina et al vs. County of Pima et al Case # C20015392 (*Aug, 2003*)

8. Estate of Floyd Wayne Houston et al v. Tom Mosley; City of Wilburton Police
   Department; and City of Wilburton Defendants – CIV-01-323-S (Sept. 2003)

Hearing in criminal matter:

1. *State of Arizona vs. James Bryan Saville*; Case No. CR2002-006589

Trial testimony:

1. *Brooks v. Maury County et al, Columbia, TN* (September 11, 2003)

### APPENDIX #4 - CURRICULUM VITAE

**Current Position:**  Director of Graduate Studies/Advisor Forensic Science
Program

Columbia College
1001 Rogers St.
Columbia, Missouri 66216
Office (573) 875-7472

**Rank:**  Professor of Criminal Justice
Service from: August 1989 to Present

## Previous Employment

### Certified Generalist Instructor - The University of Missouri-Columbia

Law Enforcement Training Institute - School of Law
321 Hearnes Center
Columbia, Missouri 65211
From - 7-15-86 to 8-15-89

*Responsibilities:*  Instructed police office recruits in police academy in the
areas of criminal investigation, interviews & interrogations,
informant management, use of force, felony arrests,
professional ethics. Police academy program coordinator
Keynote speaker at academy graduation ceremonies

### Sr. Agent - The Oklahoma Bureau of Narcotics and Dangerous Drugs

4545 North Lincoln Blvd.
Oklahoma City, Oklahoma 73102
Phone (405) 521-2885
Position - Sr. Agent, Intelligence Division / Sr. Agent,
Training and Education Division

*Responsibilities:*  Originated and managed large-scale criminal investigations
throughout the State of Oklahoma; testified in criminal court
on both the federal and state level; made arrests; served
search warrants; conducted interrogations; served on
personnel hiring boards; disciplinary boards; shooting review
and promotion boards; conducted background investigations
of prospective recruits and conducted numerous internal
affairs investigations as Sr. investigator; testified in two
congressional hearings.

I also served as training and field training Officer (FTO) for new recruits for over four years.

From - 10/1/81 to 7/9/86

## Special Agent - The Kansas Bureau of Investigation

1620 Tyler
Topeka, Kansas 66612
Phone - (913) 232-6000
Position -Special Agent, Intelligence and Organized Crime
        Division (IOCD) / Special Services Division

*Responsibilities*:     Originated and managed large-scale criminal investigations throughout the State of Kansas; testified in criminal court on both the federal and state level; made arrests; served search warrants; conducted interviews and interrogations; conducted numerous internal affairs investigations as Special Agent.

From - 6/75 to 10/80

## Publications

**Textbooks**

Lyman, M D. (1987). Narcotics and Crime Control. Charles C. Thomas Publisher: Springfield, IL.

Lyman, M. D. (1989) Gangland: Drug Trafficking by Organized Criminals. Charles C. Thomas Publisher: Springfield, IL.

Lyman, M. D. (2002) Practical Drug Enforcement, 2nd ed. CRC Press: Boca Raton, FL

Lyman, M. D. (2003). Drugs in Society: Causes, Concepts and Control, 4th ed. Anderson Publishing: Cincinnati, OH.

Lyman, M. D. (2002). Criminal Investigation: The Art and the Science, 3rd ed. Prentice Hall: Upper Saddle River, NJ.

Lyman, M. & G. Potter (2004). Organized Crime, 3rd ed . Prentice Hall: Upper Saddle River, NJ

Lyman, M. D. (2002) The Police: An Introduction, 2nd ed. Prentice Hall: Upper Saddle River, NJ. (3rd ed. will be in print in 2004)

michaellyman@mac.com

## Articles / Essays

"Transnational Organized Crime." <u>The Encyclopedia of Murder & Violent Crime (2003)</u>; Eric Hickey Editor. Sage Publications: Thousand Oaks, CA.

"Domestic Organized Crime." <u>The Encyclopedia of Murder & Violent Crime (2003)</u>. Sage Publications: Thousand Oaks, CA.

"Drug Enforcement in the United States." An essay for <u>The Encyclopedia of Law Enforcement</u>, Sage Publications: Thousand Oaks, CA. (will be in production in early 2004).

"Undercover Operations." An essay for <u>The Encyclopedia of Law Enforcement</u>, Sage Publications: Thousand Oaks, CA. (will be in production in early 2004).

"<u>The Rural Drug Threat</u>" The Missouri Sheriff's Association Magazine, 5/87.

"<u>Drug Enforcement Requires a Multifaceted Approach</u>," The Missouri Police Chief Magazine, 9/88.

"<u>Minimizing Danger in Drug Enforcement</u>" Law and Order Magazine, 9/90.

## Awards

- **Police Instructor of the Year Award** for 1988 by the Missouri Department of Public Safety, Peace Officer's Standards and Training (POST). Presented April 1989.

- **Meritorious Award for Independent Study Course** presented by the National University Continuing Education Association. April 1989.

## Academic Background:

Doctor of Philosophy (1992) Higher and Adult Education and Foundations. University of Missouri-Columbia

Master of Science in Administration of Justice – Police Agency Management (1979)
Wichita State University Graduate School, Wichita, Kansas

Bachelor of Science in Administration of Justice (1977)
Wichita State University, Wichita, Kansas

**Consulting:**         Invited to serve as consultant for the Federal Research
                        Division of the U.S. Library of Congress and the Director of
                        Central Intelligence Crime and Narcotics Center in
                        Washington DC (in January 2003.)

                        On two occasions conducted police training seminars for the
                        Public Agency Training Council located at 5101 Decatur
                        Blvd. Ste. L., Indianapolis, IN. Topics included: criminal
                        investigation; undercover operations and informant
                        management (in Columbus, OH between 1989-1991).

**Organizational
Affiliations:**

- The International Association for the Study of Organized
  Crime (IASOC)
- International Association of Chief's of Police (IACP)
- Police Executive Research Forum (PERF)
- Academy of Criminal Justice Sciences (ACJS)
- American Academy of Forensic Science (AAFS)
- American Society of Criminology (ASC)