Owensby, et al. vs. City of Cincinnati, et al.    MICHAEL D. LYMAN, Ph.D.
March 31, 2004

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - - - -
ESTATE OF ROGER D.          :
OWENSBY JR., et al.,        :
                           :
        Plaintiffs,         :
    vs.                     :   Case No. 01-CV-769
                           : (Judge S. A. Spiegel)
CITY OF CINCINNATI,        :
et al.,                    :
                           :
        Defendants.         :
- - - - - - - - - - - - - - - -


        Videoconference deposition of MICHAEL D.

LYMAN, Ph.D., a witness herein, called by the

defendants for cross-examination, pursuant to the

Federal Rules of Civil Procedure, taken before me,

Wendy Davies Welsh, a Registered Diplomate Reporter

and Notary Public in and for the State of Ohio, at

the offices of Freund, Freeze & Arnold, 105 East

Fourth Street, Suite 1400, Cincinnati, Ohio, on

Wednesday, March 31, 2004, at 2:39 p.m.

Owensby, et al. vs. City of Cincinnati, et al.                                    MICHAEL D. LYMAN, Ph.D.
March 31, 2004

Page 2

```
 1  APPEARANCES:

 2      On behalf of the Plaintiffs:

 3          Paul B. Martins, Esq.
            (via teleconference)
 4          Helmer, Martins & Morgan Co. LPA
            Suite 1900, Fourth & Walnut Centre
 5          105 East Fourth Street
            Cincinnati, Ohio  45202
 6          Phone:  (513) 421-2400

 7          John J. Helbling, Esq.
            The Helbling Law Firm, L.L.C.
 8          3672 Springdale Road
            Cincinnati, Ohio 45251
 9          Phone:  (513) 923-9740

10      On behalf of the Defendants City of Golf Manor,
        Stephen Tilley, Roby Heiland and Chris
11      Campbell:

12          Wilson G. Weisenfelder, Jr., Esq.
            Rendigs, Fry, Kiely & Dennis
13          900 Fourth & Vine Tower
            One West Fourth Street
14          Cincinnati, Ohio  45202-3688
            Phone:  (513) 381-9200
15
        On behalf of Defendants City of Cincinnati,
16      Darren Sellers, Jason Hodge:

17          Terrance A. Nestor, Esq.
            Assistant City Solicitor
18          Department of Law
            Room 214, City Hall
19          801 Plum Street
            Cincinnati, Ohio 45202
20          Phone:  (513) 352-3347

21          Neil F. Freund, Esq.
            Freund, Freeze & Arnold
22          One Dayton Centre
            1 South Main Street, Suite
23          1800 Dayton, Ohio 45402
            Phone:  (937) 222-2424

24
```

Page 3

```
 1  APPEARANCES (Continued):

 2      On behalf of the Defendants Robert B. Jorg,
        Patrick Caton, Jason Hodge, Victor Spellen and
 3      Darren Sellers:

 4          Donald E. Hardin, Esq.
            Kimberly A. Rutowski, Esq.
 5          Hardin, Lefton, Lazarus & Marks, LLC
            915 Cincinnati Club Building
 6          30 Garfield Place
            Cincinnati, Ohio 45202
 7          Phone:  (513) 721-7300

 8
                    - - -
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Page 4

```
 1           S T I P U L A T I O N S

 2          It is stipulated by and among counsel for the

 3  respective parties that the deposition of MICHAEL D.

 4  LYMAN, Ph.D., a witness herein, called by the

 5  defendants for cross-examination, pursuant to the

 6  Federal Rules of Civil Procedure, may be taken at

 7  this time by the notary; that said deposition may be

 8  reduced to writing in stenotype by the notary, whose

 9  notes may then be transcribed out of the presence of

10  the witness; and that proof of the official

11  character and qualifications of the notary is

12  expressly waived.

13                  - - -

14

15

16

17

18

19

20

21

22

23

24
```

Page 5

```
 1              I N D E X

 2      Examination by:          Page

 3      Mr. Freund . . . . . . . .    7

 4      Mr. Hardin . . . . . . . .   86

 5      Mr. Weisenfelder . . . . .  110

 6                  - - -

 7          RULE 34 REQUESTS

 8  Page 27
    Dr. Lyman's article on police pursuits, published
 9  since submission of his report

10  Page 36
    List of Dr. Lyman's cases currently under review,
11  together with an indication of the party employing
    him
12
    Page 38
13  Copies of depositions given by Dr. Lyman in case
    numbers 1 through 8 listed on page 22 of his report
14
    Page 41
15  Names of attorneys on cases 3 through 8 listed on
    page 22 of Dr. Lyman's report
16
    Page 52
17  An accurate list of every registry to which Dr.
    Lyman subscribes
18
    Page 63
19  Documents generated from Dr. Lyman's Internet
    searches, for Web sites 1 through 10 listed on page
20  21 of his report

21

22

23

24
```

Page 2 - Page 5

Owensby, et al. vs. City of Cincinnati, et al.                                    MICHAEL D. LYMAN, Ph.D.
March 31, 2004

---

Page 10

1 anything more than the materials that we just went
2 through, Doctor?
3    A. No, I did not.
4    Q. All right. The first thing I'd like to do
5 is to talk a little bit about your background. Are
6 you currently a police officer?
7    A. No, I'm not.
8    Q. Okay. When last were you involved in
9 actual police work?
10    A. I left police work in July of 1986.
11    Q. Okay. Then let's go to your CV for a
12 second and let's look -- if we can find where that
13 is. And your CV starts at page 23.
14    A. Right.
15    Q. All right. Where would I find that on
16 your CV: when you last worked as a police officer?
17    A. That would be on page 23, my position as a
18 senior agent with the Oklahoma Bureau of Narcotics,
19 Dangerous Drugs.
20    Q. All right. And there you have listed your
21 responsibilities; is that correct?
22    A. Yes.
23    Q. Okay. And you served -- you served with
24 the Oklahoma Bureau of Narcotics and Dangerous Drugs

---

Page 11

1 from when to when?
2    A. From 1981 until 1986.
3    Q. Okay. And that's listed on page 24; is
4 that right?
5    A. That's right.
6    Q. Did you effectuate any arrests while you
7 were with the Oklahoma Bureau of Narcotics and
8 Dangerous Drugs?
9    A. Yes, I did.
10    Q. Specifically, what was your position with
11 that bureau?
12    MR. MARTINS: Objection. Asked and
13    answered.
14    You may answer.
15    A. I started out as what they call an agent
16 II. I was promoted after about 14 months to the
17 position of senior agent, and that's the position
18 that I ended up in.
19    Q. And what would you do as an agent or
20 senior agent?
21    A. Well, we were a state law enforcement
22 investigative agency and the agents that I work with
23 as well as myself are criminal investigators, hold
24 police powers to conduct searches, make arrests and

---

Page 12

1 enforce the criminal code of the State of Oklahoma.
2    Q. Did you ever have to use force when
3 effectuating arrests while you were with the Bureau
4 of Narcotics and Dangerous Drugs in Oklahoma?
5    A. Well, I'm sure I did. I don't know that I
6 can even tell you specific occasions. I -- I think
7 it would be safe to say yes.
8    Q. Did anyone ever resist arrest while you
9 were an agent with the bureau between '81 and '86?
10    A. Yes.
11    Q. Did you use force to effectuate an arrest
12 at any time that you worked at the bureau between
13 '81 and '86?
14    A. Well, I think I -- I think, like I stated,
15 the chances are I did use some degree of force,
16 however you want to identify or define as force. I
17 effected a lot of arrests. They were almost all
18 felony arrests. And I can't remember anybody
19 specifically running from me.
20    It -- it was a little convoluted. Let me
21 explain that.
22    We worked in teams in district offices,
23 which is one of the reasons I went down there, by
24 the way. And so if anybody was working undercover,

---

Page 13

1 the rest of us would cover them. If there was an
2 arrest situation, the rest of us would cover them as
3 well, back them up, if you will.
4    And so there were situations where maybe
5 it wasn't my arrest but the individual might have
6 run or tried to drive away or something and -- and
7 we would pursue him as a group.
8    Q. Okay. As far as your service with the
9 Oklahoma Bureau of Narcotics, my specific question
10 is, do you have any recollection that you were ever
11 required to use force on someone who is resisting
12 arrest?
13    A. Specific recollection, no.
14    Q. Do you think there's a probability that
15 you did or -- or didn't?
16    A. I think I testified I think that I did.
17    Q. All right. Did you ever use enough force
18 to take somebody off his or her feet?
19    A. No.
20    Q. Did you receive any special use-of-force
21 training while with the Oklahoma bureau?
22    A. Yes.
23    Q. Other than what an average police officer
24 would receive?

---

Page 10 - Page 13

Owens, et al. vs. City of Cincinnati, et al.
March 31, 2004

MICHAEL D. LYMAN, Ph.D.

Case 1:01-cv-00769-SAS    Document 158-5    Filed 05/20/2004    Page 4 of 13

Page 14

1  A. Yes.
2     MR. MARTINS: Objection.
3  Q. Tell me all the special training that you
4  received when you were with the Oklahoma bureau,
5  other than what a normal police officer would
6  receive.
7     MR. MARTINS: Objection. Vague.
8     You may answer.
9  A. I don't have a laundry list to give you --
10    And I wish I did. In fact, I -- I -- I --
11 I should go down there and get that laundry list at
12 some time.
13    -- so I can just refer to my recollection.
14 I have probably somewhere in the neighborhood of,
15 oh, 1500 and 2000 hours of what -- what -- what we
16 used to call in-service training, which was training
17 beyond the basic training required by the State.
18 And that training, topicwise, was all over the
19 place.
20    Specifically responding to your question
21 about use of force, absolutely. We had not only
22 physical Red Man training but use of PR-24, where to
23 strike the body.
24    The -- the Red Man, let me explain that

Page 15

1  for a minute if you're not familiar, at least for
2  the sake of the record. The Red Man is a suit.
3  It's an actual -- a rubber suit and -- it appears to
4  be rubber, anyway. And it's padded, bright red in
5  color, that an individual, a volunteer, usually an
6  officer, puts it on his arms and his legs and his
7  torso and even his head. And that person is the
8  subject of -- of strikes from the PR-24, to help
9  train officers in use of the PR-24, for one thing.
10    Other things were legal-type training with
11 regard to use of force, the -- the legal standards
12 that were -- that were prevailing at the time. And
13 shoot/don't shoot practical scenarios with regard to
14 the use of deadly force, which is use of deadly --
15 or use of force, rather.
16 Q. And that would be -- what you just
17 explained to me in answer to my question would be
18 something that the regular police officer on the
19 street would not receive?
20 A. Well, I don't know that I can speak to
21 what a regular officer would receive over and above
22 their basic training requirements that are required
23 under law.
24 Q. Isn't it normal for police officers to

Page 16

1  continue to get in-service training during the
2  course of their employment with any major
3  municipality?
4  A. There weren't at the time. The CEU
5  requirement is a fairly recent standard.
6  Q. All right. And what was a reason for
7  leaving the Oklahoma Bureau of Narcotics?
8  A. I had decided that I wanted to leave
9  police work to become a police instructor. I had a
10 career opportunity in Columbia, where I live now, to
11 work with the Law Enforcement Training Institute,
12 which is a certified police academy under the law
13 school at the University of Missouri.
14 Q. Do you teach use of force?
15 A. I did at the time, yes.
16 Q. You did at what time?
17 A. Well, during the time that I was a
18 certified police instructor.
19 Q. Where?
20 A. I did not hear. I'm sorry?
21 Q. Where did you teach use of force?
22 A. I taught at the -- I taught at the Law
23 Enforcement Training Institute, the police academy
24 that employed me for that three years.

Page 17

1  Q. Where is that on your CV? Is that right
2  under Previous Employment?
3  A. Yes, it is.
4  Q. So your testimony is you -- you taught a
5  course in the use of force for three years at the
6  School of Law, School of Law Law Enforcement
7  Training Institute?
8  A. Let me amend that a little bit. I taught
9  as part of a team. So the answer is yes, I did
10 teach officers and, yes, over the period of the full
11 three years that I was there.
12    But the use of force training was -- was
13 more than just a single day. It was usually a
14 three-day type of arrangement. And I would teach a
15 segment of that, along with other instructors.
16 Q. What segment of use in -- use of force
17 training would you teach between '86 and '89 at the
18 Law Enforcement Training Institute?
19 A. Well, like I testified, I was involved in
20 the -- the Red Man training, which was a component
21 that addressed PR-24 use. We also address use of
22 force as it relates to felony stops, use of force as
23 it relates to drug raids and service of search
24 warrants, all of which I was personally involved in,

Case 1:01-cv-00769-SAS    Document 158-5    Filed 05/20/2004    Page 5 of 13
Owensby, et al. vs. City of Cincinnati, et al.
March 31, 2004
MICHAEL D. LYMAN, Ph.D.

Page 18

1 and use of force as it relates to arrests in
2 general.
3    Q. Do you have any materials from that
4 training, Doctor?
5    A. No.
6    Q. Are there any materials that are in
7 existence, written materials, documents that would
8 be in existence to show me precisely what you taught
9 while you were a law enforcement training person at
10 the School of Law between '86 and '89?
11    A. I don't think so. If I had anything, I
12 would certainly provide that to you. In fact, I
13 wish I had that for my own archives.
14    The reason that I don't have it is because
15 it's just outdated. And the reason it's outdated is
16 because of the new requirement for CEUs, and I think
17 I can speak for -- for many of the POST
18 organizations for most states around the country.
19    These -- these POST commissions, which is
20 police officers' standards of training, do require
21 regular rewriting of lesson plans for all areas
22 taught that are certifying areas. And consequently,
23 lesson plans that are as little as two years old are
24 outdated.

Page 19

1    Q. And therefore, following up on your
2 answer, of little or no value?
3    A. Of little or -- or no value.
4    Q. Therefore, what do you have to add in this
5 case that is of value if you haven't been involved
6 in police work since 1989?
7    A. Well, that's not to say that every word on
8 every lesson plan has been discarded and a whole new
9 genre of -- of -- of nomenclature is added to the
10 lesson plan. It's not to say that at all.
11    It's simply to say that it's updated and
12 based on new equipment, for an example, that might
13 be made available, based on recent Supreme Court
14 decisions that may or may not address certain
15 applications of the use of force, based on the
16 development or not of model policies that might come
17 into play that may or may not address use of force.
18    So the material that I taught, for the
19 most part, really is still mainstream law
20 enforcement training. And I know that from
21 interfacing with law enforcement officers on a daily
22 basis.
23    Q. Why did you leave the Law Enforcement
24 Training Institute?

Page 20

1    A. Well, it was a travel job. We -- we did a
2 lot of outreach programs throughout the state, out
3 of town a lot overnight. That's what I did in the
4 state of Kansas that I found distasteful, which is
5 why I quit the Kansas bureau. That's one of the
6 reasons I quit the Kansas bureau.
7    But I had an opportunity to teach over at
8 Columbia College. I did enjoy teaching. I -- I
9 found that to be a logical progression in my career
10 track from law enforcement officer to police
11 trainer, then to academic trainer.
12    And they had an op-- a rare opportunity
13 over at the college. The director of the program
14 had quit at the spur of the moment, and they -- they
15 made an offer to me and I accepted the offer.
16    Q. Are you currently or since either 1986 or
17 1989, whichever date you want to pick, have you been
18 engaged in any police work whatsoever?
19    A. As a sworn officer?
20    Q. Yes.
21    A. No.
22    Q. Have you effectuated any arrests since
23 1989?
24    A. No, I haven't.

Page 21

1    Q. Have you effectuated any arrests since
2 1986?
3    A. No.
4    Q. I would assume, then, that you probably
5 haven't been involved in any use-of-force matters as
6 a sworn officer since 1986?
7    A. Correct.
8    Q. As you previously testified, your current
9 position is director of graduate studies -- graduate
10 studies/advisor forensic science program. What does
11 that mean?
12    A. Well, we have a baccalaureate and a
13 master's program in criminal justice, and we have a
14 new baccalaureate program in forensic science. And
15 the reason I got, if you don't mind me saying so,
16 stuck with the directorship of the forensic science
17 program --
18    I say it that way, because that's a lot of
19 work.
20    -- I developed the program and it was my
21 vision to have such a program at the college as one
22 of just a handful, frankly, on the baccalaureate
23 level in the nation. But it has grown so much, it
24 has become an almost overwhelming responsibility.

Case 1:01-cv-00769-SAS    Document 158-5    Filed 05/20/2004    Page 6 of 13

Owensby, et al., vs. City of Cincinnati, et al.,                    MICHAEL D. LYMAN, Ph.D.
March 31, 2004

Page 22

1    But I have the responsibility to handle
2 both the graduate of the criminal -- I'm sorry, the
3 graduate directorship of the criminal justice
4 program as well as the -- the directorship of the
5 forensic science undergraduate program.
6    Q. How much time do you spend on
7 administrative duties in your position as a director
8 of graduate studies?
9    A. Well, out of a 40-hour week, if you don't
10 mind using that benchmark, I would say a third of my
11 time.
12    Q. All right. Then the other two-thirds, how
13 do you spend your time?
14    A. Well, I -- I'm a teaching faculty member
15 as well, so I have a teaching load.
16    Q. How much time --
17    A. And --
18    Q. I'm sorry. How much time do you spend
19 teaching, then, Doctor?
20    A. Well, depends on the semester. I'm not
21 trying to be evasive, but it does fluctuate a little
22 bit. For example, last semester I taught two
23 courses. The first session of this semester,
24 meaning the first eight weeks, beginning in, oh,

Page 23

1 roughly mid-January, I taught an oper-- an operating
2 procedures development course for the graduates. I
3 am not teaching any course this last eight weeks.
4 So it's a little bit different every semester.
5    Q. So I -- I'm just trying to get an idea.
6 You said you spend a third of your time in
7 administrative work. You spend some of your time
8 teaching, obviously. How do you -- what -- what --
9 what else do you do?
10    A. Well, I would say about a third of my time
11 teaching and about a third of my time working with
12 the forensic science program. There are other
13 things in -- in professordom that are quite time-
14 consuming, the least of which would be membership on
15 committees.
16    This is academic stuff, you know, personal
17 welfare and -- and things like that, you know,
18 running the college, maybe a curriculum committee,
19 curriculum development, revising courses.
20    I write textbooks. That -- that takes an
21 astronomical amount of time. Granted, not out of
22 my -- my college time. I -- I do a little bit of
23 work at the school, when I can, but a lot of that's
24 at home. But I -- I have a pretty full plate.

Page 24

1    Q. Have you ever written any texts on use of
2 force?
3    A. I've written textbooks that addressed the
4 use of force, yes.
5    Q. What textbooks have you written that
6 address use of force? Are they listed in your
7 publications?
8    A. Yes.
9    Q. Which ones of your textbooks -- which --
10 which textbooks contain use-of-force material which
11 you authored? I'm looking specifically at page 24
12 of your CV.
13    A. Well, I could just tell you. One is The
14 Police: An Introduction. That's a Prentice Hall
15 publication. The other one is Criminal
16 Investigation: The Art and the Science. That's a
17 Prentice Hall publication.
18    The other one is Practical Drug
19 Enforcement: Procedures and Administration. Or I
20 think -- actually, I think they trimmed that title
21 down to just Practical Drug Enforcement right now.
22 That's a CRC Press publication out of Boca Raton,
23 Florida. That's in the second edition.
24    And I have a book on Organized Crime and

Page 25

1 one on Drugs in Society. I can't say that they --
2 they don't address that, but, frankly, if they do
3 address it, it's on a very cursory level. I think
4 those other -- those other three that I mentioned
5 get into it considerably more.
6    Q. As far as the publications that you just
7 mentioned, what special expertise do you have to add
8 to tactic -- tactics and procedures regarding use of
9 force that the ordinary big city or ordinary
10 metropolitan police officer wouldn't have?
11    MR. MARTINS: Objection. Vague.
12    A. Well, I don't make any claim to developing
13 any new paradigms for use of force. I do not do
14 that. These textbooks, and maybe textbooks in
15 general but certainly my textbooks, make an effort
16 to take the available literature out there and put
17 it in a readable, understandable, hopefully, well-
18 organized format for people who want to become law
19 enforcement officers so they can read this and
20 understand it from the -- their very earliest
21 studies.
22    Q. For example, since you haven't been a
23 practicing, I'll use the word a practicing police
24 officer, since 1986, how is it that in 2002 -- all

Page 22 - Page 25

Owensby, et al. vs. City of Cincinnati, et al.
March 31, 2004

MICHAEL D. LYMAN, Ph.D.

---

Page 26

1 of these textbooks were at least published in 2002,
2 that you mentioned. How is it that you -- you have
3 developed this expertise without having either been
4 a police officer or involved in police work for over
5 15 years?
6    A. Well, the fact that I was a police officer
7 gives me a base of knowledge for -- for writing the
8 textbooks. The currency of the textbook deals with
9 my ability to research. That's where the research
10 component comes in.
11    Q. All right. Have you written any articles,
12 specifically referring to page 25, on use of force?
13    A. I have two textbooks that are no longer in
14 print. And I -- the reason I -- I'm hesitating, I
15 don't know for sure if they address use of force.
16 One's called Narcotics and Crime Control. That was
17 my very first publication, with Charles Thomas
18 Publishing out of Springfield, Illinois.
19        The other one is Gangland. I'm sure that
20 one does not. Narcotics and Crime Control might,
21 but, again, that's not available anymore. It's no
22 longer in print.
23    Q. Do you have your CV in front of you?
24    A. Yes.

---

Page 27

1    Q. Okay. I thought I had covered all the
2 textbooks, and -- and I may be mistaken. I -- I
3 switched to articles. Earlier I asked you what
4 textbooks dealt with use of force, and you gave me,
5 I think --
6        And I'll give you a chance to correct
7 yourself if you need to.
8        -- on page 24, Publications, you gave me
9 three of them.
10    A. That's right.
11    Q. All right. Then I went to Articles on
12 page 25, and my question is, what articles dealt
13 with use of force?
14    A. Oh, I'm sorry. I didn't know you were
15 referring to articles at that time. I -- I didn't
16 understand you'd made the switch.
17    Q. Fair enough.
18    A. Let me just look here. I don't think any
19 one of these articles deal with use of force. I
20 have published an article since I submitted this
21 report, on police pursuits. And I'm sitting here
22 trying to think if that one actually went into use
23 of force or not. It very well may have. Whether it
24 does or whether it doesn't, I'll be happy to provide

---

Page 28

1 you a copy of that.
2    Q. All right. We would make a Rule 34
3 request for that, Doctor. And when you're talking
4 about police pursuits, are you talking about hot
5 pursuit?
6    A. Yes.
7    Q. All right. You have a doctor of
8 philosophy; is that correct?
9    A. That's correct.
10    Q. And you got that in '92. You have a
11 master's in police agency management which you got
12 in '79; is that right?
13    A. Right.
14    Q. You got a bachelor of science in
15 administration of justice in '77. That's your
16 formal education?
17    A. Correct.
18    Q. And none of that involved actual street
19 police work, the -- the formal education here; is
20 that correct?
21    A. That's correct.
22    Q. Now, have -- have -- have you ever been a
23 street cop?
24    A. A uniformed officer?

---

Page 29

1    Q. Yes.
2    A. No.
3    Q. Have -- have you ever served on any
4 metropolitan police force?
5    A. No.
6    Q. Have you ever had any complaints made
7 against you by a citizen of excessive use of force?
8    A. No.
9    Q. Have you ever had to file a use-of-force
10 report?
11    A. No.
12    Q. Well, if you've never had to file a
13 use-of-force report, does that mean that you've
14 never used force when effectuating an arrest?
15    A. No. That means the standard wasn't there,
16 back when I was a sworn law enforcement officer, to
17 do that.
18    Q. All right.
19    A. Now, I -- I submitted reports, obviously,
20 on the incidents that I was involved in, but not a
21 dedicated use-of-force report, no.
22    Q. Okay. Just as a matter of interest, would
23 you agree with me that most metropolitan police
24 officers who have been engaged in police work for

---

Owensby, et al. vs. City of Cincinnati, et al.
March 31, 2004                                    MICHAEL D. LYMAN, Ph.D.

Page 30

1  some period of years would necessarily have
2  use-of-force reports in their files?
3      THE WITNESS: I'm sorry. There's a
4  problem with both the video and the audio here.
5  Actually, you're frozen right now.
6      MR. FREUND: Am I all right?
7      THE WITNESS: And -- I can -- I seem to be
8  able to hear you all right. You -- the picture
9  is just like a still photograph, however. But
10  I only received about half of the last audio
11  transmission.
12      MR. FREUND: Is -- is the movement back at
13  all?
14      THE WITNESS: No.
15      MR. FREUND: We probably have to
16  reconnect. What we'll do is I'm going to get
17  my assistant and he's going to help us here.
18  We may have to reconnect with you.
19  Something -- I don't know what happened. So
20  just hang -- hang in.
21      (Recess taken:  3:13 p.m. - 3:19 p.m.)
22      (Record read.)
23      A. I think, if it's a requirement, the
24  answer's yes. But it wasn't a requirement when I

Page 31

1  was in law enforcement.
2      Q. Right. You would agree with me, Doctor,
3  that use of force in metropolitan police work is
4  fairly commonplace, is it not?
5      MR. MARTINS: Objection.
6      A. I don't know. I can't answer that.
7      Q. Why can't you answer that, Doctor?
8      A. Because I don't have any statistics at
9  my -- available right now to show one way or the
10  other. Are you making an assumption that just
11  because a city is bigger that per capita there's a
12  bigger use of force, a greater use of force? I -- I
13  mean, I -- I won't make that assumption.
14      Q. And you probably don't know, because
15  you've never been a metropolitan police officer; is
16  that true?
17      MR. MARTINS: Objection.
18      A. Well, I've worked with them and I've
19  trained them and I have spent quite a bit of time
20  with them on a professional level. Never actually
21  been sworn in in a large metropolitan police force,
22  no.
23      Q. Have you done any studies in the -- the --
24  the number of -- of metropolitan police officers who

Page 32

1  are required to use force a particular number of
2  times per arrest?
3      MR. MARTINS: Objection.
4      A. Not that comes to mind.
5      Q. Do you know if there are any statistics
6  like that?
7      A. Regarding -- let me recap. You're --
8  you're asking if I'm aware if there's any statistics
9  addressing how often big-city law enforcement
10  officers use force; is that correct?
11      Q. Per arrest. Are required to use force per
12  arrest.
13      A. I don't know if there is or not. I would
14  suppose somewhere there would be.
15      Q. What is your thesis for your doctor of
16  philosophy?
17      A. It addresses the onset of drug abuse by
18  juvenile defendants.
19      Q. And did you have to prepare something for
20  your master's?
21      A. No.
22      Q. Okay. Have you ever been suspended while
23  you were in law enforcement? Were you ever
24  suspended?

Page 33

1      A. No, I was not.
2      Q. Were you ever fired?
3      A. No.
4      Q. Were you ever asked to resign?
5      A. No.
6      Q. What courses, when -- when you teach, what
7  courses do you teach?
8      A. In the undergraduate level I teach
9  introduction to criminal justice. I teach the
10  police in society. I teach organized crime. I
11  teach drug abuse and crime control. I teach -- have
12  taught. Don't now. Have taught laws of evidence,
13  criminal procedure. I'm trying to think.
14      That's all that comes to mind on the
15  undergraduate level. The graduate level I teach a
16  course called the Development of Standard Operating
17  Procedure. I teach another course called Current
18  Issues and Future Directions in Criminal Justice.
19      Q. Do you have any law training?
20      A. Yes.
21      Q. What's your legal training?
22      A. Well, the law training is training by
23  legal counsel as a law enforcement officer with
24  regard to criminal law and constitutional law

Page 30 - Page 33

Owensby, et al. vs. City of Cincinnati, et al.
March 31, 2004

MICHAEL D. LYMAN, Ph.D.

Page 42

1    A. I would.
2    Q. Okay. Then let me ask the question again.
3 In your opinion, when do you first consider yourself
4 to be an expert on use of force?
5    A. I don't have a date to give you.
6 That's -- I mean, I'm not -- I'm not hedging on your
7 question. I -- I -- that's a very intangible thing.
8        I have been a professor for 16 years now.
9 I have an 18-year publishing record. On the low
10 end, when I first began publishing, you know, when I
11 first left law enforcement, I can tell you I -- I
12 did not feel I was an expert on use of force. I
13 don't feel my experience in and of itself would
14 qualify me for that, even though I was an instructor
15 in the academy.
16        I think over a period of time, and I'm not
17 clear exactly whether it would be three years or
18 five years or ten years, during the period of time
19 that I researched in one form or another use of
20 force or use of deadly force, I think at some point
21 I became competent, in my estimation, in my ability
22 to -- to understand it and to apply it to practical
23 situations.
24    Q. Thank you.

Page 43

1    A. That's the best answer I can provide.
2    Q. In listening to that last answer, Doctor,
3 as I understand a portion of that answer, you would
4 agree with me that you would not be considered to be
5 an expert just because you were a practicing police
6 officer at -- for some period of time?
7    A. That's right. That's right.
8    Q. You charge $200 per hour; is that right?
9    A. Yes.
10    Q. And you charge any more for deposition
11 time like this? Do you charge hourly or a flat
12 rate?
13    A. The flat rate of $2,000.
14    Q. Why do you -- why do you charge more for a
15 deposition than you do for an hourly review?
16    A. Because it takes more than an hour to
17 prepare. It usually takes more than an hour in
18 general. Today, for an example, it took me a day
19 off work, two hours to drive to St. Louis, two hours
20 to drive home. And I've just -- I've adopted the
21 $2,000 fee just as -- as a flat fee to compensate me
22 for time lost.
23    Q. And I assume at your work you're taking a
24 vacation day?

Page 44

1    A. I'm taking a -- actually, I -- I touched
2 base with my chair, and he just let me go ahead and
3 come on in because there were no meetings today.
4    Q. Right.
5    A. We don't even have vacation days.
6    Q. Yeah. I mean, you're on --
7    A. There's no such thing, really.
8    Q. I assume you're on a salary?
9    A. I'm on a salary.
10    Q. You're not losing a dime for taking off
11 today from your -- from your faculty position; isn't
12 that true?
13    A. Not losing a dime, but I'm losing time.
14    Q. Right. You're -- you're making money
15 testifying here in this case, but not losing money
16 from being away from school?
17    A. Not losing money; losing time.
18    Q. Uh-huh. But when we say time is money, it
19 isn't for you. True?
20        MR. MARTINS: Objection.
21    A. I don't understand that.
22    Q. I -- I'll move on. How much time do
23 you -- strike that.
24        How much do you charge for in-court

Page 45

1 testimony?
2    A. It's a flat fee of $2,000 a day, prorated
3 at half-days.
4    Q. Plus expenses?
5    A. That's right.
6    Q. Have you -- have you made any estimate of
7 what your income is per year or, say, 2003, what
8 your income was in 2003 for the consulting work
9 in -- in -- like we're doing today?
10        MR. MARTINS: Objection.
11    A. I have not. I can tell you what it was
12 for the previous year, but I have not figured it out
13 yet.
14    Q. You haven't filed your --
15    A. You can only get -- excuse me.
16    Q. You haven't filed your returns yet for --
17 for 2003?
18    A. No. Those are filed in August.
19    Q. You get -- you get an extension? Is --
20 don't we have to file returns in April?
21    A. No. No, I get an extension.
22    Q. All right. Everybody around the table is
23 shaking their head like I don't know what I'm
24 talking about. I -- I have to file my return by

122

```
1              (Discussion off the record.)

2              MR. MARTINS:  If there is a videotape, I

3    want a copy.

4              MR. WEISENFELDER:  That's it.

5              MR. HELBLING:  We got it.

6              MR. MARTINS:  And if there isn't,

7    obviously, then nobody can give me a copy.

8

9

10

11                    MICHAEL D. LYMAN, Ph.D.

12

13                         -  -  -

14         (Deposition concluded at 5:40 p.m.)

15

16                         -  -  -

17

18

19

20

21

22

23

24
```

**ERRATA SHEET**

TO THE REPORTER: I, ~~Michael Latman~~ have read the entire transcript of my deposition taken on the _____ day of _____, 200__, or the same has been read to me. I request the following changes be entered upon the record for the reason(s) indicated. I have signed my name to the signature page and authorize you to attach the following changes to the original transcript:

**\*PLEASE DO NOT WRITE IN THE TRANSCRIPT\***

PAGE    LINE                    CORRECTION (and reason)

p. 20-21 - 4    I have had extensive training in Oklahoma, Kansas and have maintained my currency through professional research and peer-reviewed publications on the subject.

p. 26 -10 My Books do in fact, rely heavily on my first-hand professional experience

p. 29-3 I have not been "employed" by a metro. police dept. but I have worked/conducted investigations/made felony arrests/served countless search warrants in major metropolitan cities such as Kansas City, Oklahoma City, Wichita, Tulsa, Dallas, Albuquerque. I have also worked for extended periods of time in large metro areas while part of two different task force.

p. 31-14 My Textbook do in fact demonstrate statistical knowledge on use of force. Sections of my books addressing use of force incorporate both my professional training, experience and knowledge of professional literature as it relates to use of force.

**ERRATA SHEET**

*TO THE REPORTER: I, _____, have read the entire*
*transcript of my deposition taken on the \_\_\_\_ day of _____,*
*200\_\_, or the same has been read to me.  I request the following*
*changes be entered upon the record for the reason(s) indicated.  I*
*have signed my name to the signature page and authorize you to*
*attach the following changes to the original transcript:*

**\*PLEASE DO NOT WRITE IN THE TRANSCRIPT\***

*PAGE    LINE                    CORRECTION (and reason)*

p. 43-2  this is taken out of context. I
(clarification) do not consider a police officer as an
expert only because he/she worked
in the field in that capacity. Rather,
I consider a policing expert as
such when they have a base of
practical experience but that
knowledge has been expanded through
professional research, policy development
and training. I have authored a
total of seven text books that all deal
with police procedure. I also interact
daily with the law enforcement community.
My books are all peer-reviewed and
many are now used by major law
enforcement organizations as training
guides. For example, candidates for
promotion to Sgt. at the Dearborn, Michigan
Police Dept. required the reading of my
Criminal Investigation book; and the
Federal Drug Enforcement Administration
has purchased 5 copies of my "Practical"
book for their library

ERRATA SHEET

TO THE REPORTER:   I, _____ , have read the entire
transcript of my deposition taken on the ____ day of _____ ,
200__ , or the same has been read to me.  I request the following
changes be entered upon the record for the reason(s) indicated.   I
have signed my name to the signature page and authorize you to
attach the following changes to the original transcript:

*PLEASE DO NOT WRITE IN THE TRANSCRIPT*

PAGE    LINE              CORRECTION (and reason)

D.81    11    I have had extensive and
(clarification) repetitive training on use of
force by Training Academy's in
Kansas, Oklahoma and Missouri
this training incorporates both
practical and legal aspects of
use of force.