OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04

*Page 1 to Page 196*

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

AKF Reporters, Inc.
436 Boulevard of the Allies
Pittsburgh, PA  15219-1314
Phone:  1-888-253-3376
FAX:  1-412-261-2537

Case 1:01-cv-00769-SAS   Document 159-11   Filed 05/20/2004   Page 2 of 8

BSA   OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04   XMAX(1/142)

## Page 1

```
IN THE UNITED STATES DISTRICT COURT FOR THE
        SOUTHERN DISTRICT OF OHIO
              WESTERN DIVISION
                     - - - -

ESTATE OF ROGER D. OWENSBY,   )
JR., et al.,                  )
                              )
                              )
           Plaintiffs,        )
                              )
        -vs-                  )   Civil Action
                              )   No. 01-CV-769
CITY OF CINCINNATI, et al.,   )
                              )
                              )
           Defendants.        )


                     - - - -

        DEPOSITION OF:    CYRIL WECHT, M.D.

                     - - - -

        DATE:    February 25, 2004
                 Wednesday, 11:00 a.m.

        LOCATION:    THE WECHT LAW FIRM
                     14 Wood Street
                     Pittsburgh, PA 15222

        TAKEN BY:    Plaintiffs

        REPORTED BY:    Anthony Jude Cordova, RPR
                        Notary Public
                        AKF Reference No. AC79595
```

## Page 2

```
        DEPOSITION OF CYRIL WECHT, M.D.,
a witness, called by the Plaintiffs for examination,
in accordance with the Federal Rules of Civil
Procedure, taken by and before Anthony Jude Cordova,
RPR, a Court Reporter and Notary Public in and for
the Commonwealth of Pennsylvania, at the offices of
The Wecht Law Firm, 14 Wood Street, Pittsburgh,
Pennsylvania, on Wednesday, February 25, 2004,
commencing at 11:00 a.m.

                     - - - -

APPEARANCES:
    FOR THE PLAINTIFFS:
        Frederick Morgan, Esq.
        HELMER MARTINS & MORGAN
        Fourth & Walnut Center, Suite 1900
        105 East Fourth Street
        Cincinnati, OH 45202
        513-421-2400
    FOR THE DEFENDANTS CITY OF CINCINNATI, SELLERS
    AND HODGE:
        Neil F. Freund, Esq.
        FREUND FREEZE & ARNOLD
        One Dayton Center
        South Main Street, Suite 1800
        Dayton, OH 45402-2017
        937-913-0115
    FOR THE DEFENDANT GOLF MANOR:
        Wilson G. Weisenfelder, Jr., Esq.
        RENDIGS FRY KEILY & DENNIS
        One West Fourth Street, Suite 900
        Cincinnati, OH 45202-3688
        513-381-9292
    FOR THE DEFENDANTS CITY OF CINCINNATI AND
    STREICHER:
        Geri Hernandez Geiler, Esq. - (Via telephone)
        ASSISTANT CITY SOLICITOR, DEPARTMENT OF LAW
        Room 214, City Hall
        801 Plum Street
        Cincinnati, OH 45202
        513-352-3346
```

## Page 3

```
    FOR THE DEFENDANTS JORG, CATON, HODGE, SPELLEN
    AND SELLERS:
        Donald E. Hardin, Esq. - (Via telephone)
        HARDIN LEFTON LAZARUS & MARKS
        915 Cincinnati Club Building
        Garfield Place
```

## Page 4

```
              * INDEX OF EXHIBITS *
    Deposition Exhibit 1  --------------   7
    Deposition Exhibit 2  --------------  24
    Deposition Exhibit 3  --------------  25
    Deposition Exhibit 4  --------------  35
    Deposition Exhibit 5  --------------  44
    Deposition Exhibit 6  --------------  44
    Deposition Exhibit 7  --------------  72
    Deposition Exhibit 8  -------------- 148
    Deposition Exhibit 9  -------------- 150
    Deposition Exhibit 10 -------------- 150
    Deposition Exhibit 11 -------------- 151
    Deposition Exhibit 12 -------------- 152
    Deposition Exhibit 13 -------------- 153
    Deposition Exhibit 14 -------------- 155
    Deposition Exhibit 15 -------------- 155
    Deposition Exhibit 16 -------------- 155
    Deposition Exhibit 17 -------------- 155
    Deposition Exhibit 18 -------------- 155
    Deposition Exhibit 19 -------------- 156
    Deposition Exhibit 20 -------------- 159
    Deposition Exhibit 21 -------------- 159
    Deposition Exhibit 22 -------------- 160
    Deposition Exhibit 23 -------------- 162
    Deposition Exhibit 24 -------------- 165

    (Original Exhibits returned to Dr. Wecht.)
```

AKF Reporters, Inc.
Pittsburgh - Erie
depo@akf.com
Page 1 to Page 4
www.akf.com

Case 1:01-cv-00769-SAS   Document 159-11   Filed 05/20/2004   Page 3 of 8

BSA  OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04   XMAX(8/149)

### Page 29

(1) I recall, there was the one charge of -- it's
(2) $5,000, yes, and it included -- it included the
(3) meeting and the records and the report and
(4) everything. Yeah. $5,000 is all that I
(5) charged.
(6) Q. Doctor, as I read your report, the pages, the
(7) bottom of Page 1, 2, that is through about the
(8) middle of Page 5 is a factual summary of your
(9) understanding of events of the night of the
(10) Owensby homicide. I wonder if you would just
(11) describe the process that you went through to
(12) generate that factual summary.
(13) A. I went through the statements and testimonies
(14) of the people involved, the police officers and
(15) Ms. St. Clair and Dr. Shultz. Well, actually,
(16) up to that point, Dr. Shultz was not involved.
(17) I'm sorry. He comes in later, so that I read
(18) through those materials to which I referred a
(19) while ago.
(20) Q. You actually read Officer Jorg's statement,
(21) Officer Caton's statement and et cetera?
(22) A. Yes, I did.
(23) Q. Okay. Beginning on the third paragraph on Page
(24) 5, you detail -- or summarize, rather,
(25) Dr. Shultz's autopsy findings, and I do have

### Page 30

(1) some specific questions about some of those
(2) findings, but in general, did you find
(3) Dr. Shultz's autopsy to be within the standard
(4) of good practice in anatomical pathology as you
(5) have developed a understanding of it over your
(6) 40 years?
(7)     MR. FREUND: Objection as to form.
(8) A. Yes. It's a complete autopsy.
(9) Q. Did you find any areas in Dr. Shultz's autopsy
(10) with which you disagreed?
(11) A. Yes. One point.
(12) Q. And what was that, sir?
(13) A. Dr. Shultz had estimated a degree of coronary
(14) artery occlusion of the left anterior
(15) descending branch due to atherosclerosis as 50
(16) percent, and my estimate was 30 to 40 percent
(17) at the most. It's just a small difference.
(18) That was the only thing I recall that I -- I
(19) specifically felt was somewhat different.
(20) Q. Did you develop an understanding or an opinion
(21) regarding why you and Dr. Shultz had a
(22) different view of that on that small question?
(23) A. Well, you know, there's subjective
(24) interpretation. It's not like you take a ruler
(25) and you measure. It's not that he or I made a

### Page 31

(1) mistake. That's my take on it. I did express
(2) a comment in my report which is relevant to
(3) your question, namely that when you shrink in
(4) the process of preparing tissue for slides,
(5) then you have to take into account that the
(6) seeming degree of obstruction is really greater
(7) than it was in actual gross configuration. So
(8) that was what I thought may have been the case.
(9) Q. Doctor, are you familiar with the phrase
(10) reasonable degree of medical certainty?
(11) A. Yes.
(12) Q. What does that phrase mean to you as a -- as a
(13) forensic pathologist?
(14) A. Well, it means to me a probability versus a
(15) possibility. It means that you feel it's
(16) something more likely than not. I always
(17) analogize it in talking and thinking about it
(18) and teaching about it. It's directly analogous
(19) to a surgeon that is examining someone with an
(20) acute abdomen.
(21)     There comes a time when the surgeon
(22) decides that he's got to go in and do an
(23) exploratory laparotomy. It may be
(24) appendicitis, it may not be, but he's now
(25) reached a point based upon physical exam,

### Page 32

(1) laboratory tests that he thinks it's more
(2) likely than not, something going on that is
(3) surgically repairable, correctable, and he
(4) makes a decision.
(5)     Up until that time, you see, it was a
(6) possibility. It hadn't reached a point of
(7) reasonable medical certainty. So that's
(8) outside the realm of law. So I take it to mean
(9) if you wanted to come up with a number, I guess
(10) 51 percent or better, but who can apply
(11) numbers? I don't know. For me it's something
(12) more likely than not. It's a probability
(13) versus even a distinct reasonable, logical
(14) possibility, but you think it's -- it's now
(15) probable, not just simply possible.
(16) Q. Do you have an opinion to a reasonable degree
(17) of medical certainty with respect to the
(18) mechanism of death of Roger Owensby, Jr.?
(19) A. Yes.
(20)     MR. FREUND: Objection. Objection.
(21) Same basis as previously stated.
(22) Q. And what is your opinion, sir?
(23) A. I believe the primary mechanism of death was
(24) mechanical asphyxia.
(25) Q. Would you define mechanical asphyxia,

Page 29 to Page 32
www.akf.com
AKF Reporters, Inc.
Pittsburgh - Erie
depo@akf.com

Case 1:01-cv-00769-SAS    Document 159-11    Filed 05/20/2004    Page 4 of 8

OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04    XMAX(9/150)
BSA

### Page 33

(1) Dr. Wecht?
(2) A. Mechanical asphyxia is a diagnostic phrase that
(3) indicates a physical situation in which for one
(4) reason or another respiratory movement is
(5) compromised to a significant degree. For
(6) whatever reason, the muscles of the chest, the
(7) intercostal muscles and other muscles that
(8) participate in the pulmonary function, the
(9) diaphragm, that some kind of external pressure
(10) has been applied in some fashion such as to
(11) compromise the normal breathing process.
(12)     That compromise is of such a degree,
(13) extent and temporal nature that it leads to
(14) deprivation of oxygen to the brain setting the
(15) stage for, then, an asphyxial death that goes
(16) through various stages, hypoxia, and then its
(17) adverse effects on the lungs and heart and then
(18) leading to unconsciousness, stupor, coma, and
(19) if not reversed, death, and that's called an
(20) asphyxial death, asphyxia simply covering any
(21) and all situations from a multitude of factors
(22) and mechanisms that result in deprivation of
(23) oxygen to the body.
(24)     Mechanical asphyxia is the specific
(25) kind that I have referred to that is induced by

### Page 34

(1) some external force that is causing that
(2) diminution, compromise of normal respiratory
(3) function.
(4) Q. So asphyxia means no air?
(5) A. Yeah. That's really the literal term, no air,
(6) yes.
(7) Q. And so is drowning a form of asphyxia?
(8) A. Yes, it is.
(9) Q. But mechanical asphyxia, then, is a subset of
(10) asphyxia?
(11) A. Yes.
(12) Q. And it describes what you described as -- I
(13) believe -- correct me if I'm wrong -- as the
(14) application of an external force to portions of
(15) the body necessary or involved in respiration?
(16) A. Yes.
(17) Q. Did you form an opinion to a reasonable degree
(18) of medical certainty -- and if I ask you to
(19) state an opinion to which you view the medical
(20) certainty concept as inapposite, let me know.
(21) Did you form an opinion to a reasonable degree
(22) of medical certainty regarding the external
(23) force which led to the mechanical asphyxia in
(24) the case of Mr. Owensby?
(25) A. Yes.

### Page 35

(1) Q. And what is that opinion, sir?
(2) A. In my opinion, the force that led to the
(3) mechanical asphyxia in the case of Roger
(4) Owensby, Jr. was heavy pressure applied to the
(5) back area on both sides from the knees of one
(6) of the police officers.
(7) Q. What's the basis for that opinion, Doctor?
(8) A. The historical accounts from the different
(9) police officers as to what transpired during
(10) the scuffle with Mr. Owensby correlated with
(11) the autopsy findings set forth by Dr. Shultz in
(12) his postmortem protocol, specifically, the
(13) finding of 2 quite large areas of hemorrhage in
(14) the scapular areas that are described in his
(15) report and which are shown in 2 pictures when
(16) incisions have been made into those areas.
(17) Q. Doctor, I only have one copy of this, so I'm
(18) going to hand it to counsel before I give it to
(19) you just -- this is a print-out of one of the
(20) city's -- one of the pictures that's on the
(21) CD-ROM that I believe you all have. I will
(22) tell you that I printed it out on my dot-matrix
(23) printer at home -- or excuse me -- my ink jet
(24) printer at home.
(25)     - - - -

### Page 36

(1) (Exhibit 4 marked for identification.)
(2)     - - - -
(3) Q. Doctor, handing you what I've marked as Wecht
(4) Exhibit 4, is that one of the pictures to which
(5) you just referred?
(6) A. Yes, yes, it is.
(7) Q. And can you identify orally the aspects of that
(8) photograph which demonstrate -- you believe
(9) demonstrate the phenomenon that you just
(10) described?
(11) A. Yes. These hemorrhages are located in the back
(12) deep within muscle tissue overlying portions of
(13) the scapulas right and left. These are the
(14) wing bones, I think they're referred to in
(15) non-medical terms, one on each side, somewhat
(16) triangular shaped. They have a -- like a
(17) lengthy vertical spinous process projected
(18) toward the rear. These hemorrhages are
(19) described in the autopsy report as being in
(20) that area. I can see myself from the picture
(21) that the hemorrhages are in what I would call
(22) the posterior scapular areas.
(23) Q. And there are purplish masses in -- essentially
(24) in the middle of the -- top to bottom in the
(25) middle of the picture and off to the side from

Case 1:01-cv-00769-SAS    Document 159-11    Filed 05/20/2004    Page 5 of 8

BSA    OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04    XMAX(10/151)

Page 37

(1) the center. What are those areas?
(2) A. Yes. These are the areas of purple, extremely
(3) dark red, reddish black, whatever color
(4) somebody sees here, this very dark color, those
(5) are the areas of hemorrhage that Dr. Shultz
(6) describes in his autopsy report. I was just
(7) looking for the measurement. I think he said
(8) they were about 3 issues in diameter each. Why
(9) don't — let me just see that for a moment
(10) please. Where did I — where did I get that
(11) from his testimony? Here it is, yeah, on the
(12) bottom of Page 2. Fairly large approximately
(13) 3-inch to 4-inch in diameter contusions are
(14) seen in the deep musculature overlying the
(15) spines of the scapulae. He uses correct Latin
(16) for the plural, scapulae.
(17) Q. Is a contusion a bruise?
(18) A. Yes. It's a bruise. It's a hemorrhage outside
(19) of blood vessels. That's what a contusion or
(20) bruise or hemorrhage is.
(21) Q. So Mr. Owensby had bruises on his back?
(22) A. Well, I — I wouldn't call them bruises. I
(23) would call them hemorrhages, and he does call
(24) them hemorrhages, but he also calls them
(25) contusions.

Page 38

(1) Q. Now, were there — based on your understanding
(2) of the records, were there external bruises, in
(3) other words, what you expect to see if somebody
(4) bumps into something or has impact, what we all
(5) do on an unfortunately daily basis for some of
(6) us?
(7) A. No.
(8)   MR. HARDIN:    Objection to the form of
(9) the question.
(10) Q. Yeah. I'll rephrase the question. Were there
(11) what we would commonly refer to as bruises
(12) visible on Mr. Owensby's — on the top of his
(13) back?
(14) A. No, there were not, and Dr. Shultz specifically
(15) mentions that the subcutaneous tissues —
(16) that's fat, my words — subcutaneous tissues
(17) overlying these muscular hemorrhages are free
(18) of significant hemorrhage. The overlying skin
(19) has no visible injuries, abrasions or
(20) contusions. So he looked and he did not find
(21) any.
(22) Q. Is that an unusual state of affairs based on
(23) your knowledge, training and experience,
(24) Doctor?
(25) A. Well, no, it's not unusual when you understand

Page 39

(1) and believe and so analyze the case as to
(2) attribute those hemorrhages to a deep -- deeply
(3) applied force that presses down from a
(4) relatively flat, smooth object or
(5) instrumentality such as knees. If you have
(6) something that is sharper, well, it may
(7) naturally abraid or cut.
(8)   If you inflict punches, then, as we
(9) all know, we've been punched, or if you bumped
(10) and we've all been bumped, then you're going to
(11) see bruising on the skin and you're definitely
(12) going to see bruising beneath the skin in the
(13) subcutaneous fat which is, oh, one to one and a
(14) half, 2 inches maybe in somebody of this size.
(15)   When you don't have hemorrhage in the
(16) skin, bruising, and you don't have hemorrhage
(17) in the subcutaneous tissue, the only way you
(18) can get hemorrhage down deep is that you're
(19) really, really pressing down with substantial
(20) force and weight, and that pressure from a
(21) broad smooth object is causing the muscles to
(22) be pressed against, in this case, the scapulae,
(23) even more specifically, the protruding spinous
(24) processes of the scapulae so that hemorrhage is
(25) seen there, but there's no actual injury to the

Page 40

(1) intervening tissues, specifically the
(2) subcutaneous fat and the overlying skin.
(3) That's how you get that kind of an injury.
(4) Q. Do you have an opinion to a reasonable degree
(5) of medical certainty, Doctor, whether the
(6) injuries demonstrated in Exhibit 4 and
(7) described in the autopsy report could have been
(8) inflicted by a punch?
(9)   MR. FREUND:    Objection.
(10) A. Yes, I have an opinion.
(11) Q. What is that opinion?
(12)   MR. FREUND:    Objection.
(13) A. In my opinion with reasonable medical
(14) certainty, these kinds of hemorrhages
(15) demonstrated in the picture and described in
(16) the autopsy report are not consistent with the
(17) of kinds of injuries that you would see from
(18) one or more punches.
(19) Q. Do you have an opinion to a reasonable degree
(20) of medical certainty, Doctor, whether those
(21) injuries, again, demonstrated in Exhibit 4 and
(22) described in the autopsy findings are
(23) consistent with application of weight through
(24) kneeling by a police officer weighing
(25) approximately 250 pounds with equipment?

Case 1:01-cv-00769-SAS   Document 159-11   Filed 05/20/2004   Page 6 of 8

OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04   XMAX(11/152)
BSA

Page 41

(1) A. Yes, I have an opinion.
(2) Q. What is that opinion, sir?
(3) A. In my opinion, the application of such force
(4) applied through the knees of someone weighing
(5) with clothing and equipment about 250 pounds,
(6) that these are the kinds of hemorrhages that I
(7) would expect from that kind of a situation.
(8) Q. And have you in your career seen such
(9) hemorrhages before?
(10) A. Yes, I have.
(11) Q. And -- strike that. Was your opinion at the
(12) time -- was your opinion in those situations
(13) similar with respect to the etiology or cause
(14) of those hemorrhages?
(15) A. Yes, for the reasons that I mentioned before,
(16) the -- the anatomic explanations that I gave as
(17) to how you can get deep-seated hemorrhage with
(18) no overlying hemorrhage.
(19) Q. Reference is made, Dr. Wecht, to something
(20) called petechiae, and that's spelled P E -- how
(21) do you spell it?
(22) A. P E T E C H I A E, plural, or A without the E
(23) on the end singular, petechia, petechiae.
(24) Q. So petechiae is more than one?
(25) A. Or the adjectival form A L, petechial

Page 42

(1) hemorrhages. So --
(2) Q. To what does that refer?
(3) A. These are pinpoint hemorrhages, generally
(4) something between, you know, 1/10 or 2/10ths of
(5) a millimeter up to about 2 millimeters or so
(6) on. There's no precise parameters, but usually
(7) when they're over a couple millimeters, we then
(8) start talking about them as being hemorrhages.
(9) So petechial hemorrhages can be thought of as
(10) pinpoint hemorrhages. That's a pretty good
(11) synonymous term, tiny hemorrhages of a fairly
(12) discrete nature, although sometimes they might
(13) even begin to blend together.
(14) Q. What makes those happen?
(15) A. The primary cause is venous distention
(16) producing a backup of the blood and leading to
(17) pressure on the tiny venials causing them to
(18) burst. In other words, if there is some reason
(19) why blood is not being able to make its way
(20) back to the heart, venous blood is going back
(21) to the ride side of the heart through the --
(22) ultimately the superior vena cava and the head,
(23) face, neck, arms and shoulders and upper chest
(24) and below that from the toes up to the mid
(25) chest through the inferior vena cava both into

Page 43

(1) the first chamber of the heart, the right
(2) atrium.
(3) Q. Let me just interrupt. What does venous mean?
(4) You used that in your answer.
(5) A. Venous as relates to veins.
(6) Q. Okay.
(7) A. Blood that goes from the heart carrying oxygen
(8) is arterial blood and it goes out through the
(9) arteries, big ones and ever smaller and then
(10) finally capillaries connecting to the very
(11) tiniest veins, venials and then moving back
(12) upward in reverse so to speak now into ever
(13) increasingly larger veins carrying deoxygenated
(14) blood with carbon dioxide going to the heart so
(15) that the heart, the right side pumping through
(16) the lungs, gives off the carbon dioxide, picks
(17) up the oxygen, pumps it back into the left side
(18) of the heart and then out to the body through
(19) the arteries.
(20) So it's a continuous cycle. Venous
(21) blood just refers to blood inside veins. So
(22) the tiny veins, venials as they're called, get
(23) engorged because they are backed up. The
(24) larger veins can be distended and handle the
(25) increased pressure. The tiny venials cannot,

Page 44

(1) and when they become engorged, then some of
(2) them will burst and that little bursting gives
(3) you a petechial hemorrhage.
(4) ----
(5) (Exhibits 5 and 6 marked for identification.)
(6) ----
(7) Q. Doctor, I'm going to put in front of you
(8) Exhibits 5 and 6, Exhibit 5 being a photograph
(9) from the coroner's CD-ROM of photographs of
(10) Mr. Owensby's right eye and Exhibit 6 being a
(11) similar photograph of Mr. Owensby's left eye.
(12) Could you tell me whether in your opinion and
(13) to a reasonable degree of medical certainty,
(14) Doctor, either of those photographs
(15) demonstrates an eye which is free of petechiae?
(16) A. No. Both have petechiae, many more and much
(17) more clearly demonstrated in the right eye, but
(18) there are some in the left eye.
(19) Q. Well, when somebody's being asphyxiated,
(20) wouldn't you expect that their eyes would
(21) develop petechiae on both sides at the same
(22) time, same rate?
(23) A. No. It's not a bilaterally symmetrical process
(24) necessarily.
(25) Q. You mean asphyxia is not?

AKF Reporters, Inc.
Pittsburgh - Erie
depo@akf.com                                                Page 41 to Page 44
                                                            www.akf.com

Case 1:01-cv-00769-SAS    Document 159-11    Filed 05/20/2004    Page 7 of 8

BSA    OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04    XMAX(12/153)

Page 45

(1) A. Well, asphyxia is a generalized process of the
(2) body. Petechial hemorrhages in the eyes
(3) which -- you can get from other causes but
(4) which when associated with asphyxia are due to
(5) the pathophysiological phenomenon that I
(6) described a minute ago. What I was saying is
(7) that petechial hemorrhages are not necessarily
(8) bilateral symmetrical quantitatively.
(9)     It depends on how the blood is being
(10) engorged. It could depend on the position of
(11) the body. It could be dependent upon the way
(12) in which the mechanical pressure is played out.
(13) It's unpredictable and there is nothing that --
(14) as I say, that requires a completely balanced
(15) manifestation of the asphyxial process insofar
(16) as conjunctival petechial hemorrhages are
(17) concerned.
(18) Q. Have you seen other cases of petechial
(19) hemorrhage which you believed to a reasonable
(20) degree of medical certainty to be associated
(21) with asphyxia?
(22) A. Oh, yes, many times.
(23) Q. And in all of those other cases, were the
(24) petechiae equally distributed from one eye to
(25) the other?

Page 46

(1) A. I've never kept count, but I can tell you that
(2) in any number of cases, they're not equally
(3) distributed. They're -- as I say, it's not a
(4) matter if you got 20 on one side, you're going
(5) to have 20 on the other side. It just varies
(6) greatly.
(7) Q. So do you have an opinion, Doctor, to a
(8) reasonable degree of medical certainty whether
(9) the absence -- whether the asymmetrical
(10) distribution of petechiae between Mr. Owensby's
(11) right eye and left eye is a counter-indication
(12) of mechanical asphyxia as a primary cause of
(13) his death?
(14)     MR. HARDIN:    Objection to the form of
(15) the question.
(16) A. Yes, I have an opinion.
(17) Q. And what is that opinion, sir?
(18) A. No, it is not.
(19) Q. Were there other physical findings in
(20) connection -- strike that. Before I go on, let
(21) me ask you to describe to the best of your
(22) ability what someone undergoing mechanical
(23) asphyxia goes through, what the experience is
(24) like.
(25)     MR. FREUND:    Objection.

Page 47

(1) A. You have difficulty in breathing. Try to
(2) remember when you were a kid of playing
(3) football either for real or horsing around with
(4) other kids and a bunch of guys had piled on you
(5) and you had difficulty in breathing. Try to
(6) remember if you were horsing around in the
(7) swimming pool or in the lake or ocean and
(8) somebody was ducking you under and you reached
(9) a point that you couldn't breathe so well.
(10) That will remind you of what it's like. It's a
(11) pretty frightening and disturbing feeling.
(12)     To breathe is the most primitive,
(13) basic, fundamental need of any living organism.
(14) Try to take your favorite, most passive dog or
(15) somebody else's that wouldn't even think of
(16) barking let alone biting, hold it's mouth and
(17) nose shut and see how long before he'll try to
(18) bite your hand off. To breathe is to live, and
(19) whether you're a human being intellectualizing
(20) it or an animal primitively responding, you've
(21) got to breathe. So it's a very frightening and
(22) disturbing experience.
(23)     If you can relieve yourself of it,
(24) then you do in some way. If you can't, then as
(25) the oxygen is decreased, arterial supply of

Page 48

(1) oxygen is diminished, the brain then responds
(2) very quickly. It's insulted quite easily, the
(3) brain, and since the brain controls heart and
(4) lung function, it sets into motion a vicious
(5) cycle quite quickly resulting in further
(6) depression of respiratory function and then
(7) cardiac function, and this cycle continues
(8) leading to diminished consciousness and then
(9) unconsciousness and then stupor, coma and
(10) death.
(11)     Many times it may involve -- can't
(12) know this unless somebody has an
(13) electrocardiogram, but many times then will
(14) precipitate a cardiac arrhythmia. As the heart
(15) is insulted and deprived of its own oxygen
(16) needs, it may begin to beat atypically,
(17) erratically, irregularly, and that further
(18) complicates the picture. All of those
(19) processes set into motion faster than it took
(20) me to explain them just now, and that cycle
(21) continues unless it is reversed.
(22) Q. Does that mean that death by mechanical
(23) asphyxiation is essentially instantaneous --
(24)     MR. FREUND:    Objection.
(25) Q. -- or does it take some period of time after

Case 1:01-cv-00769-SAS   Document 159-11   Filed 05/20/2004   Page 8 of 8

OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04   XMAX(13/154)

## Page 49

(1) the mechanical force is applied?
(2) A. Death from mechanical asphyxiation is not
(3) instantaneous. First of all, you've got 4 to 6
(4) minutes of oxygen supply in your brain in a
(5) normal healthy adult.
(6) Q. What does that mean?
(7) A. It means that you've got enough oxygen in your
(8) brain to allow you not to have brain death for
(9) 4 to 6 minutes in the total absence of any
(10) oxygen whatsoever. If you're getting some
(11) oxygen, then, you know, it's a gradation. It
(12) could be 8 or 10 or 12 or 20 minutes, you know,
(13) it depends, but you don't die suddenly. The --
(14) the celerity of death is really the
(15) manifestation of the severity of the mechanical
(16) asphyxial process, what is the mechanism, is it
(17) continuous and steady, is it sporadic, has it
(18) been alleviated, has it been removed and so on.
(19)      So these are all factors that have to
(20) be considered in any particular case, but you
(21) don't die suddenly by definition. You know,
(22) you -- well, for the reasons that I said, and,
(23) see, the heart is not affected, so the heart
(24) continues to pump until it is insulted and
(25) compromised, too. So you've got the heart

## Page 50

(1) still working and getting some blood up to
(2) the -- to the brain. So you don't die
(3) suddenly.
(4) Q. Did you see indications in the autopsy findings
(5) with respect to Roger Owensby, Jr. that his
(6) heart had in fact continued to pump during the
(7) period that the mechanically asphyxiating force
(8) was applied?
(9) A. Yes.
(10) Q. And to a reasonable degree of medical
(11) certainty, Doctor, what findings demonstrate
(12) that to you?
(13)      MR. HARDIN: Objection.
(14) A. Principally, I would say the heavy, wet,
(15) edematous lungs found and described by
(16) Dr. Shultz.
(17) Q. Edematous meaning?
(18) A. Containing edema fluid. Edema fluid is the
(19) non-cellular component of blood which is forced
(20) out of the alveolar capillaries the, tiniest
(21) blood vessels in the walls of the air sac, the
(22) alveoli. That's where the blood/gas exchange
(23) takes place, where oxygen is taken in and
(24) carbon dioxide is given off.
(25)      When there is some insulting

## Page 51

(1) mechanism and when there is engorgement, then,
(2) maybe, of blood and backward, too, so that
(3) results in congestion, engorgement of vessels.
(4) It also results in the extrusion, so to speak,
(5) the seepage of this proteinaceous fluid,
(6) edematous fluid that gets out into the air
(7) sacs. So you have lungs here which were easily
(8) 2 times normal weight. These lungs are wet and
(9) heavy and they were described as showing
(10) diffuse pulmonary congestion and edema. That's
(11) a -- very typical and quite expected in the
(12) case of asphyxial death.
(13) Q. Doctor, when we talk about proteinous fluid --
(14) A. Proteinaceous.
(15) Q. We're basically talking about blood?
(16) A. From the blood.
(17) Q. From the blood?
(18) A. I wouldn't call it blood, no. It's from the
(19) blood. It's the non-cellular components, the
(20) plasma.
(21) Q. So I'm right in understanding that the heart --
(22) Mr. Owensby's heart was pumping blood which was
(23) going into his lungs but then could not engage
(24) in the blood-to-oxygen transfer which would
(25) allow his body to function normally?

## Page 52

(1)      MR. HARDIN: Objection to the form of
(2) the question.
(3) A. Well, the heart would have continued to pump
(4) and beat as long as he was alive. It's not a
(5) matter of pumping it to the heart -- to the
(6) lungs. It's more a matter of a backup then
(7) occurring because the heart is not functioning
(8) properly, and the backup leads to that
(9) congestion and the seepage of fluid. It's
(10) inadequate or compromised cardiac function that
(11) leads to pulmonary congestion and pulmonary
(12) edema.
(13) Q. Based on your knowledge, training and
(14) experience and to a reasonable degree of
(15) medical certainty, then, the heavy lungs and
(16) the pulmonary edema are consistent with death
(17) by mechanical asphyxiation?
(18) A. Yes, they are.
(19) Q. Did you have an opportunity to consider
(20) findings regarding Mr. Owensby's heart, his
(21) coronary or cardiac condition?
(22) A. Yes. I examined -- I mean, that's a integral
(23) part of the autopsy report, and the slides
(24) contained heart sections, too.
(25) Q. On Page 9 of your written opinion, Doctor, you