Case 1:01-cv-00769-SAS   Document 159-12   Filed 05/20/2004   Page 1 of 8

BSA   OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04   XMAX(14/155)

### Page 53

(1) talk about there being focal subendocardial or
(2) papillary muscle fibrosis in Mr. Owensby's
(3) heart. Is that something which suggests that
(4) he might have died — suggests to you that he
(5) might have died from some cause other than
(6) mechanical asphyxia?
(7) A. No, no, not at all.
(8) Q. What — what — what is — what is that? What
(9) do you describe there?
(10) A. Just what it is. You look under the microscope
(11) to see these small foci of fibrosis. It really
(12) means essentially nothing. Perhaps at some
(13) time in the past, there might have been some
(14) fleeting or transient ischemia for whatever
(15) reason that led to some microscopic fibrosis.
(16) It's — it's not a significant finding in terms
(17) of understanding the cause of death or in terms
(18) of predicting life expectancy.
(19)      MR. FREUND:   Page 9? Is it down at
(20) the bottom or top?
(21)      MR. MORGAN:   Top.
(22) Q. Did you — did you find anything in
(23) Mr. Owensby's heart which you considered to be
(24) abnormal for a man of his age and, as you
(25) understand it, his condition?

### Page 54

(1) A. No. I would say that the 30- to 40-percent
(2) atherosclerosis of one coronary artery would be
(3) a little — a little abnormal. I think that
(4) most 29-year-old men would not have — would
(5) not have that. So I would have to say that
(6) that is a little — somewhat more advanced than
(7) what I would expect in a 29-year-old person,
(8) but that varies greatly.
(9)      I mean, you know, people dying of
(10) heart attacks in their mid, late 20s is no
(11) longer something that causes a pathologist to
(12) be the least bit surprised. It just varies
(13) greatly, but the answer to your question is
(14) that it's probably — it is, I would say, a
(15) little beyond the upper range of normal for a
(16) 29-year-old man. The other 2 vessels, the
(17) right coronary and the circumflex, were
(18) completely patent, and that's a good sign and
(19) that's quite — quite normal.
(20) Q. On Page 12 of your opinion toward the bottom of
(21) the page, you indicate that you identified a
(22) single focus of mild atherosclerosis. Is that
(23) the 30 to 40 percent that you just described?
(24) A. Yes. That's what we were just talking about.
(25) Q. Do you have an opinion to a reasonable degree

### Page 55

(1) of medical certainty, Doctor, whether that
(2) single focus of mild atherosclerosis was a
(3) reason — and I'll use the word a advisedly —
(4) a reason for Mr. Owensby's death by mechanical
(5) asphyxia?
(6) A. Yes, I have an opinion.
(7) Q. What is that opinion?
(8) A. I believe it was completely unrelated.
(9) Q. And do you hold that opinion to a reasonable
(10) degree of medical certainty?
(11) A. Yes.
(12) Q. Do you believe that absent mechanical asphyxia,
(13) Mr. Owensby would have died on the night of
(14) November 7, 2000 as a result of his cardiac
(15) condition?
(16) A. I have no reason whatsoever to believe that he
(17) would have died as a result of any findings or
(18) all the findings in the heart if it were not
(19) for the mechanical asphyxiation.
(20) Q. Doctor, you talked about the 4 minutes. Was it
(21) 4 minutes of oxygen that the brain maintains?
(22) A. 4 to 6 minutes in normal circumstances. If
(23) it's — if you're hypothermic or you're heavily
(24) sedated with barbiturates, it could even
(25) be longer, but — but normal processes in a

### Page 56

(1) normal environment, we talk about a 4- to
(2) 6-minute period in a person with, you know,
(3) essentially normal heart and lung conditions.
(4) It could be somewhat less if you've got someone
(5) that has a very bad heart or chronic
(6) obstructive lung disease. 4 to 6 minutes is
(7) what scientific literature pretty much talks
(8) about in terms of residual oxygen in the brain
(9) before you then get brain death.
(10) Q. Do you see any indications in the autopsy of
(11) Mr. Owensby which would indicate — or any
(12) other factors that — with respect to
(13) Mr. Owensby which would indicate that he would
(14) be outside of the norm in that regard?
(15) A. No, I do not.
(16) Q. What does the 4 to 6 minutes of residual oxygen
(17) in the brain mean, if anything, with respect to
(18) the survivability of a — of the application of
(19) force sufficient to initiate the mechanical
(20) asphyxia process?
(21) A. Well, advanced or sometimes even basic
(22) cardiopulmonary resuscitation we now know, and
(23) it's just documented, it's replete through the
(24) medical/scientific literature worldwide, that a
(25) huge percentage of people can be salvaged if

Page 53 to Page 56
www.akf.com           AKF Reporters, Inc.
                      Pittsburgh - Erie           depo@akf.com

BSA    OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04    XMAX(16/157)

## Page 61

(1) A. Well, the temporal spectrum or parameter, I
(2) would say, would be conservatively, then, 4
(3) minutes from the moment of apparent
(4) unconsciousness, really would be a little bit
(5) longer because even when you're unconscious,
(6) you're still breathing. Unconsciousness is
(7) not -- is not coma let alone death, but
(8) conservatively, I would say from the moment
(9) that he is seen, noted, perceived to be
(10) unconscious, add on 4 minutes to that time, and
(11) that would be the period that I would say
(12) minimally would have been the time in which he
(13) could have been salvaged through interventive
(14) resuscitative techniques.
(15) Q. Doctor, could you turn to Page 17 of your
(16) report, please, sir? There is a paragraph
(17) beginning at the top of that page identifying
(18) what you refer to as other events that quite
(19) likely from a medical perspective could have
(20) been contributing factors in the development of
(21) the pathophysiological processes that
(22) culminated in Mr. Owensby death. Now, a
(23) pathophysiological process is what?
(24) A. Physiological means functional, things that the
(25) body does, and pathology means abnormalities,

## Page 62

(1) disruptions of some kind. So
(2) pathophysiological means something that is
(3) causing a disruption in a functional process in
(4) the body for whatever reason. It doesn't tell
(5) you what. It just tells you there's some
(6) pathology there.
(7) Q. So is a -- is pathophysiological process that
(8) culminated in Mr. Owensby's death, is that a
(9) fancy phrase for a contributing cause or a
(10) factor?
(11) A. Well --
(12)    MR. HARDIN:    Objection.
(13) A. -- it's -- it's a medical phrase for the things
(14) that caused his death. The mechanical
(15) asphyxia -- asphyxiation sets into stage the
(16) things that we've talked about. Those are the
(17) pathophysiological processes. Here where
(18) you've directed my attention on Page 17, I then
(19) refer to other things to be complete which I
(20) garnered from the records that could have
(21) played some contributory or secondary role.
(22) Q. The first of those, Doctor, is the use of mace
(23) by Officer Hunter. What does Mr. Owensby's
(24) being sprayed with mace have to do with his
(25) death as you understand the circumstances?

## Page 63

(1) A. Well, mace or any of the gas-propelled
(2) substances can induce some bronchospasm. It
(3) can lead to some additional compromise of
(4) breathing. So it certainly can be an
(5) additional factor of a negative nature in this
(6) kind of a situation.
(7) Q. Would the failure to insure that a macing
(8) victim has access to fresh air, that their face
(9) is splashed with water, things like that after
(10) the incident is over, the scene is secure,
(11) would that have any impact on the -- strike
(12) that. Let me put it a different way.
(13)    Does your opinion with respect to the
(14) use of mace as a contributing
(15) pathophysiological factor apply only to the
(16) moment of or moments immediately after the
(17) application of the mace or does it extend
(18) through the entire incident? In other words,
(19) was mace a problem throughout the incident or
(20) only at the moment of application?
(21)    MR. HARDIN:    Objection.
(22) A. Well, I would say that the effects of the mace
(23) materials from the time that they are breathed
(24) in lead to a continuum. I mean, it doesn't
(25) just go away in a second or a few seconds

## Page 64

(1) because the macing has stopped. No. It
(2) continues. If it only worked for the second or
(3) 2, you'd have a police officer pressing on the
(4) can continuously for 5, 10 minutes with a spray
(5) never ending. No. The effects are intended to
(6) last for a while.
(7) Q. The second contributing factor you identify is
(8) pressure applied to Mr. Owensby's back by
(9) Officer Caton. Given that in your opinion as
(10) you understand the facts, Officer Jorg was
(11) kneeling with both niece on Mr. Owensby's back,
(12) what -- what is what Officer Caton is doing
(13) matter?
(14)    MR. HARDIN:    Objection. Form of the
(15) question.
(16)    MR. FREUND:    I object also. You want
(17) him to assume that's true.
(18)    MR. MORGAN:    He's testified it's his
(19) opinion that it's true.
(20)    MR. FREUND:    Well, that's a
(21) credibility issue. That's why I'm objecting to
(22) the form of the question. He's a pathologist.
(23) He's not a credibility expert.
(24) Q. Let's talk for a second about the kneeling
(25) issue, Dr. Wecht. I'm glad counsel reminded

Page 61 to Page 64
www.akf.com
AKF Reporters, Inc.
Pittsburgh - Erie
depo@akf.com

Case 1:01-cv-00769-SAS    Document 159-12    Filed 05/20/2004    Page 3 of 8

OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04    XMAX(17/158)
BSA

Page 65

(1) me. In order to form the bilateral bruises,
(2) bilateral — the bilateral deep hemorrhages
(3) indicated on Exhibit 4, the autopsy photograph
(4) of Mr. Owensby's shoulder area, do you have an
(5) opinion to a reasonable degree of medical
(6) certainty whether substantial force had to be
(7) applied to each area where the deep hemorrhages
(8) are identified?
(9) A. Yes, I do. I thought I had expressed that.
(10) I'm sorry if I did not make it clear. The
(11) answer is yes, pressure had to be applied on
(12) both sides of the posterior chest wall to give
(13) you 2 separate discrete areas of substantial
(14) hemorrhage.
(15) Q. And in terms of the credibility issue, Doctor,
(16) can you envision any circumstance other than
(17) the application of the heavy grinding pressure
(18) that you described in your report and that you
(19) testified about today which would give rise to
(20) those deep muscle contusions in the absence of
(21) superficial bruises?
(22)    MR. HARDIN:    Objection.
(23) A. No. In this case, I cannot.
(24) Q. Thank you. Back to Page 17 of your report, you
(25) describe pressure applied to Mr. Owensby's back

Page 66

(1) by Officer Caton. My only question about that
(2) really is how did — based on your
(3) understanding of the facts, how did the
(4) pressure applied by Officer Caton affect the
(5) situation?
(6) A. When you have someone who is undergoing
(7) respiratory embarrassment as a result of
(8) pressure inducing mechanical asphyxiation, then
(9) any additional pressure on the back is going to
(10) enhance, is going to aggravate that situation.
(11) It's going to lead to some degree of additional
(12) movement of the chest muscles.
(13) Q. The next contributing factor you identify is
(14) additional transient hypoxia, and that's lack
(15) of oxygen; right?
(16) A. Decreased oxygen. Hypoxia is diminished or
(17) decreased oxygen. Anoxia is absence of oxygen.
(18) Q. So transient hypoxia produced by Officer
(19) Jorg's, quote, bar hold, unquote, around
(20) Mr. Owensby's neck, would you describe what you
(21) mean by that phrase?
(22) A. Yes. Well, bar hold now is my phrase. I think
(23) Officer Jorg used — I think he described it as
(24) a pressure by the mandibular angle, so I just
(25) want to make that clear. Bar hold is my phrase

Page 67

(1) here. But referring, then, to what Officer
(2) Jorg says himself about pressure in the area,
(3) mandibular angle, that's over the jaw, come
(4) down from your earlobes, and that's the angle
(5) of the mandible, the lower jaw bone, mandibular
(6) angle. Any pressure applied in that area could
(7) well have caused some diminution of arterial
(8) blood supply specifically through the carotid
(9) arteries, one or both. They have these 2 major
(10) arteries right and left, and pressure in that
(11) area could well cause some diminution of
(12) arterial blood supply. So that's why it could
(13) well have been an additional aggravating
(14) factor.
(15) Q. Finally —
(16)    MR. FREUND:    Ask that it be stricken.
(17) Q. Finally, you refer to — well, strike that.
(18) Are you — is it your opinion to a reasonable
(19) degree of medical certainty, first of all, that
(20) the use of mace by Officer Hunter was a
(21) contributing factor in the development of the
(22) pathophysiological processes that culminated in
(23) Mr. Owensby's death? Are you able to parse it
(24) that fine?
(25) A. Yes. Given the circumstances and the spraying

Page 68

(1) of the mace at a close range in these
(2) circumstances, I would say I would express that
(3) opinion with reasonable medical certainty, as I
(4) said before, probability that it did versus a
(5) possibility that it did not.
(6) Q. And as to the application of pressure to
(7) Mr. Owensby's back by Officer Caton, are you
(8) able to express an opinion to a reasonable
(9) degree of medical certainty whether that
(10) pressure applied by Officer Caton was a
(11) contributing factor in the development of the
(12) pathophysiological process?
(13)    MR. HARDIN:    Objection.
(14) A. Yes. In my opinion, it was.
(15) Q. Now, as to the activity of Officer Jorg in the
(16) area of Mr. Owensby's neck, head, are you able
(17) to express an opinion to a reasonable degree of
(18) medical certainty based on your understanding
(19) of what happened there whether those actions
(20) more likely than not were a contributing
(21) factor?
(22)    MR. HARDIN:    Objection.
(23) A. Yes. In my opinion, they were.
(24)    MR. HARDIN:    Objection to the opinion
(25) also.

AKF Reporters, Inc.
Pittsburgh - Erie
depo@akf.com
Page 65 to Page 68
www.akf.com

Case 1:01-cv-00769-SAS   Document 159-12   Filed 05/20/2004   Page 4 of 8

OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04    XMAX(21/162)
BSA

### Page 81

(1) give my explanation.
(2) So it may well have been a question
(3) or I may have just addressed it spontaneously,
(4) but my recollection is quite clear that nobody
(5) was arguing for this being a cardiac death, and
(6) when everybody left, you know, as far as I
(7) know, in terms of what was discussed there, you
(8) know, there seemed to be general acceptance,
(9) no -- no -- of what I concluded, there was no
(10) vote. That's my -- that was my impression of
(11) having been there.
(12) MR. FREUND: Ask the answer be
(13) stricken.
(14) Q. Doctor, are there any aspects of your findings
(15) or Dr. Shultz's findings which are significant
(16) to the -- to your opinions that you've stated
(17) here today which we have not discussed in the
(18) course of this deposition?
(19) A. None that can think of at this time. I believe
(20) you've covered everything set forth in my
(21) report. You've addressed Dr. Wetli's opinions,
(22) a couple things that are not in the report. I
(23) can't think of anything.
(24) MR. MORGAN: I have no further
(25) questions, Doctor. Thank you very much.

### Page 82

(1) MR. HARDIN: Before we go on, may I
(2) ask a favor? This is Don Hardin.
(3) MR. FREUND: You can have it as far
(4) as I'm concerned, Don.
(5) MR. HARDIN: The doctor referred to
(6) an exhibit -- or I'm sorry -- within his file,
(7) a synopsis of events and I just, since I'm not
(8) there, would like to see if I can get a copy of
(9) that synopsis faxed to me.
(10) MR. MORGAN: You mean before you
(11) question?
(12) MR. HARDIN: Yes.
(13) ----
(14) (There was a discussion off the record.)
(15) ----
(16) EXAMINATION
(17) ----
(18) BY MR. FREUND:
(19) Q. Doctor, my name is Neil Freund, and I am one of
(20) the lawyers for the City of Cincinnati and a
(21) couple of the officers, so I'm going to start
(22) out and ask you some questions.
(23) MR. MORGAN: I'm sorry. Could I
(24) interrupt, just ask you to specify which
(25) officers?

### Page 83

(1) MR. FREUND: Sellers and -- who else
(2) do you represent, Geri?
(3) MR. FREUND: A couple of the
(4) officers.
(5) MR. MORGAN: Individuals.
(6) MS. GEILER: I'm sorry. Are you
(7) ready?
(8) MR. FREUND: Yeah. I'm ready.
(9) MS. GEILER: Okay. We represent
(10) Streicher and Frazill and Hodge and Sellers.
(11) MR. FREUND: All right. Anything
(12) else?
(13) MR. MORGAN: No, thank you.
(14) MS. GEILER: Officially.
(15) Q. Doctor, as far as my questions are concerned, I
(16) first want to ask you a few questions about
(17) your background and all the things that you've
(18) done in your busy life. In reviewing your CV,
(19) if I could find it, appears that you -- you are
(20) not only a physician, but also a lawyer; is
(21) that correct?
(22) A. Yes.
(23) Q. And when did you get your legal degree?
(24) A. June 1962.
(25) Q. Okay. And then did you obtain a license to

### Page 84

(1) actually practice?
(2) A. Yes. I became licensed in Pennsylvania --
(3) well, I took the exam in the -- I guess the
(4) fall. I don't know when I heard, either late
(5) '62 or into '63. I'm not sure.
(6) Q. Okay. Are you still licensed to practice in
(7) the State of Pennsylvania?
(8) A. Yes.
(9) Q. Or the Commonwealth of Pennsylvania?
(10) A. Yes.
(11) Q. Yes. Anywhere else?
(12) A. No. Well, the Federal courts.
(13) Q. All right. So you can practice law in Federal
(14) courts also?
(15) A. Well, how does that work? The District Courts,
(16) the Third Circuit, and the Supreme Court. I've
(17) never done it, so -- but I think that's the way
(18) it works. I don't think -- I think that
(19) Federal licensure is in your own district and
(20) your own circuit, and then if you made the trip
(21) to the Supreme Court as a Bar Association
(22) function, then you got sworn in there.
(23) Q. And then you also continued your legal
(24) education, it looks like, at the University of
(25) Maryland; is that right?

Case 1:01-cv-00769-SAS   Document 159-12   Filed 05/20/2004   Page 5 of 8

OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04

## Page 117

(1) continue to beat in some fashion including
(2) moving in possibly to a cardiac arrhythmia. I
(3) think that could go on for a couple of minutes,
(4) maybe even longer.
(5) Q. Uh-huh. And a cardiac arrhythmia is what,
(6) Doctor?
(7) A. Abnormal beating other than the normal sinus
(8) rhythm.
(9) Q. Did Mr. Owensby undergo resuscitation?
(10)    MR. MORGAN: Vague.
(11) Q. What are you looking at, Doc?
(12) A. I'm looking at my report to see if when they
(13) finally did get there -- they did get there, so
(14) that would have been for a minimum -- minimum
(15) of close to 10 minutes. I would -- I think
(16) that they did make some attempts to do so, yes,
(17) when they arrived. They would have had to have
(18) done that before declaring him dead.
(19) Q. How long did they attempt to resuscitate him at
(20) the scene, Doctor?
(21) A. That, I do not know how long the resuscitation
(22) efforts were undertaken.
(23) Q. How long did they the attempt to resuscitate
(24) him on the way from the scene to the hospital?
(25) A. I do not know that.

## Page 118

(1) Q. How long did they attempt to resuscitate him at
(2) the hospital?
(3) A. I do not know that.
(4) Q. You would agree with me, wouldn't you, Doctor,
(5) that -- that deceased people can develop heavy
(6) lungs from resuscitation?
(7)    MR. MORGAN: Object to the form.
(8) A. No. I think that -- no. I think that there
(9) might be a small amount of blood, but, no, not
(10) any significant amount, no.
(11) Q. Did you ever testify under oath that extensive
(12) resuscitation can cause heavy lungs and
(13) pulmonary edema, Doctor?
(14) A. Not that I recall.
(15)    MR. HARDIN: Again, I'm having
(16) trouble hearing you, Doctor.
(17) A. Not that I recall.
(18)    MR. HARDIN: Thank you.
(19) Q. Do you remember testifying in a case entitled
(20) United States of America versus Livoti,
(21) L I V O T I, 22 Fed sub 2nd 235? Do you
(22) remember testifying in that case?
(23) A. No. I don't remember the name.
(24) Q. Okay. Can resuscitation cause petechial
(25) hemorrhage, Doctor?

## Page 119

(1) A. I think if you are alive, that it --
(2) theoretically, it could. I think if you are
(3) dead that it's highly unlikely, but I guess if
(4) you really continue with extensive pressure on
(5) the chest, I would say that it might be within
(6) the realm of possibility theoretically.
(7) Q. Uh-huh. Let me ask you, Doctor, if you recall
(8) testifying under oath in Federal Court in the
(9) case I referenced, it was in 1998, it was in a
(10) case with facts very similar to this, I'll
(11) represent to you, and I'll show you, I'll give
(12) you the case if you want to see it, you
(13) testified about -- first of all, you testified
(14) about petechial hemorrhages.
(15) You said petechial hemorrhages in my
(16) opinion in this case were caused principally by
(17) the state of hypoxia, the decreased oxygen.
(18) Let me ask you this. Can hypoxia cause
(19) petechial hemorrhages?
(20) A. It is believed by many that that can also be a
(21) factor when you have hypoxia which thereby
(22) leads to increased permeability of the delicate
(23) venial walls, that that can contribute to
(24) petechial hemorrhages, although the hypostasis
(25) or venous congestion is believed to be the

## Page 120

(1) primary cause.
(2) Q. Well, in this case, you said hypoxia, the
(3) decreased oxygen, principally caused the
(4) petechial hemorrhages, and the hypoxia, you
(5) said, was caused by a cardiac arrhythmia.
(6) Cardiac arrhythmias can cause hypoxia which in
(7) turn can cause petechial hemorrhages; isn't
(8) that true, Doctor?
(9) A. Well, when you say isn't it true, you're asking
(10) me generally speaking that is a possibility. I
(11) don't remember anything about that particular
(12) case, but you can get petechial hemorrhages, as
(13) I've already indicated, in cases having nothing
(14) to do with asphyxiation.
(15) Q. Well, in that case, Doctor, the medical
(16) examiner determined that this particular
(17) individual died from mechanical asphyxiation.
(18) You were testifying exactly the opposite the
(19) way you're testifying today.
(20)    MR. MORGAN: Objection.
(21) Argumentative. Move to strike.
(22) A. I disagree with that characterization to say
(23) that I gave an opinion in a case in which a
(24) similar question was involved that that means I
(25) testified the exact opposite. I think that

Page 117 to Page 120
www.akf.com                AKF Reporters, Inc.
                           Pittsburgh - Erie                    depo@akf.com

Case 1:01-cv-00769-SAS    Document 159-12    Filed 05/20/2004    Page 6 of 8

BSA    OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04    XMAX(31/172)

Page 121

(1) that is a misrepresentation any more than to
(2) say because I testified in a shooting case for
(3) a prosecution one time, that testifying for the
(4) defense in another case. Every case has its
(5) own facts and circumstances. I don't know, I
(6) don't remember one single detail about that
(7) case, where it was, or who it was or anything.
(8) So I completely reject the statement that I
(9) testified exactly the opposite. I don't think
(10) that that is correct or fair.
(11) Q. This is a reported case, and it says finally,
(12) Dr. Wecht gave — Wecht, that's you, Cyril
(13) Wecht. That's you, isn't it?
(14) MR. MORGAN: Objection.
(15) Argumentative.
(16) A. Yes. That's me.
(17) Q. Okay. Gave the following explanation for
(18) petechial hemorrhages. The petechial
(19) hemorrhages in my opinion in this case were
(20) caused principally by the state of hypoxia, the
(21) decreased oxygen, the cardiac arrhythmia then
(22) which sent into motion leading to an ever
(23) greater diminution or compromise of oxygenation
(24) coupled with chest compressions that took place
(25) for 40 to 50 minutes at the hospital, coupled

Page 122

(1) with whatever kind of compression may have
(2) taken — may have taken during the struggle
(3) between Mr. Lavoti and the other police
(4) officers and Mr. Biaz. That was your
(5) statement. Do you want to read it?
(6) A. I don't have to read it. If that's —
(7) Q. Is that accurate testimony, Doctor?
(8) A. If that's what's reported, then it's accurate.
(9) Q. I mean, is that accurate medically as far as
(10) you're concerned?
(11) A. In that case, those were my opinions, yes.
(12) Q. And in that case, your opinion was, Doctor,
(13) that the death was attributable to cardiac
(14) arrhythmia as opposed to mechanical
(15) asphyxiation and you said abnormal beating of
(16) the heat precipitated by an asthmatic attack
(17) that led to diminished oxygen that produces
(18) hypoxia, insult to the heart causing it to beat
(19) erratically. That's what you testified
(20) earlier. The cause of death in this particular
(21) case such as we have just discussed would be
(22) cardiac arrhythmia due to hypoxia.
(23) A. What is your question?
(24) Q. My question is can you have petechial
(25) hemorrhages from hypoxia alone?

Page 123

(1) A. Yes. I think you can.
(2) Q. All right. Can you have scleral hemorrhages
(3) from the hypoxia?
(4) A. No, I don't think scleral hemorrhages of a
(5) substantial nature, no. Petechial hemorrhages
(6) are one thing. Scleral hemorrhages, I don't
(7) believe so.
(8) Q. Can you have scleral hemorrhages from a cardiac
(9) arrhythmia?
(10) A. I don't think so. I'm trying to think of
(11) cases. Conjunctival congestion, yes.
(12) Hemorrhage, scleral hemorrhages, I think not.
(13) Q. Where can you have conjunctival hemorrhages
(14) that are caused by anoxia or hypoxia that is
(15) caused by a cardiac arrhythmia other than the
(16) eyes?
(17) A. Well, conjunctival refers to the eyes.
(18) MR. MORGAN: Object to the form.
(19) A. So if you're asking me about anatomic sites
(20) other than the eyes —
(21) Q. Right.
(22) A. — you can get petechial hemorrhages on the
(23) lining of the lungs, on the lining of the
(24) heart, on the pericardial sac overlying the
(25) heart, in the mediastinal soft tissues in the

Page 124

(1) chest. Those are some of the places that you
(2) can get petechial hemorrhages.
(3) Q. Okay. Just change the subject for a second.
(4) What literature would you direct me to if I
(5) wanted to educate myself on sudden cardiac
(6) death?
(7) A. Well, I would refer you to cardiology
(8) textbooks. First, heart disease, there are
(9) several out there. I don't remember any
(10) specific book, but there are some books that
(11) deal solely with heart disease. Of course, the
(12) prominent textbooks on internal medicine,
(13) Cecil, Loeb, Harrison, I'm sure they've got
(14) discussions, too, in the chapters dealing with
(15) heart disease, and then forensic pathology
(16) textbooks would deal with cardiac deaths since
(17) those kinds of cases fall into our jurisdiction
(18) many times.
(19) Q. Would you agree with me, Doctor, that people
(20) can suffer a cardiac arrhythmia from extreme
(21) exertion?
(22) A. It's within the realm of possibility, yes, and,
(23) but — and if you talk about older people,
(24) people with significant coronary artery disease
(25) or people with significant chronic lung

Case 1:01-cv-00769-SAS   Document 159-12   Filed 05/20/2004   Page 7 of 8

OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04   XMAX(32/173)

Page 125

(1) disease, the answer is yes, that can happen.
(2) Q. Would you agree with me that young people
(3) including athletes can suffer from sudden
(4) cardiac death from exertion alone?
(5) A. That is possible, but in the cases where that
(6) happens, there's almost always some other
(7) explanation, dehydration, underlying previously
(8) undiagnosed heart disease or so on. There's
(9) almost always some physiological or anatomic
(10) explanation. But is it possible in the absence
(11) of any of those things? Yes. It's possible.
(12) It would be very infrequent, I would say rare
(13) for a young athlete in good condition with no
(14) anatomic, environmental explanation or factor
(15) at play.
(16) Q. Would you agree with me, Doctor, that a young
(17) person like Mr. Owensby could suffer from a
(18) cardiac arrhythmia from a blow to the chest?
(19) A. Commotio cordis as it is called, a severe blow
(20) to the chest leading to cardiac arrhythmia can
(21) occur. These are almost always associated with
(22) some very significant force. I've seen a
(23) couple involves a cue stick in a pool room and
(24) other things like that. A blow, if it were a
(25) very strong person with a very — with a big

Page 126

(1) fist striking a blow to the chest with
(2) considerable force, I would say it would have
(3) to be within the realm of theoretical
(4) possibility. I've never seen it with just a
(5) blow to the chest from a fist. I have seen it
(6) with injuries to the chest from
(7) instrumentalities of different kinds.
(8) Q. Have you read the recent New England Medical
(9) Journal article by Dr. Merrin that came out
(10) this year regarding young athletes who died
(11) from blows to the chest from footballs,
(12) baseballs, hockey pucks, other sports objects?
(13) A. No. I do not recall that article, but that
(14) would be consistent with what I said. Those
(15) are instrumentalities, a hockey puck, a
(16) hard-hit baseball, a football spiralling in
(17) with some force. That's completely consistent
(18) with what I've said.
(19) Q. What is metabolic acidosis?
(20) A. Metabolic acidosis is when the pH goes down
(21) into the acid level and the kidneys then begin
(22) to malfunction and you'll get electrolyte
(23) disturbance. The oxygen goes down. The carbon
(24) dioxide pressure goes up. That is what is
(25) called metabolic acidosis.

Page 127

(1) Q. And is someone who is exerting himself with
(2) extreme exertion, in other words, fighting,
(3) fighting as hard as he can for a period of a
(4) minute or 2, can that individual possible --
(5) possibly develop metabolic acidosis?
(6) A. I never like to say something is impossible in
(7) medicine unless it is within the realm of
(8) physical impossibility. I find it extremely
(9) unlikely, highly improbable. Is it possible?
(10) Could there ever be, has there ever been such a
(11) case? I can't rule that out, but I think it's
(12) extremely unlikely to get metabolic acidosis in
(13) a 29-year-old person following a struggle of a
(14) minute and a half or 2. I'd find that
(15) extremely unlikely.
(16) Q. Would you agree with me that as far as a review
(17) of the autopsy report itself, if you take the
(18) autopsy report itself without -- without the
(19) histories or without other input, you really
(20) need to search for a cause of death? I mean,
(21) it's not obvious from autopsy findings?
(22) A. No. I would disagree. I think if one knew
(23) nothing and you were looking at the 29-year-old
(24) man and you did the kind of examination that
(25) there Dr. Shultz did perform and you saw these

Page 128

(1) 2 large areas of hemorrhage deep in the muscles
(2) of the back on each side and you found
(3) petechial hemorrhages in the eyes and you found
(4) wet, heavy, congested, edematous lungs, I
(5) believe that almost all forensic pathologists
(6) who then would be asked what is your primary,
(7) most likely diagnosis, Doctor, would opt for
(8) some kind of mechanical asphyxia.
(9) The only other thing -- I mean,
(10) putting that all together, that's what you
(11) would come up with I think in most instances.
(12) You would want to know more. I'm not
(13) suggesting that that should be the beginning
(14) and end. I would insist on getting background
(15) information to the extent possible, but you
(16) asked me if you had only that to deal with.
(17) Q. How would you rule out an arrhythmia, Doctor?
(18) A. I would rule out an arrhythmia in a couple of
(19) ways. One, the finding of an essentially
(20) normal heart is one, and then the positive
(21) findings of these other things that in my
(22) opinion, especially -- well, the bruises in the
(23) back, the deep hemorrhages -- I shouldn't call
(24) them -- but the deep intramuscular,
(25) perimuscular hemorrhages, they would have

Case 1:01-cv-00769-SAS   Document 159-12   Filed 05/20/2004   Page 8 of 8

BSA   OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04   XMAX(33/174)

Page 129

(1) nothing whatsoever to do with an arrhythmia.
(2) The scleral hemorrhages in my opinion, as I've
(3) already said, would have nothing to do with an
(4) arrhythmia. You have more than just petechial
(5) hemorrhages. You have significant scleral
(6) hemorrhages. So that's the way I would -- I
(7) would -- I would -- I would preliminarily rule
(8) it out. I would not say that it is impossible,
(9) but I would need to go further and get some
(10) explanation as to how the hemorrhages occurred
(11) in the back.
(12) Q. Well, the back hemorrhages didn't kill him
(13) though, did it?
(14) A. Well, not directly.
(15)    MR. MORGAN: Objection.
(16) A. But there was the indirect evidence of --
(17) Q. That's your opinion. That's your opinion. I
(18) understand that. But what the findings were in
(19) the back didn't kill him? That was not
(20) sufficient injury to cause his death?
(21)    MR. MORGAN: Objection.
(22) A. You mean the hemorrhages in and of themselves?
(23) Q. Right.
(24) A. No. They did not cause death.
(25) Q. Right. There was nothing in the examination of

Page 130

(1) the body itself sufficient to cause death; is
(2) that true?
(3)    MR. MORGAN: Object to the form.
(4) A. Well, I don't want to engage in semantical game
(5) playing with you. If you mean in a strict
(6) anatomic sense can one point to something and
(7) say like here is a rupture aorta, here is a
(8) massive myocardial infarction, here is a huge
(9) cerebral hemorrhage, here is a gunshot wound
(10) through the brain or the heart, the answer is
(11) no. If, however, you are talking about the
(12) physical and pathological changes that are
(13) present in the eyes of an experienced forensic
(14) pathologist, my answer is yes, that that would
(15) be my preliminary diagnosis.
(16)    I would want to rule out other
(17) things. We don't work in a vacuum. Sometimes
(18) we can't know other things. If a body is found
(19) in the woods or somewhere and the police can't
(20) come up with anything, we're stuck, but where
(21) you do know events, then any half-decent,
(22) half-trained forensic pathologist is going to
(23) know that you've got to correlate all of that
(24) clinical information with your anatomic
(25) findings at autopsy. That's the way we

Page 131

(1) function.
(2) Q. Did this individual have an enlarged heart,
(3) Doctor?
(4) A. No. I would say he was at the upper limits of
(5) normal for a man of his build up to about 400
(6) grams. That is the upper limit of normal.
(7) Q. Is that -- is that what the medical literature
(8) would tell me if I went to look?
(9) A. Well, I don't know what it would tell you.
(10) There are different formulas that could be
(11) used. I think in a muscular guy, 185 pounds,
(12) that would be my opinion. I would not consider
(13) something less than 400 grams as myocardial
(14) hypertrophy.
(15) Q. Is that the same thing as cardiomegaly?
(16) A. Yes. Cardiomegaly means the same thing.
(17) Q. All right. You testified earlier that sections
(18) of the heart -- that's done under the
(19) microscope; is that right?
(20) A. Yes.
(21) Q. Show focal subendocardial. What's that mean?
(22) A. It means just beneath the inner lining of the
(23) heart which is called the endocardium.
(24) Q. Or papillary muscle fibrosis. And what is
(25) focal subendocardial or papillary muscle

Page 132

(1) fibrosis?
(2) A. It means just beneath the endocardium, I saw in
(3) one of the slides a focal area of fibrosis, and
(4) papillary muscles, these are muscles that arise
(5) in the surface of the heart and they're
(6) attached to the valves that I saw focal
(7) fibrosis.
(8) Q. And fibrosis is what, Doctor?
(9) A. It's a -- fibrosis is a scarring when fibrous
(10) tissue forms.
(11) Q. And what are the causes for that scarring,
(12) Doctor, when that tissue forms?
(13) A. In the heart, it would have been some transient
(14) diminution of oxygen to that branch of the
(15) coronary artery feeding that anatomic area.
(16) Q. And that would have been at a time other than
(17) at the time that Mr. Owensby died; is that
(18) correct?
(19) A. Yes.
(20) Q. In other words, it would be days, months or
(21) years before this event?
(22) A. I would say months or years, not days.
(23) Q. Okay. Could it -- could it have occurred, this
(24) fibrosis, from some type of disease?
(25) A. Yes. It could have been the residual of an old