Case 1:01-cv-00769-SAS    Document 159-13    Filed 05/20/2004    Page 1 of 12

BSA    OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04    XMAX(34/175)

Page 133

(1) myocarditis. That would be a possibility.
(2) Q. Okay. Are you aware in the studies that
(3) myocarditis has been known to be a factor in
(4) causing sudden cardiac death?
(5) A. Yes. Acute myocarditis certainly can result in
(6) sudden cardiac death. There's no evidence,
(7) however, of a myocarditis in this case.
(8) Q. Now, you have the remnants, as you just
(9) testified, as possibly having the fibrosis from
(10) myocarditis; isn't that true? Isn't that what
(11) you just said?
(12)    MR. MORGAN: Object to the form.
(13) A. You had asked me a question before, and I said
(14) it is possible that the fibrosis could be the
(15) residua of an old myocarditis.
(16) Q. Right?
(17) A. You now asked me a question relating to sudden
(18) death associated with myocarditis, and the
(19) answer to that is not from any residual of an
(20) old myocardial infection. When you die
(21) suddenly from acute myocarditis, it's because
(22) you have active inflammation which just
(23) fortuitously and most unluckily for that
(24) individual, it hits along the pathways that
(25) control the rhythmic beating of the heart.

Page 134

(1) That's how you die.
(2)    Inflammation itself is nothing. It
(3) won't even cause you to put a Band-Aid if it
(4) were on your hand, but if it gets in the
(5) pathway that controls the beating mechanism of
(6) the heart, but that's an active myocarditis.
(7) It has nothing to do, even it were known and
(8) it's strictly -- strictly theoretical, strictly
(9) conjectural as to whether or not there had ever
(10) been any myocarditis in the past.
(11) Q. Doctor, are you familiar with the literature
(12) that indicates that old myocarditis which
(13) causes fibrosis is a known cause for cardiac
(14) arrhythmia?
(15)    MR. MORGAN: Objection to the form.
(16) A. I don't know a specific article, but I would
(17) not disagree that it could lead to some cardiac
(18) arrhythmia if it were significant and if it
(19) impinged upon the special pathways. It's
(20) something that could happen.
(21) Q. My question was are you familiar with the
(22) literature on the subject?
(23)    MR. MORGAN: Asked and answered.
(24) A. And told you I don't know the specific article.
(25) I can only deal with the subject in a -- in a

Page 135

(1) theoretical fashion.
(2) Q. All right. So you would agree with me,
(3) however, that the muscle fibrosis in the heart
(4) is an abnormality?
(5) A. Yes. It's abnormal in that it's, yeah, not
(6) part of a normal picture. That's correct.
(7) Q. And you would agree with me that you didn't
(8) find any life-threatening injuries to
(9) Mr. Owensby's head on examination?
(10) A. When you say I didn't find, the autopsy did not
(11) find and I have no disagreement with those
(12) findings.
(13) Q. And essentially the findings were negative as
(14) far as the examination of the neck; is that
(15) correct?
(16) A. That's correct.
(17) Q. And essentially the examination was negative as
(18) far as examination of the chest?
(19) A. No.
(20)    MR. FREUND: Object to the form.
(21) A. We've been discussing the hemorrhages in the
(22) posterior chest wall.
(23) Q. On the back. Okay. Maybe I'm not --
(24) A. It's the back, but it's also the back of the
(25) chest wall.

Page 136

(1) Q. Okay. That was my next question. I was going
(2) to talk to you about the back, but as far as
(3) the chest, the front of the body, there were no
(4) markings; is that correct?
(5) A. On the front of the body, other than beneath
(6) the left nipple area, some faint abrasions,
(7) other than that, there were no injuries on the
(8) anterior thorax or front of the chest.
(9) Q. Okay. Did you note whether or not Dr. Shultz
(10) found those heart abnormalities that we just
(11) talked about, the papillary muscle fibrosis or
(12) the focal subendocardial abnormality, did
(13) you -- did he note that on his autopsy report?
(14) A. No, he did not.
(15) Q. You also told the jury that he had a 50-percent
(16) stenosis -- or actually that was what
(17) Dr. Shultz said. You said it was 30- to
(18) 40-percent stenosis of the left anterior
(19) descending artery?
(20) A. That's correct.
(21) Q. And what was the cause for -- whether it's 30-
(22) to 40-percent blockage of the left anterior
(23) descending artery or 50 percent, what's the
(24) cause for that?
(25)    MR. MORGAN: Object to the form.

Case 1:01-cv-00769-SAS    Document 159-13    Filed 05/20/2004    Page 2 of 12

BSA    OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04    XMAX(35/176)

Page 137

(1) A. Well, it's an aging process that we all undergo
(2) in varying degrees of a degenerative nature.
(3) What happens anatomically is that
(4) atherosclerotic material comprised of
(5) cholesterol begins to form on the inner lining,
(6) the intimal surface, and forms a plaque.
(7) Q. That's not normal?
(8) MR. MORGAN: Objection.
(9) Q. Is that correct?
(10) A. Well, it depends.
(11) Q. For a 31-year-old?
(12) A. I said that it was more than I would expect in
(13) a 29-year-old person. That's right.
(14) Q. Okay. What are some of the causes for
(15) pulmonary edema?
(16) A. Oh, the most common cause would be probably
(17) congestive heart failure. We see it with
(18) bronchial asthma where people have attacks. We
(19) see it in cases of myocardial infarcts. We see
(20) it in cases of brain injury or brain
(21) hemorrhage, natural disease quite often where
(22) the brain is not functioning properly. We can
(23) see it in cases of people drowning. You see it
(24) in cases of people who die from drug overdoses,
(25) especially heroin, central nervous system

Page 138

(1) depressant family of drugs, all of the
(2) analgesics and sedatives and tranquilizers.
(3) Q. And you can see it in cases of significant
(4) resuscitative or resuscitation attempts, can't
(5) you?
(6) A. Not when a person is dead. If you have someone
(7) who is not dead and you are engaged in active
(8) resuscitation, you might get some congestion.
(9) Of course, the purpose of your doing the
(10) resuscitation is to get the heart going and not
(11) have the heart fail. It's the failing heart
(12) that leads to the congestion, so it's not the
(13) resuscitation itself that is doing it. The
(14) resuscitation is attempting to reverse or
(15) ameliorate the condition that is causing the
(16) congestion and the edema. If that were not the
(17) case, then you wouldn't do resuscitation
(18) because then you'd just be causing death from
(19) pulmonary congestion and edema. It's the
(20) failing heart for whatever reason that you are
(21) trying to get moving in order to prevent
(22) significant pulmonary edema and congestion.
(23) Q. Would you agree with me that cardiac
(24) arrhythmias can cause pulmonary edema?
(25) A. Yes.

Page 139

(1) Q. And cardiac arrhythmias can cause sudden
(2) cardiac death?
(3) A. Yes. If you have a severe cardiac arrhythmia,
(4) goes into ventricular fibrillation, then it can
(5) cause sudden death. Relatively sudden death
(6) depends upon the clinical circumstances of that
(7) particular case. Everything has to be
(8) completely thrown into the hopper for
(9) evaluation and scrutiny.
(10) Q. Let me see if I understand this correct. If we
(11) assume for a moment that Mr. Owensby died from
(12) a cardiac arrhythmia -- just assume that as
(13) being true for a moment -- the first thing that
(14) would happen is his heart would be beating
(15) improperly -- or what medical term would you
(16) prefer to use? Cardiac arrhythmia?
(17) A. Irregularly.
(18) Q. Irregularly. Then the next thing that would
(19) happen is, presumably, if that irregularity
(20) continued, the individual would become
(21) unconscious; is that correct?
(22) A. Some. Some are benign, but others will lead
(23) then to unconsciousness as a ramification of
(24) the diminished oxygenation to the brain.
(25) Q. Right. And the reason the individual would

Page 140

(1) become unconscious with a cardiac arrhythmia is
(2) because he or she is suffering from hypoxia
(3) which is the diminished oxygen?
(4) A. Well, yes. That's right.
(5) Q. Whereas, on the other hand, if we assume for a
(6) moment that the patient or the individual died
(7) from mechanical -- mechanical asphyxiation, the
(8) first thing that would happen is the individual
(9) would become unconscious because of hypoxia and
(10) then eventually, if that -- if that mechanical
(11) asphyxiation remains, eventually the heart
(12) would stop?
(13) MR. MORGAN: Objection. Misstates
(14) the testimony.
(15) Q. Is that true?
(16) A. Well, it's not a situation in which one process
(17) has to commence and terminate before another
(18) kicks in, but if I understand the thrust of
(19) your question, essentially, it's correct that
(20) in mechanical asphyxiation, the initial problem
(21) is the diminution of oxygen to the brain
(22) because of the compromise of the respiratory
(23) function, that's correct, and then as that
(24) compromise is in place, then at some point in
(25) time, the cardiac arrhythmia may start.

Case 1:01-cv-00769-SAS    Document 159-13    Filed 05/20/2004    Page 3 of 12

BSA    OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04    XMAX(36/177)

Page 141
(1) Yes. That's correct. The lungs are
(2) primarily compromised in cases of mechanical
(3) asphyxia. The heart, if you have a sudden
(4) cardiac death unrelated to any kind of
(5) asphyxiation, by definition it's the heart
(6) which is going awry first.
(7) Q. Well, actually, maybe my terms are not correct,
(8) but if you suffer from a cardiac arrhythmia,
(9) you're eventually not going to be able to get
(10) oxygen to the brain; true?
(11) A. In many of the arrhythmias, yes. Some -- some,
(12) as I say, are benign, atrial flutter, atrial
(13) fibrillation, but others will lead to
(14) diminished oxygen to the brain.
(15) Q. Causing an individual to become unconscious?
(16) A. That's right.
(17) Q. And if the arrhythmia continues, dead?
(18) A. If it continues unabated and not reversed, it
(19) could lead to death.
(20)     ----
(21) (There was a brief pause in the proceedings.)
(22)     ----
(23) Q. Doctor, I just have a few more questions that I
(24) need to ask you. If we assume mechanical
(25) asphyxiation as described by you, have you done

Page 142
(1) any studies or anything which would indicate
(2) how much weight needs to be on the back of an
(3) individual before he or she would be unable to
(4) breathe?
(5) A. I have not done such studies myself. I would
(6) really have to check the literature to tell you
(7) if anybody else has in terms of specific
(8) weights. At this time, I cannot give you a
(9) specific amount of weight required. I think in
(10) part it's going to depend, too, on the body
(11) build of the individual. I mean, is it a
(12) 110-pound female or is it a 250-pound guy who
(13) is a weight lifter himself. So I don't know
(14) what kinds of studies, but I will look.
(15) Myself, I do not have an answer for you now.
(16) Q. All right. And we know that Mr. Owensby was a
(17) well-built individual, don't we?
(18) A. He was so described, yes, and he appears to be
(19) a solid guy.
(20) Q. Okay. And I think I may have asked you this
(21) question already, and I apologize if I have.
(22) Have you done any studies as to the length of
(23) time that it would take for an individual to
(24) become unconscious from mechanical
(25) asphyxiation?

Page 143
(1) A. No. I have not done such studies.
(2) Q. All right. Okay. Have you done any studies as
(3) to how long -- somebody who is in full cardiac
(4) arrhythmia, how long will it take that
(5) individual to become unconscious?
(6) A. Oh, that depends on the kind of arrhythmia.
(7) You see, again, it ranges from something benign
(8) like atrial flutter to more serious.
(9) Q. V fib --
(10) A. Dysfunctional arrhythmias going into
(11) ventricular fibrillation which is incompatible
(12) with life. The heart slithers like a snake but
(13) does no pumping.
(14) Q. How long would that take?
(15) A. Well, you wouldn't be getting any oxygen, so
(16) we're back to our residual cerebral oxygen
(17) business, 4 to 6 minutes. If you have
(18) ventricular fibrillation or cardiac standstill,
(19) you're going to die. You know, some people
(20) might stretch it out, but, anyhow, we use a 4
(21) to 6 minute, but other kinds of arrhythmias, I
(22) can't tell you, I really -- I just don't know
(23) whether any studies have been done, you know,
(24) this kind of arrhythmia as, again, excluding --
(25) excluding ventricular fibrillation.

Page 144
(1) Q. Really, what I'm trying to find out from you,
(2) Doctor, is how long an individual who is in
(3) full V fib would stay conscious?
(4) A. Oh, I think probably in 15 to 20 seconds,
(5) you'll become unconscious.
(6) Q. All right. In your opinion, Doctor, was
(7) Mr. Owensby essentially deceased or clinically
(8) deceased at the time that they picked him up
(9) and took him to the car?
(10) A. No, because, again, I go with the time, a
(11) minute and a half, or here, even if I take the
(12) maximal time of 2 and a half to 3 minutes, he
(13) still has that residual oxygen, and death in
(14) modern times is determined by brain death. So
(15) the answer is no, he would not have been
(16) deceased.
(17) Q. Okay. If you assume for a moment that
(18) Dr. Shultz opined that he was for all practical
(19) purposes deceased when he was picked up or when
(20) he got up, whatever, when he was picked up, you
(21) disagree with that?
(22) A. Well, if -- again, I'm using brain death
(23) criteria. If -- if -- and I don't know what
(24) Dr. Shultz said, but if he, Dr. Shultz or
(25) anybody were to say -- well, no, Dr. Shultz,

Case 1:01-cv-00769-SAS    Document 159-13    Filed 05/20/2004    Page 4 of 12

BSA    OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04    XMAX(37/178)

Page 145

(1) not anybody, we're talking about this case. So
(2) if Dr. Shultz said that in his opinion after
(3) this scuffle, shall we call it, and he's up,
(4) he's gotten up, if he means that vital signs
(5) would have been non-existent and for all
(6) intents and purposes the individual was dead, I
(7) wouldn't disagree. That's certainly a
(8) possibility.
(9)     I can't state that with reasonable
(10) medical certainty, but it's a -- it's a
(11) reasonable possibility. I'm not trying to
(12) confuse it, but I'm saying as long as you've
(13) got oxygen in your brain, you are not -- in
(14) today's scientific parlance, you are not truly
(15) dead, but I don't know that Dr. Shultz had that
(16) in mind. He may well have been talking just
(17) about the traditional business of cardiac death
(18) where you don't have heartbeat, pulse,
(19) respiratory activity or blood pressure. If you
(20) don't have those things, technically you're
(21) dead. In the old days, that was it. Nowadays,
(22) you can start with some resuscitation and bring
(23) these people back because you do have that bit
(24) of oxygen in the brain.
(25) Q. Okay. You would agree with me that physical

Page 146

(1) exertion and stress can cause heart attacks?
(2)     MR. MORGAN: Asked and answered.
(3) A. Well, we talked about that, and in people,
(4) usually older, but not necessarily older, young
(5) people can have very bad hearts and very bad
(6) lungs, the answer is yes, it can happen. If
(7) you have someone who has an essentially normal
(8) heart and no lung disease, then I would say
(9) such a thing would be extremely rare.
(10) Q. Right.
(11) A. And, of course, it depends, too, on exertion.
(12) I mean, if -- well, I'm not going to
(13) hypothesize with ridiculous situations in which
(14) somebody is beating you and forcing you to do
(15) something and so on versus you get exerted in a
(16) ball game or something you're not used to, but,
(17) you know, you're not going to die. You're
(18) going to stop before you die.
(19)     MR. FREUND: I don't think I have
(20) anything else at this time, Doctor. Thank you
(21) very much.
(22)     THE WITNESS: Thank you.
(23)     MR. WEISENFELDER: Doctor, I don't
(24) have any questions.
(25)     ----

Page 147

(1)     EXAMINATION
(2)     ----
(3) BY MR. HARDIN:
(4) Q. Doctor, I do. My name's Don Hardin, and I'm
(5) the attorney for some of these police officers
(6) in their individual and official capacities.
(7) Would you do me a favor? Since I'm not there
(8) with you and I can't see the size of your file,
(9) can you tell me basically how many inches it
(10) is, how many inches thick?
(11) A. Probably, if you pile everything, maybe 6 to 7
(12) inches, something like that.
(13) Q. All right. And that includes testimony from
(14) various police officers; is that correct?
(15) A. Yes.
(16) Q. That would include Officer Jorg?
(17) A. Yes.
(18) Q. Do you have his testimony in the file?
(19) A. Yes.
(20) Q. Can you remove that?
(21) A. Okay. Statement of Officer Jorg.
(22) Q. Is that internal investigations statement or a
(23) statement by whom? How is it identified?
(24)     MR. MORGAN: Don, this is --
(25) A. I've got 2 things here. Here's something that

Page 148

(1) says testimony now and one was a statement;
(2) right?
(3)     MR. MORGAN: That's Hodge, Doctor.
(4) We have a statement --
(5)     THE WITNESS: Did he ask me about --
(6) what did he ask me about?
(7) Q. Jorg.
(8) A. Oh, I beg your pardon.
(9)     MR. MORGAN: He has the internal
(10) affairs statement with Sergeant Harold and
(11) Sergeant Carter.
(12)     MR. HARDIN: Could that be marked as
(13) Exhibit No. 8?
(14)     MR. MORGAN: So done, if you're going
(15) to need more labels, we're going to have to
(16) take time for the court reporter to mark them.
(17)     MR. HARDIN: Yeah, I am. I'm going
(18) to have to do some of that.
(19)     ----
(20) (Exhibit 8 marked for identification.)
(21)     ----
(22) (There was a discussion off the record.)
(23)     ----
(24) Q. No. 8 is the testimony from an IIS or an
(25) internal statement; is that right?

Case 1:01-cv-00769-SAS   Document 159-13   Filed 05/20/2004   Page 5 of 12

BSA   OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04   XMAX(40/181)

### Page 157

(1) ----
(2) MR. HARDIN: That is Exhibit 19?
(3) MR. MORGAN: That is Exhibit 19.
(4) Q. Okay. And that is your confidential memo 8/8?
(5) A. Is that what it is, August 8? Yes, August 8.
(6) That's right.
(7) Q. Okay. Who did you prepare that for?
(8) A. I guess for Mr. Gissiner.
(9) Q. Do you have any correspondence in your file
(10) prior to August 8, 2002? And when I say
(11) correspondence, I'm also asking whether you
(12) have any phone messages or anything from
(13) Mr. Gissiner to you?
(14) A. We faxed to you what I had in my file, and
(15) there is a July 19 letter and -- from him to
(16) me, July 2 letter from me to --
(17) Q. I don't have a July 19 letter.
(18) A. July 19. Yeah -- no, no, I have an August 19.
(19) Q. Okay.
(20) A. Yeah. July 19, yes.
(21) Q. I did not get a July 19 letter. That would be
(22) in your file. What was that about?
(23) A. He just sending me the transcripts of Officers
(24) Hunter, Sellers, transcript of Dr. Shultz. It
(25) says here all 3 of those are the Caton trial

### Page 158

(1) and the internal investigation interview of
(2) Officer Jorg.
(3) Q. All right. Let me ask you a question. When
(4) was the first time that you talked to anyone
(5) from the City of Cincinnati regarding giving
(6) your opinions or doing any review of this case?
(7) A. The earliest letter that I have is one, July 2
(8) from me to Mr. Gissiner acknowledging receipt
(9) of autopsy photos and slides, and I asked for
(10) additional materials that we had discussed. So
(11) obviously we talked on the phone. I don't see
(12) a letter from Mr. Gissiner, just my letter of
(13) acknowledgment of receipt of those couple of
(14) things July 2.
(15) Q. So it would be reasonable for me to assume,
(16) then, that you had some sort of conversation
(17) with Mr. Gissiner before July 2?
(18) A. Yes.
(19) Q. Did you have to sign a contract --
(20) A. Oh, wait, wait, wait, wait, wait, wait, wait,
(21) wait, wait. Hold on. Here's a June 25 letter
(22) from Mr. Gissiner to me in which he sent me
(23) State Exhibits 33, 34, 35 utilized in the trial
(24) of Officer Jorg, and then he talks about OMI
(25) had attempted to obtain actual sleeve and then

### Page 159

(1) he talks about requesting the coroner's office
(2) to send slides to me as well as autopsy photos.
(3) So that was, yeah, June 25 was his first
(4) letter.
(5) Q. All right. So can we have that one marked,
(6) then, as Exhibit 20?
(7) MR. MORGAN: Yeah. Done.
(8) ----
(9) (Exhibit 20 marked for identification.)
(10) ----
(11) Q. And then you said there was your -- something
(12) from you to him or him to you on 7/2, July 2?
(13) A. Yes. I acknowledge the receipt of those
(14) autopsy photos and slides.
(15) Q. All right. I'd like that marked Exhibit 21.
(16) ----
(17) (Exhibit 21 marked for identification.)
(18) ----
(19) Q. Doctor, would it be reasonable to assume, then,
(20) that before June 25, '02, you and Mr. Gissiner
(21) had some sort of conversation about you being
(22) hired to perform some service for the city?
(23) A. Yes, I believe so.
(24) Q. But you have no correspondence prior to that
(25) date with regard to when this first contact was

### Page 160

(1) made?
(2) A. No, I do not.
(3) Q. Did the city require that you sign a contract
(4) with them so that they could pay you?
(5) A. If they did, I would assume it would be here.
(6) I have no independent recollection at this time
(7) of some contract.
(8) Q. All right. So you don't recall any
(9) conversation about having to sign anything in
(10) order to be paid for your service?
(11) A. No. Here's a check from them dated 11/13/02.
(12) Q. How much is that check for?
(13) A. 5,000. And my bill to them preceding that
(14) payment. There's no contract or any other
(15) form.
(16) MR. HARDIN: All right. I'd like to
(17) have the check marked as Exhibit 21.
(18) MR. MORGAN: That would be 22.
(19) MR. HARDIN: I'm missing 21
(20) somewhere. Okay. 22. You're right.
(21) ----
(22) (Exhibit 22 marked for identification.)
(23) ----
(24) Q. And then you say, then, there was your bill is
(25) there?

Case 1:01-cv-00769-SAS   Document 159-13   Filed 05/20/2004   Page 6 of 12

BSA   OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04   XMAX(41/182)

Page 161

(1) A. The bill is there and the payment of the
(2) bill -- I mean the copy of the check.
(3) Q. Can you mark that Exhibit 23, the bill?
(4) MR. MORGAN: It's all one exhibit.
(5) Exhibit 22 is stapled together.
(6) MR. HARDIN: Okay. That's fine. 2
(7) different documents in Exhibit 22; right?
(8) MR. MORGAN: Exhibit 22 is a check
(9) and a stub and a bill dated 1 November 2002 and
(10) another copy of the check and another copy of
(11) the bill.
(12) MR. HARDIN: Okay. Well, just one
(13) copy is sufficient here.
(14) Q. From reviewing your file, Doctor, you have no
(15) other indication of any prior contract --
(16) contacts between you and the city prior to June
(17) 25, '02?
(18) A. I do not.
(19) Q. But it's reasonable to assume that you did have
(20) an order to trigger the correspondence of June
(21) 25?
(22) A. Yes.
(23) Q. You referred to a document that was called
(24) synopsis of events. Do you recall that?
(25) A. Yes.

Page 162

(1) Q. And that was faxed to me from within your file,
(2) and can we have that marked as Exhibit 23?
(3) MR. MORGAN: Done.
(4) ----
(5) (Exhibit 23 marked for identification.)
(6) ----
(7) Q. What is that, Doctor?
(8) A. It's a synopsis -- it's entitled Roger Owensby,
(9) Jr., black male, 67 inches, 185 pounds, 29
(10) years old, brief synopsis of the events --
(11) Q. When did you receive that?
(12) A. I don't have a date either on the -- on this
(13) 3-page document or anything indicating when I
(14) received it.
(15) Q. Was that faxed to you or --
(16) A. This does not look like a fax.
(17) Q. Okay. In there -- this is a 3-page document;
(18) is that right?
(19) A. Yes. It goes on to the third page; right.
(20) Q. And in that on Page 3 under item 6, it says a
(21) lawsuit filed by Officer Jorg contended, A,
(22) Mr. Owensby did not die of mechanical asphyxia
(23) but he died as a result of, quote, a cardiac
(24) event, end quote, and, B, the medical autopsy
(25) prepared by Dr. Daniel Shultz, quote, falsely

Page 163

(1) listed death of Roger Owensby, Jr. End of
(2) quote. Is that correct?
(3) A. Yes.
(4) Q. And that was information furnished to you by
(5) the city?
(6) A. It must have come from the city. It had to
(7) have come from the city.
(8) Q. Right. And you were aware that Jorg filed a
(9) lawsuit against the city; is that right?
(10) A. Well, it states that, yes.
(11) Q. If I were to tell you that the lawsuit Mr. Jorg
(12) filed against the city occurred on May 28,
(13) 2002, do you believe that would be before the
(14) city contacted you initially?
(15) A. I really have no -- what was the date?
(16) Q. May 28, '02?
(17) A. I don't know. The first letter is June 25. I
(18) don't know what kind of hiatus there might have
(19) been. You'll have to ask Mr. Gissiner. I just
(20) don't know.
(21) Q. Well, we don't have any correspondence from
(22) Gissiner to you or you to Gissiner or any
(23) telephone calls or anything prior to June 25;
(24) is that right?
(25) A. I do not.

Page 164

(1) Q. Okay. So, obviously, May 28 is a month before
(2) any initial contact that we can show from your
(3) file?
(4) A. Yes.
(5) Q. Okay. Would it be important for you to know
(6) that there was a lawsuit filed --
(7) A. No.
(8) Q. -- in this case?
(9) A. No.
(10) Q. Against the city?
(11) A. No. It would just tell me maybe why they were
(12) consulting me, but it would have no substantive
(13) bearing whatsoever on what I was doing.
(14) Q. Do you ever recall talking to any attorneys
(15) from the City of Cincinnati regarding this
(16) case?
(17) A. I don't have an independent recollection. I
(18) may have, and I don't remember if the meeting
(19) of August 14 at my office if any of them were
(20) attorneys. I just -- I'm sorry. It was
(21) negligent of me not to have gotten a list of
(22) the people who were there, but I don't have it.
(23) Q. I'm not faulting you or --
(24) A. Well, I should have done that, but I don't have
(25) it. So I don't know. One of them might have

Case 1:01-cv-00769-SAS   Document 159-13   Filed 05/20/2004   Page 7 of 12

BSA   OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04   XMAX(42/183)

Page 165

(1) been an attorney, and had there been any phone
(2) calls with anybody from the city attorney's
(3) office, I just don't know.
(4) Q. All right. I notice on your report of August
(5) 14, 2002 -- and I'm not sure we made that an
(6) exhibit yet, so I need to do that.
(7)     MR. FREUND:   All right. I'll give
(8) mine up.
(9)     MR. MORGAN:   That's 23, Don?
(10)    MR. HARDIN:   I thought the synopsis
(11) was 23. If I'm incorrect --
(12)    MR. MORGAN:   24. I'm sorry.
(13)    MR. HARDIN:   Okay. 24 is the
(14) letter -- I'm sorry --
(15)    MR. MORGAN:   You're definitely way
(16) over my pay grade now.
(17)    - - - -
(18) (Exhibit 24 marked for identification.)
(19)    - - - -
(20) Q. Okay. Confidential memo is item 24 dated
(21) 8/14/02?
(22) A. Yes.
(23) Q. I notice that that is not addressed to anybody
(24) in particular; is that right?
(25) A. That's correct.

Page 166

(1) Q. But you have up there confidential memo to
(2) file, attorney work product. What does that
(3) mean?
(4) A. That's my understanding from attorneys when
(5) they want a confidential memo and not an
(6) official report. Sometimes they specifically
(7) ask for it and maybe other times based upon
(8) their experiences, I just do it. I can't tell
(9) you that it was asked for in this case. Many
(10) times it is, but that's -- that usually goes
(11) hand in hand with my designation of
(12) confidential memo.
(13) Q. Okay. I just -- Mr. Gissiner, to your best
(14) knowledge, is not an attorney; right?
(15) A. I've never seen him referred to as an attorney
(16) or with a Esq. behind his name.
(17) Q. Do you know of anybody else from the office of
(18) municipal investigation who was an attorney
(19) that was involved in this case?
(20) A. I think in one of his letters, he said
(21) something about -- no. I could feel free to
(22) contact an investigator, but it does --
(23) Q. And that investigator was Mr. Plahovinsak; is
(24) that right?
(25) A. Yes.

Page 167

(1) Q. For the court reporter's convenience who is
(2) there, P L A H O V I N S A K; correct?
(3) A. Well, they have it spelled P L A -- is that
(4) what you said? P L A H O V I N S A K? That's
(5) right.
(6) Q. N S A K. Do you recall Mr. Gissiner or
(7) Mr. Plahovinsak indicating that this was
(8) attorney work product?
(9) A. No. I have no independent recollection of
(10) that, but I can only retrospectively infer that
(11) the confidential memo was sent with their
(12) specific knowledge. I do not send a
(13) confidential memo unless the person who has
(14) consulted me asks. What we usually do is we
(15) call and ask if they want the final report, if
(16) they need it, if they want a confidential memo,
(17) the rules vary from one jurisdiction to
(18) another, I am certain, despite not having
(19) specific recollection, that this would not have
(20) been sent unless Mr. Gissiner had been
(21) contacted and asked if he so wanted it -- if he
(22) wanted it in that form.
(23) Q. Is it your understanding that you were hired to
(24) investigate an investigation -- I'm sorry -- to
(25) give opinions regarding an investigation of an

Page 168

(1) incident involving Roger Owensby and the
(2) police?
(3) A. Yes.
(4) Q. I want to take you back, if I may, to a
(5) question that I think Mr. Freund asked you, and
(6) you'll have to go to exhibit -- give me a
(7) second here -- Exhibit 19 and Exhibit 24 as a
(8) comparison.
(9) A. I have these things.
(10) Q. All right. I just want you to look at -- for
(11) the purpose of this question just at the first
(12) page of the August 8 confidential memo and the
(13) August 14 confidential memo, and I think you
(14) said you can tell whether or not there are any
(15) changes by looking kind of at the last line
(16) of every --
(17) A. I said that would give me a rough idea. That's
(18) all. I did not read the entire page. I just
(19) looked at the bottom sentence.
(20) Q. Can you look at August 14 and August 8, the
(21) last couple of lines and see whether they're
(22) identical? Because I don't have August 8, so I
(23) can't do that.
(24) A. Officer Hunter worked on the right arm while
(25) Officer -- on August 8, I have Caton spelled

Page 165 to Page 168
www.akf.com
AKF Reporters, Inc.
Pittsburgh - Erie
depo@akf.com

BSA    OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04    XMAX(43/184)

Page 169

(1) wrong I have Canton. Officer handled the left
(2) arm. Officer Caton called for assistance on
(3) his radio shortly after -- 3 other officers
(4) arrived at Officer Caton's request. It appears
(5) to be the same except for the misspelling of
(6) Caton's name repeatedly in the August 8 memo.
(7) Yeah, that's right. Yeah.
(8) Q. And reading at the last line of August 14, it
(9) says 3 other officers arrived at Officer
(10) Caton's request, Officer Hunter, and then it
(11) goes on to the next page. Is that exactly the
(12) way it appears on the August 8?
(13) A. Yes, except for the misspelling of Caton's
(14) name. That's right exactly.
(15) Q. It says every other word there exactly the same
(16) way. 3 other officers arrived at --
(17) A. 3 other officers arrived, 3 other officers
(18) arrived, yes, it does.
(19) Q. At Officer Caton's request, Officer Hunter, is
(20) that same language on --
(21) A. Officer Hunter sprayed him. Officer Hunter
(22) sprayed him. Yes. That's right.
(23) Q. So Hunter's name appears on the last line?
(24) A. Well, on the August 8, Hunter -- the name
(25) Hunter is at the top of the spacing. The

Page 170

(1) Hunter doesn't -- is the first word on the top
(2) of the second page, and the 14, it's the last
(3) word on Page 1.
(4) Q. All right. So it's -- at least from looking at
(5) the first page, there were corrections or
(6) differentiations between what is on the first
(7) page of August 8 draft and the one that is on
(8) the August 14 draft? Would that be fair to
(9) say?
(10) A. What did you ask me? If the pages -- pages --
(11) Page 1 --
(12) Q. The August 14, they have differentiations in
(13) spelling of Officer Caton's name --
(14) A. On Page 1, right.
(15) Q. And the loss of Officer Hunter's name on August
(16) 8?
(17) A. Did you say the loss?
(18) Q. Yeah. It's not on the first page of the --
(19) A. Well, it's not lost. It's just the first word
(20) at the top of the next page.
(21) Q. Right. But it isn't on the first page of the
(22) August 8 letter?
(23) A. No.
(24) Q. Okay. Were you ever asked to render any
(25) opinions to the city with respect to the

Page 171

(1) lawsuit that Officer Jorg filed?
(2) A. No.
(3) Q. Let's go back to the -- to the brief synopsis
(4) that we talked about earlier. Do you need an
(5) exhibit number for that?
(6) A. 23. I have it.
(7) Q. Okay. This is material that you received from
(8) the city at some point and we don't know when;
(9) right?
(10) A. Yes.
(11) Q. From your file. And it talks about certain
(12) documents that were received, and then it's got
(13) a whole series of questions in there. Is that
(14) right?
(15) A. Yes.
(16) Q. Starting on Page 2?
(17) A. Yes.
(18) Q. Were those questions that were addressed to you
(19) before you prepared your initial draft on
(20) August 8, 2002?
(21) A. Probably. I can't be certain, but I would
(22) imagine because most of those things are
(23) addressed in my report, so I assume that the
(24) report followed the receipt of this synopsis.
(25) Q. All right. So the questions that they wished

Page 172

(1) to have answered, whoever this was, were
(2) addressed in your report to the city; is that
(3) right?
(4) A. Well, I think most of them were, yes.
(5) Q. And your belief is that those questions were
(6) posed to you before you created an initial
(7) draft?
(8) A. It's most probable, yes.
(9) Q. So that it's probable that these questions were
(10) presented to you before any drafting of any
(11) report?
(12) A. Yes. That seems logical.
(13) Q. Okay. I'm sorry. I'm trying to go through
(14) some notes here. I'd like to go to your report
(15) of September 10, 2000, and I'm not sure whether
(16) that's an exhibit in here or not.
(17)        MR. MORGAN:    Isn't that the actual
(18) report?
(19)        MR. FREUND:    Well, what is the actual
(20) report?
(21)        ----
(22) (There was a discussion off the record.)
(23)        ----
(24) Q. If you can go to Exhibit 3, Doctor, I'd like to
(25) ask you some questions about that report, if I

Case 1:01-cv-00769-SAS   Document 159-13   Filed 05/20/2004   Page 9 of 12

BSA                    OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04                    XMAX(45/186)

## Page 177

(1) that gave you the information this was one —
(2) one and a half to 3 and a half minutes?
(3) A. No. I don't recall such a specific piece of
(4) information.
(5) Q. Do you have any idea when — as to when Roger
(6) Owensby actually died?
(7) A. Well, again, if you're talking about brain
(8) death, then I believe he was dead within about
(9) 6 minutes maximally from the time that the
(10) scuffle ended. He could have been dead — wait
(11) a minute — yeah, 6 minutes after the scuffle
(12) ended. He could have been dead within —
(13) technically dead, brain death criteria, within
(14) maybe as little as 5 minutes if the mechanical
(15) asphyxiation had rendered him unconscious,
(16) stopped the cardiorespiratory activity. So
(17) allowing for some time with the scuffle and
(18) then a minimal amount of time for brain death
(19) to occur, that's where I get that 5-minute
(20) period from.
(21) Q. If I were to tell you that there's a document
(22) in Dr. Shultz's file that said the last person
(23) to see him — Mr. Owensby alive was a doctor at
(24) the emergency room, would that change your
(25) opinion?

## Page 178

(1) A. If a doctor says that he saw him alive, if that
(2) doctor's testimony was confirmed, yeah, I would
(3) have no basis to challenge him. I would just
(4) want to know what he determined — what he did
(5) to determine that Mr. Owensby was alive.
(6) Q. Uh-huh. Let me — let me go to the deep
(7) hemorrhages in the scapular area. What
(8) information do you have that Officer Jorg
(9) inflicted — put his knees on both sides of
(10) Roger Owensby's back to inflict those deep
(11) hemorrhages on both sides?
(12) A. Information that I gleaned from the records.
(13) Q. And what information was that?
(14) A. That Officer Jorg kneeled or — on
(15) Mr. Owensby's back.
(16) Q. Put both knees on his back, is that right?
(17) A. Well, I don't remember the specific
(18) information, but that referred to Officer Jorg
(19) and the juxtaposition to Mr. Owensby's back.
(20) Q. If Officer Jorg had remained during the
(21) struggle and until the time Mr. Owensby was
(22) lifted on the left side of his back, can you
(23) tell me how he could have inflicted knee
(24) grinding, knee pressure on the right side?
(25) A. Well, a man of his height can have one knee 6,

## Page 179

(1) 8 inches away with his torso being on one side.
(2) That doesn't remove it. The other possibility
(3) is a man of his size and weight could have one
(4) knee and could be pushing down for his own
(5) balance with the palm — the heel of his hand
(6) on the other side.
(7) Q. But if there were no evidence of either of
(8) those suppositions that you're talking about,
(9) then it would be fair to say he couldn't have
(10) inflicted injuries on both sides if he didn't
(11) have both knees on his back?
(12) A. Well, you're asking me, you know, to — if this
(13) didn't happen, if that didn't happen. It's up
(14) to — you know, you got 2 hemorrhages here. In
(15) my opinion, they came from deep pressure. You
(16) got no bruises on the skin. You've got no
(17) hemorrhage of the subcutaneous issue. To talk
(18) about somebody getting that from one or 2
(19) punches is anatomically, pathologically
(20) impossible in my opinion.
(21)      You've got these deep hemorrhages. I
(22) went with Jorg because that's the information
(23) that I gleaned. If it wasn't Officer Jorg, it
(24) was Officer A or B or C. Other people — my
(25) role in this case is not to prosecute Officer

## Page 180

(1) Jorg to show why and how Mr. Owensby died.
(2) Somebody caused those hemorrhages. Those
(3) hemorrhages were caused by deep-seated pressure
(4) most probably by 2 knees.
(5) Q. Now, can you tell me when those deep knee
(6) pressures might have occurred?
(7) A. Yes. During the scuffle when he was lying on
(8) the ground. I do not believe they occurred
(9) while he was in the car. I have no information
(10) that anybody got on his back while he was in
(11) the car, and I sure don't think that the EMTs
(12) did it, and I sure don't think that the
(13) emergency room doctor did.
(14) Q. All right. You have information as to what
(15) happened on the scene. Do you know whether
(16) Mr. Owensby might have had those injuries
(17) inflicted to him before the incident?
(18) A. Oh, I see. A prior altercation. I see. No.
(19) I see. I see. No, I have no — no, I have no
(20) such information, no. If you have that, then
(21) that would have to be given to me. I did see
(22) in a videotape shown to me this morning
(23) Mr. Owensby was standing up at the counter of a
(24) kind of a small take-out store, whatever, and
(25) while you could walk with those hemorrhages, he

Case 1:01-cv-00769-SAS   Document 159-13   Filed 05/20/2004   Page 10 of 12

BSA   OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04   XMAX(46/187)

Page 181

(1) did not seem to be in any distress.
(2) His distress appears to have
(3) commenced at some time after the altercation
(4) occurred. If you have knowledge that he was in
(5) some kind of an altercation before and somebody
(6) was leaning on his back, then, obviously, it
(7) would have been your duty and responsibility or
(8) somebody's to have introduced that at the trial
(9) of Officer Jorg. Perhaps it was. Maybe that's
(10) why he was acquitted.
(11) Q. Well, without all that speculation since I
(12) didn't represent him --
(13) A. No, sir. I'm responding to your speculation.
(14) I'm speculating in response to your
(15) speculation. I can only conjecture piled on
(16) top of your conjecture.
(17) Q. No. I'm just asking whether or not you can
(18) state with any reasonable medical certainty
(19) that these injuries were not inflicted at an
(20) earlier time?
(21) A. Yes, I can, based upon what I saw in the video,
(22) based upon the information given to me, based
(23) upon the fact that deep into this case all
(24) these years later, I'm hearing this for the
(25) first time, and you're very competent,

Page 182

(1) experienced trial attorneys who have done a
(2) tremendous amount of homework going in here.
(3) Yes. I can express with reasonable medical
(4) certainty that these were not inflicted prior
(5) to the scuffle with the officers.
(6) Q. All right. That's -- that's what I was trying
(7) to ask you. With regard to Officer Caton, what
(8) position do you -- what information do you have
(9) as to what position Officer Caton was in with
(10) relation to Mr. Owensby's back?
(11) A. Just what's in my report, that he worked on the
(12) right arm and that he acknowledged making 5
(13) open palm strikes on the right side of the body
(14) below the rib cage, forearm, never struck him
(15) after he was handcuffed. That's all I have.
(16) Q. Well, where do you have him anywhere in your
(17) report positioned on Mr. Owensby's back?
(18) A. I don't know. If I don't have it in the
(19) report, then I don't have it.
(20) Q. All right. I thought you said that that was a
(21) contributing factor to Mr. Owensby's death is
(22) the pressure that Mr. Caton put on him from
(23) being on his back.
(24) A. I think I was asked if that had been the case,
(25) would such pressure have possibly been a

Page 183

(1) contributing factor and to which I said yes,
(2) and that did come from somebody because I do
(3) see that it is attributable to Officer Caton on
(4) the last page of my September 10 report. So it
(5) came from somewhere in the materials. This was
(6) written before I ever had contact with
(7) Mr. Martin or Mr. Morgan.
(8) So it came from the city or the
(9) documents supplied to me from the city. I
(10) mean, I didn't make it up. I mean, I would
(11) have said somebody. If I said Caton, it had to
(12) be given to me or contained somewhere in some
(13) record.
(14) Q. Okay. And you say in there these would include
(15) the use of mace by Officer Hunter, the pressure
(16) that was applied to Mr. Owensby's back by
(17) Officer Caton, and I'm asking you where in the
(18) information did you get the information -- in
(19) the testimony did you get the information that
(20) Mr. Caton was on Mr. Owensby's back?
(21) A. At this point, I cannot refer you to a specific
(22) document. I believe that it would be contained
(23) in one of the documents that have been sent to
(24) me.
(25) Q. All right. And let me ask you about the

Page 184

(1) statements you make about Officer Jorg's bar
(2) hold. You say that, of course, is your
(3) statement; right?
(4) A. Yes. The bar hold -- bar hold is my
(5) terminology.
(6) Q. All right. Put in quotes. I wasn't sure
(7) whether you were trying to quote Officer Jorg
(8) or -- I didn't realize that was your quotation
(9) marks there. In your report earlier -- I think
(10) it's on Page 14, if you can go there?
(11) A. Yes.
(12) Q. Not there. Hang on a minute. Page 15. I'm
(13) sorry, Doctor. You have some things in there
(14) that say what are choke holds; is that correct?
(15) A. Yes.
(16) Q. And you define 2 of them used by law
(17) enforcement, those being a bar arm hold and a
(18) carotid sleeper hold. Are you referring when
(19) you say bar hold from Jorg that this was a bar
(20) arm hold he used?
(21) A. No.
(22) Q. What's the difference between a bar hold and a
(23) bar arm hold?
(24) A. Bar arm hold -- the difference between a bar
(25) arm hold and what else?

Page 181 to Page 184
www.akf.com
AKF Reporters, Inc.
Pittsburgh - Erie
depo@akf.com

Case 1:01-cv-00769-SAS   Document 159-13   Filed 05/20/2004   Page 11 of 12

BSA   OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04   XMAX(47/188)

Page 185

(1) Q. And a bar hold?
(2) A. Well, there is no difference. I mean, bar --
(3) it's called technically a bar arm hole.
(4) Q. So you're stating that Mr. Jorg applied a choke
(5) hold?
(6) A. No. I can only go with his description, and as
(7) I said, bar hold was my use of words. Officer
(8) Jorg talked about grabbing Mr. Owensby's neck
(9) in what he called a mandibular angle hold.
(10) Q. He said he grabbed Officer Jorg -- or
(11) Mr. Owensby's neck?
(12) A. Well, the mandibular angle is the upper neck,
(13) yes.
(14) Q. You said he grabbed him. Is that what you
(15) meant? Do you have information that he grabbed
(16) his --
(17) A. What do you mean grabbed? I don't understand.
(18) Q. You just said it, Doctor. I didn't. You just
(19) said it.
(20) A. Yes. Grab. When you reach out to capture
(21) something in your hand, you are grabbing it.
(22) Q. Did you ever hear of the use of a term head
(23) wrap?
(24) A. Yes. Head wrap -- well, a head wrap has no
(25) specific technical term. I know that he also

Page 186

(1) spoke about holding Mr. Owensby's forehead. I
(2) think he referred to it as a head wrap in
(3) addition to a mandibular angle hold.
(4) Q. Right. Are you aware of the use of a
(5) mandibular angle hold by police officers?
(6) A. No.
(7) Q. You've never heard that police officers are
(8) taught that technique?
(9)    MR. MORGAN:   Objection.
(10) A. No. I don't recall.
(11) Q. In all the years you've been a forensic
(12) pathologist and worked with the police, you've
(13) never heard of that; right?
(14)    MR. MORGAN:   Object to the form.
(15) A. That's correct.
(16) Q. I don't have any further questions.
(17) A. If you look in the forensic pathology
(18) textbooks -- here's a bit of free information.
(19) As a witness, I'm supposed to know enough not
(20) to volunteer, but I'll give you the courtesy of
(21) all your efforts, sir. You look in DeMayo,
(22) DeMayo, Knight, Werner, Spitz, Fisher, and you
(23) see if they have a mandibular angle discussion
(24) in their -- 3 of the best textbooks, and I'll
(25) give you some more textbooks if you want some

Page 187

(1) more references. You find it for me.
(2)    MR. HARDIN:   Thank you, very much.
(3)    ----
(4) (There was a brief pause in the proceedings.)
(5)    ----
(6)    RE-EXAMINATION
(7)    ----
(8) BY MR. MORGAN:
(9) Q. Very briefly, Dr. Wecht, first of all, did the
(10) city make you aware that your report had been
(11) disseminated to the public and quoted in
(12) newspaper articles in Cincinnati?
(13)    MR. FREUND:   Same objection. Same
(14) reasons. Continuing, Rick?
(15)    MR. MORGAN:   Sure.
(16) A. Yes. In one of the letters, Mr. Gissiner
(17) specifically referred, I think -- but, yes, he
(18) had made me aware that -- and I think he sent
(19) me a copy. I don't see it. I don't usually
(20) save newspaper articles, or in the file, I may
(21) have saved it for my personal memorabilia, but
(22) he did send it to me because, nobody else,
(23) because I've seen it, and I know that I got it
(24) from him or his office. I shouldn't say him.
(25) From somebody in his office.

Page 188

(1) Q. To the best of your knowledge, Doctor, is today
(2) the first time that you've ever spoken to an
(3) attorney representing the City of Cincinnati,
(4) to the best of your knowledge?
(5) A. My answer --
(6)    ----
(7) (There was a discussion off the record.)
(8)    ----
(9) A. My answer is the same as I gave before. I
(10) don't recall an attorney, but I can't say that
(11) that's not possible that there had been such a
(12) phone call or that among the 6 to 8 people who
(13) were in my office on August 14 at 2002, that
(14) one them might have been an attorney. I don't
(15) know. I never received any correspondence from
(16) an attorney.
(17) Q. And to your knowledge, did you ever speak with
(18) anyone representing the Owensby family
(19) personally has opposed to --
(20) A. No, I don't -- no. Well, Mr. Martin.
(21) Q. Okay.
(22) A. And you today.
(23) Q. Today.
(24) A. Yeah.
(25) Q. You spoke of -- you were questioned about

```
 1  COMMONWEALTH OF PENNSYLVANIA )        CERTIFICATE
 2  COUNTY OF ALLEGHENY          )    SS:
 3         I, Anthony Jude Cordova, RPR, a Court Reporter
 4  and Notary Public in and for the Commonwealth of
 5  Pennsylvania, do hereby certify that the witness,
 6  Cyril Wecht, was by me first duly sworn to testify to
 7  the truth, the whole truth, and nothing but the
 8  truth; that the foregoing deposition was taken at the
 9  time and place stated herein; and that the said
10  deposition was recorded stenographically by me and
11  then reduced to printing under my direction, and
12  constitutes a true record of the testimony given by
13  said witness.
14         I further certify that the inspection, reading
15  and signing of said deposition were waived by counsel
16  for the respective parties and by the witness.
17         I further certify that I am not a relative or
18  employee of any of the parties, or a relative or
19  employee of either counsel, and that I am in no way
20  interested directly or indirectly in this action.
21         IN WITNESS WHEREOF, I have hereunto set my hand
22  and affixed my seal of office this 4th day of March,
23  2004.
24                          _____
25                                  Notary Public
```

*Anthony Jude Cordova* (signature)

NOTARIAL SEAL
Anthony J. Cordova, Notary Public
City of Pittsburgh, Allegheny County
My commission expires June 14, 2007

Pittsburgh, PA       Greensburg, PA       Erie, PA
412-261-2323    /    724-853-7700    /    814-453-5700

