UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| ESTATE OF : <br> ROGER D. OWENSBY JR., et al., : <br> : <br> Plaintiff, : <br> : <br> v. : <br> : <br> CITY OF CINCINNATI, et al., : <br> : <br> Defendants. : | Case No. 01-CV-769 <br><br> Senior Judge S. Arthur Spiegel <br><br> Magistrate Judge Timothy S. Black |

**PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF HIS MOTION TO EXCLUDE EVIDENCE OF ILLEGAL DRUGS ALLEGEDLY FOUND ON OR NEAR ROGER OWENSBY, JR. ON NOVEMBER 7, 2000 (Doc. 146)**

**I.    INTRODUCTION.**

It is undisputed that no police officer involved in the beating and death of Roger Owensby, Jr. knew the contents of his pants pockets on November 7, 2000. The issue is admittedly irrelevant. Plaintiff thus moved this Court for an order precluding any argument or evidence regarding baggies of marijuana and crack cocaine that were supposedly "found" on (or maybe just near) Mr. Owensby's body at University Hospital an hour after he died. Doc. 146.

In opposing our motion, defendant City of Cincinnati does not claim that any officer knew about the baggies. Doc. 153. That is, the City does not say the officers who beat Mr. Owensby, or who left Mr. Owensby to die in the back of the Golf Manor cruiser, did so because of the baggies. That would have been an impossibility since nobody at the scene knew anything about these items allegedly "found" near Mr. Owensby's body much later. The City therefore spends very little time in its opposition addressing the baggies at all.

Instead, the City devotes most of its memo speculating about things that are not germane to this motion. In the City's view, our motion is not simply about the baggies, but actually seeks "to exclude all evidence of decedent's illegal drug possession, illegal drug dealing and drug investigation obstruction activities." Opposition at 4. The City is mistaken. The relief we seek by this motion is altogether more narrow: Exclusion of "evidence" or argument regarding the *baggies*.

Though clearly incorrect, the City's conception of this motion provides a springboard to first get past the baggies (since that "evidence" is indisputably irrelevant) and then to incorrectly assert, based on wildly inaccurate statements of "fact," that Mr. Owensby was a "drug dealer" or "assaulted" a police officer or "obstructed a drug investigation."[1] It is the City's theory of relevance—and the City's *only* theory of relevance—that these falsehoods, along with the "evidence" of the baggies of illegal drugs, are admissible evidence of the "state of mind" of both Mr. Owensby and the defendant officers who killed him on November 7.

Regarding the baggies, which is the sole issue presented in this motion, the City is both factually and legally incorrect. Again, no officer had a "state of mind" that included thoughts of the baggies. If Mr. Owensby did have illegal drugs in his pocket,

---

[1] The City proffers no evidence that Mr. Owensby was a "drug dealer." The City lists no witnesses in the Joint Final Pretrial Order whose summary says so, and the inadmissible misdemeanor and traffic offenses listed as exhibits by the City are not for drug dealing. Officer Hunter has testified that whoever it was who ran from him on September 27, 2000, even if it was Mr. Owensby, did not assault Officer Hunter. Attached Exhibit A, Hunter Depo., p. 143:16-18. Nor is Mr. Owensby's use as a punching bag by Officers Caton and Jorg on November 7, 2000 in any manner an "assault" on a police officer. As for obstructing a drug investigation, no conduct of the man who ran on September 27 amounted to such an offense. *See infra* at pp. 4-7; Doc. 88, Plaintiff's Motion for Partial Summary Judgment, at 17-22.

he didn't tell anyone and, in fact, he approached five uniformed Cincinnati Police officers in three marked cruisers, and then consented to a thorough pat-down search of his person during which no drugs were found.  It was only an hour after Mr. Owensby died (that is, an hour after these defendants were done violating Mr. Owensby's constitutional rights and wrongfully causing his death) that the baggies were suddenly "found" somewhere near Mr. Owensby's dead body miles away at University Hospital.

Finally, were the facts of this case different, such that the baggies were known to the officers before they violently beat Mr. Owensby, it would come to nothing.  The United States Supreme Court held long ago that "state of mind" evidence is irrelevant in determining whether police officers violated 42 U.S.C. § 1983 by using excessive force during an arrest.  Graham v. Connor, 490 U.S. 386, 397 (1989).  The officers' conduct is measured, instead, by an "objective reasonableness" standard that appropriately does not account for anybody's—not the officers' nor Mr. Owensby's—subjective "state of mind."

Plaintiff's Motion to Exclude Evidence of Illegal Drugs Allegedly Found On Or Near Roger Owensby, Jr. On November 7, 2000 (Doc. 146) should thus be granted.

## II.     FACTS: THE BAGGIES LATER FOUND ON OR NEAR MR. OWENSBY PLAYED NO PART IN HIS DEATH.

The only fact of consequence to this motion is undisputed: None of the defendant officers who beat Mr. Owensby and then left him to die knew anything about baggies of illegal drugs that may have been in his pocket.  It is further undisputed that the *only* reason any officer felt there was probable cause to arrest Mr. Owensby was because defendant Officer Hunter thought Mr. Owensby had run from him several

weeks earlier.[2] The baggies, no matter where they actually were prior to conveniently surfacing at University Hospital, could therefore not logically have played any role in the excessive force used against Mr. Owensby on November 7.

In an apparent effort to obscure this fact, the City's opposition discusses other aspects of the events of September 27 and November 7, 2000. Though irrelevant to this motion, and recognizing that this Court recently conducted a painstaking analysis of what undisputedly occurred both on September 27 and November 7 (Doc. 156), we respond briefly to the numerous inaccuracies contained in the City's memo.

### A.    September 27, 2000.

The City claims that on September 27 near Sam's Carryout, defendant Officers Hunter and Jorg "saw three to four persons engage in illegal drug activity." Opposition at 1. Actually, Hunter and Jorg (working in plain clothes) only *thought* they were witnessing drug activity. They detained two of the individuals at Sam's and learned that they had no drugs and no large sums of money associated with drug trafficking.[3] No charges of any kind involving drugs were ever filed by these officers against these citizens.

Officer Hunter followed the other two suspects across Seymour Avenue into Huntington Meadows apartment complex. As he did so, Officer Hunter claims that an unidentified man standing nearby said "The boys" or "Five-O," which prompted the two

---

[2] Doc. 146, Plaintiff's Motion To Exclude Evidence of Illegal Drugs Found On Or Near Roger Owensby, Jr. On November 7, 2000 ("Motion"), at Ex. C, Jorg Depo., pp. 11:11 - 12:2; Motion at Ex. D, Caton Depo., p. 23:3 - 11.

[3] Attached Exhibit A, Hunter Depo., pp. 87:10 - 89:3. These two suspects were charged only with criminal trespass and having an open container of beer. *Id*.

suspects from Sam's to run.[4]  Officer Hunter did not pursue them, but instead approached and put his arm around the unidentified man, who did not know that the plain-clothes Officer Hunter was even a police officer.  Only after Officer Hunter pulled his badge from under his shirt, and told the man he shouldn't warn others of police presence, did the man pull away and run.[5]  *This man was not involved in any drug activity and was not told by Officer Hunter that he was under arrest for anything.*[6]  Officer Hunter drew his weapon, chased the stranger through Huntington Meadows, and eventually tried to mace him—except Officer Hunter ended up macing himself.[7]  The unidentified man disappeared into an apartment building.  Officer Hunter now claims that the man committed the crime of jaywalking during the pursuit.[8]

Though the City assumes this unidentified man was Mr. Owensby, his true identity is disputed and may never be known.  But even should the City somehow convince the jury that this man was, in fact, Mr. Owensby, the City's remarkably speculative conclusions about the events of September 27 are based on several false or misleading statements of "fact."  For instance, the City repeatedly claims that this unidentified man "violently resisted arrest" on September 27, and that Officer Hunter

---

[4] Motion at Ex. A, Hunter Depo., pp. 74:13 - 75:7.

[5] Attached Exhibit A, Hunter Depo., pp. 56:10-18, 77:17 - 78:17.

[6] In its recent summary judgment Order, this Court found it "undisputed" that this unidentified man "had no involvement in the suspected drug transaction at issue."  Doc. 156 at 8 n. 3.

[7] Attached Exhibit A, Hunter Depo., pp. 57:2-19, 81:10 - 84:2.

[8] Attached Exhibit A, Hunter Depo., p. 94:16-23.

"stated that the decedent . . . assaulted him during the [September 27] incident." Opposition at 3, 6 and 9.  In truth, Officer Hunter—the only person to come into contact with this unidentified man or even see him—stated that the man who ran from him did *not* assault him, push him or react violently in any way.[9]

The City also says that on September 27 Mr. Owensby was "at the site of a four-person illegal drug exchange.  Decedent's act of tipping these suspects, so they could avoid arrest, shows decedent knew these suspects and, at a minimum, condoned illegal drug dealing."  Opposition at 7.  Bounding great chasms of missing facts and logic, the City claims that Mr. Owensby (Opposition at 8):

> associated and tipped known drug dealers in the face of an ongoing police investigation.  The fact decedent was willing to commit obstruction to assist drug dealer friends, at a time Officer Hunter and Officer Jorg saw these friends commit a drug exchange, strongly suggests the decedent knew of and approved of these friends' drug activities.  Additionally, these facts strongly suggest decedent participated in drug dealing himself; the focus of a police investigation in the subject neighborhood.

The City is lost in layers of speculation that are either unsupported or flatly contradicted by the record.  There is no evidence of an illegal drug exchange on September 27; the unidentified man was not one of the four people that Hunter and Jorg mistakenly thought were dealing drugs; he was not at Sam's Carryout, but across the street deep in Huntington Meadows; there is no evidence that he knew any of the four original suspects, much less that they were "friends" who were "known drug dealers" and that he "approved" of or "condoned" that activity; and there is absolutely no basis to claim that this unidentified man "participated in drug dealing himself."  Despite

---

[9] Attached Exhibit A, Hunter Depo., p. 143:16-18.

years of investigations, charges, hearings, trials, interviews and depositions, the City provides this Court with not one citation to admissible evidence to back up any of these reckless statements.

As to the City's repeated claims that the man from September 27 was wanted for obstruction of justice, the facts simply do not support such a charge.[10]  There is no evidence of the underlying offense of drug trafficking; no evidence that the person knew of any drug trafficking, much less any investigation; the person's statement of "The boys" or "Five-O" did not prevent Hunter from making his arrest; and the act of fleeing from a police officer does not constitute obstruction.  Thus, the only valid charge against whomever Officer Hunter confronted on September 27 was jaywalking—a charge to which the person had a viable defense when one considers that he was being chased by a man in plain clothes wielding a gun.

**B.    November 7, 2000.**

The City's inaccurate statement of the "facts" of September 27 is followed by an equally warped rendition of what occurred on the evening of November 7.  Ignoring several important and undisputed facts, the City claims the confrontation between Mr. Owensby and Officers Jorg, Caton and Hunter outside the Sunoco convenience store began this way: "After the decedent exited the store, Officer Jorg reached for his handcuffs and attempted to inform decedent he was under arrest."  Opposition at 3.  In other words, the City implies that Mr. Owensby tried to slip away from the police

---

[10] *See, e.g., State v. Bronaugh*, 69 Ohio App. 2d 24, 25-26, 429 N.E.2d 1084, 1086 (1st App. Dist. 1980); *State v. Cooper*, 151 Ohio App. 3d 790, 786 N.E.2d 88 (2nd App. Dist. 2003); and *State v. Rowland*, 67 Ohio St. 3d 374, 382, 618 N.E.2d 138, 145 (1993) (defendant's avoidance of police is not an illegal act).

*immediately* upon being confronted.

In fact, all the defendant officers admit that before that happened, Mr. Owensby had casually walked past them—past five uniformed police officers standing next to three marked cruisers—which prompted Officer Jorg to remark that "he has a lot of balls showing up here" or "Well, he's got a lot of balls to come out here and all these police officers and all these cruisers out here."[11]  Of course, walking down a public street in front of the police is not courageous at all if Mr. Owensby was not the person who ran from Officer Hunter five weeks earlier and had no contraband on his person.[12]

Then, upon being stopped outside the Sunoco store, Mr. Owensby patiently answered many questions regarding who he was, why he was there, and where he was going.[13]  Officer Jorg says that Mr. Owensby was cooperative and respectful throughout this questioning.[14]

Mr. Owensby also let Officer Jorg conduct a thorough pat-down of his person, which revealed no weapons, illegal drugs, or any other reason to further detain him.[15]  Importantly, Officer Jorg specifically stated that he did not feel anything during the pat-

---

[11] Motion at Ex. B, Sellers Depo., p. 35:9-12; Motion at Ex. C, Jorg Depo., p. 87:17-19; Motion at Ex. A, Hunter Depo., p. 126:14-20.

[12] Motion at Ex. D, Caton Depo., p. 81:2-4.

[13] Motion at Ex. C, Jorg Depo., p. 99:2 - 100:13; Motion at Ex. D, Caton Depo., p. 90:7 - 91:15.

[14] Motion at Ex. C, Jorg Depo., p. 100:17-20.

[15] Motion at Ex. C, Jorg Depo., p. 101:3-6; Motion at Ex. D, Caton Depo., pp. 90:17 - 91:7.

down search that he thought might be crack cocaine in Mr. Owensby's pockets.[16] The City ignores this critical fact. The thorough search is both fully described by Officer Jorg and visible on the Sunoco convenience store surveillance video. It strains even the City's logic for Mr. Owensby to willingly consent to a search of his person if he is carrying illegal substances.

The questioning of Mr. Owensby continued, though, with the officers asking him if he had ever struck a police officer or run from the police; Mr. Owensby said that he had not.[17] Mr. Owensby attempted politely to diffuse the escalating situation, saying to the officers that "I don't appreciate you coming at me this way."[18] Unfortunately for Mr. Owensby, nothing was to deter these officers on this night. Officer Hunter approached very close, got into Mr. Owensby's personal space, and said, "Really? When's the last time you ran from the police?" Hunter then said: "That's the guy." This unwanted and unjustified confrontation triggered a "flight response" from Mr. Owensby.[19]

The true facts thus simply do not support the City's chosen portrait of Mr. Owensby as someone desperate to elude police. If, as the City posits, Mr. Owensby had run from police several weeks earlier, had obstructed a police investigation, and was a drug dealer and a police assaulter, why would he deliberately walk anywhere near the show of force loitering outside Sam's Carryout? More to the point of the

---

[16] Motion at Ex. C, Jorg Depo., pp. 104:23 - 106:10.

[17] Motion at Ex. C, Jorg Depo., p. 101:10-17.

[18] Motion at Ex. D, Caton Depo., pp. 90:15-16, 92:15-18.

[19] Motion at Ex. D, Caton Depo., pp. 95:5-7, 98:8-10.

current motion, if Mr. Owensby really did have baggies of marijuana and crack cocaine in his pocket, why would he wait until *after* being thoroughly searched (and interrogated) to make a getaway, particularly when the search had failed to reveal the baggies?  The City has no logical answers for these questions, and for good reason: Mr. Owensby's behavior on the night of November 7 is patently inconsistent with the City's fantastically incorrect, unsupported and after-the-fact effort to smear him as a drug-carrying, drug-dealing, cop-assaulting outlaw.[20]

Finally, the City refuses to explain the gaping holes in the "evidence" regarding how the baggies of illegal drugs were "found" on (or near) Mr. Owensby's body in the first place.  Relying generally on Nurse Sue Flottemesch's testimony, the City claims that "there is absolutely no evidence in this case to support the plaintiffs' speculation that the police might have planted or tampered with this evidence at any time."  Opposition at 11.  To the contrary, such evidence abounds.

As made clear in our moving papers, Doc. 146 at 7-11, Nurse Flottemesch's testimony is contradicted by the Cincinnati Police Department Investigative Log.  She says she personally removed the baggies from Mr. Owensby's pants, while the Log says they "dropped out."  Perhaps more curious, the Log claims that Nurse Flottemesch surrendered the baggies to Detective Mary Turner.  Yet Officer Cynthia Alexander, who described how the baggies were recovered in her "Police Officer's Notes" written on the evening of November 7, makes no mention of someone named "Detective Mary

---

[20] Indeed, as already noted (Motion at 6-7), an autopsy performed within hours of Mr. Owensby's death confirmed that there was no cocaine or alcohol in his system.

Turner"—only that the baggies were "released to Randolph at CIS."[21]  And paramedic Craig Coburn provides yet another account, saying that an unidentified male police officer came into Mr. Owensby's emergency room and proceeded "going through" Mr. Owensby's pants.  The City does not say who this man was or what he was doing there.

Nor does the City even attempt to explain how these drugs did not turn up in Officer Jorg's thorough and videotaped search of Mr. Owensby.  And how do such drugs "drop out" of Mr. Owensby's pocket an hour after he dies but not when he is pummeled, beaten, dragged and thrown into a police cruiser by several officers, then dragged unconscious from the same cruiser, remaining in handcuffs while several officers and emergency medical technicians administer CPR?

Beyond all this confusion, the City has tried and failed on multiple occasions to find Mr. Owensby's fingerprints on the baggies.  They just aren't there.  The City also refuses to explain, despite being ordered to do so by this Court, the one hour disappearance of the baggies on November 27, 2000—when they were supposedly tested for fingerprints, though no results of that test have been produced in this case.  The drugs were not found in Mr. Owensby's pockets when he was searched, not found at the scene of what the City calls a "horrific" struggle, not found by any of the dozen officers present there, and there was no crack cocaine found in his blood although specifically looked for by the coroner.  Notwithstanding the City's contrary assertion, the evidence that the baggies were planted on Mr. Owensby is disturbingly strong.

---

[21] Attached Exhibit B.  Curiously, the City's list of witnesses submitted with the Joint Final Pretrial Order identifies Officers Alexander and Randolph, but not "Detective Mary Turner."  How can the City even begin to establish a chain of custody for the baggies when the person who allegedly took possession of them will not testify?

### III. NEITHER THE DEFENDANT OFFICERS' NOR MR. OWENSBY'S "STATE OF MIND" IS RELEVANT TO THE EXCESSIVE FORCE CLAIMS IN THIS CASE.

Of the issues left for trial, the City says that "evidence" of baggies of illegal drugs "found" near Mr. Owensby is relevant to only one issue: The Cincinnati defendants' violation of § 1983 regarding their excessive use of force in arresting Mr. Owensby. More specifically, the City argues that "evidence" of the baggies (in concert with the City's unsupported and reckless speculation of drug dealing, drug connections, drug activities, etc.) must be presented so the jury can consider the "state of mind" of the officers, and also the "state of mind" of Mr. Owensby. The City is mistaken.

As to the officers' "state of mind," the City claims that (Opposition at 8):

> reasonable jurors will interpret decedent's acts of fleeing and violently resisting as proof that the officers' felt much more serious violations than jaywalking had occurred. The officers' state of mind when they employed use of force techniques, after Officer Hunter positively identified decedent as a drug suspect who obstructed a police drug investigation, bears directly on the appropriate amount of force under the circumstances.

Noticeably absent from this theory of "state of mind" relevance is any mention of the baggies of marijuana and crack cocaine. There is an obvious reason for this: ***The defendants had no idea that Mr. Owensby might have had drugs in his pocket, so their "use of force techniques" could not have been influenced by later-found "evidence" of the baggies***. How does something they do not know is present influence the officers' "state of mind"? The City simply refuses to address this point.

The City's "state of mind" defense is also contrary to the law, which the City tacitly acknowledges by failing to support its "state of mind" theory with even a single citation to authority. It is well-settled that § 1983 claims involving excessive force are

-12-

analyzed under the Fourth Amendment's "objective reasonableness" standard.  As the United States Supreme Court held long ago:

> As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. See *Scott v. United States, 436 U.S. 128, 137-139 (1978);* see also *Terry v. Ohio, supra, at 21* (in analyzing the reasonableness of a particular search or seizure, "it is imperative that the facts be judged against an objective standard").  **An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.**  See *Scott v. United States, supra, at 138,* citing *United States v. Robinson,* 414 U.S. 218 (1973).[22]

Thus, the "reasonableness" of a particular use of force must be judged objectively from the perspective of a reasonable officer on the scene in light of the totality of the circumstances.[23]  The defendant officers' subjective "state of mind" cannot now be used to somehow justify their deadly use of force in arresting Mr. Owensby.

Since the defendant officers' "state of mind" is irrelevant, the City next claims (also without citation to authority) that perhaps the "evidence" of the baggies is relevant because it goes to Mr. Owensby's "state of mind":  "Moreover, the jury will question the decedent's state of mind when he fled and violently kicked the officers during arrest." Opposition at 8.  The City apparently wants to argue that Mr. Owensby ran, and then "violently" resisted arrest, because he had illegal drugs in his pocket.

But the City never explains why the *reasons* for Mr. Owensby's flight response,

---

[22] Graham v. Connor, 490 U.S. 386, 397 (1989) (emphasis added).

[23] Graham, 490 U.S. at 396-97; Darrah v. City of Oak Park, 225 F.3d 301, 307 (6th Cir. 2001).

or the *reasons* for his level of resistence, could in any fashion affect the "objective reasonableness" of the defendant officers' use of force under the Fourth Amendment. Again, under <u>Graham</u>, the officers' conduct must be measured from the objective viewpoint of a reasonable officer confronted with the circumstances of November 7. One of those circumstances was *not* the defendant officers' knowledge of Mr. Owensby's "state of mind." Mr. Owensby did not scream out his motives, and although he was asked and he answered many questions, no one ever asked him why an African American citizen who was being grilled by several officers in his face might decide he'd rather take his leave of them.

Thus, the appropriate inquiry is whether "reasonable" force was used in response to the *fact* of Mr. Owensby's flight, or to the *fact* of his level of resistence. Excessive force claims are judged not by what the victim might have been thinking, but instead by the officers' *actions* in light of the victim's *actions*.

Having ignored the law, the City complains that if this motion is granted, "the defendant officers will be unable to provide the jury with the truth behind the decedent's arrest." Opposition at 7. The City's concerns are unfounded, particularly in light of the very limited scope of this motion. While the City's idea of the "true" reasons for Mr. Owensby's arrest—not just jaywalking, but also obstruction, assault and whatever else it can come up with before trial—bear little resemblance to reality, one thing is certain: No officer was arresting Mr. Owensby for drug possession, so the baggies allegedly later "found" on him could not bear on the constitutional propriety of his arrest, much less on the "state of mind" of anyone.

IV. **EVEN IF SOMEHOW RELEVANT, THE "EVIDENCE" OR ARGUMENT REGARDING THE BAGGIES SHOULD BE EXCLUDED UNDER EVIDENCE RULE 403 AS UNFAIRLY PREJUDICIAL, CONFUSING AND MISLEADING.**

If this Court finds that the "evidence" regarding the baggies is relevant to some other issue in this case that is not mentioned or addressed by the City, it should be excluded under Rule 403, Fed. R. Evid. Since the baggies are clearly not relevant to the defendants' liability under § 1983 or Ohio's Wrongful Death law, presentation of that "evidence" for another, collateral reason would not simply present a "danger" of resulting "unfair prejudice, confusion of the issues, or misleading the jury[.]" The prejudice, confusion and misleading would be *real and substantial*.

The City has made no secret—and has even warned everybody by its opposition to this motion—that through baseless speculation it intends to assassinate Mr. Owensby's character at every turn, including by arguing to the jury that its officers' "force techniques" were somehow justified by the baggies that nobody on the scene knew about. Though such "evidence" is not relevant to the defendants' liability, if it is before the jury for any reason the City will achieve its goal: Unfair, confusing and misleading innuendo that perhaps the baggies *are* somehow relevant, and maybe *do* provide justification for the officers' abhorrent conduct. This is exactly the type of evidence that Rule 403 was intended to reach and exclude. *See, e.g.*, Meller v. Heil Co., 745 F.2d 1297, 1303 (10th Cir.), *cert. denied*, 467 U.S. 1206 (1984) (in wrongful death case, evidence of drug paraphernalia found near the decedent was excluded because it was being introduced "for the specific purpose of arousing juror sentiment against the decedent.")

Finally, the "evidence" of the baggies has no probative value regarding the appropriate measure of damages in this case. The City has proffered no testimony (expert or otherwise), no evidence and no argument to suggest that mere possession of baggies of marijuana or crack cocaine—even if the City could somehow convince the jury that the baggies were in Mr. Owensby's pockets prior to being arrested, beaten and left to die—relates to Mr. Owensby's life expectancy; future earning potential; future provision of household services; pain and suffering; loss of enjoyment of life; or any other aspect of how damages will be measured in this case. The City is silent on this issue because there is no connection between the baggies and damages.

In fact, beyond the highly suspicious "evidence" of the "found" baggies in this case, there is no evidence that Mr. Owensby ever used or possessed crack cocaine in his life. And, again, the Coroner confirmed that Mr. Owensby had no crack cocaine in his system when he died. The baggies thus simply have no relevance to this case at all. As was the situation in Meller, the City apparently has no specific reason to mention the baggies, but instead wants generally to "arouse juror sentiment" against Mr. Owensby and his family. This should not be permitted.[24]

## V. CONCLUSION.

In our motion we challenged the defendants to explain how the baggies played

---

[24] On a closely related topic, Plaintiff will shortly be filing a liminal motion to exclude evidence of Mr. Owensby's past misdemeanor convictions and arrests. Therein we demonstrate that such highly prejudicial "bad act" evidence (like the "evidence" of the baggies at issue in this motion) outweighs any potential value it might possibly have regarding damages. See, e.g., Gust v. Jones, 162 F.3d 587, 596 (10th Cir. 1998) and Toombs v. Manning, 835 F.2d 453, 469 (3rd Cir. 1987). Notably, nothing in even those inadmissible documents establishes Mr. Owensby as a crack user or a drug dealer or a cop-assaulter.

any role in the beating death of Mr. Owensby, or were in any way related to a claim or defense at issue in this case. The City has responded, but it was unable to draw such a connection. Thus, all argument or evidence regarding baggies of illegal drugs allegedly "found" on or near Mr. Owensby's body should be excluded from trial pursuant to Evidence Rules 401 and 402 as both legally and factually irrelevant, or pursuant to Evidence Rue 403 as unfairly prejudicial, confusing and misleading.

Rather than simply address the narrow relief sought by our motion, the City essentially ignored the baggies and used its opposition papers to smear Mr. Owensby through distortion, speculation, and, all too often, outright falsehoods—all in a preview of how it hopes to present this case to the jury. Trial strategies aside, though, the City did not attend to this issue at hand: The City did not demonstrate the relevance of the baggies to the excessive force and wrongful death claims remaining, or to any other issue in this case. Plaintiff's Motion (Doc. 146) should therefore be granted, and all argument or "evidence" regarding the baggies of marijuana or crack cocaine allegedly "found" on (or near) Mr. Owensby's body should be excluded for all purposes.

Respectfully submitted,

/s/Paul B. Martins
James B. Helmer, Jr.   (0002878)
Paul B.  Martins (0007623
Frederick M. Morgan, Jr.  (0027687)
HELMER, MARTINS & MORGAN CO., LPA
Fourth & Walnut Centre
Suite 1900
105 East Fourth Street
Cincinnati, Ohio 45202-4008
Telephone:   (513) 421-2400
Facsimile:    (513) 421-7902

*Trial Attorneys for Plaintiff*

CERTIFICATE OF SERVICE

      I hereby certify that a copy of the foregoing **Plaintiff's Reply Memorandum In Support Of His Motion To Exclude Evidence Of Illegal Drugs Allegedly Found On Or Near Roger Owensby, Jr. On November 7, 2000** was electronically filed on May 27, 2004.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.


                                      <u>/s/ Paul B. Martins</u>