Case 1:01-cv-00769-SAS   Document 168-2   Filed 05/27/2004   Page 1 of 13

Owensby, et al. vs. City of Cincinnati  
November 6, 2003

DAVID WILLIAM HUNTER, JR.

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - - - -

| | |
|---|---|
| ESTATE OF ROGER D. OWENSBY JR., et al., | : |
| | : |
| Plaintiffs, | : Case No. 01-CV-769 |
| vs. | : (Judge S. A. Spiegel) |
| | : |
| CITY OF CINCINNATI, et al., | : VOLUME I |
| | : |
| Defendants. | : |

- - - - - - - - - - - - - - - -

Videotaped deposition of DAVID WILLIAM HUNTER JR., a witness herein, called by the plaintiffs for cross-examination, pursuant to the Federal Rules of Civil Procedure, taken before me, Wendy Davies Welsh, a Registered Diplomate Reporter and Notary Public in and for the State of Ohio, at the offices of Helmer, Martins & Morgan Co. LPA, 1900 Fourth & Walnut Centre, 105 East Fourth Street, Cincinnati, Ohio, on Thursday, November 6, 2003, at 2:43 p.m.

Case 1:01-cv-00769-SAS   Document 168-2   Filed 05/27/2004   Page 2 of 13

Owensby, et al. vs. City of Cincinnati  
November 6, 2003

DAVID WILLIAM HUNTER, JR.

Page 2

```
1  APPEARANCES:

2     On behalf of the Plaintiffs:

3        Paul B. Martins, Esq.
         Don Stiens, Esq.
4        Frederick M. Morgan Jr., Esq.
         Helmer, Martins & Morgan Co. LPA
5        Suite 1900, Fourth & Walnut Centre
         105 East Fourth Street
6        Cincinnati, Ohio 45202
         Phone: (513) 421-2400
7
         John J. Helbling, Esq.
8        The Helbling Law Firm, L.L.C.
         3672 Springdale Road
9        Cincinnati, Ohio 45251
         Phone: (513) 923-9740
10
    On behalf of the Defendants City of Golf Manor,
11  Stephen Tilley, Roby Heiland and Chris
    Campbell:
12
         Wilson G. Weisenfelder Jr., Esq.,
13       Rendigs, Fry, Kiely & Dennis
         900 Fourth & Vine Tower
14       One West Fourth Street
         Cincinnati, Ohio 45202-3688
15       Phone: (513) 381-9200

16  On behalf of the Defendants City of Cincinnati,
    Darren Sellers, Jason Hodge:
17
         Geri Hernandez Geiler, Esq.
18       Assistant City Solicitor
              and
19       Julie F. Bissinger, Esq.
         Chief Counsel
20       Department of Law
         Room 214, City Hall
21       801 Plum Street
         Cincinnati, Ohio 45202
22       Phone: (513) 352-3346
```

Page 3

```
1  APPEARANCES (Continued):

2     On behalf of the Defendants Robert B. Jorg,
      Patrick Caton, Jason Hodge, Victor Spellen and
3     Darren Sellers:

4        Donald E. Hardin, Esq.
         Hardin, Lefton, Lazarus & Marks, LLC
5        915 Cincinnati Club Building
         30 Garfield Place
6        Cincinnati, Ohio 45202
         Phone: (513) 721-7300
7
      On behalf of the David William Hunter Jr.:
8
         Jay Clark, Esq.
9        114 East 8th Street
         Suite 400
10       Cincinnati, Ohio 45202
         Phone (513) 587-2887
11
    Also present:
12
    Richard W. Grubb, Videographer
13
    Lisa Damstrom, Law Clerk
14  Helmer, Martins & Morgan Co., L.P.A.

15  Mr. Roger Owensby

16  Mrs. Brenda Owensby

17

18                    - - -

19             S T I P U L A T I O N S
20
21     It is stipulated by and among counsel for the
22  respective parties that the deposition of DAVID
23  WILLIAM HUNTER JR., a witness herein, called by the
24  plaintiffs for cross-examination, pursuant to the
```

Page 4

1 Federal Rules of Civil Procedure, may be taken at
2 this time by the notary; that said deposition may be
3 reduced to writing in stenotype by the notary, whose
4 notes may then be transcribed out of the presence of
5 the witness; and that proof of the official
6 character and qualifications of the notary is
7 expressly waived.

                        - - -

                    I N D E X

    Examination by:              Page

    Mr. Martins . . . . . . .     5

                        - - -

                    E X H I B I T S

                                   Page

    Deposition Exhibit 6A .................   89
    Deposition Exhibit 54 .................   29
    Deposition Exhibit 55 .................   43
    Deposition Exhibit 56 .................   62
    Deposition Exhibit 57 .................   64
    Deposition Exhibit 58 .................   67

                        - - -

Page 5

1      VIDEOGRAPHER: Time is 2:43 p.m. The date
2  is November the 6th. The year is 2003.
3      If you'd please swear the witness, ma'am.
4      DAVID WILLIAM HUNTER JR.
5  being by me first duly cautioned and sworn, deposes
6  and says as follows:
7      VIDEOGRAPHER: We're on the record, Mr.
8  Martins. This is videotape number 1, sir.
9          CROSS-EXAMINATION
10 BY MR. MARTINS:
11    Q. Sir, would you state for the record your
12 full name, please.
13    A. David William Hunter Jr.
14    Q. And your age?
15    A. 36.
16    Q. Date of birth?
17    A. 5/20/67.
18    Q. What is your height?
19    A. 5' 7."
20    Q. And on November 7th of 2000 what was your
21 weight?
22    A. Approximately 175.
23    Q. Have you ever had your deposition taken
24 before?

Case 1:01-cv-00769-SAS   Document 168-2   Filed 05/27/2004   Page 3 of 13

Owensby, et al. vs. City of Cincinnati
November 6, 2003
DAVID WILLIAM HUNTER, JR.

Page 54

1 recollection of seeing Roger Owensby before
2 September of 2000?
3   A. N--
4   Q. Correct?
5   A. No. As far as what I just said.
6   Q. Right.
7   A. I know it's kind of confusing, but I'm
8 trying to answer as truthful as possible.
9   Q. Right. You have no recollection of seeing
10 Roger Owensby before September of 2000?
11   A. Right. Okay.
12   Q. Okay. Walk me through what happened in
13 September of 2000.
14   A. Me and Officer Jorg were working
15 plainclothes, old clothes, and we were doing an
16 investigation in front of the Sam's Drive Thru. It
17 was three to four individuals that we observed
18 making drug transactions. We wanted to stop those
19 individuals.
20       Officer Jorg stayed with -- with one or
21 two of the individuals and then two of the
22 individuals went across the street, across from
23 Sam's Drive Thru, across -- that would be Seymour,
24 in the direction of Huntington Meadows Apartment

Page 55

1 complex. So I responded across the street behind
2 them.
3       Another uniform car -- another uniform car
4 met me across the street, and that officer was
5 Officer Walker. I advised Officer Walker to go
6 around, because I wanted him to flank the two guys
7 we were trying to catch up to.
8       Because I could pretty much walk up to
9 them, because they probably wouldn't -- wouldn't
10 have taken me as being a police officer, but Officer
11 Walker was in uniform of the day.
12      After we had that discussion, I started in
13 one direction. Officer Walker started in another
14 direction. That's when Mr. Owensby alerted the
15 individuals that we were trying to catch up to to
16 apprehend that the police were coming and that we
17 were in the area. So they got away, because they
18 had a jump on us anyway, because -- and they're
19 already behind -- around the building.
20      So I walked up to Mr. Owensby and I put my
21 left hand on his shoulder. And I said, "What's up?"
22      And he replied, "What's up?"
23      And then I said, "You know, you can't be
24 doing what you just did."

Page 56

1      And he said, "What's that?" Or something
2 to that nature.
3      I said, "You can't be telling people" --
4 as I was saying this to him, I reached into my shirt
5 with my other hand. I was wearing my badge on a
6 chain around my neck. "You can't be telling --
7 you -- you can't be warning people that the -- the
8 police is here. That's -- and -- that's interfering
9 with an investi"--
10     As I was saying investigation or whatnot,
11 I flipped my badge out and it dropped down dangling
12 around my neck. When he saw my badge, he pushed me
13 off him, and I grabbed the back --
14     He had a hooded sweat shirt on. I grabbed
15 the back of his sweat shirt, and he tugged and
16 pulled and his sweat shirt ripped. And I was just
17 basically standing there holding his sweat shirt,
18 because he ripped right out of it.
19     At that point I -- I actually drew my
20 weapon. And I told him, "Don't move." You know,
21 "Freeze." He -- he kind of faked to the left, to
22 the right or whatever, and took off running. I had
23 no intention of shooting. I -- I didn't have the
24 authority to shoot him, and he probably knew that.

Page 57

1 That's why he probably took off running.
2      I gave chase. We ran through Huntington
3 Meadows, between the buildings, out onto Rhode
4 Island, into the intersection of Rhode Island and
5 Seymour.
6      Right there at the traffic light is a
7 crosswalk. There was a car stopped at a red light.
8 I was chasing Mr. Owensby around the car. We
9 actually went -- circled the car once or twice. And
10 then he proceeded toward -- in the direction -- on
11 Seymour in the direction of Reading Road down the
12 sidewalk.
13     At that point I was able to put my --
14 secure my weapon and I went to Mace, my chemical
15 spray. He was running down the sidewalk, and at
16 some point he tripped and fell on his own. And I
17 was trying to run up to him to Mace him, but I was
18 running and spraying at the same time. So some of
19 the chemical irritant sprayed back toward me.
20     He was on the ground. He managed to make
21 his way by using his hands and his feet, making his
22 way back to his feet. He then ran in between some
23 apartment buildings.
24     I continued to chase him. He ran into one

Case 1:01-cv-00769-SAS   Document 168-2   Filed 05/27/2004   Page 4 of 13

Owensby, et al. vs. City of Cincinnati
November 6, 2003

DAVID WILLIAM HUNTER, JR.

Page 74

1  A. Well --
2  Q. Did you want to say something?
3  A. It was not -- it was not a set -- like
4  a -- like a -- just one building. It was like
5  buildings. It was --
6  Q. Okay.
7  A. You know, it was -- it was like two or
8  three like together, but you can go through the
9  courtyard and then you can come around, and there's
10 like a building here on the right (indicating).
11 That's the way Curtis went, Officer Walker. And
12 then I was going to cut through.
13 Q. All right. At some point, then, you
14 folk-- you and Officer Walker split up and you start
15 to go your way and he goes his, right?
16 A. Yes.
17 Q. At that point someone says something to
18 warn the two individuals; is that right?
19 A. Yes.
20 Q. That's the next thing that happens?
21 A. Yes.
22 Q. Okay. And that person, if I'm
23 understanding you correctly, was Mr. Owensby?
24 A. Yes.

Page 75

1  Q. Are you sure of that?
2  A. Yes.
3  Q. What is the best of your recollection of
4  what Mr. Owensby said?
5  A. It was, The boys or Five-oh.
6  Q. Say that again.
7  A. It was either, The boys or Five-oh.
8  Q. And in response to what -- could you see
9  the two individuals at the time Mr. Owensby said
10 this?
11 A. They would -- they were just -- as he said
12 it, they were just leaving out of my view.
13 Q. Did you see -- so then you could not see
14 what, if anything, they did in response?
15 A. Oh. Ran.
16 Q. You did see that?
17 A. Yes. Uh-huh.
18 Q. Okay. Do you know if Mr. Owensby said
19 that toward them or was saying it to someone else?
20 A. He's saying it toward them, because he
21 turned to them and said it, in their direction.
22 Q. Do you know where Officer Walker was at
23 the time?
24 A. No.

Page 76

1  Q. Do you know if the individuals started
2  running because of what Mr. Owensby said or because
3  they saw a uniformed officer?
4  A. Beca--
5     MR. HARDIN: Objection.
6     You may answer.
7  A. Because of what Mr. Owensby said. Because
8  when that happened, Officer Walker didn't have
9  enough time to get around. So they -- they had --
10 they had -- they -- they couldn't have possibly even
11 seen him yet.
12 Q. But as I understand it, Mr. Owensby was
13 not one of the four individuals that you and Officer
14 Jorg had observed conducting drug activity at the
15 phone booth?
16 A. That's correct.
17 Q. He was just somebody that you happened
18 upon as you were going around the building?
19 A. Yes.
20 Q. At that point, as I understand it, you
21 walk up to Mr. Owensby and put your left hand on his
22 shoulder?
23 A. Yes.
24 Q. What shoulder did you put it on?

Page 77

1  A. On his left shoulder.
2  Q. Were you facing him face to face or did
3  you come up from behind?
4  A. Walking to his right, right beside him.
5  Q. So you put your left arm -- you're --
6  you're to his -- his right and you put your left
7  hand on his left shoulder?
8  A. Yes.
9  Q. And you say "What's up?" And he says,
10 "What's up?" And you say, you know, You can't be
11 doing that, or something like that, right?
12 A. Yes.
13 Q. And he said, What do you -- What do you
14 mean or what. And you said, What you just did. Is
15 that right?
16 A. Yes.
17 Q. And then you started to reach in your
18 shirt to pull your badge out, which was hanging on a
19 chain around your neck?
20 A. Yes.
21 Q. Do you know whether or not you got the
22 badge all the way out before Mr. Owensby started to
23 run?
24 A. Yes, I got it out.

Case 1:01-cv-00769-SAS  Document 168-2  Filed 05/27/2004  Page 5 of 13

Owensby, et al. vs. City of Cincinnati  
November 6, 2003

DAVID WILLIAM HUNTER, JR.

**Page 78**

1  Q. You got it all the way out?
2  A. Yes.
3  Q. And at that point you said he pushed off,
4  or how -- what -- what happened then?
5  A. He pushed off.
6  Q. Okay.
7     MS. GEILER: I'm sorry. What was that?
8     THE WITNESS: Pushed off. I'm sorry.
9     MS. GEILER: Okay.
10  Q. And you grabbed the hood of his sweat
11  shirt?
12  A. Yes.
13  Q. And it -- it ripped and he wiggled out of
14  or got out of the sweat shirt and took off running?
15  A. Yes.
16  Q. What did you do with the sweat shirt?
17  A. Dropped it.
18  Q. After --
19     MR. HARDIN: I'm sorry. I couldn't hear
20  the answer.
21     THE WITNESS: Dropped it. Let it go.
22  Q. After the incident did you return to get
23  the sweat shirt?
24  A. After the incident, to the best of my

**Page 79**

1  knowledge, Officer Jorg recovered the sweat shirt
2  and there was some plastic Baggies. There weren't
3  anything in them. They were just little small
4  plastic Baggies in that same area where the -- that
5  actually fell out of -- fell out of his pocket or
6  off of his person when that happened, when the sweat
7  shirt ripped.
8  Q. Did you see them fall out of his pocket or
9  off of his person?
10  A. I saw something fall, but I didn't know
11  what it was. When I came back, it was -- you know,
12  Officer Jorg had picked up the sweat shirt and the
13  Baggies.
14  Q. Were you within the eyesight of Officer
15  Jorg at that time?
16  A. No.
17  Q. So he could not see what was going on?
18  A. See what?
19  Q. Between you and Mr. Owensby and the sweat
20  shirt.
21  A. No.
22  Q. How did he know --
23  A. I told him. I told him what happened.
24  Q. -- to come to the area to collect the

**Page 80**

1  sweat shirt?
2  A. I told him what happened and where it
3  happened. Because after it happened I -- me
4  personally, I went back to in between the first set
5  of buildings where I was chasing him, because I had
6  my cell phone while I was chasing him and it fell.
7  I went to go find my cell phone.
8  Q. If you know, what happened to the sweat
9  shirt and the plastic bags?
10  A. After that do I know what happened to
11  them?
12  Q. Yeah. You said Officer Jorg picked it up.
13  A. Uh-huh.
14  Q. What happened to it after that?
15  A. I -- I don't know. I assumed he tagged
16  them or whatever. I don't know. I -- I don't know
17  what happened to them after that.
18  Q. You've never seen them since?
19  A. No.
20  Q. Did you ever fill out a property receipt
21  or -- or some property chain of custody document on
22  it?
23  A. Nope. I didn't -- I didn't have the
24  property.

**Page 81**

1  Q. Did you see -- well, he was your partner.
2  Did -- did you see Officer Jorg fill out a property
3  receipt?
4  A. No. Huh-uh.
5  Q. Did you see him put it in the car?
6  A. No.
7  Q. After Mr. Owensby wiggled out of the sweat
8  shirt, you drew your weapon?
9  A. Yes.
10  Q. He ran away; there was a chase down to
11  Rhode Island where Rhode Island intersects Seymour.
12  Do you see that on the Exhibit 57, the aerial
13  photograph?
14  A. Yes.
15  Q. And would you mark with the letter R in a
16  circle where the intersection of Rhode Island and
17  Seymour is.
18  A. Circle it?
19  Q. An R in a circle.
20  A. Okay.
21  Q. And I take it at -- at that point, if I'm
22  understanding you correctly, you and Mr. Owensby ran
23  around a car?
24  A. Yes. It was a female --

Case 1:01-cv-00769-SAS   Document 168-2   Filed 05/27/2004   Page 6 of 13

Owensby, et al. vs. City of Cincinnati
November 6, 2003
DAVID WILLIAM HUNTER, JR.

Page 82

1  Q. One -- one or two times?
2  A. Couple times. One or -- it was either
3  one -- I know it was one full time and it was either
4  another half time or it may be another full time.
5  It was a female black driver and a couple kids in
6  the car.
7       Because they were -- I -- I remember that
8  just because while I'm chasing him around the car
9  they were looking at us like we were crazy. And
10 I -- you know, they had to be wondering what was
11 going on.
12 Q. At this point that you're running around
13 the car, did you still have your weapon out?
14 A. Yep.
15 Q. So you still had your --
16 A. Yeah. I mean, yes.
17 Q. You had your -- your revolver drawn --
18 A. Well, let me -- let me back up. When we
19 got to the point of actually getting -- going into
20 the street, I recovered it. Where I have to admit
21 that I messed up was when we -- when I first
22 initially started chasing him, I wasn't supposed to
23 have my weapon out, running.
24 Q. Okay. But my only question, is at -- at

Page 83

1  the intersection of Rhode Island and Seymour when
2  you and Mr. Owensby are running around this red car,
3  you -- did you have your --
4  A. No, that's -- I --
5  Q. -- your revolver out?
6  A. I put it up. I put it up.
7  Q. Okay.
8  A. Because the mother and her kids and -- and
9  seeing -- you know, that was -- it was already
10 looking bad, you know.
11 Q. Okay. So at that point you have holstered
12 your -- your revolver?
13 A. Uh-huh.
14 Q. Is that when you take out your Mace?
15 A. I got the Mace out after the -- okay. I
16 was -- I managed to get my weapon secured, running
17 around the car. And then as he went to the sidewalk
18 to con-- you know, to go down the sidewalk, that's
19 when I went for my Mace. And he tripped.
20      Because he had -- he had me by a good four
21 steps, a good three or four steps till he fell.
22 When he fell, that's when I was able to -- I -- I
23 thought I was going to catch up to him and be able
24 to get him. As -- you know, but I was going for my

Page 84

1  Mace. Well, I actually got it out. And when I
2  sprayed it, I got backlash.
3  Q. The -- at that point where were you on the
4  aerial photograph? Can you mark with, say, the
5  letter M for Mace where you first deployed your
6  Mace?
7  A. Just past -- I -- I want to put it just
8  past the -- that intersection. It was after he got
9  back to the -- back on pavement on the sidewalk.
10 Q. All right.
11 A. Running in that direction.
12 Q. And you marked that with a M and a circle?
13 A. Yes.
14 Q. Thank you. After that, then you chased
15 him down Seymour Avenue on the sidewalk?
16 A. We were going -- we were going down
17 Seymour Avenue, but then he started to veer to the
18 left in between the buildings.
19 Q. Okay. Draw an arrow as to his path as you
20 proceeded down Seymour and then veer off to the
21 left.
22 A. (Witness complies.)
23 Q. You have an arrow?
24 A. Yes.

Page 85

1  Q. Okay. And then circle the building that
2  Mr. Owensby ran into.
3  A. I'm not -- hmm. From this picture I can't
4  really tell for sure which building it was, but it
5  was in this vicinity. I think it was this one
6  (indicating). This is the one I think it was. I'm
7  not sure, I'm not all the way positive, but I think
8  it's that one. I called out -- I know I called out
9  the -- the address over the air, so --
10 Q. The building number?
11 A. The building number.
12 Q. All right. And mark that circle with the
13 letter B for building.
14 A. (Witness complies.)
15 Q. And that's where you were joined by
16 Officer Walker?
17 A. Yes.
18 Q. When Mr. Owensby said, The guys or
19 Five-oh --
20 A. The boys.
21 Q. The boys. I'm sorry.
22 A. The boy -- it was The boy's, Five-oh,
23 Police. It was -- it was clear -- I mean, how he
24 said it and what he said, it was clear that he was

Case 1:01-cv-00769-SAS   Document 168-2   Filed 05/27/2004   Page 7 of 13

Owensby, et al. vs. City of Cincinnati
November 6, 2003
DAVID WILLIAM HUNTER, JR.

Page 86

1 letting them know that we were there.
2    Q. How -- how far was he from you when he
3 said that?
4    A. About, hmm, maybe from here to that wall
5 (indicating).
6    Q. What, ten feet?
7    A. Oh, more than that.
8    Q. More?
9    A. Maybe --
10   Q. 20 feet?
11   A. Maybe. Maybe 20 feet. I don't know
12 exactly.
13   Q. All right. When you had walked up to Mr.
14 Owensby, put your arm -- your left hand on his left
15 shoulder, around him, when you were talking to him,
16 were you looking at him?
17   A. Directly at him, yes.
18   Q. Did you notice if he had any facial hair?
19   A. If he did, it was like real light. I
20 don't remember having like a full beard or full
21 mustache or anything.
22   Q. Did he have the -- did he have -- how was
23 his hair? Was it in dreadlocks, was it short-cut?
24 How -- how was it?

Page 87

1    A. Like a short afro.
2    Q. At that point, as I understand your
3 testimony, you then return to Officer Jorg, tell him
4 what happened, right?
5    A. Uh-huh. Yes.
6    Q. And maybe -- maybe you've already answered
7 this, but do you recall whether or not Officer
8 Walker joined you and Officer Jorg?
9    A. I don't recall if he came back over there.
10   Q. Do you recall who of the two people that
11 were arrested, who was cited, their -- their names?
12   A. I don't remember their names.
13   Q. Let me show you -- let me show you what's
14 previously been marked as Exhibit 6. These are
15 two -- Exhibit 6 are two arrest and investigation
16 reports. The first one is for a Jaysen Hill and the
17 second is for a Jarvis Nixon.
18      You see the arrest location is the Sam's
19 Carry Out address of 2092 Seymour Avenue and the
20 arresting officer is Jorg, with your name also
21 listed. Do you see that?
22   A. Yes.
23   Q. Are these the two individuals that Officer
24 Jorg arrested --

Page 88

1    A. Yes.
2    Q. -- on that day?
3    A. Yes.
4    Q. Do you see that with respect to Jaysen
5 Hill he is charged with criminal trespass and an
6 open container?
7    A. Yes.
8    Q. Is there any reason why there's no charge
9 of trafficking --
10   A. Yes.
11   Q. -- or any kind of drug activity?
12   A. Yes.
13   Q. Why?
14   A. Because we didn't recover the drugs.
15   Q. Did you recover any money, any large sums
16 of money on these people out of these drug deals?
17   A. I didn't.
18      THE REPORTER: I'm sorry?
19      THE WITNESS: I did not.
20   Q. Do you know whether Officer Jorg did?
21   A. Not to my knowledge he didn't.
22   Q. So based on what you found on these
23 individuals -- well, let's talk about the second
24 one. Mr. Nixon is cited with criminal trespass.

Page 89

1 Same thing, there were no -- no drugs and no large
2 sums of money found, correct?
3    A. That's correct.
4    Q. Based on what you found at the scene when
5 you got there, there was no evidence of drug
6 activity taking place, was there?
7    A. Are you talking about after the fact?
8    Q. When -- when you're -- based on the arrest
9 and what you found on the person of these
10 individuals.
11   A. Okay. What we observed to put us there
12 went with the two that got away.
13   Q. Okay. That's what you believe?
14   A. That's what I believe.
15   Q. Let me show you what I'm going to mark as
16 Exhibit 6A.
17      (Deposition Exhibit 6A
         was marked for identi-
18       fication.)
19   Q. You see Exhibit 6A is an arrest and
20 investigation report for one Dominic Peterson, same
21 location, same date, same time. And the person is
22 searched by Officer Walker, and this person is
23 charged with criminal trespass. Was Mr. Peterson
24 also involved in this?

Case 1:01-cv-00769-SAS   Document 168-2   Filed 05/27/2004   Page 8 of 13

Owensby, et al. vs. City of Cincinnati  
November 6, 2003

DAVID WILLIAM HUNTER, JR.

Page 94

1  A. No. Jorg marked all of these when he
2  filled out the --
3  Q. Do you recall -- do you --
4  A. -- the arrest slips.
5  Q. Do you recall any discussion between you
6  and Officer Jorg as to who was going to go to court?
7  A. No.
8     Can I add something to this?
9  Q. Sure.
10  A. It's not directly related to this
11  particular thing, but when this incident happened,
12  after the night of November 7th, 2000, Officer Jorg
13  and Officer Caton were going around saying, that
14  same night, that the -- that Mr. Owensby was wanted
15  for assault on a PO and obstructing.
16     He ran from me. It was basically my
17  investigation that day. That night and from there
18  on I always said, had this tragedy not happened, the
19  only charges I was going to place on him was
20  obstruction and jaywalking. And the jaywalking is
21  because he -- I chased him through a crosswalk,
22  around a car. And obstructing is for warning the --
23  the individuals of our presence.
24     And that goes back to what I was telling

Page 95

1  you about different officers and officer discretion
2  and different styles. I wouldn't have placed a
3  criminal trespass. If, for whatever reason, I
4  didn't get the drugs and the money to make my case,
5  even though we set there and we observed them, we
6  watched them, if I couldn't make it, you know, I try
7  again another day, the next time.
8     Same way with Mr. Owensby. He pushed me
9  to flee. He didn't strike me or -- I didn't -- I
10  wasn't under the impression that he was trying to
11  harm -- or cause me harm. Therefore, I would not
12  have charged him with felon-- with assault on a PO,
13  with assault on a police officer. But they would
14  have. That's the difference between this and that.
15  That -- I'm trying to show you the --
16  Q. Right.
17  A. Okay.
18  Q. Thank you.
19  A. You're welcome.
20  Q. Do you think -- was the push a result of
21  you having your hand and arm around his shoulder?
22     MR. HARDIN: Objection.
23  A. It was when I identified myself as a
24  police officer. And he pushed me and kept saying,

Page 96

1  "I didn't do anything, I didn't do nothing, I didn't
2  do nothing." That's why I felt like he was just
3  trying to basically get away. He -- he wasn't try
4  to hurt me.
5  Q. When you put your arm around Mr. Owensby,
6  he didn't know that you were a police officer,
7  right?
8  A. No.
9  Q. Based on your training, was that an
10  assault on Mr. Owensby?
11  A. No.
12  Q. Why not?
13  A. Because I didn't strike him, I didn't -- I
14  didn't cause or attempt to cause or knowingly
15  attempt to cause him any physical harm.
16  Q. And was -- you've already indicated when
17  Mr. Owensby tried to push away, he wasn't trying to
18  strike you?
19  A. No.
20  Q. And he wasn't trying to cause you any
21  harm?
22  A. No.
23  Q. When -- when you Maced Mr. Owensby and
24  the -- the -- the blowback that you described, did

Page 97

1  you then file some sort of report about deploying
2  your Mace?
3  A. No.
4  Q. I thought that earlier today you had
5  indicated that when Mace is used, you have to --
6  A. If you actually Mace --
7  Q. -- the officer has to --
8  A. Yeah, if you actually Mace somebody. I
9  didn't get -- I didn't get to Mace him.
10  Q. How do you know the Mace didn't get to
11  him?
12  A. I don't. I don't. I don't know.
13  Q. Okay.
14  A. You're right. You're right. I don't
15  know. But I don't think it did, in my opinion.
16  Q. What color was the sweat shirt, the -- the
17  hooded sweat shirt?
18  A. Dark color. Dark blue or black.
19  Q. In the radio transmission or the
20  transcript of -- well, let me show you what's
21  previously been marked as Exhibit 7. This is a
22  transcription of the radio traffic on September 27,
23  2000. And what I want to direct your attention
24  to -- are you -- are you -- first of all, are you

# AFFIDAVIT

- - -

STATE OF OHIO        :
                     :  SS
COUNTY OF HAMILTON   :

I, Wendy L. Welsh, Notary Public in and for the State of Ohio, do hereby state that the transcript of the deposition of DAVID WILLIAM HUNTER, JR., deponent herein, having been submitted to said deponent for review and signature, has not been signed within the thirty (30) day period allowed under the Federal Rules; said deposition to now have the same force and effect as though signed.

_____
Wendy L. Welsh, Court Reporter

Sworn to before me this 27th day of January, 2004.

_____
Thomas M. Blasing
Notary Public - State of Ohio

My commission expires:
May 4, 2004.

107

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - - - -

| | | |
|---|---|---|
| ESTATE OF ROGER D. OWENSBY JR., et al., | : | |
| | : | |
| Plaintiffs, | : | Case No. 01-CV-769 |
| vs. | : | (Judge S. A. Spiegel) |
| | : | |
| CITY OF CINCINNATI, et al., | : | VOLUME II |
| | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - -

Continued videotaped deposition of DAVID WILLIAM HUNTER JR., a witness herein, called by the plaintiffs for cross-examination, pursuant to the Federal Rules of Civil Procedure, taken before me, Wendy Davies Welsh, a Registered Diplomate Reporter and Notary Public in and for the State of Ohio, at the offices of Helmer, Martins & Morgan Co. LPA, 1900 Fourth & Walnut Centre, 105 East Fourth Street, Cincinnati, Ohio, on Thursday, December 4, 2003, at 10:11 a.m.

Pages: 107 - 282

**Estate of Roger D. Owensby, Jr.**
**December 4, 2003**

**DAVID WILLIAM HUNTER, JR.**
**VOLUME II**

Page 108

```
 1  APPEARANCES:
 2      On behalf of the Plaintiffs:
 3          Paul B. Martins, Esq.
            Don Stiens, Esq.
 4          Helmer, Martins & Morgan Co. LPA
            Suite 1900, Fourth & Walnut Centre
 5          105 East Fourth Street
            Cincinnati, Ohio 45202
 6          Phone: (513) 421-2400
 7          John J. Helbling, Esq.
            The Helbling Law Firm, L.L.C.
 8          3672 Springdale Road
            Cincinnati, Ohio 45251
 9          Phone: (513) 923-9740
10      On behalf of the Defendants City of Golf Manor,
        Stephen Tilley, Roby Heiland and Chris
11      Campbell:
12          Wilson G. Weisenfelder Jr., Esq.
            Rendigs, Fry, Kiely & Dennis
13          900 Fourth & Vine Tower
            One West Fourth Street
14          Cincinnati, Ohio 45202-3688
            Phone: (513) 381-9200
15
        On behalf of the Defendants City of Cincinnati,
16      Darren Sellers, and Jason Hodge:
17          Geri Hernandez Geiler, Esq.
            Assistant City Solicitor
18          Department of Law
            Room 214, City Hall
19          801 Plum Street
            Cincinnati, Ohio 45202
20          Phone: (513) 352-3346
```

Page 109

```
 1  APPEARANCES (Continued):
 2      On behalf of the Defendants Robert B. Jorg,
        Patrick Caton, Jason Hodge, Victor Spellen and
 3      Darren Sellers:
 4          Donald E. Hardin, Esq.
            Hardin, Lefton, Lazarus & Marks, LLC
 5          915 Cincinnati Club Building
            30 Garfield Place
 6          Cincinnati, Ohio 45202
            Phone: (513) 721-7300
 7
        On behalf of David William Hunter Jr.:
 8
            Jay Clark, Esq.
 9          114 East 8th Street
            Suite 400
10          Cincinnati, Ohio 45202
            Phone (513) 587-2887
11
    Also present:
12
    Richard W. Grubb, Videographer
13
    Lisa Damstrom, Law Clerk
14  Helmer, Martins & Morgan Co., L.P.A.
15  Roger Owensby Senior
16  Brenda Owensby
17  Shawn Owensby
18              - - -
19          S T I P U L A T I O N S
20
21      It is stipulated by and among counsel for the
22  respective parties that the deposition of DAVID
23  WILLIAM HUNTER JR., a witness herein, called by the
24  plaintiffs for cross-examination, pursuant to the
```

Page 110

```
 1  Federal Rules of Civil Procedure, may be taken at
 2  this time by the notary; that said deposition may be
 3  reduced to writing in stenotype by the notary, whose
 4  notes may then be transcribed out of the presence of
 5  the witness; and that proof of the official
 6  character and qualifications of the notary is
 7  expressly waived.
 8              I N D E X
 9      Examination by:              Page
10      Mr. Martins . . . . . . . . 111, 277
11      Mr. Hardin. . . . . . . . .    258
12              - - -
13          E X H I B I T S
14                                      Page
    Deposition Exhibit 85 ................. 120
15  Deposition Exhibit 86 ................. 131
    Deposition Exhibit 87 ................. 152
16  Deposition Exhibit 88 ................. 219
    Deposition Exhibit 89 ................. 221
17  Deposition Exhibit 90 ................. 234
    Deposition Exhibit 91 ................. 236
18  Deposition Exhibit 92 ................. 238
    Deposition Exhibit 93 ................. 244
19  Deposition Exhibit 94 ................. 244
    Deposition Exhibit 95 ................. 245
20  Deposition Exhibit 96 ................. 250
21              - - -
```

Page 111

1  DAVID WILLIAM HUNTER JR.
2  being by me previously duly cautioned and sworn,
3  deposes and says as follows:
4       VIDEOGRAPHER: Time is 10:11 a.m. The
5  date is December the 4th. The year is 2003.
6       We're on the record, sir.
7       CONTINUED CROSS-EXAMINATION
8  BY MR. MARTINS:
9       Q. Officer Hunter, we're picking up where we
10 left off after November 6, your first couple hours
11 of your deposition. Remind you that you are still
12 under oath. Okay?
13      A. Yes, sir.
14      Q. All right. Have you talked with anyone
15 about your deposition on November 6th between
16 November 6th and today?
17      A. No, besides my attorney.
18      Q. Okay. Have you discussed the facts of the
19 Owensby case with anyone between November 6th and
20 today?
21      A. No.
22      Q. I want to direct your attention now to
23 November 7, 2000. I understand in the -- sometime
24 on that day you received an MTD message request for

**Page 140**

1 said, "You can" -- he said -- he -- he said, "I
2 don't have anything on me," and he lifted his shirt.
3 And then he said, "You can pat me down." He said,
4 "I'm not -- I haven't done anything. I'm not
5 wanted. You can -- you can pat me down after you
6 run me through."
7    Q. When you told Officer Jorg and Officer
8 Hunter that, "That's him," you were standing at the
9 window -- excuse me -- did they say anything in
10 response?
11    A. You said Officer --
12      MR. CLARK: You mean Caton?
13    A. Caton. It should have been Caton. You
14 said Officer Jorg and Officer Hunter.
15    Q. I'm sorry. I'm sorry. Officer -- when
16 you told Officer Jorg and Officer Caton that,
17 "That's him," when you were standing at the window,
18 did they say anything in response?
19    A. I don't remember if they said anything.
20    Q. You folks walk around to the front and
21 either Jorg or Caton start talking to Mr. Owensby
22 at -- at the -- the entrance; is that right?
23    A. Yes.
24    Q. Where are you at this point?

**Page 141**

1    A. Standing just behind them.
2    Q. Be--
3    A. Off to the left side.
4    Q. To the left of Jorg and Caton?
5    A. Just behind them, to the -- just slightly
6 to the left. I was -- they were right in the
7 doorway, both of them, because -- that's -- the
8 reason why I can't remember who was talking, because
9 at some point they both were talking, and so I don't
10 know who says what first.
11    Q. Okay. On Exhibit 86 there, would you draw
12 a circle indicating where Jorg, Caton and Owensby
13 were and put the number 2 in it.
14    A. Just a circle where they were?
15    Q. Where they were located.
16    A. Okay. All together? Just a circle all
17 together?
18    Q. Yeah.
19    A. Because -- okay. And put a number 2?
20    Q. Yes, sir. And then a number 3 with a
21 circle, indicating where you were.
22    A. (Witness complies.)
23    Q. When Officer Jorg walked over to that
24 entrance to stop and talk to Mr. Owensby, do you

**Page 142**

1 know whether or not he was carrying a nightstick?
2    A. I don't recall.
3    Q. A PR-24?
4    A. I don't recall if he was carrying one or
5 not.
6    Q. Do you know whether or not that night
7 Officer Jorg was carrying a collapsible PR-24 or a
8 regular full-size PR-24?
9    A. I don't remember what type he had.
10    Q. What happens next?
11    A. Officer Jorg and Officer Caton talk to Mr.
12 Owensby. They asked him questions. And then, like
13 I said, I -- I stood back, because I was still under
14 the contact-cover concept. If they both were going
15 to jump in and talk, then I just stood back as
16 cover. Because in actuality only one person should
17 have been talking. The other two should have been
18 standing back.
19      So once they were done doing their --
20 their thing, they -- the -- the last thing one of
21 them asked, I believe it was Officer Jorg, was,
22 "Well, have you ever fought the police?"
23    Q. Fought?
24    A. Fought. Fought the police. And then Mr.

**Page 143**

1 Owensby said no. Then, after that, that's when I
2 walked up. Well, you know, I -- not really walked
3 up, I was there, but that's when I came in the
4 doorway just, you know, where I could make eye
5 contact with Mr. Owensby. And I -- and I asked him,
6 I said, "So, have you ever ran from the police?"
7      And then when he saw that, it was a
8 reaction on his face and then that's when he broke
9 for the door.
10      THE REPORTER: I'm sorry, "broke for
11    the" --
12      THE WITNESS: The door.
13    A. Ran toward -- I mean, he was in the
14 doorway. And then it's like he tried to run past
15 us.
16    Q. When he broke to ran -- to run, did -- did
17 he push you or assault you in any way?
18    A. No.
19    Q. As he went past you, did -- did he get
20 completely past Officer Jorg and Caton before they
21 grabbed him?
22    A. I think he did. It happened so fast, but
23 I -- I think he actually just got -- because he went
24 by so fast. And then it was like, next thing you

## AFFIDAVIT

- - -

STATE OF OHIO      :
                   :  SS
COUNTY OF HAMILTON :

I, Wendy L. Welsh, Notary Public in and for the State of Ohio, do hereby state that the transcript of the deposition of DAVID WILLIAM HUNTER, JR., deponent herein, having been submitted to said deponent for review and signature, has not been signed within the thirty (30) day period allowed under the Federal Rules; said deposition to now have the same force and effect as though signed.

*Wendy L. Welsh*
Wendy L. Welsh, Court Reporter

Sworn to before me this 27th day of January, 2004.

Thomas M. Blasing
Notary Public - State of Ohio

My commission expires:
May 4, 2004.