(Tickets)

LARSON: The argument is that these tickets are issued when there are moments of suspicion. In other words, you suspect something. You think these people might be criminals, and they're being checked out. These tickets show up when no dope was found, no guns were found.

Off. DAMMERT: Mm-hmm.

LARSON: True?

Off. DAMMERT: Yes. I've--as far as I'm concerned, as far as the way I do police work, yes.

LARSON: Yeah.

Off. DAMMERT: If it is a legitimate violation that I can issue a legitimate legal ticket for and I do it because I think you're in my neck of the woods doing something you are not supposed to be doing, yes.

LARSON: (Voiceover) And in Thomas' case look how it played out. DATELINE discovered that Thomas appeared in court more than 21 separate times in an effort to settle his traffic violations, even spending two weeks in jail when he couldn't pay the rising penalties and fines. But the fines kept coming. His younger brother, Terry:

(Video of Timothy; court building; tickets; inside jail; document; police lights)

Mr. THOMAS: Everything, it just kept piling. It's like he would go to court for one, maybe spend eight hours in there for one. And another one would come. It was like they never went away.

LARSON: (Voiceover) Eventually Thomas missed court dates, arrest warrants were issued and twice he chose to run from police rather than spend more time in jail.

(Warrant; family photo)

Officer #7: (Voiceover) We have a suspect, male, black, about six-foot, red bandana. He has about 14 warrants on him.

(Dark street)

LARSON: (Voiceover) So those ominous-sounding 14 warrants for his arrest on the

21

night he was shot were not for any serious criminal activity, but all resulting from his traffic tickets.

(Police video of shooting)

Prof. HARRIS: (Voiceover) Timothy Thomas should not have driven without a license.

(Leisure crying)

Prof. HARRIS: But when this is used as a way to stop him, just to check him out, what we've got is a system that allows an end run around the Constitution.

LARSON: (Voiceover) A system that appears to target African-Americans because of the color of their skin. We wondered, was this just Cincinnati's problem? How would other cities across the United States fare when we examined them?

(Police cars; list; street in rain)

Announcer: Our investigation goes nationwide and we hear the stories behind the numbers to find out what it's like to live in fear of being pulled over just for the color of your skin.

Mr. ANDRE COFFER: We keep some bail money at home just in case I get locked up so that, you know, I can--I can get out.

Announcer: When A Pattern of Suspicion continues.

(Announcements)

Announcer: We now return to A Pattern of Suspicion.

LARSON: (Voiceover) Using open records laws in different states, DATELINE compiled and analyzed every single traffic stop or ticket issued in more than a dozen major cities where race was noted, more than four million stops or tickets overall. We used every bit of data that was available, data in many cases that has never been analyzed before.

(Man at computer; list)

LARSON: (Voiceover) From San Diego to Boston we found patterns of uneven law enforcement and stories of African-Americans like those DATELINE gathered here--all law abiding citizens who appear to have been stopped by police because of the color of their skin.

(Map; man in car; group of people)

Mr. ANDREW COFFER: I always feel like I'm under attack by the law.

LARSON: (Voiceover) Andrew Coffer of St. Louis, Missouri, a 17-year-old honor student who says he was pulled over several times on his way to high school.

(Andrew and Andre Coffer walking)

LARSON: Were you wearing anything that--that could have gotten you in trouble?

Mr. ANDREW COFFER: (Voiceover) I went to a private high school. There was a dress code so we could wear no blue jeans.

(Photo of Andrew)

Mr. ANDREW COFFER: It had to be a collar shirt, khakis.

LARSON: (Voiceover) He says police would often give him no reason for the stop. Andrew's father, Andre Coffer, has little trouble believing his son. Andre is an accountant, a Sunday school teacher, and owns his own business. He says police have pulled him more than 20 times.

(Police lights; Andre getting into vehicle; Andre driving)

LARSON: What kind of reasons do they give you for pulling you over?

Mr. ANDRE COFFER: 'We've had a lot of burglaries in the area. You're in a nice car.' You know, 'Is this your car?' You know, 'problem with your license plate,' 'taillight.' Just any, you know, anything to pull you over.

We keep some bail money at home just in case I get locked up so that, you know, I can--I can get out.

LARSON: (Voiceover) We told the group, in almost every city DATELINE examined across the country, police pulled over and ticketed blacks for non-moving violations at a rate higher than whites. In Minneapolis and Houston we found police stopped blacks for non moving violations at a rate 50 percent higher than whites. In Massachusetts we looked at ticketing patterns in Springfield, Worcester and Boston. In all of them police ticketed black drivers at a rate three times higher than white drivers. This Boston civic leader says that doesn't surprise him because he's been pulled over.

(Group of people; map; men walking)

23

Unidentified Man #10: He said, `Your registration had expired.' Well, I knew that was incorrect because I had just recently renewed my registration.

LARSON: Did you ever feel like, well, maybe I should complain about this to the president of the NAACP?

Man #10: No, because I was the president of the NAACP.

LARSON: (Voiceover) In Kansas City, Missouri; St. Louis and San Diego, DATELINE's research revealed black drivers are twice as likely to be stopped and ticketed for non-moving violations. Janice Jones says it happened to her in St. Louis as she pulled out of a gas station.

(Map; people in car)

Ms. JANICE JONES: I asked him, `Officer, why did you pull me over?' He says, `Because you have no headlights.'

(Voiceover) I tell him, `Officer, I do have headlights. They automatically come on when you turn my car on.'

(Document)

LARSON: (Voiceover) Her husband, the former press secretary for the mayor of East St. Louis, says it happened to him, too, but not nearly as many times as it's happened to his son.

(Man; photo of couple)

LARSON: One or two times?

Unidentified Man #11: No. Higher.

LARSON: Ten?

Man #11: Higher.

LARSON: Fifteen?

Man #11: Higher.

LARSON: Get out of here.

Man #11: No, sir.

LARSON: How many times do you think they've pulled him over?

Man #11: A little over 20 times.

LARSON: (Voiceover) In Denver, police stopped African-American drivers for non-moving violations more than three times the rate of whites. These four high school friends from Denver say they've all been stopped in the last year for what they believe to be ridiculous reasons.

(Map; men on stairs)

Unidentified Man #12: `Oh, well, your tire was kind of low so that's why we pulled you over.'

Unidentified Man #13: He sticks his head inside of my car and starts looking around and points to the air freshener in my window and says he pulled me over for the air freshener.

Unidentified Man #14: They're just pulling you over to see if you have drugs, guns or anything else, see if you got warrants or anything like that.

LARSON: (Voiceover) And that angers Vietnam veteran James Bonds from Worcester, Massachusetts, who says it happened to him in Shrewsbury, coming home from a Veteran's of Foreign Wars meeting.

(Military photo; cars)

Mr. JAMES BONDS: I was sitting here hearing these other stories, I'm really appalled. These young people here, especially from Denver, these are the guys that we send to Iraq to drive the Humvees, to drive the--the Jeeps. They don't get racial profiled over there, but they can't drive the kind of car that they want here in their own country. I think America should be ashamed.

LARSON: (Voiceover) And in Dayton, Ohio, and Richmond, Virginia, police ticketed black drivers for non-moving violations at a rate three times higher than whites. And again, it wasn't just in high-crime inner cities, but also in low-crime neighborhoods in cities across the country.

(Map; neighborhood)

Mr. JULIAN BOND: I've seen surveys in cities where the evidence is pretty convincing, but I've never seen a nationwide study like the one you've done.

LARSON: (Voiceover) We asked civil rights leader and national chairman of the NAACP Julian Bond to look at our findings.

25

(Julian Bond and Larson walking)

LARSON: What do you make of this?

Mr. BOND: There's no explanation for this except that this is racial profiling. This is police seeing a black person and saying, `I suspect that person more than I suspect a white person. And I'm going to stop him. I'm going to ask him questions. And I wouldn't do that to a white person.'

LARSON: (Voiceover) The police say that just isn't so. In fact, in two cities--Nashville, Tennessee, and Hartford, Connecticut--there was no significant difference in the way whites and blacks were stopped.

(Police car; map)

LARSON: (Voiceover) Remember, we did find blacks ticketed at a much higher rate for non-moving violations in 12 other cities, but the police in those cities told us race plays absolutely no role in how they issue tickets. The police said they are committed to fair and equal treatment of all citizens. So what accounts for the disproportionate ticketing of African-Americans that we discovered?

(List; busy street; vehicles)

LARSON: (Voiceover) Police in Houston, Cincinnati, Kansas City, Springfield, and St. Louis all told us economic forces may be a factor. As the St. Louis police put it, inner city black drivers may have fewer resources to rectify equipment problems. Other police departments told us that aggressive policing in inner-city black communities by definition means more police stops and more tickets being issued. They say that stops criminals and protects victims of crime.

(Police patches; documents; busy street; police lights)

LARSON: (Voiceover) Author Shelby Steele believes racial profiling is not the problem.

(Steele being interviewed)

Mr. STEELE: One of the things that bothers me is the fact that when we intimidate the police and back them up and make them afraid to police inner-city communities...

(Voiceover) ...then those communities become more vulnerable to crime because the police say, `I'm not going to go in there and have you call me a racist.

26

I'm not going to do my job.'

(Dammert driving)

Mr. STEELE: And so then, there's the drug business right there in the black community allowed to thrive.

LARSON: Thirty-five million African-Americans in this country--I mean, the overwhelming majority of African-Americans aren't criminals. Should they be treated any differently when they drive down the road by police just because of the color of their skin?

Mr. STEELE: Absolutely not. But this is the irony, if I live in that neighborhood, I want the pretext stop. Ah, if I'm raising children in that neighborhood...

(Voiceover) ...I want to feel that it's being policed.

(Dammert talking with people)

Off. DAMMERT: Did you see the cracked--crackhead back there, and all that?

Unidentified Woman #5: Yes, I do. I hear them.

Off. DAMMERT: You can call us. You know, you can call us.

LARSON: What do you say to police officers that are working in some of these most desperate neighborhoods where the people are--are--are...

(Voiceover) ...crying for police protection, where drugs have just sort of shredded the fabric of the community?

(People on street; marred building)

LARSON: And they're saying, `Hey we are using every tactic we have. We're fighting a losing battle here. Cut us some slack.'

Mr. BOND: I want to say I want you to be aggressive, I want you to do your job. But I want you to use techniques that aren't dependent on racial profiling. I want you to do your job in a fair and just manner. And if you do that, the community will applaud.

Announcer: What is the federal government doing to end racial profiling? And what are the consequences of ignoring it?

27

Ms. LEISURE: It's totally different when you're a person of African-American descent. It's as if no matter what you do, you're guilty until proven innocent.

Announcer: When A Pattern of Suspicion continues.

(Announcements)

Announcer: Later on DATELINE, it's a treasure hunt--gold, silver and cash. How can you get your share? DATELINE shows you the money.

(Announcements)

Announcer: A Pattern of Suspicion continues on DATELINE with Stone Phillips.

Pres. BUSH: (Address to Congress) Too many of our citizens have cause to doubt our nation's justice when the law points a finger of suspicion at groups instead of individuals. All our citizens are created equal and must be treated equally.

LARSON: (Voiceover) In February of 2001, during his first address to Congress, President Bush made a bold promise.

(Congress in session)

Pres. BUSH: (Address to Congress) Earlier today I asked John Ashcroft, the attorney general, to develop specific recommendations to end racial profiling. It's wrong and we will end it in America.

LARSON: (Voiceover) The Justice Department announced it would begin investigating local police departments across the country, but that announcement was made just one day before the world changed. As the images of September 11 seared the nation, racial profiling instantly was no longer such a dirty word. Many began wondering if racial profiling was a necessary evil, after all, all the hijackers had been Middle Eastern. Yet, even the current New York City Police Commissioner Raymond Kelly, who you'd think might be tempted to endorse racial profiling after 9/11, does not.

(Justice Department building; flag; police lights; people running; Ground Zero; man being searched; security tape; police car; Raymond Kelly speaking)

Mr. RAYMOND KELLY: I think it's dumb policing, much too much of a broad brush. We need specific information.

LARSON: (Voiceover) When Kelly became commissioner of US Customs in 1998, the

department faced allegations of racial profiling, charges agents were unfairly searching a disproportionate number of minorities for drugs. Kelly demanded new accountability from his customs agents. They began documenting the race of each individual they searched and the reason for the search. What happened? The number of drug searches dropped by 75 percent, but the drug seizures went up.

(Customs officials; flight schedule; bags being searched; inside airport; man opening bags; search dog)

Mr. KELLY: Any notion that somehow stopping someone simply because of their race is intelligent policing is not something that I support. And I don't think it's supported by any of the--of the evidence.

LARSON: (Voiceover) But while law enforcement officials from the president on down say racial profiling is wrong and ineffective, on the street not everyone can agree where aggressive policing ends and racial profiling begins.

(People being searched; men talking; man being searched; police lights)

Off. DAMMERT: Last week, we stopped a car downtown--loud music--pulled him over. He had felony drug warrants. That's how we police, small things lead to big things.

Mr. STEELE: I think the police ought to go where the crime is. And they ought to be professional about the way that they conduct their business. Having said that, I don't think racial profiling is much of a problem for black Americans today.

LARSON: (Voiceover) Still, national civil rights leader Julian Bond questions whether the ends justify the means.

(Police officers surrounding man)

Mr. BOND: You're driving a wedge between you and the people who want your protection more than anybody else in the community. And until you overcome this enormous handicap that you've imposed, you're not going to be effective law enforcement officers.

LARSON: (Voiceover) And what happened to the president's pledge to end racial profiling? This June, the US Justice Department announced without fanfare its response: a new federal ban on racial profiling. The new federal guidelines spell out that in the making of routine law enforcement decisions--such as deciding which motorists to stop for traffic infractions--consideration of the driver's race or ethnicity is absolutely forbidden. The ban however has no

effect on local police--not in Cincinnati, Houston, St. Louis, or any other city's police department. And it lacks two elements experts argue are necessary: requirements that police record who is stopped and why, and penalties for police who racially profile, requirements many oppose.

(Department of Justice building; busy street; police car; documents; police car; van pulled over; woman in car; ticket being written)

Mr. BOND: Without penalties, without sanctions, without record-keeping requirements and without some punishment for failing to keep those records, then this practice will continue.

LARSON: (Voiceover) We asked the Justice Department for an interview to explain how its ban would change things, and it declined, leaving many Americans, including the mother of Timothy Thomas, wondering who will ensure that all Americans will be treated equally under the law.

(Justice Department building; car pulled over)

Ms. LEISURE: It's totally different when you are a person of African-American descent. Its as if, no matter what you do, you're guilty until proven innocent.

PHILLIPS: Timothy Thomas's mother and several other Cincinnati residents who were plaintiffs in the racial profiling lawsuit against the city settled. Although the police department denied any wrong doing, the $4.5 million settlement was the largest in the city's history. Cincinnati and other cities tell us they train their officers and check their performance to make sure they are not profiling.

For more information about our report, logon to our Web site.

(Voiceover) The address is dateline.msnbc.com.

(Web address)

Announcer: Coming up in the next hour of DATELINE, getting professional help with your taxes? Watch out. DATELINE's hidden cameras find some hidden fees.

Mr. JESUS ALAMANZA: I feel robbed.

Announcer: Are tax preparers saving you money or costing you money? Plus, tax refund checks you never knew you had coming.

RENEE: I received a check for $409.

Announcer: And later, money that may be yours just for the asking.

Ms. MARILYN COPORINI: I was just laughing and crying and jumping up and down.

Announcer: How you can cash in.

(Announcements)