```
               IN THE UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF OHIO
                         WESTERN DIVISION
```

| | | |
|---|---|---|
| **ESTATE OF ROGER D. OWENSBY,** | : | CASE NO. C-1-01-769 |
| Plaintiff | : | (Judge S. Arthur Spiegel) |
| vs. | : | |
| | | **MOTION _IN LIMINE_ TO EXCLUDE** |
| **CITY OF CINCINNATI, et al.** | : | **ALL ARGUMENTS, REFERENCES,** |
| | | **REPRESENTATIONS AND EVIDENCE** |
| | : | **OF RACIAL PROFILING OR RACIAL** |
| | | **MOTIVATIONS OF DEFENDANTS** |
| Defendants | : | **CINCINNATI AND POLICE** |
| | | **CHIEF THOMAS J. STREICHER, JR.** |

**MOTION**

Now comes the Defendants, City of Cincinnati and Police Chief Thomas J. Streicher, Jr., by and through counsel, and hereby move the Court to exclude any evidence, references, representations or arguments that the underlying conduct might have involved racial profiling or been racially motivated in any way.

The presentation of such evidence, references or arguments to the jury would be highly prejudicial, inflammatory and irrelevant to the underlying controversy pursuant to Federal Rules of Evidence 201, 202 and 403. This Motion is more fully supported by the accompanying Memorandum.

                                        Respectfully submitted,

                                        J. Rita McNeil (#0043535)
                                        City Solicitor


                                        S/Neil F. Freund
                                        Neil F. Freund (#0012183)
                                        Vaseem S. Hadi (#0075617)
                                        FREUND, FREEZE & ARNOLD
                                        One Dayton Centre
                                        1 South Main Street, Suite 1800
                                        Dayton, OH 45402-2017

(937) 222-2424
(937) 222-5369 (fax)
nfreund@ffalaw.com
vhadi@ffalaw.com

Geri Hernandez Geiler (0042081)
Sr. Assistant City Solicitor
Julie F. Bissinger (0012055)
Chief Counsel
City Solicitor's Office
Room 214, City Hall
801 Plum Street
Cincinnati, OH 45202
(513) 352-3338
(513) 352-1515 (fax)
geri.geiler@cincinnati-oh.gov
julie.bissinger@cincinnati-oh.gov

**MEMORANDUM**

I.   **STATEMENT OF FACTS**

This case involves decedent Roger Owensby's acts of evading police custody on two separate occasions after he obstructed a police drug investigation. On September 27, 2000, Officers Hunter and Jorg worked plainclothes during drug investigation in front of Sam's Drive Thru near the Huntington Meadows Apartment complex. (Hunter depo. at 54)(attached as Exhibit A to plaintiffs' mot. Limine). The officers saw three to four persons, which did not include decedent Owensby, engage in illegal drug dealing. (Id.) The officers wanted to stop these persons. (Id.) Therefore, Officer Jorg stayed with two of the suspects while the other two suspects crossed the street. (Id.) Officer Hunter followed the other suspects who crossed the street. Office Walker arrived in a

2

uniformed car to assist Officer Hunter apprehend the two suspects. (Id. at 54-55.)

After discussing how to approach the suspects, Officer Hunter and Officer Walker started towards the suspects. (Id. at 55.) At this point, decedent Owensby "alerted the individuals that [the officers] were trying to catch up to apprehend that the police were coming and that [the officers] were in the area." (Id.) The suspects got away because of decedent's interference. (Id.)

Immediately afterwards, Officer Hunter approached the decedent face-to-face. (Id. at 55, 77.) He told decedent, "[y]ou know, you can't be doing what you just did. You can't be warning people that the police is here." (Id. at 55-56.) He placed his left hand on the decedent's shoulder. (Id.) Office Hunter looked "directly at" the decedent. (Id. at 86.) Next, Officer Hunter reached inside his shirt and showed decedent his badge, which Officer Hunter wore on a chain around his neck. (Id. at 56.) After viewing the police badge, the decedent pushed Officer Hunter and ran. (Id. at 56-57; 78.) Officer Hunter held the decedent's hooded sweatshirt. The decedent assaulted Officer Hunter when he forcefully pulled himself out of the garment. (Id. at 56.) While he had no intention of shooting, Officer Hunter drew his weapon and stated, "[d]on't move, freeze," to convince the decedent to cooperate. (Id.) In the face of a drawn weapon and police orders to remain, the decedent decided to run. (Id. at 56-57.) Officer Hunter chased the decedent on foot unsuccessfully. (Id. at 57.)

3

A few weeks later, on November 7, 2000, Officers Hunter, Jorg and Caton parked their cruisers in the Sam's Drive-Thru parking lot. (Jorg Depo. at 86, attached as Exhibit C to plaintiffs' mot. Limine.)  The officers wore their uniforms. (Id. at 87.) The officers saw the decedent walk from the parking lot into the convenience store. Officer Hunter positively identified the decedent as the same suspect who assisted drug dealers, obstructed the drug investigation, and resisted arrest a few weeks earlier. (Id. at 86-87.) Officer Hunter stated, "Yes, that's the man that ran ... [t]hat's the guy."  (Id. at 102; Officer Hunter depo. at 132.)  Officer Hunter explained how the decedent's interference resulted in two drug suspects evading arrest.  He further explained how the decedent assaulted him and evaded arrest for the obstruction shortly thereafter.  (Officer Caton depo. at 73, 76, 81; Officer Jorg Depo. at 75.)  Based on Officer Hunter's positive identification of the decedent as the man from the September 27, 2000 incident, the officers collectively determined that probable cause existed for an arrest.  (Officer Hunter depo. at 132.)

After the decedent exited the store, Officer Jorg reached for his handcuffs and attempted to inform decedent he was under arrest. (Id. at 12, 99, 103.) Like the earlier incident, however, the decedent ran.  The officers chased.(Id. at 102-107; Officer Caton depo. at 94-98.) The decedent resisted violently and kicked at the officers throughout. (Officer Caton depo. at 103). Eventually, the arrest was completed and decedent was placed in the back of a

police cruiser. (Officer Hunter depo. at 175; Officer Sellers depo. at 54-55.) Minutes later, the officers called for medical attention because the decedent was not moving.

The decedent presented to the University of Cincinnati Medical Center emergency room in cardiac arrest. (Depo. Suzanne A. Flottemesch, R.N. at 9, 17.) He was pronounced dead after resuscitation efforts failed. (Id. at 12). Hospital staff removed baggies containing marijuana and crack-cocaine from the decedent's pants pocket. (Id. at 19.) The autopsy report concluded that the decedent had marijuana in his system.

On November 8, 2001, the decedent's estate and next-of-kin filed a lawsuit against the City of Cincinnati, Police Chief Streicher, and other defendants asserting civil rights violations, state tort claims, wrongful death and loss of consortium. The complaint acknowledges that this controversy involves the two encounters between the decedent and Cincinnati police discussed earlier. (Compl. ¶¶ 3,4,28.) While the plaintiffs question whether mistaken identity might have occurred, the Complaint acknowledges that Officer Hunter, during the November 7, 2000 incident, identified the decedent as the same man who committed obstruction, assault and ran earlier.

Plaintiffs asserted 42 U.S.C. § 1983 claims against Cincinnati, Police Chief Thomas Streicher and individual police officers for "excessive force" and "failure to provide medical attention." The plaintiffs further claim that, immediately after

5

the arrest on November 7th, the decedent needed medical attention. (Id. ¶¶ 7,8,34.) The plaintiffs claim the defendant officers failed to appreciate the decedent's medical needs and provide medical attention in a more timely fashion. (Id.) Plaintiffs alleged inadequate training and deficient policies, of the municipal defendants, gave rise to both the "excessive force" and "medical attention" claims. It should be noted the Complaint noticeably lacks any references or allegations that the underlying controversy might have resulted from racial profiling or was racially motivated in any way. Trial is scheduled for June 14, 2004.

By coincidence, Cincinnati has been at the epicenter of a national frenzy involving allegations of police racial profiling during traffic stops in recent years. Local and national media have reported extensively on whether Cincinnati police employs racial profiling practices involving African-American men during traffic stops. This racial profiling issue climaxed, in April, 2001, when Cincinnati citizens rioted after the death of Timothy Thomas. The national and worldwide media covered the riots and Mr. Thomas' death extensively. Thus, more than any other U.S. city, Cincinnati has been at the center of a media firestorm involving police racial profiling before traffic stops.

On Friday, April 9, 2004, the NBC news magazine "Dateline" aired a report, which compared Cincinnati police officers' traffic stops of African-Americans to other major U.S. cities, to a

6

national audience. (See Exhibit B to plaintiffs' May 28, 2004 motion *in limine* to exclude prior misdemeanor convictions and arrests, filed May 28, 2004.) The "Dateline" special compared and contrasted Cincinnati traffic tickets between 1998 and 2002 with traffic tickets issued in other major U.S. cities.

Further, Dateline discussed the Thomas death in depth. Specifically, Thomas had fourteen outstanding warrants for non-moving traffic violations. Non-moving traffic violations, such as expired registrations or seat belt violations, may be difficult for police officers to ascertain before motorists are stopped. In general, the racial profiling issue in Cincinnati goes to whether police officers stop African-American motorists for valid reasons.

In contrast, the underlying events in this lawsuit do not involve race or profiling in any way. During the first incident, Cincinnati police approached decedent Owensby only after he garnered attention by knowingly obstructing an ongoing drug investigation. Again, Mr. Owensby's actions proximately resulted in two drug suspects escaping. It is undisputed that during the second incident, the police approached the decedent only after Officer Hunter identified decedent as the same man who obstructed the earlier drug investigation and ran. The Complaint is completely devoid of any allegations that racial profiling might have been involved during the underlying events at any time. Therefore, Cincinnati and Police Chief Streicher now move the Court to exclude any evidence, arguments or representations related to

racial profiling or motivations as highly prejudicial, inflammatory and irrelevant. Fed. R. Evid. 403.

## II. LAW AND ARGUMENT

The Court should exclude any evidence, representations or arguments involving racial profiling or racial motivations to avoid unfair prejudice to the defendants and inflaming the jury, especially when there is absolutely no evidence that race played a role in the underlying events. Fed. R. Evid. 401, 402, 403. "Relevant evidence" includes evidence having any tendency to make the existence of facts that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Fed. R. Evid. 401. Relevant evidence is admissible while evidence which is not relevant is not admissible. Fed. R. Evid. 402.

Relevant evidence still may be excluded if it would result in unfair prejudice, mislead, inflame or confuse the jury as follows:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed. R. Evid. 403. This standard involves a "balancing test" where courts must weigh any probative value of the evidence against the dangers of unfair prejudice, confusion or delay. United States v. Haywood, 280 F.3d 715, 720 (6th Cir. 2002).

Evidence is unfairly prejudicial only if it has 'an undue tendency to suggest decision on an improper basis,' which may

8

include an emotional basis. Advisory Committee's Note, F.R. Evid. 403. Unfairly prejudicial evidence "appeals to the jury's sympathies, arouses its sense of horror, provokes its instincts to punish,' or otherwise 'may cause a jury to base its decision on something other than the established propositions in the case.' Carter v. Hewitt, 617 F.2d 961, 972 (3d Cir. 1980), *accord* Old Chief v. United States, 519 U.S. 172, 180, 117 S.Ct. 644, 650; United States v. Skillman, 922 F.2d 1370, 1374 (9th Cir. 1990), *cert. dism'd,* 502 U.S. 922, 112 S.Ct. 353, 116 L.Ed.2d 275 (1991). Under Rule 403, evidence should be excluded as "misleading" if the jury might attach undue weight to the evidence. See, e.g., Williams v. Nashville Network, 132 F.3d 1123, 1129 (6th Cir. 1997)(excluding government report on safety of tire because the jury might place undue weight on the official character of the report); Bright v. Firestone Tire & Rubber Co., 756 F.2d 19, 23 (6th Cir. 1984)(excluding EEOC determination of probable cause of discrimination as the jury might attach undue weight to the agency's report).

In the case at bar, the jury must be shielded from all arguments, representations and evidence involving race or racial profiling in Cincinnati to avoid unfair prejudice, inflaming and misleading the jury. First, racial tensions between Cincinnati police and African-Americans have been widely reported on and scrutinized by the national media. Thus, it will be difficult already to impanel a jury that has not been exposed to this type of

9

prejudicial, inflammatory sensationalism, even if racial arguments and references are excluded at trial. Since the jury pool already has been tainted by such sensational reporting and media scrutiny, it is especially important to take all appropriate steps to assist the jury in weighing all relevant evidence in the underlying controversy, and without attaching undue weight to any particular sensationalized evidence. These steps must include excluding all arguments, references and evidence of race or racial profiling in Cincinnati.

Moreover, it is undisputed racial profiling had absolutely nothing to do with the underlying events. In contrast, decedent Owensby garnered the police officers' attention voluntarily by knowingly obstructing a drug investigation and fleeing arrest twice. While the plaintiffs question whether mistaken identity might have occurred, the parties agree that during the second incident on November 7, 2000, Officer Hunter, an African-American police officer, identified the decedent as the same man who obstructed the drug investigation and fled arrest a few short weeks earlier. Thus, this dispute involves whether the police officers had probable cause to arrest the decedent on both occasions, when the officers reasonably believed the decedent had committed obstruction, assaulted Officer Hunter, resisted arrest and fled. There is no indication whatsoever, that had the decedent been Caucasian, these same events would have unfolded any differently. Thus, any arguments related to racial profiling or potential race

motivations must be considered speculative, at best, and highly irrelevant. Fed. R. Evid. 401, 402.

In turn, evidence of collateral social issues involving the racial, political climate in Cincinnati, must be excluded to achieve any possibility of a fair trial. Unlike the Thomas issue which sparked the April, 2001 riots, or other similar situations reported by the national NBC news magazine "Dateline," this dispute does not involve the stopping of an African-American motorist for non-moving traffic violations. In contrast, decedent Owensby actively drew the police officers' attention, as they focused on four completely different drug suspects, when he committed obstruction. Recently, the plaintiffs conceded this point by stating, "<u>Mr. Owensby was not wanted for any traffic violations and was never even driving on the evening of his death. In fact, the only car to play any part in this case is the Golf Manor cruiser</u>..." (Pl. Mot. Limine to exclude prior misdemeanor convictions and arrests at 4, ¶1, filed May 28,2004.)(emphasis added).

Assuming arguendo the November 7, 2000 incident resulted from mistaken identity, Officer Hunter's positive identification of the decedent as a drug suspect, who obstructed the earlier investigation and assaulted him thereafter, still constitutes probable cause for arrest. The circumstances of this dispute are completely different from other, highly publicized situations between Cincinnati police and African-American motorists, which purportedly involved racial profiling. It would be patently unfair

11

and highly prejudicial for the plaintiffs to bootstrap this lawsuit to completely unrelated, coincidental situations which have raised questions of racial profiling, simply because the decedent happened to be African-American descent.

Finally, if the plaintiffs are permitted to set forth arguments involving potential race motivations or racial profiling, the jury undoubtedly will be inflamed and may refer to sensationalized media stories, like the recent "Dateline" report, during their deliberations.  The jury may confuse these circumstances with circumstances involving other African-American motorists, like Timothy Thomas, and completely lose sight of the fact that this case involved decedent's interference with a drug investigation as well as resisting arrest on two occasions. Cincinnati is the most unique city in the entire country today, if not the world, on the issue of police racial profiling and city relations between police and the African-American community, because of the worldwide media attention and April, 2001 riots, which invoked images of the 1992 Los Angeles riots or Watts uprising in the 1960s.

The record is completely devoid of any evidence remotely suggesting racism or racial profiling had anything to do with the underlying events.  Presentation of racial arguments or evidence cannot assist the jury in weighing the issues of probable cause, potential mistaken identity and drug activities at issue in this case.  Allowing the plaintiffs to capitalize on the unique

**A Legal Professional Association**

political and social climate in Cincinnati would thwart not only any possibility of having a fair trial, but also the safeguards Congress installed through Evidence Rule 403, when any minuscule probative value that such evidence might contain is completely outweighed by the dangers of unfair prejudice, confusion and inflaming the jury.  Fed. R. Evid. 403.

## **CONCLUSION**

_____For the foregoing reasons, Defendants Cincinnati and Police Chief Thomas J. Streicher, Jr. respectfully request the Court exclude all arguments, references, representations and evidence of racial profiling or alleged racial motivations under Federal Rule of Evidence 403.

                                      Respectfully submitted,

                                      J. Rita McNeil (#0043535)
                                      City Solicitor


                                      S/Neil F. Freund_____
                                      Neil F. Freund (0012183)
                                      Vaseem S. Hadi (0075617)
                                      FREUND, FREEZE & ARNOLD
                                      One Dayton Centre
                                      1 South Main Street, Suite 1800
                                      Dayton, OH 45402-2017
                                      (937) 222-2424
                                      (937) 222-5369 (fax)
                                      nfreund@ffalaw.com
                                      vhadi@ffalaw.com

                                      Geri Hernandez Geiler (0042081)
                                      Sr. Assistant City Solicitor
                                      Julie F. Bissinger (0012055)
                                      Chief Counsel
                                      City Solicitor's Office
                                      Room 214, City Hall
                                      801 Plum Street
                                      Cincinnati, OH 45202

                              (513) 352-3338
                              (513) 352-1515 (fax)
                              geri.geiler@cincinnati-oh.gov
                              julie.bissinger@cincinnati-oh.gov

### PROOF OF SERVICE

This will certify that a copy of the foregoing was served upon counsel of record by email this 28th day of May, 2004:

Mark T. Tillar (0029898)
240 Clark Road
Cincinnati, OH 45202
(513) 761-2958
Attorney for Plaintiff

John Helbling (0046727)
3672 Springdale Road
Cincinnati, OH 45251
513-923-9740
Attorney for Plaintiff

Paul B. Martins
HELMER, MARTINS & MORGAN CO.
Fourth & Walnut Centre, Suite 1800
105 East 4th Street Cincinnati, Ohio 45202-4008
(513) 421-7902
Attorney for Plaintiff

Donald E. Hardin (0022095)
HARDIN, LEFTON, LAZARUS &
MARKS, LLC
915 Cincinnati Club Building
30 Garfield Place
Cincinnati, OH 45202
513-721-7300
Special Counsel for Defendants
Robert Blaine Jorg, Patrick Caton,
Darren Sellers, Jason Hodge, and
Victor Spellen

Wilson G. Weisenfelder, Jr.  (0030179)
RENDIGS, FRY, KIELY & DENNIS, LLP
900 Fourth & Vine Tower
Cincinnati, OH 45202
513-381-9200
Attorney for Defendants
Village of Golf Manor,
Chief Stephen Tilley,

14

**FREUND, FREEZE & ARNOLD**
**A Legal Professional Association**

Officer Robert Heiland, and
John Doe #7 nka Chris Campbell

Ravert J. Clark
114 East 8th Street
Suite 400
Cincinnati, OH 45202
(513) 587-2887
Attorney for Defendant
Cincinnati Police Officer
David Hunter

                                        **s: Neil F. Freund**
                                        Neil F. Freund