UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| ESTATE OF ROGER D. OWENSBY JR., | : : : |
| Plaintiff, | : Case No. 01-CV-769 : : Senior Judge S. Arthur Spiegel |
| v. | : : |
| CITY OF CINCINNATI, et al., | : : : |
| Defendants. | : : : |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANT HODGE'S MOTION FOR SUMMARY JUDGMENT (doc. 192)
AND
CROSS MOTION FOR SUMMARY JUDGMENT**

Defendant Cincinnati Police Officer Jason Hodge avoided discovery in this action because his National Guard Military Police Unit was activated and sent to Iraq . Hodge Depo., p. 7:3-23.  Thus, he was not the subject of Plaintiff's prior summary judgment motions.  Doc. 156, Order, p. 30 n.20; *Estate of Roger Owensby v. City of Cincinnati*, 2004 U.S. Dist. LEXIS 9444, *41 n. 20 (S.D. Ohio May 19, 2004).  In this prior round of summary judgment briefing, this Court conducted a detailed analysis of all competing claims and granted summary judgment for Plaintiff against the City of Cincinnati, the Village of Golf Manor, their respective Chiefs of Police, and five of their police officers for their failure to provide constitutionally-mandated medical care to Mr. Owensby.  *Id.* at 90; *Estate of Owensby*, 2004 U.S. Dist. LEXIS at *119.

After his return, Officer Hodge was deposed and now moves for summary judgment. Doc. 192.  For reasons similar to those already established by this Court in its prior Order,

Officer Hodge's summary judgment motion should be denied and summary judgment should be granted against him for his failure to provide critical medical care he knew was needed by Mr. Owensby.

I.   STATEMENT OF FACTS

Plaintiff adopts the facts previously detailed in his summary judgment motion against the City of Cincinnati and its police officers. Doc. 88, pp. 2-22. Further, Plaintiff adopts the findings of fact and law established by this Court in its previous summary judgment Order. Doc. 156, Order; *Estate of Roger Owensby v. City of Cincinnati*, 2004 U.S. Dist. LEXIS 9444 (S.D. Ohio May 19, 2004). Therefore, this memorandum focuses only on additional undisputed facts specifically relating to Officer Hodge.

A.   **November 7, 2000**.

On the evening of November 7, 2000, Officer Hodge was working as an undercover drug/vice investigator in the Cincinnati Police District 4 Mini-Tact Unit with his partner, Officer Lawson. Hodge Depo., pp. 18:17 - 19:14. Although he devoted most of his on-duty time to undercover drug investigations in the geographic area covered by District 4, Officer Hodge had never heard of Roger Owensby or of anyone named "LA." *Id.* at 20:24 - 21:8.

Early in their shift, Officer Lawson received a call to report to the area of Sam's Carryout to interview a person who may have drug information. *Id.* at 26:2-10.[1] Officers Lawson and Hodge drove an unmarked car to Sam's Carryout and saw the assembled uniformed police

---

[1] That suspect was a man arrested by Officers Sellers and Hasse for minor misdemeanor marijuana possession. Doc. 156 at 11; *Estate of Owensby*, 2004 U.S. Dist. LEXIS 9444, *16. The suspect indicated that he was willing to provide information relating to where he obtained his marijuana. As a result, the Mini-Tact Unit (comprised of Officers Hodge and Lawson) was contacted to interview the suspect. Hasse Depo., pp. 54:5 - 56:6.

2

officers Jorg, Caton, Hunter, Sellers and Hasse. Not wanting to "blow our cover," Officers Lawson and Hodge drove past Sam's Carryout and parked in nearby Roselawn Park. *Id.* at 26:8-17.

### B. Officer Hodge's Role In the Arrest And Homicide Of Mr. Owensby.

While parked at Roselawn Park, Officers Hodge and Lawson heard an officer-needs-assistance call. In response, they drove out of Roselawn Park, turned left on to Seymour Avenue and left again into Sam's Carryout. As Officer Hodge got out of the car he saw Officer Hasse pointing toward the Sunoco station next door. Officer Hodge looked over and saw several police officers struggling with someone. Officer Hodge ran over to assist. *Id.* at 29:6-12.

As Officer Hodge approached, he saw Mr. Owensby laying face-down on the asphalt. Officer Jorg was kneeling on Mr. Owensby's left side, Officer Caton was kneeling on Mr. Owensby's right side, Officer Hunter was kneeling in front of Mr. Owensby's head and Officer Sellers was somewhere near Mr. Owensby's legs. *Id.* at 33:6 - 34:17; Exh. 154. Officer Hodge knelt down to the immediate right of Officer Caton on Mr. Owensby's right side between his neck and shoulders. *Id.* at 32:11-22. Mr. Owensby's right hand was already handcuffed. *Id.* at 34:18-21. He did not perceive Mr. Owensby as a threat. *Id.* at 103:15-24.

Officer Hodge assisted Officer Caton for "a couple of seconds" in pulling on Mr. Owensby's right arm to get it out from under him. *Id.* at 38:6-9. Officer Hodge felt "resistance" from Mr. Owensby when he pulled on his arm but could not say whether this muscle tension was voluntary or instead the result of a seizure or spasm. *Id.* at 105:4-18.[2] Nor does Officer Hodge

---

[2] Dr. Cyril Wecht, a forensic pathologist hired by both the City of Cincinnati and the Plaintiff to evaluate the Owensby homicide, has testified that the struggle identified by Officer Hodge could be nothing more than the struggle to breathe arising from the mechanical

3

know whether the handcuff on Mr. Owensby's right wrist was caught on the asphalt, making pulling his arm out from under him more difficult. *Id.* at 79:22 - 80:3.

Officer Hodge then reached over and took Officer Hunter's PR-24 nightstick, which he placed under Mr. Owensby's right arm. He used it to leverage the arm out from under him to place it behind his back. *Id.* at 39:4 - 40:9. Officer Caton pushed Mr. Owensby's right arm into the small of Mr. Owensby's back. *Id.* at 41:10-13. Officer Jorg then took the PR-24 from Officer Hodge, although Officer Hodge testifies that he did not know what Officer Jorg did with it. *Id.* at 41:14-21. Soon thereafter, both wrists were in the small of Mr. Owensby's back and the handcuffs were locked. *Id.* at 42:2-4. Officer Hodge then retrieved the PR-24 from Officer Jorg. *Id.* at 45:10-14.

Officers Caton and Jorg then picked up Mr. Owensby by his upper arms. *Id.* at 45:24 - 46:21. Officer Hodge moved away and gave the PR-24 back to Officer Hunter. *Id.* at 47:2-7.

---

asphyxiation that killed Mr. Owensby:

> To breathe is the most primitive, basic, fundamental need of any living organism. Try to take your favorite, most passive dog or somebody else's that wouldn't even think of barking let alone biting, hold it's mouth and nose shut and see how long before he'll try to bite your hand off. To breathe is to live, and whether you're a human being intellectualizing it or an animal primitively responding, you've got to breathe. So it's a very frightening and disturbing experience.
>
> If you can relieve yourself of it, then you do in some way. If you can't, then as the oxygen is decreased, arterial supply of oxygen is diminished, the brain then responds very quickly. It's insulted quite easily, the brain, and since the brain controls heart and lung function, it sets into motion a vicious cycle quite quickly resulting in further depression of respiratory function and then cardiac function, and this cycle continues leading to diminished consciousness and then unconsciousness and then stupor, coma and death.

Wecht Depo., pp. 47:12 - 48:10.

While being taken to the Golf Manor police cruiser, Officer Hodge claims that Mr. Owensby was taking short, choppy steps, like someone who is severely intoxicated. *Id.* at 53:19-23; Exh. 156, Hodge 11/20/00 Statement to Cincinnati Homicide Unit, p. 6. Although "[h]e appeared to be in an intoxicated state," Officer Hodge did not smell any alcohol on Mr. Owensby. Hodge Depo., p. 80:8-14.

Officer Hodge saw "a tall officer" push Mr. Owensby into the passenger side back seat of the Golf Manor cruiser while Officer Caton went to the driver's side rear door and leaned in. *Id.* at 54:9 - 55:22.[3] Officer Hodge says he did not see what else happened because he then went into the convenience store to get the manager's name and identification. *Id.* at 57:14 - 59:4. While in the convenience store, Officer Hodge bought a pack of cigarettes and a Pepsi for Officer Caton. *Id.* at 65:10-13; 88:14 - 89:2; 107:20 - 108:7. Throughout this time period, Officer Hodge never checked on the physical condition of Mr. Owensby. *Id.* at 62:21 - 63:3; 80:15-20; 113:3 - 114:21. Nor did he see any other officer check on Mr. Owensby. *Id.* at 64:21 - 65:2; 114:19-21.

While Mr. Owensby lay handcuffed in the back of the Golf Manor cruiser Officer Hodge noticed that Officer Jorg had blood "all over" his left sleeve. *Id.* at 65:18 - 68:11, Exhibit. 155, p. 16. Officer Hodge became concerned that Officer Jorg had been exposed to blood contamination, so he cut off Officer Jorg's sleeve and placed it in the trunk of Officer Jorg's cruiser. *Id.* at 68:12 - 70:15. The only person that Officer Hodge had seen bleeding was Mr.

---

[3]Although Officer Hodge admits that Officers Jorg and Caton picked Mr. Owensby up and took him to the Golf Manor cruiser, he refused to say that the "tall officer" that he saw pushing the handcuffed Mr. Owensby into the Golf Manor cruiser was Officer Jorg. At 6' 4" Officer Jorg was the tallest officer on the scene. Doc. 88, p.16.

Owensby. *Id.* at 43:13-16; 80:21-24; 83:6-9. All of this occurred while Mr. Owensby lay handcuffed, unattended and dying in the back of the Golf Manor cruiser. *Id.* at 68:15 - 69:1.

Officer Hodge then heard someone near the Golf Manor cruiser say, "I don't think he's breathing." *Id.* at 85:24 - 87:8.[4] Within a minute of hearing that statement, Officer Hodge saw Officers Hasse and Caton administering CPR to Mr. Owensby. *Id.* at 121:17 - 122:13.

Emergency personnel were called but it was too late. Mr. Owensby was taken to University Hospital where he was pronounced dead. Doc. 156, Order, p. 21; *Estate of Owensby*, 2004 U.S. Dist. LEXIS 9444 at *28. The Coroner ruled that Roger Owensby's death was a "homicide (police intervention: asphyxiation during restraint attempts)." The cause of death was "mechanical asphyxia." Exhibit 103, Coroner's Report; Doc. 156, Order, p. 21; *Estate of Owensby*, 2004 U.S. Dist. LEXIS 9444 at *29.

### C.    Mr. Owensby's Need For Medical Care / Officer Hodge's Failure To Provide Medical Care.

The following admissions of Officer Hodge establish that he was aware that Mr. Owensby was in need of medical care and that Officer Hodge deliberately chose to ignore those injuries.

#### 1.    **Blood.**

Officer Hodge admits that he saw Mr. Owensby's face while he lay on the asphalt and saw that Mr. Owensby had blood around his nose and mouth. Hodge Depo., pp. 43:13-16;

---

[4]Officer Hodge does not know if this statement was made by Officer Brazile who looked into the Golf Manor cruiser and said, "This looks fucked up. Can he breathe? It don't look like he can from the way he's laying." Exhibit 47, Brazile 11/13/00 Statement; Brazile Depo., pp. 56:14-20, 64:13 - 68:8. It may also have been said by Cincinnati Police Sgt. Watts some five minutes later when he said, "I don't think he's breathing." Caton Depo., p. 17:14-18.

80:21-24. He also saw blood "all over" Officer Jorg's shirt sleeve and knew that the only person who was bleeding was Mr. Owensby. *Id.* at 82:10 - 83:9. Further, the amount of Mr. Owensby's blood that he saw "all over" Officer Jorg's sleeve was sufficient to raise a serious concern in the mind of Officer Hodge about possible blood contamination. *Id.* at 69:2 - 70:11. Thus, Officer Hodge knew that the injury to Mr. Owensby's face was more than a scratch and warranted medical care. Nevertheless, Officer Hodge never checked on the condition of Mr. Owensby.

    2. **Silence.**

During the entire time that Officer Hodge was at the Sunoco station, he never heard Mr. Owensby make any sound. *Id.* at 78:23 - 79:4; 82:5-9. This includes the entire time while Mr. Owensby was supposedly "resisting" providing his handcuffed arms to the five officers; when he was picked up by the arms while handcuffed; and when he took the short, choppy steps to the Golf Manor cruiser. Nevertheless, Officer Hodge never checked on Mr. Owensby's condition or even determined whether he was conscious or unconscious. *Id.* at 80:15-20; 113:3-13.

    3. **Sweating.**

Officer Hodge testified that when Officers Jorg and Caton stood Mr. Owensby up, he looked "real sweaty." *Id.* at 100:18 - 101:13. Officer Hodge did not recall whether any of the arresting officers were sweating. Further, Officer Hodge specifically knew that sweating could be an indication of medical distress. *Id.* at 101:14 - 102:2. Still, he did not check on Mr. Owensby's condition or seek medical care. *Id.* at 113:3-13.

    4. **Appeared Intoxicated / Unable To Walk / No Smell Of Alcohol.**

When Mr. Owensby was picked up off of the asphalt and taken to the Golf Manor cruiser by Officers Jorg and Caton, Officer Hodge testified that he saw Mr. Owensby taking "short

7

choppy steps like, like if you notice somebody really intoxicated...." *Id.* at 53:19-23; 81:1-4; 84:2-16. While Officer Hodge testified that Mr. Owensby "appeared to be in an intoxicated state," he also acknowledges that he did not smell any alcohol on him. *Id.* at 80:12-14.

### 5. No Attempt To Provide Medical Care.

In addition to CPR training received from the Cincinnati Police Academy, Officer Hodge also had first-aid CPR training from the Army as a Military Police Sergeant. *Id.* at 60:18 - 62:20.[5] Despite this training and the indicators of medical distress observed (Mr. Owensby's bloody face, blood saturating the sleeve of Officer Jorg, no sound from Mr. Owensby at any time during the arrest and staggering transport to the Golf Manor cruiser, and perfuse sweating), Officer Hodge testified that he never checked on the physical condition of the man who he helped arrest. Instead, he walked away from the handcuffed Mr. Owensby who lay dying in the Golf Manor cruiser and into the convenience store to buy himself a pack of cigarettes and Officer Caton a soda. *Id.* at 65:10-13; 88:14 - 89:2; 107:20 - 108:7.

At the time that he was doing this, Officer Hodge admits that he did not know whether Mr. Owensby was breathing. *Id.* at 62:21 - 63:3. Also, he does not know if any other police officer checked to see if Mr. Owensby was breathing. *Id.*

At no time did Officer Hodge check to see if Mr. Owensby was conscious or unconscious. *Id.* at 80:15-20. In fact, he does not know if anyone at anytime checked on Mr.

---

[5]In stark contrast to the incredible opinion authored by defendant's proffered expert that CPR would be useless if Mr. Owensby suffered a heart attack, Officer Hodge testified that he was *never* told in his Police Academy training or his Army training that CPR was useless for someone who stopped breathing as a result of a heart attack. *Id.* at 63:14 - 64:13. In fact, the forensic expert utilized by both the City of Cincinnati and the Plaintiff has consistently testified that Mr. Owensby would be alive today if prompt CPR had been provided. Wecht Depo., pp. 59:21 - 61:14.

8

Owensby's condition. *Id.* at 64:21 - 65:2

Despite what Officer Hodge had observed, at no time did he ever seek any medical attention for Mr. Owensby. *Id.* at 113:3 - 114:21.

### III.    ARGUMENT

#### A.    This Court's Liability Opinion, Which Officer Hodge Fails Even To Acknowledge, Establishes The Proper Legal Framework Within Which To Evaluate His Motion

For reasons known only to defendant Hodge, his summary-judgment papers do not even mention the Court's, 93-page Opinion resolving summary judgment motions filed for and against all parties except Hodge. Doc. 156, 2004 U.S. Dist. Lexis 9444. In that Opinion, the Court denied the qualified-immunity motions of all the other police-officers and granted Plaintiff summary judgment against several of Officer Hodge's co-defendants on the basis that they failed to provide Mr. Owensby with obviously-necessary medical care. In the course of so doing, the Court established the principles which govern the Court's analysis of Officer Hodge's claims. Application of these principles easily shows both that Officer Hodge is not entitled to summary judgment against Plaintiff, and that Plaintiff is entitled to summary judgment against Officer Hodge.

##### 1.    The Court's Opinion establishes the law of the case, from which there is no reason for deviation.

"[U]nder the doctrine of the law of the case, findings made at one point in the litigation become the law of the case for subsequent stages of that same litigation." *United States v. Moored*, 38 F.3d 1419, 1421 (6th Cir. 1994), *citing United States v. Bell*, 988 F.2d 247, 250 (1st Cir. 1993). The doctrine "'posits that when a court decides upon a rule of law, that decision

should continue to govern the same issues in subsequent stages in the same case.' This rule of practice promotes the finality and efficiency of the judicial process by 'protecting against the agitation of settled issues.'" *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988), *citing Arizona v. California*, 460 U.S. 605, 618 (983).

Here, the law of the case doctrine is tempered by the fact that the Court's decision has not yet been made final, and might be subject to reconsideration. However, Officer Hodge's co-defendants, many of whom are represented by the same counsel as Officer Hodge, elected to appeal that decision; moreover, by failing even to acknowledge the Court's Opinion, Officer Hodge can hardly claim that he seeks its reconsideration. Therefore, the Court need not reconsider the shape of the wheel, and should, Plaintiff respectfully submits, treat its Opinion as the law of the case.

> **2. Under the analysis established by the Court, Hodge's motion for summary judgment for denial of medical care must be denied, and Plaintiff's motion for summary judgment against Hodge must be granted.**

The standard enunciated by the Court is as follows:

> In order to succeed on its motion for summary judgment as to the denial of medical care against the City of Cincinnati and its Defendant officers, the Plaintiff must demonstrate that they acted with "deliberate indifference to [Owensby's] serious medical needs." <u>Estelle</u>, 429 U.S. at 104. The Supreme Court concluded that this standard contains both an objective and a subjective component. See <u>Wilson v. Seiter</u>, 501 U.S. 294, 298-99 (1991). Under the objective component, the plaintiff must prove that the medical need was "sufficiently serious." <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994); <u>Watkins v. City of Battle Creek</u>, 273 F.3d 682, 687 (6th Cir. 2001). The subjective component, by comparison, requires that the defendant have a "sufficiently culpable state of mind." <u>Farmer</u>, 511 U.S. at 834.
>
> As the Sixth Circuit has repeatedly noted, "deliberate indifference is not mere negligence;" it is not sufficient that the officer should have objectively

> known of an obvious risk or risks to the Plaintiff's well-being. Watkins, 273 F.3d at 686; see also Weaver v. Shadoan, 340 F.3d 398, 410 (6th Cir. 2003). Rather, a defendant must both "know[] of and disregard[] an excessive risk to [a plaintiff's] health or safety." Farmer, 511 U.S. at 834. Accordingly, culpable defendants must both "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." Id.; see also Watkins, 273 F.3d at 687. Accordingly, "knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs . . . is essential to a finding of deliberate indifference." Horn, 22 F.3d at 660. It is not necessary, however, to demonstrate that the officials had a conscious intent to inflict pain upon the Plaintiff in this case. See Horn by Parks v. Madison County Fiscal Court, 22 F.3d 653, 660 (6th Cir. 1994) (noting that willful blindness to risks may suffice); Molton v. City of Cleveland, 839 F.2d 240, 243 (6th Cir. 1988). Furthermore, demonstration of the fact that the official actually drew the required inference may be demonstrated through circumstantial evidence or by showing that the risk was "obvious." Farmer, 511 U.S. at 842 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."); Watkins, 273 F.3d at 687-88; Horn, 22 F.3d at 660.

Doc. 156 at 44-45; *Estate of Owensby*, 2004 U.S. Dist. LEXIS 9444 at *60-62.

This standard obliterates the basic thrust of Officer Hodge's motion: The assertion that, because Officer Hodge testified that he did not think Mr. Owensby needed medical care, he is entitled to judgment. The Court recognized that Mr. Owensby's medical needs were obvious to those officers who admitted what they saw about his condition.[6] As with those officers, Officer

---

[6] This Court found that Defendant Officer Spellen acted with deliberate indifference to Mr. Owensby's constitutional right to medical care, even though he did not participate in the arrest, because he observed Mr. Owensby's condition and did nothing. Doc. 156 at 46-48; *Estate of Owensby*, 2004 U.S. Dist. LEXIS 9444 at *63-65. Officer Sellers was likewise found liable because he participated in the arrest and saw that Mr. Owensby was in distress, including, among other factors, the fact that he could not tell whether Mr. Owensby's "resistance" was voluntary or the result of the weight of Officer's Jorg and Caton on him; and he saw that Officer's Jorg and Caton had to slide Mr. Owensby into the Golf Manor cruiser. Doc. 156 at 48-50; *Estate of Owensby*, 2004 U.S. Dist. LEXIS 9444 at 66-67. Officer Hunter was found liable because he saw the beating inflicted and Mr. Owensby's condition as he was dragged to the Golf Manor cruiser. Doc. 156 at 50; *Estate of Owensby*, 2004 U.S. Dist. LEXIS 9444 at 67-68. Finally, the

Hodge admits that he knew facts that establish Mr. Owensby's need for medical care. Specifically, Officer Hodge admits that he knew:

- Mr. Owensby's face was bleeding;

- that Mr. Owensby's blood "all over" Officer Jorg's sleeve in a sufficient quantitiy that Officer Hodge determined that it should be immediately cut off to avoid the possibility of blood contamination;

- that despite the "struggle" and "resistance" with five police officers, Mr. Owensby made no sound as his arm was pried out from under him by Officer Hodge with the PR-24, as he was picked up and dragged to the Golf Manor cruiser, and as he was pushed into the cruiser;

- that Mr. Owensby's "short, choppy steps" as he was taken to the Golf Manor cruiser made it appear as though he was "severely intoxicated" even though Officer Hodge smelled no alcohol;

- that Mr. Owensby was sweating, which Officer Hodge recognized as an indicator of medical distress.

Against the backdrop of this Court's reasoning, then, Hodge's motion requires no heavy lifting. He admits that he was aware of Mr. Owensby's serious medical condition and deliberately chose to ignore those needs while, instead, buying a pack of cigarettes and a soda.

### B.    Officer Hodge Is Not Entitled To Qualified Immunity.

This Court has already analyzed the standard for qualified immunity in this action. Doc. 156 at 56-67; *Estate of Owensby*, 2004 U.S. Dist. LEXIS 9444 at *75-88. The qualified immunity inquiry is composed of two parts: (1) whether a constitutionally protected right has been violated; and, (2) whether the right is so clearly established that a reasonable official would

---

two Golf Manor police officers, Officers Heiland and Campbell, were found liable even though they did not participate in the arrest because they saw that Mr. Owensby's face was bleeding, that he was silent, that he was not moving, and they were told by Officer Brazile that it appeared as though Mr. Owensby was not breathing. Doc. 156 at 74-75; *Estate of Owensby*, 2004 U.S. Dist. LEXIS 9444 at 98-99.

understand that what he is doing violates that right. *Id.* at 57-58; 2004 U.S. Dist. LEXIS at *76-77.

This Court has already held that the Fourteenth Amendment right to medical care was clearly established as of the November 7, 2000 homicide of Mr. Owensby. *Id.* at 59-61; 2004 U.S. Dist. LEXIS at *79-81. Thus, the only remaining inquiry is whether Officer Hodge's conduct violated Mr. Owensby's constitutional right to medical care. Officer Hodge was trained in first-aid and CPR, based on his police training as well as his training as an Army Military Police Sergeant. Hodge Depo., pp. 60:18 - 64:13. As established above, objectively and subjectively, Officer Hodge knew that Mr. Owensby needed medical care, was trained to provide this life-saving medical care, knew that no one else was providing medical care to Mr. Owensby, and deliberately chose not to provide that care, opting instead to buy himself a pack of cigarettes and a soda while Mr. Owensby lay dying in the Golf Manor cruiser.

Consequently, for the same reasons that his companion officers were denied qualified immunity, Officer Hodge also is not entitled to qualified immunity.

### C. Officer Hodge Is Collaterally Estopped From Denying That He Was Aware Of, And Ignored, Mr. Owensby's Need For Medical Attention.

Officer Hodge was charged by the City of Cincinnati with misconduct for, *inter alia*, failing to attend to Mr. Owensby's medical needs. In Specification I against Hodge, the City charged: "On November 7, 2000, Officer Hodge was aware Mr. Owensby was injured. Officer Hodge failed to tend to or seek medical aid for Mr. Owensby's injuries." In Specification II, the City charged: "On November 7, 2000, Officer Hodge observed an injury to Mr. Owensby and rendered no appropriate first aid immediately once the incident scene was stabilized." Exhibit

163, Pre-Disciplinary Hearing Summary, at 1-2.

A Pre-Disciplinary Hearing was conducted, at which Officer Hodge was represented by the same counsel as represents him in this case. Counsel conceded to the hearing officer that Officer Hodge "observed injury to Mr. Owensby when he arrived on the scene," although counsel contested the extent of that observation. *Id.* at 3. Officer Hodge was permitted to adduce evidence and his counsel was permitted to argue. Following that hearing, the Police Division's hearing officer concluded: "There is a finding of sustained for Specification I" (*id* at 3) and [t]here is a finding of sustained for Specification II." *Id*. at 4.

When a police officer is subjected to discipline, he or she is collaterally estopped from denying that the conduct which gave rise to the discipline occurred. The disciplinary findings against Officer Hodge resulting from the Owensby homicide are binding, and Officer Hodge is "precluded from relitigating [those issues] in this action." *Greene v. Distelhorst*, 1997 U.S. App. LEXIS 15461 at *10-11 (6th Cir. 1991); *Czajkowski v. City of Chicago*, 810 F Supp. 1428, 1434 (N.D. Ill. 1993) (officer estopped from contesting facts of assault on citizen where disciplined and convicted therefor); *Wilson v. Chicago*, 900 F. Supp. 1015, 1027 (N.D. Ill. 1995) (police officers collaterally estopped from denying use of excessive force where disciplinary proceedings resulted in findings of excessive force).

In this case, then, Officer Hodge cannot deny that he was aware of Mr. Owensby's need for medical attention and ignored that need. The only question for the Court is whether that knowledge and neglect rose to the level of a Section 1983 violation, and as shown above, the law of the case easily answers that question in the affirmative.

**D.    The Excessive Force Claim.**

Beyond the issue of Officer Hodge's violation of Mr. Owensby's constitutional right to medical care, Officer Hodge has moved for summary judgment on the excessive force claim. Doc. 192, pp. 11-12. Plaintiff will not pursue and does not object to the dismissal of the excessive force claim against Officer Hodge for his role in the arrest of Mr. Owensby.

## IV.    CONCLUSION

Officer Hodge acted with deliberate indifference to Mr. Owensby's medical condition based upon his admitted subjective knowledge of Mr. Owensby's condition. Further, Officer Hodge is estopped from denying that he was aware of Mr. Owensby's need for medical attention and ignored that need based upon the Cincinnati Police administrative disciplinary proceedings. As a result, Plaintiff is entitled to summary judgment against Officer Hodge for the violation of Mr. Owensby's constitutional right to medical care based upon the same standards used to determine the liability of the other defendants in this action.

Therefore, Officer Hodge's motion for summary judgment should be denied in part (as to the failure to provide medical care) and granted in part (as to the claim of excessive force). Plaintiff's cross motion for summary judgment against Officer Hodge for his violation of Mr. Owensby's constitutional right to medical care should be granted.

                                                 Respectfully submitted,

| | |
|---|---|
| Mark T. Tillar (0029898)<br>105 E. Main Street, Ste. 202<br>Mason, Ohio  45040<br>Telephone: (513) 770-0264<br><br>John J. Helbling (0046727)<br>105 E. Main Street, Ste. 202<br>Mason, Ohio 45040<br>Telephone: (513) 770-0322 | /s/Paul B. Martins<br>James B. Helmer, Jr.  (0002878)<br>Paul B.  Martins (0007623)<br>Frederick M. Morgan, Jr.  (0027687)<br>HELMER, MARTINS & MORGAN CO., LPA<br>Fourth & Walnut Centre, Suite 1900<br>105 East Fourth Street<br>Cincinnati, Ohio 45202-4008<br>Telephone:     (513) 421-2400<br>Facsimile:       (513) 421-7902<br><br>*Trial Attorneys for Plaintiff* |

**CERTIFICATE OF SERVICE**

    I hereby certify that a copy of the foregoing Plaintiff's Memorandum in Opposition to Defendant Hodge's Motion for Summary Judgment (doc. 192) and Cross Motion for Summary Judgment, was electronically filed on September 23, 2004. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

                                                      <u>/s/ Paul B. Martins</u>