Case 1:01-cv-00769-SAS   Document 196-8   Filed 09/23/2004   Page 1 of 6

vensby, et al. vs. City of Cincinnati
vember 6, 2003

BRIAN ANTHONY BRAZILE

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - - -
ESTATE OF ROGER D.            :
OWENSBY JR., et al.,          :
                              :
        Plaintiffs,           :
   vs.                        : Case No. 01-CV-769
                              : (Judge S. A. Spiegel)
CITY OF CINCINNATI,           :
et al.,                       :
                              :
        Defendants.           :
- - - - - - - - - - - - - - -

        Videotaped deposition of BRIAN ANTHONY

BRAZILE, a witness herein, called by the plaintiffs

for cross-examination, pursuant to the Federal Rules

of Civil Procedure, taken before me, Wendy Davies

Welsh, a Registered Diplomate Reporter and Notary

Public in and for the State of Ohio, at the offices

of Helmer, Martins & Morgan Co. LPA, 1900 Fourth &

Walnut Centre, 105 East Fourth Street, Cincinnati,

Ohio, on Thursday, November 6, 2003, at 11:02 a.m.

Case 1:01-cv-00769-SAS   Document 196-8   Filed 09/23/2004   Page 2 of 6

Owensby, et al. vs. City of Cincinnati
November 6, 2003

BRIAN ANTHONY BRAZILE

Page 2

```
 1  APPEARANCES:

 2      On behalf of the Plaintiffs:

 3          Paul B. Martins, Esq.
            Don Stiens, Esq.
 4          Helmer, Martins & Morgan Co. LPA
            Suite 1900, Fourth & Walnut Centre
 5          105 East Fourth Street
            Cincinnati, Ohio  45202
 6          Phone: (513) 421-2400

 7          John J. Helbling, Esq.
            The Helbling Law Firm, L.L.C.
 8          3672 Springdale Road
            Cincinnati, Ohio 45251
 9          Phone: (513) 923-9740

10      On behalf of the Defendants City of Golf Manor,
        Stephen Tilley, Roby Heiland and Chris
11      Campbell:

12          Wilson G. Weisenfelder Jr., Esq.
            Rendigs, Fry, Kiely & Dennis
13          900 Fourth & Vine Tower
            One West Fourth Street
14          Cincinnati, Ohio  45202-3688
            Phone: (513) 381-9292
15
        On behalf of the Defendants City of Cincinnati,
16      Darren Sellers, Jason Hodge:

17          Geri Hernandez Geiler, Esq.
            Assistant City Solicitor
18          Department of Law
            Room 214, City Hall
19          801 Plum Street
            Cincinnati, Ohio 45202
20          Phone: (513) 352-3346

21

22

23

24
```

Page 3

```
 1  APPEARANCES (Continued):

 2      On behalf of Brian Anthony Brazile and the
        Defendants Robert B. Jorg, Patrick Caton, Jason
 3      Hodge, Victor Spellen and Darren Sellers:

 4          Donald E. Hardin, Esq.
            Hardin, Lefton, Lazarus & Marks, LLC
 5          915 Cincinnati Club Building
            30 Garfield Place
 6          Cincinnati, Ohio 45202
            Phone: (513) 721-7300
 7
    Also present:
 8
    Richard W. Grubb, Videographer
 9
    Lisa Damstrom, Law Clerk
10  Helmer, Martins & Morgan Co., L.P.A.

11  Mr. Roger Owensby

12  Mrs. Brenda Owensby

13  Mr. Shawn Owensby

14

15

16              S T I P U L A T I O N S

17

18      It is stipulated by and among counsel for the

19  respective parties that the deposition of BRIAN

20  ANTHONY BRAZILE, a witness herein, called by the

21  plaintiffs for cross-examination, pursuant to the

22  Federal Rules of Civil Procedure, may be taken at

23  this time by the notary; that said deposition may be

24  reduced to writing in stenotype by the notary, whose
```

Page 4

```
 1  notes may then be transcribed out of the presence of

 2  the witness; and that proof of the official

 3  character and qualifications of the notary is

 4  expressly waived.

 5
                           - - -
 6

 7                       I N D E X

 8      Examination by:              Page

 9      Mr. Martins . . . . . . . .    5
        Mr. Weisenfelder . . . .     110
10      Mr. Martins . . .            135

11

12                    E X H I B I T S

13                                         Page
    Deposition Exhibit 47 . . . . . . . .    64
14  Deposition Exhibit 48 . . . . . . . .    75
    Deposition Exhibit 49 . . . . . . . .    77
15  Deposition Exhibit 50 . . . . . . . .    78
    Deposition Exhibit 51 . . . . . . . .    80
16  Deposition Exhibit 52 . . . . . . . .    93
    Deposition Exhibit 53 . . . . . . . .   102

17

18

19                      . . .

20

21

22

23

24
```

Page 5

```
 1       VIDEOGRAPHER: The time is 11:02 a.m. The
 2  date is November the 6th. The year is 2003.
 3       Would you please swear the witness, ma'am.
 4       BRIAN ANTHONY BRAZILE
 5  being by me first duly cautioned and sworn, deposes
 6  and says as follows:
 7       VIDEOGRAPHER: We're on the record, Mr.
 8  Martins. This is videotape number 1 for this
 9  deposition.
10       MR. MARTINS: Thank you.
11            CROSS-EXAMINATION
12  BY MR. MARTINS:
13   Q. Sir, would you state for the record your
14  full name, please.
15   A. My full name is Brian Anthony Brazile.
16   Q. And your date of birth?
17   A. Is 11/11/70.
18   Q. Have you ever had your deposition taken
19  before?
20   A. No, sir.
21   Q. Let me cover some ground rules with you.
22  As you have just observed, the court reporter places
23  you under oath. I will be asking you questions. If
24  I should ask you a question that either you don't
```

Case 1:01-cv-00769-SAS    Document 196-8    Filed 09/23/2004    Page 3 of 6

Owensby, et al. vs. City of Cincinnati
November 6, 2003

BRIAN ANTHONY BRAZILE

Page 54

1  A. It was sort of like fetal sort of
2  position.
3  Q. Did you say anything to Officer Heiland at
4  that time, after seeing Mr. Owensby with your
5  flashlight?
6  A. Yes.
7  Q. What did you say to Officer Heiland?
8  A. I walked around to the other side of the
9  vehicle.
10 Q. To the -- to the --
11 A. To where they were.
12 Q. -- rear of the passenger's side of the
13 vehicle?
14 A. Where they were standing.
15 Q. Okay.
16 A. And I asked him, I said, "The guy you have
17 in your car, is he okay?" I said, "Can he breathe?"
18 I said, "He's in a" -- you know, position that
19 looked like he was in, it may have been hard, so I
20 asked him. I'm figuring he's their prisoner. No
21 one ever said whose he was. I figured he was
22 theirs, because he was in their car.
23     And basically I was just trying to let
24 them know to check on him, just to see what's going

Page 55

1  on with him or did they know or had they checked. I
2  don't know. I just had arrived.
3      And basically when I told them, you know,
4  they basically just stood there and kind of like
5  shrugged their shoulders.
6  Q. Both of them?
7  A. From what I recall.
8  Q. Did they say --
9  A. But I was mainly talking to -- to Rob.
10 Q. To -- to Heiland?
11 A. Correct.
12 Q. Did Officer Heiland or the other officer,
13 Officer Campbell, say anything to you in response?
14 A. No. No, sir.
15 Q. In your -- after you told them that --
16 voiced your concern that you weren't sure that the
17 person could breathe, or "Can he breathe," I guess,
18 was your -- your question to them, and they shrugged
19 their shoulders, was the -- the shrug, did you take
20 that to mean, We don't know, or -- or how -- how did
21 you interpret the shrug of the shoulders?
22 A. Well, once I made the statement that I
23 made and, you know, he shrugged, kind of shrugged
24 his shoulders, I took it as everything was fine.

Page 56

1  Because they didn't actually go and check.
2      I figure if it was my vehicle and someone
3  told me that, you know, something may or possibly
4  could have been wrong, you know, I would probably
5  run right over and check and see what's going on.
6      But for some reason they didn't, so I took
7  it that probably they had already checked on him and
8  they knew what was -- you know, maybe he was fine,
9  maybe, I don't know, was overexaggerating maybe.
10 Q. In any event, they -- they took no action
11 in response to your question to them as far as "Can
12 he breathe," right?
13 A. No, sir.
14 Q. As I recall, your statement was something
15 along the lines of: this looks fucked up, can he
16 breathe, it don't look like he can from the way he's
17 laying.
18 A. Uh-huh.
19 Q. Is that accurate to your recollection?
20 A. Yes.
21 Q. And you saying, in response to that,
22 Officer Heiland and possibly the other officer
23 simply shrugged their shoulders?
24 A. Yes.

Page 57

1  Q. What did you do then?
2  A. At that point in time I took it as I guess
3  everything was okay then. I went back to my vehicle
4  and proceeded to put my hat on. And like I say,
5  right after that, that's when supervisors and
6  everybody started showing up on -- onto the scene.
7  Q. Okay. So you walk back to your -- to the
8  scout car, get your hat out, put your hat on?
9  A. Uh-huh.
10 Q. Is Officer Jorg still around the area?
11 A. Somewhere, yes.
12 Q. Is Caton still around the area?
13 A. Everybody was still in the area, yes.
14 Q. Hunter's in the area?
15 A. Everyone.
16 Q. Hodge, Lawson are in the area, right?
17 A. Correct.
18 Q. Did you say to any of them, Hey, can that
19 guy breathe; it doesn't look like he's breathing in
20 the back of that Golf Manor car? Did you say
21 anything like that to them?
22     MR. HARDIN: Objection to the form of the
23 question.
24 A. Not to them.

Page 54 - Page 57

Case 1:01-cv-00769-SAS   Document 196-8   Filed 09/23/2004   Page 4 of 6

Owensby, et al. vs. City of Cincinnati
November 6, 2003

BRIAN ANTHONY BRAZILE

**Page 62**

1 to why this person wasn't seated up and was not
2 seat-belted?
3    A. No, I didn't. He was not in -- he was in
4 Golf Manor's custody and control. I don't know what
5 their policies are.
6    Q. Well, but just for the safety of the
7 person --
8    A. Uh-huh.
9    Q. -- did you raise these -- these issues?
10   A. No.
11   Q. I mean, these are -- these are safety
12 issues, right?
13       MR. HARDIN: Objection.
14   Q. Regardless of -- regardless of whose car
15 they're in, the reason the person is sitting up as
16 opposed to laying down is, at least in part, that
17 they won't suffocate or have any asphyxia, correct?
18       MR. HARDIN: Objection.
19       You may answer.
20   A. Okay.
21   Q. That's -- I mean, that's part of your
22 training, right?
23   A. Yes.
24   Q. Okay. And the same thing for a seat belt;

**Page 63**

1 a person wears a seat belt for their safety,
2 correct?
3    A. Correct.
4       MR. HARDIN: Objection.
5       You may answer.
6    Q. And so what I'm asking is, when you saw
7 this person laying down, not seat-belted, in the
8 back seat of the cruiser, did you raise any concern
9 not out of who was responsible but just out of --
10 for the safety of the person in the car?
11       MR. HARDIN: Objection. Asked and
12   answered.
13       You may answer.
14   A. That was the whole reasoning of me talking
15 to the Golf Manor officers, you know, to bring it to
16 their attention.
17   Q. When -- when you said it doesn't look --
18 he doesn't look like he can breathe?
19   A. Well, yeah, I'm saying, period, from when
20 I looked in.
21       MR. HARDIN: Objection to the form of the
22   question. I -- I am going to object to you
23   stating something that this witness did not
24   say, in the question.

**Page 64**

1       (Deposition Exhibit 47
2        was marked for identi-
3        fication.)
4    Q. Let me hand you, sir, what is marked as
5 Exhibit 47. If you would take a look at that and
6 just tell me whether or not that is a transcript of
7 a statement you gave to police Homicide detectives
8 on November 13th, 2000.
9    A. Yes, it is.
10   Q. And that's one of the statements that you
11 looked at in preparation for this deposition,
12 correct?
13   A. Yes, it is.
14   Q. I want to direct your attention to page 3.
15 About halfway down the page there's a question that
16 says, "What did you say?" Do you see that?
17   A. Yes.
18   Q. Okay. And then your answer is, "I told
19 'em it looked fucked up, you know."
20       Question: Which, which Golf Manor guy did
21 you say this to?
22       "Answer: Heiland. Cause I know Heiland."
23       MR. HARDIN: Excuse me a minute.
24       THE WITNESS: That was never said.
25       MR. HARDIN: Just -- okay. Just go ahead

**Page 65**

1 and keep reading. Can you start over again so
2 the --
3    Q. "Question: What did you say?
4       "Answer: I told 'em it looked fucked up,
5 you know.
6       "Question: Which, which Golf Manor guy
7 did you say that too (sic)?
8       "Answer: Heiland. Cause I know Heiland.
9       "Question: You know Heiland.
10      "Answer: Like I said, we went to the
11 academy together.
12      "Question: You said, 'This looks fucked
13 up.'"
14      Answer: That's exactly, "exactly what I
15 said. And uh he was just shaking his head. And I
16 said, 'You know this guy?' He said, 'No.' I was
17 like oh, 'Okay.' I said uh, 'Can he breathe?' I
18 said, 'It don't like he can'" -- "'he can from the
19 way he's laying.' And then uh he was just, he just
20 shook, he just shook his head. And uh then I said
21 that" -- "And uh then I said that because he was in
22 the car."
23      Did I read that accurately?
24   A. Yeah, pretty much, that I can recall.

Case 1:01-cv-00769-SAS    Document 196-8    Filed 09/23/2004    Page 5 of 6

Owensby, et al. vs. City of Cincinnati
November 6, 2003

BRIAN ANTHONY BRAZILE

Page 66

1  Q. Okay. And that's -- and that's -- that is
2  consistent with your recollection?
3     MR. HARDIN: For the record, before --
4     before this, I'm -- I'm going to indicate to
5     you that I am not aware of the actual accuracy
6     of this transcript. I have reason to doubt the
7     accuracy of transcripts from the Cincinnati
8     Police Division, so I'm going to register that
9     objection and let him answer the question,
10    though.
11    MR. MARTINS: Okay. Do you have any
12    indication that what I've read is inaccurate as
13    to what was said?
14 A. Some wording.
15 Q. No, I'm asking Counsel on the objection.
16 A. Oh.
17    MR. HARDIN: Mr. Martins, if I actually
18    knew that there was an inaccuracy, I'd tell
19    you.
20    MR. MARTINS: Okay.
21    MR. HARDIN: I just have reason to doubt
22    the accuracy.
23    MR. MARTINS: All right, sir.
24 BY MR. MARTINS:

Page 67

1  Q. Now, you were saying?
2  A. In the case where it says --
3     MR. WEISENFELDER: What page?
4     THE WITNESS: I'm sorry. I think it's 3.
5  A. Okay. Where it -- right under where it
6  says, "What did you say" right in the middle where
7  you started at --
8  Q. Yes?
9  A. -- "I told 'em it looked fucked up," no, I
10 didn't say "it." I said "this."
11 Q. "This looks fucked up?"
12 A. Yes.
13 Q. All right.
14 A. That's meaning the whole incident. I
15 didn't say "he" or -- I'm sorry, or "it." I -- I
16 was talking about the situation as a whole.
17 Q. Anything else?
18 A. No. That's it.
19 Q. So with respect to -- and later on, I
20 guess, he says -- further down there's a question
21 that says, "You said, 'This looks fucked up.'" I
22 guess that's -- that's accurate, right?
23 A. Okay.
24 Q. Is that correct?

Page 68

1  A. Yes.
2  Q. And then as to the other statements that
3  this transcript says you said, "Can he breathe? I
4  said," I don't -- "It don't look like he can from
5  the way he's laying," do you have a recollection of
6  saying that to Officer Heiland?
7  A. That sounds accurate.
8  Q. All right.
9     MR. HARDIN: Are you finished with that --
10    that examination about this statement?
11    MR. MARTINS: Yes. Yes.
12    MR. HARDIN: I'm -- I'm going to indicate
13    to you the only reason I objected is because I
14    think your question, as it was originally
15    posed, said that he said he cannot breathe, and
16    that is different than what he said in his
17    transcript. That's the reason the objection
18    was as to the form.
19    MR. MARTINS: Well, the -- the quote is,
20    "Can he breathe? It don't look like he can
21    from the way he's laying."
22    MR. HARDIN: I -- I understand that.
23    MR. MARTINS: Okay.
24    MR. HARDIN: But he didn't say: he cannot

Page 69

1  breathe.
2     MR. MARTINS: All right.
3     MR. HARDIN: Okay.
4  BY MR. MARTINS:
5  Q. After talking with Officer -- with
6  Sergeant Browner, did you talk to anyone else?
7  A. No.
8  Q. I'm sorry?
9  A. No, I didn't.
10 Q. At the time you spoke with Sergeant
11 Browner, am I correct in understanding that you knew
12 that there had been a physical altercation involving
13 several Cincinnati police officers? Correct?
14 A. Correct. I knew something went on, yes.
15 Q. You knew that there had been an officer
16 needs assistance call, because that's how you went
17 to that scene, correct?
18 A. Correct.
19 Q. You saw blood on Jorg's sleeve, correct?
20 A. Correct.
21 Q. And he had told you that it came from the
22 guy that you saw in the back seat of the cruiser?
23 A. Correct.
24 Q. You had seen some blood on Caton's sleeve,

# AFFIDAVIT

- - -

STATE OF OHIO :
: SS
COUNTY OF HAMILTON :

I, Wendy L. Welsh, Notary Public in and for the State of Ohio, do hereby state that the transcript of the deposition of BRIAN ANTHONY BRAZILE, deponent herein, having been submitted to said deponent for review and signature, has not been signed within the thirty (30) day period allowed under the Federal Rules; said deposition to now have the same force and effect as though signed.

*[signature]*
Wendy L. Welsh, Court Reporter

Sworn to before me this _15_ day of _January_, 2004.

*[signature]*
Thomas M. Blasing
Notary Public - State of Ohio

My commission expires:
May 4, 2004.