1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - - - - - - - - - - - - - -

ESTATE OF ROGER D.                :
OWENSBY JR., et al.,              :
                                  :
        Plaintiffs,               :
    vs.                           :  Case No. 01-CV-769
                                  : (Judge S. A. Spiegel)
CITY OF CINCINNATI,               :
et al.,                           :
                                  :
        Defendants.               :
- - - - - - - - - - - - - - -


        Deposition of JASON LEE HODGE, defendant

herein, called by the plaintiff for

cross-examination, pursuant to the Federal Rules of

Civil Procedure, taken before me, Wendy Davies

Welsh, a Registered Diplomate Reporter and Notary

Public in and for the State of Ohio, at the offices

of Helmer, Martins & Morgan Co. LPA, 1900 Fourth &

Walnut Centre, 105 East Fourth Street, Cincinnati,

Ohio, on Thursday, April 8, 2004, at 10:06 a.m.

Estate of Roger Owensby vs. City of Cinti.
April 8, 2004

JASON LEE HODGE

---

**Page 2**

```
 1   APPEARANCES:
 2       On behalf of the Plaintiffs:
 3           Paul B. Martins, Esq.
             Don Stiens, Esq.
 4           Frederick M. Morgan, Jr., Esq.
             Helmer, Martins & Morgan Co. LPA
 5           Suite 1900, Fourth & Walnut Centre
             105 East Fourth Street
 6           Cincinnati, Ohio 45202
             Phone:  (513) 421-2400
 7
 8           John J. Helbling, Esq.
             The Helbling Law Firm, L.L.C.
 9           3672 Springdale Road
             Cincinnati, Ohio 45251
10           Phone:  (513) 923-9740
11       On behalf of the Defendants City of Golf Manor,
         Stephen Tilley, Roby Neiland and Chris
12       Campbell:
13           Wilson G. Weisenfelder, Jr., Esq.
             Rendigs, Fry, Kiely & Dennis
14           900 Fourth & Vine Tower
             One West Fourth Street
15           Cincinnati, Ohio 45202-3688
             Phone:  (513) 381-9200
16
17       On behalf of the Defendants Robert B. Jorg,
         Patrick Caton, Jason Hodge, Victor Spellen and
18       Darren Sellers:
19           Donald E. Hardin, Esq.
             Kimberly A. Rutowski, Esq.
20           Hardin, Lefton, Lazarus & Marks, LLC
             915 Cincinnati Club Building
21           30 Garfield Place
             Cincinnati, Ohio 45202
22           Phone:  (513) 721-7300
23   Also present:
     Lisa Damstrom, Law Clerk
24   Helmer, Martins & Morgan Co., L.P.A.
                      - - -
```

---

**Page 3**

```
 1              S T I P U L A T I O N S
 2       It is stipulated by and among counsel for the
 3   respective parties that the deposition of JASON LEE
 4   HODGE, defendant herein, called by the plaintiff for
 5   cross-examination, pursuant to the Federal Rules of
 6   Civil Procedure, may be taken at this time by the
 7   notary; that said deposition may be reduced to
 8   writing in stenotype by the notary, whose notes may
 9   then be transcribed out of the presence of the
10   witness; and that proof of the official character
11   and qualifications of the notary is expressly
12   waived.
13
14                      - - -
```

---

**Page 4**

```
 1                    I N D E X
 2       Examination by:          Page
 3       Mr. Martins . . . . . . . .    5
 4                   - - -
 5              E X H I B I T S
 6                                   Page
 7
 8   Deposition Exhibit 152 .................   8
     Deposition Exhibit 153 .................  30
 9   Deposition Exhibit 154 .................  33
     Deposition Exhibit 155 .................  67
10   Deposition Exhibit 156 .................  83
     Deposition Exhibit 157 ................. 104
11   Deposition Exhibit 158 ................. 104
     Deposition Exhibit 159 ................. 110
12   Deposition Exhibit 160 ................. 112
     Deposition Exhibit 161 ................. 123
13   Deposition Exhibit 162 ................. 124
     Deposition Exhibit 163 ................. 128
14
15                   - - -
```

---

**Page 5**

1           JASON LEE HODGE
2  being by me first duly cautioned and sworn, deposes
3  and says as follows:
4           CROSS-EXAMINATION
5  BY MR. MARTINS:
6      Q. Sir, would you state for the record your
7  full name, please.
8      A. My name is Jason Lee Hodge.
9      Q. Your age?
10     A. 34.
11     Q. Date of birth?
12     A. February 20th, 1970.
13     Q. February what?
14     A. 20th.
15     Q. Have you ever had your deposition taken?
16     A. No.
17     Q. This sort of procedure?
18     A. No.
19     Q. Let me cover some ground rules.  You've
20  been placed under oath.  I am asking you some
21  questions.  If I should ask you a question and you
22  either don't understand the question or you haven't
23  heard the question, just ask me to clarify it or
24  repeat it.  I'll do my best.  If you give me an

Estate of Roger Owensby vs. City of Cinti.                                JASON LEE HODGE
April 8, 2004

Page 6

1 answer, I'm going to presume that you heard and
2 understood the question and are giving me a truthful
3 answer. Fair?
4    A. Yes.
5    Q. From time to time I'm going to show you
6 some exhibits, and if I show you an exhibit, just
7 look at it, and once you've had a chance to browse
8 through the exhibit, either look up at me or give me
9 some indication that you're ready, and then I'll ask
10 you whatever questions I have from the exhibit.
11 When I'm finished asking you questions other counsel
12 may ask you questions.
13    Do you have any physical or mental
14 impairment that would cause you not to understand
15 questions being asked of you today?
16    A. No.
17    Q. Are you under any medication that would
18 cause you not to either understand questions or to
19 give truthful answers?
20    A. No.
21    Q. What is your current job?
22    A. Cincinnati Police Department police
23 officer.
24    Q. Are you assigned to District 4?

Page 7

1    A. District 1.
2    Q. How long have you been in District 1?
3    A. I've been assigned to District 1 for, I'd
4 say approximately two years, but I've only spent one
5 year, since I spent the past year in Iraq and
6 Kuwait.
7    Q. When did you go to Iraq and Kuwait?
8    A. February 2003.
9    Q. When did you return?
10    A. January 10th, 2004.
11    Q. This year, 2004?
12    A. Yes.
13    Q. I take it you were there serving in a
14 military capacity with a National Guard unit?
15    A. Yes, I was.
16    Q. What was the National Guard unit?
17    A. The 324th Military Police Company.
18    Q. What rank do you hold in that?
19    A. Sergeant.
20    Q. The duties would be that of a military
21 police officer?
22    A. Military police team leader, yes.
23    Q. Before being assigned to District 1, were
24 you assigned to District 4?

Page 8

1    A. Yes.
2    Q. How long were you assigned to District 4?
3    A. From 1997 until 2000.
4    Q. Before being assigned to District 4 in
5 '97, were you assigned to any other districts?
6    A. No. I was in the police academy then.
7    Q. And graduated from the police academy
8 when?
9    A. In December of 1997.
10    Q. Do you know whether or not, of the five
11 districts in the Cincinnati Police Department,
12 whether District 4 is the largest district?
13    A. I don't believe it is, no.
14    Q. Would that be District 3?
15    A. As far as I know, I believe it's between 2
16 and 3, District 2 and 3.
17    (Deposition Exhibit 152
    was marked for identi-
18    fication.)
19    Q. Let me show you the first exhibit,
20 exhibit 152. Exhibit 152, I'm not sure if it's your
21 entire personnel file, but it is documents from your
22 personnel file; is that correct?
23    A. That's correct.
24    Q. The first page is a photograph of you in

Page 9

1 your police uniform?
2    A. Yes.
3    Q. I'm going to just go through some things
4 here that I think we'll shorten our examination.
5 The next page is a personal history and some
6 statistics that you've already given to us. Your
7 height and weight at 5'10", 198 that's listed on
8 that page, would that be fairly accurate as to your
9 height and weight as of on November 7th, 2000?
10    A. I would say roughly, yes.
11    Q. I'm sorry?
12    A. Roughly, yes. The weight, I'm not sure.
13    Q. Personal History, this gives your
14 employment history. In the Second -- on the page it
15 says Second From Last Position, and the employer you
16 have listed is U.S. Army and the address is at Ft.
17 Riley Kansas, A Co., then you have (LE) USAG. Can
18 you tell me what the USAG stands for?
19    A. United States Army Garrison.
20    Q. And the LE?
21    A. Law enforcement.
22    Q. Thank you. You did a short period of time
23 with the sheriff's department in New Orleans?
24    A. Yes.

Estate of Roger Owensby vs. City of Cinti.
April 8, 2004

JASON LEE HODGE

---

Page 18

1    A. I don't recall exactly how I found out.  I
2 think I just overheard people talking about it.
3    Q. When did you first realize that Roger
4 Owensby was injured?
5    A. When somebody called for the fire
6 department to respond.
7    Q. Am I correct in understanding that
8 November 7th, 2000, the evening of November 7th,
9 2000, was the first time that you had ever run into
10 Roger Owensby Jr.?
11    A. Yes.
12    Q. You had no prior experience with him?
13       MR. HARDIN:  I'm going to object, only
14    because of the words "run into."  I don't like
15    the connotation there.
16       MR. MARTINS:  Let me rephrase then.
17    Q. The first time you had ever encountered
18 Roger Owensby Jr. was on the evening of November 7,
19 2000?
20    A. Yes.
21    Q. At the time, as I understand it, you were
22 working in a mini-tac unit?
23    A. Yes.
24    Q. Explain to me what a mini-tac unit is.

---

Page 19

1    A. The mini-tac unit is the district level
2 plainclothes unit.  We investigate drugs and vice,
3 liquor crimes.
4    Q. I take it then you worked mainly
5 undercover?
6    A. Yes.
7    Q. Plainclothes, or I think the term's been
8 used, old clothes; is that right?
9    A. Yes.
10    Q. You're responsible for the illegal
11 activities, as you've just described them, and
12 investigating those activities within District 4's
13 geographic boundaries?
14    A. Yes.
15    Q. How long had you been in the mini-tac
16 unit?
17    A. I believe about 11 months.
18    Q. So am I correct in understanding that the
19 entire time you were in the mini-tac unit your
20 partner was Officer Lawson?
21    A. For administrative purposes, yes.  We
22 didn't always ride together, but for administrative
23 purposes we were partners.
24    Q. Were there other officers that, in this

---

Page 20

1 time period, worked in the mini-tac unit?
2    A. Yes.
3    Q. In total, do you have an estimation of the
4 number of officers who worked in mini-tac in this
5 11-month time period?
6    A. I'd say five, I believe.
7    Q. That would cover the three shifts in any
8 given day?
9    A. We didn't work three shifts.  We all
10 worked the same time and fluctuated our hours.
11    Q. So five people working on one shift?
12    A. Right.
13    Q. Then in the next shift there would be
14 another five people working mini-tac?
15    A. No.  Mini-tac was not a 24-hour continuous
16 operation.
17    Q. Thanks.  Did mini-tac work more than one
18 shift?
19    A. We would fluctuate our hours at times,
20 yes.
21    Q. So you didn't follow the traditional
22 shifts that the regular police officers followed?
23    A. Right.
24    Q. In the time that you were working in

---

Page 21

1 mini-tac and doing, among the items that you listed
2 were drug investigations, I take it then you had not
3 heard of a Roger Owensby being involved in drug
4 dealing?
5    A. I didn't know who he was, no.
6    Q. Had you ever heard of a person by the name
7 of LA, nicknamed LA being involved in drug dealing?
8    A. No.
9    Q. Had you heard about Sam's Carry Out or
10 that Sunoco station at the corner of Langdon Farm
11 and Seymour Avenue being a, for lack of a better
12 term, a hotbed of drug activity?
13    A. I was aware that drugs do get sold in that
14 location, in that area, yes.
15    Q. Had the mini-tac unit concentrated its
16 investigations in that area?
17    A. I don't believe so, no.
18    Q. How about the Huntington Meadows area
19 which borders on that intersection there?
20    A. No.  I mean, on occasion we would go to
21 different areas of District 4, but we didn't
22 specifically target those areas.
23    Q. In reviewing your prior statements, which
24 no doubt you've also reviewed, you talked about the

---

Estate of Roger Owensby vs. City of Cinti.                    JASON LEE HODGE
April 8, 2004

Page 26

1    A. Yes.
2    Q. You get a phone call from someone or, I
3  guess, Officer Lawson gets a phone call; is that
4  right?
5    A. Yes.
6    Q. Can you take me from that point forward
7  and give me your best recollection of what happened?
8    A. Well, Officer Lawson received a phone call
9  from someone stating they had somebody they'd like
10 us to talk to. I told him I would ride with him.
11 We drove up to that intersection where the Sunoco
12 was at. I saw officers standing in the Sam's Carry
13 Out parking lot and a lot of civilians around them.
14      We didn't want to blow our cover, so we
15 went over to Roselawn Park, sat over at Roselawn
16 Park. At that point we heard an assistance call
17 come out for the location those officers were at.
18    Q. Let me stop you for a second and ask some
19 questions about what you've just covered. The phone
20 call comes in. Officer Lawson takes the phone call.
21 And then I guess at some point he tells you what has
22 happened, or were you on the phone call?
23    A. No, I wasn't on the phone call.
24    Q. So he takes the phone call and tells you,

Page 27

1  "We have to go up to Sam's Carry Out," or something
2  like that?
3    A. Right.
4    Q. You get in an unmarked car, drive up
5  there. Do you recall what, the unmarked car, what
6  make the car was?
7    A. I couldn't recall that at all, no.
8    Q. Do you recall whether or not, working
9  undercover with Officer Lawson, you folks ever used
10 a maroon Camry?
11    A. We switched cars quite often, so I really
12 couldn't tell you for sure.
13    Q. In any event, you drive up and you drive
14 past Sam's Carry Out where you see the police
15 officers and the cars, but there are civilians
16 around and so you don't want to blow your cover, and
17 you drive over to Roselawn Park. Do you recall how
18 many police cars you saw at Sam's?
19    A. I don't remember how many were there.
20    Q. Is it fair to say there was more than one?
21    A. I don't know how many were there. I don't
22 remember.
23    Q. Do you recall how many officers were
24 there?

Page 28

1    A. I remember seeing two officers, but I
2  don't know how many were there.
3    Q. If you picture in your mind's eye, Sam's
4  Carry Out is located off of Seymour and there's a
5  parking lot next to Sam's, and then there's, I think
6  it's Eagle Court that drives around behind it. Were
7  the cars or car, police car, that you saw in that
8  parking lot next to Sam's?
9    A. Like I said, I don't remember how many
10 police cars were there. I don't know. The officers
11 were standing in front of Sam's Carry Out. That's
12 really all I can tell you.
13    Q. At the time, there were some telephones,
14 public telephones between Sam's and the Sunoco
15 station. Do you recall that?
16    A. No, I don't.
17    Q. Do you recall that there was a guardrail
18 between Sam's and the Sunoco station?
19    A. No, I don't.
20    Q. So you drive over to the Roselawn Park and
21 you park. Where are you specifically parked? I
22 know that there are some ball fields over there.
23    A. Lawson drove us to the first parking lot
24 inside Roselawn Park. It wasn't by the ball fields.

Page 29

1  It was just the first parking lot there.
2    Q. Could you see, from where you were parked,
3  could you see Sam's?
4    A. No.
5    Q. In any event, what happens next?
6    A. The assistance call came out and Lawson
7  drove the car over to the Sam's parking lot. That's
8  when I got out of the car. I saw Hasse at a police
9  car in the Sam's Carry Out lot. He was pointing
10 over to the Sunoco station. I looked over at the
11 Sunoco station, saw several officers struggling with
12 someone, ran over there and gave assistance to them.
13    Q. Do you recall whether or not your partner,
14 Officer Lawson, got out of the car?
15    A. I don't know what he did.
16    Q. Do you have a recollection of Officer
17 Lawson following you in the car over to the Sunoco
18 station?
19    A. I don't know what he did.
20    Q. After the event with Mr. Owensby was
21 completed, after Mr. Owensby was handcuffed and you
22 stood up, do you recall seeing the car that you and
23 Officer Lawson had driven up in the parking lot?
24    A. I don't remember seeing the car. I don't

Page 26 - Page 29

Estate of Roger Owensby vs. City of Cinti.                                    JASON LEE HODGE
April 8, 2004

Page 30

1  know.
2      Q.   So you run over and what happens?
3      A.   I kneel down next to Officer Caton and
4  assist him in placing Owensby's hands behind his
5  back for handcuffing.
6      Q.   Am I correct in understanding that Mr.
7  Owensby was situated laying face down on the
8  asphalt?
9      A.   The front of his body was on the asphalt,
10 yes.
11     Q.   Down on the asphalt, and that he was
12 located behind a car that was parked at the entrance
13 of the convenient store?
14     A.   Yes.
15     Q.   Let me show you a photograph.  This has
16 previously been marked as Exhibit 9.  Does that look
17 like the car that was parked that Mr. Owensby was
18 behind?
19     A.   I believe so, yes.
20     Q.   Thank you.  We'll mark this as
21 Exhibit 153.
              (Deposition Exhibit 153
22             was marked for identi-
23             fication.)
24     MR. MARTINS:  First, let me just show

Page 31

1  everyone.
2      MR. HARDIN:  Is that what we've referred
3  to as the all station diagram?
4      MR. MARTINS:  I don't know that, but we've
5  used it before with other witnesses.  I will
6  represent it was produced by the city.
7  BY MR. MARTINS:
8      Q.   Anyway, I've handed you, sir, Exhibit 153,
9  which is a diagram showing a portion of Sam's Carry
10 Out and then the Sunoco station at the corner of
11 Langdon Farm and Seymour Avenue.  Do you see that?
12     A.   Yes.
13     Q.   On the diagram you can see the entrance to
14 the convenient store and there is a car to the
15 immediate, as you face the convenient store, to the
16 immediate left of the entrance.
17     Here's a pen.  Would you just draw in the
18 stick figure indicating where Mr. Owensby was, just,
19 you know, head, neck, body, legs?
20     A.   I can't represent exactly where he was on
21 this document.
22     Q.   Your best recollection?
23     A.   (Witness complies.)
24     That general location.

Page 32

1      Q.   So his head is facing -- is parallel to
2  the store or his body is parallel to the store;
3  would that be fair?
4      A.   Roughly; yes.
5      Q.   It is facing --
6      A.   -- northwest.
7      Q.   Yeah, I guess, toward the -- well, toward
8  the island and the intersection of Sam's Carry Out
9  and the Sunoco station, fair?
10     A.   In that general direction, yes.
11     Q.   Now, when you come up, which side of Mr.
12 Owensby are you on?
13     A.   I'm on Owensby's right side.
14     Q.   As I understand what you've told me
15 before, you were -- or not what you've told me --
16 what you've told others before, you were between his
17 neck and his shoulder?
18     A.   Yes.
19     Q.   Are you kneeling down?
20     A.   Yes, I am.
21     Q.   To your immediate left is Officer Caton?
22     A.   Yes.
23     Q.   Across from you is Officer Jorg?
24     A.   Yes.

Page 33

1      Q.   Somewhere is Officer Hunter?
2      A.   Hunter is several feet away from his head,
3  kneeling down.
              (Deposition Exhibit 154
4             was marked for identi-
5             fication.)
6      Q.   Let me try this.  I'll give you what is
7  marked as Exhibit 154.  It's just a general sketch
8  of a body, looking at it from the back.  Would you
9  just write your name in the position where you were.
10     A.   (Witness complies.)
11     Q.   Then write "Caton" in the position where
12 Caton was.
13     MR. HELBLING:  I didn't catch, what
14 exhibit number is that?
15     MR. MARTINS:  154.
16     Q.   Then Hunter.
17     A.   Hunter was up in this area.  He wasn't
18 anywhere close to his head.  I mean, he was --
19     Q.   Would you write "Hunter" then at the top
20 and put an arrow indicating it was beyond that area.
21     A.   (Witness complies.)
22     Q.   Then Officer Jorg?
23     A.   (Witness complies.)
24     Q.   I believe when you arrived Officer Sellers

Estate of Roger Owensby vs. City of Cinti.                    JASON LEE HODGE
April 8, 2004

Page 34

1 was already there; is that right?
2     A. I believe so, yes.
3     Q. Where was Officer Sellers?
4     A. He was down at his legs somewhere. I
5 don't know exactly where.
6     Q. Would you write Officer Sellers' name and
7 just indicate with some arrows or a circle the
8 general area where Officer Sellers was?
9     A. On this, I'd rather not circle it. I
10 don't want to indicate that I'm insinuating that
11 he's on his legs or anything like that, because I
12 don't know exactly where he was at.
13     Q. However you feel comfortable in indicating
14 the general area where Officer Sellers was.
15     A. (Witness complies.)
16     Q. What did you write?
17     A. "Sellers, lower half of body."
18     Q. Am I correct in understanding that when
19 you got there Mr. Owensby's right arm had a handcuff
20 on it?
21     A. Yes.
22     Q. So you did not see the handcuff being
23 applied?
24     A. No.

Page 35

1     Q. What was Officer Caton doing at that time?
2     A. He was trying to pull Owensby's arm out
3 from under him to put it to the middle of his back.
4     Q. Was Officer Caton straddling any portion
5 of Mr. Owensby's body?
6     A. No.
7     Q. So he was not on his back or his buttocks
8 or thighs?
9     A. No.
10     Q. Is Officer Caton using both hands?
11     A. I believe he was, yes.
12     Q. Am I understanding you correctly that Mr.
13 Owensby's hand is under his body?
14     A. It wasn't completely under. It was far
15 enough under to where when I grabbed ahold of his
16 arm it felt like he was giving a lot of resistance
17 to keep us from pulling his arm all the way out, but
18 it was far enough out where I could clearly see a
19 handcuff on his right wrist.
20     Q. I take it you did not hear Mr. Owensby say
21 anything?
22     A. I don't recall if he said anything or not,
23 no.
24     Q. You don't recall him cussing or swearing?

Page 36

1     A. No.
2     Q. Or saying, "Get off of me," or "Get away
3 from me," or anything like that?
4     A. No.
5     Q. Do you recall what Mr. Owensby was
6 wearing?
7     A. No, I don't remember. No.
8     Q. This is on asphalt. Did you hear the
9 handcuffs scraping on the asphalt as you were trying
10 to pull his arm out?
11     A. I couldn't remember if I heard something
12 like that or not.
13     Q. Do you recall whether or not his hand or
14 his right arm was under him so that his fingers and
15 his hand was up by his, say, collar bone, or was his
16 hand down by his waist or down by his thigh?
17     A. It appeared to me that his hand was
18 probably around the middle part of his upper torso.
19     Q. But under him?
20     A. Not completely under him, no.
21     Q. His hand is partially under his body in
22 the middle portion of his torso. Officer Caton is
23 pulling on the arm to pull it out?
24     A. Yes.

Page 37

1     Q. Is he using both hands?
2     A. I don't recall at the time if he was using
3 both hands.
4     Q. In any event, as he is pulling, whether
5 it's with one hand or both hands, is he grabbing the
6 bicep?
7     A. I don't know what part of his arm he was
8 grabbing. I can't remember, but he was pulling on
9 his arm.
10     Q. Did you pull on his arm?
11     A. Yes, I tried to.
12     Q. Referring to Exhibit 154, if you are up by
13 his shoulder and neck and reaching to pull on his
14 arm, did you have to reach across Officer Caton to
15 do so?
16     A. No.
17     Q. So Officer Caton was down far enough that
18 you didn't have to reach across him to do it?
19     A. Right.
20     Q. When you reached across did you have to
21 lean on Mr. Owensby's back to do that?
22     A. No, I didn't have to reach across anything
23 to grab him. I was far enough away from his body
24 where I could easily grab his arm.

Estate of Roger Owensby vs. City of Cinti.                              JASON LEE HODGE
April 8, 2004

---

Page 38

1    Q. Did you use both hands?
2    A. Yes, I did.
3    Q. Did you grab his bicep?  Do you know what
4 part of his arm you grabbed?
5    A. I believe it was his upper arm, yes.
6    Q. How long did you pull on his upper arm,
7 bicep, to try and get his arm out?
8    A. I couldn't put an exact time to it.  Maybe
9 a couple seconds.
10   Q. Did you see what Officer Jorg was doing?
11   A. I wasn't paying attention to him at the
12 time, no.
13   Q. So your concentration is on his right arm,
14 and you don't know what Officer Jorg is doing?
15   A. Yes.
16   Q. Do you know whether or not Officer Jorg,
17 either his chest or his arm or his elbow, was on Mr.
18 Owensby's back or shoulder?
19   A. I didn't see anybody on Mr. Owensby at
20 all.
21   Q. Just to understand, but you don't know
22 what exact activity Officer Jorg is doing at that
23 time?
24   A. Right.

---

Page 39

1    Q. So a couple seconds go by, you were
2 grabbing at his bicep, what's the next thing that
3 you do?
4    A. I reached over and took Officer Hunter's
5 PR-24 from him.
6    Q. Did you have to get up to get the PR-24?
7    A. I just leaned over a little bit.  He was
8 maybe two or three feet away.
9    Q. So I take it you're still on your knees?
10   A. Right.
11   Q. You lean back, reach over, and grab his
12 PR-24?
13   A. I leaned to my side.  He was off to my
14 right.
15   Q. So you grab with your right hand?
16   A. Right.  Reach out and ask for it as I'm
17 taking it out of his belt.
18   Q. Was Officer Hunter standing or kneeling?
19   A. He was kneeling.
20   Q. So at the point you grab for the PR-24, is
21 it fair to say that Officer Hunter is somewhere
22 toward the right side of Mr. Owensby's head?
23   A. No.  It appeared to me that he was towards
24 the middle of it, several feet away.

---

Page 40

1    Q. Is this a collapsible PR-24?
2    A. Yes, it's collapsible.
3    Q. You grab the PR-24, you take it, you
4 extend it?
5    A. Yes.
6    Q. Then what do you do?
7    A. I place it under his arm to try to use it
8 as leverage to pull his arm out from under him and
9 place it behind his back.
10   Q. I don't have a PR-24, but I do have a Reds
11 baseball bat.  But can you just use it to
12 demonstrate to me how you used the PR-24 to pry his
13 arm out, however you did it?
14   A. I would put it, like if his hand was under
15 him, I would have put it over the top of his
16 shoulder and then underneath like his wrist area,
17 and then just use his shoulder as leverage and pull
18 it back like that (indicating).
19   Q. So he's laying down on the ground.  His
20 hand is partially under him.  You insert the PR-24
21 over the back, over the tricep, the back of the
22 upper arm?
23   A. No, right on his shoulder.
24   Q. Okay.  On the shoulder.  And loop it down

---

Page 41

1 so that it comes under his wrist?
2    A. Right.
3    Q. Then in using a -- prying it back, then
4 you pulled the wrist out?
5    A. Right.
6    Q. Were you successful in doing that?
7    A. Yes.
8    Q. The wrist came out?
9    A. Yes.
10   Q. Once his wrist came out from under him,
11 what happened next?
12   A. Caton immediately pushed his arm towards
13 the small of his back and held it there.
14   Q. Then what happened?
15   A. Officer Jorg took the PR-24 from me and
16 did the same thing to the other side.
17   Q. Were you watching Officer Jorg?
18   A. I really wasn't paying attention to him,
19 no.
20   Q. Do you know how he used the PR-24?
21   A. No, I don't.
22   Q. But in any event, he grabs the PR-24 and
23 soon thereafter Mr. Owensby's left arm is in
24 position to be handcuffed?

---

(800) 578-1542 * MERIT * (513) 381-8228

Estate of Roger Owensby vs. City of Cinti.    JASON LEE HODGE
April 8, 2004

Page 42

1  A. Yes.
2  Q. Once both wrists are in the small of Mr.
3 Owensby's back, are the handcuffs fastened?
4  A. Yes.
5  Q. If you recall, who fastened the handcuffs?
6  A. I do not recall who did it. I don't know.
7 There was a couple hands in there.
8  Q. Did you participate in doing that?
9  A. I think I held an arm still while they did
10 it.
11  Q. But you did not click the handcuffs?
12  A. No, I don't believe I did.
13  Q. Do you know if Officer Sellers
14 participated in fastening the handcuffs?
15  A. I don't believe he did, no.
16  Q. While Mr. Owensby's laying on the ground
17 and you're kneeling at his right shoulder, neck
18 area, did you get a chance to look at his face?
19  A. When I was leaning down there, no.
20  Q. While Mr. Owensby was on the ground, at
21 any time did you look at his face?
22  A. I saw his face, yes.
23  Q. While he was on the ground?
24  A. Yes.

Page 43

1  Q. When was it that you had a chance to look
2 at his face?
3  A. As I was running up to them struggling
4 with him.
5  Q. Oh, I see. So before you got down on your
6 knees?
7  A. Yes.
8  Q. Was his face towards you then so that
9 his --
10  A. I don't recall exactly how his face was
11 positioned, but I could just -- I could see his face
12 as I was running up.
13  Q. Am I correct in understanding that at that
14 point you saw that there was blood around his nose
15 and mouth?
16  A. Yes.
17  Q. Did you notice whether or not he had any
18 abrasions across his forehead?
19  A. I didn't notice that, no.
20  Q. Did you notice whether or not his eyes
21 were opened or closed?
22  A. I didn't notice that, no.
23  Q. As I understand your prior testimony, when
24 you got there you did not see anyone Mace or apply a

Page 44

1 chemical irritant to Mr. Owensby; is that right?
2  A. Right.
3  Q. You did not smell any chemical irritant?
4  A. No.
5  Q. If I understand correctly, you also suffer
6 from allergies and you said oftentime it could be
7 there but you just don't smell it; is that right?
8  A. Right.
9  Q. At any time while you were down on the
10 ground, from the time you arrived to the time the
11 handcuffs were fastened, did any of the other
12 officers change their positions from where you've
13 indicated on Exhibit 154?
14  A. From the time I arrived to the time he was
15 picked up?
16  Q. Well, I was going from the time that the
17 handcuffs were applied, were fastened. Did the
18 officers change their positions from where you've
19 indicated?
20  A. I don't know.
21  Q. You have no recollection of them being in
22 different positions?
23  A. Caton was still next to me and Jorg was
24 still across from me. I don't know what Sellers was

Page 45

1 doing. I couldn't really see him.
2  Q. Hunter was still within an arm's reach of
3 where you were kneeling?
4  A. Maybe two arms' length.
5  Q. That's the question. When you reached
6 over for the PR-24 you didn't have to get up to get
7 it, right?
8  A. No. I leaned over. I was on my knees. I
9 leaned over.
10  Q. So the handcuffs are fastened. What
11 happens next?
12  A. I get the PR-24 back from Jorg and give it
13 back to Hunter.
14  Q. What happens after that?
15  A. Owensby's picked up and taken to the
16 police car.
17  Q. Can you give me an estimation of how much
18 time transpired between the handcuffs being fastened
19 and Mr. Owensby being picked up?
20  A. I think it was roughly the same period of
21 time it took me to give Hunter his PR-24 back.
22  Q. So a matter of seconds?
23  A. Right.
24  Q. When Mr. Owensby is picked up, who picks

Estate of Roger Owensby vs. City of Cinti.                    JASON LEE HODGE
April 8, 2004

|                                                                    Page 46 |
| --- |

1  him up?

2    A. I believe Officer Caton and Jorg and

3  Sellers.

4    Q. Do you recall how the officers picked up

5  Mr. Owensby?

6    A. I believe it was under his -- under his

7  arms, by his arms.

8    Q. Bicep, armpit area?

9    A. Right.

10    Q. Was Officer Jorg still on Mr. Owensby's

11  left side and Officer Caton still on Mr. Owensby's

12  right side?

13    A. Yes.

14    Q. You said possibly Officer Sellers. Do you

15  know what role, if any, Officer Sellers played in

16  getting Mr. Owensby up?

17    A. No, because I really couldn't see him.

18    Q. Is there something in your recollection

19  that causes you to say and possibly Officer Sellers?

20    A. Because he was there with Owensby when I

21  was leaning over to Hunter, so. . .

22    Q. I take it Officer Hunter, in your

23  recollection, did not participate in picking Mr.

24  Owensby up?

|                                                                    Page 48 |
| --- |

1  could not see his face?

2    A. Yes.

3    Q. Did you hear him say anything when they

4  picked him up?

5    A. No, I didn't.

6    Q. No complaint?

7    A. (Shaking head.)

8    Q. Were you breathing heavily as a result of

9  the struggle?

10    A. I don't recall if I was or not.

11    Q. Do you know whether any of the other

12  officers were breathing heavily?

13    A. I didn't really pay attention to that. I

14  don't know.

15    Q. Did any of the officers say anything from

16  the time that Mr. Owensby was handcuffed to the time

17  that they picked him up?

18    A. Somebody had stated, "Put your feet down

19  and walk."

20    Q. That's after he's out?

21    A. Right.

22    Q. I mean, before that?

23    A. Between the time he was handcuffed and --

24    Q. Yes, sir.

|                                                                    Page 47 |
| --- |

1    A. Right.

2    Q. Once Mr. Owensby's picked up, where are

3  you in relation to Mr. Owensby? Are you facing him?

4  Are you off to the side? Are you behind him?

5    A. I'm kind of behind him. As they were

6  picking him up and I was giving the PR-24 back to

7  Hunter, I'm also moving out of the way at that time,

8  because I'm -- now I'm a person in the way, so I

9  move out of the way. Owensby was facing the

10  direction that they were going to be traveling in.

11    Q. I think you've testified that when they

12  initially picked him up, Mr. Owensby was kind of

13  balled up; is that right?

14    A. Yes.

15    Q. Describe for me what you mean by "balled

16  up"?

17    A. He had the heels of his feet pressed

18  against his buttocks.

19    Q. Was his head down?

20    A. I don't recall what his head was doing.

21    Q. Did you see his face when they picked him

22  up?

23    A. No.

24    Q. So you were sufficiently behind that you

|                                                                    Page 49 |
| --- |

1    A. No, I don't recall anybody saying

2  anything.

3    Q. From the time that you arrived on the

4  scene to the time he was handcuffed, do you recall

5  any officers saying anything?

6    A. Yes.

7    Q. What?

8    A. I heard people saying, "Stop resisting,"

9  "Give me your hands."

10    Q. Do you know who was saying that?

11    A. No, I don't.

12    Q. Once the handcuffs are fastened, is that

13  when you retrieve the PR-24 from Officer Jorg?

14    A. Yes.

15    Q. As I understand your testimony, you then

16  give it back to Officer Hunter?

17    A. Yes.

18    Q. In doing that, did you turn away from Mr.

19  Owensby after he was handcuffed but before he was

20  picked up?

21    A. I believe so, yes.

22    Q. Do you know how long you were turned away

23  from Mr. Owensby in giving Officer Hunter back the

24  PR-24?

(800) 578-1542 * MERIT * (513) 381-8228

Estate of Roger Owensby vs. City of Cinti.                    JASON LEE HODGE
April 8, 2004

Page 50

1   A. No.  I mean, as long as it would take
2 somebody to give somebody an item.  It wasn't very
3 long at all.
4   Q. Do you know whether or not, when you
5 handed the PR-24 back to Officer Hunter -- you were
6 turned away from Mr. Owensby -- but whether or not
7 Officer Hunter was facing Mr. Owensby?
8   A. He was facing me.  We were -- as I was --
9   Q. Right.  In facing him, would Mr. Owensby
10 have been behind you?
11   A. Yes -- behind me?  No.  Owensby was in
12 front of me.  I'm standing -- like if I'm facing
13 this way, you would be approximately where Owensby
14 would be at, and then Sellers would be over in this
15 direction right here (indicating).  I mean, if that
16 helps, I don't know.
17   Q. Right.  All I'm trying to understand is
18 when you stand up -- you -- the handcuffs are
19 fastened.  You get the PR-24 back from Officer Jorg.
20 You then turn to give it to Officer Hunter, and you
21 said, so you're not facing Mr. Owensby.
22       And my question is, when you're handing
23 the PR-24 back to Hunter, saying, "Thanks," or
24 whatever, is Officer Hunter, in facing you, facing

Page 51

1 Mr. Owensby?
2   A. In that general area, yes.
3   Q. So while you were not facing Mr. Owensby
4 in handing the PR-24 back, Officer Hunter would have
5 been able to see Mr. Owensby in taking the PR-24
6 from you?
7       MR. HARDIN: Objection.  Speculative.
8       You may answer if you know.
9   A. I don't know.
10   Q. Can you tell whether or not, in taking the
11 PR-24 from you, Officer Hunter, whether Mr. Owensby
12 was in Officer Hunter's line of vision?
13       MR. HARDIN: Objection.
14       You may answer.
15   A. I don't know if he was or not.
16   Q. What is it about my question that you
17 don't know?
18   A. I don't know if Hunter is facing Owensby
19 or not.  I don't know what he's seeing, what he --
20 as far as I know, they're walking away.  I don't
21 know.  I don't know what Hunter sees.
22   Q. But what I'm asking is, this is -- when
23 you gave Officer Hunter the PR-24 Mr. Owensby is
24 handcuffed, but he hasn't been picked up yet, right?

Page 52

1       MR. HARDIN: Objection.
2       You may answer.
3   A. They're picking him up as I'm handing the
4 PR-24 to Hunter.
5   Q. So then, when they were picking him up you
6 did not see them actually pick him up?
7   A. I saw them at the beginning of the period
8 when they were starting to pick him up.  I didn't
9 see them pick him completely up.  I saw them
10 grabbing him to where you're going to pick somebody
11 up and start moving him in an upward position.
12   Q. The reason you didn't see them completely
13 pick him up, is that because you were giving the
14 PR-24 back to Hunter?
15   A. Yes.
16   Q. After the handcuffs were fastened, did you
17 see Officer Caton strike Mr. Owensby?
18   A. No.
19   Q. Could Officer Caton have struck Mr.
20 Owensby and your attention been diverted to some
21 other area so that it could have happened but you
22 did not see it?
23       MR. HARDIN: Objection.  Are you talking
24       about after the handcuffing?

Page 53

1       MR. MARTINS:  Yes.
2       MR. HARDIN:  And before he was stood up?
3       MR. MARTINS:  Before he was stood up.
4       MR. HARDIN:  Okay.  Objection.
5   A. I don't know if he could have hit him or
6 not.
7   Q. Mr. Owensby is now up.  What happens next?
8   A. Now that he's standing up, I saw -- I
9 turned to look, because I heard somebody say,
10 "Walk," and "Put your feet down."  I saw the heels
11 of his feet against his buttocks.  He put his feet
12 down to the ground and started walking towards the
13 car.
14   Q. When you see him putting his feet down,
15 you're standing behind him?
16   A. Yes.
17   Q. To Mr. Owensby's right side?
18   A. Yes.
19   Q. As he is taken to the car, am I correct in
20 understanding that you describe the way his feet
21 moved as short, choppy steps, like someone who is
22 severely intoxicated?
23   A. Yes.
24   Q. Did you follow the officers as they took

(800) 578-1542 * MERIT * (513) 381-9220

Estate of Roger Owensby vs. City of Cinti.    JASON LEE HODGE
April 8, 2004

---

Page 54

1 him to the car?
2    A. No.
3    Q. He was placed in a Golf Manor cruiser; is
4 that right?
5    A. Yes.
6    Q. Did you see the officers placing him in
7 the Golf Manor cruiser?
8    A. Yes.
9    Q. As I understand your testimony, you saw
10 one officer pushing him into the back seat and
11 Officer Caton around on the far side of the cruiser
12 leaning in; is that right?
13    A. Yes.
14    Q. The officer that was pushing him into the
15 back seat was a white officer?
16    A. I don't know. I couldn't see exactly. I
17 couldn't see his head or his hands. I don't know.
18    Q. He was a tall officer?
19    A. Appeared to be tall, yes.
20    Q. Am I correct in understanding you're not
21 sure whether or not that officer was Officer Jorg?
22    A. I don't know if it was or not.
23    Q. Is it fair to say that out of the officers
24 on the scene there, Officer Jorg was the tallest

Page 55

1 officer?
2    A. I don't know. I don't know all the
3 officers that were at the scene.
4    Q. Oh, okay. Let me rephrase it. Out of the
5 officers that you've listed on Exhibit 154, Officer
6 Jorg is the tallest officer?
7    A. I don't know. The only time that I saw
8 Officer Sellers was down at the leg region of
9 Owensby. I don't recall paying attention to him
10 when he was standing up, so I don't know if he's
11 taller or not. I don't know. I have no idea -- I
12 didn't know who he was.
13    Q. Now, you see an officer pushing Mr.
14 Owensby into the back seat of the Golf Manor
15 cruiser. You see Officer Caton on the other side
16 with the door open reaching in?
17    A. That's not true exactly.
18    Q. Okay. What is untrue?
19    A. I see an officer blocking the rear
20 passenger door where Owensby was at that portion of
21 the car. And I see Officer Caton at the rear
22 driver's door leaned down. That's what I saw.
23    Q. Did you watch them, these officers, put
24 Mr. Owensby into the back seat of the car?

Page 56

1    A. I did not watch the whole process, no.
2    Q. So what you've just described is what you
3 saw, and then for some reason your attention is
4 turned away?
5    A. Yes.
6    Q. What was it that diverted your attention
7 away so that you did not watch the officers place
8 Mr. Owensby in the back of the car?
9    A. I don't know exactly what it was.
10    Q. What do you recall doing during that time
11 while Mr. Owensby was placed in the back of the car,
12 while the doors are still open, they're placing him
13 in?
14    A. I believe I was just standing there while
15 they were doing that.
16    Q. Do you recall doing anything other than
17 just standing there and not looking at the Golf
18 Manor car?
19    A. While they were putting him in the car?
20    Q. Yes, sir.
21    A. When I'm looking at the Golf Manor car I
22 remember all I was doing was standing there looking
23 at the Golf Manor car. I don't understand what
24 you're --

Page 57

1    Q. Well, you said for some reason you saw
2 them starting to put him in the car?
3    A. Right.
4    Q. Then you turned away?
5    A. Right.
6    Q. I'm trying to understand what was it that
7 you were doing that caused you to turn away?
8        MR. HARDIN: Objection. Asked and
9        answered.
10    A. I've already answered the question.
11    Q. Answer it again.
12    A. I was just standing there watching them
13 put him in the car.
14    Q. But you didn't watch them put him in the
15 car, and that's what I'm trying to understand. Why
16 did you turn your attention away?
17        MR. HARDIN: Objection. Asked and
18        answered.
19    A. I don't know.
20    Q. You also don't know what you did or what
21 it was that caused you to divert your attention
22 away; is that right?
23    A. I don't think my attention was diverted by
24 anything. It may have been I lost interest in what

(800) 578-1542 * MERIT * (513) 381-8228

Estate of Roger Owensby vs. City of Cinti.                                          JASON LEE HODGE
April 8, 2004

|  | Page 58 |
| --- | --- |

1 was going on over there.
2     Q. Do you recall then what you did after
3 that?
4     A. I believe I might have went up to the
5 front door and spoke with the manager to get his
6 information.
7     Q. Do you know why Officer Caton had to go
8 around to the driver's side of the car?
9     A. No.
10     Q. Am I correct in understanding that the
11 next time, whenever it was that you looked over at
12 the Golf Manor car, the doors were closed and Mr.
13 Owensby was somewhere in the car?
14     A. Yeah, the doors were closed the next time
15 I saw the vehicle. Yes.
16     Q. So you go over and talk to the manager.
17 Do you recall the name of the manager?
18     A. No, I don't.
19     Q. What do you recall you and the manager
20 talked about?
21     A. I asked for his identification and wrote
22 his information down on my notepad.
23     Q. Did you ask him about what he saw or
24 whether he saw anything?

|  | Page 59 |
| --- | --- |

1     A. No.
2     Q. Other than gathering his identification,
3 did you get any other information from the manager?
4     A. No.
5     Q. What happens next?
6     A. I can't really be exact on the
7 chronological order of things, because it was such a
8 long time ago. I don't remember what I did exactly
9 after that. I don't know.
10     Q. What's the next thing you remember
11 happening?
12     A. After getting the information from the
13 manager, I don't remember exactly what happened
14 right after that.
15     Q. What's the next thing you remember?
16     A. I mean, at any point of that whole
17 situation?
18     Q. Yes.
19     A. I remember being split up, being told to
20 separate from everybody.
21     Q. Who told you that?
22     A. I believe it was Sergeant Browner.
23     Q. Was this while Mr. Owensby is still in the
24 back seat of the cruiser?

|  | Page 60 |
| --- | --- |

1     A. I don't recall if he was still in the back
2 seat or not. Actually, no, I think he was -- it
3 was, I believe, while the fire fighters were working
4 with him.
5     Q. Where was Mr. Owensby?
6     A. He was on the ground on the passenger's
7 side of the vehicle.
8     Q. So the fire fighters were there
9 administering some medical attention to Mr. Owensby?
10     A. Yes, after Caton and Hasse --
11     Q. So you remember Caton and Hasse doing
12 something?
13     A. I remember them doing CPR on him, yes.
14     Q. What do you remember them doing?
15     A. I remember, I think, Caton was doing the
16 chest compressions and Hasse was doing the
17 resuscitation.
18     Q. Did you receive training, either at the
19 police academy or after the police academy, in CPR?
20     A. Yes, we have.
21     Q. At the academy?
22     A. Yes.
23     Q. Since the academy, have you received any
24 training in CPR?

|  | Page 61 |
| --- | --- |

1     A. I have, yes.
2     Q. Is that as a result of your military
3 service?
4     A. Yes.
5     Q. Between graduation from the academy and
6 November 7, 2000, had you received any additional
7 training in CPR?
8     A. No.
9     Q. To your knowledge, is there such a thing
10 as a certification in CPR?
11     A. I don't know.
12     Q. Do you know whether or not you have to
13 undergo some, for lack of a better term, a refresher
14 course to stay sharp in administering CPR?
15     A. I don't know.
16     Q. In any event, you had no such refresher
17 course between the academy and November 7, 2000?
18     A. Other than the military?
19     Q. Did you have military training between
20 that time period?
21     A. Yes.
22     Q. Between the time you graduated from the
23 academy and November 7, 2000, did you receive CPR
24 training in the military?

Estate of Roger Owensby vs. City of Cinti.                    JASON LEE HODGE
April 8, 2004

Page 62

1    A. Yes, the military routinely does first aid
2  training.
3    Q. That includes CPR training?
4    A. Yes.
5    Q. In the military CPR training, does the
6  military explain to you when CPR is appropriate?
7    A. Yes.
8    Q. What's your understanding, based on the
9  training you received?
10      MR. HARDIN: Objection to the relevancy of
11   the military training to this issue.
12      You may answer.
13    A. It depends on what the situations are. If
14  somebody stops breathing. It could be from a battle
15  injury. It just depends on what the situation is
16  when the person's not breathing and you have no air
17  resuscitation in the body.
18    Q. Did you receive similar guidance at the
19  police academy as to when to apply CPR?
20    A. Yes.
21    Q. When Mr. Owensby was taken to the car, do
22  you know whether or not he was breathing?
23    A. I don't know.
24    Q. Do you know if anyone checked?

Page 63

1    A. I don't know.
2    Q. You didn't see anyone check?
3    A. I didn't see anybody check.
4    Q. From the time Mr. Owensby was handcuffed,
5  picked up, and taken to the car, do you recall any
6  police officer inquiring of Mr. Owensby as to
7  whether or not he was okay?
8    A. No.
9    Q. Whether it's, "Are you okay," or "Hey,
10  look at me," or whatever, do you recall any such
11  statement?
12    A. I didn't follow them to the car. I
13  didn't -- I didn't hear anybody say that, no.
14    Q. In the training that you've received at
15  the academy on the application of CPR, did anyone
16  ever tell you that if someone had a heart attack and
17  stopped breathing not to bother administering CPR?
18      MR. HARDIN: Objection.
19      You may answer.
20    A. No.
21    Q. You're looking at me with a --
22    A. Well, I mean, that's -- I don't understand
23  why anybody would say that.
24      MR. HARDIN: I'm looking at you in the

Page 64

1    same way.
2      MR. MARTINS: That's good for you.
3      Q. I'm sorry. I didn't mean to interrupt
4  you. Go ahead.
5    A. No, I've never been told that.
6    Q. In your military training on CPR or any
7  kind of medical training that you've received in the
8  military, did you receive any counsel that if
9  someone has a heart attack and stops breathing not
10  to bother administering CPR?
11      MR. HARDIN: Objection to form, relevancy.
12      You may answer.
13    A. No.
14      MR. MARTINS: As to relevancy, I think you
15   know why I'm asking the question.
16      MR. HARDIN: No, I really don't. I
17   haven't figured out the theory of the case yet.
18      MR. MARTINS: All right. Well, you will.
19      MR. HARDIN: I hope so.
20  BY MR. MARTINS:
21    Q. Do you recall anyone going over to check
22  on Mr. Owensby between the time that he was taken to
23  the car and the time that you saw Officer Caton and
24  Officer Hasse attempting to administer CPR to him?

Page 65

1    A. I didn't see anybody walk over to the car,
2  no.
3    Q. In that period of time, between when Mr.
4  Owensby was placed in the cruiser and the time that
5  you saw Officer Hasse and Officer Caton
6  administering CPR, as I understand your testimony,
7  you went over to talk to the manager of the Sunoco
8  station to get his identification; is that right?
9    A. Yes.
10    Q. Do you recall doing anything else in that
11  period of time?
12    A. I bought a pack of cigarettes out of
13  the -- out of the store.
14    Q. Anything else?
15    A. I'm sure I did a lot of things. I mean,
16  you have to be more specific for what you're looking
17  for. I don't know.
18    Q. Did you notice that Officer Caton (sic)
19  had blood all over his sleeve?
20      MR. HARDIN: Objection.
21      You may answer.
22    A. He had what appeared to be blood on his
23  sleeve, yes.
24    Q. I think you've characterized it as blood

(800) 578-1542 * MERIT * (513) 381-8228

Estate of Roger Owensby vs. City of Cinti.
April 8, 2004                                                    JASON LEE HODGE

Page 66

1  "all over" his sleeve; is that right?
2        MR. HARDIN: Objection.
3        You may answer.
4    A. There was blood on his sleeve.
5    Q. Do you recall characterizing it as blood
6  "all over" his sleeve?
7        MR. HARDIN: Objection.
8        You may answer.
9    A. I don't recall saying that.  I don't
10 know -- I don't know what relevance -- what you're
11 trying to make that as -- I don't understand.  He
12 had blood on his sleeve.  The context that I put it
13 in, I don't know how that pertains to it.
14       MR. HARDIN:  Could we take a short break
15 while you're looking through that.
16       MR. MARTINS:  Almost.
17       MR. HARDIN:  Almost?
18       MR. MARTINS:  Almost.  Let me finish this.
19 Get this right out of the way.
20       THE WITNESS:  I think I'd like to take a
21 break right now.
22       MR. MARTINS:  Well, you're going to have
23 to wait a second.
24

Page 67

1          (Deposition Exhibit 155
              was marked for identi-
2              fication.)
3    Q.  I show you Exhibit 155.  Direct your
4  attention to page 16 of Exhibit 155.  Well, first,
5  the first page.  Exhibit 155 is your May 2, 2002
6  interview to Internal Investigation; is that right?
7    A.  Yes.
8    Q.  Go to page 16.  Third question down the
9  page, "When you found Officer Jorg, what'd you talk
10 about?"
11       "Answer:  Uhm that I had to get his sleeve
12 off of him because he had uh blood all over it. . ."
13       Do you see that?
14   A.  Yes.
15   Q.  Do you recall giving that answer?
16   A.  Apparently, I did.
17       MR. MARTINS:  We can take our break now.
18       MR. HARDIN:  Thank you.
19       (Recess taken:  11:29 a.m.  -  11:36 a.m.)
20 BY MR. MARTINS:
21   Q.  I note in the last sequence of questions
22 that I asked you, apparently I said "blood on
23 Officer Caton's sleeve."  I was talking about
24 Officer Jorg.  I believe, in your response you were

Page 68

1  talking about Officer Jorg also; is that right?
2        MR. HARDIN:  Objection.
3    Q.  When you said, "he had blood on his
4  sleeve," you were referring to Officer Jorg, were
5  you not?
6    A.  Yes.
7    Q.  On page 16 that I just directed your
8  attention to, where you say, "because he had blood
9  all over it," you were referring to Officer Jorg's
10 sleeve; is that right?
11   A.  Yes.
12   Q.  You participated in cutting Officer Jorg's
13 sleeve off of his shirt; is that right?
14   A.  Yes.
15   Q.  Where we were going originally on that
16 was, that took place -- do you know whether or not
17 that took place before or after you saw the CPR
18 being performed on Mr. Owensby by Officers Hasse and
19 Caton?
20   A.  Before.
21   Q.  So in cutting the sleeve off, that took
22 place before -- or that took place while Mr. Owensby
23 was in the back of the Golf Manor cruiser; is that
24 right?

Page 69

1    A.  Yes.
2    Q.  The reason you cut the sleeve off of
3  Officer Jorg's shirt is, as I understand it, you
4  were concerned about blood contamination?
5    A.  Yes.
6    Q.  I take it you asked Officer Jorg whether
7  or not it was his blood; is that correct?
8    A.  I don't remember if I asked him that or
9  not.
10   Q.  Why don't we do it this way.  Just take me
11 through the sequence.  You notice blood all over
12 Officer Jorg's sleeve.  What happens next?
13       MR. HARDIN:  Objection to the form of the
14 question.
15       You may answer.
16       MR. HARDIN:  I'll withdraw the objection.
17 Just looked at the transcript.
18       MR. MARTINS:  Thank you.
19   A.  I observed blood on Officer Jorg's sleeve
20 and I was concerned about a cross contamination.
21       I had a previous incident when I was in
22 uniform patrol where I was in a fight with another
23 individual in the slow lane of the Norwood Lateral
24 and had his blood all over me and had cuts and

Estate of Roger Owensby vs. City of Cinti.                    JASON LEE HODGE
April 8, 2004

---

Page 70

1 everything all over my hand. And this person had
2 stated that he was HIV positive. So I went through
3 a lot with having to take medication and concern
4 that I might have had that problem.
5        So I was very concerned about Jorg might
6 be going through this also. So I had tried to track
7 him down and get him to take his sleeve off. I
8 believe I asked him if he had a jacket so he could
9 take his shirt off. He didn't have his jacket, so
10 we cut his sleeve off. I placed his sleeve in the
11 trunk of the locked police car.
12    Q. Was the police car trunk that you placed
13 Officer Jorg's sleeve in the cruiser that Officer
14 Jorg and Caton were assigned to?
15    A. Yes.
16    Q. Did you place the sleeve in any sort of,
17 either envelope or bag or container of some sort?
18    A. I don't remember if I put it into
19 anything.
20    Q. In cutting the sleeve off, do you recall
21 what you used?
22    A. Officer Jorg's knife.
23    Q. Before you began the cutting the sleeve
24 off, did you put gloves on to protect yourself from

Page 71

1 the blood on the sleeve?
2    A. I don't recall if I did or not.
3    Q. Do you recall whether or not you put
4 gloves on at any time that evening while you were at
5 the Sunoco station?
6    A. I don't recall.
7    Q. Is it true that Cincinnati police
8 officers, at least at that time, carried rubber
9 gloves with them as part of their uniform equipment?
10    A. In uniform, I believe so, yes.
11    Q. When you were working undercover on that
12 night as the mini-tac unit, did you normally carry
13 gloves with you?
14    A. No.
15    Q. Did you happen to notice, when you placed
16 the sleeve in the trunk of the cruiser, Officer Jorg
17 and Officer Caton's cruiser, what other equipment
18 was in the back of the cruiser?
19    A. I don't know.
20    Q. Do you know whether or not the cruiser was
21 equipped with a defibrillator?
22    A. I don't --
23    Q. The electronic --
24    A. I don't know.

Page 72

1    Q. Do you know whether or not any police
2 officers and police cars at that time were equipped
3 with defibrillators?
4    A. I don't know.
5    Q. Do you know what a scout car is?
6    A. Yes.
7    Q. What is a scout car?
8    A. A scout car is usually a Suburban, a Chevy
9 Suburban, or a vehicle similar to that that we use
10 for larger people that are being arrested that can't
11 fit in a regular police car or to transport, used to
12 transport people from the morgue to the coroner's
13 office or from the hospital to the coroner's office.
14    Q. Do you know whether or not, at this period
15 of time, whether or not the scout cars in District 4
16 were equipped with defibrillators?
17    A. I don't know.
18    Q. Do you know whether or not any Cincinnati
19 police cars were equipped with defibrillators on
20 November 7, 2000?
21    A. No, I didn't know.
22    Q. Do you know whether or not the unmarked
23 car that you and Officer Lawson were driving was
24 equipped with a defibrillator?

Page 73

1    A. It wouldn't have been, no.
2    Q. In your experience, Cincinnati police
3 cruisers, are they normally equipped with some sort
4 of first aid equipment?
5    A. Normally, a minor, minor set of first aid
6 equipment, yes.
7    Q. Would you give me an idea of what type of
8 first aid equipment is normally found in a
9 Cincinnati police cruiser?
10    A. Usually things like Band-Aids.
11    Q. Anything else?
12    A. I don't know. I've never dealt with one
13 before.
14    Q. So in your experience, you've never dealt
15 with the first aid kit that's in a police cruiser?
16    A. No.
17    Q. At the time that you had this run-in on
18 the Norwood Lateral with the person who was bleeding
19 and you had cuts and the like on you, did you have
20 occasion to make use of the first aid kit that is
21 usually found in a police cruiser?
22    A. No.
23    Q. Were you undercover at the time?
24    A. No.

Estate of Roger Owensby vs. City of Cinti.
April 8, 2004

JASON LEE HODGE

---

Page 78

1  anything as Mr. Owensby was taken to the Golf Manor
2  cruiser?
3       A. I don't recall hearing anybody say
4  anything.
5       Q. After or while he was in the cruiser,
6  before he was taken out by Officer Hasse and Officer
7  Caton, do you recall whether you heard citizens
8  around the area saying anything?
9       A. I didn't pay attention to anybody saying
10  anything.
11      Q. You have no recollection?
12      A. Right.
13      Q. Am I correct in understanding that from
14  the time that you arrived on the scene and knelt
15  down next to Mr. Owensby to the time Mr. Owensby was
16  handcuffed and picked up, approximately 30 seconds
17  had gone by?
18      A. I don't know how much time went by. It
19  seems longer when you're doing it, so I don't know.
20      Q. Do you recall estimating the time as being
21  30 seconds?
22      A. I don't recall estimating it, no.
23      Q. Am I correct in understanding that in the
24  entire time that you were at the Sunoco station you

Page 79

1  never heard Mr. Owensby make any sound?
2       A. I didn't hear him make any sound, no.
3       Q. At any time?
4       A. No.
5       Q. Am I correct in understanding that at the
6  time you were pulling on Mr. Owensby's arm, right
7  arm, Officer Jorg was working on Mr. Owensby's left
8  arm?
9       A. He was on the left side. I'm assuming
10  that's the arm he was working on, yes.
11      Q. Do you know whether or not, with Mr.
12  Owensby laying face down, if somebody is pulling on
13  the left arm, that is going to rotate the body onto
14  the right arm?
15      A. No.
16      Q. Do you recall any movement from his torso
17  as a result of the officers pulling on the arms on
18  both sides?
19      A. I don't recall any movement from his
20  torso, just the rigidness of his arm, trying to keep
21  his arm under him.
22      Q. Do you know whether or not his arm was
23  caught on anything or his hand or the handcuffs were
24  caught on anything under him?

Page 80

1       A. No.
2       Q. You don't know?
3       A. I don't know.
4       Q. Do you recall anything being said to the
5  Golf Manor police officer who had driven the cruiser
6  in which Mr. Owensby was placed?
7       A. No.
8       Q. Would it be fair to say that from what you
9  observed of Mr. Owensby's steps as he was taken to
10  the Golf Manor cruiser that he was behaving as if he
11  was in a stooper?
12      A. He appeared to be in an intoxicated state.
13      Q. Did you smell any alcohol on him?
14      A. No, I didn't.
15      Q. I think I asked you this, but let me make
16  sure. As I understand your testimony, you don't
17  know whether or not Mr. Owensby was conscious or
18  unconscious when he was placed in the Golf Manor
19  cruiser; is that right?
20      A. That's correct.
21      Q. At the time Mr. Owensby was placed in the
22  Golf Manor cruiser you knew that he had blood around
23  his nose and mouth; is that right?
24      A. Yes.

Page 81

1       Q. You had seen his feet shuffling as they
2  took him there. I think you just described it as
3  like someone who was intoxicated; is that right?
4       A. Yes.
5       Q. You knew that five officers had been
6  involved in using physical force in arresting him;
7  is that right?
8       A. No.
9       Q. What's false about that?
10      A. What five officers are you talking about?
11      Q. Well, there's you?
12      A. Right.
13      Q. You had your hands on him?
14      A. Right.
15      Q. Officer Jorg?
16      A. Right.
17      Q. That's two. Officer Caton?
18      A. Yes.
19      Q. That's three. Officer Sellers. That's
20  four?
21      A. Right.
22      Q. What about Officer Hunter?
23      A. I did not see him.
24      Q. You never saw Officer Hunter touch him?

---

Estate of Roger Owensby vs. City of Cinti.
April 8, 2004

JASON LEE HODGE

Page 82

1   A. Never saw him touch him.
2   Q. Okay. So you knew four officers were
3 involved in physically arresting him?
4   A. Yes.
5   Q. You knew that he had made no sound, either
6 while he was laying on the asphalt when he was
7 picked up or when he was taken to the cruiser; is
8 that right?
9   A. I did not hear any sounds.
10   Q. You also saw, while he was in the cruiser,
11 that Officer Jorg's sleeve was covered with blood;
12 is that right?
13   A. Officer Jorg's sleeve had blood on it,
14 yes.
15   Q. Well, there was enough blood on Officer
16 Jorg's sleeve that you were concerned for blood
17 contamination; is that right?
18   A. Yes.
19   Q. You felt that it was necessary to cut
20 Officer Jorg's sleeve off, for his safety?
21   A. I felt it was necessary to remove him from
22 the risk of blood exposure, yes.
23   Q. You also knew that the blood did not come
24 from Officer Jorg?

Page 83

1   A. I did not know that.
2   Q. Well, when you were cutting the sleeve off
3 you saw that Officer Jorg was not bleeding; is that
4 right?
5   A. Right.
6   Q. Of the five officers on the scene around
7 Mr. Owensby, the only person that you saw bleeding
8 was Mr. Owensby; is that right?
9   A. Yes.
10   Q. I want to have you identify a few other
11 documents here.
12         (Deposition Exhibit 156
           was marked for identi-
13         fication.)
14   Q. This is Exhibit 156. November 20,
15 2000 statement of you to Homicide Unit, if you can
16 identify that. This is your statement to Homicide
17 given at 1306 hours on November 20th, 2000?
18   A. Yes.
19   Q. Is this one of the statements that you
20 examined in preparation for today's deposition?
21   A. Yes.
22   Q. I want to direct your attention to page 6
23 of the statement. It bears a Bates number of 0460.
24 The second full answer on the page begins, "And uh

Page 84

1 then he, he let those down."
2         And then you're describing the steps that
3 he took. You say, "short choppy steps like, like if
4 you notice somebody really intoxicated walking to to
5 any direction and they kinda shuffle their feet a
6 little bit. Uh I walked away from the car at that
7 time to look for my partner uh Officer Lawson." Do
8 you see that?
9   A. Yes.
10   Q. Okay. As to the first sentence that I
11 read to you, or the first part describing the steps,
12 is that a fair and accurate description of what you
13 saw, as far as the way Mr. Owensby was moving his
14 feet, the way Mr. Owensby's feet were moving as he
15 was taken to the cruiser?
16   A. Yes.
17   Q. The second part says, "I walked away from
18 the car at that time to look for my partner. . .
19 Officer Lawson."
20         Does that help refresh your recollection
21 as to why you turned your attention away from them
22 placing him in the car?
23   A. It might have been, yes.
24   Q. Do you have any independent recollection

Page 85

1 of that's why you looked away?
2   A. No, I don't.
3   Q. Further down, about three lines down from
4 that it says, "I was probably about fifteen feet
5 away from the vehicle on the uh passenger side."
6         That's consistent with what you've said
7 here today, right?
8   A. Yes.
9   Q. You say, "I saw somebody trying to, trying
10 to push him in the vehicle and I couldn't tell
11 who that was. Uhm I saw Caton on the drivers side.
12 He, he had opened the rear pass-. . . the rear. . .
13 drivers side door, and then just leaned down and I
14 couldn't see him any more. Uhm I walked away
15 again."
16         Is that accurate as to your activity at
17 that point?
18   A. Yes.
19   Q. That's what you saw, someone pushing Mr.
20 Owensby into the vehicle from the passenger back
21 door and Officer Caton from the driver's back door
22 leaning down; is that right?
23   A. Yes.
24   Q. Then you say you walked over to the store

Estate of Roger Owensby vs. City of Cinti.                    JASON LEE HODGE
April 8, 2004

Page 86

1 manager, started getting his information as a
2 witness. You then say, "a short time later,
3 somebody had walked by the car and said, 'I don't
4 think he's breathing.'" Do you see that?
5     A. Yes.
6     Q. Do you recall who said, "I don't think
7 he's breathing"?
8     A. No, I don't.
9     Q. Do you know an Officer Brazile, Brian
10 Brazile?
11    A. I know of him. I don't know him
12 personally, no.
13    Q. On November 7th did you know him?
14    A. No.
15    Q. Do you know whether or not he was at the
16 scene?
17    A. I didn't know if he was at the scene at
18 the time of the incident. Later, I was told yes, he
19 was.
20    Q. Do you know whether or not Officer Brazile
21 said, "I don't think he's breathing"?
22    A. I don't know who said it.
23    Q. Was this said to you or was it a general
24 statement that you overheard?

Page 87

1     A. I overheard it. I don't know who it was
2 said to.
3     Q. Do you recall what direction the statement
4 came from?
5     A. Somewhere in the vicinity of the police
6 car.
7     Q. Of the Golf Manor police car?
8     A. Yes.
9     Q. After you heard, "I don't think he's
10 breathing" -- I'm sorry, let me back up.
11        How far away were you from the Golf Manor
12 car when you heard someone say, "I don't think he's
13 breathing"?
14    A. I don't know how far away I was.
15    Q. You indicated earlier on this page in this
16 statement that you were about 15 feet away from the
17 car. Do you know if you were closer than 15 feet or
18 further than 15 feet?
19    A. It would probably be further than 15 feet,
20 because when I was at 15 feet, after that I walked
21 to the Sunoco, to the manager.
22    Q. So this is all after you have already
23 talked to the manager of the Sunoco station and
24 bought your cigarettes; is that right?

Page 88

1     A. According to my statement, yes.
2     Q. Is that consistent with your recollection
3 also?
4     A. I don't recall exactly what happened, but
5 looking at my statement, I believe that's true, yes.
6     Q. Would it be fair to assume that your
7 recollection of the events of November 7, 2000 would
8 have been more accurate or more clear on
9 November 20th, 2000 than they are today?
10    A. Yes.
11    Q. To the best of your recollection, you were
12 trying to tell the truth on November 20th, 2000?
13    A. Yes.
14    Q. Do you recall whether or not you bought
15 anything else from the convenient store besides the
16 cigarettes?
17    A. I don't believe I did, no.
18    Q. Do you recall whether or not you bought a
19 drink for either Officer Jorg or Officer Caton?
20    A. No, I don't -- oh, you know what, I
21 believe I bought a Pepsi or something for someone.
22 I don't remember who it was.
23    Q. Do you know whether or not that was at the
24 same time you bought the cigarettes, or did you make

Page 89

1 another trip in to buy --
2     A. I believe it was at the same time.
3     Q. Go to the next page, page 7 at the top.
4 You're describing the CPR that you've already talked
5 about, and you say in the second line, "Caton was
6 doing chest compressions. Hasse was doing the" --
7 it says "recitation" but resuscitation, I guess, is
8 what you mean.
9     A. Yes.
10    Q. "One of the supervisors I believe called
11 for. . . the rescue unit. . . the fire division got
12 there. . . they started CPR. Look like. . . they
13 were doing the compressions a lot deeper than what
14 Caton was doing."
15        Explain to me what you mean by that, "They
16 were doing the compressions a lot deeper than what
17 Caton was doing"?
18    A. Just looked like they were pressing much,
19 much harder on his chest.
20    Q. Do you know whether or not when Officer
21 Caton and Hasse were doing the CPR, whether or not
22 Mr. Owensby was still handcuffed?
23    A. I don't believe he was.
24    Q. Do you recall seeing Officer Hasse and

(800) 578-1542 * MERIT * (513) 381-8228

Estate of Roger Owensby vs. City of Cinti.                    JASON LEE HODGE
April 8, 2004

---

Page 98

1 something." Is that right?
2    A. "Or something," right.
3    Q. What else did you think it could be?
4    A. It could have been anything. I just
5 wanted to secure it as evidence, because it possibly
6 might have helped out.
7    Q. Do you know, as you sit here today, what
8 it was?
9    A. No, I don't.
10    Q. Did you ever make any inquiry after the
11 fact to find out whether or not it was crack
12 cocaine?
13    A. I wasn't at liberty for that information,
14 no.
15    Q. Did you read anything in the papers to
16 indicate that?
17    A. No.
18    Q. So you were just trying to collect
19 evidence?
20    A. Yes.
21    Q. Is that why you cut off the sleeve of
22 Officer Jorg's shirt also?
23    A. I cut his sleeve off because I was
24 concerned of cross contamination.

---

Page 99

1    Q. Did you think that that might be evidence
2 also?
3    A. I didn't think about it at the time, no.
4    Q. Why did you think that the white substance
5 around Mr. Owensby's mouth should be treated as
6 evidence but the sleeve of Officer Jorg's shirt that
7 was covered with blood should not be treated as
8 evidence?
9    A. Because there was obviously something that
10 was medically wrong with Roger Owensby at the time,
11 and I thought that maybe that substance had
12 something to do with it.
13    Q. Did you ever see Officer Hunter on his
14 knees when you were working with the other officers
15 around Mr. Owensby?
16    A. No.
17    Q. I take it you never saw Mr. Owensby put
18 anything in his mouth?
19    A. No, I didn't.
20    Q. You never saw Mr. Owensby try to discard
21 anything?
22    A. No, I didn't.
23    Q. As you sit here today, do you know whether
24 or not Mr. Owensby was the person who assaulted

---

Page 100

1 Officer Hunter a while back, as told to you by
2 Officer Caton or one of the other officers at the
3 scene?
4    A. I don't know.
5    Q. Did you ever see Officer Jorg's -- back
6 up.
7        The sleeve that you cut off of Officer
8 Jorg, do you know if it was his right sleeve or left
9 sleeve?
10    A. I believe it was his left sleeve.
11    Q. While you were at the scene assisting in
12 the arrest of Mr. Owensby, did you ever see Officer
13 Jorg placing his left arm around the area of Mr.
14 Owensby's face?
15    A. No.
16    Q. No?
17    A. No.
18    Q. Still referencing Exhibit 156, would you
19 turn to page 27, please. The last answer you give
20 on that page -- well, the question is, "When they
21 stand him up, tell me how this guy looks."
22        And you say, ". . . he looked like he
23 was. . . like he was just real sweaty. . ."
24        Do you see that?

---

Page 101

1    A. Yes.
2    Q. They ask you about his eyes being opened
3 or closed, and you say you saw -- you don't know if
4 they were open or closed, but you saw blood around
5 the mouth.
6        "Sweaty," can you expand upon that, tell
7 me what you saw?
8    A. It just appeared that he had been
9 sweating.
10    Q. Perspiration on his face?
11    A. Just around his head area. I mean, it
12 looked like he had been sweating. I don't know how
13 else to explain it.
14    Q. Was Officer Caton sweating?
15    A. I don't remember noticing if he was or
16 not.
17    Q. How about Officer Jorg?
18    A. I don't know.
19    Q. Officer Sellers?
20    A. I don't know.
21    Q. Officer Hunter?
22    A. Don't know.
23    Q. In the training that you've had, sweating
24 can be a sign of a medical problem in addition to

Estate of Roger Owensby vs. City of Cinti.
April 8, 2004

JASON LEE HODGE

---

Page 102

1 being a sign of exertion; is that right?
2     A. Sure.
3     Q. Go to page 30, please. The second
4 question on the page is, "Did he mention anything
5 about this guy trying to swallow any thing or?"
6         And your answer is, "No. I, I had thought
7 that he might of swallowed something when I saw
8 those flakes, the yellowish/white flakes. . . that's
9 why I recovered those. I thought well maybe, maybe
10 the guy swallowed crack and had stopped his heart or
11 somethin'. That's why this whole mess was going on
12 so."
13         Is that accurate, as to your frame of
14 mind, as to why you recovered the yellowish white
15 substance around Mr. Owensby's mouth?
16     A. Yes.
17     Q. Go to page 38, please. At the top of the
18 page you're asked, "During this whole time you were
19 trying to get, everybody's trying to get their, his
20 hands behind their, his back, could you hear him
21 coughing or saying get off me or"?
22         And your answer is, "I didn't hear."
23         "Question: Maybe coughing or sneezing
24 from the macing or anything?"

---

Page 103

1         "Answer: I didn't hear him say anything.
2 I don't."
3         "Question: You, you didn't hear anything
4 at all coming from him, any kind of grunts or"?
5         "Answer: Not that I."
6         "Question: Belching?"
7         "Answer: Not that I. Not that I
8 noticed. . . I don't know if he did or not. I don't
9 notice. I didn't notice any ---"
10         Do you see that?
11     A. Yes.
12     Q. Is that still accurate today as to your
13 recollection?
14     A. Yes.
15     Q. On the next page, page 39, the second
16 question that's asked, "When you arrived and started
17 assisting in this arrest, did you perceive any, any
18 kind of threat from this guy?"
19         "Answer: Did I uh? No. I mean not that
20 he was gonna hurt me. I just saw them trying to get
21 him handcuffed. And it looked like they were having
22 a hard time cuffing him."
23         Is that accurate, to your recollection?
24     A. Yes.

---

Page 104

1         (Deposition Exhibit 157
        was marked for identi-
2         fication.)
3     Q. Let me show you Exhibit 157, please. This
4 is a continuation of your November 20,
5 2000 statement to Homicide. This one begins at 1415
6 hours; is that right?
7     A. Yes.
8     Q. Is this, again, one of the statements that
9 you reviewed in preparation for this deposition?
10     A. Yes.
11     Q. You also testified before the Hamilton
12 County Grand Jury on this case; is that right?
13     A. Yes.
14         (Deposition Exhibit 158
        was marked for identi-
15         fication.)
16     Q. Let me show you Exhibit 158. This is an
17 excerpt of Grand Jury testimony beginning at
18 page 433, running through 452, and this is your
19 testimony before the Grand Jury; is that right?
20     A. Yes.
21     Q. Did you review this in preparation for
22 your deposition?
23     A. Yes.
24     Q. On page 437, the first full paragraph, you

---

Page 105

1 say, "Once I did that I could feel resistance from
2 his arm when I was trying to push his arm further
3 over."
4         Do you know whether or not the resistance
5 that you felt that evening was a result of other
6 officers pulling or pushing on Mr. Owensby as
7 opposed to Mr. Owensby actively resisting the
8 movements?
9     A. It was an active resistance on Owensby. I
10 could feel the muscle tension in his arm being very
11 rigid.
12     Q. Have you ever felt someone who is having a
13 spasm or a seizure?
14     A. I don't believe so, no.
15     Q. So you wouldn't know if the resistance
16 that you felt was a result of a spasm or seizure of
17 some sort?
18     A. No.
19     Q. The blood that you saw around Mr.
20 Owensby's mouth, do you know whether or not Mr.
21 Owensby had bit his tongue?
22     A. I don't know.
23     Q. Go to page 440, please. You see at the
24 fourth line down you're talking about, you say,

Estate of Roger Owensby vs. City of Cinti.
April 8, 2004

JASON LEE HODGE

---

Page 106

1 "After that point I noticed that Officer Jorg had
2 blood on his left sleeve." Do see that?
3    A. Yes.
4    Q. Then further down through the statement on
5 that page you say, "I finally got his attention,"
6 that's the beginning of the next paragraph, "his
7 police car was just I guess for the record it is
8 96340 where the police car where we were standing
9 behind. I was cutting his sleeve off. . ."
10       And then you continue down, and you say at
11 line 18, "He looked really upset so I went up and
12 tried to console him saying look, you know, I don't
13 think, I don't think this is your fault. I think
14 the guy might have swallowed crack or something."
15       Do you see that?
16    A. Yes.
17    Q. Do you recall saying to Officer Jorg, "I
18 think the guy might have swallowed crack or
19 something"?
20    A. Right now I don't remember saying that to
21 him, but apparently, I did.
22    Q. Well, my question is, if you cut the
23 sleeve off before CPR was administered, and that
24 would have been before you saw the white substance

---

Page 107

1 around Mr. Owensby's mouth when the hose was pulled
2 off, what basis you would have for telling Officer
3 Jorg, while you're cutting the sleeve off, that you
4 think this guy might have swallowed crack?
5       MR. HARDIN: I'm going to object on the
6    basis that, first of all, you've left out a
7    great deal of the answer that hasn't been read
8    in. It goes on for another page and a half,
9    along with the part right after what you read
10    that says, "Let me jump back-- I missed out a
11    part." So I'm going to object.
12       Go ahead and answer.
13       MR. MARTINS: No. No. No. That's fine.
14    I misread that and I withdraw the question.
15    Q. Let me ask you then, at the time you cut
16 the sleeve off of Officer Jorg, did you say anything
17 to him about thinking that the person had taken
18 crack?
19    A. I don't believe I did, no.
20    Q. On the next page, 441, at line 20 and 21
21 you say, "I came back into Sunoco store, bought him
22 a soda, walked it back to him." Do you see that?
23    A. Yes.
24    Q. Can you tell me, take a look at the

---

Page 108

1 statement, whether or not you were buying the soda
2 for Officer Jorg or Officer Caton or someone else?
3    A. It appears, Officer Caton.
4    Q. Do you have an independent recollection of
5 buying the soda for Officer Caton?
6    A. I believe I remember buying a soda, but I
7 don't remember who I bought it for.
8    Q. Go to page 446. Actually, the bottom of
9 445. Line 23, you're talking about a conversation
10 you had with Officer Caton. And then if you go over
11 onto 446, line 5 and 6 you say, "Caton had stated to
12 me that he did punch him."
13       Having seen this, do you recall a
14 conversation with Officer Caton where he said that
15 he did punch Mr. Owensby?
16    A. I've heard it several times. I don't
17 remember exactly when I was told the first time.
18    Q. My question is, do you recall Officer
19 Caton telling you that he, Officer Caton, punched
20 Mr. Owensby?
21    A. I don't remember exactly him telling me
22 that, no.
23    Q. You see that the follow-up question at
24 line 9 says, "Did he say whether he needed to punch

---

Page 109

1 him in order to do what he was trying to do or did
2 he say he was mad and punched him or you know?"
3       And you say, "I don't, I couldn't quote
4 him on anything, I don't think, I don't know."
5       Do you see that?
6    A. Yes.
7    Q. As you sit here today, do you know whether
8 or not Officer Caton ever indicated to you that he
9 punched Mr. Owensby out of anger or out of trying to
10 get him to comply?
11    A. Do I know whether or not he punched him
12 out of anger or to comply?
13    Q. I'll give a third option. That is whether
14 or not Officer Caton told you that he punched Mr.
15 Owensby at all?
16       MR. HARDIN: Wait a minute. I'm going to
17    object. I don't understand where the question
18    is.
19       MR. MARTINS: Okay. Let me rephrase it.
20    Q. You see what I just read to you,
21 lines 9 through 13. The question is put to you as
22 to whether or not Officer Caton told you that he
23 needed to punch in order to try to get Mr. Owensby
24 to do something or whether or not he was mad and

Estate of Roger Owensby vs. City of Cinti.
April 8, 2004

JASON LEE HODGE

Page 110

1 punched him.  Do you see that?

2    A.   Yes.

3    Q.   Your answer is, you didn't know at the
4 time.

5    A.   I don't know why he punched him.

6    Q.   Right.  And my question is, at that time
7 you didn't know.  Today, as you sit here, do you
8 know?

9    A.   Oh.  No.
10           (Deposition Exhibit 159
             was marked for identi-
11           fication.)

12    Q.   This is Exhibit 159.  Exhibit 159 is a
13 transcript of your testimony at Officer Caton's
14 trial on October 31, 2001; is that right?

15    A.   Yes.

16    Q.   Is this something that you reviewed in
17 preparation for your deposition?

18    A.   Yes.

19    Q.   I want to direct your attention to
20 page 840, 8-4-0.  A question was put to you at
21 line 7, "In fact, when you said the military -- when
22 I get called for the State, I'm going to go in the
23 military, but I will testify for the defense; do you
24 recall saying that?"

Page 111

1       You say, "No, I did not say that."

2       Do you have any understanding as to why,
3 or any basis for that question being put to you?

4    MR. HARDIN:  Objection.  Speculation.

5       You may answer.

6    A. I have no idea why that was asked.

7    Q. Do you recall making any statement about
8 going into the military, but coming out to testify
9 for the defense in Officer Caton's trial?

10    A. No, I don't -- like I said, I don't know
11 why that was asked of me.  I don't know anything
12 about it.

13    Q. Am I correct in understanding that your
14 entire unit was activated?

15    A. Yes.

16    MR. HARDIN:  Before you ask a question may
17 I just talk to my client a moment?

18    MR. MARTINS:  Sure.

19    (Witness and counsel conferred.)

20    MR. MARTINS:  Are you finished?

21    MR. HARDIN:  Yes.  I just wanted to ask if
22 he wanted to -- since we've been here a
23 while -- but he's okay to continue.

24    MR. MARTINS:  Are you?

Page 112

1       MR. HARDIN:  Yes.  He'd rather get it
2 done.

3       MR. MARTINS:  I think I can finish.  If
4 you want to take a break, just say so.

5       MR. HARDIN:  No.
6           (Deposition Exhibit 160
             was marked for identi-
7           fication.)

8       (Discussion off the record.)

9 BY MR. MARTINS:

10    Q.   Exhibit 160 is a March 14, 2002 statement
11 that you gave to Internal Investigation; is that
12 right?

13    A.   Yes.

14    Q.   Is this something that you reviewed in
15 preparation for this deposition?

16    A.   Yes.

17    Q.   You were represented by officer Keith
18 Fangman --

19    A.   Yes.

20    Q.   -- as your FOP rep?  On page 57 a question
21 is asked of you, "Did you ever seek to get [Mr.]
22 Owensby some medical attention when you noticed the
23 blood on his face?  At some point you said, 'I
24 noticed blood around his nose and mouth.'  Did you

Page 113

1 ever seek" --

2       You give an answer.

3       The question I want to ask you is, at any
4 point did you ever seek to get medical attention for
5 Mr. Owensby?

6    A. No.  His injuries did not appear to be
7 serious at that time.

8    Q. Well, you saw that he had blood around his
9 nose and mouth.  You saw that he was walking as if
10 he was intoxicated or his feet were moving as though
11 he were intoxicated.  You saw that his face was
12 sweaty; is that right?

13    A. Yes.

14    Q. You saw that it took two officers, one to
15 push him into the back seat and the other to go
16 around the other side to place him in the back seat
17 of the cruiser.

18    MR. HARDIN:  Objection to the form of the
19 question.

20    Q. Is that right?

21    MR. HARDIN:  Objection to the form of the
22 question.

23       You may answer.

24    A. I don't know what the officer on the other

(800) 578-1542 * MERIT * (513) 381-8228

Estate of Roger Owensby vs. City of Cinti.
April 8, 2004                                                    JASON LEE HODGE

Page 114

1 side was doing. I just saw him lean down.
2    Q. Knowing what you knew there, am I correct
3 in understanding that between that time that you saw
4 Mr. Owensby placed in the back seat of the cruiser
5 to the time that you saw Officer Hasse and Sellers
6 doing CPR on him, you never attempted to check on
7 his medical condition?
8    A. No. He didn't appear to need -- he didn't
9 have a serious medical problem at that time, that I
10 noticed.
11    Q. So you did not check on him?
12    A. No.
13    Q. To your knowledge, no other officer
14 checked on him?
15    A. I don't know what other officers did. I
16 don't know.
17    Q. To your knowledge, no other officer did?
18    A. I don't know.
19    Q. You never saw any other officer check on
20 him?
21    A. No.
22    Q. How many police officers were on the scene
23 when Officer Hasse and Sellers began administering
24 CPR to him?

Page 115

1    A. I have absolutely no idea.
2    Q. Was it more than the five officers that
3 were present when you initially showed up?
4    A. Yes.
5    Q. Do you know how many Golf Manor police
6 officers were there?
7    A. I know I spoke with one. That was a -- I
8 don't know how many there were.
9    Q. In the training that you've had from the
10 City of Cincinnati Police Department, were you ever
11 taught that after a physical struggle with a
12 suspect, after the person is handcuffed, that the
13 officer should check on the physical condition of
14 the person?
15    A. Have I ever been trained on that?
16    Q. Yes.
17    A. I don't understand what you mean by
18 "trained" on it.
19    Q. It's your term. You said, "Have I ever
20 been trained?" I said, yes.
21    A. I mean, you're going to make sure they're
22 okay. If they need -- if they require medical
23 attention for a serious injury, then we'll deal with
24 that.

Page 116

1    Q. Were you ever taught by the City of
2 Cincinnati Police Department that after you are
3 engaged in a physical altercation with someone and
4 you have them handcuffed, that you should check to
5 determine whether or not they need medical
6 attention?
7    A. I believe so, yes.
8    Q. You were?
9    A. I believe I was, yes.
10    Q. When did you receive such training?
11    A. I would assume, in the academy.
12    Q. Well, don't assume.
13    A. I don't remember.
14    Q. You haven't wanted to assume all day.
15    A. I don't remember. That was seven years
16 ago. I don't remember every single thing I was
17 trained on in the academy.
18    Q. So you don't remember such training?
19    A. No, I don't.
20    Q. Do you recall that the City of Cincinnati
21 has a use of force policy?
22    A. Yes.
23    Q. Or the police department has a use of
24 force policy?

Page 117

1    A. Yes.
2    Q. In the use of force policy it says that
3 officers are required to provide first aid
4 immediately once the scene has been stabilized?
5    A. Yes.
6    Q. Do you recall receiving any training as to
7 what the term "once the scene is stabilized" means?
8    A. No.
9    Q. When Mr. Owensby was handcuffed and picked
10 up, in your understanding, based on your experience,
11 did you think the scene was stabilized?
12    A. I didn't think I was qualified to
13 determine whether or not it was. I haven't had any
14 training -- it didn't appear to be, to me.
15    Q. When he was placed in the back seat of the
16 cruiser and the doors were closed, did you believe
17 the scene was stabilized?
18    A. No, it didn't appear to be then either.
19    Q. When you saw Officer Hasse and Caton
20 administering CPR to Mr. Owensby, did you believe
21 the scene was stabilized?
22    A. Still doesn't appear to be stabilized. I
23 mean, there's something serious going on.
24    Q. At any time that evening while you were at

(800) 578-1542 MERIT (513) 381-8289

Estate of Roger Owensby vs. City of Cinti.                                                JASON LEE HODGE
April 8, 2004

---

Page 118

1 the scene, did there come a time when you believed
2 the scene was stabilized?
3    A. Not when I was there, no.
4    Q. When did you leave the scene?
5    A. I don't know exactly when I left.  I
6 believe it was shortly after Owensby was taken to
7 University Hospital.
8    Q. So when Mr. Owensby was placed in the
9 ambulance or the life squad vehicle and taken away
10 to University Hospital, did you believe the scene
11 was stabilized at that time?
12    A. I don't know.  I really don't feel
13 qualified to answer that.  I don't know -- I haven't
14 had the training on that and I don't want to answer
15 it.
16    Q. Well, as a Cincinnati police officer you
17 are expected to comply with the Cincinnati procedure
18 concerning use of force, right?
19    A. Right.
20    Q. But in this case, I take it you don't feel
21 qualified to comment on when the scene was
22 stabilized?
23    A. Right.
24    Q. As I've given it to you under the use of

---

Page 119

1 force; is that right?
2    A. Yeah.
3    Q. The reason is, because you haven't had
4 training on that?
5    A. Right.
6    Q. Are you aware that on November 7,
7 2000 there was a mutual aid agreement signed between
8 the Cincinnati Police Department and neighboring
9 police departments, including Golf Manor?
10    A. Yes.
11    Q. Did you receive any training on what the
12 responsibilities were of Cincinnati police officers
13 when working a scene with another police division
14 that's working in conjunction, pursuant to that
15 mutual aid agreement?
16    A. No.
17    Q. Do you recall whether you received any
18 memoranda or any kind of guidance from the police
19 department concerning what your duties would be and
20 what another agency's police officer's duties would
21 be when you folks were working together under this
22 mutual aid agreement?
23    A. No, I don't recall getting any information
24 like that.

---

Page 120

1    Q. When you were at the academy I presume you
2 had classes on how to effect an arrest.
3    A. Yes.
4    Q. Is that fair?
5    A. (Nodding head.)
6    Q. In the class, were you ever taught that
7 when two or more officers are going to effect an
8 arrest on someone that they should have planned out
9 a course of action before they approach the
10 individual to effect the arrest?
11    A. If at all possible, you have time to do
12 that, yes.  You don't always have the time to do.
13    Q. Understood.  There may be an exigent
14 circumstance where you just have to act.
15    A. Right.
16    Q. But absent that, if time permits, the
17 officers should confer and arrive at a plan of
18 action on how they are going to effectuate the
19 arrest?
20    A. Right.  If you absolutely know you're
21 going to arrest somebody and if you have time, then
22 it would be good to be able to come up with a plan.
23    Q. When you were working mini-tac with
24 Officer Lawson, I take it there would be times where

---

Page 121

1 you would go in to either question somebody or to
2 make a buy.  Before doing that, would you and
3 Officer Lawson routinely get together and decide who
4 was going to do what if you were going to then
5 effectuate an arrest?
6    A. Normally, we did not make arrests in
7 plainclothes.  We would have uniform officers do
8 that.  We just merely either picked up the
9 prostitutes or bought the -- bought the drugs.
10    Q. Then at some later point, then you would
11 pass the information on to the police officers who
12 would then effectuate the arrest?
13    A. Yes.
14    Q. That's to preserve your cover or
15 anonymity?
16    A. Yes.
17    Q. When you heard someone say, "I don't think
18 he's breathing," what's your best estimate of how
19 much time elapsed between the statement being said
20 and you seeing Officer Caton and Hasse administering
21 CPR to Mr. Owensby?
22    A. Probably less than a minute, I would
23 assume.
24    Q. When the statement was said, "I don't

---

Page 118 - Page 121

Estate of Roger Owensby vs. City of Cinti.
April 8, 2004                                                                JASON LEE HODGE

Page 122

1  think he's breathing," did you look over to the Golf
2  Manor cruiser?
3      A. I don't remember if I did or not.
4      Q. Did you see officers remove Mr. Owensby
5  from the cruiser?
6      A. No.
7      Q. No?
8      A. No.
9      Q. So you hear, "I don't think he's
10 breathing," some period of time goes by, and then
11 when your attention is directed back over, you see
12 officers Caton and Hasse administering CPR?
13     A. Yes.
14     Q. When you heard, "I don't think he's
15 breathing," did you think to go over to see if there
16 was something you should do?
17     A. No, because I believe I heard Sergeant
18 Browner say, "Take him out of the car." So I felt
19 that that was already being dealt with accordingly.
20     Q. Do you know if Sergeant Browner is the
21 person who said, "I don't think he's breathing"?
22     A. I don't know. I don't know who said it.
23     Q. Do you know who Sergeant Watts is?
24     A. Yes.

Page 123

1      Q. Do you know whether Sergeant Watts is the
2  person who said, "I don't think he's breathing"?
3      A. I have no idea who said it. I don't know.
4      Q. Look at page 77. Actually, the bottom of
5  page 76. The question is, "How long were you
6  actually actively involved in this struggle?"
7         And at the top of the page, you estimate
8  it at 30 seconds. Do you see that?
9      A. Yes.
10     Q. Would that be accurate today, as you sit
11 here?
12     A. That's how long it felt. I mean, that's,
13 to the best of my recollection, that's how long it
14 felt.
15         (Deposition Exhibit 161
           was marked for identi-
16         fication.)
17     Q. Exhibit 161. Police Academy/Course
18 Training Calendar, July through December 1997. If
19 you could just glance through this and tell me
20 whether or not this appears to be the course of
21 training that you received while you were at the
22 academy.
23     A. It appears to be the same type of
24 training, yes.

Page 124

1         (Deposition Exhibit 162
           was marked for identi-
2         fication.)
3      Q. Exhibit 162. As a result of the
4  November 7th incident with Mr. Owensby, there was a
5  predisciplinary hearing and it was recommended that
6  you receive a three-day suspension; is that right?
7      MR. HARDIN: There will be an objection to
8  that question, and I'd like a continuing
9  objection with regard to any disciplinary
10 activities regarding the Roger Owensby
11 incident.
12     MR. MARTINS: I have no problem with the
13 continuing objection. Are you objecting that
14 the statement is inaccurate?
15     MR. HARDIN: No. I'm just objecting to
16 the first question about the discipline and
17 then asking for a continuing objection. I'm
18 not saying you're inaccurate, no.
19     MR. MARTINS: That's fine. Okay.
20     MR. HARDIN: You may answer.
21     A. What was your question again?
22        (Discussion off the record.)
23     Q. There was a predisciplinary hearing. And
24 as a result of the predisciplinary hearing, it was

Page 125

1  recommended that you receive a three-day suspension
2  for the events arising out of the November 7,
3  2000 incident with Mr. Owensby. Is that correct?
4      A. Yes.
5      Q. What I've handed you is a three-page
6  document. The second page is a March 11, '04 peer
7  review request; is that right?
8      A. Yes.
9      Q. Is that your signature? It says,
10 Signature of Grievant.
11     A. No, that's not my signature.
12     Q. Do you know whose signature that is?
13     A. No, I don't. I have requested for peer
14 review though.
15     Q. You see that it says, at the top it says
16 Grievant, and then it says, "Fraternal Order of
17 Police on behalf of Police Officer Jason Hodge." Do
18 you see that?
19     A. Yes.
20     Q. Then after number 4 there it says, "The
21 above-captioned grievant is dissatisfied with his
22 Notice of Disciplinary Action alleging Neglect of
23 Duty and Failure of Good Behavior with a penalty of
24 24 working hours suspension. This officer wishes to

(800) 579-1542 * MERIT * (513) 381-8228

# *A F F I D A V I T*

- - -

STATE    OF    OHIO        :
                           :    SS
COUNTY OF HAMILTON         :

    I, Wendy L. Welsh, Notary Public in and for the

State of Ohio, do hereby state that the transcript of the

deposition of JASON LEE HODGE, deponent herein, having

been submitted to said deponent for review and signature,

has not been signed within the thirty (30) day period

allowed under the Federal Rules; said deposition to now

have the same force and effect as though signed.

_____
Wendy L. Welsh, Court Reporter


Sworn to before me this *28th* day of ___*June*___, 2004.

_____
Thomas M. Blasing
Notary Public - State of Ohio

My commission expires:
May 4, 2009.