# OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04

*Page 1 to Page 196*

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

AKF Reporters, Inc.
436 Boulevard of the Allies
Pittsburgh, PA 15219-1314
Phone: 1-888-253-3376
FAX: 1-412-261-2537

Case 1:01-cv-00769-SAS   Document 196-12   Filed 09/23/2004   Page 2 of 5

BSA   OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04   XMAX(1/142)

## Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

- - - -

ESTATE OF ROGER D. OWENSBY, )
JR., et al., )
 )
 )
    Plaintiffs, )
 )
    -vs- ) Civil Action
 ) No. 01-CV-769
CITY OF CINCINNATI, et al., )
 )
 )
 )
    Defendants. )

- - - -

DEPOSITION OF: CYRIL WECHT, M.D.

- - - -

DATE: February 25, 2004
Wednesday, 11:00 a.m.

LOCATION: THE WECHT LAW FIRM
14 Wood Street
Pittsburgh, PA 15222

TAKEN BY: Plaintiffs

REPORTED BY: Anthony Jude Cordova, RPR
Notary Public
AKF Reference No. AC79595

## Page 2

DEPOSITION OF CYRIL WECHT, M.D., a witness, called by the Plaintiffs for examination, in accordance with the Federal Rules of Civil Procedure, taken by and before Anthony Jude Cordova, RPR, a Court Reporter and Notary Public in and for the Commonwealth of Pennsylvania, at the offices of The Wecht Law Firm, 14 Wood Street, Pittsburgh, Pennsylvania, on Wednesday, February 25, 2004, commencing at 11:00 a.m.

- - - -

APPEARANCES:

FOR THE PLAINTIFFS:
Frederick Morgan, Esq.
HELMER MARTINS & MORGAN
Fourth & Walnut Center, Suite 1900
105 East Fourth Street
Cincinnati, OH 45202
513-421-2400

FOR THE DEFENDANTS CITY OF CINCINNATI, SELLERS AND HODGE:
Neil F. Freund, Esq.
FREUND FREEZE & ARNOLD
One Dayton Center
South Main Street, Suite 1800
Dayton, OH 45402-2017
937-913-0115

FOR THE DEFENDANT GOLF MANOR:
Wilson G. Weisenfelder, Jr., Esq.
RENDIGS FRY KEILY & DENNIS
One West Fourth Street, Suite 900
Cincinnati, OH 45202-3688
513-381-9292

FOR THE DEFENDANTS CITY OF CINCINNATI AND STREICHER:
Geri Hernandez Geiler, Esq. - (Via telephone)
ASSISTANT CITY SOLICITOR, DEPARTMENT OF LAW
Room 214, City Hall
801 Plum Street
Cincinnati, OH 45202
513-352-3346

## Page 3

FOR THE DEFENDANTS JORG, CATON, HODGE, SPELLEN AND SELLERS:
Donald E. Hardin, Esq. - (Via telephone)
HARDIN LEFTON LAZARUS & MARKS
915 Cincinnati Club Building
Garfield Place

## Page 4

* INDEX OF EXHIBITS *

Deposition Exhibit 1 -------------- 7
Deposition Exhibit 2 -------------- 24
Deposition Exhibit 3 -------------- 25
Deposition Exhibit 4 -------------- 35
Deposition Exhibit 5 -------------- 44
Deposition Exhibit 6 -------------- 44
Deposition Exhibit 7 -------------- 72
Deposition Exhibit 8 -------------- 148
Deposition Exhibit 9 -------------- 150
Deposition Exhibit 10 ------------- 150
Deposition Exhibit 11 ------------- 151
Deposition Exhibit 12 ------------- 152
Deposition Exhibit 13 ------------- 153
Deposition Exhibit 14 ------------- 155
Deposition Exhibit 15 ------------- 155
Deposition Exhibit 16 ------------- 155
Deposition Exhibit 17 ------------- 155
Deposition Exhibit 18 ------------- 155
Deposition Exhibit 19 ------------- 156
Deposition Exhibit 20 ------------- 159
Deposition Exhibit 21 ------------- 159
Deposition Exhibit 22 ------------- 160
Deposition Exhibit 23 ------------- 162
Deposition Exhibit 24 ------------- 165

(Original Exhibits returned to Dr. Wecht.)

Case 1:01-cv-00769-SAS    Document 196-12    Filed 09/23/2004    Page 3 of 5

BSA    OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04    XMAX(12/153)

### Page 45

(1) A. Well, asphyxia is a generalized process of the
(2) body. Petechial hemorrhages in the eyes
(3) which -- you can get from other causes but
(4) which when associated with asphyxia are due to
(5) the pathophysiological phenomenon that I
(6) described a minute ago. What I was saying is
(7) that petechial hemorrhages are not necessarily
(8) bilateral symmetrical quantitatively.
(9)   It depends on how the blood is being
(10) engorged. It could depend on the position of
(11) the body. It could be dependent upon the way
(12) in which the mechanical pressure is played out.
(13) It's unpredictable and there is nothing that --
(14) as I say, that requires a completely balanced
(15) manifestation of the asphyxial process insofar
(16) as conjunctival petechial hemorrhages are
(17) concerned.
(18) Q. Have you seen other cases of petechial
(19) hemorrhage which you believed to a reasonable
(20) degree of medical certainty to be associated
(21) with asphyxia?
(22) A. Oh, yes, many times.
(23) Q. And in all of those other cases, were the
(24) petechiae equally distributed from one eye to
(25) the other?

### Page 46

(1) A. I've never kept count, but I can tell you that
(2) in any number of cases, they're not equally
(3) distributed. They're -- as I say, it's not a
(4) matter if you got 20 on one side, you're going
(5) to have 20 on the other side. It just varies
(6) greatly.
(7) Q. So do you have an opinion, Doctor, to a
(8) reasonable degree of medical certainty whether
(9) the absence -- whether the asymmetrical
(10) distribution of petechiae between Mr. Owensby's
(11) right eye and left eye is a counter-indication
(12) of mechanical asphyxia as a primary cause of
(13) his death?
(14)   MR. HARDIN:    Objection to the form of
(15) the question.
(16) A. Yes, I have an opinion.
(17) Q. And what is that opinion, sir?
(18) A. No, it is not.
(19) Q. Were there other physical findings in
(20) connection -- strike that. Before I go on, let
(21) me ask you to describe to the best of your
(22) ability what someone undergoing mechanical
(23) asphyxia goes through, what the experience is
(24) like.
(25)   MR. FREUND:    Objection.

### Page 47

(1) A. You have difficulty in breathing. Try to
(2) remember when you were a kid of playing
(3) football either for real or horsing around with
(4) other kids and a bunch of guys had piled on you
(5) and you had difficulty in breathing. Try to
(6) remember if you were horsing around in the
(7) swimming pool or in the lake or ocean and
(8) somebody was ducking you under and you reached
(9) a point that you couldn't breathe so well.
(10) That will remind you of what it's like. It's a
(11) pretty frightening and disturbing feeling.
(12)   To breathe is the most primitive,
(13) basic, fundamental need of any living organism.
(14) Try to take your favorite, most passive dog or
(15) somebody else's that wouldn't even think of
(16) barking let alone biting, hold it's mouth and
(17) nose shut and see how long before he'll try to
(18) bite your hand off. To breathe is to live, and
(19) whether you're a human being intellectualizing
(20) it or an animal primitively responding, you've
(21) got to breathe. So it's a very frightening and
(22) disturbing experience.
(23)   If you can relieve yourself of it,
(24) then you do in some way. If you can't, then as
(25) the oxygen is decreased, arterial supply of

### Page 48

(1) oxygen is diminished, the brain then responds
(2) very quickly. It's insulted quite easily, the
(3) brain, and since the brain controls heart and
(4) lung function, it sets into motion a vicious
(5) cycle quite quickly resulting in further
(6) depression of respiratory function and then
(7) cardiac function, and this cycle continues
(8) leading to diminished consciousness and then
(9) unconsciousness and then stupor, coma and
(10) death.
(11)   Many times it may involve -- can't
(12) know this unless somebody has an
(13) electrocardiogram, but many times then will
(14) precipitate a cardiac arrhythmia. As the heart
(15) is insulted and deprived of its own oxygen
(16) needs, it may begin to beat atypically,
(17) erratically, irregularly, and that further
(18) complicates the picture. All of those
(19) processes set into motion faster than it took
(20) me to explain them just now, and that cycle
(21) continues unless it is reversed.
(22) Q. Does that mean that death by mechanical
(23) asphyxiation is essentially instantaneous --
(24)   MR. FREUND:    Objection.
(25) Q. -- or does it take some period of time after

Case 1:01-cv-00769-SAS    Document 196-12    Filed 09/23/2004    Page 4 of 5

BSA    OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04    XMAX(15/156)

Page 57

(1) you have CPR initiated prior to brain death,
(2) and that's why it's so necessary to have that
(3) kind of prompt response from an emergency
(4) response team, 911 or whatever it may be called
(5) in any particular jurisdiction.
(6)     So the answer is if you've got
(7) somebody that has compromised breathing or is
(8) suffering from the effects of compromised
(9) breathing, that CPR in many -- in many cases
(10) can salvage that individual, and, again, keep
(11) in mind, we're talking about 4 to 6 minutes
(12) where you've got complete anoxia, cerebral
(13) anoxia, absolutely no oxygen getting in at all.
(14) If you have some oxygen getting in, then that
(15) period is longer by minutes and several
(16) minutes.
(17) Q. Doctor, would it be your expectation that once
(18) the force giving rise to the mechanical
(19) asphyxiation was removed, there would begin
(20) anew some oxygenation assuming that the
(21) period -- that the residual oxygen in the brain
(22) had not been completely depleted?
(23) A. Yes. As long as you remain alive, then the
(24) brain takes over. You can hold your breath
(25) like a pouting child to the point of

Page 58

(1) unconsciousness and you won't die. The brain
(2) is going to take over and breathe for you
(3) because the brain is doing your breathing now.
(4) You haven't thought about breathing since we
(5) met here this morning, have you? You've just
(6) been breathing or talking, you know, whatever.
(7) Q. The last half hour maybe, but --
(8) A. No. You haven't given one thought to
(9) breathing. Your brain's taken care of it for
(10) you. So if you remove the offending mechanism,
(11) the brain takes over. It may or may not be
(12) enough to get you started. It probably will be
(13) enough if the heart has not gone into a severe
(14) arrhythmia.
(15) Q. Doctor, you talked about advanced CPR or
(16) cardiopulmonary resuscitation. Is the type of
(17) CPR which you would -- which in your
(18) knowledge -- which, in your experience, a
(19) certified emergency medical technician is
(20) capable of affording, setting aside the
(21) ambulance and all of the equipment, just a
(22) trained EMT, would that be the type of CPR
(23) which would be appropriate for someone who had
(24) begun this chain toward mechanical
(25) asphyxiation?

Page 59

(1)     MR. HARDIN:    Objection to the form of
(2) the question.
(3) A. Yes. It would be appropriate. Obviously, it's
(4) better if you then have oxygen and some of the
(5) stimulants and so on, but to undertake basic
(6) resuscitative techniques even in the absence of
(7) those drugs and ancillary components, that is
(8) what would be indicated and that would
(9) definitely help a great deal.
(10) Q. Dr. Wecht, if the incident, the period of time
(11) that Mr. Owensby was on the ground was in the
(12) range of one and a half to 2 and a half
(13) minutes, are you able to assess without knowing
(14) anything else whether or not with appropriate
(15) medical intervention he would be alive?
(16)     MR. FREUND:    Just for
(17) clarification -- just for clarification, are
(18) we -- you want him to make that assumption?
(19)     MR. MORGAN:    Correct. I'm asking him
(20) to assume, and I'll do it that way.
(21) Q. Doctor, I'd like for you to assume that the --
(22) that Mr. Owensby was -- that the mechanical
(23) pressure was alleviated and he was being
(24) secured and hoisted or whatever happened next
(25) within one and a half to 2, 2 and a half

Page 60

(1) minutes, let's say 2 and a half minutes of the
(2) onset of the scuffle. Are you able to reach
(3) any conclusion regarding whether appropriate
(4) intervention by a trained EMT with CPR or
(5) mouth-to-mouth or both would have assured his
(6) survival?
(7)     MR. WEISENFELDER:    Objection.
(8)     MR. HARDIN:    Also object.
(9) A. Yes, I have an opinion.
(10) Q. And what is that opinion, sir?
(11) A. In my opinion, considering all the
(12) circumstances and his physical state and so on,
(13) if the mechanical asphyxial process were to be
(14) terminated, then the cardiopulmonary
(15) resuscitation had been instituted within about
(16) one and a half minutes or so on, with
(17) reasonable medical certainty, I believe that
(18) Mr. Owensby would not have died.
(19) Q. Can you take that out to any -- is there some
(20) magic number of minutes, I mean -- or, rather,
(21) I should say is there some formulaic number of
(22) minutes where that opinion changes? Obviously,
(23) 10 minutes, I assume, you know, would be
(24) different, but what's the spectrum?
(25)     MR. HARDIN:    Objection. Objection.

Case 1:01-cv-00769-SAS    Document 196-12    Filed 09/23/2004    Page 5 of 5

BSA    OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04    XMAX(16/157)

## Page 61

(1) A. Well, the temporal spectrum or parameter, I
(2) would say, would be conservatively, then, 4
(3) minutes from the moment of apparent
(4) unconsciousness, really would be a little bit
(5) longer because even when you're unconscious,
(6) you're still breathing. Unconsciousness is
(7) not -- is not coma let alone death, but
(8) conservatively, I would say from the moment
(9) that he is seen, noted, perceived to be
(10) unconscious, add on 4 minutes to that time, and
(11) that would be the period that I would say
(12) minimally would have been the time in which he
(13) could have been salvaged through interventive
(14) resuscitative techniques.
(15) Q. Doctor, could you turn to Page 17 of your
(16) report, please, sir? There is a paragraph
(17) beginning at the top of that page identifying
(18) what you refer to as other events that quite
(19) likely from a medical perspective could have
(20) been contributing factors in the development of
(21) the pathophysiological processes that
(22) culminated in Mr. Owensby death. Now, a
(23) pathophysiological process is what?
(24) A. Physiological means functional, things that the
(25) body does, and pathology means abnormalities,

## Page 62

(1) disruptions of some kind. So
(2) pathophysiological means something that is
(3) causing a disruption in a functional process in
(4) the body for whatever reason. It doesn't tell
(5) you what. It just tells you there's some
(6) pathology there.
(7) Q. So is a -- is pathophysiological process that
(8) culminated in Mr. Owensby's death, is that a
(9) fancy phrase for a contributing cause or a
(10) factor?
(11) A. Well --
(12) MR. HARDIN: Objection.
(13) A. -- it's -- it's a medical phrase for the things
(14) that caused his death. The mechanical
(15) asphyxia -- asphyxiation sets into stage the
(16) things that we've talked about. Those are the
(17) pathophysiological processes. Here where
(18) you've directed my attention on Page 17, I then
(19) refer to other things to be complete which I
(20) garnered from the records that could have
(21) played some contributory or secondary role.
(22) Q. The first of those, Doctor, is the use of mace
(23) by Officer Hunter. What does Mr. Owensby's
(24) being sprayed with mace have to do with his
(25) death as you understand the circumstances?

## Page 63

(1) A. Well, mace or any of the gas-propelled
(2) substances can induce some bronchospasm. It
(3) can lead to some additional compromise of
(4) breathing. So it certainly can be an
(5) additional factor of a negative nature in this
(6) kind of a situation.
(7) Q. Would the failure to insure that a macing
(8) victim has access to fresh air, that their face
(9) is splashed with water, things like that after
(10) the incident is over, the scene is secure,
(11) would that have any impact on the -- strike
(12) that. Let me put it a different way.
(13) Does your opinion with respect to the
(14) use of mace as a contributing
(15) pathophysiological factor apply only to the
(16) moment of or moments immediately after the
(17) application of the mace or does it extend
(18) through the entire incident? In other words,
(19) was mace a problem throughout the incident or
(20) only at the moment of application?
(21) MR. HARDIN: Objection.
(22) A. Well, I would say that the effects of the mace
(23) materials from the time that they are breathed
(24) in lead to a continuum. I mean, it doesn't
(25) just go away in a second or a few seconds

## Page 64

(1) because the macing has stopped. No. It
(2) continues. If it only worked for the second or
(3) 2, you'd have a police officer pressing on the
(4) can continuously for 5, 10 minutes with a spray
(5) never ending. No. The effects are intended to
(6) last for a while.
(7) Q. The second contributing factor you identify is
(8) pressure applied to Mr. Owensby's back by
(9) Officer Caton. Given that in your opinion as
(10) you understand the facts, Officer Jorg was
(11) kneeling with both niece on Mr. Owensby's back,
(12) what -- what is what Officer Caton is doing
(13) matter?
(14) MR. HARDIN: Objection. Form of the
(15) question.
(16) MR. FREUND: I object also. You want
(17) him to assume that's true.
(18) MR. MORGAN: He's testified it's his
(19) opinion that it's true.
(20) MR. FREUND: Well, that's a
(21) credibility issue. That's why I'm objecting to
(22) the form of the question. He's a pathologist.
(23) He's not a credibility expert.
(24) Q. Let's talk for a second about the kneeling
(25) issue, Dr. Wecht. I'm glad counsel reminded