RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 05a0290p.06

FILED
JAMES BONINI
CLERK

05 JUL -7 AM 10: 48

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

ESTATE OF ROGER D. OWENSBY, JR.,
    *Plaintiff-Appellee,*

v.

CITY OF CINCINNATI; TOM STREICHER; ROBERT JORG; PATRICK CATON; VICTOR SPELLEN; DARREN SELLERS; DAVID HUNTER,
    *Defendants-Appellants*
    *(04-3725),*

STEPHEN TILLEY; ROBERT HEILAND; CHRIS CAMPBELL,
    *Defendants-Appellants*
    *(04-3724).*

Nos. 04-3724/3725


**FOR YOUR INFORMATION**

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 01-00769—S. Arthur Spiegel, District Judge.

Argued: May 31, 2005

Decided and Filed: July 7, 2005

Before: MARTIN and ROGERS, Circuit Judges; FORESTER, District Judge.*

---

## COUNSEL

**ARGUED:** Wilson G. Weisenfelder, Jr., RENDIGS, FRY, KIELY & DENNIS, Cincinnati, Ohio, Richard Ganulin, CITY SOLICITOR'S OFFICE FOR THE CITY OF CINCINNATI, Cincinnati, Ohio, for Appellants. Paul B. Martins, HELMER, MARTINS, RICE & POPHAM CO., Cincinnati, Ohio, for Appellee. **ON BRIEF:** Wilson G. Weisenfelder, Jr., RENDIGS, FRY, KIELY & DENNIS, Cincinnati, Ohio, Richard Ganulin, CITY SOLICITOR'S OFFICE FOR THE CITY OF CINCINNATI, Cincinnati, Ohio, Ravert J. Clark, ARENSTEIN & GALLAGHER, Cincinnati, Ohio, for Appellants. Paul B. Martins, James B. Helmer, Jr., HELMER, MARTINS, RICE & POPHAM CO., Cincinnati, Ohio, for Appellee.

---

  *The Honorable Karl S. Forester, United States District Judge for the Eastern District of Kentucky, sitting by designation.

1

## OPINION

BOYCE F. MARTIN, JR., Circuit Judge. This case arises out of an encounter between Cincinnati police officers and Roger D. Owensby, Jr. that ended tragically with Owensby's death. Owensby's estate filed this action pursuant to 42 U.S.C. § 1983, alleging various claims against the individual police officers involved in the incident, as well as several municipal defendants. The district court entered an order denying qualified immunity to all of the officers and resolving several claims on summary judgment. The officers filed this interlocutory appeal challenging the district court's denial of qualified immunity. For the following reasons, we AFFIRM the denial of qualified immunity.

### I.

#### A. *Factual Background*

The following facts are described in a light most favorable to the plaintiff. On November 7, 2000, as twenty-nine-year-old Roger Owensby left a Sunoco gas station convenience store, he was stopped by three Cincinnati police officers—Robert Jorg, Patrick Caton and David Hunter—who suspected him to be an individual who had fled from Officer Hunter in the same area in a drug-related incident on September 27, 2000. At least at the beginning of this encounter, Owensby fully cooperated with the officers, truthfully answering their questions and consenting to a thorough pat-down search that yielded no sign of any weapon or contraband. At some point, however, the encounter became contentious, and Officer Hunter accused Owensby of being the individual who had previously fled from him. Owensby then attempted to slip past the officers, but was immediately tackled by Jorg and Caton and landed face down in the parking lot. Jorg pinned Owensby in a prone position with his arms under his chest while Caton rested on Owensby's legs. Caton issued an "officer needs assistance" call, and the officers began struggling with Owensby in an attempt to handcuff him. During the course of this struggle, Caton struck Owensby in the lower back and right arm and used his baton to strike his legs; at the same time, Jorg placed Owensby in a "head wrap," employed a "mandibular angle pressure point pain compliance technique" and placed his knee on Owensby's left shoulder.

By way of background, the City of Cincinnati and the Village of Golf Manor are signatories to a "Hamilton County Local Government Mutual Aid Agreement for Law Enforcement," which provides for "reciprocal police services across jurisdictional lines." As a result, when Caton called for assistance, officers from both the City of Cincinnati and the Village of Golf Manor responded. Cincinnati police officer Darren Sellers, who had been in a nearby parking lot, was one of the first to arrive on the scene. He testified that upon his arrival, Owensby was not moving and that it was impossible to discern whether the difficulty the officers were experiencing in extracting Owensby's arms from underneath him was because Owensby was resisting or because of the combined weight of the officers and Owensby. Sellers eventually was able to handcuff Owensby, at which point he announced, "He's cuffed."

Allegedly after Owensby was handcuffed, however, Caton demanded that Hunter spray mace at him. Hunter instructed Jorg to lift Owensby's head so that he could mace him directly in the face. Jorg pulled Owensby's head up, turned his own head away, and drove his knees into Owensby's back. Despite a police policy directing officers to spray chemical irritants "five to ten feet from an individual," Hunter proceeded to spray mace directly into Owensby's eyes and nose from a distance of six inches, and he did this twice. Owensby reacted only by grimacing; he did not cough or make a sound. Furthermore, despite Owensby's lack of resistance, Sellers and Hunter saw Caton

repeatedly strike Owensby in the back, only ceasing after Hunter exclaimed, "What the hell is he doing!" At this point, Owensby's face was cut and bleeding, and Jorg and Caton had Owensby's blood on the sleeves of their shirts.

Meanwhile, two Golf Manor police officers, Robert Heiland and Chris Campbell, had arrived on the scene. Because the Golf Manor police cruiser was the nearest to the arrest scene, Jorg and Caton asked Heiland's permission to place Owensby in the back seat of that cruiser, and Heiland agreed. The Cincinnati officers picked up the prone Owensby, carried him to the Golf Manor cruiser and placed him—handcuffed and possibly unconscious—in the back seat. Caton went to the other side of the cruiser, dragged Owensby headfirst into the seat and appeared to continue to beat Owensby. After the beating stopped, Owensby was left in the back seat of the cruiser with the doors locked.

Cincinnati police officer Brian Brazile soon arrived on the scene and peered into the Golf Manor cruiser with his flashlight. Noting that Owensby was bleeding and appeared unable to breathe, he said to Heiland and Campbell, who were standing near the back door of the cruiser, "This looks f[—]ed up. Can he breathe? It don't look like he can from the way he's laying." Nevertheless, Heiland, Campbell and Brazile failed to investigate Owensby's condition any further and did not attempt to provide him with any medical care.

Cincinnati police officer Victor Spellen also arrived on the scene, and his cruiser's video camera recorded all of the subsequent activity around the Golf Manor cruiser. At this point, at least eleven Cincinnati police officers and two Golf Manor officers were either on the scene or in the immediate vicinity—three of whom were trained emergency medical technicians—yet no officer attempted to provide any medical care to Owensby. Instead, the uncontroverted testimony indicates that the officers greeted each other, secured items that might have been dropped, prepared for the arrival of their supervisors and made sure that their uniforms were intact. Only Spellen and Brazile looked at Owensby, and both commented that he appeared to be hurting a great deal.

Approximately six minutes after Owensby was placed in the Golf Manor cruiser, Cincinnati police sergeant Watts arrived and asked Heiland to roll down the window so that he could check on him. Watts promptly discovered that Owensby was not breathing. Owensby was removed from the cruiser and given CPR, and emergency medical technicians from a local fire rescue department were summoned. The first responding unit arrived four minutes later, but was unable to resuscitate Owensby. Owensby was pronounced dead at 8:47 p.m. at the University of Cincinnati hospital. The coroner ruled his death a "homicide" resulting from "police intervention: asphyxiation during restraint attempts."

### B. *Procedural Background*

Owensby's estate filed this action pursuant to 42 U.S.C. § 1983, alleging various federal and state claims against the individual officers, the City of Cincinnati, the Village of Golf Manor, and the Cincinnati and Golf Manor police chiefs. Competing motions for summary judgment were filed. With respect to the estate's claims against the Cincinnati and Golf Manor police officers for failure to provide medical care to Owensby, the district court granted the estate's motion for summary judgment against Cincinnati police officers Spellen, Sellers and Hunter, as well as Golf Manor police officers Heiland and Campbell, but denied the motion as to Cincinnati police officers Jorg and Caton. Additionally, the district court granted the estate's motion for summary judgment against the City of Cincinnati, the Village of Golf Manor and their respective police chiefs for failure to train. The court did, however, grant summary judgment to all Golf Manor defendants on the estate's excessive force claim. Finally, the court held that no statutory immunity was available to any defendant with respect to the estate's state law claims because, in the court's view, Ohio's Sovereign Immunity Act violated the Ohio Constitution.

All of the individual police officers filed this interlocutory appeal challenging the district court's denial of qualified immunity. In addition, the City of Cincinnati requests that we exercise pendent jurisdiction over its appeal of the district court's award of summary judgment against it for failure to train,[1] and the Cincinnati defendants ask us to certify to the Ohio Supreme Court the question of the constitutionality of Ohio's Sovereign Immunity Act.[2]

## II.

### A. *Qualified Immunity*

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The qualified immunity analysis entails two steps. First, the court considers whether, taken in the light most favorable to the party asserting the injury, the facts alleged show that the officer's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the facts alleged fail to establish a constitutional violation, then the inquiry ends and the officer is entitled to qualified immunity. *Id.* If, however, the facts alleged are sufficient to establish a constitutional violation, then the Court must determine whether the particular right allegedly violated was clearly established at the time the violation occurred. *Id.*

In interlocutory appeals challenging a district court's denial of qualified immunity, this Court's review "is confined to the question of whether all of the conduct which the District Court deemed sufficiently supported for purposes of summary judgment met the *Harlow* standard of objective legal reasonableness." *Farm Labor Organizing Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 537 (6th Cir. 2002) (citations and internal quotation marks omitted). Thus, "we lack jurisdiction on interlocutory appeal of a denial of qualified immunity to review the district court's determination that plaintiffs have presented sufficient evidence to prove the underlying or basic facts alleged in support of their constitutional claim." *Id.* at 536-37 (citation omitted).

*1.   Do the Facts, Viewed in the Light Most Favorable to the Estate, Demonstrate a Constitutional Violation?*

The district court held that no police officer was entitled to qualified immunity because the evidence, when viewed in the light most favorable to the estate, was sufficient to establish that each officer violated Owensby's Fourteenth Amendment right to adequate medical care while in police custody. The officers challenge the district court's holding on several grounds, none of which are persuasive.

*a.   What Level of Culpability is Required?*

The first issue that the officers raise concerns the level of culpability required to establish a violation of Owensby's constitutional right to medical care. The Cincinnati officers argue that the district court erred in applying the traditional deliberate indifference standard and urge us to adopt a heightened standard requiring proof of malice and intent to harm.

---

[1] During oral argument, counsel for the Cincinnati defendants also suggested that we review the district court's grant of summary judgment to the estate on its claims against Spellen, Sellers and Hunter for failure to provide medical care.

[2] The estate has filed a motion to dismiss the pending appeals for lack of jurisdiction. We will not issue a separate ruling on that motion, however, because the issues raised in the motion are adjudicated in this opinion.

In general, the level of culpability required to support section 1983 liability depends upon the circumstances of each case. The determining factor is "whether the circumstances allowed the state actors time to fully consider the potential consequences of their conduct." *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002) (citation and internal quotation marks omitted). The deliberate indifference standard normally applies in cases, like the present one, where a pretrial detainee is alleged to have been denied adequate medical care. *See, e.g., Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004) ("Whether a convicted prisoner or a pretrial detainee, deliberate indifference to one's need for medical attention suffices for a claim under 42 U.S.C. § 1983"); *Ewolski*, 287 F.3d at 510 ("in the context of pretrial detention, the fault requirement for a due process violation may be satisfied by showing that state officials were deliberately indifferent to the basic medical needs of detainees"); *Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2001) (holding that to sustain a cause of action under section 1983 for failure to provide adequate medical care to a pretrial detainee, the "plaintiff must establish that the defendants acted with deliberate indifference to serious medical needs"). In contrast, the heightened standard requiring malice and intent to harm normally applies "when unforseen circumstances demand an officer's instant judgment," such as in a "high speed vehicle chase." *Ewolski*, 287 F.3d at 511 (citation and internal quotation marks omitted).

The Cincinnati police officers argue that this case is more analogous to vehicular chase cases than traditional prisoner or pretrial detainee cases, essentially because only about six minutes passed between the time Owensby was taken into custody and the time medical care was provided. This argument assumes, however, that actual deliberation was not possible within those six minutes. That assumption is erroneous. During the six minutes that Owensby was denied medical care after being taken into custody, the officers had time to do such things as greet each other, prepare for the arrival of their superiors, pick up dropped items and straighten their uniforms; some officers even had time to observe and discuss the apparent severity of Owensby's injuries. Under these circumstances, there is no question that the officers had "time to fully consider the potential consequences of their conduct." *Id.* at 510. Accordingly, the district court properly applied the traditional deliberate indifference standard.

        b.     *Is there Sufficient Evidence of Deliberate Indifference?*

The officers next argue that the evidence, even when viewed in the light most favorable to the estate, is insufficient to establish that they acted with the requisite deliberate indifference. "Deliberate indifference requires that the defendants knew of and disregarded a substantial risk of serious harm to [the pretrial detainee's] health and safety." *Watkins*, 273 F.3d at 686 (citation omitted). We have little difficulty finding a substantial risk of serious harm to Owensby's health and safety, as evidenced by his death, which the coroner ruled a homicide resulting from the officers' restraint attempts. The primary dispute concerns the second aspect of the deliberate indifference standard—whether the officers knew of this risk and disregarded it.

We agree with the district court's conclusion that the evidence—again, when viewed in the light most favorable to the estate—indicates that each officer did, in fact, know of and disregard the substantial risk of harm to Owensby's health and safety. In reaching this conclusion, the district court engaged in a detailed and lengthy analysis of the evidence relating to each officer, which we find persuasive and adopt in its entirety. Without duplicating that extensive analysis, we note in summary that each officer viewed Owensby in significant physical distress, yet made no attempt to summon or provide any medical care until several minutes later, when Sergeant Watt checked on Owensby and discovered that he was not breathing. This evidence is sufficient to demonstrate that

each officer's failure to provide medical care to Owensby constituted a violation of the Fourteenth Amendment.[3]

### c.  *Is Proximate Cause Required?*

The Cincinnati officers also argue that the district court erred in holding that the estate need not prove that the officers' failure to provide medical care was the proximate cause of Owensby's death. We recently held in *Blackmore* that while medical proof may be necessary to assess whether the denial of medical care caused a serious medical injury in cases where the prisoner or pretrial detainee's "affliction is seemingly minor or non-obvious," no such evidence is required where the individual had a "serious need for medical care that was so obvious that even a layperson would easily recognize the necessity for a doctor's attention." 390 F.3d at 899.

As we explained in *Blackmore*:

> Where the seriousness of a prisoner's needs for medical care is obvious even to a lay person, the constitutional violation may arise. This violation is not premised upon the "detrimental effect" of the delay, but rather that the delay alone in providing medical care creates a substantial risk of serious harm. When prison officials are aware of a prisoner's obvious and serious need for medical treatment and delay medical treatment of that condition for non-medical reasons, their conduct in causing the delay creates the constitutional infirmity. In such cases, the effect of the delay goes to the extent of the injury, not the existence of a serious medical condition.

*Id.*

In light of the facts as discussed above, we agree with the district court's assessment that Owensby's need for medical care was obvious. Accordingly, the estate need not prove that the officers' acts or omissions were the proximate cause of Owensby's death in order to hold the officers liable under section 1983. *Id.*

### 2.  *Was Owensby's Fourteenth Amendment Right to Adequate Medical Care Clearly Established?*

Finally, the Cincinnati police officers argue that the "contours" of Owensby's right to medical care were not clearly established at the time of the incident in question. The Cincinnati officers believe that the fact that Owensby was, in their words, a "just-arrested fleeing and resisting suspect" distinguishes this case from the typical case involving the denial of medical care to a pretrial detainee. This argument is similar to the Cincinnati officers' unpersuasive argument that the heightened standard of culpability requiring proof of malice or intent to harm should apply in this case, and it fails for similar reasons. That Owensby may have fled or resisted before being taken into custody is irrelevant. There is no evidence that he was attempting to flee or resist during the time that he was in police custody and denied medical care; in fact, the evidence suggests that Owensby may have been unconscious when he was placed in the Golf Manor police cruiser and never regained consciousness. The Cincinnati officers do not dispute that, in general, the Fourteenth Amendment

---

[3] The Golf Manor police officers also argue that they owed Owensby no constitutional duty because Owensby was in the Cincinnati police officers' custody, not theirs. This argument is unpersuasive. Even though the Cincinnati officers arrested Owensby, the Golf Manor officers agreed to lock Owensby in their police cruiser, over which they maintained exclusive control and possession. Under these circumstances, the Golf Manor officers unquestionably had custody of Owensby—at least during the time that he was locked in their cruiser—thereby creating a constitutional duty to provide him with adequate medical care.

right of pretrial detainees to adequate medical care is, and has long been, clearly established. We find no principled basis on which to find Owensby's right to medical care any less clearly established than the right of other pretrial detainees.

## B. *Additional Matters*

### 1. *Pendent Jurisdiction*

The City of Cincinnati requests that we exercise pendent jurisdiction over its appeal of the district court's award of summary judgment in favor of the estate on its failure to train claims against the City and its police chief. Additionally, during oral argument, counsel for the Cincinnati defendants urged us to review the district court's award of summary judgment against Spellen, Sellers and Hunter on the estate's claims that they unconstitutionally failed to provide medical care to Owensby. We hold that the exercise of pendent jurisdiction over these matters is unwarranted because the issues presented are not "inextricably intertwined" with the qualified immunity issues that are properly before us in this interlocutory appeal. *See Tucker v. City of Richmond, Ky.*, 388 F.3d 216, 224 (6th Cir. 2004) (explaining that our jurisdiction in interlocutory qualified immunity appeals is limited to the specific issue of whether qualified immunity was properly denied, but that we may exercise pendent jurisdiction over matters presenting issues that are "inextricably intertwined" with the qualified immunity issues).

### 2. *Motion to Certify Question to the Supreme Court of Ohio*

The Cincinnati defendants filed with this Court a "motion to certify to the Supreme Court of Ohio the trial court's erroneous invalidation of Ohio Revised Code Chapter 2744." As noted, the district court held that no statutory immunity was available with respect to the state law claims because chapter 2744, which contains Ohio's Sovereign Immunity Act, violated the Ohio Constitution. We hold that certification is inappropriate at this stage because the question of the constitutionality of chapter 2744 would not be "determinative of the proceeding." Ohio Supreme Court Practice Rule XVIII § 1 (providing that the Supreme Court of Ohio may answer a question of law certified to it only where, among other requirements, the question "may be determinative of the proceeding").

### 3. *Jurisdiction to Review the Denial of Immunity Under Chapter 2744 as a "Collateral Order"*

Finally, the defendants argue that this court has jurisdiction, based on the "collateral order" doctrine, to review the district court's order denying their request for statutory immunity on the estate's state law claims. An order denying statutory immunity pursuant to chapter 2744, however, does not qualify as a collateral order because the statute provides immunity only from liability, not from suit. *See Sinick v. County of Summit*, No. 02-3463, 2003 WL 22220529, at *8 (6th Cir. Sept. 24, 2003) (noting that chapter 2744 clearly pronounces that "the statute is providing immunity *from liability*, rather than from immunity from suit"); *Gratsch v. Hamilton County*, No. 00-3398, 2001 WL 406440, at *7 (6th Cir. April 3, 2001) (holding that the court lacked jurisdiction to review an order denying statutory immunity pursuant to chapter 2744 on interlocutory appeal because "the state statute authorizes immunity from liability for damages only, as opposed to complete immunity from suit."). Where statutory immunity protects defendants from liability, as opposed to suit, denial of such immunity is not "effectively unreviewable on appeal from a final judgment" and, accordingly, cannot be reviewed on appeal as a collateral order. *See Summers v. Leis*, 368 F.3d 881, 888-89 (6th Cir. 2004). We therefore have no jurisdiction over the district court's denial of immunity under chapter 2744.

## III.

For these reasons, the district court's denial of qualified immunity is AFFIRMED and the case is REMANDED for further proceedings not inconsistent with this opinion.

Nos. 04-3724/3725  *Estate of Owensby v. City of Cincinnati, et al.*                                    Page 8