Westlaw.

--- F.3d ----    Page 1
--- F.3d ----, 2006 WL 265460 (C.A.6 (Mich.)), 2005 Fed.App. 0047P
**(Cite as: --- F.3d ----)**

Briefs and Other Related Documents

United States Court of Appeals, Sixth Circuit.
Bonita CLARK-MURPHY, as Personal Rep. of the Estate of Jeffrey Clark, Deceased, Plaintiff-Appellee,
v.
Brian FOREBACK and Kristine Wakefield, Defendants-Appellants (05-1323),
Lee Gilman, Ginger Bayne, Bruce Stout, Anthony Vandervlucht, Joann Friedt, Don Wise, Shirley Whittaker, Rina Becher, Tom Lauters, Andy Dyer, Mike Harvey, Mark Fox, and Thomas Dowker, Defendants-Appellants (05-1394).
**No. 05-1323, 05-1394.**

Argued: Nov. 2, 2005.
Decided and Filed: Feb. 6, 2006.

Appeal from the United States District Courts for the Western District of Michigan at Kalamazoo and Grand Rapids. Nos. 04-00103; 03-00145- Richard A. Enslen, District Judge.

ARGUED: Kevin R. Himebaugh, Office of the Attorney General, Corrections Division, Lansing, Michigan, for Appellants. Paul W. Broschay, Fieger, Fieger, Kenney & Johnson, Southfield, Michigan, for Appellee. ON BRIEF: Kevin R. Himebaugh, Office of the Attorney General, Corrections Division, Lansing, Michigan, for Appellants. Paul W. Broschay, Tammy J. Reiss, Geoffrey N. Fieger, Fieger, Fieger, Kenney & Johnson, Southfield, Michigan, for Appellee.

Before: MOORE and SUTTON, Circuit Judges; BUNNING, District Judge.[FN*]

   FN* The Honorable David L. Bunning, United States District Judge for the Eastern District of Kentucky, sitting by designation.

SUTTON, J., delivered the opinion of the court, in which BUNNING, D. J., joined.
MOORE, J. (pp. 12-13), delivered a separate opinion concurring in part and dissenting in part.

OPINION

SUTTON, Circuit Judge.

*1 At issue in this § 1983 action is whether the district court properly denied qualified immunity to 15 Michigan corrections officers on duty at various points during the isolation, dehydration and eventual death of inmate Jeffrey Clark. Viewing the facts in the light most favorable to Clark-Murphy (the representative of Clark's estate), we affirm the denial of qualified immunity as to 11 of the employees and reverse it as to 4 of them (Andy Dyer, Kristine Wakefield, Rina Becher and JoAnn Friedt).

I.

According to Clark-Murphy's version of this lamentable episode, here is what happened during the last six days of the Bellamy Creek Correctional Facility's custody over Jeffrey Clark.

*June 29.* On Saturday, June 29, 2002, the prison, located in Ionia, Michigan, was on "heat alert," a warning that applies whenever outdoor temperatures exceed 85 degrees and a warning that applied to the prison from June 29 to July 5. D. Ct. Op. at 2, JA 1991-92. At roughly 5:30 p.m. that day, Clark collapsed outside while waiting in line to enter the mess hall. Two prison officials, Captain Andy Dyer and Lieutenant Don Wise, attended to him, laying him down under the shade of a tree. Sergeant Kristine Wakefield, who also came to Clark's assistance, observed that "[h]e was crying. He said stuff about his dad, he said stuff about dying. He didn't make sense, really. [He] was not connecting a lot of it." JA 557. She did not perceive any physical problems with Clark but "thought [he]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                                    Page 2

--- F.3d ----, 2006 WL 265460 (C.A.6 (Mich.)), 2005 Fed.App. 0047P
**(Cite as: --- F.3d ----)**

had some mental problems." JA 558. Using a wheelchair, Wakefield and Dyer transported Clark to an observation cell.

As its name suggests, an observation cell gives officers an opportunity to observe a prisoner more closely than would be possible if the prisoner were in the general prison population. Two observation cells were located near the "pod," the control center at the junction of two residence wings in the Bellamy prison. Each of the observation cells has a small window and two slots through which officers may pass food to the inmate and (if appropriate) cuff the inmate's hands or feet. On the way to meals or exercise, prisoners in the general population pass by the observation cells.

When the officers placed Clark in one of the observation cells on June 29, Wakefield observed that "he start[ed] barking like a dog, screaming at the top of his lungs." JA 561. Dyer told Sergeant Tom Lauters, the officer in charge of the unit, that Clark "need[ed] to be referred-his behavior was real erratic and [ ] he needed to be referred for psychological services." JA 2504. Some officers on the housing unit, however, told Wakefield that they thought Clark was "faking." JA 202.

That same day, Lauters filled out a psychiatric referral form, called a "Roberta-R" (which stands for reasoning, orientation, behavior, emotions, recall-and-memory, talk, appearance and relationships), noting that Clark had suffered a seizure. JA 2588. When Lauters and other officers attempted to move Clark to his regular cell later that day, Clark "stiffened up and his legs just gave out," JA 2592, and when they arrived at his regular cell Lauters noticed Clark's packed duffel bag, from which he inferred that Clark had planned to leave his cell and was "a manipulator," JA 2593. Based on these observations, Lauters returned Clark to the observation cell. So far as the record shows, this was the last time the door to Clark's cell was opened while he was alive; the officers handled all other contact with him through the slots in his cell door.

*2 *June 30.* When officer Bruce Stout arrived at work at 6 a.m. on Sunday morning, he found the water to Clark's cell turned off. Sergeant Mike Harvey, the supervisor of the unit during this shift, telephoned JoAnn Friedt, a registered nurse, telling her that "prisoner Clark was barking and would not talk or respond to me." JA 2751. In response, Friedt said that she "was aware of it" and that she "put the Roberta-R Form in for psych to follow-up with him ." JA 2780.

At 7 p.m., during Lauters' shift, Clark was "[w]alking back and forth, barking and yelling." JA 769. Despite this odd behavior, Lauters did not determine whether Clark was receiving psychiatric care: "I knew that healthcare was contacted. I left it at that." JA 2599. At 10:35 p.m., during the night shift, the log book revealed that Clark was "still beating on [the] door and yelling." JA 769. At some point that weekend, inmate Andre Williams heard Clark asking for water.

*July 1.* On Monday, at 5:40 a.m., officer Anthony VanderVlucht noted that "Clark is acting very strange, talking and yelling at himself." JA 769. When Harvey arrived at 6 a.m., VanderVlucht told him that Clark was not drinking. By the end of VanderVlucht's 16-hour shift at 2 p.m., he had not seen Clark sleep.

During Harvey's morning shift, psychologist Mark Fox observed Clark and noted that he was "acting somewhat strangely" and that it "was kind of difficult to carry on a conversation with him." JA 1783. Fox diagnosed Clark with "psychosis." JA 1788. As Fox was leaving, Clark asked him if he could turn the water on. Fox says he asked Harvey to do so but, according to Harvey, Fox "said [Clark] was acting out to try to manipulate his way to a transfer." JA 2754. Officer Ginger Bayne recalled that it was Fox who ordered the water turned off. Later that day, Bayne observed Clark drinking from his toilet, an observation she shared with Harvey. She acknowledged that Clark needed mental health attention but did nothing because "that is what the Roberta-R was for." JA 1465. She also noted that the water had been turned off during this shift.

At 7:52 p.m., during Lauters' shift, Clark "threw his food tray on the floor and wall." JA 769. Lauters claims that Clark's water was never turned off during his shift. When officer Brian Foreback and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Lieutenant Shirley Whittaker relieved Lauters later that night, however, Foreback observed that the water to Clark's cell was turned off. Foreback could not remember whether the water was ever turned back on during his shift. That night, Rina Becher, a relief sergeant who was filling in for another sergeant, "observed [Clark] pacing back and forth naked and telling me he was selling candy canes." JA 2107. She believed that Clark needed to see someone (presumably a psychologist or a psychiatrist) but was satisfied when she learned that a Roberta-R had been filled out.

*July 2.* On Tuesday, Stout arrived at 6 a.m., relieving Whittaker, and again found the water in Clark's cell turned off. Roughly two hours into the shift, Harvey instructed Stout to turn on the water. Another officer observed Clark urinating in the corner of the cell; the urine ran under the door, leading inmate-workers to complain about the "sticky" floor. JA 212.

**\*3** Later that day, Tim Nelson, unit chief of the outpatient mental health unit, sent Deputy Warden Lee Gilman an e-mail stating that "it is my clinical opinion that prisoner Clark is psychotic and should have been or should be referred ... for intense psychiatric treatment.... [H]is current level of functioning requires intense interventions." JA 822. The record does not reveal any response by Gilman to this e-mail. That afternoon, Lauters, who still did not know whether Clark had received medical attention, noticed that Clark's cell was "trashed." JA 2613. Officer Tom Dowker reported that Clark refused his dinner that day.

*July 3.* On Wednesday, Clark refused his breakfast. The officer who attempted to deliver his food noticed that "the floor, walls, and Clark were covered with something that looked like dried food." JA 213. Harvey asked Rufus Wright, the residence unit manager, if he could move Clark and informed Wright that the water to the cell was off. "It's 90 degrees," Wright responded, "you can't have the water off." JA 214.

From outside the observation cell, Fox observed Clark for "a couple of minutes," JA 1798, noting that he was virtually non-responsive and that he " was laying on his cell floor when [I] arrived. He refused to get up and talk to [me]... [H]e continues to act in an odd manner, but he has become less aggressive in behavior, i.e., not banging on the cell doors much.... Unable to assess because inmate is refusing to talk." JA 1795-96. Fox informed Harvey that "Clark had a history of acting out to get into segregation." JA 214. Later, Nelson contacted Fox regarding a report from an officer concerned about Clark's condition. According to Nelson, Fox said " he was not going to go back to the housing unit as he had already talked to Clark." JA 214. "Clark was a 'manipulator,' " Fox added, "and was 'trying to have things his way .' " JA 214.

On the next shift, Lauters noticed nothing unusual about Clark, though as far as he knew Clark still had not received psychiatric help. Officer Thomas Dowker, who worked with Lauters every day that Clark was in the cell, acknowledged some deterioration in Clark's condition. Officer Ricardo Dominguez observed Clark lying naked on his bed. According to the log book, Clark refused to accept his evening meal. During Clark's time in the observation cell, several inmates heard Clark asking for water as they passed his cell on the way to the mess hall. JA 573, 1288-94, 1640, 2016, 2017, 2020.

*July 4.* At roughly 1 a.m., during Whittaker's shift, Clark was discovered dead. His body lay naked on the floor, in full rigor mortis, with eyes open and vomit encrusted on his mouth. The water to Clark's cell was turned off and the toilet was dry. When an emergency medical crew arrived, they asked how long it had been since someone had checked on Clark. Upon being informed it had been 35 to 45 minutes, one of them said, "Jesus. He's rigored." JA 216.

**\*4** Michigan Detective Michael Morey investigated the scene and noted a strong odor of urine, a pool of urine beneath Clark's mattress and debris on the floor, including uneaten food. Due to the smearing of filth on the cell window, Morey determined that " very little of the activity inside that cell could have been observed from the outside." JA 2050. Gilman reached the same conclusion: Due to "the filth on the inside of the window of the door," he did not "

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                                    Page 4

--- F.3d ----, 2006 WL 265460 (C.A.6 (Mich.)), 2005 Fed.App. 0047P
**(Cite as: --- F.3d ----)**

believe that officers in the pod could see anybody in those cells." JA 785.

An autopsy revealed that Clark had died of dehydration.

On March 3, 2003, Clark's estate, through his sister Bonita Clark-Murphy, filed two lawsuits against a number of prison employees under 42 U.S.C. § 1983, alleging that they were deliberately indifferent to Clark's medical needs in violation of the Eighth and Fourteenth Amendments. Ruling on three summary-judgment motions filed by different groups of defendants in the two cases, the district court eventually dismissed the claims against several employees as a matter of law. As to the remaining 15 defendants, the district court ruled (1) that there was a fact dispute about whether they were deliberately indifferent to Clark's need for water, ventilation and medical care, and (2) that qualified immunity did not apply to these employees because Clark's right to these necessities and services was clearly established at the time of the incident. Thirteen of the employees filed an interlocutory challenge to this ruling, while two of them filed a separate interlocutory challenge to the ruling. We have jurisdiction over each interlocutory appeal, *Mitchell v. Forsyth*, 472 U.S. 511, 527 (1985); we give de novo review to the district court's summary judgment decisions, *Thomas v. Cohen*, 304 F.3d 563, 568 (6th Cir.2002); and we have exercised our discretion to consolidate the two appeals and resolve them together.

II.

Something obviously went wrong during the last six days of the State of Michigan's custody over Jeffrey Clark, and the question is whether a triable issue of fact exists over the constitutional responsibility of these 15 defendants for his suffering and eventual death. Faced with this grim set of allegations and with the requirement that we must accept them as true at this stage of the litigation, one might be tempted to invoke the doctrine of *res ipsa loquitur* and let the trial begin. But the Constitution gives governments considerable leeway when it comes to the day-to-day challenges of managing a prison and

erects a series of hurdles that allegations of prisoner mistreatment must clear before they proceed to a jury.

First, the standard of care in this area is not negligence, *Farmer v. Brennan*, 511 U.S. 825, 835 (1994), which is why *res ipsa loquitur* does not apply, *Sweeney v. Erving*, 228 U.S. 233, 240 (1913). Under the Eighth Amendment, an inmate may bring a § 1983 claim regarding his conditions of confinement only when he can show that there has been "deliberate indifference" to his "medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *see also Farmer*, 511 U.S. at 832 ("The Amendment [ ] imposes duties on these officials [to] ensure that inmates receive adequate food, clothing, shelter, and medical care, and ... [to] 'take reasonable measures to guarantee the safety of the inmates.' ") (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)). To establish "deliberate indifference," an inmate must show that the alleged mistreatment was "objectively" serious and that the defendants "subjectively" ignored the inmate's medical or safety needs. *Farmer*, 511 U.S. at 829, 834. A claimant may satisfy the subjective prong of this inquiry by establishing that "the official knows of and disregards an excessive risk to inmate health or safety," which is to say "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

*5 Second, qualified immunity prevents the officers from being held liable for constitutional violations if the right at issue was not "clearly established" at the time of the violation. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). Under *Saucier*, the "dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202.

A.

Turning to the constitutional question, we note that little room for debate exists about the objective component of Clark-Murphy's Eighth Amendment claim. In the abstract, the deprivation of water and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                                   Page 5

--- F.3d ----, 2006 WL 265460 (C.A.6 (Mich.)), 2005 Fed.App. 0047P
**(Cite as: --- F.3d ----)**

medical care, including psychological services, of course would be "sufficiently serious" to satisfy this requirement, *Farmer,* 511 U.S. at 834, and the defendants do not argue otherwise. The question is whether the defendants satisfy the subjective component of the claim, a question that we will answer by dividing the defendants into two groups-those involved only in treating Clark's collapse outside the mess hall on June 29 and those involved in his treatment from that day forward.

1.

Captain Dyer and Sergeant Wakefield assisted Clark after he collapsed outside the mess hall on June 29. Each defendant's involvement in Clark's care ended after the two of them transferred him to Lauters' unit later that day. While they each perceived that Clark needed psychological care, they had no reason to expect that Lauters or any of the other defendants charged with Clark's care would fail to secure that help. Nor did they leave it at that. Each of them took reasonable steps to ensure that Lauters looked out for Clark's safety in this area. *See, e.g.,* JA 2504 (Dyer told Lauters that Clark needed psychological services); JA 190 (Wakefield "radioed to the unit to find out any information that would help us on him"). *See Farmer,* 511 U.S. at 844 (noting that "officials who actually knew of a substantial risk ... may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted").

Clark-Murphy has not produced evidence indicating or even suggesting that these defendants had any reason to think Clark was not receiving the psychological treatment he needed after June 29. And there is no evidence that these defendants had any reason to think that Clark was dehydrated at this point in time. While it fairly can be said that each of these defendants perceived a risk to Clark's health, they acted reasonably in response to that perception. Clark was moved to an observation cell, and the officers looked into his treatment history and communicated their concerns that Clark needed psychiatric assistance. Clark-Murphy does not allege that these officers had any other responsibility for, or interaction with, Clark after this incident. On this record, the constitutional claims of deliberate indifference fail as a matter of law against these two defendants. *See Williams v. Mehra,* 186 F.3d 685, 692-93 (6th Cir.1999) (en banc) ("Plaintiff would need to show that the doctors actually knew that [their actions] constituted an excessive risk to [plaintiff's] health or safety."); *Davis v. Agosto,* No. 02-6141, 2004 WL 376833, at *4 (6th Cir. Feb. 27, 2004) (requiring "reliable inference[s] of wantonness") (internal quotation marks omitted).

2.

*6 The claims against most of the remaining 13 officers are another matter. Each of these officers had some involvement with Clark after his June 29 collapse, and each of them learned at one time or another about his serious psychological needs or his potential for dehydration. As shown by the following assessment of the evidence, Clark-Murphy has presented sufficient evidence from which 11 of these defendants (all but Becher and Friedt) could have inferred that a substantial risk of serious harm existed to Clark's health and safety from the deprivation of water or psychological treatment, or both.

DEPUTY WARDEN

Lee Gilman

Gilman received an e-mail on July 2 from the head of the outpatient mental health unit stating that "it is my clinical opinion that prisoner Clark is psychotic . ... [H]is current level of functioning requires intense interventions," JA 211; the record offers no indication that Gilman responded to this e-mail.

LIEUTENANTS

Shirley Whittaker

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                                    Page 6

--- F.3d ----, 2006 WL 265460 (C.A.6 (Mich.)), 2005 Fed.App. 0047P
**(Cite as: --- F.3d ----)**

Shifts: June 30 through July 4, 10 p.m. to 6 a.m.
Whittaker agreed that Clark had "a mental problem [and] that he needed some sort of psychologist or other mental health professional," JA 2070; the water was turned off during her shifts; she did not follow up to ensure that Clark was receiving needed care; and she was the supervisor on duty the night Clark died.

### Donald Wise

Shifts: June 29 through July 3, 2 p.m. to 10 p.m.
Wise worked every day that Clark occupied the cell; he observed Clark's strange behavior; he knew the water had been turned off by Harvey and Lauters; and he did nothing to ensure Clark received medical treatment.

### SERGEANTS

### Rina Becher

Shift: July 1, 10 p.m. to 6 a.m.
Becher observed Clark "pacing back and forth naked and telling me he was selling candy canes," JA 2107; she believed he needed psychiatric help and was told that a Roberta-R had been completed for him.

### Mike Harvey

Shifts: June 30 through July 3, 6 a.m. to 2 p.m.
On each day that Clark was in the observation cell, the water was off for at least part of Harvey's shift; Harvey was aware of Clark's mental illness and that Clark was not drinking or eating; VanderVlucht told Harvey that he was concerned that Clark was not drinking; Fox relayed information to Harvey that Clark wanted water; and on July 3, the day Clark died, the water was still off during Harvey's shift.

### Tom Lauters

Shifts: June 29 through July 3, 2 p.m. to 10 p.m.
Lauters was told by Dyer that Clark needed "psychological services," JA 2504; and he did nothing after filling out a referral form-"healthcare was contacted, I left it that," JA 2599-even though Clark's disturbing behavior persisted throughout Lauters' shifts.

### OFFICERS

### Ginger Bayne

Shifts: June 30 and July 1, 6 a.m. to 2 p.m.
Bayne saw Clark drinking from the toilet; Clark asked her for water; she told Stout "that Clark was a problem," JA 1495; and while she knew that Clark needed mental health care she did not ensure that it was provided.

### Tom Dowker

*7 Shifts: June 29 through July 3, 2 p.m. to 10 p.m.
Dowker heard "screeching, barking, [ ] jibberish" from Clark, JA 1559; he thought that Clark needed "psychological or psychiatric intervention," *id.*; he perceived Clark deteriorating on July 3; and he did nothing to ensure Clark was getting help.

### Brian Foreback

Shifts: July 1 and 3, 10 p.m. to 6 a.m.
During his July 1 shift, the water was turned off both when Foreback began the shift and when he ended it; the water was turned off when he began his July 3 shift up until Clark's dead body was discovered; and it appears that Foreback did not check on Clark during his last shift.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                                    Page 7
--- F.3d ----, 2006 WL 265460 (C.A.6 (Mich.)), 2005 Fed.App. 0047P
(Cite as: --- F.3d ---)

### Bruce Stout

Shifts: June 30 and July 2, 6 a.m. to 2 p.m.
Stout knew the water was repeatedly turned off in Clark's cell; he knew that Clark had exhibited symptoms of mental illness; and he did nothing to ensure that Clark was getting help.

### Anthony VanderVlucht

Shifts: June 30, 10 p.m. to 6 a.m.; July 1, 6 a.m. to 2 p.m.
VanderVlucht realized Clark was not drinking water; he inferred that this posed a risk to Clark's health; he perceived symptoms of mental illness (heard Clark barking and yelling); and he did nothing to seek help for Clark.

### MEDICAL

### JoAnn Friedt, nurse

Shift: June 30, 6 a.m. to 2 p.m.
Harvey telephoned Friedt, telling her that "prisoner Clark was barking and would not talk or respond to me." JA 2751. In response, Friedt said that "I was aware of it and that I put the Roberta-R Form in for psych to follow-up with him." JA 2780.

### Mark Fox, psychologist

Shifts: Visited Clark on July 1 and 3.
As a psychologist, Fox was well-positioned to identify Clark's psychosis and to address it; he did not address the problem during his first examination and gave Clark only a cursory examination the day he died, despite his awareness that Clark was suffering from psychosis and despite seeing Clark in a non-responsive condition; and Fox may have ordered the water turned off in Clark's cell.

As this record evidence shows, each of these defendants, except for Becher and Friedt, repeatedly perceived sufficient facts to infer that Clark faced serious risks to his health and safety. With regard to the dehydration claim, Clark-Murphy has presented evidence indicating that the water repeatedly was off during many of these defendants' shifts, that other inmates heard Clark asking for water throughout the week, that officers perceived that Clark was not drinking and that the prison was on a heat alert throughout this six-day period. With regard to the mental-illness claim, many of the officers testified that they believed Clark needed psychological attention. *See* Gilman Br. at 11 (Fox diagnosed Clark with psychosis); *id.* at 17 (Gilman was advised that "Clark needed psychiatric treatment"); *id.* at 21 (Bayne thought that Clark had "mental health" needs); *id.* at 24 (VanderVlucht "thought Clark's problems were psychological"); *id.* at 25 (Dowker "thought ... Clark needed psychological or psychiatric intervention"); *id.* at 27 (Harvey "thought that Clark 'had some mental issues' "); *id.* at 29 (Whittaker "thought that Clark needed to be seen by a mental health professional").

*8 Despite these widely held beliefs, the record shows that Clark languished in his cell for five days without the door being opened and apparently with the officers unable readily to see into his cell for part of this time. Even though prison rules required officers to go up the chain of command if they felt that a referral had not secured the requisite assistance for an inmate, these defendants pin much of their defense on the fact that they (or others) had completed psychological-referral forms. *See, e.g.,* JA 2599 (Lauters: "I knew that healthcare was contacted, I left it at that."). While this fact may be relevant to whether the individual defendants recklessly disregarded a risk of harm to Clark or responded reasonably to it, the fact does not suffice to establish that the defendants are entitled to qualified immunity as a matter of law at this stage of the case given their repeated interactions with Clark and repeated opportunities to assess the seriousness of the situation.

None of this, to be sure, establishes that these defendants either singly or as a group showed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                                          Page 8

--- F.3d ----, 2006 WL 265460 (C.A.6 (Mich.)), 2005 Fed.App. 0047P
**(Cite as: --- F.3d ----)**

deliberate indifference to Clark. For summary-judgment purposes, we hold only that these 11 defendants could have perceived a substantial risk of serious harm to Clark. Whether in fact they perceived, inferred or disregarded that risk is an issue for trial. *See Farmer,* 511 U.S. at 842 (" Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways ..., and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."); *see also Comstock v. McCrary,* 273 F.3d 693, 703 (6th Cir.2001) (noting that it is " permissible for reviewing courts to infer from circumstantial evidence that a prison official had the requisite knowledge").

In contrast to these 11 defendants, Sergeant Becher and nurse Friedt worked just one 8-hour shift between Clark's seizure on June 29 and his death on July 3 or July 4. While a prison employee doubtlessly could exhibit deliberate indifference toward an inmate in the course of one shift, neither Friedt nor Becher had sufficient exposure to Clark to make out a triable issue of fact that any such wantonness occurred on their part.

Only one of Nurse Friedt's shifts (an eight-hour shift on Sunday, June 30) involved Clark. Friedt became aware of Clark's situation by way of a Roberta-R form, which mentioned "some type of seizure." JA 2784. A Roberta-R form is used only "for psychiatric or mental conditions." JA 2778. As a nurse, Friedt was not expected to become involved with mental-health issues unless the inmate was being watched for self-harm, which was not the case here. She also knew that the officers had not prepared a health-care contact sheet, a fact that was inconsistent with a medical emergency. Knowing that the hospital could have been called the night before if there had been "an imminent need for care, " JA 2778, Friedt, without more, fairly could have deduced that the situation with Clark was under control. The officers on the scene had not contacted a hospital or a nurse; they instead had sought psychiatric care; and 12 hours had passed since the original incident-all prior to her arrival. Quite possibly, on this record, Friedt reasonably could have done nothing more. But she did more: She called the officer on duty in Clark's cell block (Thelen) to determine if Clark needed medical assistance. Officer Thelen informed Friedt, "All he's on is custody watch [which did not impose a responsibility on Friedt]. He does not need medical care." JA 2780. When Harvey called later, he mentioned that Clark was having psychiatric difficulties. Since she was not qualified to help an inmate with psychiatric needs, she let Harvey know that the referral to the psychiatric department had been completed. In contrast to Harvey, no allegation has been made that Friedt knew the psychiatric referral had failed to secure Clark the help he needed. No evidence indicates that Harvey or anyone else told Friedt that a psychologist or psychiatrist needed to see Clark that day, and Clark-Murphy has offered no theory of liability or damages relating to the fact that Fox did not see Clark until the next day. On these facts, it is doubtful that negligence could be proved, much less deliberate indifference.

*9 Sergeant Becher was a relief sergeant who was filling in for another sergeant on July 1 and worked just one 8-hour shift during the six days at issue. While she learned firsthand during the shift that Clark needed psychiatric care (based on seeing him pace back and forth naked in his cell and based on hearing him offer to sell her candy canes), she responded appropriately to this observation by asking whether a psychiatric referral (a Roberta-R) had been completed for Clark. She was told that several Roberta-Rs had been completed for him. And of course earlier that day Fox (the psychologist) had paid his first visit to Clark. On this record, Becher simply did not have the repeated opportunities that others had to know that proper mental-health care was not being provided for Clark. *See Davis v. Oakland County,* No. 96-1678, 1998 WL 180608, at *4 (6th Cir. Apr. 7, 1998) ("It was not unreasonable" for defendant "to assume that the trained medical professional ... would follow-up in an appropriate manner."). Nor does any evidence indicate that she was aware that he repeatedly was not drinking water (or eating food). Later during the shift, she asked an officer how Clark was doing. The officer responded that he was doing "okay" but that he had attempted to shove a pillow down his toilet. JA 210. In response, Becher

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                                                      Page 9
--- F.3d ----, 2006 WL 265460 (C.A.6 (Mich.)), 2005 Fed.App. 0047P
**(Cite as: --- F.3d ----)**

asked if "they would have to shut the water off and the officer told her no, they had already done that." *Id.* To the extent this evidence shows that Becher was aware that the water to Clark's cell was turned off, it shows only that it was turned off toward the end of her shift and solely in response to an incident that temporarily would have justified shutting off the water. In the absence of other evidence that Becher was aware that Clark was not drinking (or eating) or that the water was turned off in his cell for an extended period of time, Clark-Murphy has not tenably shown that Becher recklessly ignored Clark's need for water.

Given the brief exposures of these two defendants to Clark and given the resulting absence of evidence regarding their purposeful indifference to his health and safety needs, the claims against these defendants must be dismissed as a matter of law. *See Gibson v. Matthews,* 926 F.2d 532, 535 (6th Cir.1991) ("[P]ersonal liability on any of the defendants.... must be based on the actions of that defendant in the situation that the defendant faced, and not based on any problems caused by the errors of others, either defendants or non-defendants."); *see also Vance v. Peters,* 97 F .3d 987, 992 (7th Cir.1996) ("The focus must be on whether any of the defendants had the personal involvement necessary to permit a finding of liability.").

### B.

Having concluded that a triable issue of fact exists over whether 11 of the defendants showed deliberate indifference to Clark's health and safety needs, we turn to whether that right was clearly established in June 2002. Under *Saucier,* the " dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." 533 U.S. at 202; *Comstock,* 273 F.3d at 702; *see also Anderson v. Creighton,* 483 U.S. 635, 640 (1987) ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."). "If the officer's mistake as to what the law requires is reasonable," however, "the officer is entitled to the immunity defense."

*Saucier,* 533 U.S. at 205.

**\*10** At the time of this incident, it should come as no surprise that Clark had a clearly established right not to be deprived of food and water. *See Kent v. Johnson,* 821 F.2d 1220, 1229 (6th Cir.1987) (holding that "[t]he Eighth Amendment affords prisoners protection against ... exposure to egregious physical conditions which deprive them of basic human needs"); *see also Cherrington v. Skeeter,* 344 F.3d 631, 637 (6th Cir.2003) (noting that when the state "fails to provide for [a prisoner's] basic human needs-e.g ., food, clothing, shelter, medical care, and reasonable safety-it transgresses the substantive limits on state action set by the Eighth Amendment").

The same holds true for Clark's right to psychological treatment. *See Comstock,* 273 F.3d at 702 (noting that a "prison inmate has [an] Eighth Amendment right [to] be free from deliberate indifference to serious psychiatric needs"); *Greason v. Kemp,* 891 F.2d 829, 834 (11th Cir.1990) (noting that "every reported decision handed down after *Estelle* and before [June 1985] ... recognized that deliberate indifference to an inmate's need for mental health care is actionable on eighth amendment grounds"); *Woodall v. Foti,* 648 F.2d 268, 270 (5th Cir.1981) (holding that an allegation that prisoner "had been denied medically necessary psychiatric care" stated a claim under the Eighth Amendment); *Inmates of the Allegheny County Jail v. Pierce,* 612 F.2d 754, 763 (3d Cir.1979) (holding that "when inmates with serious mental ills are effectively prevented from being diagnosed and treated ... the system of care does not meet the constitutional requirements set forth by *Estelle* "); *see also Heflin v. Stewart County,* 958 F.2d 709, 717 (6th Cir.1992) (holding that "[t]here can be no doubt that in 1987 existing law clearly established the right [of inmates] ... to receive care for [ ] serious medical needs"); *Fitzke v. Shappell,* 468 F.2d 1072, 1076 (6th Cir.1972) (holding that " fundamental fairness and our most basic conception of due process mandate that medical care be provided to one who is incarcerated and may be suffering from serious illness").

As the above cases suggest and as the following

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----    Page 10

--- F.3d ----, 2006 WL 265460 (C.A.6 (Mich.)), 2005 Fed.App. 0047P
**(Cite as: — F.3d —)**

cases confirm, the defendants' distinction between medical care and psychological care-"prisoner Clark showed signs that he needed psychological or psychiatric help, not medical help," Foreback Br. at 36-does not protect them from liability. *See Horn v. Madison County Fiscal Court,* 22 F.3d 653, 660 (6th Cir.1994) ("[P]sychological needs may constitute serious medical needs."); *Davis,* 1998 WL 180608, at *4 ("Medical needs encompass treatment for mental illness."); *see also Partridge v. Two Unknown Police Officers of Houston,* 791 F.2d 1182, 1187 (5th Cir.1986) ("A serious medical need may exist for psychological or psychiatric treatment, just as it may exist for physical ills."); *Pierce,* 612 F.2d at 763 ("Although most challenges to prison medical treatment have focused on ... physical ills, we perceive no reason why psychological or psychiatric care should not be held to the same standard."); *Bowring v. Godwin,* 551 F.2d 44, 47 (4th Cir.1977) ("We see no underlying distinction between the right to medical care for physical ills and its psychological or psychiatric counterpart.").

*11 Neither are the defendants correct in contending that Clark-Murphy cannot prove " proximate cause between their actions and Clark's death." Gilman Br. at 50. The claimant need only demonstrate a link between each defendant's misconduct and Clark's *injury,* which may include his death as well as the "pain and suffering," JA 25, that preceded his death. *See, e.g., Boretti v. Wiscomb,* 930 F.2d 1150, 1154 (6th Cir.1991) (holding that "physical pain and mental anguish [suffered] during the time he was denied [treatment] .... may constitute cruel and unusual punishment within the meaning of the Eighth Amendment"); *Westlake v. Lucas,* 537 F.2d 857, 860 (6th Cir.1976) (holding that "a prisoner who is needlessly allowed to suffer pain when relief is readily available does have a cause of action against those whose deliberate indifference is the cause of his suffering" ).

One of the defendants (Whittaker) claims the complaint does not contain any allegations against her, requiring that she be dismissed from the case. Not true. The complaint lists Whittaker as a defendant; it alleges that the defendants, including Whittaker, observed Clark's deteriorating condition and failed to seek treatment; and the summary-judgment evidence shows that a triable issue of fact exists over Whittaker's alleged indifference.

III.

For these reasons, we affirm the denial of qualified immunity as to 11 of the defendants (Gilman, Whittaker, Wise, Harvey, Lauters, Bayne, Dowker, Foreback, Stout, Vandervlucht and Fox) but reverse as to 4 of them (Dyer, Wakefield, Becher and Friedt), and remand for further proceedings consistent with this opinion.

CONCURRING IN PART, DISSENTING IN PART

KAREN NELSON MOORE, Circuit Judge, concurring in part and dissenting in part.
I dissent in part because I would affirm the denial of qualified immunity for JoAnn Friedt and Rina Becher for the following reasons.

The majority's reliance on the brevity of Friedt's one-shift-long involvement with Clark to decide that Friedt was entitled to qualified immunity erroneously disregards other factors relevant to this inquiry, such as the Defendant's position and expertise and the severity of distressing behavior that she saw Clark display. Friedt's awareness of Clark's seizure, which was noted on the Roberta-R Form that Friedt received and read, carries enhanced significance because she is a registered nurse who admitted at her deposition that seizures can be "life[-]threatening" and that she could not assess whether the seizure was of medical concern without seeing Clark. Joint Appendix at 2782 (Friedt Dep. at 38). Although the majority further concludes that Friedt did not ignore a serious risk to Clark's health because Officer Thelen told Friedt that Clark did not require medical care, Friedt knew that Thelen did not have medical expertise, and given Friedt's own training, Friedt should have taken further action to assess Clark's health. The majority's conjecture that "[q]uite possibly, on this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----    Page 11

--- F.3d ----, 2006 WL 265460 (C.A.6 (Mich.)), 2005 Fed.App. 0047P
**(Cite as: --- F.3d ----)**

record, Friedt reasonably could have done nothing more," [FN1] Majority Opinion ("Maj.Op.") at 9, is flatly contradicted by the record. Friedt herself testified that when she gets a call from a resident unit officer regarding a medical concern relating to a prisoner, as she did from Sergeant Mike Harvey, she has three options: talking to the prisoner on the phone, seeing the prisoner on his unit, or having the prisoner come to the clinic. In this instance, Friedt chose none of these courses of conduct, and instead, opted to do nothing.

> FN1. The majority's willingness to infer facts in favor of Defendant Friedt, a moving party, as evidenced by this statement and the majority's assumption that Friedt "could have deduced that the situation with Clark was under control," Maj. Op. at 9, contravenes our obligation, in reviewing the grant of a motion for summary judgment, to "view all the facts and the inferences drawn therefrom in the light most favorable to the nonmoving party." *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1048 (6th Cir.2001).

*12 The majority attempts to absolve Friedt's inaction by asserting that Friedt had no responsibility to respond to a prisoner's potentially life-threatening health risk because she was made aware of this risk by prison paperwork that is ordinarily used for psychological rather than medical health issues. This amounts to a rule that a prison's medical-care personnel can turn a blind eye to health-care concerns placed before them. This is precisely what the Eighth Amendment disallows: " deliberate indifference" to "a substantial risk of serious harm" to a prisoner's health. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Friedt, a medical professional, ignored a fact that she knew indicated a potential serious health risk-a seizure-that may have required immediate medical care. Therefore, that a health-care contact sheet had not been prepared and that the hospital was not contacted is irrelevant in the face of concrete facts that Clark might have been confronting a serious health risk that required prompt medical attention.

Regardless of whether and when Psychologist Mark Fox or any other mental health professional saw Clark, because Friedt knew of Clark's seizure, she knew that he may have required *medical* attention. [FN2] As in *Comstock v. McCrary*, the circumstances reveal that Friedt should have investigated Clark's condition before determining that he did not require immediate care, and her decision not to do so amounts to deliberate indifference. *See Comstock v. McCrary*, 273 F.3d 693, 707-08 (6th Cir.2001). Therefore, Friedt's decision not to see Clark, particularly when she knew that he would not be seen by someone from psychological services that day, smacks of reckless disregard for the health risks he may have been facing.

> FN2. The majority notes that the Plaintiff " has offered no theory of liability or damages relating to the fact that [Psychologist] Fox did not see Clark until the next day." Maj. Op. at 9. This reasoning seems out of place given that the majority does not require the Plaintiff to make such a robust showing of specific causation and damages regarding the other Defendants in this case. In fact, the majority expressly criticizes that " defendants pin much of their defense on the fact that they (or others) had completed psychological-referral forms" because " prison rules required officers to go up the chain of command if they felt that a referral had not secured the requisite assistance for an inmate." *Id.* at 9. In any event, it does not require much speculation to conclude that had Friedt seen Clark, she would have gotten him proper treatment, and perhaps he would have survived or at least avoided some degree of suffering.

The majority again relies too heavily on the extent of Becher's contact with Clark to determine whether she ignored a significant health risk. Although Becher worked only one shift in the time between Clark's collapse and his death, she observed Clark " pacing back and forth naked and telling me he was selling candy canes." Joint Appendix at 2107 (Becher Dep. at 20). One would expect that this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                Page 12

--- F.3d ----, 2006 WL 265460 (C.A.6 (Mich.)), 2005 Fed.App. 0047P
**(Cite as: --- F.3d ----)**

behavior is sufficiently bizarre to arouse great concern in anyone witnessing it. Moreover, although Becher testified at her deposition that she was unaware that there was a heat alert, that the water in Clark's cell was off, and that Clark was experiencing a mental disturbance, other statements made during her deposition cast doubt on these self-serving assertions. Given that a factfinder may determine that " 'a prison official had the requisite knowledge of a substantial risk ... [by] inference from circumstantial evidence," ' including " 'from the very fact that the risk was obvious," ' *Lemarbe v. Wisneski,* 266 F.3d 429, 436 (6th Cir.2001) (quoting *Farmer v. Brennan,* 511 U.S. 834, 842 (1994)); *see also* Majority Op. at 9, Becher has not put forth sufficient evidence to show that she was not aware of the health risks Clark faced, and thus she should not be dismissed from the case.

*13 For the foregoing reasons, I would affirm the district court's denial of qualified immunity to Friedt and Becher, and accordingly I dissent in part.

C.A.6 (Mich.),2006.
Clark-Murphy v. Foreback
--- F.3d ----, 2006 WL 265460 (C.A.6 (Mich.)), 2005 Fed.App. 0047P

Briefs and Other Related Documents (Back to top)

• 05-1394 (Docket) (Mar. 29, 2005)
• 05-1323 (Docket) (Mar. 15, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.