UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| ESTATE OF ROGER D. OWENSBY JR., | : : : : |
| Plaintiff, | : Case No. 01-CV-769 : : Senior Judge S. Arthur Spiegel |
| v. | : : |
| CITY OF CINCINNATI, et al., | : : : |
| Defendants. | : : |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO RESCHEDULE TRIAL DATE (Doc. 224)**

**I.   INTRODUCTION**

Roger Owensby, Jr. died at the hands of Cincinnati police officers on November 7, 2000. More than 5 years have now elapsed and the family of Roger Owensby, Jr. is still waiting to try or otherwise resolve this case.

As they have with the past two trial settings, Defendants again want to delay the April 3, 2006 trial of this civil rights / wrongful death case. This time, Defendants state that the trial needs to be rescheduled because they plan to file a petition for writ of certiorari with the Supreme Court. Because this thinly veiled attempt to again avoid trial is without merit, Defendants' Motion to Reschedule Trial Date (Doc. 224) should be denied and this Court should hold firm the April 3 trial date.

## II. DEFENDANTS HAVE HAD MORE THAN 7 MONTHS TO FILE THEIR PETITION FOR CERTIORARI

Two weeks before the last June 14, 2004 trial date,[1] these Defendants filed interlocutory appeals challenging this Court's summary judgment rulings and the denial of qualified immunity.[2] As a result, this Court was forced to vacate the trial date.[3]

Seven months ago, on July 7, 2005, the Sixth Circuit denied Defendants' appeal, affirmed the decisions of this Court, and remanded the case back to this Court for trial. *Estate of Owensby v. City of Cincinnati*, 414 F.3d 596 (6th Cir. 2005). Despite having seven months to do so, Defendants did not file a petition for writ of certiorari.

Instead, they filed a petition with the Sixth Circuit for rehearing *en banc*.[4] That petition was denied by the original panel members and all of the active members of the Sixth Circuit 2 ½ months ago, on December 7, 2005.[5] Again, these Defendants chose not to file a petition for writ of certiorari.

On January 12, 2006, the Sixth Circuit issued its mandate returning jurisdiction to this Court.[6] Again, Defendants chose not to file any petition for writ of certiorari.

The next week, on January 18, 2006, this Court held a Status Conference and told the parties that this case would proceed to trial in April unless it was settled before then.[7] Defendants did not file a petition for writ of certiorari.

---

[1] Doc. 142, Notice setting trial for June 14, 2004.

[2] Doc. 171, Notice of Interlocutory Appeal; Doc. 186, Notice of Interlocutory Appeal.

[3] Doc. 184, Order vacating trial schedule.

[4] 7/20/05 Petition for Rehearing *En Banc* of City of Cincinnati Police Officers, attached as Exhibit A.

[5] 12/7/05 Order Denying Petition for Rehearing *En Banc*, attached as Exhibit B.

[6] Doc. 223, Mandate.

[7] Doc. 222, Notice of Status Conference.

On January 25, 2006, desperate to avoid trial and to wrest jurisdiction from this Court, Defendants filed an untimely motion in the Sixth Circuit asking it to stay the issuance of the mandate that already had been issued 2 weeks earlier.[8] The Sixth Circuit denied Defendants' untimely motion to stay the mandate on February 9, 2006.[9] Still Defendants did not file a petition for writ of certiorari.

On January 31, 2006, the parties and the Chief Mediator for the Sixth Circuit met with this Court to discuss possible settlement. This Court told the parties that this case would proceed to trial as a peremptory setting, beginning on April 3, if it was not settled. At that time, Defendants told the Court and the Plaintiff that they would endeavor to settle this case by the end of February. Plaintiff's counsel informed the Defendants and the Sixth Circuit Mediator that we were available to meet and finalize settlement discussion at any time of Defendants' choosing. Four weeks have elapsed with no meeting. Instead, the only time Defendants' counsel would agree to meet was February 28, the last day promised to finalize a settlement. Thus, with respect to settlement discussions between the parties, the month of February has been wasted. No settlement has been reached and no progress towards settlement made.

Defendants, however, were not idle in February. They filed this motion to delay the trial. Then the defendants filed a baseless motion to take a third trial deposition of Dr. Wecht—a forensic pathologist who they selected, hired and relied upon; who they have already deposed twice; and, knowing that, if granted, such a third trial deposition would certainly delay this trial because Dr. Wecht would not be available before the April 3 trial.[10] Finally, earlier this week—without waiting for this Court to address this motion to stay the trial and without seeking

---

[8] Appellants' Motion to Stay the Mandate Pending the Filing of a Petition for Writ of Certiorari, attached as Exhibit C.

[9] 2/9/06 Order Denying Motion to Stay Mandate, attached as Exhibit D.

[10] Doc. 225, Defendants' Motion to Re-open Trial Deposition of Dr. Wecht. On this subject, we will have more to say in our Memorandum Contra.

such a stay from the Sixth Circuit—Defendants filed the attached motion with the United States Supreme Court asking it to take the extraordinary step of staying the trial.[11] But defendants still filed no petition for writ of certiorari.

Having sat on their hands during this time, Defendants' plea to once again delay the trial of this case rings hollow and should be denied. A firm trial date is the only thing that will cause the Defendants to seriously consider settlement and, if they do not want to settle, then the Owensby family is entitled to their long-overdue day in court.

### III. THE PROBABILITY THAT THE SUPREME COURT WILL GRANT DEFENDANTS' PETITION FOR WRIT OF CERTIORARI IS REMOTE

Even if the Defendants were to file a petition for writ of certiorari, the odds of the Supreme Court accepting this case is so remote as to not justify vacating the April 3 trial date. Last month, Chief Justice Roberts issued the 2005 Year-End Report on the Federal Judiciary, copy attached. In an appendix to that Report the Supreme Court chronicled its case load.

In the 2004 Term, the Supreme Court received 7,496 filings, of which only 87 were argued and 85 disposed of in 73 signed opinions.[12] Thus, the statistical odds of certiorari being granted in any case are approximately 100 to 1. Stated differently, Defendants have a 1 percent chance of success in persuading the Supreme Court to accept their petition for writ of certiorari. Of course, in those cases, unlike here, there were petitions for certiorari filed with the Supreme Court.

In reality, the odds against Defendants are even greater. In October 2002, former Chief Justice Rehnquist spoke to the Federal Judicial Center National Symposium for United States Court of Appeals Judges. In that speech, Chief Justice Rehnquist observed that the Supreme

---

[11] Application of City of Cincinnati Police Officers Jorg, Caton, Spellen, Sellers, and Hunter for Stay of Trial Pending Consideration of Petition for Writ of Certiorari, attached as Exhibit E.

[12] 2005 Year-End Report on the Federal Judiciary, p. 7, Appendix, http://www.supremecourtus.gov/publicinfo/year-end/year-endreports.html, copy attached.

Court was "considerably cutting down on our docket."[13] He also explained that "almost by 'conscious parallelism,' to use antitrust language, the Justices of our court have come to the conclusion that we should limit our docket to cases where there is a split between court of appeals or state supreme courts on a question of federal law, where a federal or state statute is declared unconstitutional, or where the case involves a matter of obvious national importance."[14] None of these criteria apply here.

Here, Defendant say that they will seek a writ of certiorari for an interlocutory appeal involving the denial of qualified immunity for a well-established constitutional right that has existed since 1979.[15] There is no "split between court of appeals or state supreme courts on a question of federal law." No federal or state statue was declared unconstitutional in this denial of qualified immunity. And while this case is obviously important to the parties, it does not involve "a matter of obvious national importance."

Therefore, the exceedingly remote chance of a writ of certiorari being granted does not justify vacating the trial of this case.

IV.  **DEFENDANTS' CHANCE OF SUCCESS IN THE SUPREME COURT IS EVEN MORE REMOTE THAN THEIR CHANCE OF CERTIORARI BEING GRANTED**

In support of their motion to vacate the trial date, Defendants' argue that they plan to present three arguments to the Supreme Court. Doc. 224, p. 2. All three arguments are contradicted by the facts and established law.

    A.    **The Court Applied the Proper Fourteenth Amendment "Deliberate Indifference" Standard.**

Defendants argue that the Supreme Court will reverse this Court and the Sixth Circuit because, "the few minutes and limited information available to the officers while Mr. Owensby was in the physical custody of Golf Manor required application of the substantive due process

---

[13] Chief Justice William H. Rehnquist, Remarks at the Federal Judicial Center National Symposium for United States Court of Appeals Judges, p. 2 (October 21, 2002), http://www.supremecourtus.gov/publicinfo/speeches/sp_10-21-02.html, attached.

[14] *Id.*

[15] *Owensby*, 385 F. Supp. 2d at 643, *citing Bell v. Wolfish*, 441 U.S. 520 (1979).

'malice and intent to harm' standard rather then the "traditional deliberative indifference standard.'"[16]

At the outset, it is worth noting that these same Defendants argued to this Court that it should have employed the very Fourteenth Amendment deliberate indifference standard that it now claims is improper.[17] Having lost in the trial court, even though this Court adopted the standard they urged, Defendants (for the first time on appeal) adopted a new strategy of insisting upon a "malice and intent to harm" standard.

Defendants' new argument was considered and rejected by a unanimous Sixth Circuit panel.[18] It was also raised by Defendants in their petition for rehearing *en banc*.[19] Again, this argument was rejected by all of the active judges of the Sixth Circuit.[20]

Defendants' factual statements in support of this failed argument are also inaccurate. Defendants state that none of the officers knew that Mr. Owensby was in need of medical care.[21] On the contrary, the record is replete with findings that the police officers knew that Mr. Owensby was in dire need of medical attention, as demonstrated in the following chart.

---

[16] Doc. 224, p. 2.

[17] *Estate of Owensby v. City of Cincinnati*, 385 F. Supp. 2d 626, 642 (S.D. Ohio 2004) ("the Cincinnati Defendants aver that a long line of caselaw conclusively establishes that Owensby's rights in the complained-of circumstances were governed by the Fourteenth Amendment and that the 'deliberate indifference' standard therefore applies.").

[18] *Estate of Owensby v. City of Cincinnati,* 414 F.3d 596, 603 (6th Cir. 2005) ("Under the circumstances, **there is no question** that the officers had 'time to fully consider the potential consequences of their conduct.' [*citing Ewolski v. City of Cincinnati*, 287 F. 3d 492] at 510. Accordingly, the district court properly applied the traditional deliberate indifference standard.") (emphasis added).

[19] Exhibit A, 7/20/05 Motion for *En Banc* Rehearing, pp. 6-10, attached.

[20] Exhibit B, 12/7/05 Order Denying Petition for *En Banc* Rehearing, attached.

[21] Doc. 224, p. 2.

| Officer Spellen | "Officer Spellen, a trained EMT, was one of the few officers who actually observed Owensby in the rear of the car. . .he was aware that Owensby had been maced. Furthermore, and far more significant, he specifically agreed with Brazile – the officer who had commented that it appeared as though Owensby could not breathe – that he was 'hurting a . . . lot a bit' (doc. 88). . . .the Court finds it indisputable, based upon the medical testimony at issue and Owensby's autopsy photos, that he suffered substantial physical injury to his face, resulting in blood that would have been readily visible to someone observing him. In light of these circumstances, and his own subjective comment that Owensby was 'hurting,' it can be concluded, as a matter of law, that Spellen was subjectively aware of the risk to Owensby's well-being that his condition posed and that, despite this knowledge, he did nothing to summon any medical care." *Owensby*, 385 F. Supp. 2d at 648-49. |
|---|---|
| Officer Sellers | "Officer Sellers participated in the arrest; however, his testimony almost uniformly reveals that he viewed Owensby as a man in distress. In his deposition, he began by noting that he could not ascertain whether Owensby's 'resistence' to the attempts to handcuff him was due to his active resistance or merely a consequence of the weight placed upon him by Officers Jorg and Caton. He claims that Hunter maced Owensby twice, at close range, after he had already been handcuffed by the officers, yet remained motionless and silent. He testified that Caton repeatedly punched Owensby in the back after he had been handcuffed and was not resisting. Finally, he notes that Jorg and Caton had to slide Owensby into the rear seat of the police care prone and head first.<br>     On these facts, the Court finds, as a matter of law, that a reasonable jury could only conclude that Officer Sellers was subjectively aware of a substantial risk of serious harm to Owensby, yet did nothing to aid him by summoning appropriate medical care." *Owensby*, 385 F. Supp. 2d at 649-50. |
| Officer Hunter | "Officer Hunter. . . recalls seeing Owensby dragged to the Golf Manor car. He, however, recalls seeing Caton punch Owensby repeatedly not only while he lay handcuffed on the ground but also after he had been placed in the golf Manor cruiser, handcuffed and defenseless. Again, when these facts are viewed in a light most favorable to Hunter and the disputed facts are also noted, no reasonable jury could conclude that Hunter did not subjectively recognize that Owensby faced a substantial risk of serious harm and still failed to summon or otherwise provide appropriate medical care for his condition." *Owensby*, 385 F. Supp. 2d at 650. |

| Officer Jorg[22] | Owensby "was immediately tackled by Officers Jorg and Caton, . . . forced into a parked car and, ultimately, facedown in the parking lot . . . Jorg lay across [Owensby's] shoulders . . . Jorg quickly progressed to placing Owensby in a 'head wrap,' technique that required him to lie across Owensby's shoulders and place his left arm aroung Mr. Owensby's head, placing the crease of his elbow at the center of Owensby's head. While so holding his head, Jorg employed a 'mandibular angle pressure point pain compliance technique' by exerting pressure at the base of Owensby's right ear with his right hand. He also placed his knee on Mr. Owensby's left shoulder in the area of his left scapula." *Owensby*, 385 F. Supp. 2d at 634.<br>    "It is uncontested, however, that [the Deputy Coroner] Dr. Schultz found two bilateral deep muscle contusions on Owensby's back, just above the shoulder blades, resulting from heavy, sharp pressure on his back." *Owensby*, 385 F. Supp. 2d at 635.<br>    Officer Jorg acknowledged that blood on the sleeve of his shirt came "from the bad guy." *Owensby*, 385 F. Supp. 2d at 636. |
|---|---|
| Officer Caton | "To be sure, Jorg and Caton are, by all accounts of the officers involved, accused of inflicting most of the physical harm on Owensby, although the extent of such harm is in great dispute. . . . Jorg and Caton had blood from Mr. Owensby on their shirts . . ." *Owensby*, 385 F. Supp. 2d at 650.<br>    Officers Hunter and Sellers testified that they saw Officer Caton repeatedly punch Mr. Owensby in the back after he was handcuffed. *Owensby*, 385 F. Supp. 2d at 650.<br>    "Jorg and Caton . . . carr[ied] him to the cruiser, placed him, handcuffed and unconscious, on the backseat of the Golf Manor cruiser. Caton proceeded to the other side of the cruiser and assisted in dragging Mr. Owensby headfirst into the rear of the auotmobile. In his deposition, Hunter testified that Caton continued to beat Owensby even after he had been placed, handcuffed, in the back of the cruiser." *Owensby*, 385 F. Supp. 2d at 635-36. |

Defendants also incorrectly argue that "[c]are was provided immediately to Mr. Owensby as soon as a Cincinnati sergeant observed Owensby inside the Golf Manor vehicle and detected that he was not breathing,"[23] implying that this was the first time that any Defendant knew that

---

[22]Despite the virtually unanimous testimony of the other police officers that Mr. Owensby was unresponsive and had to be carried to the Golf Manor police cruiser, Officers Caton and Jorg testified that Mr. Owensby was conscious and walked to the cruiser on his own power. Therefore, the Court had no choice but to find a genuine issue of material fact existed as to the knowledge of Officer's Jorg and Caton, precluding summary judgment against these two officers. *Owensby*, 385 F. Supp. 2d at 650.

[23]Doc. 224, p. 2.

Mr. Owensby was in serious need of medical care. This is untrue. In addition to the facts detailed above, the undisputed fact is that 5 minutes before the sergeant made this observation, another Cincinnati police officer, Officer Brazile, used his flashlight to look at Mr. Owensby as he lay unconscious, bleeding and handcuffed on the backseat of the Golf Manor cruiser. At that time, Officer Brazile stated to the nearby Golf Manor police officers, "This looks fucked up. Can he breathe? It don't look like he can from the way he is laying."[24] This Court then found that it was equally undisputed that, "despite his observations, Officer Brazile made no further investigation, comment, or effort to aid Owensby, and he walked away."[25]

Finally, Defendants' contention that there was not enough time to appreciate and act upon Mr. Owensby's obvious need for medical care is belied by the above Officer Brazile findings and testimony. Further, as noted by the Sixth Circuit, the undisputed record establishes that,

> During the six minutes that Owensby was denied medical care after being taken into custody, the officers had time to do such things as greet each other, prepare for the arrival of their superiors, pick up dropped items and straighten their uniforms; some officers even had time to observe and discuss the apparent severity of Owensby's injuries. Under these circumstances, **there is no question** that the officers had "time to fully consider the potential consequences of their conduct."[26]

### B. Proof Of Proximate Cause Is Not Required Where The Need For Medical Care Is Obvious

Defendants' next misguided argument is that this Court erred in failing to require proximate cause as an element of proof for the denial of medical care.[27] This Court correctly found that proximate cause is not an element of the denial of constitutionally-required medical

---

[24] *Owensby*, 385 F. Supp. 2d at 636.

[25] *Id.*

[26] *Estate of Owensby v. City of Cincinnati*, 414 F.3d 596, 603 (6th Cir. 2005) (emphasis added), *citing Ewolski v. City of Brunswick*, 287 F. 3d 492, 510 (6th Cir. 2002).

[27] Doc. 224, p. 2.

care where, as here, the need for serious medical care was obvious.[28] Defendants' argument was also considered and rejected by the Sixth Circuit.[29]

      **C.    When Determining Whether Qualified Immunity Is Appropriate, All Facts Should Be Construed In Favor Of The Plaintiff.**

Finally, Defendants argue that it was error to view the allegations in the light most favorable to the Plaintiff in deciding whether the police officers were entitled to qualified immunity because the Court also granted summary judgment for the Plaintiff.[30] Defendants are mixing apples and oranges.

With respect to Plaintiff's ***motion for summary judgment***, this Court properly viewed "all evidence, facts, and reasonable inferences in a light most favorable to the non-moving party [Defendants]."[31] However, Defendants forget that this is an interlocutory appeal of the denial of qualified immunity to the police officers—not a *de novo* challenge to this Court's summary

---

[28]*Owensby*, 385 F. Supp. 2d at 652 ("An unbroken line of caselaw spanning decades focuses, as does *Rich* [*v. City of Mayfield Heights*, 955 F.2d 1092, 1097 (6th Cir. 1992)], on the need to provide medical care to an prisoner or pretrial detainee, rather than any purported requirement that it be optimally efficacious. . . . The very phrasing of the standard emphasizes that it is the failure to respond to known needs that is fundamentally objectionable, rather than the undesired results that may ultimately accrue; subsequent caselaw recognizes this fact. Accordingly, the City's and Chief Streicher's contention that Plaintiff's failure to prove that medical care would have prevented his death somehow undermines or precludes his constitutional claim for denial of medical care is without merit.").

[29]*Owensby*, 414 F.3d at 604 ("We recently held in *Blackmore v. Kalamazoo*] that while medical proof may be necessary to assess whether the denial of medical care caused a serious medical injury in cases where the prisoner o pretrial detainee's 'affliction is seemingly minor or non-obvious,' no such evidence is required where the individual had a 'serious need for medical care that was obvious that even a layperson would easily recognize the necessity for a doctor's attention.' 390 F.3d [890] at 899 [6th Cir. 2004)]. . . . In light of the facts as discussed above, we agree with the district court's assessment that Owensby's need for medical care was obvious. Accordingly, the estate need not prove that the officers' acts or omissions were the proximate cause of Owensby's death in order to hold the officers liable under section 1983. *Id.*").

[30]Doc. 224, p. 2.

[31]*Owensby*, 385 F. Supp. 2d at 640.

judgment decision. In fact, the Sixth Circuit expressly refused to exercise pendent jurisdiction over the summary judgment decisions of this Court in this interlocutory appeal.[32]

The well-settled law is that in determining whether a police officer is entitled to *qualified immunity*, the facts surrounding the alleged constitutional violation must be viewed "in the light most favorable to the party asserting the injury."[33]

Defendants' argument was likewise rejected twice—first by the three judge panel and later by all of the active judges of the Sixth Circuit.[34]

## V. DEFENDANTS' CITED AUTHORITY IS NOT APPLICABLE TO THE ESTABLISHED FACTS OF THIS CASE

Defendants cite four cases in support of the flawed arguments detailed above.[35]

First, Defendants cite an excessive force case, *Lyons v. City of Xenia*, 417 F.3d 565 (6th Cir. 2005).[36] In *Lyons*, an officer responding to a distress call by his female partner was initially denied qualified immunity for tackling a mother who was struggling with his partner.[37] In reconsidering and granting the police officer qualified immunity, the Sixth Circuit stated that the use of force was not excessive given the fact that the tackling officer was responding to his

---

[32]*Owensby*, 414 F.3d at 605.

[33]*Owensby*, 385 F. Supp. 2d at 654, *quoting Saucier v. Katz*, 533 U.S. 194, 201 (2001).

[34]*Owensby*, 414 F.3d at 602 ("The qualified immunity analysis entails two steps. First, the court considers whether, taken in the light most favorable to the party asserting the injury, the facts alleged show that the officer's conduct violated a constitutional right."). Defendants also resurrected this same argument in their rehearing petition. Exhibit A, 7/20/05 Motion for Rehearing, pp. 3-6, attached. Once again, it was summarily rejected. Exhibit B, 12/7/05 Order Denying Petition for *En Banc* Rehearing, attached.

[35]Doc. 224, pp. 2-3.

[36]*Id.*

[37]*Lyons*, 417 F.3d at 570.

female partner's distress call from within a house, the officer fairly believed that his partner was at risk, and upon entry, he saw the plaintiff in close proximity to, and yelling at, his partner.[38]

*Lyons* was based upon the Supreme Court's decision in an excessive force, vehicle flight case, *Brosseau v. Haugen*, 543 U.S. 194 (2004). In *Brosseau*, an officer shot a man as he attempted to flee from law enforcement officers in a car, placing persons in the immediate area at risk from that flight.[39] Under these circumstances, the Supreme Court found that the officer's actions were entitled to qualified immunity because they "fell in the 'hazy border between excessive and acceptable force.'"[40]

Neither *Lyons* nor *Brosseau* establish any new standard of review in determining qualified immunity. And neither case involves the violation of the constitutional duty to provide medical care to a pretrial detainee. As found by this Court and affirmed by the Sixth Circuit, the denial of medical care to Mr. Owensby by the Cincinnati police officers did not fall within the "hazy border" between proper and improper conduct. All of the officers knew that Mr. Owensby was in obvious need of medical care and all of the officers had ample time to provide that care. They simply were deliberately indifferent to their well-established constitutional duty. As found by the Sixth Circuit, in the six minutes while Mr. Owensby lie bleeding, handcuffed and unconscious in the backseat of the Golf Manor cruiser, "the officers had time to do such things as greet each other, prepare for the arrival of their superiors, pick up dropped items and straighten their uniforms; some officers even had time to observe and discuss the apparent severity of Owensby's injuries."[41] Thus, affirming this Court's determination, the Sixth Circuit found that

---

[38]*Id.* at 576-77.

[39]*Id.* at 571-72 *citing Brosseau*, 543 U.S. at 194, 197.

[40]*Id.* at 572 *citing Brosseau*, 543 U.S. at 201, *citing Saucier*, 533 U.S. at 206.

[41]*Owensby*, 414 F.3d at 603 (6th Cir. 2005).

"there is no question that the officers had 'time to fully consider the potential consequences of their conduct.'"[42]

Next, Defendants attach to their motion the recently decided case, *Clark-Murphy v. Foreback*, 2006 WL 265460 (6th Cir. Feb. 6, 2005).[43] That case involves the isolation, dehydration and eventual death of an inmate with psychiatric problems. According to the Defendants, "a panel of the Sixth Circuit granted qualified immunity to two public officials because they only had 'brief exposure' with the decedent and did not have 'repeated opportunities' to know that proper medical care was not being provided."[44] What Defendants fail to tell this Court is that the Sixth Circuit also denied qualified immunity to 11 other officers who dealt with the decedent prisoner.[45]

In *Clarke-Murphy* a prison inmate, Mr. Clark, who was diagnosed with "psychosis," was placed in an isolation cell for 6 days, was deprived of water, and a number of the officers in charge of keeping the inmate under observation failed to perform their duties.[46] The Sixth Circuit had no problem in denying qualified immunity to the 11 officers involved in the decedent's treatment from the time he was placed in isolation until his death.[47]

Defendants also fail to explain the circumstances giving rise to the Sixth Circuits' decision to grant qualified immunity to the referenced "two public officials"—Nurse Friedt and

---

[42]*Id.* (emphasis added), *citing Ewolski*, 287 F. 3d at 510.

[43]Doc. 224, p. 3, attachment.

[44]*Id.*

[45]*Clark-Murphy*, 2006 WL 265460 at *1.

[46]*Id.* at *1-4.

[47]*Id.* at *6 ("Each of the officers had some involvement with Clark after his June 29 collapse, and each of them learned at one time or another about his serious psychological needs or his potential for dehydration. . . . Clark-Murphy has presented sufficient evidence from which 11 of these defendants (all but Becher and Friedt) could have inferred that a substantial risk of serious harm existed to Clark's health and safety from the deprivation of water or psychological treatment, or both.")

Sergeant Becher.[48]  Nurse Friedt was granted qualified immunity because her exposure to Mr. Clark occurred on only one shift.  She reviewed a form that indicated that Mr. Clark had suffered from "some type of seizure."[49]  As a nurse she was not expected to become involved in mental health issues unless the inmate was being watched for self-harm, which was not the case.  Nevertheless, Nurse Friedt called the officer on duty in Mr. Clark's cell block to determine whether he needed medical assistance.  She was told that he was merely in a custody watch and did not need medical care.[50]  She also checked to ensure that a referral to the psychiatric department had been submitted on behalf of the inmate.[51]

Sergeant Becher was a relief sergeant whose exposure to Mr. Clark was during one shift.  Upon learning that Mr. Clark required psychiatric care, Sergeant Becher ensured that the proper psychiatric referral had been completed and submitted.[52]  Sergeant Becher was unaware that Mr. Clark was not drinking water or eating food.  In fact, Sergeant Becher asked how Mr. Clark was doing and was told that he was doing "okay" and that the water to his cell had been temporarily turned off because he had attempted to shove a pillow down his toilet.[53]

It is in this context that the Sixth Circuit stated, "Given the brief exposure of these two defendants to Clark and given the resulting absence of evidence regarding their purposeful indifference to his health and safety, the claims against these defendants must be dismissed as matter of law."[54]

---

[48] *Id.* at *8-9.

[49] *Id*. at *8.

[50] *Id.*

[51] *Id.*

[52] *Id*. at *9.

[53] *Id.*

[54] *Id.*

This is a far cry from the circumstances of this case. Here, the Cincinnati police officers knew that Mr. Owensby: had been in a struggle with five police officers; had been twice maced from a distance of 6 inches (when the standard is 5-10 feet); had been beaten repeatedly by Officer Caton after he was handcuffed; was unresponsive; had blood on his face; had to be carried to a police cruiser; had to be pulled into the backseat of the car; looked as though he was not breathing; and was jokingly referred to by two Cincinnati police officers as, "hurting a lot of bit." Such facts clearly constitute deliberate indifference to Mr. Owensby's serious medical needs. There is no basis for overturning the denial of qualified immunity upon any of the cases cited by the Defendants in there motion to reschedule this trial.

Finally, Defendants quote, *Jackson v. Schultz*, 429 F.3d 586 (6th Cir. 2005), for the proposition that "there are no cases finding a constitutional right to medical care under these exact (or even vaguely similar) circumstances. Even if a constitutional violation were established, *Brosseau* compels a finding that such a violation is not clearly established."[55] Again, this quote is taken out of context and does not apply to the facts of this case.

It is worth noting that *Jackson* was written by Sixth Circuit Judge Rogers. Judge Rogers was one of the Sixth Circuit Judges who found that qualified immunity did not apply to the Defendants in this case. In fact, *Jackson* was decided on November 18, 2005, while these Defendants' motion for rehearing was pending before Judge Rogers. Presumably, if Judge Rogers felt that *Brosseau* required that these Defendants be granted qualified immunity he could have voted for a rehearing. Instead, Judge Rogers, the other members of the panel, and all of the active judges of the Sixth Circuit denied Defendants' motion for rehearing on December 7, 2005—a month after the *Jackson* decision was issued.[56]

---

[55]Doc. 224, p. 3.

[56]Exhibit B, 12/7/05 Order Denying Motion for Rehearing *En Banc*.

In *Jackson*, the decedent was shot in a bar. Two Detroit Fire Department EMTs were dispatched to the bar where they found the decedent "alive but bleeding profusely."[57] The EMTs moved the decedent into their ambulance where, it is alleged, they later watched him die. Decedent's estate sued the EMTs for the alleged denial of medical care.[58]

In finding that the EMTs were entitled to qualified immunity, *Jackson* recited the applicable law:

> It is not a constitutional violation for a state actor to render incompetent medical assistance or fail to rescue those in need. *DeShaney* [*v. Winnegago County Dep't of Social Services*], 489 U.S. [189] at 196 [1989]). The two applicable exceptions to this general rule are (1) the custody exception and (2) the state-created danger exception. *Id*. at 199-201. Neither of these exceptions applies under any set of facts that could be proven consistent with Jackson's allegations.[59]

Noting that "custody might be found where an unconscious drunk is handcuffed and transported to jail" and pretrial detainees are clearly in custody, *Jackson* found that the decedent was never in custody, i.e., never restrained of personal liberty.[60] *Jackson* went on to find that the Sixth Circuit "has never held that one merely placed in an ambulance is in custody."[61] *Jackson* also found that there was no state-created danger in placing the decedent in an ambulance.[62]

---

[57]*Jackson*, 429 F.3d at 588.

[58]*Id.*

[59]*Id*. at 590.

[60]*Id.*

[61]*Id.*

[62]I*d*. at 591 ("No set of facts consistent with the allegations could support a finding that the risk of violence by a private party was more probable in the inside of the ambulance versus the scene of a bar with decedent was actually shot.")

Thus, it was in this context that Circuit Judge Rogers wrote that "there are not cases finding a constitutional right to medical care under these exact (or even vaguely similar) circumstances."[63]

Obviously, *Jackson* is inapplicable to the facts in this case. Mr. Owensby was clearly in custody when he was handcuffed and placed in the locked Golf Manor cruiser. This Court so found[64] and the Sixth Circuit affirmed this finding.[65] As a pretrial detainee, Mr. Owensby was in custody and owed the constitutional duty of medical care. Defendants were deliberately indifferent to this well-established constitutional duty and, thus, are not entitled to qualified immunity.

## VI.    CONCLUSION

Throughout this prolonged litigation the Defendants have consistently employed various means to avoid trial. This present attempt to vacate the April 3 trial is based upon the representation that Defendants are contemplating filing a petition for a writ of certiorari. Defendants have had over 7 months to file their petition for writ of certiorari and have not done so. Moreover, the minuscule chance of the Supreme Court accepting such a petition is contrary to the facts, legal standards and policies of the Supreme Court. As such Defendants' motion is without merit and should be denied. The Owensby family deserves to have this matter finally resolved by settlement or trial within the next month.

---

[63] *Id.* at 592.

[64] *Owensby*, 385 F. Supp. 2d at 662.

[65] *Owensby*, 414 F.3d at 603, n. 3.

                                  Respectfully submitted,

| | |
|---|---|
| Mark T. Tillar (0029898)<br>105 E. Main Street, Ste. 202<br>Mason, Ohio  45040<br>Telephone: (513) 770-0264<br><br>John J. Helbling (0046727)<br>105 E. Main Street, Ste. 202<br>Mason, Ohio 45040<br>Telephone: (513) 770-0322 | /s/Paul B. Martins<br>James B. Helmer, Jr.  (0002878)<br>Paul B.  Martins (0007623)<br>HELMER, MARTINS, RICE<br>    & POPHAM CO., LPA<br>Fourth & Walnut Centre, Suite 1900<br>105 East Fourth Street<br>Cincinnati, Ohio 45202-4008<br>Telephone:    (513) 421-2400<br>Facsimile:    (513) 421-7902<br><br>*Trial Attorneys for Plaintiff* |

## CERTIFICATE OF SERVICE

      I hereby certify that a copy of the foregoing **Plaintiff's Memorandum in Opposition to Defendants' Motion to Reschedule Trial Date (Doc. 224)**, was electronically filed on February 24, 2006.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

      /s/ Paul B. Martins