**EMBARGOED FOR RELEASE**
**January 1, 2006, 12:01 a.m. E.S.T.**
For further information contact
Public Information Office 202-479-3211

# 2005 Year-End Report on the Federal Judiciary

**I.    Introduction**

New Year's Day in America means football, parades, and, of course, the Year-End Report on the Federal Judiciary. I am pleased to carry on the tradition launched by Chief Justice Burger, and continued for the past 19 years by Chief Justice Rehnquist, of issuing on New Year's Day a report on the state of the federal courts. I recognize that it is a bit presumptuous for me to issue this Report at this time, barely three months after taking the oath as Chief Justice. It remains for me very much a time for listening rather than speaking. But I do not intend to start the New Year by breaking with a 30-year-old tradition, and so will highlight in this Report issues that are pressing and apparent, even after only a few months on the job.

First and foremost: the state of the federal judiciary is strong. We celebrated on September 24th the 250th anniversary of the birth of Chief Justice John Marshall. If Marshall were able to observe the work of the federal courts today, there doubtless would be much that would surprise him. But he would see in the work of the men and women who took the same judicial oath he did the same commitment to uphold the Constitution and to fulfill the Framers' vision of a judicial branch with the strength and independence "to say what the law is," without fear or favor. Marbury v. Madison (1803).

## II. Violence Directed at Judges

No review of the year just passed can ignore the violent events that took place in Illinois and Georgia in February and March. The Nation was shocked by the horrific murders of a U. S. District Court judge's husband and mother by a disappointed litigant, and the terrible incident in Atlanta in which a judge, court reporter, and deputy were killed in the Fulton County courthouse. These attacks underscored the need for all branches of government, state and federal, to improve safety and security for judges and judicial employees, both within and outside courthouses. We see emerging democracies around the world struggle to establish court systems in which judges can apply the rule of law free from the threat of violence; we must take every step to ensure that our own judges, to whom so much of the world looks as models of independence, never face violent attack for carrying out their duties.

## III. Appropriations and Judicial Independence

Article III of our Constitution seeks to protect judicial independence by providing that district and appellate judges serve during good behavior and receive "a Compensation, which shall not be diminished during their Continuance in Office." These provisions alone, important as they are, cannot guarantee judicial independence, and a strong and independent judiciary is not something that, once established, maintains itself. It is instead a trust that every generation is called upon to preserve, and the values it secures can be lost as readily through neglect as direct attack.

In recent years, the budget for the federal judiciary and the ever-lengthening appropriations process have taken a toll on the operations of the courts. There are two

areas of concern that have come to the fore and now warrant immediate attention and action. The first may come as a surprise to many: unlike many other elements of the federal government, the judiciary is required to pay a large and ever-increasing portion of its budget as rent to another part of the government — the General Services Administration (GSA). According to information compiled by the Administrative Office of the U. S. Courts, while the judiciary spends almost sixteen percent of its total budget on GSA rent — twenty-two percent of its "salaries and expenses" appropriations — only three percent of the Department of Justice budget goes toward GSA rent, and the Executive Branch as a whole spends less than two-tenths of one percent of its budget on GSA rent. During fiscal year 2005, the judiciary paid $926 million to GSA in rent, even though GSA's actual cost for providing space to the judiciary was $426 million. The disparity between the judiciary's rent and that of other government agencies, and between the cost to GSA of providing space and the amount charged to the judiciary, is unfair. The federal judiciary cannot continue to serve as a profit center for GSA.

Escalating rents combined with across-the-board cuts imposed during fiscal years 2004 and 2005 resulted in a reduction of approximately 1,500 judicial branch employees as of mid-December when compared to October 2003. We are grateful that our fiscal year 2006 appropriation provides the judiciary with a 5.4 percent increase over fiscal year 2005. While this should allow the courts to restore some of these staffing losses, the judiciary must still find a long-term solution to the problem of ever-increasing rent payments that drain resources needed for the courts to fulfill their vital mission.

A more direct threat to judicial independence is the failure to raise judges' pay. If judges' salaries are too low, judges effectively serve for a term dictated by their financial

position rather than for life. Figures gathered by the Administrative Office show that judges are leaving the bench in greater numbers now than ever before. In the 1960s, only a handful of district and appellate court judges retired or resigned; since 1990, 92 judges have left the bench. Of those, 21 left before reaching retirement age. Fifty-nine of them stepped down to enter the private practice of law. In the past five years alone, 37 judges have left the federal bench — nine of them in the last year.

There will always be a substantial difference in pay between successful government and private sector lawyers. But if that difference remains too large — as it is today — the judiciary will over time cease to be made up of a diverse group of the Nation's very best lawyers. Instead, it will come to be staffed by a combination of the independently wealthy and those following a career path before becoming a judge different from the practicing bar at large. Such a development would dramatically alter the nature of the federal judiciary.

Chief Justice Rehnquist wrote often about the need to raise judicial pay — going so far as to say in his 2002 Year-End Report that he felt at risk of "beating a dead horse." Despite his entreaties, however, the situation has gotten worse, not better. According to information gathered by the Administrative Office, the real pay of federal judges has declined since 1969 by almost 24 percent, while the real pay of the average American worker during that time has increased by over 15 percent.

Three years ago, in January 2003, the National Commission on the Public Service concluded that "Congress should grant an immediate and significant increase in judicial, executive and legislative salaries" and that "[i]ts first priority in doing so should be an immediate and substantial increase in judicial salaries." Yet no effective action has been

taken to address this problem. I am not the first person to observe that the way judicial and other high-level government salaries are set — allowing the salaries to stagnate until large increases are required — simply does not work. And all those in public service whose pay scales are tied to those of higher-level officials feel the pinch of compressed salaries.

I understand that it is difficult for Congress to raise the salaries of federal judges, especially in a tight budget climate. I also understand that it is the responsibility of Congress to do difficult things when necessary to preserve our constitutional system. Our system of justice suffers as the real salary of judges continues to decline. Every time an experienced judge leaves the bench early, the judiciary suffers a real loss. Every time a judge leaves the bench for a higher paying job, the independence fostered by life tenure is weakened. Every time a potential nominee refuses to be considered, the pool of candidates from which judges are selected narrows.

If Congress gave judges a raise of 30 percent tomorrow, judges would — after adjusting for inflation — be making about what judges made in 1969. This is not fair to our Nation's federal judges and should not be allowed to continue. Unfortunately, judges do not have a natural constituency to argue on their behalf. They do not serve a particular group, and courts — by their very design — often have to render unpopular decisions. Judges must rely on the Congress and the President to increase their pay.

The federal judiciary, as one of the three coordinate branches of government, makes only modest requests of the other branches with respect to funding its vital mission of preserving the rule of law under our Constitution. Those of us in the judiciary understand the challenges our country faces and the many competing interests that must

be balanced in funding our national priorities. But the courts play an essential role in ensuring that we live in a society governed by the rule of law, including the Constitution's guarantees of individual liberty. In order to preserve the independence of our courts, we must ensure that the judiciary is provided the tools to do its job.

A New Year inevitably kindles fresh hope. In the coming year, the men and women of the federal judiciary will faithfully discharge their heavy responsibility of ensuring equal justice under law. The other two branches of government can aid us in that effort by, first, enacting a significant pay raise for federal judges, and, second, eliminating or at least sharply lowering the courthouse rent that the judiciary is required to pay GSA. These two steps — whose budgetary impact would be vanishingly small — would go a long way toward maintaining a strong and independent federal judiciary with the resources to administer justice efficiently and fairly. And that is priceless.

### IV.   In Memoriam

On September third, the Nation lost a distinguished and dedicated public servant, and we in the judiciary lost a good friend and colleague. William H. Rehnquist led the Third Branch of our government for almost 19 years. He will be counted by history — an avocation to which he offered four books of his own — as among the handful of great Chief Justices of the United States. For the many of us both within and outside the judiciary who were fortunate enough to know him personally, he will always be remembered as a fair, thoughtful, and decent man.

### V.   Conclusion

I want to thank the judges and court staff throughout the country for their continued hard work and dedication to our common calling over the past year. I extend to all my wish for a Happy New Year.

# Appendix

**Workload of the Courts**

<u>The Supreme Court of the United States</u>

The total number of case filings in the Supreme Court decreased from 7,814 in the 2003 Term to 7,496 in the 2004 Term — a decrease of 4.1 percent. Filings in the Court's *in forma pauperis* docket decreased from 6,092 to 5,755 — a 5.5 percent decline. The Court's paid docket increased by 19 cases, from 1,722 to 1,741 — a 1.1 percent increase. During the 2004 Term, 87 cases were argued and 85 were disposed of in 74 signed opinions, compared to 91 cases argued and 89 disposed of in 73 signed opinions in the 2003 Term. No cases from the 2004 Term were scheduled for reargument in the 2005 Term.

<u>The Federal Courts' Caseload</u>

Filings in the U.S. bankruptcy courts surged to an all-time record during 2005, rising 10 percent to 1,782,643.[1] This growth stemmed from the passage of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005. Appeals also reached new levels due in part to a surge in criminal appeals and prisoner

---

[1] Nonbusiness filings increased 10 percent, and business petitions decreased 2 percent. While chapter 7 and chapter 12 filings grew 17 percent and 53 percent, respectively, chapter 11 and chapter 13 filings dropped 36 percent and 6 percent, respectively. The reduction in chapter 11 filings represented a return to a more typical level after last year's 220 percent rise in chapter 11 petitions filed in the Southern District of New York. Bankruptcy filings have soared 60 percent over the last 10 years.

petitions.[2] In contrast, district court civil filings declined by 10 percent, primarily as a result of decreases in federal question filings and diversity of citizenship cases.[3]

---

[2] Filings in the regional courts of appeals rose 9 percent to an all-time high of 68,473, marking the 10th consecutive record-breaking year and the 11th successive year of growth. This increase stemmed from upswings in criminal appeals, original proceedings, and prisoner petitions following the U.S. Supreme Court's decisions in Blakely v. Washington, 542 U.S. 296 (2004) and U.S. v. Booker, 543 U.S. 220 (2005), and from continued growth in appeals of administrative agency decisions involving the Board of Immigration Appeals (BIA). As large as the increase is, it would have been higher had not the Court of Appeals for the Fifth Circuit's operations been affected by Hurricane Katrina. That court's data include 92 appeals filings for the month of September, significantly lower than the 700 to 1,000 it reported for each month from October 2004 to August 2005. Nationwide, criminal appeals rose 28 percent to 16,060. The largest increases were in cases involving drugs (up 31 percent to 6,099), immigration (up 55 percent to 2,896), firearms and explosives (up 23 percent to 2,505), and property (up 15 percent to 1,967). Administrative agency appeals rose 12 percent to 13,713, primarily due to challenges to BIA decisions, which began rising in 2002. Appeals filings have increased 32 percent since 1996.

[3] Specifically, total federal question filings dropped 16 percent because of the substantial decline in filings (19,630 cases) in the District of South Carolina. In the previous year, an abnormally high number of cases related to personal property financial investments were filed in this district. Federal question filings related to civil rights also fell last year, declining by 10 percent. Most of these cases involved employment issues and other types of civil rights issues.

Total diversity of citizenship filings dropped 8 percent, mainly as a result of a 15 percent decrease in personal injury/product liability filings. The District of Minnesota reported a large drop in cases involving the anticholesterol drug Baycol. The Central District of California reported declines in multidistrict litigation cases involving both hormone replacement therapy medication and diet drugs. The Northern District of Ohio saw a major decrease in filings in multidistrict litigation cases which addressed claims of injuries caused by welding rods containing manganese.

Filings with the United States as plaintiff or defendant rose 8 percent. Cases with the United States as defendant climbed 9 percent, mainly as a result of a 29 percent jump in prisoner petitions. Especially significant was the 45 percent rise in motions to vacate sentence. In addition, federal *habeas corpus* prisoner petitions increased 16 percent. Increases in both motions to vacate sentence and federal *habeas corpus* prisoner petitions are, in part, related to the Booker decision. Filings related to the recovery of defaulted student loans and drug-related seizures of property increased 18 percent and 6 percent, respectively.

Over the past 10 years, civil filings have declined 6 percent, mostly as a result of decreases in prisoner petitions, civil rights employment cases, and personal injury/product liability cases.

Criminal filings dropped by a small amount,[4] as did the number of defendants in cases activated by pretrial services.[5] Persons under postconviction supervision remained stable at 112,931.[6]

---

[4] Criminal case filings declined 2 percent to 69,575, and defendants in these cases declined one percent to 92,226. This drop was likely attributable in part to the effects of Hurricane Katrina. After Katrina, district courts in the Fifth and Eleventh Circuits reported fewer cases than normal. The decrease in filings in 2005 lowered the cases per authorized judgeship from 105 to 102. The median case disposition time for defendants rose from 6.2 months in 2004 to 6.8 months in 2005, as courts took longer to process post-Booker cases.

Overall drug cases declined 1 percent to 18,198; the numbers of defendants, however, rose 1 percent to 32,637. Immigration filings rose less than 1 percent, but, nonetheless, stood at record high levels of 17,134 cases and 18,322 defendants. Prosecution of sex offenses rose 9 percent to 1,779 cases, primarily due to an increase in filings of sexually explicit material cases. The criminal filing category with the largest numeric increase was non-marijuana drug filings, as cases went up 5 percent to 13,102 and defendants climbed 6 percent to 25,121. Firearms and explosives cases declined 4 percent to 9,207 cases. This year's decrease was the first since 1996, a period during which criminal case filings grew 45 percent.

[5] The number of defendants in pretrial services system cases opened in 2005, including pretrial diversion cases, fell less than 1 percent to 99,365. Nevertheless, pretrial services officers prepared 1 percent more pretrial reports, and the number of defendants interviewed increased 2 percent. In conjunction with all pretrial services cases closed during the year, a total of 231,060 pretrial hearings were held, an increase of 4 percent over the total in 2004. During the past 10 years, cases activated in the pretrial services system have increased 52 percent.

[6] Persons serving terms of supervised release following their release from prison totaled 82,832 on September 30, 2005, and they constituted 73 percent of all persons under postconviction supervision. The number of individuals on parole declined 5 percent to 2,778 and made up only 2 percent of those under supervision. The number of persons on probation declined 8 percent to 26,554, due to a continuing drop in the imposition of sentences of probation by both district judges and magistrate judges. Of the 112,931 persons under postconviction supervision, 44 percent had been convicted of a drug-related offense, the same as one year ago. There are now 27 percent more persons under postconviction supervision than there were in 1996.