OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04

*Page 1 to Page 196*

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

AKF Reporters, Inc.
436 Boulevard of the Allies
Pittsburgh, PA 15219-1314
Phone: 1-888-253-3376
FAX: 1-412-261-2537

Case 1:01-cv-00769-SAS    Document 230-22    Filed 03/07/2006    Page 2 of 18

BSA        OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04        XMAX(1/142)

### Page 1

(1) IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO
(2) WESTERN DIVISION
(3) ----
(4) ESTATE OF ROGER D. OWENSBY, JR., et al., )
(5) )
(6) Plaintiffs, )
(7) -vs- ) Civil Action No. 01-CV-769
(8) CITY OF CINCINNATI, et al., )
(9) )
(10) Defendants. )
(11)
(12)
(13) ----
(14) DEPOSITION OF: CYRIL WECHT, M.D.
(15) ----
(16) DATE: February 25, 2004
        Wednesday, 11:00 a.m.
(17)
(18) LOCATION: THE WECHT LAW FIRM
        14 Wood Street
(19)    Pittsburgh, PA 15222
(20)
(21) TAKEN BY: Plaintiffs
(22) REPORTED BY: Anthony Jude Cordova, RPR
        Notary Public
(23) AKF Reference No. AC79595
(24)
(25)

### Page 2

(1) DEPOSITION OF CYRIL WECHT, M.D.,
    a witness, called by the Plaintiffs for examination,
(2) in accordance with the Federal Rules of Civil
    Procedure, taken by and before Anthony Jude Cordova,
(3) RPR, a Court Reporter and Notary Public in and for
    the Commonwealth of Pennsylvania, at the offices of
(4) The Wecht Law Firm, 14 Wood Street, Pittsburgh,
    Pennsylvania, on Wednesday, February 25, 2004,
(5) commencing at 11:00 a.m.
(6) ----
(7) APPEARANCES:
    FOR THE PLAINTIFFS:
(8) Frederick Morgan, Esq.
    HELMER MARTINS & MORGAN
(9) Fourth & Walnut Center, Suite 1900
    105 East Fourth Street
(10) Cincinnati, OH 45202
    513-421-2400
(11) FOR THE DEFENDANTS CITY OF CINCINNATI, SELLERS AND HODGE:
(12) Neil F. Freund, Esq.
    FREUND FREEZE & ARNOLD
(13) One Dayton Center
    South Main Street, Suite 1800
(14) Dayton, OH 45402-2017
    937-913-0115
(15)
    FOR THE DEFENDANT GOLF MANOR:
(16) Wilson G. Weisenfelder, Jr., Esq.
    RENDIGS FRY KEILY & DENNIS
(17) One West Fourth Street, Suite 900
    Cincinnati, OH 45202-3688
(18) 513-381-9292
    FOR THE DEFENDANTS CITY OF CINCINNATI AND
(19) STREICHER:
    Geri Hernandez Geiler, Esq. - (Via telephone)
(20) ASSISTANT CITY SOLICITOR, DEPARTMENT OF LAW
(21) Room 214, City Hall
(22) 801 Plum Street
(23) Cincinnati, OH 45202
(24) 513-352-3346
(25)

### Page 3

(1) FOR THE DEFENDANTS JORG, CATON, HODGE, SPELLEN AND SELLERS:
(2) Donald E. Hardin, Esq. - (Via telephone)
    HARDIN LEFTON LAZARUS & MARKS
(3) 915 Cincinnati Club Building
    Garfield Place
(4)
(5)
(6)
(7)
(8)
(9)
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

### Page 4

(1) * INDEX OF EXHIBITS *
(2) Deposition Exhibit 1 --------------- 7
    Deposition Exhibit 2 --------------- 24
(3) Deposition Exhibit 3 --------------- 25
    Deposition Exhibit 4 --------------- 35
(4) Deposition Exhibit 5 --------------- 44
    Deposition Exhibit 6 --------------- 44
(5) Deposition Exhibit 7 --------------- 72
    Deposition Exhibit 8 --------------- 148
(6) Deposition Exhibit 9 --------------- 150
    Deposition Exhibit 10 -------------- 150
(7) Deposition Exhibit 11 -------------- 151
    Deposition Exhibit 12 -------------- 152
(8) Deposition Exhibit 13 -------------- 153
    Deposition Exhibit 14 -------------- 155
(9) Deposition Exhibit 15 -------------- 155
    Deposition Exhibit 16 -------------- 155
(10) Deposition Exhibit 17 ------------- 155
    Deposition Exhibit 18 -------------- 155
(11) Deposition Exhibit 19 ------------- 156
    Deposition Exhibit 20 -------------- 159
(12) Deposition Exhibit 21 ------------- 159
    Deposition Exhibit 22 -------------- 160
(13) Deposition Exhibit 23 ------------- 162
    Deposition Exhibit 24 -------------- 165
(14)
    (Original Exhibits returned to Dr. Wecht.)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

Case 1:01-cv-00769-SAS    Document 230-22    Filed 03/07/2006    Page 3 of 18

BSA    OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04    XMAX(7/148)

### Page 25

(1) (Exhibit 2 marked for identification.)
(2) - - - -
(3) Q. I'm going to put one document in front of you,
(4) Doctor. I'll identify it as Wecht 2 entitled
(5) Subject Control Techniques. At the bottom, it
(6) says Office of Municipal Investigation, City of
(7) Cincinnati with the date of August 14, 2002. I
(8) just want to ask is that a document that you
(9) were provided in connection with the
(10) investigation?
(11)      MR. FREUND:    Objection.
(12) A. Yes.
(13) Q. Go ahead, Doctor.
(14) A. Yes. This is what was sent to me.
(15) Q. What -- as you moved through the material, did
(16) you reach a point at which you did form
(17) opinions regarding Mr. Owensby's death?
(18) A. Yes.
(19) Q. And what did you do, if anything, to
(20) memorialize those opinions?
(21) A. I wrote a report that was dated September 10,
(22) 2002, and it was sent to Mr. Gissiner.
(23) - - - -
(24) (Exhibit 3 marked for identification.)
(25) - - - -

### Page 26

(1) Q. I'm going to hand you what I've marked as Wecht
(2) Deposition Exhibit 3 and ask you, Doctor,
(3) whether you can identify that as a true and
(4) accurate copy of the report that you generated
(5) on or about September 10, 2002?
(6)      MR. FREUND:    Objection. Same basis.
(7) I just -- since you kind of changed gears, I
(8) just want to the renew the objection on the
(9) same basis as I had earlier, and as long as
(10) you're on these reports, then I will not
(11) object.
(12)      MR. MORGAN:    Okay. Except as to
(13) form?
(14)      MR. FREUND:    Yeah.
(15) A. Yes, it is.
(16) Q. Thank you, Doctor. Was this the first time in
(17) your career that you've been asked to conduct
(18) an evaluation of a death away from the time of
(19) death, in other words, subsequent to the death
(20) relying in part on autopsy results from a
(21) coroner in another jurisdiction?
(22) A. No. I had done it hundreds of times before.
(23) Q. Was there anything unusual about the nature of
(24) the material that you were provided in terms of
(25) your experience as a forensic pathologist?

### Page 27

(1) A. No. It was quite expected and seemed to be
(2) appropriate.
(3) Q. Based on your knowledge, training and
(4) experience, are the documents that were
(5) provided to you the type of documents on which
(6) forensic pathologists regularly rely in their
(7) professional practice?
(8) A. Yes.
(9) Q. About how much time, if you know -- and if you
(10) need to dive into billing records or something
(11) to do that, I'll defer it -- but do you know
(12) about how much time you spent on the
(13) assignment?
(14) A. I don't bill by the hour unless I'm
(15) specifically requested to, so I can't tell you
(16) from the records. Gee, I don't know. Not
(17) counting leading into today, looking over
(18) everything again and meeting with you for an
(19) hour prior to this deposition, but including
(20) the time that I had spent in a meeting that was
(21) held at my office with various people from
(22) Cincinnati, I don't know, I'd say it probably
(23) was around -- probably around 20 hours.
(24) Q. You spoke of a meeting various people from
(25) Cincinnati. Do you have any idea who attended

### Page 28

(1) that meeting?
(2) A. You know, I apologize. I'm -- I kind of
(3) disciplined myself to make notes of such
(4) meetings, at least in terms of people in
(5) attendance, but the answer is I did not do so.
(6) I can only tell you that the meeting was at my
(7) office. I think --
(8) Q. That's fine, Doctor, if you don't have it.
(9) A. I can just tell you the meeting was on August
(10) 14, and I'm sorry, I know there were officials,
(11) but I apologize, except I know that
(12) Mr. Gissiner was there, and that's all I
(13) remember, I mean in terms of a specific name.
(14) Q. Understood. Thank you, Doctor.
(15)      MR. FREUND:    What year? What year?
(16)      MR. MORGAN:    2002.
(17) A. I'm sorry. August 14, 2002.
(18) Q. Do you recall the position of any of the people
(19) involved? And, again, if not, that's fine.
(20) A. I can only tell you that some were in the
(21) police department, and beyond that, I better
(22) not retrospectively conjecture.
(23) Q. Fair enough. Do you recall what compensation
(24) you were paid by the city for your work?
(25) A. Well, yes. I do have the -- I think, as far as

Case 1:01-cv-00769-SAS   Document 230-22   Filed 03/07/2006   Page 4 of 18

BSA   OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04   XMAX(8/149)

### Page 29

(1) I recall, there was the one charge of -- it's
(2) $5,000, yes, and it included -- it included the
(3) meeting and the records and the report and
(4) everything. Yeah. $5,000 is all that I
(5) charged.
(6) Q. Doctor, as I read your report, the pages, the
(7) bottom of Page 1, 2, that is through about the
(8) middle of Page 5 is a factual summary of your
(9) understanding of events of the night of the
(10) Owensby homicide. I wonder if you would just
(11) describe the process that you went through to
(12) generate that factual summary.
(13) A. I went through the statements and testimonies
(14) of the people involved, the police officers and
(15) Ms. St. Clair and Dr. Shultz. Well, actually,
(16) up to that point, Dr. Shultz was not involved.
(17) I'm sorry. He comes in later, so that I read
(18) through those materials to which I referred a
(19) while ago.
(20) Q. You actually read Officer Jorg's statement,
(21) Officer Caton's statement and et cetera?
(22) A. Yes, I did.
(23) Q. Okay. Beginning on the third paragraph on Page
(24) 5, you detail -- or summarize, rather,
(25) Dr. Shultz's autopsy findings, and I do have

### Page 30

(1) some specific questions about some of those
(2) findings, but in general, did you find
(3) Dr. Shultz's autopsy to be within the standard
(4) of good practice in anatomical pathology as you
(5) have developed a understanding of it over your
(6) 40 years?
(7) MR. FREUND: Objection as to form.
(8) A. Yes. It's a complete autopsy.
(9) Q. Did you find any areas in Dr. Shultz's autopsy
(10) with which you disagreed?
(11) A. Yes. One point.
(12) Q. And what was that, sir?
(13) A. Dr. Shultz had estimated a degree of coronary
(14) artery occlusion of the left anterior
(15) descending branch due to atherosclerosis as 50
(16) percent, and my estimate was 30 to 40 percent
(17) at the most. It's just a small difference.
(18) That was the only thing I recall that I -- I
(19) specifically felt was somewhat different.
(20) Q. Did you develop an understanding or an opinion
(21) regarding why you and Dr. Shultz had a
(22) different view of that on that small question?
(23) A. Well, you know, there's subjective
(24) interpretation. It's not like you take a ruler
(25) and you measure. It's not that he or I made a

### Page 31

(1) mistake. That's my take on it. I did express
(2) a comment in my report which is relevant to
(3) your question, namely that when you shrink in
(4) the process of preparing tissue for slides,
(5) then you have to take into account that the
(6) seeming degree of obstruction is really greater
(7) than it was in actual gross configuration. So
(8) that was what I thought may have been the case.
(9) Q. Doctor, are you familiar with the phrase
(10) reasonable degree of medical certainty?
(11) A. Yes.
(12) Q. What does that phrase mean to you as a -- as a
(13) forensic pathologist?
(14) A. Well, it means to me a probability versus a
(15) possibility. It means that you feel it's
(16) something more likely than not. I always
(17) analogize it in talking and thinking about it
(18) and teaching about it. It's directly analogous
(19) to a surgeon that is examining someone with an
(20) acute abdomen.
(21) There comes a time when the surgeon
(22) decides that he's got to go in and do an
(23) exploratory laparotomy. It may be
(24) appendicitis, it may not be, but he's now
(25) reached a point based upon physical exam,

### Page 32

(1) laboratory tests that he thinks it's more
(2) likely than not, something going on that is
(3) surgically repairable, correctable, and he
(4) makes a decision.
(5) Up until that time, you see, it was a
(6) possibility. It hadn't reached a point of
(7) reasonable medical certainty. So that's
(8) outside the realm of law. So I take it to mean
(9) if you wanted to come up with a number, I guess
(10) 51 percent or better, but who can apply
(11) numbers? I don't know. For me it's something
(12) more likely than not. It's a probability
(13) versus even a distinct reasonable, logical
(14) possibility, but you think it's -- it's now
(15) probable, not just simply possible.
(16) Q. Do you have an opinion to a reasonable degree
(17) of medical certainty with respect to the
(18) mechanism of death of Roger Owensby, Jr.?
(19) A. Yes.
(20) MR. FREUND: Objection. Objection.
(21) Same basis as previously stated.
(22) Q. And what is your opinion, sir?
(23) A. I believe the primary mechanism of death was
(24) mechanical asphyxia.
(25) Q. Would you define mechanical asphyxia,

Case 1:01-cv-00769-SAS   Document 230-22   Filed 03/07/2006   Page 5 of 18

BSA   OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04   XMAX(14/155)

### Page 53

(1) talk about there being focal subendocardial or
(2) papillary muscle fibrosis in Mr. Owensby's
(3) heart. Is that something which suggests that
(4) he might have died -- suggests to you that he
(5) might have died from some cause other than
(6) mechanical asphyxia?
(7) A.  No, no, not at all.
(8) Q.  What -- what -- what is -- what is that? What
(9) do you describe there?
(10) A. Just what it is. You look under the microscope
(11) to see these small foci of fibrosis. It really
(12) means essentially nothing. Perhaps at some
(13) time in the past, there might have been some
(14) fleeting or transient ischemia for whatever
(15) reason that led to some microscopic fibrosis.
(16) It's -- it's not a significant finding in terms
(17) of understanding the cause of death or in terms
(18) of predicting life expectancy.
(19)     MR. FREUND:  Page 9? Is it down at
(20) the bottom or top?
(21)     MR. MORGAN:  Top.
(22) Q.  Did you -- did you find anything in
(23) Mr. Owensby's heart which you considered to be
(24) abnormal for a man of his age and, as you
(25) understand it, his condition?

### Page 54

(1) A.  No. I would say that the 30- to 40-percent
(2) atherosclerosis of one coronary artery would be
(3) a little -- a little abnormal. I think that
(4) most 29-year-old men would not have -- would
(5) not have that. So I would have to say that
(6) that is a little -- somewhat more advanced than
(7) what I would expect in a 29-year-old person,
(8) but that varies greatly.
(9)     I mean, you know, people dying of
(10) heart attacks in their mid, late 20s is no
(11) longer something that causes a pathologist to
(12) be the least bit surprised. It just varies
(13) greatly, but the answer to your question is
(14) that it's probably -- it is, I would say, a
(15) little beyond the upper range of normal for a
(16) 29-year-old man. The other 2 vessels, the
(17) right coronary and the circumflex, were
(18) completely patent, and that's a good sign and
(19) that's quite -- quite normal.
(20) Q.  On Page 12 of your opinion toward the bottom of
(21) the page, you indicate that you identified a
(22) single focus of mild atherosclerosis. Is that
(23) the 30 to 40 percent that you just described?
(24) A.  Yes. That's what we were just talking about.
(25) Q.  Do you have an opinion to a reasonable degree

### Page 55

(1) of medical certainty, Doctor, whether that
(2) single focus of mild atherosclerosis was a
(3) reason -- and I'll use the word a advisedly --
(4) a reason for Mr. Owensby's death by mechanical
(5) asphyxia?
(6) A.  Yes, I have an opinion.
(7) Q.  What is that opinion?
(8) A.  I believe it was completely unrelated.
(9) Q.  And do you hold that opinion to a reasonable
(10) degree of medical certainty?
(11) A.  Yes.
(12) Q.  Do you believe that absent mechanical asphyxia,
(13) Mr. Owensby would have died on the night of
(14) November 7, 2000 as a result of his cardiac
(15) condition?
(16) A.  I have no reason whatsoever to believe that he
(17) would have died as a result of any findings or
(18) all the findings in the heart if it were not
(19) for the mechanical asphyxiation.
(20) Q.  Doctor, you talked about the 4 minutes. Was it
(21) 4 minutes of oxygen that the brain maintains?
(22) A.  4 to 6 minutes in normal circumstances. If
(23) it's -- if you're hypothermic or you're heavily
(24) sedated with barbiturates, it could even
(25) be longer, but -- but normal processes in a

### Page 56

(1) normal environment, we talk about a 4- to
(2) 6-minute period in a person with, you know,
(3) essentially normal heart and lung conditions.
(4) It could be somewhat less if you've got someone
(5) that has a very bad heart or chronic
(6) obstructive lung disease. 4 to 6 minutes is
(7) what scientific literature pretty much talks
(8) about in terms of residual oxygen in the brain
(9) before you then get brain death.
(10) Q. Do you see any indications in the autopsy of
(11) Mr. Owensby which would indicate -- or any
(12) other factors that -- with respect to
(13) Mr. Owensby which would indicate that he would
(14) be outside of the norm in that regard?
(15) A.  No, I do not.
(16) Q.  What does the 4 to 6 minutes of residual oxygen
(17) in the brain mean, if anything, with respect to
(18) the survivability of a -- of the application of
(19) force sufficient to initiate the mechanical
(20) asphyxia process?
(21) A.  Well, advanced or sometimes even basic
(22) cardiopulmonary resuscitation we now know, and
(23) it's just documented, it's replete through the
(24) medical/scientific literature worldwide, that a
(25) huge percentage of people can be salvaged if

Page 53 to Page 56
www.akf.com
AKF Reporters, Inc.
Pittsburgh - Erie
depo@akf.com

Case 1:01-cv-00769-SAS    Document 230-22    Filed 03/07/2006    Page 6 of 18

BSA    OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04    XMAX(18/159)

### Page 69

(1) Q. The last contributing factor you identify is
(2) the lapse of time prior to the commencement of
(3) appropriate and critical resuscitative
(4) measures. Would you explain the relevance of
(5) the lapse of time?
(6) A. Well, this question and my answer relate to
(7) what we have been discussing in terms of
(8) resuscitation. There is an inverse proportion
(9) that is applicable here. The sooner the
(10) intervention is undertaken, the greater is the
(11) likelihood of responsiveness and
(12) salvageability. The longer the lapse of time,
(13) the less likely is there to be a reversability
(14) and salvageability. The period of time is what
(15) I've expressed before. I refer to these times
(16) which I had gotten from the records. My
(17) answers before were given in response to the
(18) time periods that you set forth in your
(19) questions.
(20) Q. Thank you, Doctor. Since you were provided
(21) records, I will represent to you that Officer
(22) Caton has testified that when he placed
(23) Mr. Owensby in the back of the Golf Manor
(24) police cruiser, quote, he was face down
(25) essentially with his head turned toward the

### Page 70

(1) front seat of the cruiser with one foot on the
(2) floor and one foot underneath him.
(3)     Do you have an opinion to a
(4) reasonable degree of medical certainty whether
(5) placing someone who is in the condition of
(6) Mr. Owensby after the altercation with his
(7) hands cuffed behind his back, face down in the
(8) back of a patrol – of a police cruiser is a
(9) candidate – an additional candidate for a
(10) contributing factor in the development of the
(11) pathophysiological process assuming that he was
(12) alive at the time that he was placed in the
(13) car?
(14)     MR. HARDIN:  Objection. Objection.
(15)     MR. FREUND:  I'll object.
(16) A. Yes, I do.
(17) Q. What is that opinion, sir?
(18)     MR. FREUND:  Objection.
(19)     MR. HARDIN:  Objection.
(20) A. I believe that that kind of physical
(21) positioning would have been an additional
(22) aggravating factor in terms of Mr. Owensby's
(23) respiratory compromise. This position in its
(24) full form is referred to as positional
(25) asphyxiation. From what you have described,

### Page 71

(1) what the records have set forth, it would be at
(2) least a modified, semi or quasi form of
(3) positional – of potential positional
(4) asphyxiation, not the completely prone position
(5) but partially so and with the hands cuffed
(6) behind the back and then lying in that position
(7) prostrate. So, in my opinion, with reasonable
(8) medical certainty, that kind of positioning
(9) would have aggravated the situation and would
(10) have added to the respiratory embarrassment.
(11)     MR. HARDIN:  Move to strike.
(12) Q. You refer to the lapse of time – strike that.
(13) You refer to the potential resuscitative
(14) measures as appropriate and critical. Are
(15) those words selected advisedly or do they just
(16) capture your general impression of what would
(17) have been appropriate? That's a terrible
(18) question. I'll withdraw it. What did you mean
(19) by the use of the phrase appropriate and
(20) critical with respect to the resuscitative
(21) measures?
(22) A. Appropriate because that's the thing to do.
(23) Critical because if you don't do it, you may be
(24) missing a chance to save the person's life.
(25) Q. The last opinion you express, Doctor, is that

### Page 72

(1) there was no evidence of significant cardiac
(2) disease which is something we have discussed to
(3) some extent.
(4)     - - - -
(5) (There was a discussion off the record.)
(6)     - - - -
(7) (Exhibit 7 marked for identification.)
(8)     - - - -
(9) Q. Dr. Wecht, have you ever heard a term called
(10) sudden cardiac death?
(11) A. I guess I had.
(12) Q. I'm going to hand you what I've marked as
(13) Exhibit Wecht 7, a document entitled Affidavit
(14) and signed by a Charles V., as in Victor,
(15) Wetli, W E T L I, M.D., under oath on 13
(16) September 2002. Have you had an opportunity –
(17) as a result of my providing this document to
(18) your office, have you had an opportunity to
(19) review it?
(20) A. Yes.
(21) Q. Do you agree with Dr. Wetli that Mr. Owensby,
(22) Jr. expired as a consequence of what he refers
(23) to as sudden cardiac death?
(24) A. No.
(25) Q. Do you – looking at paragraph 5 on the second

Case 1:01-cv-00769-SAS    Document 230-22    Filed 03/07/2006    Page 7 of 18

BSA    OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04    XMAX(21/162)

### Page 81

(1) give my explanation.
(2) So it may well have been a question
(3) or I may have just addressed it spontaneously,
(4) but my recollection is quite clear that nobody
(5) was arguing for this being a cardiac death, and
(6) when everybody left, you know, as far as I
(7) know, in terms of what was discussed there, you
(8) know, there seemed to be general acceptance,
(9) no -- no -- of what I concluded, there was no
(10) vote. That's my -- that was my impression of
(11) having been there.
(12)     MR. FREUND:    Ask the answer be
(13) stricken.
(14) Q. Doctor, are there any aspects of your findings
(15) or Dr. Shultz's findings which are significant
(16) to the -- to your opinions that you've stated
(17) here today which we have not discussed in the
(18) course of this deposition?
(19) A. None that can think of at this time. I believe
(20) you've covered everything set forth in my
(21) report. You've addressed Dr. Wetli's opinions,
(22) a couple things that are not in the report. I
(23) can't think of anything.
(24)     MR. MORGAN:    I have no further
(25) questions, Doctor. Thank you very much.

### Page 82

(1)     MR. HARDIN:    Before we go on, may I
(2) ask a favor? This is Don Hardin.
(3)     MR. FREUND:    You can have it as far
(4) as I'm concerned, Don.
(5)     MR. HARDIN:    The doctor referred to
(6) an exhibit -- or I'm sorry -- within his file,
(7) a synopsis of events and I just, since I'm not
(8) there, would like to see if I can get a copy of
(9) that synopsis faxed to me.
(10)     MR. MORGAN:    You mean before you
(11) question?
(12)     MR. HARDIN:    Yes.
(13)     - - - -
(14) (There was a discussion off the record.)
(15)     - - - -
(16)     EXAMINATION
(17)     - - - -
(18) BY MR. FREUND:
(19) Q. Doctor, my name is Neil Freund, and I am one of
(20) the lawyers for the City of Cincinnati and a
(21) couple of the officers, so I'm going to start
(22) out and ask you some questions.
(23)     MR. MORGAN:    I'm sorry. Could I
(24) interrupt, just ask you to specify which
(25) officers?

### Page 83

(1)     MR. FREUND:    Sellers and -- who else
(2) do you represent, Geri?
(3)     MR. FREUND:    A couple of the
(4) officers.
(5)     MR. MORGAN:    Individuals.
(6)     MS. GEILER:    I'm sorry. Are you
(7) ready?
(8)     MR. FREUND:    Yeah. I'm ready.
(9)     MS. GEILER:    Okay. We represent
(10) Streicher and Frazill and Hodge and Sellers.
(11)     MR. FREUND:    All right. Anything
(12) else?
(13)     MR. MORGAN:    No, thank you.
(14)     MS. GEILER:    Officially.
(15) Q. Doctor, as far as my questions are concerned, I
(16) first want to ask you a few questions about
(17) your background and all the things that you've
(18) done in your busy life. In reviewing your CV,
(19) if I could find it, appears that you -- you are
(20) not only a physician, but also a lawyer; is
(21) that correct?
(22) A. Yes.
(23) Q. And when did you get your legal degree?
(24) A. June 1962.
(25) Q. Okay. And then did you obtain a license to

### Page 84

(1) actually practice?
(2) A. Yes. I became licensed in Pennsylvania --
(3) well, I took the exam in the -- I guess the
(4) fall. I don't know when I heard, either late
(5) '62 or into '63. I'm not sure.
(6) Q. Okay. Are you still licensed to practice in
(7) the State of Pennsylvania?
(8) A. Yes.
(9) Q. Or the Commonwealth of Pennsylvania?
(10) A. Yes.
(11) Q. Yes. Anywhere else?
(12) A. No. Well, the Federal courts.
(13) Q. All right. So you can practice law in Federal
(14) courts also?
(15) A. Well, how does that work? The District Courts,
(16) the Third Circuit, and the Supreme Court. I've
(17) never done it, so -- but I think that's the way
(18) it works. I don't think -- I think that
(19) Federal licensure is in your own district and
(20) your own circuit, and then if you made the trip
(21) to the Supreme Court as a Bar Association
(22) function, then you got sworn in there.
(23) Q. And then you also continued your legal
(24) education, it looks like, at the University of
(25) Maryland; is that right?

Case 1:01-cv-00769-SAS    Document 230-22    Filed 03/07/2006    Page 8 of 18

BSA    OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04    XMAX(23/164)

### Page 89

(1) MR. MORGAN: Object to the form.
(2) A. Some of the things I had seen, I guess, and
(3) others I had read and, I believe, some people I
(4) talked to.
(5) Q. That's one of the cases that you participated
(6) in?
(7) A. I was a consultant, yes. I did not testify.
(8) Q. Okay. A consultant for Simpson or for the --
(9) A. For the defense.
(10) Q. For Simpson?
(11) A. Yes, for the defense attorneys, for -- O.J.
(12) Simpson was the defendant. It was his
(13) attorneys who consulted me, not Mr. Simpson.
(14) Q. Okay. You've written extensively on the
(15) assassination of President John F. Kennedy; is
(16) that right?
(17) A. Yes.
(18) Q. And I think you told the folks that you were on
(19) a forensic panel that later reviewed the
(20) assassination; is that true?
(21) A. Yes.
(22) Q. And that panel reached certain conclusions; is
(23) that correct?
(24) A. The specific panel did, yes, and then the
(25) overall Congressional committee did.

### Page 90

(1) Q. How many forensic pathologists were on that
(2) panel?
(3) A. 9.
(4) Q. And how many dissenters were there to that
(5) panel?
(6) A. The basic dissent regarding the Warren
(7) Commission report's conclusion about a sole
(8) assassin, I was the only dissenter. The others
(9) had criticisms of various kinds with regard to
(10) whether Oswald was the sole assassin. I was
(11) the own dissenter.
(12) Q. Right. You believed, and I think still
(13) believe, that there were other assassins, other
(14) shooters?
(15) MR. MORGAN: Objection.
(16) A. I believe there were 2 shooters; that's
(17) correct.
(18) Q. But you were the only one on that panel that
(19) believed that?
(20) MR. MORGAN: Asked and answered.
(21) Lack of foundation.
(22) A. Yes. On that panel, that's correct.
(23) Q. All right. Incidentally, how many board
(24) certified forensic pathologists do you believe,
(25) just give me a rough estimate, a reasonable

### Page 91

(1) estimate, there are in the United States of
(2) America?
(3) MR. MORGAN: Foundation.
(4) A. You say Board certified forensic pathologists?
(5) Q. Yes.
(6) A. Gee.
(7) Q. Just give me a reasonable estimate.
(8) A. I'm not sure. I think perhaps somewhere
(9) between 500 to 750 or it could even be more by
(10) now. I don't know.
(11) Q. Okay. In other words, you are not the only
(12) forensic pathologist in the United States?
(13) A. No, of course not.
(14) MR. MORGAN: Object to the form.
(15) Q. There are numerous other forensic pathologists
(16) available to look at cases similar to this as
(17) experts?
(18) A. Yes, and they do. I have colleagues who do a
(19) lot of consulting work, of course.
(20) Q. Okay. Have you ever taught forensic
(21) pathologists on how to be a good expert witness
(22) in front of a jury like you're testifying
(23) today?
(24) A. I don't recall giving that kind of a talk to a
(25) group of forensic pathologists. I'm sure there

### Page 92

(1) have been forensic pathologists in groups,
(2) perhaps, where I have discussed this, but I
(3) don't recall -- well, maybe the American
(4) Academy of Forensic Sciences, past years,
(5) talked about this, but I don't remember whether
(6) it was only in the pathology section or more
(7) broadly for the academy.
(8) Q. Okay. Any estimate of how many courses you may
(9) have taught about how to be a good expert
(10) witness?
(11) A. I've never taught a course on that subject.
(12) It's been included in discussions, and I talk
(13) about it in the -- whenever I teach or give a
(14) lecture, but I never taught a course on that.
(15) Q. All right. And where would you give those
(16) lectures?
(17) MR. MORGAN: Objection.
(18) A. Oh, medical students, medical societies, bar
(19) association groups, professional organizations
(20) of different kinds, medical legal, forensic
(21) scientific, graduate schools.
(22) Q. All right. Let me -- let me see if I
(23) understand your prior testimony correctly, and
(24) I, for the record, would not ask these
(25) questions but for the fact that the Court has

Case 1:01-cv-00769-SAS   Document 230-22   Filed 03/07/2006   Page 9 of 18

BSA   OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04   XMAX(24/165)

### Page 93

(1) overruled our motion, and I don't want to waive
(2) anything by asking these questions, but I need
(3) to now. When did you first have contact with
(4) the Owensbys' attorneys?
(5) A. You mean -- you mean the private attorneys now?
(6) Q. Right.
(7)     MR. MORGAN:  Object as vague.
(8) A. I think that somebody, one of his attorneys,
(9) probably called to my office. The best I can
(10) deduce from this is I think it probably was in
(11) the fall of last year, maybe in October. The
(12) first letter I have here is dated November 20,
(13) but that's already talking about a deposition
(14) that as you know had been scheduled for
(15) December. So, obviously, I had been contacted
(16) before.
(17) Q. Do you have any documents that would let us
(18) know to a more certain date when you would have
(19) first been contacted by the Owensbys'
(20) attorneys?
(21) A. No, I do not. I do not. That's all I have.
(22) This is my entire file.
(23) Q. When you began talking to the Owensbys'
(24) attorneys, had you received any type of letter
(25) of release by the City of Cincinnati?

### Page 94

(1)     MR. MORGAN:  Lacks foundation.
(2) A. No. I had not received any letter. I recall
(3) telling my administrative assistant Eileen
(4) Young to be sure to determine if I could
(5) consult then with private attorneys. This
(6) doesn't happen often but once in a while, and I
(7) specifically told Eileen Young to do that.
(8) Q. Would you pull out any document which would
(9) indicate that the City of Cincinnati ever
(10) released you to talk to the Owensbys'
(11) attorneys?
(12) A. No. As I said, I don't have any such document.
(13) Q. All right. You were under contract with the
(14) City of Cincinnati; is that correct?
(15)     MR. MORGAN:  Vague.
(16) A. Well, I had consulted with them and had
(17) submitted the report to them.
(18) Q. Uh-huh.
(19) A. Yes.
(20) Q. Uh-huh. You were paid for your services?
(21) A. Yes.
(22) Q. You were paid $5,000; is that correct?
(23) A. Yes. That covered everything, the review and
(24) analysis of the records, the written report,
(25) examination of the microscopic slides, some

### Page 95

(1) research that I had done and the meeting with
(2) the various officials at my office on August 14
(3) of 2002.
(4) Q. And it was your understanding that you were
(5) hired as a forensic pathologist consultant; is
(6) that correct?
(7)     MR. MORGAN:  Lacks foundation.
(8) A. Yes, by them, that's correct.
(9) Q. When did your service end with the City of
(10) Cincinnati?
(11) A. I considered it ended, I would say, after the
(12) meeting and then some --
(13) Q. After what meeting?
(14) A. After that meeting on August 14 and a
(15) subsequent letter that I received from
(16) Mr. Gissiner.
(17) Q. Uh-huh.
(18) A. Did you -- did you get back from her what was
(19) faxed?
(20)     MR. MORGAN:  Yeah.
(21) A. I'll tell you more specifically. You faxed
(22) more than one page. You faxed several pages.
(23) Q. You mentioned earlier in your testimony that
(24) this was somewhat unusual that you would first
(25) act as a consultant for one side and then act

### Page 96

(1) as a consultant for the other side?
(2)     MR. MORGAN:  I'm going to object as
(3) misstating the record. Mr. -- Dr. Wecht was
(4) contacted for the taking of his deposition.
(5) I'm not aware of anything in the record
(6) indicating that he's acting as a consultant for
(7) the plaintiff in this case.
(8) Q. Do you want to answer the question?
(9)     MR. MORGAN:  Objection. That's
(10) calling for a conclusion of law --
(11)     MR. HARDIN:  For the record, we're
(12) having trouble hearing the statements being
(13) made by other counsel.
(14)     MR. MORGAN:  Object as vague,
(15) calling for a conclusion of law, lacking
(16) foundation, misstating the record.
(17) Q. I think my question was you testified earlier
(18) it's somewhat unusual to act as a consultant
(19) for one party and then turn around and act as a
(20) consultant for another party; is that correct?
(21)     MR. MORGAN:  Same objections. Same
(22) objections.
(23) A. Not only is it unusual, but it's something that
(24) I would not do. I'm simply -- I would never go
(25) from one side to the other. This is a matter

Case 1:01-cv-00769-SAS   Document 230-22   Filed 03/07/2006   Page 10 of 18

BSA    OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04    XMAX(25/166)

### Page 97

(1) that deals with the very same subject that I
(2) dealt with before with absolutely no change in
(3) the opinions that I have expressed. I don't
(4) really know whose side anybody is on at this
(5) time.
(6) Quite frankly, I'm aware one way or
(7) another that one of the officers is suing the
(8) City of Cincinnati. I think it's Mr. Hodge,
(9) Officer Hodge, and yet I heard the attorney
(10) from the City of Cincinnati say that she's
(11) representing Mr. Hodge. It doesn't look like
(12) I'm on different sides. It looks like the City
(13) of Cincinnati can't seem to make up its mind,
(14) not for me to -- I'm just testifying here
(15) pursuant to the opinions I have expressed.
(16) I would never switch from one side to
(17) the other because in so doing, I would have to
(18) express different opinions by definition.
(19) Furthermore, if I had been apprised that I
(20) could not testify inasmuch as this had gone
(21) before a Federal judge, then, obviously, I
(22) would not be sitting here today.
(23) Q. How much are you -- are you charging by the
(24) hour now?
(25) A. No. I do not charge by the hour unless I'm

### Page 98

(1) requested to do so, as I said before.
(2) Q. How do you charge?
(3) MR. MORGAN: Vague.
(4) Q. For your time?
(5) A. Today and for the past year or so, I ask for a
(6) $5,000 fee. Back then, I asked for 300 --
(7) 3,500. So I believe in this case that the
(8) charge would have been $3,500 to the attorney
(9) who consulted me, Attorney Paul Martins, I
(10) think is associated with Mr. Morgan, and then
(11) of course there's a charge for the deposition
(12) today.
(13) Q. How much is that?
(14) A. The deposition charge, I think, is -- I believe
(15) it's 2,500 for 2 hours, and then it's $500 per
(16) hour for each hour beyond 2 hours.
(17) Q. I think there's a letter in the file somewhere
(18) that I saw that you were sent a check for maybe
(19) $7,500? Do you remember that?
(20) A. Yeah. You're right. You're right. 7,000. So
(21) that would be the 3,500, the 2,500 is 6,000,
(22) and maybe an additional thousand was probably
(23) then for the -- my secretary would have charged
(24) for the meeting and review of all the records
(25) and everything in advance with Mr. Morgan.

### Page 99

(1) Q. And what was the charge to Mr. Paul Martins for
(2) one of the lawyers for the Owensbys? The
(3) 3,500, what was that charge for?
(4) A. No. That's part of the 7,000.
(5) Q. Yeah. What was that charge for?
(6) A. Oh, that charge was to get out all the records
(7) and review everything all over again.
(8) Q. Well, you had already written your opinions,
(9) hadn't you, Doctor?
(10) MR. MORGAN: Objection.
(11) Argumentative.
(12) A. Yes.
(13) Q. Please?
(14) A. Yes. I had written opinions. That is correct.
(15) Q. And you wrote more opinions than we see or that
(16) we have marked as an exhibit, did you not?
(17) That was the opinions that you discussed -- I
(18) don't know what Exhibit number it is, but it's
(19) the September 10, 2002 -- Exhibit 3, I guess it
(20) is. See if you can find Exhibit 3.
(21) A. September 10. Is this Exhibit 3? Addressed to
(22) Mr. Mark Gissiner?
(23) Q. Yes. That's Exhibit 3.
(24) A. Yes. That's right. That was the report that
(25) was sent to Mr. Gissiner.

### Page 100

(1) Q. Yeah. How many reports did you generate in
(2) this case?
(3) A. Just this. This is the only report.
(4) Q. You didn't generate a report which is dated
(5) August 8, 2002?
(6) A. August 8? Could I see that please?
(7) Q. Yeah.
(8) - - - -
(9) (There was a discussion off the record.)
(10) - - - -
(11) A. This is -- this was the first report,
(12) confidential memo to the file sent to, I guess,
(13) Mr. Gissiner which appears to be pretty much
(14) the same and some things have been highlighted.
(15) Q. Yeah. That's my highlighting, Doctor.
(16) A. Oh, I'm sorry. Okay. Yeah. So the answer is
(17) that this was sent first and then the formal
(18) report was sent one month later.
(19) Q. So the report that you generated on August 8,
(20) 2002 wasn't the formal report?
(21) A. No. I call it -- I call it what it is there, a
(22) confidential memo. That's the language we use
(23) in my office and sent as a work product to the
(24) attorney if that's what they prefer.
(25) Q. Do you remember generating another report dated

Case 1:01-cv-00769-SAS   Document 230-22   Filed 03/07/2006   Page 11 of 18

BSA   OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04   XMAX(27/168)

### Page 105

1. Q. All right. Are you familiar with Dr. Wetli?
2. You were asked earlier about his affidavit.
3. Are you familiar with Dr. Wetli?
4. A. Yes. I — I — I — I know who he is. I know
5. him. We've met through the years, but, yes,
6. so, I mean, I know him.
7. Q. Do you respect him as far as being a competent
8. forensic pathologist?
9. A. Yes. Dr. Wetli is a competent, Board
10. certified, experienced forensic pathologist.
11. Q. Have you ever testified in cases with Dr. Wetli
12. where you were on the same side?
13. A. Probably. I can't remember for sure, but the
14. odds are that I have. I just don't know.
15. Nothing comes to mind, but it's very likely
16. that that has happened or been consulted. I
17. don't know — you know, you asked about
18. testifying. I just don't recall. The odds are
19. probably somewhat greater that we have been
20. consulted by the same side in some case over
21. the years.
22. Q. Anyway, you think that — at least even though
23. you criticized his opinions in this case, you
24. think he's a competent forensic pathologist,
25. don't you?

### Page 106

1. MR. MORGAN: Object to form.
2. A. Yes. I disagreed. I would prefer to say
3. disagreed, and, yes, he is a competent,
4. experienced forensic pathologist.
5. Q. And you would agree that me that 2 competent
6. forensic pathologists like you and Dr. Wetli
7. could have differing opinions?
8. MR. MORGAN: Vague, foundation,
9. incomplete hypothetical.
10. A. Yes.
11. Q. Would you both be right with differing
12. opinions?
13. A. It depends on how differing they are. If you
14. have a 180-degree spectrum, if you're at
15. opposite ends, you both can't be right, but
16. what if you're — you know, one's a little to
17. the left of the middle and the other's a little
18. to the right of the middle.
19. Q. Kind of like politics?
20. A. No political ramifications intended, just
21. then — you know, then you're both — you both
22. could be partly right and both could be partly
23. wrong. Who knows, you know, and, of course,
24. right or wrong, we don't know what God thinks.
25. So right or wrong, I guess you mean as

### Page 107

1. perceived by third parties including judges and
2. juries.
3. Q. Okay. Do you know a Dr. Tom Newman? I think
4. he's a Board certified emergency medicine
5. specialist in California.
6. A. Not offhand. Tom Newman. No. I don't
7. recognize the name.
8. Q. Have you ever done any studies in asphyxiation,
9. regarding asphyxiation?
10. A. I have not conducted any special studies. I
11. have just dealt with cases. I think maybe some
12. of the papers I've written have made reference
13. to it. I have not conducted any special
14. studies or undertaken any specific research
15. projects.
16. Q. Okay. Thanks, Doctor. So — so no studies, no
17. specific studies and no specific research in
18. asphyxiation?
19. A. That's correct.
20. Q. All right. Have you ever done any specific
21. studies in what I will be talking about later
22. in the field of sudden cardiac death syndrome?
23. A. No, no specific studies. Again, this is a
24. subject I've dealt with in various papers that
25. I have published and some book chapters. I

### Page 108

1. have not conducted what I would consider to be
2. a research project or special study.
3. Q. Okay. How many times do you believe that a
4. judge or a jury has disagreed with your
5. opinions that you've given in court like you
6. are today?
7. MR. MORGAN: Foundation.
8. Speculation.
9. A. Oh, I have no way of knowing that. I don't
10. keep track. I would say where I testify in my
11. jurisdictions as a forensic pathologist called
12. by the prosecution —
13. Q. I'm talking about as a consultant. I'm sorry.
14. A. Oh, I'm sorry. As a consultant, you mean aside
15. from the — my own county and the 5 counties
16. for which I do autopsies? Well, that's where
17. I'm a consultant, too, but you want me to
18. exclude those?
19. Q. Yeah, because that's your job testifying in
20. criminal cases here — here in this area. I'm
21. talking about acting as a consultant for O.J.
22. Simpson or Jon-Benet Ramsey or all these other
23. high-profile cases you've been in?
24. MR. MORGAN: Are you limited your
25. question to those cases?

Case 1:01-cv-00769-SAS   Document 230-22   Filed 03/07/2006   Page 12 of 18

BSA   OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04   XMAX(28/169)

### Page 109

(1) MR. FREUND: No. I'm talking about
(2) independent consultant that doesn't involve his
(3) job here in Allegheny County.
(4) MR. MORGAN: Object to the form.
(5) Move to strike the prior reference.
(6) A. I really -- I just have no way of answering
(7) that. Most of the time, I don't even know the
(8) results. Very few attorneys are thoughtful or
(9) considerate enough to take a moment to call or
(10) write. So I just don't know.
(11) Q. How many times do you think that you have
(12) testified in court?
(13) A. Now, here again, tell me in what capacity.
(14) Q. In any capacity.
(15) A. In any capacity?
(16) Q. Yes.
(17) A. I would say maybe around -- 40 years, probably
(18) around 500 in all kinds of cases.
(19) Q. Okay. Have you done any additional review in
(20) this case since you've changed sides from
(21) Cincinnati to the Owensbys?
(22) MR. MORGAN: Objection. Move to
(23) strike. Lacks foundation. Misstates the
(24) testimony. Argumentative.
(25) A. I don't consider I changed sides. My role is

### Page 110

(1) as a forensic pathology consultant, and my
(2) opinions have not changed at all. The question
(3) that you asked, yes, I think that I -- I may
(4) have reviewed some additional materials -- not
(5) materials -- some additional book references or
(6) so on. I don't know for certain. I don't
(7) believe that I have received any additional
(8) materials from Mr. Martin or Mr. Morgan, not
(9) that I recall.
(10) Q. Did you review the deposition testimony that
(11) was given in this case by Dr. Shultz?
(12) A. No. Are you talking about something that took
(13) place recently?
(14) Q. Yes.
(15) A. No, because I -- I -- Mr. Morgan had mentioned
(16) that. The answer is no, I have not received
(17) that.
(18) Q. Okay. Have you received anything recently from
(19) the Owensbys' attorneys?
(20) A. No.
(21) MR. MORGAN: Well, for the purposes
(22) of the record, you and the Doctor and I jointly
(23) watched the videotapes of the convenience store
(24) and the cruiser cam before the deposition.
(25) THE WITNESS: Thank you.

### Page 111

(1) MR. MORGAN: I didn't provide that to
(2) the Doctor, but I showed it.
(3) A. I saw that for the first time earlier today.
(4) That's right.
(5) Q. And, surely, since you were ready to give
(6) opinions today, you didn't use those videotapes
(7) to support your opinions; is that correct?
(8) A. No. I did not need the videos. That's right.
(9) I had never seen them.
(10) Q. All right. I assume that you have no opinion
(11) whether or not Mr. Owensby resisted arrest in
(12) this case; is that correct?
(13) MR. MORGAN: Objection.
(14) A. That's correct. I would not express opinions
(15) in that regard.
(16) Q. And I assume you also have no opinions as to
(17) whether or not Mr. Owensby attempted to run or
(18) escape in this case; is that correct?
(19) A. I would not be expressing opinions in that
(20) regard.
(21) Q. And I assume that you don't have any opinions
(22) on the extent of the struggle that took place
(23) in this case between Mr. Owensby and the police
(24) officers; is that correct?
(25) MR. MORGAN: Vague.

### Page 112

(1) A. Well, other than the opinions which I have
(2) expressed that relate to what happened to
(3) Mr. Owensby and then that, of course, does
(4) correlate with some of those events, but beyond
(5) medical pathological opinions, no, I'm not
(6) expressing other opinions. If you mean
(7) police -- I don't know what you mean, so I
(8) better not speculate.
(9) Q. All right. Do you know whether or not
(10) Mr. Owensby, when he hit the ground, went down
(11) back first or face first?
(12) A. I'm trying to think if I know that from the
(13) reports.
(14) Q. As you sit here, if you don't remember, just
(15) say so.
(16) A. I'm not absolutely certain. The abrasions are
(17) on the front pretty much. I kind of think he
(18) went down face first, but that doesn't mean
(19) that he might not have gone down backward first
(20) and then been turned over. No. I don't know
(21) for certain -- I --
(22) Q. I can accept that.
(23) A. I'd have to check further.
(24) Q. All right. Do you know how he went down,
(25) whether one officer took him down or more than

Page 109 to Page 112
www.akf.com
AKF Reporters, Inc.
Pittsburgh - Erie
depo@akf.com

Case 1:01-cv-00769-SAS    Document 230-22    Filed 03/07/2006    Page 13 of 18

BSA    OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04    XMAX(31/172)

### Page 121

(1) that is a misrepresentation any more than to
(2) say because I testified in a shooting case for
(3) a prosecution one time, that testifying for the
(4) defense in another case. Every case has its
(5) own facts and circumstances. I don't know, I
(6) don't remember one single detail about that
(7) case, where it was, or who it was or anything.
(8) So I completely reject the statement that I
(9) testified exactly the opposite. I don't think
(10) that that is correct or fair.
(11) Q. This is a reported case, and it says finally,
(12) Dr. Wecht gave — Wecht, that's you, Cyril
(13) Wecht. That's you, isn't it?
(14)    MR. MORGAN: Objection.
(15) Argumentative.
(16) A. Yes. That's me.
(17) Q. Okay. Gave the following explanation for
(18) petechial hemorrhages. The petechial
(19) hemorrhages in my opinion in this case were
(20) caused principally by the state of hypoxia, the
(21) decreased oxygen, the cardiac arrhythmia then
(22) which sent into motion leading to an ever
(23) greater diminution or compromise of oxygenation
(24) coupled with chest compressions that took place
(25) for 40 to 50 minutes at the hospital, coupled

### Page 122

(1) with whatever kind of compression may have
(2) taken — may have taken during the struggle
(3) between Mr. Lavoti and the other police
(4) officers and Mr. Biaz. That was your
(5) statement. Do you want to read it?
(6) A. I don't have to read it. If that's —
(7) Q. Is that accurate testimony, Doctor?
(8) A. If that's what's reported, then it's accurate.
(9) Q. I mean, is that accurate medically as far as
(10) you're concerned?
(11) A. In that case, those were my opinions, yes.
(12) Q. And in that case, your opinion was, Doctor,
(13) that the death was attributable to cardiac
(14) arrhythmia as opposed to mechanical
(15) asphyxiation and you said abnormal beating of
(16) the heat precipitated by an asthmatic attack
(17) that led to diminished oxygen that produces
(18) hypoxia, insult to the heart causing it to beat
(19) erratically. That's what you testified
(20) earlier. The cause of death in this particular
(21) case such as we have just discussed would be
(22) cardiac arrhythmia due to hypoxia.
(23) A. What is your question?
(24) Q. My question is can you have petechial
(25) hemorrhages from hypoxia alone?

### Page 123

(1) A. Yes. I think you can.
(2) Q. All right. Can you have scleral hemorrhages
(3) from the hypoxia?
(4) A. No, I don't think scleral hemorrhages of a
(5) substantial nature, no. Petechial hemorrhages
(6) are one thing. Scleral hemorrhages, I don't
(7) believe so.
(8) Q. Can you have scleral hemorrhages from a cardiac
(9) arrhythmia?
(10) A. I don't think so. I'm trying to think of
(11) cases. Conjunctival congestion, yes.
(12) Hemorrhage, scleral hemorrhages, I think not.
(13) Q. Where can you have conjunctival hemorrhages
(14) that are caused by anoxia or hypoxia that is
(15) caused by a cardiac arrhythmia other than the
(16) eyes?
(17) A. Well, conjunctival refers to the eyes.
(18)    MR. MORGAN: Object to the form.
(19) A. So if you're asking me about anatomic sites
(20) other than the eyes —
(21) Q. Right.
(22) A. — you can get petechial hemorrhages on the
(23) lining of the lungs, on the lining of the
(24) heart, on the pericardial sac overlying the
(25) heart, in the mediastinal soft tissues in the

### Page 124

(1) chest. Those are some of the places that you
(2) can get petechial hemorrhages.
(3) Q. Okay. Just change the subject for a second.
(4) What literature would you direct me to if I
(5) wanted to educate myself on sudden cardiac
(6) death?
(7) A. Well, I would refer you to cardiology
(8) textbooks. First, heart disease, there are
(9) several out there. I don't remember any
(10) specific book, but there are some books that
(11) deal solely with heart disease. Of course, the
(12) prominent textbooks on internal medicine,
(13) Cecil, Loeb, Harrison, I'm sure they've got
(14) discussions, too, in the chapters dealing with
(15) heart disease, and then forensic pathology
(16) textbooks would deal with cardiac deaths since
(17) those kinds of cases fall into our jurisdiction
(18) many times.
(19) Q. Would you agree with me, Doctor, that people
(20) can suffer a cardiac arrhythmia from extreme
(21) exertion?
(22) A. It's within the realm of possibility, yes, and,
(23) but — and if you talk about older people,
(24) people with significant coronary artery disease
(25) or people with significant chronic lung

Case 1:01-cv-00769-SAS   Document 230-22   Filed 03/07/2006   Page 14 of 18

BSA   OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04   XMAX(32/173)

### Page 125

(1) disease, the answer is yes, that can happen.
(2) Q. Would you agree with me that young people
(3) including athletes can suffer from sudden
(4) cardiac death from exertion alone?
(5) A. That is possible, but in the cases where that
(6) happens, there's almost always some other
(7) explanation, dehydration, underlying previously
(8) undiagnosed heart disease or so on. There's
(9) almost always some physiological or anatomic
(10) explanation. But is it possible in the absence
(11) of any of those things? Yes. It's possible.
(12) It would be very infrequent, I would say rare
(13) for a young athlete in good condition with no
(14) anatomic, environmental explanation or factor
(15) at play.
(16) Q. Would you agree with me, Doctor, that a young
(17) person like Mr. Owensby could suffer from a
(18) cardiac arrhythmia from a blow to the chest?
(19) A. Commotio cordis as it is called, a severe blow
(20) to the chest leading to cardiac arrhythmia can
(21) occur. These are almost always associated with
(22) some very significant force. I've seen a
(23) couple involves a cue stick in a pool room and
(24) other things like that. A blow, if it were a
(25) very strong person with a very -- with a big

### Page 126

(1) fist striking a blow to the chest with
(2) considerable force, I would say it would have
(3) to be within the realm of theoretical
(4) possibility. I've never seen it with just a
(5) blow to the chest from a fist. I have seen it
(6) with injuries to the chest from
(7) instrumentalities of different kinds.
(8) Q. Have you read the recent New England Medical
(9) Journal article by Dr. Merrin that came out
(10) this year regarding young athletes who died
(11) from blows to the chest from footballs,
(12) baseballs, hockey pucks, other sports objects?
(13) A. No. I do not recall that article, but that
(14) would be consistent with what I said. Those
(15) are instrumentalities, a hockey puck, a
(16) hard-hit baseball, a football spiralling in
(17) with some force. That's completely consistent
(18) with what I've said.
(19) Q. What is metabolic acidosis?
(20) A. Metabolic acidosis is when the pH goes down
(21) into the acid level and the kidneys then begin
(22) to malfunction and you'll get electrolyte
(23) disturbance. The oxygen goes down. The carbon
(24) dioxide pressure goes up. That is what is
(25) called metabolic acidosis.

### Page 127

(1) Q. And is someone who is exerting himself with
(2) extreme exertion, in other words, fighting,
(3) fighting as hard as he can for a period of a
(4) minute or 2, can that individual possible --
(5) possibly develop metabolic acidosis?
(6) A. I never like to say something is impossible in
(7) medicine unless it is within the realm of
(8) physical impossibility. I find it extremely
(9) unlikely, highly improbable. Is it possible?
(10) Could there ever be, has there ever been such a
(11) case? I can't rule that out, but I think it's
(12) extremely unlikely to get metabolic acidosis in
(13) a 29-year-old person following a struggle of a
(14) minute and a half or 2. I'd find that
(15) extremely unlikely.
(16) Q. Would you agree with me that as far as a review
(17) of the autopsy report itself, if you take the
(18) autopsy report itself without -- without the
(19) histories or without other input, you really
(20) need to search for a cause of death? I mean,
(21) it's not obvious from autopsy findings?
(22) A. No. I would disagree. I think if one knew
(23) nothing and you were looking at the 29-year-old
(24) man and you did the kind of examination that
(25) there Dr. Shultz did perform and you saw these

### Page 128

(1) 2 large areas of hemorrhage deep in the muscles
(2) of the back on each side and you found
(3) petechial hemorrhages in the eyes and you found
(4) wet, heavy, congested, edematous lungs, I
(5) believe that almost all forensic pathologists
(6) who then would be asked what is your primary,
(7) most likely diagnosis, Doctor, would opt for
(8) some kind of mechanical asphyxia.
(9) The only other thing -- I mean,
(10) putting that all together, that's what you
(11) would come up with I think in most instances.
(12) You would want to know more. I'm not
(13) suggesting that that should be the beginning
(14) and end. I would insist on getting background
(15) information to the extent possible, but you
(16) asked me if you had only that to deal with.
(17) Q. How would you rule out an arrhythmia, Doctor?
(18) A. I would rule out an arrhythmia in a couple of
(19) ways. One, the finding of an essentially
(20) normal heart is one, and then the positive
(21) findings of these other things that in my
(22) opinion, especially -- well, the bruises in the
(23) back, the deep hemorrhages -- I shouldn't call
(24) them -- but the deep intramuscular,
(25) perimuscular hemorrhages, they would have

Page 125 to Page 128
www.akf.com
AKF Reporters, Inc.
Pittsburgh - Erie
depo@akf.com

Case 1:01-cv-00769-SAS   Document 230-22   Filed 03/07/2006   Page 15 of 18

BSA   OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04   XMAX(34/175)

### Page 133

(1) myocarditis. That would be a possibility.
(2) Q. Okay. Are you aware in the studies that
(3) myocarditis has been known to be a factor in
(4) causing sudden cardiac death?
(5) A. Yes. Acute myocarditis certainly can result in
(6) sudden cardiac death. There's no evidence,
(7) however, of a myocarditis in this case.
(8) Q. Now, you have the remnants, as you just
(9) testified, as possibly having the fibrosis from
(10) myocarditis; isn't that true? Isn't that what
(11) you just said?
(12)     MR. MORGAN: Object to the form.
(13) A. You had asked me a question before, and I said
(14) it is possible that the fibrosis could be the
(15) residua of an old myocarditis.
(16) Q. Right?
(17) A. You now asked me a question relating to sudden
(18) death associated with myocarditis, and the
(19) answer to that is not from any residual of an
(20) old myocardial infection. When you die
(21) suddenly from acute myocarditis, it's because
(22) you have active inflammation which just
(23) fortuitously and most unluckily for that
(24) individual, it hits along the pathways that
(25) control the rhythmic beating of the heart.

### Page 134

(1) That's how you die.
(2)     Inflammation itself is nothing. It
(3) won't even cause you to put a Band-Aid if it
(4) were on your hand, but if it gets in the
(5) pathway that controls the beating mechanism of
(6) the heart, but that's an active myocarditis.
(7) It has nothing to do, even it were known and
(8) it's strictly -- strictly theoretical, strictly
(9) conjectural as to whether or not there had ever
(10) been any myocarditis in the past.
(11) Q. Doctor, are you familiar with the literature
(12) that indicates that old myocarditis which
(13) causes fibrosis is a known cause for cardiac
(14) arrhythmia?
(15)     MR. MORGAN: Objection to the form.
(16) A. I don't know a specific article, but I would
(17) not disagree that it could lead to some cardiac
(18) arrhythmia if it were significant and if it
(19) impinged upon the special pathways. It's
(20) something that could happen.
(21) Q. My question was are you familiar with the
(22) literature on the subject?
(23)     MR. MORGAN: Asked and answered.
(24) A. And told you I don't know the specific article.
(25) I can only deal with the subject in a -- in a

### Page 135

(1) theoretical fashion.
(2) Q. All right. So you would agree with me,
(3) however, that the muscle fibrosis in the heart
(4) is an abnormality?
(5) A. Yes. It's abnormal in that it's, yeah, not
(6) part of a normal picture. That's correct.
(7) Q. And you would agree with me that you didn't
(8) find any life-threatening injuries to
(9) Mr. Owensby's head on examination?
(10) A. When you say I didn't find, the autopsy did not
(11) find and I have no disagreement with those
(12) findings.
(13) Q. And essentially the findings were negative as
(14) far as the examination of the neck; is that
(15) correct?
(16) A. That's correct.
(17) Q. And essentially the examination was negative as
(18) far as examination of the chest?
(19) A. No.
(20)     MR. FREUND: Object to the form.
(21) A. We've been discussing the hemorrhages in the
(22) posterior chest wall.
(23) Q. On the back. Okay. Maybe I'm not --
(24) A. It's the back, but it's also the back of the
(25) chest wall.

### Page 136

(1) Q. Okay. That was my next question. I was going
(2) to talk to you about the back, but as far as
(3) the chest, the front of the body, there were no
(4) markings; is that correct?
(5) A. On the front of the body, other than beneath
(6) the left nipple area, some faint abrasions,
(7) other than that, there were no injuries on the
(8) anterior thorax or front of the chest.
(9) Q. Okay. Did you note whether or not Dr. Shultz
(10) found those heart abnormalities that we just
(11) talked about, the papillary muscle fibrosis or
(12) the focal subendocardial abnormality, did
(13) you -- did he note that on his autopsy report?
(14) A. No, he did not.
(15) Q. You also told the jury that he had a 50-percent
(16) stenosis -- or actually that was what
(17) Dr. Shultz said. You said it was 30- to
(18) 40-percent stenosis of the left anterior
(19) descending artery?
(20) A. That's correct.
(21) Q. And what was the cause for -- whether it's 30-
(22) to 40-percent blockage of the left anterior
(23) descending artery or 50 percent, what's the
(24) cause for that?
(25)     MR. MORGAN: Object to the form.

Page 133 to Page 136
www.akf.com
AKF Reporters, Inc.
Pittsburgh - Erie
depo@akf.com

Case 1:01-cv-00769-SAS   Document 230-22   Filed 03/07/2006   Page 16 of 18

BSA   OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04   XMAX(35/176)

Page 137

(1) A. Well, it's an aging process that we all undergo
(2) in varying degrees of a degenerative nature.
(3) What happens anatomically is that
(4) atherosclerotic material comprised of
(5) cholesterol begins to form on the inner lining,
(6) the intimal surface, and forms a plaque.
(7) Q. That's not normal?
(8) MR. MORGAN: Objection.
(9) Q. Is that correct?
(10) A. Well, it depends.
(11) Q. For a 31-year-old?
(12) A. I said that it was more than I would expect in
(13) a 29-year-old person. That's right.
(14) Q. Okay. What are some of the causes for
(15) pulmonary edema?
(16) A. Oh, the most common cause would be probably
(17) congestive heart failure. We see it with
(18) bronchial asthma where people have attacks. We
(19) see it in cases of myocardial infarcts. We see
(20) it in cases of brain injury or brain
(21) hemorrhage, natural disease quite often where
(22) the brain is not functioning properly. We can
(23) see it in cases of people drowning. You see it
(24) in cases of people who die from drug overdoses,
(25) especially heroin, central nervous system

Page 138

(1) depressant family of drugs, all of the
(2) analgesics and sedatives and tranquilizers.
(3) Q. And you can see it in cases of significant
(4) resuscitative or resuscitation attempts, can't
(5) you?
(6) A. Not when a person is dead. If you have someone
(7) who is not dead and you are engaged in active
(8) resuscitation, you might get some congestion.
(9) Of course, the purpose of your doing the
(10) resuscitation is to get the heart going and not
(11) have the heart fail. It's the failing heart
(12) that leads to the congestion, so it's not the
(13) resuscitation itself that is doing it. The
(14) resuscitation is attempting to reverse or
(15) ameliorate the condition that is causing the
(16) congestion and the edema. If that were not the
(17) case, then you wouldn't do resuscitation
(18) because then you'd just be causing death from
(19) pulmonary congestion and edema. It's the
(20) failing heart for whatever reason that you are
(21) trying to get moving in order to prevent
(22) significant pulmonary edema and congestion.
(23) Q. Would you agree with me that cardiac
(24) arrhythmias can cause pulmonary edema?
(25) A. Yes.

Page 139

(1) Q. And cardiac arrhythmias can cause sudden
(2) cardiac death?
(3) A. Yes. If you have a severe cardiac arrhythmia,
(4) goes into ventricular fibrillation, then it can
(5) cause sudden death. Relatively sudden death
(6) depends upon the clinical circumstances of that
(7) particular case. Everything has to be
(8) completely thrown into the hopper for
(9) evaluation and scrutiny.
(10) Q. Let me see if I understand this correct. If we
(11) assume for a moment that Mr. Owensby died from
(12) a cardiac arrhythmia – just assume that as
(13) being true for a moment – the first thing that
(14) would happen is his heart would be beating
(15) improperly – or what medical term would you
(16) prefer to use? Cardiac arrhythmia?
(17) A. Irregularly.
(18) Q. Irregularly. Then the next thing that would
(19) happen is, presumably, if that irregularity
(20) continued, the individual would become
(21) unconscious; is that correct?
(22) A. Some. Some are benign, but others will lead
(23) then to unconsciousness as a ramification of
(24) the diminished oxygenation to the brain.
(25) Q. Right. And the reason the individual would

Page 140

(1) become unconscious with a cardiac arrhythmia is
(2) because he or she is suffering from hypoxia
(3) which is the diminished oxygen?
(4) A. Well, yes. That's right.
(5) Q. Whereas, on the other hand, if we assume for a
(6) moment that the patient or the individual died
(7) from mechanical – mechanical asphyxiation, the
(8) first thing that would happen is the individual
(9) would become unconscious because of hypoxia and
(10) then eventually, if that – if that mechanical
(11) asphyxiation remains, eventually the heart
(12) would stop?
(13) MR. MORGAN: Objection. Misstates
(14) the testimony.
(15) Q. Is that true?
(16) A. Well, it's not a situation in which one process
(17) has to commence and terminate before another
(18) kicks in, but if I understand the thrust of
(19) your question, essentially, it's correct that
(20) in mechanical asphyxiation, the initial problem
(21) is the diminution of oxygen to the brain
(22) because of the compromise of the respiratory
(23) function, that's correct, and then as that
(24) compromise is in place, then at some point in
(25) time, the cardiac arrhythmia may start.

Case 1:01-cv-00769-SAS   Document 230-22   Filed 03/07/2006   Page 17 of 18

BSA   OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04   XMAX(36/177)

### Page 141

(1) Yes. That's correct. The lungs are
(2) primarily compromised in cases of mechanical
(3) asphyxia. The heart, if you have a sudden
(4) cardiac death unrelated to any kind of
(5) asphyxiation, by definition it's the heart
(6) which is going awry first.
(7) Q. Well, actually, maybe my terms are not correct,
(8) but if you suffer from a cardiac arrhythmia,
(9) you're eventually not going to be able to get
(10) oxygen to the brain; true?
(11) A. In many of the arrhythmias, yes. Some -- some,
(12) as I say, are benign, atrial flutter, atrial
(13) fibrillation, but others will lead to
(14) diminished oxygen to the brain.
(15) Q. Causing an individual to become unconscious?
(16) A. That's right.
(17) Q. And if the arrhythmia continues, dead?
(18) A. If it continues unabated and not reversed, it
(19) could lead to death.
(20)      ----
(21) (There was a brief pause in the proceedings.)
(22)      ----
(23) Q. Doctor, I just have a few more questions that I
(24) need to ask you. If we assume mechanical
(25) asphyxiation as described by you, have you done

### Page 142

(1) any studies or anything which would indicate
(2) how much weight needs to be on the back of an
(3) individual before he or she would be unable to
(4) breathe?
(5) A. I have not done such studies myself. I would
(6) really have to check the literature to tell you
(7) if anybody else has in terms of specific
(8) weights. At this time, I cannot give you a
(9) specific amount of weight required. I think in
(10) part it's going to depend, too, on the body
(11) build of the individual. I mean, is it a
(12) 110-pound female or is it a 250-pound guy who
(13) is a weight lifter himself. So I don't know
(14) what kinds of studies, but I will look.
(15) Myself, I do not have an answer for you now.
(16) Q. All right. And we know that Mr. Owensby was a
(17) well-built individual, don't we?
(18) A. He was so described, yes, and he appears to be
(19) a solid guy.
(20) Q. Okay. And I think I may have asked you this
(21) question already, and I apologize if I have.
(22) Have you done any studies as to the length of
(23) time that it would take for an individual to
(24) become unconscious from mechanical
(25) asphyxiation?

### Page 143

(1) A. No. I have not done such studies.
(2) Q. All right. Okay. Have you done any studies as
(3) to how long -- somebody who is in full cardiac
(4) arrhythmia, how long will it take that
(5) individual to become unconscious?
(6) A. Oh, that depends on the kind of arrhythmia.
(7) You see, again, it ranges from something benign
(8) like atrial flutter to more serious.
(9) Q. V fib --
(10) A. Dysfunctional arrhythmias going into
(11) ventricular fibrillation which is incompatible
(12) with life. The heart slithers like a snake but
(13) does no pumping.
(14) Q. How long would that take?
(15) A. Well, you wouldn't be getting any oxygen, so
(16) we're back to our residual cerebral oxygen
(17) business, 4 to 6 minutes. If you have
(18) ventricular fibrillation or cardiac standstill,
(19) you're going to die. You know, some people
(20) might stretch it out, but, anyhow, we use a 4
(21) to 6 minute, but other kinds of arrhythmias, I
(22) can't tell you, I really -- I just don't know
(23) whether any studies have been done, you know,
(24) this kind of arrhythmia as, again, excluding --
(25) excluding ventricular fibrillation.

### Page 144

(1) Q. Really, what I'm trying to find out from you,
(2) Doctor, is how long an individual who is in
(3) full V fib would stay conscious?
(4) A. Oh, I think probably in 15 to 20 seconds,
(5) you'll become unconscious.
(6) Q. All right. In your opinion, Doctor, was
(7) Mr. Owensby essentially deceased or clinically
(8) deceased at the time that they picked him up
(9) and took him to the car?
(10) A. No, because, again, I go with the time, a
(11) minute and a half, or here, even if I take the
(12) maximal time of 2 and a half to 3 minutes, he
(13) still has that residual oxygen, and death in
(14) modern times is determined by brain death. So
(15) the answer is no, he would not have been
(16) deceased.
(17) Q. Okay. If you assume for a moment that
(18) Dr. Shultz opined that he was for all practical
(19) purposes deceased when he was picked up or when
(20) he got up, whatever, when he was picked up, you
(21) disagree with that?
(22) A. Well, if -- again, I'm using brain death
(23) criteria. If -- if -- and I don't know what
(24) Dr. Shultz said, but if he, Dr. Shultz or
(25) anybody were to say -- well, no, Dr. Shultz,

Page 141 to Page 144
www.akf.com
AKF Reporters, Inc.
Pittsburgh - Erie
depo@akf.com

Case 1:01-cv-00769-SAS   Document 230-22   Filed 03/07/2006   Page 18 of 18

BSA   OWENSBY vs. CITY OF CINCINNATI, DEPO. OF CYRIL WECHT, M.D., 2-25-04   XMAX(40/181)

### Page 157

(1) ----
(2)   MR. HARDIN: That is Exhibit 19?
(3)   MR. MORGAN: That is Exhibit 19.
(4) Q. Okay. And that is your confidential memo 8/8?
(5) A. Is that what it is, August 8? Yes, August 8.
(6)   That's right.
(7) Q. Okay. Who did you prepare that for?
(8) A. I guess for Mr. Gissiner.
(9) Q. Do you have any correspondence in your file
(10)  prior to August 8, 2002? And when I say
(11)  correspondence, I'm also asking whether you
(12)  have any phone messages or anything from
(13)  Mr. Gissiner to you?
(14) A. We faxed to you what I had in my file, and
(15)  there is a July 19 letter and -- from him to
(16)  me, July 2 letter from me to --
(17) Q. I don't have a July 19 letter.
(18) A. July 19. Yeah -- no, no, I have an August 19.
(19) Q. Okay.
(20) A. Yeah. July 19, yes.
(21) Q. I did not get a July 19 letter. That would be
(22)  in your file. What was that about?
(23) A. He just sending me the transcripts of Officers
(24)  Hunter, Sellers, transcript of Dr. Shultz. It
(25)  says here all 3 of those are the Caton trial

### Page 158

(1)   and the internal investigation interview of
(2)   Officer Jorg.
(3) Q. All right. Let me ask you a question. When
(4)   was the first time that you talked to anyone
(5)   from the City of Cincinnati regarding giving
(6)   your opinions or doing any review of this case?
(7) A. The earliest letter that I have is one, July 2
(8)   from me to Mr. Gissiner acknowledging receipt
(9)   of autopsy photos and slides, and I asked for
(10)  additional materials that we had discussed. So
(11)  obviously we talked on the phone. I don't see
(12)  a letter from Mr. Gissiner, just my letter of
(13)  acknowledgment of receipt of those couple of
(14)  things July 2.
(15) Q. So it would be reasonable for me to assume,
(16)  then, that you had some sort of conversation
(17)  with Mr. Gissiner before July 2?
(18) A. Yes.
(19) Q. Did you have to sign a contract --
(20) A. Oh, wait, wait, wait, wait, wait, wait, wait,
(21)  wait, wait. Hold on. Here's a June 25 letter
(22)  from Mr. Gissiner to me in which he sent me
(23)  State Exhibits 33, 34, 35 utilized in the trial
(24)  of Officer Jorg, and then he talks about OMI
(25)  had attempted to obtain actual sleeve and then

### Page 159

(1)   he talks about requesting the coroner's office
(2)   to send slides to me as well as autopsy photos.
(3)   So that was, yeah, June 25 was his first
(4)   letter.
(5) Q. All right. So can we have that one marked,
(6)   then, as Exhibit 20?
(7)   MR. MORGAN: Yeah. Done.
(8)   ----
(9)   (Exhibit 20 marked for identification.)
(10)  ----
(11) Q. And then you said there was your -- something
(12)  from you to him or him to you on 7/2, July 2?
(13) A. Yes. I acknowledge the receipt of those
(14)  autopsy photos and slides.
(15) Q. All right. I'd like that marked Exhibit 21.
(16)  ----
(17)  (Exhibit 21 marked for identification.)
(18)  ----
(19) Q. Doctor, would it be reasonable to assume, then,
(20)  that before June 25, '02, you and Mr. Gissiner
(21)  had some sort of conversation about you being
(22)  hired to perform some service for the city?
(23) A. Yes, I believe so.
(24) Q. But you have no correspondence prior to that
(25)  date with regard to when this first contact was

### Page 160

(1)   made?
(2) A. No, I do not.
(3) Q. Did the city require that you sign a contract
(4)   with them so that they could pay you?
(5) A. If they did, I would assume it would be here.
(6)   I have no independent recollection at this time
(7)   of some contract.
(8) Q. All right. So you don't recall any
(9)   conversation about having to sign anything in
(10)  order to be paid for your service?
(11) A. No. Here's a check from them dated 11/13/02.
(12) Q. How much is that check for?
(13) A. 5,000. And my bill to them preceding that
(14)  payment. There's no contract or any other
(15)  form.
(16)  MR. HARDIN: All right. I'd like to
(17)  have the check marked as Exhibit 21.
(18)  MR. MORGAN: That would be 22.
(19)  MR. HARDIN: I'm missing 21
(20)  somewhere. Okay. 22. You're right.
(21)  ----
(22)  (Exhibit 22 marked for identification.)
(23)  ----
(24) Q. And then you say, then, there was your bill is
(25)  there?