FOCUS - 55 of 92 DOCUMENTS

**AMERICAN ENVIRONMENTAL ENTERPRISES, INC., Plaintiff-Appellee, v. HEALTH ENVIRONMENTAL LOSS PREVENTION, INC. (H.E.L.P.) and THE CITY OF YOUNGSTOWN, OHIO, Defendant-Appellant**

**No. 89-3590**

**UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

*1990 U.S. App. LEXIS 22027*

**December 17, 1990, Filed**

**NOTICE: [*1]**

NOT RECOMMENDED FOR FULL-TEXT PUBLICATION SIXTH CIRCUIT RULE 24 LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 24 BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**SUBSEQUENT HISTORY:** *Reported as Table Case at 921 F.2d 276, 1990 U.S. App. LEXIS 25133.*

**PRIOR HISTORY:** On Appeal from the United States District Court for the Northern District of Ohio; No. 88-00327; Jack B. Streepy, Magistrate.

**JUDGES:**

Guy and Boggs, Circuit Judges, and William O. Bertelsman, District Judge. *

* The Honorable William O. Bertelsman, United States District Judge for the Eastern District of Kentucky, sitting by designation.

**OPINIONBY:**

PER CURIAM

**OPINION:**

American Environmental Enterprises, Inc. ("American"), had a contract with the City of Youngstown to remove asbestos from some city property. American thought it deserved additional payment beyond the contract price for the removal of what it called "extra" asbestos. The city refused to pay more, so American walked off the job and sued for breach of contract. The city counterclaimed for breach of contract and a jury found in favor of American on its claim, and against the city on its counterclaim.

The city appeals from [*2] these jury verdicts, and appeals from the trial court's denial of its Rule 60(b)(2) motion for a new trial based on the fact that after the trial American's President, Paul Buckley, was indicted and convicted on charges of criminally violating the Clean Air Act because of asbestos abatement procedures he used at another site. For the reasons that follow, we uphold the jury's verdict and affirm the district court's denial of the city's Rule 60(b)(2) motion.

*I*

The contract underlying these proceedings was signed in August 1987. American promised to remove asbestos from a site ("the Avanti site") in Youngstown for $ 297,000. The city provided American with a sample-based estimate of the total amount of asbestos at the Avanti site. However, this sample turned out to be inaccurate. H.E.L.P., which was acting as a consultant to the city on the Avanti abatement project, discovered additional amounts of asbestos behind a boiler plate at the Avanti site in October 1987.

American estimated that it would cost $ 125,000 to remove the plate and this additional asbestos, making the contract a losing proposition for American unless the price was renegotiated. The city and American met on November [*3] 23 to discuss changing the contract price. The city refused to change the price, contending that the contract American signed obligated it to remove all of the asbestos found at the Avanti site, even if the actual amount differed significantly from the amount estimated by the city. American informed the city that it would halt work and abandon the site if the city did not approve the change in price. The city refused to approve

a change, and American walked off the job on November 24.

American brought suit on four claims, including one alleging tortious interference with contract, and brought an action for a declaratory judgment that American could base its bid for the contract on the amounts of asbestos contained in the city's sample. The city counterclaimed, contending that American had breached the contract. The jury ultimately decided two of American's claims and the city's counterclaim. The jury found that the city had breached the contract and American had not. It also found that the city had not tortiously interfered with American's contract with its bonding company.

One of American's witnesses at trial was its President, Paul Buckley. Mr. Buckley testified as an expert on [*4] the subject of asbestos abatement methods. The city also had experts testify on this subject, among them the Carano brothers, James and Nicholas. James Carano was President and C.E.O. of H.E.L.P. Final judgment on the jury's verdict was entered on May 31, 1989. Mr. Buckley was indicted for violating the Clean Air Act during work at the LTV Steel Campbell Works site ("LTV site") on September 20, 1989.

The city filed a timely appeal from the court's judgment on June 28, 1989. The city filed its Rule 60(b)(2) motion with the district court on November 1, 1989. This circuit held its briefing schedule in abeyance until the district court ruled on the city's motion. The district court denied the motion on February 16, 1990. The city has not yet filed an appeal from this denial, though its brief on this appeal, containing an argument contesting the court's denial of the Rule 60(b)(2) motion, was filed on April 25, 1990.

*II*

Two of the city's contentions, those on American's suit and the city's counterclaims, are intertwined. Both parties agree that American breached the contract by stopping work, but was justified if the city breached the contract when it refused to renegotiate the contract [*5] price. We shall therefore examine both appeals together.

We begin by noting that we do not, strictly speaking, review the verdicts of juries. "Our review of the sufficiency of the evidence is by a review of a trial judge's rulings on motions for directed verdict or JNOV." *Moran v. Johns-Manville Corp, 691 F.2d 811, 813 (6th Cir. 1982). Young v. Langley, 793 F.2d 792 (6th Cir.), cert. denied, 479 U.S. 950 (1986).* As the city never moved for either a directed verdict or JNOV at trial, and does not offer any explanation for its failure on appeal, we are without jurisdiction to review the jury's findings.

We would, however, affirm the jury's verdicts if we did have jurisdiction. The key question the jury had to resolve was whether the contract was ambiguous with respect to American's ability to rely upon the amounts contained in the city's sample when preparing and making its bid. At trial, American introduced much evidence that the custom in the asbestos abatement industry was that such preliminary samples could be relied upon, and that any subsequent discoveries requiring more work than initially described would lead to renegotiation of the contract price. If the contract [*6] was ambiguous with respect to American's ability to rely on the sample, then this evidence was admissible and properly could be considered by the jury. This court cannot overturn a jury verdict without finding that no reasonable jury could have reached the verdict reached by that jury. *Moran, 691 F.2d at 813.* This rule is doubly important in this diversity case, where we must follow Ohio law. Ohio prohibits a jury verdict from being overturned on appeal if sufficient evidence exists that reasonable minds could differ over the verdict. *O'Day v. Webb, 29 Ohio St. 2d 215, 280 N.E.2d 896 (1972).* Thus, the mere existence of American's evidence requires us to affirm the jury's verdict, provided that the contract is ambiguous as a matter of law.

We would be compelled to uphold the jury's verdict because the contract is ambiguous as a matter of law. First, the district court clearly charged the jury that the contract was ambiguous, and that therefore evidence of industry custom was admissible. There is no evidence that counsel for the city objected to this charge, or otherwise made the court aware of possible error or omissions in the instructions. Since *Fed. R. Civ. P. 51* provides [*7] that "no party may assign as error the giving or failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict," *Roberts v. City of Troy, 773 F.2d 720, 723 (6th Cir. 1985),* the city cannot now claim upon appeal that the contract was ambiguous.

At oral argument, the city contended that it never conceded that the contract was ambiguous by failing to object to the court's charge. Rather, it claims that at trial it conceded only that the contract was clear that American had the duty to remove all of the asbestos discovered on the site, and was ambiguous only as to how much that might turn out to be. However, the trial court's jury instruction did not make this distinction. It instead simply stated that the contract was ambiguous. Even if this was the city's theory at trial, it was required by Rule 51 to object to the jury instructions as proposed by the judge if it wished to preserve its theory for appeal. Without such an objection being made at the time, we cannot reverse for an error in the jury instruction.

Even if we were to entertain an objection to the instruction, we would still find that the contract was ambiguous. Under Ohio [*8] law, a contract is ambiguous if it is reasonably "susceptible to more than one meaning." *Burris v. Grange Mutual Companies, 545*

*N.E.2d 83, 88, 46 Ohio St. 3d 84, 89 (1989).* "Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." *Aultman Hospital v. Community Mutual Insurance Company, 544 N.E.2d 920, 923, 46 Ohio St. 3d 51, 54 (1989).* An examination of the contract leads to the conclusion that this contract was replete with ambiguity on this point.

We note from the outset that the primary source of the ambiguity is the fact that the same contract documents were prepared for bidders to demolish the Avanti site and for bidders to abate the asbestos at the Avanti site. The city originally planned to have one bidder fulfill both functions, but changed its mind after its first bidder withdrew from the contract. It then bid out the demolition and asbestos contracts separately, but it used the same contract documents. This decision leads to many portions of the contract being ambiguous, as a bidder for only the asbestos [*9]   contract could reasonably presume that many provisions of the general instructions to the contract that refer to demolition of the site would not apply to the asbestos contractor.

No language in the contract documents clearly states that American may not rely on the preliminary sample in formulating and submitting its bid. Instead of such language, we find many individual portions of the contract that could be interpreted to forbid such reliance, but which are not sufficiently clear to preclude alternative interpretations.

The first such portion is in the first page of the contract, in the section entitled "General Conditions and Instructions to Bidders," in the subsection entitled Plans and Specifications. It reads as follows:

Bidders are advised to carefully examine the Contract Drawings and Specifications for the proposed work. The Contract Drawings show the surface an underground structures likely to affect the performance of the work, insofar as they have been determined, but the information shown is not guaranteed as being correct and complete, bidders being expected to examine the Contract Drawings and the location of the work under the ground and judge for themselves [*10]  all of the circumstances affecting the cost of the work or of the time required for its completion.

The key problem in this clause is that the phrase "the work" is capable of varying definitions. It could be interpreted in accord with the city's wishes to mean "demolition of all structures and removal of all asbestos." Alternatively, it could refer solely to subsurface demolition work, as the bidder is "expected to examine" only that portion of the work located "under the ground." A clause so readily capable of alternative meanings is the

very definition of an ambiguous contract.

Two more portions of the contract that could be interpreted to place the burden on American to discover the full amount of asbestos for abatement can be found at page 2-3 of the contract documents. The first, entitled Conditions of Work, reads in pertinent part as follows:

Each bidder must inform himself fully of the conditions relating to construction and labor under which the work is now being or will be performed. Failure to do so will not relieve a successful bidder of his obligation to furnish all material and labor necessary to carry out the provisions of the Contract Documents and to complete [*11]  the contemplated work for the consideration set forth in his bid.

We again find the phrase "the work" dangling undefined throughout this portion. Also, we again have language that could refer solely to the demolition part of the contract, in that each bidder need only "inform himself fully of the conditions relating to construction." "Construction" could easily refer to the circumstances surrounding the demolition aspect of the contract, including the construction of buildings at the site and the materials used in the buildings. Such information could be of interest to the asbestos contractor, as the contractor would have to know where asbestos could be found and have the proper materials on hand to remove any substance blocking its access to the asbestos. The information would be of much more importance, however, to the demolition contractor because the contractor would need to know how to destroy the building most efficiently.

The requirement that bidders also inform themselves about the conditions relating to "labor" does not detract from this interpretation. The two items that the contractor must inform himself about, "construction and labor," could be read as being a synonym [*12]  for all aspects of the work to be performed. However, the construction of the entire provision does not support this interpretation. Failure of the contractor to inform himself "will not relieve a successful bidder of his obligation to furnish all material and labor necessary. . . ." This sentence is of parallel construction to the first sentence. "Material" is placed in the same position as "construction," and "labor" is used in the same position in both sentences. This suggests that the phrase "conditions relating to construction" refers to the problems attendant to completing "the work." Thus, this provision requires the contractor to provide such machines, equipment and other "material" as are necessary to complete the work.

The next clause, entitled Examination of Site, is advanced by the city as establishing that American assumed the responsibility to remove all asbestos even if

not contained in the sample. It reads as follows:

Each bidder shall, and is directed to inspect the entire site of the proposed work and judge for himself as to all of the circumstances affecting the cost and progress of work and shall assume all patent and latent risks in connection therewith.

 [*13]
The phrase "all patent and latent risks" could refer to the risk that American would discover more asbestos at the site than was suggested in the sample. n1 "Risk" is defined as "the possibility of loss, injury, disadvantage, or destruction." Webster's Third International Dictionary 1961 (Merriam-Webster 1986). American can only "lose" or be "injured" if it first possessed something which the discovery of unexpected amounts of asbestos would place in jeopardy. In this case, that "something" is American's profit. Thus, this clause can be interpreted as requiring American to assume the risk that subsequent discovery of unexpected amounts of asbestos, a "latent" risk, would cost it its profit.

> n1 The city contends that this clause should be interpreted in light of the following portion of the contract. This portion includes requirements that prospective bidders make borings or test pits, and states that the city does not guarantee the accuracy of any sample it obtains from borings. Conditions of Soil, 2-3 of contract. This contention is not persuasive because the obvious intention of this clause refers to borings for soil conditions which would hamper the demolition of the building. We can see this from the portion of the clause which establishes the burden of the contractor. "The Contractor must assume all risk as to the nature and behavior of the soil which may be encountered or of soil or water which underlies the work or is adjacent thereto, including any difficulties that may be due to quicksand or other unfavorable conditions that may be encountered in the work, whether apparent upon surface inspection or disclosed in the process of carrying forward the work." The demolition contractor would have to face these problems as part of the effort to remove the building's foundation. There is no indication in the Joint Appendix that American as the asbestos contractor would have to perform subsurface work.

 [*14]

This interpretation, however, is not the only one possible. To begin with, it is unclear with what the "patent and latent risks" are to be "connected." Are they connected with the "cost and progress of the work," or are they connected with the "circumstances" affecting the work? "Patent and latent risks" is a legal phrase most often used in the context of personal injury suits arising from allegedly unsafe products. A bidder could reasonably interpret the contract in light of this use of the phrase. A bidder could quite reasonably read the clause as requiring assumption of all "patent and latent risks" in "connection" with "all the circumstances" regarding the work. This portion of the contract, then, would be an assumption of liability regarding any personal injury suits that might arise from unsafe conditions, whether patent or latent, existing at the site. These suits would obviously affect the cost and the manner of work.

Finally, at 2-7 in the contract we find the section entitled Approximate Quantities for Comparing Proposals. This section reads:

The quantities of work as given for each item in the Proposal are approximate and are given only as uniform basis [sic] for  [*15] comparison for proposals. They are not guaranteed to be accurate statement [sic] of estimates of quantities or work that are to be performed under the contract and any departure therefrom will not be accepted as valid grounds for any claim in damages or loss of profits.

Aside from the difficulty of comprehending the last sentence, one could interpret the portion as stating the role that the preliminary sample played in the formation of the contract. This portion could be interpreted to prevent American from relying on the preliminary sample because that sample was explicitly intended to be used solely to compare competing bids. One could presume that the words "or" and "are" are typographical errors, and that the sample was intended not to be a guarantee of "estimates of quantities work that is to be performed." The amount of asbestos in the preliminary sample would then be an estimate of the work American would have to perform, and American would thereby be unable to sue to recover any loss it suffered because of the subsequent discovery of additional asbestos.

While this interpretation of this portion standing alone is difficult to dispute, the portion does not in fact  [*16]  stand alone. This portion, as well as all of the preceding portions we have examined, were part of the General Conditions and Instructions to Bidders section of the contract. In another portion of the contract, section 02065 entitled "Asbestos Abatement," the General Conditions were expressly made applicable "to work specified in this section." Section 02065, § 1.01 (A). Section 1.02 seems to support the instructions of the General Conditions standing alone, as it states that the preliminary sample "is not to be assumed [to] represent[] a complete listing of locations and quantities." Id. at § 1.02 (A). The section further states that "it is the intention of this portion of the project that all asbestos containing materials be removed from the site. . . ." Id. at

§ 1.02(C). These sentences combined seem to support the city's contention that American signed a contract that placed the burden on it to discover the full amount of asbestos in making a profitable bid.

This interpretation does not dispose of this case in the city's favor because an addendum to the contract purports to repeal the requirements of section 02065. Addendum No. 1 states that "the reference to asbestos [*17] abatement or regulated substances, Section 02065, referred to in the contract documents . . . is hereby a non-performance part of these documents." American contends that this section revokes the applicability of section 02065 to the contract, removing the language that most clearly places the burden of loss on American regarding future discoveries of asbestos.

The city claims that Addendum No. 1 did not have the effect that American claims for it. The city notes that Addendum No. 1 is entitled "To the Plans and Specifications For: DEMOLITION OF FORMER REPUBLIC AEROQUIP FACILITY." This title, the city contends, clearly limited the scope of the addendum to the demolition contract. A second part to Addendum No. 1 applied to plans and specifications for Asbestos Removal and did not include any language repealing or limiting Section 02065.

The city's contention, however, does not render Addendum No. 1 unambiguous. Why, for example, would the city need to place an addendum covering asbestos removal in the demolition contract at all? To the extent that a demolition contractor might be led by the contract documents to suspect that it might be liable for asbestos abatement, so too might an [*18] asbestos contractor reasonably suspect that the general specifications described earlier at pages 6-9 refer only to demolition contractors. The fact that neither a demolition nor an asbestos contractor can readily determine from the face of the contract documents which portions apply solely to the contractor merely reinforces the court's determination that the contract is ambiguous.

The language of Addendum No. 1 itself also creates ambiguity regarding its scope. What does "non-performance" mean? What is included in "these documents"? At oral argument, counsel for American stated that a "non-performance" part of a contract is interpreted in the construction industry to mean that the party who would otherwise have to perform that aspect of the contract is excused from doing so. This assertion provides additional evidence of the soundness of our conclusion that this addendum is ambiguous. The very fact that the counsel explained the meaning of the addendum in light of the custom of the construction industry shows that the language itself is not clear on its face. We can discover the meanings of the terms in the addendum, but only through the explanation of the parties involved, that [*19] is to say, through the

introduction of extrinsic evidence. If, to interpret the contract, we must refer to evidence that can only be admitted if the contract is ambiguous, that fact in itself suggests that the contract is ambiguous.

If, as we hold, the contract is ambiguous, then we must uphold the jury's finding that the city breached the contract by refusing to renegotiate the price with American. This finding also resolves the city's appeal on its counterclaim. Ohio law permits a party to abandon a contract upon the material breach of the contract by the other contracting party. *Mooney v. Green, 4 Ohio App. 3d 175, 178, 446 N.E.2d 1135, 1138 (1982).* Since the finding that the city breached the contract must be upheld, and because the city's breach was prior to American's leaving the site, the city cannot as a matter of law succeed on its counterclaim.

*III*

*Fed. R. Civ. P. 60(b)(2)* provides that a party may be relieved from a final judgment when "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b)" is found. "Newly discovered evidence must pertain to facts which existed at the time of trial." *Davis* [*20] by *Davis v. Jellico Community Hospital, Inc, 912 F.2d 129, 135 (6th Cir. 1990).* We review a district court's grant or denial of a Rule 60(b)(2) motion under an abuse of discretion standard. *Davis, 912 F.2d at 133.*

The district court rejected the city's motion for three reasons. First, the evidence is not "newly discovered" under the rule because the indictment did not exist at the time of the trial. Second, evidence of an indictment is not admissible at trial to impeach a witness. *Fed.R.Evid. 609.* Finally, the evidence of Buckley's misdeeds would only have impeached his testimony. "To come within Rule 60(b)(2), the evidence 'must be of such a material and controlling nature as will probably change the result . . . not merely cumulative or tending to impeach or contradict a witness.'" J. App. at 621, quoting 7 Moore, Moore's Federal Practice para. 60.23[4] at 60-200 to 60-203.

We affirm the district court's denial of the city's motion on two grounds. First, we do not believe that we have jurisdiction to hear the city's appeal from the denial. A denial of a Rule 60(b)(2) motion is appealable. *Browder v. Director, Dept. of Corrections of Illinois, 434 U.S. 257,* [*21] *263 n.7 (1978).* The city never filed an appeal, and the brief filed in this appeal containing the city's Rule 60(b)(2) argument was filed 68 days after the motion was denied. An appeal to be timely must be taken within 30 days of the date of entry of the final judgment. *Fed. R. Civ. P. 4(a)(1).* Also, the time for appeal may be extended upon a showing of excusable neglect or good cause upon the filing of a motion within 30 days of the expiration of the original 30 day period for appeals, *Fed.*

1990 U.S. App. LEXIS 22027, *

*R. Civ. P. 4(a)(5).* In this case, appellant's brief was filed with this court eight days after the expiration of this extended time period. We are therefore without jurisdiction to hear the appeal.

The city contends that our decision to hold this appeal in abeyance until the district court disposed of the Rule 60(b)(2) motion "evinced to Appellant a clear intent to maintain jurisdiction over the entire case and not to relinquish jurisdiction to the district court." Appellant's Reply Brief at 5. This opinion misunderstands the nature of our prior decision. We cannot create our own jurisdiction. We were without power to decide the merits of appellant's Rule 60(b)(2) motion at the earlier time because **[*22]** an appellate court cannot for the first time hear matters properly under consideration before a district court. We chose to stay the appeal schedule because the time expended on preparing and reviewing the appeal would have been mooted had the city's Rule 60(b)(2) motion been granted. We meant nothing more than this, and we said nothing more than this.

We would hold that the district court did not abuse its discretion in denying the order even if we had jurisdiction over the case. The court's first and third reasons remain valid, though the second reason, that a mere indictment may not be used to impeach a witness, has been overtaken by Buckley's conviction. Regarding the first reason, we note that even if evidence at issue is not the indictment but instead the facts underlying the indictment, the city does not meet the "due diligence" requirement of the Rule. One of the city's experts, James

Carano, worked at the very site involved in Buckley's conviction. Also, the city admits that it was aware at the time of trial that Buckley was under investigation for Clean Air Act violations. The court did not abuse its discretion in light of these facts, as the city could have impeached **[*23]** Buckley's testimony with the facts underlying his conviction had it been more diligent.

The court's ruling that the conviction and indictment would merely be used to impeach Buckley's testimony is also not an abuse of discretion. Although the city contends that Buckley's testimony is completely discredited by his conviction because it proves that his testimony about proper EPA procedures is incorrect, this does not mean that American would not have prevailed. The jury could still have found that the city was obligated to pay extra once additional amounts of asbestos were discovered. American provided other witnesses besides Buckley who stated that the custom of the industry is that asbestos abatement contractors rely on the samples provided by the site owner in determining the amount of asbestos to remove, and that the contract price is renegotiated if additional asbestos must be removed. Even if Buckley's evidence were completely overthrown by his conviction, sufficient evidence still exists to support the jury's verdicts.

*IV*

For the foregoing reasons, we AFFIRM the district court in all respects.