FOCUS - 21 of 92 DOCUMENTS

**UNITED STATES OF AMERICA, Plaintiff-Appellee, v. CHARLES NATHANIEL EDGECOMBE, Defendant-Appellant.**

No. 03-1615

**UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

*107 Fed. Appx. 532; 2004 U.S. App. LEXIS 17807*

**August 17, 2004, Filed**

**NOTICE:** [**1] NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. Sixth Circuit Rule 28(g) limits citation to specific situations. Please see Rule 28(g) before citing in a proceeding in a court in the Sixth Circuit. If Cited, a copy must be served on other parties and the court. This notice is to be prominently displayed if this decision is reproduced.

**SUBSEQUENT HISTORY:** Post-conviction relief denied at *Edgecombe v. United States, 2006 U.S. Dist. LEXIS 2816 (W.D. Mich., Jan. 19, 2006)*

**PRIOR HISTORY:** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN.

**DISPOSITION:** Convictions affirmed.

**COUNSEL:** For UNITED STATES OF AMERICA, Plaintiff - Appellee: Jennifer L. McManus, FTS 456-2408, 616-456-2404, U.S. Attorney's Office for the Western District of Michigan, Grand Rapids, MI.

For CHARLES NATHANIEL EDGECOMBE, Defendant - Appellant: Timothy C. Quinnell, FTS 228-6809, 906-228-3650, Osstyn, Bays, Ferns & Quinnell, Marquette, MI.

**JUDGES:** Before: BOGGS, Chief Judge; and NELSON and SUTTON, Circuit Judges.

**OPINIONBY:** BOGGS, NELSON, SUTTON

**OPINION:**

[*534] PER CURIAM. Charles Nathaniel Edgecombe appeals from his jury convictions for drug trafficking crimes. He asserts various evidentiary and other trial errors. The evidence against Mr. Edgecombe was overwhelming, and many of his allegations of error have been forfeited in whole or part through a failure to object at trial. With these [**2] considerations in mind, we affirm.

I

Edgecombe was indicted on April 17, 2002, and charged with two counts: distributing cocaine, in violation of *21 U.S.C. § 841 (a)(1)*, and use of a communication facility (a telephone) to facilitate distribution of cocaine, in violation of *21 U.S.C. § 843(b)*.

On January 30, 2002, sheriff's deputies in Marquette, Michigan, received a tip that Edgecombe was selling drugs at the Value Host Motel. On the same day, they contacted a civilian informant, Jeffrey Dooley, and enlisted him in a controlled buy operation. Dooley had been arrested on January 10 for delivering cocaine, which he testified that he had bought from Edgecombe.

The sting began later on January 30, with a cellular phone call from Dooley to Edgecombe, which the police recorded. A tape of this call was later played for the jury. Both Dooley and Deputy Sheriff Mike Aalto, who participated in the operation, identified Edgecombe's voice on the tape. (Aalto had spoken with Edgecombe before this operation.) On the tape, Dooley asked Edgecombe for "a couple" or "two." He testified at trial that this referred to grams of cocaine. Edgecombe [**3] replied, "I'll come over there." Shortly thereafter, a large blue Cadillac with two black males drove by, turned around, and left. Dooley recognized it as Edgecombe's car, and concluded that Edgecombe left because he got "spooked." Lieutenant Jeff Racine, another investigating officer, also watched the car from Dooley's window.

Edgecombe called back and asked Dooley to meet him at the local Burger King. Deputy Aalto and Lt. Racine gave Dooley $ 200 in buy money and searched him, then tailed Dooley's car to the Burger King and parked nearby. By then it was night. A third officer, Detective Hunter, also parked his unmarked car in the McDonald's parking lot across the street, giving him another vantage point on the deal.

When Hunter arrived on the scene, he found a blue

Cadillac already parked at the Burger King. Edgecombe and another man emerged from the restaurant with a food bag and got in the Cadillac. They drove off in the direction of the Value Host Motel. Dooley then arrived in his car.

Shortly thereafter, the blue Cadillac returned. (Dooley testified that he had telephoned Edgecombe while waiting, and Edgecombe had said he had been there already, but would return.) The Cadillac [**4] drove right past Hunter's parked car, and Detective Hunter visually identified Edgecombe as a passenger. Dooley got out and approached the passenger side of the Cadillac. He leaned in. Then he returned to his car and left. The Cadillac left and drove off in the direction of the Value Host Motel. None of the officers directly observed an exchange between Edgecombe and Dooley.

Police followed Dooley to a predetermined rendezvous. They recovered from [*535] the back seat of Dooley's car a Burger King bag that contained approximately 1.8 grams of cocaine.

Dooley's testimony played an important part in the trial. He recounted that he walked over to Edgecombe's car to talk to him, gave him $ 200, and then saw Edgecombe throw the paper bag with drugs through Dooley's car window, where it landed in the back seat. Dooley testified that he believed there were four men in the car. On cross-examination, Edgecombe's counsel challenged the accuracy of Dooley's recollection. He elicited an admission that Dooley had earlier told the grand jury that he did not get out of his car during the drug exchange. Dooley replied, "It was a year ago. I don't recall everything exactly."

Dooley testified that he recognized [**5] Edgecombe because he had met him several times before, and had bought drugs from him at least once. In particular, Dooley testified that he saw Edgecombe once or twice a week for "the last couple of months" prior to the buy, and that he had bought drugs from him on "many occasions." This testimony conformed to an earlier evidentiary ruling of the trial court. The court had held that evidence concerning Dooley's earlier drug transactions with Edgecombe was admissible to show that Dooley knew Edgecombe and could recognize him, but it instructed the prosecution to limit such evidence to "a month or two before, a month or two after" the date of the bust.

Dooley acknowledged at trial that he had been arrested for drugs prior to the January 30 arrest of Edgecombe, and that he had originally agreed to be an informant as part of a deal to obtain leniency from the Marquette County Prosecutor. However, he testified that by the time of Edgecombe's trial, the deal had fallen through (because Dooley had kept using drugs). At the time he testified, neither the state nor the United States had promised him any benefit for testifying against Edgecombe.

Edgecombe's counsel attempted to cross-examine [**6] Dooley about a prior arrest for domestic violence. The trial court sustained the government's objection on the ground of relevance. Dooley recollected, with some hesitation, that there were probably four men in the Cadillac; the officers' testimony had only made reference to two men.

Deputy Aalto, Lt. Racine, and Detective Hunter also testified at trial, reporting the observations attributed to them above. All three identified Edgecombe as the passenger in the Cadillac. The government also presented evidence from the desk clerk at the Value Host Motel, who testified that Edgecombe was a guest on January 30, 2002, the day of the controlled buy. The clerk, Jessica Shandonay, knew "Nate" (the defendant) slightly, and recalled that she was surprised to see him at the hotel, since he lived in town. Finally, the government bolstered its case by playing for the jury a surveillance videotape secretly taken in the home of Dooley's girlfriend in March 2002, as part of the investigation of Edgecombe. On the tape, Edgecombe converses with Dooley and his girlfriend. The government's brief asserts that, on the tape, Edgecombe calls Dooley by his first name, and states that he will have to take [**7] time off from work because UPSET (the Marquette anti-drug task force, to which Aalto, Racine, and Hunter all belonged) was putting pressure on him. Edgecombe has not contested the government's description of the videotape's contents.

Edgecombe put on one witness: Anthony Stewart, a boxing coach at a nearby college and an acquaintance of Edgecombe. Stewart testified that it was he [*536] who drove the blue Cadillac on January 30, 2002, and that there were three other men in the car with him. In this telling, Stewart drove, Edgecombe was in the back seat with his cousin Jason and the passenger in the front seat was, not Edgecombe, but a man known only as "Crazy-Eyed Jay." Stewart testified that Crazy-Eyed Jay told him he had to meet someone at the Burger King. When the men arrived at Burger King, a light-colored car drove up and a white man got out (Dooley is white) and talked to Crazy-Eyed Jay. Jay reached for the Cadillac's door handle, and "someone in the back" yelled, "Don't get out of the car. Throw it in there to him." Jay then threw something small in the driver's side of the other car. Defense counsel elicited no explanation for why Stewart and the other men were with Crazy-Eyed Jay. [**8]

On cross-examination, the government elicited admissions from Mr. Stewart that he had previously been subpoenaed and interviewed by the Assistant U.S. Attorney and a detective about the case, and had given somewhat divergent testimony. In that interview, Stewart had told the government that he was at the Value Host Motel with Edgecombe, and that Edgecombe (not Crazy-

Eyed Jay) asked Stewart to drive him to see a man he    consideration in return for his testimony, even though

the highly incriminating facts that Edgecombe was in the blue Cadillac, at the Burger King, on the day of the drug bust. In addition, Stewart had earlier told investigators that he and Edgecombe had been at the Value Host Motel that day. Stewart's [**13] testimony was by no means sufficient to alter the overwhelming nature of the case against Edgecombe. Cf. *United States v. Moore*, 917 F.2d 215, 226 (6th Cir. 1990) (holding that the evidence against a defendant accused of robbing a post office was "overwhelming," [*538] for purpose of analysis of alleged comments on defendant's failure to testify, where two eyewitnesses placed Moore at the scene as a robber, and an unindicted co-defendant and a fourth witness said he did it, while an indicted co-defendant exonerated Moore).

In addition, when a defendant fails to make timely objection to an evidentiary error, our review is for plain error only. *See United States v. Haywood*, 280 F.3d 715, 725 (6th Cir. 2002). Under plain error review, this court cannot grant relief unless there is (1) an error of law that is (2) plain and (3) affects substantial rights. *United States v. Cotton*, 535 U.S. 625, 631, 152 L. Ed. 2d 860, 122 S. Ct. 1781 (2002). And there is a further hurdle: "An appellate court may . . . exercise its discretion to notice a forfeited error . . . only if . . . the error seriously affect[s] the fairness, integrity, or public reputation of judicial [**14] proceedings." *Ibid.*

III

We now consider Edgecombe's six claims of error, in light of the foregoing discussion. None provides a basis for reversal.

A

Edgecombe argues that it was reversible error for the district court to fail to give its limiting instruction relating to Dooley's "other acts" testimony immediately after the testimony was given. As previously noted, the court did give such an instruction during final instructions. "It is within the trial judge's discretion to decide whether to give the limiting instruction contemporaneous with the introduction of the evidence or during final instructions." *United States v. Chance*, 306 F.3d 356, 388 (6th Cir. 2002).

Edgecombe's claim is given slightly more force by the fact that the instruction at issue was not especially clear. A lawyer, confronted with the court's instruction that "you may only consider [the "other acts" evidence of Dooley's prior drug purchases from Edgecombe] in deciding whether this defendant committed the crimes charged which are before you," would realize, even from a cold record, that the emphasis is meant to fall on the word "this" -- the point is that the prior acts evidence can be [**15] considered only to prove Edgecombe's identity, and Dooley's basis for recognizing him. And it may well be that the district court did supply such an emphasis when delivering the instruction in open court. Nevertheless, we agree that the instruction was not ideal from the standpoint of a lay jury.

However, Edgecombe did not object to the wording of this instruction. Our review is for plain error only. Plain error is not present, because the other evidence against Edgecombe was overwhelming, and thus any error could not have affected his substantial rights. *United States v. Ortiz*, 507 F.2d 1224, 1226 (6th Cir. 1974).

B

The district court did not err in sustaining the government's objection when Edgecombe's counsel attempted to cross-examine Dooley about his prior arrest for domestic violence. By its terms, Fed. R. Evid. 609(a) only permits a witness to be impeached on credibility with evidence "that [the] witness . . . has been convicted of a crime." *Ibid.* Edgecombe has not contested the government's representation at trial and on appeal that Dooley was never convicted for this offense. *See Chance*, 306 F.3d at 385 [**16] (noting that even indictment for a crime is insufficient to render it admissible as impeachment, if there is no conviction).

[*539] C

We next consider Edgecombe's objection to the court's refusal to give a "quid pro quo" cautionary instruction with respect to Dooley's testimony. The government argues that only plain error review should apply to this issue, since Edgecombe's counsel referred to Sixth Circuit Instruction 7.06A (which deals with paid informants), but appears to have meant Instruction 7.07 (which deals with cooperating witnesses). We disagree, and conclude that Edgecombe preserved this argument. Neither the parties nor the court could have been in any doubt about the point that counsel was raising.

However, that point lacks merit. Both of the proposed instructions at issue explicitly assume that the witness has either been promised, or has actually received, a quid pro quo of the relevant sort in exchange for testimony. *See* 6th Cir. Pattern Criminal Jury Instruction 7.07(1) ("You have . . . heard that the government has promised [the witness], [a consideration] . . . in exchange for his testimony against the defendant."); Instruction 7.06A(1) ("You have . . . heard [**17] that [the witness] received money [or something else of value] from the government in exchange for providing information."). Here, the evidence indicated that Dooley was *not* promised any quid pro quo for his testimony, nor had he received any such consideration. Thus the court was obviously within its discretion in declining to give such an instruction. And even if there had been error in failing to give the requested instruction, the error would be harmless in light of the overwhelming evidence against Edgecombe.

D

Edgecombe's most substantial argument is that he is entitled to a new trial because the government, in closing argument, improperly commented on his failure to testify, in violation of the *Fifth Amendment*. The prosecutor stated: "How can the defendant possibly basically concede that he's the person on that tape who's setting up the drug deal and then ask you to believe that it wasn't him who followed through?"; "You haven't heard a single witness get up here and say that they were with him somewhere else other than the Burger King [on] January 30"; that there was "no alibi whatsoever"; and that "the one witness" who was able to place Edgecombe anywhere at the [**18] time of the drug sale was Stewart.

Because Edgecombe did not object, only plain error review applies.

Indirect references to a defendant's failure to testify can violate the *Fifth Amendment*. *Byrd v. Collins, 209 F.3d 486, 533 (6th Cir. 2000)*. A reviewing court must undertake a "probing analysis," and must "look at all the surrounding circumstances in determining whether or not there has been a constitutional violation." *Ibid.* The relevant factors are (1) whether the remarks are "manifestly intended" to reflect on the accused's silence or are such that the jury would "naturally and necessarily" take them as such; (2) whether the remarks were isolated or extensive; (3) whether the evidence of guilt was otherwise overwhelming; and (4) what curative instructions were given. *Id. at 533-34*. Statements suggesting that the government's evidence is uncontradicted "are more objectionable where the facts are such that only the defendant could have contradicted the evidence in question." *Raper v. Mintzes, 706 F.2d 161, 165 (6th Cir. 1983)*.

The prosecutor's remarks here were somewhat troubling. However, most of them dealt with issues on [**19] which Edgecombe [*540] *could* have produced witnesses other than himself to address them, such as the identity of his voice on the tape, or the absence of an alibi. Moreover, quite apart from any commentary by the prosecution, the evidence against Edgecombe was overwhelming. Any error certainly did not rise to the level of plain error, which requires that it "seriously affect the fairness, integrity, or public reputation of judicial proceedings." *Cotton, 535 U.S. at 631*.

E

Next, the government concedes that the Assistant United States Attorney erred by stating, during closing argument at trial, that Dooley could identify Edgecombe reliably because he had been buying drugs from Edgecombe "two to three times a week for a year." Government counsel then dwelled on the point for a few sentences, asking the jury to "use your common sense" to reflect if it was possible for Dooley to misidentify Edgecombe under the circumstances, even if he was a little cloudy about how many men had been in the Cadillac on that day. The district court's earlier evidentiary ruling had allowed such "other acts" references for the purpose of proving identity, but it had limited the time period [**20] that the government could discuss to a couple of *months* on either side of the bust. The actual evidence of Edgecombe's drug dealing presented during the government's case-in-chief corresponded to the limit that the district court had set. The question is whether this error requires reversal. Edgecombe did not object to the prosecutor's remark, so review is for plain error only.

A conviction will ordinarily be reversed based on improper remarks during argument only when the impropriety is flagrant. To determine flagrancy, we consider four factors: (1) whether the remarks tended to mislead the jury or to prejudice the accused (including whether the trial judge gave an appropriate cautionary instruction to the jury); (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused. If the comment is determined not to be flagrant, then reversal is proper only when three conditions occur: the proof against the defendant was not overwhelming; opposing counsel objected to the conduct; and the district court failed to give a curative instruction. *United States v. Monus, 128 F.3d 376, 394 (6th Cir. 1997)*. [**21]

By this standard, the erroneous remark here was not flagrant. It had some prejudicial tendency, but the difference in prejudice between the prosecutor's improper remark ("many" drug purchases in a year or so) and a *permissible* description of the evidence ("many" drug purchases in a few months) is very slight. Moreover, the remark was isolated to a single place in the government's closing argument, it does not appear to have deliberately false, and the evidence against Edgecombe was extremely powerful. Thus, since the error was not flagrant and counsel did not object, there was no reversible error. *Ibid.*

F

Finally, Edgecombe asserts that the prosecution violated *Brady v. Maryland, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963)*, by failing to turn over to his counsel material evidence that could have been used to impeach Dooley, the government's lead witness. At sentencing, Edgecombe claims, the government gave him for the first time a copy of Dooley's girlfriend Jodi Bell's grand jury testimony, and a related police report. These documents indicated that Ms. Bell had sexual relations with Edgecombe in return for cocaine, and bought cocaine from him as [*541] well. Edgecombe [**22]

did subpoena Bell, and she was present at trial, but Edgecombe did not call her.

This *Brady* argument is obviously unconvincing, and counsel might have exercised better professional judgment by omitting it. n1 The government's *Brady* disclosure obligation does not apply when the defendant knew or should have known the essential facts permitting him to take advantage of the exculpatory information at issue. *United States v. Mullins, 22 F.3d 1365, 1371 (6th Cir. 1994)*; *United States v. Zuazo, 243 F.3d 428, 431 (8th Cir. 2001)* ("The government does not suppress evidence in violation of *Brady* by failing to disclose evidence to which the defendant had access through other channels."). Information that Bell had sex with Edgecombe in return for drugs is, of course, within Edgecombe's own knowledge. Even apart from this fatal flaw, such evidence would have tended to *strengthen* the jury's perception of Edgecombe as a drug dealer, thus working to his disadvantage.

    n1 As the previous discussion shows, Mr. Edgecombe's counsel identified a number of appellate issues that, while not ultimately meritorious, were at least colorable. When that is so, counsel should brief such issues, to the exclusion of chaff like the purported *Brady* claim here.

[**23]

IV

For the reasons discussed above, the judgment is AFFIRMED.